1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF OHIO (TOLEDO)
2
                  Case No. 11-00047-CIV-DAK
3
FEDERAL TRADE COMMISSION,        )
4 AND THE STATE OF OHIO,          )
                                 )
5      PLAINTIFFS,                )
                                 )
6      -v-                        )
                                 )
7 PROMEDICA HEALTH SYSTEM, INC.,)
                                 )
8      DEFENDANT.                 )    West Palm Beach, Florida
                                 )    February 10, 2011
9 _____)

10

11                 VOLUME 1, PAGES 1 - 267

12      TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS

13          BEFORE THE HONORABLE DAVID A. KATZ

14          SENIOR UNITED STATES DISTRICT JUDGE

15

16 Appearances:

17 FOR PLAINTIFF FTC          Matthew J. Reilly, ESQ.
                              U.S. Federal Trade Commission
18                            601 New Jersey Avenue, Northwest
                              Washington, DC 20580
19
                              Jeffrey H. Perry, ESQ.
20                            U.S. Federal Trade Commission
                              600 Pennsylvania Avenue, Northwest
21                            Washington, DC 20580

22 Reporter                   Stephen W. Franklin, RMR, CRR, CPE
   (561)514-3768              Official Court Reporter
23                            701 Clematis Street, Suite 417
                              West Palm Beach, Florida  33401
24

25 (APPEARANCES CONTINUED ON PAGE 2.)

```
 1   Appearances (Continued):

 2   FOR PLAINTIFF FTC          Sara Y. Razi, ESQ.
                                U.S. Federal Trade Commission
 3                              601 New Jersey Avenue, Northwest
                                Washington, DC 20580
 4
                                Janelle Filson, ESQ.
 5                              U.S. Federal Trade Commission
                                601 New Jersey Avenue, Northwest
 6                              Washington, DC 20580

 7   FOR PLAINTIFF             Beth A. Finnerty, ESQ.
     STATE OF OHIO             Office of the Attorney General
 8                             Antitrust Section
                               23rd Floor
 9                             150 East Gay Street
                               Columbus, OH 43215
10

11   FOR THE DEFENDANT         David Marx, Jr., ESQ.
                               McDermott, Will & Emery, LLP
12                             Suite 4400
                               227 West Monroe Street
13                             Chicago, IL 60606

14                             Amy E. Hancock, ESQ.
                               McDermott, Will & Emery, LLP
15                             600 Thirteenth Street, N.W.
                               Washington, DC 20005
16
                               Amy J. Carletti, ESQ.
17                             McDermott, Will & Emery, LLP
                               227 West Monroe Street
18                             Chicago, IL 60606

19                             Stephen Y. Wu, ESQ.
                               McDermott, Will & Emery, LLP
20                             227 West Monroe Street
                               Chicago, IL 60606
21

22

23

24

25
```

1          (Call to the order of the Court.)

2               THE COURT:  Please be seated, ladies and gentlemen.

3               I think I can almost see you from here.  Give me one

4     moment, please.

5               Again, good morning, ladies and gentlemen.

6               VOICES:  Good morning, Your Honor.

7               THE COURT:  As you may know, the parties have agreed

8     that this preliminary injunction hearing will today be divided

9     as to time between the Plaintiff, FTC, and the Defendants

10    ProMedica three hours and three hours.  And we'll try, as will

11    counsel, to stick with that.  If we run over somewhat, I will

12    understand it because of the various restrictions imposed upon

13    us by this setup in this courtroom.

14              Tomorrow we will continue at 9:00 a.m., and I would

15    assume we will be done somewhere between 12:00 and

16    1:00 tomorrow.

17              Is that an accurate reflection of the time agreements

18    that the parties have made?

19              MR. REILLY:  Yes, Your Honor.

20              THE COURT:  Thank you.

21              I'd like now to have counsel make their appearances

22    for the record.

23              MR. REILLY:  Good morning, Your Honor.  Matt Reilly

24    for the Federal Trade Commission, with Jeff Perry, Sara Razi

25    and Janelle Filson, and for the State of Ohio, Beth Finnerity,

1    F-i-n-n-e-r-i-t-y.

2                THE COURT:  Thank you.

3                Mr. Marx.

4                MR. MARX:  Your Honor, David Marx from McDermott,

5    Will and Emery, accompanied by Amy Hancock, Amy Carletti and

6    Steven Wu, on behalf of ProMedica Health System.

7                THE COURT:  Thank you.

8                Mr. Reilly.

9                Oh, before we get started . . .

10      (Discussion held off the record.)

11               MR. REILLY:  Good morning, Your Honor.

12               THE COURT:  Good morning.

13               MR. REILLY:  As you know, this matter has

14   co-plaintiffs, the FTC, Federal Trade Commission, and the

15   State of Ohio Attorney General.  I think I'll be presenting on

16   behalf of the co-plaintiffs today unless Ms. Finnerity comes

17   up and tackles me because I'm doing a terrible job.  So absent

18   that, I think you'll be hearing from me this morning.

19               Just going to do a quick overview before I get into

20   some of the facts and evidence.

21               We're here today, Your Honor, because the dominant

22   health system, ProMedica, is acquiring a fierce close

23   competitor and already has, in fact, acquired a fierce close

24   competitor.

25               This acquisition is unlawful in two separate relevant

1    markets and is presumed unlawful in a very strong manner, not

2    by a short margin but by a very wide margin.

3           The Plaintiffs have presented this Court with

4    hundreds of exhibits that already strengthen the strong

5    presumption.  The evidence that we have presented to this

6    Court does not rely on the presumption, it strengthens an

7    already strong presumption, and we'll talk a lot this morning

8    about what the presumption means.

9           And this strong presumption cannot be rebutted by

10   Defendant, especially in this 13B proceeding.  We don't think

11   they will be able to rebut the presumptions in the merits

12   trial, but for this 13B proceeding, the challenge is

13   overwhelming.

14          And the proposed relief that we're asking for is

15   necessary to prevent consumer harm and maintain St. Luke's

16   viability during the merits trial.  And we'll talk more about

17   the relief either later this morning or tomorrow.

18          Of course, Your Honor, both sides haven't put forth

19   four-and-a-half hours of arguments because we agree on

20   everything.  We of course disagree on a lot, and that's why

21   we're in this courtroom rather than somewhere else, on the

22   golf course.  But it's pretty astounding how much we do agree

23   on, and throughout this presentation, I will make sure I point

24   out to you to the best of my understanding where we agree with

25   the Defendant and where we disagree, so you'll have a better

1    understanding of what facts are in dispute.

2           Since we last met with you, Your Honor, there's been

3    a lot going on in the part three merits trial.  Since the TRO

4    hearing, the initial scheduling conference took place on

5    February 5th, both parties presented about an hour of argument

6    and an overview, and the scheduling order has been entered.

7    There's a full discovery plan in place.  Initial disclosures

8    have been exchanged, preliminary witnesses lists due on

9    February 16th, and interrogatories, requests for admissions.

10          As you mentioned at the TRO hearing, and this hasn't

11   changed, nor will it, the trial on the merits will begin on

12   May 31st, 2011, and that trial on the merits will have up to

13   210 hours of live testimony, and we expect the administrative

14   law judge, Judge Chappell, to issue an opinion by the end of

15   this year.

16          So why are we here?  We're here for a very simple

17   reason, Your Honor, it's to maintain the status quo while the

18   Commission does its Congressionally-mandated job of analyzing

19   this transaction, having the merits trial there.

20          Maintaining the status quo means preventing

21   phenomenal rate increases during the merits trial, prevent job

22   reductions and service line cuts at St. Luke's, all of which

23   have been planned, and preserve the commission's ability to

24   obtain full and effective relief after the merits trial.  That

25   is the purpose of the 13B.  Rather than letting parties

1    consummate, the 13B has been designed to make sure, if
2    warranted, the Commission is able to get full and effective
3    relief after they decide this in the first instance and later,
4    to -- directly to an appeal, to the Court of Appeals directly.
5          Those are the same three goals under the voluntary
6    hold separate agreement that was in place and still is in
7    place, and these are the exact same objectives that we will
8    ask for this Court to enter into an order.
9          So why are we here?  Your Honor, as you understand by
10   now, this is not the merits trial.  The only purpose of
11   proceeding under Section 13(b) is to preserve the status quo
12   until the FTC can perform its function.  And that comes from
13   the Fourth Circuit Food Town.
14         So this Court is clear, this is not the merits trial,
15   but what we're asking you to enter into here is very
16   important.  It's very important to make sure that interim harm
17   through dramatic price increases don't occur.  It's important
18   to make sure St. Luke's continues the exact same service lines
19   and same staffing levels that has allowed it to get very high
20   patient satisfaction levels.
21         The District Court is not authorized to determine
22   whether the antitrust laws have been or are about to be
23   violated.  Adjudicatory function is vested in the FTC in the
24   first instance.  That comes from the D.C. Circuit.
25         So that's why we're here, Your Honor, asking you to

1    please maintain the status quo of the merits trial which is

2    already underway, which is fast-moving, comes to its

3    conclusion.

4           So the preliminary injunction standard under 13(b) is

5    a public interest standard.  This Court should rule for us if

6    it believes such action would be in the public interest.  And

7    that public interest has two separate elements:  Likelihood of

8    success on the merits and weighing of the equities.

9           It's been very clear in the court law that the FTC

10   should be entitled to injunctive relief more broadly available

11   to the FTC than private parties.  The CCC Holdings is the last

12   13(b) case opinion decided by a court.

13          And the FTC, an expert agency acting on the public's

14   behalf, should be able to obtain injunctive relief more

15   readily than private parties.

16          The standard for a preliminary injunction under 13(b)

17   is significantly lower than the traditional preliminary

18   injunction standard, and I don't think there's any dispute

19   about that.

20          So what does likelihood of success on the merits

21   mean?  It means -- and again, this is clear in every circuit

22   that's decided this, including the Sixth Circuit, that the FTC

23   need only to raise serious and substantial questions.  And

24   this comes from FTC Butterworth, Sixth Circuit in 1997.  "The

25   FTC meets its burden if the FTC has raised questions going to

```
1    the merits so serious, substantial, difficult and doubtful as

2    to make them fair grounds for thorough investigation, study,

3    deliberation and determination by the FTC in the first

4    instance, and ultimately, by the Court of Appeals."

5            The precedents irrefutably teach that in this

6    context, the likelihood of success on the merits has a less

7    substantial meaning than in other preliminary injunction

8    cases.  That comes again, Your Honor, from the last 13(b)

9    opinion issued by any court in the country.

10           So the Defendant in their papers have repeated that

11   we have a burden of likelihood of success on the merits, and

12   they're correct.  But what they don't say, and there's very

13   little dispute and no dispute by every circuit, including the

14   Sixth Circuit, that we meet our burden if we raise serious and

15   substantial questions.  That's all we have to do in the 13(b)

16   proceeding agreed on by every court; and we have met our

17   likelihood of success on the merits standard.

18           At the merits trial, we will be required to show that

19   this acquisition violates the Clayton Act, and so I thought it

20   would be important to give a brief overview what the Clayton

21   Act says.  The Clayton Act requires only a showing that the

22   transaction may be -- that the effects of the transaction may

23   be to substantially lessen competition.  Not will, not will

24   definitely; may be substantially to lessen competition.

25           In a very famous Supreme Court case, Brown Shoe,
```

1    famous in our little antitrust world, Congress used the words

2    "may be "to indicate that its concern was with probabilities,

3    not with certainties.

4         In another well-known Supreme Court case,

5    Philadelphia National Bank, the fundamental purpose of

6    amending Section 7 was to arrest the trend towards

7    concentration, the tendency to monopoly, before the consumer's

8    alternatives disappear through the merger.  And that's what's

9    known as the incipiency standard, Your Honor.  The Clayton Act

10   allows the FTC to act without showing certainty if there may

11   be substantially less in competition because rather than

12   waiting and seeing what the actual effects of an acquisition

13   are and see what harm occurs, that is not in the public

14   interest.

15        And, again, the last 13(b) case decided in the

16   country:  "To establish a violation of Section 7, the FTC need

17   not show that the challenged merger will lessen competition,

18   but only that the loss of competition is a sufficiently

19   probable and imminent result of the merger acquisition."

20        So that is the standard when it comes to likelihood

21   of success, Your Honor.  If we raise serious substantial

22   questions that warrant further investigation, we have met our

23   likelihood of success on the merits prong of 13(b).

24        The second element under 13(b) is weighing the

25   equities.  Those are the two.  It's pretty simple, at least in

1    the words.

2        And the FTC almost -- always chose the equities

3    because the public equities are more important than private

4    equities, and the most important public equity is effective

5    enforcement of the antitrust laws.  That was the specific

6    intent of Congress when enacting 13(b), again from CCC

7    Holdings.  Private equities are not proper considerations for

8    granting or withholding injunctive relief under 13(b).

9    Instead, public equities are paramount.

10        And to put this in more context, Your Honor, no court

11    in the country has ever decided against the FTC in a 13(b)

12    case after they met their likelihood of success on the merits

13    requirement after they raised serious substantial questions

14    because a paramount public equity is effective enforcement of

15    the antitrust laws, the FTC has never been denied relief in a

16    13(b) case where it's met its burden on that prong.

17        We're also going to be talking a lot this morning

18    about the presumption of harm, and we believe that at least

19    for one of the markets, the large market, the presumption of

20    harm is undisputed here.  And the Courts place substantial

21    weight on the presumption of anticompetitive effects.

22        And this comes again from Philadelphia National Bank.

23    "A merger that causes undue market share and significantly

24    increases concentration is so inherently likely to lessen

25    competition substantially, that it must be enjoined in the

1    absence of evidence clearly showing that a merger is not

2    likely to have such anticompetitive effects."  That's the

3    strength of presumption, presumption of illegality once the

4    FTC shows undue market share and concentration.

5           And this is from Whole Foods in the D.C. Circuit.

6    "Once undue concentration is shown, the FTC is entitled to a

7    presumption against the merger on the merits, and therefore,

8    does not need detailed evidence of anticompetitive effects at

9    this preliminary stage."

10          And it's important for us to point out that we only

11   have to show undue concentration in one market.  In this

12   matter, Your Honor, we have shown undue concentration, a

13   strong presumption in two separate relevant product markets.

14          And in Warner Communications, from the Ninth

15   Circuit --

16          THE COURT:  Go ahead, and then I have a question.

17          MR. REILLY:  The Ninth Circuit talks about what the

18   Court's role is in this preliminary proceeding.  The Court

19   does not resolve conflicts in the evidence, compare

20   concentration ratios and effects on competition in other

21   cases, or undertake an extensive analysis of the antitrust

22   issues at the preliminary relief stage.

23          THE COURT:  I am fairly certain, but I want to make

24   sure that when you talk about markets you're not talking about

25   Toledo and Lucas County; you're talking about the segments

```
 1    within an institution, such as ProMedica or St. Luke's or

 2    other competing institutions.

 3              MR. REILLY:  Yeah, when we talk about markets, Your

 4    Honor, there are two markets that we define:  The relevant

 5    product market, which could be obstetric services, general

 6    acute care services, and then the geographic market, which is

 7    Lucas County.  Those two combined will get you the market

 8    shares and market concentrations.  You have to do both to make

 9    those calculations.

10              And, again, the D.C. Circuit very recently held that

11    the courts trench on the FTC's role when they choose between

12    plausible, well-supported expert studies.  Again, court after

13    court has recognized, Your Honor, that this is a preliminary

14    proceeding, and that the merits trial in this case is ongoing.

15    The opening statements will be coming in May, and that is

16    where the Congress wanted the Commission to do its job in the

17    first instance.

18              I realize that this Court is very familiar with

19    ProMedica and all the hospitals in Lucas County, but I guess

20    for the benefit of maybe people in the galleries, I'll do a

21    brief overview of ProMedica and then, St. Luke's.

22              ProMedica is a health system of 10 hospitals, not

23    including St. Luke's, located throughout northwest Ohio and

24    southeast Michigan.  In Lucas County, ProMedica has three

25    hospitals, the Toledo Hospital, 660 staff beds; Bay Park
```

1    Community Hospital with 86 staff beds, and Flower Hospital

2    with 257 staff beds.

3         ProMedica also owns a for-profit Paramount Health

4    Care, one of the largest commercial health plans in Lucas

5    County, where it is clear that when Paramount makes business

6    decisions, it considers the impact on the ProMedica hospitals.

7    When ProMedica hospitals make business decisions, it considers

8    the impact on Paramount.  ProMedica's ownership of Paramount

9    are not our primary issue we're relying on in this case on the

10   merits trial, it does add to the likely competitive harm that

11   will result from this transaction.

12        ProMedica is self-proclaimed as the dominant provider

13   of healthcare.  Month to month, ProMedica health system has

14   market dominance in the Toledo MSA, and the self-proclaimed

15   dominant hospital provider in Lucas County.

16        And I want to point out, Your Honor, that the first

17   sub-bullet there, "ProMedica health system has market

18   dominance in the Toledo MSA," that comes from ProMedica's

19   presentation to Standards & Poor.  It is not a middle manager

20   in a cubical writing a memo that was never distributed and

21   that no one read.  This was an official ProMedica presentation

22   to Standard & Poor.  Standard & Poor relies on these

23   presentations to give ProMedica its credit rating, and people

24   rely on ProMedica's credit rating to lend money to ProMedica.

25        There is a strong fiduciary duty to be as fair and

```
1   accurate as possible when making presentations to Standard &

2   Poor's, and they call themselves -- they said they have market

3   dominance to Standard & Poor's.

4           St. Luke's is a general acute care hospital with 178

5   staff beds.  It's located in Maumee, a southwestern suburb of

6   Toledo.  I think there's no dispute about this at all, Your

7   Honor, that St. Luke's ranks high in quality and patient

8   satisfaction.  The hospital is regularly recognized by

9   third-party quality rating organizations that rank St. Luke's

10  within the top 10 percent of hospitals nationally.  St. Luke's

11  has very high clinical outcome measures and high patient

12  satisfaction scores.  And the fact that St. Luke's is a very

13  high quality low cost hospital is not disputed by the

14  Defendant.

15          In their submissions by the expert, ProMedica's

16  submission by the expert in their pretrial briefings,

17  ProMedica has claimed that St. Luke's is just not a

18  significant competitor.  They're just not significant.  They

19  have very few discharges per day, they have very few

20  obstetrics discharges per day, and they say only 10 a day.

21  But it's important to put this in context, Your Honor, in

22  Lucas County.  St. Luke's volume is greater than almost every

23  other hospital in Lucas County.  By commercial discharges, the

24  things we're focusing on in this preliminary injunction

25  proceeding, St. Luke's is the third largest hospital in Lucas
```

1    County, larger than UTMC on commercial discharges for general

2    acute care services, larger than Flower, larger than

3    St. Charles, larger than St. Anne, and larger than Bay Park.

4              So by some logic that you shouldn't be concerned

5    about an acquisition of an insignificant competitor, that

6    would apply to the vast majority under that standard of

7    hospitals located in Lucas County.

8              THE COURT:  Would you consider, Mr. Reilly, the

9    self-proclaimed dominant hospital provider language that

10   you've quoted just a few moments ago for purposes of this case

11   as a -- an admission against interest?

12             MR. REILLY:  Yeah, I would consider it an admission

13   against interest because our theory is they have been telling

14   people outside of ProMedica that they are dominant, and when

15   you acquire a close, vigorous competitor like St. Luke's, they

16   become even more dominant.  The starting point prior to

17   acquiring St. Luke's was they were self-proclaimed dominant

18   provider in Lucas County.  And when you acquire a close

19   competitor you become even more dominant.  Those sort of

20   findings are relevant for an antitrust investigation and a

21   merger investigation.

22             So don't take our word for it that based on our

23   numbers that St. Luke's is the third largest hospital in Lucas

24   County.  Mr. Wakeman, the CEO, recently was celebrating the

25   same fact.  He wrote in a July 2010 e-mail to other executives

1   at St. Luke's, █████████████████████████████████

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ██████████████████████████████████

5          They are a significant hospital by any standard

6   within Lucas County.

7          ProMedica has also argued that St. Luke's is not

8   unique.  They don't offer any unique services.  Everything

9   they offer is offered at the ProMedica hospitals.  And, Your

10  Honor, that's exactly the point.  That's why we're here today.

11  If St. Luke's offered only psychiatric care, offered something

12  that ProMedica didn't offer, we wouldn't even open an

13  investigation.  The fact that they're offering the exact same

14  services that ProMedica does and they're competing vigorously

15  to draw and attract patients, that's why we're here.  The fact

16  that St. Luke's does not offer unique services is a reason why

17  there's a competitive problem from this acquisition.  It's not

18  a reason why there isn't a problem.

19         ProMedica and St. Luke's have termed this acquisition

20  as a joinder.  I just want this Court to be clear that the

21  joinder is a functional equivalent of an acquisition.

22  ProMedica acquired St. Luke's as Ms. Hanley said in an

23  investigational hearing, that St. Luke's has become us.

24         And ProMedica's economic and decision-making control

25  at St. Luke's is not disputed.  They will negotiate health

1    plan contracts at St. Luke's, approve strategic plans, annual

2    operating and capital budgets, and they will pool St. Luke's

3    funds and assets with ProMedica for investment.  As PX223

4    states, bottom line, for accounting purposes, ProMedica has

5    acquired St. Luke's.  So while it's being termed as a joinder,

6    it is an acquisition under Section 7, and it is de facto

7    control of St. Luke's by ProMedica.

8         We also heard some talk about, well, St. Luke's

9    has -- still has an independent board, and so they will play

10   some role in making sure that the hospital keeps the same

11   services and so in some ways that the order is not necessary

12   because of the independent St. Luke's board.

13        Prior to the acquisition, Mr. Wakeman, the CEO of St.

14   Luke's, predicted that ProMedica would have a window dressing

15   local board for St. Luke's.  And he was right.  Within 18

16   months, ProMedica will have approval of two thirds of St.

17   Luke's board, and it will have a right to remove any board

18   member with or without cause after a short stub term, as it's

19   called, after that period expires.

20        So let me give you, Your Honor, a brief overview of a

21   Section 7 case, prima facie Section 7 case established when

22   the FTC makes a showing that the transaction would lead to

23   undue concentration in the market for a particular product in

24   a particular geographic area.  The D.C. Circuit in Whole Foods

25   thought that even at this preliminary stage, the FTC did not

1    have to determine what the relevant product markets were.  We

2    have, in fact, alleged two relevant product markets fully

3    supported by the evidence, and both of those markets, as I

4    will show, there is a significant undue concentration which

5    creates a presumption of illegality of this transaction in

6    which the Defendants have to rebut.  Once we show our -- once

7    we meet the burden of our presumption, the burden of

8    production shifts to the Defendant to attempt to show that the

9    presumption does not accurately indicate probable

10   anticompetitive effects.  That's what they have to do after we

11   meet our presumption, and if they don't, we're entitled to

12   preliminary relief.

13          The first relevant product market is general acute

14   care inpatient hospital services.  That is what we call a

15   broad cluster market of inpatient surgical, medical and

16   supporting services that are provided in a hospital setting to

17   commercially-insured patients.  It excludes outpatient,

18   psychiatric and tertiary services but includes most of the

19   basic services that require an overnight hospital stay.

20          And there is no dispute, Your Honor, by Defendants

21   that this is a relevant product market, it's appropriate, and

22   this is consistently recognized by the courts, including the

23   Sixth Circuit, as being an appropriate market.

24          So when I say cluster markets, Your Honor, what that

25   means is, I think everyone in this Court knows that knee

1       surgery is not a substitute for a hip surgery, for example.

2       You're not going to get a hip surgery if there's a price

3       increase for knee surgery, but it's a cluster market.

4               It's really an analytical tool for convenience.  You

5       put all the general acute care services in a cluster, and you

6       analyze the competitive effects and dynamics of the cluster,

7       rather than going service by service by service.  It would be

8       appropriate to go service by service, but I think the

9       courtroom will be pretty empty by the time we get into about

10      20 services because of the tedium of doing that.

11              But it's important to remember the only services that

12      should be put in the cluster are the ones that have the exact

13      same competitive dynamics and market participants as the other

14      goods in the cluster.  That's when you do it.  In the Southern

15      District of New York in 2009, the Emiga Group said it very

16      well:  "It's used as a matter of political convenience because

17      there's no need to define separate markets for a large number

18      of individual hospital services when market shares and entry

19      conditions are similar for each."

20              And that's the key language, Your Honor:  When market

21      shares and entry conditions are similar for each.  If they're

22      not, there's no discretion to put it in the cluster.  You

23      cannot put a good in the cluster market that has different

24      market participants and different market shares because it

25      would mislead this Court and imply that, yeah, this same

1    competitive dynamics exists for the other services.

2         Our expert, Professor Town, stated that the purpose

3    of the cluster market is to formulate aggregates across those

4    products in order to do the analysis in a practical way.  And

5    that's what it is, it's practical convenience.  That's why we

6    use cluster markets.

7         In Little Rock Cardiology, it was clear that if

8    there's some good that there is no overlap, some service that

9    one hospital offers that the other doesn't, it's not

10   appropriate to put in the cluster market.  So in this case the

11   cluster market is the cluster of services offered by St.

12   Luke's for which ProMedica hospitals overlap, meaning offer

13   the same services.

14        The second relevant product market is inpatient

15   obstetrical services.  I think it's safe to say there has been

16   a dispute about this relevant product market, and there is a

17   very simple reason why obstetrical services should not be put

18   in the general acute care cluster market services.

19        UTMC and Mercy St. Anne do not offer obstetrics.  So

20   in our general acute care market, UTMC is a competitor.  They

21   have some share.  And by putting obstetrics in that cluster,

22   we're saying, well, UTMC looks like they still have some share

23   and presence.  They don't.  You move goods, services form a

24   cluster when the market participants and market shares are

25   different.

1          And that's why we are having a separate market for

2   obstetrics to account for the different competitive

3   conditions.  It's the exact same reason, Your Honor, why you

4   exclude outpatient and tertiary services from general acute

5   care.  For outpatient services there are usually many more

6   competitors.  There might be many more competitors, there

7   could be ambulatory surgical centers, there could be imaging

8   centers.  There could be a lot of things that make the

9   competitive dynamics different.  That is why we exclude

10  outpatient, that's why tertiary services are excluded from the

11  general acute care product market, because the tertiary

12  services people are willing to travel much further.  Those

13  services are not in the general acute care market.

14         In the Sixth Circuit, even set up different markets

15  based on different competitive conditions.  This is the

16  Butterworth case.  Where in Butterworth in the Sixth Circuit

17  accepts two market definitions, general acute care inpatient

18  hospital services and primary care inpatient hospital

19  services, each with different competitors.

20         I don't think -- I don't think there's much reason to

21  guess why the Defendant is fighting so much on us alleging a

22  separate market for obstetrics.  And it's really for a simple

23  reason.  To the market for obstetrics, this acquisition

24  creates a merger to duopoly with ProMedica having more than

25  80 percent share.  And the Defendant is fully aware that no

1    court has ever sanctioned a merger to duopoly, never mind in a
2    13(b) setting, and that's why we're fighting over this.
3          So the Defendant has come up with a couple arguments
4    that we understand of why there shouldn't be a separate market
5    for obstetrics.  One is that negotiating rates -- they argue
6    that when you negotiate rates as a bundle, it doesn't really
7    matter what the market power is for any one good, the bundle
8    price is all that matters.  And it's pretty clear analytically
9    that negotiating rates for a bundle of services does not
10   prevent the exercise of market power over any one service.
11         The simple analogy, is Your Honor, if you had two
12   goods and they're both competitive goods and you're buying
13   them in a bundle, and you got a monopoly in one, you'd expect
14   the bundle price to reflect the market power for one of the
15   goods.  It's not, that, oh, as long as you have some
16   competition for one of the goods, that market power over all
17   the other goods won't be exercised.
18         And Professor Town explains in paragraph 81 of his
19   expert declaration the rationale and reasoning for that.
20   ProMedica's expert did not give an opinion on this.
21         Also another reason, even putting aside that the
22   price of the bundle will reflect the market power for each
23   individual good in that bundle, there's also another very
24   important fact, and we've redacted this.  Hospitals in Lucas
25   County, including the hospitals St. Luke's and ProMedica often

1   carve out, often separate for OB services separately.  So to

2   the extent that the price of the bundle of goods -- this is

3   page 21, Your Honor.

4          THE COURT:  I'm there.  Thank you.

5          MR. REILLY:  To the extent that there's any reason to

6   believe, which there isn't, that the price of the bundle will

7   somehow reflect competition throughout the entire bundle

8   rather than the market power for any good, ProMedica, after

9   the merger to duopoly, with more than an 80 percent share in

10  this market could easily tell health plans, let's contract for

11  obstetrics separately and here's what the rate's going to be.

12  The bundle doesn't protect health plans and employers from a

13  carve-out.  These carve-outs happen a lot in Lucas County.

14  We've given you several examples in your slides, and it surely

15  will happen after ProMedica has an 80 percent-plus share.

16         Now I'm turning to relevant geographic market.  We've

17  just talked about relevant product market.  And this is

18  usually, Your Honor, usually in hospital merger cases where

19  the biggest fight occurs.  The FTC typically alleges a narrow

20  geographic market, and the Defendant alleges a much broader

21  geographic market.  The reason being the broader the

22  geographic market, the less concentrated the market is.

23         And so let me tell you what the key question is to

24  determine geographic market.  If a hypothetical monopolist

25  acquired all of the hospitals in Lucas County, could it raise

1    rates to commercial health plans by five to 10 percent?

2    That's a question.  So let me put this in context of Lucas

3    County.

4           We're here today because ProMedica acquired St.

5    Luke's, and we think the evidence overwhelmingly demonstrates

6    that there will be dramatic price increases at St. Luke's and

7    also very likely price increases at ProMedica, as well.  To

8    determine relevant geographic market, it's a different test.

9    What it means, Your Honor, is if ProMedica acquired Mercy

10   St. Anne's, Mercy St. Charles, Mercy St. Vincent's, UTMC and

11   St. Luke's, if ProMedica, for example, had a monopoly,

12   controlled all of the hospitals in Lucas County, could they

13   raise rates by a mere five to 10 percent?  And if the answer

14   to that question is yes, then the geographic market is Lucas

15   County.

16          And that analytical tool which is in the guidelines,

17   in the case law, is not in dispute.

18          And throughout the six-month investigation and even

19   today, it appears to us that the Defendant concedes the

20   relevant geographic market is Lucas County for general acute

21   care services.  And for good reason.  I don't think there's

22   any evidence in the entire record that would lead one to

23   believe that if ProMedica acquired all the Mercy Hospitals,

24   UTMC, and St. Luke's, they would not be able to raise rates by

25   a small but significant amount, five to 10 percent.

1          And the supporting evidence on the geographical

2     market is this slide 22, Your Honor, is very strong.  We have

3     health plan testimony that support this geographic market,

4     testimony from other third-party hospitals.  We see when you

5     look at who's leaving Lucas County for general acute care

6     services, very, very few are leaving, less than three percent

7     of Lucas County residents are getting care anywhere else.

8     They don't travel for general acute care services.

9          And for obstetrics patients, it's less than one

10    percent of Lucas County residents are leaving Lucas County.

11    The appropriate geographic market here is Lucas County for

12    both general acute care services and for obstetrics.

13         Again, talking about obstetrics and the merger to

14    duopoly, only ProMedica and Mercy offer OB services after this

15    acquisition.

16         For the general acute care market, ProMedica's own

17    expert acknowledged that it's more likely than not that Lucas

18    County is the general acute care market under the hypothetical

19    monopolist test.

20         And so when we're trying to determine what the

21    relevant geographic market is for obstetric services, here's

22    basically what it comes down to.  So the Defendant

23    acknowledges that for the hundreds of services in the general

24    acute care bundle, the appropriate geographic market is Lucas

25    County.  But for the one service, the one service, obstetrics,

1    where it creates a merger duopoly, they're implying that Wood

2    County Hospital should be in that geographic market.

3            So for the hundreds of services in general acute

4    care, geographic market, Lucas County; for obstetrics, Lucas

5    County plus Wood County.  And Your Honor, I have to tell you

6    that's pretty implausible, with all due respect.  I could see

7    if you're having elective hip surgery, you might be willing to

8    travel a little bit further for a general acute care service

9    such as that.  But when the woman is in labor and there's

10   quite a rush to get to the hospital, no one is going from

11   Lucas County to Wood County.  We made the drive from the

12   center of Lucas County to Wood County Hospital.  We made the

13   drive from St. Luke's to Wood County Hospital.

14           I also happen to have a six-month pregnant wife at

15   home.  The entire time I was making that drive I'm like, my

16   wife would kill me if I drove her all the way to Wood County

17   to have the baby.  There aren't enough flowers around that I

18   would have to buy her for that anger she would have.

19           And the numbers support this, Your Honor.  Only

20   six-tenths of one percent of Lucas County residents obtain OB

21   services outside of Lucas County.  For Wood County, it's less

22   than two-tenths of one percent.  No one from Lucas County is

23   going to Wood County to deliver their babies.  They wouldn't

24   go to Lucas County if there's a monopoly, they wouldn't leave

25   Lucas County if there's a monopoly or a slight price increase

1    for obstetrics.  And so the appropriate geographic market for

2    both the general acute care services and the obstetrics market

3    is Lucas County.

4          I'm just showing you again, affirming what I just

5    mentioned, that the average driving time, and even looking at

6    the percentiles, for obstetric services is only 11.3 minutes.

7    Even for the five percent of patients who travel the longest,

8    the average drive time is just 24.5 minutes.  Wood County

9    Hospital is 33 minutes away from central Lucas County.

10         I know Your Honor is very familiar with Mercy health

11   partners, so I'll be very brief on this.  Mercy health

12   partners has three hospitals:  St. Vincent's, St. Charles and

13   St. Anne's.  St. Anne's, again, Your Honor, does not offer

14   obstetrical services.

15         One thing that this Court might not realize, that in

16   the geographic and prior market that we've alleged, Pro --

17   Mercy is 60 percent smaller market share than ProMedica.  You

18   hear a lot about there being a mirror image, ProMedica and

19   Mercy is identical.  Mercy is 60 percent smaller market share

20   than ProMedica.  ProMedica's significantly larger.

21         And in the southwest Lucas County, where in

22   particular St. Luke's and ProMedica are fighting for patients,

23   where the patient's number one and number two choices are

24   either ProMedica or St. Luke's, Mercy's share is very small,

25   almost 25 percent less than both ProMedica and St. Luke's.

1    They are not mirror images or identical, and of course, Mercy

2    does not have ownership in Paramount or any other health plan.

3           UTMC has 226 staff beds.  They do, of course, offer

4    tertiary services.  Their market share for the general acute

5    care market is about equal to St. Luke's, and they, too, do

6    not offer obstetrical services.

7           So, again, the Defendant has basically claimed that

8    ProMedica and Mercy are twins, they're mirror images of each

9    other, and let's look at what the differences are.

10          For inpatient market shares, ProMedica is almost

11   47 percent, Mercy's 28.7 percent.  And, Your Honor, this is

12   before ProMedica acquired St. Luke's.

13          For obstetric market shares, ProMedica has a

14   71.2 percent share, Mercy a 19.5 percent share.  And, again,

15   Your Honor, this is before ProMedica acquired St. Luke's and

16   now has over an 80 percent market share, an extraordinary

17   market share in obstetric services.

18          ProMedica offers OB services at all Lucas County

19   hospitals, Mercy does not.  ProMedica owns an integrated

20   health plan, Mercy does not.  ██████████████████████████

21   ███████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ███████████████████████████   They are not mirror images of

24   each other, Your Honor, despite where the location and the

25   maps of the Defendant shows.

1          So we've talked a lot about the standard in 13(b),

2     and we've mentioned the presumption of illegality once we show

3     undue concentration.  This slide, Your Honor, shows what we're

4     talking about.  There's not only a strong presumption, there's

5     actually a very strong presumption of competitive harm that

6     this merger has created.  And the Courts have found there to

7     be a presumption of illegality at even lower levels than this.

8     The merger guidelines have a HHI of 2500 or more.  That's a

9     highly concentrated market.  If the market becomes more

10    concentrated by a level of 200 and that becomes a point where

11    the presumption is created under the merger guidelines, and

12    the courts have even a lower standard historically for when

13    the presumption is created.

14         As we talked about, this acquisition exceeds these

15    standards for a presumption by a wide, wide margin.

16         For general acute care, ProMedica and St. Luke's

17    shares 58.3 percent of the Lucas County market.  The

18    post-acquisition, HHI is 4,391, 4,391.  That is almost 2000

19    points above what the guidelines call are a highly

20    concentrated market.

21         And the change in HHI for the general acute care

22    market is 1078, almost five times, more than five times the

23    amount necessary for us to be entitled to a presumption that

24    this merger is illegal, which is very important in the merits

25    trial and is even more important in a 13(b) proceeding.

```
1              For obstetrics, the market shares are, as I said,

2     again, Your Honor, extraordinary.  ProMedica and St. Luke's

3     has a combined 80.5 percent market share.  The

4     post-acquisition is 6,854, which is almost three times as much

5     as what you need for a highly concentrated market, and the HHI

6     increase is 1323, almost seven times higher than what you

7     would need to get the presumption.  This is a very, very

8     strong presumption and creates an incredible challenge for the

9     Defendant to rebut, which they must in order to prevail here.

10             Amazingly, Your Honor, for general acute care, the

11    Defendant has conceded that that's the right market, those are

12    the right market shares, and that the presumption based on

13    these numbers alone are intact.  That's not an issue of

14    dispute here.  They've conceded that that for general acute

15    care is the appropriate market and the appropriate market

16    shares.

17             As I mentioned, the Supreme Court and other courts

18    around the country have put a lot of weight on the presumption

19    of illegality.  It's very important for them because, again,

20    once you get market shares and market concentrations that are

21    that high, there is a strong presumption that the merger's

22    illegal and that the merger will cause competitive harm.

23             THE COURT:  Pardon me.

24             MR. REILLY:  Sure.

25             THE COURT:  That the mergers are illegal or legal?
```

1              MR. REILLY:  The mergers are illegal.

2         Philadelphia National Bank, a Supreme Court case in

3    1963, combined share was 30 percent for the merging companies.

4    The Court held that that merger was illegal.

5         University Health, Eleventh Circuit hospital merger

6    case, the combined share was 43 percent.  The Eleventh Circuit

7    found that merger was illegal.

8         Cardinal Health, another 13(b) case, combined share,

9    there were two mergers there, 13 -- 37, excuse me, and almost

10   40 percent.  The Court found that that merger was illegal.

11        And then the Northern District of Ohio, 198413(b)

12   case, Bass Brothers, 29 percent combined share.  The Court

13   found that that merger was illegal.  All these based on the

14   presumption.

15        ProMedica, general acute care market share is

16   58 percent, for obstetrics 81 percent, far in excess of the

17   combined market shares that courts have already found to be

18   illegal because of the presumption.

19        So what do the Defendants argue?  They've conceded

20   that there are very high market shares here, and -- for at

21   least the general acute care.  And for obstetrics, their

22   pretty extraordinary market share's even higher.  So I think

23   they're arguing that market shares don't matter, they don't

24   matter, this Court shouldn't consider the strong market

25   shares, the high market shares and the strong presumption as

1    created from this acquisition.  So what we did is we put up

2    the market shares of every participant in Lucas County:  11.5

3    for St. Luke's, 13 for UTMC, 28.7 for Mercy, and 46.8 for

4    ProMedica.

5         We're trying to test, do these market shares predict

6    higher prices, predict the rates that those hospitals are able

7    to get from health plans?  And what you'd expect to see if

8    market shares really weren't relevant or didn't have any

9    meaning is pretty much a straight line.  Each hospital would

10   get very similar pricing levels.  In fact, you might expect

11   that the larger hospitals would have lower cost because all

12   these alleged efficiencies and their pricing would be lower.

13        Well, Professor Town, our expert, analyzed the

14   relative pricing for each hospital in Lucas County controlled

15   for acuity, meaning that it was an apples to apples

16   comparison, to the volume adjusted basis.  And it's important

17   to know that he was the only expert in this case who looked at

18   relative pricing at both hospitals.

19        Ms. Guerin-Calvert, ProMedica's expert, did not.  So

20   this is what Professor Town's pricing level has found.

21        St. Luke's, with the lowest market share, has the

22   lowest pricing, UTMC with slightly higher market share has

23   slightly higher pricing, Mercy with higher market share than

24   UTMC, has higher pricing, and ProMedica, with its 40, almost

25   47 percent market share, has the highest pricing.  So rather

1    than market shares being meaningless predictors of pricing and

2    rates that hospitals can get from health plans and employers,

3    it's almost a perfect predicter.

4           In fact, Your Honor, if someone asked you to guess or

5    predict what the hospital rates are for each hospital and what

6    they get from health plans and from employers, if you could

7    have one piece of information, one piece of information to

8    predict that, it would be market shares.  Market shares mean

9    higher rates in Lucas County.  This acquisition, added to

10   ProMedica's dominance by already adding to their very high

11   market share and the very high pricing power in Lucas County.

12          As I already mentioned, Your Honor, and hopefully

13   demonstrated, that the market shares and market concentration

14   figures alone, alone create a very strong prima facie case.

15   Because of the market shares and the market concentration

16   numbers, there is a very strong presumption recognized by the

17   courts, recognized by the merger guidelines that this merger

18   is illegal because it would create and cause competitive harm

19   to the citizens of Lucas County.

20          But we do not rest on the presumption.  We could.  We

21   could sit down, and I don't think the Defendants can rebut the

22   presumption, especially in a 13(b) proceeding, where all we

23   have to do is raise serious and substantial questions, that's

24   all we have to do, and the presumption alone gets us to that

25   point on the likelihood of success.  But we didn't stop there,

1    Your Honor.

2         We have put together an extraordinary number of

3    documents, over a thousand exhibits that support our theory of

4    competitive harm and bolster the presumption, expert analysis,

5    five expert reports, 16 investigational hearings, 17 employer

6    declarations, four hospital declarations, five physician

7    declarations, six health plan declarations, eight fact witness

8    depositions and four expert depositions.

9         So to the extent that we are standing before this

10   Court, who's making a very important decision, expecting a

11   rubber stamp because of our presumption, that is not true.  We

12   have gathered a lot of evidence, and this evidence doesn't

13   weaken the presumption, it doesn't maintain the presumption;

14   it strengthens the presumption.

15        And one fact alone, as we already talked about, the

16   relative pricing at each of the hospitals, ProMedica's pricing

17   is more than 70 percent on average more expensive than St.

18   Luke's.  And so if all that happened in this merger, if all

19   that's happened is that ProMedica raised St. Luke's prices to

20   ProMedica's own current rates, prices would go up to

21   extraordinary levels.  This is what health plans which we

22   talked about are very concerned about.  This is what St.

23   Luke's board expected to happen, and also, even though there

24   are statements to the contrary, this is what ProMedica

25   expected to happen and tell its potential partners this.

1          And we haven't even talked, which we'll talk about

2     later, what happens when a self-proclaimed dominant firm

3     becomes more dominant, what happens to their ability to get

4     higher prices from health plans and employers in Lucas County?

5     This is just a simple fact that if St. Luke's, now that

6     they're part of ProMedica, now that they no longer have

7     10 percent market share and have a 60 percent market share for

8     general acute care services, have an 80 percent market share

9     for obstetrics, what will happen to their prices.

10          So the statement has been made by Defendants pretty

11     frequently that they're shocked, shocked that St. Luke's had

12     in their documents all about this extraordinary, outstanding

13     managed care pricing of ProMedica, how St. Luke's rates will

14     increase dramatically and saying that they never got that from

15     them.

16          Well, Your Honor, they did get it from them.  This is

17     a partnership presentation that ProMedica makes to potential

18     partners.  This is what, kind of nice to meet you, let me tell

19     you what the benefits are of joining ProMedica.  One of the

20     benefits are payor system leverage.  ProMedica tells that, to

21     try to get potential partners to join them.

22          And to be clear, when business people use terms like

23     leverage and clout, they're describing market power, Your

24     Honor.  Payor system leverage, ProMedica's using that as a

25     marketing tool to say, come join our partnership, we have

1    payor system leverage, and you will have it, as well, if you

2    join us.

3           We're going to go through a lot of St. Luke's

4    documents and make this exact same point that are perfectly

5    consistent with that theory in this case these are ordinary

6    course documents from the highest St. Luke executives, most

7    often the CEO, sending memos to the board of directors.  These

8    are not, again -- there is a middle manager defense that we

9    hear about, that this middle manager wrote this, he or she

10   didn't know what they were talking about, ignore it.

11          I have yet to hear a crazed CEO defense or a crazed

12   board of directors defense.  These documents that we're going

13   through right now were sent by senior executives at St. Luke's

14   to the St. Luke's board of directors so that the St. Luke's

15   board of directors could make the most important decision they

16   have had to make in years, at least 15 years, according to

17   Mr. Wakeman, the CEO.

18          St. Luke's talks about it, if they joined a system in

19   Lucas County, their value would be diluted and their payments

20   will skyrocket, skyrocket.  That's what would happen to their

21   rates if they joined the system.

22          This is their presentation that Mr. Wakeman, the CEO,

23   made to St. Luke's board of directors in deciding what should

24   they do going forward in terms of remaining independent or

25   look for a partner.  Mr. Wakeman presented to the entire board

1    of directors:  ProMedica, believed to have the most favorable
2    managed care contracts in the area.  Again, on another page,
3    impact on community, the St. Luke's affiliation with ProMedica
4    has the greatest potential for higher hospital rates.  A
5    ProMedica-St. Luke's partnership would have a lot of
6    negotiating clout.  This is St. Luke's to its board of
7    directors in talking about one of the benefits of joining
8    ProMedica.

9              And just to make sure everyone understood, this is
10   from the due diligence meeting, and ProMedica or Mercy
11   affiliation could still stick it to employers.  That is, in
12   case there was any ambiguity, to continue forcing higher rates
13   on employers and insurance companies.  That's the impact that
14   St. Luke's anticipated from this acquisition.  That's
15   consistent, perfectly consistent, why we're here today, that
16   this merger will harm consumers, that this merger's not good
17   for the community because it will result in higher rates for
18   employers, employers in Lucas County.  St. Luke's, prior to
19   the acquisition, agreed.

20             Again, talking about if they join, they go to the
21   dark green side.  This is -- I think refers to ProMedica.  We
22   may pick up several million dollars in additional health plan
23   fees.  Again, join ProMedica, get higher rates from health
24   plans, get higher rates from employers, and that was the
25   anticipated likely effect of joining ProMedica.  There's no

1    ambiguity here, Your Honor, none at all.

2            Again, another document.  This is from Mr. Wakeman,

3    the CEO, to board members.  If we consider merging with one of

4    the large systems, any hope of lower cost and improved quality

5    will be diminished.  Again, anticipating the likely impact and

6    effects of joining a large system like ProMedica.

7            So we have ordinary course documents from ProMedica

8    and from St. Luke's that fully anticipate what will happen to

9    rates when St. Luke's joins ProMedica.  This is slide 37, Your

10   Honor.  We redacted the specific testimony.  This is what the

11   health plans are saying about the transaction:  I expect a

12   rate increase of approximately 20 to 30 percent within three

13   years.  The acquisition could also give ProMedica enough

14   leverage to increase rates across all of its Lucas County

15   hospitals.

16           Another rating plan.  St. Luke's actual reimburse

17   rates are 40 to 55 percent lower than Flower and Park.  After

18   acquisitions, rates of the -- the rates of the community

19   hospital rise to acquirer's rates.

20           And so there is a lot more testimony from health

21   plans.  It's important, Your Honor, to point out that,

22   especially in light of ProMedica's argument that this

23   acquisition will improve quality of care, improve coordination

24   of care, result in better outcomes, fewer unnecessary tests,

25   less readmissions, all these great things, health plans, to

1    the extent that they believe it, should be very supportive of

2    this acquisition.  They should be, because lower healthcare

3    cost is good for them and good for their bottom line.  There

4    is not one health plan, not one health plan, there's nothing

5    in the record that shows any support by any health plan for

6    this acquisition.

7            In some of the predicted rate increases that you have

8    on your redacted slide, you may note that those are, for the

9    numbers we put in there, lower than the 70 percent estimate of

10   Professor Town.  In fact, the 70 percent is a average based on

11   adjusted for volume.  And so for one health plan has

12   significantly low lower rates at St. Luke's than at ProMedica,

13   which in this case it does, you'd expect to see different

14   health plans having different rate differentials.

15           And also, Your Honor, I think it's important to point

16   out that we're still talking about dramatic price increases,

17   whether you're evaluating how much more expensive ProMedica is

18   now for the same services than St. Luke's, what the health

19   plans are saying, we are having some sort of a range of what

20   the likely price increases will be after this acquisition at

21   St. Luke's, and all of them are dramatic and extraordinary.

22   There are no single-digit rate increases anywhere in the

23   record that are predicted by anyone.

24           In addition to health plans, local employers are

25   concerned about the competitive harm for this transaction.

```
1    Slide 38 has a bunch of them.  I'll just read a couple because
2    obviously you can read them, Your Honor.
3             One very large employer.  "I'm concerned that
4    ProMedica's acquisition of St. Luke's will lead to higher
5    healthcare costs for our employees in the Toledo area."
6             Another one.  "I am concerned that ProMedica's
7    acquisition of St. Luke's will enable it to demand higher
8    rates."
9             So there is -- there are documents in St. Luke's and
10   ProMedica that talk about higher rates, health plans expect
11   higher rates, local employers expect higher rates.  This is
12   the type of evidence that on top of the already strong,
13   irrebuttable presumption we are bringing forth in a 13(b)
14   proceeding, where we're only required to raise serious
15   substantial questions.
16            So I think it's pretty clear, we hope it is, Your
17   Honor, that market shares do matter and that market shares are
18   a very strong predictor of pricing by hospitals in Lucas
19   County.
20            So it seems like what the Defendant argues next is
21   that St. Luke's and ProMedica, they're really not close
22   substitutes.  They're not vigorous competitors, in the hope
23   that even though ProMedica acquired St. Luke's, as long as
24   they don't acquire a vigorous close competitor, there
25   shouldn't be any issue.
```

1          Well, again, Your Honor, the documents that St.

2     Luke's and ProMedica created not for this Court, but while

3     they're running their business, belie that point. ████████

4     ████████████████████████████████████████████████████████████

5     ████████████████████████████████████████████████████████████

6     ████████████████████████████

7          ████████████████████████████████████████████████████

8     ████████████████████████████████████████████████

9     ████████████████████████████  This is done, again, during the

10    ordinary course of business.

11          And also, ProMedica and St. Luke's compete vigorously

12    for the same patients.  Again, really right around St. Luke's

13    primary service area, a core service area as they define it.

14    Based on market share data on zip codes that ProMedica's

15    expert put forth, it's clear that ProMedica and St. Luke's

16    have the top two general acute care market shares in eight of

17    St. Luke's top 10 zip codes.  In these zip codes Mercy is much

18    smaller.  Patients in that area prefer to go to either St.

19    Luke's or ProMedica hospitals.  They're the number one and two

20    choices, and that's why it's important for health plan

21    networks to have either one in the network.

22          This is, again, St. Luke's core service area.  St.

23    Luke's calculated market shares not for this review of the

24    Court but in the ordinary course of business, as well.  And in

25    their calculations, ProMedica and St. Luke's market shares are

1    substantially higher than Mercy for both general acute care

2    and obstetrics, and I have the PX numbers there, as well.

3              In all but one zip code in this area, ProMedica and

4    St. Luke's were first and second by market share.

5              And, again, in an ordinary course document by ███,

6    they define the southwest Lucas County area, and they

7    acknowledge -- this was not made for litigation.  They

8    acknowledge that their presence in southwest Lucas County is

9    significantly smaller than ProMedica and St. Luke's, having

10   almost an 80 percent share for ProMedica and St. Luke's, with

11   ███ and ███ much smaller.  And Mr. Wakeman acknowledged

12   that ProMedica was the most significant competitor of St.

13   Luke's in the core service area.

14             ProMedica and St. Luke's compete and compete

15   vigorously and compete for the same patients, especially in

16   that area around St. Luke's, and that competition will be lost

17   or is lost because of this acquisition.

18             There's also been a claim that St. Luke's just does

19   nothing unique, they're not a significant competitor.  We

20   don't even really bother with them.  We don't notice them.

21   They're not doing well financially, and so they don't matter.

22   And so if St. Luke's doesn't matter, the acquisition by

23   ProMedica shouldn't matter.  Again, this claim is belied by

24   the evidence.  ProMedica knew it was losing market share and

25   revenues to St. Luke's.  They knew it.  They recognized that

1    in their documents.  St. Luke's was stealing market share from

2    ProMedica.  ProMedica was very worried, which I'll talk about

3    more, about St. Luke's readmission to Anthem for the simple

4    reason, it would cost ProMedica millions of dollars.

5           Again, if St. Luke's wasn't significant, if they

6    weren't a close substitute for many patients, adding St.

7    Luke's into a health plan network should have had no or very

8    little impact to ProMedica.  Again, natural experiment

9    evidence that ProMedica and St. Luke's were very close

10   substitutes.

11          And ProMedica did not want Paramount to add St.

12   Luke's to its network again for the very, very simple reason

13   that if St. Luke's was added to Paramount, ProMedica hospitals

14   would lose a significant amount of business.  St. Luke's has

15   the ability and has taken patients and share away from

16   ProMedica, and that again is lost because of this acquisition.

17          And this is a environmental assessment document from

18   ProMedica, 2010, very recent.  ProMedica writes, in metro

19   Toledo, ProMedica's share of the inpatient market declined ███

20   █████ through nine months of 2009, with St. Luke's hospital

21   picking up ████████████████.

22          And just so we're clear, that one percent share

23   doesn't seem that impressive, that is millions of dollars.

24   One percent of the inpatient market is millions of dollars,

25   and that's what St. Luke's was stealing from ProMedica.

1          And when ProMedica notices this and says, really,

2     what should we do about this, there are really two options.

3     One is to improve the services at the ProMedica hospitals,

4     improve patient satisfaction levels, improve amenities so you

5     basically are giving these patients who are choosing St.

6     Luke's a reason to go to ProMedica, or you can acquire your

7     close competitor who is stealing share from you and then

8     recapture a substantial portion of recent losses.

9          The first option benefits consumers, the second

10    option doesn't.

11         And also, before we go on to the next document,

12    ProMedica has claimed that St. Luke's is really an

13    unattractive option.  Look at their numbers, look at people

14    who are going there.  Patients weren't going there, they had

15    low occupancy rates, there's nothing unique about them.  There

16    was nothing attractive about St. Luke's that would really

17    compel or persuade a person to go there.

18         That, Your Honor, is again belied by the evidence.

19    St. Luke's was stealing share, and ProMedica knew that if St.

20    Luke's is included in the health plan network, patients who

21    were choosing ProMedica would then go to St. Luke's, and

22    that's what happened.

23         So St. Luke's was excluded from Anthem's network in

24    2005 and readmitted in 2009.  We're going to talk a fair

25    amount about the steps, the extraordinary steps that ProMedica

1    took to make sure that St. Luke's wasn't added into Anthem's

2    network.  But ProMedica estimated that St. Luke's readmission

3    to Anthem's network would cost, and it's on page 43, a

4    significant sum of money.

5            St. Luke's market share in the core service area once

6    ███████ added St. Luke's to its network went up significantly

7    by almost ███████████████████, while ProMedica's market

8    share and in St. Luke's core service area declined.  Mercy and

9    UTMC shares stayed the same.  Again, that shows closeness of

10   competition, Your Honor.  That shows vigorous competition.

11   Patients who couldn't go to St. Luke's are going to ProMedica.

12   Once ██████ patients were allowed to choose St. Luke's and use

13   them in that work, ProMedica lost significant share, St.

14   Luke's gained significant share, and Mercy and UTMC's shares

15   stayed the same.

16           St. Luke's was excluded from Paramount.  Paramount

17   is, of course, owned by ProMedica in 2001 and readmitted in

18   2010.  They're readmitted after this acquisition was

19   consummated, not before.

20           ProMedica estimated that St. Luke's readmission into

21   Paramount would reduce impatient admissions by up to ███ per

22   year at the other ProMedica hospitals.

23           And it's interesting to note, Your Honor, that by

24   adding St. Luke's to the Paramount network, UTMC would only

25   lose ██ by this projection, admissions a year.  In Wood

1    County, ▮▮▮.  ▮▮▮.  So when St. Luke's is added to

2    Paramount, ProMedica lost by far the most number of inpatient

3    business.  UTMC, a fraction of that, and Wood County ▮▮▮.

4    And, again, these are projections based right before -- right

5    before ProMedica, Paramount added St. Luke's.

6             THE COURT:  Would you go back one?

7             Okay.  Thank you.

8             MR. REILLY:  And this loss of admissions by adding

9    St. Luke's to Paramount was a big concern for ProMedica

10   executives.  They knew by adding St. Luke's into the Paramount

11   network ProMedica would lose share, would lose business, St.

12   Luke's would gain.

13            You do not see this.  You do not expect this to

14   happen if St. Luke's is an insignificant, meaningless,

15   irrelevant hospital, or if it's not located in an area where

16   both St. Luke and ProMedica are vigorously fighting for

17   patients.

18            And one thing I thought was very interesting in the

19   same document, PX40-008, was also estimated that by Paramount

20   adding St. Luke's to its network, Paramount's enrollment could

21   upper bound increase by ▮▮▮.  And, again, that's very

22   interesting if you do believe, as the Defendants claim, that

23   St. Luke's isn't meaningful, they're insignificant.  Just that

24   act alone of adding St. Luke's to Paramount's network would

25   cause people to switch to Paramount because now they have

1    access to St. Luke's.  Again, a vibrant, high quality, low

2    cost hospital that was independent and now is part of the

3    dominant system in Lucas County.

4         One thing that I think surprised many of us was when

5    you see a very large system with a very large market share

6    like ProMedica, if you look at the St. Luke's documents, you

7    see a lot of references to ProMedica.  They're fixated and

8    focused on the dominant firm, the 800-pound gorilla, as they

9    say.

10        And you look at the large systems documents or look

11   at their actions, you really do see that the large system

12   really isn't that concerned, or ignores, it doesn't even

13   notice the small independent competitor.

14        Here, Your Honor, it literally is amazing how much

15   ProMedica fixated on St. Luke's, sought to have them excluded

16   from health plans, not just one health plan, several health

17   plans, and really took all these actions to make sure that St.

18   Luke's wasn't in health plan networks, because, again, St.

19   Luke's had the ability and did take business and patients from

20   ProMedica.

21        ProMedica charged a tax to health plans, meaning if

22   you added St. Luke's to your network, we're going to charge

23   you to do that, charge higher rates.  And then, of course, we

24   talked about ProMedica refused to allow Paramount to include

25   St. Luke's in its network for the simple reason that they

1   would lose business.

2          ProMedica engaged in a prolonged and sustained effort

3   to keep St. Luke's out of ████.  And this is clear in the

4   documents.  They did not want St. Luke's in the ████ network

5   and have to compete with them on a level playing field.

6          This is a ProMedica-████ 2008 letter of agreement.

7   ProMedica writes in the letter of agreement, ████ will not

8   add any participating network hospital provider located in

9   western Lucas County.  And if they do, they'd have to pay an

10  additional 2.5 percent.  That's what ProMedica did to make

11  sure that St. Luke's wasn't in ████ network.  They didn't

12  want them in there, again, because of its location and its

13  ability to compete against ProMedica, it would steal business

14  and steal share from ProMedica.

15         In this document I think, Your Honor, from ████

16  ████████████████████████, I think speaks

17  volumes, because ProMedica has said to this Court in papers,

18  and will likely say, that these health plans are very large,

19  they have all the leverage, they tell us what rates they want

20  us to charge, and we charge them.  The health plans have all

21  the power.

22         Well, if they do, one would wonder why ProMedica

23  already has extraordinary rates today, much higher than any

24  other hospital in Lucas County.  But this is what ProMedica

25  writes about ████, a very large health plan.  ████ cannot

1    sign up St. Luke's until January 1st, 2009.

2         THE COURT:  I think you misread that.

3         MR. REILLY:  ██████ cannot sign up St. Luke's until,

4    I'm sorry, July 1st, 2009, and will have to pay ProMedica for

5    the privilege.  So if ██████ wants to add St. Luke's into its

6    network, ProMedica wrote that ██████ would have to pay

7    ProMedica for the privilege.

8         That doesn't sound like all-powerful health plans to

9    me, Your Honor.

10         Just so there's no ambiguity, why did ProMedica want

11   St. Luke's excluded from the ██████ network?  It says it right

12   here in this document:  Toledo network to exclude St. Luke's,

13   and increase in market share.  No St. Luke's means ProMedica

14   has more and more business and higher market share.

15         MR. MARX:  Your Honor, I don't want to interrupt

16   Mr. Reilly, but I do want to note that some of these documents

17   that we're publicly displaying were submitted by ProMedica and

18   by St. Luke's for confidential designation, and in that

19   respect should be treated as such.  Unless we waive the

20   privilege, I don't think the FTC should be disclosing some of

21   that information publicly.

22         THE COURT:  I'd like to have you indicate over --

23   jointly, if you can, over the noon hour, which of those

24   documents they are, and I will make an appropriate open court

25   order --

1          MR. MARX:  Thank you.

2          THE COURT:  -- that they not be used outside of this

3    hearing by anyone other than the Court.

4          MR. MARX:  Thank you, Your Honor.

5          MR. REILLY:  Going to slide 50.

6          ProMedica --

7          You actually can take that slide off just in case, I

8    don't know.

9          ProMedica had told ███████ that if they added St.

10   Luke's to the network, that was a deal breaker.  If they

11   didn't delay 18 months, that was a deal breaker.  Little

12   insignificant St. Luke's, the inclusion of them in the ███████

13   network was so important to ProMedica, or the exclusion was so

14   important to ProMedica, that ProMedica called ██████ adding

15   them a deal breaker.

16         Again, Your Honor, St. Luke's is a very important,

17   very significant close competitor to ProMedica.  ProMedica

18   knew that, and they acted accordingly, to make sure that they

19   got the upper hand.

20         Slide 51, Your Honor.  This testimony from a health

21   plan that confirms once again that the motivation for

22   excluding St. Luke's from the network was ProMedica's loss of

23   volume.  That's what they were concerned about, and this has

24   been treated confidentiality, so I'm putting that excerpt in

25   there for you to read and not putting on the screen.

1          So in addition to ████, ProMedica also sought

2    exclusions of St. Luke's from ████ and ████, as well.  It's

3    not just one health plan, it's three separate health plans

4    that ProMedica did not want St. Luke's in the network.

5          He wrote, ProMedica would like to see St. Luke's out

6    of the ████ network.  ProMedica indicated that would be an

7    advantage to them.  An advantage to them, of course, would be

8    they wouldn't have to compete on a level playing field with

9    St. Luke's, and ProMedica would not be losing share and

10   patients to St. Luke's, evidence of close competition.

11         Same with ████, Your Honor.  Determine opportunity

12   for St. Luke's exclusion and OP services exclusion, a

13   ProMedica document.

14         And St. Luke's didn't have its head in the sand, Your

15   Honor.  ProMedica's fixation on St. Luke's was not a secret.

16   St. Luke's knew exactly what was going on and they wrote,

17   slide 55, ProMedica desires the St. Luke's geographic service

18   area, so they will continue to starve St. Luke's through

19   exclusive managed care contracts and owned physicians.  St.

20   Luke's knew what ProMedica was up to and knew they had a plan

21   of fixation on them, and St. Luke's expressed a lot of

22   frustration about that because they were wanting to compete

23   against ProMedica.

24         ProMedica leadership also refused to give Paramount

25   members access to St. Luke's.  We talked about this before.

1    I'm going to go through a few of the documents on this.

2         It was clear that Paramount leaders wanted St. Luke's

3    in.  This is a St. Luke's presentation.  And ProMedica leaders

4    wanted to keep St. Luke's out.  Paramount will only let us

5    back in under certain conditions.

6         So as we talked about it, just to reiterate,

7    Paramount leaders, by adding St. Luke's, would have a more

8    attractive network.  They would be adding a hospital that a

9    lot of people like to go to because of its very high quality

10   and patient satisfaction levels.  ProMedica did not want

11   Paramount to add St. Luke's because of the loss of business to

12   ProMedica.

13        And St. Luke's believed that Paramount would only let

14   them back in when we give them the keys, meaning that they

15   give St. Luke's -- ProMedica acquires St. Luke's, and that's

16   what had to happen before St. Luke's was added back into

17   Paramount.

18        Do you want to take a break now, Your Honor?

19        THE COURT:  Is this a good breaking point for you?

20        MR. REILLY:  Absolutely.

21        THE COURT:  All right.  Ten, 15 minutes.

22     (A recess was taken from 10:30 a.m. to 10:46 a.m., after

23   which the following proceedings were had:)

24        THE COURT:  Please proceed, Mr. Reilly.

25        MR. REILLY:  Thank you, Your Honor.

1          So we're on slide 59.  In the interest of time, I

2     think I have made a few cuts from the slides, so I will say

3     the slide number to an extent, not for a while that I skipped

4     some.  Maybe I won't have to.

5          So St. Luke's had a view of ProMedica that was quite

6     different than what they're presenting to this Court in

7     affidavits and in testimony and depositions.

8          In 2007, St. Luke's considered an antitrust suit

9     against ProMedica in response to the aggressive competitive

10    tactics.  One document from St. Luke's basically said, the

11    antitrust lawsuit's an option, look into it.  St. Luke's knew

12    they were being excluded by ProMedica from networks, knew that

13    they were harming their business volume because they could not

14    compete on a level playing field for patients, and they're

15    reviewing all their options.

16         Slide 60.  In St. Luke's true view, ProMedica ––

17    St. Luke's knew that ProMedica had an aggressive strategy to

18    take over St. Luke's or put them out of business.  There's

19    nothing about saving St. Luke's in that document, Your Honor.

20         And this is not confidential.  Slide 61, there was

21    a –– St. Luke's true view of ProMedica at the Perrysburg

22    Chamber of Commerce, in October 2008, Mr. Wakeman, CEO of

23    St. Luke's, made this statement.

24         This is public notes from a speech.  If we are going

25    to use the competitive model in healthcare to provide the best

1    value to employers and consumers, then we should compete on
2    price, quality and service, not on how well you can lock out
3    hospitals and other healthcare providers from health insurance
4    networks.  Would you want Pepsi and Coke to use their clout
5    with grocery store chains to keep a better tasting, lower
6    price soda pop from being on the shelf for your purchasing and
7    consumption, if you choose?
8            Just so it's clear, there is no evidence in the
9    record whatsoever, Your Honor, that Mercy did anything to
10   exclude St. Luke's from the networks, unlike ProMedica.
11   There's nothing in the record.  In fact, as we'll talk about
12   later, Mercy knew that it needed St. Luke's in the network to
13   make sure that health plan network had adequate coverage in
14   the Lucas County area.  And we're going to talk about that.
15           At the same time, Mercy had such a small share in the
16   southwest Lucas County, that excluding St. Luke's would just
17   benefit ProMedica.  So Mercy wasn't being altruistic, they
18   just knew there's no reason to even try to exclude St. Luke's.
19   All the exclusion, when they have the Pepsi-Coke analogy, was
20   done by ProMedica against St. Luke's.
21           Again, we're not condemning this.  In some ways it's
22   vigorous, vigorous competition.  But don't come into this
23   court and say, Your Honor, St. Luke's meaningless,
24   insignificant, we'll really didn't compete against them.
25   ProMedica was fixated on St. Luke's and did everything they

```
 1    could to make sure that they weren't included in health plan

 2    networks.

 3           Page 62, December 2008 document from Mr. Wakeman, he

 4    writes:  The hospital that has added the greatest value to the

 5    community in terms of cost outcomes is the one that has lost

 6    the most money.  That's St. Luke's.  The organization has

 7    taken the greatest resources from the community, made the best

 8    bottom line and performs poorly in terms of cost and outcomes,

 9    which is, according to Mr. Wakeman in his deposition,

10    ProMedica.  That was St. Luke's views of ProMedica prior to

11    entering this joinder.  And this was a mere year, a mere year

12    before agreeing to an exclusive due diligence period with

13    ProMedica.

14           So it's a fair question for this Court to ask, and

15    even if you didn't ask it, I'm going to answer it.  So why did

16    St. Luke's choose ProMedica?  St. Luke's, you look through the

17    documents, seems to have some concern for the community, was

18    aware, very aware of what was likely to happen to health plan

19    rates at St. Luke's by joining ProMedica, and so why would

20    they do it?

21           It's very clear, Your Honor.  St. Luke's chose

22    ProMedica.  They had other options.  ███████ wanted an exclusive

23    due diligence period, ██████ wanted an exclusive due diligence

24    period.  St. Luke's chose ProMedica, and the question is why,

25    especially when they're fully cognizant of the impact on the
```

```
1    community and employers, employers and employees through
2    higher rates.
3         And the answer is pretty simple.  Joining
4    ProMedica -- or at least one of the answers, sure would make
5    life much easier right now for St. Luke's.  Extraordinary
6    rates on health plan contracts, no longer having to compete
7    against a very large dominant system that had a constant
8    bull's eye on St. Luke's back.  It makes life easier.  It's
9    not easy for St. Luke's, an independent hospital, to compete
10   against someone with that much market power who's fixated on
11   them.  And that is indisputable, that it was much easier for
12   St. Luke's, rather than competing against them, which they
13   were doing, to join, become part of the dominant system rather
14   than compete against it.
15        There's also concern about retaliation.  And this is,
16   again, not a theory we're making up.  St. Luke's fear that if
17   ProMedica -- St. Luke's fear of retaliation from ProMedica if
18   it affiliated with another partner.  Choosing ProMedica would
19   reduce or eliminate significant ProMedica actions that are
20   bound to happen if St. Luke's partners with Mercy or UTMC.
21        When Mr. Wakeman was asked about that, he just
22   explained, ProMedica had a reputation of being aggressive in
23   the market.
24        And this is what St. Luke's told their board.  If
25   they chose someone else other than ProMedica, ProMedica would
```

```
1    have a scorched earth response, a scorched earth response, if
2    they chose another partner besides ProMedica.
3            In another colorful document, an e-mail from
4    Mr. Wakeman, the wrath of Alan Brass, former CEO of ProMedica,
5    would come down from us -- from ProMedica.  St. Luke's was
6    afraid if they made a decision to go with any other partner,
7    that there'd be significant retaliation from ProMedica.  They
8    told the board that, they told their board that when the board
9    was in the process of making a very important decision.  So
10   coming in saying we had no choices, no one else wanted us,
11   this was necessary, there was a real fear of retaliation from
12   ProMedica if, in fact, they did, for example, choose UTMC.
13           Slide 68.
14           So we have focused a lot this morning on what happens
15   to St. Luke's bargaining power and bargaining leverage now
16   that they're part of a system that has 60 percent market share
17   in general acute care services, 80 percent market share in
18   obstetrics, and now is part of the system that has enjoyed the
19   highest rates in Lucas County.
20           We don't stop there, Your Honor.  There's also a
21   concern founded in the evidence that ProMedica's negotiating
22   leverage already at very phenomenal levels, will increase even
23   further, and we'll explain why.
24           Bargaining leverage of hospitals versus health plans
25   are determined really through bilateral negotiations.  Each
```

1    side's leverage is determined by its importance or value to

2    the other side.  It's a very large hospital system that has a

3    lot of hospitals nearby, negotiating with a health plan.  That

4    health plan really wants them in the network, and if they

5    don't have them in the network, that health plan is going to

6    suffer the consequences from lost business and lost volume.

7    So that hospital system has a lot of leverage.

8          On the other hand, if the health plan has a lot of

9    members, they can offer a hospital tens of thousands, hundreds

10   of thousands of covered lives, then that health plan has

11   relatively more leverage than other small health plans because

12   a hospital that can't reach an agreement with that health plan

13   is going to lose a significant amount of business because that

14   health plan controls a lot of covered lives.

15         That is the crux, that is the foundation of how these

16   prices or rates are determined between health plans and

17   hospitals.

18         ProMedica, an already expensive health system, now

19   becomes even more of a must-have system and can extract even

20   higher rates by adding St. Luke's to its family of hospitals

21   into Lucas County.  We'll explain why.

22         To counter -- slide 69.  To counter all the evidence

23   relating to ProMedica's increased dominance and marketing

24   clout, Defendant states that a Mercy-UTMC health plan network

25   would be just fine, that if a health plan had to put together

1    a network of just Mercy and UTMC, that network would be fine,

2    you could still say no to ProMedica, you wouldn't have to

3    agree to even more exorbitant rates.  And so that is a

4    constraint on ProMedica after this acquisition.

5            But the interesting thing is and the informative

6    thing and the telling thing is, Your Honor, that a network of

7    just Mercy and UTMC has never been offered in Lucas County.

8    It has never been offered.

9            This is to Mr. Wachsman.  To your knowledge, has any

10   payor ever excluded both ProMedica and St. Luke's from their

11   network at the same time?  Not to my knowledge.

12           As a result of this acquisition, health plans now

13   must agree to ProMedica's rates or offer an unprecedented

14   network of just Mercy and UTMC.  And so not only has it been

15   offered before, no health plan thinks it's viable, no health

16   plan has said, yeah, we could run with that.  We could offer a

17   network of Mercy and UTMC and it would be successful, it would

18   be attractive, it would grow in members.  There's nothing in

19   the record, despite all of the affidavits and testimony from

20   health plans that say, yeah, that's a network we can market

21   and be successful.

22           And because now, if you don't say yes to ProMedica,

23   that's the network you're stuck with, that's the network you

24   have to offer, you're going to be much more willing to accept

25   ProMedica's rate increases and rate demands.

```
 1              And this is an important -- this is an important
 2    fact, Your Honor, that this relates right back to the fact
 3    that ProMedica and St. Luke's are very close competitors,
 4    especially in that southwest portion of Lucas County.
 5              They're the number one and number two choice based on
 6    surveys, based on market shares.  And employers know and
 7    health plans know that you have to at least offer employers
 8    and employees a number one and number two choice, not a
 9    hospital like Mercy-UTMC in that area that has significantly
10    smaller share which directly correlates to the preference.
11              And, again, we are not saying that a UTMC-Mercy
12    health plan network that would deny medical care to Lucas
13    County.  No.  The question is, is it sufficiently attractive
14    even though it's never been done before, that a health plan
15    could say no to ProMedica's rate demands and still have a
16    successful, attractive growing network.
17              THE COURT:  Well, your view would be that it would be
18    especially true in OB?
19              MR. REILLY:  Especially true, excuse me, Your Honor?
20              THE COURT:  In OB?
21              MR. REILLY:  Yeah, in OB, as we talked about a survey
22    we put up there, that's absolutely true, that, again, the
23    survey that St. Luke's did while they're running the business,
24    it showed for obstetric services, and I'll get you the slide
25    if you want, that ProMedica and St. Luke's hospitals are the
```

1    number one, number two and number three choice, meaning

2    St. Luke's, TTH and Flower, for those patients who live there

3    in obstetrics.  So for obstetrics, with ProMedica's

4    80 percent-plus share, it would be particularly true, as well.

5            And so on slide 70, Your Honor, we've put forth the

6    testimony from health plans, and I would say testimony that is

7    entirely un-rebutted at this point, about how difficult it

8    would be to offer a commercially attractive successful network

9    in Lucas County with just UTMC and Mercy.

10           Page 70.  I will not say the name of the health plan,

11   page 70.  We cannot create a viable hospital network in Lucas

12   County for our local clients that consists of only UT and

13   Mercy.

14           Slide 71, Your Honor, more health plan testimony,

15   un-rebutted.  I won't say the name of the health plan.  It

16   would be exponentially more difficult to market a network in

17   Lucas County without ProMedica and St. Luke's.

18           Slide 72, Your Honor.  There's a good reason why

19   health plans believe this.  And it's very telling that to the

20   extent that UTMC and Mercy would be a viable health plan

21   network, that there's not one example, at least in the last 10

22   years, by any other health plan who offered it, and there's

23   not one health plan who says, yeah, that would be a network

24   that I could really grow and be successful.

25           And the reason why is because employers, employers

1  have testified, slide 72, that that network of just UTMC and

2  Mercy would result in very unhappy employees, and it would not

3  be acceptable.  And I'll just read a couple.

4        First one.  A health plan with a network that

5  excluded ProMedica and St. Luke's would not be a viable

6  alternative for our Toledo area employees because it would

7  force many of our employees to go to unfamiliar,

8  inconveniently located providers who are not their first

9  choice for care.

10        Then another one, the second one, the last one I'll

11  read:  A network that included only UTMC and Mercy Hospitals

12  would be untenable to our employees.

13        Health plans have to be responsive to employees and

14  employers, and this is what employers are testifying to about

15  their employees' preferences.

16        Slide 73, another health plan.  And it's made it very

17  clear that the addition of St. Luke's into the ProMedica

18  network has increased ProMedica's bargaining power.  And I'll

19  read from this.

20        Because of location and the addition of size, when

21  you mention location, what specifically are you referring to?

22        There's no other hospital in the southwest corner of

23  Toledo community hospital.  So everyone in that whole area, it

24  just gives them a lot more leverage because they have -- St.

25  Luke's corridor, the whole southern Maumee area.

1          Another health plan testimony that is again

2     un-rebutted, slide 74, the joinder would absolutely make it

3     harder, absolutely make it harder to serve its membership in

4     Lucas County without ProMedica.

5          Slide 76, we expect and it still might occur, that

6     the Defendant may try to characterize this proceeding as

7     nonprofit hospitals versus health plans.  And putting aside

8     that St. Luke's document makes it clear that higher rates will

9     stick it to employers and health plans, employers who are

10    worse off, that expense will be borne in part by the

11    employees.

12         So this isn't an issue about health plans having a

13    less favorable bottom line if rates increase at Lucas County

14    hospitals.  In fact, 70 percent of Lucas County employers are

15    self-insured, 70 percent.  Health plans negotiate rates, but

16    any cost increases are borne directly by employers and

17    employees.  That means higher premiums, higher co-pays, higher

18    out-of-pocket costs for those who are already struggling,

19    these important services.  And also higher healthcare costs

20    means residents either have to give up medical care, delay

21    services or even not afford insurance.  The cost of the higher

22    rates that will result from this transaction are not borne by

23    the for-profit health plans, they are borne by the employer

24    and the employees, and that is not in dispute.

25         Slide 77.  Again, several local employers have

1    testified what are the consequences of higher healthcare

2    costs.  And just reading the last one, PX2054, many of this

3    employers' employees live paycheck to paycheck and simply do

4    not have the ability to absorb higher healthcare costs.

5    That's what at stake here, Your Honor, in this preliminary

6    proceeding.

7              Seventy-eight.

8              I'm not sure if the Defendant is contesting this

9    point, but just in case they are, I'd like to make it.  There

10   has been some sentiment in past hospital merger cases that

11   there should be no concern about mergers between two nonprofit

12   hospitals because nonprofit hospitals don't fully exploit

13   their market power.  Sure, they could charge more, but they

14   don't.  They constrain themselves, they just charge as much as

15   they need to cover cost.  And we know that that is not true,

16   and there is overwhelming evidence that in Lucas County,

17   ProMedica is particularly aggressive in seeking the highest

18   rates possible.

19             It's not just ProMedica.  They're very aggressive,

20   but other nonprofit hospitals do this, as well.  And Lucas

21   County, going back to the earlier slide we showed on market

22   shares and pricing levels, higher market shares in Lucas

23   County means higher prices.  It's that simple.  That's what it

24   means.

25             Seventy-nine.

```
1              THE COURT:  Well, is there also not the opportunity
2       for shifting of costs?  And by that I mean that the
3       wholly-owned entity which offers insurance products in the
4       healthcare industry to have -- be able to reduce its premiums
5       by reducing the costs of the healthcare through its
6       controlling shareholder?  Have you followed?
7              MR. REILLY:  Yeah, can I see if I understand your
8       question?  If so, I'll answer it.
9              Is your question does -- are you referring to
10      ProMedica's ownership of Paramount and whether ProMedica will
11      give Paramount favorable rates?  If not, I didn't
12      understand --
13             THE COURT:  Yeah -- no, no, absolutely.  And I'm not
14      afraid.  I said:  Is that another issue which affects the
15      market?
16             MR. REILLY:  Absolutely.  There's another issue.
17      What happens when ProMedica is negotiating with health plans?
18      And, again this is clear in the documents, is that they of
19      course want to get the highest rates possible, and we have
20      some testimony that makes that crystal clear.
21             But typically, if a large hospital system does not
22      reach an agreement with a third-party health plan, that
23      hospital loses all that volume.  But in many -- but in many
24      ways, if that health plan now, the third-party health plan,
25      becomes less attractive, that benefits their own health plan.
```

1    Because if ProMedica, especially after this acquisition where

2    the other health plans have to say yes to ProMedica's rate

3    demands or I'm going to offer an unprecedented, never been

4    offered network.  So if they no to ProMedica's health demands,

5    what happens is their network becomes significantly less

6    attractive and people who offer ProMedica hospitals, like

7    Paramount, they become more profitable.

8         And honestly, some people -- some health plans have

9    testified that they would consider exiting Lucas County if

10   they only have a UTMC-Mercy network because they don't think

11   it's going to work.

12        THE COURT:  I'm sorry, you could have just answered

13   me and said, Judge, give me a few minutes, I'll get to it.  It

14   wouldn't offend me.

15        MR. REILLY:  It's okay.

16        So, Your Honor, we had not -- our primary focus of

17   this investigation is not ProMedica's ownership of Paramount.

18   To be honest with you, in a 13(b) proceeding, with such a very

19   strong presumption and two separate markets, with all the

20   additional testimony and evidence and ordinary course

21   documents that support our theory, we're not going to spend a

22   lot of time on this.  But we wanted to flag it and say, yeah,

23   this does complicate and this does make the already incredibly

24   high risk of anticompetitive harm even greater.

25        Can you go back to 79, please?

1          And this is slide 79, Your Honor.  It's indisputable,

2    every health plan has said, yeah, nonprofit hospitals always

3    seek the highest reimbursement rates possible, consistent

4    across every health plan testimony there.

5          Go ahead.  Eighty.

6          Their own expert, Ms. Guerin-Calvert, conceded that

7    ProMedica will exercise its full market power.

8          I'll read the second question:  Are you aware of

9    ProMedica ever saying to any health plan, that's too much?

10          I have never heard of -- there may be an exception,

11    but I do not recall any medium -- small, medium or large

12    hospital ever saying, please, no, it's too much.

13          Mr. Oostra, CEO of ProMedica, says, we try to

14    maximize our revenue and reduce expenses.

15          For what purpose?

16          Well, in the case of our revenue enhancement, we want

17    to make sure that for managed care companies, that we're

18    getting the revenue we're entitled to, you know, in case of

19    expense reduction, we're trying to reduce expenses in order

20    that we can get a decent operating margin so we can continue

21    to exist as an organization.

22          Then Mr. Oostra was asked, is ProMedica happy with

23    the rates they have with managed care organizations?

24          No, we would always like more.

25          So, Your Honor, it's non dispute.  If ProMedica, as a

```
 1    result of its acquisition, has greater negotiating clout with
 2    health plans, they will fully exercise it, as they are doing
 3    now, as they are doing now, getting extraordinary rates in
 4    Lucas County relative to other hospitals, and they will do
 5    that in the future.  The nonprofit status of ProMedica does
 6    not factor into this analysis at all.
 7            Slide 85.
 8            So what is the Defendant's response to this
 9    overwhelming evidence of harm?  Well, as I understand it, and
10    I'm sure Mr. Marx will say it a lot more eloquently than me,
11    it's either an independent St. Luke's can increase rates to
12    the same levels as ProMedica can, or ProMedica can raise rates
13    higher than an independent St. Luke's can, but they won't.
14            The second point on the "or" Your Honor is exactly
15    what we're talking about.  If ProMedica can raise rates higher
16    than St. Luke's, they will.  So let's focus on the first
17    point, an independent St. Luke's can increase rates to the
18    same levels that ProMedica can.
19            Where is that in the record?  No one health plan
20    believes that.  St. Luke's documents didn't believe that,
21    ProMedica's documents didn't believe that.  There's no
22    evidence in the record that that's the case, that rates were
23    going to go up anyways at St. Luke's, they will go up to the
24    same level independent or with ProMedica.  No support in the
25    record for that.
```

1          Your Honor, when ProMedica's presenting to potential

2    partners and they're talking about increased payor system

3    leverage, they don't say, join us and you get increased payor

4    system leverage or stay independent and you'll have the same.

5          When St. Luke's recommended to their board, if we

6    join ProMedica we'll have extraordinary marketing -- managed

7    care clout and access to outstanding contracts.  They didn't

8    say, if we stay independent we'll have the exact same rates.

9    The market share pricing chart shows that St. Luke's and

10   ProMedica's leverage is not even close to being the same.  So

11   ProMedica, by acquiring St. Luke's, and that was the intent of

12   St. Luke's, and that was the design that ProMedica knew was

13   going to happen, has the ability to charge significantly

14   phenomenally higher rates than St. Luke's ever could,

15   independently.

16          So to the extent that St. Luke's was seeking modest

17   rate increases by doing a much better job marketing

18   themselves, making it clear that you don't have to be the

19   biggest to be the best, that's great, that's competition.

20   They should sit down with health plans and get those rates.

21   But to even imply, without any support in the record, that an

22   independent St. Luke's could enjoy the exact same rates as

23   self-proclaimed dominant ProMedica, that's not true, Your

24   Honor, and there's no support in the record.

25          We also made the point that excess capacity in Lucas

1    County will constrain any ProMedica post-acquisition rate

2    increases.  And I guess the question I have, Your Honor, is

3    when does this excess capacity start constraining ProMedica?

4    When?  Health plans are already telling Mr. Oostra that they

5    have some of the highest rates in all of Ohio.  There's been

6    excess capacity now, excess capacity the last three years

7    under the way they're measuring it.  There's no evidence that

8    excess capacity lowered rates.

9         The rates are very reasonable, that ProMedica,

10   because its excess capacity, can't get significantly higher

11   rates than St. Luke's and UTMC and Mercy.  This excess

12   capacity is a tool that is available now to the extent it

13   really could constrain ProMedica, and there's no evidence that

14   excess capacity exists today, that existed the last three

15   years had any impact, any constraining impact on ProMedica's

16   rates, but that's what they want you to rely on, excess

17   capacity will save the day.

18        They also claim, they being ProMedica -- I guess I

19   should use singular rather than plural -- health plans can

20   steer patients to non-ProMedica hospitals to defeat a price

21   increase.  Meaning that you have a tier network, meaning if

22   you go to one hospital like Mercy-UTMC you'd pay a lower rate,

23   if you go to the ProMedica hospitals, you pay a higher rate.

24        Again, Your Honor, there's no evidence except for

25   Mercy employees, who, Mercy, since they were a hospital,

1    wanted their employees to go to the hospital, that no employer

2    has relied on and no health plan has relied on steering in the

3    past.  It just doesn't happen in Lucas County.

4         And, again, if these health plans had some incredible

5    constraining tools in their arsenal right now that they could

6    use to get someone like ProMedica to lower their rates, why

7    aren't they using it now?  If steering really was going to

8    save the day and in these incredibly highly concentrated

9    markets, in a merger to duopoly in obstetrics and there's some

10   tool that health plans could use to get lower rates today, why

11   aren't they using it?  They're not using it because it's not a

12   viable feasible option, and steering is not going to save the

13   day.

14        Eighty-six.

15        As I think I mentioned to you during the TRO hearing,

16   it's often the case when we see large systems acquiring

17   independent hospitals, that the claim and the argument that we

18   hear right out of the gate is, we're doing this to improve the

19   quality at the small independent hospital.  And then we look

20   at the numbers and we see, yeah, the independent quality

21   numbers look like the independent hospital are not up to par,

22   that they're not high quality, and this big system has a track

23   record of acquiring lower quality hospitals and improving

24   them.  That's what we often see.

25        Here, we see the opposite, Your Honor.  We see

1    St. Luke's, and this is not in dispute, as a very high-

2    quality, very low-cost hospital, top 10 percent of hospitals

3    nationally, great patient satisfaction numbers, great outcome

4    numbers.  St. Luke's quality is already and has been and would

5    continue to be as an independent hospital outstanding.

6            And this chart was put in the board of directors

7    report to St. Luke's talking about an affiliation.

8            Can you do the arrows?

9            That St. Luke's where, in that quadrant low cost,

10   high quality, where the quality on the vertical axis is better

11   the higher you are and the lower cost, that side.

12           Show where Toledo is.

13           That's Toledo Hospital, and that's Flower Hospital.

14           This was done, again, presented to the board of

15   directors at St. Luke's when they were considering who to

16   partner with.  This wasn't some chart that we made for this

17   proceeding, this wasn't some chart that we made for the merits

18   trial that's ongoing.  This chart was in St. Luke's documents

19   and shows St. Luke's compared to the ProMedica hospitals to be

20   significantly higher quality and significantly lower cost.

21           Eighty-nine.

22           And rather than St. Luke's saying to their board, our

23   executives and board members, saying, this acquisition is

24   great, it will improve the quality of St. Luke's, the opposite

25   happened.  St. Luke's board members and executives were

1    concerned.  They were concerned.  They were worried about the

2    acquisition's negative impact on the quality of St. Luke's.

3    Mr. Wakeman acknowledged in his deposition, board members and

4    he himself were concerned that by joining a lower quality

5    health system, St. Luke's quality would decline.

6           And we share those concerns, Your Honor.  This is not

7    an acquisition where, by acquiring a low quality independent

8    hospital, this high-quality system will then increase and

9    improve St. Luke's quality.

10          Slide 90.

11          This is a reference of Mr. Oostra writing to

12   Ms. Stelle, Ms. Barbara Stelle, another executive at

13   ProMedica.

14          Mr. Oostra writes:  We see subpar-quality scores when

15   we look at published comparisons.  We continue to hear how

16   hard it is to send patients to us.  We hear from payors that

17   we are among the most expensive in Ohio.

18          Again, consistent with what Professor Town found, as

19   well.

20          And Ms. Stelle writes:  Randy, you are absolutely

21   correct.

22          And so I think if I understand their improved quality

23   claims as talking about better coordinating care across three

24   hospitals, and now four hospitals, by having four hospitals in

25   one geographic market, we will be able to coordinate care

1    better, and that would be a big benefit in the quality at all

2    the hospitals, I guess the question I'd like this Court to

3    consider is, if owning multiple hospitals in a -- in the same

4    geographic market was really a benefit to the quality scores,

5    why, in all the years that ProMedica has had TTH, has had

6    Flower, and has had Bay Park, why wouldn't they have been able

7    to do all of this coordination of care and create sense of

8    excellence, why aren't ProMedica's current quality scores far

9    and above St. Luke's?

10         If being able to coordinate care across multiple

11   hospitals was really going to result in higher quality, why

12   haven't we seen it in the three hospitals they've owned in the

13   last several years?  Is hospital number four the magic number?

14   Is now by adding St. Luke's and having four hospitals to give

15   quality care in one region is that going to now drastically

16   improve quality, when we have seen no evidence of that.

17         Slide 91.

18         So I'm going to go through -- I'm really done with

19   what we call our case in chief, talking about the incredibly

20   high market shares in two separate markets, talking about the

21   presumption, very strong presumption, widely recognized by

22   courts in the merger guidelines, the duopoly in obstetrical

23   services markets, and I've reviewed a portion, but a fairly

24   significant amount of ordinary course documents and testimony

25   from a wide array of market participants that all predict

1    dramatic 80 price increases.

2          And so the question remains, what can the Defendant

3    do to rebut this evidence, rebut the presumption and also

4    strengthened presumption by all the evidence that we have put

5    forth in this 13(b) proceeding, where all we have to raise is

6    serious substantial questions to prevail.

7          So we think there are probably three potential

8    defenses:  Entry conditions.  Entry must be timely, likely,

9    sufficient to overcome harm; efficiencies, merger-specific

10   efficiencies that outweigh anticompetitive harm.  They have to

11   outweigh the anticompetitive harm here.  They can't just point

12   to some efficiencies and say, okay, we get to approve our

13   merger under the antitrust laws.  And then other defenses,

14   like failing firms.

15         The most important to take away from this is none of

16   these defenses, or any other defense, rebuts the strong

17   presumption or outweighs the likely harm here.

18         Can we jump to 96?  If we have time I'll go back to

19   entry.  I don't see the Defendant pushing entry nearly as much

20   as some of the other arguments.  It's pretty clear from the

21   documents, from the testimony that new entry is not occurring

22   in Lucas County.  Their own expert claims that Lucas County is

23   over-bedded.  That's not the sort of community that you're

24   going to start building new hospitals.

25         So I'm going to focus more on the efficiencies.

```
 1   According to the D.C. Circuit in the Heinz case, efficiencies

 2   must be extraordinary, extraordinary to overcome high

 3   concentration levels.  We have high concentration levels here.

 4   If the Defendant has any chance of prevailing, they have to

 5   point to extraordinary market -- extraordinary efficiencies.

 6          And just do a summary of what our expert's analysis

 7   of their efficiencies showed, they're not true cost savings,

 8   the efficiencies claimed by ProMedica are not merger specific,

 9   they're unsubstantiated, they're speculative, and they're made

10   for litigation.

11          And a lot of times I'll explain to you what I mean by

12   made for litigation.  We suspect that sometimes but we never

13   see evidence of it.  We have seen explicit evidence of that in

14   this case, and we'll talk about that.

15          And before I move on, I want to point out there's

16   been several experts in this case.  We presented three, they

17   have one.  Our expert, Mr. Gabe Dagen, did a full

18   comprehensive efficiencies analysis and looked at all the

19   claimed efficiencies by ProMedica and reached his conclusions

20   that are exactly what I outlined in those bullets.

21          Their expert, Ms. Guerin-Calvert, did not do an

22   efficiencies analysis.  So we have one expert who did one and

23   one who did not, and these are our conclusions from our

24   expert.

25          Sorry about that, Your Honor.  I'm trying to cut some
```

1    slides to get within the time.

2            THE COURT:  That's all right.

3            MR. REILLY:  The efficiency claims are not credible.

4            Here is what ProMedica has said about the

5    efficiencies either in testimony or in their documents.

6    They're largely guesswork.  They represent a first pass at the

7    efficiencies.  The efficiencies are based on a gut feeling,

8    that there must be some efficiencies there, there must be.

9    Gut feeling.  And estimates are preliminary and subject to

10   further analysis, revision and substantiation.

11           Those are the type of rigor they brought to these

12   efficiencies analysis.  When they talk to this Court about how

13   these efficiencies are so likely and substantial, remember the

14   type of rigor that went into the analysis.

15           During Mr. Oostra in an investigational hearing, if

16   the claimed efficiencies proved unobtainable, ProMedica would

17   just find other efficiencies.  So the list of efficiencies, if

18   they don't pass, if they fall by the wayside, they will find

19   more.  Again, not the type of rigor necessary in any merger

20   analysis case, especially one here with such a strong

21   presumption and so much evidence of likely competitive harm.

22           And this was the one I was referring to, Your Honor.

23   This is an e-mail, internal e-mail of ProMedica.  Unfavorable

24   response from Compass Lexicon.  Haven't accomplished enough in

25   savings.  We will need to be more aggressive with the timeline

1    of the first three to five years.  FTC -- and that's us, Your

2    Honor.  FTC discounts value of each year the farther out you

3    go.

4            They were designed to persuade us, and when it didn't

5    work I think they've been designed to persuade you, and I can

6    tell you how I hope that goes.  But they literally have said

7    the FTC, you better discount those less because you can't go

8    further out.  That's what we're going to want to see.  It

9    wasn't an analysis of what can we truly get and what can we

10   expect, what does the FTC want to see.  And if you come up

11   with an analysis and report that the FTC doesn't want to see,

12   go back and change it.

13           Just to put some context about how extraordinary the

14   efficiencies they must demonstrate, ProMedica has the burden

15   of showing efficiencies must be, Philadelphia National Bank,

16   Supreme Court, where a merger substantially lessens

17   competition, it is not saved because, on some ultimate

18   reckoning of social or economic debits or credits, it may be

19   deemed beneficial.

20           In another Supreme Court case, Proctor and Gamble,

21   possible economies, and economies there meaning economies of

22   scale, efficiencies cannot be used as a defense to legality

23   because Congress was aware that some mergers that lessen

24   competition may also result in economies but it struck the

25   balance in favor of protecting consumers.

1              Slide 102.

2              Another defense that the Defendants may put forth is

3    a failing firm defense.  We talked a little bit about this at

4    the TRO hearing.  The failing firm defense is very narrow and

5    imposes a very high burden on the Defendant.  And, again, Your

6    Honor, the Defendant has the burden of showing that they meet

7    the failing firm defense.

8              The failing firm has strict limits according to the

9    Ninth Circuit in the case in front of you.  And General

10   Dynamics called the failing firm defense, the lesser of two

11   evils.  It's a pretty intuitive case, Your Honor.

12             If you were to let a dominant firm such as ProMedica

13   acquire a hospital and become even more dominant, or you let

14   that hospital exit the market.  They're going to close their

15   doors and stop taking patients.  In that scenario you let the

16   self-proclaimed dominant firm become more dominant rather than

17   let them close it.  That's what the purpose of the failing

18   firm defense is.

19             Again, Your Honor, it's very important to remember

20   that if they do present a failing firm defense, this has never

21   succeeded in any 13(b) proceeding.  They're going to ask you

22   to do something that has never been done, if they're putting

23   forth a failing firm defense.

24             Slide 103.  The Defendant must meet two prongs.

25   There must be a grave possibility of imminent failure, and no

1    alternative purchasers existed.  Those are the two prongs, and

2    ProMedica fails both.

3        An unfortunate fact for this defense or even the

4    flailing firm defense that we talk about, that on all

5    important financial indicators St. Luke's was trending

6    upwards.  In the first eight months of 2010, St. Luke's was

7    trending upwards on growth, on revenue, on capacity

8    utilization, on operating cash flow margin, or EBITDA, and on

9    market share.  They're all going up.

10        We have seen failing firm hospitals, Your Honor.  We

11    have accepted this defense in our investigations, and they

12    looked nothing like St. Luke's did.  When we see -- when we

13    put these indications up on the graph, we see the death

14    spiral, we see downward trends throughout, and that's when we

15    say, yeah, this failing firm defense is legitimate.

16        Here, St. Luke's on every important trend was going

17    in the right direction, not only the numbers show that, their

18    documents show that as well, and including the documents of

19    representations made to the board of directors.

20        And again, St. Luke's failed to pursue less harmful

21    alternatives.  They had UTMC, who was very interested in

22    affiliating with St. Luke's, and we'll talk about that more

23    later.

24        And under the failing firm, there can be no other

25    alternative.  St. Luke's said no to UTMC, not the other way

```
1    around.
2         Page 104.  Even less likely to succeed is what the
3    courts have termed the weakest defense, flailing firm.  This
4    is the Seventh Circuit.  Case law is highly skeptical.
5    Financial weakness is probably the weakest ground of all for
6    justifying a merger.  It certainly cannot be the primary
7    justification of a merger.
8         A weak company defense would expand the failing
9    company doctrine, a defense which has strict limits.
10        And I will tell you what they have to show on the
11   flailing firm if they want you to credit that.  The critical
12   question, this is the critical question, and we have the case
13   law from the Eleventh Circuit to show where it came from, and
14   there's other cases, as well.
15        Can ProMedica show that St. Luke's alleged weakness
16   is so significant that it rebuts the presumption of harm?  And
17   that's what University Health says, that a hospital merger
18   case requires a substantial showing that the acquired firm's
19   weakness, which cannot be resolved by any competitive means,
20   would cause the firm's market share to reduce to a level that
21   would undermine the Government's prima facie case.  That's
22   what they need.  Can they show that St. Luke's market shares
23   were likely to decrease so dramatically, were likely to
24   plummet, that then they can rebut the very strong presumption
25   in this case in two markets, not just one.
```

1          So let's see what that means.  What do you have to

2     find is a reasonable approximation of what St. Luke's shares

3     would have done absent this transaction.

4          So right before 2010, Your Honor, that is St. Luke's

5     market share for both general acute care services and

6     obstetrics.  As you can tell from 2008, 2009, 2010, they're

7     growing, they're increasing.

8          Mr. Wakeman, the CEO who was brought in to turn

9     around St. Luke's, who had successfully turned around three

10    other independent hospitals, had put in a plan, we'll talk

11    about this later, and it was working.  Their share was

12    growing, their revenue was growing, their occupancy rate was

13    increasing, and this is what it looked like.

14         In order for the Defendant here to have you credit a

15    failing firm -- flailing firm -- excuse me -- to say, yeah,

16    they can rebut the presumption, here's what has to happen to

17    St. Luke's market shares.  For general acute care services,

18    St. Luke's market share has to fall from 11.5 to 2 percent.

19    For obstetrics, it has to fall from 9.3 to 1.3 percent.

20    That's the dramatic fall in market share that they have to

21    convince you will happen in order to rebut the presumption

22    under flailing firm.

23         And, Your Honor, I promise you I know they think

24    we've gotten millions of pages, documents we probably have.

25    There's not one document that even closely resembles this in

1   St. Luke's documents.  There's no representations made to the

2   board.  There is nothing.  There's no saying, wow, our market

3   share's grown significantly over the last two years.  I hope

4   it doesn't plummet to 1.5.  I think our market share will

5   plummet to 1.5 to two percent.  There's nothing.  It's a made

6   for litigation argument with no support in the documents and

7   no support in the testimony.

8           Page 108, slide 108.

9           As I had already referenced, St. Luke's is in the

10  middle of a very successful three-year turnaround plan.  They

11  hired Mr. Wakeman, who is affectionately called by us a

12  hospital turnaround expert, in 2008.  And Mr. Wakeman

13  immediately saw a huge potential in St. Luke's because a

14  decline in revenue, in itself, in an area where you have

15  growth means opportunity.  He created and executed a

16  turnaround plan to improve the hospital's financial

17  performance.

18          Before Mr. Wakeman got there, St. Luke's, to his

19  knowledge, had never had a one-year strategic plan.  He came

20  up with an aggressive three-year turnaround plan with

21  aggressive goals and objectives, and he met those goals and

22  objectives.

23          So here's his three-year growth plan, increase

24  inpatient net revenue by 10.5 million.  He was hoping to do

25  that by 2011.  He -- I should say St. Luke's.  It was a team

1    effort, I'm sure.  Accomplished April 2009.

2             Increase outpatient net revenue by 15 million;

3    accomplished April 2009, way ahead of schedule.  Increase OP

4    ratio from 40 percent -- outpatient ratio, from 40 percent to

5    60 percent.  Got up to 47 percent by August 2010.

6             Physician alignment strategy, accomplished.

7             Ninety percent managed care access, fell short in

8    July 2009.  Hit 83 percent, but because Paramount refused to

9    add St. Luke's to his network, it wasn't able to meet that

10   goal.

11            And then 40 percent inpatient market share in the

12   core service area, they hit 43 percent by 2010.  They hit all

13   of their goals on this very aggressive, very ambitious

14   three-year plan.

15            And the results were very telling and showed

16   significant progress.  Net patient revenue in 2007 were

17   127 million.  By 2010, ██████████.  Market share, core

18   service area, 34.1 percent in 2007.  43 percent, 2010.  And

19   also had a lot of physicians on the staff.

20            Mr. Wakeman acknowledged that the three-year plan was

21   successful.  St. Luke's had substantial cash and reserves

22   totaling ██████████ on August 31st, 2010, right before the

23   acquisition here.  And the market rebound eased a lot of the

24   financial stress on St. Luke's after the 2008 financial

25   crisis.  Of course, the 2008 financial crisis didn't just

1    impact St. Luke's, it impacted a lot of businesses around the

2    country, including St. Luke's, and the rebound in the markets

3    has improved significantly their financial progress.

4          They're paying bills and debt obligations on time and

5    making necessary capital improvements, and they're attracting

6    a growing number of patients.  And they now have a positive

7    operating cash flow margin, or they did right before the

8    joinder.  An incredible, dramatic improvement in operating

9    cash flow margin from negative ████████ in 2009 to positive

10   ████████ as of August 31st, 2010, right before the joinder.

11   This came in Ms. Hanley's declaration and Mr. Wakeman's

12   deposition and declaration.  Dramatic improvement in operating

13   cash flow margin or EBITDA.

14         Historically high revenues.  The point there is where

15   Mr. Wakeman became CEO and you see what has happened to

16   revenues since he came on.

17         And this is the operating cash flow margin put in

18   graphically.  As you can tell in 2007, it was positive.  It

19   then went down significantly in 2009, by the end of 2009, and

20   then that is a dramatic improvement in operating cash flow

21   margin, positive ███, is it, in 2010 for the first eight

22   months, right before the joinder.

23         If that trend continued going downward, if revenue

24   was going downward, capacity utilization, market share, all

25   those things, then maybe, maybe ProMedica could put together a

1    failing firm or even a very, very difficult flailing firm

2    defense.  These types of progress, these types of financial

3    improvements, these trends upwards are devastating to both

4    their failing firm and their flailing firm defense.

5          We've also seen in ProMedica's submission to this

6    Court and also their expert reports about St. Luke's really,

7    really low occupancy rates.  It's a sign that they're not

8    significant, they're not unique.  It's a sign, ProMedica says,

9    that no one wants to go there.  They don't do anything

10   special, and they're not -- they can't fill their beds.

11         Well, you should look at more recent data.  From data

12   from 2008, that might have been true.  Actually, it wouldn't

13   have been as bad as they said if they had used the right

14   number of staff beds, but this is what we see is happening in

15   2010 at the time that the acquisition with ProMedica was

16   consummated.

17         Mr. Wakeman to the board:  In the past three years we

18   went from an organization with declining activity to near

19   capacity.

20         Mr. Wakeman to the board again:  We are at capacity

21   for a number of days throughout the month.  In 2010, our

22   concern is burned out staff and lack of beds.  Several service

23   lines, and especially obstetrics have experienced great growth

24   in the past two years.

25         Mr. Wakeman on capacity, we're pretty tight.

1           Letter to Ohio Department of Health:  We're

2    experiencing a surge in obstetrical patients at this time.

3    Our maternity unit has been full with patients laboring,

4    waiting in triage in the family birthing center waiting room

5    because they desire to have their babies born at St. Luke's.

6           Mr. Oppenlander, St. Luke's former treasurer, noted

7    that the hospital is close to capacity with inpatients.  These

8    are all coming at the time Mr. Wakeman implemented their plan.

9    They're saying that St. Luke's has such low capacity

10   utilization, that's a sign that they're failing, that's a sign

11   that they're flailing.  That's a sign that no one wants to go

12   there.  Not true, Your Honor.  Look at the most recent data

13   and documents that tell a very different story.

14           118.

15           So what does ProMedica do about the excellent

16   financial progress, the trending upwards of virtually every

17   significant financial number in 2010, the time period right

18   before they stopped being an independent company?  Well, I

19   think they're arguing that St. Luke's improvement is the

20   result of remedial and unsustainable decisions to freeze

21   hiring and salaries and limit capital improvements in 2009 and

22   2010.

23           That's not true, Your Honor.  St. Luke's turnaround

24   was due to sustainable improvements, increasing volume,

25   increasing revenues, sound cost-cutting measures.

1          Contrary to ProMedica's assertions, St. Luke's

2    actually increased FTEs each year since at least 2007.  You

3    can tell from 1122 in 2008 to 1277.  And St. Luke's is the

4    only hospital in Lucas County that did not lay off employees.

5    This is not a hospital that's saying let's fire everyone and

6    lay people off because we have to cut costs.  They have not

7    laid off employees, and they have grown.

8          Contrary to ProMedica's assertions, St. Luke's did

9    not freeze capital expenditures in 2009 and 2010.  They did

10   not.  St. Luke's spent at least 7.5 million on capital

11   expenditures in those years.  That's in Mr. Dagen's

12   supplemental declaration.

13         And contrary to ProMedica's assertions, St. Luke's

14   would not have cut service lines and employees absent this

15   joinder, absent the acquisition.  This was considered some

16   period in spring.  In August of 2009 it was presented to the

17   board of directors about cutting unprofitable services and it

18   was rejected.  It was rejected based on the conclusion that

19   St. Luke's would no longer be able to fulfill its current

20   mission to fully serve the community.  It was rejected.

21         And then even after it was rejected, St. Luke's

22   senior executives presented more options to the board of

23   directors, including remaining independent by talking about

24   cutting services.  That option was rejected, it wasn't

25   revisited for at least a year before the joinder was

1   consummated.  It wasn't a viable or threat that they were

2   going to do, especially this was before -- especially in light

3   of the outstanding financial progress and significant

4   financial improvements they made prior to the joinder.

5           Also, Mr. Dagen's conservative projections show that

6   St. Luke's could have achieved profitability without cutting

7   services and employee levels.  Again, that comes from our

8   expert declaration, paragraph 57 through 65.

9           So remarkably, Your Honor, in 2009, 2010, St. Luke's

10  took several cost-cutting measures, and yet still grew patient

11  volumes and maintained the high levels of quality and patient

12  satisfaction.  Rather than saying, Your Honor, don't believe

13  or just ignore the incredible progress that St. Luke's has

14  made in 2010, ignore it or don't give it weight because they

15  cut costs.  But that's a sign of good business.  That's a sign

16  of an excellent management team.  They were able to cut costs

17  in an economic downturn and still produce an excellent,

18  high-quality product with great patient satisfaction.  So

19  rather than using it as a source of criticism or taking weight

20  away from evidence, they should be praised for that.

21          And not surprisingly during an economic downturn,

22  both ProMedica and Mercy were also forced to cut costs and

23  services in response to the 2008 financial downturn.  They all

24  did.  Nonprofit hospitals across the country did.

25          I don't think anyone's arguing that ProMedica is

1    failing or Mercy's failing, yet they did the same thing.

2    ProMedica froze new positions, cut staff, reduced

3    discretionary spending, eliminated services, reduced employee

4    benefits, all because of the economic downturn.

5         And Mercy -- that's redacted, Your Honor, but they

6    took several that you can see in your slide 122, several

7    cost-cutting measures that look, even for both ProMedica and

8    Mercy, looked like they're even more aggressive cost cutting

9    than St. Luke's did.  So don't look at their cost cutting to

10   say I'm going to discount their incredible financial progress,

11   St. Luke's in 2010; everyone cut costs.

12        There's also been a lot of paper written about

13   St. Luke's pension fund.  ProMedica's expert called it

14   unfunded in the first declaration and then it was changed to

15   under-funded.  And it was under-funded, Your Honor; it is not

16   unfunded.

17        The facts.

18        In 2009, St. Luke's pension fund was 71 percent

19   funded, on par with such failing companies such as ExxonMobil,

20   CBS, Disney, and Motorola.  A lot of companies, Your Honor, of

21   incredible size, of financial reserves were facing similar

22   pension issues because of the equities market's decline.  It

23   had nothing to do with St. Luke's.  When the equity markets go

24   down it becomes less funded, when they go up it becomes more

25   funded.

1          And sure enough, in 2010, St. Luke's pension fund was

2    76 percent funded.

3          And there's no risk.  I want to make sure this is

4    clear.  There's no risk that retirees from St. Luke's aren't

5    getting their pension money.  There's no risk at all.

6    St. Luke's has sufficient funds to pay this for decades.

7    86 million in the fund that pays out about 3 million a year on

8    average.  That is not -- they are not going to run out of

9    pension money for decades, Your Honor.

10          They also made a change to their pension fund,

11    switched from a defined benefit plan to a defined contribution

12    plan, which will minimize pension swings and equity market

13    swings and cycles by doing the switch.  So the pension issue

14    in terms of being fully funded/not being funded should just

15    decrease over time.

16          In terms of St. Luke's bond rating, there's been a

17    lot of information put out about this as well.  ProMedica in

18    their filings calls the Baa credit rating just above junk bond

19    status.  We call it what Moody's calls it, Baa credit rating

20    is investment grade.  There's actually another notch that if

21    St. Luke's went down, there would still be investment grade.

22    St. Luke's credit rating is investment grade according to the

23    official Moody's definition.

24          28 percent of Moody's hospital and this comes from

25    Mr. Brick, are in this category.  Similarly rated hospitals

1    had plenty of access to the debt markets.  They borrowed

2    $2.6 billion from January 2010 to January 2011.  And

3    St. Luke's is better positioned in many categories, low debt

4    load, being that their cash to debt ratio was, by many fold,

5    better than the average hospital for Baa rating.

6         And this total bond size was, compared to their cash

7    reserves, was fairly low.  They had the ability at any time

8    and they were contemplating this, paying off the bond in its

9    entirety.  You see in St. Luke's documents contemplating this

10   because they had large cash reserves and a small bond debt,

11   and they could have paid it off.

12        In terms of the bond rating, there are several

13   factors.  And, again, Mr. Brick offers an expert opinion on

14   this, that could change your rating up, continue growth and

15   stability of inpatient and outpatient volume trends,

16   significantly improved and sustainable operating performance

17   for multiple years, improve market share, strengthening of

18   debt coverage measures and liquidity balance.  All of these

19   are trends up that would likely improve, not result in further

20   downgrades to St. Luke's bond rating.

21        It's really important for this Court to remember,

22   St. Luke's has never, never been late or failed to make a

23   payment on its bonds.  They are never late.  And Mr. Wakeman

24   called the bond payment the equivalent of a car payment.  Only

25   in this court in this proceeding has this bond rating and bond

```
 1    taken on larger than life measures.  It was a car payment.

 2    According to Mr. Wakeman prior to this proceeding starting and

 3    getting in front of you.

 4            So I'm not, unfortunately, going to end, but I'm

 5    going to -- last word for now on St. Luke's financial progress

 6    and the great work that they have done, especially in the

 7    first eight months of 2010.  This is Mr. Wakeman's last words

 8    to the board on behalf of the independent St. Luke's.  In many

 9    ways, Your Honor, this is frozen in time.  There will never

10    be -- I shouldn't say never.  An independent CEO no longer

11    exists at St. Luke's, they're part of ProMedica.  This is

12    Mr. Wakeman's last words to the board of directors, where, of

13    course, Mr. Wakeman always provides accurate information to

14    the board.  He said so, and you would not expect otherwise.

15            Inpatient up 7.5 percent, outpatient up 6.1 percent,

16    activity is running hot all month.  While we still have

17    capacity for outpatient, especially in the offsite centers,

18    inpatient capacity is limited, except for weekends.  The high

19    activity produced a positive operating margin of ████

20    ████████  in gross revenue.  That's not impressive, but

21    it's better than a loss.  The positive margin confirms that we

22    can run in the black if activity stays high.  After much work,

23    we have built our volume up to a point where we can produce an

24    operating margin and keep our variable expenses under control.

25            Continues, same memo to the board of directors.  The
```

1    entire St. Luke's family has much to be proud of with the

2    accomplishments in the past three years.  We went from an

3    organization with declining activity to near capacity.  Our

4    leadership status in quality, service and low cost stayed

5    firmly in place.  In the past six months, our financial

6    performance has improved significantly.  Has improved

7    significantly.  The volume increase and awareness of expense

8    control were key.

9            Those are the words of Mr. Wakeman to the board of

10   directors right before the joinder in a matter, in a

11   preliminary matter where the Defendant is pushing failing and

12   flailing firm and making St. Luke's financial situation,

13   trying to make it center of this analysis.

14           Slide 132.

15           Okay.  In their pretrial brief, Defendants claim that

16   there have been a string of hospital merger cases in the past

17   that both DOJ and FTC lost that also had a very strong

18   presumption.  I'm not going to contest that the DOJ and FTC

19   lost hospital cases in the past, Your Honor.  That I'll

20   stipulate to.  But they're absolutely wrong.  It is false that

21   these hospitals, that the 13(b) preliminary relief was denied

22   with a strong presumption in place.  It's not true, and I'll

23   tell you why.

24           The combined market shares in these cases are

25   substantially smaller than this case, and the Government

1    didn't meet its burden.  I mean, they cited some of these

2    cases because we alleged a narrower geographic market, that

3    the Court did not find for that.  And there was no

4    presumption.  There's one case which I'm going to talk about

5    where the Government had a presumption, a hospital merger

6    case, and was not denied relief.  Every other case where the

7    presumption was in place, they won.

8            And, again, it's not in dispute that there is a

9    presumption at least in general acute care market in this

10   case, not in dispute.

11           So Mercy, yeah, DOJ alleged a combined share of

12   86 percent, but the Court held the Government had not proven

13   the relevant geographic market, so market share was only

14   10 percent.  There was no presumption in Mercy.  The combined

15   market share was 10 percent.  Not relevant to this case, Your

16   Honor.

17           FTC versus Tenet.  Government alleged market shares

18   based on 84 percent combined.  Court held that the Government

19   failed to prove geographic market, which the share was

20   inaccurate.  And if we didn't prove geographic market in this

21   case, Your Honor, if we didn't put forth evidence to let you

22   determine what it was, then we wouldn't have a presumption.

23   But of course we did.

24           FTC versus Freeman.  FTC alleged post-merger HHI of

25   3088, but the Court held that geographic market was not

1    proven, and the post-merger HHI was 1322, compared to the HHIs

2    in this case, Your Honor, and the combined shares of

3    21-24 percent.

4         Again, as I point out, here the Defendant concedes

5    that the Plaintiffs have established a presumption of

6    competitive harm based on high market concentration levels.

7    And the reason for this, again, Your Honor, to repeat myself,

8    is simple.  We have proven geographic market, we have met our

9    burden in geographic market, if we have presented evidence

10   that will lead this Court to believe that ProMedica could

11   acquire Mercy, all the Mercy Hospitals in Lucas County, UTMC

12   and St. Luke's and raise prices.  And if we have shown that

13   and if we have put forth all the evidence to prove this, then

14   we're entitled to the presumption.

15        And, again, Your Honor, I'm not aware of one piece of

16   evidence in this matter that contradicts the geographic market

17   here.  I'm not.  The fact that ProMedica could acquire Mercy

18   and UTMC and St. Luke's and not raise prices by five to

19   10 percent, there's no evidence saying otherwise.

20        There is one exception -- I'm sorry, let me talk

21   about Evanston.  This is the last litigated hospital case.

22   The post-merger HHI was just over 3000, and because it was a

23   consummated deal, prices had already increased by 20 percent.

24   So that was the last litigated hospital case, significantly

25   less concentrated market, significant price increases.

1          The presumption matters, Your Honor, and we have not

2     lost cases, except Butterworth, where there was a presumption

3     in place.

4          So Butterworth is a case in the Sixth Circuit where

5     the Defendant could point to and say there was a presumption

6     there, and yet the FTC was denied preliminary relief.  But I

7     want to inform this Court the reasons that the Butterworth

8     Court did this.  The Court credited arguments that a nonprofit

9     hospital was not likely to raise prices, in part because the

10    local community board would not allow it.  And the Court also

11    relied on the hospital's commitment to freeze prices for three

12    years and limit price increases for four years after that.

13         In terms of the first point, there was a sentiment

14    that nonprofit hospitals don't exercise market power, that

15    they're not going to charge as much as they can.  The judge

16    and the Court found there that that's what the evidence said.

17    Here, Your Honor, it's not even in dispute.  Mr. Oostra's

18    testimony, health plan testimony, ProMedica's own experts'

19    testimony.  ProMedica, like other nonprofit hospitals, will

20    fully exercise market power if they have it.  The Court in

21    Butterworth found differently.  The evidence must have been

22    different.

23         And you're not hearing anything in this court, nor

24    will you, about pricing freezes or pricing caps.  And the

25    reason why the Defendants in Butterworth did that is because

1    they were saying we're confident that prices won't go up,

2    prices won't go up, so we will agree to a pricing freeze, a

3    pricing cap.

4           You're not going to hear that from ProMedica.

5    ProMedica's telling this Court, yeah, prices are going to go

6    up at St. Luke's.  Of course they are.  Totally different from

7    Butterworth.  We're talking about how high prices are going

8    up.

9           THE COURT:  What community was Butterworth in?

10          MR. REILLY:  Grand Rapids, Michigan.

11          THE COURT:  And it appears that there was a community

12   board which at least controlled price increases.

13          MR. REILLY:  Yeah.  It's actually a very good -- even

14   if it wasn't a good question, I'd tell you it was a very good

15   question, Your Honor.

16          THE COURT:  Thank you very much.

17          MR. REILLY:  There was evidence in that case that the

18   local community board was involved, seeing some of the rate

19   increases, the rate suggestions.  Also, there was a sentiment

20   that because the local community board lives in the community,

21   a CEO is in the community, they wouldn't want hospital rates

22   to increase because it'd hurt their businesses.

23          And your question reminded me of another point.  For

24   ProMedica, when they negotiated rates with health plans, those

25   rate negotiations, possible contracts, draft contracts never

1    go to the ProMedica board.

2           Mr. Oostra testified that he rarely sees them.  Only

3    in the rare exception.  It doesn't go to the board.  There's

4    not this ProMedica board looking at, well, 40 percent price

5    increases, give that a haircut.  That's too much.  Never.  If

6    they have evidence of that, ask them to see it because we

7    haven't seen it.  The ProMedica board does not offer a

8    constraint or a limit of how much ProMedica would charge.

9           THE COURT:  Well, so this local community board

10   references to the Butterworth's board, not an outside communal

11   board?

12          MR. REILLY:  That's right.

13          THE COURT:  Thank you.

14          MR. REILLY:  Slide 135.

15          Let me mention another point that was in their

16   pretrial brief.  Since it's a fairly new point and we haven't

17   responded to yet, we thought we would.

18          In their pretrial brief, ProMedica mentions the

19   recent ▆▆ negotiations as a sign that they will be

20   reasonable, they will be fair, they won't raise rates too

21   much.  And that's what they're putting forth.

22          Actually, we have a strong disagreement with that

23   conclusion.  In fact, the ▆▆ negotiations affirm why the

24   proposed court order is necessary.  Because ProMedica entered

25   into a voluntary hold separate letter with us, ▆▆ had

1    leverage and had a tool to constrain ProMedica that it

2    wouldn't otherwise have.  Under that letter, ███ could

3    continue St. Luke's rates indefinitely.  They had that option

4    because of the voluntary hold separate letter.

5         The important constraint on dramatic price increases

6    will evaporate without an order from this Court.  That changes

7    the leverage.

8         And also Your Honor, this comes from Hospital Corp of

9    America, Judge Posner.

10        For ProMedica to point to recent results from the ███

11   negotiations and say, ah, look, we're fair and reasonable,

12   they have two antitrust actions filed against them, one here

13   and one in D.C.; they know we're watching.

14        And Judge Posner says it beautifully:

15   Post-acquisition evidence that is subject to manipulation by

16   the party seeking to use it is entitled to little or no

17   weight.

18        I wouldn't put a very high probability that they're

19   going to make these exorbitant demands from ███ right before

20   we're seeing you or seeing Judge Chappell in D.C., Your Honor.

21        Slide 136.

22        There has been some mention in this case, especially

23   by the Defendant, that St. Luke's needed to join with

24   ProMedica because of healthcare reform.  Healthcare reform is

25   not a blank check for the self-proclaimed dominant firm to

1    become even more dominant, for the self-proclaimed dominant

2    firm to acquire a very close significant vigorous competitor.

3    It's not -- healthcare reform, depends on who you talk to.

4    Everyone has a different opinion what it will look like, when

5    it will be enacted, what the Courts will do with it.  It

6    cannot be at this stage saying healthcare reform, we get to

7    have a merger to do all obstetrics.  Healthcare reform, we get

8    to have a 60 percent market share in general acute care

9    services.

10        And that being said, it is indisputable that

11   St. Luke's is a high-quality, low-cost provider.  And as much

12   as there are different opinions from everyone, I think there's

13   pretty universal feeling that a high-quality, low-cost

14   provider will do very well under proposed healthcare reform as

15   incentives are put in place to have outcomes at a low cost.

16        And St. Luke's agreed.  St. Luke's wrote:  Is

17   uniquely positioned for smooth transition to expected

18   healthcare reform.  The hospital already focuses on quality

19   and cost; key components of reform.  They thought they were in

20   a very good situation to thrive under this new motto or do

21   better than other hospitals, and I've seen nothing to change

22   that, because, again, they are a high-quality, low-cost.

23        137.

24        So I'm going to summarize, of course, my view of what

25   ProMedica has to ask this Court to accept in order to prevail,

1    and I respectfully suggest that they have to ask you to make

2    history.  This Court would have to approve uncontested

3    double-digit rate increases in two relevant markets:

4            Allow HHI increases in the thousands;

5            Endorse a merger to duopoly for the first time ever

6    in the 13(b) context, or in a merits trial, for that matter;

7            Sanction higher prices on the novel theory that

8    current prices are too low.  Your Honor, current prices are

9    too low.  ProMedica will decide what a fair rate is, not

10   competition, ProMedica.  And this is a novel theory, so we are

11   anxious to get their brief and see what's the support for

12   this.  We didn't know of any case.

13           And the only case they cited was Long Island Jewish

14   Memorial Hospital.  I remember saying, that court didn't say

15   prices are going up dramatically after an acquisition, but

16   they're still fair, but they're still competitive.  They

17   didn't say that.  In Long Island Jewish Memorial the Court

18   said there's no evidence that prices will increase.  So they

19   can't cite Long Island Jewish Memorial for this novel theory.

20           Ask them.  I don't know.  Cite a case where the court

21   said this merger will result in significantly higher prices,

22   but that's okay because the prices are still fair.  There are

23   none.  They're asking you to adopt a novel theory that has not

24   been adopted by any other court on a merits trial, never mind

25   a 13(b) preliminary setting.

1          Credit, for the first time in 13(b) history, a

2     failing firm defense.  Never been done.  They're asking you to

3     do that.

4          Deny preliminary relief on the equities.  For the

5     first time ever in 13(b), despite FTC showing of likelihood of

6     success.  If we show serious financial questions, every time

7     the FTC has done that, they have always won on the equities.

8     And they're asking you with all these equities thrown in, to

9     deny relief, even though we raise serious substantial

10    questions.

11         Accept an efficiencies defense to an otherwise

12    clearly anticompetitive merger.  Never been done.  They're

13    going to talk a lot about efficiencies, talk about how they

14    offset the harm here.  They're going to ask you to make

15    history in that, as well, Your Honor.  Absent a lot of history

16    being made, I respectfully suggest to this Court that based on

17    the presumption, based on the standard for 13(b), based on the

18    incredible number of ordinary course documents that support

19    our theory, out of the mouths of ProMedica and St. Luke's when

20    they didn't know we were watching and didn't know you were

21    watching, based on testimony from every health plan where they

22    can't point to one health plan that says, this is good for the

23    community, this is good for healthcare, based on the numerous,

24    numerous employers who are concerned about this transaction

25    and expressed concern and expressed how higher healthcare

```
 1    costs affect them, based on testimony from third-party
 2    hospitals, based on five expert reports submitted to this
 3    Court, that has been, and I would like to say long before we
 4    got to that point, an incredible amount of evidence, combined
 5    with the presumption to have us raise serious substantial
 6    questions.  And if we have done that, we are entitled to
 7    preliminary relief.
 8             I'm going to talk about the preliminary relief.
 9             How much time do I have?
10             THE COURT:  Five.
11             MR. REILLY:  Thank you, Your Honor.
12             THE COURT:  Six, actually.
13             MR. REILLY:  Slide 138.
14             I expect, I hope we'll be talking more about our
15    proposed order tomorrow.  I just want to make a few points now
16    in my remaining six minutes, assuming it's not down to five.
17             The relief is necessary to maintain the status quo.
18    We already talked about that.  And the objectives of the
19    proposed order are pretty clear, prevent dramatic and
20    immediate price increases;
21             Preserve St. Luke's service lines and staffing
22    levels, all of which ProMedica is contemplating cutting;
23             And ensure the availability of effective relief, if
24    warranted, after the merits trial.
25             Those are the goals of the proposed order.  And let's
```

 1    be very clear.  Absent preliminary relief, rates at St. Luke's
 2    will increase dramatically.  After the TRO hearing, ProMedica
 3    asked us whether we'd be willing to modify one aspect of the
 4    voluntary hold separate letter.  It wasn't, hey, we just want
 5    to make sure this voluntary hold separate letter allows us to
 6    make more investment in St. Luke's.  We want to make sure that
 7    we can get more efficiencies.  The one request they had was,
 8    we want to be able to notify health plans immediately,
 9    immediately, that if you rule against us, that they can
10    renegotiate significantly higher rates from health plans.
11    That was their one request that they wanted.  They plan to
12    raise rates immediately the minute that the voluntary hold
13    separate letter doesn't apply or there's no order from this
14    Court.
15         Again, the Commission finds that divestiture is
16    warranted after the merits trial, the public is entitled to
17    full effective remedy.  That means reestablishing St. Luke's
18    as a full-service community, with service lines and employees
19    in place.  ProMedica's contemplating consolidating service
20    lines from St. Luke's.  The Commission has a right and the
21    public has a right after the merits trial to spin off or
22    potentially divest the exact same hospital that was acquired
23    through the joinder in terms of service lines, staffing
24    levels.  We don't want, it's not in the public's interest to
25    have service lines consolidated and moved from St. Luke's to

1    Flower, Bay Park, TTH.

2           ProMedica argues that there's no relief necessary

3    from this Court because a joinder agreement protects all the

4    services and protects St. Luke's.  Your Honor, the joinder

5    agreement protects a handful of services.  We're not exactly

6    sure if, in fact, they did change the joinder agreement and

7    start consolidating and moving services out of St. Luke's, who

8    would enforce it?  Would it be the St. Luke's hospital now

9    owned by ProMedica would sue ProMedica?  A potential lawsuit

10   by a controlled entity against another entity cannot be a

11   substitute for effective enforcement of the antitrust laws.

12          To the extent that ProMedica does intend to keep

13   St. Luke's service lines exactly the same, does intend to keep

14   St. Luke's staffing levels the same, then this order has no

15   burden on them.  If they're not going to do what -- if they

16   weren't going to do anyways what we're asking for in the

17   order, then enter the order and hopefully, we won't have to

18   bother you again because they're going to keep the service

19   lines and staffing levels intact.  They've never said they're

20   not going to jack up rates to health plans or employers at

21   St. Luke's.

22          And let's be clear.  ProMedica is considering

23   consolidating moving service lines.  Mr. Oostra said recently

24   that they're considering consolidating service lines.

25   Navigant is studying where service lines should be moved from

```
1    one hospital to the other.  This isn't some theory that we're
2    coming up with.  They're actively and continuing looking at
3    this.
4             So how does the proposed order relate to the
5    voluntary hold separate order?  The overriding objectives are
6    the same.  As we said, maintain the same service lines,
7    staffing levels, same high-quality, low-cost model that made
8    St. Luke's an invaluable asset to the community.  Maintain the
9    status quo while the merits trial runs its very quick pace.
10            But the letter agreement was also voluntary, had
11   little specificity and didn't have independent oversight.
12   Those are some things we're talking about and are asking for
13   in the proposed order.
14            The hold separate proposed order that we put before
15   this Court is very similar to dozens of hold separate
16   agreements that companies have entered into with the FTC.
17   They all appoint a monitor.  A monitor's goal is to monitor,
18   not to run the business.  Not surprisingly in their pretrial
19   brief, Defendant talked about all these extraordinary powers
20   that the monitor has.  Those are very -- those are
21   extraordinary, rarely-used powers that in case the business
22   starts going down, they have to be able to do something.
23            And, in fact, so rarely used, that in the last 30
24   years, even though those types of powers in terms of cutting
25   salaries by a monitor have been in hold separate agreements,
```

```
 1    never been used.  So by pointing to something that has

 2    virtually a tiny, tiny little probability of being used by a

 3    hold separate monitor and saying, look at this, it is a rare,

 4    rare, rare never used case that the monitor is going to use

 5    the powers in there.

 6          And, again, there's a 13(b) case in the Central

 7    District of California where the FTC has asked for the Court

 8    to appoint a director to manage the held-separate businesses.

 9    We are not seeking a director here, Your Honor.  We are not,

10    for the very simple reason St. Luke's management team under

11    Mr. Wakeman has implemented a successful dramatic three-year

12    turnaround plan.  All their numbers are improving.  They said

13    they've made significant financial progress.  We want

14    Mr. Wakeman and St. Luke's to run St. Luke's during the

15    interim period of the order.  That's -- we don't need a

16    director to run it.  They already have a great management team

17    in place.

18          One last point.  In their pretrial brief they said

19    that the proposed order by you would limit ProMedica's

20    investment in St. Luke's.  Well, they already signed a joinder

21    agreement that said they would invest 30 million.  So in some

22    ways they're saying the joinder agreement means that it's so

23    ironclad you don't need an order, oh, on the other hand, we

24    did commit to spending 30 million in the joinder agreement,

25    but that's negotiable.  It's in the joinder agreement.
```

1    There's nothing in our proposed order that limits ProMedica's

2    ability to make investments in St. Luke's.

3           And notably, they didn't cite anything in our

4    proposed order.  They made a general statement.  They want us

5    to put -- you want us to put explicitly ProMedica can invest

6    as much as it wants to in St. Luke's or invest what they've

7    already committed, we'll put that in there.

8           They also claim that the proposed order prohibits

9    St. Luke's inclusion in ProMedica Healthcare Obligated Group.

10   Again, Your Honor, nowhere in the order.  Not even a fair

11   reading of the order implies that.  If it would help, we would

12   make that perfectly clear in the order that you think you are

13   contemplating issuing, to make that perfectly clear.  Those

14   are things they're talking about they may do.  The order was

15   not designed nor does the clear language of the order say

16   that's got to happen.

17          Nor does it impede coordination of care, Your Honor.

18   We have an explicit statement in there saying the types of

19   things that hospitals in the community do to better coordinate

20   care, to form accountable care organizations, that can all

21   happen, as well.  That's all free to happen.  The order does

22   not prohibit that.

23          Again, Your Honor, I just want to, on my last point,

24   say that the order is not for some three, four-year period.

25   It is literally to maintain the status quo during the merits

1    trial.  The ALJ, administrative law judge, Judge Chappell,

2    will issue his opinion by the end of the year.  We fully

3    expect if we don't meet our burden and prevail on the merits

4    trial, they will be coming running to you to say we have to

5    revise this order, we have to eliminate this order, we won, we

6    being ProMedica, in the merits trial, let's revisit this.

7            So we're not asking you to do something that's going

8    to last for years.  It's a short period of time while the

9    Commission does its job in the first instance and conducts the

10   merit trial to determine the merits of this case.

11           That's all I have, Your Honor, unless you have any

12   questions.

13           THE COURT:  I presume you will discuss this tomorrow,

14   perhaps, but if one assumes for purposes of discussion only,

15   that the Court does not issue any order that the joinder

16   proceeds apace, that the order of the ALJ then goes in early

17   2012 to the Commission, and from the Commission to the Sixth

18   Circuit, we're talking a minimum of two years, the question

19   I -- in that scenario, what do you see as the issues facing

20   the unwinding of the transaction should the FTC ultimately

21   prevail in the Sixth Circuit?

22           MR. REILLY:  Uh-huh.

23           Would you like me to address that now or tomorrow,

24   Your Honor?

25           THE COURT:  Whichever you prefer.

```
1              MR. REILLY:  Yeah, I'll just address it.

2              It would be significantly more challenging if -- and

3     I really do hope as a hypothetical question, if you didn't

4     issue your order and as is played out on the trial of the

5     merits in front of the ALJ, appeal of the Commission and the

6     Sixth Circuit, you're right, a significant amount of time will

7     go by.  And I think it's -- with certainty, the rates that

8     employers are paying for healthcare at Lucas County would

9     increase.  We also think that it's very likely that service

10    lines would be moved from St. Luke's.  At that point it's

11    really, we prevail on the merits trial, appeal to the

12    Commission, the Commission decides what is effective relief.

13             I mentioned the Evanston case, because so much time

14    had passed and there wasn't preliminary relief, a spinoff

15    wasn't possible.  There's too much integration.  There's all

16    this stuff going on.  And that's the exact purpose of 13(b),

17    Your Honor, is that it maintains effective relief if, in fact,

18    we do prevail on the merits trial, if, in fact, we prevail in

19    front of the Commission, and the Sixth Circuit, that's a lot

20    of work to prove our case and go that far and then not have

21    effective relief.

22             THE COURT:  Thank you.

23             May I see you and David?

24             (Discussion held off the record.)

25             Ladies and gentlemen, we'll now break until 1:30.  I
```

1    would intend to start very promptly so that we can vacate the

2    premises for the benefit of the staff of this courthouse

3    before 5:00 o'clock.

4            Thank you.  Enjoy your lunch hour.

5        (A recess was taken from 12:22 p.m. to 1:28 p.m., after

6    which the following proceedings were had:)

7            THE COURT:  Thank you, ladies and gentlemen.  Please

8    be seated.

9            Ready, Mr. Marx?

10           MR. MARX:  I am, Your Honor.  Thank you very much.

11           Two preliminary matters, if I might?

12           THE COURT:  Of course.

13           MR. MARX:  I think we have an agreed statement for

14    you if -- between the parties to -- relating to the documents

15    that the Government was referring to this morning in terms of

16    their confidentiality.  That's the handwritten version that

17    we've just provided to you.  I apologize for the fact that we

18    couldn't get it typed over lunchtime, but . . .

19           THE COURT:  Very clear.

20           Let me read the order that I am putting in place now

21    at 1:29.  As I indicated this morning and I now incorporate it

22    in this offer, to the extent that any confidential documents

23    subject to the protective orders entered in this case were

24    discussed in this morning session or may accidentally be

25    discussed in this or tomorrow morning's session, the contents

1    of such documents shall not be discussed, disclosed or used

2    outside the confines of this courtroom.

3           It is so ordered.

4           MR. MARX:  Thank you, Your Honor.

5           Second point, I put a notebook just to the right of

6    Cathy for Your Honor that has the slides to which we'll be

7    referring this afternoon.  I think they're organized like one

8    through six today.  So, for example, behind tab number 1 will

9    be the few slides that I will be referring to, and as we

10   rotate through this afternoon our presentation, we'll let you

11   know where to find the other ones.

12          I also left a box, which you don't have to worry

13   about this afternoon, to the right of Cathy on the chair.

14   Those represent the three notebooks of Defendant's exhibits in

15   connection with the preliminary injunction hearing, but you

16   don't have to worry about those today, and we'll be happy to

17   take those upstairs for you afterwards if you like.

18          THE COURT:  Thank you.

19          MS. HANCOCK:  Thank you, Your Honor.  Before I begin

20   the Defendant's presentation this afternoon, I would like to

21   introduce some of the individuals who are here today

22   representing ProMedica and St. Luke's.

23          First, Mr. Larry Peterson, who's the chairman of the

24   board of ProMedica Health System, Your Honor.  You may know

25   some of these gentlemen and ladies.

```
 1          Jamie Black, who is the chairman of the board of

 2     St. Luke's.  Randy Oostra, who's the chief executive officer

 3     and president of ProMedica Health System.  Jeff Kuhn, who's

 4     the chief legal officer of ProMedica.  Marshall Bennett who --

 5     from Marshall & Melhorn, for whom we should have entered an

 6     appearance today on behalf of ProMedica this morning, but he

 7     was sort of behind us, and big as he is, it's my fault, I

 8     forgot to introduce him.

 9          And Priya Bathija, the associate general counsel of

10     ProMedica Health System is also here.

11          Your Honor, this joinder between ProMedica and

12     St. Luke's couldn't have happened five years ago, and it

13     probably couldn't even have happened three years ago.  The

14     simple truth is that the previous leadership of both

15     institutions wouldn't have and couldn't have made this joinder

16     transaction happen.  Back then, St. Luke's, which has always

17     been fiercely protective of its independence, probably

18     wouldn't even have sat down with ProMedica to discuss a

19     transaction like this one.

20          Why not?  Well, we saw a couple of slides I think

21     that provided a pretty good indication of why not this

22     morning.  You saw the slide where -- that indicated that

23     ProMedica had a reputation of being aggressive in the market.

24     You saw another slide that discussed the wrath of Alan Brass

25     would have come down on us from ProMedica.  Those documents I
```

1    think describe others' perception of ProMedica Health System

2    and ProMedica's reputation in the marketplace.

3            In fact, the first two options that St. Luke's

4    considered for partners were Mercy and the University of

5    Toledo Medical Center.

6            Now, Mercy lost interest in St. Luke's because of

7    St. Luke's troubled financial situation and a consultant's

8    assessment that limited purpose joint ventures between

9    St. Luke's and Mercy wouldn't be financially viable.

10   St. Luke's and UTMC danced around for a long time, but they

11   never got very far, far enough in their discussions to pursue

12   any meaningful due diligence.  And that was one, one, but not

13   the only reason that St. Luke's concluded that the fit with

14   UTMC didn't seem right.

15           But, Your Honor, people and circumstances change.

16   And when the discussions between Mercy and UTMC stalled,

17   St. Luke's began to examine more closely the potential for an

18   affiliation with ProMedica.

19           As an organization, ProMedica's personality changed

20   when Randy Oostra became ProMedica's chief executive officer.

21   And perhaps surprisingly to St. Luke's, when Dan Wakeman and

22   Randy and their boards began to talk about a transaction,

23   ProMedica and St. Luke's found they had more reasons to join

24   than they might otherwise have expected.  And we'll talk about

25   those reasons over the course of the next couple of days.

```
 1              Now, first, I want to address a couple of issues that
 2    Mr. Reilly raised this morning directly.  This won't be the
 3    only time we address these issues, but I want to address a
 4    couple before we get too far along.
 5              First, I want to affirmatively and unqualifiedly
 6    state that no matter what Dan Wakeman may have thought or
 7    hoped about how a joinder with ProMedica might affect
 8    St. Luke's ability to increase its reimbursement from
 9    commercial payors, and when I see his statements and I read
10    them, the terms "irrational exuberance" come to mind.
11              ProMedica did not pursue this joinder with the
12    purpose or intent of raising the rates it charges payors to
13    treat their commercially insured members or employees.  Let's
14    be clear about something.  High rates do not violate the
15    antitrust laws.  High prices are not per se unlawful.  Never
16    have been, never will be.
17              The fact that prices go up doesn't violate the
18    antitrust laws either.  The only time that higher prices
19    violate the antitrust laws is when they reach supra
20    competitive levels, when they achieve a level above a
21    competitive price.  But high prices in and of themselves
22    aren't anticompetitive.  And to the extent that ProMedica
23    charges higher prices than other providers in Toledo, there's
24    nothing wrong with that.  It's not inherently unlawful.
25              THE COURT:  It's usually just the reverse, isn't it?
```

1          MR. MARX:  Yes, it is usually just the reverse.  But

2     as a practical matter, there's no evidence in this case either

3     that the prices that ProMedica's charging are anticompetitive.

4          The FTC's economist, I asked him, do you have any

5     evidence that the prices that ProMedica's charging in the

6     marketplace are anticompetitive?  No.  Do you have any

7     evidence that ProMedica has exercised whatever bargaining

8     leverage or market power or whatever it is that you want to

9     call it, do you have any evidence that ProMedica has exercised

10    its size to achieve supra competitive prices, prices above the

11    competitive market level?

12          Answer:  No.

13          So whether or not ProMedica charges high prices now

14    really is irrelevant.  The issue is whether or not as a result

15    of this transaction, ProMedica will be able to charge

16    commercially -- commercial insurers prices above the

17    competitive level, supra competitive prices.

18          In the Government's world, in the Government's world,

19    they say if there's a merger and prices go up, we have an

20    antitrust violation.  That's simply not the law, and we'll

21    take that on a little bit more as we proceed over the course

22    of the next couple of days.

23          But there's not a shred of evidence to suggest that

24    ProMedica will change its approach to managed care contracting

25    for itself or for St. Luke's now that St. Luke's has joined

1    ProMedica Health System.  Nor is there any evidence to support

2    the notion that ProMedica could or would try to charge payors

3    the rate for St. Luke's that ProMedica charges for its other

4    Toledo Hospitals.  There is no basis to suggest that

5    ProMedica's prices for St. Luke's will go up by the 71 percent

6    that Plaintiff's economist has suggested.  There's simply no

7    factual basis for it.

8            Now, we've heard a lot, we've heard a lot about

9    Mr. Wakeman's statements and representations to the St. Luke's

10   board.  I probably missed it when Mr. Reilly mentioned it this

11   morning in his presentation, but I certainly don't recall any

12   citations to -- this morning to Mr. Wakeman's belated

13   recognition, his "aha moment," if you will, that St. Luke's

14   rates with its two largest commercial payors, MMO and Anthem,

15   weren't covering St. Luke's cost of delivering care to those

16   patients.  It was that realization, and it came to Mr. Wakeman

17   late, it came to him after all of his other turnaround tricks,

18   if you will -- and I don't use that term pejoratively, but all

19   of the steps that he had taken, and Ms. Carletti's going to

20   talk some more about this in a little bit, he pursued them and

21   there was still a problem.  St. Luke's was still losing money.

22   Couldn't figure out why.  And the realization that he came to

23   was that the rates that St. Luke's was charging MMO and Anthem

24   weren't sufficient to cover the cost of care that they were

25   delivering to their patients.

1          And when Mr. Wakeman realized that and he went to MMO

2     and he went to Anthem and said we've got to renegotiate these

3     rates because we're losing money hand over fist, and the trend

4     is going down, not up, MMO and Anthem refused to renegotiate.

5     They've said, we've got a contract, we're not going to

6     renegotiate now.

7          And it was that -- at that point when it became clear

8     to Mr. Wakeman and to the board at St. Luke's that they had to

9     abandon any thought of remaining independent, and that's

10    ultimately what led them to the joinder with ProMedica.

11         All of the evidence that's been adduced so far in

12    this case shows that ProMedica will use the same methodology

13    to negotiate with payors for St. Luke's that it uses with

14    other -- for all of its hospitals.

15         And it's true that a recently negotiated contract

16    between St. Luke's and MMO which ProMedica negotiated does

17    provide for a rate increase for St. Luke's to be implemented

18    over the four-year term of the contract.  And I want to

19    emphasize the four-year term of the contract.

20         But even after the rate increases have been

21    implemented, MMO will still be paying St. Luke's less than

22    Paramount, ProMedica's insurer, will be paying St. Luke's for

23    St. Luke's participation in the Paramount network.

24         Now, the FTC suggests, not surprised, the FTC

25    suggests that ProMedica has manipulated those negotiations

1    with MMO because we're meeting with you and because the FTC

2    has filed this administrative complaint.

3              I said there was a four-year contract, and it is a

4    four-year contract.  And the reality is that the rates that

5    ProMedica has negotiated with MMO that cover the course of

6    that four-year contract are going to be in existence long

7    after you've resolved this case for us and long after the FTC,

8    and if we have to, the Sixth Circuit, has resolved it for us,

9    as well.  This is a four-year contract.  We're stuck with

10   these rates for four years.  So if we manipulated them for

11   purposes of producing evidence in these two cases, it's going

12   to have a financial impact on us for four years.  This was a

13   hard-bargained contract, it wasn't manipulated.

14             Let me focus on another point quickly before I cede

15   the day as to others.  I want to talk about the number of

16   commercially insured patients that have the potential to be

17   affected by this joinder.  The FTC focuses on market shares.

18   At least today they mentioned a couple of times the number of

19   patients who might be affected by this transaction.  Now, the

20   Plaintiffs allege that this joinder is going to substantially

21   harm competition in the markets for general acute care

22   inpatient hospital services and inpatient obstetrical services

23   sold to commercial health plans.

24             Remarkably, there was hardly any mention of Mercy,

25   which, as you know, has three hospitals, offers a wide range

1    of services from different geographic locations proximately

2    located to ProMedica, or UTMC as a competitor, as competitors

3    in this marketplace.

4          Listening to the FTC, one might think that the market

5    for general acute care services, not just obstetrical

6    services, is a duopoly.  It isn't.  General acute care

7    services has four competitors.  There will be three.  But let

8    me talk about this duopoly point because the FTC has made that

9    point a couple of times as it relates to obstetrical services.

10         As a practical matter, the only obstetrical services

11   that St. Luke's presently provides are basic OB services.

12   St. Luke's handles uncomplicated deliveries.  High-risk

13   deliveries only occur at Mercy and at ProMedica.  There has

14   been a duopoly in this marketplace for high risk deliveries

15   since time out of mind.  And there is no suggestion, and I

16   didn't hear the FTC say it this morning, that there has been

17   any exercise of market power by either ProMedica or

18   St. Luke's -- I'm sorry, ProMedica or Mercy with respect to

19   those high risk deliveries.

20         So to the extent that this transaction, this joinder

21   may result in a duopoly for inpatient obstetrical services for

22   the low risk deliveries, one needn't be concerned about the

23   potential for the duopoly to cause higher price.  We've had a

24   duopoly.  There's no evidence that -- there's no evidence that

25   there's been a problem here.

1          Now, let me talk for a minute about how many patients

2    are actually going to be affected by this transaction.  The

3    number of commercially-insured patients that St. Luke's treats

4    who are in the relevant product market in 2009 was 3790

5    patients, or about 10 admissions a day.  Ten admissions a day.

6          Of those 10, on average, Aetna insured one, Anthem

7    insured two, Frontpath insured one, MMO insured four.  We've

8    got a new contract with them that's in effect until 2014.  I'm

9    not as worried about them anymore.  United insured one, Cigna

10   less than one, and Paramount also less than one.

11         And just so we're clear, only one out of those 10

12   commercially-insured admissions to St. Luke's per day was an

13   expected mother admitted to deliver a healthy baby.

14              THE COURT:  Did this come from one of these?

15              MR. MARX:  The next slide I think shows -- did

16   this --

17              THE COURT:  Are these -- is what you have on the

18   screen in here?

19              MR. MARX:  Yes, behind tab 1, Your Honor.

20              THE COURT:  Thank you very much.

21              MR. MARX:  Hopefully in the order.

22              THE COURT:  I'm going to give this to Cathy, because

23   I have it very nicely on the screen.

24              MR. MARX:  There you go.

25              THE COURT:  Thank you.

1          MR. MARX:  My pleasure.  Feel free to interrupt me

2     any time.  I'll do the best I can to answer the questions.  I

3     can't always.

4          THE COURT:  That one wasn't too hard.

5          MR. MARX:  Okay.  Took me a little longer to get to

6     the answer than I think you were expecting, but that happens

7     all the time.

8          Now, the Plaintiff's position, the FTC's position and

9     the State, too, is that the addition of St. Luke's 10

10    commercially-insured admissions a day, combined with the 44,

11    by the way that ProMedica admits, will somehow enable

12    ProMedica to raise the rates it or St. Luke's charges

13    commercial payors, like MMO and Anthem, to supra competitive

14    levels.

15         Now, Mr. Reilly suggested -- he's done this a couple

16    times, so I got curious.  He suggested that the Defendant

17    concedes -- they said it in their brief.  They had a slide.

18    They said Defendant concedes that Plaintiffs have established

19    a presumption of competitive harm based on high market

20    concentration levels.  I heard it this morning.  I read it in

21    their brief when we first got their brief.  They said,

22    incredibly, Defendant appears virtually to concede that the

23    extraordinarily high market concentration establishes

24    Plaintiff's strong prima facie case.

25         So I looked at the footnote and I looked at the

1    cites, because I'm not always that articulate, and I

2    frequently make mistakes when I talk.  And I wanted to be sure

3    that I hadn't said something like that.  Because if I had, it

4    would have been a terrible mistake.  So I looked at page 42 of

5    the transcript from our temporary restraining order

6    discussion, and here's what I said.

7              First, the Government relies, as Mr. Reilly suggested

8    I would say, the Government relies in the first instance on

9    high market shares and market concentration.  The Government

10   says that those high market shares create a presumption of

11   anticompetitive effects, but the cases all hold that high

12   market shares and market concentration only create that

13   presumption when they accurately predict future competitive

14   effects.

15             And in this case, the market shares and the market

16   concentration in Toledo are not an accurate predictor of the

17   competitor's market power or the likelihood that ProMedica

18   will be able to increase rates above competitive levels as a

19   result of its joinder with St. Luke's.

20             I didn't make any concession there, at least not one

21   that I've been able -- I've read this a few times, and I don't

22   see where I conceded anything.

23             And then on the second citation, page 50, I said -- I

24   don't see a concession here either --

25             The reality of these competitive alternatives and the

1    substantial constraint on ProMedica, despite its market share,

2    is borne out by the ability of a payor, such as MMO, to

3    exclude ProMedica completely from its network, as it did up

4    until 2008.

5         So I don't see any concession there, I just want to

6    be sure the record is clear.  I haven't conceded, I haven't

7    conceded for a second that they've established a presumption

8    of competitive harm based on high market concentration levels.

9    Not only do I not concede it, they can't prove it.

10        And when you look at the market share numbers and the

11   concentration levels in the face of the competitive reality of

12   the marketplace, you'll see they haven't met their burden of

13   proof at all.

14        So for the next three hours, we plan to discuss with

15   you the reasons why, in light of ProMedica's commitment to

16   maintain St. Luke's as a fully operational general acute care

17   inpatient hospital, offering essentially the same services it

18   was providing at the time of the joinder for the next 10

19   years.  And to my knowledge, Plaintiffs still have not cited a

20   case where a court has entered a preliminary injunction in the

21   face of that kind of contractual and performance commitment

22   negotiated by the parties to the transaction.

23        And tomorrow I'm going to show you -- I'm going to

24   show you where in that joinder agreement it specifically says

25   that St. Luke's board will have a right to enforce it if

1    ProMedica violates it, but I'm not going to do that today.

2    But I'm going to explain to you why the Plaintiffs are not

3    entitled, in light of that and other facts, to any injunctive

4    relief, let alone the draconian preliminary injunction they

5    have proposed, which ironically would not only return

6    St. Luke's to the perilous financial situation it faced

7    immediately prior to its joinder with ProMedica, but would

8    worsen it.  In fact, it would prohibit, as drafted -- I may be

9    misreading it, but I don't think so.  As drafted, the

10   Plaintiff's proposed preliminary injunction would prohibit

11   St. Luke's from engaging in conduct that it could have pursued

12   itself, such as, for example, exercising its contractual right

13   to terminate contracts with payors, renegotiating contracts

14   with payors, changing its service offerings, hiring or firing

15   employees, had it not pursued the joinder and continued to

16   operate on its own.

17          Finally, as I wrap up my introduction to our

18   defense -- I know it seems like more than an introduction -- I

19   want to respond to your question about how hard it might be to

20   unwind the joinder if the FTC somehow prevails in its part

21   three complaint and beyond.  We'll talk about this in a little

22   bit more detail tomorrow, as well.  I'm not surprised that the

23   FTC would say it's virtually impossible to unwind a

24   consummated deal, but it's really not that hard particularly

25   in this case.  Because we know that St. Luke's will continue

```
1    to exist as a fully operational general acute inpatient care

2    hospital, offering almost all of the same services that it's

3    offering today.  That's not going to change.  It's not going

4    to change for 10 years.

5             But if in the interim for some reason ProMedica does

6    what the FTC predicts it will do -- and we say it won't, by

7    the way -- and that is, raise prices above competitive levels

8    to payors, the FTC has a whole host of remedies that it can

9    pursue in addition to divestiture of the fully operational

10   hospital that will exist in two or three years.

11            And it's pursued these kinds of remedies in other

12   cases.  It could, for example, if we negotiated an

13   anticompetitive agreement with the payor, say, give the payor

14   the right to terminate that agreement on 60 days' notice if it

15   wanted to.  The FTC orders that kind of relief all the time in

16   other cases.

17            Not only that.  This case may be an economist's

18   dream.  Very rarely do you have a situation where you know

19   exactly what the prices were before the allegedly

20   anticompetitive conduct and what the prices were after the

21   allegedly anticompetitive conduct.  We know what the contracts

22   provide today in terms of reimbursement rates.

23            And if ProMedica, on behalf of St. Luke's,

24   renegotiates a contract that St. Luke's has with a payor,

25   we'll know what the new price is.  And if the FTC can prove
```

1    that that price is supra competitive, damages calculation

2    ought to be pretty easy.  So the FTC will have all sorts of

3    remedies that it can pursue if it ultimately prevails.

4         It's going to have a hospital that isn't going to be

5    very much different than the one that we have today.  And if

6    we do negotiate supra competitive prices in new contracts,

7    they can give the payors the right to terminate the contract,

8    and -- and it will be easy for those payors or the FTC, if it

9    wanted to pursue a remedy of disgorgement or something like

10   that, and I'm not suggesting it by the way, but if they did,

11   they could, because they'd know what the price was before and

12   they'd know what the price was after.

13        You very rarely see an antitrust case where the

14   computation of damages, if they exist, could be that easy.

15        So if we lose, if we're wrong about this, and I don't

16   think we are, if we're wrong about all this and ultimately the

17   FTC is able to meet its burden of proof before the Federal

18   Trade Commission, and they can find a way to get the Sixth

19   Circuit to affirm, then there will be a remedy there, and it

20   won't be very hard to undo this deal.

21        Okay.  Let me talk for a minute about what our agenda

22   is for the rest of the afternoon.  First, my colleague, Amy

23   Hancock, is going to discuss the legal standard this Court

24   should apply in evaluating Plaintiff's request for injunctive

25   relief and the role of the Court in evaluating both the

 1    underlying merits of the Plaintiff's case and the question

 2    whether the requested injunctive relief is in the public

 3    interest.

 4            After that, Ms. Carletti's going to discuss St.

 5    Luke's deteriorating financial condition and its viability as

 6    a stand-alone community hospital as of August 31st, 2010, the

 7    date of its joinder with ProMedica.

 8            Then I will come back and discuss the nature and

 9    history of competition in the alleged relevant market, as well

10    as the likely competitive effects of the joinder.  I doubt

11    that it will come as a surprise to you that the conclusion I

12    will reach is that Plaintiffs cannot meet their burden of

13    showing that the joinder is likely to substantially lessen

14    competition in either the alleged general acute care inpatient

15    services or obstetric services markets in Lucas County.

16            Mr. Wu will then discuss the parties' motivation for

17    pursuing the joinder, and finally, you'll hear from me for the

18    last time today when I discuss the joinder's pro-competitive

19    benefits both for the parties and for the community they

20    serve.

21            At the end of the day today, I'll give you a preview

22    of what we intend to talk about tomorrow.

23            Thank you, Your Honor.  With that --

24            THE COURT:  Excuse me.

25            MR. MARX:  Sure.

1          THE COURT:  One of the things which I have not heard

2     from anyone is assuming increased concentration, could a

3     facility dictate admission or exclusion of other entities to

4     coverage under a healthcare insurer's plans, et cetera?

5          MR. MARX:  For example, could ProMedica negotiate

6     with Anthem an agreement that would say we don't want Mercy to

7     be part of the network?

8          THE COURT:  Whoever it may be.

9          MR. MARX:  Sure.

10         And the answer to that is, they could try.  And,

11    indeed, that was the lay of the land, as you'll hear, up until

12    2008.

13         And just so we're clear, there's nothing

14    anticompetitive about that either, as long as, as long as the

15    excluded provider has other -- as long as --

16         THE COURT:  Alternatives.

17         MR. MARX:  Exactly.  Exactly.

18         And there's no -- you know, there's no payor that

19    represents, as best I can tell, even in this narrow

20    commercially-insured payor market, no payor represents more

21    than maybe 21, 22 percent.

22         So to the extent that ProMedica negotiated with

23    Anthem, as it did, to exclude, if you will -- not to include.

24    I don't want to use -- not to include Mercy as part of

25    Anthem's network, Mercy was free to negotiate with MMO, as it

1    did.  And, by the way, it did negotiate the exclusion of

2    ProMedica from MMO's network.

3            But there was a trade-off there.  In exchange for the

4    narrower network, ProMedica said, if you do that, we know that

5    it's going to mean we're going to get more volume of patients

6    from you, because there are going to be a whole host of

7    patients that wouldn't otherwise go to Mercy, and in exchange

8    for that volume we'll give you a better price.  That is a

9    pro-competitive result, not an anticompetitive result, and

10   that's what was taking place here.

11           To a certain extent, we still have that.  You've

12   heard a lot about, you'll hear some more about, everybody, all

13   the employers, you know, the payors, they all want open

14   networks.  They want to be able to select any provider they

15   want.  And in Toledo, for the most part now, that's what

16   happens.  Anthem's network is open, MMO's network is open.  I

17   think all of them are, except for one.

18           And, of course, the Government says that these closed

19   networks can't succeed, but then they say but Paramount is

20   doing great.  And it is.  And the fact that Paramount, with a

21   narrow or limited access network is doing well demonstrates

22   that employers and their insureds will accept the limited

23   access network as long as they're getting some other benefits

24   for it, and one of the benefits they get is a lower price.

25           So that's a long-winded answer to your simple

1    question, I think.

2              THE COURT:  Thank you very much.

3              MR. MARX:  Amy.

4              MS. HANCOCK:  Thank you, Your Honor.  Good afternoon.

5              THE COURT:  Good afternoon.

6              MS. HANCOCK:  To the extent I'm using slides, they

7    will appear behind tab 2 in the notebook, and they will appear

8    on your screen, of course.

9              I'm going to discuss the legal standards presented by

10   the case that we're here for.  The ultimate question presented

11   by the FTC's challenge here is whether the joinder agreement

12   between ProMedica and St. Luke's violates Section 7 of the

13   Clayton Act.  That's 15 U.S.C, Section 18.

14             Section 7 prohibits mergers where in any line of

15   commerce in any section of the country the results of the

16   merger may be substantially to lessen competition.

17             Responsibility for deciding this question lies in the

18   first instance with an administrative law judge of the Federal

19   Trade Commission, and then with the five Federal Trade

20   Commissioners themselves on appeal, and ultimately with the

21   Sixth Circuit.

22             But before we get to the Section 7 question, we have

23   another federal statute that we're dealing with here, and

24   that's section 13(b) of the Federal Trade Commission Act.

25   13(b) allows the FTC to seek a preliminary injunction to block

1    consummation of a transaction pending resolution of an

2    administrative trial.  The responsibility for deciding the

3    questions under that statute lie with this Court and again,

4    ultimately, with the Sixth Circuit.  And what this Court must

5    decide, must exercise its independent responsibility to

6    decide, is whether, weighing the equities, both public and

7    private, determining whether -- considering the likelihood of

8    the Commission's ultimate success on the merits of its Section

9    7 claim, is entering an injunction in the public interest.

10       So since Section 13(b) is the primary statute of

11   concern to the Court, let's start there.

12       The FTC has argued in the past and suggests here that

13   it's entitled to injunctive relief merely because it has

14   alleged an antitrust violation, but that standard has been

15   rejected by the courts.

16       For example, in FTC versus Freeman, the FTC argued

17   that it need only show a, quote, "fair or tenable chance of

18   success on the merits," and the Court rejected that.  As you

19   can see, the Court said, such a standard runs contrary to

20   Congressional intent and reduces the judicial function to a

21   mere rubber stamp of the FTC's decisions.  The Court found

22   that Congress expected courts to use their independent

23   judgment to review preliminary injunction actions and said we

24   have, therefore, adopted a more stringent standard.

25       That more stringent standard is characterized in --

1  characterized in different ways by different courts, but most

2  often the statement is that to show a likelihood of ultimate

3  success, the FTC must raise questions going to the merits so

4  serious, substantial, difficult and doubtful as to make them

5  fair ground for investigation, study, deliberation and

6  determination by the FTC in the first instance, and

7  ultimately, the Court of Appeals.

8      An articulation of that standard is found in FTC

9  versus Butterworth and also is recited in this FTC versus

10  Freeman.

11     Significantly, courts have noted that the FTC's

12  burden under this serious, substantial, difficult and doubtful

13  standard is, quote, "not insubstantial."  That's what the D.C.

14  Circuit found in a case FTC versus Arch Koal.

15     In fact, if the FCC shows just a fair or tenable

16  chance of success on the merits, that will not suffice for

17  injunctive relief.  That's from FTC versus Tenet Healthcare.

18     So as the Court of Appeals in D.C. Circuit said in

19  the Whole Foods case, the Court may not simply rubber stamp an

20  injunction whenever the FTC provides some threshold evidence;

21  it must exercise independent judgment about the questions that

22  Section 53(b) commits to it.

23     So if this Court's role is to exercise independent

24  judgment about the questions committed to it by Section 53(b),

25  what are those questions?

```
 1              First, what is the FTC's ultimate likelihood of

 2     success on the merits of its Section 7 claim?  And, second, do

 3     the equities favor entering the injunction?

 4              So to synthesize the two statutes and the various

 5     roles, it is not appropriate for this Court merely to look at

 6     the FTC's complaint and motion, listen to Mr. Reilly's

 7     recitation of allegedly high market shares and high

 8     concentration and declare that a preliminary injunction is

 9     necessary.  Rather, the Court must use -- exercise independent

10     judgment and view the evidence presented by both the FTC and

11     the Defendant, weigh the equities, including both public and

12     private equities, and then decide whether the Commission is

13     likely ultimately to succeed on the merits of its Section 7

14     claim and decide whether entering an injunction is in the

15     public interest.

16              So turning to the likelihood of ultimate success on

17     the merits.  Because the Court does have to make a decision as

18     to the likelihood of that success, it must necessarily dive

19     into the facts and theories that make up the Plaintiff's

20     claim, and it must, of course, concern itself with whether

21     those facts and theories make out a violation of Section 7.

22              A review of cases from a variety of jurisdictions

23     show that thoroughness with which, even in preliminary

24     injunction hearings, courts have reviewed the Government's

25     claims.
```

1          So, for example, a case, California versus Sutter
2     (phonetic), which was a Section 7 case brought by the State of
3     California challenging a hospital merger, but it also was
4     under the same standard, even though the state was the
5     Plaintiff, the Court held a full-day -- four-day evidentiary
6     hearing before denying the State's request for injunctive
7     relief.
8          In FTC versus Butterworth, the District Court in the
9     Western District of Michigan held a five-day trial and
10    admitted over 900 exhibits before denying the FTC's request
11    for a PI.
12         In FTC versus Tenet, the District Court also held a
13    five-day trial, and in FTC versus Freeman, the District Court
14    originally granted a request for the TRO without a hearing,
15    but the Court of Appeals reversed and it went back to the
16    district court for a two-day trial and the admission of a ton
17    of evidence.
18         I mention these cases and the thoroughness of the
19    district court's review not to argue that we should have a
20    longer trial here, as happy as all of those -- all of us from
21    the snowy north are to be here, but rather, to emphasize that
22    the FTC's bold assertion that they're entitled to a
23    preliminary injunction because they filed a complaint and
24    pointed to high market shares is simply not correct.  That's
25    not the end of the story.

1          Rather, this Court must exercise independent judgment

2     and weigh whether all the evidence from both the Plaintiffs

3     and the Defendants supports the request.

4          All right.  So with that, we turn to what are the

5     requirements of Section 7?  Section 7 is referred to as an

6     incipiency statute.  That is, it forbids mergers or other

7     combinations, the effect of which may be substantially to

8     lessen competition.

9          But the fact that the statute is forward-looking does

10     not mean that any theoretical claim that a merger or

11     transaction might violate the law is sufficient to state a

12     claim.  It might lessen -- the fact that the statute is

13     forward-looking does not mean that any theoretical claim that

14     a merger or other transaction might lead to a lessening of

15     competition is insufficient -- is sufficient to find a

16     violation of Section 7.

17          I hope Your Honor followed that.

18          Rather, the Supreme Court has held Section 7 deals in

19     probabilities, not ephemeral possibilities.  That's United

20     States versus Marine Bank Corp.

21          So recognizing that Section 7 deals in probabilities,

22     the Court in Long Island Jewish, United States versus Long

23     Island Jewish Medical Center articulated the standard the

24     Plaintiff must meet to show a Section 7 violation.  The Court

25     said, there must be a reasonable probability of a substantial

```
1    impairment of competition by an increase in prices above

2    competitive levels to render a merger illegal under Section 7.

3    A mere possibility will not suffice.

4           The Government has the burden on every aspect of the

5    proof -- proof of its Section 7 claim.  It must prove a

6    relevant product in geographic market and that the transaction

7    is likely to have anticompetitive effects in that market.

8           There was some talk earlier about product in

9    geographic market.  We do not agree with the Government's

10   allegation that there is a separate product market for OB

11   services.  But the reality is that the primary area of

12   disagreement in this case has to do with whether the FTC can

13   show that the transaction is likely to have anticompetitive

14   effects.

15          The FTC relies heavily on market concentration and

16   increases in market concentration to support their claim.  But

17   as we are going to discuss, the fact that a market is

18   concentrated, even the fact that the transaction results in a

19   large increase in concentration is not enough to justify entry

20   of an injunction.

21          Mr. Reilly said that we say market shares don't

22   matter, but that's not the case.  What we say is what the

23   cases say, which is that market shares and market

24   concentration are merely the beginning of the inquiry.

25          We cited in our brief to United States versus Baker
```

1    Hughes, a case from the D.C. Circuit, which involved very high

2    market shares, and what the Court referred to as a, quote,

3    "dramatic increase in HHI as a result of the transaction."

4    Nevertheless, the injunction was denied in that case.

5            High concentration levels are common in many markets,

6    including in virtually all nonurban hospital markets.  And

7    that fact is significant not just for this case but for the

8    future and the implications of some of the things the FTC's

9    theory suggests.  They argue that whenever there is a merger

10   in a concentrated market that results in a merger guidelines

11   violation of the concentration levels and the elimination of a

12   competitor, they're entitled to an injunction.  But virtually

13   every hospital market in the United States, outside of very

14   large cities, New York City, Chicago, has very few

15   competitors, hospital competitors.  Toledo has four.  Most

16   markets have actually fewer than that; some five.

17           The implication of the Government's analysis is that

18   virtually any hospital merger in any market is going to

19   entitle the FTC to an injunction, and that's a very

20   significant fact, given that all over the country, hospitals

21   are facing pressures brought about by the provisions of

22   healthcare reform to consolidate in order to do things like

23   have accountable care organizations and other factors that

24   healthcare reform is going to impose on the markets.

25           So as I mentioned, most nonurban hospital markets are

```
 1    very concentrated.  And, in fact, the FTC has requested

 2    preliminary injunctions in several of them.

 3          Between 1993 and 2000, the Government brought six

 4    hospital merger challenges and did not persuade a federal

 5    court to grant a preliminary injunction in any one of them.

 6          If we could have the next slide.

 7          I'm going to talk about these cases just a little

 8    bit.  The first one, Your Honor, is FTC versus Butterworth.

 9    Again, a case that's been mentioned from the Western District

10    of Michigan.  The Government alleged a general acute inpatient

11    hospital services market and a separate primary care inpatient

12    hospital services market.  And interestingly, that market,

13    that second market, the primary care inpatient market, was

14    also a cluster market, like the general acute care market.

15    The FTC points to that as precedent for the fact that their OB

16    services market is a relevant geographic market -- a relevant

17    product market.  But nothing in that case suggested that --

18    first of all, the Court described that market, the primary

19    care services market, the evidentiary basis for it the Court

20    described as very thin.

21          But there's nothing in that case or any other case to

22    suggest that you could pluck a single service, OB, out of the

23    all of the general acute care services that are offered inside

24    a hospital and say that's a relevant product.

25          In any event, in both markets as you could see the
```

```
 1    market concentration numbers were high, pre and post market

 2    shares were high and the increases in HHI were very high.

 3            The Court -- after a five-day evidentiary trial, the

 4    Court agreed that the FTC had made out its prima facie case

 5    for a violation of Section 7, but it nevertheless refused to

 6    grant the injunction.  The Court was persuaded that the two

 7    hospitals' justification for the merger, that it would result

 8    in efficiencies and cost savings because, for among other

 9    reasons, it would eliminate the need for one of the hospitals

10    to build an entirely new facility might result in benefits to

11    the community that outweighed the anticompetitive effect.

12            The next case we're going to talk -- I wanted to

13    mention is FTC versus Tenet Healthcare.  Again, the product

14    market was alleged to be general acute inpatient services.

15    And the case involved the merger of two hospitals in Poplar

16    Bluff, Missouri, a small town in the southeast section of that

17    state.  The two merging hospitals were the only two hospitals

18    in Poplar Bluff, although Tenet owned another hospital within

19    the same general geographic area, and there were other larger

20    hospitals in nearby communities.

21            The FTC alleged that in its geographic market, the

22    merging firms accounted for 84 percent of the market, and had,

23    as you can see, extraordinarily high HHIs.

24            A preliminary injunction was granted by the District

25    Court in that case, but reversed by the Court of Appeals.  As
```

1  they do here, the FTC pointed to testimony that supposedly

2  established that payors believed it was essential, essential

3  for their plans to include a Poplar Bluff hospital in their

4  benefit package because their subscribers would not travel to

5  other towns for primary and secondary care services.

6       According to payor testimony, their subscribers,

7  quote, "find it convenient to use a Poplar Bluff hospital, and

8  therefore the payors asserted that they would not be able to

9  steer patients away from Poplar Bluff hospitals in response to

10  a price increase."  These facts are discussed at page 1049 of

11  the decision.

12       The Court of Appeals found the geographic market

13  contrived, and indeed, absurd, and reversed the District

14  Court's grant of a preliminary injunction.

15       THE COURT:  Well, we don't have -- do we really have

16  any question about geographic market as contrasted to lines of

17  service, as I prefer to call it?

18       MS. HANCOCK:  Exactly.  No, we don't have a question

19  about geographic market, but the decisions that the -- we

20  don't have much of a question about geographic market, before

21  Mr. Marx throws something at me.

22       The fact that the case was decided on the

23  Government's failure to properly allege a geographic market

24  isn't the end of the inquiry from our perspective in terms of

25  what the case teaches us about useful lessons applicable to

1    this case.

2          The Court noted that the reliance on the testimony of

3    large sophisticated third-party payors, managed care companies

4    like Anthem, MMO and Aetna would be here, to the effect that

5    they were powerless in the face of a price increase was, as

6    the Court said, suspect.

7          The Court said, we question the District Court's

8    reliance on the testimony in face of -- in the face of

9    contrary evidence that these for-profit entities would

10   unhesitatingly accept a price increase rather than steer their

11   subscribers to hospitals in nearby communities.  Without

12   necessarily being disingenuous or self-serving, or both, the

13   testimony is at least contrary to the payor's economic

14   interests, and thus, suspect.

15         And the Court went on:  In spite of their testimony

16   to the contrary, the evidence shows that large, sophisticated

17   third-party buyers can and do resist price increases,

18   especially where consolidation results in cost savings to the

19   merging entities.  The testimony of the market participants

20   spoke to current competitor perceptions and consumer habits

21   and failed to show where customers would practicably go for

22   inpatient hospital services, by implication and response to a

23   price increase.

24         That's precisely the position here, Your Honor.  The

25   FTC points to payor affidavits and declarations allegedly to

1    the effect that ProMedica will have increased leverage as a

2    result of this transaction, and it points to evidence

3    allegedly showing that some of St. Luke's patients prefer not

4    to travel beyond southwest Toledo.

5            But as will be discussed in greater detail by my

6    colleagues a little bit later on, that evidence is suspect.

7    And although there is some characteristics of the Tenet case

8    that are very like this case, there are some important

9    differences.  Here, after the merger, two very significant

10   competitors continued to exist within the confines of the

11   geographic market alleged by the Government.  Payors don't

12   have to convince purchasers of services to go to Cleveland for

13   those services, they only have to convince someone to go to

14   St. Vincent instead of the Toledo Hospital.  There's no

15   geographic difference between St. Vincent's and Toledo

16   Hospital.

17           So we're not talking about having to expand the

18   geographic market.  We're saying that the real competitive

19   conditions on the ground are such that these large

20   sophisticated payors have the ability to steer patients away

21   from ProMedica hospital in response to a price increase.  And

22   the Government's failure to take into account the likely

23   market dynamics in response to the merger, instead their focus

24   exclusively on the static conditions that exist today, is

25   inappropriate, and that's what the case stands for.

```
 1              The next case I want to discuss is FTC versus
 2    Freeman.  This is another case involving a merger of two
 3    hospitals in a small to medium size town in Missouri.  The
 4    case involved two hospitals in Joplin, Missouri, where there
 5    were three hospitals before the merger, one large, and the two
 6    merging parties, both of which were smaller.  And of those two
 7    smaller hospitals, Oak Hill had, according to the decision,
 8    been experiencing financial difficulties such that its
 9    trustees believed a merger with Freeman would strengthen its
10    financial standing and enable it better to compete.
11              The Court of Appeals in that case upheld the District
12    Court's decision to deny the request for preliminary
13    injunction, and, again, although the decision deals with
14    whether the evidence supported the alleged geographic market,
15    the Court's criticism of the FTC's evidence is relevant here
16    on the point that it's too static, it presents a too static
17    view of the market.
18              As the Court said, the testimony from market
19    participants in this case spoke mainly to current competitor
20    perceptions and current consumer habits and not to the crucial
21    question of where consumers could practicably go to seek
22    alternative acute care inpatient services in the event of a
23    merger.
24              A similar finding about the impact and relevance of
25    customer complaints is expressed in a case that was not a
```

1    hospital merger case, FTC versus Arch Koal.  There, the Court

2    of Appeals for the District of Columbia Circuit found that

3    while the Court does not doubt the sincerity of the anxiety

4    expressed by customers, the substance of their concern

5    articulated is little more than a truism of economics.  A

6    decrease in the number of suppliers may lead to a decrease in

7    the level of competition in the market.  Customers do not, of

8    course, have the expertise to say what will happen in the

9    market.

10           And, again, that's FTC versus Arch Koal, 329 F.2d, at

11   145.

12           And so returning to the hospital merger cases, United

13   States versus Long Island Jewish Medical Center, a case from

14   the Eastern District of New York, in this challenge brought by

15   the Department of Justice rather than the Federal Trade

16   Commission, but nevertheless involving the same statute,

17   Section 7 and Section 13(b), there are some aspects of this

18   case that are similar to the aspects of Long Island Jewish

19   that are similar to this case in that the FTC alleges here the

20   combination of ProMedica and St. Luke's creates a must-have

21   hospital system, and there, the Government made a similar

22   allegation.

23           The merging parties, Northshore Hospital System and

24   Long Island Jewish were located just 2 miles from each other.

25   The hospitals were described as being fierce competitors, and

1    both were quality teaching hospitals that provide high level

2    training programs.  The Government alleged a product mark

3    market consisting of acute inpatient services provided by

4    anchor hospitals to managed care plans, and in that product

5    market in the geographic market alleged, the merged firm had a

6    100 percent market share.

7            Nevertheless, the Court denied a preliminary

8    injunction, again focusing on the fact that the Government's

9    theory of the case failed adequately to address the real world

10   competitive conditions faced by the hospitals.

11           Despite the Government's economic expert's testimony

12   that he had calculated the merged firms would have the ability

13   to raise prices 20 percent, the Court found that the

14   Government had not shown likely anticompetitive effects.

15   According to the Court's decision, the Government failed to

16   prove by a preponderance of evidence that the merged entity

17   would, in all probability, produce an anticompetitive effect

18   by a price rise above competitive levels.

19           In reaching this conclusion, the Court was influenced

20   by evidence that there were suitable alternative hospitals.

21   As here, the evidence showed that there were several hospitals

22   offering identical services to the merging parties located

23   within a few miles of them.  And also, the Court was

24   influenced by the countervailing bargaining power of the large

25   insurance companies in the market, among other factors.

1          The last of the cases I'm going to discuss in detail,

2     Your Honor, is United States versus Mercy Health System.

3     There, the Government sued to challenge the merger of the only

4     two general acute care hospitals in Dubuque, Iowa.

5          THE COURT:  It should be made clear for the record

6     that this is totally unrelated to the Mercy system that has

7     been referred to in these proceedings.

8          MS. HANCOCK:  You are exactly right, Your Honor.

9     Thank you.

10         Again, the facts presented a market with allegedly

11    very high market shares.  According to the Government, the two

12    hospitals would have had a combined 78 percent share of the

13    market for general acute inpatient services.  Nevertheless, a

14    preliminary injunction was denied, and after a careful review

15    of actual marketplace realities facing the hospitals and the

16    payors in the market.

17         As the Court noted in that case, although a great

18    deal of emphasis is placed on market share statistics, they

19    are not conclusive indicators of anticompetitive effects.

20    That's at 902 F.Supp, at 976.

21         Further, like other courts that have denied

22    government requests, the Mercy Health Systems court found that

23    the Government's case rests too heavily on past healthcare

24    conditions and makes invalid assumptions as to the reactions

25    of third party payors and patients to price changes.  The

```
 1   Government's case fails to undergo a dynamic approach to
 2   antitrust analysis, choosing instead to look at the situation
 3   as it currently exists within a competitive market.
 4           In short, the decisions in these litigated hospital
 5   merger cases demonstrate, first and foremost, that the
 6   existence of high market shares and an increase in
 7   concentration, even a very large increase in concentration,
 8   simply is not enough to justify the entry of a preliminary
 9   injunction where, as will be the case here, the evidence shows
10   the market is and will continue to function competitively.
11           And, secondly, they show courts even at a preliminary
12   injunction stage, closely and in detail analyzing the factors
13   necessary to establish whether the FTC is likely to prevail on
14   its Section 7 claim.
15           Finally, what we learned from these courts is, as the
16   District Court for the District of Columbia said in FTC versus
17   Arch Koal, antitrust theory and speculation cannot trump
18   facts, and even Section 13(b) cases must be resolved on the
19   basis of the record evidence relating to the market and its
20   probable future.
21           THE COURT:  Go ahead and finish it.  I have a
22   question.
23           MS. HANCOCK:  That's fine.  Now's a good time.
24           THE COURT:  Now, I'm listening and I'm guessing --
25   you don't have to guess very much -- that ProMedica and
```

1   St. Luke's are objecting to the selection of these two

2   segments of their respective offerings to the public, acute

3   care and OB, because they are the most -- those which reflect

4   the largest growth concentration.

5           Do the cases ever discuss the favorable, in most

6   instances I would surmise, or unfavorable impact on other

7   lines of service, which impact is made possible as a result of

8   the increased concentration?

9           MS. HANCOCK:  Well, let me take it one step at a

10  time.

11          First of all, ProMedica does not object to the

12  product market, the general acute care inpatient services

13  product market.  That is the product market, it's referred to

14  as a cluster market, that has been used by all the cases that

15  analyze hospital mergers in recent times, and it is the

16  appropriate market in which to analyze the effects of the

17  merger of two hospitals.

18          THE COURT:  Thank you.

19          MS. HANCOCK:  We do object to plucking out of that

20  general cluster market the single service of OB, and we don't

21  think that there's any legal support for that in the case law

22  or any basis for doing it other than to give the Government

23  the advantage of being able to stand up and say it's merger to

24  duopoly.

25          But there's no basis for taking OB out of the general

1    acute care market.  It is true that someone who wants to

2    deliver a baby can only deliver a baby.  They don't want a

3    knee replacement.  But that's also true of every other

4    individual service line that's offered in hospitals.

5              In terms of the second part of your question, Your

6    Honor, I'm not sure I understand whether they've --

7              THE COURT:  Well, let me --

8              MS. HANCOCK:  Does the combination of the general

9    acute care services give either party market power in some

10    other, like, tertiary services that aren't part of the alleged

11    market?  Is that . . .

12              THE COURT:  In other words, do the cases discuss the

13    probable impact on the abilities of the providers of these

14    services to increase the concentration in those areas, as

15    well, and/or to dictate because of their increased, call it

16    power, bargaining power, with respect to those lines of

17    service?

18              MS. HANCOCK:  And I think the answer, subject to

19    being corrected by people who are smarter than me about this,

20    I think the answer to that is no.  The point of defining the

21    relevant market, to say this is the market in which we are

22    going to analyze the effects of this transaction is, it's

23    saying this is the group of products or services that are

24    reasonably interchangeable as to which, if one could exercise

25    power and raise prices over this group of products, that would

1    have an impact on customers' choices.

2           The point of leaving other products and services out

3    is that a price increase in the chosen product market is not

4    going to have an impact on the products that are not part of

5    the product market.

6           So the structure -- so in order to determine whether

7    there's a Section 7 violation, you don't just look at market

8    shares and market power and market concentration.  You have to

9    look at the structure, history and probable future of the

10   market.  And Mr. Marx, Ms. Carletti, Mr. Wu are all going to

11   discuss factors related to the structure, history and probable

12   future of this market.

13          But what I would just say is that the evidence in

14   this case will show, that when analyzing those factors, the

15   probable future of the market for inpatient hospital services

16   in Toledo, the joinder of St. Luke's hospital into the

17   ProMedica Health System will not confer upon ProMedica the

18   sort of market power condemned by Section 7.  That is, the

19   power to raise prices above a competitive level.

20          And that brings me to an additional area of

21   disagreement between us and the FTC over what must be shown to

22   show a likely anticompetitive effect.

23          An anticompetitive effect in the context of a Section

24   7 case is determined by looking at, first, with reasonable

25   probability, will the merged entity have enough market power

1    to enable it to increase prices above a competitive level?

2          Is that the wrong slide?  No, that's it.  Okay.

3          Increase prices above competitive levels for a

4    substantial period of time.  And, second, will the merged

5    entity reduce the quality of care, treatment or medical

6    services rendered?  This is from United States versus Long

7    Island Jewish Medical Center.

8          Here, although the Plaintiffs point to some comments

9    made when St. Luke's was -- first began its discussions with

10   ProMedica suggesting concerns on St. Luke's part about

11   ProMedica's quality scores, there is no serious evidence to

12   support the notion that ProMedica has any intension to or is

13   likely to try to reduce the quality of care of medical

14   services offered at St. Luke's.  Any such claim is clearly

15   contrary to every intent and every incentive that ProMedica

16   has to maintain the quality of St. Luke's.

17         Rather, Plaintiff focuses more on their price claims.

18   Their characterization of the likely impact on prices in the

19   market as a result of the transaction is not consistent with

20   the requirement of establishing a Section 7 claim.  They point

21   to the possibility that prices will rise, and say that that

22   shows a Section 7 violation.  But Section 7 does not condemn

23   price increases, nor does it condemn price increases that

24   result from mergers.  Section 7 forbids mergers where the

25   effect may be substantially to lessen competition.  And when

 1    courts have talked about substantial lessening of competition,

 2    they have talked about the ability to raise prices above a

 3    competitive level.

 4          Plaintiffs have not argued and they cannot prove that

 5    ProMedica is currently achieving supra competitive prices and

 6    as will be discussed in much greater detail later, they're not

 7    going to be able to show that they're likely to be able to

 8    raise prices to a supra competitive level as a result of the

 9    merger.

10          The next question in front of the judge on~-- in

11    front of the Court, I beg your pardon, on the Section 13 fee,

12    is weighing the equities.  In addition to considering whether

13    Plaintiffs have demonstrated that they are likely to prevail

14    on the merits, the Court must separately consider whether

15    equities favor entering the injunction.

16          Under Section 53B, the Court may properly consider

17    both public and private equities, and many courts deny

18    preliminary injunctions in hospital merger cases on the

19    grounds that the equities do not support entry of the

20    injunction, even in a case where the Plaintiff has made out a

21    prima facie showing.  That is, in FTC versus Butterworth where

22    the Court denied a preliminary injunction even though they

23    found that the FTC had made its prima facie showing of a

24    Section 7 violation, the Court nevertheless found that the

25    public interest in the likely efficiencies that would be

1  achieved from the consolidation of the two hospitals justified

2  denying the injunction.

3  Also in FTC versus Freeman, the Court denied an

4  injunction on equities ground where one hospital's financial

5  status was such that it might not be in business to complete

6  the merger by the time the FTC concluded its administrative

7  hearing.

8  This Court must weigh the equities and make an

9  independent determination as to whether those equities favor

10  the entry of an injunction, and deny the Plaintiff's request

11  if it finds that they do not.  And that analysis and inquiry

12  is separate from and distinct from the inquiry of whether they

13  are likely to succeed on the merits of their Section 7 claim.

14  And finally, the last legal standard sort of issue

15  has to do with the purpose of the injunction under Section

16  13(b).  Again, Mr. Marx is going to discuss in greater detail

17  the reasons why the evidence demonstrates that an injunction

18  is not necessary here for the reasons that injunctions are

19  required in Section 13(b).  The purpose of an injunction is to

20  avoid the need for intrusive relief later on, since the

21  difficulty of unscrambling the merged assets often precludes

22  an effective order of divestiture.  That's a quote from FTC

23  versus Whole Foods.

24  But here, we submit that an effective order of

25  divestiture can be achieved without the need for the

1    injunction.  Mr. Marx has already mentioned the reasons for

2    that, and there will some additional discussion of it again

3    later.

4            And with that, Your Honor, I'm done, unless you have

5    questions for me.

6            THE COURT:  No, thank you.  You've answered them.

7            MS. CARLETTI:  Good afternoon, Your Honor.  While I

8    have the dubious task of discussing financials and St. Luke's

9    financial viability on August 31st of 2010, I'm going to be

10   speaking for about a half hour.  So we can keep going through.

11   I don't know if you want to take a break?

12           THE COURT:  No, why don't we go ahead and when you're

13   through, we'll take a break.

14           MS. CARLETTI:  Okay.

15           Well, like I said, what I'm going to be discussing

16   for the next half hour or so is St. Luke's financial

17   stability, its viability and its deteriorating financial state

18   as of August 31st of 2010.  And if you actually look at

19   St. Luke's operating expenses over the course of the last

20   decade, you'll see some -- a lot of red on that graph.  You'll

21   note that over the course of the last decade, St. Luke's

22   operating expenses exceeded its net patient revenue every year

23   over the course of the last decade except for four.  And even

24   in the last five years alone, St. Luke's operating expenses

25   exceeded its operating income in every year but one, and that

1   was 2006, when St. Luke's was able to have operating income of

2   about ███████.

3          Ultimately in 2007, though, that number dropped

4   significantly, and St. Luke's recorded an operating loss of

5   ████████.

6          Now, these results don't change if you look at

7   St. Luke's parent company, Ohio Care.  In fact, these results

8   get worse.  In 2007 alone, Ohio Care recorded an operating

9   loss of over ███████.  2008, that number jumped to be an

10  operating loss for Ohio Care of over ████████.  And in

11  2009, Ohio Care recorded over ████████ in operating losses.

12         Now, in the past, up until about 2008, St. Luke's had

13  been able to use its investment income to generate the cash

14  that it needed to operate the hospital.  And oftentimes that

15  masked the hospital's operating losses.  But in 2008, with the

16  market crash, St. Luke's could no longer do that, and it could

17  no longer subsidize its hospital losses with its investment

18  income.

19         Now, prior to the hiring of Dan Wakeman in 2008,

20  St. Luke's tried a number of different things to improve its

21  financial performance, and I will note that it was

22  unsuccessful in doing so.  It laid off employees, it developed

23  a management services organization to try to support

24  independent and additional employed physicians, it

25  renegotiated its payor contracts, it leveraged its investments

1    through leases and short-term financing, and it cut expenses

2    for medical supplies.

3              And the Plaintiff's right, in 2008, St. Luke's

4    brought Dan Wakeman on to try to turn things around.  And when

5    he came onboard he established a three-year strategic plan,

6    with the main goal to try to improve St. Luke's financials and

7    get its declining revenues -- and getting its declining

8    revenues up, but also to try to decrease its costs.

9              And once Wakeman started at St. Luke's, he began

10   implementing additional measures, along with the St. Luke's

11   staff, to try to cut costs in 2008 and 2009.

12             He froze capital spending, with the exception of

13   capital that was necessary for patient safety, patient care,

14   regulatory oversight, the breakdown of necessary assets, or

15   capital expenditures that were needed for very high strategic

16   importance.

17             He also reduced senior management salaries, and he

18   froze the salaries of other staff members.  St. Luke's also

19   froze its hiring for all employees, other than the hiring of

20   replacements of individuals who were related to patient care

21   services and patient safety.  In fact, St. Luke's at the time

22   had developed a committee that would actually review every

23   single individual who St. Luke's was considering hiring and

24   determine whether they should hire that person and whether or

25   not it fit within their goals.

```
 1              At the same time, St. Luke's reduced its paid time
 2     off for employees and required employees to contribute greater
 3     amounts for their health insurance, and actually converted its
 4     defined benefit retirement plan to a defined contribution
 5     retirement plan.
 6              Earlier this morning you heard Mr. Reilly tell you,
 7     this is what everybody was doing.  The economy was going down.
 8     And he's right, companies all over this country were doing
 9     this at the time of the drop in the economy.
10              But there's one key factor that's unique to
11     St. Luke's.  They were cutting themselves down to the bone,
12     and in 2009, St. Luke's Hospital was the only hospital in
13     Toledo that didn't make a profit.  Everybody else did.
14              You also heard a little bit this morning about Dan
15     Wakeman's three-year plan and -- but you didn't really hear a
16     lot of details about what that plan was, and overall, what the
17     strategic initiative was.
18              When Dan Wakeman came to St. Luke's, he developed his
19     three-year strategic goal and it was based off of five
20     pillars, one of which was growth.  The other were things like
21     people, quality, service, finance, corporate initiatives.  A
22     large part of the growth plan, the thing we're really focused
23     on here, entailed removing services from St. Luke's general
24     acute care inpatient offerings and shifting those to
25     outpatient services.
```

```
 1              Now, to the extent that Wakeman succeeded in doing
 2    that, to the extent he succeeded in increasing outpatient
 3    volume, that didn't have any effect on inpatient acute care
 4    revenue.  And that really is the key focus here in this case.
 5    It's the market that the Plaintiffs are focused on, and as
 6    you'll see in a little bit, covering of the cost that
 7    St. Luke's had to provide inpatient care ultimately was the
 8    real problem that St. Luke's had.
 9              And an initiative to try to increase outpatient
10    revenue didn't fix that problem.  And I'll show you some
11    slides in a little bit that actually show you that.
12              Another large element of the growth plan that Dan
13    Wakeman had was to rebuild St. Luke's staff by acquiring
14    additional physician practices.  And this morning Mr. Reilly
15    showed you a slide.  I think it was number 113, which actually
16    showed you Ohio Care's patient revenue, not profits, not
17    EBITDA, but only patient revenue over the last decade or so.
18    And if you notice the large jump he pointed to in 2009, well,
19    that large jump was due to Dan Wakeman's goal of acquiring
20    additional patient practices, and that revenue that came in
21    from that jump --
22              THE COURT:  You mean doctors' practices.
23              MS. CARLETTI:  Sorry, doctors' practice, you're
24    absolutely right.  And the revenue that came in from that
25    large jump, while it did increase Ohio Care's revenue in
```

```
1    general, I believe that everybody here would agree that that

2    growth is not necessarily sustainable.  And so you saw that

3    increase by the acquisition of these additional practices, but

4    it's just not sustainable.

5              THE COURT:  And I presume the increase was, in part,

6    offset by the cost of the acquisition and the continuing cost

7    in some instances of the acquisition.

8              MS. CARLETTI:  Absolutely.  Absolutely.

9              And those costs and the revenue ultimately, I think

10   the financials show, that the revenue that comes in, and

11   you'll see it with the cost coverage issues, ultimately

12   weren't able to cover the cost of care that St. Luke's was

13   providing.  So ultimately, St. Luke's was different from the

14   prior hospitals and the prior turnaround situations that Dan

15   Wakeman had.

16             And we also had a declining economy.  And although

17   Dan Wakeman was unable -- was able to meet some of his goals,

18   he was unable to get St. Luke's financials to the point where

19   it could continue as a viable community hospital servicing

20   this community.

21             And I'll actually show you what those numbers look

22   like, if we could pull the screen back up.  Let's go back to

23   slide two.

24             You see that in 2007, like I said, we had a operating

25   loss of ██████████.  In 2008, that jumped to ██████████.
```

1    In 2009, that plummeted all the way down to ███████████.

2         And I want to point 2009 out to you for a key reason.

3    And that is this morning, if you remember when Mr. Reilly was

4    going through all of the goals that Mr. Wakeman had met, he

5    showed you that Mr. Wakeman had achieved most of those goals

6    by the early half of 2009, and yet, you see that St. Luke's

7    operating losses ███████████ between 2008 and 2009, when he

8    supposedly met every one of the goals.

9         So what was the result of this?  Well, first and

10   foremost, St. Luke's financial performance caused Moody's to

11   downgrade St. Luke's bond rating four grades, and that

12   downgrade happened in just 16 months.  In other words, in just

13   16 months, St. Luke's ability to access capital markets

14   decreased significantly.  And that resulted in an increase of

15   St. Luke's costs of borrowing.

16        Now, Moody's analysis downgrading St. Luke's bond

17   rating is very telling, and ultimately, Mooing's concluded

18   that it was downgrading St. Luke's really for three reasons.

19   First, because St. Luke's had sustained continued operating

20   losses, and those losses ████████████████████████████████

21   ████████████████.

22        The other reason that was a significant factor for

23   Moody's was the fact that St. Luke's had unfavorable

24   commercial payor contracts.  Ultimately, the reimbursement

25   rates it received from its payors just weren't covering its

1    costs.

2          And, finally, Moody's was also concerned, and one of

3    the reasons it cited in its opinion downgrading the bond

4    rating was, St. Luke's depleting cash reserves.

5          Now, the Plaintiffs will argue and have told you that

6    based upon their expert's analysis, St. Luke's rating was

7    going to go up, and their expert, Mr. Bricks, came to that

8    conclusion by doing no independent verification of his own.

9    And I think we've gone through this fully in our Daubert

10   motion, but ultimately, the conclusions that Mr. Bricks comes

11   to regarding St. Luke's bond ratings is really based off of

12   looking at the documents and doing no independent verification

13   of his own.

14         So let's actually look at what Moody said.  Let's go

15   to the next one.  Oh, I'm sorry.  Keep going back.  All the

16   way back to number 7.  There we go.

17         One of the challenges that Moody's identified for

18   St. Luke's in downgrading its bond rating was the fact that it

19   had three consecutive years of operating losses.  And this was

20   the exact state that St. Luke's found itself in at the time of

21   the transaction.

22         Moody's also noted that a continued challenge would

23   be St. Luke's unfavorable commercial contracts and its ongoing

24   challenges with negotiating higher commercial reimbursement

25   rates with its two largest commercial payors, who at the time

1     were MMO and Anthem.

2            And as you can see here, Moody's identifies them as

3     accounting for approximately 22 percent of St. Luke's gross

4     revenue.

5            Later in the report, Moody's notes that St. Luke's

6     inability to negotiate more competitively priced contracts

7     with its payors is one of its challenges, but also that

8     St. Luke's commercial payor rates -- and it's not on this

9     slide, but they said St. Luke's commercial payor rates were,

10    quote, "well under the market medians in the region."

11           The market conditions that St. Luke's faced in Toledo

12    were also among St. Luke's most difficult and important

13    challenges going forward.  As you can see here, Moody's

14    recognized the challenge of competing in this market, and

15    noted it was a very competitive market, with a number of

16    hospitals that were part of two larger and financially

17    stronger systems, ProMedica and Mercy, both of which had

18    higher bond ratings than St. Luke's, and also in both --

19           Next one.

20           And also in St. Luke's primary service area, as well

21    as Toledo at large, St. Luke's faced weak demographics,

22    declining volume trends, high-end employment levels and low

23    median income levels.  This didn't seem like it was going to

24    change, and there didn't seem to be much improvement in sight.

25           Ultimately, Moody's was also concerned about

```
 1    St. Luke's cash reserves and how St. Luke's --

 2             Go ahead.  You can go to the next one.

 3             -- and how St. Luke's decrease in operating cash flow

 4    could result in a depletion of St. Luke's cash reserves.  And,

 5    in fact, Moody's stated this outlook reflects our concern that

 6    cash reserves could decline if operating cash flow deficits

 7    continue.

 8             Now, the issue here with the cash reserves I think is

 9    important, and there wasn't much talked about it this morning,

10    but one of the theories that the Plaintiffs and their expert,

11    Mr. Gabe Dagen, had put forward is that the solution to

12    St. Luke's financial problems at the time were for St. Luke's

13    just to drive down its cash reserves, for it to dip into its

14    unrestricted net assets, and it didn't really matter where the

15    cash came from, just as long as St. Luke's had cash available

16    to spend it on its operations.

17             But this suggestion really ignores the reality of

18    what a reserve is.  It's a safety net.  And if you bleed down

19    that reserve fund, you jeopardize the hospital's future

20    financial viability.  It's exactly what Moody's recognized,

21    too.  And it also ignored the fact that ratings companies like

22    Moody's focus on cash reserves and depleting cash reserves and

23    what the consequences of that could be.

24             And that is a reduction in the hospital's ability to

25    meet its outstanding obligations and borrow the capital
```

1   necessary to continue to invest in its future.  And

2   ultimately, as a result of St. Luke's financial performance in

3   2008 and 2009 and Moody's downgrade of St. Luke's bond rating,

4   St. Luke's violated its refunding bonds.

5          And at the time, St. Luke's had approximately

6   $8.3 million outstanding for the refunding bonds that the City

7   of Maumee had issued on St. Luke's behalf.  These were insured

8   by Ambac (phonetic).  At the time, Ambac issued a notice of

9   default which actually gave Ambac the right to call the

10  balance of the bonds.  But the only way that Ambac granted a

11  waiver of that default was the closing of this joinder with

12  ProMedica.

13         St. Luke's financial performance and its operating

14  losses also affected its ability to make necessary capital

15  expenditures so that it could keep up with both patient care

16  and healthcare reform.  As you might be aware, healthcare

17  reform requires quote-unquote meaningful use of electronic

18  medical records, or EMR systems by 2015.  And if a hospital

19  doesn't meet that requirement, it will face cuts in its

20  Medicare reimbursement.

21         Even with federal stimulus funds, St. Luke's did not

22  have the capital that was required to purchase, to implement,

23  or to support the infrastructure, systems and personnel

24  required for an EMR.  But that wasn't it.  St. Luke's had a

25  nurse call system that experienced regular downtime, and the

1    manufacturer no longer supported the system.  But in August of

2    2010, St. Luke's didn't have the $700,000 available to install

3    a new system, and, in fact, had deferred the installation of

4    that system indefinitely.

5         Also, the radiographic surgery tables that surgeons

6    at St. Luke's uses to guide them through certain procedures

7    were beyond their useful life at St. Luke's.  But, again,

8    St. Luke's didn't have the $450,000 necessary to invest in

9    these assets.

10        Same is true for its air handler.  It needed a new

11   air handler for its heating and air conditioning system.  It

12   is beyond its normal life.  But, again, St. Luke's didn't have

13   the $250,000 necessary to buy a new one and has deferred

14   investment in it until 2012, which is risking heating and air

15   conditioning outages at the hospital.

16        The 11 birthing beds -- there are 11 birthing beds

17   that St. Luke's uses that are currently over 10 years old and

18   are past their useful life.  New beds would cost $110,000, but

19   this purchase has now been put off indefinitely because

20   St. Luke's doesn't have the money to pay for it.

21        The same is true for a $50,000 parking lot repair.

22   St. Luke's didn't have the funds to be able to repair this.

23        And as you've heard a lot about, St. Luke's could not

24   sufficiently fund its defined benefit or pension plan for its

25   retirees.  At the time of the joinder, St. Luke's faced an

1    unfunded pension liability of ██████.

2            Can we go back for a second?

3            Let me be clear about one thing.  We are not

4    asserting a failing firm defense in this case.  But the

5    financial liability of St. Luke's at the time of the joinder

6    is relevant, and it's relevant to the issue of St. Luke's

7    competitive significance in this market.  It's relevant to how

8    St. Luke's was perceived by the market, other competitors, the

9    payors, employees and the patients that it served.

10           And can we pull up the next slide but not show it to

11   the gallery?

12           As you can see here in June of 2010, one of

13   St. Luke's competitors recognized its financial difficulties

14   and the consequences that those financial difficulties might

15   have on St. Luke's business.  I'm not going to name who this

16   was, but I will quote part of it to you.  And it says, there

17   are multiple issues including theirs, St. Luke's, very poor

18   financial help.  Their pension obligations were unfunded by

19   over ██████, and year to date, they have an operating

20   loss of ██████.  Apparently, they have no action plan to

21   deal with either one of these.

22           Even though, as the Plaintiffs have pointed out,

23   St. Luke's has treated an increasing number of inpatients and

24   outpatients, it still could not make up for this operating

25   shortfall.  And that's because the turnaround measures that

1    Dan Wakeman and St. Luke's tried to implement never solved the

2    real problem.  It never solved the fact that St. Luke's

3    contracts with its commercial payors weren't covering its

4    costs.

5           You heard a lot this morning about revenues.  You

6    heard a lot this morning about increasing in volumes, but you

7    never heard anything about the other side of that coin, and

8    that is what it took to pay for St. Luke's to provide those

9    services.

10          Now, St. Luke's was unable to do what hospitals both

11   in and out of Toledo are able to do in their contracts with

12   commercial payors.  They were able -- they weren't able to

13   negotiate the best rates possible so that they could, at a

14   minimum --

15          And let's pull up the slide but not show it to the

16   gallery.

17          St. Luke's was unable to do what everybody else in

18   and out of Toledo tried to do, which was get the highest

19   possible reimbursement rates to cover their indirect and

20   direct costs, but also allow it to generate a small operating

21   margin that would allow the hospital to support indigent and

22   charity care, as well as invest in its own future.

23          And as you can see by this slide, and I'll give you a

24   chance to look at that --

25          THE COURT:  All right.  Thank you.

1          MS. CARLETTI:  -- as well as the next one, which is
2     another slide, that's the exact goal of what other hospitals
3     in the area were doing.
4          Okay.  Let's pull up now 16, please.
5          And like I said, you saw a lot this morning about
6     revenues and the fact that in 2009, St. Luke's received just
7     over ████████████ in total payments, but you never heard about
8     the other side, which is that in 2009, it cost St. Luke's over
9     ████████████ to provide those services.  Ultimately, it had a
10    ████████████ deficit between total reimbursements and total
11    costs in 2009 alone.
12         That ultimately resulted in a cost coverage ratio of
13    ████████████.  What does that mean?  Well, for every dollar that
14    St. Luke's spent on treating a patient, it only collected ██
15    ████████.  And that was in 2009.
16         And what I want to point out about 2009 is that for
17    the first half of 2009 St. Luke's was not in Anthem's network.
18    It was receiving out-of-network rates from Anthem.  And as
19    you'll see in a little bit, Anthem was one of its top four
20    payors.  So ultimately, for the first half of the year it was
21    receiving higher rates than what it ultimately got in the last
22    half of the year.
23         And if you actually look at Anthem's cost coverage
24    ratio for St. Luke's in 2010, a year in which St. Luke's was
25    part of the Anthem network for the whole year, St. Luke's cost

1  coverage ratio with Anthem in 2010 was less than a hundred

2  percent, ███████████████.

3         So let's actually turn to the next slide and talk a

4  little bit about payors.  The one thing I do want to note is

5  that St. Luke's cost coverage ratio in 2009 was ███████████.

6  That's the year in which Dan Wakeman supposedly met most of

7  his goals.

8         But the cost coverage ratio over time at St. Luke's

9  had decreased.  If you looked at 2006, St. Luke's cost

10 coverage ratio for all of its payors was ████████.  In 2009,

11 that decreased to ████████████.

12        Now, that ████████████ cost coverage ratio in 2006

13 includes Medicare, Medicaid, Charity Care, entities that

14 St. Luke's doesn't negotiate its reimbursement rates.  So if

15 you actually take those out, you take out Medicare, Medicaid

16 and Charity Care, St. Luke's cost coverage ratios from 2006 to

17 2009 follow the exact same trajectory.

18        In 2006, the cost coverage ratio, excluding those

19 entities, was ███████████, and that dropped to ██████████ in

20 2009.

21        Ultimately, what does that mean?  Well, St. Luke's

22 commercial contracts were unable to contribute towards its

23 cost, and it was insufficient to support Medicare, Medicaid

24 and Charity Care, as well as St. Luke's investment in its

25 future.

1          And that's significant, because as you can see here,

2     out of the total pool of St. Luke's largest payors and the

3     charges that it made for general acute care medical services,

4     in 2009, ███████ of its total charges for general acute

5     medical services were with four payors:  Medicare, Medicaid,

6     and then its two largest commercial payors, MMO and Anthem.

7          And in 2009, three of those payors had cost coverage

8     ratios less than a hundred percent.  And as we were just

9     talking about a few minutes ago, Anthem was above a hundred

10    percent, although that number reflects the fact that it

11    received higher out-of-network rates for the first half of the

12    year, and if you look at its 2010 number, it also is below a

13    hundred percent.

14         And I want to use MMO as a quick example to show you

15    this decline in the trajectory of the cost coverage ratios and

16    how things just got worse even after Dan Wakeman came in with

17    his turnaround plan.

18         In 2006, MMO's cost coverage ratio was ███████.

19    It was meeting its costs but it was just barely doing it.  In

20    2009, that dropped to ██████.  And this also happened with

21    most of St. Luke's other payors.  You have the exact same

22    trajectory downward.

23         And, again, as I note here on the slide, the Anthem

24    numbers for 2009, again, are just over a hundred percent, but

25    those reflect out-of-network rates.

1      I'd like to show you this point in another way, which

2  ultimately is that St. Luke's couldn't cover the cost of care

3  for its services.  And I'll break this out by inpatient and

4  outpatient.

5      In 2009, MMO, St. Luke's largest commercial payor, on

6  average for every inpatient that St. Luke's saw, it lost over

7  ███.  For every outpatient it made ███.

8      For Anthem, if you look at its in-network rates from

9  July 1st, 2009, to December 31st, 2009, on average for every

10  inpatient that St. Luke's saw, it lost over ███, and the ███

11  per outpatient it made was nowhere near able to cover that

12  deficit.

13      In general, St. Luke's inpatient rates were

14  approximately ██ percent below market average on a per diem

15  basis and ███ percent on a case rate basis.

16      In St. Luke's situation, where its inpatient rates

17  were so far below market and its cost coverage ratios for

18  commercial payors were below a hundred percent, any increase

19  in patient volume, no matter how high it was, and the focus of

20  the Plaintiffs of increase in revenue and increase in volume

21  doesn't take this into consideration.  Any increase in volume

22  was not going to make up this difference, it just wasn't.

23      THE COURT:  To what do you attribute the tremendous

24  differential in inpatient?

25      MS. CARLETTI:  I think just the higher cost and the

1    inability to recover those costs and the rates that they were

2    receiving.

3              THE COURT:  Inability --

4              MS. CARLETTI:  Uh-huh.

5              THE COURT:  Inadequate negotiating ing posture.

6              MS. CARLETTI:  That, and the fact -- and this is

7    exactly what I was getting to.  When St. Luke's went to these

8    commercial payors, when it realized this problem, it went to

9    MMO and Anthem and it said, look, we need to increase our

10   rates.  We need to do it so we can continue to remain a viable

11   stand-alone community hospital.  And MMO and Anthem told them

12   no, they weren't significant enough, they weren't going to do

13   it.  They weren't going to increase those rates.

14             And you know, the intent in those negotiations was to

15   simply secure interim rate increases that would at least cover

16   St. Luke's cost of treating Anthem and MMO patients.  And the

17   intent there was to increase those rates 'til the end of the

18   contract and then sit down again and try to increase those

19   rates once again.  Because fundamentally this was the problem.

20   It wasn't trying to cut costs.  You know, they tried to cut

21   costs.  It didn't work.  And ultimately, the problem here was

22   trying to get those reimbursement rates up.  And it didn't

23   work.

24             And once St. Luke's and Dan Wakeman realized that and

25   tried to fix it, they couldn't do anything else.  You know,

1   this is what I was moving into next, but they looked at other

2   options.  They looked at reducing their workforce.  They

3   looked at reducing salaries and wages by $6 million and

4   reducing their benefits by 31 percent.  But it wasn't going to

5   get them to break even.

6          They looked at cutting these services, obstetrics,

7   cardiac services, the diabetes center, you know, all of these

8   services where the reimbursements and the revenues that

9   St. Luke's took in under its payor contracts didn't positively

10  contribute to its finances.

11         But even cutting these services wouldn't have taken

12  St. Luke's to a break even point.  And, in fact, it would have

13  detrimentally affected the community.  It would have resulted

14  in a reduction of 25 percent of St. Luke's staff.

15         So in the end, St. Luke's was bleeding.  And in the

16  words of Dan Wakeman, as of December 15th 2009, St. Luke's was

17  in a dire financial position.  It couldn't change its rates

18  with its payors.

19         Now, obviously the Plaintiffs dispute this, and based

20  upon their expert's analysis, they argue that St. Luke's was

21  going to turn the tides, it was going to have positive --

22  operate in positive cash flows and it was going to be able to

23  do that through 2013.  I would submit to you that these

24  conclusions are really sensitive to the assumptions that Dagen

25  makes in coming up with these projections.

1          One of which was the fact that St. Luke's expenses

2     were only going to grow by about three percent.  And this

3     projection, from what I understand of it, is based upon some

4     document that Mr. Dagen reviewed that he said was a St. Luke's

5     document, but I'll submit to you that I have no idea what that

6     document is.  I have no idea who created it.  We don't know

7     why it was created, when it was created, whether it was

8     official budgeting document, frankly, what the document even

9     is.

10         And that's because in his analysis, Mr. Dagen never

11    talked to anybody at St. Luke's about it.  And in all those

12    depositions and investigational hearing transcripts that

13    Mr. Reilly told you he's submitting as part of this hearing,

14    in not a single one of those did the Plaintiffs or the FTC

15    ever ask any St. Luke's employee about this purported

16    document.

17         And so it's -- in other words, these financial

18    calculations and the prediction that Plaintiffs have and that

19    their expert has that, you know, things were going to get

20    better for St. Luke's, are based off of some document that

21    their expert has never independently verified.

22         You know, it's significant, because when these

23    assumptions don't really fit with reality -- and, Mike, if you

24    can pull back slide two -- it's clear looking at this and

25    looking at, you know, operating income and the losses, from

1    2007 through 2009, St. Luke's expenses rose faster than its

2    revenue.  And that was continuing in 2010.

3         So this notion to suggest that all of a sudden what's

4    happened over the last three years -- and, you know, if you

5    look back, the last five years, to suggest that this was going

6    to change dramatically and things were going to be okay for

7    St. Luke's, it -- it should have given Mr. Dagen pause.

8         You know, the evidence here belies the fact that

9    St. Luke's would have achieved the dramatic turnaround that

10   the Plaintiffs are arguing would happen here.

11        You know, if we can go to -- there we go.

12        Even Dan Wakeman himself admitted that although he

13   was successful with many of these three-year goals, he was

14   unable to meet very -- one very important goal, and that was

15   financial performance.

16        No one here is saying that Mr. Wakeman didn't do a

17   good job, but in the end, St. Luke's was unable to fix the

18   real problem that it had, which was its inability to cover the

19   cost of its inpatient care with its current commercial

20   reimbursement rates, and it particularly couldn't fix that

21   problem when the payors wouldn't negotiate with it.

22        You know, at the time of this joinder, St. Luke's

23   faced a competitive market with weak demographics, declining

24   volume trends, high unemployment, low median incomes and

25   reimbursement rates that just didn't keep up with the cost of

1    providing inpatient care.

2         And as you'll see by his very own words, as

3    Mr. Wakeman predicted, in the end, notwithstanding all other

4    events, if St. Luke's had to stand alone in August of 2010,

5    the hospital would have been out of business in three to four

6    years.

7         So if you don't have any other questions, that's it.

8         THE COURT:  Leave that up for a minute.

9         Thank you.

10        We'll take a 10-minute break now.

11   (A recess was taken from 3:13 p.m. to 3:25 p.m., after

12   which the following proceedings were had:)

13        THE COURT:  Thank you, ladies and gentlemen.  Please

14   be seated.

15        Go right ahead, Mr. Marx.  I can hear you from here.

16        MR. MARX:  I want to spend the next 40 or 45 minutes,

17   if I can contain myself, talking about the nature and history

18   of competition in the relevant markets that the Government has

19   alleged, and the competitive effects of the joinder on those

20   markets.  And there are several reasons why the market shares

21   and concentration levels on which the Government focuses are

22   not enough to establish a likelihood that the Plaintiffs can

23   prove that the joinder will violate Clayton Act, Section 7.

24        First, ProMedica and Mercy are each other's closest

25   competitors in the Toledo market for general acute care

1    inpatient and OB services.  And, as such, Mercy will constrain

2    ProMedica's ability to exercise market power if it dared to

3    try.

4            Second, St. Luke's simply isn't in the same

5    competitive sphere as Mercy and ProMedica are.  It does not

6    offer any unique services.  It doesn't have a unique location

7    that make it a must-have for employers or payors.  And if you

8    look at the declarations that the Government provided and even

9    some that we provided, you'll see they almost all describe

10   Mercy or ProMedica as a must-have system.  UTMC is a must-have

11   system because of the high level tertiary and quaternary care,

12   q-u-a-t-e-r-n-a-r-y, I think.

13           But St. Luke's is never described as a must-have

14   system.  It's not in the same competitive sphere as ProMedica

15   and Mercy.

16           THE COURT:  Well, true, but both Mercy and ProMedica

17   have, or have had, or are in the process, I would guess, of

18   seeking land for expansion in southwest Toledo, southwest

19   Lucas County, because of their absence from that quadrant.

20   And what impact will that have on the community, St. Luke's,

21   and the remaining three competitors?

22           MR. MARX:  You're exactly right.  ProMedica has land

23   at Arrowhead, Mercy has land, Strayer land, and of course,

24   UTMC is located right there anyway.  And they're expanding in

25   various different ways, and they each have strategies for

1    addressing the southwestern portion of the marketplace to try

2    and attract more patients from there.

3          And as Mercy and ProMedica expand their operations,

4    expand the range of services and the way that they deliver

5    services in the southwestern portion, they will continue to

6    constrain each other.  They're not going to be able to

7    exercise market power.  They're not going to be able to raise

8    prices above competitive levels because they're right there

9    competing against each other.

10         The effect on St. Luke's, however, would be that

11   St. Luke's would find it harder -- even harder to compete than

12   its found itself so far.  And that is because it doesn't offer

13   anything unique.

14         Is Maumee a desirable part of the marketplace?

15   Absolutely.  But let's be clear about this.  While the

16   Government wants you to focus on St. Luke's core service area

17   where it draws 90 percent of its patients, the reality is

18   that's just a part of the relevant market.  And if they're

19   going to define the relevant market as Lucas County, what

20   they're essentially saying is from a patient's perspective,

21   any of the hospitals in Lucas County are reasonably

22   interchangeable with each other.  So if a patient wants to go

23   to St. Luke's but for some reason ProMedica attempts to raise

24   St. Luke's rates above competitive levels, well, they can go

25   to Mercy Hospital that's in Lucas County, they can go to UTMC.

1   They may prefer, patients may prefer to go to the closest

2   hospital.

3          But let me just give you --

4          THE COURT:  Unless they're driven by the payor.

5          MR. MARX:  But payors can, and will, if they need to,

6   incentivize patients to seek the lower-cost provider.

7          For example, we know, we know that -- what's the best

8   way to put this without disclosing information I shouldn't be

9   disclosing?  We know that there is a parent of somebody who --

10  of a competitor in Toledo that actually does have as part of

11  its health plan, tiering.  So it encourages its members to go

12  to hospitals that are lower cost by covering a higher

13  percentage of their healthcare than if they go to, say, a

14  second tier provider in the network.

15         We know that there's another payor, because the

16  depositions last week disclosed it.  I won't tell you who it

17  is publicly, but I'll tell you who it is privately in the

18  stuff we submit, that has a pilot program now that's intended

19  to incentivize and steer.  I don't like the use of that term,

20  but that really is -- to steer patients to lower cost

21  providers.

22         We know that even -- and I can't remember whether

23  it's -- and this is a matter of public record so I'm not going

24  to be disclosing anything confidential -- I don't remember if

25  it's Anthem or MMO that has some feature on its website that

1    allows patients to check and see which of the providers in its

2    network is lower cost.  Now, is that a steering mechanism?

3    Not yet, but it's the first step in trying to, I think,

4    condition members to think more about the cost of the care

5    that they're seeking.

6         And the problem here for St. Luke's, as the

7    competitors respond, is that -- and that's what -- and that's

8    what Mercy and ProMedica are doing as they expand their

9    operations in southwest Ohio, the payors will have the ability

10   to steer their members.  And they're not going to need to

11   steer them to St. Luke's because they can't -- they can get

12   everything they want from somebody else.  And that's really

13   been the problem.

14        And payors are well equipped to defeat any attempt by

15   ProMedica to exercise market power.  We know, we know that

16   payers have demonstrated the ability to market a network

17   without one of the two multi-hospital systems.  They've done

18   it in the past, and there's no reason to believe that they

19   couldn't do it in the future if ProMedica attempts to raise

20   St. Luke's prices to anticompetitive levels.

21        And, again, while the Government downplays it, the

22   fact that there is excess capacity in the market in place, and

23   the fact that physicians in Toledo -- and this is a little bit

24   different than you find in, I think, lots of other cities

25   where I've been involved in investigations -- physicians in

1    Toledo are members of all the -- they practice at all the

2    hospitals, and they actually practice at all the hospitals.

3    They're credentialed there.  Not all of them at all of them,

4    but a lot of them at all of them.

5            And what that means is if a payor has a patient and

6    that patient's physician probably has the ability to treat the

7    patient at a Mercy hospital or at a ProMedica hospital or UTMC

8    and maybe even St. Luke's, so if ProMedica tries to increase

9    rates the payor can say, look, you don't have to change your

10   physician, your physician can treat you at Mercy.

11           THE COURT:  It's changing again, as it did 15, 16

12   years ago, because of the acquisition of practices and as part

13   of those acquisitions saying you may only admit to this

14   hospital.

15           MR. MARX:  Fair point.

16           And, you know, we checked that, because we wanted to

17   know whether or not with, for example, Mercy's employed

18   physicians -- and as you know, they employ about a hundred,

19   and they're acquiring more physician practices.

20           UTMC, of course, has its faculty practice plan, and

21   it employs those physicians.

22           And, of course, ProMedica's physician group employs a

23   couple of hundred private primary care and specialty

24   physicians.

25           But we checked to see whether or not even those

```
 1    employed physicians were credentialed and practiced at other

 2    hospitals, and frankly surprising to me, but true, they do.

 3    So ProMedica doesn't restrict its physicians from practicing

 4    at other hospitals.  Indeed, many physicians from the

 5    ProMedica physicians group practiced at St. Luke's before this

 6    joinder, just like they admit some patients to Mercy.  Same

 7    thing is true for some of the Mercy physicians.  That's one of

 8    the unique characteristics about the Toledo market that make

 9    this market share and concentration analysis that the

10    Government wants to rely on less -- an inadequate predictor of

11    future competitive performance.

12           In other situations, other markets, I might say,

13    well, that might be a factor.  But separately, as well, of

14    course, there are -- there remain lots of independent

15    physicians who have privileges at multiple hospitals and will

16    treat patients.

17           And one of the things that we see, there was a

18    study -- in our post-trial findings, I'll get you the --

19    there's too many things for me to remember to give it to you

20    precisely -- but there was a study as to why it is that

21    patients select their hospitals.  And the most important

22    criteria was not the hospital I think is what this showed,

23    it's the physician.  And one of the beauties about this market

24    is, the physicians practice in multiple hospitals.

25           So it's not a situation where ProMedica can say take
```

```
 1     us or you don't get treated.  You can take us, and if you take
 2     us you can get treated at our hospitals and now St. Luke's,
 3     and payors have the ability to say, no, you're trying to
 4     charge us too much, and their members' physicians will still
 5     be able to admit their patients someplace else.
 6                THE COURT:  Sorry to interrupt.
 7                MR. MARX:  No, that's okay.  Anytime you have a
 8     question.
 9                There's simply no evidence here -- oh, I started to
10     talk about the excess capacity.  The excess capacity is
11     important because it demonstrates that if ProMedica and
12     St. Luke's, after the joinder, can't reach an agreement with a
13     payor, the excess capacity establishes that the payor~-- the
14     other hospitals could pick up the slack and treat the patients
15     from -- that otherwise ProMedica or St. Luke's would treat.
16     The payor doesn't need to worry about where am I going to send
17     my patients.  There's plenty of excess capacity at Mercy and
18     UTMC.
19                Using raw market share percentages to infer market
20     power, Your Honor, simply overstates St. Luke's competitive
21     significance.  The reality is -- I don't like to say it this
22     way, but it's true -- St. Luke's has been a bit player in a
23     market where ProMedica and Mercy are the major players.  This
24     market has an overabundance of capacity, which, by the way,
25     increases costs.
```

1          So you wonder why it is, why it is that costs may be,

2     or appear to be higher in Toledo?  It's because we have excess

3     capacity.  We're over-bedded there.  And when you have more

4     beds than you're filling, and you're staffing those beds, you

5     have a cost that you're not recovering for because you're not

6     treating patients.  Or if you're treating the Medicare and

7     Medicaid patients, you're not getting compensated for the

8     cost.

9          And the simple truth is Toledo can't continue to

10    support four independent hospitals and systems.  It's just not

11    big enough.  ProMedica's commitment to continue to maintain

12    and operate St. Luke's as a locally managed and controlled

13    community hospital will benefit that market.

14         THE COURT:  Are you getting your cost figures?  Are

15    you using cost figures from the published costs, or are you

16    using what they're actually charging to those covered by an

17    insurer who is part of a plan?

18         MR. MARX:  We're looking at two elements.  In terms

19    of the development of the cost coverage ratio, we look at the

20    direct and indirect costs of providing the care from our

21    financial statements and those of St. Luke's.  Plus, we look

22    for a margin.

23         On the revenue side, we're looking at what we

24    actually collect from the payors.  That's the way that --

25         THE COURT:  Fine; thank you.

```
1              MR. MARX:  We've talked some about this.  You're
2     familiar with this.  I'll try and click through this a little
3     bit quicker.  Again, you haven't heard as much about Mercy,
4     you know a lot about Mercy, but I have to protect the record a
5     little bit here.  So Mercy, as you know, operates three
6     hospitals in Toledo which are proximately located to the -- to
7     ProMedica.  You're familiar with the area, so you're more
8     familiar with the area than me.  We've got the Toledo
9     hospital, of course, which is the flagship hospital, appears
10    to be located a little bit more centrally up in the north.
11             A little bit north of there we have Flower Hospital.
12    Of course, St. Anne Mercy is located approximately to Flower.
13    St. Vincent Mercy Medical Center, Mercy's flagship hospital is
14    located not far from the Toledo Hospital and then I guess east
15    of the river we have St. Charles Mercy and Bay Park.
16    St. Luke's, of course, is located in that green dot on the
17    south.
18             Now, the Mercy and ProMedica hospitals offer similar
19    services.  They compete vigorously to attract patients to
20    those services.  The Toledo hospital and St. Vincent both
21    provide sophisticated tertiary services, both have a trauma
22    unit and a children's hospital on campus.
23             There's evidence, Your Honor, that Mercy is able to
24    and poised to respond to ProMedica's expansion into the
25    southwest, more directly into the southwest segment of Toledo.
```

1    And given the history of ProMedica's and Mercy's rivalry, it's

2    not surprising, as you point out, that Mercy already owns land

3    just 2 miles from St. Luke's at Strayer Road in at Monclova

4    Township.  And it is well positioned -- it's their words, not

5    mine -- to move forward with its plans to expand its services

6    in southwest Toledo.

7         Indeed, we know that Mercy has already received site

8    plan approval to construct a new 73-bed hospital.  It might

9    not have plans to do that right now, but it doesn't need to

10   build a new hospital to be able to compete effectively in the

11   southwest.  It simply needs to add a couple of primary care

12   physicians for example.

13        I don't know if it's doing that or not, but I

14   wouldn't be surprised if it was.  If it adds a couple of

15   employees, a couple more primary care physicians, then all of

16   a sudden it's better able to compete with ProMedica and

17   St. Luke's after the joinder than perhaps it was before.

18        Now, ProMedica and Mercy have been head-to-head

19   competitors in every important dimension.  And here, I will

20   take the slide.

21        Each offers a full array of general acute care

22   inpatient services, including the most advanced services.  Not

23   quite as advanced perhaps as UTMC, but more advanced than what

24   St. Luke's offers.

25        Each offers general acute care services in three

1    separate but overlapping locations.  Each has taken steps to

2    reposition their services on a systemwide basis so as to

3    deliver their services more efficiently and cost-effectively,

4    as the demographics of the Toledo area have changed.

5            Let me provide an example, because it's something

6    that St. Luke's can't do, Your Honor, on its own.  Mercy

7    eliminated high quality OB services at St. Anne's.  It used to

8    provide OB services at St. Anne's, and it eliminated them

9    there because St. Anne's didn't attract enough patients to

10   sustain a profitable OB service.

11           Instead, what Mercy did was consolidate its OB

12   services at St. Charles and at St. Vincent.  That's the kind

13   of repositioning, reconfiguration of services that Mercy could

14   do because it had three hospitals.  And if it couldn't reach

15   minimum efficient scale, as the economists like to call it, at

16   St. Anne's delivering babies, then it could take that

17   underutilized capacity, consolidate it at St. Charles and at

18   St. Vincent and free up the beds at St. Anne's to provide a

19   different service.  That's what we call repositioning.

20           The problem for St. Luke's is, as Ms. Carletti told

21   you, when the OB services line is losing money because it

22   isn't delivering enough babies to be able to be profitable, or

23   the cardiovascular surgery service line is unprofitable

24   because they're not doing enough cases to be profitable,

25   St. Luke's has only one option.  They have to close the

```
1    service or continue to offer it unprofitably.

2            With ProMedica, they will have the opportunity to

3    consolidate and achieve cost savings that it couldn't do by

4    itself.  And ProMedica engaged Navigant to analyze how

5    ProMedica and St. Luke's can best combine their services in a

6    manner that's cost effective and efficiently serves the

7    community.  That's what Navigant was brought in to do.

8            And one specific example that the FTC has already

9    approved is the consolidation of inpatient rehab services at

10   Flower Hospital.  St. Luke's had underutilized impatient

11   rehab -- we've talked about this a little bit.  Rehab

12   services, they weren't using all of it.  Flower,

13   unfortunately, had a similar situation.

14           By shifting the underutilized rehab beds from St.

15   Luke's to Flower, ProMedica and St. Luke's are enhancing

16   Flower's rehabilitation services, that's good for the

17   community, and they're allowing St. Luke's to re-purpose the

18   newly opened space to accommodate more medical surgical beds.

19           Directly in the market that for reasons that I don't

20   quite understand, the FTC somehow thinks we're going to

21   change.

22           The increase in med surge beds will allow St. Luke's

23   to accept more patients that present to its emergency room and

24   reduce a sometimes unfortunate and unfortunately high

25   emergency room diversion rate.  And as you know, if the beds
```

```
1    in the hospital are filled, then a hospital can't accept new
2    patients into its emergency room because it has no place to
3    put them when they leave the emergency room.  That's what
4    happens when you get diversion.  St. Luke's has had that
5    problem periodically.
6         Changes like that are not the kind of actions
7    St. Luke's can do on its own.  It doesn't have the other
8    facilities to be able to generate those kinds of efficiencies.
9    And that inability to reposition and realign its services is
10   one of the reasons that St. Luke's considered eliminating
11   unprofitable service lines, like OB, cardiac services, its
12   diabetes center, cardiac and pulmonary rehab and tobacco
13   treatment.
14        With ProMedica, St. Luke's can realign its services.
15   That's one of the pro-competitive benefits that St. Luke's
16   joinder with a local system as opposed to a Cleveland Clinic
17   or somebody from Detroit might provide.
18        Now, the parties themselves, third parties, I'm
19   sorry, recognize that ProMedica and Mercy are each other's
20   primary competitors.
21        One of the payors during a deposition that the FTC
22   took said, and I won't identify who it is, in response to the
23   question:
24        In your view, are there particular hospitals that
25   compete more closely with each other than with a broader range
```

1   of hospitals?

2           Answer:  I think the ones I mentioned previously, the

3   lineup between ProMedica and Mercy, and they're very

4   competitive.

5           No surprise, no surprise.  Take a look at how they

6   line up.

7           Although, ProMedica and Mercy are the predominant

8   competitors in Toledo, they face stiff competition -- we

9   haven't heard much about these guys either -- from UTMC.

10          UTMC is an academic teaching hospital that offers

11  almost the same primary and secondary care inpatient hospital

12  services as Mercy and ProMedica and St. Luke's, with the one

13  exception of OB services.  UTMC, as we've said, is the only

14  hospital to offer certain sophisticated quaternary services.

15          St. Luke's doesn't have anything unique to offer.  It

16  provides general acute inpatient care services with only

17  limited tertiary offerings.  I can show you an example of this

18  with the next slide, the top 15.  There we go.

19          Slide seven lists the top 15 diagnostic related

20  groups for St. Luke's in order of the number of -- I think

21  it's the number of commercial discharges.

22          So for OB, I think the number was, gosh, one a day

23  would be about 366 or so commercial discharges.

24          And you can see as you work down that list of DRG

25  groups, with the exception of newborns, where UTMC doesn't

1    offer the service and St. Anne doesn't anymore, every other

2    hospital in the market that the Government has alleged,

3    including Wood County, which I understand is in Wood County,

4    but I leave up there only because it offers OB services, as

5    well, every other hospital offers the same basic services.

6    St. Luke's offers nothing unique.

7             In addition -- next slide, please.

8             The services that St. Luke's is offering, and this is

9    a little messy to read but I'll try to explain it to you, are

10   generally, as you would expect, not as complex as the services

11   that are offered by the competing hospitals.  And the way that

12   you can tell this, although it is a little messy, is

13   St. Luke's is always represented with respect to each of the

14   DRGs listed on the -- DRG groupings listed on the left-hand

15   side, it's the first of the four bars.  And what this slide

16   depicts is the level of complex -- average level of complexity

17   of care delivered by the hospital with respect to that

18   particular service line.

19            So if we look, for example, at, well, pick eye care

20   as a better example, the nervous system for the point I want

21   to make, you can see that St. Luke's hospital has the lowest

22   of the level of acuity, average level of acuity for the four

23   different systems in the market.

24            Same thing is true for ear, nose, mouth, and throat.

25   Gosh, it's also true for respiratory system, true for

```
 1    circulatory system, not quite true for digestive system.

 2          And then there's another slide, as well, that I think

 3    shows a few more of these.  And, again, for most of the

 4    services that are depicted, St. Luke's acuity of care,

 5    complexity of care is a little bit lower.

 6          THE COURT:  You do recognize that certain judges are

 7    red-green colorblind?

 8          MR. MARX:  That's why I wanted to tell you, Your

 9    Honor, that St. Luke's is the one on the top, and to the

10    extent that its line doesn't extend that far to the right, it

11    proves my point.

12          I live with someone who's colorblind, Your Honor, a

13    little bit colorblind.  You can imagine what it's like trying

14    to pick out clothes.

15          St. Luke's, besides not offering patients a unique

16    set of services, also doesn't offer patients a unique location

17    that would make it a must-have provider.  None of the hospital

18    facilities in Toledo are more than a 25-minute drive from each

19    other, and they're all pretty well connected by highways.

20          As a practical matter, St. Luke's location is not so

21    important or distinct as to require its inclusion in a

22    network.

23          And I can't help but point out if St. Luke's had

24    something that was unique, if it was so important to payors in

25    Toledo, then you would see its market share be higher.  And,
```

```
1    frankly, I would think that you would have seen the rates that
2    it was charging before higher, because it would have been more
3    valuable than it was.  You don't see that.
4          And if we look at -- if we look at -- and the
5    Government likes to focus on this a lot, where it is that
6    St. Luke's draws its patients from, it draws them from a very
7    narrow area.  Now, I know this doesn't look like a narrow
8    area, but I'll explain to you how we get there in a minute.
9          This is most of Lucas County, but it's St. Luke's
10   90 percent service area.  This is where it draws 90 percent of
11   its patients.  As a practical matter, I think if we focused it
12   even more, you'd see that most of the patients are drawn from
13   a core service area closer in around the hospital.
14         But if you compare where St. Luke's draws its
15   patients from with, say, where -- what's the next one that you
16   want to bring up -- oh, let's compare it to Mercy.  We've
17   overlaid Mercy's 90 percent service area on top of St. Luke's.
18   So all of the red and purple -- well, I'll tell you, this
19   right here -- well, you can't see that.  That blue is the area
20   that represents part of St. Luke's 90 percent service area
21   from which -- it isn't part of Mercy's 90 percent service
22   area.  The point of this chart is to show you Mercy dwarfs --
23   Mercy's 90 percent service area dwarfs St. Luke's 90 percent
24   service area.  It draws from a much, much wider area.
25         I could show you the same things, but I'm not.  I
```

1    could show you the same things for UTMC, and for ProMedica.

2    But instead, I want to focus you on what I think is slide 17.

3    No, it's not slide -- yeah, there we go, slide 17.

4         Let's back up to slide 16.  Slide 16 shows the total

5    discharges within St. Luke's 90 percent service area for the

6    DRGs in which St. Luke's has three or more commercial

7    discharges.  This was in 2008.

8         And the point of this slide is to show you that

9    within that 90 percent service area where St. Luke's draws

10   90 percent of its patients, it had 2573 commercially-insured

11   admissions.  But Mercy had, gosh, more than twice as many from

12   that same area.  And ProMedica had even more.

13        The point here is that Mercy is the smallest -- I'm

14   sorry, St. Luke's is the smallest, even within the service --

15   the 90 percent service area from which it's drawing its

16   patients.

17        Let me see if I can show you, as well, what this

18   means in terms of patients' willingness to travel from

19   St. Luke's primary service area to outside.

20        And if you look at this chart, the red on the left

21   represents sort of the -- the map represents, is intended to

22   depict the number of patients who travel, frankly, from west

23   to east, who are willing to leave where St. Luke's is located

24   to get care further away.  And what we see generally for

25   general acute care patients is -- and this is -- St. Luke's as

1    compared to Mercy, as it turns out, there were 802 discharges

2    from July 2009 until March 2010 that, from Mercy on the east,

3    of patients who came from the western part of this geographic

4    market.

5              In contrast, St. Luke's only drew 238 patients to

6    itself from the eastern part.  So patients are willing to go

7    from St. Luke's primary service area outside to where Mercy

8    and ProMedica and UTMC have their hospitals.

9              So this travel issue is not -- it's just not a big

10   deal.  Patients will go where they need to go to get care.

11             THE COURT:  But within the 90 percent area.  A

12   combined would be 68 to 32.

13             MR. MARX:  Well, in this 90 percent area, the area

14   that we're looking at represents the area from which

15   St. Luke's draws 90 percent of its patients.  This isn't

16   really market share.  This is -- so that's the . . .

17             Now, if we -- if we focus on the fact -- we turn now

18   to the question of whether or not St. Luke's really is

19   ProMedica's primary rival.  We've talked some already about

20   the fact that St. Luke's has a low volume of

21   commercially-insured patients.  Most of its discharges --

22             Next slide, I think.

23             Most of its patients -- keep going.  No, back up.

24   There you go.

25             Most of St. Luke's patients are government paid

```
 1    patients.  Sixty-three percent of St. Luke's inpatient
 2    discharges in 2007 were government pay, charity or other care.
 3    Only 36.4 percent of St. Luke's patients were commercially
 4    insured in 2007, 3700 patients, about 10 a day.
 5            In 2008, the payor mix deteriorated a little bit for
 6    St. Luke's.  The commercial pay, commercially insured patients
 7    dropped from 36.4 to 35.4.  And this is a trend I don't think
 8    the Government's going to point you to.
 9            In 2009, the payor mix deteriorated again for
10    St. Luke's when its commercially insured patients dropped to
11    34.7 percent.
12            And that's important, obviously, because the
13    Government pay patients have a lower cost coverage ratio than
14    even the low cost coverage ratio that St. Luke's was getting
15    for commercial pay patients, which means that it has -- that's
16    what creates the -- that's what created the big long red bar
17    that Ms. Carletti was showing.
18            Now, with respect to OB services -- let's flip a
19    couple slides down then.  There we go.
20            With respect to OB services, newborns delivered in
21    2009, St. Luke's had only 353 commercially-insured newborn
22    deliveries.  Again, less than one a day.  Now, interestingly
23    about this number -- let's go back one.  We should have a
24    total discharges, don't we?  Do we have total newborn
25    discharges back one, or no?  Yes, we do.
```

1          This slide, Your Honor, represents St. Luke's total

2     newborn discharges in 2009.  It shows that they -- there were

3     527 babies born at St. Luke's altogether.

4          In order to be able to run a profitable OB program,

5     newborns program, you need 700 to 800 deliveries.  St. Luke's

6     isn't anywhere near the minimum efficient scale required to

7     have a profitable OB program.  And, of course, of these 527

8     newborns, the next slide should show you -- I thought we had

9     the 353.  There you go.  353 were commercially insured.

10          Now, I know that the Plaintiffs are going to cite to

11     you Mr. Wakeman's statements regarding the volume of OB

12     patients at St. Luke's being so great that they didn't have

13     enough rooms to provide services to its patients.  You should

14     be aware that in March 2010, there were more babies born at

15     St. Luke's in any one month than had ever been born there

16     before, as best we can tell, and have been born there since.

17     So in March 2010 it's true, they were working at capacity for

18     OB services for newborns.

19          Now, the other point that's important, however, is

20     that St. Luke's is the only hospital in Toledo that has OB

21     beds that are unstaffed.  All of the other hospitals in Toledo

22     that deliver newborns staff their -- that section of the

23     hospital at a hundred percent of their licensed beds.

24     St. Luke's didn't.  So it actually -- had it staffed those

25     beds at a hundred percent instead of what it was doing, it

1    would have had more capacity.  It wouldn't have been bursting

2    as much as . . .

3         Now, to suggest that the joinder will grant ProMedica

4    newfound market power to demand anticompetitive rates ignores

5    the realities of payor networks in Toledo.  Payors have

6    leverage to negotiate favorable rates.  They have more

7    leverage based on the size of their membership and thus the

8    amount of dollars they pay to a particular hospital.  That

9    comes as no surprise.  The bigger the payor, the better the

10   rates it's going to be able to negotiate.

11        And we know from past experience that the payors have

12   been able to market networks that didn't include all of the

13   providers.  Until 2008, that's the way it was.  MMO contracted

14   with Mercy, UTMC and St. Luke's, Anthem contracted with

15   ProMedica and UTMC.  And, of course, ProMedica Paramount

16   contracted with ProMedica and UTMC, as well.

17        And all of these plans were successful.  They all

18   grew, they were able to market their health plans to employers

19   successfully in the marketplace.

20        Interestingly enough, there were some plans that were

21   open network that had all four providers.  And you would

22   think, you would think that if having open access was so

23   important, plans like Aetna, for example, would have been much

24   more successful than they've turned out to be.  They had all

25   the hospitals in their network.  But for whatever reason, they

1    weren't able to increase their market share terribly much.

2    Were they able to compete?  Yes, but as a practical matter, I

3    think their market share now may be what, about, what are we,

4    nine or 10 percent?  There should be a pie chart there

5    someplace that will reflect that, and I will find it for you.

6    Twenty-eight.  Aetna's eight percent.

7            And for all this period of time, even when the others

8    only had -- only had networks consisting of one of the two big

9    systems, and UTMC, or and UTMC and St. Luke's, Aetna had them

10   all.  I think Frontpath may have had them all, too.  And they

11   weren't able to demonstrate -- St. Luke's certainly didn't add

12   enough for them to increase their share to the level that MMO,

13   Anthem and Paramount had attained with their narrower

14   networks.

15           So the whole notion that it would be impossible for

16   payors to market a narrower network today, well, I don't

17   disagree with the notion that consumers prefer more choice.

18   If the tradeoff is between choice or having to pay more, I

19   think Paramount's success demonstrates that employers are

20   willing to take a little bit less choice if that's the option.

21           Give me just a moment, Your Honor.  I'm trying to see

22   what I can skip that we've already covered.  I keep stealing

23   my colleague's time, and I'm cognizant of the 5:00 o'clock

24   hard stop.

25           I want to point out something in particular as it

1    relates to something we talked about earlier, and that is the

2    overlap of physicians.  Again, distinguishing this

3    marketplace, the overlap of physicians among the different

4    health plans makes it easier for them to -- for the health

5    plans to encourage patients to treat -- to get treatment at

6    other hospitals in the event that ProMedica attempts to

7    exercise market power by raising prices above competitive

8    levels.

9            I think that we've got a slide that should show, I

10   think -- oh, yeah, we do.  Slide 36 for just a second.

11           The review that Ms. Guerin-Calvert, who, by the way,

12   was the economic expert who testified in the Long Island

13   Jewish case, so it's not like she doesn't have a history of

14   accurately assessing competitive effects in hospital merger

15   cases that courts have decided, when they looked at -- when

16   Meg and her colleagues looked at the physician overlaps, what

17   we did see was that physicians tend to practice at multiple

18   hospitals.  We wanted to look specifically at the issue for OB

19   services, and that should be the next slide.  And I guess

20   we're not going to let everybody see that, but you can see

21   that on your monitor, I think, and I can see it if I look at

22   the page.

23           There are 19 OBs who admitted patients to St. Luke's

24   during this time period, 2007 to 2009.  Of the 19

25   obstetricians who admitted patients to St. Luke's, virtually

1    all of them admitted patients to Mercy.  You can see that if

2    you look at the distribution of numbers over the years.  And

3    11 of them admitted more patients to Mercy than to St. Luke's.

4          I think somebody's going to correct me if I get this

5    wrong.  We've highlighted the two OBs who submitted

6    declarations for the FTC; is that right?  And you'll note that

7    they tend not to admit patients to Mercy hospitals, but most

8    of the others do.

9          Let me talk for a minute about contract.  Plaintiffs

10   have cited no evidence because no such evidence exists that

11   ProMedica currently exercises any anticompetitive market

12   power, nor do they have any evidence that ProMedica will

13   operate any differently because of the joinder.  ProMedica

14   currently negotiates contracts with commercial payors using

15   that benchmark that we've discussed known as the cost coverage

16   rate.

17         Ron Wachsman's declaration, Ron Wachsman's

18   declaration, which is going to be exhibit number TT -- you

19   don't have to -- I'm just telling you for the record, it's in

20   the notebooks.  I'm not going to flash it up for you on the

21   screen, but his affidavit describes in detail how it is that

22   ProMedica negotiates contracts with payors.  And they do this

23   using this cost coverage ratio, where ProMedica attempts to

24   negotiate rates that cover its direct and indirect costs and

25   provide it with a small margin.

```
 1              And Mr. Oostra testified that, you know, we'd like to
 2      get a 4 percent margin if we could do it.  Frankly, I think
 3      the rating agencies would like for them to get a 4 percent
 4      margin, but they can't.  They haven't been able to.  They have
 5      been able to get somewhere a little bit north of three percent
 6      but they haven't been able to get to 4 percent.
 7              And of course that's no different than what the other
 8      hospitals that are -- even the not-for profits that are
 9      profitable in Toledo do, that's what they strive to do.  The
10      affidavits from the competing hospitals, whether they're the
11      ones in Toledo or the ones in -- oh, Wood County or Fulton
12      County all say the same thing.  When we negotiate with payors,
13      first, we try to get the best price we possibly can.  I don't
14      know think the antitrust laws prohibit that.  If they do, I
15      haven't heard about it.
16              And, second, we try to negotiate a price that covers
17      our costs and gives us a margin so that we can reinvest in our
18      facility, so that we can make sure our balance sheet is strong
19      so that we have access to capital.
20              In UTMC's case they have a strong academic mission
21      that they need to try and fulfill.  That costs money, and
22      that's what that little extra margin is for.
23              So to the extent that ProMedica does that, it's not
24      doing anything that anybody else is doing.  St. Luke's would
25      like to be able to do that, but so far that wasn't a benchmark
```

1    that it was able to reach.  Without any hard evidence that

2    ProMedica plans to exert any anticompetitive market power,

3    Plaintiffs are relying instead on documents created by

4    St. Luke's to insinuate that the only reason for the joinder

5    is so that St. Luke's can extract higher rates from commercial

6    payors.

7            They're not studying any documents that came from us

8    for that.

9            And that's one of the things that makes this case

10   distinguishable from the Evanston Northwestern Highland Park

11   Hospital case.  In that case, the documents contemporaneously

12   prepared documents, prepared by the executives both for

13   Evanston and for Highland Park made it clear before the -- for

14   years before the transaction, they thought that merging would

15   enable both of them to extract anticompetitive higher prices

16   from payors.  It was clear that that was their primary intent

17   when they pursued the deal, and that was their intent for

18   years, and it came from both parties' documents.

19           You don't see that in ProMedica's documents here,

20   number one.  Number two, in that case, of course, they had

21   post-transaction evidence, because the FTC let the deal go

22   through, they waited four or five years and then said, let's

23   see what happened, and lo and behold, in that particular case

24   the evidence demonstrated that Evanston Northwestern

25   Healthcare Highland Park combined were able to extract higher

1    prices from payors after the deal and remarkably, never

2    understand this, but remarkably, the CEOs of the two hospitals

3    boasted about the fact that but for the transaction, they

4    wouldn't have been able to do that.

5         So the evidence is radically different in that case

6    than what we have here.  In fact, the only post-joinder

7    evidence that we have here so far was the contract that

8    ProMedica negotiated with MMO.  And while that contract -- for

9    St. Luke's, just for St. Luke's.  And while that contract does

10   provide for rate increases during the course of the four-year

11   contract, even at the end, the cost coverage ratio that's

12   presently estimated will only -- will be less than the cost

13   coverage ratio that derives from the amount that Paramount is

14   paying St. Luke's as a in-network provider in the Paramount

15   network now.

16        Your Honor, I think I've overstayed my welcome as I

17   talk about competitive effects, and we have a couple of other

18   topics to cover this afternoon.  So I think I'm going to sit

19   down and close with simply telling you that we think

20   ProMedica's commitment to continue to maintain and operate

21   St. Luke's as a locally managed and controlled community

22   hospital in the end will put the community, the Toledo

23   community, in a better position than it would have been absent

24   the joinder.

25        And with that, I'll let Mr. Wu explain to you why it

1  is that the parties pursued this transaction.

2      MR. WU:  Your Honor, a natural question after hearing

3  Plaintiff's argument, is what were St. Luke's and ProMedica's

4  true motivations for entering into their joinder agreement.  I

5  will address that question and the process that St. Luke's

6  went through to search for an affiliation partner and why

7  St. Luke's and ProMedica chose to proceed with their joinder.

8      For St. Luke's, the main motivation for seeking an

9  affiliation was that its senior management and its board

10  concluded that it could no longer continue as a full-service

11  stand-alone independent community hospital.

12      Now, this morning you heard a lot about St. Luke's

13  CEO, Dan Wakeman's three-year turnaround plan and how it

14  resulted in increased volumes and increased revenue.  Now,

15  that's all true.  But as my colleague, Ms. Carletti,

16  described, those turnarounds failed to preserve St. Luke's

17  ability to continue as a stand-alone independent community

18  hospital.

19      Indeed, St. Luke's senior management recognized that

20  its efforts to gain revenue through volume weren't working

21  because they simply weren't enough to overcome its poor

22  financial condition.  In addition, St. Luke's had to devise a

23  strategy for reacting to and complying with the passage of the

24  landmark healthcare reform law, which mandates or effectively

25  requires several costly initiatives on the part of hospitals,

1    including investments in IT infrastructure, the ability to

2    accept risk for patients, the ability to accept bundled

3    payments from Medicare as it was coordinating care among

4    different types of providers in the community.

5         Therefore, St. Luke's found itself at a crossroads,

6    and for a fiercely independent hospital, there were no perfect

7    options, and St. Luke's management thus reported that going it

8    alone would be extremely challenging and weighed whether to

9    give up St. Luke's cherished independence.

10        As it began evaluating potential affiliation

11   partners, St. Luke's examined several factors, not just

12   increased reimbursement rates, as Plaintiffs would have you

13   believe.  The factors that St. Luke's board considered when it

14   ultimately approved a joinder included, for example, cultural

15   compatibility, access to capital, the ability to better manage

16   expenses, as well as, of course, the ability to respond to a

17   reformed healthcare marketplace.

18        St. Luke's CEO, Dan Wakeman, the FTC's proclaimed

19   turnaround expert, states in paragraph 7 of his supplemental

20   declaration exactly what St. Luke's was seeking from an

21   affiliation.

22      (Video played as follows:)

23        "St. Luke's poor financial condition in the years

24   prior to the joinder with PHS was a motivating factor for

25   St. Luke's consideration of the joinder, as well as its

1    consideration of other possible affiliations.  St. Luke's

2    financial condition required it to affiliate with a system

3    that could provide it with an infusion of capital and a stable

4    financial structure for future investment in St. Luke's

5    physical plant and clinical operations to meet the

6    requirements of healthcare reform.

7         "St. Luke's hope that any affiliation with another

8    hospital system would allow it to cover more of its direct and

9    indirect costs of providing care, including making up for the

10   cost of shortfalls in Medicare and Medicaid reimbursement,

11   charity care and bad debt, through above-cost reimbursement

12   rates from commercial payors.  St. Luke's also hoped that any

13   affiliation with other hospital systems would result in

14   reimbursement rates from its commercial payors that would

15   allow St. Luke's to earn a positive margin to reinvest in its

16   facilities and services."

17        (Video concluded.)

18        Therefore, in late 2009 -- late 2008, excuse me, and

19   early 2009, St. Luke's began its search for a potential

20   affiliation partner by contacting a number of hospital systems

21   located outside of Toledo.  These comprised namely of the

22   Cleveland Clinic, the University of Michigan Health System,

23   and McClaren Health.  However, none of these hospital systems

24   were interested in a potential affiliation with St. Luke's.

25        As to the Cleveland Clinic, it demanded that

1    St. Luke's first pay the Cleveland Clinic about $300,000 to

2    conduct preliminary due diligence of St. Luke's.

3            Given St. Luke's current financial condition at the

4    time, it declined the Cleveland Clinic's invitation to spend

5    more money to disclose exactly what St. Luke's already knew

6    about its poor financial condition and its operational

7    challenges.

8            Now, St. Luke's also contacted the University of

9    Michigan health system in nearby Ann Arbor.  However, the

10   University of Michigan health system neither wanted to disrupt

11   its patient referral patterns from northwest Ohio nor provide

12   St. Luke's with a significant influx of capital that it

13   recognized St. Luke's required.

14           Finally, St. Luke's also reached out to McClaren

15   Health, which it -- also based in Michigan, which had grown in

16   the past through a series of acquisitions.  However, McClaren

17   told St. Luke's that its location in the southwest Toledo area

18   did not fit within McClaren's strategic geographic plan.

19           With no partners outside of Toledo, St. Luke's then

20   considered the other Toledo area hospitals as potential

21   partners.

22           As Mr. Marx alluded to earlier, St. Luke's first

23   considered an affiliation with the University of Toledo

24   Medical Center.  Despite beginning talks with the UTMC first

25   out of the local systems and even signing a Memorandum of

1   Understanding with the UTMC in April of 2009, St. Luke's and

2   UTMC never got to the point of conducting due diligence or

3   discussing what the structure of any potential affiliation

4   would look like.

5           In any event, an affiliation with UTMC raised serious

6   and numerous concerns with St. Luke's senior management and

7   its board.  For example, St. Luke's was very concerned about

8   how UTMC's academic culture, which focuses on teaching

9   residents and research, would mesh with St. Luke's culture,

10  which focused exclusively on providing quality patient care,

11  as stated by St. Luke's board chairman, Jamie Black, in

12  paragraph 17 of his declaration.

13          St. Luke's was also concerned about the UTMC's

14  apparent tin ear for employee relations, as shown by awarding

15  bonuses to senior leadership at a time when it was laying off

16  employees.  St. Luke's was also concerned about UTMC's

17  unionized workforce.

18          CEO Dan Wakeman summarized his concerns about UTMC to

19  members of the St. Luke's board in writing.

20          The superior/inferior attitude was fueled by their

21  academic base and the perceived poor management practices by

22  St. Luke's, as verified by our operational losses.  Comments

23  such as our pension shortfall being a deal breaker even before

24  we start, or that our HR benefit management could benefit from

25  their expertise.  General comments from UTMC staff and board

1    members that once they take over St. Luke's, it will be run

2    like a real business.

3           Now, more fundamentally, St. Luke's leadership was

4    concerned about UTMC's lower quality and much higher cost of

5    providing care, particularly in light of healthcare reform.

6    St. Luke's CEO Dan Wakeman summarized these concerns about a

7    potential affiliation with UTMC in paragraph 32 of his

8    declaration.

9           (Video played as follows:)

10          "St. Luke's senior management and its board were

11   concerned about -- concerned that UTMC as a state entity was

12   bureaucratic and would not have the flexibility financially to

13   affiliate with St. Luke's.  St. Luke's was also concerned

14   about UTMC's higher costs of providing care, its lower quality

15   scores and it's unionized workforce."

16          (Video concluded.)

17          Besides the UTMC, St. Luke's also explored a

18   potential joint venture or a full-blown merger with Mercy

19   Health Partners.

20          Specifically, St. Luke's and Mercy explored service

21   line joint ventures that would have covered cardiac services

22   and women's and children's services.  These would essentially

23   consist of consolidating cardiac services at Mercy and women's

24   and children's services at St. Luke's.

25          Now, the FTC has argued that instead of a joinder

1    with ProMedica, St. Luke's could have pursued joint ventures

2    with another partner and obtained much of the same benefits

3    it's going to accrue from a ProMedica joinder.  However, and

4    as you'll see on your monitor, St. Luke's and Mercy, with the

5    aid of a consultant, Healthcare Futures, concluded that these

6    joint ventures simply weren't feasible.

7         Having determined that a joint venture or series of

8    joint ventures wouldn't be feasible, St. Luke's then

9    approached Mercy about the possibility of a full-blown merger.

10   However, Mercy recognized the problems that an affiliation

11   with St. Luke's would pose.  Indeed, Mercy enumerated the same

12   issues, operational, capital, reimbursement, that St. Luke's

13   had itself identified as serious problems, as shown on points

14   one, two and three of the slide that's on your monitor.

15        Tellingly, Mercy came to the same conclusion that

16   St. Luke's had.  Namely, that it had a major commercial

17   reimbursement issue.  Mercy ultimately concluded that a merger

18   with St. Luke's was not to its advantage, and it would be

19   better served simply competing with a combined ProMedica and

20   St. Luke's.

21        In fact, Mercy made its views known through a news

22   letter in which it stated:  We believe that a partnership or

23   merger with St. Luke's would ultimately encumber our own

24   strategic advances, and, rather, it is to our advantage to

25   invest our capital, management expertise and time in our own

1     southwest strategy.

2          Now, even as St. Luke's was thinking about giving up

3     its independence, it was still trying to preserve some measure

4     of autonomy and local control.  Not surprising, given its

5     history of fierce independence.  However, St. Luke's senior

6     management and its board were both concerned that a merger

7     with Mercy, part of Catholic Healthcare Partners, which as you

8     know is headquartered in Cincinnati, would result in a loss of

9     local control and governance.

10          At the same time that the board and the senior

11     management were considering a merger with Mercy, St. Luke's

12     medical staff made it known that it would oppose any merger

13     with Mercy because of its poor relations with staff

14     physicians, further complicating the actual implementation of

15     how any merger with Mercy would work, as shown in paragraph 33

16     of Mr. Wakeman's declaration.

17          Given these alternatives, St. Luke's then decided to

18     respond to ProMedica's overtures.  The two had initially

19     discussed potential service language, very similar to what

20     Mercy and St. Luke's had discussed.  Not surprisingly, the two

21     also concluded that only a full merger might work -- a full

22     joinder might work.  And, in fact, that's what they did.  They

23     concluded that a full joinder would best address both parties'

24     needs, St. Luke's on the one hand, ProMedica's on the other,

25     as well as that of the communities they serve.

```
1              For example, in an e-mail to St. Luke's CEO, Dan

2    Wakeman on August the 4th of 2009, the chairman of the board

3    for St. Luke's parent entity, Ohio Care Health System, William

4    Aman (phonetic) wrote:  We've not talked much about the

5    ProMedica option, but when personalities are put aside, it may

6    be the easiest option to accomplish with the greatest

7    community benefit without having to totally sacrifice our

8    independence and identity.

9              Accordingly, St. Luke's entered into the joinder

10   agreement for a number of reasons, as St. Luke's CEO Dan

11   Wakeman states in paragraph 35 of his declaration.

12        (Video played as follows:)

13             "St. Luke's entered into the joinder agreement with

14   PHS for several reasons.  First, St. Luke's poor financial

15   performance, despite treating more patients over time,

16   threatened its viability as a stand-alone community hospital.

17             "Second, St. Luke's needed capital to invest in the

18   infrastructure, fund its pension obligations and increase

19   employee compensation, all of which St. Luke's had deferred

20   because of the lack of operating funds.

21             "Third, St. Luke's needed to align itself with other

22   local healthcare systems to prepare for changes in healthcare

23   delivery that healthcare reform will accelerate."

24        (Video stopped.)

25             Now, that was St. Luke's perspective.
```

1          ProMedica, on the other hand, initially shared many

2     of the same concerns identified by St. Luke's itself and by

3     Mercy.  As ProMedica's CEO, Randy Oostra stated in

4     paragraph 17 of his declaration.

5          (Video played as follows:)

6          "PHS had concerns about the potential joinder with

7     St. Luke's.  PHS's concerns included the fact that St. Luke's

8     financial condition was weak and deteriorating.  St. Luke's

9     was in default on its bond obligations, it had an unfunded

10    pension obligation of about $45 million, it had deferred

11    capital expenditures on its physical plant for many years, had

12    not made the necessary investment in IT infrastructure to

13    begin to adopt the electronical (sic) medical records programs

14    it would need under healthcare reform.

15         "PHS's board was concerned that St. Luke's financial

16    condition might have a negative impact on PHS's own financial

17    condition going forward."

18         (Video stoped.)

19         Nevertheless, after thorough due diligence, ProMedica

20    concluded that a joinder between it and St. Luke's would

21    benefit each other and the community, as Mr. Oostra explains.

22         (Video played as follows:)

23         "PHS's board concluded that the joinder with

24    St. Luke's was in the best interest of both hospitals and of

25    the communities they serve.

1           "Both PHS and St. Luke's have a strong commitment to

2     serving their local communities.  By adding St. Luke's to its

3     system, PHS believed that it could achieve operating

4     efficiencies and that it could avoid the capital costs of

5     constructing a new hospital facility on land, known as the

6     Arrowhead property, in the southwest portion of Toledo, where

7     PHS had planned to build a new facility."

8           (Video stopped.)

9           Now, ProMedica had also concluded that a joinder with

10    St. Luke's would allow it to right-size the services and

11    overcapacity within its system in a way that will not impact

12    patient care, expand the geographic reach of its system and

13    improve quality by sharing best practices.

14          Importantly, and I can't emphasize this enough,

15    ProMedica did not enter into or ever consider that the

16    St. Luke's joinder would allow it to raise reimbursement rates

17    from commercial payors above the competitive level.  Indeed,

18    the Plaintiffs can point to no ProMedica document out of the

19    4 million pages it produced in response to the FTC's

20    investigation that states ProMedica, as a result of this

21    joinder, will gain the ability to raise either St. Luke's

22    rates or its own above the competitive level.

23          To summarize, the St. Luke's and ProMedica joinder

24    enables both parties to meet their critical objectives.  For

25    St. Luke's, it maintains an independent board, it gives it

```
 1    access to the capital that it was denied, it will allow it to

 2    achieve cost savings, it will provide the potential to

 3    stabilize the financial condition of the system, which I think

 4    no one will dispute.  And last, but not least, it will provide

 5    the ability for St. Luke's, as a formerly independent

 6    stand-alone community hospital, to be able to meet the

 7    requirements of healthcare reform.

 8            For ProMedica, a joinder with St. Luke's will allow

 9    it to improve the geographic access to its system, it will

10    enable ProMedica to realign the services within its system to

11    better meet the community's needs; and, lastly, it will

12    enable -- it will allow it to increase clinical best practices

13    by sharing those best practices between it and St. Luke's.

14            THE COURT:  I guess another one also, it would

15    eliminate the need to build the Arrowhead facility.

16            MR. WU:  That's exactly right, and that's a

17    significant cost avoidance savings for the system.

18            Now, as a result of their negotiations, ProMedica is

19    contractually obligated to operate St. Luke's as a fully

20    operational community hospital for the next decade, while

21    preserving core services, including obstetrics, St. Luke's

22    independent board, St. Luke's medical staff and even the

23    St. Luke's name and logo.  Again, ProMedica is obligated to do

24    this for the next decade, long after the FTC proceeding and

25    any appeals are exhausted.
```

```
 1              Moreover, ProMedica cannot change these obligations

 2     without the consent of St. Luke's independent board of

 3     trustees, who have a fiduciary duty to their hospital, not

 4     ProMedica.

 5              Now, I want to point you to -- I don't have a slide,

 6     but Article 16.3 explicitly lays out and recognizes the right

 7     of St. Luke's board to enforce these commitments that

 8     ProMedica had made, and that can be found at PX58.

 9              THE COURT:  What's the role of the parent of

10     St. Luke's?  What is it intended to be after the joinder?

11              MR. WU:  By parent, I take your question to refer to

12     the St. Luke's board?

13              THE COURT:  No, Ohio --

14              MR. WU:  As a result of the joinder, Ohio Care, I

15     believe --

16              THE COURT:  Disappears?

17              MR. WU:  No longer exists.

18              THE COURT:  Thank you.

19              MR. WU:  Now, in addition to preserving St. Luke's,

20     the joinder will create significant pro-competitive benefits

21     that Mr. Marx will now address, unless you have any further

22     questions.

23              THE COURT:  Thank you, no.

24              MR. MARX:  Almost there, Your Honor, for today,

25     anyway.
```

```
 1              I want to spend a few minutes talking about the

 2      pro-competitive benefits of the transaction that Mr. Wu just

 3      alluded to.

 4              I want to direct your attention, as well, because I'm

 5      not going to go into great detail about it, but Gary

 6      Akenberger's affidavit, which is exhibit BBB, contains a lot

 7      of the details surrounding what it is that I'm going to try

 8      and summarize in sort of a high level fashion before we finish

 9      for today.

10              The Plaintiff's proposed preliminary injunction, and

11      I'll have a lot more to say about this tomorrow, threatens to

12      reverse the pro-competitive benefits that the parties, and by

13      extension the community, have already recognized, as well as

14      the benefits that are yet to come.  The joinder's already

15      benefited St. Luke's and its patients by financially

16      stabilizing the flailing hospital and preventing some of the

17      drastic measures that St. Luke's was going to have to

18      implement to remain financially viable.

19              And there I'm referring to significantly cutting

20      services and personnel, which reminds me about something that

21      I forgot to mention earlier today.  You may remember that

22      slide that Mr. Reilly put up that alluded to how much of a

23      decrease in St. Luke's market share there would have to be to

24      irradicate this presumption of illegality that the market

25      shares in the -- remember that slide up and then down.
```

1          And he said, and I think I got this right, that there

2     were no documents that you would find that suggested at all

3     that as a result of this transaction, St. Luke's share would

4     drop to the levels that would eliminate the presumption.

5          And my colleagues reminded me that there was a

6     document -- there were documents that discussed that as it

7     relates at least to OB services, because you'll recall, or I

8     know we've cited, and I'll have them for you if I need to

9     tomorrow, there were documents that St. Luke's created that

10    said our financial situation's really bad.  We need to

11    consider cutting -- I think Ms. Carletti talked about this --

12    we need to consider cutting OB services, we need to consider

13    cutting cardiovascular surgery, and then a whole host of other

14    services that frankly aren't general acute inpatient care

15    services.

16         And the significance of that document is that if

17    that's what St. Luke's had done, its market share and OB

18    services would have dropped to zero percent.  It wouldn't have

19    been in that market segment anymore.

20         So it's not an issue of whether or not there are

21    documents that show it would have dropped to 1.2 percent or

22    1.8 percent, it would have been gone.

23         So to suggest there are no documents that

24    contemplated that possibility, that's not right.  There were

25    documents that contemplated.

```
 1              And one of the pro-competitive benefits that resulted

 2       from this transaction, from this joinder, is the fact that

 3       that wasn't necessary anymore.

 4              In addition, the joinder infused St. Luke's with

 5       additional capital to pursue much needed capital upgrades,

 6       including federally-mandated IT upgrades.

 7              The joinder -- the FTC poo-poos this stuff, but it's

 8       not insignificant, and Gary Akenberger's affidavit talks about

 9       it.  The joinder also permits the parties to achieve

10       significant savings by taking advantage of scale, economies

11       and infrastructure and services that the hospitals cannot

12       implement alone.

13              The parties estimate that they will achieve

14       approximately 27 to $30 million in savings annually and 125 to

15       $150 million in capital avoidance savings.  And you recognized

16       one of the big capital avoidance savings was the elimination

17       of the need to built a new facility at Arrowhead, and that's

18       one of the two big ones.  But the other big one we shouldn't

19       lose sight of is the avoidance of the need to build the new

20       patient tower at Flower.  And the reason for that is, Flower's

21       got mostly semi-private rooms.  It's not the industry norm.

22              If, if ProMedica's joinder with St. Luke's doesn't go

23       forward, then ProMedica contemplated that it would have to

24       build a new patient tower at Flower that would have private

25       rooms, at a cost of -- I can't remember if that was -- give me
```

```
1    a second and I'll get you the number.

2              It was a lot of money.

3              And that cost will be avoided, too.  And what that

4    means is the funds that ProMedica won't have to spend

5    duplicating resources that are already there and

6    under-utilized, can be used for other purposes to benefit the

7    community.

8              Now, entry of the Plaintiff's requested preliminary

9    injunction threatens to irradicate all of those benefits.  And

10   I would point out to the extent that that preliminary

11   injunction that the Government has imposed is entered by the

12   Court, it seriously diminishes, decreases ProMedica's ability

13   to and incentive to invest the $30 million of capital that the

14   joinder agreement requires ProMedica to invest over the course

15   of the next three years.

16             It's interesting, the Government sort of wants it

17   both ways.  It doesn't want ProMedica to be involved at all in

18   St. Luke's operations.  Doesn't want the joinder agreement to

19   go forward at all, but it does want to force ProMedica to make

20   St. Luke's better than it was the day before the joinder

21   occurred.

22             And quite frankly, Your Honor, we will discuss this

23   at more length tomorrow.  They can't have it both ways.  If --

24   if a preliminary injunction is entered here, and we don't

25   think you should, but if you do enter one, you can't enter one
```

1     that the law doesn't allow you to enter one that requires us

2     to make St. Luke's better than it was the day that we got it.

3            The most you can do, I think, if you do anything,

4     would be to say you can't make it worse than it was when you

5     got it.  But you can't impose an affirmative obligation to us

6     to say, you got to invest $30 million that, frankly, you know,

7     we had no obligation to invest prior to the time of the

8     joinder.  That's a big difference.  We'll talk about that

9     tomorrow.

10           Now, the joinder has significantly benefited

11    St. Luke's and its patients by immediately securing the

12    financial viability of the hospital.  Ms. Carletti explained

13    that prior to the joinder, St. Luke's had a financial problem.

14    This chart identifies it.

15           Its bond rating had been downgraded, it was in

16    technical default on its bond obligations, it didn't have the

17    capital that it needed to maintain its infrastructure and

18    prepare for the evolution of healthcare reform, and, of

19    course, there was that lingering $45 million under-funding of

20    its pension obligation.

21           When it joined with ProMedica on September 1st, those

22    problems were immediately alleviated.  Pursuant to the terms

23    of the joinder agreement, St. Luke's has become part of

24    ProMedica's financially obligated group, which means that

25    ProMedica has assumed responsibilities for -- assumed

1    responsibility for St. Luke's liabilities, including those

2    bonds that it was in technical default on, and its unfunded

3    pension liability.

4            ProMedica negotiated with Ambac to cure that pesky

5    bond default status, bond covenant violation status.  And

6    immediately -- well, within the time it was required,

7    ProMedica contributed $5 million to St. Luke's foundation and,

8    of course, is committed to contribute another $30 million over

9    three years to fund capital improvements that St. Luke's had

10   deferred because it didn't have the capital to make the

11   investments.

12           So St. Luke's bond rating moved up.  Where did it

13   move to?  I think it was better than it was in 2008, before,

14   before -- there we go.  It was better than it was in 2008

15   before Moody's made the first reduction of St. Luke's bond

16   rating from whatever -- I guess it was A1 down to A2, and then

17   they bumped it down to Baa2 in February 2010, and after the

18   joinder with us, St. Luke's now has a bond rating of Aa3,

19   which means its cost of capital to the extent that it needs it

20   is even lower.

21           Now, as you know, the joinder alleviated St. Luke's

22   doomsday plans of cutting services or personnel, but

23   St. Luke's only, only rejected those possibilities because it

24   chose, instead, to affiliate with another entity that could

25   and would maintain St. Luke's as a full-service community

1    hospital going forward.

2           And you can take that slide off.  We can go to the

3    13, I think.

4           Mr. Wu showed you this a minute ago.  Section 7.1 of

5    the joinder agreement is very important.  It obligates

6    ProMedica to maintain St. Luke's using its current name and

7    identity and its current location for a minimum of 10 years

8    after the closing date as a fully operational acute care

9    hospital providing the services listed.

10           Section 13.2 prohibits ProMedica from taking any

11    action that would cause St. Luke's to cease to operate as a

12    general acute care hospital.

13           No other hospital merger case exists that I know of

14    where the hospital, acquiring hospital, has made a similar

15    commitment to this one.  The community benefit commitment that

16    the Butterworth case talks about, it's not the same thing.

17    This is a commitment between the two parties that negotiated,

18    hotly negotiated, frankly, the transaction to maintain the

19    hospital as a fully operational general acute inpatient care

20    services hospital.

21           Now, the community benefits and Dr. Peron's

22    declaration, the exhibit number to which I should know, but

23    don't -- discusses this, and Dr. Peron said -- ah -- OOO,

24    actually, is the exhibit number.  He says, I believe that if

25    St. Luke's continues to put off needed investments in its

1    physical plant -- and he, by the way, is the chairman of the

2    division of urology at St. Luke's and a former member of

3    St. Luke's medical executive committee -- he believes that if

4    St. Luke's continues to put off needed investments in its

5    physical plant, which is much older than average, on average

6    than the rest of the hospitals in the Toledo area, and in its

7    services, it might not continue to provide the same quality of

8    care that its patients have come to expect.

9         And, in fact, we'll see when we talk more in detail

10   tomorrow about this particular issue, unfortunately,

11   unfortunately, what we have found was because of St. Luke's

12   financial situation and Mr. Oostra testified about this in his

13   deposition last week, indeed, the indicators are that St.

14   Luke's quality of care has diminished some during the tail end

15   of 2009 and into 2010 before the time that it joined with us.

16        So the financial situation that existed there was

17   beginning to have, it appears to us, based on the quality data

18   that's being reported, to have had an impact, unfortunately,

19   at St. Luke's.  That's something we intend to turn around if

20   you'll let us, but if not, I think it presages what's likely

21   to happen if this injunction is entered the way that the

22   Government wants you to.

23        Now, ProMedica's already committed $5 million in

24   capital to the foundation, it's committed another $30 million,

25   and you might say, well, what for?  Well, Section 6.1 of the

1    joinder agreement -- shall commit a minimum -- a minimum of

2    $30 million to St. Luke's over the three-year period following

3    the closing date.

4           What is St. Luke's likely to use that $30 million

5    for?  Exhibit 6.1 talks -- now, we'll go there -- about that.

6    These are capital projects that are to occur at the St. Luke's

7    main campus.  And there are several of them.  Update their

8    information technology systems, construct -- do some

9    construction on an outpatient lobby, conversion of all

10   existing patient rooms in St. Luke's to updated private rooms.

11   Again, right now, St. Luke's has semi-private rooms.  Not the

12   industry norm.  Renovate the heart center, and so on.

13          These were all items that were negotiated and agreed

14   by the parties that that $30 million, the minimum of

15   $30 million, would be used to fund, all projects that

16   St. Luke's couldn't do on its own.

17          And as Ms. Lori Johnson's affidavit says, the

18   information technology investment is particularly important,

19   because the healthcare reform law requires hospitals to invest

20   in an electronic health record and other systems, like disease

21   registries and computerized physician order entry systems, and

22   then integrate those systems with its existing core IT

23   applications and similar systems located in physicians'

24   offices.

25          This is the whole notion of what we refer to as

1    clinical integration.

2           These IT upgrades will benefit patients by enabling

3    healthcare providers to comply with evidence-based best

4    practices, and if the hospitals fail to achieve the meaningful

5    use requirements by 2015, they're going to face cuts in

6    Medicare reimbursement.

7           Prior to the joinder with ProMedica, St. Luke's

8    couldn't have afforded those IT upgrades.

9           There are other efficiencies that have resulted

10    already and that will continue to result because of and only

11    because of the transaction.  These are the kinds of things

12    that Gary Akenberger talks about in his declaration.  I'll

13    just highlight a couple.  ProMedica's added St. Luke's to

14    ProMedica's medical malpractice insurance policy.  That saves

15    St. Luke's about $600,000 over a 12-month period.  And while

16    the ongoing savings may be only $273,000 per year, St. Luke's

17    couldn't have done this by itself.  It's because St. Luke's is

18    able -- we're able to spread the risk over an additional

19    hospital.  St. Luke's couldn't do that by itself.

20           You know, $594,000 might not seem like a lot.

21    $273,000 might not seem like a lot, but if you're losing

22    15.9 million every year, it's not unimportant.

23           St. Luke's saved another 50,000 when ProMedica added

24    it to its neonatal services contract.

25           Gary Akenberger's affidavit talks about a whole host

1   of cost savings that integration teams from ProMedica and

2   St. Luke's have worked together since the joinder occurred.

3           No question, a lot of this integration work did not

4   take place before the parties decided to enter into the

5   joinder transaction back in, gosh, it seems like just

6   yesterday, but it was May 2010.  But what the parties did was

7   say, are there opportunities there that we think we might be

8   able to achieve, and they identified them.  Did they run them

9   all to ground?  Did they do the kind of efficiency study that

10  the FTC would credit?  And, frankly, to be honest with you,

11  I'm not sure they would ever credit an efficiency study that

12  hospitals did because their standards are just impossible to

13  meet.

14          But that doesn't mean that there aren't good business

15  case efficiencies and cost-saving opportunities there.

16          Since the joinder occurred, Gary Akenberger and a

17  group of others from both hospitals have been working together

18  to say where can we save money, big and small.  That's what

19  Gary's affidavit is all about, and that's where he comes up

20  with the numbers that are reflected or will be reflected in a

21  minute.

22          Yeah, that's one of them.

23          Those service line opportunities and integration

24  opportunities, I think a big chunk of that, frankly, Your

25  Honor, is the contemplated consolidation of the open heart

1   surgery program at St. Luke's with the Toledo Hospital.  That

2   program's just bleeding money as a practical matter, and

3   St. Luke's doesn't do enough of those cases to be able to

4   support it.

5           But in any event, Gary and his people have come up

6   with, as indicated in the affidavit, about $19 million-worth

7   of cost savings.

8           Included among those, I think as well are some back

9   room kinds of things.  You know, better prices for supplies

10  that St. Luke's will be able to get when it purchases through

11  the volumes that ProMedica can achieve, a whole host of, for

12  lack of a better term, back room cost savings that St. Luke's

13  couldn't get by itself, but once it integrates with ProMedica,

14  it can.

15          Reduced cost for physician coverage.  St. Luke's

16  couldn't do it by itself.  For whatever reason, ProMedica has

17  a better deal with physicians to provide -- to provide

18  coverage during odd hours.

19          And then, of course, there are these capital cost

20  avoidances.  Ah, here we go.  Flower was 25 to 30 million in

21  capital cost, with operating costs avoided of about 1.6 to

22  $2 million on an annual basis.  Of course, that 60-bed

23  hospital at Arrowhead would have been 90 to a hundred million

24  dollars that they can save.

25          The implementation of electronic medical records at

```
 1    St. Luke's, this is a big deal, would save six to $10 million

 2    and another about a million dollars-worth of ongoing savings.

 3            That's where the real efficiencies are.  Those are

 4    benefits that we think benefit not only the parties that they

 5    couldn't achieve by themselves, but will also ultimately

 6    benefit the community.

 7            As I've said, entry of the preliminary injunction

 8    will eliminate all of these benefits, has the potential to

 9    eliminate all of them.  ProMedica would have a diminished

10    incentive to continue its investment in St. Luke's if the

11    Court grants the preliminary injunction the Plaintiffs seek.

12    And ProMedica's integration teams, Gary Akenberger's teams,

13    would lose the momentum towards integration -- integration,

14    consistent, by the way, with the joinder agreement that

15    they've already generated.

16            For all of these reasons, all the reasons that we've

17    been discussing this afternoon, in the absence of the joinder,

18    St. Luke's future competitive viability, and that's really

19    what this relates to, would be as perilous as it was before

20    the consummation of the joinder last September.

21            Absent the joinder, St. Luke's would revert back to

22    its pre-joinder financial state, facing mounting debt

23    obligations, likely reverting to its barely above junk status

24    credit rating, which would jeopardize its ability to borrow

25    additional cash and increase its cost of doing it, and lacking
```

 1   the capital it needs to make the deferred capital improvements

 2   required to prepare for and comply with the requirements of

 3   healthcare reform.

 4          That would be, that would be St. Luke's state if you

 5   entered the preliminary injunction that the Government

 6   requests.  And because we don't want to turn back the clock

 7   that way, and because we don't think the Government has

 8   satisfied its burden of showing that it can ultimately succeed

 9   on the merits of this case, or that the injunction would be in

10   the public interest, we respectfully request that you deny

11   their request.

12          That's it for us for today.  We'll be back tomorrow,

13   I think after Mr. Reilly and the FTC spend an hour talking

14   about what we've been talking about.  We'll talk for an hour

15   and a half about, I think, probably a little bit more focused

16   response to some of the points that Mr. Reilly made this

17   morning, and, of course, whatever else he throws at us

18   tomorrow morning, to the extent that I'm able enough to

19   respond to them, and we'll also talk about, specifically about

20   the terms of this preliminary injunction that they've proposed

21   and why it -- it's the wrong thing for the Court to do.

22          THE COURT:  Thank you all very much.

23          MR. MARX:  Thank you, Your Honor.

24          THE COURT:  See you tomorrow morning at 9:00.

25      (The evening recess was taken at 4:54 p.m.  Court to

```
 1   reconvene on Friday, February 11, 2011, at 9:00 a.m.)

 2                          *  *  *  *  *

 3                          CERTIFICATE

 4       I, Stephen W. Franklin, Registered Merit Reporter, and

 5   Certified Realtime Reporter, certify that the foregoing is a

 6   correct transcript from the record of proceedings in the

 7   above-entitled matter.

 8       Dated this 10th day of FEBRUARY, 2011.

 9

10       /s/Stephen W. Franklin
         _____
11       Stephen W. Franklin, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

$10 [1]  233/1
$10 million [1]  233/1
$110,000 [1]  168/18
$150 [1]  223/15
$150 million [1]  223/15
$19 [1]  232/6
$19 million-worth [1]  232/6
$2 [1]  232/22
$2 million [1]  232/22
$2.6 [1]  93/2
$2.6 billion [1]  93/2
$250,000 [1]  168/13
$273,000 [2]  230/16 230/21
$30 [9]  223/14 224/13 225/6 226/8 228/24
  229/2 229/4 229/14 229/15
$30 million [9]  223/14 224/13 225/6 226/8
  228/24 229/2 229/4 229/14 229/15
$300,000 [1]  211/1
$45 [2]  217/10 225/19
$45 million [2]  217/10 225/19
$450,000 [1]  168/8
$5 [2]  226/7 228/23
$5 million [2]  226/7 228/23
$50,000 [1]  168/21
$594,000 [1]  230/20
$6 [1]  176/3
$6 million [1]  176/3
$600,000 [1]  230/15
$700,000 [1]  168/2
$8.3 [1]  167/6
$8.3 million [1]  167/6

**'**

'til [1]  175/17

**-**

-v [1]  1/6

**/**

/s/Stephen [1]  235/10

**0**

008 [1]  47/19

**1**

1.2 percent [1]  222/21
1.3 percent [1]  83/19
1.5 [2]  84/4 84/5
1.6 [1]  232/21
1.8 percent [1]  222/22
10 [16]  1/8 13/22 15/20 25/1 42/17 62/21
  123/5 123/6 123/11 124/9 126/18 128/4
  168/17 199/4 202/4 227/7
10 percent [8]  15/10 25/13 25/25 36/7 73/2
  96/14 96/15 97/19
10-minute [1]  179/10
10.5 million [1]  84/24
100 percent [1]  148/6
102 [1]  80/1
103 [1]  80/24
104 [1]  82/2
1049 [1]  143/10
1078 [1]  30/22
108 [2]  84/8 84/8
10:30 [1]  53/22
10:46 [1]  53/22
10th [1]  235/8
11 [4]  168/16 168/16 204/3 235/1

**11-00047-CIV-DAK [1]  1/2**
11.3 [1]  28/6
11.5 [2]  33/2 83/18
1122 [1]  89/3
113 [1]  161/15
118 [1]  88/14
12-month [1]  230/15
122 [1]  91/6
125 [1]  223/14
127 million [1]  85/17
1277 [1]  89/3
12:00 and [1]  3/15
12:22 [1]  113/5
13 [41]  7/11 8/4 8/12 8/16 9/8 9/15 10/15
  10/23 10/24 11/6 11/8 11/11 11/16 23/2 30/1
  30/25 32/8 32/9 33/3 34/22 41/13 67/18 76/5
  80/21 95/21 103/6 103/25 104/1 104/5
  104/17 109/6 112/16 133/24 133/25 134/10
  147/17 150/18 155/11 156/16 156/19 227/3
13.2 [1]  227/10
132 [1]  95/14
1322 [1]  97/1
1323 [1]  31/6
135 [1]  100/14
136 [1]  101/21
137 [1]  102/23
138 [1]  105/13
13B [4]  5/10 5/12 6/25 7/1
145 [1]  147/11
15 [6]  37/16 53/21 133/13 184/11 193/18
  193/19
15 million [1]  85/2
15.9 million [1]  230/22
150 [1]  2/9
15th [1]  176/16
16 [7]  35/5 163/12 163/13 171/4 184/11
  197/4 197/4
16.3 [1]  220/6
16th [1]  6/9
17 [5]  35/5 197/2 197/3 212/12 217/4
178 [1]  15/4
18 [3]  18/15 51/11 133/13
19 [2]  203/23 203/24
19.5 percent [1]  29/14
1963 [1]  32/3
198413 [1]  32/11
1993 [1]  141/3
1997 [1]  8/24
1:00 tomorrow [1]  3/16
1:28 [1]  113/5
1:29 [1]  113/21
1:30 [1]  112/25
1st [4]  50/1 50/4 174/9 225/21

**2**

2 miles [2]  147/24 189/3
2 percent [1]  83/18
2.5 percent [1]  49/10
20 [2]  20/10 39/12
20 percent [2]  97/23 148/13
200 [1]  30/10
2000 [2]  30/18 141/3
20005 [1]  2/15
2001 [1]  46/17
2005 [1]  45/24
2006 [6]  158/1 172/9 172/12 172/16 172/18
  173/18
2007 [12]  54/8 85/16 85/18 86/18 89/2 158/3
  158/8 162/24 178/1 199/2 199/4 203/24
2008 [27]  49/6 54/22 56/3 83/6 84/12 85/24

85/25 87/12 89/3 90/23 126/4 131/12 158/9
  158/12 158/15 158/19 159/3 159/11 162/25
  163/7 167/3 197/7 199/5 201/13 210/18
  226/13 226/14
2009 [56]  20/15 44/20 45/24 50/1 50/4 83/6
  85/1 85/3 85/8 86/9 86/19 86/19 88/21 89/9
  89/16 90/9 91/18 123/4 158/11 159/11
  160/12 161/18 163/1 163/2 163/6 163/7
  167/3 171/6 171/8 171/11 171/15 171/16
  171/17 172/5 172/10 172/17 172/20 173/4
  173/7 173/20 173/24 174/5 174/9 174/9
  176/16 178/1 198/2 199/9 199/21 200/2
  203/24 210/18 210/19 212/1 216/2 228/15
2010 [40]  16/25 44/18 46/18 81/6 83/4 83/6
  85/5 85/12 85/17 85/18 85/22 86/10 86/21
  87/15 87/21 88/17 88/22 89/9 90/9 90/14
  91/11 92/1 93/2 94/7 130/6 157/9 157/18
  168/2 169/12 171/24 172/1 173/12 178/2
  179/4 198/2 200/14 200/17 226/17 228/15
  231/6
2011 [6]  1/8 6/12 84/25 93/2 235/1 235/8
2012 [2]  111/17 168/14
2013 [1]  176/23
2014 [1]  123/8
2015 [2]  167/18 230/5
20580 [4]  1/18 1/21 2/3 2/6
21 [2]  24/3 131/21
21-24 percent [1]  97/3
210 [1]  6/13
22 [1]  26/2
22 percent [2]  131/21 165/3
226 [1]  29/3
227 [3]  2/12 2/17 2/20
238 [1]  198/5
23rd [1]  2/8
24.5 [1]  28/8
25 [1]  232/20
25 percent [2]  28/25 176/14
25-minute [1]  195/18
2500 [1]  30/8
257 [1]  14/2
2573 [1]  197/10
267 [1]  1/11
27 [1]  223/14
28 percent [1]  92/24
28.7 [1]  33/3
28.7 percent [1]  29/11
29 percent [1]  32/12

**3**

3 million [1]  92/7
30 [1]  108/23
30 million [3]  109/21 109/24 232/20
30 percent [2]  32/3 39/12
3000 [1]  97/22
3088 [1]  96/25
31 percent [1]  176/4
31st [7]  6/12 85/22 86/10 130/6 157/9 157/18
  174/9
32 [2]  198/12 213/7
329 [1]  147/10
33 [2]  28/9 215/15
33401 [1]  1/23
34.1 percent [1]  85/18
34.7 percent [1]  199/11
35 [1]  216/11
35.4 [1]  199/7
353 [3]  199/21 200/9 200/9
36 [1]  203/10
36.4 [1]  199/7

**3**

36.4 percent [1] 199/3
366 [1] 193/23
37 [2] 32/9 39/9
3700 [1] 199/4
3768 [1] 1/22
3790 [1] 123/4
38 [1] 41/1
3:13 [1] 179/11
3:25 [1] 179/11

**4**

4 million [1] 218/19
4 percent [1] 205/2
4,391 [2] 30/18 30/18
40 [3] 33/24 39/17 179/16
40 percent [5] 32/10 85/4 85/4 85/11 100/4
417 [1] 1/23
42 [1] 125/4
43 [1] 46/3
43 percent [3] 32/6 85/12 85/18
43215 [1] 2/9
44 [1] 124/10
4400 [1] 2/12
45 [1] 179/16
46.8 [1] 33/3
47 percent [3] 29/11 33/25 85/5
4:54 [1] 234/25
4th [1] 216/2

**5**

50 [2] 51/5 125/23
50,000 [1] 230/23
51 [1] 51/20
514-3768 [1] 1/22
527 [2] 200/3 200/7
53 [2] 135/22 135/24
53B [1] 155/16
55 [2] 39/17 52/17
561 [1] 1/22
57 [1] 90/8
58 percent [1] 32/16
58.3 percent [1] 30/17
59 [1] 54/1
5:00 o'clock [2] 113/3 202/23
5th [1] 6/5

**6**

6,854 [1] 31/4
6.1 [2] 228/25 229/5
6.1 percent [1] 94/15
60 [2] 54/16 128/14
60 percent [6] 28/17 28/19 36/7 58/16 85/5 102/8
60-bed [1] 232/22
600 [2] 1/20 2/15
601 [3] 1/18 2/3 2/5
60606 [3] 2/13 2/18 2/20
61 [1] 54/20
62 [1] 56/3
65 [1] 90/8
660 [1] 13/25
68 [2] 58/13 198/12
69 [1] 59/22

**7**

7.1 [1] 227/4
7.5 million [1] 89/10
7.5 percent [1] 94/15

**7** (col 2)

70 [3] 62/5 62/10 62/11
70 percent [5] 35/17 40/9 40/10 64/14 64/15
700 [1] 200/5
701 [1] 1/23
71 [1] 62/14
71 percent [2] 91/18 119/5
71.2 percent [1] 29/14
72 [2] 62/18 63/1
73 [1] 63/16
73-bed [1] 189/8
74 [1] 64/2
76 [1] 64/5
76 percent [1] 92/2
77 [1] 64/25
78 percent [1] 149/12
79 [2] 67/25 68/1

**8**

80 [1] 76/1
80 percent [6] 22/25 24/9 29/16 36/8 43/10 58/17
80 percent-plus [2] 24/15 62/4
80.5 percent [1] 31/3
800 [1] 200/5
800-pound [1] 48/8
802 [1] 198/1
81 [1] 23/18
81 percent [1] 32/16
83 percent [1] 85/8
84 percent [2] 96/18 142/22
85 [1] 69/7
86 [1] 14/1
86 million [1] 92/7
86 percent [1] 96/12

**9**

9.3 [1] 83/19
90 [2] 74/10 232/23
90 percent [15] 181/17 196/10 196/10 196/17 196/20 196/21 196/23 196/23 197/5 197/9 197/10 197/15 198/11 198/13 198/15
900 [1] 137/10
902 [1] 149/20
91 [1] 75/17
96 [1] 76/18
976 [1] 149/20
9:00 [3] 3/14 234/24 235/1

**A**

a.m [4] 3/14 53/22 53/22 235/1
A1 [1] 226/16
A2 [1] 226/16
Aa3 [1] 226/18
abandon [1] 120/9
abilities [1] 152/13
ability [31] 6/23 36/3 44/15 48/19 49/13 65/4 70/13 93/7 110/2 117/8 126/2 145/20 148/12 155/2 163/13 166/24 167/14 180/2 183/9 183/16 184/6 186/3 208/17 209/1 209/2 209/15 209/16 218/21 219/5 224/12 233/24
able [62] 5/11 7/2 8/14 25/24 33/6 66/4 74/25 75/6 75/10 85/9 89/19 90/16 106/8 108/22 118/15 125/18 125/21 129/17 132/14 143/8 151/23 155/7 155/7 158/1 158/13 162/12 162/17 168/22 170/11 170/12 170/12 174/11 176/22 181/6 181/7 186/5 188/23 189/10 189/16 190/22 192/8 200/4 201/10 201/12 201/18 202/1 202/2 202/11 205/4 205/5 205/6 205/25 206/1 206/25 207/4 219/6 230/18 230/18 231/8 232/3 232/10 234/18

**A** (col 3)

above [23] 30/19 75/9 92/18 117/20 118/10 118/16 125/18 128/7 139/1 148/18 153/19 154/1 154/3 155/2 173/9 181/8 181/24 203/7 210/11 218/17 218/22 233/23 235/7
above-cost [1] 210/11
above-entitled [1] 235/7
absence [3] 12/1 180/19 233/17
absent [8] 4/17 83/3 89/14 89/15 104/15 106/1 207/23 233/21
absolutely [12] 53/20 61/22 64/2 64/3 66/13 66/16 74/20 95/20 161/24 162/8 162/8 181/15
absorb [1] 65/4
absurd [1] 143/13
academic [4] 193/10 205/20 212/8 212/21
accelerate [1] 216/23
accept [9] 60/24 102/25 104/11 132/22 144/10 191/23 192/1 209/2 209/2
acceptable [1] 63/3
accepted [1] 81/11
accepts [1] 22/17
access [13] 48/1 52/25 70/7 85/7 93/1 132/21 132/23 163/13 201/22 205/19 209/15 219/1 219/9
accidentally [1] 113/24
accommodate [1] 191/18
accompanied [1] 4/5
accomplish [1] 216/6
accomplished [4] 78/24 85/1 85/3 85/6
accomplishments [1] 95/2
according [10] 37/16 56/9 77/1 80/8 92/22 94/2 143/6 146/7 148/15 149/11
accordingly [2] 51/18 216/9
account [2] 22/2 145/22
accountable [2] 110/20 140/23
accounted [1] 142/22
accounting [2] 18/4 165/3
accrue [1] 214/3
accurate [4] 3/17 15/1 94/13 125/16
accurately [3] 19/9 125/13 203/14
achieve [11] 117/20 118/10 191/3 218/3 219/2 223/9 223/13 230/4 231/8 232/11 233/5
achieved [5] 90/6 156/1 156/25 163/5 178/9
achieving [1] 155/5
acknowledge [2] 43/7 43/8
acknowledged [4] 26/17 43/11 74/3 85/20
acknowledges [1] 26/23
acquire [8] 16/15 16/18 41/24 45/6 80/13 97/17 97/17 102/2
acquired [12] 4/23 17/22 18/5 24/25 25/4 25/9 25/23 29/12 29/15 41/23 82/18 106/22
acquirer's [1] 39/19
acquires [1] 53/15
acquiring [10] 4/22 16/17 70/11 72/16 72/23 74/7 161/13 161/19 184/19 227/14
acquisition [46] 4/25 9/19 10/12 10/19 16/5 17/17 17/19 17/21 18/6 18/13 22/23 26/15 30/14 30/18 31/4 33/1 34/9 38/14 38/19 39/13 39/23 40/2 40/6 40/20 41/4 41/7 43/17 43/22 44/16 46/18 60/4 60/12 67/1 69/1 71/1 73/23 74/7 85/23 87/15 89/15 101/15 103/15 162/3 162/6 162/7 184/12
acquisition's [1] 74/2
acquisitions [3] 39/18 184/13 211/16
across [6] 21/3 39/14 68/4 74/23 75/10 90/24
act [9] 9/19 9/21 9/21 10/9 10/10 47/24 133/13 133/24 179/23
acted [1] 51/18
acting [1] 8/13

# A

action [3]  8/6 169/20 227/11
actions [6]  48/11 48/17 57/19 101/12 134/23 192/6
actively [1]  108/2
activity [5]  87/18 94/16 94/19 94/22 95/3
actual [4]  10/12 39/16 149/15 215/14
actually [27]  30/5 51/7 87/12 89/2 92/20 99/13 100/22 105/12 123/2 140/16 157/18 159/22 160/3 161/11 161/15 162/21 164/14 167/9 171/23 172/3 172/15 182/10 184/2 187/16 187/24 200/24 227/24
acuity [4]  33/15 194/22 194/22 195/4
acute [67]  13/6 15/4 16/2 19/13 20/5 21/18 21/20 22/4 22/11 22/13 22/17 25/20 26/5 26/8 26/12 26/16 26/18 26/24 27/3 27/8 28/2 29/4 30/16 30/21 31/10 31/14 32/15 32/21 36/8 42/16 43/1 58/17 83/5 83/17 96/9 102/8 121/21 122/5 122/6 126/16 128/1 130/14 141/10 141/14 141/23 142/14 146/22 148/3 149/4 149/13 151/2 151/12 152/1 152/9 160/24 161/3 173/3 173/4 179/25 189/21 189/25 193/16 197/25 222/14 227/8 227/12 227/19
add [8]  14/10 44/11 49/8 50/5 53/11 85/9 189/11 202/11
added [12]  34/9 44/13 46/1 46/6 47/1 47/5 48/22 51/9 53/16 56/4 230/13 230/23
adding [13]  34/10 44/6 46/24 47/8 47/10 47/20 47/24 51/14 53/7 53/8 59/20 75/14 218/2
addition [11]  40/24 52/1 63/17 63/20 124/9 128/9 155/12 194/7 208/22 220/19 223/4
additional [13]  38/22 49/10 67/20 153/20 157/2 158/24 159/10 161/14 161/20 162/3 223/5 230/18 233/25
address [9]  111/23 112/1 117/1 117/3 117/3 148/9 208/5 215/23 220/21
addressing [1]  181/1
adds [1]  189/14
adduced [1]  120/11
adequate [1]  55/17
adequately [1]  148/9
Adjudicatory [1]  7/23
adjusted [2]  33/16 40/11
administrative [6]  6/13 111/1 121/2 133/18 134/2 156/6
admission [4]  16/11 16/12 131/3 137/16
admissions [9]  6/9 46/21 46/25 47/8 123/5 123/5 123/12 124/10 197/11
admit [4]  184/13 185/6 186/5 204/7
admits [1]  124/11
admitted [7]  123/13 137/10 178/12 203/23 203/25 204/1 204/3
adopt [2]  103/23 217/13
adopted [2]  103/24 134/24
advanced [3]  189/22 189/23 189/23
advances [1]  214/24
advantage [6]  52/7 52/7 151/23 214/18 214/24 223/10
Aetna [4]  123/6 144/4 201/23 202/9
Aetna's [1]  202/6
affect [2]  105/1 117/7
affected [5]  121/17 121/19 123/2 167/14 176/13
affectionately [1]  84/11
affects [1]  66/14
affidavit [7]  204/21 221/6 223/8 229/17 230/25 231/19 232/6

affidavits [4]  54/7 60/19 144/25 205/10
affiliate [3]  210/2 213/13 226/24
affiliated [1]  57/18
affiliating [1]  81/22
affiliation [17]  38/3 38/11 73/7 116/18 208/6 208/9 209/10 209/21 210/7 210/13 210/20 210/24 211/23 212/3 212/5 213/7 214/10
affiliations [1]  215/14
affirm [2]  100/23 129/19
affirmative [1]  225/5
affirmatively [1]  117/5
affirming [1]  28/4
afford [1]  64/21
afforded [1]  230/8
afraid [2]  58/6 66/14
after [49]  6/24 7/3 11/12 11/13 13/12 18/18 18/19 19/10 24/8 24/15 26/14 39/17 40/20 46/18 53/22 60/4 67/1 85/24 89/21 94/22 98/12 103/15 105/24 106/2 106/16 106/21 113/5 119/17 120/20 121/7 121/7 128/20 129/12 130/4 142/3 145/9 149/14 173/16 179/11 186/12 189/17 207/1 208/2 217/19 219/24 220/10 226/17 227/8 234/13
afternoon [10]  114/7 114/10 114/13 114/20 129/22 133/4 133/5 157/7 207/18 233/17
afterwards [1]  114/17
again [92]
against [17]  11/11 12/7 16/11 16/13 49/13 52/23 54/9 55/20 55/24 57/7 57/10 57/12 57/14 101/12 106/9 107/10 181/9
agencies [1]  205/3
agency [1]  8/13
agenda [1]  129/21
aggregates [1]  21/3
aggressive [11]  54/9 54/17 57/22 65/17 65/19 78/25 84/20 84/21 85/13 91/8 115/23
ago [6]  16/10 115/12 115/13 173/9 184/12 227/4
agree [8]  5/19 5/22 5/24 60/3 60/13 99/2 139/9 162/1
agreed [7]  3/7 9/16 38/19 102/16 113/13 142/4 229/13
agreeing [1]  56/12
agreement [28]  7/6 49/6 49/7 59/12 66/22 107/3 107/5 107/6 108/10 109/21 109/22 109/24 109/25 126/24 128/13 128/14 131/6 133/11 186/12 208/4 216/10 216/13 224/14 224/18 225/23 227/5 229/1 233/14
agreements [3]  3/17 108/16 108/25
ah [3]  101/11 227/23 232/20
aha [1]  119/13
ahead [7]  12/16 68/5 85/3 150/21 157/12 166/2 179/15
aid [1]  214/5
air [4]  168/10 168/11 168/11 168/14
Akenberger [2]  230/12 231/16
Akenberger's [4]  221/6 223/8 230/25 233/12
Alan [2]  58/4 115/24
align [1]  216/21
alignment [1]  85/6
ALJ [3]  111/1 111/16 112/5
all-powerful [1]  50/8
allegation [2]  139/10 147/22
allege [2]  121/10 143/23
alleged [21]  19/2 28/16 33/12 82/15 96/2 96/11 96/17 96/24 130/9 130/14 134/14 141/10 142/14 142/21 145/11 146/14 148/2 148/5 152/10 179/19 194/2
allegedly [6]  128/19 128/21 136/7 144/25 145/3 149/10

alleges [3]  24/19 24/20 147/19
alleging [1]  22/21
alleviated [2]  225/22 226/21
allow [14]  48/24 98/10 103/4 170/20 170/21 191/22 210/8 210/15 218/10 218/16 219/1 219/8 219/12 225/1
allowed [2]  7/19 46/12
allowing [1]  191/17
allows [4]  10/10 106/5 133/25 183/1
alluded [3]  211/22 221/3 221/22
almost [18]  3/3 11/2 15/22 28/25 29/10 30/18 30/22 31/4 31/6 32/9 33/24 34/3 43/10 46/7 128/2 180/9 193/11 220/24
alone [19]  31/13 34/14 34/14 34/24 35/15 47/24 127/4 130/6 157/24 158/8 171/11 175/11 179/4 208/11 208/17 209/8 216/16 219/6 223/12
along [2]  117/4 159/10
already [36]  4/23 5/4 5/7 8/2 32/17 34/10 34/12 35/15 41/12 49/23 58/22 59/18 64/18 67/23 71/4 73/4 84/9 97/23 102/18 105/18 109/16 109/20 110/7 157/1 189/2 189/7 191/8 198/19 202/22 215/21 221/13 221/14 224/5 228/23 230/10 233/15
also [83]
alternative [5]  63/6 81/1 81/25 146/22 148/20
alternatives [5]  10/8 81/21 125/25 131/16 215/17
although [10]  142/18 145/7 146/13 149/17 154/8 162/16 173/10 178/12 193/7 194/12
altogether [1]  200/3
altruistic [1]  55/17
always [9]  11/2 68/2 68/24 94/13 104/7 115/16 124/3 125/1 194/13
am [5]  12/23 41/6 113/10 113/20 186/16
Aman [1]  216/4
amazing [1]  48/14
Amazingly [1]  31/10
Ambac [5]  167/8 167/8 167/9 167/10 226/4
ambiguity [3]  38/12 39/1 50/10
ambitious [1]  85/13
ambulatory [1]  22/7
amending [1]  10/6
amenities [1]  45/4
America [1]  101/9
among [7]  74/17 142/8 148/25 165/12 203/3 209/3 232/8
amount [10]  25/25 30/23 44/14 45/25 59/13 75/24 105/4 112/6 201/8 207/13
amounts [1]  160/3
Amy [6]  2/14 2/16 4/5 4/5 129/22 133/3
analogy [2]  23/11 55/19
analysis [22]  12/21 21/4 35/4 69/6 77/6 77/18 77/22 78/10 78/12 78/14 78/20 79/9 79/11 95/13 140/17 150/2 156/11 163/16 164/6 176/20 177/10 185/9
analytical [2]  20/4 25/16
analytically [1]  23/8
analyze [5]  20/6 151/15 151/16 152/22 191/4
analyzed [1]  33/13
analyzing [2]  6/18 150/12 153/14
anchor [1]  148/4
and/or [1]  152/15
anger [1]  27/18
Ann [1]  211/9
Anne [4]  16/3 21/19 188/12 194/1
Anne's [8]  25/10 28/13 28/13 190/7 190/8 190/9 190/16 190/18
annual [2]  18/1 232/22

**A**

annually [1]  223/14
another [41]  10/4 23/21 23/23 32/8 38/2 39/2
 39/16 41/6 57/18 58/2 58/3 63/10 63/16 64/1
 66/14 66/16 74/12 79/20 80/2 92/20 99/23
 100/15 107/10 115/24 121/14 133/23 142/18
 146/2 161/12 171/2 174/1 182/15 195/2
 210/7 214/2 219/14 226/8 226/24 228/24
 230/23 233/2
answer [12]  25/13 56/15 57/3 66/8 118/12
 124/2 124/6 131/10 132/25 152/18 152/20
 193/2
answered [2]  67/12 157/6
answers [1]  57/4
Anthem [25]  44/3 119/14 119/23 120/2
 120/4 123/6 124/13 131/6 131/23 144/4
 165/1 171/18 171/19 171/25 172/1 173/6
 173/9 173/23 174/8 175/9 175/11 175/16
 182/25 201/14 202/13
Anthem's [7]  45/23 46/1 46/3 131/25 132/16
 171/17 171/23
anticipate [1]  39/8
anticipated [2]  38/14 38/25
anticipating [1]  39/5
anticompetitive [30]  11/21 12/2 12/8 19/10
 67/24 76/10 76/11 104/12 117/22 118/3
 118/6 125/11 128/13 128/20 128/21 131/14
 132/9 139/7 139/13 142/11 148/14 148/17
 149/19 153/22 153/23 183/20 201/4 204/11
 206/2 206/15
antitrust [21]  2/8 7/22 10/1 11/5 11/15 12/21
 16/20 54/8 54/11 76/13 101/12 107/11
 117/15 117/18 117/19 118/20 129/13 134/14
 150/2 150/17 205/14
anxiety [1]  147/3
anxious [1]  103/11
any [93]
anybody [2]  177/11 205/24
anymore [4]  123/9 194/1 222/19 223/3
anyone [3]  40/23 51/3 131/2
anyone's [1]  90/25
anything [12]  55/9 87/9 98/23 110/3 125/22
 170/7 175/25 181/13 182/24 193/15 205/24
 225/3
Anytime [1]  186/7
anyway [2]  180/24 220/25
anyways [2]  69/23 107/16
anywhere [3]  26/7 40/22 200/6
apace [1]  111/16
apologize [1]  113/17
apparent [1]  212/14
Apparently [1]  169/20
appeal [4]  7/4 112/5 112/11 133/20
appeals [10]  7/4 9/4 135/7 135/18 137/15
 142/25 143/12 146/11 147/2 219/25
appear [3]  133/7 133/7 187/2
appearance [1]  115/6
appearances [4]  1/16 1/25 2/1 3/21
appears [5]  25/19 99/11 124/22 188/9 228/17
apples [2]  33/15 33/15
applicable [1]  143/25
applications [1]  229/23
apply [3]  16/6 106/13 129/24
appoint [1]  108/17 109/8
approach [2]  118/24 150/1
approached [1]  214/9
appropriate [12]  19/21 19/23 20/8 21/10
 26/11 26/24 28/1 31/15 31/15 50/24 136/5
 151/16

approval [2]  18/16 189/8
approve [3]  18/1 76/12 103/2
approved [2]  191/9 209/14
approximately [6]  39/12 165/3 167/5 174/14
 188/12 223/14
approximation [1]  83/2
April [3]  85/1 85/3 212/1
April 2009 [2]  85/1 85/3
Arbor [1]  211/9
Arch [4]  135/14 147/1 147/10 150/17
area [56]  18/24 38/2 41/5 42/13 42/13 42/18
 42/22 43/3 43/6 43/13 43/16 46/5 46/8 47/15
 52/18 55/14 61/9 63/6 63/23 63/25 84/14
 85/12 85/18 139/11 142/19 153/20 165/20
 171/3 181/16 188/7 188/8 190/4 196/7 196/8
 196/10 196/13 196/17 196/19 196/20 196/22
 196/23 196/24 196/24 197/5 197/9 197/12
 197/15 197/19 198/7 198/11 198/13 198/13
 198/14 211/17 211/20 228/6
areas [1]  152/14
aren't [9]  27/17 72/7 72/11 75/8 92/4 117/22
 152/10 222/14 231/14
argue [6]  23/5 32/19 137/19 140/9 164/5
 176/20
argued [5]  17/7 134/12 134/16 155/4 213/25
argues [2]  41/20 107/2
arguing [4]  32/23 88/19 90/25 178/10
argument [5]  6/5 39/22 72/17 84/6 208/3
arguments [4]  5/19 23/3 76/20 98/8
around [12]  27/17 31/18 42/12 43/16 82/1
 83/9 83/9 86/1 116/10 159/4 196/13 228/19
array [2]  75/25 189/21
arrest [1]  10/6
Arrowhead [5]  180/23 218/6 219/15 223/17
 232/23
arrows [1]  73/8
arsenal [1]  72/4
Article [1]  220/6
articulate [1]  125/1
articulated [2]  138/23 147/5
articulation [1]  135/8
aside [3]  23/21 64/7 216/5
ask [10]  7/8 56/14 56/15 80/21 100/6 102/25
 103/1 103/20 104/14 177/15
asked [6]  34/4 57/21 68/22 106/3 109/7
 118/4
asking [9]  5/14 7/15 7/25 103/23 104/2 104/8
 107/16 108/12 111/7
aspect [2]  106/3 139/4
aspects [2]  147/17 147/18
asserted [1]  143/8
asserting [1]  169/4
assertion [1]  137/22
assertions [3]  89/1 89/8 89/13
assessing [1]  203/14
assessment [2]  44/17 116/8
asset [1]  108/8
assets [5]  18/3 156/21 159/14 166/14 168/9
associate [1]  115/9
assume [1]  3/15
assumed [2]  225/25 225/25
assumes [1]  111/14
assuming [2]  105/16 131/2
assumptions [3]  149/24 176/24 177/23
astounding [1]  5/22
attained [1]  202/13
attempt [2]  19/8 183/14
attempts [4]  181/23 183/19 203/6 204/23
attention [1]  221/4
attitude [1]  212/20

Attorney [2]  2/7 4/15
attract [4]  17/15 181/2 188/19 190/9
attracting [1]  86/5
attractive [8]  45/16 53/8 60/18 61/13 61/16
 62/8 66/25 67/6
attribute [1]  174/23
August [10]  85/5 85/22 86/10 89/16 130/6
 157/9 157/18 168/1 179/4 216/2
August 2010 [1]  85/5
August 31st [5]  85/22 86/10 130/6 157/9
 157/18
authorized [1]  7/21
autonomy [1]  215/4
availability [1]  105/23
available [4]  8/10 71/12 166/15 168/2
Avenue [4]  1/18 1/20 2/3 2/5
average [14]  28/5 28/8 35/17 40/10 92/8 93/5
 123/6 174/6 174/9 174/14 194/16 194/22
 228/5 228/5
avoid [2]  156/20 218/4
avoidance [4]  219/17 223/15 223/16 223/19
avoidances [1]  232/20
avoided [2]  224/3 232/21
awarding [1]  212/14
aware [8]  22/25 56/18 56/18 68/8 79/23
 97/15 167/16 200/14
awareness [1]  95/7
away [7]  28/9 44/15 76/15 90/20 143/9
 145/20 197/24
axis [1]  73/10

**B**

Baa [3]  92/18 92/19 93/5
Baa2 [1]  226/17
babies [6]  27/23 88/5 190/16 190/22 200/3
 200/14
baby [4]  27/17 123/13 152/2 152/2
back [30]  47/6 53/5 53/14 53/16 57/8 61/2
 65/21 67/25 76/18 79/12 115/16 130/8
 137/15 162/22 162/22 164/15 164/16 169/2
 177/24 178/5 197/4 198/23 199/23 199/25
 231/5 232/8 232/12 233/21 234/6 234/12
bad [3]  87/13 210/11 222/10
Baker [1]  139/25
balance [4]  79/25 93/18 167/10 205/18
Bank [5]  10/5 11/22 32/2 79/15 138/20
bar [1]  199/16
Barbara [1]  74/12
barely [2]  173/19 233/23
bargained [1]  121/13
bargaining [7]  58/15 58/15 58/24 63/18
 118/7 148/24 152/16
bars [1]  194/15
base [1]  212/21
based [32]  16/22 22/15 31/12 32/13 40/10
 42/14 47/4 61/5 61/6 78/7 89/18 96/18 97/6
 104/16 104/17 104/17 104/21 104/23 105/1
 105/2 124/19 126/8 160/19 164/6 164/11
 176/19 177/3 177/20 201/7 211/15 228/17
 230/3
basic [3]  19/19 122/11 194/5
basically [4]  26/22 29/7 45/5 54/10
basis [11]  33/16 119/4 119/7 141/19 150/19
 151/22 151/25 174/15 174/15 190/2 232/22
Bass [1]  32/12
Bathija [1]  115/9
Bay [5]  13/25 16/3 75/6 107/1 188/15
BBB [1]  221/6
Beach [2]  1/8 1/23
beauties [1]  185/23

## B

beautifully [1]  101/14
became [3]  86/15 116/20 120/7
because [134]
become [9]  16/16 16/19 17/23 57/13 67/7
 80/13 80/16 102/1 225/23
becomes [8]  30/9 30/10 36/3 59/19 66/25
 67/5 91/24 91/24
bed [2]  189/8 232/22
bedded [2]  76/23 187/3
beds [21]  13/25 14/1 14/2 15/5 29/3 87/10
 87/14 87/22 168/16 168/16 168/18 187/4
 187/4 190/18 191/14 191/18 191/22 191/25
 200/21 200/23 200/25
before [57]  1/13 4/9 4/19 10/7 29/12 29/15
 35/9 45/11 46/19 47/4 47/5 52/25 53/16
 56/12 60/15 61/14 77/15 83/4 84/18 85/22
 86/7 86/10 86/22 88/18 89/25 90/2 95/10
 101/19 105/3 108/14 113/3 114/19 117/4
 121/14 128/19 129/11 129/17 133/22 137/6
 137/10 143/20 146/5 185/5 189/17 196/2
 200/16 206/13 206/14 212/23 221/8 224/20
 226/13 226/14 226/15 228/15 231/4 233/19
beg [1]  155/11
began [6]  116/17 116/22 154/9 159/9 209/10
 210/19
begin [3]  6/11 114/19 217/13
beginning [3]  139/24 211/24 228/17
behalf [7]  4/6 4/16 8/14 94/8 115/6 128/23
 167/7
behind [4]  114/8 115/7 123/19 133/7
behold [2]  206/23
being [28]  18/5 19/23 24/21 28/18 34/1 54/12
 55/6 55/17 57/22 70/10 71/18 75/10 88/18
 92/14 92/14 93/4 102/10 104/16 109/2 111/6
 115/23 144/12 147/25 151/23 152/19 200/12
 212/23 228/18
belated [1]  119/12
belie [1]  42/3
belied [2]  43/23 45/18
belies [1]  178/8
believe [16]  11/18 24/6 25/23 40/1 47/22
 62/19 69/20 69/21 90/12 97/10 162/1 183/18
 209/13 214/22 220/15 227/24
believed [5]  38/1 53/13 143/2 146/9 218/3
believes [3]  8/6 69/20 228/3
below [4]  173/12 174/14 174/17 174/18
benchmark [2]  204/15 205/25
beneficial [1]  79/19
benefit [19]  13/20 55/17 75/1 75/4 92/11
 113/2 143/4 160/4 168/24 187/13 212/24
 212/24 216/7 217/21 224/6 227/15 230/2
 233/4 233/6
benefited [2]  221/15 225/10
benefits [22]  36/19 36/20 38/7 45/9 66/25
 91/4 130/19 132/23 132/24 142/10 176/4
 192/15 214/2 220/20 221/2 221/12 221/14
 223/1 224/9 227/21 233/4 233/8
Bennett [1]  115/4
besides [3]  58/2 195/15 213/17
best [17]  5/24 54/25 56/7 70/19 124/2 131/19
 170/13 182/7 191/5 200/16 205/13 215/23
 217/24 218/13 219/12 219/13 230/3
Beth [2]  2/7 3/25
better [30]  5/25 39/24 55/5 70/17 73/10
 74/23 75/1 79/7 93/3 93/5 94/21 102/21
 110/19 132/8 146/10 177/20 189/16 194/20
 201/9 207/23 209/15 214/19 219/11 224/20
 225/2 226/13 226/14 232/9 232/12 232/17

between [21]  3/9 3/15 13/11 59/16 65/11
 113/14 115/11 116/8 116/16 120/16 133/12
 141/3 145/15 153/21 163/7 171/10 193/3
 202/18 217/20 219/13 227/17
beyond [4]  127/21 145/4 168/7 168/12
big [15]  47/9 72/22 75/1 115/7 187/11 198/9
 199/16 202/8 223/16 223/18 223/18 225/8
 231/18 231/24 233/1
bigger [1]  201/9
biggest [2]  124/9 70/19
bilateral [1]  58/25
billion [1]  93/2
bills [1]  86/4
birthing [3]  88/4 168/16 168/16
bit [25]  27/8 80/3 118/21 119/20 127/22
 141/8 145/6 160/14 161/6 161/11 171/19
 172/4 183/23 186/22 188/3 188/5 188/10
 188/11 191/11 195/5 195/13 199/5 202/20
 205/5 234/15
black [3]  94/22 115/1 212/11
blank [1]  101/25
bleed [1]  166/18
bleeding [2]  176/15 232/2
block [1]  133/25
blown [2]  213/18 214/9
blue [1]  196/19
Bluff [5]  142/16 142/18 143/3 143/7 143/9
board [69]  18/9 18/12 18/15 18/17 18/17
 35/23 37/7 37/12 37/14 37/15 37/23 37/25
 38/6 39/3 57/24 58/8 58/8 58/8 70/3 73/4
 73/14 73/22 73/23 73/25 74/3 81/19 84/2
 87/17 87/20 89/17 89/22 94/8 94/12 94/14
 94/25 95/9 98/10 99/12 99/18 99/20 100/1
 100/3 100/4 100/7 100/9 100/10 100/11
 114/24 115/1 119/10 120/8 126/25 208/9
 209/13 212/7 212/11 212/19 212/25 213/10
 215/6 215/10 216/2 217/15 217/23 218/25
 219/22 220/2 220/7 220/12
boards [1]  116/22
boasted [1]  207/3
bold [1]  137/22
bolster [1]  35/4
bond [25]  92/16 92/18 93/6 93/8 93/10 93/12
 93/20 93/24 93/25 93/25 163/11 163/16
 164/3 164/11 164/18 165/18 167/3 217/9
 225/15 225/16 226/5 226/5 226/12 226/15
 226/18
bonds [5]  93/23 167/4 167/6 167/10 226/2
bone [1]  160/11
bonuses [1]  212/15
born [5]  88/5 200/3 200/14 200/15 200/16
borne [5]  64/10 64/16 64/22 64/23 126/2
borrow [2]  166/25 223/24
borrowed [1]  93/1
borrowing [1]  163/15
both [48]  5/18 6/5 13/8 19/3 23/12 26/12
 28/2 28/25 33/18 43/1 47/16 60/10 81/2 83/5
 87/3 90/22 91/7 95/17 115/14 129/25 130/19
 134/6 136/10 136/11 138/2 141/25 144/12
 146/6 148/1 155/17 165/17 165/18 167/15
 170/10 180/16 188/20 188/21 206/12 206/15
 206/18 215/6 215/23 217/24 218/1 218/24
 224/17 224/23 231/17
bother [2]  43/20 107/18
bottom [4]  18/4 40/3 56/8 64/13
bound [2]  47/21 57/20
box [1]  114/12
Brass [2]  115/24
break [8]  53/18 112/25 157/11 157/13 174/3
 176/5 176/12 179/10

breakdown [1]  159/14
breaker [4]  51/10 51/11 51/15 212/23
breaking [1]  53/19
Brick [2]  92/25 93/13
Bricks [2]  164/7 164/16
brief [14]  9/20 13/21 18/20 28/11 95/15
 100/16 100/18 103/11 108/19 109/18 124/17
 124/21 124/21 139/25
briefings [1]  15/16
bring [1]  196/16
bringing [1]  41/13
brings [1]  153/20
broad [1]  19/15
broader [3]  24/20 24/21 192/25
broadly [1]  8/10
Brothers [1]  32/12
brought [8]  78/11 83/8 137/2 140/21 141/3
 147/14 159/4 191/7
Brown [1]  9/25
budgeting [1]  177/8
budgets [1]  18/2
build [6]  142/10 189/10 218/7 219/15 223/19
 223/24
building [1]  76/24
built [2]  94/23 223/17
bull's [1]  57/8
bullet [1]  14/17
bullets [1]  77/20
bumped [1]  226/17
bunch [1]  41/1
bundle [12]  23/6 23/7 23/9 23/13 23/14
 23/22 23/23 24/2 24/6 24/7 24/12 26/24
bundled [1]  209/2
burden [19]  8/25 9/11 9/14 11/16 19/7 19/7
 79/14 80/5 80/6 96/1 97/9 107/15 111/3
 126/12 129/17 130/12 135/12 139/4 234/8
bureaucratic [1]  213/12
burned [1]  87/22
bursting [1]  201/1
business [27]  14/5 14/7 36/22 42/3 42/10
 42/24 44/14 47/3 47/11 48/19 49/1 49/13
 50/14 53/11 54/13 54/18 59/6 59/13 61/23
 90/15 108/18 108/21 156/5 169/15 179/5
 213/2 231/14
businesses [3]  86/1 99/22 109/8
Butterworth [15]  8/24 22/16 22/16 98/2 98/4
 98/7 98/21 98/25 99/7 99/9 135/9 137/8
 141/8 155/21 227/16
Butterworth's [1]  100/10
buy [2]  27/18 168/13
buyers [1]  144/17
buying [1]  23/12

## C

calculated [2]  42/23 148/12
calculation [1]  129/1
calculations [3]  13/9 42/25 177/18
California [3]  109/7 137/1 137/3
called [6]  18/19 51/14 80/10 84/11 91/13
 93/24
calls [2]  92/18 92/19
Calvert [4]  33/19 68/6 77/21 203/11
came [18]  82/13 84/19 86/11 86/16 119/16
 119/17 119/22 159/5 160/18 161/20 161/24
 164/7 166/15 173/16 198/3 206/7 206/18
 214/15
campus [2]  188/22 229/7
can't [25]  59/12 71/10 76/11 79/7 87/10
 103/19 104/22 124/3 126/9 132/19 182/22
 183/11 186/12 187/9 190/6 192/1 195/23

**C**

can't... [8] 196/19 205/4 218/14 223/25 224/23 224/25 225/4 225/5
cannot [15] 5/9 20/23 49/25 50/3 62/11 79/22 82/6 82/19 102/6 107/10 130/12 150/17 155/4 220/1 223/11
cap [1] 99/3
capacity [29] 70/25 71/3 71/6 71/6 71/8 71/10 71/12 71/14 71/17 81/7 86/24 87/19 87/20 87/25 88/7 88/9 94/17 94/18 95/3 183/22 186/10 186/10 186/13 186/17 186/24 187/3 190/17 200/17 201/1
capital [37] 18/2 86/5 88/21 89/9 89/10 159/12 159/13 159/15 163/13 166/25 167/14 167/22 205/19 209/15 210/3 211/12 214/12 214/25 216/17 217/11 218/4 219/1 223/5 223/5 223/15 223/16 224/13 225/17 226/9 226/10 226/19 228/24 229/6 232/19 232/21 234/1 234/1
caps [1] 98/24
car [2] 93/24 94/1
cardiac [5] 176/7 192/11 192/12 213/21 213/23
Cardinal [1] 32/8
Cardiology [1] 21/7
cardiovascular [2] 190/23 222/13
care [139]
Care's [2] 161/16 161/25
careful [1] 149/14
Carletti [8] 2/16 4/5 153/10 190/20 199/17 208/15 222/11 225/12
Carletti's [2] 119/19 130/4
carve [3] 24/1 24/13 24/13
carve-out [1] 24/13
carve-outs [1] 24/13
case [134]
cases [29] 9/8 12/21 24/18 65/10 82/14 95/16 95/19 95/24 96/2 98/2 121/11 125/11 128/12 128/16 136/22 137/18 139/23 141/7 147/12 149/1 150/5 150/18 151/5 151/14 152/12 155/18 190/24 203/15 232/3
cash [25] 81/8 85/21 86/7 86/9 86/13 86/17 86/20 93/4 93/6 93/10 158/13 164/4 166/1 166/3 166/4 166/6 166/6 166/8 166/13 166/15 166/15 166/22 166/22 176/22 233/25
categories [1] 93/3
category [1] 209/9
Catholic [1] 215/7
Cathy [3] 114/6 114/13 123/22
cause [7] 18/18 31/22 34/18 47/25 82/20 122/23 227/11
caused [1] 163/10
causes [1] 11/23
CBS [1] 91/20
CCC [2] 8/11 11/6
cease [1] 227/11
cede [1] 121/14
celebrating [1] 16/24
center [12] 27/12 88/4 95/13 116/5 138/23 147/13 154/7 176/7 188/13 192/12 211/24 229/12
centers [3] 22/7 22/8 94/17
central [2] 28/9 109/6
centrally [1] 188/10
CEO [21] 16/24 18/13 37/7 37/11 37/17 37/22 39/3 54/22 58/4 68/13 83/8 86/15 94/10 99/21 208/13 209/18 212/18 213/6 216/1 216/10 217/3
CEOs [1] 207/2

certain [6] 12/23 53/5 132/11 168/6 193/14 195/6
certainly [3] 82/6 119/11 202/11
certainties [1] 10/3
certainty [2] 10/10 112/7
CERTIFICATE [1] 235/3
Certified [1] 235/5
certify [1] 235/5
cetera [1] 131/4
chains [1] 55/5
chair [1] 114/13
chairman [5] 114/23 115/1 212/11 216/2 228/1
challenge [7] 5/12 31/8 133/11 147/14 149/3 164/22 165/14
challenged [1] 10/17
challenges [6] 141/4 164/17 164/24 165/7 165/13 211/7
challenging [3] 112/2 137/3 209/8
Chamber [1] 54/22
chance [4] 77/4 134/17 135/16 170/24
change [17] 30/21 79/12 92/10 93/14 102/21 107/6 116/15 118/24 128/3 128/4 158/6 165/24 176/17 178/6 184/9 191/21 220/1
changed [4] 6/11 91/14 116/19 190/4
changes [4] 101/6 149/25 192/6 216/22
changing [2] 127/14 184/11
Chappell [3] 6/14 101/20 111/1
characteristics [2] 145/7 185/8
characterization [1] 154/18
characterize [1] 64/6
characterized [2] 134/25 135/1
charge [12] 48/22 48/23 49/20 49/20 65/13 65/14 70/13 98/15 100/8 118/15 119/2 186/4
charged [1] 48/21
charges [7] 117/12 117/23 118/13 119/3 124/12 173/3 173/4
charging [5] 118/3 118/5 119/23 187/16 196/2
charity [6] 170/22 172/13 172/16 172/24 199/2 210/11
Charles [6] 16/3 25/10 28/12 188/15 190/12 190/17
chart [9] 70/9 73/6 73/16 73/17 73/18 196/22 197/20 202/4 225/14
check [2] 101/25 183/1
checked [2] 184/16 184/25
cherished [1] 209/9
Chicago [4] 2/13 2/18 2/20 140/14
chief [4] 75/19 115/2 115/14 116/20
children's [3] 188/22 213/22 213/24
choice [7] 61/5 61/8 62/1 63/9 202/17 202/18 202/20
choices [4] 28/23 42/20 58/10 153/1
choose [5] 13/11 46/12 55/7 56/16 58/12
choosing [4] 45/5 45/21 57/18 150/2
chose [7] 11/2 56/21 56/24 57/25 58/2 208/7 226/24
chosen [1] 153/3
chunk [1] 231/24
Cigna [1] 123/9
Cincinnati [1] 215/8
circuit [34] 7/13 7/24 8/21 8/22 8/24 9/13 9/14 12/5 12/15 12/17 13/10 18/24 19/23 22/14 22/16 32/5 32/6 77/1 80/9 82/4 82/13 98/4 111/18 111/21 112/6 112/19 121/8 129/19 133/21 134/4 135/14 135/18 140/1 147/2
circulatory [1] 195/1
circumstances [1] 116/15

citation [1] 125/23
citations [1] 119/12
cite [4] 103/19 103/20 110/3 200/10
cited [7] 96/1 103/13 126/19 139/25 164/3 204/10 222/8
cites [1] 125/1
cities [2] 140/14 183/24
citizens [1] 34/19
City [2] 140/14 167/6
CIV [1] 1/2
claim [20] 43/18 43/23 47/22 71/18 72/17 95/15 110/8 134/9 136/2 136/14 136/20 138/10 138/12 138/13 139/5 139/16 150/14 154/14 154/20 156/13
claimed [6] 15/17 29/7 45/12 77/8 77/19 78/16
claims [5] 74/23 76/22 78/3 136/25 154/17
Clayton [6] 9/19 9/20 9/21 10/9 133/13 179/23
clear [40] 7/14 8/9 8/21 14/5 17/20 21/7 23/8 36/22 41/16 42/15 44/22 49/3 53/2 55/8 56/21 63/17 64/8 66/18 66/20 70/18 76/20 92/4 105/19 106/1 107/22 110/12 110/13 110/15 113/19 117/14 120/7 123/11 126/6 131/13 149/5 169/3 177/24 181/15 206/13 206/16
clearly [3] 12/1 104/12 154/14
Clematis [1] 1/23
Cleveland [6] 145/12 192/16 210/22 210/25 211/1 211/4
click [1] 188/2
clients [1] 62/12
Clinic [4] 192/16 210/22 210/25 211/1
Clinic's [1] 211/4
clinical [4] 15/11 210/5 219/12 230/1
clock [1] 234/6
close [19] 4/22 4/23 16/15 16/18 41/21 41/24 44/6 44/9 45/7 51/17 52/10 61/3 70/10 80/14 80/17 88/7 102/2 190/25 207/19
closed [1] 132/18
closely [4] 83/25 116/17 150/12 192/25
closeness [1] 46/9
closer [1] 196/13
closest [2] 179/24 182/1
closing [3] 167/11 227/8 229/3
clothes [1] 195/14
clout [6] 36/23 38/6 55/4 59/24 69/1 70/7
cluster [20] 19/15 19/24 20/3 20/5 20/6 20/12 20/14 20/22 20/23 21/3 21/6 21/10 21/11 21/11 21/18 21/21 21/24 141/14 151/14 151/20
co [3] 4/14 4/16 64/17
co-pays [1] 64/17
co-plaintiffs [2] 4/14 4/16
code [1] 43/3
codes [3] 42/14 42/17 42/17
cognizant [2] 56/25 202/23
coin [1] 170/7
Coke [2] 55/4 55/19
colleague [2] 129/22 208/15
colleague's [1] 202/23
colleagues [3] 145/6 203/16 222/5
collect [1] 187/24
collected [1] 171/14
colorblind [3] 195/7 195/12 195/13
colorful [1] 58/3
Columbia [2] 147/2 150/16
Columbus [1] 2/9
combination [2] 147/20 152/8
combinations [1] 138/7

**C**

combine [1]  191/5
combined [18]  13/7 31/3 32/3 32/6 32/8
32/12 32/17 95/24 96/11 96/14 96/18 97/2
105/4 124/10 149/12 198/12 206/25 214/19
comes [17]  4/16 7/12 7/24 8/2 8/24 9/8 10/20
11/22 14/18 26/22 90/7 92/24 101/8 162/10
164/10 201/9 231/19
coming [6]  13/15 58/10 88/8 108/2 111/4
176/25
comments [3]  154/8 212/22 212/25
commerce [2]  54/22 133/15
commercial [34]  14/4 15/23 16/1 25/1 117/9
118/16 119/14 121/23 124/13 163/24 164/23
164/24 164/25 165/8 165/9 170/3 170/12
172/22 173/6 174/5 174/18 175/8 178/19
193/21 193/23 197/6 199/6 199/15 204/14
206/5 210/12 210/14 214/16 218/17
commercially [16]  19/17 62/8 117/13 118/16
121/16 123/3 123/12 124/10 131/20 197/10
198/21 199/3 199/6 199/10 199/21 200/9
commercially-insured [8]  19/17 123/3
123/12 124/10 131/20 197/10 198/21 199/21
COMMISSION [24]  1/3 1/17 1/20 2/2 2/5
3/24 4/14 6/18 7/2 13/16 106/15 106/20
111/9 111/17 111/17 112/5 112/12 112/12
112/19 129/18 133/19 133/24 136/12 147/16
commission's [2]  6/23 134/8
Commissioners [1]  133/20
commit [2]  109/24 229/1
commitment [9]  98/11 126/15 126/21 187/11
207/20 218/1 227/15 227/15 227/17
commitments [1]  220/7
commits [1]  135/22
committed [5]  110/7 135/24 226/8 228/23
228/24
committee [2]  159/22 228/3
common [1]  140/5
communal [1]  100/10
Communications [1]  12/14
communities [5]  142/20 144/11 215/25
217/25 218/2
community [51]  14/1 38/3 38/17 39/18 56/5
56/7 56/17 57/1 63/23 76/23 89/20 98/10
99/9 99/11 99/18 99/20 99/20 99/21 100/9
104/23 106/18 108/8 110/19 130/6 130/19
142/11 162/19 162/20 175/11 176/13 180/20
187/13 191/7 191/17 207/21 207/22 207/23
208/11 208/17 209/4 216/7 216/16 217/21
219/6 219/20 221/13 224/7 226/25 227/15
227/21 233/6
community's [1]  219/11
companies [10]  32/3 38/13 68/17 91/19
91/20 108/16 144/3 148/25 160/8 166/21
company [4]  82/8 82/9 88/18 158/7
compare [3]  12/19 196/14 196/16
compared [4]  73/19 93/6 97/1 198/1
comparison [1]  33/16
comparisons [1]  74/15
Compass [1]  78/24
compatibility [1]  209/15
compel [1]  45/17
compensated [1]  187/7
compensation [1]  216/19
compete [21]  42/11 43/14 43/14 43/15 49/5
49/13 52/8 52/22 54/14 55/1 55/24 57/6 57/9
57/14 146/10 181/11 188/19 189/10 189/16
192/25 202/2
competing [8]  13/2 17/14 57/12 165/14 181/9

194/11 205/10 214/19
competition [30]  9/23 9/24 10/11 10/17
10/18 11/25 12/20 23/16 24/7 43/16 46/10
46/10 52/10 55/22 70/19 79/17 79/24 103/10
121/21 130/9 130/14 133/16 138/8 138/15
139/1 147/7 154/25 155/1 179/18 193/8
competitive [72]  14/10 17/17 20/6 20/13 21/1
22/2 22/9 22/15 23/12 30/5 31/22 34/18 35/4
40/25 54/9 54/25 78/21 82/19 97/6 103/16
117/20 117/21 118/10 118/11 118/17 118/17
124/13 124/19 125/13 125/18 125/25 126/8
126/11 128/7 129/1 129/6 130/10 130/18
132/9 139/2 145/18 148/10 148/18 150/3
153/19 154/1 154/3 155/3 155/5 155/8
165/15 169/7 178/23 179/19 180/5 180/14
181/8 181/24 185/11 186/20 192/15 193/4
203/7 203/14 207/17 218/17 218/22 220/20
221/2 221/12 223/1 233/18
competitively [2]  150/10 165/6
competitor [19]  4/23 4/24 15/18 16/5 16/15
16/19 21/20 41/24 43/12 43/19 45/7 48/13
51/17 102/2 122/2 140/12 144/20 146/19
182/10
competitor's [1]  125/17
competitors [19]  22/6 22/6 22/19 41/22 61/3
122/2 122/7 140/15 140/15 145/10 147/25
169/8 169/13 179/25 180/21 183/7 189/19
192/20 193/8
complaint [4]  121/2 127/21 136/6 137/23
complaints [1]  146/25
complete [1]  156/5
completely [1]  126/3
complex [2]  194/10 194/16
complexity [2]  194/16 195/5
complicate [1]  67/23
complicating [1]  215/14
comply [2]  230/3 234/2
complying [1]  208/23
components [1]  102/19
comprehensive [1]  77/18
comprised [1]  210/21
computation [1]  129/14
computerized [1]  229/21
concede [2]  124/22 126/9
conceded [7]  31/11 31/14 32/19 68/6 125/22
126/6 126/7
concedes [4]  25/19 97/4 124/17 124/18
concentrated [10]  24/22 30/9 30/10 30/20
31/5 72/8 97/25 139/18 140/10 141/1
concentration [39]  10/7 11/24 12/4 12/6
12/11 12/12 12/20 18/23 19/4 30/3 34/13
34/15 77/3 77/3 97/6 124/20 124/23 125/9
125/12 125/16 126/8 126/11 131/2 136/8
139/15 139/16 139/19 139/24 140/5 140/11
142/1 150/7 150/7 151/4 151/8 152/14 153/8
179/21 185/9
concentrations [2]  13/8 31/20
concern [12]  10/2 47/9 56/17 57/15 58/21
65/11 87/22 104/25 134/11 136/20 147/4
166/5
concerned [23]  16/4 35/22 40/25 41/3 41/6
48/12 51/23 74/1 74/1 74/4 104/24 122/22
164/2 165/25 212/7 212/13 212/16 213/4
213/11 213/11 213/13 215/6 217/15
concerns [8]  74/6 154/10 212/6 212/18 213/6
217/2 217/6 217/7
concession [2]  125/20 125/24 126/5
concluded [13]  116/13 156/6 163/17 208/10
210/17 213/16 214/5 214/17 215/21 215/23
217/20 217/23 218/9

conclusion [7]  8/3 89/18 100/23 130/1
148/19 164/8 214/15
conclusions [4]  77/19 77/23 164/10 176/24
conclusive [1]  149/19
condemn [2]  154/22 154/23
condemned [1]  153/18
condemning [1]  55/21
condition [11]  130/5 183/4 208/22 209/23
210/2 211/3 211/6 217/8 217/16 217/17
219/3
conditioning [2]  168/11 168/15
conditions [11]  20/19 20/21 22/3 22/15 53/5
76/8 145/19 145/24 148/10 149/24 165/11
conduct [4]  127/11 128/20 128/21 211/2
conducting [1]  212/2
conducts [1]  111/9
confer [1]  153/17
conference [1]  6/4
confident [1]  99/1
confidential [4]  50/18 54/20 113/22 182/24
confidentiality [2]  51/24 113/16
confines [2]  114/2 145/10
confirms [2]  51/21 94/21
conflicts [1]  12/19
Congress [5]  10/1 11/6 13/16 79/23 134/22
Congressional [1]  134/20
Congressionally [1]  6/18
Congressionally-mandated [1]  6/18
connected [1]  195/19
connection [1]  114/15
consecutive [1]  164/19
consent [1]  220/2
consequences [4]  59/6 65/1 166/23 169/14
conservative [1]  90/5
consider [12]  16/8 16/12 32/24 39/3 67/9
75/3 155/14 155/16 218/15 222/11 222/12
222/12
consideration [3]  174/21 209/25 210/1
considerations [1]  11/7
considered [7]  54/8 89/15 116/4 192/10
209/13 211/20 211/23
considering [7]  73/15 107/22 107/24 134/7
155/12 159/23 215/11
considers [2]  14/6 14/7
consist [1]  213/23
consistent [7]  37/5 38/15 38/15 68/3 74/18
154/19 233/14
consistently [1]  19/22
consisting [2]  148/3 202/8
consists [1]  62/12
consolidate [4]  140/22 190/11 190/17 191/3
consolidated [1]  106/25
consolidating [5]  106/19 107/7 107/23
107/24 213/23
consolidation [4]  144/18 156/1 191/9 231/25
constant [1]  57/7
constrain [6]  65/14 71/1 71/13 101/1 180/1
181/6
constraining [3]  71/3 71/15 72/5
constraint [4]  60/4 100/8 101/5 126/1
construct [2]  189/8 229/8
constructing [1]  218/5
construction [1]  229/9
consultant [1]  214/5
consultant's [1]  116/7
consumer [2]  5/15 144/20 146/20
consumer's [1]  10/7
consumers [6]  38/16 45/9 55/1 79/25 146/21
202/17
consummate [1]  7/1

# C

consummated [5]  46/19 87/16 90/1 97/23 127/24
consummation [2]  134/1 233/20
consumption [1]  55/7
contacted [1]  211/8
contacting [1]  210/20
contain [1]  179/17
contains [1]  221/6
contemplated [4]  222/24 222/25 223/23 231/25
contemplating [5]  93/8 93/9 105/22 106/19 110/13
contemporaneously [1]  206/11
contents [1]  113/25
contest [1]  95/18
contesting [1]  65/8
context [7]  9/6 11/10 15/21 25/2 79/13 103/6 153/23
continue [24]  3/14 38/12 52/18 68/20 73/5 74/15 93/14 101/3 127/25 150/10 162/19 166/7 167/1 175/10 181/5 187/9 187/11 191/1 207/20 208/10 208/17 228/7 230/10 233/10
continued [7]  1/25 2/1 86/23 127/15 145/10 163/19 164/22
continues [4]  7/18 94/25 227/25 228/4
continuing [3]  108/2 162/6 178/2
contract [20]  24/10 120/5 120/15 120/18 120/19 121/3 121/4 121/6 121/9 121/13 123/8 128/24 129/7 175/18 204/9 207/7 207/8 207/9 207/11 230/24
contracted [3]  201/13 201/14 201/16
contracting [1]  118/24
contracts [21]  18/1 38/2 52/19 57/6 70/7 99/25 99/25 127/13 127/13 128/21 129/6 158/25 163/24 164/23 165/6 170/3 170/11 172/22 176/9 204/14 204/22
contractual [2]  126/21 127/12
contractually [1]  219/19
contradicts [1]  97/16
contrary [9]  35/24 89/1 89/8 89/13 134/19 144/9 144/13 144/16 154/15
contrast [1]  198/5
contrasted [1]  143/16
contribute [4]  160/2 172/22 176/10 226/8
contributed [1]  226/7
contribution [2]  92/11 160/4
contrived [1]  143/13
control [6]  17/24 18/7 94/24 95/8 215/4 215/9
controlled [6]  25/12 33/14 99/12 107/10 187/12 207/21
controlling [1]  66/6
controls [1]  59/14
convenience [3]  20/4 20/16 21/5
convenient [1]  143/7
conversion [1]  229/9
converted [1]  160/3
convince [3]  83/21 145/12 145/13
coordinate [3]  74/25 75/10 110/19
coordinating [2]  74/23 209/3
coordination [3]  39/23 75/7 110/17
core [11]  42/13 42/22 43/13 46/5 46/8 85/12 85/17 181/16 196/13 219/21 229/22
corner [1]  63/22
Corp [2]  101/8 138/20
corporate [1]  160/21
correct [5]  9/12 74/21 137/24 204/4 235/6

corrected [1]  152/19
correlates [1]  61/10
corridor [1]  63/25
cost [94]
cost-cutting [3]  88/25 90/10 91/7
cost-effectively [1]  190/3
cost-saving [1]  231/15
costly [1]  208/25
costs [36]  41/5 64/18 64/19 65/2 65/4 66/2 66/5 89/6 90/15 90/16 90/22 91/11 105/1 159/8 159/11 162/9 163/15 164/1 170/4 170/20 171/11 173/19 175/1 175/20 175/21 186/25 187/1 187/15 187/20 204/24 205/17 205/21 210/9 213/14 218/4 232/21
counsel [3]  3/11 3/21 115/9
counter [2]  59/22 59/22
countervailing [1]  148/24
country [9]  9/9 10/16 11/11 31/18 86/2 90/24 133/15 140/20 160/8
County [102]
couple [18]  23/3 41/1 63/3 115/20 116/25 117/1 117/4 118/22 121/18 122/9 124/15 184/23 189/11 189/14 189/15 199/19 207/17 230/13
course [52]  5/18 5/20 5/22 29/1 29/3 37/6 39/7 42/10 42/24 43/5 46/17 48/23 52/7 66/19 67/20 75/24 85/25 94/13 96/23 99/6 102/24 104/18 112/3 116/25 118/21 121/15 132/18 133/8 136/20 147/8 157/19 157/21 157/23 180/23 184/20 184/22 185/14 188/9 188/12 188/16 200/7 201/15 205/7 206/20 207/10 209/16 224/14 225/19 226/8 232/19 232/22 234/17
court [138]
court's [8]  12/18 135/23 137/19 143/14 144/7 146/12 146/15 148/15
courthouse [1]  113/2
courtroom [4]  3/13 5/21 20/9 114/2
courts [21]  11/20 13/11 19/22 30/6 30/12 31/17 32/17 34/17 75/22 82/3 102/5 134/15 134/22 135/1 135/11 136/24 149/21 150/11 150/15 155/1 155/17 203/15
covenant [1]  226/5
cover [12]  65/15 119/24 121/5 162/12 170/19 174/2 174/11 175/15 178/18 204/24 207/18 210/8
coverage [26]  55/13 93/18 131/4 162/11 171/12 171/23 172/1 172/5 172/8 172/10 172/12 172/16 172/18 173/7 173/15 173/18 174/17 187/19 199/13 199/14 204/15 204/23 207/11 207/13 232/15 232/18
covered [5]  59/10 59/14 187/16 202/22 213/21
covering [5]  119/15 161/6 163/25 170/3 182/12
covers [1]  205/16
CPE [1]  1/22
crash [1]  158/16
crazed [2]  37/11 37/11
create [7]  34/14 34/18 62/11 75/7 125/10 125/12 220/20
created [21]  30/6 30/11 30/13 33/1 42/2 84/15 177/6 177/7 177/7 199/16 206/3 222/9
creates [6]  19/5 22/24 27/1 31/8 147/20 199/16
credentialed [2]  184/3 185/1

credible [1]  78/3
credit [11]  14/23 14/24 82/11 83/14 92/18 92/19 92/22 104/1 231/10 231/11 233/24
credited [1]  98/8
credits [1]  79/18
crisis [2]  85/25 85/25
criteria [1]  185/22
critical [3]  82/11 82/12 218/24
criticism [2]  90/19 146/15
crossroads [1]  209/5
CRR [2]  1/22 235/11
crucial [1]  146/20
crux [1]  59/15
crystal [1]  66/20
cubical [1]  14/20
cultural [1]  209/14
culture [2]  212/8 212/9
cure [1]  226/4
curious [1]  124/16
current [12]  35/20 75/8 89/19 103/8 103/8 144/20 146/19 146/20 178/19 211/3 227/6 227/7
currently [5]  150/3 155/5 168/17 204/11 204/14
customer [1]  146/25
customers [3]  144/21 147/4 147/7
customers' [1]  153/1
cut [12]  77/25 89/6 89/14 90/15 90/16 90/22 91/2 91/11 159/1 159/11 175/20 175/20
cuts [4]  6/22 54/2 167/19 230/5
cutting [18]  88/25 89/17 89/24 90/6 90/10 91/7 91/8 91/9 105/22 108/24 160/11 176/6 176/11 221/19 222/11 222/12 222/13 226/22
cycles [1]  92/13

# D

D.C [10]  7/24 12/5 13/10 18/24 77/1 101/13 101/20 135/13 135/18 140/1
Dagen [6]  77/17 166/11 176/24 177/4 177/10 178/7
Dagen's [2]  89/11 90/5
DAK [1]  1/2
damages [2]  129/1 129/14
Dan [22]  116/21 117/6 158/19 159/4 160/14 160/18 161/12 161/19 162/14 162/17 170/1 172/6 173/16 175/24 176/16 178/12 208/13 209/18 212/18 213/6 216/1 216/10
danced [1]  116/10
dared [1]  180/2
dark [1]  38/21
data [5]  42/14 87/11 87/11 88/12 228/17
date [4]  130/7 169/19 227/8 229/3
Dated [1]  235/8
Daubert [1]  164/9
DAVID [4]  1/13 2/11 4/4 112/23
days [3]  87/21 116/25 118/22
days' [1]  128/14
DC [5]  1/18 1/21 2/3 2/6 2/15
de [1]  18/6
deal [15]  51/10 51/11 51/15 97/23 127/24 129/20 149/18 169/21 198/10 206/17 206/21 207/1 212/23 232/17 233/1
dealing [1]  133/23
deals [3]  138/18 138/21 146/13
death [1]  81/13
debits [1]  79/18
debt [8]  86/4 93/1 93/3 93/4 93/10 93/18 210/11 233/22
decade [6]  157/20 157/21 157/23 161/17 219/20 219/24

**D**

decades [2]  92/6 92/9
December [3]  56/3 174/9 176/16
December 15th [1]  176/16
December 2008 [1]  56/3
December 31st [1]  174/9
decent [1]  68/20
decide [6]  7/3 103/9 134/5 134/6 136/12
136/14
decided [8]  8/12 8/22 10/15 11/11 143/22
203/15 215/17 231/4
decides [1]  112/12
deciding [3]  37/23 133/17 134/2
decision [11]  17/24 35/10 37/15 58/6 58/9
136/17 143/11 146/7 146/12 146/13 148/15
decision-making [1]  17/24
decisions [6]  14/6 14/7 88/20 134/21 143/19
150/4
declaration [16]  23/19 86/11 86/12 89/12
90/8 91/14 204/17 204/18 209/20 212/12
213/8 215/16 216/11 217/4 227/22 230/12
declarations [7]  35/6 35/6 35/7 35/7 144/25
180/8 204/6
declare [1]  136/8
decline [5]  74/5 84/14 91/22 166/6 173/15
declined [3]  44/19 46/8 211/4
declining [7]  87/18 95/3 159/7 159/7 162/16
165/22 178/23
decrease [7]  82/23 92/15 147/6 147/6 159/8
166/3 221/23
decreased [3]  163/14 172/9 172/11
decreases [1]  224/12
deemed [1]  79/19
default [6]  167/9 167/11 217/9 225/16 226/2
226/5
defeat [2]  71/20 183/14
DEFENDANT [37]  1/8 2/11 5/10 5/25 9/10
15/14 19/8 22/21 22/25 23/3 24/20 25/19
26/22 29/7 29/25 31/9 31/11 41/20 59/24
64/6 65/8 76/2 76/19 77/4 80/5 80/6 80/24
83/14 95/11 97/4 98/5 101/23 108/19 124/16
124/18 124/22 136/11
Defendant's [3]  69/8 114/14 114/20
Defendants [11]  3/9 19/6 19/20 32/19 34/21
36/10 47/22 80/2 95/15 98/25 138/3
defense [26]  37/8 37/11 37/12 76/16 79/22
80/2 80/3 80/4 80/7 80/10 80/18 80/20 80/23
81/3 81/4 81/11 81/15 82/3 82/8 82/9 87/2
87/4 104/2 104/11 127/18 169/4
defenses [3]  76/8 76/13 76/16
deferred [6]  168/3 168/13 216/19 217/10
226/10 234/1
deficit [2]  171/10 174/12
deficits [1]  166/6
define [5]  13/4 20/17 42/13 43/6 181/19
defined [5]  92/11 92/11 160/4 160/4 168/24
defining [1]  152/20
definitely [1]  9/24
definition [1]  92/23
definitions [1]  22/17
delay [2]  51/11 64/20
deliberation [2]  9/3 135/5
deliver [7]  27/23 123/13 152/2 152/2 181/4
190/3 200/22
delivered [2]  194/17 199/20
deliveries [7]  122/12 122/13 122/14 122/19
122/22 199/22 200/5
delivering [4]  119/15 119/25 190/16 190/22
delivery [1]  216/23

demand [2]  41/7 201/4
demanded [1]  210/25
demands [5]  60/25 61/15 67/3 67/4 101/19
demographics [3]  165/21 178/23 190/4
demonstrate [3]  79/14 150/5 202/11
demonstrated [4]  34/13 155/13 183/16
206/24
demonstrates [5]  25/5 132/21 156/17 186/11
202/19
denied [11]  11/15 95/21 96/6 98/6 140/4
148/7 149/14 149/21 155/22 156/3 219/1
deny [7]  61/12 104/4 104/9 146/12 155/17
156/10 234/10
denying [3]  137/6 137/10 156/2
Department [2]  88/1 147/15
depends [1]  102/3
depict [1]  197/22
depicted [1]  195/4
depicts [1]  194/16
depleting [2]  164/4 166/22
depletion [1]  164/4
deposition [5]  56/9 74/3 86/12 192/21 228/13
depositions [5]  35/8 35/8 54/7 177/12 182/16
derives [1]  207/13
describe [2]  116/1 180/9
described [5]  141/18 141/20 147/25 180/13
208/16
describes [1]  204/21
describing [1]  36/23
design [1]  70/12
designation [1]  50/18
designed [4]  7/1 79/4 79/5 110/15
desirable [1]  181/14
desire [1]  88/5
desires [1]  52/17
despite [7]  29/24 60/19 104/5 126/1 148/11
211/24 216/15
detail [9]  127/22 145/5 149/1 150/12 155/6
156/16 204/21 221/5 228/9
detailed [1]  12/8
details [2]  160/16 221/7
deteriorated [2]  199/5 199/9
deteriorating [3]  130/5 157/17 217/8
determination [3]  9/3 135/6 156/9
determine [10]  7/21 19/1 24/24 25/8 26/20
52/11 96/22 111/10 153/6 159/24
determined [5]  58/25 59/1 59/16 153/24
214/7
determining [1]  134/7
detrimentally [1]  176/13
Detroit [1]  192/17
devastating [1]  87/3
developed [3]  158/22 159/22 160/18
development [1]  187/19
devise [1]  208/22
diabetes [2]  176/7 192/12
diagnostic [1]  193/19
dictate [2]  131/3 152/15
didn't [52]  17/12 33/8 34/25 37/10 49/11
51/11 52/14 55/24 56/15 66/11 69/20 69/21
70/7 79/4 85/25 96/1 96/20 96/21 103/12
103/14 103/17 104/20 104/20 108/11 110/3
112/3 116/14 122/16 125/20 160/13 160/15
161/3 161/10 165/23 165/24 166/14 168/22
168/8 168/12 168/22 175/21 175/22 176/9
178/16 178/25 190/9 200/12 200/24 201/12
202/11 225/16 226/10
diem [1]  174/14
difference [3]  145/15 174/22 225/8
differences [2]  29/9 145/9

different [31]  20/23 20/24 21/25 22/2 22/9
22/14 22/15 22/19 25/8 40/13 40/14 54/6
88/13 98/22 99/6 102/4 102/12 122/1 129/5
135/1 135/1 158/20 162/13 180/25 183/24
190/19 194/23 203/3 205/7 207/5 209/4
differential [1]  174/24
differentials [1]  40/14
differently [2]  98/21 204/13
difficult [7]  9/1 62/7 62/16 87/1 135/4 135/12
165/12
difficulties [3]  146/8 169/13 169/14
difficulty [1]  156/21
digestive [1]  195/1
digit [2]  40/22 103/3
diligence [8]  38/10 56/12 56/23 56/23 116/12
211/2 212/2 217/19
diluted [1]  37/19
dimension [1]  189/19
diminished [3]  39/5 228/14 233/9
diminishes [1]  224/12
dip [1]  166/13
dire [1]  176/17
direct [5]  170/20 187/20 204/24 210/8 221/4
direction [1]  81/17
directly [7]  7/4 7/4 61/10 64/16 117/2 188/25
191/19
director [3]  109/8 109/9 109/16
directors [15]  37/7 37/12 37/14 37/15 37/23
38/1 38/7 73/6 73/15 81/19 89/17 89/23
94/12 94/25 95/10
disagree [3]  5/20 5/25 202/17
disagreement [2]  100/22 139/12 153/21
disappear [1]  10/8
Disappears [1]  220/16
discharges [14]  15/19 15/20 15/23 16/1
193/21 193/23 197/5 197/7 198/1 198/21
199/2 199/24 199/25 200/2
disclose [1]  211/5
disclosed [2]  114/1 182/16
disclosing [4]  50/20 182/8 182/9 182/24
disclosures [1]  6/7
discount [2]  79/7 91/10
discounts [1]  79/2
discovery [1]  6/7
discretion [1]  20/22
discretionary [1]  91/3
discuss [17]  111/13 115/18 126/14 129/23
130/4 130/8 130/16 130/18 133/9 139/17
146/1 149/1 151/5 152/12 153/11 156/16
224/22
discussed [11]  113/24 113/25 114/1 115/24
143/10 145/5 155/6 204/15 215/19 215/20
222/6
discusses [1]  227/23
discussing [4]  157/8 157/15 212/3 233/17
discussion [5]  4/10 111/14 112/24 125/6
157/2
discussions [3]  116/11 116/16 154/9
disease [1]  229/20
disgorgement [1]  129/9
disingenuous [1]  144/12
Disney [1]  91/20
displaying [1]  50/17
dispute [17]  6/1 8/18 9/13 9/13 15/6 19/20
21/16 25/17 31/14 64/24 68/25 73/1 96/8
96/10 98/17 176/19 219/4
disputed [2]  15/13 17/25
disrupt [1]  211/10
distinct [2]  156/12 195/21
distinguishable [1]  206/10

**D**

distinguishing [1]  203/2
distributed [1]  14/20
distribution [1]  204/2
district [22]  1/1 1/1 1/14 7/21 20/15 32/11
  109/7 137/8 137/9 137/12 137/13 137/16
  137/19 141/9 142/24 143/13 144/7 146/11
  147/2 147/14 150/16 150/16
dive [1]  136/18
diversion [2]  191/25 192/4
divest [1]  106/22
divestiture [4]  106/15 128/9 156/22 156/25
divided [1]  3/8
division [1]  228/2
doctors' [2]  161/22 161/23
doctrine [1]  82/9
document [24]  39/2 43/5 44/17 45/11 47/19
  49/15 50/12 52/13 54/10 54/19 56/3 58/3
  64/8 83/25 177/4 177/5 177/6 177/8 177/8
  177/16 177/20 218/18 222/6 222/16
documents [49]  35/3 36/12 37/4 37/6 37/12
  39/7 41/9 42/1 44/1 48/6 48/10 49/4 50/16
  50/24 53/1 56/17 66/18 67/21 69/20 69/21
  73/18 75/24 76/21 78/5 81/18 81/18 83/24
  84/1 84/6 88/13 93/9 104/18 113/14 113/22
  114/1 115/25 164/12 206/3 206/7 206/11
  206/12 206/18 206/19 222/2 222/6 222/9
  222/21 222/23 222/25
does [50]  5/6 6/18 8/20 12/8 12/19 14/10
  17/14 17/16 19/9 23/9 28/13 29/2 29/19
  29/20 40/13 43/18 66/9 66/21 67/23 67/23
  69/5 71/3 79/10 88/15 100/7 107/12 107/13
  108/4 110/15 110/17 110/21 111/9 111/15
  120/16 128/5 136/17 138/9 138/13 147/3
  151/11 152/8 154/22 154/23 171/13 172/21
  180/5 182/10 205/23 207/9 224/19
doesn't [39]  21/9 23/6 24/12 35/12 35/13
  43/22 44/23 45/10 48/12 50/8 72/3 79/11
  84/4 100/3 106/13 117/17 167/19 168/20
  172/14 174/21 180/6 181/12 185/3 186/16
  189/9 192/7 193/15 193/25 194/1 195/10
  195/16 196/7 203/13 223/22 224/17 224/18
  225/1 231/14 232/3
doing [27]  4/17 20/10 43/21 57/13 69/2 69/3
  70/17 72/18 92/13 132/20 132/21 151/22
  158/22 160/7 160/8 161/1 164/8 164/12
  171/3 173/19 183/8 189/13 190/24 200/25
  205/24 205/24 233/25
DOJ [3]  95/17 95/18 96/11
dollar [1]  171/13
dollars [7]  38/22 44/4 44/23 44/24 201/8
  232/24 233/2
dollars-worth [1]  233/2
dominance [5]  14/14 14/18 15/3 34/10 59/23
dominant [22]  4/21 14/12 14/15 16/9 16/14
  16/16 16/17 16/19 36/2 36/3 48/3 48/8 57/7
  57/13 70/23 80/12 80/13 80/16 80/16 101/25
  102/1 102/1
don't [89]
done [18]  3/15 42/9 55/20 61/14 73/14 75/18
  80/22 83/3 94/6 104/2 104/7 104/12 105/6
  124/15 157/4 183/17 222/17 230/17
doomsday [1]  226/22
doors [1]  80/15
dot [1]  188/16
double [1]  103/3
double-digit [1]  103/3
doubt [2]  130/10 147/3
doubtful [3]  9/1 135/4 135/12

down [24]  26/22 34/21 58/5 70/20 86/19
  91/24 92/21 105/16 108/22 115/18 115/25
  120/4 160/7 160/11 163/1 166/13 166/18
  175/18 193/24 199/19 207/19 221/25 226/16
  226/17
downgrade [3]  163/11 163/12 167/3
downgraded [1]  225/15
downgrades [1]  93/20
downgrading [4]  163/16 163/18 164/3
  164/18
downplays [1]  183/21
downtime [1]  167/25
downturn [4]  90/17 90/21 90/23 91/4
downward [4]  81/14 86/23 86/24 173/22
dozens [1]  108/15
Dr. [2]  227/21 227/23
Dr. Peron [1]  227/23
Dr. Peron's [1]  227/21
draconian [1]  127/4
draft [1]  99/25
drafted [2]  127/8 127/9
dramatic [14]  7/17 25/6 40/16 40/21 76/1
  83/20 86/8 86/12 86/20 101/5 105/19 109/11
  140/3 178/9
dramatically [5]  36/14 82/23 103/15 106/2
  178/6
drastic [1]  221/17
drastically [1]  75/15
draw [1]  17/15
drawing [1]  197/15
drawn [1]  196/12
draws [8]  181/17 196/6 196/6 196/10 196/14
  196/24 197/9 198/15
dream [1]  128/18
dressing [1]  18/14
drew [1]  198/5
DRG [2]  193/24 194/14
DRGs [2]  194/14 197/6
drive [6]  27/11 27/13 27/15 28/8 166/13
  195/18
driven [1]  192/4
driving [1]  28/5
drop [2]  160/9 222/4
dropped [7]  158/3 172/19 173/20 199/7
  199/10 222/18 222/21
drove [1]  27/16
dubious [1]  157/8
Dubuque [1]  149/4
due [12]  6/8 27/6 38/10 56/12 56/23 56/23
  88/24 116/12 161/19 211/2 212/2 217/19
duopoly [15]  22/24 23/1 24/9 26/14 27/1
  72/9 75/22 103/5 122/6 122/8 122/14 122/21
  122/23 122/24 151/24
duplicating [1]  224/5
during [27]  5/16 6/21 42/9 72/15 78/15 90/21
  109/14 110/25 192/21 203/24 207/10 228/14
  232/18
duty [2]  14/25 220/3
dwarfs [2]  196/22 196/23
dynamic [1]  150/1
dynamics [6]  20/6 20/13 21/1 22/9 80/10
  145/23

**E**

e-mail [5]  16/25 58/3 78/23 78/23 216/1
each [27]  20/19 20/21 22/19 23/22 29/8
  29/24 33/9 33/14 34/5 35/16 58/25 79/2 89/2
  147/24 179/24 180/25 181/6 181/9 181/22
  189/21 189/25 190/1 192/19 192/25 194/13
  195/18 217/21

ear [2]  194/24 212/14
earlier [6]  65/21 139/8 160/6 203/1 211/22
  221/21
early [3]  111/16 163/6 210/19
earn [1]  210/15
earth [2]  58/1 58/1
eased [1]  85/23
easier [4]  57/5 57/8 57/11 203/4
easiest [1]  216/6
easily [1]  24/10
east [4]  2/9 188/14 197/23 198/2
eastern [2]  147/14 198/6
easy [4]  57/9 129/2 129/8 129/14
EBITDA [3]  81/8 86/13 161/17
economic [8]  17/24 79/18 90/17 90/21 91/4
  144/13 148/11 203/12
economics [1]  147/5
economies [5]  79/21 79/21 79/21 79/24
  223/10
economist [2]  118/4 119/6
economist's [1]  128/17
economists [1]  190/15
economy [3]  160/7 160/9 162/16
effect [12]  38/25 123/8 138/7 142/11 144/4
  145/1 148/17 153/22 153/23 154/25 161/3
  181/10
effective [13]  6/24 7/2 11/4 11/14 105/23
  106/17 107/11 112/12 112/17 112/21 156/22
  156/24 191/6
effectively [3]  189/10 190/3 208/24
effects [21]  9/22 10/12 11/21 12/2 12/8 12/20
  19/10 20/6 39/6 125/11 125/14 130/10 139/7
  139/14 148/14 149/19 151/16 152/22 179/19
  203/14 207/17
efficiencies [34]  33/12 76/9 76/10 76/12
  76/25 77/1 77/5 77/7 77/8 77/18 77/19 77/22
  78/5 78/7 78/7 78/8 78/12 78/13 78/16 78/17
  78/17 79/14 79/15 79/22 104/11 104/13
  106/7 142/8 155/25 192/8 218/4 230/9
  231/15 233/3
efficiency [3]  78/3 231/9 231/11
efficient [2]  190/15 200/6
efficiently [2]  190/3 191/6
effort [2]  49/2 85/1
efforts [1]  208/20
eight [8]  35/7 42/16 65/7 81/6 86/21 94/7
  202/6 202/6
Eighty [3]  68/5 72/14 73/21
Eighty-nine [1]  73/21
Eighty-six [1]  72/14
either [17]  5/17 28/24 42/18 42/21 64/20
  69/11 78/5 117/18 118/2 122/17 125/24
  130/14 131/14 152/9 169/21 193/9 218/21
elective [1]  27/7
electronic [3]  167/17 229/20 232/25
electronical [1]  217/13
element [2]  10/24 161/12
elements [2]  8/7 187/18
Eleventh [3]  32/5 32/6 82/13
eliminate [7]  57/19 111/5 142/9 219/15 222/4
  233/8 233/9
eliminated [3]  91/3 190/7 190/8
eliminating [1]  192/10
elimination [2]  140/11 223/16
eloquently [1]  69/10
else [11]  5/21 26/7 57/25 58/10 160/13
  170/17 175/25 183/12 186/5 205/24 234/17
emergency [4]  191/23 191/25 192/2 192/3
Emery [5]  2/11 2/14 2/17 2/19 4/5
Emiga [1]  20/15

**E**

emphasis [1] 149/18
emphasize [3] 120/19 137/21 218/14
employ [1] 184/18
employed [3] 158/24 184/17 185/1
employee [5] 90/7 91/3 177/15 212/14
216/19
employees [27] 41/5 57/1 61/8 63/2 63/6 63/7
63/12 63/13 64/11 64/17 64/24 65/3 71/25
72/1 89/4 89/7 89/14 106/18 117/13 127/15
158/22 159/19 160/2 160/2 169/9 189/15
212/16
employees' [1] 63/15
employer [4] 35/5 41/3 64/23 72/1
employers [33] 24/12 34/2 34/6 36/4 38/11
38/13 38/18 38/18 38/24 40/24 41/11 55/1
57/1 57/1 61/6 61/7 62/25 62/25 63/14 63/14
64/9 64/9 64/14 64/16 64/25 104/24 107/20
112/8 132/13 132/22 180/7 201/18 202/19
employers' [1] 65/3
employment [1] 165/22
employs [2] 184/21 184/22
empty [1] 20/9
EMR [2] 167/18 167/24
enable [7] 41/7 124/11 146/10 154/1 206/15
219/10 219/12
enables [1] 218/24
enabling [1] 230/2
enacted [1] 102/5
enacting [1] 11/6
encourage [1] 203/5
encourages [1] 182/11
encumber [1] 214/23
end [15] 6/14 86/19 94/4 111/2 130/21
137/25 143/24 165/22 175/17 176/15 178/17
179/3 207/11 207/22 228/14
Endorse [1] 103/5
enforce [3] 107/8 126/25 220/7
enforcement [3] 11/5 11/14 107/11
engaged [2] 49/2 191/4
engaging [1] 127/11
enhancement [1] 68/16
enhancing [1] 191/15
enjoined [1] 11/25
enjoy [2] 70/22 113/4
enjoyed [1] 58/18
enough [21] 27/17 39/13 78/24 92/1 116/11
139/19 150/8 153/25 175/12 179/22 187/11
190/9 190/22 190/24 200/13 201/20 202/12
208/21 218/14 232/3 234/18
enrollment [1] 47/20
ensure [1] 105/23
entailed [1] 160/23
enter [8] 7/8 7/15 107/17 218/15 224/25
224/25 225/1 231/4
entered [12] 6/6 100/24 108/16 113/23 115/5
126/20 216/9 216/13 224/11 224/24 228/21
234/5
entering [6] 56/11 134/9 136/3 136/14
155/15 208/4
entire [5] 24/7 25/22 27/15 37/25 95/1
entirely [2] 62/7 142/10
entirety [1] 93/9
entities [5] 131/3 144/9 144/19 172/13
172/19
entitle [1] 140/19
entitled [14] 8/10 12/6 19/11 30/23 68/18
97/14 101/16 105/6 106/16 127/3 134/13
137/22 140/12 235/7

entity [9] 66/3 107/10 107/10 148/16 153/25
154/5 213/11 216/3 226/24
entry [14] 20/18 20/21 76/8 76/8 76/19 76/19
76/21 139/19 150/8 155/19 156/10 224/8
229/21 233/7
enumerated [1] 214/11
environmental [1] 44/17
ephemeral [1] 138/19
equal [1] 29/5
equipped [1] 183/14
equities [22] 8/8 10/25 11/2 11/3 11/4 11/7
11/9 91/22 104/4 104/7 104/8 134/6 136/3
136/11 136/12 155/12 155/15 155/17 155/19
156/4 156/8 156/9
equity [4] 11/4 11/14 91/23 92/12
equivalent [2] 17/21 93/24
especially [17] 5/10 34/22 39/22 43/15 56/25
61/4 61/18 61/19 67/1 78/20 87/23 90/2 90/2
94/6 94/17 101/22 144/18
ESQ [9] 1/17 1/19 2/2 2/4 2/7 2/11 2/14 2/16
2/19
essential [2] 143/2 143/2
essentially [3] 126/17 181/20 213/22
establish [3] 10/16 150/13 179/22
established [6] 18/21 97/5 124/18 126/7
143/2 159/5
establishes [2] 124/23 186/13
establishing [1] 154/20
estimate [2] 40/9 223/13
estimated [4] 46/2 46/20 47/19 207/12
estimates [1] 78/9
et [1] 131/4
evaluating [4] 40/17 129/24 129/25 209/10
Evanston [5] 97/21 112/13 206/10 206/13
206/24
evaporate [1] 101/6
even [81]
evening [1] 234/25
event [5] 141/25 146/22 203/6 212/5 232/5
events [1] 179/4
ever [13] 11/11 12/1 60/10 68/9 68/12 70/14
103/5 104/5 151/5 177/15 200/15 218/15
231/11
every [29] 8/21 9/13 9/16 15/22 33/2 68/2
68/4 81/16 88/16 96/6 104/6 104/21 139/4
140/13 152/3 154/15 154/15 157/22 157/25
159/22 163/8 171/13 174/6 174/7 174/9
189/19 194/1 194/5 230/22
everybody [6] 132/12 160/7 160/13 162/1
170/17 203/20
everyone [7] 19/25 38/9 63/23 89/5 91/11
102/4 102/12
everything [4] 5/20 17/8 55/25 183/12
evidence [85]
evidence-based [1] 230/3
evidentiary [3] 137/5 141/19 142/3
evils [1] 80/11
evolution [1] 225/18
exact [14] 7/7 7/18 17/13 20/12 22/3 37/4
70/8 70/22 106/22 112/16 164/20 171/2
172/17 173/21
exactly [17] 17/10 52/16 69/14 77/20 107/5
107/13 128/19 131/17 131/17 143/18 149/8
166/20 175/7 180/22 209/20 211/5 219/16
examine [1] 116/17
examined [1] 209/11
example [23] 20/1 25/11 58/12 62/21 114/8
127/12 128/12 131/5 134/16 137/1 173/14
182/7 184/17 189/12 190/5 191/8 193/17
194/19 194/20 201/23 209/14 212/7 216/1

examples [1] 24/14
exceeded [2] 157/22 157/25
exceeds [1] 30/14
excellence [1] 75/8
excellent [3] 88/15 90/16 90/17
except [5] 71/24 94/18 98/2 132/17 157/23
exception [6] 68/10 97/20 100/3 159/12
193/13 193/25
excerpt [1] 51/24
excess [16] 32/16 70/25 71/3 71/6 71/6 71/8
71/10 71/11 71/14 71/16 183/22 186/10
186/10 186/13 186/17 187/2
exchange [2] 132/3 132/7
exchanged [1] 6/8
exclude [7] 22/4 22/9 50/12 55/10 55/18
126/3 131/23
excluded [9] 22/10 45/23 46/16 48/15 50/11
54/12 60/10 63/5 131/15
excludes [1] 19/17
excluding [3] 51/22 55/16 172/18
exclusion [6] 51/13 52/12 52/12 55/19 131/3
132/1
exclusions [1] 52/2
exclusive [4] 52/19 56/12 56/22 56/23
exclusively [2] 145/24 212/10
excuse [5] 32/9 61/19 83/15 130/24 210/18
executed [1] 84/15
executive [4] 74/12 115/2 116/20 228/3
executives [8] 16/25 37/6 37/13 47/10 73/23
73/25 89/22 206/12
exercise [16] 23/10 68/7 69/2 98/14 98/20
122/17 134/5 135/21 135/23 136/9 138/1
152/24 180/2 181/7 183/15 203/7
exercised [3] 23/17 118/7 118/9
exercises [1] 204/11
exercising [1] 127/12
exert [1] 206/2
exhausted [1] 219/25
exhibit [5] 204/18 221/6 227/22 227/24
229/5
Exhibit 6.1 [1] 229/5
exhibits [4] 5/4 35/3 114/14 137/10
exist [6] 68/21 128/1 128/10 129/14 145/10
145/24
existed [3] 71/14 81/1 228/16
existence [2] 121/6 150/6
existing [2] 229/10 229/22
exists [7] 21/1 71/14 94/11 150/3 204/10
220/17 227/13
exit [1] 80/14
exiting [1] 67/9
exorbitant [2] 60/3 101/19
expand [7] 82/8 145/17 181/3 181/4 183/8
189/5 218/12
expanding [1] 180/24
expansion [2] 180/18 188/24
expect [16] 6/13 23/13 33/7 33/10 39/11
40/13 41/10 41/11 47/13 64/5 79/10 94/14
105/14 111/3 194/10 228/8
expected [6] 35/23 35/25 102/17 116/24
123/13 134/22
expecting [2] 35/10 124/6
expenditures [5] 89/9 89/11 159/15 167/15
217/11
expense [3] 64/10 68/19 95/7
expenses [10] 68/14 68/19 94/24 157/19
157/22 157/24 159/1 177/1 178/1 209/16
expensive [4] 35/17 40/17 59/18 74/17
experience [1] 201/11
experienced [2] 87/23 167/25

**E**

experiencing [2]  88/2 146/8
experiment [1]  44/8
expert [33]  8/13 13/12 15/15 15/16 21/2
 23/19 23/20 26/17 33/13 33/17 33/19 35/4
 35/5 35/8 42/15 68/6 76/22 77/17 77/21
 77/22 77/24 84/12 87/6 90/8 91/13 93/13
 105/2 164/7 166/10 177/19 177/21 203/12
 209/19
expert's [4]  77/6 148/11 164/6 176/20
expertise [3]  147/8 212/25 214/25
experts [1]  77/16
experts' [1]  98/18
expires [1]  18/19
explain [7]  58/23 59/21 77/11 127/2 194/9
 196/8 207/25
explained [2]  57/22 225/12
explains [2]  23/18 217/21
explicit [2]  77/13 110/18
explicitly [2]  110/5 220/6
exploit [1]  65/12
explored [2]  213/17 213/20
exponentially [1]  62/16
expressed [5]  52/21 104/25 104/25 146/25
 147/4
extend [1]  195/10
extension [1]  221/13
extensive [1]  12/21
extent [22]  24/2 24/5 35/9 40/1 54/3 62/20
 70/16 71/12 107/12 113/22 117/22 122/20
 131/22 132/11 133/6 161/1 161/2 195/10
 205/23 224/10 226/19 234/18
extra [1]  205/22
extract [4]  59/19 206/5 206/15 206/25
extraordinarily [2]  124/23 142/23
extraordinary [19]  29/16 31/2 32/22 35/2
 35/21 36/12 40/21 45/25 49/23 57/5 69/3
 70/6 77/2 77/2 77/5 77/5 79/13 108/19
 108/21
extremely [1]  209/8
exuberance [1]  117/10
ExxonMobil [1]  91/19
eye [2]  57/8 194/19

**F**

F-i-n-n-e-r-i-t-y [1]  4/1
F.2d [1]  147/10
F.Supp [1]  149/20
face [8]  126/11 126/21 144/5 144/8 144/8
 167/19 193/8 230/5
faced [6]  127/6 148/10 165/11 165/21 168/25
 178/23
facie [7]  18/21 34/14 82/21 124/24 142/4
 155/21 155/23
facilities [3]  192/8 195/18 210/16
facility [7]  131/3 142/10 205/18 218/5 218/7
 219/15 223/17
facing [5]  91/21 111/19 140/21 149/15
 233/22
fact [66]  4/23 15/12 16/25 17/13 17/15 19/2
 23/24 33/10 34/4 35/7 35/15 36/5 40/10
 55/11 58/12 61/2 61/2 64/14 81/3 97/17
 100/23 107/6 108/23 112/17 112/18 113/17
 116/3 117/17 127/8 132/20 135/15 138/9
 138/12 139/17 139/18 140/7 140/20 141/1
 141/15 143/22 148/8 158/7 159/21 163/23
 164/18 166/5 166/21 168/3 170/2 171/6
 173/10 175/6 176/12 177/1 178/8 183/22
 183/23 198/17 198/20 207/3 207/6 214/21

 215/22 217/7 223/2 228/9
facto [1]  18/6
factor [5]  69/6 160/10 163/22 185/13 209/24
factors [8]  93/13 140/23 148/25 150/12
 153/11 153/14 209/11 209/13
facts [9]  4/20 6/1 91/17 127/3 136/19 136/21
 143/10 149/10 150/18
factual [1]  119/7
faculty [1]  184/20
fail [1]  230/4
failed [7]  81/20 93/22 96/19 144/21 148/9
 148/15 208/16
failing [23]  76/14 80/3 80/4 80/7 80/8 80/10
 80/17 80/20 80/23 81/10 81/15 81/24 82/8
 83/15 87/1 87/4 88/10 91/1 91/1 91/19 95/11
 104/2 169/4
fails [2]  81/2 150/1
failure [3]  80/25 143/23 145/22
fair [14]  9/2 14/25 45/24 56/14 100/20
 101/11 103/9 103/16 103/22 110/10 134/17
 135/5 135/15 184/15
fairly [4]  12/23 75/23 93/7 100/16
fall [4]  78/18 83/18 83/19 83/20
false [1]  95/20
familiar [5]  13/18 28/10 188/2 188/7 188/8
family [3]  59/20 88/4 95/1
famous [2]  9/25 10/1
far [14]  32/16 47/2 75/8 112/20 116/11
 116/11 117/4 120/11 174/17 181/12 188/14
 195/10 205/25 207/7
farther [1]  79/2
fashion [1]  221/8
fast [1]  8/2
fast-moving [1]  8/2
faster [1]  178/1
fault [1]  115/7
favor [1]  79/25 136/3 155/15 156/9
favorable [5]  38/1 64/13 66/11 151/5 201/6
FCC [1]  135/15
fear [3]  57/16 57/17 58/11
feasible [3]  72/12 214/6 214/8
feature [1]  182/25
February [6]  1/8 6/5 6/9 226/17 235/1 235/8
February 16th [1]  6/9
February 2010 [1]  226/17
February 5th [1]  6/5
federal [15]  1/3 1/17 1/20 2/2 2/5 3/24 4/14
 129/17 133/18 133/19 133/23 133/24 141/4
 147/15 167/21
federally [1]  223/6
federally-mandated [1]  223/6
fee [1]  155/11
Feel [1]  124/1
feeling [3]  78/7 78/9 102/13
fees [1]  38/23
fell [1]  85/7
few [15]  15/19 15/19 16/10 26/6 53/1 54/2
 67/13 105/15 114/9 125/21 140/14 148/23
 173/9 195/3 221/1
fewer [2]  39/24 140/16
fiduciary [2]  14/25 220/3
field [3]  49/5 52/8 54/14
fierce [4]  4/22 4/23 147/25 215/5
fiercely [2]  115/17 209/6
fight [1]  24/19
fighting [4]  22/21 23/2 28/22 47/16
figure [1]  119/22
figures [3]  34/14 187/14 187/15
filed [3]  101/12 121/2 137/23
filings [1]  92/18

fill [1]  87/10
filled [1]  192/1
filling [1]  187/4
Filson [2]  2/4 3/25
finally [6]  127/17 130/17 150/15 156/14
 164/2 211/14
finance [1]  160/21
finances [1]  176/10
financial [61]  81/5 82/5 84/16 85/24 85/24
 85/25 86/3 87/2 88/16 88/17 90/3 90/4 90/23
 91/10 91/21 94/5 95/5 95/12 104/6 109/13
 116/7 121/12 127/6 130/5 146/8 146/10
 156/4 157/9 157/16 157/17 158/21 163/10
 166/12 166/20 167/2 167/13 169/5 169/13
 169/14 169/18 176/17 177/17 178/15 187/21
 208/22 209/23 210/2 210/4 211/3 211/6
 216/14 217/8 217/15 217/16 219/3 222/10
 225/12 225/13 228/12 228/16 233/22
financially [17]  43/21 116/9 165/16 213/12
 221/15 221/18 225/24
financials [4]  157/8 159/6 162/10 162/18
financing [1]  159/1
finding [1]  146/24
findings [2]  16/20 185/18
finds [2]  106/15 156/11
fine [4]  59/25 60/1 150/23 187/25
finish [2]  150/21 221/8
Finnerity [2]  3/25 4/16
Finnerty [1]  2/7
fire [1]  89/5
firing [1]  127/14
firm [31]  36/2 48/8 80/3 80/4 80/7 80/8 80/10
 80/12 80/16 80/18 80/20 80/23 81/4 81/10
 81/15 81/24 82/3 82/11 83/15 83/15 83/22
 87/1 87/1 87/4 87/4 95/12 101/25 102/2
 104/2 148/5 169/4
firm's [2]  82/18 82/20
firmly [1]  95/5
firms [3]  76/14 142/22 148/12
first [53]  7/3 7/24 9/3 13/17 14/16 19/13 43/4
 45/9 63/4 63/8 69/16 78/6 79/1 81/6 86/21
 91/14 94/7 98/13 103/5 104/1 104/5 111/9
 114/23 116/3 117/1 117/5 124/21 125/7
 125/8 129/22 133/18 135/6 136/1 141/8
 141/18 150/5 151/11 153/24 154/9 163/9
 163/19 171/17 171/20 173/11 179/24 183/3
 194/15 205/13 211/1 211/22 211/24 216/14
 226/15
fist [1]  120/3
fit [4]  116/13 159/25 177/23 211/18
five [23]  25/1 25/13 25/25 28/7 30/22 30/22
 35/5 35/6 79/1 97/18 105/2 105/10 105/16
 115/12 133/19 137/9 137/13 140/16 142/3
 157/24 160/19 178/5 206/22
five percent [1]  28/7
five-day [3]  137/9 137/13 142/3
fix [4]  161/10 175/25 178/17 178/20
fixated [4]  48/7 48/15 55/25 57/10
fixation [2]  52/15 52/21
flag [1]  67/22
flagship [2]  188/9 188/13
flailing [10]  81/4 82/3 82/11 83/15 83/22
 87/1 87/4 88/11 95/12 221/16
flash [1]  204/20
flexibility [1]  213/12
flip [1]  199/18
Floor [1]  2/8
Florida [2]  1/8 1/23
flow [8]  81/8 86/7 86/9 86/13 86/17 86/20
 166/3 166/6

**F**

Flower [15]  14/1 16/2 39/17 62/2 73/13 75/6
107/1 188/11 188/12 191/10 191/12 191/15
223/20 223/24 232/20
Flower's [2]  191/16 223/20
flowers [1]  27/17
flows [1]  176/22
focus [12]  67/16 69/16 76/25 121/14 145/23
161/4 166/22 174/9 181/16 196/5 197/2
198/17
focused [7]  48/8 58/14 160/22 161/5 196/11
212/10 234/15
focuses [5]  102/18 121/17 154/17 179/21
212/8
focusing [2]  15/24 148/8
fold [1]  93/4
follow [1]  72/17
followed [2]  66/6 138/17
following [4]  53/23 113/6 179/12 229/2
follows [5]  209/22 213/9 216/12 217/5
217/22
Food [1]  7/13
Foods [4]  12/5 18/24 135/19 156/23
footnote [1]  124/25
for-profit [3]  14/3 64/23 144/9
forbids [1]  138/6 154/24
force [2]  63/7 224/19
forced [1]  90/22
forcing [1]  38/12
foregoing [1]  235/5
foremost [2]  150/5 163/10
forgot [2]  115/8 221/21
form [2]  21/23 110/20
former [3]  58/4 88/6 228/2
formerly [1]  219/5
formulate [1]  21/3
forth [10]  5/18 41/13 42/15 62/5 76/5 80/2
80/23 96/21 97/13 100/21
forward [10]  37/24 138/9 138/13 165/13
166/11 189/5 217/17 223/23 224/19 227/1
forward-looking [2]  138/9 138/13
found [24]  30/6 32/7 32/10 32/13 32/17
33/20 74/18 98/16 98/21 116/23 134/21
135/8 135/14 143/12 147/2 148/13 149/22
155/23 155/24 164/20 181/12 209/5 220/8
228/11
foundation [3]  59/15 226/7 228/24
founded [1]  58/21
four [32]  5/19 35/6 35/8 74/24 74/24 75/13
75/14 98/12 110/24 120/18 120/19 121/3
121/4 121/6 121/9 121/10 121/12 122/7
123/7 137/5 140/15 157/23 163/11 171/19
173/5 179/5 187/10 194/15 194/22 201/21
206/22 207/10
four-and-a-half [1]  5/19
four-day [1]  137/5
four-year [8]  110/24 120/18 120/19 121/3
121/4 121/6 121/9 207/10
Fourth [1]  7/13
fraction [1]  47/3
Franklin [4]  1/22 235/4 235/10 235/11
frankly [11]  177/8 185/2 196/1 197/22 205/2
222/14 224/22 225/6 227/18 231/10 231/24
free [4]  110/21 124/1 131/25 190/18
Freeman [7]  96/24 134/16 135/10 137/13
146/2 146/9 156/3
freeze [4]  88/20 89/9 98/11 99/2
freezes [1]  98/24
frequently [2]  36/11 125/2

Friday [1]  235/1
front [6]  80/9 94/3 112/5 112/19 155/10
155/11
Frontpath [2]  123/7 202/10
froze [4]  91/2 159/12 159/18 159/19
frozen [1]  94/9
frustration [1]  52/22
FTC [107]
FTC's [14]  13/11 118/4 124/8 133/11 134/21
135/11 136/1 136/19 137/10 137/22 140/8
146/15 209/18 218/19
FTEs [1]  89/2
fueled [1]  212/20
fulfill [2]  89/19 205/21
full [17]  6/7 6/24 7/2 68/7 77/17 88/3 106/17
106/18 137/5 189/21 208/10 213/18 214/9
215/21 215/21 215/23 226/25
full-blown [2]  213/18 214/9
full-day [1]  137/5
full-service [1]  106/18 208/10 226/25
fully [17]  19/2 22/25 39/8 56/25 65/12 69/2
89/20 92/14 98/20 111/2 126/16 128/1 128/9
164/9 219/19 227/8 227/19
Fulton [1]  205/11
function [4]  7/12 7/23 134/20 150/10
functional [1]  17/21
fund [10]  91/13 91/18 92/1 92/7 92/10
166/19 168/24 216/18 226/9 229/15
fundamental [1]  10/5
fundamentally [2]  175/19 213/3
funded [8]  91/15 91/15 91/19 91/24 91/25
92/2 92/14 92/14
funded/not [1]  92/14
funding [1]  225/19
funds [6]  18/3 92/6 167/21 168/22 216/20
224/4
further [11]  10/22 22/12 27/8 58/23 78/10
79/8 93/19 149/21 197/24 215/14 220/21
future [15]  69/5 125/13 140/8 150/20 153/9
153/12 153/15 166/19 167/1 170/22 172/25
183/19 185/11 210/4 233/18
Futures [1]  214/5

**G**

Gabe [2]  77/17 166/11
gain [3]  47/12 208/20 218/21
gained [1]  46/14
galleries [1]  215/9
gallery [2]  169/11 170/16
Gamble [1]  79/20
Gary [7]  221/5 223/8 230/12 230/25 231/16
232/5 233/12
Gary's [1]  231/19
gate [1]  72/18
gathered [1]  35/12
gave [1]  167/9
Gay [1]  2/9
general [72]  2/7 4/15 13/5 15/4 16/1 19/13
20/5 21/18 21/20 22/4 22/11 22/13 22/17
25/20 26/5 26/8 26/12 26/16 26/18 26/23
27/3 27/8 28/2 29/4 30/16 30/21 31/10 31/14
32/15 32/21 36/8 42/16 43/1 58/17 80/9 83/5
83/17 96/9 102/8 110/4 115/9 121/21 122/5
122/6 122/16 128/1 130/14 140/14 141/14
141/23 142/14 142/19 149/4 149/13 151/12
151/20 151/25 152/8 160/23 162/1 173/3
173/4 174/13 179/25 189/21 189/25 193/16
197/25 212/25 222/14 227/12 227/19
generally [2]  194/10 197/24
generate [3]  158/13 170/20 192/8

generated [1]  233/15
gentlemen [6]  3/2 3/5 112/25 113/7 114/25
179/13
geographic [49]  13/6 18/24 24/16 24/20
24/21 24/22 24/24 25/8 25/14 25/20 26/3
26/11 26/21 26/24 27/2 27/14 28/1 28/16
52/17 74/25 75/4 96/2 96/13 96/19 96/20
96/25 97/8 97/9 97/16 122/1 139/6 139/9
141/16 142/19 142/21 143/12 143/16 143/19
143/20 143/23 145/11 145/15 145/18 146/14
148/5 198/3 211/18 218/12 219/9
geographical [1]  26/1
gets [1]  34/24
getting [11]  26/7 68/18 69/3 92/5 94/3
132/23 159/7 175/7 187/7 187/14 199/14
give [28]  3/3 9/20 14/23 18/20 23/20 39/13
52/24 53/14 53/15 64/20 66/11 67/13 75/14
90/14 100/5 123/22 128/13 129/7 130/21
132/8 151/22 152/9 170/23 182/3 185/19
202/21 209/9 223/25
given [7]  24/14 140/20 178/7 189/1 211/3
215/4 215/17
gives [3]  63/24 205/17 218/25
giving [2]  45/5 215/2
goal [7]  85/10 108/17 159/6 160/19 161/19
171/2 178/14
goals [12]  7/5 84/21 84/21 85/13 105/25
159/25 162/17 163/4 163/5 163/8 172/7
178/13
goes [2]  79/6 111/16
going [150]
golf [1]  5/22
gone [2]  164/9 222/22
good [31]  3/5 3/6 3/23 4/11 4/12 20/23 21/8
23/7 23/23 24/8 25/21 38/16 40/3 40/3 53/19
62/18 90/15 99/13 99/14 99/14 102/20
104/22 104/23 115/21 133/4 133/5 150/23
157/7 178/17 191/16 231/14
goods [8]  20/14 21/23 23/12 23/12 23/15
23/16 23/17 24/2
gorilla [1]  48/8
gosh [4]  193/22 194/25 197/11 231/5
got [23]  23/13 36/14 51/19 84/18 85/5 105/4
110/16 116/11 120/2 120/5 123/8 124/16
124/21 171/21 173/16 188/8 203/9 212/2
222/1 223/21 225/2 225/5 225/6
gotten [1]  83/24
governance [1]  215/9
government [38]  95/25 96/5 96/12 96/17
96/18 113/15 125/7 125/8 125/9 132/18
139/4 141/3 141/10 145/11 147/21 148/2
148/14 148/15 149/3 149/11 149/22 151/22
179/18 179/21 180/8 181/16 183/21 185/10
194/2 196/5 198/25 199/2 199/13 224/11
224/16 228/22 234/5 234/7
Government's [13]  82/21 118/18 118/18
136/24 139/9 140/17 143/23 145/22 148/8
148/11 149/23 150/1 199/8
grade [3]  92/20 92/21 92/22
grades [1]  163/11
Grand [1]  99/10
grant [4]  141/5 142/6 143/14 201/3
granted [3]  137/14 142/24 167/10
granting [1]  11/8
grants [1]  233/11
graph [2]  81/13 157/20
graphically [1]  86/18
grave [1]  80/25
great [13]  39/25 70/19 73/3 73/3 73/24 87/23
90/18 94/6 109/16 132/20 149/17 200/12

## G

great... [1]  221/5
greater [7]  15/22 67/24 69/1 145/5 155/6 156/16 160/2
greatest [4]  38/4 56/4 56/7 216/6
green [3]  38/21 188/16 195/7
grew [2]  50/14 201/18
grocery [1]  55/5
gross [2]  94/20 165/3
ground [5]  82/5 135/5 145/19 156/4 231/9
grounds [2]  9/2 155/19
group [8]  20/15 110/9 152/23 152/25 184/22 185/5 225/24 231/17
groupings [1]  194/14
groups [2]  193/20 193/25
grow [3]  60/18 62/24 177/2
growing [5]  61/16 83/7 83/12 83/12 86/6
grown [3]  84/3 89/7 211/15
growth [10]  81/7 84/15 84/23 87/23 93/14 151/4 160/20 160/22 161/12 162/2
Guerin [4]  33/19 68/6 77/21 203/11
guess [12]  13/19 22/21 34/4 71/2 71/18 75/2 150/25 180/17 188/14 203/19 219/14 226/16
guessing [1]  150/24
guesswork [1]  78/6
guide [1]  168/6
guidelines [7]  25/16 30/8 30/11 30/19 34/17 75/22 140/10
gut [2]  78/7 78/9
guys [1]  193/9

## H

habits [2]  144/20 146/20
hadn't [1]  125/3
haircut [1]  100/5
half [9]  5/19 157/10 157/16 163/6 171/17 171/20 171/22 173/11 234/15
Hancock [3]  2/14 4/5 129/23
hand [7]  51/19 59/8 109/23 120/3 194/14 215/24 217/1
handful [1]  107/5
handler [2]  168/10 168/11
handles [1]  122/12
handwritten [1]  113/16
Hanley [1]  17/22
Hanley's [1]  86/11
happen [23]  24/13 24/15 27/14 35/23 35/25 36/9 37/20 39/8 47/14 53/16 56/18 57/20 70/13 72/3 83/16 83/21 110/16 110/21 110/21 115/16 147/8 178/10 228/21
happened [11]  35/18 35/19 45/22 73/25 86/15 115/12 115/13 163/12 173/20 178/4 206/23
happening [1]  87/14
happens [8]  36/2 36/3 58/14 66/17 67/5 124/6 132/16 192/4
happy [3]  68/22 114/16 137/20
hard [8]  74/16 121/13 124/4 127/19 127/24 129/20 202/24 206/1
hard-bargained [1]  121/13
harder [4]  64/3 64/3 181/11 181/11
hardly [1]  121/24
harm [25]  5/15 7/16 10/13 11/18 11/20 14/10 30/5 31/22 34/18 35/4 38/16 40/25 67/24 69/9 76/9 76/10 76/11 76/17 78/21 82/16 97/6 104/14 121/21 124/19 126/8
harmful [1]  81/20
harming [1]  54/13
hasn't [1]  6/10

haven't [14]  5/18 36/1 75/12 78/24 100/7 100/16 126/6 126/12 188/3 193/9 205/4 205/6 205/15
having [16]  6/19 22/1 22/24 27/7 40/14 40/19 43/9 57/6 64/12 74/24 75/14 145/17 201/22 202/18 214/7 216/7
he's [3]  124/15 160/8 177/13
head [3]  52/14 189/18 189/18
head-to-head [1]  189/18
headquartered [1]  215/8
health [146]
healthcare [46]  14/13 40/2 41/5 54/25 55/3 64/19 65/1 65/4 66/4 66/5 101/24 101/24 102/3 102/6 102/7 102/14 102/18 104/23 104/25 110/9 112/8 131/4 135/17 140/22 140/24 142/13 149/23 167/16 167/16 182/13 206/25 208/24 209/17 210/6 213/5 214/5 215/7 216/22 216/22 216/23 217/14 219/7 225/18 229/19 230/3 234/3
healthy [1]  123/13
hear [13]  28/18 37/9 37/11 72/18 74/15 74/16 99/4 122/16 130/17 131/11 132/12 160/15 179/15
heard [18]  18/8 68/10 119/8 119/8 124/20 131/1 132/12 160/6 160/14 168/23 170/5 170/6 170/7 171/7 188/3 193/9 205/15 208/12
hearing [18]  3/8 4/18 6/4 6/10 17/23 51/3 72/15 78/15 80/4 98/23 106/2 114/15 137/6 137/14 156/7 177/12 177/13 208/2
hearings [2]  35/5 136/24
heart [2]  229/12 231/25
heating [2]  168/11 168/14
heavily [2]  139/15 149/23
Heinz [1]  77/1
held [12]  4/10 13/10 32/4 96/12 96/18 96/25 109/8 112/24 137/5 137/9 137/12 138/18
held-separate [1]  109/8
help [3]  110/11 169/18 195/23
here [83]
here's [5]  24/11 26/21 83/16 84/23 125/6
hey [1]  106/4
HHI [10]  30/8 30/18 30/21 31/5 96/24 97/1 97/22 103/4 140/3 142/2
HHIs [2]  97/1 142/23
high [66]  7/19 15/7 15/11 15/11 15/13 31/21 32/20 32/25 34/10 34/11 48/1 53/9 67/24 72/22 73/1 73/19 74/8 75/20 77/2 77/3 80/5 86/14 90/11 90/18 94/18 94/22 97/6 99/7 101/18 102/11 102/13 102/22 108/7 117/14 117/15 117/21 118/13 122/12 122/14 122/19 124/19 124/23 125/9 125/10 125/11 126/8 136/7 136/7 137/24 140/1 140/5 142/1 142/2 142/2 142/23 148/1 149/11 150/6 159/15 165/22 174/19 178/24 180/11 190/7 191/24 221/8
high-end [1]  165/22
high-quality [6]  74/8 90/18 102/11 102/13 102/22 108/7
High-risk [1]  122/12
higher [64]  31/6 32/22 33/6 33/22 33/23 33/23 33/24 34/9 36/4 38/4 38/12 38/17 38/23 38/24 41/4 41/7 41/10 41/11 41/11 43/1 48/23 49/23 50/14 57/2 59/20 64/8 64/17 64/17 64/17 64/19 64/21 65/1 65/4 65/22 65/23 69/13 69/15 70/14 71/10 71/23 73/11 73/20 75/11 103/7 103/21 104/25 106/10 117/18 117/23 122/23 164/24 165/18 171/21 173/11 174/25 182/12 187/2 195/25 196/2 206/5 206/15 206/25 213/4 213/14

highest [8]  33/25 37/6 58/19 65/17 66/19 68/3 71/5 170/18
Highland [3]  206/10 206/13 206/25
highlight [1]  230/13
highlighted [1]  204/5
highly [5]  30/9 30/19 31/5 72/8 82/4
highways [1]  195/19
Hill [1]  146/7
himself [2]  74/4 178/12
hip [3]  20/1 20/2 27/7
hire [1]  159/24
hired [1]  84/11
hiring [6]  88/21 127/14 158/19 159/19 159/19 159/23
historically [2]  30/12 86/14
history [11]  103/2 104/1 104/15 104/15 130/9 153/9 153/11 179/17 189/1 203/13 215/5
hit [3]  85/8 85/12 85/13
hold [12]  7/6 100/25 101/4 106/4 106/5 106/12 108/5 108/14 108/15 108/25 109/3 125/11
Holdings [2]  8/11 11/7
home [1]  27/15
honest [2]  67/18 231/10
honestly [1]  67/8
Honor [161]
HONORABLE [1]  1/13
hope [9]  39/4 41/16 41/22 79/6 84/3 105/14 112/3 138/17 210/7
hoped [2]  117/7 210/12
hopefully [3]  34/12 107/17 123/21
hoping [1]  84/24
hospital [189]
hospital's [6]  84/16 98/11 156/4 158/15 166/19 166/24
hospitals [136]
hospitals' [1]  142/7
host [5]  128/8 132/6 222/13 230/25 232/11
hot [1]  94/16
hotly [1]  227/18
hour [7]  6/5 50/23 113/4 157/10 157/16 234/13 234/14
hours [6]  3/10 3/10 5/19 6/13 126/14 232/18
however [8]  181/10 200/19 210/23 211/9 211/16 214/3 214/10 215/5
HR [1]  212/24
huge [1]  84/13
Hughes [1]  140/1
huh [2]  111/22 175/4
hundred [11]  172/1 173/8 173/9 173/13 173/24 174/18 184/18 184/23 200/23 200/25 232/23
hundreds [4]  5/4 26/23 27/3 59/9
hurt [1]  99/22
hypothetical [3]  24/24 26/18 112/3

## I

I'd [6]  3/21 50/22 65/9 75/2 99/14 174/1
I'll [35]  4/15 13/20 28/11 41/1 44/2 61/24 63/3 63/10 63/18 66/8 67/13 68/8 76/18 77/11 95/19 95/22 112/1 124/2 130/21 161/10 162/21 170/23 174/3 177/5 182/17 185/18 188/2 194/9 196/8 196/18 207/25 221/11 222/8 224/1 230/12
I'm [66]  4/17 24/4 24/16 27/15 28/4 41/3 50/4 51/24 53/1 56/15 65/8 66/13 67/3 67/12 69/10 75/18 75/18 76/25 77/25 85/1 91/10 94/4 94/4 95/18 96/4 97/15 97/17 97/20 102/24 105/8 122/18 123/8 123/22 125/1

**I**

I'm... [32]  126/23 126/23 127/1 127/2 127/22
129/10 133/6 133/9 141/7 149/1 150/24
150/24 152/6 157/4 157/9 157/15 164/15
169/15 182/23 192/18 196/25 197/13 202/21
202/23 204/19 204/20 207/18 221/4 221/7
221/19 231/11 234/18
I've [7]  75/23 102/21 125/21 125/21 183/25
207/16 237/7
idea [2]  177/5 177/6
identical [3]  28/19 29/1 148/22
identified [4]  164/17 214/13 217/2 231/8
identifies [2]  165/2 225/14
identify [1]  192/22
identity [2]  216/8 227/7
ignore [3]  37/10 90/13 90/14
ignored [1]  166/21
ignores [3]  48/12 166/17 201/4
IL [3]  2/13 2/18 2/20
illegal [11]  30/24 31/22 31/25 32/1 32/4 32/7
32/10 32/13 32/18 34/18 139/2
illegality [6]  12/3 19/5 30/2 30/7 31/19
221/24
image [1]  28/18
images [3]  29/1 29/8 29/23
imagine [1]  195/13
imaging [1]  22/7
immediate [1]  105/20
immediately [8]  84/13 106/8 106/9 106/12
127/7 225/11 225/22 226/6
imminent [2]  10/19 80/25
impact [23]  14/6 14/8 38/3 38/13 39/5 44/8
56/25 71/15 71/15 74/2 86/1 121/12 146/24
151/6 151/7 152/13 153/1 153/4 154/18
180/20 217/16 218/11 228/18
impacted [1]  86/1
impairment [1]  139/1
impatient [2]  46/21 191/10
impede [1]  110/17
implausible [1]  27/6
implement [4]  167/22 170/1 221/18 223/12
implementation [2]  215/14 232/25
implemented [4]  88/8 109/11 120/17 120/21
implementing [1]  159/10
implication [2]  140/17 144/22
implications [1]  140/8
implies [1]  110/11
imply [2]  20/25 70/21
implying [1]  27/1
importance [2]  59/1 159/16
important [46]  7/16 7/16 7/17 9/20 11/3 11/4
12/10 15/21 20/11 23/24 30/24 30/25 31/19
33/16 35/10 37/15 39/21 40/15 42/20 51/1
51/14 51/16 58/9 61/1 61/1 64/19 76/15
80/19 81/5 81/16 93/21 101/5 145/8 165/12
166/9 178/14 185/21 186/11 189/19 195/21
195/24 199/12 200/19 201/23 227/5 229/18
Importantly [1]  218/14
impose [2]  140/24 225/5
imposed [2]  3/12 224/11
imposes [1]  80/5
impossible [3]  127/23 202/15 231/12
impressive [2]  44/23 94/20
improve [16]  39/23 39/23 45/3 45/4 45/4
72/18 73/24 74/9 75/16 84/16 93/17 93/19
158/20 159/6 218/13 219/9
improved [6]  39/4 74/22 86/3 93/16 95/6
95/6
improvement [5]  86/8 86/12 86/20 88/19

165/24
improvements [7]  86/5 87/3 88/21 88/24
90/4 226/9 234/1
improving [2]  72/23 109/12
in-network [2]  174/8 207/14
inability [5]  165/6 175/1 175/3 178/18 192/9
inaccurate [1]  96/20
inadequate [2]  175/5 185/10
inappropriate [1]  145/25
INC [1]  1/7
incentive [3]  154/15 224/13 233/10
incentives [1]  102/15
incentivize [2]  182/6 182/19
incipiency [2]  10/9 138/6
include [5]  48/24 131/23 131/24 143/3
201/12
included [6]  45/20 56/1 63/11 209/14 217/7
232/8
includes [2]  19/18 172/13
income [6]  157/25 158/1 158/13 158/18
165/23 177/25
incomes [1]  178/24
inconveniently [1]  63/8
incorporate [1]  113/21
increase [59]  20/3 27/25 31/6 36/14 39/12
39/14 47/21 50/13 58/22 64/13 69/11 69/17
71/21 74/8 84/23 85/2 85/3 95/7 99/22
103/18 106/2 112/9 117/8 120/17 125/18
139/1 139/19 140/3 143/10 144/5 144/10
144/23 145/21 150/6 150/7 152/14 153/3
154/1 154/3 161/9 161/25 162/3 162/5
163/14 174/18 174/20 174/20 174/21 175/9
175/13 175/17 175/18 184/8 191/22 202/1
202/12 216/18 219/12 233/25
increased [13]  59/23 63/18 70/2 70/3 89/2
97/23 131/2 145/1 151/8 152/15 208/14
208/14 209/12
increases [32]  6/21 7/17 11/24 25/6 25/7 40/7
40/16 40/20 40/22 60/25 64/16 70/17 71/2
76/1 97/25 98/12 99/12 99/19 100/5 101/5
103/3 103/4 105/20 120/20 139/16 142/2
144/17 154/23 154/23 175/15 186/25 207/10
increasing [7]  83/7 83/13 88/24 88/25 161/2
169/23 170/6
incredible [8]  31/8 72/4 86/8 90/13 91/10
91/21 104/18 105/4
incredibly [4]  67/23 72/8 75/19 124/22
indeed [8]  131/11 143/13 185/4 189/7 208/19
214/11 218/17 228/13
indefinitely [3]  101/3 168/4 168/19
independence [5]  115/17 209/9 215/3 215/5
216/8
independent [45]  18/9 18/12 37/24 48/2
48/13 57/9 69/11 69/13 69/17 69/24 70/4
70/8 70/22 72/17 72/19 72/20 72/21 73/5
74/7 83/10 88/18 89/23 94/8 94/10 108/11
120/9 134/5 134/22 135/21 135/23 136/9
138/1 156/9 158/24 164/8 164/12 185/14
187/10 208/11 208/17 209/6 218/25 219/5
219/22 220/2
independently [2]  70/15 177/21
indicate [3]  10/2 19/9 50/22
indicated [4]  52/6 113/21 115/22 232/6
indication [1]  115/21
indications [1]  81/13

indicators [3]  81/5 149/19 228/13
indigent [1]  170/21
indirect [4]  170/19 187/20 204/24 210/9
indisputable [3]  57/11 68/1 102/10
individual [2]  20/18 23/23 152/4 159/23
individuals [2]  114/21 159/20
industry [3]  66/4 223/21 229/12
infer [1]  186/19
inferior [1]  212/20
influenced [2]  148/19 148/24
influx [1]  211/12
inform [1]  98/7
information [8]  34/7 34/7 50/21 92/17 94/13
182/8 229/8 229/18
informative [1]  60/5
infrastructure [6]  167/23 209/1 216/18
217/12 223/11 225/17
infused [1]  223/4
infusion [1]  210/3
ing [1]  175/5
inherently [1]  11/24 117/24
initial [2]  6/4 6/7
initially [2]  215/18 217/1
initiative [2]  160/17 161/9
initiatives [2]  160/21 208/25
injunction [53]  1/12 3/8 8/4 8/16 8/18 9/7
15/24 114/15 126/20 127/4 127/10 133/25
134/9 134/23 135/20 136/3 136/8 136/14
136/24 137/23 139/20 140/4 140/12 140/19
141/5 142/6 142/24 143/14 146/13 148/8
149/14 150/9 150/12 155/15 155/20 155/22
156/2 156/4 156/10 156/15 156/17 156/19
157/1 221/10 224/9 224/11 224/24 228/21
233/7 233/11 234/5 234/9 234/20
injunctions [3]  141/2 155/18 156/18
injunctive [9]  8/10 8/14 11/8 127/3 129/24
130/2 134/13 155/17 137/6
inpatient [49]  19/14 19/15 21/14 22/17 22/18
29/10 44/19 44/24 47/2 84/24 85/11 93/15
94/15 94/18 121/22 121/22 122/21 126/17
128/1 130/14 141/10 141/11 141/13 142/14
144/22 146/22 148/3 149/13 151/12 153/15
160/24 161/3 161/7 174/3 174/6 174/10
174/13 174/16 174/24 178/19 179/1 180/1
189/22 191/9 193/11 193/16 199/1 222/14
227/19
inpatients [2]  88/7 169/23
inquiry [4]  139/24 143/24 156/11 156/12
inside [1]  141/23
insignificant [6]  16/5 47/14 47/23 51/12
55/24 223/8
insinuate [1]  206/4
install [1]  168/2
installation [1]  168/3
instance [8]  7/3 7/24 9/4 13/17 111/9 125/8
133/18 135/6
instances [2]  151/6 162/7
instead [10]  11/9 145/14 145/23 150/2
190/11 197/2 200/25 206/3 213/25 226/24
institution [1]  13/1
institutions [2]  13/2 115/15
insubstantial [1]  135/13
insufficient [2]  138/15 172/23
insurance [7]  38/13 55/3 64/21 66/3 148/25
160/3 230/14
insured [21]  19/17 64/15 117/13 121/16
123/3 123/6 123/7 123/7 123/7 123/9 123/12
124/10 131/20 167/7 197/10 198/21 199/4
199/6 199/10 199/21 200/9
insureds [1]  132/22

**I**

insurer [2]  120/22 187/17
insurer's [1]  131/4
insurers [1]  118/16
intact [2]  31/13 107/19
integrate [1]  229/22
integrated [1]  29/19
integrates [1]  232/13
integration [8]  112/15 230/1 231/1 231/3
231/23 233/12 233/13 233/13
intend [5]  107/12 107/13 113/1 130/22
228/19
intended [3]  182/18 197/21 220/10
intension [1]  154/12
intent [9]  11/6 70/11 117/12 134/20 154/15
175/14 175/17 206/16 206/17
interchangeable [2]  152/24 181/22
interest [15]  8/5 8/6 8/7 10/14 16/11 16/13
54/1 106/24 116/6 130/3 134/9 136/15
155/25 217/24 234/10
interested [2]  81/21 210/24
interesting [5]  46/23 47/18 47/22 60/5
224/16
interestingly [3]  141/12 199/22 201/20
interests [1]  144/14
interim [4]  7/16 109/15 128/5 175/15
internal [1]  78/23
interrogatories [1]  6/9
interrupt [3]  50/15 124/1 186/6
introduce [2]  114/21 115/8
introduction [2]  127/17 127/18
intrusive [1]  156/20
intuitive [1]  80/11
invalid [1]  149/24
invaluable [1]  108/8
invest [13]  109/21 110/5 110/6 167/1 168/8
170/22 214/25 216/17 224/13 224/14 225/6
225/7 229/19
investigation [9]  9/2 10/22 16/20 16/21 17/13
25/18 67/17 135/5 218/20
investigational [4]  17/23 35/5 78/15 177/12
investigations [2]  81/11 183/25
investment [14]  18/3 92/20 92/21 92/22
106/6 109/20 158/13 158/17 168/14 172/24
210/4 217/12 229/18 233/10
investments [6]  110/2 158/25 209/1 226/11
227/25 228/4
invitation [1]  211/4
involved [6]  99/18 140/1 142/15 146/4
183/25 224/17
involving [2]  146/2 147/16
Iowa [1]  149/4
ironclad [1]  109/23
ironically [1]  127/5
irradicate [2]  221/24 224/9
irrational [1]  117/10
irrebuttable [1]  41/13
irrefutably [1]  9/5
irrelevant [2]  47/15 118/14
Island [10]  103/13 103/17 103/19 138/22
138/23 147/13 147/18 147/24 154/7 203/12
isn't [15]  17/18 24/6 47/23 48/12 64/12 108/1
117/25 122/6 129/4 143/24 180/4 190/22
196/21 198/15 200/6
issue [20]  6/14 14/9 31/13 41/25 64/12 66/14
66/16 92/13 111/2 111/15 112/4 118/14
156/14 166/8 169/6 198/9 203/18 214/17
222/20 228/10
issued [3]  9/9 167/7 167/8

issues [8]  12/22 91/22 111/19 117/1 117/3
162/11 169/17 214/12
issuing [1]  110/13
it'd [1]  99/22
it's [150]
items [1]  229/13
itself [16]  84/14 118/25 127/12 136/20
164/20 181/12 191/4 198/6 209/5 214/13
216/21 217/2 230/17 230/19 232/13 232/16

**J**

jack [1]  107/20
Jamie [2]  115/1 212/11
Janelle [2]  2/4 3/25
January [3]  50/1 93/2 93/2
January 1st [1]  50/1
January 2010 [1]  93/2
January 2011 [1]  93/2
Jeff [2]  3/24 115/3
Jeffrey [1]  1/19
jeopardize [2]  166/19 233/24
Jersey [3]  1/18 2/3 2/5
Jewish [10]  103/13 103/17 103/19 138/22
138/23 147/13 147/18 147/24 154/7 203/13
job [7]  4/17 6/18 6/21 13/16 70/17 111/9
178/17
Johnson's [1]  229/17
join [10]  36/21 36/25 37/2 38/20 38/23 57/13
70/3 70/6 101/23 116/23
joinder [1]  103]
joinder's [2]  130/18 221/14
joined [5]  37/18 37/21 118/25 225/21 228/15
joining [7]  36/19 38/7 38/25 39/6 56/19 57/3
74/4
joins [1]  39/9
joint [7]  116/8 213/18 213/21 214/1 214/6
214/7 214/8
jointly [1]  50/23
Joplin [1]  146/4
Jr [1]  2/11
judge [5]  1/14 6/14 6/14 67/13 98/15 101/9
101/14 101/20 111/1 111/1 133/18 155/10
judges [1]  195/6
judgment [5]  134/23 135/21 135/24 136/10
138/1
judicial [1]  134/20
July [5]  16/25 50/4 85/8 174/9 198/2
July 1st [2]  50/4 174/9
July 2009 [2]  85/8 198/2
July 2010 [1]  16/25
jump [5]  76/18 161/18 161/19 161/21 161/25
jumped [2]  158/9 162/25
June [1]  169/12
junk [2]  92/18 233/23
jurisdictions [1]  136/22
just [96]
Justice [1]  147/15
justification [2]  82/7 142/7
justified [1]  156/1
justify [2]  139/19 150/8
justifying [1]  82/6

**K**

KATZ [1]  1/13
keep [13]  49/3 53/4 55/5 94/24 107/12
107/13 107/18 157/10 164/15 167/15 178/25
198/23 202/22
keeps [1]  107/19
key [7]  20/20 24/23 95/8 102/19 160/10
161/4 163/2

keys [1]  53/14
kill [1]  27/16
kind [6]  36/18 126/21 128/15 190/12 192/6
231/9
kinds [4]  128/11 192/8 230/11 232/9
knee [3]  19/25 20/3 152/3
knew [15]  43/24 43/25 45/19 47/10 51/18
52/16 52/20 52/20 54/11 54/12 54/17 55/12
55/18 70/12 211/5
know [70]  3/7 4/13 28/10 33/17 37/10 51/8
61/6 61/7 65/15 68/18 83/23 101/13 103/12
103/20 104/20 104/20 114/11 114/24 121/25
127/18 127/25 128/18 128/21 128/25 129/11
129/12 131/18 132/4 132/13 157/11 175/14
175/20 175/25 176/7 177/6 177/19 177/22
177/25 178/4 178/8 178/11 178/22 182/7
182/7 182/9 182/15 182/22 183/15 183/15
184/16 184/17 184/18 188/4 188/5 189/7
189/13 191/25 196/7 200/10 201/11 205/1
205/14 215/8 222/8 225/6 226/21 227/13
227/22 230/20 232/9
knowledge [4]  60/9 60/11 84/19 126/19
known [6]  10/4 10/9 204/15 214/21 215/12
218/5
knows [1]  19/25
Koal [4]  135/14 147/1 147/10 150/17
Kuhn [1]  115/3

**L**

labor [1]  27/9
laboring [1]  88/3
lack [3]  87/22 216/20 232/12
lacking [1]  233/25
ladies [6]  3/2 3/5 112/25 113/7 114/25
179/13
laid [2]  89/7 158/22
land [7]  131/11 180/18 180/22 180/23 180/23
189/2 218/5
landmark [1]  208/24
language [4]  16/9 20/20 110/15 215/19
large [31]  11/19 20/17 39/4 39/6 41/3 48/5
48/5 48/10 48/11 49/18 49/25 57/7 59/2
66/21 68/11 72/16 93/10 139/19 140/14
144/3 144/16 145/19 146/5 148/24 150/7
160/22 161/12 161/18 161/19 161/25 165/21
largely [1]  78/6
larger [10]  16/1 16/2 16/2 16/3 16/3 28/20
33/11 94/1 142/19 165/16
largest [9]  14/4 15/25 16/23 119/14 151/4
164/25 173/2 173/6 174/5
Larry [1]  114/23
last [35]  6/2 8/11 9/8 10/15 62/21 63/10 65/2
71/6 71/14 75/13 84/3 94/5 94/7 94/12 97/21
97/24 108/23 109/18 110/23 111/8 130/18
149/1 156/14 157/19 157/21 157/23 157/24
161/17 171/21 178/4 178/5 182/16 219/4
228/13 233/20
lastly [1]  219/11
late [5]  93/22 93/23 119/17 210/18 210/18
later [11]  5/17 7/3 36/2 55/12 81/23 83/11
145/6 155/6 156/20 157/3 165/5
law [13]  6/14 8/9 25/17 82/4 82/13 111/1
118/20 133/18 138/1 151/21 208/24 225/1
229/19
laws [9]  7/22 11/5 11/15 76/13 107/11
117/15 117/18 117/19 205/14
lawsuit [1]  107/9
lawsuit's [1]  54/11
lay [3]  89/4 89/6 131/11
laying [1]  212/15

# L

lays [1]  220/6
lead [6]  18/22 25/22 41/4 97/10 138/14 147/6
leaders [3]  53/2 53/3 53/7
leadership [5]  52/24 95/4 115/14 212/15 213/3
learned [1]  150/15
leases [1]  159/1
least [18]  10/25 11/18 32/21 37/16 57/4 61/7 62/21 89/2 89/10 89/25 96/9 99/12 121/18 125/20 144/13 175/15 219/4 222/7
leave [5]  27/24 179/8 192/3 194/4 197/23
leaving [4]  26/5 26/6 26/10 153/2
led [1]  120/10
left [3]  114/12 194/14 197/20
left-hand [1]  194/14
legal [6]  31/25 115/4 129/23 133/9 151/21 156/14
legality [1]  79/22
legitimate [1]  81/15
lend [1]  14/24
length [1]  224/23
less [25]  9/6 10/11 24/22 26/6 26/9 27/21 28/25 39/25 64/13 66/25 67/5 79/7 81/20 82/2 91/24 97/25 120/21 123/10 123/10 172/1 173/8 185/10 199/22 202/20 207/12
lessen [10]  9/23 9/24 10/17 11/24 79/23 130/13 133/16 138/8 138/12 154/25
lessening [2]  138/14 155/1
lessens [1]  79/16
lesser [1]  80/10
lessons [1]  143/25
let [31]  18/20 24/23 25/2 36/18 53/4 53/13 80/12 80/13 80/15 80/17 96/21 97/20 100/15 113/20 114/10 121/14 122/7 123/1 127/4 129/21 151/9 152/7 169/3 182/3 190/5 197/17 203/20 204/9 206/21 207/25 228/20
let's [22]  24/10 29/9 69/16 83/1 89/5 105/25 107/22 111/6 117/13 134/11 162/22 164/14 164/14 170/15 171/4 172/3 181/15 196/16 197/4 199/18 199/23 206/22
letter [11]  49/6 49/7 88/1 100/25 101/2 101/4 106/4 106/5 106/13 108/10 214/22
letting [1]  6/25
level [25]  30/10 33/20 49/5 52/8 54/14 69/24 82/20 117/20 118/11 118/17 147/7 148/1 153/19 154/1 155/3 155/8 180/11 194/16 194/16 194/22 194/22 202/12 218/17 218/22 221/8
levels [41]  7/19 7/20 30/7 33/10 35/21 45/4 53/10 58/22 65/22 69/12 69/18 77/3 77/3 90/7 90/11 97/6 105/22 106/24 107/14 107/19 108/7 117/20 124/14 124/20 125/18 126/8 126/11 128/7 139/2 140/5 140/11 148/18 154/3 165/22 165/23 179/21 181/8 181/24 183/20 203/8 222/4
leverage [22]  36/20 36/23 36/24 37/1 39/14 49/19 58/15 58/22 58/24 59/1 59/7 59/11 63/24 70/3 70/4 70/10 101/1 101/7 118/8 145/1 201/6 201/7
leveraged [1]  158/25
Lexicon [1]  78/24
liabilities [1]  226/1
liability [3]  169/1 169/5 226/3
licensed [1]  200/23
lie [1]  134/3
lies [1]  133/17
life [6]  57/5 57/8 94/1 168/7 168/12 168/18
light [5]  39/22 90/2 126/15 127/3 213/5

likelihood [17]  8/7 8/20 9/6 9/11 9/17 10/20 10/23 11/12 34/25 104/5 125/17 134/7 135/2 136/1 136/16 136/18 179/22
likely [38]  11/24 12/2 14/10 25/7 26/17 38/25 39/5 40/20 49/18 56/18 76/8 76/17 78/13 78/21 82/2 82/23 82/23 93/19 98/9 112/9 130/10 130/13 136/13 139/7 139/13 145/22 148/14 150/13 153/22 154/13 154/18 155/7 155/13 155/25 156/13 228/20 229/4 233/23
likes [1]  196/5
limit [4]  88/21 98/12 100/8 109/19
limited [5]  94/18 116/8 132/21 132/22 193/17
limits [3]  80/8 82/9 110/1
line [15]  6/22 18/4 33/9 40/3 56/8 64/13 133/14 152/4 190/21 190/23 193/6 194/18 195/10 213/21 231/23
lineup [1]  193/3
lingering [2]  125/19
liquidity [1]  93/18
list [2]  78/17 193/24
listed [3]  194/14 194/14 227/9
listen [1]  136/6
listening [2]  124/12 150/24
lists [2]  6/8 193/19
literally [3]  48/14 79/6 110/25
litigated [3]  97/21 97/24 150/4
litigation [4]  43/7 77/10 77/12 84/6
little [37]  9/13 10/1 21/7 27/8 44/8 51/11 80/3 101/16 108/11 109/2 118/21 119/20 124/5 127/21 141/7 145/6 147/5 160/14 161/6 161/11 171/19 172/4 183/23 188/2 188/5 188/10 188/11 191/11 194/9 194/12 195/5 195/13 199/5 202/20 205/5 205/22 234/15
live [4]  6/13 62/2 65/3 195/12
lives [3]  19/10 59/14 99/20
LLP [4]  2/11 2/14 2/17 2/19
lo [1]  206/23
load [1]  93/4
lobby [1]  229/9
local [15]  18/15 40/24 41/11 62/12 64/25 98/10 99/18 99/20 100/9 192/16 211/25 215/4 215/9 216/22 218/2
locally [2]  187/12 207/21
located [18]  13/23 15/5 16/7 47/15 49/8 63/8 122/2 147/24 148/22 180/24 188/6 188/10 188/12 188/14 188/16 197/23 210/21 229/23
location [9]  29/24 49/12 63/20 63/21 180/6 195/16 195/20 211/17 227/7
locations [2]  122/1 190/1
lock [1]  55/2
logic [1]  16/4
logo [1]  219/23
long [26]  23/15 41/23 103/13 103/17 103/19 105/3 116/10 121/6 121/7 131/14 131/14 131/15 132/23 132/25 138/22 138/22 147/13 147/18 147/24 154/6 166/15 199/16 203/12 219/24
long-winded [1]  132/25
longer [11]  36/6 57/6 89/19 94/10 124/5 137/20 158/16 158/17 168/1 208/10 220/17
longest [1]  28/7
looked [15]  33/17 77/18 81/12 83/13 91/8 124/25 124/25 125/4 172/9 176/1 176/2 176/3 176/6 203/15 203/16

looking [12]  28/5 100/4 108/2 138/9 138/13 153/24 164/12 177/24 177/25 187/18 187/23 198/14
looks [1]  21/22
Lori [1]  229/17
lose [9]  44/14 46/25 47/11 47/11 49/1 59/13 129/15 223/19 233/13
loses [1]  66/23
losing [6]  43/24 52/9 119/21 120/3 190/21 230/21
loss [11]  10/18 47/8 51/22 53/11 94/21 158/4 158/9 158/10 162/25 169/20 215/8
losses [11]  45/8 158/11 158/15 158/17 163/7 163/20 163/20 164/19 167/14 177/25 212/22
lost [14]  43/16 43/17 44/16 46/13 47/2 56/5 59/6 59/6 95/17 95/19 98/2 116/6 174/6 174/10
lot [54]  5/7 5/20 6/3 11/17 22/8 24/13 28/18 30/1 31/18 35/12 37/3 38/5 39/20 48/7 52/21 53/9 58/14 59/3 59/7 59/8 59/14 63/24 67/22 69/10 77/11 85/19 85/23 86/1 91/12 91/20 92/17 104/13 104/15 112/19 119/8 119/8 132/12 157/20 160/16 168/21 168/23 170/5 170/6 171/5 184/4 188/4 196/5 208/12 221/6 221/11 224/2 230/20 230/21 231/3
lots [2]  183/24 185/14
low [24]  15/13 40/12 45/15 48/1 73/2 73/9 74/7 87/7 88/9 93/3 93/7 95/4 102/11 102/13 102/15 102/22 103/8 103/9 108/7 122/22 165/22 178/24 198/20 199/14
low-cost [5]  73/2 102/11 102/13 102/22 108/7
lower [28]  8/17 30/7 30/12 33/11 33/12 39/4 39/17 40/2 40/9 40/12 55/5 71/22 72/6 72/10 72/23 73/11 73/20 74/4 132/24 182/6 182/12 182/20 183/2 195/5 199/13 213/4 213/14 226/20
lower-cost [1]  182/6
lowered [1]  71/8
lowest [3]  33/21 33/22 194/21
Lucas [87]
Luke [2]  37/6 47/16
Luke's [784]
lunch [1]  113/4
lunchtime [1]  113/18

# M

magic [1]  75/13
mail [5]  16/25 58/3 78/23 78/23 216/1
main [3]  159/6 208/8 229/7
mainly [1]  146/19
maintain [16]  5/15 6/17 8/1 35/13 105/17 108/6 108/8 110/25 126/16 154/16 187/11 207/20 225/17 226/25 227/6 227/18
maintained [1]  90/11
Maintaining [1]  6/20
maintains [2]  112/17 218/25
major [2]  186/23 214/16
majority [1]  16/6
makes [10]  14/5 18/22 36/17 57/8 64/8 66/20 149/24 176/25 203/4 206/9
making [11]  15/1 17/24 18/10 27/15 35/10 57/16 58/9 70/18 86/5 95/12 210/9
malpractice [1]  230/14
manage [2]  109/8 209/15
managed [12]  36/13 38/2 52/19 68/17 68/23 70/6 85/7 118/24 144/3 148/4 187/12 207/21
management [15]  90/16 109/10 109/16 158/23 159/17 208/9 208/19 209/7 212/6 212/21 212/24 213/10 214/25 215/6 215/11

# M

manager [3]  14/19 37/8 37/9
mandated [2]  6/18 223/6
mandates [1]  208/24
manipulated [3]  120/25 121/10 121/13
manipulation [1]  101/15
manner [2]  5/1 191/6
manufacturer [1]  168/1
map [1]  197/21
maps [1]  29/25
March [3]  198/2 200/14 200/17
March 2010 [3]  198/2 200/14 200/17
margin [21]  5/2 5/2 30/15 68/20 81/8 86/7
 86/9 86/13 86/17 86/21 94/19 94/21 94/24
 170/21 187/22 204/25 205/2 205/4 205/17
 205/22 210/15
Marine [1]  138/20
mark [1]  148/2
market [336]
market's [1]  91/22
marketing [4]  36/25 59/23 70/6 70/17
marketplace [11]  116/2 118/6 122/3 122/14
 126/12 149/15 181/1 181/14 201/19 203/3
 209/17
markets [34]  5/1 11/19 12/13 12/24 13/3
 13/4 19/1 19/2 19/3 19/24 20/17 21/6 22/14
 67/19 72/9 75/20 75/23 82/25 86/2 91/23
 93/1 103/3 121/21 130/15 140/5 140/6
 140/16 140/24 140/25 141/25 163/13 179/18
 179/20 185/12
Marshall [2]  115/4 115/5
Marx [12]  2/11 4/3 4/4 69/10 113/9 143/21
 153/10 156/16 157/1 179/15 211/22 220/21
masked [1]  158/15
maternity [1]  88/3
Matt [1]  3/23
matter [26]  4/13 12/12 20/16 23/7 32/23
 32/24 41/17 43/21 43/22 43/23 95/10 95/11
 97/16 103/6 117/6 118/2 122/10 139/22
 166/14 174/19 182/23 195/20 196/11 202/2
 232/2 235/7
matters [3]  23/8 98/1 113/11
Matthew [1]  1/17
Maumee [4]  15/5 63/25 167/7 181/14
maximize [1]  68/14
May 2010 [1]  231/6
May 31st [1]  6/12
maybe [6]  13/20 54/4 86/25 86/25 131/21
 184/8
McClaren [3]  210/23 211/14 211/16
McClaren's [1]  211/18
McDermott [5]  2/11 2/14 2/17 2/19 4/4
me [50]  3/3 4/17 4/18 18/20 24/23 25/2 27/16
 31/23 32/9 36/18 50/9 61/19 67/13 67/13
 67/14 69/10 83/15 97/20 99/23 100/15
 111/23 113/20 121/14 122/8 123/1 124/1
 124/5 129/21 130/17 130/24 143/21 151/9
 152/7 152/19 153/20 157/5 169/3 182/3
 185/2 185/19 188/8 190/5 197/17 202/21
 204/4 204/9 210/18 221/20 222/5 223/25
mean [12]  8/21 34/8 66/2 77/11 96/1 132/5
 138/10 138/13 161/22 171/13 172/21 231/14
meaning [10]  9/7 21/12 33/9 33/15 48/21
 53/14 62/1 71/21 71/21 79/21
meaningful [4]  47/23 116/12 167/17 230/4
meaningless [3]  34/1 47/14 55/23
means [21]  5/8 6/20 8/21 19/25 25/9 50/13
 64/17 64/20 65/23 65/24 82/19 83/1 84/15
 106/17 109/22 184/5 197/18 199/15 224/4

225/24 226/19
measure [1]  215/3
measures [9]  15/11 88/25 90/10 91/7 93/18
 94/1 159/10 169/25 221/17
measuring [1]  71/7
mechanism [1]  183/2
med [1]  191/22
median [2]  165/23 178/24
medians [1]  165/10
Medicaid [6]  172/13 172/15 172/23 173/5
 187/7 210/10
medical [22]  19/15 61/12 64/20 116/5 138/23
 147/13 154/5 154/7 154/13 159/2 167/18
 173/3 173/5 188/13 191/18 211/24 215/12
 217/13 219/22 228/3 230/14 232/25
Medicare [9]  167/20 172/13 172/15 172/23
 173/5 187/6 209/3 210/10 230/6
medium [3]  68/11 68/11 146/3
meet [21]  9/17 19/11 36/18 80/6 80/24
 85/9 96/1 111/3 129/17 130/12 138/24
 162/17 166/25 167/19 178/14 210/5 218/24
 219/6 219/11 231/13
meeting [3]  38/10 121/1 173/19
meets [1]  8/25
Meg [1]  203/16
Melhorn [1]  115/5
member [2]  18/18 228/2
members [15]  39/3 52/25 59/9 60/18 73/23
 73/25 74/3 117/13 159/18 182/11 183/4
 183/10 184/1 212/19 213/1
members' [1]  184/4
membership [2]  64/3 201/7
memo [2]  14/20 94/25
Memorandum [1]  211/25
Memorial [3]  103/14 103/17 103/19
memos [1]  37/7
mention [7]  63/21 100/15 101/22 121/24
 137/18 142/13 221/21
mentioned [16]  6/10 28/5 30/2 31/17 34/12
 72/15 112/13 119/10 121/18 140/25 141/9
 157/1 193/2
mentions [1]  100/18
Mercy [129]
Mercy's [9]  28/24 29/11 91/1 184/17 188/13
 189/1 196/17 196/21 196/23
Mercy-UTMC [3]  59/24 61/9 71/22
mere [5]  25/13 56/11 56/11 134/21 139/3
merely [3]  134/13 136/5 139/24
merged [6]  148/5 148/12 148/16 153/25
 154/4 156/21
merger [85]
merger's [2]  31/21 38/16
merger-specific [1]  76/9
mergers [10]  31/25 32/1 32/9 65/11 79/23
 133/14 138/6 151/15 154/24 154/24
merging [9]  32/3 39/3 142/17 142/22 144/19
 146/6 147/23 148/22 206/14
merit [2]  111/10 235/4
merits [49]  5/11 5/16 6/3 6/11 6/12 6/19 6/21
 6/24 7/10 7/14 8/1 8/8 8/20 9/1 9/6 9/11 9/17
 9/18 10/23 11/12 12/7 13/14 14/10 30/24
 73/17 103/6 103/24 105/24 106/16 106/21
 108/9 110/25 111/3 111/6 111/10 112/5
 112/11 112/18 130/1 134/8 134/18 135/3
 135/16 136/2 136/13 136/17 155/14 156/13
 234/9
mesh [1]  212/9
messy [2]  194/9 194/12
met [11]  6/2 9/16 10/22 11/12 11/16 84/21
 97/8 126/12 163/4 163/8 172/6

methodology [1]  120/12
metro [1]  44/18
Michigan [13]  15/24 99/10 137/9 141/10
 210/22 211/9 211/10 211/15
middle [4]  14/19 37/8 37/9 84/10
might [31]  22/6 27/7 28/15 33/10 64/5 87/12
 113/11 116/24 117/7 121/19 122/4 127/19
 138/11 138/12 138/14 142/10 156/5 167/16
 169/14 185/12 185/13 189/8 192/17 215/21
 215/22 217/16 228/7 228/25 230/20 230/21
 231/7
Mike [1]  177/23
miles [3]  147/24 148/23 189/3
million [33]  38/22 84/24 85/2 85/17 89/10
 92/7 92/7 109/21 109/24 167/6 176/3 217/10
 218/19 223/14 223/15 224/13 225/6 225/19
 226/7 226/8 228/23 228/24 229/2 229/4
 229/14 229/15 230/22 232/6 232/20 232/22
 232/23 233/1 233/2
millions [4]  44/4 44/23 44/24 83/24
mind [4]  23/1 103/24 117/10 122/15
mine [1]  189/5
minimize [1]  92/12
minimum [8]  111/18 170/14 190/15 200/6
 227/7 229/1 229/1 229/14
minute [10]  106/12 123/1 129/21 179/8
 179/10 195/18 196/8 204/9 227/4 231/21
minutes [9]  28/6 28/8 28/9 53/21 67/13
 105/16 173/9 179/16 221/1
mirror [4]  28/18 29/1 29/8 29/23
mislead [1]  20/25
misread [1]  50/2
misreading [1]  127/9
missed [1]  119/10
mission [2]  89/20 205/20
Missouri [3]  142/16 146/3 146/4
mistake [1]  125/4
mistakes [1]  125/2
mix [2]  199/5 199/9
MMO [24]  119/14 119/23 120/1 120/4
 120/16 120/21 121/1 121/5 123/7 124/13
 126/2 131/25 144/4 165/1 173/6 173/14
 174/5 175/9 175/11 175/16 182/25 201/13
 202/12 207/8
MMO's [3]  132/2 132/16 173/18
model [2]  54/25 108/7
modest [1]  70/16
modify [1]  106/3
moment [3]  3/4 119/13 202/21
moments [1]  16/10
momentum [1]  233/13
Monclova [1]  189/3
money [14]  14/24 46/4 56/6 92/5 92/9 119/21
 120/3 168/20 190/21 205/21 211/5 224/2
 231/18 232/2
monitor [9]  108/17 108/17 108/20 108/25
 109/3 109/4 203/21 214/4 214/14
monitor's [1]  108/17
monopolist [2]  24/24 26/19
monopoly [5]  10/7 23/13 25/11 27/24 27/25
Monroe [3]  2/12 2/17 2/20
month [8]  14/13 14/13 25/18 27/14 87/21
 94/16 200/15 230/15
months [9]  18/16 44/20 51/11 81/6 86/22
 94/7 95/5 163/12 163/13
Moody [1]  164/14
Moody's [18]  92/19 92/23 92/24 163/10
 163/16 163/23 164/2 164/17 164/22 165/2
 165/5 165/13 165/25 166/5 166/20 166/22
 167/3 226/15

## M

Mooing's [1] 163/17
Moreover [1] 220/1
morning [32] 3/5 3/6 3/23 4/11 4/12 4/18 5/7
  5/17 11/15 58/14 113/15 113/21 113/24
  115/6 115/22 117/2 119/11 119/12 122/16
  124/20 160/6 160/14 161/14 163/3 166/9
  170/5 170/6 171/5 208/12 234/17 234/18
  234/24
morning's [1] 113/25
most [31] 11/4 19/18 37/6 37/15 38/1 43/12
  47/2 56/6 74/17 76/15 88/12 132/15 135/1
  140/15 140/25 151/3 151/5 163/5 165/12
  172/6 173/21 185/21 189/22 195/3 196/9
  196/12 198/21 198/23 198/25 204/7 225/3
mostly [1] 223/21
mother [1] 123/13
motion [2] 136/6 164/10
motivating [1] 209/24
motivation [3] 51/21 130/16 208/8
motivations [1] 208/4
Motorola [1] 91/20
motto [1] 102/20
mounting [1] 233/22
mouth [1] 194/24
mouths [1] 104/19
move [4] 21/23 77/15 189/5 226/13
moved [4] 106/25 107/25 112/10 226/12
moving [4] 8/2 107/7 107/23 176/1
Mr [3] 74/14 107/23 228/12
Mr. [98]
Mr. Brick [2] 92/25 93/13
Mr. Bricks [2] 164/7 164/10
Mr. Dagen [3] 177/4 177/10 178/7
Mr. Dagen's [2] 89/11 90/5
Mr. Gabe [2] 77/17 166/11
Mr. Larry [1] 114/23
Mr. Marx [10] 4/3 69/10 113/9 143/21
  153/10 156/16 157/1 179/15 211/22 220/21
Mr. Oostra [8] 68/13 68/22 71/4 74/11 78/15
  100/2 205/1 217/21
Mr. Oostra's [1] 98/17
Mr. Oppenlander [1] 88/6
Mr. Reilly [16] 4/8 16/8 50/16 53/24 117/2
  119/10 124/15 125/7 139/21 160/6 161/14
  163/3 177/13 221/22 234/13 234/16
Mr. Reilly's [1] 136/6
Mr. Wachsman [1] 60/9
Mr. Wakeman [36] 16/24 18/13 37/17 37/22
  37/25 39/2 43/11 54/22 56/3 56/9 57/21 58/4
  74/3 83/8 84/11 84/12 84/18 85/20 86/15
  87/17 87/20 87/25 88/8 93/23 94/2 94/13
  95/9 109/11 109/14 119/16 120/1 120/8
  163/4 163/5 178/16 179/3
Mr. Wakeman's [7] 86/11 94/7 94/12 119/9
  119/12 200/11 215/16
Mr. Wu [5] 130/16 153/10 207/25 221/2
  227/4
Ms [1] 17/22
Ms. [18] 4/16 33/19 68/6 74/12 74/12 74/20
  77/21 86/11 119/19 130/4 153/10 190/20
  199/17 203/11 208/15 222/11 225/12 229/17
Ms. Barbara [1] 74/12
Ms. Carletti [6] 153/10 190/20 199/17
  208/15 222/11 225/12
Ms. Carletti's [2] 119/19 130/4
Ms. Finnerity [1] 4/16
Ms. Guerin-Calvert [4] 33/19 68/6 77/21
  203/11

Ms. Hanley's [1] 86/11
Ms. Lori [1] 229/17
Ms. Stelle [2] 74/12 74/20
MSA [2] 14/14 14/18
much [58] 5/22 12/12 22/20 22/21 24/20 31/4
  33/9 40/17 42/17 43/11 48/14 49/23 57/5
  57/10 57/11 60/24 65/14 68/9 68/12 70/17
  76/19 78/21 94/22 95/1 98/15 99/16 100/5
  100/8 100/21 102/11 105/9 110/6 112/13
  112/15 113/10 123/20 129/5 133/2 143/20
  150/25 155/6 165/24 166/9 186/4 188/3
  193/9 196/24 196/24 201/2 201/23 202/1
  213/4 214/2 216/4 221/22 223/5 228/5
  234/22
multi [1] 183/17
multi-hospital [1] 183/17
multiple [7] 75/3 75/10 93/17 169/17 185/15
  185/24 203/17
must [34] 11/15 31/9 59/19 60/13 76/8 77/2
  78/8 78/8 79/14 79/15 80/24 80/25 98/21
  134/4 134/5 135/3 135/21 136/9 136/18
  136/20 138/1 138/24 138/25 139/5 147/20
  150/18 153/21 155/14 156/8 180/7 180/10
  180/10 180/13 195/17
must-have [7] 59/19 147/20 180/7 180/10
  180/10 180/13 195/17
myself [2] 97/7 179/17

## N

N.W [1] 2/15
name [5] 62/10 62/15 169/15 219/23 227/6
namely [2] 210/21 214/16
narrow [6] 24/19 80/4 131/19 132/21 196/7
  196/7
narrower [4] 96/2 132/4 202/13 202/16
National [4] 10/5 11/22 32/2 79/15
nationally [2] 15/10 73/3
natural [2] 44/8 208/2
nature [3] 138/8 179/17
Navigant [3] 107/25 191/4 191/7
near [4] 87/18 95/3 174/11 200/6
nearby [4] 59/3 142/20 144/11 211/9
nearly [1] 76/19
necessarily [3] 136/18 144/12 162/2
necessary [20] 5/15 18/11 30/23 58/11 78/19
  86/5 100/24 105/17 107/2 136/9 150/13
  156/18 159/13 159/14 167/1 167/14 168/8
  168/13 217/12 223/3
need [32] 8/23 10/16 12/8 20/17 31/5 31/7
  65/15 78/25 82/22 109/15 109/23 134/17
  142/9 156/20 156/25 175/9 175/10 182/5
  183/10 186/16 189/9 198/10 200/5 205/21
  217/14 219/15 222/8 222/10 222/12 222/12
  223/17 223/19
needed [11] 55/12 101/23 158/14 159/15
  168/10 216/17 216/21 223/5 225/17 227/25
  228/4
needn't [1] 122/22
needs [5] 189/11 215/24 219/11 226/19 234/1
negative [3] 74/2 86/9 217/16
negotiable [1] 109/25
negotiate [17] 17/25 23/6 64/15 120/13 129/6
  131/5 131/25 132/1 165/6 170/13 172/14
  178/21 201/6 201/10 204/24 205/12 205/16
negotiated [12] 99/24 120/15 120/16 121/5
  126/22 128/12 131/22 207/8 226/4 227/17
  227/18 229/13
negotiates [2] 204/14 204/22
negotiating [9] 23/5 23/9 38/6 58/21 59/3
  66/17 69/1 164/24 175/5

negotiations [8] 58/25 99/25 100/19 100/23
  101/11 120/25 175/14 219/18
neither [1] 211/10
neonatal [1] 230/24
nervous [1] 194/20
net [6] 84/24 85/2 85/16 157/22 166/14
  166/18
network [81]
networks [12] 42/21 48/18 54/12 55/4 55/10
  56/2 132/14 132/19 201/5 201/12 202/8
  202/14
never [38] 11/15 14/20 23/1 36/14 60/7 60/8
  61/14 67/3 68/10 77/12 80/20 80/22 84/19
  93/22 93/22 93/23 94/9 94/10 99/25 100/5
  103/24 104/2 104/12 107/19 109/1 109/4
  116/11 117/15 117/16 170/1 170/2 170/7
  171/7 177/10 177/21 180/13 207/1 212/2
nevertheless [7] 140/4 142/5 147/16 148/7
  149/13 155/24 217/19
new [27] 1/18 2/3 2/5 20/15 76/21 76/24 91/2
  100/16 102/20 123/8 128/25 129/6 140/14
  142/10 147/14 168/3 168/10 168/13 168/18
  189/8 189/10 192/1 218/5 218/7 223/17
  223/19 223/24
newborn [3] 199/21 199/24 200/2
newborns [6] 193/25 199/20 200/5 200/8
  200/18 200/22
newfound [1] 201/4
newly [1] 191/18
news [1] 214/21
next [29] 41/20 45/11 116/25 118/22 123/15
  126/14 126/18 141/6 142/12 146/1 155/10
  157/16 164/15 165/19 166/2 169/10 171/1
  172/3 176/1 179/16 193/18 194/7 196/15
  198/22 200/8 203/19 219/20 219/24 224/15
nice [1] 36/18
nicely [1] 123/23
nine [4] 44/20 65/25 73/21 202/4
Ninety [1] 85/7
Ninety percent [1] 85/7
Ninth [3] 12/14 12/17 80/9
no [125]
non [2] 68/25 71/20
non-ProMedica [1] 71/20
none [5] 39/1 76/15 103/23 195/17 210/23
nonprofit [10] 64/7 65/11 65/12 65/20 68/2
  69/5 90/24 98/8 98/14 98/19
nonurban [2] 140/6 140/25
noon [1] 50/23
norm [2] 223/21 229/12
normal [1] 168/12
north [4] 137/21 188/10 188/11 205/5
NORTHERN [2] 1/1 32/11
Northshore [1] 147/23
northwest [6] 1/18 1/20 2/3 2/5 13/23 211/11
Northwestern [2] 206/10 206/24
nose [1] 194/24
not-for [1] 205/8
notably [1] 110/3
notch [1] 92/20
note [8] 40/8 46/23 50/16 157/21 158/21
  172/4 173/23 204/6
notebook [2] 114/5 133/7
notebooks [2] 114/14 204/20
noted [6] 88/6 135/11 144/2 149/17 164/22
  165/15
notes [2] 54/24 165/5
nothing [18] 40/4 43/19 45/15 45/16 54/19
  55/11 60/18 81/12 84/2 84/5 91/23 102/21
  110/1 117/24 131/13 141/17 141/21 194/6

**N**

notice [5]  43/20 48/13 128/14 161/18 167/8
notices [1]  45/1
notify [1]  106/8
notion [6]  119/2 154/12 178/3 202/15 202/17 229/25
notwithstanding [1]  179/3
novel [4]  103/7 103/10 103/19 103/23
Now's [1]  150/23
nowhere [2]  110/10 174/11
number [48]  20/17 28/23 28/23 35/2 42/19 47/2 54/3 61/5 61/5 61/8 61/8 62/1 62/1 62/1 75/13 75/13 86/6 87/14 87/21 88/17 104/18 114/8 121/15 121/18 123/3 147/6 158/3 158/9 158/20 161/15 164/16 165/15 169/23 173/10 173/12 193/20 193/21 193/22 197/22 199/23 204/18 206/20 206/20 210/20 216/10 224/1 227/22 227/24
number 1 [1]  114/8
number 113 [1]  161/15
number 7 [1]  164/16
number one [1]  61/8
number two [1]  61/8
numbers [19]  16/23 27/19 31/13 34/16 40/9 43/2 45/13 72/20 72/21 73/3 73/4 81/17 109/12 126/10 142/1 162/21 173/24 204/2 231/20
numerous [3]  104/23 104/24 212/6
nurse [1]  167/25

**O**

o'clock [2]  113/3 202/23
Oak [1]  146/7
OB [35]  24/1 26/14 27/20 29/18 61/18 61/20 61/21 122/11 139/10 141/15 141/22 151/3 151/20 151/25 180/1 190/7 190/8 190/10 190/11 190/21 192/11 193/13 193/22 194/4 199/18 199/20 200/4 200/7 200/11 200/18 200/20 203/18 222/7 222/12 222/17
object [2]  151/11 151/19
objecting [1]  151/1
objectives [6]  7/7 84/21 84/22 105/18 108/5 218/24
obligated [4]  110/9 219/19 219/23 225/24
obligates [1]  227/5
obligation [4]  217/10 225/5 225/7 225/20
obligations [8]  86/4 166/25 169/18 216/18 217/9 220/1 225/16 233/23
OBs [2]  203/23 204/5
obstetric [7]  13/5 26/21 28/6 29/13 29/17 61/24 130/15
obstetrical [21]  21/15 21/17 28/14 29/6 75/22 88/2 121/22 122/5 122/9 122/10 122/21
obstetricians [1]  203/25
obstetrics [30]  15/20 21/19 21/21 22/2 22/22 22/23 23/5 24/11 26/9 26/12 26/13 26/25 27/4 28/1 28/2 31/1 32/16 32/21 36/9 43/2 58/18 62/3 62/3 72/9 83/6 83/19 87/23 102/7 176/6 219/21
obtain [3]  6/24 8/14 27/20
obtained [1]  214/2
obviously [3]  41/2 176/19 199/12
occupancy [3]  45/15 83/12 87/7
occur [4]  7/17 64/5 122/13 229/6
occurred [3]  224/21 231/2 231/16
occurring [1]  76/21
occurs [2]  10/13 24/19
October [1]  54/22

October 2008 [1]  54/22
odd [1]  232/18
off [21]  4/10 51/7 64/10 89/4 89/6 89/7 93/8 93/11 106/21 112/24 132/3 158/22 160/2 160/19 164/11 168/19 177/20 212/15 227/2 227/25 228/4
offend [1]  67/14
offer [28]  17/8 17/9 17/12 17/16 21/12 21/19 26/14 28/13 29/3 29/6 59/9 60/13 60/16 60/24 61/7 62/8 67/3 67/6 100/7 113/22 180/6 181/12 188/18 191/1 193/14 193/15 194/1 195/16
offered [13]  17/9 17/11 17/11 21/11 60/7 60/8 60/15 62/22 67/4 141/23 152/4 154/14 194/11
offering [7]  17/13 126/17 128/2 128/3 148/22 194/8 195/15
offerings [4]  127/14 151/2 160/24 193/17
offers [12]  21/9 29/18 66/3 93/13 121/25 189/21 189/24 189/25 193/10 194/4 194/5 194/6
Office [1]  2/7
officer [3]  115/2 115/4 116/20
offices [1]  229/24
official [4]  1/22 14/21 92/23 177/8
offset [2]  104/14 162/6
offsite [1]  94/17
often [3]  23/25 24/1 37/7 72/16 72/24 135/2 156/21
oftentimes [1]  158/14
oh [9]  2/9 4/9 23/15 109/23 164/15 186/9 196/16 203/10 205/11
OHIO [21]  1/1 1/4 2/7 3/25 4/15 13/23 32/11 71/5 74/17 88/1 158/7 158/8 158/10 158/11 161/16 161/25 183/9 211/11 216/3 220/13 220/14
okay [12]  47/7 67/15 76/12 95/15 103/22 124/5 129/21 154/2 157/14 171/4 178/6 186/7
old [1]  168/17
older [1]  228/5
onboard [1]  159/5
once [14]  12/3 12/6 19/6 19/6 30/2 31/20 46/5 46/12 51/21 159/9 175/19 175/24 213/1 232/13
one [167]
one-year [1]  84/19
ones [6]  20/12 114/11 193/2 205/11 205/11 223/18
ongoing [5]  13/14 73/18 164/23 230/16 233/2
only [68]  7/10 8/23 9/21 10/18 12/10 15/20 17/11 20/11 26/14 27/19 28/6 30/4 33/17 41/14 46/24 53/4 53/13 60/14 62/12 63/11 67/10 81/17 89/4 93/24 96/13 100/2 103/13 111/14 116/13 117/3 117/18 122/10 122/13 123/11 125/12 126/9 127/5 128/17 134/17 142/17 145/13 149/3 152/2 160/12 161/17 167/10 171/14 177/2 184/13 190/25 193/13 193/16 194/4 198/5 199/3 199/21 200/20 202/8 202/8 206/4 207/6 207/12 215/21 226/23 226/23 230/10 230/16 233/4
OOO [1]  227/23
Oostra [14]  68/13 68/22 71/4 74/11 74/14 78/15 100/2 107/23 115/2 116/20 205/1 217/3 217/21 228/12
Oostra's [1]  98/17
OP [2]  52/12 85/3
open [8]  17/12 50/24 132/13 132/16 132/16 201/21 201/22 231/25
opened [1]  191/18

opening [1]  13/15
operate [8]  127/16 158/14 176/22 187/12 204/13 207/20 219/19 227/11
operates [1]  188/5
operating [35]  18/2 68/20 81/8 86/7 86/8 86/12 86/17 86/20 93/16 94/19 94/24 157/19 157/22 157/24 157/25 158/1 158/4 158/8 158/10 158/11 158/15 162/24 163/7 163/19 164/19 166/3 166/6 167/13 169/19 169/24 170/20 177/25 216/20 218/3 232/21
operational [9]  126/16 128/1 128/9 211/6 212/22 214/12 219/20 227/8 227/9
operations [5]  166/16 181/3 183/9 210/5 224/18
opinion [8]  6/14 8/12 9/9 23/20 93/13 102/4 111/2 164/3
opinions [1]  102/12
Oppenlander [1]  88/6
opportunities [4]  231/7 231/15 231/23 231/24
opportunity [4]  52/11 66/1 84/15 191/2
oppose [1]  215/12
opposed [1]  192/16
opposite [2]  72/25 73/24
option [11]  45/9 45/10 45/13 54/11 72/12 89/24 101/3 190/25 202/20 216/5 216/6
options [7]  45/2 54/15 56/22 89/22 116/3 176/2 209/7
order [52]  3/1 6/6 7/8 18/11 21/4 31/9 50/25 68/19 83/14 83/21 100/24 101/6 102/25 105/15 105/19 105/25 106/13 107/14 107/17 107/17 108/4 108/5 108/14 109/15 109/19 109/23 110/1 110/4 110/8 110/10 110/11 110/12 110/14 110/15 110/21 110/24 111/5 111/5 111/15 111/16 112/4 113/20 123/21 125/5 140/22 153/6 156/22 156/24 193/20 200/4 229/21
ordered [1]  114/3
orders [2]  113/23 128/15
ordinary [8]  37/5 39/7 42/10 42/24 43/5 67/20 75/24 104/18
organization [6]  56/6 68/21 87/18 95/3 116/19 158/23
organizations [4]  15/9 68/23 110/20 140/23
organized [1]  114/7
originally [1]  137/14
other's [2]  179/24 192/19
others [4]  121/15 202/7 204/8 231/17
others' [1]  116/1
otherwise [7]  94/14 97/19 101/2 104/11 116/24 132/7 186/15
ought [1]  129/2
our [74]  9/14 9/16 10/1 10/22 14/9 16/13 16/22 16/22 19/6 19/7 19/11 21/2 21/20 33/13 35/3 35/11 36/25 41/5 62/13 63/7 63/12 67/16 67/21 68/14 68/16 73/22 75/19 76/12 77/6 77/17 77/23 77/23 81/11 84/2 84/4 87/21 88/3 90/7 94/23 94/24 95/3 95/5 97/8 104/19 105/14 110/1 110/3 111/3 112/20 114/10 125/5 127/17 129/21 139/25 143/24 164/9 166/5 175/9 185/18 186/2 187/20 205/17 205/17 205/18 212/22 212/23 212/24 214/23 214/24 214/25 214/25 216/7 222/10
out-of-network [3]  171/18 173/11 173/25
out-of-pocket [1]  64/18
outages [1]  168/15
outcome [2]  15/11 73/3
outcomes [4]  39/24 56/5 56/8 102/15
outlined [1]  77/20

## O

outlook [1]  166/5
outpatient [16]  19/17 22/4 22/5 22/10 85/2
  85/4 93/15 94/15 94/17 160/25 161/2 161/9
  174/4 174/7 174/11 229/9
outpatients [1]  169/24
outs [1]  24/13
outside [10]  16/14 27/21 51/2 100/10 114/2
  140/13 197/19 198/7 210/21 211/19
outstanding [6]  36/12 70/7 73/5 90/3 166/25
  167/6
outweigh [2]  76/10 76/11
outweighed [1]  142/11
outweighs [1]  76/17
over [48]  3/11 23/2 23/10 23/16 29/16 35/3
  50/22 50/23 54/18 76/23 84/3 92/15 97/22
  113/18 116/25 118/21 120/3 120/18 137/10
  140/20 152/25 153/21 157/19 157/21 157/23
  158/9 158/10 158/11 160/8 161/17 168/17
  169/19 171/17 171/8 172/8 173/24 174/6
  174/10 178/4 187/3 204/2 213/1 216/15
  224/14 226/8 229/2 230/15 230/18
over-bedded [2]  76/23 187/3
overabundance [1]  186/24
overall [1]  160/16
overcapacity [1]  218/11
overcome [3]  76/9 77/2 208/21
overlaid [1]  196/17
overlap [4]  21/8 21/12 203/2 203/3
overlapping [1]  190/1
overlaps [1]  203/16
overnight [1]  19/19
overriding [1]  108/5
oversight [2]  108/11 159/14
overstates [1]  186/20
overstayed [1]  207/16
overtures [1]  215/18
overview [5]  4/19 6/6 9/20 13/21 18/20
overwhelming [3]  5/13 65/16 69/9
overwhelmingly [1]  25/5
own [18]  26/16 35/20 66/25 68/6 76/22 98/18
  127/16 164/8 164/13 170/22 179/2 190/6
  192/7 214/23 214/25 217/16 218/22 229/16
owned [6]  46/17 52/19 66/3 75/12 107/9
  142/18
ownership [4]  14/8 29/2 66/10 67/17
owning [1]  75/3
owns [3]  14/3 29/19 189/2

## P

p.m [5]  113/5 113/5 179/11 179/11 234/25
pace [1]  108/9
package [1]  143/4
page [13]  1/25 24/3 38/2 46/3 56/3 62/10
  62/11 82/2 84/8 125/4 125/23 143/10 203/22
Page 104 [1]  82/2
page 1049 [1]  143/10
Page 108 [1]  84/8
page 21 [1]  24/3
page 42 [1]  125/4
page 43 [1]  46/3
page 50 [1]  125/23
Page 62 [1]  56/3
page 70 [2]  62/10 62/11
pages [3]  1/11 83/24 218/19
paid [3]  93/11 160/1 198/25
Palm [2]  1/8 1/23
paper [1]  91/12
papers [2]  9/10 49/17

par [2]  72/21 91/19
paragraph [8]  23/18 90/8 209/19 212/12
  213/7 215/15 216/11 217/4
paragraph 17 [2]  212/12 217/4
paragraph 33 [1]  215/15
paragraph 35 [1]  216/11
paragraph 57 [1]  90/8
paragraph 7 [1]  209/19
paragraph 81 [1]  23/18
paramount [41]  11/9 11/14 14/3 14/5 14/8
  14/8 29/2 44/11 44/13 46/16 46/16 46/21
  46/24 47/2 47/5 47/9 47/10 47/19 47/25
  48/24 52/24 53/2 53/4 53/7 53/11 53/13
  53/17 66/10 66/11 67/7 67/17 85/8 120/22
  120/23 123/10 132/19 132/20 201/15 202/13
  207/13 207/14
Paramount's [3]  47/20 47/24 202/19
pardon [1]  31/23 155/11
parent [5]  158/7 182/9 216/3 220/9 220/11
Park [9]  13/25 16/3 39/17 75/6 107/1 188/15
  206/10 206/13 206/25
parking [1]  168/21
participant [1]  33/2
participants [6]  20/13 20/24 21/24 75/25
  144/19 146/19
participating [1]  49/8
participation [1]  120/23
particular [8]  18/23 18/24 28/22 192/24
  194/18 201/8 202/25 206/23 228/10
particularly [6]  62/4 65/17 127/24 178/20
  213/5 229/18
parties [24]  3/7 3/18 6/5 6/25 8/11 8/15
  113/14 126/22 130/19 146/6 147/23 148/22
  192/18 192/18 208/1 218/24 221/12 223/9
  223/13 227/17 229/14 231/4 231/6 233/4
parties' [3]  130/16 206/18 215/23
partner [8]  37/25 57/18 58/2 58/6 73/16
  208/6 210/20 214/2
partners [13]  28/11 28/12 35/25 36/18 36/21
  57/20 70/2 116/4 209/11 211/19 211/21
  213/19 215/7
partnership [4]  36/17 36/25 38/5 214/22
party [10]  15/9 26/4 66/22 66/24 101/16
  105/1 144/3 144/17 149/25 152/9
pass [2]  78/6 78/18
passage [1]  208/23
passed [1]  112/14
past [15]  65/10 72/3 87/17 87/24 95/2 95/5
  95/16 95/19 134/12 149/23 158/12 168/18
  183/18 201/11 211/16
patient [30]  7/20 15/7 15/11 45/4 53/10 73/3
  85/16 90/10 90/11 90/18 157/22 159/13
  159/13 159/20 159/21 161/16 161/17 161/20
  167/15 171/14 174/19 181/22 184/5 184/7
  211/11 212/10 218/12 223/20 223/24 229/10
patient's [3]  28/23 181/20 184/6
patients [98]
patients' [1]  197/18
patterns [1]  211/11
pause [1]  178/7
pay [15]  49/9 50/4 50/6 71/22 71/23 92/6
  168/20 170/8 199/2 199/6 199/13 199/15
  201/8 202/18 211/1
paycheck [2]  65/3 65/3
payers [1]  183/16
paying [6]  86/4 93/8 112/8 120/21 120/22
  207/14
payment [4]  93/23 93/24 93/24 94/1
payments [3]  37/19 171/7 209/3
payor [32]  36/20 36/24 37/1 60/10 70/2 70/3

126/2 128/13 128/13 128/24 131/18 131/20
  131/20 143/6 144/25 158/25 163/24 165/8
  165/9 174/5 176/9 182/4 182/15 184/5 184/9
  186/13 186/13 186/16 199/5 199/9 201/5
  201/9
payor's [1]  144/13
payors [58]  74/16 117/9 117/12 119/2 119/14
  120/13 124/13 127/13 127/14 128/8 129/7
  129/8 132/13 143/2 143/8 144/3 145/11
  145/20 149/16 149/25 163/25 164/25 165/7
  169/9 170/3 170/12 171/20 172/4 172/10
  173/2 173/15 173/6 173/7 173/21 174/18
  175/8 176/18 178/21 180/7 182/5 183/9
  183/14 186/3 187/24 192/21 195/24 201/5
  201/11 202/16 204/14 204/22 205/12 206/6
  206/10 207/1 210/12 210/14 218/17
pays [2]  64/17 92/7
pejoratively [1]  119/18
pending [1]  134/1
Pennsylvania [1]  1/20
pension [17]  91/13 91/18 91/22 92/1 92/5
  92/9 92/10 92/12 92/13 168/24 169/1 169/18
  212/23 216/18 217/10 225/20 226/3
people [15]  13/20 14/23 16/14 22/1 36/22
  45/13 47/25 53/9 67/6 67/8 89/6 116/15
  152/19 160/21 232/5
Pepsi [2]  55/4 55/19
Pepsi-Coke [1]  55/19
per [8]  15/19 15/20 46/21 117/15 123/12
  174/11 174/14 230/16
perceived [2]  169/8 212/21
percent [124]
percentage [1]  182/13
percentages [1]  186/19
percentiles [1]  28/6
perception [1]  116/1
perceptions [2]  144/20 146/20
perfect [2]  34/3 209/6
perfectly [4]  37/4 38/15 110/12 110/13
perform [1]  7/12
performance [11]  84/17 93/16 95/6 126/21
  158/21 163/10 167/2 167/13 178/15 185/11
  216/15
performs [1]  56/8
perhaps [4]  111/14 116/21 189/17 189/23
perilous [2]  127/6 233/19
period [14]  18/19 56/12 56/23 56/24 88/17
  89/16 109/15 110/24 111/8 154/4 202/7
  203/24 229/2 230/15
periodically [1]  192/5
permits [1]  223/9
Peron [1]  227/23
Peron's [1]  227/21
Perry [2]  1/19 3/24
Perrysburg [1]  54/21
person [2]  45/17 159/24
personalities [1]  216/5
personality [1]  116/19
personnel [3]  167/23 221/20 226/22
perspective [3]  143/24 181/20 216/25
persuade [4]  45/17 79/4 79/5 141/4
persuaded [1]  142/6
pesky [1]  226/4
Peterson [1]  114/23
phenomenal [2]  6/21 58/22
phenomenally [1]  70/14
Philadelphia [4]  10/5 11/22 32/2 79/15
phonetic [3]  137/2 167/8 216/4
PHS [6]  209/24 216/14 217/6 218/1 218/3
  218/7

# P

PHS's [4]  217/7 217/15 217/16 217/23
physical [4]  210/5 217/11 228/1 228/5
physician [12]  35/6 85/6 161/14 184/6
  184/10 184/10 184/19 184/22 185/23 203/16
  229/21 232/15
physicians [23]  52/19 85/19 158/24 183/23
  183/25 184/18 184/21 184/24 185/1 185/3
  185/4 185/5 185/7 185/15 185/24 186/4
  189/12 189/15 203/2 203/3 203/17 215/14
  232/17
physicians' [1]  229/23
PI [1]  137/11
pick [4]  38/22 186/14 194/19 195/14
picking [1]  44/21
pie [1]  202/4
piece [3]  34/7 34/7 97/15
pillars [1]  160/20
pilot [1]  182/18
place [17]  6/4 6/7 7/6 7/7 11/20 95/5 95/22
  96/7 98/3 102/15 106/19 109/17 113/20
  132/10 183/22 192/2 231/4
placed [1]  149/18
PLAINTIFF [8]  1/17 2/2 2/7 3/9 137/5
  138/24 154/17 155/20
Plaintiff's [12]  119/6 124/8 124/24 127/10
  129/24 130/1 136/19 156/10 159/3 208/3
  221/10 224/8
plaintiffs [30]  1/5 4/14 4/16 5/3 97/5 121/20
  124/18 126/19 127/2 130/12 138/2 154/8
  155/4 155/13 161/5 164/5 166/10 169/22
  174/20 176/19 177/14 177/18 178/10 179/22
  200/10 204/9 206/3 209/12 218/18 233/11
plan [89]
planned [2]  6/23 218/7
plans [66]  14/4 18/1 24/10 24/12 25/1 33/7
  34/2 34/6 35/21 36/4 38/24 39/11 39/21
  39/25 40/14 40/19 40/24 41/10 48/16 48/17
  48/21 49/18 49/20 50/8 52/3 58/24 59/11
  59/16 60/12 60/20 61/7 62/6 62/19 63/13
  64/7 64/9 64/12 64/15 64/23 66/17 67/2 67/8
  69/2 70/20 71/4 71/19 72/4 72/10 99/24
  106/8 106/10 107/20 121/23 131/4 143/3
  148/4 189/5 189/9 201/17 201/18 201/20
  201/23 203/4 203/5 206/2 226/22
plant [4]  210/5 217/11 228/1 228/5
plausible [1]  13/12
play [1]  18/9
played [6]  112/4 209/22 213/9 216/12 217/5
  217/22
player [1]  186/22
players [1]  186/23
playing [3]  49/5 52/8 54/14
please [10]  3/2 3/4 8/1 53/24 67/25 68/12
  113/7 171/4 179/13 194/7
pleasure [1]  124/1
plenty [2]  93/1 186/17
pluck [1]  141/22
plucking [1]  151/19
plummet [3]  82/24 84/4 84/5
plummeted [1]  163/1
plural [1]  71/19
plus [4]  24/15 27/5 62/4 187/21
pocket [1]  64/18
point [64]  5/23 12/10 14/16 16/16 17/10
  30/10 34/25 37/4 39/21 40/15 42/3 53/19
  62/7 65/9 69/14 69/17 70/25 76/11 77/5
  77/15 86/14 94/23 97/4 98/5 98/13 99/23
  100/15 100/16 101/10 104/22 105/4 109/18

110/23 112/10 114/5 120/7 121/14 122/8
  122/9 146/16 152/20 153/2 154/8 154/20
  162/18 163/2 171/16 174/1 176/12 184/15
  189/2 194/20 195/11 195/23 196/22 197/8
  197/13 199/8 200/19 202/25 212/2 218/18
  220/5 224/10
pointed [4]  137/24 143/1 161/18 169/22
pointing [1]  109/1
points [7]  30/19 105/15 141/15 144/25 145/2
  214/13 234/16
poised [1]  188/24
policy [1]  230/14
political [1]  20/16
poo [1]  223/7
poo-poos [1]  223/7
pool [2]  18/2 173/2
poor [10]  14/19 14/22 14/22 169/17 208/21
  209/23 211/6 212/21 215/13 216/14
Poor's [2]  15/2 15/3
poorly [1]  56/8
poos [1]  223/7
pop [1]  55/6
Poplar [5]  142/15 142/18 143/3 143/7 143/9
portion [6]  45/8 61/4 75/23 181/1 181/5
  218/6
pose [1]  214/11
position [5]  124/8 124/8 144/24 176/17
  207/23
positioned [3]  93/3 102/17 189/4
positions [1]  91/2
positive [9]  86/6 86/9 86/18 86/21 94/19
  94/21 176/21 176/22 210/15
positively [1]  176/9
Posner [2]  101/9 101/14
possibilities [2]  138/19 226/23
possibility [5]  80/25 139/3 154/21 214/9
  222/24
possible [11]  15/1 65/18 66/19 68/3 79/21
  99/25 112/15 151/7 170/13 170/19 210/1
possibly [1]  205/13
post [11]  30/18 31/4 71/1 96/24 97/1 97/22
  101/15 142/1 185/18 206/21 207/6
post-acquisition [4]  30/18 31/4 71/1 101/15
post-joinder [1]  207/6
post-merger [3]  96/24 97/1 97/22
post-transaction [1]  206/21
post-trial [1]  185/18
posture [1]  175/5
potential [22]  35/25 36/17 36/21 38/4 70/1
  76/7 84/13 107/9 116/17 121/16 122/23
  209/10 210/19 210/24 211/20 212/3 213/7
  213/18 215/19 217/6 219/2 233/8
potentially [1]  106/22
pound [1]  48/8
power [36]  23/7 23/10 23/14 23/16 23/22
  24/8 34/11 36/23 49/21 57/10 58/15 63/18
  65/13 68/7 98/14 98/20 118/8 122/17 125/17
  148/24 152/9 152/16 152/16 152/25 153/8
  153/18 153/19 153/25 180/2 181/7 183/15
  186/20 201/4 203/7 204/12 206/2
powerful [1]  50/8
powerless [1]  144/5
powers [4]  108/19 108/21 108/24 109/5
practicably [2]  144/21 146/21
practical [8]  21/4 21/5 118/2 122/10 195/20
  196/11 202/2 234/2
practice [6]  161/23 184/1 184/2 184/20
  185/24 203/17
practiced [2]  185/1 185/5
practices [11]  161/14 161/20 161/22 162/3

184/12 184/19 212/21 218/13 219/12 219/13
  230/4
practicing [1]  185/3
praised [1]  90/20
pre [2]  142/1 233/22
pre-joinder [1]  233/22
precedent [1]  141/15
precedents [1]  9/5
precisely [2]  144/24 185/20
precludes [1]  156/21
predict [6]  33/5 33/6 34/5 34/8 75/25 125/13
predicted [4]  18/14 40/7 40/23 179/3
predicter [1]  34/3
prediction [1]  177/18
predictor [3]  41/18 125/16 185/10
predictors [1]  34/1
predicts [1]  128/6
predominant [1]  193/7
prefer [7]  42/18 111/25 143/17 145/3 182/1
  182/1 202/17
preference [1]  61/10
preferences [1]  63/15
pregnant [1]  27/14
preliminary [55]  1/12 3/8 6/8 8/4 8/16 8/17
  9/7 12/9 12/18 12/22 13/13 15/24 18/25
  19/12 65/5 78/9 95/11 95/21 98/6 103/25
  104/4 105/7 105/8 106/1 112/14 113/11
  114/15 126/20 127/4 127/10 133/25 134/23
  136/8 136/23 137/23 141/2 141/5 142/24
  143/14 146/12 148/7 149/14 150/8 150/11
  155/18 155/22 211/2 221/10 224/8 224/10
  224/24 233/7 233/11 234/5 234/20
premises [1]  113/2
premiums [2]  64/17 66/4
prepare [3]  216/22 225/18 234/2
prepared [2]  206/12 206/12
preponderance [1]  148/16
presages [1]  228/20
presence [2]  21/23 43/8
present [2]  80/20 191/23
presentation [9]  5/23 14/19 14/21 36/17
  37/22 53/3 114/10 114/20 119/11
presentations [2]  14/23 15/1
presented [13]  5/3 5/5 6/5 37/25 73/14 77/16
  89/16 89/22 97/9 133/9 133/10 136/10
  149/10
presenting [3]  4/15 54/6 70/1
presently [2]  122/11 207/12
presents [1]  146/16
preserve [5]  6/23 7/11 105/21 208/16 215/3
preserving [2]  219/21 220/19
president [1]  115/3
pressures [1]  140/21
presume [2]  111/13 162/5
presumed [1]  5/1
presumption [74]  5/5 5/6 5/7 5/8 5/9 11/18
  11/19 11/21 12/3 12/3 12/7 12/13 19/5 19/7
  19/9 19/11 30/2 30/4 30/5 30/7 30/11 30/13
  30/15 30/23 31/7 31/8 31/12 31/18 31/21
  32/14 32/18 32/25 34/16 34/20 34/22 34/24
  35/4 35/11 35/13 35/13 35/14 41/13 67/19
  75/21 75/21 76/3 76/4 76/17 78/21 82/16
  82/24 83/16 83/21 95/18 95/22 96/4 96/5
  96/7 96/9 96/14 96/22 97/5 97/14 98/1 98/2
  98/5 104/17 105/5 124/19 125/10 125/13
  126/7 221/24 222/4
presumptions [1]  5/11
pretrial [6]  15/16 95/15 100/16 100/18
  108/18 109/18
pretty [18]  5/22 10/25 20/9 23/8 27/6 32/22

**P**

pretty... [12]  33/9 36/10 41/16 57/3 76/20 80/11 87/25 102/13 105/19 115/21 129/2 195/19
prevail [10]  31/9 76/6 102/25 111/3 111/21 112/11 112/18 112/18 150/13 155/13
prevailing [1]  77/4
prevails [2]  127/20 129/3
prevent [4]  5/15 6/21 23/10 105/19
preventing [2]  6/20 221/16
preview [1]  130/21
previous [1]  115/14
previously [1]  193/2
price [44]  7/17 20/2 23/8 23/14 23/22 24/2 24/6 25/6 25/7 27/25 40/16 40/20 55/2 55/6 71/20 76/1 97/25 98/12 99/12 100/4 101/5 105/20 117/21 122/23 128/25 129/1 129/11 129/12 132/8 132/24 143/10 144/5 144/10 144/17 144/23 145/21 148/18 149/25 153/3 154/17 154/23 154/23 205/13 205/16
priced [1]  165/6
prices [58]  33/6 35/19 35/20 36/4 36/9 59/16 65/23 97/12 97/18 97/23 98/9 98/11 99/1 99/2 99/5 99/7 103/7 103/8 103/8 103/15 103/18 103/21 103/22 117/15 117/17 117/18 117/21 117/23 118/3 118/5 118/10 118/10 118/13 118/16 118/17 118/19 119/5 128/7 128/19 128/20 129/6 139/1 148/13 152/25 153/19 154/1 154/3 154/18 154/21 155/2 155/5 155/8 181/8 183/20 203/7 206/15 207/1 232/9
pricing [21]  33/10 33/12 33/14 33/18 33/20 33/22 33/23 33/24 33/25 34/1 34/11 35/16 35/16 36/13 41/18 65/22 70/9 98/24 98/24 99/2 99/3
prima [7]  18/21 34/14 82/21 124/24 142/4 155/21 155/23
primary [21]  14/9 22/18 42/13 67/16 82/6 134/10 139/11 141/11 141/13 141/18 143/5 165/20 184/23 189/11 189/15 192/20 193/11 197/19 198/7 198/19 206/16
prior [15]  16/16 18/13 28/16 38/18 56/10 90/4 94/2 127/7 158/19 162/14 162/14 209/24 225/7 225/13 230/7
private [12]  8/11 8/15 11/3 11/7 134/7 136/12 155/17 184/23 223/21 223/24 229/10 229/11
privately [1]  182/17
privilege [3]  50/5 50/7 50/20
privileges [1]  185/15
Priya [1]  115/9
pro [8]  28/16 130/18 132/9 192/15 220/20 221/2 221/12 223/1
pro-competitive [7]  130/18 132/9 192/15 220/20 221/2 221/12 223/1
probabilities [3]  10/2 138/19 138/21
probability [5]  101/18 109/2 138/25 148/17 153/25
probable [7]  10/19 19/9 150/20 152/13 153/9 153/11 153/15
probably [8]  76/7 82/5 83/24 115/13 115/17 119/10 184/6 234/15
problem [17]  17/17 17/18 119/21 122/25 161/8 161/10 170/2 175/8 175/19 175/21 178/18 178/21 183/6 183/13 190/20 192/5 225/13
problems [4]  166/12 214/10 214/13 225/22
procedures [1]  168/6
proceed [3]  53/24 118/21 208/7

proceeding [19]  5/10 5/12 7/11 9/16 12/18 13/14 15/25 30/25 34/22 41/14 64/6 65/6 67/18 73/17 76/5 80/21 93/25 94/2 219/24
proceedings [6]  1/12 53/23 113/6 149/7 179/12 235/6
proceeds [1]  111/16
process [3]  58/9 180/17 208/5
proclaimed [10]  14/12 14/14 16/9 16/17 36/2 70/23 80/16 101/25 102/1 209/18
Proctor [1]  79/20
produce [3]  90/17 94/23 148/17
produced [2]  94/19 218/19
producing [1]  121/11
product [26]  12/13 13/5 18/23 19/1 19/2 19/13 19/21 21/14 21/16 22/11 24/17 90/18 123/4 139/6 139/8 139/10 141/17 141/24 142/13 148/2 148/4 151/12 151/13 151/13 153/3 153/5
production [1]  19/8
products [6]  21/4 66/3 152/23 152/25 153/2 153/4
Professor [6]  21/2 23/18 33/13 33/20 40/10 74/18
profit [4]  14/3 64/23 144/9 160/13
profitability [1]  90/6
profitable [7]  67/7 190/10 190/22 190/24 200/4 200/7 205/9
profits [2]  116/16 205/8
program [5]  182/18 200/4 200/5 200/7 232/1
program's [1]  232/2
programs [2]  148/2 217/13
progress [9]  85/16 86/3 87/2 88/16 90/3 90/13 91/10 94/5 109/13
prohibit [4]  110/22 127/8 127/10 205/14
prohibits [3]  110/8 133/14 227/10
projection [2]  46/25 177/3
projections [3]  47/4 90/5 176/25
projects [2]  229/6 229/15
prolonged [1]  49/2
PROMEDICA [433]
ProMedica's [75]  14/8 14/18 14/24 15/15 17/24 23/20 26/16 28/20 33/19 34/10 35/16 35/20 36/24 39/22 41/4 41/6 42/14 44/19 46/7 51/22 52/15 58/21 59/23 60/13 60/25 61/15 62/3 63/18 66/10 67/2 67/4 67/17 69/21 70/1 70/10 71/15 75/8 87/5 89/1 89/8 89/13 91/13 98/18 99/5 106/19 109/19 110/1 116/2 116/19 116/20 118/3 118/5 119/5 120/22 126/15 154/11 180/2 184/22 187/11 188/24 189/1 198/19 206/19 207/20 208/3 215/18 215/24 217/3 223/22 224/12 225/24 228/23 230/13 230/14 233/12
ProMedica-St [1]  38/5
promise [1]  83/23
promptly [1]  113/1
prong [2]  10/23 11/16
prongs [2]  80/24 81/1
proof [4]  126/13 129/17 139/5 139/5
proper [1]  11/7
properly [2]  143/23 155/16
property [1]  218/6
proposed [11]  5/14 100/24 102/14 105/15 105/19 105/25 108/4 108/13 108/14 109/19 110/1 110/4 110/8 127/5 127/10 221/10 234/20
protect [2]  24/12 188/4
protecting [1]  79/25
protective [2]  113/23 115/17
protects [3]  107/3 107/4 107/5
proud [1]  95/1

prove [10]  96/19 96/20 97/13 112/20 126/9 128/25 139/5 148/16 155/4 179/23
proved [1]  78/6
proven [3]  96/12 97/1 97/8
proves [1]  195/11
provide [22]  54/25 120/17 128/22 148/1 161/7 170/8 171/9 188/21 190/5 190/8 190/18 192/17 200/13 204/25 207/10 210/3 211/11 219/2 219/4 228/7 232/17 232/17
provided [5]  11/6 113/17 115/21 148/3 180/8 180/9
provider [13]  14/12 14/15 16/9 16/18 49/8 102/11 102/14 131/15 132/14 182/6 182/14 195/17 207/14
providers [10]  55/3 63/8 117/23 152/13 182/21 183/1 201/13 201/21 209/4 230/3
provides [4]  94/13 122/11 135/20 193/16
providing [9]  126/18 162/13 179/1 187/20 210/9 212/10 213/5 213/14 227/9
provisions [1]  140/21
proximately [2]  122/1 188/6
psychiatric [2]  17/11 19/18
public [21]  8/5 8/6 8/7 10/13 11/3 11/4 11/9 11/14 54/24 106/16 106/21 130/2 134/6 134/9 136/11 136/15 151/2 155/17 155/25 182/23 234/10
public's [2]  8/13 106/24
publicly [3]  50/17 50/21 182/17
published [2]  74/15 187/15
pull [5]  162/22 169/10 170/15 171/4 177/24
pulmonary [1]  192/12
purchase [2]  167/22 168/19
purchasers [2]  81/1 145/12
purchases [1]  232/10
purchasing [1]  55/6
purple [1]  196/18
purported [1]  177/15
purpose [12]  6/25 7/10 10/5 21/2 68/15 80/17 112/16 116/8 117/12 156/15 156/19 191/17
purposes [5]  16/10 18/4 111/14 121/11 224/6
Pursuant [1]  225/22
pursue [7]  81/20 116/11 117/11 128/9 129/3 129/9 223/5
pursued [7]  119/20 127/11 127/15 128/11 206/17 208/1 214/1
pursuing [1]  130/17
pushing [2]  76/19 95/11
put [46]  5/18 11/10 15/21 20/5 20/12 20/22 20/23 21/10 21/17 25/2 31/18 33/1 35/2 40/9 42/15 54/18 59/25 61/22 62/5 73/6 76/4 79/13 80/2 81/13 83/10 86/17 86/25 92/17 96/21 97/13 101/18 102/15 108/14 110/5 110/5 110/7 114/5 166/11 168/19 182/8 192/3 207/22 216/5 221/22 227/25 228/4
putting [8]  21/21 23/21 51/24 51/25 64/7 80/22 100/21 113/20
PX [1]  43/2
PX2054 [1]  65/2
PX223 [1]  18/3
PX40 [1]  47/19
PX40-008 [1]  47/19
PX58 [1]  220/8

**Q**

q-u-a-t-e-r-n-a-r-y [1]  180/12
quadrant [2]  73/9 180/19
quality [54]  15/7 15/9 15/13 39/4 39/23 48/1 53/9 55/2 72/19 72/20 72/22 72/23 73/2 73/4 73/10 73/10 73/20 73/24 74/2 74/4 74/5 74/7

## Q

quality... [32]  74/8 74/9 74/14 74/22 75/1
75/4 75/8 75/11 75/15 75/16 90/11 90/18
95/4 102/11 102/13 102/18 102/22 108/7
148/1 154/5 154/11 154/13 154/16 160/21
190/7 212/10 213/4 213/14 218/13 228/7
228/14 228/17
quaternary [2]  180/11 193/14
question [41]  12/16 24/23 25/2 25/14 56/14
56/24 61/13 66/8 66/9 68/8 71/2 75/2 76/2
82/12 82/12 99/14 99/15 99/23 111/18 112/3
127/19 130/1 133/1 133/10 133/17 133/22
143/16 143/18 143/20 144/7 146/21 150/22
152/5 155/10 186/8 192/23 198/18 208/2
208/5 220/11 231/3
questions [21]  8/23 8/25 9/15 10/22 11/13
34/23 41/15 76/6 104/6 104/10 105/6 111/12
124/2 134/3 135/3 135/21 135/24 135/25
157/5 179/7 220/22
quick [3]  4/19 108/9 173/14
quicker [1]  188/3
quickly [1]  121/14
quite [6]  27/10 54/5 189/23 191/20 195/1
224/22
quo [7]  6/17 6/20 7/11 8/1 105/17 108/9
110/25
quote [8]  134/17 135/13 140/2 143/7 156/22
165/10 167/17 169/16
quote-unquote [1]  167/17
quoted [1]  16/10

## R

radically [1]  207/5
radiographic [1]  168/5
raise [31]  8/23 9/14 10/21 24/25 25/13 25/24
34/23 41/14 69/12 69/15 76/5 97/12 97/18
98/9 100/20 104/9 105/5 106/12 124/12
128/7 135/3 148/13 152/25 153/19 155/2
155/8 181/7 181/23 183/19 218/16 218/21
raised [5]  8/25 11/13 35/19 117/2 212/5
raising [2]  117/12 203/7
Randy [5]  74/20 115/2 116/20 116/22 217/3
range [4]  40/19 121/25 181/4 192/25
rank [1]  15/9
ranks [1]  15/7
Rapids [1]  99/10
rare [4]  100/3 109/3 109/4 109/4
rarely [5]  100/2 108/21 108/23 128/18
129/13
rarely-used [1]  108/21
rate [27]  6/21 39/12 40/7 40/14 40/22 60/25
60/25 61/15 67/2 70/17 71/1 71/22 71/23
83/12 99/18 99/19 99/25 103/3 103/9 119/3
120/17 120/20 174/15 175/15 191/25 204/16
207/10
rate's [1]  24/11
rated [1]  92/25
rates [123]
rather [21]  5/21 6/25 10/11 20/7 24/8 33/25
57/12 57/13 71/19 73/22 80/16 90/12 90/19
136/9 137/21 138/1 138/18 144/10 147/15
154/17 214/24
rating [25]  14/23 14/24 15/9 39/16 92/16
92/18 92/19 92/22 93/5 93/12 93/14 93/20
93/25 163/11 163/17 164/4 164/6 164/18
167/3 205/3 225/15 226/12 226/16 226/18
233/24
ratings [3]  164/11 165/18 166/21
ratio [18]  85/4 85/4 93/4 171/12 171/24

172/1 172/5 172/8 172/10 172/12 172/18
173/18 187/19 199/13 199/14 204/23 207/11
207/13
rationale [1]  23/19
ratios [5]  12/20 172/16 173/8 173/15 174/17
raw [1]  186/19
Razi [2]  2/2 3/24
re [1]  191/17
re-purpose [1]  191/17
reach [8]  59/12 66/22 117/19 130/12 186/12
190/14 206/1 218/12
reached [2]  77/19 211/14
reaching [1]  148/19
reacting [1]  208/23
reactions [1]  149/24
read [13]  14/21 41/1 41/2 51/25 63/3 63/11
63/19 68/8 113/20 117/9 124/20 125/21
194/9
readily [1]  8/15
reading [2]  65/2 110/11
readmission [3]  44/3 46/2 46/20
readmissions [1]  39/25
readmitted [3]  45/24 46/17 46/18
Ready [1]  113/9
real [8]  58/11 145/18 148/9 161/8 170/2
178/18 213/2 233/3
realign [3]  192/9 192/14 219/10
realities [2]  149/15 201/5
reality [8]  121/4 125/25 126/11 139/11
166/17 177/23 181/17 186/21
realization [2]  119/16 119/22
realize [2]  13/18 28/15
realized [3]  120/1 175/8 175/24
really [46]  20/4 22/22 23/6 33/8 41/21 42/12
43/20 45/1 45/2 45/12 45/16 48/11 48/12
48/17 55/24 58/25 59/4 62/24 71/13 72/7
75/4 75/11 75/18 87/6 87/7 93/21 112/3
112/11 118/14 127/24 143/15 160/15 160/22
161/4 163/18 164/11 166/14 166/17 176/24
177/23 182/20 183/12 198/16 198/18 222/10
233/18
Realtime [1]  235/5
reason [31]  6/17 17/16 17/18 21/17 22/3
22/20 22/23 23/21 24/5 24/21 25/21 44/4
44/12 45/6 48/25 55/18 62/18 62/25 97/7
98/25 109/10 116/13 128/5 163/2 163/22
181/23 183/18 201/25 206/4 223/20 232/16
reasonable [6]  71/9 83/2 100/20 101/11
138/25 153/24
reasonably [2]  152/24 181/21
reasoning [1]  23/19
reasons [17]  98/7 116/23 116/25 126/15
142/9 156/17 156/18 157/1 163/18 164/3
179/20 191/19 192/10 216/10 216/14 233/16
233/16
rebound [2]  85/23 86/2
rebuild [1]  161/13
rebut [9]  5/11 19/6 31/9 34/21 76/3 76/3
82/24 83/16 83/21
rebuts [2]  76/16 82/16
rebutted [4]  5/9 62/7 62/15 64/2
recall [3]  68/11 119/11 222/7
recapture [1]  45/8
received [4]  163/25 171/6 173/11 189/7
receiving [3]  171/18 171/21 175/2
recent [7]  44/18 45/8 87/11 88/12 100/19
101/10 151/15
recently [4]  13/10 16/24 107/23 120/15
recess [4]  53/22 113/5 179/11 234/25
recitation [1]  136/7

recited [1]  135/9
reckoning [1]  79/18
recognition [1]  119/13
recognize [2]  192/19 195/6
recognized [15]  13/13 15/8 19/22 34/16
34/17 43/25 75/21 165/14 166/20 169/13
208/19 211/13 214/10 221/13 223/15
recognizes [1]  220/6
recognizing [1]  138/21
recommended [1]  70/5
reconfiguration [1]  190/13
reconvene [1]  235/1
record [23]  3/22 4/10 25/22 40/5 40/23 55/9
55/11 60/19 69/19 69/22 69/25 70/21 70/24
72/23 112/24 126/6 149/5 150/19 182/23
188/4 204/19 229/20 235/6
recorded [3]  158/4 158/8 158/11
records [3]  167/18 217/13 232/25
recover [1]  175/1
recovering [1]  187/5
red [5]  157/20 195/7 196/18 197/20 199/16
red-green [1]  195/7
redacted [4]  23/24 39/10 40/8 91/5
reduce [9]  46/21 57/19 66/4 68/14 68/19
82/20 154/5 154/13 191/24
reduced [5]  91/2 91/3 159/17 160/1 232/15
reduces [1]  134/20
reducing [4]  66/5 176/2 176/3 176/4
reduction [4]  68/19 166/24 176/14 226/15
reductions [1]  6/22
reestablishing [1]  106/17
refer [2]  220/11 229/25
reference [1]  74/11
referenced [1]  84/9
references [2]  48/7 100/10
referral [1]  211/11
referred [4]  138/5 140/2 149/7 151/13
referring [7]  63/21 66/9 78/22 113/15 114/7
114/9 221/19
refers [1]  38/21
reflect [6]  23/14 23/22 24/7 151/3 173/25
202/5
reflected [2]  231/20 231/20
reflection [1]  3/17
reflects [2]  166/5 173/10
reform [21]  101/24 101/24 102/3 102/6
102/7 102/14 102/18 102/19 140/22 140/24
167/16 167/17 208/24 210/6 213/5 216/23
217/14 219/7 225/18 229/19 234/3
reformed [1]  209/17
refunding [2]  167/4 167/6
refused [5]  48/24 52/24 85/8 120/4 142/5
regarding [2]  164/11 200/11
region [2]  75/15 165/10
Registered [1]  235/4
registries [1]  229/21
regular [1]  167/25
regularly [1]  15/8
regulatory [1]  159/14
rehab [5]  191/9 191/11 191/11 191/14
192/12
rehabilitation [1]  191/16
Reilly [18]  1/17 3/23 4/8 16/8 50/16 53/24
117/2 119/10 124/15 125/7 139/21 160/6
161/14 163/3 177/13 221/22 234/13 234/16
Reilly's [1]  136/6
reimburse [1]  39/16
reimbursement [19]  68/3 117/8 128/22
163/24 164/24 167/20 170/19 172/14 175/22
178/20 178/25 209/12 210/10 210/11 210/14

**R**

reimbursement... [4] 214/12 214/17 218/16 230/6
reimbursements [2] 171/10 176/8
reinvest [2] 205/17 210/15
reiterate [1] 53/6
rejected [8] 89/18 89/18 89/20 89/21 89/24 134/15 134/18 226/23
relate [1] 108/4
related [3] 153/11 159/20 193/19
relates [5] 61/2 122/9 203/1 222/7 233/19
relating [3] 59/23 113/14 150/19
relations [2] 212/14 215/13
relative [4] 33/14 33/18 35/16 69/4
relatively [1] 59/11
relevance [1] 146/24
relevant [33] 4/25 12/13 13/4 16/20 19/1 19/2 19/13 19/21 21/14 21/16 24/16 24/17 25/8 25/20 26/21 33/8 96/13 96/15 103/3 123/4 130/9 139/6 141/16 141/16 141/24 146/15 152/21 169/6 169/6 169/7 179/18 181/18 181/19
reliance [2] 144/2 144/8
relied [5] 72/2 72/2 98/11
relief [33] 5/14 5/17 6/24 7/3 8/10 8/14 11/8 11/15 12/22 19/12 95/21 96/6 98/6 104/4 104/9 105/7 105/8 105/17 105/23 106/1 107/2 112/12 112/14 112/17 112/21 127/4 128/15 129/25 130/2 134/13 135/17 137/7 156/20
relies [4] 14/22 125/7 125/8 139/15
rely [4] 5/6 14/24 71/16 185/10
relying [2] 14/9 206/3
remain [3] 175/10 185/14 221/18
remaining [5] 37/24 89/23 105/16 120/9 180/21
remains [1] 76/2
remarkably [4] 90/9 121/24 207/1 207/2
remedial [1] 88/20
remedies [3] 128/8 128/11 129/3
remedy [3] 106/17 129/9 129/19
remember [12] 20/11 78/13 80/19 93/21 103/14 163/3 182/22 182/24 185/19 221/21 221/25 223/25
reminded [2] 99/23 222/5
reminds [1] 221/20
remove [1] 18/17
removing [1] 160/23
render [1] 139/2
rendered [1] 154/6
renegotiate [4] 106/10 120/2 120/4 120/6
renegotiated [1] 158/25
renegotiates [1] 128/24
renegotiating [1] 127/13
Renovate [1] 229/12
repair [2] 168/21 168/22
repeat [1] 97/7
repeated [1] 9/10
replacement [1] 152/3
replacements [1] 159/20
report [3] 73/7 79/11 165/5
reported [2] 209/7 228/18
Reporter [4] 1/22 1/22 235/4 235/5
reposition [2] 190/2 192/9
repositioning [2] 190/13 190/19
represent [2] 78/6 114/14
representations [3] 81/19 84/1 119/9
represented [1] 194/13

representing [1] 114/22
represents [7] 131/19 131/20 196/20 197/21 197/21 198/14 200/1
reputation [3] 57/22 115/23 116/2
request [11] 106/7 106/11 129/24 137/6 137/10 137/14 138/3 146/12 156/10 234/10 234/11
requested [3] 130/2 141/1 224/8
requests [3] 6/9 149/22 234/6
require [2] 19/19 195/21
required [11] 9/18 41/14 156/19 160/2 167/22 167/24 200/6 210/2 211/13 226/6 234/2
requirement [3] 11/13 154/20 167/19
requirements [5] 138/5 210/6 219/7 230/5 234/2
requires [7] 9/21 82/18 167/17 208/25 224/14 225/1 229/19
research [2] 212/9
resembles [1] 83/25
reserve [2] 166/18 166/19
reserves [12] 85/21 91/21 93/7 93/10 164/4 166/1 166/4 166/6 166/8 166/13 166/22 166/22
residents [5] 26/7 26/10 27/20 64/20 212/9
resist [1] 144/17
resolution [1] 134/1
resolve [1] 121/9
resolved [4] 82/19 121/7 121/8 150/18
resources [2] 56/7 224/5
respect [8] 27/6 50/19 122/18 152/16 194/13 194/17 199/18 199/20
respectfully [3] 103/1 104/16 234/10
respective [1] 151/2
respiratory [1] 194/25
respond [6] 127/19 183/7 188/24 209/16 215/18 234/19
responded [1] 100/17
response [13] 54/9 58/1 58/1 69/8 78/24 90/23 143/9 144/22 145/21 145/23 192/22 218/19 234/16
responsibilities [1] 225/25
responsibility [4] 133/17 134/2 134/5 226/1
responsive [1] 63/13
rest [3] 34/20 129/22 228/6
restraining [1] 125/5
restrict [1] 185/3
restrictions [1] 3/12
rests [1] 149/23
result [36] 10/19 14/11 38/17 39/24 60/12 63/2 64/22 69/1 75/11 79/24 88/20 93/19 103/21 118/14 122/21 125/19 132/9 132/9 140/3 142/7 142/10 145/2 151/7 154/19 154/24 155/8 163/9 166/4 167/2 210/13 215/8 218/20 219/18 220/14 222/3 230/10
resulted [6] 163/14 171/12 176/13 208/14 223/1 230/9
results [8] 85/15 101/10 133/15 139/18 140/10 144/18 158/6 158/7
retaliation [4] 57/15 57/17 58/7 58/11
retirees [2] 92/4 168/25
retirement [2] 160/4 160/5
return [1] 127/5
returning [1] 147/12
revenue [27] 68/14 68/16 68/18 81/7 83/12 84/14 84/24 85/2 85/16 86/23 94/20 157/22 161/4 161/10 161/16 161/17 161/20 161/24 161/25 162/9 162/10 165/4 174/20 178/2 187/23 208/14 208/20
revenues [9] 43/25 86/14 86/16 88/25 159/7

159/8 170/5 171/6 176/8
reverse [3] 117/25 118/1 221/12
reversed [3] 117/15 142/25 143/13
revert [1] 233/21
reverting [1] 233/23
review [7] 42/23 134/23 136/22 137/19 149/14 159/22 203/11
reviewed [3] 75/23 136/24 177/4
reviewing [1] 54/15
revise [1] 111/5
revision [1] 78/10
revisit [1] 111/6
revisited [1] 89/25
right [57] 18/15 18/17 31/11 31/12 37/13 42/12 47/4 47/4 50/11 53/21 57/5 61/2 72/5 72/18 78/2 81/17 83/4 85/22 86/7 86/10 86/22 87/13 88/17 95/10 100/12 101/19 106/20 106/21 112/6 114/5 114/13 116/14 126/25 127/12 128/14 129/7 138/4 149/8 159/3 160/8 161/24 167/9 170/25 179/15 180/22 180/24 181/8 189/9 195/10 196/19 204/6 218/10 219/16 220/6 222/1 222/24 229/11
right-size [1] 218/10
rigor [3] 78/11 78/14 78/19
rise [3] 39/19 148/18 154/21
risk [10] 67/24 92/3 92/4 92/5 122/12 122/14 122/19 122/22 209/2 230/18
risking [1] 168/14
rival [1] 198/19
rivalry [1] 189/1
river [1] 188/15
RMR [2] 1/22 235/11
Road [1] 189/3
Rock [1] 21/7
role [6] 12/18 13/11 18/10 129/25 135/23 220/9
roles [1] 136/5
Ron [2] 204/17 204/17
room [7] 88/4 191/23 191/25 192/2 192/3 232/9 232/12
rooms [6] 200/13 223/21 223/25 229/10 229/10 229/11
rose [1] 178/1
rotate [1] 114/10
rubber [2] 35/11 134/21 135/19
rule [2] 8/5 106/9
run [10] 3/11 60/16 92/8 94/22 108/18 109/14 109/16 200/4 213/1 231/8
running [4] 42/3 61/23 94/16 111/4
runs [2] 108/9 134/19
rush [1] 27/10

**S**

sacrifice [1] 216/7
safe [1] 21/15
safety [3] 159/13 159/21 166/18
salaries [5] 88/21 108/25 159/17 159/19 176/3
same [65] 7/5 7/7 7/18 7/19 16/25 17/13 18/10 20/13 20/25 21/13 22/3 37/4 40/18 42/12 43/15 46/9 46/15 47/19 52/11 55/15 60/11 69/12 69/18 69/24 70/4 70/8 70/10 70/22 75/3 91/1 94/25 106/22 107/13 107/14 108/6 108/6 108/7 120/12 126/17 128/2 137/4 142/19 147/16 160/1 168/10 168/21 172/17 173/21 180/4 180/14 185/6 193/11 194/5 194/24 196/25 197/1 197/12 205/12 214/2 214/11 214/15 215/10 217/2 227/16 228/7

**S**

Sanction [1]  103/7
sanctioned [1]  23/1
sand [1]  52/14
Sara [2]  2/2 3/24
sat [1]  115/18
satisfaction [8]  7/20 15/8 15/12 45/4 53/10
73/3 90/12 90/18
satisfied [1]  234/8
save [6]  71/17 72/8 72/12 231/18 232/24
233/1
saved [2]  79/17 230/23
saves [1]  230/14
saving [2]  54/19 231/15
savings [16]  77/7 78/25 142/8 144/18 191/3
219/2 219/17 223/10 223/14 223/15 223/16
230/16 231/1 232/7 232/12 233/2
saw [8]  84/13 115/20 115/22 115/24 162/2
171/5 174/6 174/10
say [66]  9/12 15/20 19/24 21/15 36/25 48/9
49/18 54/2 55/23 60/2 60/20 60/22 61/15
62/6 62/10 62/15 67/2 67/22 69/10 70/3 70/8
76/12 81/15 83/15 84/25 91/10 94/10 98/5
101/11 103/14 103/17 105/3 110/15 110/24
111/4 118/19 122/16 125/8 127/23 128/6
128/13 131/6 132/19 139/21 139/22 139/23
141/24 147/8 151/23 152/21 153/13 154/21
182/13 184/9 185/12 185/25 186/3 186/21
196/15 205/12 221/11 225/4 225/6 228/25
231/7 231/18
saying [26]  21/22 36/14 39/11 40/19 58/10
61/11 68/9 68/12 73/22 73/23 84/2 88/9 89/5
90/12 97/19 99/1 102/6 103/14 109/3 109/22
110/18 145/18 152/23 178/16 181/20 184/13
says [15]  9/21 45/1 50/11 62/23 68/13 82/17
87/8 101/14 104/22 125/10 126/24 132/18
169/16 227/24 229/17
scale [4]  79/22 190/15 200/6 223/10
scenario [2]  80/15 111/19
schedule [1]  85/3
scheduling [2]  6/4 6/6
scorched [2]  58/1 58/1
scores [6]  15/12 74/14 75/4 75/8 154/11
213/15
screen [6]  51/25 123/18 123/23 133/8 162/22
204/21
se [1]  117/15
search [2]  208/6 210/19
seated [3]  3/2 113/8 179/14
second [21]  10/24 21/14 43/4 45/9 63/10 68/8
69/14 114/5 125/23 126/7 136/2 141/13
152/5 154/4 169/2 180/4 182/14 203/10
205/16 216/17 224/1
secondary [2]  143/5 193/11
secondly [1]  150/11
secret [1]  52/15
section [53]  2/8 7/11 10/6 10/16 18/6 18/21
18/21 133/12 133/13 133/14 133/15 133/22
133/24 134/8 134/10 135/22 135/24 136/2
136/13 136/21 137/2 138/5 138/5 138/16
138/18 138/21 138/24 139/2 139/5 142/5
142/16 147/17 147/17 150/14 150/18 153/7
153/18 153/23 154/20 154/22 154/22 154/24
155/11 155/16 155/24 156/13 156/15 156/19
179/23 200/22 227/4 227/10 228/25
Section 53 [2]  135/22 135/24
secure [1]  175/15
securing [1]  225/11
seeing [4]  10/12 99/18 101/20 101/20

seek [5]  68/3 133/25 146/21 182/6 233/11
seeking [8]  65/17 70/16 101/16 109/9 180/18
183/5 208/8 209/20
seem [6]  44/23 116/14 165/23 165/24 230/20
230/21
seems [4]  41/20 56/17 127/18 231/5
seen [8]  75/12 75/16 77/13 81/10 87/5 100/7
102/21 196/1
sees [1]  100/2
segment [2]  188/25 222/19
segments [2]  12/25 151/2
select [2]  132/14 185/21
selection [1]  151/1
self [11]  14/12 14/14 16/9 16/17 36/2 64/15
70/23 80/16 101/25 102/1 144/12
self-insured [1]  64/15
self-proclaimed [9]  14/12 14/14 16/9 16/17
36/2 70/23 80/16 101/25 102/1
self-serving [1]  144/12
semi [2]  223/21 229/11
semi-private [2]  223/21 229/11
send [2]  74/16 186/16
sending [1]  37/7
senior [11]  1/14 37/13 89/22 159/17 208/9
208/19 212/6 212/15 213/10 215/5 215/10
sense [1]  75/7
sensitive [1]  176/24
sent [1]  37/13
sentiment [2]  65/10 98/13 99/19
separate [27]  4/25 7/6 8/7 12/13 20/17 22/1
22/22 23/4 24/1 52/3 67/19 75/20 100/25
101/4 106/4 106/5 106/13 108/5 108/14
108/15 108/25 109/3 109/8 139/10 141/11
156/12 190/1
separately [4]  24/1 24/11 155/14 185/13
September [2]  225/21 233/20
September 1st [1]  225/21
series [2]  211/16 214/7
serious [16]  8/23 9/1 9/14 10/21 11/13 34/23
41/14 76/6 104/6 104/9 105/5 135/4 135/12
154/11 212/5 214/13
seriously [1]  224/12
serve [5]  64/3 89/20 130/20 215/25 217/25
served [2]  169/9 214/19
serves [1]  191/6
service [73]  6/22 7/18 20/7 20/7 20/7 20/8
20/8 21/8 23/10 26/25 26/25 27/8 42/13
42/13 42/22 43/13 46/5 46/8 52/17 55/2
85/12 85/18 87/22 89/14 95/4 105/21 106/18
106/18 106/19 106/23 106/25 107/13 107/18
107/23 107/24 107/25 108/6 112/9 127/14
141/22 143/17 151/7 151/20 152/4 152/17
160/21 165/20 181/16 190/10 190/19 190/23
191/1 192/11 194/1 194/18 196/10 196/13
196/17 196/20 196/21 196/23 196/24 197/5
197/9 197/14 197/15 197/19 198/7 208/10
213/20 215/19 226/25 231/23
services [178]
servicing [1]  162/19
serving [2]  144/12 218/2
session [2]  113/24 113/25
set [2]  22/14 195/16
setting [3]  19/16 23/2 103/25
setup [1]  3/13
seven [2]  31/6 193/19
Seventh [1]  82/4
Seventy [2]  65/7 65/25
Seventy-eight [1]  65/7
Seventy-nine [1]  65/25
several [18]  24/14 38/22 48/16 64/25 75/13

77/16 87/22 90/10 91/6 91/6 93/12 141/2
148/21 179/20 208/25 209/11 216/14 229/7
shall [2]  114/1 229/1
share [87]
share's [2]  32/22 84/3
shared [1]  217/1
shareholder [1]  66/6
shares [58]  13/8 20/18 20/21 20/24 21/24
29/10 29/13 30/17 31/1 31/12 31/16 31/20
32/17 32/20 32/23 32/25 32/25 33/2 33/5
33/8 34/1 34/8 34/8 34/13 34/15 41/17 41/17
42/16 42/23 42/25 46/9 64/15 64/15 65/22
65/22 75/20 82/22 83/2 83/17 95/24 96/7
97/2 121/17 125/9 125/10 125/12 125/15
136/7 137/24 139/21 139/23 140/2 142/2
149/11 150/6 153/8 179/20 221/25
sharing [2]  218/13 219/13
sheet [1]  205/18
shelf [1]  55/6
shifting [3]  66/2 160/24 191/14
shifts [1]  19/8
shocked [2]  36/11 36/11
Shoe [1]  9/25
short [6]  5/2 18/18 85/7 111/8 150/4 159/1
short-term [1]  159/1
shortfall [2]  169/25 212/23
shortfalls [1]  210/10
should [37]  8/5 8/10 8/14 20/12 21/17 27/2
37/23 40/1 40/2 44/7 45/2 50/19 50/20 55/1
65/11 70/20 71/19 84/25 87/11 90/20 92/14
107/25 111/20 115/5 129/24 137/19 149/5
159/24 178/7 199/23 200/8 200/13 202/4
203/9 203/19 224/25 227/22
shouldn't [8]  16/4 23/4 32/24 41/25 43/23
94/10 182/8 223/18
show [45]  9/18 10/17 12/11 19/4 19/6 19/8
30/2 73/12 81/17 81/18 82/10 82/23 82/25
82/22 90/5 104/6 126/23 126/24 134/17
135/2 136/23 138/24 139/13 144/21 150/11
153/14 153/22 155/7 161/10 161/11 162/10
162/21 169/10 170/15 173/14 174/1 193/17
196/22 196/25 197/1 197/8 197/17 200/8
203/9 222/21
showed [10]  61/24 65/21 77/7 85/15 148/21
161/15 161/16 163/5 185/22 227/4
showing [15]  9/21 10/10 12/1 18/22 28/4
79/15 80/6 82/18 104/5 130/13 145/3 155/21
155/23 199/17 234/8
shown [8]  12/6 12/12 97/12 148/14 153/21
212/14 214/13 215/15
shows [17]  12/4 29/25 30/3 40/5 46/9 46/10
70/9 73/19 120/12 123/15 135/15 144/16
150/9 154/22 195/3 197/4 200/2
shred [1]  118/23
sic [1]  217/13
side [7]  38/21 59/2 73/11 170/7 171/8 187/23
194/15
side's [1]  59/1
sides [1]  5/18
sight [2]  165/24 223/19
sign [10]  50/1 50/3 87/7 87/8 88/10 88/10
88/11 90/15 90/15 100/19
signed [1]  109/20
significance [3]  169/7 186/21 222/16
significant [37]  15/18 15/18 17/5 19/4 25/25
43/12 43/19 44/5 44/14 46/4 46/13 46/14
51/17 57/19 58/7 59/13 75/24 82/16 85/16
87/8 88/17 90/3 97/25 102/2 109/13 112/6
140/7 140/20 145/9 163/22 173/1 175/12
177/22 211/12 219/17 220/20 223/10

**S**

significantly [27]  8/17 11/23 28/20 40/12
43/9 46/6 61/9 67/5 70/13 71/10 73/20 73/20
84/3 86/3 86/19 93/16 95/6 95/7 97/24
103/21 106/10 112/2 135/11 158/4 163/14
221/19 225/10
signing [1]  211/25
similar [14]  20/19 20/21 33/10 91/21 108/15
146/24 147/18 147/19 147/21 188/18 191/13
215/19 227/14 229/23
Similarly [1]  92/25
simple [16]  6/16 10/25 21/17 22/22 23/11
36/5 44/3 44/12 48/25 57/3 65/23 97/8
109/10 115/14 132/25 187/9
simply [15]  65/3 118/20 119/6 135/19 137/24
150/8 175/15 180/4 186/9 186/20 189/11
207/19 208/21 214/6 214/19
since [12]  6/2 6/3 71/25 86/16 89/2 100/16
122/15 134/10 156/20 200/16 231/2 231/16
sincerity [1]  147/3
single [5]  40/22 141/22 151/20 159/23
177/14
single-digit [1]  40/22
singular [1]  71/19
sit [4]  34/21 70/20 175/18 207/18
site [1]  189/7
situation [11]  95/12 102/20 116/7 127/6
128/18 150/2 174/16 185/25 191/13 228/12
228/16
situation's [1]  222/10
situations [2]  162/14 185/12
six [11]  25/18 27/14 27/20 35/7 72/14 95/5
105/12 105/16 114/8 141/3 233/1
six-month [2]  25/18 27/14
six-tenths [1]  27/20
Sixth [15]  8/22 8/24 9/14 19/23 22/14 22/16
98/4 111/17 111/21 112/6 112/19 121/8
129/18 133/21 134/4
Sixty [1]  199/1
Sixty-three percent [1]  199/1
size [7]  63/20 91/21 93/6 118/10 146/3 201/7
218/10
skeptical [1]  82/4
skip [1]  202/22
skipped [1]  54/3
skyrocket [2]  37/20 37/20
slack [1]  186/14
slide [76]  26/2 30/3 39/9 40/8 41/1 51/5 51/7
51/20 52/17 54/1 54/3 54/16 54/20 58/13
59/22 61/24 62/5 62/14 62/18 63/1 63/16
64/2 64/5 64/25 65/21 68/1 69/7 74/10 75/17
80/1 80/24 84/8 91/6 95/14 100/14 101/21
105/13 115/22 115/24 123/15 124/17 141/6
154/2 161/15 162/23 165/9 169/10 170/15
170/23 171/2 172/3 173/23 177/24 189/20
193/18 193/19 194/7 194/15 195/2 197/2
197/3 197/3 197/4 197/4 197/8 198/22 200/1
200/8 203/9 203/10 203/19 214/14 220/5
221/22 221/25 227/2
slides [9]  24/14 54/2 78/1 114/6 114/9 115/20
133/6 161/11 199/19
slight [1]  27/25
slightly [2]  33/22 33/23
small [13]  25/25 28/24 48/13 55/15 59/11
68/11 72/19 93/10 142/16 146/3 170/20
204/25 231/18
smaller [9]  28/17 28/19 42/18 43/9 43/11
61/10 95/25 146/6 146/7
smallest [2]  197/13 197/14

smarter [1]  152/19
smooth [1]  102/17
snowy [1]  137/21
social [1]  79/18
soda [1]  55/6
sold [1]  121/23
solution [1]  166/11
solved [2]  170/1 170/2
somebody [3]  182/9 183/12 192/17
somebody's [1]  204/4
somehow [4]  24/7 124/11 127/20 191/20
someone [7]  34/4 57/10 57/25 72/6 145/13
152/1 195/12
someplace [2]  186/5 202/5
something [15]  17/11 80/22 108/22 109/1
111/7 117/14 125/3 129/9 143/21 190/5
195/24 202/25 203/1 221/20 228/19
sometimes [2]  77/12 191/24
somewhat [1]  3/11
somewhere [3]  3/15 5/21 205/5
sophisticated [5]  144/3 144/16 145/20
188/21 193/14
sorry [10]  50/4 67/12 77/25 97/20 122/18
161/23 164/15 186/6 192/19 197/14
sort [9]  16/19 40/19 76/23 115/7 153/18
156/14 197/21 221/8 224/16
sorts [1]  129/2
sought [2]  48/15 52/1
sound [2]  50/8 88/25
source [1]  90/19
south [1]  188/17
southeast [2]  13/24 142/16
southern [2]  20/14 63/25
southwest [17]  28/21 43/6 43/8 55/16 61/4
63/22 145/4 180/18 180/18 183/9 188/25
188/25 189/6 189/11 211/17 215/1 218/6
southwestern [3]  15/5 181/1 181/5
space [1]  191/18
speaking [1]  137/10
speaks [1]  49/16
special [1]  87/10
specialty [1]  184/23
specific [5]  11/5 39/10 76/9 77/8 191/8
specifically [5]  63/21 126/24 203/18 213/20
234/19
specificity [1]  108/11
speculation [1]  150/17
speculative [1]  77/9
speech [1]  54/24
spend [7]  67/21 166/16 179/16 211/4 221/1
224/4 234/13
spending [3]  91/3 109/24 159/12
spent [2]  89/10 171/14
sphere [2]  180/5 180/14
spin [1]  106/21
spinoff [1]  112/14
spiral [1]  81/14
spite [1]  144/15
spoke [2]  144/20 146/19
spread [1]  230/18
spring [1]  89/16
St [209]
St. [603]
St. Anne [4]  16/3 21/19 188/12 194/1
St. Anne's [4]  25/10 190/7 190/16 190/18
St. Charles [6]  16/3 25/10 28/12 188/15
190/12 190/17
St. Luke's [582]
St. Vincent [4]  145/14 188/20 190/12 190/18
St. Vincent's [3]  25/10 28/12 145/15

stability [2]  93/15 157/17
stabilize [1]  219/3
stabilizing [1]  221/16
stable [1]  210/3
staff [19]  13/25 14/1 14/2 15/5 29/3 85/19
87/14 87/22 91/2 113/2 159/11 159/18
161/13 176/14 200/22 212/25 215/12 215/13
219/22
staffed [1]  200/24
staffing [7]  7/19 105/21 106/23 107/14
107/19 108/7 187/4
stage [5]  12/9 12/22 18/25 102/6 150/12
stake [1]  65/5
stalled [1]  116/16
stamp [3]  35/11 134/21 135/19
stand [8]  130/6 151/23 175/11 179/4 208/11
208/17 216/16 219/6
stand-alone [6]  130/6 175/11 208/11 208/17
216/16 219/6
standard [26]  8/4 8/5 8/16 8/18 9/17 10/9
10/20 14/22 14/22 15/1 15/3 16/6 17/5 30/1
30/12 104/17 129/23 134/14 134/19 134/24
134/25 135/8 135/13 137/4 138/23 156/14
standards [4]  14/19 30/15 133/9 231/12
standing [2]  35/9 146/10
stands [1]  145/25
start [6]  71/3 76/24 107/7 113/1 134/11
212/24
started [3]  4/9 159/9 186/9
starting [2]  16/16 94/2
starts [1]  108/22
starve [1]  52/18
state [15]  1/4 2/7 3/25 4/15 117/6 124/9
137/2 137/4 138/11 142/17 157/17 164/20
213/11 233/22 234/4
State's [1]  137/6
stated [5]  21/2 166/5 212/11 214/22 217/3
statement [6]  36/10 54/23 110/4 110/18
113/13 135/2
statements [6]  13/15 35/24 117/9 119/9
187/21 200/11
states [14]  1/1 1/14 18/4 59/24 138/20 138/22
139/25 140/13 147/13 149/2 154/6 209/19
216/11 218/20
static [3]  145/24 146/16 146/16
statistics [1]  149/18
status [14]  6/17 6/20 7/11 8/1 69/5 92/19
95/4 105/17 108/9 110/25 156/5 226/5 226/5
233/23
statute [7]  133/23 134/3 134/10 138/6 138/9
138/12 147/16
statutes [1]  136/4
stay [3]  19/19 70/4 70/8
stayed [3]  46/9 46/15 95/4
stays [1]  94/22
steal [2]  49/13 49/14
stealing [5]  44/1 44/25 45/7 45/19 202/22
steer [8]  71/20 143/9 144/10 145/20 182/19
182/20 183/10 183/11
steering [4]  72/2 72/7 72/12 183/2
Stelle [3]  74/12 74/12 74/20
step [2]  151/9 183/3
Stephen [5]  1/22 2/19 235/4 235/10 235/11
steps [4]  45/25 45/25 119/19 190/1
Steven [1]  4/6
stick [3]  3/11 38/11 64/9
stiff [1]  193/8
still [23]  7/6 18/9 21/22 38/11 40/16 60/2
61/15 64/5 90/10 90/17 92/21 94/16 103/16
103/16 103/22 119/21 119/21 120/21 126/19

# S

still... [4] 132/11 169/24 186/4 215/3
stimulus [1] 167/21
stipulate [1] 95/20
stop [4] 34/25 58/20 80/15 202/24
stoped [1] 217/18
stopped [3] 88/18 216/24 218/8
store [1] 55/5
story [2] 88/13 137/25
straight [1] 33/9
strategic [8] 18/1 84/19 159/5 159/15 160/17 160/19 211/18 214/24
strategies [1] 180/25
strategy [4] 54/17 85/6 208/23 215/1
Strayer [1] 180/23 189/3
Street [6] 1/23 2/9 2/12 2/15 2/17 2/20
strength [1] 12/3
strengthen [2] 5/4 146/9
strengthened [1] 76/4
strengthening [1] 93/17
strengthens [2] 5/6 35/14
stress [1] 85/24
strict [2] 80/8 82/9
string [1] 95/16
stringent [2] 134/24 134/25
strive [1] 205/9
strong [29] 5/1 5/4 5/7 5/9 12/13 14/25 26/2 30/4 30/5 31/8 31/21 32/24 32/25 34/14 34/16 41/12 41/18 67/19 75/21 76/16 78/20 82/24 95/17 95/22 100/22 124/24 205/18 205/20 218/1
stronger [1] 165/17
struck [1] 79/24
structure [5] 153/6 153/9 153/11 210/4 212/3
struggling [1] 64/18
stub [1] 18/18
stuck [2] 60/23 121/9
studies [1] 13/12
study [6] 9/2 135/5 185/18 185/20 231/9 231/11
studying [2] 107/25 206/7
stuff [3] 112/16 182/18 223/7
sub [1] 14/17
sub-bullet [1] 14/17
subject [4] 78/9 101/15 113/23 152/18
submission [2] 15/16 87/5
submissions [1] 15/15
submit [4] 156/24 176/23 177/5 182/18
submitted [3] 50/17 105/2 204/5
submitting [1] 177/13
subpar [1] 74/14
subpar-quality [1] 74/14
subscribers [3] 143/4 143/6 144/11
subsidize [1] 158/17
substance [1] 147/4
substantial [22] 8/23 9/1 9/7 9/15 10/21 11/13 11/20 34/23 41/15 45/8 76/6 78/13 82/18 85/21 104/9 105/5 126/1 135/4 135/12 138/25 154/4 155/1
substantially [12] 9/23 9/24 10/11 11/25 43/1 79/16 95/25 121/20 130/13 133/16 138/7 154/25
substantiation [1] 78/10
substitute [3] 20/1 44/6 107/11
substitutes [2] 41/22 44/10
suburb [1] 15/5
succeed [5] 82/2 132/19 136/13 156/13 234/8
succeeded [3] 80/21 161/1 161/2
success [18] 8/8 8/20 9/6 9/11 9/17 10/21

10/23 11/12 34/25 104/6 134/8 134/18 135/3 135/16 136/2 136/16 136/18 202/19
successful [11] 60/17 60/21 61/16 62/8 62/24 84/10 85/21 109/11 178/13 201/17 201/24
successfully [2] 83/9 201/19
such [23] 8/6 12/2 13/1 27/9 50/19 55/15 67/18 78/20 80/12 88/9 91/19 91/19 114/1 126/2 127/12 134/19 145/19 146/8 154/14 156/5 180/1 204/10 212/23
sudden [2] 178/3 189/16
sue [1] 107/9
sued [1] 149/3
suffer [1] 59/6
suffice [2] 135/16 139/3
sufficient [5] 76/9 92/6 119/24 138/11 138/15
sufficiently [3] 10/18 61/13 168/24
suggest [9] 103/1 104/16 118/23 119/4 141/22 178/3 178/5 201/3 222/23
suggested [6] 119/6 124/15 124/16 125/7 141/17 222/2
suggesting [2] 129/10 154/10
suggestion [2] 122/15 166/17
suggestions [1] 99/19
suggests [4] 120/24 120/25 134/12 140/9
suit [1] 54/8
suitable [1] 148/20
Suite [2] 1/23 2/12
sum [1] 46/4
summarize [3] 102/24 218/23 221/8
summarized [2] 212/18 213/6
summary [1] 77/6
superior [1] 212/20
superior/inferior [1] 212/20
supplemental [2] 89/12 209/19
suppliers [1] 147/6
supplies [2] 159/2 232/9
support [23] 26/3 27/19 35/3 40/5 67/21 69/24 70/21 70/24 84/6 84/7 103/11 104/18 119/1 139/16 151/21 154/12 155/19 158/23 167/23 170/21 172/23 187/10 232/4
supported [4] 13/12 19/3 146/14 168/1
supporting [2] 19/16 26/1
supportive [1] 40/1
supports [1] 138/3
supposedly [3] 143/1 163/8 172/6
supra [8] 117/19 118/10 118/17 124/13 129/1 129/6 155/5 155/8
Supreme [7] 9/25 10/4 31/17 32/2 79/16 79/20 138/18
sure [32] 5/23 7/1 7/16 7/18 12/24 18/10 31/24 38/9 46/1 48/17 49/11 51/18 55/13 56/1 57/4 65/8 65/13 68/17 69/10 85/1 92/1 92/3 106/5 106/6 107/6 125/2 126/6 130/25 131/9 152/6 205/18 231/11
surely [1] 24/14
surge [2] 88/2 191/22
surgeons [1] 168/5
surgery [9] 20/1 20/1 20/2 20/3 27/7 168/5 190/23 222/13 232/1
surgical [3] 19/15 22/7 191/18
surmise [1] 151/6
surprise [4] 130/11 193/5 193/5 201/9
surprised [4] 48/4 120/24 127/22 189/14
surprising [3] 185/2 189/2 215/4
surprisingly [4] 90/21 108/18 116/21 215/20
surrounding [1] 221/7
survey [2] 61/21 61/23
surveys [1] 61/6
suspect [4] 77/12 144/6 144/14 145/6

sustain [1] 190/10
sustainable [4] 88/24 93/16 162/2 162/4
sustained [2] 49/2 163/19
Sutter [1] 137/1
swings [2] 92/12 92/13
switch [2] 47/25 92/13
switched [1] 92/11
synthesize [1] 136/4
system [65] 1/7 4/6 4/22 13/22 14/13 14/17 36/20 36/24 37/1 37/18 37/21 39/6 48/3 48/5 48/11 57/7 57/13 58/16 58/18 59/2 59/7 59/18 59/19 66/21 70/2 70/4 72/22 74/5 74/8 114/24 115/3 115/10 116/1 119/1 147/21 147/23 149/2 149/6 153/17 167/25 168/1 168/3 168/4 168/11 180/10 180/11 180/14 192/16 194/20 194/25 195/1 195/1 210/2 210/8 210/22 211/9 211/10 216/3 218/3 218/11 218/12 219/3 219/9 219/10 219/17
systems [21] 39/4 48/10 72/16 149/22 165/17 167/18 167/23 183/17 187/10 194/23 202/9 210/13 210/20 210/23 211/25 216/22 229/8 229/20 229/21 229/22 229/23
systemwide [1] 190/2

# T

tab [3] 114/8 123/19 133/7
tab 1 [1] 123/19
tab 2 [1] 133/7
tables [1] 168/5
tackles [1] 4/17
tactics [1] 54/10
tail [1] 228/14
take [27] 16/22 48/19 51/7 53/18 54/18 76/15 114/17 118/21 145/22 151/9 157/11 157/13 172/15 172/15 174/21 179/10 185/25 186/1 186/1 189/20 190/16 193/5 202/20 213/1 220/11 227/2 231/4
taken [10] 44/15 53/22 56/7 94/1 113/5 119/19 176/11 179/11 190/1 234/25
taking [6] 80/15 90/19 132/10 151/25 223/10 227/10
talk [43] 5/7 5/16 12/24 13/3 18/8 36/1 41/10 44/2 45/24 55/11 55/14 77/14 78/12 81/4 81/22 83/10 96/4 97/20 102/3 104/13 104/13 105/8 116/22 116/24 119/20 121/15 122/8 123/1 125/2 127/21 129/21 130/22 139/8 141/7 142/12 172/3 186/10 204/9 207/17 225/8 228/9 234/14 234/19
talked [23] 24/17 30/1 30/14 35/15 35/22 36/1 48/24 52/25 53/6 61/21 80/3 105/18 108/19 155/1 155/2 166/9 177/11 188/1 191/11 198/19 203/1 216/4 222/11
talking [27] 11/17 12/24 12/25 26/13 30/4 37/10 38/7 38/20 40/16 69/15 70/2 73/7 74/23 75/19 75/20 89/23 99/7 105/14 108/12 110/14 111/18 145/17 173/9 179/17 221/1 234/13 234/14
talks [8] 12/17 37/18 211/24 223/8 227/16 229/5 230/12 230/25
task [1] 157/8
tasting [1] 55/5
tax [1] 48/21
teach [1] 9/5
teaches [1] 143/25
teaching [3] 148/1 193/10 212/8
team [4] 84/25 90/16 109/10 109/16
teams [3] 231/1 233/12 233/12
technical [2] 215/16 226/2
technology [2] 229/8 229/18
tedium [1] 20/10

**T**

tell [22]  24/10 24/23 27/5 35/25 36/18 49/19 79/6 82/10 83/6 86/18 88/13 89/3 95/23 99/14 131/19 160/6 182/16 182/17 194/12 195/8 196/18 200/16
telling [9]  16/13 60/6 62/19 71/4 85/15 99/5 163/17 204/19 207/19
Tellingly [1]  214/15
tells [1]  36/20
temporary [1]  125/5
Ten [2]  53/21 123/5
tenable [2]  134/17 135/15
tend [2]  203/17 204/7
tendency [1]  10/7
Tenet [6]  96/17 135/17 137/12 142/13 142/18 145/7
tens [1]  59/9
tenths [2]  27/20 27/22
term [7]  18/18 119/18 120/18 120/19 159/1 182/19 232/12
termed [3]  17/19 18/5 82/3
terminate [3]  127/13 128/14 129/7
terms [19]  36/22 37/24 56/5 56/8 92/14 92/16 93/12 98/13 106/23 108/24 113/15 117/10 128/22 143/24 152/5 187/18 197/18 225/22 234/20
terrible [2]  4/17 125/4
terribly [1]  202/1
tertiary [9]  19/18 22/4 22/10 22/11 29/4 152/10 180/11 188/21 193/17
test [3]  25/8 26/19 33/5
testified [7]  63/1 65/1 67/9 100/2 203/12 205/1 228/12
testifying [1]  63/14
testimony [33]  6/13 26/3 26/4 39/10 39/20 51/20 54/7 60/19 62/6 62/6 62/14 64/1 66/20 67/20 68/4 75/24 76/21 78/5 84/7 98/18 98/18 98/19 104/21 105/1 143/1 143/6 144/2 144/8 144/13 144/15 144/19 146/18 148/11
tests [1]  39/24
thank [34]  3/20 4/2 4/7 24/4 47/7 51/1 51/4 53/25 99/16 100/13 105/11 112/22 113/4 113/7 113/10 114/4 114/18 114/19 123/20 123/25 130/23 133/2 133/4 149/9 151/18 157/6 170/25 179/9 179/13 187/25 220/18 220/23 234/22 234/23
that's [89]
the 4th [1]  216/2
theirs [1]  169/17
themselves [8]  15/2 65/14 70/18 117/21 133/20 160/11 192/18 233/5
theoretical [2]  138/10 138/13
theories [3]  136/19 136/21 166/10
theory [14]  16/13 35/3 37/5 57/16 67/21 103/7 103/10 103/19 103/23 104/19 108/1 140/9 148/9 150/17
there'd [1]  58/7
there's [89]
therefore [5]  12/7 134/24 143/8 209/5 210/18
they'd [3]  49/9 129/11 129/12
they're [97]
they've [14]  31/14 32/19 75/12 79/5 107/19 109/13 110/6 120/5 126/7 152/6 183/17 201/24 233/15 234/20
thin [1]  141/20
thing [15]  28/15 47/18 48/4 60/5 60/6 60/6 91/1 160/22 169/3 172/4 185/7 194/24 205/12 227/16 234/21
things [23]  15/24 22/8 39/25 86/25 108/12

110/14 110/19 131/1 140/8 140/22 158/20 159/4 160/20 173/16 177/19 178/6 185/17 185/19 196/25 197/1 206/9 230/11 232/9
think [99]
thinking [1]  215/2
thinks [2]  60/15 191/20
third [12]  15/9 15/25 16/23 26/4 66/22 66/24 105/1 144/3 144/17 149/25 192/18 216/21
third-party [7]  15/9 26/4 66/22 66/24 105/1 144/3 144/17
thirds [1]  18/16
Thirteenth [1]  2/15
thorough [2]  9/2 217/19
thoroughness [2]  136/23 137/18
those [95]
though [9]  35/23 41/23 61/14 104/9 108/24 137/4 155/22 158/3 169/22
thought [9]  9/19 18/25 47/18 100/17 102/19 117/6 120/9 200/8 206/14
thousand [1]  35/3
thousands [3]  59/9 59/10 103/4
threat [1]  90/1
threatened [1]  216/16
threatens [2]  221/11 224/9
three [59]  3/10 3/10 6/3 7/5 13/24 26/6 28/12 31/4 39/12 52/3 62/1 71/6 71/14 74/23 75/12 76/7 77/16 79/1 83/9 84/10 84/20 84/23 85/14 85/20 87/17 95/2 98/11 109/11 110/24 114/14 115/13 121/25 122/7 126/14 127/21 128/10 146/5 159/5 160/15 160/19 163/18 164/19 173/7 177/2 178/4 178/13 179/5 180/21 188/5 189/25 190/14 197/6 199/1 205/5 208/13 214/14 224/15 226/9 229/2
three-year [12]  84/10 84/20 84/23 85/14 85/20 109/11 159/5 160/15 160/19 178/13 208/13 229/2
threshold [1]  135/20
thrive [1]  102/20
throat [1]  194/24
through [32]  7/17 10/8 37/3 37/13 44/20 52/18 53/1 56/16 57/1 58/25 66/5 75/18 90/8 106/23 114/8 114/10 157/10 157/13 159/1 163/4 164/9 168/6 176/23 178/1 188/2 206/22 208/6 208/20 210/11 211/16 214/21 232/10
throughout [6]  5/23 13/23 24/7 25/18 81/14 87/21
thrown [1]  104/8
throws [2]  143/21 234/17
thus [3]  144/14 201/7 209/7
tides [1]  176/21
tier [2]  71/21 182/14
tiering [1]  182/11
tight [1]  87/25
timeline [1]  78/25
timely [1]  76/8
times [10]  30/22 30/22 31/4 31/6 77/11 121/18 122/9 124/16 125/21 151/15
tin [1]  212/14
tiny [2]  109/2 109/2
tobacco [1]  192/12
today [27]  3/8 4/16 4/21 17/10 25/4 25/19 38/15 49/23 71/14 72/10 114/8 114/16 114/21 115/6 121/18 127/1 128/3 128/22 129/5 130/18 130/21 145/24 202/16 220/24 221/9 221/21 234/12
together [5]  35/2 59/25 86/25 231/2 231/17
told [9]  51/9 57/24 58/8 58/8 164/5 175/11 177/13 190/20 211/17
TOLEDO [60]  1/1 12/25 13/25 14/14 14/18

15/6 41/5 44/19 50/12 63/6 63/23 73/12 73/13 116/5 117/23 119/4 125/16 132/15 140/15 145/4 145/14 145/15 153/16 160/13 165/11 165/21 170/11 170/18 179/25 180/18 182/10 183/23 184/1 185/8 187/2 187/9 188/6 188/8 188/14 188/20 188/25 189/6 190/4 193/8 195/18 195/25 200/20 200/21 201/5 205/9 205/11 207/22 210/21 211/17 211/19 211/20 211/23 218/6 228/6 232/1
tomorrow [18]  3/14 3/16 5/17 105/15 111/13 111/23 113/25 126/23 127/22 130/22 221/11 222/9 224/23 225/9 228/10 234/12 234/18 234/24
ton [1]  137/16
too [19]  29/5 68/9 68/12 100/5 100/20 103/8 103/9 112/15 117/4 124/4 124/9 146/16 146/16 149/23 166/21 185/19 186/4 202/10 224/3
took [9]  6/4 46/1 48/17 90/10 91/6 124/5 170/8 176/9 192/22
tool [6]  20/4 25/16 36/25 71/12 72/10 101/1
tools [1]  72/5
top [10]  15/10 41/12 42/16 42/17 73/2 171/19 193/18 193/19 195/9 196/17
topics [1]  207/18
total [10]  93/6 171/7 171/10 171/10 173/2 173/4 197/4 199/24 199/24 200/1
totaling [1]  85/22
totally [3]  99/6 149/6 216/7
towards [3]  10/6 172/22 233/13
tower [2]  223/20 223/24
town [8]  7/13 21/2 23/18 33/13 40/10 74/18 142/16 146/3
Town's [1]  33/20
towns [1]  143/5
Township [1]  189/4
track [1]  72/22
trade [13]  1/3 1/17 1/20 2/2 2/5 3/24 4/14 129/18 132/3 133/19 133/19 133/24 147/15
trade-off [1]  132/3
tradeoff [1]  202/18
traditional [1]  8/17
training [1]  148/2
trajectory [3]  172/17 173/15 173/22
transaction [41]  6/19 9/22 9/22 14/11 18/22 19/5 39/11 40/25 64/22 83/3 104/24 111/20 115/16 115/19 116/22 118/15 121/19 122/20 123/2 126/22 134/1 138/11 138/14 139/6 139/13 139/18 140/3 145/2 152/22 154/19 164/21 206/14 206/21 207/3 208/1 221/2 222/3 223/2 227/18 230/11 231/5
transcript [3]  1/12 125/5 235/6
transcripts [1]  177/12
transition [1]  102/17
trauma [1]  188/21
travel [9]  22/12 26/8 27/8 28/7 143/4 145/4 197/18 197/22 198/9
treasurer [1]  88/6
treat [7]  117/13 184/6 184/10 185/16 186/14 186/15 203/5
treated [5]  50/19 51/24 169/23 186/1 186/2
treating [5]  171/14 175/16 187/6 187/6 216/15
treatment [3]  154/5 192/13 203/5
treats [1]  123/3
tremendous [1]  174/23
trench [1]  13/11
trend [5]  10/6 81/16 86/23 120/3 199/7
trending [3]  81/5 81/7 88/16
trends [6]  81/14 87/3 93/15 93/19 165/22

**T**

trends... [1] 178/24
triage [1] 88/4
trial [36] 5/12 5/16 6/3 6/11 6/12 6/19 6/21
6/24 7/10 7/14 8/1 9/18 13/14 14/10 30/25
73/18 103/6 103/24 105/24 106/16 106/21
108/9 111/1 111/4 111/6 111/10 112/4
112/11 112/18 134/2 137/9 137/13 137/16
137/20 142/3 185/18
tricks [1] 119/17
tried [5] 158/20 170/1 170/18 175/20 175/25
tries [1] 184/8
TRO [6] 6/3 6/10 72/15 80/4 106/2 137/14
troubled [1] 116/7
true [30] 35/11 54/16 54/21 61/18 61/19
61/22 62/4 65/15 70/23 77/7 87/12 88/12
88/23 95/22 120/15 152/1 152/3 168/10
168/21 180/16 185/2 185/7 186/22 194/24
194/25 194/25 195/1 200/17 208/4 208/15
truism [1] 147/5
truly [1] 79/9
trump [1] 150/17
trustees [2] 146/9 220/3
truth [2] 115/14 187/9
try [23] 3/10 36/21 55/18 64/6 68/13 119/2
131/10 154/13 158/23 159/4 159/6 159/8
159/11 161/9 175/18 180/3 181/1 188/2
194/9 205/13 205/16 205/21 221/7
trying [12] 26/20 33/5 68/19 77/25 95/13
175/20 175/22 183/3 186/3 195/13 202/1
215/3
TT [1] 204/18
TTH [3] 62/2 75/5 107/1
turn [8] 83/8 138/4 159/4 172/3 176/21
198/17 228/19 234/6
turnaround [13] 84/10 84/12 84/16 84/20
88/23 109/12 119/17 162/14 169/25 173/17
178/9 208/13 209/19
turnarounds [1] 208/16
turned [2] 83/9 201/24
turning [2] 24/16 136/16
turns [1] 198/1
Twenty [1] 202/6
Twenty-eight [1] 202/6
twice [1] 197/11
twins [1] 29/8
two [70] 4/25 8/7 10/25 12/13 13/4 13/7
18/16 19/2 22/17 23/11 27/22 28/23 32/9
42/16 42/19 45/2 61/5 61/8 62/1 65/11 67/19
75/20 80/10 80/24 81/1 82/25 84/3 84/5
87/24 101/12 103/3 111/18 113/11 116/3
119/14 121/11 123/7 128/10 136/4 137/16
142/6 142/15 142/17 142/17 145/9 146/2
146/4 146/5 146/6 149/4 149/11 151/1
151/17 156/1 162/23 164/25 165/16 173/6
177/24 183/17 187/18 202/8 204/5 206/20
207/2 214/14 215/18 215/20 223/18 227/17
two-day [1] 137/16
two-tenths [1] 27/22
type [4] 41/12 78/11 78/14 78/19
typed [1] 113/18
types [5] 87/2 87/2 108/24 110/18 209/4
typically [2] 24/19 66/21

**U**

U.S [4] 1/17 1/20 2/2 2/5
U.S.C [1] 133/13
Uh [2] 111/22 175/4
Uh-huh [2] 111/22 175/4

ultimate [6] 79/17 133/10 134/8 135/2 136/1
136/16
ultimately [31] 9/4 111/20 120/10 129/3
129/16 133/20 134/4 135/7 136/13 158/3
161/7 162/9 162/11 162/13 163/17 163/24
164/10 165/25 167/2 171/9 171/12 171/20
171/21 172/21 174/2 175/21 209/14 214/17
214/23 233/5 234/8
un [3] 62/7 62/15 64/2
un-rebutted [1] 62/7 62/15 64/2
unable [7] 162/17 162/18 170/10 170/17
172/22 178/14 178/17
unattractive [1] 45/13
uncomplicated [1] 122/12
uncontested [1] 103/2
under [34] 7/5 7/11 8/4 8/16 10/24 11/8 16/6
18/6 26/18 30/11 53/5 71/7 76/13 81/24
83/22 91/15 91/15 94/24 101/2 102/14
102/20 109/10 131/4 134/3 135/12 137/4
139/2 155/16 156/15 165/10 176/9 217/14
224/6 225/19
under-funded [2] 91/15 91/15
under-funding [1] 225/19
under-utilized [1] 224/6
undergo [1] 150/1
underlying [1] 182/21
undermine [1] 82/21
understand [12] 3/12 7/9 23/4 66/7 66/12
69/9 74/22 152/6 177/3 191/20 194/3 207/2
understanding [3] 5/24 6/1 212/1
understood [1] 38/9
undertake [1] 12/21
underutilized [3] 190/17 191/10 191/14
underway [1] 8/2
undisputed [1] 11/20
undo [1] 129/20
undue [8] 11/23 12/4 12/6 12/11 12/12 18/23
19/4 30/3
unemployment [1] 178/24
unfamiliar [1] 63/7
unfavorable [4] 78/23 151/6 163/23 164/23
unfortunate [2] 81/3 191/24
unfortunately [6] 94/4 191/13 191/24 228/10
228/11 228/18
unfunded [6] 91/14 91/16 169/1 169/18
217/9 226/2
unhappy [1] 63/2
unhesitatingly [1] 144/10
unimportant [1] 230/22
unionized [2] 212/17 213/15
unique [16] 17/8 17/8 17/16 43/19 45/15
87/8 160/10 180/6 180/6 181/13 185/8
193/15 194/6 195/15 195/16 195/24
uniquely [1] 102/17
unit [2] 88/3 188/22
UNITED [10] 1/1 1/14 123/9 138/19 138/22
139/25 140/13 147/12 149/2 154/6
universal [1] 102/13
University [7] 32/5 82/17 116/4 210/22 211/8
211/10 211/23
unlawful [4] 4/25 5/1 117/15 117/24
unless [6] 4/16 50/19 111/11 157/4 182/4
220/21
unlike [1] 55/10
unnecessary [1] 39/24
unobtainable [1] 78/16
unprecedented [2] 60/13 67/3
unprofitable [3] 89/17 190/23 192/11
unprofitably [1] 191/1
unqualifiedly [1] 117/5

unquote [1] 167/17
unrelated [1] 149/6
unrestricted [1] 166/14
unscrambling [1] 156/21
unstaffed [1] 200/21
unsubstantiated [1] 77/9
unsuccessful [1] 158/22
unsustainable [1] 88/20
untenable [1] 63/12
until [11] 7/12 50/1 50/3 112/25 123/8 126/4
131/11 158/12 168/14 198/2 201/13
unwind [2] 127/20 127/23
unwinding [1] 111/20
Update [1] 229/7
updated [1] 229/10
upgrades [4] 223/5 223/6 230/2 230/8
upheld [1] 146/11
upon [5] 3/12 153/17 164/6 176/20 177/3
upper [2] 47/21 51/19
upstairs [1] 114/17
upwards [4] 81/6 81/7 87/3 88/16
urology [1] 228/2
us [49] 3/13 8/5 12/10 17/23 22/21 25/19
30/23 34/24 37/2 48/4 49/19 49/20 53/4 58/5
58/10 70/3 74/16 79/1 79/4 84/11 100/25
105/5 106/3 106/5 106/9 110/4 110/5 115/7
115/25 121/7 121/8 121/12 137/20 143/25
153/21 186/1 186/1 186/2 186/4 205/17
206/7 225/1 225/5 226/18 228/15 228/17
228/20 234/12 234/17
used [15] 10/1 20/16 51/2 79/22 87/13
108/21 108/23 109/1 109/2 109/4 114/1
151/14 190/7 224/6 229/15
useful [3] 143/25 168/7 168/18
uses [3] 120/13 168/6 168/17
using [13] 36/24 72/7 72/11 72/11 90/19
133/6 186/19 187/15 187/16 191/12 204/14
204/23 227/6
usually [5] 22/5 24/18 24/18 117/25 118/1
UT [1] 62/12
utilization [3] 81/8 86/24 88/10
utilized [1] 224/6
UTMC [64] 16/1 21/19 21/20 21/22 25/10
25/24 29/3 33/3 33/22 33/24 46/9 46/24 47/3
57/20 58/12 59/24 60/1 60/7 60/14 60/17
61/9 61/11 62/9 62/20 63/1 63/11 67/10
71/11 71/22 81/21 81/25 97/11 97/18 116/10
116/14 116/16 122/2 180/10 180/24 181/25
184/7 184/20 186/18 189/23 193/9 193/10
193/13 193/25 197/1 198/8 201/14 201/15
201/16 202/9 202/9 211/24 212/1 212/2
212/5 212/18 212/25 213/7 213/11 213/17
UTMC's [7] 46/14 205/20 212/8 212/13
212/16 213/4 213/14
UTMC-Mercy [2] 61/11 67/10

**V**

vacate [1] 113/1
valuable [1] 196/3
value [5] 37/19 55/1 56/4 59/1 79/2
variable [1] 94/24
variety [1] 136/22
various [3] 3/12 136/4 180/25
vast [1] 16/6
venture [2] 213/18 214/7
ventures [5] 116/8 213/21 214/1 214/6 214/8
verification [2] 164/8 164/12
verified [2] 177/21 212/22
version [1] 113/16
versus [28] 58/24 64/7 96/17 96/24 134/16

**V**

versus... [23]  135/9 135/9 135/14 135/17 137/1 137/8 137/12 137/13 138/20 138/22 139/25 141/8 142/13 146/1 147/1 147/10 147/13 149/2 150/16 154/6 155/21 156/3 156/23

vertical [1]  73/10

very [134]

vested [1]  7/23

viability [8]  5/16 130/5 157/9 157/17 166/20 216/16 225/12 233/18

viable [10]  60/15 62/11 62/20 63/5 72/12 90/1 116/9 162/19 175/10 221/18

vibrant [1]  48/1

Video [10]  209/22 210/17 213/9 213/16 216/12 216/24 217/5 217/18 217/22 218/8

view [8]  54/5 54/16 54/21 61/17 102/24 136/10 146/17 192/24

views [2]  56/10 214/21

vigorous [7]  16/15 41/22 41/24 46/10 55/22 55/22 102/2

vigorously [5]  17/14 42/11 43/15 47/16 188/19

Vincent [5]  145/14 188/13 188/20 190/12 190/18

Vincent's [3]  25/10 28/12 145/15

violate [5]  117/14 117/17 117/19 138/11 179/23

violated [2]  7/23 167/4

violates [3]  9/19 127/1 133/12

violation [12]  10/16 118/20 134/14 136/21 138/16 138/24 140/11 142/5 153/7 154/22 155/24 226/5

virtually [8]  88/16 109/2 124/22 127/23 140/6 140/12 140/18 203/25

volume [23]  1/11 15/22 33/16 40/11 51/23 54/13 59/6 66/23 88/24 93/15 94/23 95/7 132/5 132/8 161/3 165/22 174/19 174/20 174/21 178/24 198/20 200/11 208/20

volumes [15]  49/17 90/11 170/6 208/14 232/11

voluntary [8]  7/5 100/25 101/4 106/4 106/5 106/12 108/5 108/10

**W**

Wachsman [1]  60/9

Wachsman's [2]  204/17 204/17

wages [1]  176/3

waited [1]  206/22

waiting [3]  10/12 88/4 88/4

waive [1]  50/19

waiver [1]  167/11

Wakeman [57]  16/24 18/13 37/17 37/22 37/25 39/2 43/11 54/22 56/3 56/9 57/21 58/4 74/3 83/8 84/11 84/12 84/18 85/20 86/15 87/17 87/20 87/25 88/8 93/23 94/2 94/13 95/9 109/11 109/14 116/21 117/6 119/16 120/1 120/8 158/19 159/4 159/9 160/18 161/1 161/13 162/15 162/17 163/4 163/5 170/1 172/6 173/16 175/24 176/16 178/12 178/16 179/3 209/18 212/18 213/6 216/2 216/11

Wakeman's [10]  86/11 94/7 94/12 119/9 119/12 160/15 161/19 200/11 208/13 215/16

want [68]  12/23 14/16 17/20 44/11 49/4 49/12 49/19 50/10 50/15 50/16 52/4 53/10 53/18 55/4 61/25 66/19 68/16 71/16 77/15 79/8 79/10 79/11 82/11 92/3 98/7 99/21 105/15 106/4 106/6 106/8 106/24 109/13

110/4 110/5 110/23 117/1 117/3 117/5 118/8 120/18 121/15 126/5 127/19 131/6 131/24 132/13 132/14 132/15 146/1 152/2 157/11 163/2 171/16 172/4 173/14 179/16 183/12 194/20 196/16 197/2 202/25 220/5 221/1 221/4 224/17 224/18 224/19 234/6

wanted [17]  13/16 53/2 53/4 56/22 56/23 58/10 67/22 72/1 106/11 125/2 128/15 129/9 142/12 184/16 195/8 203/18 211/10

wanting [1]  52/22

wants [11]  50/5 59/4 87/9 88/11 110/6 152/1 181/16 181/22 185/10 224/16 228/22

Warner [1]  12/14

warrant [1]  10/22

warranted [3]  7/2 105/24 106/16

Washington [5]  1/18 1/21 2/3 2/6 2/15

wasn't [24]  44/5 46/1 48/18 49/11 55/17 73/16 73/17 79/9 85/9 89/24 90/1 99/14 106/4 112/14 112/15 121/13 124/4 166/9 167/24 174/22 175/20 176/4 205/25 223/3

watching [3]  101/13 104/20 104/21

ways [9]  18/11 55/21 66/24 94/9 109/22 135/1 180/25 224/17 224/23

wayside [1]  78/18

we'd [2]  106/3 205/1

we'll [32]  3/10 5/7 5/16 36/1 55/11 55/24 58/23 59/21 70/6 70/8 77/14 81/22 83/10 105/14 110/7 112/25 114/6 114/10 114/16 116/24 118/20 127/21 128/25 132/8 157/13 179/10 225/8 228/9 229/5 234/12 234/14 234/19

we're [74]  4/21 5/14 5/21 6/16 7/15 7/25 11/17 14/9 15/24 17/10 17/15 19/11 21/22 23/2 25/4 26/20 30/3 33/5 37/3 37/12 38/15 40/16 41/14 44/22 45/24 48/22 50/17 54/1 55/14 55/21 57/16 67/21 68/17 68/18 68/19 69/15 72/18 79/8 87/25 88/1 97/14 99/1 99/7 101/11 101/13 101/20 107/5 107/16 108/1 108/12 111/7 111/18 120/3 120/5 121/1 121/9 123/11 129/15 129/16 131/13 132/5 133/10 133/23 142/12 145/17 145/18 160/22 187/3 187/18 187/23 191/20 198/14 203/20 230/18

we've [31]  23/24 24/14 24/16 28/16 30/1 30/2 62/5 83/24 87/5 113/17 119/8 119/8 120/2 120/5 122/23 123/7 164/9 188/1 188/8 191/11 193/13 196/16 198/19 202/22 203/9 204/5 204/15 216/4 222/8 233/16 234/14

weak [4]  82/8 165/21 178/23 217/8

weaken [1]  35/13

weakest [2]  82/3 82/5

weakness [3]  82/5 82/15 82/19

website [1]  182/25

week [2]  182/16 228/13

weekends [1]  94/18

weigh [3]  136/11 138/2 156/8

weighed [1]  209/8

weighing [4]  8/8 10/24 134/6 155/12

weight [5]  11/21 31/18 90/14 90/19 101/17

welcome [1]  207/16

well [78]  10/4 13/12 18/8 20/16 21/22 25/7 33/13 36/16 37/1 42/1 42/24 43/2 43/21 49/22 52/2 55/2 61/17 62/4 65/20 66/1 68/16 69/9 74/19 81/18 82/14 87/11 88/18 92/17 100/4 100/9 102/14 104/15 109/20 110/21 115/20 121/9 127/22 130/9 132/21 143/15 151/9 152/7 152/15 157/15 161/18 163/9 165/10 165/20 170/22 171/1 171/13 172/21 172/24 180/16 181/24 183/14 185/13 185/13 189/4 194/5 194/19 195/2 195/19 196/18

196/19 197/17 198/13 201/16 202/16 209/16 209/25 215/25 221/4 221/13 226/6 228/25 228/25 232/8

well-known [1]  10/4

well-supported [1]  13/12

went [13]  46/6 78/14 86/19 87/18 92/21 95/2 120/1 120/2 137/15 144/15 175/7 175/8 208/6

weren't [20]  33/8 44/6 45/14 56/1 107/16 119/15 119/24 162/12 163/25 170/3 170/12 175/12 175/12 175/13 191/12 202/1 202/11 208/20 208/21 214/6

west [6]  1/8 1/23 2/12 2/17 2/20 197/22

western [4]  49/9 137/9 141/9 198/3

what's [7]  10/8 103/11 178/3 182/7 196/15 220/9 228/20

whatever [6]  118/7 118/8 201/25 226/16 232/16 234/17

whatsoever [1]  55/9

whenever [2]  135/20 140/9

where [79]

whether [33]  7/22 40/17 66/10 106/3 118/13 118/14 130/2 133/11 134/6 134/7 136/12 136/14 136/20 138/2 139/12 146/14 150/13 152/6 153/6 155/12 155/14 156/9 156/12 159/24 159/24 177/7 182/22 184/17 184/25 198/18 205/10 209/8 222/20

Whichever [1]  111/25

while [18]  6/17 18/5 42/2 46/7 54/3 61/23 94/16 108/9 111/8 147/3 157/7 161/25 181/15 183/21 207/8 207/9 219/20 230/15

who's [7]  26/5 35/10 57/10 114/23 115/2 115/3 195/12

Whoever [1]  131/8

whole [14]  12/5 18/24 63/23 63/25 128/8 132/6 135/19 156/23 171/25 202/15 222/13 229/25 230/25 232/11

wholly [1]  66/3

wholly-owned [1]  66/3

whom [1]  115/5

why [53]  5/20 6/16 7/9 7/25 17/10 17/15 17/16 17/18 21/5 21/17 22/1 22/3 22/9 22/10 22/21 23/2 23/4 38/15 42/20 49/22 50/10 56/15 56/19 56/24 58/23 59/21 62/18 62/25 72/6 72/10 75/5 75/6 75/8 75/11 95/23 98/25 100/23 115/20 115/21 119/22 126/15 127/2 156/17 157/12 177/7 179/20 185/20 187/1 187/1 195/8 207/25 208/6 234/21

wide [5]  5/2 30/15 30/15 75/25 121/25

widely [1]  75/21

wider [1]  196/24

wife [2]  27/14 27/16

William [1]  216/3

willing [7]  22/12 27/7 60/24 106/3 197/23 198/6 202/20

willingness [1]  197/18

winded [1]  132/25

window [1]  18/14

withholding [1]  11/8

within [19]  13/1 15/10 17/6 18/15 39/12 78/1 142/18 145/10 148/23 150/3 159/25 197/5 197/9 197/14 198/11 211/18 218/11 219/10 226/6

without [15]  10/10 18/18 62/17 64/4 70/21 90/6 101/6 137/14 144/11 156/25 182/8 183/17 206/1 216/7 220/2

witness [1]  35/7

witnesses [1]  6/8

woman [1]  27/9

women's [2]  213/22 213/23

**W**

won [3]  96/7 104/7 111/5
won't [14]  23/17 54/4 62/15 69/13 99/1 99/2
100/20 107/17 117/2 128/6 129/20 182/16
192/22 224/4
wonder [2]  49/22 187/1
Wood [14]  27/1 27/5 27/11 27/12 27/13
27/16 27/21 27/23 28/8 46/25 47/3 194/3
194/3 205/11
words [11]  10/1 11/1 94/7 94/12 95/9 152/12
163/12 176/16 177/17 179/2 189/4
work [13]  46/13 67/11 79/5 94/6 94/22
112/20 175/21 175/23 193/24 215/15 215/21
215/22 231/3
worked [1]  231/2
workforce [3]  176/2 212/17 213/15
working [4]  83/11 200/17 208/20 231/17
world [4]  10/1 118/18 118/18 148/9
worried [3]  44/2 74/1 123/9
worry [3]  114/12 114/16 186/16
worse [4]  64/10 158/8 173/16 225/4
worsen [1]  127/8
worth [2]  232/6 233/2
wouldn't [23]  17/12 27/23 27/24 52/8 60/2
67/14 75/6 87/12 96/22 99/21 101/2 101/18
115/15 115/18 116/9 132/7 176/11 178/21
189/14 201/1 207/4 214/8 222/18
wow [1]  84/2
wrap [1]  127/17
wrath [2]  58/4 115/24
writes [6]  44/18 49/7 49/25 56/4 74/14 74/20
writing [3]  14/20 74/11 212/19
written [1]  91/12
wrong [7]  95/20 117/24 129/15 129/16 154/2
204/5 234/21
wrote [7]  16/25 37/9 50/6 52/5 52/16 102/16
216/4
Wu [7]  2/19 4/6 130/16 153/10 207/25 221/2
227/4

**Y**

yeah [21]  13/3 16/12 20/25 60/16 60/20
61/21 62/23 66/7 66/13 67/22 68/2 72/20
81/15 83/15 96/11 99/5 99/13 112/1 197/3
203/10 231/22
year [42]  6/15 46/22 46/25 56/11 56/11 79/2
84/10 84/19 84/20 84/23 85/14 85/20 89/2
89/25 92/7 109/11 110/24 111/2 120/18
120/19 121/3 121/4 121/6 121/9 157/22
157/25 159/5 160/15 160/19 169/19 171/20
171/22 171/24 171/25 172/6 173/12 178/13
207/10 208/13 229/2 230/16 230/22
years [43]  37/16 37/16 39/13 62/22 71/6
71/15 75/5 75/13 79/1 84/3 87/17 87/24
89/11 93/17 95/2 98/12 98/12 108/24 111/8
111/18 115/12 115/13 121/10 121/12 126/19
128/4 128/10 157/24 164/19 168/17 178/4
178/5 179/6 184/12 204/2 206/14 206/18
206/22 209/23 217/11 224/15 226/9 227/7
yes [8]  3/19 25/14 60/22 67/2 118/1 123/19
199/25 202/2
yesterday [1]  231/6
yet [8]  37/11 90/10 91/1 98/6 100/17 163/6
183/3 221/14
York [3]  20/15 140/14 147/14
you'd [5]  23/13 33/7 40/13 71/22 196/12
you'll [18]  4/18 5/25 70/4 126/12 130/17
131/11 132/12 157/20 157/20 161/6 162/11
171/19 179/2 180/9 204/6 214/4 222/7

228/20
you're [26]  12/24 12/25 20/2 23/12 27/7
40/17 60/23 60/24 76/23 98/23 99/4 112/6
157/12 161/23 180/22 186/3 187/4 187/4
187/5 187/5 187/6 187/7 188/1 188/7 188/7
230/21
you've [5]  16/10 121/7 132/11 157/6 168/23

**Z**

zero [1]  222/18
zip [4]  42/14 42/17 42/17 43/3