```
1                    UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO (TOLEDO)
2
                      Case No. 11-00047-CIV-DAK
3
  FEDERAL TRADE COMMISSION,      )
4 AND THE STATE OF OHIO,         )
                                 )
5      PLAINTIFFS,               )
                                 )
6      -v-                       )
                                 )
7 PROMEDICA HEALTH SYSTEM, INC., )
                                 )
8      DEFENDANT.                )    West Palm Beach, Florida
                                 )    February 11, 2011
9 _____ )

10


11                 VOLUME 2, PAGES 268 - 415

12      TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS

13            BEFORE THE HONORABLE DAVID A. KATZ

14            SENIOR UNITED STATES DISTRICT JUDGE

15


16 Appearances:

17 FOR PLAINTIFF FTC           Matthew J. Reilly, ESQ.
                               U.S. Federal Trade Commission
18                             601 New Jersey Avenue, Northwest
                               Washington, DC 20580
19
                               Jeffrey H. Perry, ESQ.
20                             U.S. Federal Trade Commission
                               600 Pennsylvania Avenue, Northwest
21                             Washington, DC 20580

22 Reporter                    Stephen W. Franklin, RMR, CRR, CPE
   (561)514-3768               Official Court Reporter
23                             701 Clematis Street, Suite 417
                               West Palm Beach, Florida  33401
24

25 (APPEARANCES CONTINUED ON PAGE 2.)
```

```
1    Appearances (Continued):

2    FOR PLAINTIFF FTC           Sara Y. Razi, ESQ.
                                 U.S. Federal Trade Commission
3                                601 New Jersey Avenue, Northwest
                                 Washington, DC 20580
4
                                 Janelle Filson, ESQ.
5                                U.S. Federal Trade Commission
                                 601 New Jersey Avenue, Northwest
6                                Washington, DC 20580

7    FOR PLAINTIFF               Beth A. Finnerty, ESQ.
     STATE OF OHIO               Office of the Attorney General
8                                Antitrust Section
                                 23rd Floor
9                                150 East Gay Street
                                 Columbus, OH 43215
10

11   FOR THE DEFENDANT           David Marx, Jr., ESQ.
                                 McDermott, Will & Emery, LLP
12                               Suite 4400
                                 227 West Monroe Street
13                               Chicago, IL 60606

14                               Amy E. Hancock, ESQ.
                                 McDermott, Will & Emery, LLP
15                               600 Thirteenth Street, N.W.
                                 Washington, DC 20005
16
                                 Amy J. Carletti, ESQ.
17                               McDermott, Will & Emery, LLP
                                 227 West Monroe Street
18                               Chicago, IL 60606

19                               Stephen Y. Wu, ESQ.
                                 McDermott, Will & Emery, LLP
20                               227 West Monroe Street
                                 Chicago, IL 60606
21

22

23

24

25
```

```
1          (Call to the order of the Court.)

2              THE COURT:  Are we ready?  Ready, Matt?

3              MR. REILLY:  Yes.

4              THE COURT:  Thank you.

5              MR. REILLY:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. REILLY:  So I realized you heard me speak for

8       about three straight hours yesterday, and as much as I love

9       the microphone, I'm going to actually have Mr. Perry, Federal

10      Trade Commission counsel, speak for one minute, and then I'll

11      speak for 59 minutes.

12              I'm kidding.  About 30 minutes.

13              Thank you, Your Honor.

14              THE COURT:  You're welcome.

15              MR. PERRY:  Your Honor, he says he's kidding, but

16      we'll see if I'm still standing here for about two minutes.

17              THE COURT:  Would you identify yourself for Steve.

18              MR. PERRY:  Of course, Your Honor.  Jeff Perry, on

19      behalf of the Federal Trade Commission.

20              As my colleague Mr. Reilly mentioned, I'm going to

21      talk for about a half hour, Your Honor.  And my goal really is

22      to try to join issue and engage as much as we can,

23      specifically responding to the points that Mr. Marx and his

24      colleagues made yesterday.  And our goal really is to present

25      for the Court an honest and full exchange on the issues, and
```

1   obviously, we feel very, very strongly that, at a minimum, at

2   the end of our time today, if you haven't already, the

3   conclusion that will be unavoidable is that there are, again,

4   at a minimum, serious substantial questions that remain, and

5   we think, frankly, Your Honor, there are even stronger more

6   concerning issues than that.

7        Your Honor, I want to start out briefly by responding

8   to a point Mr. Marx made yesterday in the context of the FTC's

9   enforcement policy.  And Mr. Marx, in defending the

10  transaction, suggested that ProMedica might be the victim of

11  an overaggressive enforcement policy in the hospital arena by

12  the FTC, and Mr. Marx specifically suggested that there are a

13  number of hospital transactions, acquisitions and mergers

14  taking place across the country.  And he's right about that

15  fact, Your Honor.

16       And Mr. Marx went on to suggest that in many of those

17  markets, the Commission and courts, if called upon to review

18  the transaction, would find highly concentrated markets with

19  few competitors.  And Mr. Marx is right about that, too.

20       And we should savor this.  I don't know how many

21  times I'll say that, but that's, I think, two.

22       THE COURT:  He's starting to get taller.

23       MR. REILLY:  Don't say it, Jeff.

24       MR. PERRY:  Again, Your Honor, there are a number of

25  markets across the country in which there are a relatively

1    small number of hospital competitors and there are a

2    relatively large and growing number of transactions in those

3    markets.  And Mr. Marx would have you believe that ProMedica

4    is caught up in an enforcement policy of the FTC, and I assume

5    that the State of Ohio must be complicit in this as well,

6    where we look at nothing more than market shares and market

7    structure, and condemn hospital mergers on those bases alone.

8    And, Your Honor, that is not true.

9          If we could bring up the first slide.  I want to give

10   you a little bit of background, if I could, because I think

11   this will make the point clear.

12         As Your Honor can see on the slide, in the nine years

13   between 2001 and 2009, the FTC, as you know, gets notified of

14   hospital transactions above a certain size, and we received

15   hundreds of those notifications.  And in more than 98 percent

16   of those cases, Your Honor, the Commission determined either

17   that no investigation was warranted at all, or that an

18   investigation could be completed within just a matter of

19   weeks.  And that is a telling piece of context, I think, Your

20   Honor, for why we're here today.

21         This is not the typical hospital merger that we see,

22   and we are not here because we are blindly following a policy

23   that says anytime there is significant concentration caused by

24   a hospital merger, the FTC will run into court.

25         And, in fact, if you look at the 13(b) cases, Your

1    Honor, in the hospital arena, this is, as far as we're aware,

2    the second preliminary injunction action the FTC has brought

3    in a hospital case in the last dozen years.  This is not the

4    typical case, Your Honor, and obviously our goal has been and

5    my goal briefly this morning will be to continue to emphasize

6    and explain why this is different, why is this case different

7    than the hundreds of hospital mergers we look at and decide to

8    not raise anywhere near this level of concern.

9          So why is this merger harmful?  Mr. Marx made the

10   point yesterday and continually tries to characterize

11   St. Luke's as a bit player, too small to matter, too

12   insignificant today and too insignificant in the context of

13   this merger to add any market power to ProMedica.  Your Honor,

14   that is not true.  I cannot, unfortunately, agree with

15   Mr. Marx on that point.

16         And how do we know that St. Luke's matters?  How do

17   we know that they're not a bit player?  We know, Your Honor,

18   not because of the work that we've done, frankly, although it

19   certainly confirms the evidence.  We know because we look at

20   the players and how they behave in the marketplace on a

21   day-to-day basis as they're trying to compete for patients,

22   compete for dollars and survive in the marketplace.  And what

23   we see is and what we've shown, Your Honor, is that ProMedica,

24   frankly much to our surprise, was incredibly fixated on

25   St. Luke's.

1           We look at a lot of transactions where a large

2     hospital system acquires a smaller system, and it's very, very

3     common to see the smaller system focused on the competition

4     and the constraint placed on it by the larger system.  It is

5     highly unusual, Your Honor, that we see what we've seen here.

6     And that is, specifically, the larger system intensely,

7     intensely laser-focused on the smaller system and competing

8     with them.

9           And we know why.  We know that ProMedica was losing

10    market share to St. Luke's, the struggling insignificant firm,

11    in a time period leading up to the transaction, they were

12    taking market share from ProMedica.  They were taking millions

13    of dollars in business from ProMedica, and in response,

14    ProMedica was making concerted efforts not just to exclude

15    them from Paramount, its own health plan, but to exclude them

16    from other health plans.  And when St. Luke's was admitted to

17    other health plans, like Anthem, we know that ProMedica lost

18    millions in response.

19          For its part, obviously St. Luke's was well aware of

20    the competition, was very concerned not just about aggressive

21    competition, but about the exclusionary tactics it perceived

22    from ProMedica.  And prior to the joinder, prying to joining

23    forces and coming in before the Court, as you know, Your

24    Honor, St. Luke's actually considered an antitrust lawsuit

25    against ProMedica.  That's how intense the competition was

1    between these two firms.

2            And, Your Honor, it's not up on the slide for

3    confidentiality reasons, but we look to the parties'

4    documents, but we also look at health plans.  And you can see

5    testimony from a large health plan operating in Lucas County.

6    This is a health plan that was subject to hours of

7    cross-examination in deposition by ProMedica's counsel.  And

8    you see on your screens there and on your slides the portion

9    that's redacted.  And I won't reveal it, but I think you'll

10   see that it makes clear that St. Luke's does matter.

11           We know that St. Luke's, in conducting ordinary

12   course surveys, discovered that there are a large number of

13   patients that have St. Luke's and ProMedica as their top two

14   hospitals.

15           And Mr. Marx has made the point yesterday and made

16   the point repeatedly that there's nothing unique about

17   St. Luke's.  What's so unique about St. Luke's?

18           If we can look at the next slide, Mr. Marx is going

19   to make me pay him royalties here, but I've stolen one of his

20   slides.  And what I think it highlights, and I know Mr. Marx

21   didn't intend for it to highlight, but it does highlight

22   what's unique about St. Luke's.  And what you see is -- and

23   this is important, because we've clustered the market together

24   for analytical convenience, and that's appropriate to do for

25   antitrust analysis.  But it's important also to keep our eye

1    on the fact that there are a large number of services for

2    which St. Luke's, prior to the joinder, competed head to head

3    against ProMedica.

4         And they competed by providing high quality care,

5    which ProMedica's highest executives called the highest

6    quality in the county, and they competed on the basis of low

7    affordable rates for employers and their employees.

8         And you see by looking at the chart that St. Luke's

9    competed with ProMedica's hospitals for obstetrics,

10   gastroenterology, cardiology, newborn services, general

11   surgery.  I won't read the whole list.  I don't even know,

12   frankly, Your Honor, what the last one on the list means.  I

13   can't say it, but I do know that St. Luke's competed

14   aggressively with ProMedica for that service as well.

15        And, Your Honor, the only thing I want to point out

16   before we move on from this slide -- and this is a well-done

17   slide.  It suggests on its face that there are lots of

18   competitors.  And I can understand why Mr. Marx presented it

19   that way.  There are lots of checkmarks on the chart, and it

20   suggests there are lots of places to go for patients and that

21   they have lots of choice today.

22        Wood County Hospital, I don't think even Mr. Marx

23   with all his talent was able to explain why he put Wood County

24   on this chart.  I understand at least that with respect to

25   general acute care services, ProMedica doesn't assert that

277

1    Wood County is in the relevant market, but that made its way

2    onto the chart for some reason.

3         And of course, all of the ProMedica hospitals are

4    listed separately.  And that's fine, but we have to keep

5    track, of course, of the fact that those are not independent

6    competitors.  That is the large dominant system in Lucas

7    County with its four hospitals that obviously don't compete

8    with each other.

9         And, Your Honor, I want to go through a few of the

10   types of evidence and summarize as best I can what the

11   evidence shows.  And as you know, the FTC has presented

12   testimony from three expert witnesses in addition to testimony

13   from the party officials, from health plans, from employers.

14   And Mr. Dagen provided and submitted to the Court two sworn

15   affidavits.  He was deposed by Mr. Marx, who had seven hours

16   at his disposal to cross-examine Mr. Dagen.  And here is the

17   testimony that remains from Mr. Dagen after all of that.

18   Mr. Dagen, I want to point out, was the only -- still remains

19   the only expert in this proceeding to develop a

20   forward-looking assessment of St. Luke's finances.

21        Now, we know from Mr. Wakeman and his statements to

22   the board what Mr. Wakeman thought about St. Luke's trends and

23   St. Luke's finances at the time leading up to the joinder, and

24   Mr. Dagen has assimilated a huge body of evidence and

25   projected forward what St. Luke's finances would look like.

1    And that's important for to us look at.

2           And here, very quickly, are his conclusions.

3           Mr. Dagen concludes that St. Luke's, as an

4    independent St. Luke's, would be able to continue to invest in

5    its facilities, would be able to maintain high quality, would

6    be able to continue to attract patients, which we know it was

7    doing in increasing volume leading up to the joinder.  And why

8    does he predict that success?  The reason is St. Luke's is

9    sitting, as an independent St. Luke's before the joinder, was

10   sitting on cash reserves of 65 million and only 11 million in

11   total debt.  And that's important to keep in mind.  This is

12   not one bond, when you hear ProMedica's counsel talk about

13   St. Luke's being in some sort of technical default on their

14   bonds, and, of course, they never missed a payment, had money

15   set aside so they could pay off the full bond at any point.

16          But they have 65 million sitting in cash, an

17   independent St. Luke's did, and 11 million in total debt.

18          We've heard a lot about the St. Luke's pension fund,

19   but when you boil down to it, an independent St. Luke's had

20   nearly 90 million in cash and assets sitting in their pension

21   fund and was paying out on average about 3 million a year.

22   That's three decades, roughly, of payments.  Even assuming the

23   markets never rebound at all, even assuming their pension fund

24   and reserves never increase, that's decades, decades of

25   payments.

1            And Mr. Dagen, when he projects forward in his

2    analysis, shows that even assuming that St. Luke's fully funds

3    its EMR, which ProMedica, without basis, claims St. Luke's

4    couldn't do, and even assuming that in addition to fully

5    funding the EMR, St. Luke's fully funds its private room

6    expansions, repays all of its outstanding debt, invests in

7    capital improvements at rates even higher than they had in the

8    past, pays out pension funds at rates even higher than they

9    have in the past, even assuming all of those conservative

10   assumptions, Mr. Dagen's analysis concludes that St. Luke's

11   would remain a high quality operator of general acute care

12   services and OB services and would have $33 million still

13   sitting in the bank, Your Honor, after all of those

14   investments.

15           Now, Mr. Dagen, as I said, submitted two

16   declarations, I think 50 or 60 pages of sworn testimony in

17   this matter.  And Mr. Marx had seven hours at his disposal to

18   tear through as much of that as he could and try to

19   demonstrate that Mr. Dagen's analysis was flawed in some way.

20           And, Your Honor, here, as best I can tell, is what

21   Marx developed based on having seven hours of available

22   cross-examination.  I didn't hear -- at least, Your Honor, I

23   didn't see testimony cited where Mr. Dagen somehow was shown

24   to have missed something in his analysis or overstated their

25   competitive significance.  What I heard was Mr. Marx yesterday

1    saying that with respect to one of Mr. Dagen's assumptions,

2    Mr. Marx didn't know what document he was referring to.  Well,

3    I was curious about that, because Mr. Marx frankly made quite

4    a show of it and said, I have no idea what that document is, I

5    have no idea who created it, we don't know why it was created,

6    when it was created, whether it was an official budgeting

7    document, frankly, what the document even is.

8         Well, that got us curious enough to make sure we

9    hadn't missed something, so we checked last night.  And, Your

10   Honor, this, I guess for a little context, this relates to a

11   sentence in Mr. Dagen's report.  You see it on the middle of

12   the slide there, where Mr. Dagen summarizes that he has

13   estimated St. Luke's financial condition absent its joinder

14   with ProMedica, and has calculated these projections based on

15   the following assumptions.  And one of the assumptions, it was

16   number 3, says increases in operating expenses consistent with

17   projections contained in St. Luke's ordinary course of

18   business documents.

19        So Mr. Dagen didn't assume that expenses wouldn't

20   increase.  When it was projecting St. Luke's future, it

21   assumed expenses would go up.  And he didn't make up the

22   number as to how quickly they would increase, he looked at

23   ordinary course documents.  And the mystery ordinary course

24   document, which was cited as a footnote to that exact

25   sentence, listed in schedule B of Mr. Dagen's report, it's

1    PX395, it was produced to the FTC by ProMedica.

2            It was seen through e-mail traffic by at least six

3    ProMedica and St. Luke's high level executives that we've been

4    able to count so far, including the CEO of St. Luke's,

5    Mr. Wakeman; and the CFO of ProMedica, Ms. Hanley; and

6    St. Luke's treasurer.  The mystery of this document escapes

7    me, but I wanted to make sure the Court was clear that

8    Mr. Dagen's assumptions on this were, in fact, based on

9    ordinary course documents that were disclosed to us from

10   ProMedica's files.

11           In addition to Mr. Dagen, I know, Your Honor, through

12   his report and also through defense counsel's Daubert motion,

13   is aware that we submitted testimony from Mr. Errol Brick.

14   The title of this slide is accurate, Your Honor.  Mr. Brick is

15   a bond rating expert.  He is the only witness in this trial

16   that can make that claim.  He has over 30 years of experience

17   in this very specific, frankly to me at least, very confusing

18   field of healthcare bond ratings.  And what he does for a

19   living for decades is work with healthcare systems, like Johns

20   Hopkins, Rush University Medical Center, smaller community

21   hospitals all over the country, and he helps them and works

22   with them to understand their credit ratings and their

23   ability, the extent to which those credit ratings affect their

24   ability to raise money.

25           And unlike the six witnesses from ProMedica, five

282

1    fact witnesses and Ms. Guerin-Calvert, Mr. Brick is uniquely

2    qualified to testify on this issue, and here's what he said:

3    St. Luke's, leading up to the joinder, had a Baa credit

4    rating.  Which means nothing to me, but if you read

5    Mr. Brick's testimony, you'll see that is an investment grade

6    credit rating.

7           So what does that mean?  Could they raise money?  The

8    answer is yes.  In 2010 alone, 21 different hospital

9    competitors with Baa ratings were able to access the credit

10   markets at reasonable rates and raised a total of

11   $2.6 billion.  2.6 billion.  That's not junk bond status,

12   that's not just above junk bond.  That is, even in a tough

13   climate, even in a tough economy, evidence that these

14   hospitals with similar ratings can raise money.

15          And, of course, Your Honor, we know from Mr. Dagen's

16   work, which was reviewed and considered by Mr. Brick, that

17   St. Luke's didn't need to raise money.  That's the benefit of

18   having $65 million in the bank and only 11 or 12 million in

19   total debt.  You don't need to raise money.

20          Now, Your Honor, Mr. Marx and his colleagues made a

21   great deal yesterday and have throughout this proceeding,

22   they've argued over and over with, frankly, very impressive

23   looking charts that every time a patient, commercial patient,

24   walks through the door at St. Luke's, poor St. Luke's was

25   losing money.  Your Honor, it's just not true.  Here's the

1   real story.

2          Contrary to ProMedica's assertions, St. Luke's

3   commercial rates do fully cover this direct cost.  And by

4   direct cost we mean, frankly, what everyone means by direct

5   cost in this context, the cost of providing care to those

6   patients.

7          And, in fact, the commercial rates that St. Luke's

8   gets cover not just those direct costs, but there's sufficient

9   money left over to help them cover their indirect costs.

10         And that's why -- it's not surprising, Your Honor,

11  because that's why Mr. Wakeman was so excited about the

12  increase in volume in the time period leading up to the

13  joinder.  Outpatient volume was going up, outpatient revenue

14  was going up, inpatient volume was going up, inpatient revenue

15  was going up.  And that was a good thing, Your Honor.

16         You didn't see Mr. Wakeman saying, bar the doors,

17  we're losing money.  The more people come in here, the more we

18  lose.  No.

19         What Mr. Wakeman said to his board, the last words of

20  an independent CEO to his board of directors in September of

21  2010 was that the positive margin, positive margin, confirms

22  that we can run in the black if activity stays high.

23  Mr. Wakeman was telling his board the more volume the better,

24  our margins are positive, and we can run in the black as long

25  as we keep patients coming in the doors, and we know they were

```
 1    coming in the doors, Your Honor.

 2            Now, Your Honor, this, in addition to Mr. Wakeman's

 3    statements to his board, the notion that St. Luke's rates and

 4    prices it was getting from commercial health plans, including

 5    the large commercial health plans, were sufficient to cover

 6    its cost of care, comes from the sworn testimony of

 7    ProMedica's expert witness herself.  And, Your Honor, we're

 8    not putting the information up on the screen for obvious

 9    reasons, but this information demonstrates that contrary to

10    what their lawyers say, St. Luke's was making money as these

11    patients came in the door in increasing numbers.

12            And if you'll bear with me, I'll try to walk through

13    the slide here, and you'll see I won't mention the name of the

14    health plan, but there's one on the top, and I suspect you've

15    heard of them, and there's one on the bottom, which I suspect

16    you're familiar with, as well.  And you see we've got

17    information for 2009 and 2010.

18            And, Your Honor, with the exception of correcting one

19    minor error where the wrong cost figures were used for the

20    wrong year, this is taken exactly from Table 11 from

21    Ms. Guerin-Calvert's expert report.  This is not something

22    conducted by Mr. Dagen or Mr. Brick.  This is not -- these are

23    not calculations created by Mr. Town, our economic expert.

24    This is their expert's presentation based on information taken

25    from St. Luke's financials.
```

1        And if you'll walk with me across the first row, for

2    example, you'll see that health plan in 2009.  And you'll see

3    the total cases.  That's just what you think it is, people

4    coming through the door.  And you see total payments.  Again,

5    that's the money coming in.

6        And then the next column is the direct cost.  That's

7    what it costs St. Luke's to treat those patients.

8        Now, it doesn't include rent.  But guess what, the

9    good news is your rent doesn't go up when more patients come

10    in.  This is the direct cost of treating patients.  And as

11    long as you're covering with those payments your direct costs,

12    what that tells you is every time someone comes through the

13    door, you make money.

14        And what you see the next column, total contribution,

15    and Your Honor has noticed at this point there are no negative

16    signs here.  These are positive numbers.  Total contribution,

17    you see the figure there for 2009, and then obviously the last

18    column is per patient.  They walk through the door.  Do they

19    lose money?  No, they make money.  And here's how much they

20    made per patient in 2009, here's how much they made per

21    patient in 2010.  And guess what, as Mr. Wakeman's turnaround

22    plan was going into effect, look at the way the numbers were

23    trending.  For both of these health plans the contribution per

24    patient was positive in '09, it was positive in 2010, and it

25    was going up, Your Honor.

1          Now, Your Honor, I hope you'll bear with me for

2     bouncing around a bit.  I'm trying to be responsive to

3     Mr. Marx's arguments.  And the next argument or claim we heard

4     quite a bit, and I can understand why they're making this

5     claim, but again, the facts just don't bear it out.

6          The Defendant claims over and over again that absent

7     the joinder, St. Luke's would have cut service lines.  Your

8     Honor, there is no basis in the evidence for this claim.  And

9     let me walk you through, if I could, just very briefly what

10    the evidence in the record does show.

11         This scenario, the possibility of cutting service

12    lines, made its way onto a document in the summer or very

13    early fall of 2009.  And the timing is important, of course,

14    because we know that 2010 was the time period when

15    Mr. Wakeman's turnaround plan was really taking effect.  That

16    wasn't apparent in late '08, the year he got there.  It wasn't

17    as apparent in early '09.

18         So at the most difficult time of St. Luke's financial

19    experience, at some point on a document they considered as one

20    option the possibility that they might have to limit services

21    going forward.  And then what happened, Your Honor?  They

22    firmly rejected it.  It made its way onto a list of things to

23    consider and they made a decision, and the decision was not to

24    do that.  And we know why because Mr. Wakeman told us.  They

25    rejected the possibility of cutting services, in his words,

1    because St. Luke's would no longer be able to fulfill its

2    current mission to fully serve the community, and for that

3    reason they said, no, we're not going to do it.

4         And that decision was made about a year before the

5    joinder, Your Honor.  And we have combed through the record

6    for the year from that point up through the joinder to find

7    out, did they consider it again.  Maybe it fell off one

8    presentation, but was it something in the minds of the

9    executives in the time period leading up to the joinder, and

10   is it something that might reasonably have happened absent the

11   joinder?

12        Your Honor, there's no evidence of it.  There isn't.

13   We've seen nothing.  And we've been through the documents, and

14   I assume and hope that if there was something we were missing

15   after the hours of argument, the TRO proceeding and here, that

16   we would have seen it from Mr. Marx and his colleagues.  If it

17   exists, Your Honor, we're not aware of it.

18        Instead, what you saw is, in that year leading up to

19   the joinder, after rejecting that possibility, St. Luke's had

20   two options that they considered.  One was go it alone.  And

21   the good news was Mr. Wakeman's plan was taking shape, and

22   they had the option to go it alone.  Mr. Wakeman was aware

23   that volumes were up, revenues were up, market shares were up,

24   earnings were up, and that was a realistic possibility, as was

25   affiliating with a number of potential providers.  And I'll

1   talk about that in a few minutes.  Because, frankly, everyone

2   seemed to be interested in affiliating with St. Luke's,

3   notwithstanding the argument that they're an insignificant

4   fledgling competitor.

5          And what we see is essentially, as I said, that

6   argument or that possibility of eliminating service lines

7   never came up again as far as we can see.  And it's not

8   surprising, because when we look at Mr. Dagen's projections,

9   when we consider Mr. Wakeman's specific testimony, and when we

10  think about the significant financial turnaround that happened

11  in 2010, it's no wonder that they didn't consider it.

12         And, Your Honor, while we're on the subject of the

13  financial turnaround, I would just caution Your Honor.

14  Defense counsel has put forward a significant number of slides

15  showing earnings and profits, and they're very compelling at

16  first glance.  But, Your Honor, there is a lot of information

17  in those slides from 2004, 2005, 2006 up through 2008 or '9.

18  It's curious, though, Your Honor, if you look through those

19  slides, what you'll see missing in a great number of them is

20  information from 2010.

21         Now, here we are in 2011.  They obviously have access

22  to the information.  And what you see, both from the ordinary

23  course statements of Mr. Wakeman, from the analysis of our

24  experts, and from the continuing high quality of care provided

25  from St. Luke's leading up to the joinder is that 2010 was

1    different than 2009 for St. Luke's, just as it was for a great

2    number of hospitals and companies around the country.

3           Now, Your Honor, again, responding to a point made

4    yesterday by Mr. Marx, he talked a bit about quality.  And I

5    don't want to misquote him, but I understood him generally to

6    say and generally refer to Mr. Oostra's deposition, and I was

7    there for the deposition and I remember generally what

8    Mr. Oostra testified to.  And Mr. Marx indicated that

9    Mr. Oostra wasn't sure, but the quality may be declining or

10   may have declined more recently at St. Luke's.

11          Your Honor, what's interesting is Mr. Oostra was not

12   the only one to testify on the subject.  Mr. Wakeman, the

13   St. Luke's CEO, the individual who Mr. Oostra did testify he

14   has confidence in to continue to run St. Luke's hospital as

15   long as it's part of the ProMedica system, Mr. Wakeman

16   testified on this subject.  And here's what he said, Your

17   Honor.

18          During the first -- and I'm not quoting, but during

19   the first nine months of 2010, St. Luke's was -- and here I

20   will quote, one of the higher quality organizations in Lucas

21   County.  And specifically, Mr. Wakeman was asked at his

22   deposition about the most recent round of quality metrics

23   looking at St. Luke's.  There are a number of metrics, and

24   often some metrics go up and some go down, but here are a few

25   of note.

1        St. Luke's most recently, according to Mr. Wakeman,

2   and this deposition was 10 days ago, Your Honor.  This is

3   about as a recent information as we have access to, improved

4   in heart attack care, improved in emergency department,

5   obstetrics, outpatient surgery, outpatient lab, patient

6   satisfaction.  Improved in cardiac intervention door-to-artery

7   time.

8        And Mr. Wakeman testified specifically and

9   acknowledged that at the beginning of 2010, St. Luke's

10  remained as the hospital among the lowest cost and highest

11  quality of care in the area, and he said second perhaps not to

12  ProMedica, but to Mercy.

13       And, Your Honor, in fairness, I'll point out that I

14  think Mr. Wakeman testified that St. Luke's may have dropped a

15  couple of points, his words, on the question of would you

16  recommend St. Luke's to a friend.  I think, Your Honor,

17  frankly that's a pretty good tradeoff.  The heart attack

18  care's getting better, all those other measures are getting

19  better.  You drop a couple of points on would you recommend to

20  a friend, I think St. Luke's would have been just fine with

21  that.

22       Now, Your Honor, I've combined a lot of information

23  in this slide here, and essentially, this is -- these

24  represent, as I understand them, some of the most significant.

25  By significant, I mean the stress that ProMedica's counsel has

```
 1    put on these arguments, the arguments that they've put forward
 2    why Your Honor doesn't have to worry.  And, of course, the
 3    standard here, as you know, for likelihood of success, is just
 4    serious substantial questions.  But they say, Your Honor,
 5    don't worry, Mercy's here.  And Mercy is significant, Your
 6    Honor.  Make no mistake.  The FTC and the State of Ohio are
 7    not arguing that Mercy is an insignificant competitor.
 8    They're not ProMedica.  Their market share is 60 percent
 9    lower.  Their prices, not surprisingly because their market
10    share's lower, are 30 percent lower than ProMedica.  But Mercy
11    exists and Mercy is a competitor.
12            And it's a wise strategy because the attempt,
13    frankly, Your Honor, I think -- I shouldn't say attempt.  The
14    potential effect is that it detracts the Court from the real
15    question.  And the real question for antitrust analysis, as
16    Your Honor knows, is not whether any competition remains.
17    Mercy does remain.  Not all their hospitals have OB, but they
18    will still be here.  But the question is not is there any
19    competition left?  The question is is there substantial
20    competition eliminated by the merger?  And the answer is yes.
21            And, Your Honor, as I'll discuss in the context of
22    these other points, if Mercy were enough to restrain
23    ProMedica, Your Honor, I don't think we would be seeing the
24    rates that we're seeing today, with ProMedica again having
25    rates 30 percent higher than Mercy and among the highest in
```

1    the state of Ohio.

2              If you'd go back just for a second.

3              Very briefly, Your Honor, ProMedica made a similar

4    argument as to excess capacity saying, you don't have to

5    worry, Judge, as long as other hospitals have excess capacity,

6    ProMedica could never exercise market power even if they were

7    so inclined.

8              Your Honor, it's not true.  And the reason we know

9    it's not true is because that's not a new phenomenon in Lucas

10   County.  There has been excess capacity for years.  And,

11   frankly, Your Honor, if two new hospitals with 400 beds opened

12   this week, we might look at it and say this is something new,

13   this may have a constraining effect on ProMedica that didn't

14   exist yesterday.  But that is not the case, Your Honor.  This

15   excess capacity has existed, it's persisted for a long time in

16   Lucas County.  It has not solved the extraordinarily high

17   rates that ProMedica already can charge.

18             To the extent it gave or gives health plans a strong

19   weapon to resist rate increases, where's the evidence of it,

20   Your Honor?

21             And the same thing, just very briefly, on selective

22   payor contracting.  ProMedica has put that forward as another

23   argument for why they could never exercise market power,

24   because health plans will just exclude them and be able to

25   save money with narrower networks.  Your Honor, health plans

```
 1    have had that ability for years.  Where's the evidence that

 2    that has restrained ProMedica?  Where is it?

 3              Your Honor, this is redacted, and you can see it on

 4    your screen.  But the point on steering, Mr. Marx yesterday --

 5    notwithstanding the fact that Mercy's existence hasn't

 6    constrained ProMedica.  The excess capacity hasn't restrained

 7    ProMedica.  The ability to have payor selective and narrower

 8    contracting hasn't restrained ProMedica.

 9              Mr. Marx says, Judge, don't worry, because in the

10    future maybe there will be some steering, and it's on one of

11    the health plan's websites where you can see cost information,

12    and maybe in the future there will be some steering.

13              The notion, frankly, Your Honor, that this Court

14    should not be concerned about this transaction, based on that

15    argument, Your Honor, we submit it just doesn't hold water.

16              Your Honor, again, broad physician admitting

17    privileges.  Mr. Marx and ProMedica has argued on their behalf

18    that physicians have privileges at a large number of hospitals

19    and therefore they could easily switch their patients over

20    seamlessly between hospitals, and therefore ProMedica could

21    never raise rates because patients would just switch from

22    ProMedica hospitals to the other hospitals where their

23    physicians have privileges.

24              And you see there we've redacted it, but you see a

25    health plan talking about whether their members would go for
```

1    that or whether their members instead have a preference for a

2    hospital and would not seamlessly switch hospitals just

3    because their physicians have privileges somewhere else.

4            And again, Your Honor, if overlapping physician

5    privileges gave health plans an effective weapon to resist

6    rate increases from ProMedica, where's the proof?  We just

7    haven't seen it, Your Honor.

8            Go to the next slide.

9            Your Honor, this is heavily redacted, but it's

10   important, it's an important slide.  I've talked now for a few

11   minutes about Defendant's arguments for different factors that

12   might restrain them, and I've made the conclusion or made the

13   argument that the current prices, the current margins, the

14   current cost coverage ratios earned by ProMedica demonstrate

15   that those arguments don't hold water.  And, again, I'm not

16   going to mention the numbers, Your Honor, but these are not

17   developed by Mr. Dagen, by Mr. Brick, by Mr. Town.  These are

18   not guesses.  This is an ordinary course document from

19   ProMedica.

20           And, Your Honor, these are not the cost coverage

21   ratios they've been telling the Court about.  These are not

22   the cost coverage ratios that they assert are just enough to

23   cover their costs of care.

24           And, Your Honor, I won't read the numbers, but I

25   think it's a fair characterization to say they differ by a

1      wide margin from what the Court has heard about.

2             Your Honor, in the context of defending the merger,

3      Mr. Marx also has argued that ProMedica, with its vast

4      resources -- and I should say we don't disagree with Mr. Marx

5      there.  So I found another one.  They have nearly a billion

6      dollars, I think, in cash and reserves.  And Mr. Marx has

7      argued that with all that money, ProMedica, on behalf of

8      St. Luke's, will be able to fully fund the MR, pave the

9      parking lot, all sorts of things that ProMedica will be able

10     to do on St. Luke's behalf.

11            And, Your Honor, I just want to make the point

12     briefly.  This is a very dangerous argument.  As Mr. Marx has

13     pointed out, there are lots of hospital transactions across

14     the country, and many of them are in situations where a large

15     system with lots of money is acquiring a small independent

16     hospital.  It cannot be the rule that if you have a lot of

17     money, you get to acquire your competitor.  There is no deep

18     pockets defense to the antitrust laws, Your Honor.

19            Your Honor, just a few more slides.  And Mr. Reilly

20     has been very patient, as I've run over a bit.

21            THE COURT:  Do you have eyes in the back of your

22     head?

23            MR. PERRY:  Was he fidgeting, Your Honor?  Would you

24     warn me if he gets close?

25            MR. REILLY:  I'm not fast enough to catch him

1    quickly, Your Honor.

2         MR. PERRY:  Your Honor, just a few points.

3         We've talked about the impressive turnaround at

4    St. Luke's.  That's evident, Your Honor, not just in the

5    financials, in the margins and the -- their ability to cover

6    costs with their health plan reimbursement rates.  It's

7    apparent from the fact that everybody in town seemed to want

8    to affiliate with them.

9         And Your Honor has the information in the slides and

10   the information's in the record, so I'm going to try to move

11   quickly here.  And you'll see that UTMC was sincerely

12   interested in affiliating with St. Luke's.  There's evidence

13   in the record from Mr. Wakeman that it was he that chose to

14   cease discussions with UTMC, not the other way around.

15        Janelle, if you'll bring up slide 20.

16        Your Honor, it's redacted unfortunately, but you've

17   got it on your slide.  This is the deposition testimony of

18   Dr. Gold, at UTMC.  ProMedica had two and a half hours to

19   cross-examine Dr. Gold.  At the end of Dr. Gold's deposition

20   this is the testimony that stood.  I won't read it, but if you

21   do, Your Honor, and you have any doubt about UTMC's sincere

22   interest or any doubt about who it was that ended negotiations

23   between UTMC and St. Luke's, I would be very surprised.

24        And we know why, Your Honor.  St. Luke's -- and I

25   won't read all the quotes, but we know St. Luke's thought that

1    an affiliation with UTMC, at least before it went with

2    ProMedica, was best for the community.  And Your Honor can

3    read these, but St. Luke's leadership believes this

4    affiliation is in the best interests of the community with the

5    potential partnership leading the way for economic change.

6            They talk about endless benefits, what's best for the

7    broadest part of the community.  You notice, Your Honor,

8    nothing on this slide about sticking it to employers, which is

9    how they described the ProMedica joinder.

10           Go to 22.

11           Your Honor, this one's redacted, as well.  Mercy is

12   another entity that ProMedica has argued, looked at St. Luke's

13   and conclusively decided that they had no interest whatsoever.

14   This is the sworn deposition testimony that stood after

15   ProMedica's lawyers had two and a half hours to cross-examine

16   Mercy.  You tell me, Your Honor, whether Mercy was and

17   continues to be interested in St. Luke's.

18           Your Honor, I want to talk just for a brief minute

19   about the capital avoidance claims.  And that is the bulk of

20   the efficiencies asserted by ProMedica.  We've heard about the

21   Arrowhead project, and Your Honor obviously mentioned it this

22   morning, that ProMedica says could be avoided through this

23   joinder.  Your Honor, ProMedica, as you know, has owned the

24   land in Arrowhead for a decade.  They've not broken ground,

25   they've not finished permitting, it's not showing up in their

1    strategic plans, it's not showing up in their budgets.  Where

2    is the evidence that this is ever going to happen, Your Honor?

3    And if that's true -- or happen anytime soon for sure.

4           And if there is no evidence that this is something

5    they're actively considering, then it is not an avoidance of

6    an expenditure caused by the joinder.  Your Honor, there was

7    no progress being made in Arrowhead, and that's true for the

8    new tower at Flower Hospital that they've pointed to, as well.

9           And I know Your Honor has talked about, and you asked

10   the question about if the transaction were blocked and if

11   ProMedica were to open a new facility at Arrowhead or

12   somewhere in southwest Lucas County, what would be the effect

13   on St. Luke's.  Your Honor, I'm sure Mr. Reilly will fill in

14   the gaps for me, but I would offer the following:

15          St. Luke's, through Mr. Wakeman's turnaround plan,

16   has established it can compete against ProMedica.  We know

17   that from its financial performance leading up to the joinder.

18   It isn't fun, I'm sure, but they've demonstrated they're able

19   to do it.  They're already doing it.  ProMedica already has

20   three hospitals in the area.  Adding an additional hospital

21   would not add a new competitor to the region.  And, again,

22   more importantly, there is no real indication in the record

23   that that scenario -- it's a fair question, but no indication

24   in the record that that is likely to happen anytime in the

25   near future, if ever.

1            And, Your Honor, the last point on the efficiencies.

2    By ProMedica's own admission, the potential efficiencies are

3    still being evaluated.  They've described them as a gut

4    feeling, they've said on the record if we don't find these,

5    we'll find others.

6            Those are not the types of efficiencies that this

7    Court ought to credit to permit an otherwise anticompetitive

8    deal.

9            And as Your Honor knows, there has never been a

10   transaction that otherwise has been found to be

11   anticompetitive that was permitted on efficiencies ground.

12   And the notion or the argument that this is the one, when the

13   estimates haven't been finalized, when the work is ongoing,

14   when no decisions have been made, and when that issue,

15   frankly, will be a focus I'm sure of discovery in the merits

16   trial, which is getting underway, it would, respectfully, Your

17   Honor, not be appropriate for this case to be the first one in

18   history to allow an anticompetitive deal on efficiencies

19   grounds.

20           And, Your Honor, the very last point I wanted to

21   make, and I've gone over my time, is that healthcare reform is

22   not a blank check.  Your Honor, we don't know what it is,

23   frankly, but it's not a blank check.  Mr. Wakeman himself has

24   talked about the uncertainty and accountable care organization

25   requirements.  He said exactly what they're going to look

```
1    like, and who's going to be in them and how they're going to

2    perform has yet to be defined, and he said it's all

3    speculation.

4           Again, Your Honor, that may develop fast enough to be

5    ripe for discovery in the merits trial.  I'm sure discovery

6    will continue.  But with that much uncertainty, as St. Luke's

7    itself has described, that is not an appropriate basis or

8    foundation to approve an otherwise anticompetitive deal.

9           And there's one last point.  If we could do slide 18.

10   I apologize for having my third last point in my presentation.

11          We've talked a lot about whether a Mercy-UTMC network

12   is viable.  And that's important, because that's what health

13   plans have to look at.  They now have a situation where

14   ProMedica, who controls St. Luke's, can sit across the table

15   with them at negotiations and say, pay our prices or be

16   willing to live without a network that includes any of the

17   ProMedica hospitals or St. Luke's.  In other words, all you

18   get is Mercy and UTMC.  And if that's not good enough for you,

19   you gotta pay the piper.

20          Your Honor, we keep putting to the Defendants the

21   question of if, if that's a viable network, if that's enough

22   for health plans to still have meaningful leverage across the

23   table from ProMedica, show us the evidence that anywhere in

24   history a health plan has competed in the marketplace with

25   that network.  Not a different limited network, but
```

```
 1    Mercy-UTMC.  Show us one example.  And we haven't seen it,

 2    Your Honor.

 3            And the fact that other networks have been viable and

 4    successful doesn't prove that a Mercy-UTMC network would be

 5    viable.  And, in fact, we have sworn testimony from health

 6    plans that says it's not viable.  Our members wouldn't be

 7    happy, and we would, as a result, if we want to continue to do

 8    business in Lucas County, unfortunately, be forced to pay

 9    higher rates.

10            Now, Your Honor, I apologize to Mr. Reilly, but I

11    want to do it on the record for taking more time than I

12    planned.

13            If you have questions, of course, I'm happy to answer

14    them.  Otherwise, I'll leave them to Mr. Reilly.

15            THE COURT:  Thank you.

16            MR. PERRY:  Thank you, Your Honor.

17            THE COURT:  Now, Mr. Reilly, because some of your

18    time was taken, do not talk so rapidly for the court reporter.

19            MR. REILLY:  I will not.  I just want to state that

20    Mr. Perry will be looking for a new job starting Monday.  I'm

21    sure he'll be hired by someone.

22            MR. PERRY:  Don't be so sure.

23            THE COURT:  Probably ProMedica.

24            MR. MARX:  I don't think so.

25            MR. REILLY:  They're hiring everyone else.
```

```
1            I want to follow up on your question, and I think
2   Mr. Perry answered it very well comprehensively, that
3   ProMedica has had land in the Maumee area, talking about
4   opening a hospital for over a decade now.  There is nothing
5   been done on that, nothing in the budget, no shovel to the
6   ground.
7            Same with Mercy.  Mercy has owned the land for
8   several years.  There's sworn testimony, which we'll get to,
9   which you have already, saying that there are current plans,
10  but they do not plan to open that hospital actually because of
11  change in a legal requirement on joint venture and physician
12  ownership.  There are no plans for Mercy to own a hospital.
13  We have sworn testimony to that.  That testimony was tested in
14  a long deposition; nothing.
15           So for this Court to say that -- or think sometime in
16  the future, in the way distant future, that maybe, maybe Mercy
17  will open a hospital, a small hospital -- they are planning a
18  very small hospital in Maumee when they're actually planning
19  it, or ProMedica, if they have to spin off St. Luke's, may
20  open a hospital sometime in the distant future, 11 years and
21  counting since they had that land --
22           THE COURT:  Well, it'd be a very small hospital for
23  30 million.
24           MR. REILLY:  Very small hospital.
25           THE COURT:  Less than 30 beds?
```

1            MR. REILLY:  That's correct, Your Honor.

2            And to say that that should give this Court comfort,

3    when we know, and the evidence overwhelmingly demonstrates

4    that the harm to employers and employees in Lucas County will

5    happen immediately, either when the voluntary hold separate

6    ends or if this Court does not enter the order.  That was the

7    plans.  ProMedica has asked for permission to give health

8    plans notice.  It wasn't allowed under the voluntary hold

9    separate agreement, saying we're renegotiating those rates as

10   soon as we can.

11           So that harm is immediate.  The hardship will be

12   borne immediately by employers and employees in Lucas County.

13   And having some potential ephemeral possibility of a new small

14   hospital in the future in Maumee is not enough.

15           Slide 26, please.

16           Continuing the theme of showing no organization but

17   just talking about specific points, Ms. Hancock yesterday

18   cited Whole Foods for the proposition that the Court must

19   exercise independent judgment when deciding a 13(b) matter.

20   And we agree.  That's why we have presented this Court with

21   overwhelming evidence, the parties' own documents, sworn

22   testimony from health plans, sworn testimony from employers,

23   sworn testimony from third-party hospitals, five expert

24   affidavits, we put those forward to this Court so that they

25   could -- this Court could exercise independent judgment.  We

1    agree.

2          But also, continuing our theme yesterday, let's see

3    what else Whole Foods made clear, the same case cited by the

4    Defendant yesterday.  And I read:  "A district court must not

5    require the FTC to prove the merits, because in a 53(b)

6    preliminary injunction proceeding" -- and that's 13(b), Your

7    Honor -- "a court is not authorized to determine whether the

8    antitrust laws are about to be violated.  That responsibility

9    lies with the FTC.

10         "Second, market definition --"

11         THE COURT:  Let me stop you there just a minute.

12         MR. REILLY:  Sure.

13         THE COURT:  It would appear that what these cases and

14   this quote, in particular, is saying, that the expansive

15   nature of the trial in front of the ALJ, as I understood it

16   from the TRO hearing, 270 hours is my recollection, correct?

17         MR. REILLY:  210 hours.

18         THE COURT:  210.

19         MR. REILLY:  210 hours of live testimony.

20         THE COURT:  Live testimony.

21         And extensive additional, I presume, discovery.

22         MR. REILLY:  Correct, Your Honor.

23         THE COURT:  That that ferrets out the information as

24   to actual antitrust law violation, that that's not the purpose

25   of 13(b) preliminary injunction considerations.

1          MR. REILLY:  That's correct, Your Honor.

2          THE COURT:  Okay.  Thank you.

3          MR. REILLY:  And you hear from us when we talk about

4    the proposed relief.  The sole purpose of 13(b) is to maintain

5    the status quo while the Commission does its job in the first

6    instance.

7          So I want to read the second Whole Foods quote,

8    because it really, I think, explains the limited role and our

9    burden in a 13(b) proceeding.  And, again, I want to make it

10   abundantly clear that we're not resting on, that the burden

11   under 13(b) is much lower than the private preliminary

12   injunction standard.  We believe that we have exceeded that

13   burden by a wide margin, and we believe that we will be

14   successful in the merits trial, presenting much of the same

15   evidence, of course through live testimony.

16         "Market definition will not always be crucial to the

17   FTC's likelihood of success on the merits, nor does the FTC

18   necessarily need to settle on a market definition at this

19   preliminary stage."

20         Your Honor, Whole Foods, the District Court -- excuse

21   me, Court of Appeals, cited by Defendant, that is what we --

22   that explains our requirements under 13(b).  We don't even

23   have to settle on product market definition, geographic market

24   definitions.  We present evidence to you, and then if there is

25   serious substantial questions, we're entitled to preliminary

```
1    relief.
2              But I'm going to point out, because I think you're
3    confused, we of course, we of course, we of course have put
4    forth product markets, two separate ones, geographic market,
5    one, and bolstered it with a lot of evidence, and much of it
6    is not in dispute.  Those are the same product markets and
7    geographic market in our Part III complaint.
8              I was not putting that quote up there to tell you we
9    have changed our minds, Your Honor.
10             THE COURT:  No, no, I understand.
11             MR. REILLY:  It was a matter of that is what we could
12   do if we are so inclined in a 13(b) proceeding, and we weren't
13   because we didn't have to be.
14             Slide 27.
15             So I think this is probably the favorite point of
16   back and forth between Mr. Marx and myself.  I have the
17   benefit of having the last word today, so I think I'll get the
18   last word if this little debate continues.
19             But I'm really confused, I'm really confused by
20   Mr. Marx's statement yesterday that ProMedica does not concede
21   the Plaintiff's presumption.  And maybe I'm missing something.
22   Product market, they have conceded, at least for general acute
23   care.  I'm still not sure for the entire principle of cluster
24   market if there are different competitive dynamics, different
25   market participants, different market shares, the case law
```

1    says it's inappropriate to put that service in the bundle.

2    And if you ask the Defendant are there different market

3    participants in obstetrics, are there different market shares,

4    the answer is yes.

5            I still don't understand, except for saying there's

6    no case, I don't understand why they think it's analytically

7    appropriate to put obstetrics in the cluster market.  But I

8    digress.

9            Geographic market, no debate, Lucas County.  Market

10   shares, don't -- haven't seen any market shares from their

11   expert, haven't seen any market shares that contradict ours.

12   So there seems to be agreement on market shares.  Calculating

13   HHIs, and HHI increases are just math, arithmetic from having

14   market shares.

15           Your Honor, there are no missing variables that you

16   need to show market concentration.  That's it.  Product

17   market, geographic market, market shares.  And they concede

18   those.  So I put these cases up again.  You've seen them.

19   U.S. Supreme Court, Philadelphia National Bank.  The merger

20   guidelines say the exact same thing, a merger that causes

21   undue market share and significantly increases concentration

22   is so inherently likely to lessen competition substantially,

23   that it must be enjoined in the absence of evidence clearly

24   showing that the merger is not likely to have such

25   anticompetitive effects.

308

```
1              In Whole Foods, once undue concentration is shown,
2      the FTC is entitled to a presumption against the merger on the
3      merits and therefore does not need detailed evidence of
4      anticompetitive effect at this preliminary phase.
5              There's nothing in the case law, nothing in the
6      guidelines saying that if we show undue concentration, we get
7      a presumption if the Defendant agrees.  It's case law.  It's
8      Supreme Court.  We show undue market concentration, there is a
9      strong presumption of illegality.  There's no Defendant saying
10     that we disagree that, yeah, we have high market shares, we
11     have undue concentration, but there should be no presumption.
12             Can you go to slide 30?
13             In my remaining time, Your Honor, I want to talk
14     briefly, and I will talk more about it in my remaining 30
15     minutes after Defendant speaks, that I want to make a general
16     point about the proposed relief this Court -- we're asking
17     this Court to enter.  The proposed relief has far less impact
18     on ProMedica than almost all 13(b) orders.  Let me explain
19     that.
20             As Your Honor asked yesterday, this transaction, this
21     acquisition, was not Hart Scott Rodino reportable.  It was not
22     reportable, we say.  And so ProMedica had the option, and did,
23     to consummate without making the filing.  And they did
24     consummate, as we all know.
25             In every 13(b) proceeding, except actually ironically
```

1    what's happening in central California right now, in Lab Corp,

2    in every 13(b) proceeding, what we asked, what the FTC asked

3    from the Court is to enjoin the merger, prevent the merger

4    from being consummated.  And that's, if we show serious and

5    substantial questions, that's what courts have granted.  They

6    block the merger.

7              And in no case in 13(b), if the District Court issued

8    an injunction against consummation, did that deal survive.  In

9    no case.  That may change, Your Honor, with the expedited,

10   very fast-moving merits trial under new Commission rules.  But

11   federal district courts under the 13(b) standard have killed

12   deals by issuing an injunction.  That's how draconian or how

13   serious the 13(b) relief has been in every other case up until

14   now in Lab Corp.

15             That's burdensome, that's important.  Defendants come

16   in in 13(b) proceedings and say we have incredible

17   efficiencies, there are incredible benefits that will happen,

18   prices will go down, there will be no loss of competition.

19   And the federal district court judge in 13(b) issues an

20   injunction if we meet our burden, and it blocks the deal

21   entirely and forever.

22             We're not asking for that here, Your Honor.  We're

23   asking for a modest proposed relief that doesn't do anything

24   to change ProMedica's ability to consummate the transaction.

25   They've already consummated it.  If we prevail on the merits

1    trial and appeal to the Commission and to the circuit, they

2    might -- ProMedica may have to spin off St. Luke's.  That's in

3    our proposed relief in the Part III trial.

4         What we're asking for today is so much less than what

5    is always asked for under 13(b).  So I want you to keep that

6    in mind when Mr. Marx talks about the parade of horribles that

7    will occur if you enter this order.

8         We have what I call a natural experiment, Your Honor.

9    We have a voluntary hold separate agreement.

10        THE COURT:  I want to stop you because I want to tell

11   you that since this, really, while it's for the Plaintiff's

12   and the Defendant's benefit, it is primarily to enlighten the

13   Court.  I am extending your time by 15 minutes and your time

14   by 15 minutes because there appears to be more information

15   coming, and therefore, more time needed for rebutting that.

16        Thank you.

17        MR. REILLY:  Thank you.

18        And will my 15 minutes be now?

19        THE COURT:  Now, not the next half hour.

20        MR. REILLY:  What about tomorrow, Your Honor?  Maybe

21   we could --

22        THE COURT:  If it rains, we'll be outside.

23        MR. REILLY:  Thank you, Your Honor.

24        We have a six-month natural experiment in this case.

25   ProMedica and the FTC entered into a voluntary hold separate

```
1    agreement.  That was entered into in mid August.  I think

2    that's the date.  Six months.  It was six months.  I counted

3    it this morning and I can't remember the date, but it was six

4    months.

5              And the principles and objectives of that voluntary

6    hold separate agreement are exactly, are exactly the

7    objectives of the proposed order we gave this Court.  Do not

8    remove and eliminate service lines or staffing from

9    St. Luke's.  Do not increase dramatically rates at St. Luke's.

10   And please maintain the status quo, so that if, at the end of

11   the day, the Commission, if warranted, in the public seeks

12   full and effective relief, St. Luke's will be very similar,

13   low cost, high quality that existed prior to the joinder.

14   That's what we're asking for, maintain the status quo.  Not to

15   do some crazy things, not to change St. Luke's into some

16   specialty hospital, not to improve, increase the revenues by

17   triple, not invest $500 million into it.  Maintain the status

18   quo.  That's what we're asking for.

19             And during this six months of a voluntary hold

20   separate agreement, the parade of horribles that you're about

21   to hear about has not materialized.  They have not.  In fact,

22   instead, the Defendant claims that under this voluntary hold

23   separate agreement, they've been able to make significant

24   improvements at St. Luke's.  So rather than being burdensome,

25   restrictive, they're telling this Court that they have
```

312

```
1    achieved some incredible things.
2             And, again, the principles and objectives of the
3    voluntary hold separate agreement are exactly the same
4    objectives and principles of the proposed order to this Court.
5             Thirty-one.  Thank you.
6             So again, and I repeat myself, which I often do.
7    With my extra 15 minutes I might do it more.  The relief is
8    necessary, Your Honor, to maintain the status quo, prevent
9    dramatic and immediate price increases.  I have already
10   mentioned this, I have notified health plans under
11   modification, the voluntary hold separate, to do that
12   immediately.
13            And there will be a lot of talk about the joinder
14   agreement and what the joinder agreement prevents ProMedica
15   from doing, and the commitment for 10 years, I understand
16   that.  But there's nothing, there's nothing in the joinder
17   agreement that prohibits ProMedica from raising rates
18   significantly on St. Luke's, whether it's up to the level that
19   ProMedica currently enjoys or some other level.  Nothing
20   prevents that.
21            And so the joinder agreement I don't think should,
22   and I'll tell you why, may, may possibly give this Court
23   comfort on some things.  It does not address the dramatic
24   price increases that ProMedica's documents -- I'm going to
25   talk about that, because they say there are no documents --
```

313

```
 1    St. Luke's documents, health plans, employers, everyone
 2    predicts will happen with confidence.
 3            Preserve St. Luke's service lines and staffing
 4    levels.
 5            And, again, I want to make it clear that one of the
 6    reasons why we think this is very important is because
 7    ProMedica plans, it plans reducing St. Luke's staffing to
 8    Flower Hospital levels, and that is a reduction in staffing.
 9    Maybe the reduction in staffing at St. Luke's won't matter.
10    Maybe the high patient satisfaction levels that St. Luke's now
11    enjoys and has for several years may not change from the
12    reduction in staffing.  Maybe there wasn't any reason why
13    St. Luke's was the only hospital in Lucas County who didn't
14    lay off employees.  Maybe that wasn't necessary.
15            But maintain the staffing levels to what they were
16    prior to the joinder to, again, maintain St. Luke's as a
17    high-quality, low-cost hospital.
18            Last point, I'll mention, ensure the availability of
19    effective relief, if warranted, after the merits trial.
20            Slide 32.
21            Actually, since I have more time, I'm going to jump
22    around a little bit, because I had a very nice segue into the
23    proposed order slides, Your Honor, and because of the time I
24    skipped it.
25            Could you go to slide 28, please?
```

1       You asked -- all your questions yesterday were very

2 good, Your Honor. You asked a question in particular that I

3 thought really hit at the heart of the matter in terms of the

4 proposed order. And it was, what would happen if you didn't

5 issue relief in this case and at the end of the day after the

6 merits trial and affirmed by the Sixth Circuit, that

7 St. Luke's should be spun off to -- as an independent

8 competitor to another partner, and how difficult would it be

9 to get effective relief if this Court doesn't issue an order.

10       And I mentioned briefly yesterday but I want to

11 reiterate, the primary purpose for 13(b) is, there are two

12 purposes: One, to preserve the Commission's ability to get

13 effective relief, and to prevent interim harm.

14       The order that we propose to this Court will do both.

15 And let me show you some cases that talk about this.

16       The purpose of the injunction, FTC versus Whole

17 Foods, which is getting a lot of coverage this morning,

18 preliminary injunction -- this is the D.C. Circuit -- avoids

19 the need for intrusive relief later, since even with the

20 considerable flexibility of equitable relief, the difficulty

21 of unscrambling merged assets often precludes an effective

22 order of divestiture.

23       Another FTC case, Illinois Cereal Mills, 1988. The

24 persistent problem, and the persistent problem referred to by

25 the Court was getting effective relief after consummation

1    without any agreements in place.  The persistent problem has

2    been long recognized by the courts and is one of the

3    underlying reasons for the Commission's authority to seek

4    preliminary relief under Section 13(b) of the FTC Act.  That's

5    why preliminary relief is available.  That's what Congress

6    intended.

7              In FTC versus Libbey, another 13(b) case in DC,

8    preserving the status quo so that meaningful relief will be

9    available to the FTC is another equity that weighs in favor of

10    issuing the preliminary injunction.  Unscrambling the eggs

11    after the fact may not be a realistic option in this case.

12              And Areeda v. Hovenkamp, a simple injunction prior to

13    consummation of the merger transaction is the least disruptive

14    equitable relief to all concerned, and here, of course, we're

15    not asking an injunction on consummation.  We're asking you to

16    continue the same principles and objectives, with some changes

17    and some further protections that the voluntary hold separate

18    agreement has in place and has had in place for six months.

19              I had mentioned to you yesterday in response to your

20    question the Evanston case.  The Evanston was the last

21    litigated hospital merger case and was consummated.  The FTC

22    prevailed under the merits trial in the Evanston case.  On

23    full appeal to the Commission, the complaint counsel, the FTC

24    prevailed, but a divestiture wasn't ordered by the Commission.

25              Why?  Because time had passed since the consummation

1    of the merger.  Assets had been commingled, changes had been

2    made.  All these changes of the commingling that happens after

3    consummation without an agreement in place made effective

4    divestiture relief, which is by far the most effective remedy,

5    restoring free acquisition competition, it made it infeasible,

6    and the Commission entered into a much less effective remedy.

7         That is a hospital merger case after consummation

8    without any hold separate agreement or other preliminary

9    relief in place, and the FTC was not able, the Commission

10   decided divestiture wasn't viable because the eggs were

11   scrambled.

12        Defendant suggested yesterday that this Court

13   shouldn't order relief because the FTC has all this data, and

14   we could continue investigating ProMedica, its rates and the

15   competitive dynamics in Lucas County to determine whether, I

16   guess, everyone is acting competitively.  So instead of

17   putting modest relief in place that we are entitled to if we

18   prevail under 13(b) by raising serious substantial questions,

19   it seems the Defendant is suggesting that we should protect

20   consumers and the Commission's ability to obtain effective

21   relief by investigating further, issue more subpoenas for

22   documents, data, schedule more depositions, interview more

23   market participants to monitor post-acquisition

24   anticompetitive effects.

25        And that cuts against the entire purpose of 13(b) and

817

```
 1    the incipiency standard.  We have voluntary relief in place
 2    now.  We're asking this Court to extend it.  And rather than
 3    saying let the integration occur fully, let prices increase
 4    dramatically, the suggestion is we should study the industry
 5    more.
 6              And we have perfect data and will be able to go into
 7    court a couple years later maybe and say, wow, we were right,
 8    we were right, rates in Lucas County at both ProMedica and
 9    St. Luke's hospitals increased after this acquisition.
10              In United States versus Philadelphia National Bank,
11    again, I read this yesterday, a fundamental purpose of
12    amending Section 7 was to arrest the trend to a concentration,
13    the tendency to monopoly before, before the consumers'
14    alternatives disappeared through merger.  It's before.  13(b)
15    is don't see what happens, don't investigate further, don't
16    compare data, let's do it before anything happens.  We don't
17    have to prove things are definitely going to happen, we just
18    have to raise evidence going to the merits that there's
19    serious substantial questions here.
20              I was kind of curious.  What would we tell consumers
21    if we said, Your Honor, Mr. Marx had a great suggestion
22    yesterday, we withdraw our motion for preliminary injunction,
23    we're going to go back to the FTC and use our small team and
24    investigate ProMedica, St. Luke's, and Lucas County
25    competitive dynamics further.  And then after two years, or
```

1    one year, 18 months we were wrong, what do we tell these

2    consumers?  What do we tell employers and employees in Lucas

3    County?  I'm sorry that you're paying dramatically more for

4    healthcare cost, already an incredible burden on your family,

5    but we wanted to study it.  We had the option of saying

6    maintain the status quo, prevent price increases, but there

7    was a suggestion that we should study it.

8         How do we make them whole?  What's our answer to

9    them?  The harm from this transaction would be immediate and

10   it would be dramatic.  Higher healthcare costs for Lucas

11   County employers and employees are something they should not

12   have to pay through an acquisition.  Prices are already high

13   enough, and we talk about high prices in and of themselves are

14   not a violation of antitrust laws, but getting higher prices

15   through a merger is a violation of Section 7.  We will prove

16   that at the merits trial, and here, we have already raised

17   serious and substantial questions.

18        THE COURT:  Thank you, gentlemen.  We'll now take a

19   15-minute break, start promptly at 10:30.

20        (A recess was taken from 10:15 a.m. to 10:29 a.m., after

21   which the following proceedings were had:)

22        THE COURT:  Please be seated, everyone.

23        MR. MARX:  Thank you, Your Honor.

24        THE COURT:  You're welcome, Mr. Marx.

25        MR. MARX:  One housekeeping matter.  If I'm not

1    careful there's going to be a lot of housekeeping matters.

2    Everything keeps flipping around here.

3              I promised you yesterday that I would give you the

4    citation to the exhibit that says that 70 percent of the

5    patients choose their hospital by virtue of their selection of

6    a physician, and the exhibit number is Defendant's exhibit EE

7    lots of zeros 101.

8              THE COURT:  Thank you.

9              MR. MARX:  Thank you.

10             What I'd like to do with my hour and 45 minutes --

11   wow.

12             THE COURT:  There's no compulsion to use the entire

13   amount.  I want to make it clear.

14             MR. MARX:  Your Honor, they tell me that all the

15   time.  I'm used to it.  And there's a good chance that I won't

16   use all of it, but I'm not going to promise.

17             But what I want to do with the time that I do use is,

18   first, spend some time addressing in -- I don't think I can

19   find the right word to describe it, but I'll use scatter shot,

20   or disorganized or less organized fashion, several of the

21   points that Mr. Reilly and then this morning Mr. Perry and

22   then Mr. Reilly again made during the course of the

23   presentation yesterday.  Yesterday I really tried to present

24   sort of the affirmative story for the transaction from

25   ProMedica's perspective.  Today I want to respond to some

1    particular points that the Government's made that we think are

2    particularly relevant, and frankly, wrong.

3              Before I do that, though, after all of the

4    conversation yesterday and this morning, I just want to take a

5    minute to take a step back and remind the Court of what is at

6    issue here.  The Government seeks an injunction to halt

7    implementation of the joinder agreement between ProMedica and

8    St. Luke's.  To show that they are entitled to the relief that

9    they seek, the Court must find both that Plaintiffs have

10   demonstrated an ultimate likelihood of proving that the

11   joinder violates Clayton Act, Section 7; that is, that it will

12   substantially lessen competition in either the general acute

13   care inpatient services or inpatient obstetrical services

14   markets in Lucas County; and, second, weighing the public and

15   private equities, the entry of the injunction is in the public

16   interest.

17             That is, the Plaintiffs have to show that the effect

18   of the transaction may be substantially to lessen competition.

19   And the measure of whether the transaction might substantially

20   lessen competition is whether the transaction gives the

21   merging parties market power, which in the context of a

22   Clayton Act, Section 7 case is, means the power to increase

23   prices above a competitive level, whether the transaction

24   gives them that power.  We think it does.

25             I'm going to spend some time now responding

321

1    individually to some of the evidence that the Government has

2    cited in support of their claim that ProMedica will be able to

3    exercise market power as a result of its joinder with

4    St. Luke's.

5              So the first question, the first question I think we

6    need to address -- and I will have -- I don't know how many of

7    these slides I'm going to get through, Your Honor, or actually

8    use.  I don't know that I've provided you with a copy yet.

9    They will all show up on your screen, and before we're done,

10   I'll promise you I will give you a set of the ones we use.  I

11   don't want to burden you with ones that, frankly, I may not

12   use.

13             THE COURT:  Very good.  That's okay.

14             MR. MARX:  So let's talk first about the Government's

15   evidence about ProMedica's prices?  What is the evidence that

16   ProMedica, with St. Luke's, will have the power to raise

17   prices above competitive levels?

18             And the FTC's presented -- I don't mean to diminish

19   the role of the Ohio Attorney-General's office, but it's

20   really the Government has presented an expert report and

21   testimony of their expert to the effect that he calculates

22   that ProMedica can increase prices by about 71 percent.  And

23   the question is sort of where does that number come from?

24             Now, in support of that yesterday, the Government

25   presented a slide -- and I'll pay you as much for yours as

322

1    you're paying me to use mine today.  But they use the

2    left-hand side of the slide to suggest that high market shares

3    mean higher prices.  And I think the response to that is the

4    prices that they're looking at are not real world prices, they

5    are constructed prices.  Why do I say that?  Well, Professor

6    Town, their economist, admitted that the prices that he

7    calculated that are essentially reflected on that chart but

8    get to the 71 percent increase, are not based on prices that

9    are actually charged by any competitor in the relevant market.

10   Instead, he says that he constructed those rates for purposes

11   of his report.

12         And so slide two shows you the questions that we

13   asked him about that when I did have the opportunity to depose

14   him for a little over seven hours.  The question was whether

15   or not I'm going to find any of the average weighted prices

16   depicted on exhibit 4 -- and frankly, that's the source of the

17   bar chart that I think you saw yesterday -- in any of the

18   contracts negotiated between the hospitals in Toledo and the

19   managed care organizations.

20         Answer:  The prices in table four are unlikely to

21   appear in their exact form in any contract.

22         Well, I asked him, so there are not prices -- I had

23   trouble with this question.  There are not prices -- these are

24   not the prices on exhibit 4 to deposition exhibit 1 are not

25   the prices that hospitals and payors actually negotiated, are

1    they?

2          Answer:  My understanding is that hospitals and

3    payors negotiate many different dimensions to their contracts,

4    and this is one dimension which is the point of this exercise.

5    So, no, you are not going to see, you know, these actual

6    numbers in a contract, and they're not going to negotiate

7    these exact numbers that are reflected in the contract.  The

8    point of this exercise is to construct a price to make the

9    comparison.

10          The Plaintiffs then take those constructed prices,

11    which the Plaintiff's expert admitted cannot be found in any

12    contract and have nothing to do with the prices charged by any

13    actual hospital to any actual payor in the market, to create

14    the chart they showed you yesterday.  That's the chart 29,

15    it's the left-hand side of the first slide.  To support the

16    notion that high market shares purportedly, and I think I'm

17    quoting Mr. Reilly pretty accurately, perfectly predict high

18    rates.  That's what they say.

19          But what the real competitors in the real market have

20    said is that the difference in price between ProMedica and

21    Mercy is about five percent, and that Mercy and ProMedica

22    price about the same, and they are very competitive.

23          I'm not making that up.  One of the payors -- and I

24    think this slide will appear on your screen but it won't

25    appear on the public screen.  One of the payors was asked

1    about that, and this is what his response was.  How do the

2    rates that ProMedica has with unidentified payor compare to

3    the rates that Mercy has with unidentified payor?

4            ProMedica's rates are a step higher than Mercy rates.

5            What percentage difference might there be?

6            I'd probably put it at five percent.

7            That's not the only evidence that we have that the

8    constructed prices don't adequately -- accurately reflect

9    what's taking place in the market.  We have another slide.

10   This one I think we can show publicly, slide four, that came

11   from a report that St. Luke's commissioned to understand why,

12   even though it was generating more revenues from increased

13   patient volumes, it was unable to earn a positive return on

14   its operations.

15           Why was all that red ink continuing to appear in

16   2009, notwithstanding the fact that what the Government

17   describes as the turnaround plan was taking hold?  And this

18   slide contains third party survey data that shows the costs

19   and net revenues that hospitals in the Toledo area actually

20   incur and what they actually get.  And remarkably, the numbers

21   are pretty close.  They don't look anything like the

22   70 percent difference that we've seen.

23           As you can see, the net revenues that hospitals in

24   the Toledo area actually receive track pretty closely to the

25   costs that they incur to deliver that care, as you would

1    expect, since all of the hospitals' testimony in this case is

2    that they price their services generally to recover their

3    costs, direct and indirect, plus a small margin.  That's what

4    you see here.

5            Not surprisingly, the Plaintiff's expert chart of

6    constructed rates doesn't look anything like slide four.

7            THE COURT:  Well, let me ask you a question.

8            MR. MARX:  Sure.

9            THE COURT:  And this appears to me counterintuitive,

10   but increased concentration and therefore power through the

11   use of market share can lead to the ability to negotiate

12   better prices as between the institution and the insurer, the

13   plan.  The institution then has, do they not, two

14   alternatives, assuming they achieve better pricing:  One, pass

15   it on to the public; two, increase bottom line?

16           MR. MARX:  You're saying the instant~-- the hospital,

17   assuming that it can achieve higher prices, can either --

18   or -- I'm a little confused.

19           THE COURT:  Achieve lower prices --

20           MR. MARX:  Sure.  Can either pass them on or keep it

21   for the bottom line.

22           All right.  Let me see if I understand.  If we assume

23   that a hospital has market power and it exercises that market

24   power to charge higher prices to the insurer -- is that the

25   hypothetical that you want me to assume?  Then the question

1   becomes what does the hospital do with the increased revenues

2   that it generates through the exercise of that market power.

3          Okay.  Now, just so we're clear, just because it

4   charges higher prices, that doesn't mean that they're super

5   competitive, that they're anticompetitive prices.  Higher

6   prices we've all said, I think, are not necessarily bad.  But

7   you're right.  The hospital has a number of options.

8          It can reduce its -- it can either increase quality,

9   provide more services, expend that additional income to

10  provide more and better care to the community, it can drop it

11  to the bottom line without doing that.  But bear in mind that

12  here you're dealing with not-for-profit hospitals who have an

13  obligation to use their profits, and I'm using that term in

14  quotes because it's the excess of revenues over expenses, or

15  whatever it is that they call it.

16         THE COURT:  Uh-huh.

17         MR. MARX:  But they have that obligation to use that

18  for the benefit and -- for the public benefit.

19         And, yes, do they retain some of those earnings, if

20  you will, for future use?  Of course they do.  But they have

21  an obligation.  That's their mission.

22         You know, for UTMC, for example, they have an

23  academic mission.  They're going to use those funds, if they

24  can make a profit and the State doesn't take it away from

25  them, to further their educational mission, in addition to

```
 1    their healthcare mission.

 2              ProMedica, St. Luke's, they have an obligation to use

 3    whatever profits they have to fulfill their charitable

 4    mission.

 5              And that's what ProMedica has a history of doing.

 6    And remember here, ProMedica is the only competitor in Toledo

 7    that truly is completely locally owned, locally managed.  It

 8    doesn't have outside sources of -- you know, it doesn't have a

 9    parent in Cincinnati, it doesn't have the State behind it.

10    St. Luke's is local, too.  But even there, you know, you've

11    seen the situation it is.

12              And ProMedica really has the local interest at heart.

13    And that's the way it's always run its operations.  Maybe a

14    little differently than it was a few years ago, but that's the

15    mission, and that's the way that they would use those

16    revenues.

17              And I think we've seen that.  Already we've seen that

18    with respect to St. Luke's.  They've invested the $5 million,

19    they're committed to investing another 30 million, if they can

20    do it.

21              So the point here is that to the extent that they are

22    able to turn St. Luke's around, it will be for the public

23    benefit, not for -- not for shareholders, because they don't

24    have any.

25              Now, coming back to the issue about prices and
```

1    whether or not we're going to see this 71 percent price

2    increase, Plaintiff's entire theory of this 71 percent

3    post-joinder price increase is manufactured out of those

4    constructed prices that Mr. Town developed.  But his

5    prediction really has no basis in reality, and we submit that

6    the Court can't use that as a basis to decide that ProMedica

7    will likely be able to raise prices above competitive levels

8    as a result of this transaction.

9         Now, you could fairly ask whether the Government put

10    on a shred of evidence from any payor in the market suggesting

11    that they would agree to a 71 percent price increase from

12    ProMedica.  And I think the answer to that is no.

13         The next slide which you have in front of you but

14    they don't, we asked a not insignificant payor, what if the

15    bargaining hospital were making a demand about reimbursement

16    rates that unidentified payor considered completely

17    unreasonable and that hospital was unwilling to budge?  They

18    would walk away.  They'd be able to substitute Mercy-UTMC for

19    ProMedica and offer a competitive product in the marketplace.

20    They've done it before.  They've done it before, Anthem's done

21    it before.

22         There is still another payor witness who said, again

23    in the next slide in front of you, we will not give up price

24    just to have someone in our market.

25         And bear in mind, bear in mind, what the Government's

1    saying is for these 10 -- for these 10 commercially-insured
2    patients that St. Luke's admits every day, if I've got my
3    numbers right I think it's four for MMO, we know they're
4    protected for the next four years because they just
5    renegotiated the contract; maybe two for Anthem and one -- one
6    admission every day, do you really think that ProMedica's
7    going to be able to go to them and say, we've got one more
8    patient today than we had yesterday, you've got to pay us
9    70 percent more as a result?
10         Does that make sense?  It doesn't make sense to me.
11   It just doesn't make sense to me.  I don't think it will
12   happen.  I don't think they've proved it can happen.
13         Second point, new point.  Let's talk about Mercy's
14   competitive presence.  This is -- one of the difficulties that
15   we have with the Government's case is they take a series of
16   snapshots, but they don't really, they don't really provide a
17   dynamic assessment of the marketplace.  And that's what you
18   need to do, and that's what the cases say that we need to do.
19   You've gotta see how competition is changing and how it works
20   over time dynamically.
21         I want to show you on slide seven -- you can see it;
22   I can't~-- the competitive presence of a major competitor in
23   southwest Toledo.  And what this document is -- well, let me
24   lay a foundation here.
25         Mr. Reilly showed you a snippet of a little piece of

1    this document from this competitor during his presentation,

2    ostensibly to suggest that the competitor is not significant

3    and thus, not a constraint on ProMedica's ability to set

4    prices in this little southwest corner of Toledo.  And I want

5    to discuss that, that evidence, that proposition, but first, I

6    want to make a couple of points.

7         We talked about this I think yesterday, you and I,

8    when I was talking.  Southwest Toledo, where the six to eight,

9    or 10, however many zip codes there are right around

10   St. Luke's, is not the relevant geographic market in this

11   case.  Mr. Reilly's right.  Mr. Perry's right.  We agree, at

12   least as it relates to general acute care inpatient services,

13   Lucas County is the relevant geographic market.  And what that

14   means is that all of the hospitals in Lucas County must

15   compete across that entire geographic market or the market's

16   incorrectly alleged.

17        In other words, neither ProMedica, nor St. Luke's,

18   nor any other competitor in the market is able to raise

19   prices, will be able to raise prices in those eight zip codes

20   immediately surrounding St. Luke's because we all agree that

21   if somebody tried to do that, patients who live in those eight

22   zip codes would be able to go to the other zip codes in Lucas

23   County.  That's what we mean when we define -- when we agree

24   on a relevant market definition.

25        So any notion of saying, well, St. Luke's has this

1    market share in these six or eight or 10 counties, and

2    ProMedica has that market share or Mercy has that market

3    share, it means nothing, it's irrelevant.

4           The further point about this snippet, however, is

5    what it reveals about the FTC's static approach to the

6    analysis in this case.  Remember, they have to show that as a

7    result of this transaction, as a result of this transaction,

8    going forward into the future, ProMedica will be able to

9    exercise market power.  And none of the other competitive

10   dynamics that exist in the market will be able to stop the

11   exercise of that market.  They have to show that none of the

12   other competitors will make a competitive response that will

13   constrain -- I'm sorry, I'm trying not to go that fast -- that

14   will constrain ProMedica's ability to raise prices above

15   competitive, whether it's Mercy, or UTMC, or whether it's the

16   Anthem and MMO, who certainly have bargaining leverage on

17   their side.  They represent 20 percent of the commercially

18   insured market each.  You know, they have some bargaining

19   power.

20          Whether it's the physicians who practice at all of

21   the hospitals and therefore are in a position to take patients

22   and say, if ProMedica tries to charge too much, we can admit

23   you to Mercy's hospitals.  They all act as a competitive

24   restraint.

25          But the FTC completely ignores -- let me come back to

1    this document as it relates to a particular competitor, what

2    this document actually demonstrates about competitive

3    conditions in the marketplace.

4         Let's see slide eight.  Slide eight, the full

5    document, now, is notes of a competitor's board retreat from

6    March of 2010.  The sentence that Mr. Reilly put on the screen

7    is from the top of the third page of the document, as you can

8    see from the bottom of this slide.  That's the one that

9    so-and-so's current market share of this sector is blank, with

10   ProMedica having a bigger share and St. Luke's having a bigger

11   share.

12        But on the page before the one that Mr. Reilly showed

13   you, in fact, the sentence that comes right before the

14   sentence that he showed you, let me direct you to the sentence

15   in the middle of the page, which is what this competitor said.

16   And that is:  We intend to grow our market share, and so on,

17   by achieving 36 percent market share.

18        This demonstrates precisely the kind of competitive

19   response reflecting the actual market dynamics that show why

20   the FTC's singular focus on high market shares simply doesn't

21   answer the question, what's likely to be the effect of this

22   transaction.  And this isn't the only document like this that

23   we have even for this competitor.

24        In the next document I'm showing you on your monitor,

25   this competitor lays out its competitive response to the

1    possibility that ProMedica will acquire St. Luke's.  This was

2    this competitor's white paper strategy.

3         The competitor recognized the challenges ProMedica

4    faced in taking on the competitively weak St. Luke's.  And, by

5    the way, these are many of the reasons this particular

6    competitor walked away from, wasn't really interested in, and

7    frankly, I don't think they've changed their mind no matter

8    what it is they tell you about their interest in St. Luke's.

9    If they're interested, they're only interested because we're

10   more interested, including the ones we've highlighted on the

11   slide.

12        Several years of operating losses without any

13   substantive actions to mitigate them, extensive capital needs

14   for a large aging plant and medical equipment evidenced by the

15   extended and consistent series of operating losses.  The

16   management of St. Luke's has been indecisive, evidenced by the

17   extensive and consistent series of operating losses.  They've

18   been indecisive.  I don't know if that was the reason.

19        If we look at the next slide, this looks at the next

20   page of the same document.  And you'll see that after walking

21   through all of the challenges faced by St. Luke's Hospital,

22   this particular competitor concluded -- and this is extremely

23   important -- certainly, one would be able to make a very sound

24   argument that from a community need, these beds could be

25   eliminated from the Toledo inventory and not be missed except

1    for the pride the Maumee community takes in its hospital.

2    I'll come back to that in just a minute, but I think that's

3    telling.

4           And actually let me just digress, because you've

5    asked the question, and I might as well answer it now.  If the

6    Court issues the preliminary injunction to block this

7    transaction, what's likely to happen?

8           It's true that while ProMedica has not included

9    expansion at Arrowhead or a reconstruction -- or the

10   construction of a new patient tower at Flower on its strategic

11   plans for the last couple of years.  It's also true that

12   ProMedica isn't much into strategic planning.  They don't do

13   some of the kinds of strategic plans that I've seen lots of

14   hospitals do.  That doesn't mean, however, that they hadn't

15   thought about it, didn't plan for it, weren't planning for it

16   before 2008 came and went, and doesn't mean that one of the

17   reasons they're pursuing this deal because they recognized

18   they need to have a stronger physical presence in the

19   southwest of Toledo, where the growth is.  To the extent

20   there's growth, this is where it is.

21          They certainly have been and continue to consider

22   those plans.  You know, they just built Bay Park Hospital 10

23   years ago.  So they know what it takes to build a hospital

24   like that, and that's, frankly, the kind of hospital they were

25   contemplating as I understand it for Arrowhead.

835

1            If this deal doesn't go forward it's fair to assume

2     that ProMedica will pursue one of those two options.  They've

3     said that, I'm representing it.  I wouldn't be saying it if

4     there wasn't evidence to support it.  I think the documents

5     support it.

6            There's no question I think we've seen that other

7     competitors have an intent to pursue the strategy in that

8     growth area, as well.

9            What does this mean for St. Luke's?  St. Luke's is

10    not going to be able to continue to compete successfully for

11    the long term, Your Honor.  It's just not going to happen.

12    St. Luke's, remember, is effectively the smallest of the four

13    hospitals.  It has one hospital, ProMedica has three, Mercy

14    has three.  UTMC is an academic medical center.  It's

15    different.  May only have one, but it's a different one.

16           St. Luke's doesn't have the range of services that

17    Mercy offers as a system, that ProMedica offers as a system.

18    It doesn't have the geographic coverage that either of those

19    two offer as a system.

20           And you can see that UTMC from one of those overlap

21    maps that I showed you yesterday sort of dwarfs St. Luke's

22    patient draw area in large part because of the broader

23    services that Mercy offers, as well.

24           Also important, but I'm not even going to say most

25    important, also important, St. Luke's doesn't have the

836

1  financial wherewithal on its own to reposition itself as the

2  market demographics change.  And we've seen some of that

3  already.  And it isn't prepared, it isn't prepared and it

4  doesn't have the financial capability to invest to prepare for

5  healthcare reform, which is another game changer.

6       You know, 2008 was significant obviously to the way

7  that hospital . . .

8       Healthcare reform is going to be just as significant

9  in a somewhat different way.  It's going to require a massive

10  investment in information technology infrastructure and

11  operations, very expensive.  I'm told that it's essentially

12  the most expensive item that hospitals have to invest in over

13  the course of the next five years.  And if they don't, then

14  they're going to find themselves with decreased, decreased

15  reimbursement from an already under-paying government.

16       Simply put, what all of this means, I think, is,

17  consistent with what we said, Toledo can't support anymore

18  four independent hospital systems.  St. Luke's ultimately will

19  have to be less in the future than what it was on August 31st,

20  2010, the day of the joinder.  It's got to be less.

21       The Government consistently says you can trust

22  Mr. Wakeman, you can trust Mr. -- the one point that they

23  haven't been willing to trust him on, though, was what he said

24  to the board finally, what he said during his deposition, if

25  we don't close some of these services that are unprofitable as

```
1   we stand alone, if we don't close some of these service lines,
2   whether it's obstetrics, cardiovascular surgery, diabetes,
3   occupational health, there were six of them if my memory
4   serves, but if we don't close these, we're going to close our
5   doors in three to four years.
6          Now, Mr. Dagen can run his computations, but the
7   Government has said, you know, Mr. Wakeman's the guy.  And
8   that's what he said.  And that's what we think is likely to
9   happen, because we don't think that St. Luke's is going to be
10  able to compete against ProMedica, Mercy and UTMC and the
11  resources that they bring to bear in the longterm without this
12  transaction.
13         So the short answer to your question I think is entry
14  of the preliminary injunction that the Government is
15  requesting really is not in the public interest.  St. Luke's
16  is going to go away, and as one competitor has said, those
17  beds won't be missed, we don't need them.
18         Now, I digressed.  Let me finish that point.
19  Hopefully, I've answered your question.
20         The next slide, which is slide 11, again still from
21  this strategy paper, demonstrates three key points.  First,
22  that the other competitor intends to expand in southwest
23  Toledo and to increase its market share.  Second, that the
24  competitor views the market as newly competitive.  And, third,
25  that by expanding its presence in the area through hiring
```

1   physicians, this competitor apparently believes it can compete
2   effectively, attracting patients from the area without even
3   the need to invest in a brick and mortar facility.
4         It's important to bear in mind that entry doesn't
5   require new entry.  The case law establishes that expansion by
6   existing competitors in the market is the functional
7   equivalent of entry.  That's what the Baker Hughes case says.
8         Thus, this particular competitor's plans show that
9   expansion is already occurring, and this Court should not
10  ignore its likely competitive significance.  This is the sort
11  of dynamic analysis that the Government failed to pursue in
12  the cases that it's lost and the Court must take into
13  consideration in evaluating its ultimate likelihood of
14  success.
15        THE COURT:  One of these points you've just made goes
16  back to something with which I had disagreed with you before
17  and continue experientially to disagree.  When a hospital
18  acquires a practice, my guess is that they will, in
19  negotiation of the acquisition of that practice, direct
20  admissions only to that hospital.  That is why this last point
21  on slide 11 makes sense, and only why.
22        MR. MARX:  Okay.  And let me respond directly that,
23  because I don't know why I -- it's so easy for me to get them
24  to agree with me and I am having so much trouble with you.
25  But that's okay.  I'm going to try and change that.

1          Can we get slides 34 and 35 for a minute, please?

2    Thirty-four and we'll go to 35.

3          I understand.  As I get older, I become less

4    persuasive, I think.

5          THE COURT:  There's another institution that I am --

6    forget it.

7          MR. MARX:  First, first, just so there's no

8    misunderstanding about this, the FTC has not, has not raised

9    any concerns at all about the effects of this joinder on the

10   market for physician services.

11         THE COURT:  I understand that.

12         MR. MARX:  I just want to be sure that that's --

13         THE COURT:  That's not the reason I raise the issue.

14         MR. MARX:  I know, and I'm going to come to that

15   reason right now.

16         As we said, physicians and patients have the right to

17   see each other at almost all hospitals, and I've said that's

18   pretty unique here.

19         But specifically with respect to the agreement that

20   ProMedica enters into with respect to the physicians

21   practices, physicians that it acquires, I want to direct your

22   attention to slide 35.  And that is -- where that says -- and

23   this is an excerpt from the agreement that it enters into with

24   its employed physicians.

25         And it's true, it's true that in order to promote the

1    delivery of efficient cost effective and quality care -- you

2    can read this because I'm reading it -- for patients from

3    ProMedica and so forth, physician agrees to utilize services

4    available from ProMedica and its affiliates.  Not unusual for

5    an employed physician.  Except when use of a different

6    provider is required by the terms of a patient's enrollment or

7    participation in an insurance or other healthcare plan.

8           So, for example, if, if -- if ProMedica and Anthem

9    can't reach an agreement and the Anthem insured's physician is

10   a PPG physician, ProMedica physician group physician, then

11   that physician has to send that patient to a facility with --

12   that has a contract.

13          THE COURT:  Well --

14          MR. MARX:  Okay.  Or if the patient, on his or her

15   own initiative, requests to use a different provider, the

16   physician has to honor that request.

17          So while it is true, while it's true that employed

18   physicians are encouraged, you know, contractually encouraged

19   to use their employer, they don't have to, they don't have to

20   under two critical circumstances.  If the payor -- and that's

21   why this is so important.  That's why the fact that payor --

22   that physicians have privileges at other hospitals is such an

23   effective constraint.  And ProMedica's agreement with its

24   physicians will ensure that that constraint continues to

25   exist.

1          So hopefully now, I've responded a little better to

2     your question or a little --

3          THE COURT:  This I was aware of.

4          MR. MARX:  Well, but I think that goes to the

5     question, is there incentive?  Yes.  There's no question.  But

6     that's what you would expect, and that's one of the reason why

7     you vertically integrate, because you can deliver the care

8     more cost effectively.  That's a benefit to consumers, and

9     presumably that will reduce the cost of delivery.

10         But -- so that was one of the points I was going to

11    cover.  We've covered it a little early.  That's great.  Let's

12    go back to a different point.

13         Quality.  Your Honor, one of the Plaintiff's

14    oft-repeated themes in this case is that this case involves

15    the merger of the low-cost, high-quality hospital with the

16    higher-cost, lower-quality system.  That may have been true in

17    the past, however, the most recent quality data on both

18    outcomes and patient satisfaction call that perception into

19    question.

20         Now, you didn't hear about this yesterday, and this

21    is another example of Plaintiff's continuing failure to

22    consider probable future market dynamics.  But Mr. Oostra,

23    when he was deposed, was asked about how he views the

24    significance of relatively small St. Luke's.  Do you really

25    believe that folding St. Luke's into your hospital system will

1    allow you to better coordinate care and improve on the quality

2    and methods you've been seeking to improve on?

3         Absolutely.

4         Why?

5         Yesterday I got a report on the first fold-in of

6    St. Luke's and ProMedica.

7         This is since St. Luke's has been -- and it covers

8    the time period actually preceding the joinder.  And basically

9    what Mr. Oostra is saying is St. Luke's scores weren't as good

10   as they have been.  I think what we'll ultimately see is, and

11   the data that I saw, was that St. Luke's was the second worst

12   of all of ProMedica's hospitals during that time period on

13   these scores.

14        But as Mr. Oostra said, HCAP's scores, which are the

15   patient satisfaction scores, that we see are the lowest in our

16   system.  So they came to our system, their HCAP scores are the

17   lowest.  Their quality metrics as we look as quality metrics

18   is the second lowest in our system.

19        So St. Luke's has entered the system and for the time

20   period just preceding the joinder, their scores were lower.

21   Again, frankly, that would have been a predicted effect given

22   the deteriorating financial condition.  Again, bear in mind,

23   2009, as the data showed, St. Luke's lost about -- their

24   operating income was about negative 15-something million

25   dollars.  Our concern was that it was going to have an impact

1    on quality.  It appears that it might have because they

2    weren't able to do things that make investments that they

3    should have made, and so on.

4        Hopefully, that won't become a trend, it will only

5    become a point in time, and we'll be able to turn that around.

6    But quality is important, and we were concerned about where we

7    are.

8        I gave you one example yesterday, and Mr. Reilly

9    turned to it today, so I'll give you one last chance to

10   explain how the difference in our -- what I was conceding.

11       You know, this whole issue of have I conceded the

12   presumption of whatever.  And he's right, we agree on market

13   definition for the most part, we agree on~-- we agree on the

14   geographic market, again, except for OB services.  We'll just

15   carve that out for now.  And we agree on the static market

16   share computations.  Okay?

17       And so the question, as best I can tell, is, well,

18   haven't I just conceded that there's a presumption of

19   illegality?  And let me make clear exactly why I haven't.

20   I've said it once.  I said it at the TRO hearing and I

21   repeated it yesterday, and I'll just say this.  The Government

22   says that those high market shares create a presumption of

23   anticompetitive effects.  That's what they say.  What I say

24   is, but the cases all hold that high market shares and market

25   concentration only create that presumption when they

1     accurately predict future competitive effects.

2             And my point is, the market shares in this case, the

3     market concentration ratios in this case do not accurately

4     predict future competitive effects. And in the absence of

5     that, I haven't conceded that there's any presumption that the

6     Government's entitled to.

7             Okay. But that's not the only instance, it's not the

8     only instance where we think the Government has overreached a

9     touch in trying to construe and present the evidence. So let

10    me give you a few more. And I don't mean to suggest that

11    these are the only instances that they've overreached, but

12    they are some of them.

13            You've heard and read several times that it was part

14    of St. Luke's, and I'm quoting now, "internal strategic plans

15    unambiguously to raise its prices and stick it to employers.

16    That is, to continue to -- to continue forcing high rates on

17    employers and insurance companies." That's the end of the

18    quote. Plaintiffs allege this in paragraph 3, I think, of

19    their complaint, and they've said it now several times.

20            In their pretrial brief -- well, a closer examination

21    of the source of this allegation reveals that the quote did

22    not come, it did not come -- you can put that back up -- from

23    an internal strategic plan. Where it came from was the notes

24    of a due diligence meeting that do not even make it clear who

25    may have made this statement that has now become a headline.

1             The FTC argues that -- they said it in their brief,

2    prehearing brief, at page 6, that a strategic goal for

3    ProMedica in 2011 is to obtain a substantial rate hike for

4    St. Luke's.  That's the second one of these overreaches, a top

5    strategic goal for ProMedica in 2011 is to obtain a

6    substantial rate hike for St. Luke's.

7             We thought this was interesting, because we weren't

8    aware that that was a top strategic goal for ProMedica.  We

9    also don't remember ever saying anything like that.  So we

10   took a look at the documents that the Government cited in

11   footnote 34, and on the slide you can see we brought the

12   footnote up for you.

13            So slide 14 is PX1113.  And it's actually a

14   St. Luke's document.  You can sort of tell that, I think, if

15   you see all the Bates numbers, but it's a St. Luke's document,

16   not a ProMedica document.  And additionally, it simply states

17   that, quote, "rates will be in excess of Medicare

18   reimbursement levels for patient care."  It doesn't say

19   anything at all about ProMedica's strategic goals, which is

20   what it cited -- which is what it's apparently cited to

21   support.  So I don't see how this particular document supports

22   the proposition stated in the brief, which was, a top

23   strategic goal for ProMedica in 2011 is to obtain a

24   substantial rate hike for St. Luke's.  That's a St. Luke's

25   document, not a ProMedica document.

846

```
 1              THE COURT:  But many Medicare-insured patients also

 2    have secondary coverage to take up the slack between that

 3    which Medicare authorizes to pay and that which is charged; am

 4    I correct?

 5              MR. MARX:  You are correct.

 6              THE COURT:  Okay.

 7              MR. MARX:  But, but again -- and I'm not contesting

 8    that point.  What I'm suggesting here is the Government's

 9    saying that a top strategic goal for ProMedica is to obtain a

10    substantial rate hike.  The support they're citing for that

11    proposition is, number one, in the first, a St. Luke's

12    document, not a ProMedica document.  So to make the leap from

13    St. Luke's saying it to being a top strategic goal for

14    ProMedica, I think is a stretch.

15              But they also then cite PX169-002, the second

16    document seems to be the source of the statement in its brief.

17    But again, again, a closer look at this document reveals that

18    it was a St. Luke's document, not a ProMedica document, and

19    it's a St. Luke's document that was prepared before the

20    joinder.  It doesn't say anything about ProMedica's goals.

21              And, you know, I'm pretty touchy about that.  It's

22    one thing to say that St. Luke's wanted to pursue the joinder,

23    it thought if it pursued the joinder it would be able to

24    increase its rates.  It's a whole other thing to say that

25    ProMedica pursued this deal to increase St. Luke's rates.  And
```

1    that's where we do seriously disagree, because I don't think

2    there's any evidence to that.  And to suggest that somehow

3    there is and then cite back to these St. Luke's documents, I

4    don't think that's right.

5         And, finally, finally, the FTC cites in that

6    footnote 34 -- this is slide 17 -- to an e-mail between two

7    ProMedica employees.  One ProMedica employee is discussing a

8    meeting he had with Dennis Wagner, the finance director for

9    St. Luke's Hospital, to discuss the turnaround financials from

10   St. Luke's.  And it reveals that the estimated nine to 10

11   percent increase for 2011 to two payors was based on, and I'm

12   quoting here, the hope they can negotiate this level of

13   increase with our health.  Medicare -- and then it goes on to

14   say, there was no real basis for that assumption.

15        The conclusion I draw from an examination of the

16   documents in footnote 34 is, you cannot infer from these

17   documents that it was, quote, a top strategic goal for

18   ProMedica in 2011 to obtain a substantial rate hike for

19   St. Luke's.

20        Now, that wasn't the only example, I said I'd give

21   you a couple more, and I will, of the FTC's overreaching.  Let

22   me direct your attention to slide 18.

23        One example is that the FTC claims that payors are

24   concerned about a hypothetical rate increase at St. Luke's.

25   And yesterday they used a declaration from one of the payors

1    to support this point, and I think you have the excerpt from

2    the declaration on your screen, and you can see that concern

3    expressed there.  I expect PHS to increase St. Luke's rates

4    significantly by at least 20 percent and also to increase the

5    rates at existing hospitals.

6         Now, what's the reality?  Well, the reality is that

7    this particular payor that expressed this concern didn't admit

8    any patients to St. Luke's during the time period of 2007 to

9    2009.  How do we know that?

10         Is this one up there for him but not for me?  I hate

11   it when they do that.

12         We look at the slide that is 21, I think, that shows

13   St. Luke's inpatient discharges by payor.  You see that 2007,

14   '8 and '9?  If you go back to slide 19, Your Honor, and you

15   look at who the identity of the payor, whose declaration it

16   is --

17         THE COURT:  Uh-huh.

18         MR. MARX:  -- you will not find that name listed

19   among the payor group, which means they didn't admit any

20   patients to St. Luke's.

21         Now, another theme that the FTC has emphasized is

22   that employers are concerned -- I think we can take that slide

23   down off the screen -- is that employers are concerned about

24   the increased leverage ProMedica will have with the addition

25   of St. Luke's.

1              Now, the FTC submitted declarations from employers

2     that purport to be concerned about that leverage, and in one

3     of them -- not showing it publicly -- the employer says, I am

4     concerned that the merger will increase ProMedica's leverage

5     with health plans, leading ProMedica to charge higher rates at

6     its hospitals, including newly acquired St. Luke's.

7              The reality is, employers don't have any knowledge

8     about what we charge the payors, they rely on the payors to do

9     their negotiating for them.  They don't negotiate, the

10    employers, directly with any of the hospitals, whether it's us

11    or any of them.

12             And, in fact, I think that's what this very same

13    employer said in the supplemental declaration that we

14    submitted.  I don't know of anything specific in terms of

15    whether ProMedica has any leverages in the hospital service

16    market.  That's at slide 25.

17             And one more example, one more example to examine the

18    FTC's claims that differ with reality.  They claim that

19    ProMedica will raise rates after the joinder with St. Luke's,

20    and payors will be powerless to resist this rate increase,

21    that payors will be forced to accept any rate ProMedica

22    charges -- demands.

23             The reality is, the reality is payors will refuse to

24    accept ProMedica's rates for St. Luke's.

25             Let me try and take you through this.  This is a

1   little bit messier, I think is the way that I would describe

2   it, but I'm going to try and work you through it so that you

3   see how these negotiations and discussions actually work.  At

4   least it will give you one example.  I don't think we've seen

5   many yet.

6         The first slide that you have in front of you, slide

7   28, is -- it's the beginning of a series of e-mail

8   communications between Amy Hutt, H-u-t-t, ProMedica's

9   corporate director of payor relations who was asking a payor

10  what would get St. Luke's closer to the other ProMedica

11  hospitals in terms of their form of compensation.  ████████

12  █████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████

15        ████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████

19  ██████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ██████████████████████████

24        ████████████████████████████████████████████

25  ██████████████████████████████████████



352

1 ████████████████████████████████████████

2 █████████████████████████████████████

3 ████████████████████████████████

4 █████████████████████████████████████

5          This is not the kind of exchange that you would

6 expect to see if ProMedica was exercising or able to exercise

7 the market power that the Government now claims it has because

8 it's treating 10 more, 10 more commercially-insured patients a

9 day and one more, actually, from this particular payor, if

10 I -- maybe even less than one, if I remember the particular --

11          So as to this, okay, as to this particular payor,

12 this isn't ███, it's not ██████, it's one of the smaller

13 payors.  If ProMedica's ever going to be able to exercise

14 market power, it's going to be with somebody like this, one of

15 the one peoples or less than one peoples that we showed you on

16 that slide as we broke down those.  Didn't happen.  Didn't

17 happen.

18          Okay.  Another point.  This was one I messed up

19 yesterday so I want to clean it up.  I've got to be sure to

20 clean it up.

21          The issue here, the Government says that four-year

22 contract that we negotiated with MMO, that's just manipulated

23 evidence.  They're saying -- and you can't trust -- you can't

24 trust what we say about not raising rates to super competitive

25 levels.

1          They mischaracterize our position to begin with.  We

2     argue that St. Luke's would seek and likely attain rates that

3     cover its cost, its costs, and contribute to St. Luke's

4     reinvestment, not ProMedica -- not the cost that ProMedica's

5     incurring in its other hospitals.  ProMedica will use the

6     standard industry methodology to determine St. Luke's prices,

7     covering its costs and providing margins.  That's what we did

8     when we negotiated St. Luke's four-year contract with MMO.

9          Now, just so we're clear, St. Luke's, back in 2009

10    when it negotiated a new contract with Frontpath, before the

11    joinder but after St. Luke's realized, belatedly, that its

12    contracts weren't generating sufficient revenues to cover its

13    costs, St. Luke's on its own negotiated a contract with

14    Frontpath that provided a cost coverage rate of 126 percent.

15         We've never said that an independent St. Luke's can

16    raise prices to ProMedica's rates.  We've never said that

17    ProMedica can take St. Luke's rates to the level of the Toledo

18    Hospital.  Couldn't, wouldn't, can't.

19         And to be clear, because I think the question came up

20    yesterday, and we do agree with the Government on this, we're

21    not asserting any sort of not-for-profit hospital defense.

22    What we are saying, though, is if you look at the contract

23    that St. Luke's negotiated on its own in 2009, before it was

24    talking to us, with █████████, that generated a cost coverage

25    rate of 126 percent, that would appear to be a market

1    competitive rate.  That's the kind of rate that St. Luke's

2    could have negotiated on its own.

3         To the extent that after this joinder, ProMedica

4    attempts to negotiate contracts with third party payors like

5    it did with ███, that after two years will get us to a

6    117-percent cost coverage ratio, where is the exercise of

7    market power?  How is that a super competitive price?  It's

8    less than what St. Luke's negotiated on its own with ████████

9    before they talked to us.  So it's not manipulated evidence.

10   We're going to have that contract for four years.  And it's

11   not super competitive.  It's not super competitive either.

12        And this goes to a subtle point that the FTC is

13   trying to persuade you of, I think, wrongly.  And that is that

14   the FTC is trying to create a new legal standard for a Clayton

15   Act, Section 7 violation.  Their standard is anytime you have

16   a merger with high concentration levels and prices go up

17   afterwards, Clayton Act, Section 7 has been violated.  Doesn't

18   matter how much the price goes up.  If there's a merger and

19   after the merger the prices go up and you've got high market

20   shares, you've got a Clayton Act, Section 7 violation.

21        That's just not the law and it's not right.

22        Here -- and the ████████████ example demonstrates

23   exactly why not, because before the transaction, St. Luke's

24   negotiated a new contract with ████████ all by itself, the

25   prices went up.  They went up to a 126-percent cost coverage

1    ratio.

2            After the transaction, ProMedica comes in, negotiates

3    a new contract with ███.  Prices went up, yes, they did, to a

4    cost coverage ratio less than what it was that St. Luke's had

5    negotiated with ████████.

6            The Government would say that's a violation.  It's

7    not a super competitive price.  How can that be a violation?

8            And what's particularly troubling about this in the

9    way the Government's approached it is, they would say -- maybe

10   Matt will come back up and say that I'm not telling the truth

11   about this, but I hope not.  They would say they actually

12   assumed for purposes of doing their financial analysis of

13   St. Luke's going forward, they assumed that St. Luke's is

14   going to increase prices by maybe seven and a half or

15   10 percent.

16           So if St. Luke's can do it on its own, if

17   ProMedica -- if after the transaction ProMedica's doing the

18   same thing, how is that resulting in an anticompetitive

19   effect?  I don't see it.  It shouldn't be a violation.  I

20   don't think it is a violation.

21           Oh, okay.  We're going to go to slide 33.

22           The Government pins its hope on St. Luke's financial

23   recovery on Mr. Dagen's analysis, and they keep telling you

24   that all the market indicators have turned around in 2011.

25   I'm sorry, 2010, and they're going to keep trending that way

```
1    in 2011.  And I just want to make one point about this.  One
2    point in time, one data point, if you will, does not make a
3    trend.  This is not the first time -- 2009 was not the first
4    time that St. Luke's was in the red in the last decade.  And
5    this is the chart that my friend, Amy Carletti, showed you
6    yesterday.  And there's more red on this page than there is
7    blue.
8            And just so we're clear about this, 2008 was a bad
9    year.  Everybody had trouble in 2008.  St. Luke's had more
10   trouble than it had in 2007.  But not in 2009.  Everybody in
11   Toledo made money in 2009, except for St. Luke's, when it
12   almost doubled its loss from 2008.
13           So as I said, one point is not a trend.  Maybe things
14   were getting better, but there were reasons why they were, and
15   it's not clear that they would have continued that way in the
16   future.
17           Okay.  Oh, I should do this.  Let's do slides 36 to
18   40, and then we're going to talk about the remedy.
19           The FTC's sort of suggesting to you that ProMedica --
20   they're certainly saying that ProMedica's the worst possible
21   partner for St. Luke's.  They also seem to be suggesting that
22   through the St. Luke's documents and otherwise, that, you
23   know, we're the only ones that would be able to exercise
24   market power in this market as a result of this transaction;
25   and that's just not right.
```

357

1          If you look at the way that St. Luke's analyzed the

2     alternatives that it had available to it in 2009 once it

3     finally realized its stand-alone strategy wasn't going to work

4     anymore, it looked at UTMC.  And the document makes clear that

5     even with UTMC, as it's looking at the pros and cons of the

6     different affiliation partners, that with UTMC they'd be able

7     to increase prices and cost to the community.

8          So UTMC was, while the Government likes them as a

9     potential partner, St. Luke's certainly thought that they were

10    going to be able to increase prices, and they say so on the

11    very next slide.  It says, again, potential for more favorable

12    managed care contracts, including, perhaps, Paramount.

13    Because remember, UTMC was part of the Paramount network.

14    Paramount contracts with ProMedica's hospitals and with UTMC

15    because of some of the unique services that it provides.

16          Okay.  What about Mercy?  Well, when St. Luke's was

17    looking at Mercy, it said -- sounds familiar -- could increase

18    prices/cost to the community.  So it really didn't view Mercy

19    much differently, and that's reflected in the next slide where

20    it builds it out a little bit, and it says, Mercy's system

21    would increase leverage with result being potentially higher

22    rates.  That's St. Luke's talking, not us.

23          Now, we looked at the market shares and tried to

24    determine whether or not any of the other possible

25    transactions with local providers would create what I like to

1  call a guidelines violation.  I call it a guidelines

2  violation, because the fact that it's a guidelines violation

3  doesn't mean it violates the law, it just means that the FTC

4  and the antitrust division don't like it and they want to

5  investigate it more.  The guidelines are not the law.

6        So we looked at a combination of ProMedica and

7  St. Luke's, and here you see I think we agree with the

8  Government on this.  I think we took their numbers.  The

9  post-acquisition HHI is 4400, and the change was big, and then

10  if you look at it in obstetrics, it's even bigger.

11        But if you look at a Mercy-St. Luke's transaction,

12  the post acquisition HHI would be 4000 and the change would be

13  663.  That's a guidelines violation, too.  It's as much of a

14  guidelines violation almost as ours.

15        And if you look at UTMC and St. Luke's, they end up

16  post-transaction at an HHI of 3600.  That's under the new

17  merger guidelines.  That's highly concentrated market.  And

18  the change is 302.  And I think, I think, I think Mr. Reilly,

19  if you asked him, would say, would that presumptively be

20  anticompetitive, that UTMC-St. Luke's transaction with those

21  numbers?  I think that's what the guidelines would say.

22        Of course, they don't do obstetrics, so we don't have

23  a number there.  But if you looked at Mercy and St. Luke's for

24  obstetrics, again, it's off the chart, and it's definitely a

25  guidelines violation.

359

```
1              That's enough about rebuttal points.  I could
2    probably go on, but I'm running out of time.  So I want to
3    talk about the remedy and I want to talk about this
4    preliminary injunction.
5              Your Honor, it would be -- it's difficult to talk
6    about the proposed preliminary injunction without actually
7    looking at it.  I don't know if you have a copy.  I do have a
8    copy that I'd like to -- if you have a copy handy, that's
9    great.
10             I suspect you guys have one.
11             MR. REILLY:  What's this?
12             I'm kidding.
13             MR. MARX:  We red lined it just a little.
14             If you don't, Your Honor, I do have one for you.
15             THE COURT:  I have one in this mass of paper
16    someplace.  Give me just a minute.
17             MR. MARX:  If you want, I have an extra one for you.
18             You've got it now.
19             THE COURT:  Thank you.
20             MR. MARX:  Thank you.
21             Your Honor, an injunction is not necessary and we
22    believe will do more harm than good in this case.
23             In the ordinary case, in the ordinary case, the
24    purpose of the injunction is to prevent the acquiring entity
25    from causing the acquired entity to waste away during the
```

1    pendency of the Part III administrative proceeding so that a

2    viable remedy exists if the FTC prevails in the litigation.

3    That risk simply does not exist in this case.

4         ProMedica has no incentive, particularly in light of

5    the joinder agreement -- and I will talk about this a little

6    bit more, although I feel like we've talked about it quite a

7    bit -- to make St. Luke's a viable competitor -- to make

8    St. Luke's a less viable competitor than it was the day the

9    parties consummated the joinder agreement.  ProMedica simply

10   has no incentive not to improve St. Luke's, as it's already

11   begun to do.

12        The purpose of a preliminary injunction in a hospital

13   merger case like this one is to preserve the availability of

14   an adequate remedy, to return to the level of competition in

15   the market -- to return the level of competition in the market

16   to what it was at the time of the legal challenge if, if the

17   FTC ultimately prevails following a full trial on the merits

18   of its claim.

19        The Plaintiff's proposed injunction goes way beyond

20   that.  Now, remember, the FTC allowed the parties to

21   consummate this deal, and the FTC didn't object to the parties

22   beginning the integration process, as witnessed by the hold

23   separate agreement that we've been operating under only until

24   we could get to this point in time.

25        The overarching requirements of that whole separate

1    agreement are:  ProMedica shall maintain the viability,

2    competitiveness and marketability of St. Luke's, it shall not

3    eliminate, transfer, consolidate any clinical service that was

4    offered at St. Luke's on August 31, 2010, or terminate or

5    cause or allow termination of any contract between a managed

6    care organization and St. Luke's.

7            And I don't think there's any question that we have

8    complied with the terms of the hold separate agreement while

9    it's been in place, but we're getting a little tired of it.

10           The proposed injunction goes way beyond what the

11   whole separate agreement provides.  Frankly, Your Honor, and

12   this is the most troubling part about it, it would restrict

13   St. Luke's from engaging in certain ordinary business

14   functions that it otherwise would have been able to perform by

15   itself before the joinder.

16           What do I mean by that?  Let's take a look at

17   precisely what this proposed injunction says.  And we start --

18   I would like to start by focusing on the definitions.

19           And in the appendix, which is on page -- I think it's

20   going to be eight.  Yeah, page 8 of the proposed order, you

21   see Appendix A, the following definitions shall apply.

22           THE COURT:  Uh-huh.

23           MR. MARX:  And what this says is in definition A,

24   ProMedica is St. Luke's, including but not limited to, the

25   third line -- ProMedica means the Defendant, so on, and so on,

```
 1   and so on, including but not limited to St. Luke's.  So
 2   ProMedica is St. Luke's for purposes of this preliminary
 3   injunction.
 4           Now, what does the proposed injunction prohibit
 5   ProMedica and/or St. Luke's from doing that it might have done
 6   prior to the joinder Well, for that, you have to go back to
 7   Section 1A on page 2 and 3.  It prohibits ProMedica, which,
 8   again, means St. Luke's, as best I can tell, from exercising
 9   direction or control or influencing directly or indirectly
10   St. Luke's or any of its operations, including but not limited
11   to:
12           One, exercising any direction or control over, or
13   influencing, directly or indirectly, or otherwise
14   participating in or advising with regard to the negotiations
15   of the -- or the contracting process between St. Luke's and a
16   payor.
17           Essentially what they're saying is ProMedica can't
18   have any involvement in, if I understand this right,
19   St. Luke's contracting with payors.
20           Now this is a little metaphysical.  Would you use the
21   term metaphysical when we were talking about this last night?
22           You know, when you're talking about ProMedica and
23   St. Luke's being the same thing, that's what the definition
24   says, this gets harder to understand.  And part of our
25   concern, part of my concern is, you know, if there's going to
```

1    be an order entered in this case, which we think there

2    shouldn't be, we want to be absolutely certain that we know

3    exactly what we can or can't do, because the worst thing that

4    could happen to us is that we inadvertently get sideways with

5    this order.

6              Let's be clear with this, as we go on, it says,

7    ProMedica can't be -- and this is where some of it doesn't

8    make sense.  ProMedica is prohibited from, restrained and

9    enjoined from negotiating with a payor to include St. Luke's

10   as part of the Defendant's system.

11             I think what they're saying is we can't include

12   St. Luke's in any contract that ProMedica -- you know, the

13   early ProMedica -- okay.  I understand that.

14             Let's go to part three, because the third part is the

15   part that is the most troubling.  It prohibits ProMedica or

16   St. Luke's from terminating or causing or allowing the

17   termination of, lapsing or modifying any contract between any

18   payor and St. Luke's.

19             Now, what that means is St. Luke's contracts with

20   payors are frozen in time on August 31st.  So to the extent

21   that St. Luke's had a contract with a payor that would have

22   said you can terminate without cause on 60 days' notice, can't

23   do that.  They're prohibited from doing that, because this

24   provision says ProMedica, St. Luke's, can't terminate, or

25   cause, or allow the termination or lapsing of any contract,

1    any contract.

2           So even though St. Luke's might have had, pursuant to

3    its existing contracts with a payor, the right to terminate

4    the contract, to modify the contract, to -- it can't do that

5    now.  And there's no dispute about that, because it goes on to

6    say:  Provided, however -- they contemplate -- this sort of

7    contemplates this a little bit -- any preexisting contract

8    with St. Luke's that has expired or is due for renewal, the

9    rates for the services of St. Luke's for the next term may be

10   increased to the highest year-over-year escalator.

11          They can't renegotiate the contract.  So if St.

12   Luke's had a contract like it did, for example, with MMO that

13   was negotiated in, what, 2005 or something, with rates set in

14   2005, under this agreement, St. Luke's, Paramount, no one

15   could renegotiate that contract to more current rates.

16          The main source of -- the main source of St. Luke's

17   financial difficulties has been its inability -- we've heard

18   this for two days -- to cover its cost through its commercial

19   reimbursements.

20          Dan Wakeman understood that.  That's why he went back

21   to MMO and to Anthem and said, I've got to renegotiate these

22   deals.  That's why Mr. Wakeman, a couple of days before the

23   joinder, without any notice to us, sent a letter to MMO and

24   said on December 31st, I have to give you six months notice,

25   on December 31st, 2010, we're done.  And that's the reason we

365

```
1   had to do that little separate carve-out for MMO, because that
2   contract had been terminated not by us but by St. Luke's
3   before.
4           So to continue to force St. Luke's to live by the
5   rates that it was getting on August 31st, 2010, without any
6   opportunity, as it would have had if it were operating all by
7   itself, to renegotiate those contracts with payors effectively
8   ensures that St. Luke's operating losses will not only
9   continue, but they will grow.  Because it's not as if
10  St. Luke's costs are going to be frozen in time, it's not as
11  if their expenses aren't going to go up during the course of
12  the year or two years that it takes us to persuade the FTC or
13  the Sixth Circuit that this transaction isn't anticompetitive.
14          And in the meantime, this preliminary injunction that
15  the Government's proposed is going to put St. Luke's financial
16  viability in jeopardy again.
17          That's just one example.
18          THE COURT:  Well, why would any such order prohibit
19  St. Luke's from renegotiating a preexisting contract?
20          MR. MARX:  You're asking the wrong guy, Your Honor.
21          THE COURT:  Okay.  I will.
22          MR. MARX:  I agree with you.
23          Okay.  But that's not the only problem.
24          If we go on, it says -- where is this one?  Oh, 1B.
25  Oh, 1B.
```

366

1            It prohibits ProMedica or St. Luke's from, and I'm

2    looking at the second part of 1B, the bottom half, I may come

3    back to the top half in a minute, from eliminating or

4    transferring any clinical service that was offered at

5    St. Luke's on the day before the acquisition date.

6            Stop there for a second.

7            What that says is, St. Luke's is operating a

8    cardiovascular service line that is bleeding profusely.  It's

9    costing them -- it's in the report someplace.  It's a

10   million-something a year or more.  And what this proposed

11   preliminary injunction says is, you can't stop the bleeding,

12   you're going to have to let this patient bleed out.  I'm

13   sorry, I won't do that anymore.

14           If there's an unprofitable service line, they can't

15   do anything about it for a year or two years.  Again, the

16   issue is, is this preliminary injunction in the public

17   interest?  Is it going to make St. Luke's better or worse?  I

18   thought the purpose of the preliminary injunction, to the

19   extent they're asking for it, is to make sure that St. Luke's

20   doesn't get worse.  That's all this does.

21           If we look at 1D and 1E, the preliminary injunction

22   would prohibit St. Luke's from hiring, transferring,

23   terminating or reducing the salary or compensation

24   arrangements of any employee.  We can't manage our human

25   resources.

```
 1              You know, I can understand the notion of you can't
 2    cut people so that you can't deliver care, but if, as we think
 3    is true, ProMedica is able to deliver high-quality care more
 4    cost-effectively because it staffs -- it staffs its
 5    departments better, then why shouldn't St. Luke's benefit from
 6    that the same way that the Government wants ProMedica to
 7    benefit from what it says is St. Luke's higher quality?  This
 8    order would prohibit that.
 9              To get St. Luke's cost coverage ratios back to the
10    level that it needs to cover its costs, it needs to be able to
11    reduce some of those costs.  Can't do that.  And that's
12    particularly true if the Government's not going to let us
13    renegotiate contracts so that on the revenue side we can cover
14    some of the costs.
15              THE COURT:  So you're saying, look, if it doesn't
16    adversely impact quality of care, it should be fine.
17              MR. MARX:  Yes, that's what I'm saying.
18              THE COURT:  Okay.
19              MR. MARX:  But this order doesn't give us a chance to
20    do that.
21              This is the order they proposed.  This is what --
22    this is what we're reacting to.
23              Now, even if one were -- and please don't
24    misunderstand me.  I am not suggesting that there is any
25    preliminary injunction.
```

```
 1              THE COURT:  No, no.

 2              MR. MARX:  Okay.  I wouldn't be able to get out of

 3    the room, Your Honor.  I don't know who'd get me first.

 4              THE COURT:  I think by now I might have a suspicion

 5    of your position.

 6              MR. MARX:  That's good.  At least I have been clear.

 7              Now, we've said, we've said that this preliminary --

 8              You can take that one down.

 9              This preliminary injunction is -- oh, I'm sorry.  Was

10    that the next one that I just -- I'm sorry.  I'm getting ahead

11    of myself.

12              There's more things about this preliminary injunction

13    that apparently I don't like.  The proposed -- it would bar us

14    from in any way combining St. Luke's into ProMedica's

15    operation.

16              What does that mean?  I'm looking now at 1B again.

17    It's the first part of what I told you I might come back to.

18    I guess I am.  Consolidating, integrating or otherwise

19    combining the held-separate business -- that would be

20    St. Luke's defined a third time, I guess -- into or with any

21    other operations or businesses of ProMedica.

22              What does that mean?  Does that mean, for example,

23    that ProMedica can't integrate -- can't help St. Luke's move

24    towards electronic health records by integrating or

25    consolidating their electronic health records with
```

1    ProMedica's?  Does that mean that we can't provide any of the

2    back room cost savings and efficiencies that St. Luke's can't

3    get by itself?  That's what I read that to mean.  But, again,

4    it seems to me that's not helping anybody, and it's certainly

5    not in the public interest.

6         The preliminary injunction that the Government's

7    proposed, frankly, would create a very strong disincentive for

8    ProMedica to make the $30 million capital infusion that the

9    joinder agreement requires over the next three years.

10    THE COURT:  Would you put that last slide on?

11    Okay.

12    MR. MARX:  Okay?

13    THE COURT:  Thank you.

14    MR. MARX:  You understand where I'm coming from.

15    THE COURT:  Uh-huh.

16    MR. MARX:  The proposed preliminary injunction really

17    would have a chilling effect on ProMedica's investment of

18    $30 million, as the joinder agreement requires over the next

19    three years, because we wouldn't have any control over what

20    happens.  We wouldn't have any ability to generate the

21    benefits that would come from that capital investment.

22         And, of course, as I said on I think yesterday

23    morning -- yesterday afternoon, the Court can't require

24    ProMedica -- and I don't even think the Government thinks that

25    it can require us to make St. Luke's better than it was the

```
 1   day that it joined us.  We're willing to do that if we can

 2   have an opportunity to derive -- for the community to derive

 3   the benefits.  But if we can't, there's a real disincentive

 4   perhaps to doing that.

 5         And, of course, if ProMedica doesn't make that

 6   $30 million investment in those capital projects that were

 7   identified on exhibit 6.1 to the joinder agreement, then it's

 8   going to cripple St. Luke's ability to fund those investments,

 9   including the electronic medical records, which would have a

10   ripple effect, as we're beginning to see I think already.  I

11   hope not, but I think we are, on St. Luke's patient care, its

12   quality of service and ultimately its ability to comply with

13   the dictates, mandates of healthcare reform.

14         THE COURT:  Assuming that the injunction sought is so

15   as to stop creation of a new entity, the unwinding of which

16   would be difficult, if not impossible, then the language

17   should be toward that end, I believe I'm hearing you saying,

18   if it is issued, and not to stop all integration of

19   cooperation, if you will.

20         MR. MARX:  Yes.  If that's what you feel compelled to

21   do, that's right.

22         But frankly, we don't think you need to do it because

23   we've got the joinder agreement that creates that legal

24   obligation.  And while the FTC poo-poos it, they still

25   haven't, and I keep inviting them, maybe they're going to do
```

1    it when I can't talk anymore.  I keep asking them to cite me

2    another case where you have this kind of contractual and

3    performance commitment to maintain the acquired entity really

4    substantially the way that it was.

5            We're not -- we can't turn St. Luke's into a

6    sub-acute care facility.  Frankly, that's what we're

7    contemplating in some respects for Flower, but we can't do it

8    for St. Luke's.  The joinder agreement won't let us.

9            You know, we can't turn it into an ambulatory surgery

10   center.  The joinder agreement doesn't let us do that.

11           And while, again, I understand that -- and we've

12   tripped through those slides, the Section 7.1, 13 -- see, you

13   know what that says.  The Government says that joinder

14   agreement's just illusory, that's what they say about that.

15   But that's without any merit at all.

16           If I can get the Article 3.1(b)(ii) slide, please.

17   Got to be near the end.

18           Article 3.1(b)(ii).  Let's look at little bit at what

19   St. Luke's board looks like.

20           THE COURT:  This article is from the joinder

21   agreement.

22           MR. MARX:  Joinder agreement.

23           St. Luke's board consists of 27 members.  ProMedica

24   has the right to appoint two of those 27.  It has the right to

25   approve St. Luke's appointees, but we can't unreasonably

1    withhold that approval.

2          The ex officio members include the list of people

3    there, and St. Luke's appoints the remaining 21 members of

4    that 27-person board.

5          But here's maybe the more important provision that

6    shows that the board is not just window dressing, and that's

7    in some place in Article 16 of the joinder agreement.  And

8    here's what it says:  Parties acknowledge that St. Luke's,

9    acting by affirmative vote of at least 11 of its hospital

10   appointees serving on the board, will have the right to seek

11   specific performance or injunctive or other equitable relief

12   to enforce the terms and conditions of Articles 6, 7 and 13.

13         Those are the operative ones that talk about

14   maintaining the hospital as a viable, ongoing, competitive,

15   general acute inpatient care hospital.

16         So that makes it clear that St. Luke's board, its

17   independent board, has a remedy if, for some reason ProMedica

18   doesn't abide by its obligations under the joinder agreement,

19   and I have no reason to believe that that's what would happen.

20         Now, I don't particularly envy your job trying to

21   make the decision that you need to make, particularly as it

22   relates to whether or not to issue this preliminary

23   injunction.  You've been buried in documents.  I fear that

24   you're going to be buried in more documents and information,

25   but we'll send them to you on a disc so there's not as much

1    paper at home.  I can relate to that.

2         THE COURT:  You fear or you know?

3         MR. MARX:  I haven't seen any drafts yet, but I know

4    I -- well, I haven't seen any drafts yet, but I suspect it's

5    more likely than not.  It's more likely that you're going to

6    be inundated with more documents and information than it is

7    that ProMedica's going to be able to raise prices above

8    competitive levels.  That I'm certain of.

9         I suspect, I suspect that you've been contemplating

10   how you're going to deal with all this stuff.  And let me

11   suggest a simple answer to you.

12        As you know, St. Luke's and ProMedica entered into

13   the joinder agreement, and that requires ProMedica to

14   continuously operate St. Luke's as a general acute inpatient

15   care services offering essentially -- hospital offering

16   essentially the same services for the next 10 years.  The FTC

17   suggests that somehow that contract is meaningless, and that

18   the board of St. Luke's can't be trusted to hold ProMedica to

19   that agreement, or that ProMedica's board won't abide by the

20   agreement.

21        I think -- I just don't see how you can accept that

22   argument.  As a lawyer, number one, I believe that contracts

23   mean something.  And I have to believe that people like Jamie

24   Black, people like Larry Peterson, who are clothed in the robe

25   of fiduciary duty, they have a fiduciary obligation to their

```
 1    respective organizations.  They take those obligations at

 2    St. Luke's and ProMedica seriously.

 3              Indeed, in that regard I would point out that in all

 4    likelihood, the only two people in this room who are not being

 5    paid to be here today are Mr. Black, the chairman of

 6    St. Luke's board, and Mr. Peterson, the chairman of

 7    ProMedica's board.  They're here precisely because of their

 8    contractual and fiduciary obligations to their board and to

 9    their organizations.

10              And I ask you to trust men and women like Mr. Black,

11    like Mr. Peterson, to do their jobs and to comply with those

12    obligations.  If the goal of this Court is to ensure that

13    St. Luke's will be a viable and vigorous acute care hospital

14    in the event that divestiture is ordered, the best way to make

15    sure that happens is to let these gentlemen and their boards

16    do their -- and Randy Oostra and others do their jobs as board

17    members and representatives of their respective communities.

18              It is not to enter the protected -- the preliminary

19    injunction that the Plaintiffs seek.

20              Now, I am going to be done a few minutes early, Your

21    Honor.

22              The Plaintiffs simply have not met their twin burdens

23    to obtain the preliminary injunction they seek under Section

24    13(b).  They haven't established a likelihood of ultimate

25    success on the merits of their claim.  And once you get beyond
```

```
1    those market shares and concentration analyses, as you must,

2    the analysis of the dynamic market conditions, not the static

3    March or August 2010 pictures on which Plaintiffs have

4    focused, reveals a very competitive market where the hospital

5    providers and the large powerful payors have demonstrated the

6    ability to adapt over time as market conditions have changed.

7           There's simply no evidence that irrespective of its

8    size or the way that ProMedica might think or describe itself,

9    ProMedica has the ability or the intent to exercise market

10   power.  And by that, I mean the ability to raise prices above

11   competitive levels for St. Luke's or for itself.

12          And the joinder of ProMedica and St. Luke's with

13   St. Luke's 10 commercially-insured admissions a day isn't

14   going to tip the competitive balance to enable ProMedica to

15   exercise market power in the future.  But even if, even if

16   there is a question about that, entry of a preliminary

17   injunction in this case simply isn't in the public interest

18   for all the reasons we've articulated for the past two days.

19          If the FTC prevails -- and I remain confident that it

20   will not -- it will have a remedy.  Indeed, St. Luke's is

21   likely, based on the commitment ProMedica's already shown to

22   make it better, to be a stronger, better financed, higher

23   quality general acute inpatient care hospital in a year or two

24   years than it was on August 31st, 2010, the day of the

25   joinder.
```

```
 1              For all of those reasons, I respectfully request that
 2    you deny the injunction.
 3              Thank you.
 4              THE COURT:  Thank you, Mr. Marx.
 5              Mr. Reilly.
 6              MR. REILLY:  Thank you, Your Honor.
 7              I just wanted to, in closing, thank this Court and
 8    Cathy and the Court for their indulgence, being responsive to
 9    our many questions.  And it's actually been an obviously
10    heated debate, but nothing but amicable.  And on the same line
11    I'd like to thank and commend Mr. Marx and his team.  As you
12    know, we have some significant disagreements on the issues,
13    but everything has been professional and amicable, and I do
14    thank them for that, as well.  And I hope that compliment of
15    Mr. Marx will not take away from my 30 minutes, Your Honor.
16              THE COURT:  I'll add 30 seconds.
17              MR. REILLY:  I only complimented him for five
18    seconds, Your Honor.
19              So, Your Honor, Mr. Marx is correct.  We could keep
20    going forever on the point-counterpoint.  And I don't intend
21    to do that.  You're very smart.  You give a time limit, so we
22    finally will wrap this up.
23              But one point I wanted to make is, it's been stated
24    repeatedly that there are no ProMedica documents that talk
25    about providing higher rates for St. Luke's or any partner,
```

1    and I've yet to hear one word, one word about the ProMedica

2    partnership presentation, PX226.  I think it's the first

3    document I talked about at the TRO, it's the first ProMedica

4    document I talked about yesterday.  I'm pretty sure I

5    mentioned it during the Part III conference last week.

6          And this ProMedica partnership presentation talks

7    about the benefits.  ProMedica's presenting it to potential

8    partners.  And it says one of the benefits, payor system

9    leverage.  St. Luke's documents, as you know, talk all about

10   ProMedica benefits to St. Luke's, believed to have the most

11   favorable managed care contracts.  A St. Luke's affiliation

12   with ProMedica has the greatest potential for higher hospital

13   rates.  A ProMedica-St. Luke's partnership would have a lot of

14   negotiating clout.  And that's another PX I put up yesterday,

15   Your Honor, and it's in your binder, slide 33 from my

16   presentation yesterday.

17         Your Honor, both ProMedica and St. Luke's are saying

18   the exact same thing, same thing as health plans, same thing

19   as employers, that when St. Luke's becomes part of ProMedica,

20   ProMedica has very high managed care clout now.  They can talk

21   about the pricing not being in the contracts that Professor

22   Town put together, but he took all the data from all of the

23   managed care companies, individual claim data, control for

24   such things as acuity mix and volume, he came up with prices

25   that have really been untouched.

```
 1              They can talk about that they're not in the contract.
 2    Their expert, Ms. Guerin-Calvert, had the exact same data.
 3    She never did a relative pricing metrics, and I'm sure
 4    Mr. Marx will have a cross-examination to do at the merits
 5    trial.  Those pricing differential showing ProMedica at
 6    70 percent higher than St. Luke's is un-rebutted, and it's
 7    consistent, totally consistent with St. Luke's documents,
 8    ProMedica's documents, health plan testimony and everything
 9    else we've presented in this case.
10              So I want to talk briefly about -- not that
11    briefly -- about the order.  Your Honor, as I said at the
12    outset, there are three primary goals under 13(b) and three
13    primary goals from the voluntary hold separate order that we
14    entered into with ProMedica, is, do not allow internal harm to
15    competition, do not allow rates to health plans to increase
16    dramatically while we're doing the merits trial in DC.  That
17    is a primary goal.
18              The second primary goal is to maintain St. Luke's,
19    maintain the service lines, maintain the staffing levels.  And
20    I'll be the first one to acknowledge, Your Honor, this is why
21    13(b) likes to block acquisitions before they're consummated.
22    It becomes a lot messier.  There's no doubt about that.  But
23    Congress has decided which mergers or acquisitions are
24    reportable, and this one wasn't reportable, and that creates a
25    challenge for us, it creates a challenge to ProMedica, it
```

```
 1    creates a challenge to this Court.  We acknowledge that.

 2          But, again, the voluntary hold separate agreement

 3    which has been in place for six months, offers some

 4    protection.  And we would say it worked.  It has worked.

 5    ProMedica's claim that they've had some improvements that were

 6    allowed under it, rates have not skyrocketed, and the exact

 7    same service lines are in place as they were prior to the

 8    joinder.

 9          In terms of not allowing ProMedica or St. Luke's to

10    negotiate new contracts, that's a challenge, Your Honor,

11    because now St. Luke's is part of ProMedica.  St. Luke's is

12    ProMedica.  And if you have a businessperson who's employed by

13    ProMedica negotiating rates, it's tough to distinguish

14    ProMedica from St. Luke's, because it truly is wholly owned.

15    They are one.

16          And so it --

17          THE COURT:  Can I stop you there for just a minute?

18          You have both indicated that the hold separate

19    agreement has worked for a period of six months, and that I am

20    therefore presuming that the primary thrust of a preliminary

21    injunction in this setting would be to continue the benefits

22    of that hold separate agreement without deterring the

23    marketplace activities of St. Luke's.  Is that roughly

24    correct?

25          MR. REILLY:  That is correct, Your Honor.  It
```

1    absolutely is correct.  The voluntary hold separate agreement,

2    while, of course, it was give and take, like most voluntary

3    agreements are, we felt at the time and negotiated right prior

4    to consummation, that the three objectives that we had were in

5    place.

6         There were things we'd like to improve on.  There are

7    certain things that weren't in there that we put in the

8    proposed order that we think would be helpful.  The things in

9    our proposed order are exactly consistent with dozens of hold

10   separate agreements that the FTC and private parties have

11   signed through the years.

12        And so we think the more formal hold separate

13   agreement, as a proposed order to this Court, works.  There's

14   literally three decades of track record that's saying that

15   parties and the FTC who signed these hold separate agreements

16   for some long periods of time, they do a great job protecting

17   interim competition and making sure that the business that may

18   be divested in this case is viable and the exact same one that

19   was competing against ProMedica prior to the joinder.

20        And let me mention -- and so, Your Honor, I do agree

21   with that.  Obviously, I would expect that ProMedica wants no

22   proposed order entered.  We would like a stronger proposed

23   order entered.  But if you're asking me, which it seems like

24   you are, whether the voluntary hold separate agreement has

25   more or less done an effective job at maintaining St. Luke's

```
 1    in terms of same service lines, same staffing levels, yes.

 2    Has it done a fairly good job of making sure that rates during

 3    this merits trial period has not skyrocketed?  Yes, it has.

 4           And in terms of St. Luke's negotiating rates, and

 5    this is exactly the same as the voluntary hold separate

 6    agreement, ProMedica has negotiated rates for two health plans

 7    during the voluntary hold separate agreement.  It doesn't

 8    prohibit that.  All it does, as we talked about yesterday,

 9    allows the health plan, if there is some sign of ProMedica or

10    St. Luke's saying let's get those rates very, very high, that

11    they wouldn't ask for as an independent competitor or wouldn't

12    get as an independent competitor, the health plans have a

13    little bit of leverage as long as the voluntary hold separate

14    agreement, as long as the order in place.

15           It's saying, we do want to work on a contract.  Two

16    health plans have done that.  I think one's in the public

17    record, MMO, and the other is not in the public record -- have

18    done that during the voluntary hold separate agreement.  And

19    we believe because of that extra option, a little bit of

20    leverage when you're negotiating rates with the St. Luke's now

21    part of the ProMedica system, that has helped I think make

22    those negotiations more fair while these litigations are going

23    on.

24           So that -- it does not prohibit negotiations between

25    health plans and St. Luke's.  In fact, during the voluntary
```

1   hold separate agreement, which has very closely tracked

2   language, negotiations have taken place, and ProMedica is

3   actually telling this Court that those negotiations were fair

4   and reasonable.

5          Let me just state that we understand what the joinder

6   agreement says in terms of 10 years as a general acute care

7   hospital.  We do.  And we also understand that the joinder

8   agreement requires $30 million of investment over three years,

9   I think it is.  And from what I'm hearing the Defendant saying

10  is the $30 million that's contractually committed in the

11  joinder agreement, that may or may not happen.  There's no

12  guarantee we're going to make that commitment.  But the

13  joinder agreement that talks about maintaining St. Luke's as a

14  general acute care hospital for 10 years, that is ironclad.

15         To the extent that ProMedica does not intend to move

16  any service lines out of St. Luke's so that the Commission, at

17  the end of the day, can have pretty much the exact same

18  hospital if we prevail -- I totally understand that's an open

19  question -- if we prevail on the merits trial, then they will

20  have that option.

21         But I don't think ProMedica has said that they're not

22  going to consolidate or move service lines out of St. Luke's.

23  The joinder agreement mentions six general categories.

24  Mr. Wakeman already testified, for example, that some might

25  not be covered in there.

```
1              And so to the extent that Mr. Oostra said they're

2     still looking for consolidation opportunities, Navigant is

3     still studying consolidation opportunities.

4              And I want to be perfectly clear here, Your Honor.

5     I'm not saying ProMedica is doing something wrong.  If you own

6     four hospitals in one geographic market it may make sense,

7     like Mercy did, move obstetrics into one, out of another.  It

8     may make sense.  So that's not the issue.  We're not saying

9     ProMedica is going to run out and if you don't put in a

10    proposed order, start gutting St. Luke's.  That's not what

11    we're saying.  But what -- the hospital system, with four

12    hospitals in one close proximate geographic market may make

13    different decisions.

14             And the board, which we talked about yesterday, the

15    St. Luke's board, which in short time ProMedica will have

16    approval over the board members, they might agree.  The board

17    may agree, rather than suing the St. Luke's board, as they're

18    part of ProMedica, suing ProMedica, they might say, yeah, that

19    makes sense, as one hospital out four in a system within the

20    geographic area, let's move services around.  It doesn't

21    require any bad intentions.

22             But that happens in the ordinary course.  We saw that

23    with Mercy, and that's what we don't want to happen.  So,

24    again, I'm not at all saying that these board members don't

25    take their role very seriously, that they're not -- that they
```

1    don't understand the fiduciary duty and won't follow it.  As

2    Navigant has said and as Mr. Oostra has said, they're now

3    studying these things.  These studies are ongoing about what

4    to do.

5         So, again, not saying there's any bad intentions,

6    Your Honor, but it is not guaranteed at all that ProMedica

7    won't decide and the board won't agree that moving services

8    out of St. Luke's doesn't make sense.  And that's what an

9    order from this Court will prevent from happening.

10        And, again, to the extent that ProMedica does not

11   intend to move any services out of St. Luke's, there's nothing

12   supporting that on the record, then enter the order, Your

13   Honor.  We ask the Court to do that, and we won't bother you.

14   And then 10 years later, whatever, a year later, ProMedica may

15   say, I told you so, and we'll say you were right, or maybe

16   your order actually made the difference.

17        And I just want to make a general point.  As I said

18   yesterday, a private contract between two entities now owned

19   by one entity is not a substitute, is not a substitute for

20   effective enforcement of the antitrust laws.  It can't be.

21   And as much as you don't want to be involved, having an order

22   from you and making sure that everything goes as it has under

23   the voluntary hold separate agreement would truly, would truly

24   then further the goals, the Congressionally-mandated goals of

25   13(b).  That's what we're asking.

```
 1              THE COURT:  If, with a capital "I", if an order were
 2     to come out, would it not almost require that if the parties
 3     agree to a variation on the theme during the tenure of the
 4     order, that's not a violation?
 5              MR. REILLY:  Not at all.  You mean the parties being
 6     the FTC and the State of Ohio and ProMedica, not ProMedica and
 7     St. Luke's?  Yes, we agree.
 8              As has happened in the past in the voluntary hold
 9     separate agreement, Mr. Marx has called me.  I usually don't
10     pick up his call, but the caller ID was broken, and we talked
11     about, can we make some changes here and he told him why and
12     he said, yeah, that makes sense.  You explained it.
13              And to say that you're not likely to be involved.  We
14     have done that now a couple times.
15              THE COURT:  But where you can't agree, I would
16     suppose where the Court retains jurisdiction would give
17     either/or both parties the opportunity to seek the Court's,
18     quote, "guidance," unquote.
19              MR. REILLY:  That's correct.  And we hope that
20     guidance will be in West Palm Beach, Your Honor, during the
21     winter months, or in Toledo during the summer months.
22              That's absolutely correct, Your Honor.  And, again, I
23     will go through the reasons, for the record, why a preliminary
24     injunction should issue here, why we've easily met our burden.
25     But, in fact, it is your order.  If you issue it, you're the
```

1    one who has to enforce it if there are any issues.  And, of

2    course, you have to be comfortable with it.

3            And this is not an easy thing to draft.  I'd be the

4    first one to admit.  That's why 13(b) works much more

5    effectively if you can stop a merger before consummation, but

6    sometimes you can't.  But the overriding goal of 13(b),

7    protect interim competition and maintain the assets if in

8    case, at the end of the day, a divestiture or spinoff is

9    warranted.  That's what we're asking this Court to do, to help

10   us in that important goal.

11           And as I said before, we expect to have a successful

12   outcome in the merits trial, but it wouldn't be the first time

13   I was wrong in predicting what a judge would do.  And if we

14   don't win at the merits trial in front of Judge Chappell, we

15   will probably arguing, let the full appeal to the Commission

16   take place, ProMedica will be arguing they had 210 hours of

17   live testimony, full discovery, fast-moving.  We tried this

18   case in front of an independent ALJ and complaint counsel,

19   which is us in the merits trial, complaint counsel lost, I

20   expect that.

21           And I expect them to rush to you quickly if we lose

22   the merits trial.  And that decision will come out by the end

23   of the year under the new Part III rules.

24           And we already have six months of the voluntary hold

25   separate agreement to say the sky hasn't fallen, St. Luke's

```
 1    seems to be doing very well, continuing the same high quality
 2    of care.
 3            And I was going to use as one of my points
 4    Mr. Wakeman's testimony about some quality went up, indicators
 5    went up, a couple went down.
 6            There's really nothing on the record, Your Honor,
 7    that St. Luke's has not continued to be a very high-quality,
 8    great hospital for the citizens of Lucas County.
 9            So that is my points on the order.  I would be the
10    first one to admit that if this was easy to draft so that all
11    the goals and objectives are met perfectly, I would have a
12    different job.  There are some probably in this courtroom who
13    think I should probably have a different job anyways.
14            THE COURT:  Just Mr. Perry.
15            MR. REILLY:  He's not going to be working with me
16    much longer anyway, Your Honor.
17            MR. PERRY:  I'm not under oath, am I, Your Honor?
18            MR. REILLY:  So let me just take a few minutes to --
19    and actually, I think I will finish early -- just summarize
20    what I think we've presented and learned over the last day and
21    a half.
22            It's my hope and it's my firm belief that this Court
23    understands that the preliminary injunction standard under
24    13(b) is significantly lower than the traditional preliminary
25    injunction standard.  The role of this Court is not to
```

1    determine the merits of the case.  Rather, the Plaintiffs have

2    met their burden when they have raised serious and substantial

3    questions.

4         Once the Plaintiffs have met their serious and

5    substantial burden, the Court should weigh the equities of

6    granting relief.

7         I know you're sick of hearing us saying it, but it's

8    very important.  No court in America in a 13(b), federal

9    district court in a 13(b) proceeding has denied the Federal

10   Trade Commission relief after meeting the serious and

11   substantial burden.  No one has.  And it's simple why.  The

12   paramount public equity is effective enforcement of the

13   antitrust laws.

14        And once Plaintiffs have demonstrated an undue

15   concentration and relevant market, the acquisition is presumed

16   to be illegal because it is so inherently likely to lessen

17   competition substantially, that it must be enjoined in the

18   absence of evidence clearly showing that the merger is not

19   likely to have such anticompetitive effects.

20        I wish I was paid a dollar for every time I read the

21   Philadelphia National Bank, Your Honor, to this Court, but

22   that's again that case.

23        Plaintiffs have clearly shown that the acquisition

24   increases concentration levels significantly in two markets

25   that were already highly concentrated prior to the

```
1    acquisition.

2         The obstetric market, this acquisition has created a

3    merger to duopoly.  For both of these markets, there is a very

4    strong presumption of harm.  But rather than resting on these

5    very strong presumptions, Plaintiffs have introduced an

6    incredible volume of evidence that strengthens the

7    presumptions.  Documents from both ProMedica and St. Luke's

8    that vividly discuss the strong likelihood of dramatically

9    higher prices at St. Luke's after the acquisition, un-rebutted

10   evidence that higher market shares do, in fact, predict what

11   the pricing levels will be in Lucas County, vivid examples and

12   multiple documents about the fierce head-to-head competition

13   that ProMedica and St. Luke's engaged in and ProMedica's

14   fixation on St. Luke's.

15        I am quite sure in the last three years the only time

16   anyone from ProMedica has described St. Luke's as a bit player

17   has been in this courtroom.  The documents belie that

18   description of St. Luke's.

19        Testimony from health plans strengthen the

20   presumption.  Every health plan has entered an affidavit, of

21   any size, into this saying that they have concerns about the

22   deal.  Not one health plan has said this deal is good for us,

23   good for the community or good for our members.

24        Employers have entered multiple declarations talking

25   about several things:  Concern about higher rates, the impact
```

1    that these higher rates would have on their employees, and

2    also even weighing in on the health plan that we used, offered

3    just to Mercy-UTMC network, our employees wouldn't be happy,

4    it wouldn't be sufficient.  We would look elsewhere.

5              So that is what the testimony says from the

6    declarants.  Again, numerous in number, consistent and

7    strengthen an already very strong presumption.

8              The Defendants have not come close to rebutting the

9    presumption.  The Defendant has talked a lot about Mercy,

10   implying that as long as one competitor remains, the

11   acquisition isn't problematic.  Of course, only talking about

12   Mercy and saying only Mercy matters ignores again all the

13   documentary evidence that we found in ProMedica and St. Luke's

14   documents talking about the vigorous competition and why

15   St. Luke's matters and why ProMedica was concerned about

16   St. Luke's stealing share.

17             The Defendant's focus on St. Luke's financial state

18   completely ignores St. Luke's remarkable financial progress in

19   the several months before being acquired by ProMedica,

20   increasing revenues, increasing capacity utilization, smart

21   cost-cutting measures, increasing inpatient and outpatient

22   procedures, growing market shares, and most importantly,

23   dramatically improving the profits from a negative 2.5 percent

24   operating cash flow margin to a positive 3.8 percent.

25             And I know Mr. Marx said, well, eight months doesn't

```
 1    make a trend.  And unfortunately, we don't know if a trend
 2    would have continued because the acquisition occurred.  But it
 3    was significant enough that Mr. Wakeman wrote a glowing memo
 4    proud, rightly proud to the board of directors.  We call that
 5    the last words of an independent CEO to an independent board.
 6    The financial progress we have made over the last year has
 7    been significant.  They were very proud, and they should have
 8    been.
 9           So we're not saying the eight months is eight years,
10    but at the same time it's not just a little blip in time.  It
11    wasn't to Mr. Wakeman, and it shouldn't be considered
12    insignificant to this Court.
13           To be honest with you, this is going back to
14    Mr. Marx, my favorite debate, but I'm at least going to tie it
15    into a point.  I think Mr. Marx, and since I get the last word
16    I'm going to tell you, I know Mr. Marx is saying that, sure,
17    under the guidelines which every federal district court has
18    applied and under the case law, including Supreme Court
19    precedent, the FTC is entitled to a presumption based on~-- a
20    very strong presumption based on showing undue concentration.
21           Then he says, yeah, but the current market shares
22    don't predict future competitive significance.  And that's
23    general dynamics, that's flailing firm, and that's the defense
24    that could rebut the presumption.
25           And so for antitrust lawyers it could be a
```

```
1    fascinating debate.  Maybe it's not for this Court, but the

2    fact is that we do have a presumption.

3              And I do want to mention on failing firm, they're not

4    even making a failing firm defense.  For good reason.  It's

5    not like they say, well, we could but we just decided not to.

6    They could not come close to meeting the failing firm defense

7    on either prong.

8              On flailing firm, which as I read a case yesterday,

9    the financial status of a company is the weakest justification

10   for doing a merger.  In the case law, University Health is

11   very clear, flailing firm can be used to rebut the

12   presumption.  And unfortunately for ProMedica's defense on

13   that, is the presumption is so strong.  St. Luke's market

14   share for obstetrics and general acute care services would

15   have to plummet below two percent.  Below two percent.

16   There's nothing in the record that suggests that.

17             We talk about -- he mentioned cutting services.

18   That's been rejected.  There's no document, not one bit of

19   testimony that says for general acute care shares growing,

20   it's going to plummet.  It's not true.  That flailing firm

21   defense has to fail.

22             And maybe they're asking for a new novel defense

23   that's saying we can't meet failing, we can't meet flailing,

24   but we've talked a lot about St. Luke's financial situation,

25   let's come up with a new novel defense.  I don't know.  In the
```

1    merits trial, that would be an incredible challenge.  In a

2    13(b) proceeding, it should just be a nonstarter, Your Honor.

3         So I've already talked about the importance of the --

4    having some relief from this Court and the three objectives

5    that we're hoping to keep in place at least until the merits

6    trial takes course.  I just want to say one more thing on the

7    joinder agreement and mention a -- reiterate a point I made

8    earlier, that the joinder agreement does not say anything

9    about rates.  It doesn't.

10        We understand that if this Court denies the order,

11   there may be some sort of hospital or some services that the

12   Commission may decide that they want spun off if we prevail,

13   but it's not going to be the St. Luke's that we have talked

14   about and presented evidence on really did make a difference

15   in Lucas County.

16        And if the order is denied and two years later, that

17   was your timeframe yesterday, we do prevail, it's not clear to

18   us at all what that St. Luke's would look like without help

19   and assistance from this Court.  But it is clear, Your Honor,

20   if rates do increase as dramatically as I think the evidence

21   and we think the evidence has demonstrated that it likely will

22   without court intervention, there's nothing that can be done

23   for the citizens of Lucas County who paid higher rates during

24   those two years.  There's nothing.  There's no recourse.

25   There's no way to say an order was denied by this Court, rates

```
 1    went up.  Sure, the Commission may be able to get some sort of
 2    relief.
 3           It's very difficult when the eggs are scrambled.  But
 4    there's nothing that can be done to say, sorry, people in
 5    Lucas County, you're paying higher healthcare costs, there's
 6    nothing to be done.
 7           We will try to restore some competition later.  That
 8    is lost.  That burden of higher healthcare cost is now
 9    incorporated and it's done.  And so we really ask the Court to
10    consider two objectives of 13(b), protecting interim
11    competition, and maintaining the Commission's right to get a
12    full and effective divestiture.
13           So, Your Honor, I think I'm finished.  I do
14    officially ask this Court on behalf of the FTC and the State
15    of Ohio to grant this injunction.
16           Thank you very much, and thank you for your time.
17           THE COURT:  Ladies and gentlemen, it is a pleasure
18    for me to say this from time to time, that the quality of the
19    presentations has been of the highest order.  The information
20    from both sides has been of the highest order, and I thank you
21    and commend you.
22           I would like to see for a moment, Matt, you and
23    David.
24           (Discussion held off the record.)
25           I'm sorry.  You want me to formally say we are in
```

1    recess; thank you very much, ladies and gentlemen.

2        (Proceedings concluded.)

3                        * * * * *

4                        CERTIFICATE

5        I, Stephen W. Franklin, Registered Merit Reporter, and

6    Certified Realtime Reporter, certify that the foregoing is a

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9        Dated this 11th day of FEBRUARY, 2011.

10

11       /s/Stephen W. Franklin
         _____
12       Stephen W. Franklin, RMR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

$2.6 [1] 282/11
$2.6 billion [1] 282/11
$30 [5] 369/8 369/18 370/6 382/8 382/10
$30 million [5] 369/8 369/18 370/6 382/8 382/10
$33 [1] 279/12
$33 million [1] 279/12
$5 [1] 327/18
$5 million [1] 327/18
$500 [1] 311/17
$500 million [1] 311/17
$65 [1] 282/18
$65 million [1] 282/18

**'**

'08 [1] 286/16
'09 [2] 285/24 286/17
'8 [1] 348/14
'9 [2] 288/17 348/14

**-**

-v [1] 268/6

**/**

/s/Stephen [1] 395/11

**0**

002 [1] 346/15

**1**

10 [15] 290/2 312/15 329/1 329/1 330/9 331/1 334/22 347/10 352/8 352/8 373/16 375/13 382/6 382/14 384/14
10 percent [1] 355/15
101 [1] 319/7
10:15 [1] 318/20
10:29 [1] 318/20
10:30 [1] 318/19
11 [7] 268/8 282/18 284/20 302/20 337/20 338/21 372/9
11 million [2] 278/10 278/17
11-00047-CIV-DAK [1] 268/2
117-percent [1] 354/6
11th [1] 395/9
12 million [1] 282/18
126 percent [2] 353/14 353/25
126-percent [1] 354/25
13 [37] 272/25 303/19 304/6 304/25 305/4 305/9 305/11 305/22 306/12 308/18 308/25 309/2 309/7 309/11 309/13 309/16 309/19 310/5 314/11 315/4 315/7 316/18 316/25 317/14 371/12 372/12 374/24 378/12 378/21 384/25 386/4 386/6 387/24 388/8 388/9 393/2 394/10
14 [1] 345/13
15 [4] 310/13 310/14 310/18 312/7
15-minute [1] 318/19
15-something [1] 342/24
150 [1] 269/9
16 [1] 372/7
17 [1] 347/6
18 [3] 300/9 318/1 347/22
19 [1] 348/14
1988 [1] 314/23
1A [1] 362/7
1B [4] 365/24 365/25 366/2 368/16
1D [1] 366/21
1E [1] 366/21

**2**

2.5 percent [1] 390/23
2.6 billion [1] 282/11
20 [1] 296/15
20 percent [2] 331/17 348/4
20005 [1] 269/15
2001 [1] 272/13
2004 [1] 288/17
2005 [3] 288/17 364/13 364/14
2006 [1] 288/17
2007 [3] 348/8 348/13 356/10
2008 [6] 288/17 334/16 336/6 356/8 356/9 356/12
2009 [16] 272/13 284/17 285/2 285/17 285/20 286/13 289/1 324/16 342/23 348/9 353/9 353/23 356/3 356/10 356/11 357/2
2010 [19] 282/8 283/21 284/17 285/21 285/24 286/24 288/11 288/20 288/25 289/19 290/9 332/6 336/20 355/25 361/4 364/25 365/5 375/3 375/24
2011 [10] 268/8 288/21 345/3 345/5 345/23 347/11 347/18 355/24 356/1 395/9
20580 [4] 268/18 268/21 269/3 269/6
21 [3] 282/8 348/12 372/3
210 [4] 304/17 304/18 304/19 386/16
22 [1] 297/10
227 [3] 269/12 269/17 269/20
23rd [1] 269/8
25 [1] 349/16
26 [1] 303/15
268 [1] 282/11
27 [3] 306/14 371/23 371/24
27-person [1] 372/4
270 [1] 304/16
28 [2] 313/25 350/7
29 [1] 323/14

**3**

3 million [1] 278/21
3.1 [2] 371/16 371/19
3.8 percent [1] 390/24
30 [7] 270/12 281/16 302/25 308/12 308/14 376/15 376/16
30 million [2] 302/23 327/19
30 percent [2] 291/10 291/25
302 [1] 358/18
31 [1] 361/4
31st [6] 336/19 363/20 364/24 364/25 365/5 375/24
32 [1] 313/20
33 [2] 355/21 377/15
33401 [1] 268/23
34 [4] 339/1 345/11 347/6 347/16
35 [3] 339/1 339/2 339/22
36 [1] 356/17
36 percent [1] 332/17
3600 [1] 358/16
3768 [1] 268/22

**4**

40 [1] 356/18
400 [1] 292/11
4000 [1] 358/12
415 [1] 268/11
417 [1] 268/23
43215 [1] 269/9
4400 [2] 269/12 358/9
45 [1] 319/10

**5**

50 [1] 279/16
514-3768 [1] 268/22
53 [1] 304/5
561 [1] 268/22
59 [1] 270/11

**6**

6.1 [1] 370/7
60 [3] 279/16 291/8 363/22
600 [2] 268/20 269/15
601 [3] 268/18 269/3 269/5
60606 [3] 269/13 269/18 269/20
65 million [2] 278/10 278/16
663 [1] 358/13

**7**

7.1 [1] 371/12
70 percent [4] 319/4 324/22 329/9 378/6
701 [1] 268/23
71 percent [5] 321/22 322/8 328/1 328/2 328/11

**9**

90 million [1] 278/20
98 percent [1] 272/15

**A**

a.m [2] 318/20 318/20
abide [2] 372/18 373/19
ability [17] 281/23 281/24 293/1 293/7 296/5 309/24 314/12 316/20 325/11 330/3 331/14 369/20 370/8 370/12 375/6 375/9 375/10
able [41] 276/23 278/4 278/5 278/6 281/4 282/9 287/1 292/24 295/8 295/9 298/18 311/23 316/9 317/6 321/2 327/22 328/7 328/18 329/7 330/18 330/19 330/22 331/8 331/10 333/23 335/10 337/10 343/2 343/5 346/23 352/6 352/13 356/23 357/6 357/10 361/14 367/3 367/10 368/2 373/7 394/1
above [9] 272/14 282/12 320/23 321/17 328/7 331/14 373/7 375/10 395/8
above-entitled [1] 395/8
absence [3] 307/23 344/4 388/18
absent [3] 280/13 286/6 287/10
absolutely [4] 342/3 363/2 380/1 385/22
abundantly [1] 305/10
academic [2] 326/23 335/14
accept [3] 349/21 349/24 373/21
access [3] 282/9 288/21 290/3
according [1] 290/1
accountable [1] 299/24
accurate [1] 281/14
accurately [4] 323/17 324/8 344/1 344/3
achieve [3] 325/14 325/17 325/19
achieved [1] 312/1
achieving [1] 332/17
acknowledge [3] 372/8 378/20 379/1
acknowledged [1] 290/9
acquire [2] 295/17 333/1
acquired [4] 349/6 359/25 371/3 390/19
acquires [3] 274/2 338/18 339/21
acquiring [2] 295/15 359/24
acquisition [16] 308/21 316/5 316/23 317/9 318/12 338/19 358/9 358/12 366/5 388/15 388/23 389/1 389/2 389/9 390/11 391/2
acquisitions [3] 271/13 378/21 378/23
across [7] 271/14 271/25 285/1 295/13 300/14 300/22 330/15

# A

act [7]  315/4 320/11 320/22 331/23 354/15
354/17 354/20
acting [2]  316/16 372/9
action [1]  273/2
actions [1]  333/13
actively [1]  298/6
activities [1]  379/23
activity [1]  283/22
actual [5]  304/24 323/5 323/13 323/13
332/19
actually [24]  270/9 274/24 302/10 302/18
308/25 313/21 321/7 322/9 322/25 324/19
324/20 324/24 332/2 334/4 342/8 345/13
350/3 352/9 355/11 359/6 376/9 382/3
384/16 387/19
acuity [1]  377/24
acute [14]  276/25 279/11 306/22 320/12
330/12 371/6 372/15 373/14 374/13 375/23
382/6 382/14 392/14 392/19
adapt [1]  375/6
add [3]  273/13 298/21 376/16
Adding [1]  298/20
addition [6]  277/12 279/4 281/11 284/2
326/25 348/24
additional [3]  298/20 304/21 326/9
additionally [1]  345/16
address [2]  312/23 321/6
addressing [1]  319/18
adequate [1]  360/14
adequately [1]  324/8
administrative [1]  360/1
admission [2]  299/2 329/6
admissions [2]  338/20 375/13
admit [5]  331/22 348/7 348/19 386/4 387/10
admits [1]  329/2
admitted [3]  274/16 322/6 323/11
admitting [1]  293/16
adversely [1]  367/16
advising [1]  362/14
affect [1]  281/23
affidavit [1]  389/20
affidavits [2]  277/15 303/24
affiliate [1]  296/8
affiliates [1]  340/4
affiliating [3]  287/25 288/2 296/12
affiliation [4]  297/1 297/4 357/6 377/11
affirmative [2]  319/24 372/9
affirmed [1]  314/6
affordable [1]  276/7
after [26]  277/17 279/13 287/15 287/19
297/14 308/15 313/19 314/5 314/25 315/11
316/2 316/7 317/9 317/25 318/20 320/3
333/20 349/19 353/11 354/3 354/5 354/19
355/2 355/17 388/10 389/9
afternoon [1]  369/23
afterwards [1]  354/17
again [46]
against [8]  274/25 276/3 298/16 308/2 309/8
316/25 337/10 380/19
aggressive [1]  274/20
aggressively [1]  276/14
aging [1]  333/14
ago [3]  290/2 327/14 334/23
agree [22]  273/14 303/20 304/1 328/11
330/11 330/20 330/23 338/24 343/12 343/13
343/13 343/15 353/20 358/7 365/22 380/20
383/16 383/17 384/7 385/3 385/7 385/15
agreement [61]

agreement's [1]  371/14
agreements [4]  315/1 380/3 380/10 380/15
agrees [2]  308/7 340/3
ahead [1]  368/10
ALJ [2]  304/15 386/18
allegation [1]  344/21
allege [1]  344/18
alleged [1]  330/16
allow [6]  299/18 342/1 361/5 363/25 378/14
378/15
allowed [3]  303/8 360/20 379/6
allowing [2]  363/16 379/9
allows [1]  381/9
almost [5]  308/18 339/17 356/12 358/14
385/2
alone [6]  272/7 282/8 287/20 287/22 337/1
357/3
already [22]  271/2 292/17 298/19 298/19
302/9 309/25 312/9 318/4 318/12 318/16
327/17 336/3 336/15 338/9 360/10 370/10
375/21 382/24 386/24 388/25 390/7 393/3
also [15]  275/4 275/25 281/12 295/3 304/2
334/11 335/24 335/25 345/9 346/1 346/15
348/4 356/21 382/7 390/2
alternatives [3]  317/14 325/14 357/2
although [2]  273/18 360/6
always [3]  305/16 310/5 327/13
am [11]  310/13 338/24 339/5 346/3 349/3
367/24 368/18 374/20 379/19 387/17 389/15
ambulatory [1]  317/12
amending [1]  317/12
America [1]  388/8
amicable [2]  376/10 376/13
among [3]  290/10 291/25 348/19
amount [1]  319/13
Amy [4]  269/14 269/16 350/8 356/5
analyses [1]  375/1
analysis [12]  275/25 279/2 279/10 279/19
279/24 288/23 291/15 331/6 338/11 355/12
355/23 375/2
analytical [1]  275/24
analytically [1]  307/6
analyzed [1]  357/1
and/or [1]  362/5
another [18]  292/22 295/5 297/12 314/8
314/23 315/7 315/9 324/9 327/19 328/22
336/5 339/5 341/21 348/21 352/18 371/2
377/14 383/7
answer [12]  282/8 291/20 301/13 307/4
318/8 322/20 323/2 328/12 332/21 334/5
337/13 373/11
answered [2]  302/2 337/19
Anthem [6]  274/17 329/5 331/16 340/8
340/9 364/21
Anthem's [1]  328/20
anticompetitive [13]  299/7 299/11 299/18
300/8 307/25 308/4 316/24 326/5 343/23
355/18 358/20 365/13 388/19
antitrust [12]  269/8 274/24 275/25 291/15
295/18 304/8 304/24 318/14 358/4 384/20
388/13 391/25
any [69]
anybody [1]  369/4
anymore [4]  336/17 357/4 366/13 371/1
anyone [1]  389/16
anything [10]  309/23 317/16 324/21 325/6
345/9 345/19 346/20 349/14 366/15 393/8
anytime [4]  272/23 298/3 298/24 354/15
anyway [1]  387/16
anyways [1]  387/13

anywhere [2]  273/8 300/23
apologize [2]  300/10 301/10
apparent [2]  286/16 286/17 296/7
apparently [3]  338/1 345/20 368/13
appeal [3]  310/1 315/23 386/15
Appeals [1]  305/21
appear [6]  304/13 322/21 323/24 323/25
324/15 353/25
Appearances [3]  268/16 268/25 269/1
appears [3]  310/14 325/9 343/1
appendix [2]  361/19 361/21
applied [1]  391/18
apply [1]  361/21
appoint [1]  371/24
appointees [2]  371/25 372/10
appoints [1]  372/3
approach [1]  331/5
approached [1]  355/9
appropriate [4]  275/24 299/17 300/7 307/7
approval [2]  372/1 383/16
approve [2]  300/8 371/25
area [10]  290/11 298/20 302/3 324/19 324/24
335/8 335/22 337/25 338/2 383/20
Areeda [1]  315/12
aren't [1]  365/11
arena [2]  271/11 273/1
argue [1]  353/2
argued [5]  282/22 293/17 295/3 295/7
297/12
argues [1]  345/1
arguing [3]  291/7 386/15 386/16
argument [12]  286/3 287/15 288/3 288/6
292/4 292/23 293/15 294/13 295/12 299/12
333/24 373/22
arguments [5]  286/3 291/1 291/1 294/11
294/15
arithmetic [1]  307/13
around [10]  286/2 289/2 296/14 313/22
319/2 327/22 330/9 343/5 355/24 383/20
arrangements [1]  366/24
arrest [1]  317/12
Arrowhead [6]  297/21 297/24 298/7 298/11
334/9 334/25
artery [1]  290/6
article [4]  371/16 371/18 371/20 372/7
Articles [1]  372/12
articulated [1]  375/18
aside [1]  278/15
ask [8]  307/2 325/7 328/9 374/10 381/11
384/13 394/9 394/14
asked [16]  289/21 298/9 303/7 308/20 309/2
309/2 310/5 314/1 314/2 322/13 322/22
323/25 328/14 334/5 341/23 358/19
asking [17]  308/16 309/22 309/23 310/4
311/14 311/18 315/15 315/15 317/2 350/9
365/20 366/19 371/1 380/23 384/25 386/9
392/22
assert [2]  276/25 294/22
asserted [1]  297/20
asserting [1]  353/21
assertions [1]  283/2
assessment [2]  277/20 329/17
assets [4]  278/20 314/21 316/1 386/7
assimilated [1]  277/24
assistance [1]  393/19
assume [6]  272/4 280/19 287/14 325/22
325/25 335/1
assumed [3]  280/21 355/12 355/13
assuming [8]  278/22 278/23 279/2 279/4
279/9 325/14 325/17 370/14

# A

assumption [1] 347/14
assumptions [5] 279/10 280/1 280/15 280/15 281/8
attack [2] 290/4 290/17
attain [1] 353/2
attempt [2] 291/12 291/13
attempts [1] 354/4
attention [2] 339/22 347/22
Attorney [2] 269/7 321/19
Attorney-General's [1] 321/19
attract [1] 278/6
attracting [1] 338/2
August [7] 311/1 336/19 361/4 363/20 365/5 375/3 375/24
August 2010 [1] 375/3
August 31 [1] 361/4
August 31st [4] 336/19 363/20 365/5 375/24
authority [1] 315/3
authorized [1] 304/7
authorizes [1] 346/3
availability [2] 313/18 360/13
available [5] 279/21 315/5 315/9 340/4 357/2
Avenue [4] 268/18 268/20 269/3 269/5
average [2] 278/21 322/15
avoidance [2] 297/19 298/5
avoided [1] 297/22
avoids [1] 314/18
aware [7] 273/1 274/19 281/13 287/17 287/22 341/3 345/8
away [6] 326/24 328/18 333/6 337/16 359/25 376/15

# B

Baa [2] 282/3 282/9
back [22] 269/2 295/21 306/16 317/23 320/5 327/25 331/25 334/2 338/16 341/12 344/22 347/3 348/14 353/9 355/10 362/6 364/20 366/3 367/9 368/17 369/2 391/13
background [1] 272/10
bad [4] 326/6 356/8 383/21 384/5
Baker [1] 338/7
balance [1] 375/14
bank [5] 279/13 282/18 307/19 317/10 388/21
bar [3] 283/16 322/17 368/13
bargaining [3] 328/15 331/16 331/18
based [10] 279/21 280/14 281/8 284/24 293/14 322/8 347/11 375/21 391/19 391/20
bases [1] 272/7
basically [1] 342/8
basis [8] 273/21 276/6 279/3 286/8 300/7 328/5 328/6 347/14
Bates [1] 345/15
Bay [1] 334/22
Beach [3] 268/8 268/23 385/20
bear [9] 284/12 286/1 286/5 326/11 328/25 328/25 337/11 338/4 342/22
because [72]
become [4] 339/3 343/4 343/5 344/25
becomes [3] 326/1 377/19 378/22
beds [4] 292/11 302/25 333/24 337/17
before [32] 268/13 274/23 276/16 278/9 287/4 297/1 317/13 317/13 317/14 317/16 320/3 321/9 328/20 328/20 328/21 332/12 332/13 334/16 338/16 346/19 353/10 353/23 354/9 354/23 361/15 364/22 365/3 366/5 378/21 386/5 386/11 390/19
begin [1] 353/1

beginning [4] 290/9 350/7 360/22 370/10
begun [1] 360/11
behalf [5] 270/19 293/17 295/7 295/10 394/14
behave [1] 273/20
behind [1] 327/9
being [13] 278/13 298/7 299/3 309/4 311/24 346/13 357/21 362/23 374/4 376/8 377/21 385/5 390/19
belatedly [1] 353/11
belie [1] 389/17
belief [1] 387/22
believe [10] 272/3 305/12 305/13 341/25 359/22 370/17 372/19 373/22 373/23 381/19
believed [1] 377/10
believes [2] 297/3 338/1
below [2] 392/15 392/15
benefit [9] 282/17 306/17 310/12 326/18 326/18 327/23 341/8 367/5 367/7
benefits [8] 297/6 309/17 369/21 370/3 377/7 377/8 377/10 379/21
best [8] 277/10 279/20 297/2 297/4 297/6 343/17 362/8 374/14
Beth [1] 269/7
better [14] 283/23 290/18 290/19 325/12 325/14 326/10 341/1 342/1 356/14 366/17 367/5 369/25 375/22 375/22
between [17] 272/13 275/1 293/20 296/23 306/16 320/7 322/18 323/20 325/12 346/2 347/6 350/8 361/5 362/15 363/17 381/24 384/18
beyond [3] 360/19 361/10 374/25
big [1] 358/9
bigger [3] 332/10 332/10 358/10
billion [3] 282/11 282/11 295/5
binder [1] 377/15
bit [18] 272/10 273/11 273/17 286/2 286/4 289/4 295/20 313/22 350/1 357/20 360/6 360/7 364/7 371/18 381/13 381/19 389/16 392/18
black [5] 283/22 283/24 373/24 374/5 374/10
blank [3] 299/22 299/23 332/9
bleed [1] 366/12
bleeding [2] 366/8 366/11
blindly [1] 272/22
blip [1] 391/10
block [3] 309/6 334/6 378/21
blocked [1] 298/10
blocks [1] 309/20
blue [1] 356/7
board [29] 277/22 283/19 283/20 283/23 284/3 332/5 336/24 371/19 371/23 372/4 372/6 372/10 372/16 372/17 373/18 373/19 374/6 374/7 374/8 374/16 383/14 383/15 383/16 383/16 383/17 383/24 384/7 391/4 391/5
boards [1] 374/15
body [1] 277/24
boil [1] 378/19
bolstered [1] 306/5
bond [6] 278/12 278/15 281/15 281/18 282/11 282/12
bonds [1] 278/14
borne [1] 303/12
both [12] 285/23 288/22 314/14 317/8 320/9 341/17 377/17 379/18 385/17 389/3 389/7 394/20
bother [1] 384/13
bottom [6] 284/15 325/15 325/21 326/11 332/8 366/2

bouncing [1] 286/2
break [1] 318/19
brick [7] 281/13 281/14 282/1 282/16 284/22 294/17 338/3
Brick's [1] 282/5
brief [6] 297/18 344/20 345/1 345/2 345/22 346/16
briefly [10] 271/7 273/5 286/9 292/3 292/21 295/12 308/14 314/10 378/10 378/11
bring [3] 272/9 296/15 337/11
broad [1] 293/16
broader [1] 335/22
broadest [1] 297/7
broke [1] 352/16
broken [2] 297/24 385/10
brought [2] 273/2 345/11
budge [1] 328/17
budget [1] 302/5
budgeting [1] 280/6
budgets [1] 298/1
build [1] 334/23
builds [1] 357/20
built [1] 334/22
bulk [1] 297/19
bundle [1] 307/1
burden [11] 305/9 305/10 305/13 309/20 318/4 321/11 385/24 388/2 388/5 388/11 394/8
burdens [1] 374/22
burdensome [2] 309/15 311/24
buried [1] 372/23 372/24
business [6] 274/13 280/18 301/8 361/13 368/19 380/17
businesses [1] 368/21
businessperson [1] 379/12

# C

calculated [2] 280/14 322/7
calculates [1] 321/21
Calculating [1] 307/12
calculations [1] 284/23
California [1] 309/1
called [3] 271/17 276/5 385/9
caller [1] 385/10
Calvert [2] 282/1 378/2
Calvert's [1] 284/21
came [8] 284/11 288/7 324/10 334/16 342/16 344/23 353/19 377/24
can't [40] 276/13 311/3 328/6 329/22 336/17 340/9 352/23 352/23 353/18 362/17 363/3 363/7 363/11 363/22 363/24 364/4 364/11 366/11 366/14 366/24 367/1 367/2 367/11 368/23 368/23 369/1 369/2 369/23 370/3 371/1 371/5 371/7 371/9 371/25 373/18 384/20 385/15 386/6 392/23 392/23
cannot [4] 273/14 295/16 323/11 347/16
capability [1] 336/4
capacity [6] 292/4 292/5 292/10 292/15 293/6 390/20
capital [7] 279/7 297/19 333/13 369/8 369/21 370/6 385/1
cardiac [1] 290/6
cardiology [1] 276/10
cardiovascular [2] 337/2 366/8
care [39] 276/4 276/25 279/11 283/5 284/6 288/24 290/4 290/11 294/23 299/24 306/23 320/13 322/19 324/25 326/10 330/12 340/1 341/7 342/1 345/18 357/12 361/6 367/2 367/3 367/16 370/1 371/6 372/15 373/15 374/13 375/23 377/11 377/20 377/23 382/6

**C**

care... [4] 382/14 387/2 392/14 392/19
care's [1] 290/18
careful [1] 319/1
Carletti [2] 269/16 356/5
carve [2] 343/15 365/1
carve-out [1] 365/1
case [51]
cases [9] 272/16 272/25 285/3 304/13 307/18 314/15 329/18 338/12 343/24
cash [5] 278/10 278/16 278/20 295/6 390/24
catch [1] 295/25
categories [1] 382/23
Cathy [1] 376/8
caught [1] 272/4
cause [3] 361/5 363/22 363/25
caused [2] 272/23 298/6
causes [1] 307/20
causing [2] 359/25 363/16
caution [1] 290/13
cease [1] 296/14
center [3] 281/20 335/14 371/10
central [1] 309/1
CEO [4] 281/4 283/20 289/13 391/5
Cereal [1] 314/23
certain [5] 272/14 361/13 363/2 373/8 380/7
certainly [7] 273/19 331/16 333/23 334/21 356/20 357/9 369/4
CERTIFICATE [1] 395/4
Certified [1] 395/6
certify [1] 395/6
CFO [1] 281/5
chairman [2] 374/5 374/6
challenge [6] 360/16 378/25 378/25 379/1 379/10 393/1
challenges [2] 333/3 333/21
chance [3] 319/15 343/9 367/19
change [11] 297/5 302/11 309/9 309/24 311/15 313/11 336/2 338/25 358/9 358/12 358/18
changed [3] 306/9 333/7 375/6
changer [1] 336/5
changes [4] 315/16 316/1 316/2 385/11
changing [1] 329/19
Chappell [1] 386/14
characterization [1] 294/25
characterize [1] 273/10
charge [5] 292/17 325/24 331/22 349/5 349/8
charged [3] 322/9 323/12 346/3
charges [2] 326/4 349/22
charitable [1] 327/3
chart [11] 276/8 276/19 276/24 277/2 322/7 322/17 323/14 323/14 325/5 356/5 358/24
charts [1] 282/23
check [2] 299/22 299/23
checked [1] 280/9
checkmarks [1] 276/19
Chicago [3] 269/13 269/18 269/20
chilling [1] 369/17
choice [1] 276/21
choose [1] 319/5
chose [1] 296/13
Cincinnati [1] 327/9
circuit [4] 310/1 314/6 314/18 365/13
circumstances [1] 340/20
citation [1] 319/4
cite [3] 346/15 347/3 371/1
cited [9] 279/23 280/24 303/18 304/3 305/21 321/2 345/10 345/20 345/20

cites [1] 347/5
citing [1] 346/10
citizens [2] 387/8 393/23
CIV [1] 268/2
claim [10] 281/16 286/3 286/5 286/8 321/2 349/18 360/18 374/25 377/23 379/5
claims [7] 279/3 286/6 297/19 311/22 347/23 349/18 352/7
Clayton [5] 320/11 320/22 354/14 354/17 354/20
clean [2] 352/19 352/20
clear [22] 272/11 275/10 281/7 304/3 305/10 313/5 319/13 326/3 343/19 344/24 353/9 353/19 356/8 356/15 357/4 363/6 368/6 372/16 383/4 392/11 393/17 393/19
clearly [3] 307/23 388/18 388/23
Clematis [1] 268/23
climate [1] 282/13
clinical [2] 361/3 366/4
close [9] 295/24 324/21 336/25 337/1 337/4 337/4 383/12 390/8 392/6
closely [2] 324/24 382/1
closer [3] 344/20 346/17 350/10
closing [1] 376/7
clothed [1] 373/24
clout [2] 377/14 377/20
cluster [2] 306/23 307/7
clustered [1] 275/23
codes [4] 330/9 330/19 330/22 330/22
colleague [1] 270/20
colleagues [3] 270/24 282/20 287/16
Columbus [1] 269/9
column [3] 285/6 285/14 285/18
combed [1] 287/5
combination [1] 358/6
combined [1] 290/22
combining [2] 368/14 368/19
comes [4] 284/6 285/12 332/13 355/2
comfort [2] 303/2 312/23
comfortable [1] 386/2
coming [8] 274/23 283/25 284/1 285/4 285/5 310/15 327/25 369/14
commend [2] 376/11 394/21
commercial [6] 282/23 283/3 283/7 284/4 284/5 364/18
commercially [4] 329/1 331/17 352/8 375/13
commercially-insured [3] 329/1 352/8 375/13
commingled [1] 316/1
commingling [1] 316/2
COMMISSION [22] 268/3 268/17 268/20 269/2 269/5 270/10 270/19 271/17 272/16 305/5 309/10 310/1 311/11 315/23 315/24 316/6 316/9 382/16 386/15 388/10 393/12 394/1
Commission's [4] 314/12 315/3 316/20 394/11
commissioned [1] 324/11
commitment [4] 412/15 371/3 375/21 382/12
committed [1] 327/19 382/10
common [1] 274/3
communications [1] 350/8
communities [1] 374/17
community [12] 281/20 287/2 297/2 297/4 297/7 326/10 333/24 334/1 357/7 357/18 370/2 389/23
companies [3] 289/2 344/17 377/23
company [1] 392/9
compare [2] 317/16 324/2
comparison [1] 323/9

compelled [1] 370/20
compelling [1] 288/15
compensation [2] 350/11 366/23
compete [8] 273/21 273/22 277/7 298/16 330/15 335/10 337/10 338/1
competed [6] 276/2 276/4 276/6 276/9 276/13 300/24
competing [2] 274/7 380/19
competition [24] 274/3 274/20 274/21 274/25 291/16 291/19 291/20 307/22 309/18 316/5 320/12 320/18 320/20 329/19 360/14 360/15 378/15 380/17 386/7 388/17 389/12 390/14 394/7 394/11
competitive [35] 279/25 306/24 316/15 317/25 320/23 321/17 323/22 326/5 328/7 328/19 329/14 329/22 331/9 331/12 331/15 331/23 332/2 332/18 332/25 337/24 338/10 344/1 344/4 352/24 354/1 354/7 354/11 354/11 355/7 372/14 373/8 375/4 375/11 375/14 391/22
competitively [2] 316/16 333/4
competitiveness [1] 361/2
competitor [28] 288/4 291/7 291/11 295/17 298/21 314/8 322/9 327/6 329/22 330/1 330/2 330/18 332/1 332/15 332/23 332/25 333/3 333/6 333/22 337/16 337/22 337/24 338/1 360/7 360/8 381/11 381/12 390/10
competitor's [3] 332/5 333/2 338/8
competitors [9] 271/19 272/1 276/18 277/6 282/9 323/19 331/12 335/7 338/6
complaint [5] 306/7 315/23 344/19 386/18 386/19
completed [1] 272/18
completely [4] 327/7 328/16 331/25 390/18
complicit [1] 272/5
complied [1] 361/8
compliment [1] 376/14
complimented [1] 376/17
comply [2] 370/12 374/11
comprehensively [1] 302/2
compulsion [1] 319/12
computations [2] 337/6 343/16
concede [2] 306/20 307/17
conceded [4] 306/22 343/11 343/18 344/5
conceding [1] 343/10
concentrated [3] 271/18 358/17 388/25
concentration [16] 272/23 307/16 307/21 308/1 308/6 308/8 308/11 317/12 325/10 343/25 344/3 354/16 375/1 388/15 388/24 391/20
concern [7] 273/8 342/25 348/2 348/7 362/25 362/25 389/25
concerned [10] 274/20 293/14 315/14 343/6 347/24 348/22 348/23 349/2 349/4 390/15
concerning [1] 271/6
concerns [2] 339/9 389/21
concerted [1] 274/14
concluded [2] 333/22 395/2
concludes [2] 278/3 279/10
conclusion [3] 271/3 294/12 347/15
conclusions [1] 278/2
conclusively [1] 297/13
condemn [1] 272/7
condition [2] 280/13 342/22
conditions [4] 332/3 372/12 375/2 375/6
conducted [1] 284/22
conducting [1] 275/11
conference [1] 377/5
confidence [2] 289/14 313/2
confident [1] 375/19

## C

confidentiality [1]  275/3
confirms [2]  273/19 283/21
confused [4]  306/3 306/19 306/19 325/18
confusing [1]  281/17
Congress [2]  315/5 378/23
Congressionally [1]  384/24
Congressionally-mandated [1]  384/24
cons [1]  357/5
conservative [1]  279/9
consider [7]  286/23 287/7 288/9 288/11 334/21 341/22 394/10
considerable [1]  314/20
consideration [1]  338/13
considerations [1]  304/25
considered [6]  274/24 282/16 286/19 287/20 328/16 391/11
considering [1]  298/5
consistent [8]  280/16 333/15 333/17 336/17 378/7 378/7 380/9 390/6
consistently [1]  336/21
consists [1]  371/23
consolidate [2]  361/3 382/22
consolidating [2]  368/18 368/25
consolidation [2]  383/2 383/3
constrain [2]  331/13 331/14
constrained [1]  293/6
constraining [1]  292/13
constraint [4]  274/4 330/3 340/23 340/24
construct [1]  323/8
constructed [6]  322/5 322/10 323/10 324/8 325/6 328/4
construction [1]  334/10
construe [1]  344/9
consumers [4]  316/20 317/20 318/2 341/8
consumers' [1]  317/13
consummate [4]  308/23 308/24 309/24 360/21
consummated [5]  309/4 309/25 315/21 360/9 378/21
consummation [9]  309/8 314/25 315/13 315/15 315/25 316/3 316/7 380/4 386/5
contained [1]  280/17
contains [1]  324/18
contemplate [1]  364/6
contemplates [1]  364/7
contemplating [3]  334/25 371/7 373/9
contesting [1]  346/7
context [8]  271/8 272/19 273/12 280/10 283/5 291/21 295/2 320/21
continually [1]  273/10
continue [16]  273/5 278/4 278/6 289/14 300/6 301/7 315/16 316/14 334/21 335/10 338/17 344/16 344/16 365/4 365/9 379/21
continued [5]  268/25 269/1 356/15 387/7 391/2
continues [3]  297/17 306/18 340/24
continuing [6]  288/24 303/16 304/2 324/15 341/21 387/1
continuously [1]  373/14
contract [32]  322/21 323/6 323/7 323/12 329/5 340/12 352/22 353/8 353/10 353/13 353/22 354/10 354/24 355/3 361/5 363/12 363/17 363/21 363/25 364/1 364/4 364/4 364/7 364/11 364/12 364/15 365/2 365/9 373/17 378/1 381/15 384/18
contracting [1]  292/22 293/8 362/15 362/19
contracts [14]  322/18 323/3 353/12 354/4 357/12 357/14 363/19 364/3 365/7 367/13

373/22 377/11 377/21 379/10
contractual [2]  371/2 374/8
contractually [2]  340/18 382/10
contradict [1]  307/11
contrary [2]  283/2 284/9
contribute [1]  353/3
contribution [3]  285/14 285/16 285/23
control [4]  362/9 362/12 369/19 377/23
controls [1]  300/14
convenience [1]  275/24
conversation [1]  320/4
cooperation [1]  370/19
coordinate [1]  342/1
copy [4]  321/8 359/7 359/8 359/8
corner [1]  330/4
Corp [2]  309/1 309/14
corporate [1]  350/9
correct [13]  303/1 304/16 304/22 305/1 346/4 346/5 376/19 379/24 379/25 380/1 385/19 385/22 395/7
correcting [1]  284/18
cost [36]  283/3 283/4 283/5 283/5 284/6 284/19 285/6 285/10 290/10 293/11 294/14 294/20 294/22 311/13 313/17 318/4 340/1 341/8 341/9 341/15 341/16 353/3 353/4 353/14 353/24 354/6 354/25 355/4 357/7 357/18 364/18 367/4 367/9 369/2 390/21 394/8
cost-cutting [1]  390/21
cost-effectively [1]  367/4
costing [1]  366/9
costs [18]  283/8 283/9 285/7 285/11 294/23 296/6 318/10 324/18 324/25 325/3 353/3 353/7 353/13 365/10 367/10 367/11 367/14 394/5
couldn't [2]  279/4 353/18
counsel [6]  270/10 275/7 278/12 288/14 290/25 315/23 386/18 386/19
counsel's [1]  281/12
count [1]  281/4
counted [1]  311/2
counterintuitive [1]  325/9
counterpoint [1]  376/20
counties [1]  331/1
counting [1]  302/21
country [5]  271/14 271/25 281/21 289/2 295/14
county [29]  275/5 276/6 276/22 276/23 277/1 277/7 289/21 292/10 292/16 298/12 301/8 303/4 303/12 307/9 313/13 316/15 317/8 317/24 318/3 318/11 320/14 330/13 330/14 330/23 387/8 389/11 393/15 393/23 394/5
couple [9]  290/15 290/19 317/7 330/6 334/11 347/21 364/22 385/14 387/5
course [32]  270/18 275/12 277/3 277/5 278/14 280/17 280/23 280/23 281/9 282/15 286/13 288/23 291/2 294/18 301/13 305/15 306/3 306/3 306/3 315/14 319/22 326/20 336/13 358/22 365/11 369/22 370/5 380/2 383/22 386/2 390/11 393/6
court [77]
Court's [1]  385/17
courtroom [1]  387/12 389/17
courts [4]  271/17 309/5 309/11 315/2
cover [12]  283/3 283/8 283/9 284/5 294/23 296/5 341/11 353/3 353/12 364/18 367/10 367/13
coverage [12]  294/14 294/20 294/22 314/17 335/18 346/2 353/14 353/24 354/6 354/25 355/4 367/9

covered [2]  341/11 382/25
covering [2]  285/11 353/7
covers [1]  342/7
CPE [1]  268/22
crazy [1]  311/15
create [6]  323/13 343/22 343/25 354/14 357/25 369/7
created [5]  280/5 280/5 280/6 284/23 389/2
creates [4]  370/23 378/24 378/25 379/1
creation [1]  370/15
credit [6]  281/22 281/23 282/3 282/6 282/9 299/7
cripple [1]  370/8
critical [1]  305/16
cross [6]  275/7 277/16 279/22 296/19 297/15 378/4
cross-examination [3]  275/7 279/22 378/4
cross-examine [3]  277/16 296/19 297/15
CRR [2]  268/22 395/12
crucial [1]  305/16
curious [4]  280/3 280/8 288/18 317/20
current [8]  287/2 294/13 294/13 294/14 302/9 332/9 364/15 391/21
currently [1]  312/19
cut [2]  286/7 367/2
cuts [1]  316/25
cutting [4]  286/11 286/25 390/21 392/17

## D

D.C [1]  314/18
Dagen [15]  277/14 277/16 277/17 277/18 277/24 278/3 279/1 279/15 279/23 280/12 280/19 281/11 284/22 294/17 337/6
Dagen's [9]  279/10 279/19 280/1 280/11 280/25 281/8 282/15 288/8 355/23
DAK [1]  268/2
Dan [1]  364/20
dangerous [1]  295/12
data [12]  316/13 316/22 317/6 317/16 324/18 341/17 342/11 342/23 356/2 377/22 377/23 378/2
date [3]  311/2 311/3 366/5
Dated [1]  395/9
Daubert [1]  281/12
DAVID [3]  268/13 269/11 394/23
day-to-day [1]  273/21
days [4]  290/2 364/18 364/22 375/18
days' [1]  363/22
DC [7]  268/18 268/21 269/3 269/6 269/15 315/7 378/16
deal [13]  282/21 299/8 299/18 300/8 309/8 309/20 334/17 335/1 346/25 360/21 373/10 389/22 389/22
dealing [1]  326/12
deals [2]  309/12 364/22
debate [5]  306/18 307/9 376/10 391/14 392/1
debt [4]  278/11 278/17 279/6 282/19
decade [3]  297/24 302/4 356/4
decades [5]  278/22 278/24 278/24 281/19 380/14
December [2]  364/24 364/25
December 31st [2]  364/24 364/25
decide [4]  273/7 328/6 384/7 393/12
decided [4]  297/13 316/10 378/23 392/5
deciding [1]  303/19
decision [5]  286/23 286/23 287/4 372/21 386/22
decisions [2]  299/14 383/13
declarants [1]  390/6
declaration [4]  347/25 348/2 348/15 349/13

**D**

declarations [3]  279/16 349/1 389/24
declined [1]  289/10
declining [1]  289/9
decreased [2]  336/14 336/14
deep [1]  295/17
default [1]  278/13
DEFENDANT [15]  268/8 269/11 286/6
304/4 305/21 307/2 308/7 308/9 308/15
311/22 316/12 316/19 361/25 382/9 390/9
Defendant's [5]  294/11 310/12 319/6 363/10
390/17
Defendants [3]  300/20 309/15 390/8
defending [2]  271/9 295/2
defense [11]  281/12 288/14 295/18 353/21
391/23 392/4 392/6 392/12 392/21 392/22
392/25
define [1]  330/23
defined [2]  300/2 368/20
definitely [2]  317/17 358/24
definition [8]  304/10 305/16 305/18 305/23
330/24 343/13 361/23 362/23
definitions [3]  305/24 361/18 361/21
deliver [4]  324/25 341/7 367/2 367/3
delivery [2]  340/1 341/9
demand [1]  328/15
demands [1]  349/22
demographics [1]  336/2
demonstrate [2]  279/19 294/14
demonstrated [5]  298/18 320/10 375/5
388/14 393/21
demonstrates [6]  284/9 303/3 332/2 332/18
337/21 354/22
denied [3]  388/9 393/16 393/25
denies [1]  393/10
Dennis [1]  347/8
deny [1]  376/2
department [1]  290/4
departments [1]  367/5
depicted [1]  322/16
depose [1]  322/13
deposed [2]  277/15 341/23
deposition [11]  275/7 289/6 289/7 289/22
290/2 296/17 296/19 297/14 302/14 322/24
336/24
depositions [1]  316/22
derive [2]  370/2 370/2
describe [3]  319/19 350/1 375/8
described [4]  297/9 299/3 300/7 389/16
describes [1]  324/17
description [1]  389/18
detailed [1]  308/3
deteriorating [1]  342/22
determine [5]  304/7 316/15 353/6 357/24
388/1
determined [1]  272/16
deterring [1]  379/22
detracts [1]  291/14
develop [2]  277/19 300/4
developed [3]  279/21 294/17 328/4
diabetes [1]  337/2
dictates [1]  370/13
didn't [21]  275/21 279/22 279/23 280/2
280/19 280/21 282/17 283/16 288/11 292/13
306/13 313/13 314/4 334/15 341/20 348/7
348/19 352/16 352/16 357/18 360/21
differ [2]  294/25 349/18
difference [6]  323/20 324/5 324/22 343/10
384/16 393/14

different [22]  273/6 273/6 282/8 289/1
294/11 300/25 306/24 306/24 306/25 307/2
307/3 323/3 335/15 335/15 336/9 340/5
340/15 341/12 357/6 383/13 387/12 387/13
differential [1]  378/5
differently [2]  327/14 357/19
difficult [5]  286/18 314/8 359/5 370/16 394/3
difficulties [2]  329/14 364/17
difficulty [1]  314/20
digress [2]  307/8 334/4
digressed [1]  337/18
diligence [1]  344/24
dimension [1]  323/4
dimensions [1]  323/3
diminish [1]  321/18
direct [12]  283/3 283/4 283/4 283/8 285/6
285/10 285/11 325/3 332/14 338/19 339/21
347/22
direction [2]  362/9 362/12
directly [4]  338/22 349/10 362/9 362/13
director [2]  347/8 350/9
directors [2]  283/20 391/4
disagree [4]  295/4 308/10 338/17 347/1
disagreed [1]  338/16
disagreements [1]  376/12
disappeared [1]  317/14
disc [1]  372/25
discharges [1]  348/13
disclosed [1]  281/9
discovered [1]  275/12
discovery [5]  299/15 300/5 300/5 304/21
386/17
discuss [4]  291/21 330/5 347/9 389/8
discussing [1]  347/7
Discussion [1]  394/24
discussions [2]  296/14 350/3
disincentive [2]  369/7 370/3
disorganized [1]  319/20
disposal [2]  277/16 279/17
dispute [2]  306/6 364/5
disruptive [1]  315/13
distant [2]  302/16 302/20
distinguish [1]  379/13
district [10]  268/1 268/1 268/14 304/4
305/20 309/7 309/11 309/19 388/9 391/17
divested [1]  380/18
divestiture [7]  314/22 315/24 316/4 316/10
374/14 386/8 394/12
division [1]  358/4
document [35]  280/2 280/4 280/7 280/7
280/24 281/6 286/12 286/19 294/18 329/23
330/1 332/1 332/2 332/5 332/7 332/22
332/24 333/20 345/14 345/15 345/16 345/21
345/25 345/25 346/12 346/12 346/16 346/17
346/18 346/18 346/19 357/4 377/3 377/4
392/18
documentary [1]  390/13
documents [27]  275/4 280/18 280/23 281/9
287/13 303/21 312/24 312/25 313/1 316/22
335/4 345/10 347/3 347/16 347/17 356/22
372/23 372/24 373/6 376/24 377/9 378/7
378/8 389/7 389/12 389/17 390/14
does [31]  275/10 275/21 278/8 281/18 282/7
286/10 291/17 303/6 305/5 305/17 306/20
308/3 312/23 320/24 321/23 326/1 329/10
335/9 356/2 360/3 362/4 366/20 368/16
368/22 368/22 369/1 381/8 381/24 382/15
384/10 393/8
doesn't [41]  276/25 285/8 285/9 291/2
293/15 301/4 309/23 314/9 325/6 326/4

326/24 327/8 327/8 327/9 329/10 329/11
332/20 334/14 334/16 335/1 335/16 335/18
335/25 336/4 338/4 345/18 346/20 354/17
358/3 363/7 366/20 367/15 367/19 370/5
371/10 372/18 381/7 383/20 384/8 390/25
393/9
doing [14]  278/7 298/19 312/15 326/11 327/5
355/12 355/17 362/5 363/23 370/4 378/16
383/5 387/1 392/10
dollar [1]  388/20
dollars [4]  273/22 274/13 295/6 342/25
dominant [1]  277/6
don't [89]
done [19]  273/18 276/16 302/5 321/9 328/20
328/20 328/20 362/5 364/25 374/20 380/25
381/2 381/16 381/18 385/14 393/22 394/4
394/6 394/9
door [6]  282/24 284/11 285/4 285/13 285/18
290/6
door-to-artery [1]  290/6
doors [4]  283/16 283/25 284/1 337/5
doubled [1]  356/12
doubt [3]  296/21 296/22 378/22
down [7]  278/19 289/24 309/18 348/23
352/16 368/8 387/5
dozen [1]  273/3
dozens [1]  380/9
Dr. [3]  296/18 296/19 296/19
Dr. Gold [2]  296/18 296/19
Dr. Gold's [1]  296/19
draconian [1]  309/12
draft [2]  386/3 387/10
drafts [2]  373/3 373/4
dramatic [3]  312/9 312/23 318/10
dramatically [7]  311/9 317/4 318/3 378/16
389/8 390/23 393/20
draw [2]  335/22 347/15
dressing [1]  372/6
drop [2]  290/19 326/10
dropped [1]  290/14
due [2]  344/24 364/8
duopoly [1]  389/3
during [19]  289/18 289/18 311/19 319/22
330/1 336/24 342/12 348/8 359/25 365/11
377/5 381/2 381/7 381/18 381/25 385/3
385/20 385/21 393/23
duty [2]  373/25 384/1
dwarfs [1]  335/21
dynamic [3]  329/17 338/11 375/2
dynamically [1]  329/20
dynamics [7]  306/24 316/15 317/25 331/10
332/19 341/22 391/23

**E**

e-mail [3]  281/2 347/6 350/7
each [3]  277/8 331/18 339/17
earlier [1]  393/8
early [6]  286/13 286/17 341/11 363/13
374/20 387/19
earn [1]  324/13
earned [1]  294/14
earnings [3]  287/24 288/15 326/19
easily [2]  293/19 385/24
East [1]  269/9
easy [3]  338/23 386/3 387/10
economic [2]  284/23 297/5
economist [1]  322/6
economy [1]  282/13
educational [1]  326/25
EE [1]  319/6

## E

effect [13]  285/22 286/15 291/14 292/13 298/12 308/4 320/17 321/21 332/21 342/21 355/19 369/17 370/10
effective [17]  294/5 311/12 313/19 314/9 314/13 314/21 314/25 316/3 316/4 316/6 316/20 340/1 340/23 380/25 384/20 388/12 394/12
effectively [6]  335/12 338/2 341/8 365/7 367/4 386/5
effects [7]  307/25 316/24 339/9 343/23 344/1 344/4 388/19
efficiencies [8]  297/20 299/1 299/2 299/6 299/11 299/18 309/17 369/2
efficient [1]  340/1
efforts [1]  274/14
eggs [3]  315/10 316/10 394/3
eight [10]  330/8 330/19 330/21 331/1 332/4 332/4 361/20 390/25 391/9 391/9
either [10]  272/16 303/5 320/12 325/17 325/20 326/8 335/18 354/11 385/17 392/7
either/or [1]  385/17
electronic [3]  368/24 368/25 370/9
eliminate [2]  311/8 361/3
eliminated [2]  291/20 333/25
eliminating [2]  288/6 366/3
else [4]  294/3 301/25 304/3 378/9
elsewhere [1]  390/4
emergency [1]  290/4
Emery [4]  269/11 269/14 269/17 269/19
emphasize [1]  273/5
emphasized [1]  348/21
employed [4]  339/24 340/5 340/17 379/12
employee [2]  347/7 366/24
employees [9]  276/7 303/4 303/12 313/14 318/2 318/11 347/7 390/1 390/3
employer [3]  340/19 349/3 349/13
employers [18]  276/7 277/13 297/8 303/4 303/12 303/22 313/1 318/2 318/11 344/15 344/17 348/22 348/23 349/1 349/7 349/10 377/19 389/24
EMR [2]  279/3 279/5
enable [1]  375/14
encouraged [2]  340/18 340/18
end [11]  271/2 296/19 311/10 314/5 344/17 358/15 370/17 371/17 382/17 386/8 386/22
ended [1]  296/22
endless [1]  297/6
ends [1]  303/6
enforce [2]  372/12 386/1
enforcement [5]  271/9 271/11 272/4 384/20 388/12
engage [1]  270/22
engaged [1]  389/13
engaging [1]  361/13
enjoin [1]  309/3
enjoined [3]  307/23 363/9 388/17
enjoys [2]  312/19 313/11
enlighten [1]  310/12
enough [11]  280/8 291/22 294/22 295/25 300/4 300/18 300/21 303/14 318/13 359/1 391/3
enrollment [1]  340/6
ensure [3]  313/18 340/24 374/12
ensures [1]  365/8
enter [5]  303/6 308/17 310/7 374/18 384/12
entered [11]  310/25 311/1 316/6 342/19 363/1 373/12 378/14 380/22 380/23 389/20 389/24

enters [2]  339/20 339/23
entire [5]  306/23 316/25 319/12 328/2 330/15
entirely [1]  309/21
entities [1]  384/18
entitled [7]  305/25 308/2 316/17 320/8 344/6 391/19 395/8
entity [6]  297/12 359/24 359/25 370/15 371/3 384/19
entry [6]  320/15 337/13 338/4 338/5 338/7 375/16
envy [1]  372/20
ephemeral [1]  303/13
equipment [1]  333/14
equitable [3]  314/20 315/14 372/11
equities [2]  320/15 388/5
equity [2]  315/9 388/12
equivalent [1]  338/7
Errol [1]  281/13
error [1]  284/19
escalator [1]  364/10
escapes [1]  281/6
ESQ [9]  268/17 268/19 269/2 269/4 269/7 269/11 269/14 269/16 269/19
essentially [7]  288/5 290/23 322/7 336/11 362/17 373/15 373/16
established [2]  298/16 374/24
establishes [1]  333/15
estimated [2]  280/13 347/10
estimates [1]  299/13
evaluated [1]  299/3
evaluating [1]  338/13
Evanston [3]  315/20 315/20 315/22
even [32]  271/5 276/11 276/22 278/22 278/23 279/2 279/4 279/7 279/8 279/9 280/7 282/12 282/13 292/6 305/22 314/19 324/12 327/10 332/23 335/24 338/2 344/24 352/10 357/5 358/10 364/2 367/23 369/24 375/15 375/15 390/2 392/4
event [1]  374/14
ever [4]  298/2 298/25 345/9 352/13
every [10]  282/23 285/12 308/25 309/2 309/13 329/2 329/6 388/20 389/20 391/17
everybody [3]  296/7 356/9 356/10
everyone [6]  283/4 288/1 301/25 313/1 316/16 318/22
everything [4]  319/2 376/13 378/8 384/22
evidence [41]  273/19 277/10 277/11 277/24 282/13 286/8 286/10 287/12 292/19 293/1 296/12 298/2 298/4 300/23 303/3 303/21 305/15 305/24 306/5 307/23 308/3 317/18 321/1 321/15 321/15 324/7 328/10 330/5 335/4 344/9 347/2 352/23 354/9 375/7 388/18 389/6 389/10 390/13 393/14 393/20 393/21
evidenced [2]  333/14 333/16
evident [1]  296/4
ex [1]  372/2
exact [9]  280/24 307/20 322/21 323/7 377/18 378/2 379/6 380/18 382/17
exactly [10]  284/20 299/25 311/6 311/6 312/3 343/19 354/23 363/3 380/9 381/5
examination [5]  275/7 279/22 344/20 347/15 378/4
examine [4]  277/16 296/19 297/15 349/17
example [16]  285/2 301/1 326/22 340/8 341/21 343/8 347/20 347/23 349/17 349/17 350/4 354/22 364/12 365/17 368/22 382/24
examples [1]  389/11
exceeded [1]  305/12

except [6]  307/5 308/25 333/25 340/5 343/14 356/11
exception [1]  284/18
excerpt [2]  339/23 348/1
excess [7]  292/4 292/5 292/10 292/15 293/6 326/14 345/17
exchange [2]  270/25 352/5
excited [1]  283/11
exclude [3]  274/14 274/15 292/24
exclusionary [1]  274/21
excuse [1]  305/20
executives [3]  276/5 281/3 287/9
exercise [16]  292/6 292/23 303/19 303/25 321/3 323/4 323/8 326/2 331/9 331/11 352/6 352/13 354/6 356/23 375/9 375/15
exercises [1]  325/23
exercising [3]  352/6 362/8 362/12
exhibit [7]  319/4 319/6 319/6 322/16 322/24 322/24 370/7
exhibit 1 [1]  322/24
exhibit 4 [2]  322/16 322/24
exhibit 6.1 [1]  370/7
exist [4]  292/14 331/10 340/25 360/3
existed [2]  292/15 311/13
existence [1]  293/5
existing [3]  338/6 348/5 364/3
exists [3]  287/17 291/11 360/2
expand [1]  337/22
expanding [1]  337/25
expansion [3]  334/9 338/5 338/9
expansions [1]  279/6
expansive [1]  304/14
expect [8]  325/1 341/6 348/3 352/6 380/21 386/11 386/20 386/21
expedited [1]  309/9
expend [1]  326/9
expenditure [1]  298/6
expenses [5]  280/16 280/19 280/21 326/14 365/11
expensive [2]  336/11 336/12
experience [2]  281/16 286/19
experientially [1]  338/17
experiment [2]  310/8 310/24
expert [13]  277/12 277/19 281/15 284/7 284/21 284/23 303/23 307/11 321/20 321/21 323/11 325/5 378/2
expert's [1]  284/24
experts [1]  288/24
expired [1]  364/8
explain [4]  273/6 276/23 308/18 343/10
explained [1]  385/12
explains [2]  305/8 305/22
expressed [2]  348/3 348/7
extend [1]  317/2
extended [1]  333/15
extending [1]  310/13
extensive [3]  304/21 333/13 333/17
extent [10]  281/23 292/18 327/21 334/19 354/3 363/20 366/19 382/15 383/1 384/10
extra [3]  312/7 359/17 381/19
extraordinarily [1]  292/16
extremely [1]  333/22
eye [1]  275/25
eyes [1]  295/21

## F

face [1]  276/17
faced [2]  333/4 333/21
facilities [1]  278/5
facility [4]  298/11 338/3 340/11 371/6

# F

fact [22]  271/15 272/25 276/1 277/5 281/8
282/1 283/7 293/5 296/7 301/3 301/5 311/21
315/11 324/16 332/13 340/21 349/12 358/2
381/25 385/25 389/10 392/2
factors [1]  294/11
facts [1]  286/5
fail [1]  392/21
failed [1]  338/11
failing [4]  392/3 392/4 392/6 392/23
failure [1]  341/21
fair [5]  294/25 298/23 335/1 381/22 382/3
fairly [2]  328/9 381/2
fairness [1]  290/13
fall [1]  286/13
fallen [1]  386/25
familiar [2]  284/16 357/17
family [1]  318/4
far [5]  273/1 281/4 288/7 308/17 316/4
fascinating [1]  392/1
fashion [1]  319/20
fast [5]  295/25 300/4 309/10 331/13 386/17
fast-moving [2]  309/10 386/17
favor [1]  315/9
favorable [2]  357/11 377/11
favorite [2]  306/15 391/14
fear [2]  372/23 373/2
February [2]  268/8 395/9
federal [12]  268/3 268/17 268/20 269/2
269/5 270/9 270/19 309/11 309/19 388/8
388/9 391/17
feel [3]  271/1 360/6 370/20
feeling [1]  299/4
fell [1]  287/7
felt [1]  380/3
ferrets [1]  304/23
few [11]  271/19 277/9 288/1 289/24 294/10
295/19 296/2 327/14 344/10 374/20 387/18
fidgeting [1]  295/23
fiduciary [4]  373/25 373/25 374/8 384/1
field [1]  281/18
fierce [1]  389/12
figure [1]  285/17
figures [1]  284/19
files [1]  281/10
filing [1]  308/23
fill [1]  298/13
Filson [1]  269/4
finalized [1]  299/13
finally [5]  336/24 347/5 347/5 357/3 376/22
finance [1]  347/8
financed [1]  375/22
finances [3]  277/20 277/23 277/25
financial [17]  280/13 286/18 288/10 288/13
298/17 336/1 336/4 342/22 355/12 355/22
364/17 365/15 390/17 390/18 391/6 392/9
392/24
financials [3]  284/25 296/5 347/9
fine [3]  277/4 290/20 367/16
finish [2]  337/18 387/19
finished [2]  297/25 394/13
Finnerty [1]  269/7
firm [9]  274/10 387/22 391/23 392/3 392/4
392/6 392/8 392/11 392/20
firmly [1]  286/22
firms [1]  275/1
first [29]  272/9 285/1 288/16 289/18 289/19
299/17 305/5 319/18 321/5 321/5 321/14
323/15 330/5 337/21 339/7 339/7 342/5

346/11 350/6 356/3 356/3 368/3 368/17
377/2 377/3 378/20 386/4 386/12 387/10
five [6]  281/25 303/23 323/21 324/6 336/13
376/17
fixated [1]  273/24
fixation [1]  389/14
flailing [5]  391/23 392/8 392/11 392/20
392/23
flawed [1]  279/19
fledgling [1]  288/4
flexibility [1]  314/20
flipping [1]  392/17
Floor [1]  269/8
Florida [2]  268/8 268/23
flow [1]  390/24
Flower [4]  298/8 313/8 334/10 371/7
focus [3]  299/15 332/20 390/17
focused [3]  274/3 274/7 375/4
focusing [1]  361/18
fold [1]  342/5
fold-in [1]  342/5
folding [1]  341/25
follow [2]  302/1 384/1
following [6]  272/22 280/15 298/14 318/21
360/17 361/21
Foods [6]  303/18 304/3 305/7 305/20 308/1
314/17
footnote [5]  280/24 345/11 345/12 347/6
347/16
footnote 34 [3]  345/11 347/6 347/16
force [1]  365/4
forced [2]  301/8 349/21
forces [1]  274/23
forcing [1]  344/16
foregoing [1]  395/6
forever [2]  309/21 376/20
forget [1]  339/6
form [2]  322/21 350/11
formal [1]  380/12
formally [1]  394/25
forth [3]  306/4 306/16 340/3
forward [11]  277/20 277/25 279/1 286/21
288/14 291/1 292/22 303/24 331/8 335/1
355/13
forward-looking [1]  277/20
found [4]  295/5 299/10 323/11 390/13
foundation [2]  300/8 329/24
four [16]  277/7 322/20 324/10 325/6 329/3
329/4 335/12 336/18 337/5 339/2 352/21
353/8 354/10 383/6 383/11 383/19
four-year [2]  352/21 353/8
Franklin [4]  268/22 395/5 395/11 395/12
frankly [26]  271/5 273/18 273/24 276/12
280/3 280/7 281/17 282/22 283/4 288/1
290/17 291/13 292/11 293/13 299/15 299/23
320/2 321/11 322/16 333/7 334/24 342/21
361/11 369/7 370/22 371/6
free [1]  316/5
friend [3]  290/16 290/20 356/5
front [6]  304/15 328/13 328/23 350/6 386/14
386/18
Frontpath [2]  353/10 353/14
frozen [2]  363/20 365/10
FTC [49]
FTC's [8]  271/8 305/17 321/18 331/5 332/20
347/21 349/18 356/19
fulfill [2]  287/1 327/3
full [9]  270/25 278/15 311/12 315/23 332/4
360/17 386/15 386/17 394/12
fully [7]  279/2 279/4 279/5 283/3 287/2

295/8 317/3
fun [1]  298/18
functional [1]  338/6
functions [1]  361/14
fund [5]  278/18 278/21 278/23 295/8 370/8
fundamental [1]  317/11
funding [1]  279/5
funds [4]  279/2 279/5 279/8 326/23
further [7]  315/17 316/21 317/15 317/25
326/25 331/4 384/24
future [17]  280/20 293/10 293/12 298/25
302/16 302/16 302/20 303/14 326/20 331/8
336/19 341/22 344/1 344/4 356/16 375/15
391/22

# G

game [1]  336/5
gaps [1]  298/14
gastroenterology [1]  276/10
gave [4]  292/18 294/5 311/7 343/8
Gay [1]  269/9
general [18]  269/7 276/10 276/25 279/11
306/22 308/15 320/12 330/12 372/15 373/14
375/23 382/6 382/14 382/23 384/17 391/23
392/14 392/19
General's [1]  321/19
generally [4]  289/5 289/6 289/7 325/2
generate [1]  369/20
generated [1]  353/24
generates [1]  326/2
generating [2]  324/12 353/12
gentlemen [4]  318/18 374/15 394/17 395/1
geographic [13]  305/23 306/4 306/7 307/9
307/17 330/10 330/13 330/15 335/18 343/14
383/6 383/12 383/20
gets [4]  272/13 283/8 295/24 362/24
getting [11]  284/4 290/18 290/18 299/16
314/17 314/25 318/14 356/14 361/9 365/5
368/10
give [17]  272/9 303/2 303/7 312/22 319/3
321/10 328/23 343/9 344/10 347/20 350/4
359/16 364/24 367/19 376/21 380/2 385/16
given [1]  342/21
gives [3]  292/18 320/20 320/24
glance [1]  288/16
glowing [1]  391/3
goal [16]  270/21 270/24 273/4 273/5 345/2
345/5 345/8 345/23 346/9 346/13 347/17
374/12 378/17 378/18 386/6 386/10
goals [7]  345/19 346/20 378/12 378/13
384/24 384/24 387/11
goes [9]  338/15 341/4 347/13 354/12 354/18
360/19 361/10 364/5 384/22
going [86]
Gold [2]  296/18 296/19
Gold's [1]  296/19
gone [1]  299/21
good [18]  270/5 270/6 283/15 285/9 287/21
290/17 300/18 314/2 319/15 321/13 342/9
359/22 368/6 381/2 389/22 389/23 389/23
392/4
got [16]  280/8 284/16 286/16 296/17 329/2
329/7 329/8 336/20 342/5 352/19 354/19
354/20 359/18 364/21 370/23 371/17
gotta [2]  300/19 329/19
government [24]  320/6 321/1 321/20 321/24
324/16 328/9 336/15 336/21 337/7 337/14
338/11 343/21 344/8 345/10 352/7 352/21
353/20 355/6 355/22 357/8 358/8 367/6
369/24 371/13

**G**

Government's [10]  320/1 321/14 328/25
329/15 344/6 346/8 355/9 365/15 367/12
369/6
grade [1]  282/5
grant [1]  394/15
granted [1]  309/5
granting [1]  388/6
great [8]  282/21 288/19 289/1 317/21 341/11
359/9 380/16 387/8
greatest [1]  377/12
ground [3]  297/24 299/11 302/6
grounds [1]  299/19
group [2]  340/10 348/19
grow [2]  332/16 365/9
growing [3]  272/2 390/22 392/19
growth [3]  334/19 334/20 335/8
guarantee [1]  382/12
guaranteed [1]  384/6
Guerin [3]  282/1 284/21 378/2
guess [7]  280/10 285/8 285/21 316/16 338/18
368/18 368/20
guesses [1]  294/18
guidance [2]  385/18 385/20
guidelines [12]  307/20 308/6 358/1 358/1
358/2 358/5 358/13 358/14 358/17 358/21
358/25 391/17
gut [1]  299/3
gutting [1]  383/10
guy [2]  337/7 365/20
guys [1]  359/10

**H**

H-u-t-t [1]  350/8
hadn't [2]  280/9 334/14
half [8]  276/1 296/18 297/15 310/19 355/14
366/2 366/3 387/21
halt [1]  320/6
Hancock [2]  269/14 303/17
hand [2]  322/2 323/15
handy [1]  359/8
Hanley [1]  281/5
happen [19]  298/2 298/3 298/24 303/5
309/17 313/2 314/4 317/17 329/12 329/12
334/7 335/11 337/9 352/16 352/17 363/4
372/19 382/11 383/23
happened [4]  286/21 287/10 288/10 385/8
happening [2]  309/1 384/9
happens [6]  316/2 317/15 317/16 369/20
374/15 383/22
happy [3]  301/7 301/13 390/3
harder [1]  362/24
hardship [1]  303/11
harm [7]  303/4 303/11 314/13 318/9 359/22
378/14 389/4
harmful [1]  273/9
Hart [1]  308/21
hasn't [4]  293/5 293/6 293/8 386/25
hate [1]  348/10
haven't [14]  271/2 294/7 299/13 301/1
307/10 307/11 336/23 343/18 343/19 344/5
370/25 373/3 373/4 374/24
having [12]  279/21 282/18 291/24 300/10
303/13 306/17 307/13 332/10 332/10 338/24
384/21 393/4
HCAP [1]  342/16
HCAP's [1]  342/14
he'll [1]  301/21
he's [5]  270/15 271/14 271/22 343/12 387/15

head [5]  276/2 276/2 295/22 389/12 389/12
head-to-head [1]  389/12
headline [1]  344/25
health [46]
healthcare [12]  281/18 281/19 299/21 318/4
318/10 327/1 336/5 336/8 340/7 370/13
394/5 394/8
hear [6]  278/12 279/22 305/3 311/21 341/20
377/1
heard [9]  270/7 278/18 279/25 284/15 286/3
295/1 297/20 344/13 364/17
hearing [5]  304/16 343/20 370/17 382/9
388/7
heart [4]  290/4 290/17 314/3 327/12
heated [1]  376/10
heavily [1]  294/9
held [2]  368/19 394/24
held-separate [1]  368/19
help [4]  283/9 368/23 386/9 393/18
helped [1]  381/21
helpful [1]  380/8
helping [1]  369/4
helps [1]  281/21
here [42]  270/16 272/20 272/22 274/5 275/19
277/16 278/2 279/20 283/17 284/13 285/16
287/15 288/21 289/19 289/24 290/23 291/3
291/5 291/18 296/11 309/22 315/14 317/19
318/16 319/2 320/6 325/4 326/12 327/6
327/21 329/24 339/18 346/8 347/12 352/21
354/22 358/7 374/5 374/7 383/4 385/11
385/24
here's [7]  282/2 282/25 285/19 285/20
289/16 372/5 372/8
herself [1]  284/7
HHI [4]  307/13 358/9 358/12 358/16
HHIs [1]  307/13
high [28]  276/4 278/5 279/11 281/3 283/22
288/24 292/16 308/10 311/13 313/10 313/17
318/12 318/13 322/2 323/16 323/17 332/20
341/15 343/22 343/24 344/16 354/16 354/19
367/3 377/20 381/10 387/1 387/7
high-quality [4]  313/17 341/15 367/3 387/7
higher [28]  279/7 279/8 289/20 291/25 301/9
318/10 318/14 322/3 324/4 325/17 325/24
326/4 326/5 341/16 349/5 357/21 367/7
375/22 376/15 377/12 378/6 389/9 389/10
389/25 390/1 393/23 394/5 394/8
higher-cost [1]  341/16
highest [7]  276/5 276/5 290/10 291/25
364/10 394/19 394/20
highlight [2]  275/21 275/21
highlighted [1]  333/10
highlights [1]  275/20
highly [4]  271/18 274/5 358/17 388/25
hikes [5]  345/3 345/6 345/24 346/10 347/18
himself [1]  299/23
hired [1]  387/1
hiring [3]  301/25 337/25 366/22
history [3]  299/18 300/24 327/5
hit [1]  314/3
hold [35]  293/15 294/15 303/5 303/8 310/9
310/25 311/6 311/19 311/22 312/3 312/11
315/17 316/8 324/17 343/24 360/22 361/8
373/18 378/13 379/2 379/18 379/22 380/1
380/9 380/12 380/15 380/24 381/5 381/7
381/13 381/18 382/1 384/23 385/8 386/24
home [1]  373/1
honest [2]  270/25 391/13
honor [169]
HONORABLE [1]  268/13

hope [9]  286/1 287/14 347/12 355/11 355/22
370/11 376/14 385/19 387/22
hopefully [3]  337/19 341/1 343/4
hoping [1]  393/5
Hopkins [1]  281/20
horribles [2]  310/6 311/20
hospital [76]
hospitals [42]  275/14 276/9 277/3 277/7
281/21 282/14 289/2 291/17 292/5 292/11
293/18 293/20 293/22 293/22 294/2 298/20
300/17 303/23 317/9 322/18 322/25 323/2
324/19 324/23 326/12 330/14 331/21 331/23
334/14 335/13 336/12 339/17 340/22 342/12
348/5 349/6 349/10 350/11 353/5 357/14
383/6 383/12
hospitals' [1]  325/1
hour [3]  270/21 310/19 319/10
hours [13]  270/8 275/6 277/15 279/17
279/21 287/15 296/18 297/15 304/16 304/17
304/19 322/14 386/16
housekeeping [2]  318/25 319/1
Hovenkamp [1]  315/12
however [5]  330/9 331/4 334/14 341/17
364/6
huge [1]  277/24
Hughes [1]  338/7
huh [4]  326/16 348/17 361/22 369/15
human [1]  366/24
hundreds [2]  272/15 273/7
Hutt [1]  350/8
hypothetical [2]  325/25 347/24

**I**

I'd [6]  319/10 324/6 347/20 359/8 376/11
386/3
I'll [18]  270/10 271/21 284/12 287/25 290/13
291/21 301/14 306/17 312/22 313/18 319/19
321/10 321/25 334/2 343/9 343/21 376/16
378/20
I'm [72]
I've [17]  275/19 290/22 294/10 294/12
295/20 299/21 321/8 329/2 334/13 337/19
339/17 341/1 343/20 352/19 364/21 377/1
393/3
ID [1]  385/10
idea [2]  280/4 280/5
identified [1]  370/7
identify [1]  270/17
identity [1]  348/15
ignore [1]  338/10
ignores [3]  331/25 390/12 390/18
ii [2]  371/16 371/18
III [5]  306/7 310/3 360/1 377/5 386/23
IL [3]  269/13 269/18 269/20
illegal [1]  388/16
illegality [2]  308/9 343/19
Illinois [1]  314/23
illusory [1]  371/14
immediate [3]  303/11 312/9 318/9
immediately [4]  303/5 303/12 312/12 330/20
impact [4]  308/17 342/25 367/16 389/25
implementation [1]  320/7
implying [1]  390/10
importance [1]  393/3
important [20]  275/23 275/25 278/1 278/11
286/13 294/10 294/10 300/12 313/3 313/6
333/23 335/24 335/25 335/25 338/4 340/21
343/6 372/5 386/10 388/8
importantly [2]  298/22 390/22
impossible [1]  370/16

# I

**impressive** [2] 282/22 296/3
**improve** [5] 311/16 342/1 342/2 360/10 380/6
**improved** [3] 290/3 290/4 290/6
**improvements** [3] 279/7 311/24 379/5
**improving** [1] 390/23
**inability** [1] 364/17
**inadvertently** [1] 363/4
**inappropriate** [1] 307/1
**INC** [1] 268/7
**incentive** [3] 341/5 360/4 360/10
**incipiency** [1] 317/1
**inclined** [2] 292/7 306/12
**include** [4] 285/8 363/9 363/11 372/2
**included** [1] 334/8
**includes** [1] 300/16
**including** [10] 281/4 284/4 333/10 349/6 357/12 361/24 362/1 362/10 370/9 391/18
**income** [2] 326/9 342/24
**incorporated** [1] 394/9
**incorrectly** [1] 330/16
**increase** [32] 278/24 280/20 280/22 283/12 311/9 311/16 317/3 320/22 321/22 322/8 325/15 326/8 328/2 328/3 328/11 337/23 346/24 346/25 347/11 347/13 347/24 348/3 348/4 349/4 349/20 355/14 357/7 357/10 357/17 357/21 378/15 393/20
**increased** [6] 317/9 324/12 325/10 326/1 348/24 364/10
**increases** [9] 280/16 292/19 294/6 307/13 307/21 312/9 312/24 318/6 388/24
**increasing** [5] 278/7 284/11 390/20 390/20 390/21
**incredible** [6] 309/16 309/17 312/1 318/4 389/6 393/1
**incredibly** [1] 273/24
**incur** [2] 324/20 324/25
**incurring** [1] 353/5
**indecisive** [2] 333/16 333/18
**Indeed** [2] 374/3 375/20
**independent** [18] 277/5 278/4 278/9 278/17 278/19 283/20 295/15 303/19 303/25 314/7 336/18 353/15 372/17 381/11 381/12 386/18 391/5 391/5
**indicated** [2] 289/8 379/18
**indication** [2] 298/22 298/23
**indicators** [2] 355/24 387/4
**indirect** [2] 283/9 325/3
**indirectly** [2] 362/9 362/13
**individual** [2] 289/13 377/23
**individually** [1] 321/1
**indulgence** [1] 376/8
**industry** [2] 317/4 353/6
**infeasible** [1] 316/5
**infer** [1] 347/16
**influencing** [2] 362/9 362/13
**information** [17] 284/8 284/9 284/17 284/24 288/16 288/20 288/22 290/3 290/22 293/11 296/9 304/23 310/14 336/10 372/24 373/6 394/19
**information's** [1] 296/10
**infrastructure** [1] 336/10
**infusion** [1] 369/8
**inherently** [2] 307/22 388/16
**initiative** [1] 340/15
**injunction** [49]
**injunctive** [1] 372/11
**ink** [1] 324/15

**inpatient** [10] 283/14 283/14 320/13 320/13 330/12 348/13 372/15 373/14 375/23 390/21
**insignificant** [7] 273/12 273/12 274/10 288/3 291/7 328/14 391/12
**instance** [3] 305/6 344/7 344/8
**instances** [1] 344/11
**instant** [1] 325/16
**instead** [5] 287/18 294/1 311/22 316/16 322/10
**institution** [3] 325/12 325/13 339/5
**insurance** [2] 340/7 344/17
**insured** [5] 329/1 331/18 346/1 352/8 375/13
**insured's** [1] 340/9
**insurer** [2] 325/12 325/24
**integrate** [2] 341/7 368/23
**integrating** [2] 368/18 368/24
**integration** [3] 317/3 360/22 370/18
**intend** [5] 275/21 332/16 376/20 382/15 384/11
**intended** [1] 315/6
**intends** [1] 337/22
**intense** [1] 274/25
**intensely** [2] 274/6 274/7
**intent** [2] 335/7 375/9
**intentions** [2] 383/21 384/5
**interest** [9] 296/22 297/13 320/16 327/12 333/8 337/15 366/17 369/5 375/17
**interested** [7] 288/2 296/12 297/17 333/6 333/9 333/9 333/10
**interesting** [2] 289/11 345/7
**interests** [1] 297/4
**interim** [4] 314/13 380/17 386/7 394/10
**internal** [3] 344/14 344/23 378/14
**intervention** [2] 290/6 393/22
**interview** [1] 316/22
**introduced** [1] 389/5
**intrusive** [1] 314/19
**inundated** [1] 373/6
**inventory** [1] 333/25
**invest** [5] 278/4 311/17 336/4 336/12 338/3
**invested** [1] 327/18
**investigate** [3] 317/15 317/24 358/5
**investigating** [2] 316/14 316/21
**investigation** [2] 272/17 272/18
**investing** [1] 327/19
**investment** [6] 282/5 336/10 369/17 369/21 370/6 382/8
**investments** [3] 279/14 343/2 370/8
**invests** [1] 279/6
**inviting** [1] 370/25
**involved** [2] 384/21 385/13
**involvement** [1] 362/18
**involves** [1] 341/14
**ironclad** [1] 382/14
**ironically** [1] 308/25
**irrelevant** [1] 331/3
**irrespective** [1] 375/7
**isn't** [11] 287/12 298/18 332/22 334/12 336/3 336/3 352/12 365/13 375/13 375/17 390/11
**issue** [16] 270/22 282/2 299/14 314/5 314/9 316/21 320/6 327/25 339/13 343/11 352/21 366/16 372/22 383/8 385/24 385/25
**issued** [2] 309/7 370/18
**issues** [6] 270/25 271/6 309/19 334/6 376/12 386/1
**issuing** [2] 309/12 315/10
**it'd** [1] 302/22
**it's** [119]
**item** [1] 336/12
**itself** [8] 300/7 346/1 354/24 361/15 365/7

**369/3 375/8 375/11**

# J

**Jamie** [1] 373/23
**Janelle** [2] 269/4 296/15
**Jeff** [2] 270/18 271/23
**Jeffrey** [1] 268/19
**jeopardy** [1] 365/16
**Jersey** [3] 268/18 269/3 269/5
**job** [8] 301/20 305/5 372/20 380/16 380/25 381/2 387/12 387/13
**jobs** [2] 374/11 374/16
**Johns** [1] 281/19
**join** [1] 270/22
**joinder** [67]
**joined** [1] 370/1
**joining** [1] 274/22
**joint** [1] 302/11
**Jr** [1] 269/11
**judge** [6] 268/14 292/5 293/9 309/19 386/13 386/14
**judgment** [2] 303/19 303/25
**jump** [1] 313/21
**junk** [2] 282/11 282/12
**jurisdiction** [1] 385/16
**just** [75]
**justification** [1] 392/9

# K

**KATZ** [1] 268/13
**keep** [13] 275/25 277/4 278/11 283/25 300/20 310/5 325/20 355/23 355/25 370/25 371/1 376/19 393/5
**keeps** [1] 319/2
**key** [1] 337/21
**kidding** [3] 270/12 270/15 359/12
**killed** [1] 309/11
**kind** [6] 317/20 332/18 334/24 352/5 354/1 371/2
**kinds** [1] 334/13
**know** [74]
**knowledge** [1] 349/7
**knows** [2] 291/16 299/9

# L

**lab** [3] 290/5 309/1 309/14
**ladies** [2] 394/17 395/1
**land** [4] 297/24 302/3 302/7 302/21
**language** [2] 370/16 382/2
**lapsing** [2] 363/17 363/25
**large** [12] 272/2 274/1 275/5 275/12 276/1 277/6 284/5 293/18 295/14 333/14 335/22 375/5
**larger** [2] 274/4 274/6
**Larry** [1] 373/24
**laser** [1] 274/7
**laser-focused** [1] 274/7
**last** [25] 273/3 276/12 280/9 283/19 285/17 299/1 299/20 300/9 300/10 306/17 306/18 313/18 315/20 334/11 338/20 343/9 356/4 362/21 369/10 377/5 387/20 389/15 391/5 391/6 391/15
**late** [1] 286/16
**later** [6] 314/19 317/7 384/14 384/14 393/16 394/7
**law** [10] 304/24 306/25 308/5 308/7 338/5 354/21 358/3 358/5 391/18 392/10
**laws** [5] 295/18 304/8 318/14 384/20 388/13
**lawsuit** [1] 274/24
**lawyer** [1] 373/22

# L

lawyers [3]  284/10 297/15 391/25
lay [2]  313/14 329/24
lays [1]  332/25
lead [1]  325/11
leadership [1]  297/3
leading [11]  274/11 277/23 278/7 282/3
283/12 287/9 287/18 288/25 297/5 298/17
349/5
leap [1]  346/12
learned [1]  387/20
least [14]  276/24 279/22 281/2 281/17 297/1
306/22 315/13 330/12 348/4 350/4 368/6
372/9 391/14 393/5
leave [1]  301/14
left [4]  283/18 291/19 322/2 323/15
left-hand [2]  322/2 323/15
legal [4]  302/11 354/14 360/16 370/23
less [14]  302/25 308/17 310/4 316/6 319/20
336/19 336/20 339/3 352/10 352/15 354/8
355/4 360/8 380/25
lessen [5]  307/22 320/12 320/18 320/20
388/16
let [28]  286/9 304/11 308/18 314/15 317/3
317/3 325/7 325/22 329/23 331/25 332/14
334/4 337/18 338/22 343/19 344/9 347/21
349/25 366/12 367/12 371/8 371/10 373/10
374/15 380/20 382/5 386/15 387/18
let's [14]  304/2 317/16 321/14 329/13 332/4
341/11 356/17 361/16 363/6 363/14 371/18
381/10 383/20 392/25
letter [1]  364/23
level [10]  273/8 281/3 312/18 312/19 320/23
347/12 353/17 360/14 360/15 367/10
levels [15]  313/4 313/8 313/10 313/15 321/17
328/7 345/18 352/25 354/16 373/8 375/11
378/19 381/1 388/24 389/11
leverage [9]  300/22 331/16 348/24 349/2
349/4 357/21 377/9 381/13 381/20
leverages [1]  349/15
Libbey [1]  315/7
lies [1]  304/9
light [1]  360/4
likelihood [7]  291/3 305/17 320/10 338/13
374/4 374/24 389/8
likely [16]  298/24 307/22 307/24 328/7
332/21 334/7 337/8 338/10 353/2 373/5
373/5 375/21 385/13 388/16 388/19 393/21
likes [2]  357/8 378/21
limit [2]  286/20 376/21
limited [5]  300/25 305/8 361/24 362/1
362/10
line [7]  325/15 325/21 326/11 361/25 366/8
366/14 376/10
lined [1]  359/13
lines [11]  286/7 286/12 288/6 311/8 313/3
337/1 378/19 379/7 381/1 382/16 382/22
list [6]  276/11 276/12 286/22 372/2
listed [3]  277/4 280/25 348/18
literally [1]  380/14
litigated [1]  315/21
litigation [1]  360/2
litigations [1]  381/22
little [24]  272/10 280/10 306/18 313/22
322/14 325/18 327/14 329/25 330/4 341/1
341/2 341/11 350/1 357/20 359/13 360/5
361/9 362/20 364/7 365/1 371/18 381/13
381/19 391/10
live [7]  300/16 304/19 304/20 305/15 330/21

365/4 386/17
living [1]  281/19
LLP [4]  269/11 269/14 269/17 269/19
local [3]  327/10 327/12 357/25
locally [2]  327/7 327/7
long [12]  283/24 285/11 289/15 292/5 292/15
302/14 315/2 335/11 380/16 381/13 381/14
390/10
longer [2]  287/1 387/16
longterm [1]  337/11
looked [6]  280/22 297/12 357/4 357/23 358/6
358/23
looking [12]  276/8 277/20 282/23 289/23
301/20 322/4 357/5 357/17 359/7 366/2
368/16 383/2
looks [2]  333/19 371/19
lose [3]  283/18 285/19 386/21
losing [3]  274/9 282/25 283/17
loss [2]  309/18 356/12
losses [4]  333/12 333/15 333/17 365/8
lost [5]  274/17 338/12 342/23 386/19 394/8
lot [15]  274/1 278/18 288/16 290/22 295/9
295/16 300/11 306/5 312/13 314/17 319/1
377/13 378/22 390/9 392/24
lots [8]  276/17 276/19 276/20 276/21 295/13
295/15 319/7 334/13
love [1]  270/8
low [4]  276/6 311/13 313/17 341/15
low-cost [2]  313/17 341/15
lower [8]  291/9 291/10 291/10 305/11 325/19
341/16 342/20 387/24
lower-quality [1]  341/16
lowest [4]  290/10 342/15 342/17 342/18
Lucas [25]  275/5 277/6 289/20 292/9 292/16
298/12 301/8 303/4 303/12 307/9 313/13
316/15 317/8 317/24 318/2 318/10 320/14
330/13 330/14 330/22 387/8 389/11 393/15
393/23 394/5
Luke's [308]

# M

mail [3]  281/2 347/6 350/7
main [2]  364/16 364/16
maintain [15]  278/5 305/4 311/10 311/14
311/17 312/8 313/15 313/16 318/6 361/1
371/3 378/18 378/19 378/19 386/7
maintaining [4]  372/14 380/25 382/13
394/11
major [1]  329/22
makes [6]  275/10 338/21 357/4 372/16
383/19 385/12
making [10]  274/14 284/10 286/4 308/23
323/23 328/15 380/17 381/2 384/22 392/4
manage [1]  366/24
managed [7]  322/19 327/7 357/12 361/5
377/11 377/20 377/23
management [1]  333/16
mandated [1]  384/24
mandates [1]  370/13
manipulated [2]  352/22 354/9
manufactured [1]  328/3
maps [1]  335/21
March [2]  332/6 375/3
margin [6]  283/21 283/21 295/1 305/13
325/3 390/24
margins [4]  283/24 294/13 296/5 353/7
market [112]
market's [1]  330/15
marketability [1]  361/2
marketplace [7]  273/20 273/22 300/24

328/19 329/17 332/3 379/23
markets [11]  271/17 271/18 271/25 272/3
278/23 282/10 306/4 306/6 320/14 388/24
389/3
Marx [46]
Marx's [2]  286/3 306/20
mass [1]  359/15
massive [1]  336/9
materialized [1]  311/21
math [1]  307/13
Matt [3]  270/2 355/10 394/22
matter [12]  272/18 273/11 275/10 279/17
303/19 306/11 313/9 314/3 318/25 333/7
354/18 395/8
matters [4]  273/16 319/1 390/12 390/15
Matthew [1]  268/17
Maumee [4]  302/3 302/18 303/14 334/1
maybe [23]  287/7 293/10 293/12 302/16
302/16 306/21 310/20 313/9 313/10 313/12
313/14 317/7 327/13 329/5 352/10 355/9
355/14 356/13 370/25 372/5 384/15 392/1
392/22
McDermott [4]  269/11 269/14 269/17
269/19
me [51]
mean [24]  282/7 283/4 290/25 321/18 322/3
326/4 330/23 334/14 334/16 335/9 344/10
358/3 361/16 368/16 368/22 368/22 369/1
369/3 373/23 375/10 385/5
meaningful [2]  300/22 315/8
meaningless [1]  373/17
means [12]  276/12 282/4 283/4 320/22
330/14 331/3 336/16 348/19 358/3 361/25
362/8 363/19
meantime [1]  365/14
measure [1]  320/19
measures [2]  290/18 390/21
medical [4]  281/20 333/14 335/14 370/9
Medicare [4]  345/17 346/1 346/3 347/13
Medicare-insured [1]  346/1
meet [3]  309/20 392/23 392/23
meeting [4]  344/24 347/8 388/10 392/6
members [10]  293/25 294/1 301/6 371/23
372/2 372/3 374/17 383/16 383/24 389/23
memo [1]  391/3
memory [1]  337/3
men [1]  374/10
mention [6]  284/13 294/16 313/18 380/20
392/3 393/7
mentioned [7]  270/20 297/21 312/10 314/10
315/19 377/5 392/17
mentions [1]  382/23
Mercy [41]  290/12 291/5 291/7 291/10
291/11 291/17 291/22 291/25 297/11 297/16
297/16 300/11 300/18 301/1 301/4 302/7
302/7 302/12 302/16 323/21 323/21 324/3
324/4 328/18 331/2 331/15 335/13 335/17
335/23 337/10 357/16 357/17 357/18 358/11
358/23 383/7 383/23 390/3 390/9 390/12
390/12
Mercy's [5]  291/5 293/5 329/13 331/23
357/20
Mercy-St [1]  358/11
Mercy-UTMC [5]  300/11 301/1 301/4
328/18 390/3
merged [1]  314/21
merger [30]  272/21 272/24 273/9 273/13
291/20 295/2 307/19 307/20 307/24 308/2
309/3 309/3 309/6 315/13 315/21 316/1
316/7 317/14 318/15 341/15 349/4 354/16

**M**

merger... [8] 354/18 354/19 358/17 360/13
386/5 388/18 389/3 392/10
mergers [4] 271/13 272/7 273/7 378/23
merging [1] 320/21
merit [2] 371/15 395/5
merits [26] 299/15 300/5 304/5 305/14
305/17 308/3 309/10 309/25 313/19 314/6
315/22 317/18 318/16 360/17 374/25 378/4
378/16 381/3 382/19 386/12 386/14 386/19
386/22 388/1 393/1 393/5
messed [1] 352/18
messier [2] 350/1 378/22
met [5] 374/22 385/24 387/11 388/2 388/4
metaphysical [2] 362/20 362/21
methodology [1] 353/6
methods [1] 342/2
metrics [6] 289/22 289/23 289/24 342/17
342/17 378/3
microphone [1] 270/9
mid [1] 311/1
middle [2] 280/11 332/15
might [19] 271/10 286/20 287/10 292/12
294/12 310/2 312/7 320/19 324/5 334/5
343/1 362/5 364/2 368/4 368/17 375/8
382/24 383/16 383/18
million [20] 278/10 278/10 278/16 278/17
278/20 278/21 279/12 282/18 282/18 302/23
311/17 327/18 327/19 342/24 366/10 369/8
369/18 370/6 382/8 382/10
million-something [1] 366/10
millions [2] 274/12 274/18
Mills [1] 314/23
mind [8] 278/11 310/6 326/11 328/25 328/25
333/7 338/4 342/22
minds [2] 287/8 306/9
mine [1] 322/1
minimum [2] 271/1 271/4
minor [1] 284/19
minute [10] 270/10 297/18 304/11 318/19
320/5 334/2 339/1 359/16 366/3 379/17
minutes [14] 270/11 270/12 270/16 288/1
294/11 308/15 310/13 310/14 310/18 312/7
319/10 374/20 376/15 387/18
mischaracterize [1] 353/1
misquote [1] 289/5
missed [5] 278/14 279/24 280/9 333/25
337/17
missing [4] 287/14 288/19 306/21 307/15
mission [7] 287/2 326/21 326/23 326/25
327/1 327/4 327/15
mistake [1] 291/6
misunderstand [1] 367/24
misunderstanding [1] 339/8
mitigate [1] 333/13
mix [1] 377/24
MMO [9] 329/3 331/16 352/22 353/8 364/12
364/21 364/23 365/1 381/17
modest [2] 309/23 316/17
modification [1] 312/11
modify [1] 364/4
modifying [1] 363/17
moment [1] 394/22
Monday [1] 301/20
money [19] 278/14 281/24 282/7 282/14
282/17 282/19 282/25 283/9 283/17 284/10
285/5 285/13 285/19 285/19 292/25 295/7
295/15 295/17 356/11
monitor [2] 316/23 332/24

monopoly [1] 317/13
Monroe [3] 269/12 269/17 269/20
month [1] 310/24
months [16] 289/19 311/2 311/2 311/4
311/19 315/18 318/1 364/24 379/3 379/19
385/21 385/21 386/24 390/19 390/25 391/9
morning [9] 270/5 270/6 273/5 297/22 311/3
314/17 319/21 320/4 369/23
mortar [1] 338/3
most [24] 286/18 289/22 290/1 290/24 316/4
335/24 336/12 341/17 343/13 361/12 363/15
377/10 380/2 390/22
motion [2] 281/12 317/22
move [8] 276/16 296/10 368/23 382/15
382/22 383/7 383/20 384/11
moving [3] 309/10 384/7 386/17
Mr [3] 284/22 295/8 336/22
Mr. [146]
Mr. Black [2] 374/5 374/10
Mr. Brick [4] 281/14 282/1 282/16 294/17
Mr. Brick's [1] 282/5
Mr. Dagen [15] 277/14 277/16 277/17
277/18 277/24 278/3 279/1 279/15 279/23
280/12 280/19 281/11 284/22 294/17 337/6
Mr. Dagen's [9] 279/10 279/19 280/1 280/11
280/25 281/8 282/15 288/8 355/23
Mr. Errol [1] 281/13
Mr. Marx [44]
Mr. Marx's [2] 286/3 306/20
Mr. Oostra [19] 289/8 289/9 289/11 289/13
341/22 342/9 342/14 383/1 384/2
Mr. Oostra's [1] 289/6
Mr. Perry [5] 270/9 301/20 302/2 319/21
387/14
Mr. Perry's [1] 330/11
Mr. Peterson [2] 374/6 374/11
Mr. Reilly [15] 270/20 295/19 298/13 301/10
301/14 301/17 319/21 319/22 323/17 329/25
332/6 332/12 343/8 358/18 376/5
Mr. Reilly's [1] 330/11
Mr. Town [3] 284/23 294/17 328/4
Mr. Wakeman [23] 277/21 277/22 281/5
283/11 283/16 283/19 283/23 286/24 287/22
288/23 289/12 289/15 289/21 290/1 290/8
290/14 296/13 299/23 336/22 364/22 382/24
391/3 391/11
Mr. Wakeman's [8] 284/2 285/21 286/15
287/21 288/9 319/5 337/7 387/4
Ms. [5] 281/5 282/1 284/21 303/17 378/2
Ms. Guerin-Calvert [2] 282/1 378/2
Ms. Guerin-Calvert's [1] 284/21
Ms. Hancock [1] 303/17
Ms. Hanley [1] 281/5
much [26] 270/8 270/22 273/24 279/18
285/19 285/20 300/6 305/11 305/14 306/5
310/4 316/6 321/25 331/22 334/12 338/24
354/18 357/19 358/13 372/25 382/17 384/21
386/4 387/16 394/16 395/1
multiple [2] 389/12 389/24
must [9] 272/5 303/18 304/4 307/23 320/9
330/14 338/12 375/1 388/17
myself [3] 306/16 312/6 368/11
mystery [2] 280/23 281/6

**N**

N.W [1] 269/15
name [2] 284/13 348/18
narrower [2] 292/25 293/7
National [3] 307/19 317/10 388/21
natural [2] 310/8 310/24

nature [1] 304/15
Navigant [2] 383/2 384/2
near [3] 273/8 298/25 371/17
nearly [2] 278/20 295/5
necessarily [2] 305/18 326/6
necessary [3] 312/8 313/14 359/21
need [15] 282/17 282/19 305/18 307/16
308/3 314/19 321/6 329/18 329/18 333/24
334/18 337/17 338/3 370/22 372/21
needed [1] 310/15
needs [3] 333/13 367/10 367/10
negative [3] 285/15 342/24 390/23
negotiate [7] 323/3 323/6 325/11 347/12
349/9 354/4 379/10
negotiated [14] 322/18 322/25 352/22 353/8
353/10 353/13 353/23 354/2 354/8 354/24
355/5 364/13 380/3 381/6
negotiates [1] 355/2
negotiating [6] 349/9 363/9 377/14 379/13
381/4 381/20
negotiation [1] 338/19
negotiations [8] 296/22 300/15 350/3 362/14
381/22 381/24 382/2 382/3
neither [1] 330/17
net [2] 324/19 324/23
network [8] 300/11 300/16 300/21 300/25
300/25 301/4 357/13 390/3
networks [2] 292/25 301/3
never [11] 278/14 278/23 278/24 288/7 292/6
292/23 293/21 299/9 353/15 353/16 378/3
new [25] 268/18 269/3 269/5 292/9 292/11
292/12 298/8 298/11 298/21 301/20 303/13
309/10 329/13 334/10 338/5 353/10 354/14
354/24 355/3 358/16 370/15 379/10 386/23
392/22 392/25
newborn [1] 276/10
newly [2] 337/24 349/6
news [2] 285/9 287/21
next [21] 275/18 285/6 285/14 286/3 294/8
310/19 328/13 328/23 329/4 332/24 333/19
333/19 336/13 337/20 357/11 357/19 364/9
368/10 369/9 369/18 373/16
nice [1] 313/22
night [2] 280/9 362/21
nine [3] 272/12 289/19 347/10
no [60]
none [2] 331/9 331/11
nonstarter [1] 393/2
NORTHERN [1] 268/1
Northwest [4] 268/18 268/20 269/3 269/5
not-for-profit [2] 326/12 353/21
note [1] 289/25
notes [2] 332/5 344/23
nothing [23] 272/6 275/16 282/4 287/13
297/8 302/4 302/5 302/14 308/5 308/5
312/16 312/16 312/19 323/12 331/3 376/10
384/11 387/6 392/16 393/22 393/24 394/4
394/6
notice [5] 297/7 303/8 363/22 364/23 364/24
noticed [1] 285/15
notifications [1] 272/15
notified [2] 272/13 312/10
notion [6] 284/3 293/13 299/12 323/16
330/25 367/1
notwithstanding [3] 288/3 293/5 324/16
novel [2] 392/22 392/25
number [21] 271/13 271/24 272/1 272/2
275/12 276/1 280/16 280/22 287/25 288/14
288/19 289/2 289/23 293/18 319/6 321/23
326/7 346/11 358/23 373/22 390/6

**N**

number 3 [1]  280/16
numbers [12]  284/11 285/16 285/22 294/16 294/24 323/6 323/7 324/20 329/3 345/15 358/8 358/21
numerous [1]  390/6

**O**

oath [1]  387/17
OB [3]  279/12 291/17 343/14
object [1]  360/21
objectives [9]  311/5 311/7 312/2 312/4 315/16 380/4 387/11 393/4 394/10
obligation [6]  326/13 326/17 326/21 327/2 370/24 373/25
obligations [4]  372/18 374/1 374/8 374/12
obstetric [1]  389/2
obstetrical [1]  320/13
obstetrics [10]  276/9 290/5 307/3 307/7 337/2 358/10 358/22 358/24 383/7 392/14
obtain [7]  316/20 345/3 345/5 345/23 346/9 347/18 374/23
obvious [1]  284/8
obviously [10]  271/1 273/4 274/19 277/7 285/17 288/21 297/21 336/6 376/9 380/21
occupational [1]  337/3
occur [2]  310/7 317/3
occurred [1]  391/2
occurring [1]  338/9
off [10]  278/15 287/7 302/19 310/2 313/14 314/7 348/23 358/24 393/12 394/24
offer [3]  298/14 328/19 335/19
offered [3]  361/4 366/4 390/2
offering [2]  373/15 373/15
offers [4]  335/17 335/17 335/23 379/3
office [2]  269/7 321/19
official [2]  268/22 280/6
officially [1]  394/14
officials [1]  277/13
officio [1]  372/2
oft [1]  341/14
oft-repeated [1]  341/14
often [3]  289/24 312/6 314/21
oh [6]  269/9 355/21 356/17 365/24 365/25 368/9
OHIO [9]  268/1 268/4 269/7 272/5 291/6 292/1 321/19 385/6 394/15
okay [21]  305/2 321/13 326/3 338/22 338/25 340/14 343/16 344/7 346/6 352/11 352/18 355/21 356/17 357/16 363/13 365/21 365/23 367/18 368/2 369/11 369/12
older [1]  339/3
once [6]  308/1 343/20 357/2 374/25 388/4 388/14
one [110]
one's [2]  297/11 381/16
ones [6]  306/4 321/10 321/11 333/10 356/23 372/13
ongoing [3]  299/13 372/14 384/3
only [30]  276/15 277/18 277/19 278/10 281/15 282/18 289/12 313/13 324/7 327/6 332/22 333/9 335/15 338/20 338/21 343/4 343/25 344/7 344/8 344/11 347/20 356/23 360/23 365/8 365/23 374/4 376/17 389/15 390/11 390/12
Oostra [10]  289/8 289/9 289/11 289/13 341/22 342/9 342/14 374/16 383/1 384/2
Oostra's [1]  289/6
open [5]  298/11 302/10 302/17 302/20

382/18
opened [1]  292/11
opening [1]  302/4
operate [1]  373/14
operating [11]  275/5 280/16 333/12 333/15 333/17 342/24 360/23 365/6 365/8 366/7 390/24
operation [1]  368/15
operations [5]  324/14 327/13 336/11 362/10 368/21
operative [1]  372/13
operator [1]  279/11
opportunities [2]  383/2 383/3
opportunity [4]  322/13 365/6 370/2 385/17
option [7]  286/20 287/22 308/22 315/11 318/5 381/19 382/20
options [3]  287/20 326/7 335/2
order [41]  270/1 303/6 310/7 311/7 312/4 313/23 314/4 314/9 314/14 314/22 316/13 339/25 361/20 363/1 363/5 365/18 367/8 367/19 367/21 378/11 378/13 380/8 380/9 380/13 380/22 380/23 381/14 383/10 384/9 384/12 384/16 384/21 385/1 385/4 385/25 387/9 393/10 393/16 393/25 394/19 394/20
ordered [2]  315/24 374/14
orders [1]  308/18
ordinary [11]  275/11 280/17 280/23 280/23 281/9 288/22 294/18 359/23 359/23 361/13 383/22
organization [3]  299/24 303/16 361/6
organizations [4]  289/20 322/19 374/1 374/9
organized [1]  319/20
ostensibly [1]  330/2
others [2]  299/5 374/16
otherwise [8]  299/7 299/10 300/8 301/14 356/22 361/14 362/13 368/18
ought [1]  377/16
our [37]  270/24 271/2 273/4 273/24 275/25 283/24 284/23 288/23 300/15 301/6 304/2 305/8 305/22 306/7 306/9 309/20 310/3 317/22 317/23 318/8 328/24 332/16 337/4 342/15 342/16 342/18 342/25 343/10 347/13 353/1 362/24 366/24 376/9 380/9 385/24 389/23 390/3
ours [2]  307/11 358/14
outcome [1]  386/12
outcomes [1]  341/18
outpatient [5]  283/13 283/13 290/5 290/5 390/21
outset [1]  378/12
outside [2]  310/22 327/8
outstanding [1]  279/6
over [25]  281/16 281/21 282/22 282/22 283/9 286/6 286/6 293/19 295/20 299/21 302/4 322/14 326/14 329/20 336/12 362/12 364/10 369/9 369/18 369/19 375/6 382/8 383/16 387/20 391/6
overaggressive [1]  271/11
overarching [1]  360/25
overlap [1]  335/20
overlapping [1]  294/4
overreached [2]  344/8 344/11
overreaches [1]  345/4
overreaching [1]  347/21
overriding [1]  386/6
overstated [1]  279/24
overwhelming [1]  303/21
overwhelmingly [1]  303/3
own [12]  274/15 299/2 302/12 303/21 336/1 340/15 353/13 353/23 354/2 354/8 355/16

383/5
owned [5]  297/23 302/7 327/7 379/14 384/18
ownership [1]  302/12

**P**

page [10]  268/25 332/7 332/12 332/15 333/20 345/2 356/6 361/19 361/20 362/7
page 2 [1]  362/7
page 6 [1]  345/2
page 8 [1]  361/20
pages [2]  268/11 279/16
paid [3]  374/5 388/20 393/23
Palm [3]  268/8 268/23 385/20
paper [4]  333/2 337/21 359/15 373/1
parade [2]  310/6 311/20
paragraph [1]  344/18
paragraph 3 [1]  344/18
paramount [6]  274/15 357/12 357/13 357/14 364/14 388/12
parent [1]  327/9
Park [1]  334/22
parking [1]  295/9
participants [3]  306/25 307/3 316/23
participating [1]  362/14
participation [1]  340/7
particular [12]  304/14 314/2 320/1 332/1 333/5 333/22 338/8 345/21 348/7 352/9 352/10 352/11
particularly [6]  320/2 355/8 360/4 367/12 372/20 372/21
parties [10]  320/21 360/9 360/20 360/21 372/8 380/10 380/15 385/2 385/5 385/17
parties' [2]  275/3 303/21
partner [4]  314/8 356/21 357/9 376/25
partners [2]  357/6 377/8
partnership [4]  297/5 377/2 377/6 377/13
party [4]  277/13 303/23 324/18 354/4
pass [2]  325/14 325/20
passed [1]  315/25
past [5]  279/8 279/9 341/17 375/18 385/8
patient [20]  282/23 282/23 285/18 285/20 285/21 285/24 290/5 295/20 313/10 324/13 329/8 334/10 335/22 340/11 340/14 341/18 342/15 345/18 366/12 370/11
patient's [1]  340/6
patients [23]  273/21 275/13 276/20 278/6 283/6 283/25 284/11 285/7 285/9 285/10 293/19 293/21 319/5 329/2 330/21 331/21 338/2 339/16 340/2 346/1 348/8 348/20 352/8
pave [1]  295/8
pay [9]  275/19 278/15 300/15 300/19 301/8 318/12 321/25 329/8 346/3
paying [5]  278/21 318/3 322/1 336/15 394/5
payment [1]  278/14
payments [4]  278/22 278/25 285/4 285/11
payor [25]  292/22 293/7 323/13 324/2 324/3 328/10 328/14 328/16 328/22 340/20 340/21 348/7 348/13 348/15 348/19 350/9 350/9 352/9 352/11 362/16 363/9 363/18 363/21 364/3 377/8
payors [18]  322/25 323/3 323/23 323/25 347/11 347/23 347/25 349/8 349/8 349/20 349/21 349/23 352/13 354/4 362/19 363/20 365/7 375/5
pays [1]  279/8
pendency [1]  360/1
Pennsylvania [1]  268/20
pension [4]  278/18 278/20 278/23 279/8
people [8]  283/17 285/3 367/2 372/2 373/23

**P**

people... [3]  373/24 374/4 394/4
peoples [2]  352/15 352/15
per [4]  285/18 285/20 285/20 285/23
perceived [1]  274/21
percent [28]  272/15 291/8 291/10 291/25
319/4 321/22 322/8 323/21 324/6 324/22
328/1 328/2 328/11 329/9 331/17 332/17
347/11 348/4 353/14 353/25 354/6 354/25
355/15 378/6 390/23 390/24 392/15 392/15
percentage [1]  324/5
perception [1]  341/18
perfect [1]  317/6
perfectly [3]  323/17 383/4 387/11
perform [2]  300/2 361/14
performance [3]  298/17 371/3 372/11
perhaps [3]  290/11 357/12 370/4
period [10]  274/11 283/12 286/14 287/9
342/8 342/12 342/20 348/8 379/19 381/3
periods [1]  380/16
permission [1]  303/7
permit [1]  299/7
permitted [1]  299/11
permitting [1]  297/25
Perry [7]  268/19 270/9 270/18 301/20 302/2
319/21 387/14
Perry's [1]  330/11
persisted [1]  292/15
persistent [3]  314/24 314/24 315/1
person [1]  372/4
perspective [1]  319/25
persuade [2]  354/13 365/12
persuasive [1]  339/4
Peterson [3]  373/24 374/6 374/11
phase [1]  308/4
phenomenon [1]  292/9
Philadelphia [3]  307/19 317/10 388/21
PHS [1]  348/3
physical [1]  334/18
physician [13]  293/16 294/4 302/11 319/6
339/10 340/3 340/5 340/9 340/10 340/10
340/10 340/11 340/16
physicians [12]  293/18 293/23 294/3 331/20
338/1 339/16 339/20 339/21 339/24 340/18
340/22 340/24
pick [1]  385/10
pictures [1]  375/3
piece [2]  272/19 329/25
pins [1]  355/22
piper [1]  300/19
place [18]  271/14 315/1 315/18 315/18 316/3
316/9 316/17 317/1 324/9 361/9 372/7 379/3
379/7 380/5 381/14 382/2 386/16 393/5
placed [1]  274/4
places [1]  276/20
PLAINTIFF [3]  268/17 269/2 269/7
Plaintiff's [8]  306/21 310/11 323/11 325/5
328/2 341/13 341/21 360/19
PLAINTIFFS [13]  268/5 320/9 320/17
323/10 344/18 374/19 374/22 375/3 388/1
388/4 388/14 388/23 389/5
plan [23]  274/15 275/5 275/6 284/14 285/2
285/22 286/15 287/21 293/25 296/6 298/15
300/24 302/10 324/17 325/13 334/15 340/7
344/23 378/8 381/9 389/20 389/22 390/2
plan's [1]  293/11
planned [1]  301/12
planning [4]  302/17 302/18 334/12 334/15
plans [37]  274/16 274/17 275/4 277/13 284/4

284/5 285/23 292/18 292/24 292/25 294/5
298/1 300/13 300/22 301/6 302/9 302/12
303/7 303/8 303/22 312/10 313/1 313/7
313/7 334/11 334/13 334/22 338/8 344/14
349/5 377/18 378/15 378/15 381/6 381/12 381/16
381/25 389/19
plant [1]  333/14
player [3]  273/11 273/17 389/16
players [1]  273/20
please [7]  303/15 311/10 313/25 318/22
339/1 367/23 371/16
pleasure [1]  394/17
plummet [2]  392/15 392/20
plus [1]  325/3
pockets [1]  295/18
point [51]
point-counterpoint [1]  376/20
pointed [2]  295/13 298/8
points [15]  272/13 290/15 290/19 291/22
296/2 303/17 319/21 320/1 330/6 337/21
338/15 341/10 359/1 387/3 387/9
policy [4]  271/9 271/11 272/4 272/22
poo [1]  370/24
poo-poos [1]  370/24
poor [1]  282/24
poos [1]  370/24
portion [1]  275/8
position [3]  330/11 353/1 368/5
positive [8]  283/21 283/21 283/24 285/16
285/24 285/24 324/13 390/24
possibility [8]  286/11 286/20 286/25 287/19
287/24 288/6 303/13 333/1
possible [2]  356/20 357/24
possibly [1]  312/22
post [5]  316/23 328/3 358/9 358/12 358/16
post-acquisition [2]  316/23 358/9
post-joinder [1]  328/3
post-transaction [1]  358/16
potential [9]  287/25 291/14 297/5 299/2
303/13 357/9 357/11 377/7 377/12
potentially [1]  357/21
power [20]  273/13 292/6 292/23 320/21
320/22 320/24 321/3 321/16 325/10 325/23
325/24 326/2 331/9 331/19 352/7 352/14
354/7 356/24 375/10 375/15
powerful [1]  375/5
powerless [1]  349/20
PPG [1]  340/10
practice [3]  331/20 338/18 338/19
practices [1]  339/21
precedent [1]  391/19
preceding [2]  342/8 342/20
precisely [1]  332/18 361/17 374/7
precludes [1]  314/21
predict [6]  278/8 323/17 344/1 344/4 389/10
391/22
predicted [1]  342/21
predicting [1]  386/13
prediction [2]  328/5
predicts [1]  313/2
preexisting [2]  364/7 365/19
preference [1]  294/1
prehearing [1]  345/2
preliminary [39]  268/12 273/2 304/6 304/25
305/11 305/19 305/25 308/4 314/18 315/4
315/5 315/10 316/8 317/22 334/6 337/14
359/4 359/6 360/12 362/2 365/14 366/11
366/16 366/18 366/21 367/25 368/7 368/9
368/12 369/6 369/16 372/22 374/18 374/23
375/16 379/20 385/23 387/23 387/24

prepare [1]  336/4
prepared [3]  336/3 336/3 346/19
presence [4]  329/14 329/22 334/18 337/25
present [4]  270/24 305/24 319/23 344/9
presentation [8]  284/24 287/8 300/10 319/23
330/1 377/2 377/6 377/16
presentations [1]  394/19
presented [9]  276/18 277/11 303/20 321/18
321/20 321/25 378/9 387/20 393/14
presenting [2]  305/14 377/7
preserve [3]  313/3 314/12 360/13
preserving [1]  315/8
presumably [1]  341/9
presume [1]  304/21
presumed [1]  388/15
presuming [1]  379/20
presumption [20]  306/21 308/2 308/7 308/9
308/11 343/12 343/18 343/22 343/25 344/5
389/4 389/20 390/7 390/9 391/19 391/20
391/24 392/2 392/12 392/13
presumptions [2]  389/5 389/7
presumptively [1]  358/19
pretrial [1]  344/20
pretty [8]  290/17 323/17 324/21 324/24
339/18 346/21 377/4 382/17
prevail [6]  309/25 316/18 382/18 382/19
393/12 393/17
prevailed [2]  315/22 315/24
prevails [3]  360/2 360/17 375/19
prevent [6]  309/3 312/8 314/13 318/6 359/24
384/9
prevents [2]  312/14 312/20
price [14]  312/9 312/24 318/6 323/8 323/20
323/22 325/2 328/1 328/3 328/11 328/23
354/7 354/18 355/7
prices [57]
prices/cost [1]  357/18
pricing [5]  325/14 377/21 378/3 378/5
389/11
pride [1]  334/1
primarily [1]  310/12
primary [6]  314/11 378/12 378/13 378/17
378/18 379/20
principle [1]  306/23
principles [4]  311/5 312/2 312/4 315/16
prior [10]  274/22 276/2 311/13 313/16
315/12 362/6 379/7 380/3 380/19 388/25
private [5]  279/5 305/11 320/15 380/10
384/18
privileges [6]  293/17 293/18 293/23 294/3
294/5 340/22
probable [1]  341/22
probably [7]  301/23 306/15 324/6 359/2
386/15 387/12 387/13
problem [4]  314/24 314/24 315/1 365/23
problematic [1]  390/11
procedures [1]  390/22
proceeding [11]  277/19 282/21 287/15 304/6
305/9 306/12 308/25 309/2 360/1 388/9
393/2
proceedings [5]  268/12 309/16 318/21 395/2
395/7
process [2]  360/22 362/15
produced [1]  281/1
product [6]  305/23 306/4 306/6 306/22
307/16 328/19
professional [1]  376/13
Professor [2]  322/5 377/21
profit [3]  326/12 326/24 353/21
profits [4]  288/15 326/13 327/3 390/23

**P**

profusely [1]  366/8
progress [3]  298/7 390/18 391/6
prohibit [6]  362/4 365/18 366/22 367/8
381/8 381/24
prohibited [2]  363/8 363/23
prohibits [4]  312/17 362/7 363/15 366/1
project [1]  297/21
projected [1]  277/25
projecting [1]  280/20
projections [3]  280/14 280/17 288/8
projects [2]  279/1 370/6
PROMEDICA [215]
ProMedica -- you [1]  363/12
ProMedica's [43]
ProMedica-St. Luke's [1]  377/13
promise [2]  319/16 321/10
promised [1]  319/3
promote [1]  339/25
promptly [1]  318/19
prong [1]  392/7
proof [1]  294/6
propose [1]  314/14
proposed [27]  305/4 308/16 308/17 309/23
310/3 311/7 312/4 313/23 314/4 359/6
360/19 361/10 361/17 361/20 362/4 365/15
366/10 367/21 368/13 369/7 369/16 380/8
380/9 380/13 380/22 380/22 383/10
proposition [4]  303/18 330/5 345/22 346/11
pros [1]  357/5
protect [2]  316/19 386/7
protected [2]  329/4 374/18
protecting [2]  380/16 394/10
protection [1]  379/4
protections [1]  315/17
proud [3]  391/4 391/4 391/7
prove [4]  301/4 304/5 317/17 318/15
proved [1]  329/12
provide [4]  326/9 326/10 329/16 369/1
provided [5]  277/14 288/24 321/8 353/14
364/6
provider [2]  340/6 340/15
providers [3]  287/25 357/25 375/5
provides [2]  357/15 361/11
providing [4]  276/4 283/5 353/7 376/25
proving [1]  320/10
provision [2]  363/24 372/5
proximate [1]  383/12
prying [1]  274/22
public [14]  311/11 320/14 320/15 323/25
325/15 326/18 327/22 337/15 366/16 369/5
375/17 381/16 381/17 388/12
publicly [2]  324/10 349/3
purport [1]  349/2
purportedly [1]  323/16
purpose [9]  304/24 305/4 314/11 314/16
316/25 317/11 359/24 360/12 366/18
purposes [4]  314/12 322/10 355/12 362/2
pursuant [1]  364/2
pursue [4]  335/2 335/7 338/11 346/22
pursued [2]  346/23 346/25
pursuing [1]  334/17
put [21]  276/23 288/14 291/1 291/1 292/22
303/24 306/3 307/1 307/7 307/18 324/6
328/9 332/6 336/16 344/22 365/15 369/10
377/14 377/22 380/7 383/9
putting [4]  284/8 300/20 306/8 316/17
PX [1]  377/14
PX1113 [1]  345/13

PX169 [1]  346/15
PX169-002 [1]  346/15
PX226 [1]  377/2
PX395 [1]  281/1

**Q**

qualified [1]  282/2
quality [32]  276/4 276/6 278/5 279/11
288/24 289/4 289/9 289/20 289/22 290/11
311/13 313/17 326/8 340/1 341/13 341/15
341/16 341/17 342/1 342/17 342/17 343/1
343/6 367/3 367/7 367/16 370/12 375/23
387/1 387/4 387/7 394/18
question [32]  290/15 291/15 291/15 291/18
291/19 298/10 298/23 300/21 302/1 314/2
315/20 321/5 321/5 321/23 322/14 322/23
325/7 325/25 332/21 334/5 335/6 337/13
337/19 341/2 341/5 341/5 341/19 343/17
353/19 361/7 375/16 382/19
questions [12]  271/4 291/4 301/13 305/25
309/5 314/1 316/18 317/19 318/17 322/12
376/9 388/3
quickly [5]  278/2 280/22 296/1 296/11
386/21
quite [4]  280/3 286/4 360/6 389/15
quo [7]  305/5 311/10 311/14 311/18 312/8
315/8 318/6
quote [9]  289/20 304/14 305/7 306/8 344/18
344/21 345/17 347/17 385/18
quotes [2]  296/25 326/14
quoting [4]  289/18 323/17 344/14 347/12

**R**

rains [1]  310/22
raise [19]  273/8 281/24 282/7 282/14 282/17
282/19 293/21 317/18 321/16 328/7 330/18
330/19 331/14 339/13 344/15 349/19 353/16
373/7 375/10
raised [4]  282/10 318/16 339/8 388/2
raising [3]  312/17 316/18 352/24
Randy [1]  374/16
range [1]  335/16
rapidly [1]  301/18
rate [14]  292/19 294/6 345/3 345/6 345/24
346/10 347/18 347/24 349/20 349/21 353/14
353/25 354/1 354/1
rates [60]
rather [5]  311/24 317/2 383/17 388/1 389/4
rating [3]  281/15 282/4 282/6
ratings [5]  281/18 281/22 281/23 282/9
282/14
ratio [5]  354/6 355/1 355/4
ratios [5]  294/14 294/21 294/22 344/3 367/9
Razi [1]  269/2
reach [1]  340/9
reacting [1]  367/22
read [14]  276/11 282/4 294/24 296/20
296/25 297/3 304/4 305/7 317/11 340/2
344/13 369/3 388/20 392/8
reading [1]  340/2
ready [2]  270/2 270/2
real [9]  283/1 291/14 291/15 298/22 322/4
323/19 323/19 347/14 370/3
realistic [2]  287/24 315/11
reality [7]  328/5 348/6 348/6 349/7 349/18
349/23 349/23
realized [3]  270/7 353/11 357/3
really [25]  270/21 270/24 286/15 305/8
306/19 306/19 310/11 314/3 319/23 321/20
327/12 328/5 329/6 329/16 329/16 333/6

337/15 341/24 357/18 369/16 371/3 377/25
387/6 393/14 394/9
Realtime [1]  395/6
reason [13]  277/2 278/8 287/3 292/8 313/12
333/18 339/13 339/15 341/6 364/25 372/17
372/19 392/4
reasonable [2]  282/10 382/4
reasonably [1]  287/10
reasons [10]  275/3 284/9 313/6 315/3 333/5
334/17 356/14 375/18 376/1 385/23
rebound [1]  278/23
rebut [2]  391/24 392/11
rebuttal [1]  359/1
rebutted [2]  378/6 389/9
rebutting [2]  310/15 390/8
receive [1]  324/24
received [1]  272/14
recent [3]  289/22 290/3 341/17
recently [2]  289/10 290/1
recess [2]  318/20 395/1
recognized [2]  315/2 333/3 334/17
recollection [1]  304/16
recommend [2]  290/16 290/19
reconstruction [1]  334/9
record [17]  286/10 287/5 296/10 296/13
298/22 298/24 299/4 301/11 380/14 381/17
381/17 384/12 385/23 387/6 392/16 394/24
395/7
records [3]  368/24 368/25 370/9
recourse [1]  393/24
recover [1]  325/2
recovery [1]  355/23
red [4]  324/15 356/4 356/6 359/13
redacted [6]  275/9 293/3 293/24 294/9
296/16 297/11
reduce [3]  326/8 341/9 367/11
reducing [2]  313/7 366/23
reduction [3]  313/8 313/9 313/12
refer [1]  289/6
referred [1]  314/24
referring [1]  280/2
reflect [1]  324/8
reflected [3]  322/7 323/7 357/19
reflecting [1]  332/19
reform [4]  299/1 336/5 336/8 370/13
refuse [1]  349/23
regard [2]  362/14 374/3
region [1]  298/21
Registered [1]  395/5
Reilly [16]  268/17 270/20 295/19 298/13
301/10 301/14 301/17 319/21 319/22 323/17
329/25 332/6 332/12 343/8 358/18 376/5
Reilly's [1]  330/11
reimbursement [4]  296/6 328/15 336/15
345/18
reimbursements [1]  364/19
reinvestment [1]  353/4
reiterate [2]  314/11 393/7
rejected [3]  286/22 286/25 392/18
rejecting [1]  287/19
relate [1]  373/1
relates [4]  280/10 330/12 332/1 372/22
relations [1]  350/9
relative [1]  378/3
relatively [3]  271/25 272/2 341/24
relevant [7]  277/1 320/2 322/9 330/10
330/13 330/24 388/15
relief [32]  305/4 306/1 308/16 308/17 309/13
309/23 310/3 311/12 312/7 313/19 314/5
314/9 314/13 314/19 314/20 314/25 315/4

**R**

relief... [15] 315/5 315/8 315/14 316/4 316/9
316/13 316/17 316/21 317/1 320/8 372/11
388/6 388/10 393/4 394/2
rely [1] 349/8
remain [4] 271/4 279/11 291/17 375/19
remained [1] 290/10
remaining [3] 308/13 308/14 372/3
remains [4] 277/17 277/18 291/16 390/10
remarkable [1] 390/18
remarkably [1] 324/20
remedy [8] 316/4 316/6 356/18 359/3 360/2
360/14 372/17 375/20
remember [9] 289/7 311/3 327/6 331/6
335/12 345/9 352/10 357/13 360/20
remind [1] 320/5
remove [1] 311/8
renegotiate [5] 364/11 364/15 364/21 365/7
367/13
renegotiated [1] 329/5
renegotiating [2] 303/9 365/19
renewal [1] 364/8
rent [2] 285/8 285/9
repays [1] 279/6
repeat [1] 312/6
repeated [2] 341/14 343/21
repeatedly [2] 275/16 376/24
report [9] 280/11 280/25 281/12 284/21
321/20 322/11 324/11 342/5 366/9
reportable [4] 308/21 308/22 378/24 378/24
reporter [5] 268/22 268/22 301/18 395/5
395/6
reposition [1] 336/1
represent [2] 290/24 331/17
representatives [1] 374/17
representing [1] 335/3
request [2] 340/16 376/1
requesting [1] 337/15
requests [1] 340/15
require [7] 304/5 336/9 338/5 369/23 369/25
383/21 385/2
required [1] 340/6
requirement [1] 302/11
requirements [3] 299/25 305/22 360/25
requires [4] 369/9 369/18 373/13 382/8
reserves [3] 278/10 278/24 295/6
resist [3] 292/19 294/5 349/20
resources [3] 295/4 337/11 366/25
respect [5] 276/24 280/1 327/18 339/19
339/20
respectfully [2] 299/16 376/1
respective [2] 374/1 374/17
respects [1] 371/7
respond [2] 319/25 338/22
responded [1] 341/1
responding [4] 270/23 271/7 289/3 320/25
response [8] 274/13 274/18 315/19 322/3
324/1 331/12 332/19 332/25
responsibility [1] 304/8
responsive [2] 286/2 376/8
resting [2] 305/10 389/4
restore [1] 394/7
restoring [1] 316/5
restrain [2] 291/22 294/12
restrained [4] 293/2 293/6 293/8 363/8
restraint [1] 331/24
restrict [1] 361/12
restrictive [1] 311/25
result [8] 301/7 321/3 328/8 329/9 331/7

331/7 356/24 357/21
resulting [1] 355/18
retain [1] 326/19
retains [1] 385/16
retreat [1] 332/5
return [3] 324/13 360/14 360/15
reveal [1] 275/9
reveals [5] 331/5 344/21 346/17 347/10
375/4
revenue [3] 283/13 283/14 367/13
revenues [10] 287/23 311/16 324/12 324/19
324/23 326/1 326/14 327/16 353/12 390/20
review [1] 271/17
reviewed [1] 282/16
right [28] 271/14 271/19 309/1 317/7 317/8
319/19 325/22 326/7 329/3 330/9 330/11
330/11 332/13 339/15 339/16 343/12 347/4
354/21 356/25 362/18 364/3 370/21 371/24
371/24 372/10 380/3 384/15 394/11
rightly [1] 391/4
ripe [1] 300/5
ripple [1] 370/10
risk [1] 360/3
RMR [2] 268/22 395/12
robe [1] 373/24
Rodino [1] 308/21
role [4] 305/8 321/19 383/25 387/25
room [4] 279/5 368/3 369/2 374/4
roughly [2] 278/22 379/23
round [1] 289/22
row [1] 285/1
royalties [1] 279/6
rule [1] 295/16
rules [2] 309/10 386/23
run [8] 272/24 283/22 283/24 289/14 295/20
327/13 337/6 383/9
running [1] 359/2
rush [2] 281/20 386/21

**S**

salary [1] 366/23
same [28] 292/21 302/7 304/3 305/14 306/6
307/20 312/3 315/16 323/22 333/20 349/12
355/18 362/23 367/6 373/16 376/10 377/18
377/18 377/18 378/2 379/7 380/18 381/1
381/1 381/5 382/17 387/1 391/10
Sara [1] 269/2
satisfaction [4] 290/6 313/10 341/18 342/15
save [1] 292/25
savings [1] 369/2
savor [1] 271/20
saw [4] 287/18 322/17 342/11 383/22
say [55]
saying [43]
says [34] 270/15 272/23 280/16 293/9 297/22
301/6 307/1 319/4 322/10 336/21 338/7
339/22 343/22 349/3 352/21 357/11 357/20
361/17 361/23 362/24 363/6 363/24 365/24
366/7 366/11 367/7 371/13 371/13 372/8
377/8 382/6 390/5 391/21 392/19
scatter [1] 319/19
scenario [2] 286/11 298/23
schedule [2] 280/25 316/22
scores [6] 342/9 342/13 342/14 342/15
342/16 342/20
Scott [1] 308/21
scrambled [2] 316/11 394/3
screen [8] 284/8 293/4 321/9 323/24 323/25
332/6 348/2 348/23
screens [1] 275/8

seamlessly [2] 293/20 294/2
seated [1] 318/22
second [15] 273/2 290/11 292/2 304/10 305/7
320/14 329/13 337/23 342/11 342/18 345/4
346/15 366/6 376/8 378/18
secondary [1] 346/2
seconds [2] 376/16 376/18
Section [12] 269/8 315/4 317/12 318/15
320/11 320/22 354/15 354/17 354/20 362/7
371/12 374/23
Section 7 [6] 317/12 320/11 320/22 354/15
354/17 354/20
Section 7.1 [1] 371/12
sector [1] 332/9
seeing [2] 291/23 291/24
seek [7] 315/3 320/9 353/2 372/10 374/19
374/23 385/17
seeking [1] 342/2
seeks [2] 311/11 320/6
seem [1] 356/21
seemed [2] 288/2 296/7
seems [6] 307/12 316/19 346/16 369/4
380/23 387/1
seen [19] 274/5 281/2 287/13 287/16 294/7
301/1 307/10 307/11 307/18 324/22 327/11
327/17 327/17 334/13 335/6 336/2 350/4
373/3 373/4
segue [1] 313/22
selection [1] 319/5
selective [2] 292/21 293/7
send [2] 340/11 372/25
SENIOR [1] 268/14
sense [10] 329/10 329/10 329/11 338/21
363/8 383/6 383/8 383/19 384/8 385/12
sent [1] 364/23
sentence [6] 280/11 280/25 332/6 332/13
332/14 332/14
separate [35] 303/5 303/9 306/4 310/9
310/25 311/6 311/20 311/23 312/3 312/11
315/17 316/8 360/23 360/25 361/8 361/11
365/1 368/19 378/13 379/2 379/18 379/22
380/1 380/10 380/12 380/15 380/24 381/5
381/7 381/13 381/18 382/1 384/23 385/9
386/25
separately [1] 277/4
September [1] 283/20
series [4] 329/15 333/15 333/17 350/7
serious [11] 271/4 291/4 305/25 309/4
309/13 316/18 317/19 318/17 388/2 388/4
388/10
seriously [3] 347/1 374/2 383/25
serve [1] 287/2
serves [1] 337/4
service [19] 276/14 286/7 286/11 288/6 307/1
311/8 313/3 337/1 349/15 361/3 366/4 366/8
366/14 370/12 378/19 379/7 381/1 382/16
382/22
services [28] 276/1 276/10 276/25 279/12
279/12 286/20 286/25 320/13 320/13 325/2
326/9 330/12 335/16 335/23 336/25 339/10
340/3 343/14 357/15 364/9 373/15 373/16
383/20 384/7 384/11 392/14 392/17 393/11
serving [1] 372/10
set [4] 278/15 321/10 330/3 364/13
setting [1] 379/21
settle [2] 305/18 305/23
seven [6] 277/15 279/17 279/21 322/14
329/21 355/14
several [8] 302/8 313/11 319/20 333/12
344/13 344/19 389/25 390/19

**S**

shall [3] 361/1 361/2 361/21
shape [1] 287/21
share [17] 274/10 274/12 291/8 307/21
325/11 331/1 331/2 331/3 332/9 332/10
332/11 332/16 332/17 337/23 343/16 390/16
392/14
share's [1] 291/10
shareholders [1] 327/23
shares [24] 272/6 287/23 306/25 307/3
307/10 307/10 307/11 307/12 307/14 307/17
308/10 322/2 323/16 332/20 343/22 343/24
344/2 354/20 357/23 375/1 389/10 390/22
391/21 392/19
short [2] 337/13 383/15
shot [1] 319/19
should [21] 271/20 293/14 295/4 303/2
308/11 312/21 314/7 316/19 317/4 318/7
318/11 338/9 343/3 356/17 367/16 370/17
385/24 387/13 388/5 391/7 393/2
shouldn't [6] 291/13 316/13 355/19 363/2
367/5 391/11
shovel [1] 302/5
show [18] 280/4 286/10 300/23 301/1 307/16
308/6 308/8 309/4 314/15 320/8 320/17
321/9 324/10 329/21 331/6 331/11 332/19
338/8
showed [8] 323/14 329/25 332/12 332/14
335/21 342/23 352/15 356/5
showing [10] 288/15 297/25 298/1 303/16
307/24 332/24 349/3 378/5 388/18 391/20
shown [5] 273/23 279/23 308/1 375/21
388/23
shows [6] 277/11 279/2 322/12 324/18
348/12 372/6
shred [1] 328/10
sick [1] 388/7
side [4] 322/2 323/15 331/17 367/13
sides [1] 394/20
sideways [1] 363/4
sign [1] 381/9
signed [2] 380/11 380/15
significance [4] 279/25 338/10 341/24
391/22
significant [13] 272/23 288/10 288/14 290/24
290/25 291/5 311/23 330/2 336/6 336/8
376/12 391/3 391/7
significantly [5] 307/21 312/18 348/4 387/24
388/24
signs [1] 285/16
similar [3] 282/14 292/3 311/12
simple [3] 315/12 373/11 388/11
simply [8] 332/20 336/16 345/16 360/3 360/9
374/22 375/7 375/17
since [8] 302/21 310/11 313/21 314/19
315/25 325/1 342/7 391/15
sincere [1] 296/21
sincerely [1] 296/11
singular [1] 332/20
sit [1] 300/14
sitting [5] 278/9 278/10 278/16 278/20
279/13
situation [3] 300/13 327/11 392/24
situations [1] 295/14
six [16] 281/2 281/25 310/24 311/2 311/2
311/3 311/19 315/18 330/8 331/1 337/3
364/24 379/3 379/19 382/23 386/24
six-month [1] 310/24
Sixth [2] 314/6 365/13

size [3] 272/14 375/8 389/21
skipped [1] 313/24
sky [1] 386/25
skyrocketed [2] 379/6 381/3
slack [1] 346/2
slide [59]
slides [12] 275/8 275/20 288/14 288/17
288/19 295/19 296/9 313/23 321/7 339/1
356/17 371/12
small [11] 272/1 273/11 295/15 302/17
302/18 302/22 302/24 303/13 317/23 325/3
341/24
smaller [5] 274/2 274/3 274/7 281/20 352/12
smallest [1] 335/12
smart [2] 376/21 390/20
snapshots [1] 329/16
snippet [2] 329/25 331/4
so's [1] 332/9
so-and-so's [1] 332/9
sole [1] 305/4
solved [1] 292/16
somebody [2] 330/21 352/14
somehow [3] 279/23 347/2 373/17
someone [3] 285/12 301/21 328/24
someplace [2] 359/16 366/9
something [16] 279/24 280/9 284/21 287/8
287/10 287/14 292/12 298/4 306/21 318/11
338/16 342/24 364/13 366/10 373/23 383/5
sometime [2] 302/15 302/20
sometimes [1] 386/6
somewhat [1] 336/9
somewhere [2] 294/3 298/12
soon [2] 298/3 303/10
sorry [8] 318/3 331/13 355/25 366/13 368/9
368/10 394/4 394/25
sort [11] 278/13 319/24 321/23 335/21
338/10 345/14 353/21 356/19 364/6 393/11
394/1
sorts [1] 295/9
sought [1] 370/14
sound [1] 333/23
sounds [1] 357/17
source [5] 322/16 344/21 346/16 364/16
364/16
sources [1] 327/8
southwest [6] 298/12 329/23 330/4 330/8
334/19 337/22
speak [2] 370/10 270/11
speaks [1] 308/15
specialty [1] 311/16
specific [5] 281/17 288/9 303/17 349/14
372/11
specifically [6] 270/23 271/12 274/6 289/21
290/8 339/19
speculation [1] 300/3
spend [2] 319/18 320/25
spin [2] 302/19 310/2
spinoff [1] 386/8
spun [2] 314/7 393/12
St [5] 290/1 341/25 358/11 358/20 364/11
St. [303]
St. Luke's [302]
staffing [9] 311/8 313/3 313/7 313/8 313/9
313/12 313/15 378/19 381/1
staffs [2] 367/4 367/4
stage [1] 305/19
stand [2] 337/1 357/3
stand-alone [1] 357/3
standard [9] 291/3 305/12 309/11 317/1
353/6 354/14 354/15 387/23 387/25

standing [1] 270/16
start [5] 271/7 318/19 361/17 361/18 383/10
starting [2] 271/22 301/20
state [12] 268/4 269/7 272/5 291/6 292/1
301/19 326/24 327/9 382/5 385/6 390/17
394/14
stated [2] 345/22 376/23
statement [3] 306/20 344/25 346/16
statements [3] 277/21 284/3 288/23
states [4] 268/1 268/14 317/10 345/16
static [1] 331/5 343/15 375/2
status [9] 282/11 305/5 311/10 311/14
311/17 312/8 315/8 318/6 392/9
stays [1] 283/22
stealing [1] 390/16
steering [3] 293/4 293/10 293/12
step [2] 320/5 324/4
Stephen [5] 268/22 269/19 395/5 395/11
395/12
Steve [1] 270/17
stick [1] 344/15
sticking [1] 297/8
still [13] 270/16 277/18 279/12 291/18 299/3
300/22 306/23 307/5 328/22 337/20 370/24
383/2 383/3
stolen [1] 275/19
stood [2] 296/20 297/14
stop [9] 304/11 310/10 331/10 366/6 366/11
370/15 370/18 379/17 386/5
story [2] 283/1 319/24
straight [1] 270/8
strategic [14] 298/1 334/10 334/12 334/13
344/14 344/23 345/2 345/5 345/8 345/19
345/23 346/9 346/13 347/17
strategy [5] 291/12 333/2 335/7 337/21
357/3
Street [6] 268/23 269/9 269/12 269/15
269/17 269/20
strengthen [2] 389/19 390/7
strengthens [1] 389/6
stress [1] 290/25
stretch [1] 346/14
strong [9] 292/18 308/9 369/7 389/4 389/5
389/8 390/7 391/20 392/13
stronger [4] 271/5 334/18 375/22 380/22
strongly [1] 271/1
structure [1] 272/7
struggling [1] 274/10
studies [1] 384/3
study [3] 317/4 318/5 318/7
studying [2] 383/3 384/3
stuff [1] 373/10
sub [1] 371/6
sub-acute [1] 371/6
subject [4] 275/6 288/12 289/12 289/16
submit [2] 293/15 328/5
submitted [5] 277/14 279/15 281/13 349/1
349/14
subpoenas [1] 316/21
substantial [16] 271/4 291/4 291/19 305/25
309/5 316/18 317/19 318/17 345/3 345/6
345/24 346/10 347/18 388/2 388/5 388/11
substantially [6] 307/22 320/12 320/18
320/19 371/4 388/17
substantive [1] 333/13
substitute [3] 328/18 384/19 384/19
subtle [1] 354/12
success [5] 278/8 291/3 305/17 338/14
374/25
successful [3] 301/4 305/14 386/11

**S**

successfully [1]  335/10
such [5]  307/24 340/22 365/18 377/24
388/19
sufficient [4]  283/8 284/5 353/12 390/4
suggest [6]  271/16 322/2 330/2 344/10 347/2
373/11
suggested [3]  271/10 271/12 316/12
suggesting [6]  316/19 328/10 346/8 356/19
356/21 367/24
suggestion [3]  317/4 317/21 318/7
suggests [4]  276/17 276/20 373/17 392/16
suing [2]  383/17 383/18
Suite [2]  268/23 269/12
summarize [2]  277/10 387/19
summarizes [1]  280/12
summer [2]  286/12 385/21
super [6]  326/4 352/24 354/7 354/11 354/11
355/7
supplemental [1]  349/13
support [9]  321/2 321/24 323/15 335/4 335/5
336/17 345/21 346/10 348/1
supporting [1]  384/12
supports [1]  345/21
suppose [1]  385/16
Supreme [3]  307/19 308/8 391/18
sure [26]  280/8 281/7 289/9 298/3 298/13
298/18 299/15 300/5 301/21 301/22 304/12
306/23 325/8 325/20 339/12 352/19 366/19
374/15 377/4 378/3 380/17 381/2 384/22
389/15 391/16 394/1
surgery [4]  276/11 290/5 337/2 371/9
surprise [1]  273/24
surprised [1]  296/23
surprising [2]  283/10 288/8
surprisingly [2]  291/9 325/5
surrounding [1]  330/20
survey [1]  324/18
surveys [1]  275/12
survive [2]  273/22 309/8
suspect [6]  284/14 284/15 359/10 373/4
373/9 373/9
suspicion [1]  368/4
switch [3]  293/19 293/21 294/2
sworn [10]  277/14 279/16 284/6 297/14
301/5 302/8 302/13 303/21 303/22 303/23
system [25]  268/7 274/2 274/2 274/3 274/4
274/6 274/7 277/6 289/15 295/15 335/17
335/17 335/19 341/16 341/25 342/16 342/16
342/18 342/19 357/20 363/10 377/8 381/21
383/11 383/19
systems [2]  281/19 336/18

**T**

table [4]  284/20 300/14 300/23 322/20
tactics [1]  274/21
take [20]  318/18 320/4 320/5 323/10 326/24
329/15 331/21 338/12 346/2 348/22 349/25
353/17 361/16 368/8 374/1 376/15 380/2
383/25 386/16 387/18
taken [5]  284/20 284/24 301/18 318/20 382/2
takes [4]  334/1 334/23 365/12 393/6
taking [9]  271/14 274/12 274/12 286/15
287/21 301/11 324/9 324/17 333/4
talent [1]  276/23
talk [28]  270/21 278/12 288/1 297/6 297/18
301/18 305/3 308/13 308/14 312/13 312/25
314/15 318/13 321/14 329/13 356/18 359/3
359/3 359/5 360/5 371/1 372/13 376/24

377/9 377/20 378/1 378/10 392/17
talked [18]  289/4 294/10 296/3 298/9 299/24
300/11 330/7 354/9 360/6 377/3 377/4 381/8
383/14 385/10 390/9 392/24 393/3 393/13
talking [11]  293/25 302/3 303/17 330/8
353/24 357/22 362/21 362/22 389/24 390/11
390/14
talks [3]  310/6 377/6 382/13
taller [1]  271/22
team [2]  317/23 376/11
tear [1]  279/18
technical [1]  278/13
technology [1]  336/10
tell [14]  279/20 297/16 306/8 310/10 312/22
317/20 318/1 318/2 319/14 333/8 343/17
345/14 362/8 391/16
telling [8]  272/19 283/23 294/21 311/25
334/3 355/10 355/23 382/3
tells [1]  285/12
tendency [1]  317/13
tenure [1]  385/3
term [4]  326/13 335/11 362/21 364/9
terminate [4]  361/4 363/22 363/24 364/3
terminated [1]  365/2
terminating [2]  363/16 366/23
termination [3]  361/5 363/17 363/25
terms [10]  314/3 340/6 349/14 350/11 361/8
372/12 379/9 381/1 381/4 382/6
tested [1]  302/13
testified [5]  289/8 289/16 290/8 290/14
382/24
testify [3]  282/2 289/12 289/13
testimony [31]  275/5 277/12 277/12 277/17
279/16 279/23 281/13 282/5 284/6 288/9
296/17 296/20 297/14 301/5 302/8 302/13
302/13 303/22 303/22 303/23 304/19 304/20
305/15 321/21 325/1 378/8 386/17 387/4
389/19 390/5 392/19
thank [26]  270/4 270/13 301/15 301/16
305/2 310/16 310/17 310/23 312/5 318/18
318/23 319/8 319/9 359/19 359/20 369/13
376/3 376/4 376/6 376/7 376/11 376/14
394/16 394/16 394/20 395/1
that's [137]
theme [4]  303/16 304/2 348/21 385/3
themes [1]  341/14
themselves [1]  318/13 336/14
theory [1]  328/2
there's [49]
therefore [7]  293/19 293/20 308/3 310/15
325/10 331/21 379/20
they'd [2]  328/18 357/6
they're [44]
they've [21]  282/22 291/1 294/21 297/24
297/25 298/8 298/18 299/3 299/4 309/25
311/23 327/18 328/20 328/20 329/12 333/7
333/17 335/2 344/11 344/19 379/5
thing [14]  276/15 283/15 292/21 307/20
346/22 346/24 355/18 362/23 363/3 377/18
377/18 377/18 386/3 393/6
things [15]  286/22 295/9 311/15 312/1
312/23 317/17 343/2 356/13 368/12 377/24
380/6 380/7 380/8 384/3 389/25
think [104]
thinks [1]  369/24
third [9]  300/10 303/23 324/18 332/7 337/24
354/4 361/25 363/14 368/20
third-party [1]  303/23
Thirteenth [1]  269/15
Thirty [2]  312/5 339/2

Thirty-four [1]  339/2
Thirty-one [1]  312/5
those [54]
though [6]  288/18 320/3 324/12 336/23
353/22 364/2
thought [8]  277/22 296/25 314/3 334/15
345/7 346/23 357/9 366/18
three [18]  270/8 277/12 278/22 298/20
335/13 335/14 337/5 337/21 363/14 369/9
369/19 378/12 378/12 380/4 380/14 382/8
389/15 393/4
through [34]  277/9 279/18 281/2 281/11
281/12 282/24 284/12 285/4 285/12 285/18
286/9 287/5 287/6 287/13 288/17 288/18
297/22 298/15 305/15 317/14 318/12 318/15
321/7 325/10 326/2 333/21 337/25 349/25
350/2 356/22 364/18 371/12 380/11 385/23
throughout [1]  282/21
thrust [1]  379/20
thus [2]  330/3 338/8
tie [1]  391/14
timeframe [1]  393/17
times [4]  271/21 344/13 344/19 385/14
timing [1]  286/13
tip [1]  375/14
tired [1]  361/9
title [1]  281/14
today [12]  271/2 272/20 273/12 276/21
291/24 306/17 310/4 319/25 322/1 329/8
343/9 374/5
together [2]  275/23 377/22
told [5]  286/24 336/11 368/17 384/15 385/11
TOLEDO [15]  268/1 322/18 324/19 324/24
327/6 329/23 330/4 330/8 333/25 334/19
336/17 337/23 353/17 356/11 385/21
tomorrow [1]  310/20
too [7]  271/19 273/11 273/11 273/12 327/10
331/22 358/13
took [3]  345/10 358/8 377/22
top [10]  275/13 284/14 332/7 345/4 345/8
345/22 346/9 346/13 347/17 366/3
total [8]  278/11 278/17 282/10 282/19 285/3
285/4 285/14 285/16
totally [2]  378/7 382/18
touch [1]  344/9
touchy [1]  346/21
tough [3]  282/12 282/13 379/13
toward [1]  370/17
towards [1]  368/24
tower [2]  298/8 334/10
town [6]  284/23 294/17 296/7 322/6 328/4
377/22
track [3]  277/5 324/24 380/14
tracked [1]  382/1
TRADE [8]  268/3 268/17 268/20 269/2
269/5 270/10 270/19 388/10
tradeoff [1]  290/17
traditional [1]  387/24
traffic [1]  281/2
transaction [29]  271/10 271/18 274/11
293/14 298/10 299/10 308/20 309/24 315/13
318/9 319/24 320/18 320/19 320/20 320/23
328/8 331/7 331/7 332/22 334/7 337/12
354/23 355/2 355/17 356/24 358/11 358/16
358/20 365/13
transactions [6]  271/13 272/2 272/14 274/1
295/13 357/25
transcript [2]  269/12 395/7
transfer [1]  361/3
transferring [2]  366/4 366/22

414

# T

treasurer [1] 281/6
treat [1] 285/7
treating [2] 285/10 352/8
trend [6] 317/12 343/4 356/3 356/13 391/1
trending [2] 285/23 355/25
trends [1] 277/22
trial [23] 281/15 299/16 300/5 304/15 305/14 309/10 310/1 310/3 313/19 314/6 315/22 318/16 360/17 378/5 378/16 381/3 382/19 386/12 386/14 386/19 386/22 393/1 393/6
tried [4] 319/23 330/21 357/23 386/17
tries [2] 273/10 331/22
triple [1] 311/17
tripped [1] 371/12
TRO [4] 287/15 304/16 343/20 377/3
trouble [4] 322/23 338/24 356/9 356/10
troubling [3] 355/8 361/12 363/15
true [17] 272/8 273/14 282/25 292/8 292/9 298/3 298/7 334/8 334/11 339/25 339/25 340/17 340/17 341/16 367/3 367/12 392/20
truly [4] 327/7 379/14 384/23 384/23
trust [6] 336/21 336/22 336/23 352/23 352/24 374/10
trusted [1] 373/18
truth [1] 355/10
try [8] 270/22 279/18 284/12 296/10 338/25 349/25 350/2 394/7
trying [7] 273/21 286/2 331/13 344/9 354/13 354/14 372/20
turn [4] 327/22 343/5 371/5 371/9
turnaround [8] 285/21 286/15 288/10 288/13 296/3 298/15 324/17 347/9
turned [2] 343/9 355/24
twin [1] 374/22
two [39] 270/16 271/21 275/1 275/13 277/14 279/15 287/20 292/11 296/18 297/15 306/4 314/11 317/25 322/12 325/13 325/15 329/5 335/2 335/19 340/20 347/6 347/11 354/5 364/18 365/12 366/15 371/24 374/4 375/18 375/23 381/6 381/15 384/18 388/24 392/15 392/15 393/16 393/24 394/10
types [2] 277/10 299/6
typical [2] 272/21 273/4

# U

U.S [5] 268/17 268/20 269/2 269/5 307/19
Uh [4] 326/16 348/17 361/22 369/15
Uh-huh [4] 326/16 348/17 361/22 369/15
ultimate [3] 320/10 338/13 374/24
ultimately [4] 336/18 342/10 360/17 370/12
un [2] 378/6 389/9
un-rebutted [2] 378/6 389/9
unable [1] 324/13
unambiguously [1] 344/15
unavoidable [1] 271/3
uncertainty [2] 299/24 300/6
under [26] 303/8 305/11 305/22 309/10 309/11 310/5 311/22 312/10 315/4 315/22 316/18 336/15 340/20 358/16 360/23 364/14 372/18 374/23 378/12 379/6 384/22 386/23 387/17 387/23 391/17 391/18
under-paying [1] 336/15
underlying [1] 315/3
understand [25] 276/18 276/24 281/22 286/4 290/24 306/10 307/5 307/6 312/15 324/11 325/22 334/25 339/3 339/11 362/18 362/24 363/13 367/1 369/14 371/11 382/5 382/7

382/18 384/1 393/10
understanding [1] 323/2
understands [1] 387/23
understood [3] 289/5 304/15 364/20
underway [1] 299/16
undue [7] 307/21 308/1 308/6 308/8 308/11 388/14 391/20
unfortunately [5] 273/14 296/16 301/8 391/1 392/12
unidentified [1] 324/2 324/3 328/16
unique [5] 275/16 275/17 275/22 339/18 357/15
uniquely [1] 282/1
UNITED [3] 268/1 268/14 317/10
University [1] 281/20 392/10
unlike [1] 281/25
unlikely [1] 322/20
unprofitable [2] 336/25 366/14
unquote [1] 385/18
unreasonable [1] 328/17
unreasonably [1] 371/25
unscrambling [2] 314/21 315/10
until [3] 309/13 360/23 393/5
untouched [1] 377/25
unusual [2] 274/5 340/4
unwilling [1] 328/17
unwinding [1] 370/15
upon [1] 271/17
us [30] 278/1 280/8 281/9 286/24 300/23 301/1 305/3 329/8 349/10 353/24 354/5 354/9 357/22 363/4 364/23 365/2 365/12 367/12 367/19 368/13 369/25 370/1 371/8 371/10 378/25 386/10 386/19 388/7 389/22 393/18
used [5] 284/19 319/15 347/25 390/2 392/11
using [1] 326/13
usually [1] 385/9
utilization [1] 390/20
utilize [1] 340/3
UTMC [24] 296/11 296/14 296/18 296/23 297/1 300/11 300/18 301/1 301/4 326/22 328/18 331/15 335/14 335/20 337/10 357/4 357/5 357/6 357/8 357/13 357/14 358/15 358/20 390/3
UTMC's [1] 296/21
UTMC-St [1] 358/20

# V

variables [1] 307/15
variation [1] 385/3
vast [1] 295/3
venture [1] 302/11
versus [3] 314/16 315/7 317/10
vertically [1] 341/7
very [53]
viability [2] 361/1 365/16
viable [12] 300/12 300/21 301/3 301/5 301/6 316/10 360/2 360/7 360/8 372/14 374/13 380/18
victim [1] 271/10
view [1] 357/18
views [2] 337/24 341/23
vigorous [2] 374/13 390/14
violated [2] 304/8 354/17
violates [2] 320/11 358/3
violation [16] 304/24 318/14 318/15 354/15 354/20 355/6 355/7 355/19 355/20 358/1 358/2 358/2 358/13 358/14 358/25 385/4
virtue [1] 319/5
vivid [1] 389/11

vividly [1] 389/8
volume [8] 268/11 278/7 283/12 283/13 283/14 283/23 377/24 389/6
volumes [2] 287/23 324/13
voluntary [24] 303/5 303/8 310/9 310/25 311/5 311/19 311/22 312/3 312/11 315/17 317/1 378/13 379/2 380/1 380/2 380/24 381/5 381/7 381/13 381/18 381/25 384/23 385/8 386/24
vote [1] 372/9

# W

Wagner [1] 347/8
Wakeman [24] 277/21 277/22 281/5 283/11 283/16 283/19 283/23 286/24 287/22 288/23 289/12 289/15 289/21 290/1 290/8 290/14 296/13 299/23 336/22 364/20 364/22 382/24 391/3 391/11
Wakeman's [8] 284/2 285/21 286/15 287/21 288/9 298/15 337/7 387/4
walk [5] 284/12 285/1 285/18 286/9 328/18
walked [1] 333/6
walking [1] 333/20
walks [1] 282/24
want [50]
wanted [6] 281/7 299/20 318/5 346/22 376/7 376/23
wants [2] 367/6 380/21
warn [1] 295/24
warranted [4] 272/17 311/11 313/19 386/9
Washington [5] 268/18 268/21 269/3 269/6 269/15
wasn't [14] 286/16 286/16 289/9 303/8 313/12 313/14 315/24 316/10 333/6 335/4 347/20 357/3 378/24 391/11
waste [1] 359/25
water [2] 293/15 294/15
we'd [1] 380/6
we'll [11] 270/16 299/5 302/8 310/22 318/18 339/2 342/10 343/5 343/14 372/25 384/15
we're [48]
we've [37] 273/18 273/23 274/5 275/23 278/18 281/3 284/16 287/13 287/13 293/24 296/3 297/20 300/11 324/22 326/6 327/17 327/17 329/7 333/10 335/6 336/2 341/11 350/4 353/15 353/16 360/6 360/23 364/17 368/7 368/7 370/23 371/11 375/18 378/9 385/24 387/20 392/24
weak [1] 333/4
weakest [1] 392/9
weapon [2] 292/19 294/5
websites [1] 293/11
week [2] 292/12 377/5
weeks [1] 272/19
weigh [1] 388/5
weighing [2] 320/14 390/2
weighs [1] 315/9
weighted [1] 322/15
welcome [2] 270/14 318/24
well [32] 272/5 274/19 276/14 276/16 280/2 280/8 284/16 297/11 298/8 302/2 302/22 322/5 322/22 325/7 329/23 330/25 334/5 335/8 335/23 340/13 341/4 343/17 344/20 348/6 357/16 362/6 365/18 373/4 376/14 387/1 390/25 392/5
well-done [1] 276/16
went [6] 271/16 297/1 334/16 354/25 354/25 355/3 364/20 387/4 387/5 387/5 394/1
weren't [7] 306/12 334/15 342/9 343/2 345/7

## W

weren't... [2]  353/12 380/7
West [6]  268/8 268/23 269/12 269/17 269/20
385/20
what's [12]  275/17 275/22 289/11 297/6
309/1 318/8 324/9 332/21 334/7 348/6 355/8
359/11
whatever [4]  326/15 327/3 343/12 384/14
whatsoever [1]  297/13
where [29]  272/6 274/1 279/23 280/12
284/19 293/2 293/11 293/22 295/14 298/1
300/13 321/23 330/8 334/19 334/20 339/22
343/6 344/8 344/23 347/1 354/6 357/19
363/7 365/24 369/14 371/2 375/4 385/15
385/16
where's [3]  292/19 293/1 294/6
wherewithal [1]  336/1
whether [24]  280/6 291/16 293/25 294/1
297/16 300/11 304/7 312/18 316/15 320/19
320/20 320/23 322/14 328/1 328/9 331/15
331/15 331/20 337/2 349/10 349/15 357/24
372/22 380/24
while [13]  288/12 305/5 310/11 334/8 340/17
340/17 357/8 361/8 370/24 371/11 378/16
380/2 381/22
white [1]  333/2
who'd [1]  368/3
who's [2]  300/1 379/12
whole [12]  276/11 303/18 304/3 305/7
305/20 308/1 314/16 318/8 343/11 346/24
360/25 361/11
wholly [1]  379/14
whose [1]  348/15
why [49]
wide [2]  295/1 305/13
willing [3]  300/16 336/23 370/1
win [1]  386/14
window [1]  372/6
winter [1]  385/21
wise [1]  291/12
wish [1]  388/20
withdraw [1]  317/22
withhold [1]  372/1
within [2]  272/18 383/19
without [18]  279/3 300/16 308/23 315/1
316/3 316/8 326/11 333/12 337/11 338/2
359/6 363/22 364/23 365/5 371/15 379/22
393/18 393/22
witness [3]  281/15 284/7 328/22
witnessed [1]  360/22
witnesses [3]  277/12 281/25 282/1
women [1]  374/10
won't [18]  275/9 276/11 284/13 294/24
296/20 296/25 313/9 319/15 323/24 337/17
343/4 366/13 371/8 373/19 384/1 384/7
384/7 384/13
wonder [1]  288/11
Wood [3]  276/22 276/23 277/1
words [6]  283/19 286/25 290/15 300/17
330/17 391/5
work [8]  273/18 281/19 282/16 299/13 350/2
350/3 357/3 381/15
worked [3]  379/4 379/4 379/19
working [1]  387/15
works [4]  281/21 329/19 380/13 386/4
world [1]  322/4
worry [4]  291/2 291/5 292/5 293/9
worse [2]  366/17 366/20
worst [3]  342/11 356/20 363/3

wouldn't [12]  280/19 301/6 335/3 353/18
368/2 369/19 369/20 381/11 381/11 386/12
390/3 390/4
wow [2]  317/7 319/11
wrap [1]  376/22
wrong [7]  284/19 284/20 318/1 320/2 365/20
383/5 386/13
wrongly [1]  354/13
wrote [1]  391/3
Wu [1]  269/19

## Y

yeah [5]  308/10 361/20 383/18 385/12
391/21
year [19]  278/21 284/20 286/16 287/4 287/6
287/18 318/1 352/21 353/8 356/9 364/10
364/10 365/12 366/10 366/15 375/23 384/14
386/23 391/6
year-over-year [1]  364/10
years [35]  272/12 273/3 281/16 292/10 293/1
302/8 302/20 312/15 313/11 317/7 317/25
327/14 329/4 333/12 334/11 334/23 336/13
337/5 354/5 354/10 365/12 366/15 369/9
369/19 373/16 375/24 380/11 382/6 382/8
382/14 384/14 389/15 391/9 393/16 393/24
yes [12]  270/3 282/8 291/20 307/4 326/19
341/5 355/3 367/17 370/20 381/1 381/3
385/7
yesterday [49]
yet [6]  300/2 321/8 350/5 373/3 373/4 377/1
you'd [1]  292/2
you'll [12]  275/9 282/5 284/12 284/13 285/1
285/2 285/2 286/1 288/19 296/11 296/15
333/20
you're [25]  270/14 284/16 285/11 306/2
311/20 318/3 318/24 322/1 325/16 326/7
326/12 362/22 365/20 366/12 367/15 372/24
373/5 373/10 376/21 380/23 381/20 385/13
385/25 388/7 394/5
you've [15]  284/14 296/16 307/18 327/10
329/8 329/19 334/4 338/15 342/2 344/13
354/19 354/20 359/18 372/23 373/9
yours [1]  321/25
yourself [1]  270/17

## Z

zeros [1]  319/7
zip [4]  330/9 330/19 330/22 330/22