IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

FEDERAL TRADE COMMISSION, et al.,

                          Plaintiff,                  Case No. 3:11 CV 47

       -vs-

PROMEDICA HEALTH SYSTEM, INC.,        <u>FINDINGS OF FACT</u>
                                        <u>AND CONCLUSION OF LAW</u>

                         Defendant.

KATZ, J.

## BRIEF OVERVIEW

The Federal Trade Commission ("FTC") and the State of Ohio ("Ohio") initiated this action against ProMedica Health System, Inc. ("ProMedica") seeking a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. §26, enjoining ProMedica from further consolidating its operations with those of St. Luke's Hospital ("St. Luke's") pursuant to a Joinder Agreement executed on August 31, 2010.

This matter is now before the Court following a hearing on Plaintiffs' motion for a preliminary injunction (Doc. No.4), which took place on February 10-11, 2011.  Also before the Court are Plaintiffs' Supplemental Memorandum in Support  (Doc. No. 83), Defendant's Pre-Trial Brief in Opposition (Doc. No. 85), Defendant's Post-Trial Brief in Opposition (Doc. No. 103), Plaintiff's Post-Hearing Brief in Support (Doc. No. 104), Defendant's Notice of Supplemental Authority (Doc. No. 109), Defendant's Supplemental Post-Trial Brief in Opposition (Doc. No. 111), and Plaintiffs' Supplemental Post-Hearing Memorandum (Doc. No. 113).

It must be remembered that at this stage the Court has heard only summaries of testimony and neither party has had the benefit of presenting live witnesses subjected to extensive cross-

examination.  The Administrative Law Judge has scheduled over 200 hours beginning May 31, 2011, for a trial and will have the opportunity to hear live testimony and judge the credibility of witnesses, both fact and expert.

Initially, the Court acknowledges the difficulty of this determination because of the possible adverse impact on the contracting parties.  However, following the one and a half-day hearing and reviewing hundreds of pages of briefs and exhibits, the Court is driven to the conclusion that the Plaintiffs have satisfied their burden of proof and will grant the preliminary injunction.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1345.  Pursuant to Fed. R. Civ. P. 52 and Fed. R. Civ. P. 65, the Court sets forth the following findings of facts and conclusions of law.

## FINDINGS OF FACT

### I.    THE RELEVANT PARTIES AND HISTORY

#### A.    Procedural History

1.    ProMedica Health System, Inc. ("ProMedica" or "PHS") and St. Luke's Hospital ("St. Luke's") entered into a Joinder Agreement on May 25, 2010.  PX 00058.

2.    On September 1, 2010, St. Luke's became a part of ProMedica pursuant to the Joinder Agreement.

3.    In July 2010, the FTC and Ohio ("Plaintiffs") opened investigations into ProMedica's acquisition of St. Luke's.  The FTC and ProMedica subsequently entered into a voluntary Hold Separate Agreement ("HSA") that, to date, restricted ProMedica from making certain changes to St. Luke's.

2

4.    On January 6, 2011, the FTC filed an administrative complaint alleging the consummated joinder violates Section 7 of the Clayton Act, as amended 15 U.S.C. § 18.

5.    On January 7, 2011, Plaintiffs filed a Complaint for a Temporary Restraining Order ("TRO) and Preliminary Injunction, arguing that this relief was necessary to maintain the *status quo* during the pendency of the FTC's administrative proceeding.  (Doc. No. 1.) Plaintiffs also filed Motions for a TRO (Doc. No. 3) as well as for a Preliminary Injunction (Doc. No. 4).

6.    The Court held a hearing on Plaintiff's Motion for TRO on January 13, 2011.  (Doc. No. 52.)  The parties agreed to an extension of an existing voluntary HSA until two days after the Court rules on Plaintiff's Motion for Preliminary Injunction.  (Doc. No. 61-1.)  Based upon that agreement, Plaintiffs requested and the Court granted withdrawal of the Motion for TRO.  (Doc. No. 62.)

7.    The parties conducted limited fact discovery until February 4, 2011 (Doc. No. 69), and this Court held a two-day hearing on the Motion for Preliminary Injunction on February 10 and February 11, 2011.  (Doc. Nos. 101 and 102.)

8.    A full administrative trial on the merits will begin on May 31, 2011, before Administrative Law Judge Chappell, and will include up to 210 hours of live testimony.

**B.      ProMedica Health System, Inc.**

9.    Defendant ProMedica is a not-for-profit integrated healthcare delivery system serving northwestern and west central Ohio and southeast Michigan., DX-ZZ (Guerin-Calvert Supp. Decl.) ¶ 4, which includes Lucas County.

10.    Excluding St. Luke's, ProMedica operates three general acute-care hospitals in Lucas County: The Toledo Hospital ("TTH"); Flower Hospital ("Flower"); and Bay Park Hospital ("Bay Park").

11.    TTH is a 794-bed facility but staffed for only 660, and offers primary, secondary, and some tertiary-level services, including high-level obstetrics services, a NICU, cardiovascular surgery, and trauma care.

12.    Flower Hospital is staffed to use 257 out of its 292 licensed beds and provides primary, secondary, as well as some sophisticated services, particularly for oncology.

13.    Bay Park Community Hospital, which is licensed and staffed for 86 beds, is a community hospital, located in the eastern part of Toledo, across the Maumee River.

14.    TTH, Flower and Bay Park offer inpatient obstetrics services.

15.    Flower and Bay Park do not offer tertiary level services.

16.    ProMedica also operates the Toledo Children's Hospital, which is located on the same campus as TTH and houses 151 beds in its facility.

17.    ProMedica also operates an insurance company, ProMedica Insurance Group or Paramount Health Care ("Paramount").  Paramount is a commercial insurance plan that markets a Health Maintenance Organization ("HMO"), a Preferred Provider Organization ("PPO") and a Medicare managed plan. DX-DDD ¶ 10.

18.    ProMedica also operates a multi-speciality physician group, ProMedica Physicians Group, or PPG, which employs approximately 250 primary care physicians and specialists located throughout the Toledo area.

4

19.     In 2009, ProMedica's revenues totaled approximately $1.6 billion.  (Doc. No. 29 at ¶ 13.);
        PX 15 at 6.

20.     ProMedica is a dominant hospital system in Lucas County.  PX 270 at 25; PX 221 at 2;
        and PX 319.

21.     ProMedica accounted for almost 50 percent of patient days for general acute-care services
        in Lucas County from July 2009 through March 2010.  PX 2125 at 29; PX 2150 at 1.

22.     In obstetrics services, ProMedica accounted for 71.2 percent of patient days for services
        from July 2009 through March 2010.  PX 2125 at 29; PX 2150 at 2.

23.     ProMedica receives the highest commercial reimbursement rates in Lucas County.  PX
        2125 at 27; PX 153; and PX 2072 at ¶16.

24.     In 2009, ProMedica's hospitals in Lucas County had lower quality measures and outcomes
        than St. Luke's.  PX 1172; PX 1030 at 18-19; and PX 1016 at 6.

        **C.      St. Luke's Hospital**

25.     St. Luke's is a formerly independent, non-profit general acute-care community hospital,
        located in Maumee, Ohio, the southwestern portion of Lucas County, Ohio.

26.     St. Luke's has 178 staffed beds and provides a full array of general acute-care services and
        some tertiary cardiac services through its Heart Center.

27.     Prior to the acquisition by ProMedica, St. Luke's was broadly recognized as a low-cost,
        high-quality hospital.  PX 380; PX 1072 at 1; PX 2065; TRO Tr. At 54:9-10.

28.     St. Luke's is located in a desirable and strategically important southwestern suburb in
        Lucas County.  PX 2008 at 52:14-20; PX 2005 at 117:6-13, 118:3-5; PX 2016 at 61:7-
        62:17, 76:5-18.   St. Luke's is easily accessible from major highways, and its location

provides it with access to a growing population of employed and commercially-insured patients. PX 2008 at 53:25-55:24; PX 1132; PX 2065 at ¶ 8.

29. St. Luke's revenues for 2009 were approximately $156 million. PX 1006 at 5; (Doc. No. 26 at ¶ 13).

### D. The Acquisition

30. On May 25, 2010, ProMedica entered into a Joinder Agreement with OhioCare Health System, Inc. ("OHS"), St. Luke's and St. Luke's Foundation, Inc. ("SLF") to acquire St. Luke's, SLF, and other affiliates. Prior to the acquisition, OHS was the parent company of St. Luke's, SLF, and other affiliates. Upon consummation of the acquisition, ProMedica became the sole corporate member or shareholder of St. Luke's and other OHS affiliates. PX 58.

31. The Joinder Agreement vests ProMedica with economic and decision-making control over St. Luke's and other OHS Affiliates. Among other things, and subject only to certain limited qualifications, ProMedica has the right to: (a) appoint ProMedica nominees to the boards of directors of St. Luke's and other OHS affiliates; (b) approve members from the boards of St. Luke's and other OHS Affiliates; (d) remove members from the boards of St. Luke's and other OHS Affiliates; (d) adopt and approve strategic plans and annual operating and capital budgets for St. Luke's and other OHS Affiliates; (e) authorize and approve non-budgeted operaring expenses and capital expenditures above certain amounts for them; (f) authorize and approve the incurrence or assumption of debt above certain amounts; (g) authorize and approve contracts for expenditures above certain amounts; (h) authorize and approve any merger, consolidation, sale or lease of St. Luke's and other

6

OHS Affiliates; and (i) appoint and remove the President, Secretary, and Treasurer of St. Luke's and other OHS Affiliates. PX 58 at 16-18.   ProMedica also has the exclusive right to negotiate contracts with managed care organizations on behalf of St. Luke's.  PX 58 at 25, 58.

32.  The Agreement requires ProMedica to add St. Luke's to the provider network of its health-insurance subsidiary, Paramount, at rates comparable to other general acute-care hospitals in the ProMedica system. PX 58 at 22-23.  After the consummation of the Acquisition, Paramount added St. Luke's to its network.  PX 2021 at 73:14-19.

33.  The Agreement requires ProMedica to provide $5 million to SLF, and also to provide St. Luke's with a $10 million per year for three years for capital projects.  PX 140 at 1.  This capital commitment is an absolute obligation of ProMedica as long as St. Luke's and the other OHS Affiliates remain in the ProMedica system (and survives if ProMedica removes them from its system) and cannot be reduced or delayed for any reason.  PX 58 at 22.  The Agreement also envisions return of these dollars in the event a federal court rescinds the Agreement.  PX 140 at 1.

34.  The Agreement requires ProMedica to maintain St. Luke's as an acute-care hospital providing six general categories of services in its current location for ten years, but does not require ProMedica to maintain or provide any other services at St. Luke's that are not specified in the Agreement, including but not limited to oncology, cardiology, orthopedics, spinal neurosurgery, pediatrics, or diabetes care, and does not require any minimum service levels.  PX 58 at 23, 45-46.

7

35.  The Agreement prohibited ProMedica from terminating OHS Affiliates' employees for 90 days after consummation of the Acquisition.  This obligation has since expired, and as a result, ProMedica is free to reduce staff levels at St. Luke's without limitation.  PX 58 at 46.   ProMedica intends to reduce staffing levels at St. Luke's.  PX 20 at 15.

36.  ProMedica's acquisition of St. Luke's and other OHS Affiliates was not reportable under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.  PX 57 at 1.

**E.      The Voluntary Hold-Separate Agreement**

37.  On August 18, 2010, the FTC and ProMedica entered into a limited, 60-day Hold-Separate Agreement ("HSA") to allow the expedited FTC investigation to continue.  PX 69.

38.  The HSA includes several key provisions designed to temporarily preserve St. Luke's viability, competitiveness, and marketability.  The HSA prevents, among other things: (1) ProMedica's termination of St. Luke's health-plan contracts (while allowing health plans the option to extend their contracts with St. Luke's past the termination date, if a new agreement is not reached); (2) the elimination, transfer, or consolidation of any clinical service at St. Luke's; and (3) the termination of employees at St. Luke's without cause. PX 69 at ¶¶ 1-5.

39.  On October 15, 2010, ProMedica agreed to extend the HSA to expire 15 days after ProMedica substantially complied with subpoenas and civil investigative demands.  On the same day, the FTC granted ProMedica's request for a modification to the HSA to allow ProMedica to move inpatient rehabilitation beds at St. Luke's to Flower to create additional medical/surgical rooms at St. Luke's.

40.     After the TRO hearing on January 13, 2011 ProMedica agreed to extend the HSA (with one modification) until 5:00 p.m. on the second day following the Court's ruling on Plaintiffs' Motion for Preliminary Injunction.  Dkt. #61-1 at 2.

## II.     FUNDAMENTALS OF HOSPITAL COMPETITION AND PRICING

### A.     Reimbursements for Hospital Services

41.     Privately-insured patients obtain health insurance coverage primarily through commercial health plans.  PX 2124 at ¶ 7 (Town Decl.).  Health plans negotiate with hospitals to determine the scope of coverage for their members and the reimbursement rates for services.  PX 2065 at ¶ 3; PX 2067 at ¶ 11; PX 2072 at ¶ 8.

42.     For patients covered by Medicare or Medicaid, the government sets the reimbursement rates for hospital services.  PX 2117 at ¶ 7 n.1 (Wachsman (PHS) Decl.); PX 2027 at 134:11-134:13 (Town Dep.).

43.     Self-pay patients, including indigent patients, pay hospitals directly for services received.  *See* PX 2124 at ¶ 6 (Town Decl.); PX 2027 at 99:7-101:7 (Town Dep.).  Hospitals often provide indigent and charity care at a discount or at the hospitals' own expense.  *See* PX 2117 at ¶ 4 (Wachsman (PHS) Decl.).

### B.     Relationships Between Employees, Employers, Health Plans, and Hospitals

44.     Employers offer their employees health insurance as part of compensation packages.  PX 2124 at ¶ 8 (Town Decl.).

45.     Employers that offer health insurance negotiate with health plans and select the combination of rates, benefit structures, and healthcare provider networks that best meets

9

the needs of the employer and its employees.  PX 2124 at ¶ 11 (Town Decl.); PX 2070 at ¶ 3, 6; PX 2058 at ¶ 5; PX 2059 at ¶ 4.

46. Employers generally do not negotiate directly with hospitals; instead, employers rely on health plans to do so.  PX 2053 at ¶ 4; PX 2059 at ¶ 5; PX 2061 at ¶ 5.

47. Hospitals compete with each other for inclusion in health plans' provider networks and, once included, for the use of their hospital by health plans' members. *See infra* § II.C.3.

48. Similarly, health plans compete with one another to be offered by employers in the menu of plans that are available to employees.  PX 2124 at ¶ 9 (Town Decl.).  Once on the employer's menu, health plans compete with one another to attract enrollees.  PX 2124 at ¶ 9 (Town Decl.).

49. Health plans regularly survey members and review consumer preferences in order to maintain marketable and attractive provider networks that appeal to employers and employees.  *See* PX 2067 at ¶ 6; PX 2072 at ¶ 6; PX 2013 at 49:19-51:2.

50. Health plans offer two broad classes of insurance arrangements to employers: self-insured and fully-insured.  PX 2124 at ¶ 10 (Town Decl.).  Under self-insured plans, employers collect premiums from their employees and pay the full costs of employees' healthcare, bearing the risk that healthcare costs may exceed premiums.  PX 2124 at ¶ 10 (Town Decl.); PX 2072 at ¶ 3; PX 2067 at ¶ 4; PX 2013 at 34:14-35:4.  Under self-insured plans, the employers pay the health plan in exchange for administration of its employees' claims.  PX 2124 at ¶ 10 (Town Decl.); PX 2072 at ¶ 3; PX 2013 at 34:14-35:4.  Under fully-insured plans, a health plan collects premiums from employers and pays the cost of the

employees' healthcare, bearing the risk that healthcare costs may exceed premiums. PX 2124 at ¶ 10 (Town Decl.); PX 2013 at 34:8-13; PX 2072 at ¶ 3.

## C. Rate Negotiations Between Health Plans and Hospitals

### 1. Bargaining Dynamics

51. Rates for hospital services are determined through contract negotiations between hospitals and health plans. PX 2124 at ¶ 16 (Town Decl.). Health plans negotiate rates for hospital services on behalf of their customers, who are both self-insured and fully-insured employers. PX 2124 at ¶ 17 (Town Decl.); PX 2013 at 49:15-18; PX 2072 at ¶ 12. These negotiations typically involve a series of offers and counteroffers, and result in either the inclusion of a hospital in a health plan's network or the failure of the health plan and hospital to reach an agreement. PX 2124 at ¶ 7 (Town Decl.); PX 2065 at ¶ 11.

52. The rates and terms of the contracts that are negotiated by a hospital and a health plan are a function of each party's bargaining leverage in negotiations. PX 2013 at 53:1-7; PX 2065 at ¶ 11. The respective degrees of bargaining leverage are determined by how each party would fare if no agreement were reached. PX 2124 at ¶ 18 (Town Decl.); PX 2067 at ¶ 13.

53. Failure to reach an agreement depends on the hospital's and health plan's respective "walk-away" points. PX 2124 at ¶ 18 (Town Decl.); PX 2013 at 51:11-53:7. If a hospital demands rates above a health plan's walk-away point, the health plan will refuse to contract with the hospital. PX 2124 at ¶ 18 (Town Decl.) If a health plan only offers to pay rates below a hospital's walk-away point, the hospital will refuse to contract with the health plan. PX 2124 at ¶ 18 (Town Decl.) Each party's walk-away point is a function of that party's bargaining leverage. PX 2124 at ¶ 18 (Town Decl.)

11

54.    The bargaining power of a hospital is tied to the value that the health plan's current and potential members place on having in-network access to that hospital.  PX 2124 at ¶ 19 (Town Decl.); PX 2013 at 50:5-9.  This is reflected in the number of the health plan's members that use or would use the hospital.  PX 2072 at ¶ 9; PX 2067 at ¶ 12 .  The more a health plan's members value a hospital, the more bargaining leverage the hospital possesses in its negotiations with the health plan.  PX 2124 at ¶ 19 (Town Decl.); PX 2065 at ¶ 13; PX 2067 at ¶ 13.  If failing to reach an agreement with a particular hospital would make a health plan's network substantially less attractive to the health plan's members, then that hospital would have substantial bargaining leverage against the health plan.  PX 2124 at ¶ 19 (Town Decl.)

55.    In Lucas County, there is a strong, positive correlation between a hospital's market share and the rates that the hospital succeeds in negotiating with health plans.  PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl., Ex. 4).  In other words, the higher a hospital's market share, the higher the rates it is able to demand and receive from health plans:  St. Luke's has the smallest market share in Lucas County – 11.5% for GAC – and receives the lowest rates; UTMC has a 13% GAC market share and its average rates are $X^1$ % greater than St. Luke's; Mercy has a 29% GAC market share and its average rates are X% greater than St. Luke's; and ProMedica has a 46.8% GAC market share, with average rates exceeding St. Luke's by X%.  PX 2139 at 13 (Town Supp. Decl. Exhs.).  ProMedica's economic expert did not calculate or even estimate the rate differentials

---

[1]

  Due to the confidential nature of information in this litigation and consistent with the Stipulated Interim Protective Order (Doc. No. 16), the Court will refer to such information as X, Y, or Z, as necessary, in these Findings of Fact.

among the various Lucas County hospitals and therefore Dr. Town's calculation of rate

differentials is unrebutted.

56.     A hospital's bargaining power with health plans also depends in part on the availability of

alternatives that could serve as substitutes for the hospital in the eyes of the health plan's

current and prospective members.  PX 2072 at ¶ 9 ; PX 2067 at ¶ 12; PX 2006 at 121:10-

121:19 (Wachsman (PHS) IH).  The larger the number of such alternatives and the more

closely substitutable they are in the eyes of health plan members, the lower the hospital's

bargaining leverage against the health plan.  PX 2013 at ¶ 54:9-25; PX 2065 at ¶ 11 ; PX

2124 at ¶ 22 (Town Decl.).

57.     If a hospital is able to negotiate with a health plan to exclude competing hospitals from the

health plan's network, the remaining in-network hospitals benefit from the reduced

competition for the health plan's members.  PX 2124 at ¶ 14 (Town Decl.).

58.     As the corollary of the hospitals' bargaining leverage, a health plan's bargaining power in

negotiations is determined by how much the hospital values being included in the health

plan's network.  PX 2124 at ¶ 20 (Town Decl.); PX 2065 at ¶ 12.  This depends on the size

of the health plan's membership, or patient volume, that the health plan can offer the

hospital.  PX 2072 at ¶ 9 ; PX 2067 ¶ 12; PX 2124 at ¶ 20 (Town Decl.).  The more patient

volume that a hospital stands to lose if it fails to reach an agreement with the health plan,

the greater the bargaining leverage the health plan will have with the hospital.  PX 2124 at

¶ 20 (Town Decl.); PX 2072 at ¶ 9.

59.     In the past, hospitals and health plans in Lucas County have sometimes failed to reach

agreement in contract negotiations, resulting in the health plans offering narrower or

13

exclusive provider networks.  PX 2138 at ¶ 15  (Town Supp. Decl.); PX 2136 at ¶ 27

(Guerin-Calvert Supp. Decl.).  The threat of termination is implicit, if not explicit, in

negotiations between hospitals and health plans.   PX 2016 at 41:8-41:12, 93:17-94:16 ;

PX 2017 at 21:16-23.  Thus, in Lucas County, the threat of failing to reach an agreement,

resulting in the exclusion of a hospital from a health plan's network, is a significant factor

in the negotiations between hospital and health plans.  PX 2124 (Town Decl.) at ¶ 21; PX

2016 at 94:4-25; PX 2013 at 51:23-52:25.

### 2.    Health Plans' Criteria for Creating Hospital Networks

60.    Health plans generally value a broad network of providers, desiring to have in-network

access to physicians and hospitals that span the geographic areas in which their members

work and reside.  PX 2124 at ¶ 9 (Town Decl.).  Health plans that do not have sufficient

geographic coverage in a market will have difficulty marketing their insurance products to

employers and their employees.  PX 2124 at ¶ 9 (Town Decl.).

61.    A hospital's market share, geographic location, and breadth of services are important

criteria for inclusion in the health plan's provider network.  PX 2072 at ¶ 9; PX 2016 at

72:7-74:18.

62.    Health plans will find it difficult to market products to employers if their networks do not

include the hospitals desired by current and potential members.  PX 2124 at ¶ 9 (Town

Decl.).

63.    In deciding whether to add a hospital to its network, a health plan balances the value its

current and prospective members place on having in-network access to the hospital against

the costs of adding that hospital to the network.  PX 2124 at ¶ 12 (Town Decl.).

14

### 3. Hospitals Compete for Network Inclusion, as well as for Selection by Health-Plan Members

64.     Hospitals compete with one another on multiple levels.  PX 2124 at ¶ 13 (Town Decl.).

First, hospitals compete with one another for inclusion in health plans' provider networks.

PX 2124 at ¶¶ 12, 13, 18 (Town Decl.).  Health plan members have access to in-network

hospitals at rates substantially lower than out-of-network hospitals.  PX 2124 at ¶ 11

(Town Decl.).  Because of this cost difference experienced by members, a hospital's

volume of patients from a specific health plan is determined largely by whether the

hospital is part of the health plan's provider network.  PX 2124 at ¶ 15 (Town Decl.).  All

things being equal, an out-of-network hospital will treat significantly fewer patients from

that health plan than an in-network hospital, because members bear higher out-of-pocket

costs to use out-of-network hospitals.  PX 2124 at ¶ 15 (Town Decl.).

65.     Second, hospitals in a particular health plan network compete with each other to attract the

health plan's members.  PX 2124 at ¶ 14 (Town Decl.).  Because members generally face

little or no out-of-pocket price difference between in-network hospitals, in-network

hospitals compete primarily on non-price dimensions, such as location, quality, patient

experience, and other factors.  PX 2124 at ¶ 14 (Town Decl.).  This type of competition is

reduced if a hospital successfully negotiates with the health plan to have one or more of its

competitors excluded from the health plan's network.  PX 2124 at ¶ 14 (Town Decl.).

### 4. Hospital Rates Reflect Relative Bargaining Power with Health Plans

66.     If a health plan's network is substantially less attractive or marketable to employers due to

the exclusion of a hospital, that hospital will be able to command higher rates for its

15

inclusion in the health plan's network than a less-valued hospital.  PX 2124 at ¶¶ 19, 23 (Town Decl.); PX 2067 at ¶¶ 12-13.

67.  A hospital may have greater bargaining power with respect to some of its services by virtue of the attractiveness of its offerings and/or the lack of alternative providers for those services.   PX 2124 at ¶¶ 19, 22-23 (Town Decl.).  A hospital can impose a separate rate structure on health plans for these particular services by negotiating a "carve-out," also referred to as a "case rate."  PX 2124 at ¶ 23 (Town Decl.); PX 2026 at 73:19-21 (Guerin-Calvert Dep.).  A hospital with enhanced bargaining power for certain services can also exploit the bargaining power across additional services, leading to higher rates for any number of the hospital's services.  PX 2124 at ¶ 23 (Town Decl.).

**III.  GENERAL ACUTE-CARE INPATIENT HOSPITAL SERVICES SOLD TO COMMERCIAL HEALTH PLANS CONSTITUTE A RELEVANT PRODUCT MARKET**

68.  General acute-care ("GAC") inpatient hospital services sold to commercial health plans are a relevant product market in which to evaluate the effects of the Acquisition.  PX 2124 at ¶ 29 (Town Decl.).  GAC services are a broad "cluster market" of inpatient surgical, medical, and supporting services provided in a hospital setting to commercially-insured patients.  PX 2124 at ¶ 27 (Town Decl.); *see also* PX 2013 at 18:7-19:5; PX 2012 at 94:20-95:7.  "[T]he purpose of the cluster market is to formulate aggregates across products in order to do the analysis in a practical way." PX 2027 at 45:3-11 (Town Dep.).

69.  The GAC product market excludes services that St. Luke's currently does not perform, such as most complex "tertiary" and "quaternary" services.  PX 2124 at ¶ 29 (Town Decl.); *see also* PX 2002 at 78:1-25 (Hanley (PHS) IH); PX02067 at ¶ 7.

16

70.     The GAC market also excludes outpatient services.  Patients would not substitute outpatient services in response to price increases for inpatient services, because such substitution is instead based on clinical considerations.  PX 2067 at ¶ 8; PX 2013 at 21:9-22:3; PX 2124 at ¶ 31 (Town Decl.).

71.     ProMedica has conceded that GAC services constitute an appropriate relevant market for this case.  Dkt. #26 (Answer) at ¶ 19 ("ProMedica admits that general acute-care inpatient hospital services sold to commercial health plans constitutes a valid service market.").

**IV.     INPATIENT OBSTETRICAL SERVICES SOLD TO COMMERCIAL HEALTH PLANS CONSTITUTE A RELEVANT PRODUCT MARKET**

72.     Inpatient obstetrical ("OB") services are a cluster of procedures relating to pregnancy, labor, and post-delivery care provided to patients for the labor and delivery of newborns.  PX 2075 at ¶ 4; PX 2081 at ¶ 3.  No other hospital services are reasonably interchangeable with inpatient obstetrical services.  PX 2124 at ¶ 30 (Town Decl.); PX 2075 at ¶ 4; PX 2081 at ¶ 3; PX 2013 at 65:19-66:9.

73.     In this case, it would be inappropriate to analyze OB services as part of the cluster market of GAC services because OB services are offered by a different set of providers in Lucas County and, thus, are subject to different competitive conditions than are GAC services.  Specifically, two other Lucas County hospitals, UTMC and Mercy St. Anne Hospital, do not provide OB services.  PX 2124 at  ¶¶ 28, 30 (Town Decl.); PX 2064 at ¶ 9; PX 2068 at ¶¶ 6, 8, 11.

74.     ProMedica and St. Luke's acknowledge this reality by obtaining and tracking separate market shares and other data for OB services.  *See, e.g.*, PX 1016 at 3 (Dec. 2009 SLH

17

Affiliation Update); PX 1077 at 3, 5 (2008 SLH Market Report); PX 9 at 22 (PHS Credit Presentation).

75.     Moreover, hospitals often "carve out" OB services from other GAC services and negotiate separate rates for OB services.  *See, e.g.,* PX 365 at 30; PX 363 at 19, 22.

## V.     LUCAS COUNTY IS THE RELEVANT GEOGRAPHIC MARKET

76.     The relevant geographic market is no broader than Lucas County.  This conclusion is compelled by the fact that a hypothetical monopolist controlling every hospital in Lucas County could increase the price of inpatient general acute-care services and obstetrics services in Lucas County by at least 5-10 percent, a small but significant amount.  PX 2124 at ¶¶ 26, 32 (Town Decl.).  Health plans agree that an overwhelming number of patients are unwilling to travel outside of Lucas County for general acute-care services.  PX 2013 at 30:10-34:1, 66:10-19; PX 2065 at ¶ 9.  ProMedica's expert also acknowledged that it is more likely than not that Lucas County is the relevant geographic market for GAC services under the hypothetical monopolist test.  PX 2026 at 51:4-53:16 (Guerin-Calvert Dep.).  Indeed, Defendant has not seriously disputed that Lucas County is the relevant geographic market for GAC.

77.     With extremely rare exception, Lucas County residents do not use more distant providers of GAC or OB services.  PX 2124 at ¶ 36 (Town Decl.); *see also* PX 2125 at  40-41 (Town Decl., Ex. 7).  Only 2.1% of Lucas County residents leave the county for GAC services, and only 0.6% leave the county for OB services.  PX 2124 at ¶ 36 (Town Decl.).

78.     Defendant has suggested that inpatient OB services are the one service for which Lucas County residents are willing to drive outside of Lucas County, pointing to Wood County

18

Hospital as a possible alternative.  However, Defendant has not pointed to evidence in the record to support this claim.  Rather, the evidence shows that *fewer* OB patients (0.6%) leave Lucas County for care than do patients in need of other hospital services (2.1%), which is not surprising in light of the nature of OB services (delivering babies).  PX 2124 at ¶ 36 (Town Decl.).  95 percent of Lucas County residents drive fewer than 24.5 minutes for OB services and residents' average drive time is just 11.5 minutes.  PX 2125 at 24-25 (Town Decl., Ex. 3).  Wood County Hospital is approximately 30 minutes from Toledo, and so it is not a realistic competitor in the market for OB services.

79.  Health plans have testified that the residents of Lucas County are not willing to travel outside of Lucas County for inpatient hospital care, and that they would not be able to market health plan networks to Lucas County residents that consist solely of hospitals outside of Lucas County.  *See, e.g.,* PX 2013 at 29:6-30:23, 33:1-34:1, 66:10-19; PX 2065 at ¶ 9; PX 2016 at 26:20-27:5.

80.  Physicians in Lucas County have testified that their patients seek inpatient hospital care close to home, especially for obstetric services.  It is more convenient for them, as well as for friends and family who want to come to visit.  PX 2081 at ¶ 6; PX 2075 at ¶¶ 6-8; PX 2082 at ¶ 5.  Further, physicians testified that even if hospitals in Lucas County were to raise their prices significantly, their patients would rather pay higher prices than travel to hospitals outside of Lucas County to receive inpatient hospital care. PX 2081 at ¶ 6; PX 2075 at ¶ 7; PX 2082 at ¶ 5.

81.  ProMedica acknowledges that it competes only with other Lucas County hospitals for GAC services.  PX 2002 at 22:10-22, 72:20-73:15 (Hanley (PHS) IH).  ProMedica's

19

counsel noted at the TRO hearing: "[P]ayers and their patients have alternative hospitals to turn to that are conveniently located in the market. And those alternative hospitals are Mercy's three hospitals and UTMC." TRO Hearing Tr. at 50:11-14.

82. Neither X nor Y views itself as a competitor with the Lucas County hospitals. PX 2056 at ¶¶ 4-6; PX 2057 at ¶ 7.

## VI. EXTRAORDINARILY HIGH MARKET CONCENTRATION LEVELS ESTABLISH A STRONG PRESUMPTION OF HARM TO COMPETITION IN BOTH RELEVANT MARKETS

83. The calculation and the examination of market concentration is an important tool for performing merger analysis, as it provides relevant information regarding the current competitive conditions in a market. PX 2124 at ¶ 48 (Town Decl.).

84. Markets that are more highly concentrated are presumed to be less competitive than less concentrated markets. In less competitive markets, firms will charge higher prices to consumers, and generally have less incentive to innovate and offer higher quality goods and services. PX 2124 at ¶ 48 (Town Decl.). Indeed, in Lucas County, market shares of the hospital systems are an accurate predictor of each hospital's relative rates. *See infra* Section II.C.1.

### A. Market Structure

#### 1. Additional Market Participants

85. In addition to ProMedica and St. Luke's, there are only two other general acute-care competitors in Lucas County: Mercy Health Partners ("Mercy") and the University of Toledo Medical Center ("UTMC"). *See supra* Section V.

#### a. Mercy

20

86.  Mercy is a not-for-profit health system providing inpatient and outpatient hospital services in northwestern Ohio and southeastern Michigan.  In Lucas County, Mercy has three general acute-care hospitals:  Mercy St. Vincent Medical Center ("St. Vincent"), Mercy St. Charles Hospital ("St. Charles"), and Mercy St. Anne Hospital ("St. Anne").  PX 2068 at ¶¶ 2-3.

87.  St. Vincent is a 445-bed critical-care regional referral and teaching center near downtown Toledo.  St. Vincent is a tertiary facility that also houses a children's hospital on its campus.  PX 2068 at ¶¶ 3-4.  St. Charles is a 294-bed, full-service community hospital located in an eastern suburb of Toledo.  *Id.* at ¶ 5.  St. Anne is a small community hospital with 100 beds in northwestern Toledo.  *Id.* at ¶ 6.

88.  St. Anne, which is the closest Mercy hospital to ProMedica's Flower Hospital, does not provide obstetrical services.  PX 2068 at ¶ 8; *see also* PX 2006 at 128:10-11 (Wachsman (PHS) IH).

89.  Mercy has a GAC market share of 28.7%, and an OB market share of 19.5% by patient days.  PX 2125 at 29 (Town Decl. Ex. 5); *see also* PX 2150 (market share chart).  ProMedica's market share is 60% higher than Mercy's for GAC services and three times larger for OB services.  PX 2124 at ¶ 43 (Town Decl.).  Immediately prior to the Acquisition, ProMedica's severity-adjusted rates were X percent higher than Mercy's rates, on average.  PX 2138 at ¶ 3 (Town Supp. Decl.).

**b.  UTMC**

21

90. UTMC was formed when the University of Toledo and the Medical Center of Ohio merged in 2006. UTMC is the only academic medical center in the area, and provides GAC services as well as tertiary and quaternary hospital services. PX 2064 at ¶¶ 1-3 .

91. UTMC does not provide inpatient obstetrical services. PX 2064 at ¶ 9.

92. UTMC has a 13% market share for GAC services in Lucas County, which is less than one-third of ProMedica's market share. *See* PX 2125 at 29 (Town Decl. Ex. 5); PX 2150 (Market share chart). Immediately prior to the Acquisition, ProMedica's severity-adjusted rates were 51% higher than UTMC's rates, on average. PX 2138 at ¶ 3 (Town Supp. Decl.).

> **2.** **The Acquisition Left Only Three Competitors in the Lucas County GAC Services Market**

93. ProMedica concedes that the Acquisition reduced the number of general acute-care competitors in Lucas County from four to three – leaving only ProMedica, Mercy, and UTMC. 2/10 PI Hearing Tr. at 122:6-7; 1/13 TRO Hearing Tr. at 50:9-14.

> **3.** **The Acquisition Results in a Duopoly in the Lucas County OB Services Market**

94. In the relevant market for inpatient OB services, the Acquisition is a merger to duopoly with Mercy being the only remaining competitor. 2/10 PI Hearing Tr. at 122:20-22; PX 2000 at 132:24-133:11 (Steele (PHS) IH).

> **B.** **Market Shares, Concentration, and the Presumption of Competitive Harm**

95. The Acquisition significantly increases concentration in the already highly-concentrated Lucas County markets for GAC and OB services. ProMedica's post-Acquisition market share is 58.3% in the GAC market, where only two competitors remain, and 80.5% in the

22

OB market, where only one competitor remains.  PX 2124 at ¶¶ 51-52 (Town Decl.); PX 2125 at 29 (Town Decl., Ex. 5); PX 2150 (market share charts).

96.    Under the U.S. Department of Justice and the Federal Trade Commission Horizontal Merger Guidelines ("*Merger Guidelines*"), which guide federal courts for merger analysis, a transaction that increases concentration by 200 points and results in a highly-concentrated market (HHI over 2,500) is presumed likely to enhance market power.  PX 2214 at § 5.3 (*Merger Guidelines)*.  This Acquisition far exceeds these thresholds:  in the GAC market, concentration rises 1,078 points to 4,391; in OB, concentration rises 1,323 points to 6,854.  PX 2124 at ¶ 52 (Town Decl.); PX 2125 at 29 (Town Decl., Ex. 5); PX 2150 (GAC and OB market share charts based on Town Decl. data).

97.    By a wide margin, therefore, viewed from the above-cited thresholds, the Acquisition is presumptively anticompetitive in both relevant markets based on these high levels of market concentration, and is presumed likely to enhance ProMedica's market power in both markets.  PX 2214 at § 5.3 (*Merger Guidelines)*; *see* Conclusions of Law at Section II.D.

## VII.    PROMEDICA AND ST. LUKE'S WERE SIGNIFICANT COMPETITORS PRIOR TO THE ACQUISITION

### A.    Because ProMedica's Lucas County Hospitals and St. Luke's Hospital Were Close Substitutes, the Acquisition Eliminates Significant Competition

#### 1.    Independent St. Luke's Hospital and ProMedica's Lucas County Hospitals Were Close Substitutes

98.    St. Luke's provides care to a significant number of commercial patients in the Lucas County market.  PX 2139 at 17 (Town Supp. Decl., Ex. 7); PX 2023 at 49:11-51:13 (Wakeman (SLH) Dep.); PX 1409 (July 2010 Wakeman e-mail).

23

99.    St. Luke's is the third-largest hospital in the market based on commercial volume: St. Luke's had 2,846 commercial discharges between July 1, 2009 and March 31, 2010, exceeded only by St. Vincent and TTH.  PX 2139 at 17 (Town Supp. Decl., Ex. 7).  By July 2010, St. Luke's had surpassed UTMC, Flower Hospital, and St. Charles Hospital to serve the third-largest number of patients in the market based on total discharges and outpatient visits.  PX 2023 at 49:11-51:13 (Wakeman (SLH) Dep.); PX 1409 (July 2010 Wakeman e-mail).

100.   Prior to the Acquisition, ProMedica was St. Luke's "most significant competitor."  PX 2008 at 245:23-246:23 (Wakeman (SLH) IH) (using inpatient market shares in SLH core service area); PX 2009 at 172:10-19 (Dewey (SLH) IH) (in obstetrics).

101.   According to internal documents, in St. Luke's core service area (St. Luke's top eight zip codes), St. Luke's and ProMedica had the first- and second-largest market shares, respectively, for GAC.  PX 1235 at 3 ("Total Inpatient Market Share 1997-2010").  ProMedica and St. Luke's had the first- and second-largest market shares, respectively, for OB in St. Luke's core service area.  PX 1235 at 5 ("Total Inpatient Market Share 1997-2010").

102.   Based on Ms. Guerin-Calvert's data, in St. Luke's top ten zip codes by volume, (accounting for 64% of admissions), ProMedica (43%) and St. Luke's (26%) rank first and second in market share.  PX 2138 at ¶ 25 (Town Supp. Decl.); PX 2123 at 41-42 (Guerin-Calvert Decl.).  In eight of St. Luke's top ten zip codes, and in all of St. Luke's "core" zip codes, St. Luke's and ProMedica had the first- and second-highest shares of the GAC

24

market.  PX 2123 at 42 (Guerin-Calvert Supp. Decl. at 25); PX 2138 at ¶ 5 (Town Supp. Decl.); PX 2139 at 3 (Town Supp. Decl., Ex. 1).

103.   In a 2008 survey conducted by St. Luke's in the ordinary course of business, respondents ranked St. Luke's and TTH first and second in patient preference and awareness within St. Luke's primary service area.  PX 1077 at 9-14 ("St. Luke's Market Report 2008").  For obstetrics ("maternity"), TTH, St. Luke's, and Flower ranked as the top three preferred hospitals.  PX 1077 at 13 ("St. Luke's Market Report 2008").

104.   Testimony by executives of ProMedica and St. Luke's, third-party hospitals, and health plans all confirm the similarities in size and service offerings between St. Luke's and Flower Hospital.  PX 2068 at ¶ 12; PX 2013 at 56:20-57:14; PX 2075 at ¶ 12; PX 2005 at 183:14-20 (Oostra (PHS) IH); PX 2008 at 184:11-16 (Wakeman (SLH) IH); *see also* PX 291 at 1 (March 2010 Steele and Sattler e-mails).

105.   ProMedica's and St. Luke's market shares in southwestern Lucas County are significantly greater than Mercy's in both relevant product markets.  PX 2138 at ¶¶ 5-6 (Town Supp. Decl.); PX 2125 at 38-41 (Town Decl. Ex. 7).  See also,  PX 2290 at 2-3

### 2.      Independent St. Luke's Impacted ProMedica's Bottom Line

106.   A 2010 ProMedica report concluded that "[m]arket share continued to wane early in 2009" and that "[a]dding St. Luke's would 'recapture' a substantial portion of recent losses."  PX 159 at 5 (ProMedica 2010 Environmental Assessment).  The same report noted, "[I]n metro Toledo, ProMedica's share of the inpatient market declined 1% through nine months of 2009, with St. Luke's Hospital picking up half of that share[.]"  PX 159 at 12 (ProMedica 2010 Environmental Assessment).  One percent of ProMedica's 2009 gross

revenue represents tens of millions of dollars.  PX 322 at 1 (PHS Gross Revenues 1Q2009).

107.   Real-world natural experiments in the marketplace confirm that St. Luke's successfully competed with ProMedica for a significant number of patients.  For example, ProMedica estimated that St. Luke's readmission to X's network in 2009, after being excluded since 2005, would cost ProMedica X dollars in gross margin annually.  PX 333 at 2.  After St. Luke's was readmitted in July 2009, St. Luke's market share in its core service area rose from 36 percent to 43.1 percent in 2010, while ProMedica's market share in the same area declined.  PX 1235 at 3.  Mercy's and UTMC's shares during this period changed little in comparison.  PX 1235 at 3.

108.   ProMedica estimated that St. Luke's readmission to Paramount's network, after being excluded since 2001, would lead to a reduction of 255-344 commercial inpatient admissions (and hundreds of outpatient procedures) at ProMedica hospitals each year.  PX 40 at 7-8 (ProMedica 2010 analysis); *see also* PX 236 at 2 (ProMedica 2008 analysis).  ProMedica estimated that the impact on Flower Hospital alone would be $2.8 million of lost margin annually.  PX 240 at 2; PX 291 at 1.  The loss of admissions and "the potential for the acute care impact (loss) to be bigger over time" concerned ProMedica executives.  PX 236 at 1.  ProMedica estimated that some of the losses would be offset by an increase in membership for Paramount – up to 15,000 new members – solely from the addition of St. Luke's into the Paramount network.  PX 40 at 8 (ProMedica 2010 analysis); *see also* PX 236 at 2 (ProMedica 2008 analysis).

**B.       ProMedica Took Aim at St. Luke's as a Significant Marketplace Competitor**

109. St. Luke's was significant enough in the marketplace that ProMedica sought to have third-party health plans exclude St. Luke's from their hospital provider networks and ProMedica refused to admit St. Luke's into Paramount's provider network.  *See, e.g.,* PX 1127 at 1 (St. Luke's Competitor Assessment 2000-2008); PX 231 at 15 (X's 2008 Letter of Agreement); PX 1233 at 5 (St. Luke's 2009 Presentation).

110. ProMedica's 2008 Letter of Agreement with X contained a provision preventing X from adding St. Luke's (referred to in the agreement as the "participating network provider in western Lucas County") until July 1, 2009.  PX 231 at 15.  The Letter of Agreement also specified a  X% rate increase for all ProMedica hospitals to be paid by X to ProMedica upon adding St. Luke's to its network.  PX 231 at 15.

111. A ProMedica executive noted in a May 7, 2008 e-mail that X "would add [St. Luke's] as soon as they are able" but that they "will have to pay PHS for the privilege."  PX 380 at 1 (May 2008 Wachsman e-mail).  The issue of St. Luke's exclusion from X's network was the "main deal breaker" for ProMedica in its negotiations with X and required a "huge effort" to accomplish.  PX 295 at 1 (February 2008 Wachsman e-mail).  ProMedica wanted to exclude St. Luke's in order to prevent a loss of volume to St. Luke's.  PX 2017 at 60:7-60:23 ; PX 328 at 1 (ProMedica notes re: X).

112. ProMedica sought to exclude St. Luke's from X's network and indicated to X that this would be "an advantage to them."  PX 2267 at 1 (X e-mail).

113. ProMedica evaluated opportunities to exclude St. Luke's from X'**s** network.  PX 407 at 1 (ProMedica Managed Care Strategy Recommendations).

114. St. Luke's noted that "Paramount leaders want SLH in; ProMedica leaders want to keep SLH out." PX 1233 at 5 (St. Luke's 2009 Presentation). A 2008 St. Luke's internal document stated that Paramount would "only let us back in when we give them [ProMedica] the keys." PX 1119 at 4 (St. Luke's Growth Pillar Update).

**C.      St. Luke's Executives Knew St. Luke's Was Being Targeted by ProMedica and Feared Retaliation if St. Luke's Chose Other Affiliation Partners**

115. In 2007, St. Luke's considered filing an antitrust suit against ProMedica, in response to perceived efforts by ProMedica to exclude or disadvantage St. Luke's in the market. PX 1144 at 3 (2007 Notes, Rupley, VP of Marketing and Planning); PX 1207 at 3 (2007 Mem. to Board of Directors).

116. A St. Luke's competitor assessment observed that "ProMedica desires the SLH geographic area, so they will continue to starve SLH through exclusive managed care contracts and owned physicians. They will do this until we sign up with them or are weakened[.]" PX 1127 at 1 (St. Luke's Competitor Assessment 2000-2008).

117. A St. Luke's document noted that ProMedica is "continuing an aggressive strategy to take over St. Luke's or put us out of business." PX 1152 at 1 (Notes re: Paramount negotiations).

118. In a speech to the Perrysburg Chamber of Commerce in 2008, St. Luke's CEO Daniel Wakeman stated that in order to "provide the best value to employers and consumers," hospitals should compete on "price, quality and service," but instead were competing on "how well you can lock out hospitals and other healthcare providers [from] health insurance networks." PX 1380 at 1; PX 2023 at 137:11-140:17 (Wakeman (SLH) Dep.) (confirming that speech referred to ProMedica and X and that St. Luke's was at the time

28

excluded from X and Paramount).  Unlike ProMedica, there is no evidence in the record that Mercy ever attempted to persuade a health plan to exclude St. Luke's.

119.  In 2008, Mr. Wakeman described ProMedica as "[t]he organization that has taken the greatest resources from the community, made the best bottom line and perform[ed] poorly in terms of costs and outcomes."  PX 1378 at 1 (December 2008 Wakeman e-mail); PX 2023 at 98:14-22 (Wakeman (SLH) Dep.) (confirming that reference is to ProMedica).

120.  After years of competing vigorously against ProMedica, St. Luke's decided to become part of the ProMedica system, primarily to gain access to ProMedica's extraordinary health plan rates and out of fear of ProMedica's retaliation.  In October 2009, in describing a possible affiliation with ProMedica, Mr. Wakeman advised leaders of the St. Luke's Board of Directors that ProMedica would bring "strong market/capital position" and "incredible access to outstanding pricing on managed care agreements" to St. Luke's.  PX 1125 at 2.  Mr. Wakeman concluded: "Taking advantage of these strengths may not be the best thing for the community in the long run.  Sure would make life easier right now though."  PX 1125 at 2.

121.  St. Luke's feared that ProMedica would retaliate if St. Luke's affiliated with X or Y.  PX 1030 at 21 (St. Luke's 2009 Affiliation Analysis Update); PX 1232 at 3 (August 2009 Wakeman e-mail to Board of Directors); PX 1130 at 6 (August 2009 Due Diligence Notes).  St. Luke's determined that choosing ProMedica "[w]ould reduce or eliminate significant ProMedica actions that are bound to happen if St. Luke's partners with X or Y."  PX 1030 at 16 (St. Luke's 2009 Affiliation Analysis Update).  If St. Luke's partnered with X, St. Luke's expected a "[s]corched [e]arth [r]esponse" from ProMedica and "the wrath of

29

Alan [Brass, then-CEO of ProMedica]."  PX 1030 at 21 (St. Luke's 2009 Affiliation

Analysis Update); PX 1232 at 3 (August 2009 Wakeman e-mail to Board of Directors).

122.  St. Luke's suspected that ProMedica was "threatening [X]" in order to "keep St. Luke's

Hospital out of potential affiliations[.]" PX 1130 at 6 (Notes from Due Diligence

Meetings, August 26, 2009).

**VIII.  THE ACQUISITION ENABLES PROMEDICA TO RAISE RATES FOR ST. LUKE'S AND PROMEDICA'S OTHER LUCAS COUNTY HOSPITALS**

**A.  By Joining a Dominant System, St. Luke's Can Obtain Higher Rates Than It Could On Its Own**

**1.  ProMedica and St. Luke's Understood that the Acquisition Would Increase St. Luke's Bargaining Leverage and Rates**

123.  ProMedica clearly was aware of its bargaining leverage before the Acquisition, as it even

advertised this strength to entice potential affiliation partners.  PX 226 at 8 (PHS

presentation to potential hospital partners) ("Why ProMedica? ... Payer System

Leverage").

124.  SLH's own ordinary-course documents show that St. Luke's was fully aware that its

acquisition by ProMedica would increase SLH's bargaining leverage and result in higher

healthcare prices to health plans, employers, and patients.

125.  A presentation to SLH's Board of Directors, regarding potential affiliation partners, states:

"An SLH affiliation with ProMedica has the greatest potential for higher hospital rates.  A

ProMedica-SLH partnership would have a lot of negotiating clout."  PX 1030 at 20

(Affiliation Analysis Update, October 30, 2009).

126.  Formal notes, distributed among SLH's executives and assessing potential affiliation

scenarios, point out that a "ProMedica or Mercy affiliation could still stick it to employers,

30

that is, to continue forcing high rates on employers and insurance companies."  PX 1130 at 5 (Notes from Due Diligence Meetings, August 26, 2009).

127.   In an email to SLH's Board of Directors on October 11, 2009, SLH's CEO, Daniel Wakeman, wrote that "incredible access to outstanding pricing on managed care agreements" is among the important "things Pro[M]edica brings to the table" as an affiliation partner, and that "[t]aking advantage" of this strength "may not be the best thing for the community in the long run" but that it "[s]ure would make life much easier right now though."  PX 1125 at 2; *see also* PX 1130 at 4 ("Concern that U.T.[M.C.] does/may not have as high of [sic] reimbursement rates as ProMedica and/or Mercy.").

128.   A presentation from SLH's top executives to SLH's Board of Directors in early 2009 states: "[I]n essence, the message [to payors] would be pay us now (a little bit more) or pay us later (at the other hospital system contractual rates)."  PX 1018 at 9 (Options for St. Luke's: St. Luke's is now at a cross-roads); PX 2008 at 182:1-15 (Wakeman (SLH) IH). This same presentation states: "Option 3: Affiliate with ProMedica. What do they bring? Strong managed care contracts."  PX 1018 at 14 (Options for St. Luke's: St. Luke's is now at a cross-roads).

129.   SLH's CEO, Daniel Wakeman, and its Director of Marketing & Strategic Planning, Scott Rupley, both noted that an independent St. Luke's acts as a competitive constraint in the market and that SLH's merger with a larger system would lead to higher rates.  PX 1144 at 3 (Rupley Notes from Planning Session, January 9, 2007) (Health plans should care about SLH's independence because "St. Luke's Hospital keeps the systems a little more honest. The [health plans] lose clout if St. Luke's is no longer independent."); *see also* PX 1229

(Email from Wakeman (SLH) to Oppenlander (SLH), August 20, 2009) ("[W]e need to show [X] that we intend to merge with another system, and all the value we produce will [be] diluted, as our payments skyrocket.").

130. St. Luke's anticipated as much as X to Y in additional revenues from X, Y, and Paramount as a result of joining ProMedica. PX 1231 ("Yes we asked X for X dollars, but if we go over to the dark green side [i.e., PHS] … we may pick up as much as Y dollars in additional X, Y and Paramount fees").

131. St. Luke's anticipated that the transaction with ProMedica, and its potential for higher prices, would undergo antitrust scrutiny. PX 1228 at 2 (Email from Oppenlander (SLH) to Rupley (SLH), October 15, 2009) ("Slides 6, 11 and 17 will need some modification in your discussion of managed care rates/leverage. Unfortunately we can't talk about raising rates, managed care leverage and the like due to anti-trust issues."); PX 1030 at 17 ("significant legal, regulatory considerations … ProMedica: HHI with St. Luke's is 34.7% and 29.9% without … . Any obstetrics affiliation may need to be carefully reviewed. Note: Anything [referring to HHIs] over 18% throws up a red flag.")

### 2. Health Plans Expect the Acquisition to Result in Increased Bargaining Leverage and Higher Rates

132. Health plans testified that the Acquisition has enhanced the bargaining leverage of St. Luke's and ProMedica.

a. X's representative testified that the Acquisition eliminates competition between ProMedica and St. Luke's and increases ProMedica's bargaining leverage against X. PX 2067 at ¶ 20. The increased bargaining leverage results from the fact that the Acquisition has made the prospect of walking away from PHS far less

economically feasible for X than it was before the Acquisition.  *Id*. at ¶ 21

("Without St. Luke's and ProMedica, X's network would be much less attractive

and we would lose members, particularly in southwestern Lucas County."); *see*

*also* PX 2016 at 86:5-20 ("If ProMedica walked away, we would be devastated,

business-wise.").

b.       X's executive testified that the Acquisition increases ProMedica's bargaining

leverage against X.  PX 2017 at 51:14-20.

c.       X's representative testified that the addition of St. Luke's to ProMedica's hospital

network in Lucas County likely increased ProMedica's bargaining leverage and

that this increase is potentially significant.   PX 2013 at 61:6-23.

d.       X's representative testified that X used its negotiated rates with St. Luke's as a

benchmark in negotiations with ProMedica.  PX 2073 at ¶ 11.  However, as a result

of the Acquisition, "what little leverage we had in negotiations with PHS has all

but disappeared, and PHS's ability to demand higher rates from X and our clients

has increased even further."  PX 2073 at ¶ 15.

e.       X's executive  testified that SLH's merger with a larger system might give SLH the

ability to negotiate higher rates.  PX 2001 at 56:4-11.  X's executive testified that,

as a result the Acquisition, X will "[a]bsolutely" find it harder to serve its members

in Lucas County without ProMedica in its network.  *Id*. at 63:11-19.  The executive

also testified that if a contract was not reached with ProMedica, X would cease to

operate in Lucas County.  *Id*. at 64:12-65:4.

133.  Health plans also testified that the Acquisition will likely allow ProMedica to demand and obtain higher reimbursement rates for not only St. Luke's but also ProMedica's other Lucas County hospitals.

a.  X's representative  testified that X expects ProMedica, "at a minimum," to increase SLH's reimbursement rates to the rates received by PHS's other hospitals.  PX 2067 at ¶¶ 20, 22.  In fact, since the Acquisition, PHS has already presented X with a proposal to increase SLH's rates to those received by PHS's other hospitals, resulting in an estimated rate increase of 22 percent.  PX 2016 at 96:6-15.  X is also concerned that the Acquisition could give ProMedica enough leverage to increase rates at PHS's other Lucas County hospitals.  PX 2067 at ¶ 22.

b.  An X executive, testified that, based on his experience, hospital mergers in which a large system acquires an independent community hospital typically cause the community hospital's rates to rise to the rates of the acquiring system through the greater bargaining leverage of the larger system.  PX 2072 at ¶ 18("This occurs in large part because the community hospital gains increased leverage to negotiate with health plans by having a larger hospital system in a local area to use as leverage").  The executive likened these past mergers to ProMedica's acquisition of St. Luke's.  PX 2072 at ¶ 18.  X's current reimbursement rates at SLH are approximately 40 percent to 55 percent lower than its rates to PHS's Flower and Bay Park.  PX 2072 at ¶ 16.

c.  X's representative testified that the Acquisition reduced competition in the market for general acute-care services in Lucas County.  PX 2013 at 60:21-25.  When

34

competition is reduced in a market, healthcare costs and the reimbursement rates that X has to pay typically rise. PX 2013 at 61:1-5. The increased bargaining leverage that ProMedica obtained as a result of the Acquisition creates the potential for ProMedica to increase its reimbursement rates to X. PX 2013 at 61:18-23.

d.    X's representative testified that, as a result of the bargaining leverage that ProMedica gained by acquiring St. Luke's, X "will have no choice but to accept these [increased] rates or consider exiting Lucas County altogether. As a direct result of this change in leverage, I expect PHS to increase SLH's rates significantly by at least 20% and also to increase the rates at its existing hospitals." PX 2073 at ¶ 15.

e.    X's executive testified that X expects SLH's reimbursement rates to rise as a result of the Acquisition. PX 2001 at 62:6-12.

f.    X's executive testified that "[a] hospital's relative bargaining leverage against X is based on the hospital's importance and desirability" in the eyes of X's members. PX 2065 at ¶ 13. X's executive also testified that "the greater the hospital's relative bargaining leverage, the higher the prices and the less favorable the contract terms it will be able to demand from X." PX 2065 at ¶ 11.

g.    ProMedica's economic expert, Margaret Guerin-Calvert, testified that an independent St. Luke's could obtain virtually the same rates as it could as part of ProMedica's system. PX 2026 at 216:11-217:23 (Guerin-Calvert Dep.). This claim, which was not supported by any ordinary course documents or testimony, or

35

empirical support, is contradicted by numerous ProMedica and St. Luke's documents, as well as testimony from dozens of third-party witnesses.

134. Health plan executives testified that their firms will have little choice but to share with both their self- and fully-insured members any rate increases at St. Luke's or ProMedica's legacy hospitals after the Acquisition.  PX 2067 at ¶ 26 ("When hospitals increase rates, health plans like X are forced to pass on the cost increase to employers and individuals, which results in significant increases in premiums."); PX 2013 at 14:20-15:20 ( X  must pass on any healthcare cost savings or increases to its members); PX 2072 at ¶ 20 increases in healthcare costs will fall directly on X's self-insured members and indirectly, via higher premiums, on X's fully-insured members); PX 2065 at ¶ 3("any discounts or rate increases that result from X's negotiations with healthcare providers flow directly and fully to our plan sponsors"); PX 2001 at 60:20-61:10; PX 2004 at 39:7-40:14 ; PX 2073 at ¶ 16.

**B.** **Already Dominant and High-Priced, ProMedica Becomes a Must-Have System With the Acquisition**

**1.** **ProMedica Becomes Even More Dominant Than Before**

135. Prior to the Acquisition, ProMedica acknowledged its dominance in the Lucas County market through ordinary course documents.

a. A Standard & Poor's credit presentation stated: "ProMedica Health System has market dominance in the Toledo MSA."  PX 270 at 25 (ProMedica "Credit Presentation" to Standard & Poor's on 04/02/2008).

b. A 2010 presentation noted ProMedica's "leading market position within the Toledo metropolitan area" celebrating "dominant market share[s]" in oncology,

orthopedics, and women's services.  PX 320 at 3 (Kaufman Hall Presentation on ProMedica's Credit and Capital Position).

    c.    In its "2010 Environmental Assessment," ProMedica noted its status as a "clear market leader" in cancer services and orthopedics.  PX 159 at 12-13.  Regarding obstetrics services, the document states: "ProMedica has expanded on its already commanding share of the women's product line in metro Toledo, growing from 65% to 65.9% through nine months of 2009."  PX 159 at 12-13 (ProMedica "2010 Environmental Assessment").

    d.    In a 2009 document, ProMedica noted that it was the "clear market leader" in obstetrics for the metro Toledo area, with a "commanding and largely stable market share" of 65% as of June 2008.  PX 265 at 60 (ProMedica "2009 Environmental Assessment Draft").

    e.    In a strengths, weaknesses, opportunities and threats ("SWOT") analysis, ProMedica listed its "[d]ominant market share" as a strength.  PX 319 ("TTH Medical Executive Committee SWOT Analysis Results 2007").

136.    ProMedica's pre-Acquisition dominance was evident in its ability to successfully negotiate St. Luke's exclusion from X's network for 16 months. See VII B ¶¶ 109-111.

137.    Prior to the Acquisition, ProMedica had the highest market shares for inpatient general acute-care and obstetrics services and the highest prices in Lucas County.  PX 2125 at 27, 29 (Town Decl. Exhs.); PX 2139 at 13 (Town Supp. Decl. Exhs.); *see also* PX 153 (Email from Oostra (PHS) to Steele (PHS), Jan. 14, 2009) ("we hear from payors we are among the most expensive in ohio [sic]").

138.    Market shares correlate with a hospital's market power.  PX 2138 at ¶ 32 (Town Supp. Decl.).  Professor Town's examination of hospital prices in Lucas County prior to the Acquisition demonstrates a high correlation between market shares and prices.  PX 2138 at ¶ 33 (Town Supp. Decl.).  ProMedica, the system with the highest market shares, had the highest prices.  *Id*.  Mercy, the system with the second-highest share, had the second-highest prices.  *Id*.  UTMC, with the third-highest share, had the third-highest prices.  *Id*. And St. Luke's, with the smallest share, had the lowest prices.  *Id*.

139.    Professor Town's analysis of willingness-to-pay demonstrates that consumers place 28 percent more value on having access to ProMedica hospitals in their networks than Mercy hospitals. PX 2138 at ¶ 6 (Town Supp. Decl.).

140.    The Acquisition increases ProMedica's market shares for inpatient general acute-care services and obstetrics and its bargaining leverage with health plans.  PX 2124 at ¶ 52, 55 (Town Decl.).  The Acquisition increases ProMedica's market share among Lucas County hospitals from 47 percent to 58 percent for inpatient general acute-care services, and from 71 percent to over 80 percent for inpatient obstetrics services.  PX 2125 at 29 (Town Decl., Ex. 5).  The increases in ProMedica's market shares create a strong presumption of enhanced market power.  PX 2124 at ¶ 53 (Town Decl.).

141.    Patients in southwest Lucas County prefer to receive inpatient general acute-care and obstetrics services from ProMedica or St. Luke's.  PX 2124 at ¶ 59 (Town Decl.); PX 2125 at 38-39 (Town Decl. Exs.).  St. Luke's and ProMedica have the first- and second-largest market shares for general acute-care services in 11 of St. Luke's top drawing zip codes and for obstetrics services in 10 of St. Luke's top drawing zip codes.  *See* PX 2125 at 38-39

38

(Town Decl. Exs.).  Because St. Luke's was critical to health plans serving southwestern Lucas County residents that did not contract with ProMedica, the Acquisition removes consumers' ability to choose an independent St. Luke's and increases PHS's bargaining power in the Toledo area.  PX 2016 at 75:18-76:10.  X's own ordinary course calculations demonstrate that in the southwestern portion of the market St. Luke's maintained a 40 percent share,  ProMedica a 36 percent share, UTMC a 11 percent share, and Mercy a 10 percent share.  PX 2290 at 2,3 (X  Business Development Committee Meeting Minutes, March 9, 2010).

142.    Ownership of St. Luke's – the only community hospital in southwest Lucas County – increases ProMedica's bargaining leverage with health plans.  PX 2016 at 75:10-76:10 ; PX 2017 at 51:14-20. Development of proposed health care facilities by others were a response to growth in Lucas County's southwest quadrant.  PX 2005 at 80:17-82:20 (Oostra (PHS) IH); PX 2018 at 54:14-57:6; PX 1148 at 10 (Health Leaders: Toledo Market Overview, 2008).  These developments, near St. Luke's, were motivated by a "void" in ProMedica's hospital coverage in Lucas County.  PX 2005 at 81:3-82:20 (Oostra (PHS) IH).  As Ms. Guerin-Calvert, ProMedica's expert, stated: "St. Luke's would serve as ProMedica's principle [sic] access to the southern and western portions of the Toledo MSA."  PX 2136 at ¶ 94 (Guerin-Calvert Supp. Decl.).

**2.      Health Plans Expect It Will Be Far More Difficult to Market a Hospital Network Without ProMedica**

143.    The acquisition of St. Luke's increases ProMedica's market share and, in turn, its bargaining power with health plans, by a significant amount, because ProMedica now

owns the only community hospital located in Maumee, in the southwestern portion of Lucas County. PX 2016 at 75:10-77:10 .

144. The Acquisition increases ProMedica's importance to X**.** PX 2016 at 76:11-14. X's representative stated that "it would be exponentially more difficult to market a network in Lucas County without ProMedica *and* St. Luke's." PX 2067 at ¶ 21**.** The representative testified that post-Acquisition: "If [ProMedica] decided to walk away, it would be significantly detrimental to [X's] business." PX 2016 at 76:17-18.

145. X's executive testified that the Acquisition would "absolutely" make it harder to serve its membership in Lucas County without ProMedica. PX 2001 at 63:11.

146. X's representative testified that the acquisition of St. Luke's has increased PHS' bargaining power and given PHS the ability to demand higher rates. PX 2073 at ¶ 15 . Further, the representative testified that X has no choice but to accept the rate increases or consider exiting the market all together. PX 2073 at ¶ 15.

147. X's executive  testified that X added St. Luke's to its network in 2008 because it concluded that it needed St. Luke's to be competitive in the market. PX 2017 at 56:4-11**.** The executive also testified that he expects ProMedica's acquisition of St. Luke's to increase ProMedica's bargaining leverage with X. PX 2017 at 51:14-20.

148. X's representative testified that the addition of St. Luke's to ProMedica's network likely increases ProMedica's bargaining leverage. PX 2013 at 61:6-14**.**

149. No health plan in at least the last ten years has offered a network without both ProMedica and St. Luke's. PX 2022 at 69:3-6 (Wachsman (PHS) Dep.); PX 2138 at ¶ 17 (Town Supp. Decl.).

40

### C.     ProMedica Will Exercise its Increased Leverage to Extract Higher Rates

#### 1.     ProMedica is Particularly Aggressive in Seeking Highest Rates Possible

150.    ProMedica's CEO, Randall Oostra, concedes that PHS exercises its bargaining leverage to obtain the most favorable reimbursement rates possible from commercial health plans.  PX 2005 at 259:22-24 (Oostra (PHS) IH) ("Q: Is one of ProMedica's goals to increase or to maximize revenue?  A: Yes."), 260:20-22 ("Q: Is ProMedica happy with the rates that they have with managed care organizations?  A: No.  We would always like more.").  ProMedica's own expert, Ms. Guerin-Calvert, concedes that PHS seeks to obtain the highest rates possible from commercial health plans.  PX 2026 at 220:2-12 (Guerin-Calvert Dep.) ("Q: Are you aware of ProMedica ever saying to any health plan, 'That's too much?'  A: I have never heard of – there may be an exception, but I do not recall any small, medium, or large hospital ever saying, 'Please, no, it's too much.'").

151.    ProMedica claims that it attempts to obtain a cost-coverage ratio of only X percent from commercial health plans, PX 2117 at ¶ 8 (Wachsman (PHS) Decl.).  However, PHS's documents and testimony tell a different story.  ProMedica's cost-coverage ratios for significant third-party, commercial health plans range from X percent (X) to Y percent (Y).  PX 233 (PHS's Annualized Cost-Coverage Ratios for 2009); *see also* PX 2022 at 37:6-40:9 (Wachsman (PHS ) Dep.) (supporting the view that PHS seeks to maximize cost-coverage ratios with third-party, commercial health plans, given the bargaining dynamic between PHS and each health plan); PX 381 (explanation of the cost-coverage ratio as a calculation of operating margin – that is, net revenue as a percentage of cost).

152. ProMedica's aggressiveness in seeking the highest rates possible was evidenced during X's last round of contract negotiations with PHS in 2009.  X's representative testified that PHS "sought a rate increase of approximately X-Y% plus an annual inflation adjustment[,] … substantially greater than that sought by St. Luke's and other hospitals in Lucas County in our last round of negotiations."  PX 2067 at ¶ 18.

153. In Lucas County, there is a strong, positive correlation between a hospital's market share and the rates that the hospital is able to negotiate with commercial health plans.  PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl. Exhs.).  ProMedica's market share and rates are the highest in Lucas County.  PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl. Exhs.).

**2.    ProMedica's Ownership of Paramount May Further Enhance ProMedica's Incentive to Seek Post-Acquisition Rate Increases**

154. Paramount pays lower reimbursement rates to ProMedica's hospitals, relative to the rates that third-party health plans pay to PHS's hospitals.  PX 2006 at 60:6-11 (Wachsman (PHS) IH); PX 2013 at 62:11-15.

155. ProMedica's ownership of Paramount may increase PHS's incentive to bargain more aggressively with health plans for higher rates.  PX 2067 at ¶ 24;  PX 2016 at 49:6-13 ; PX 2124 at ¶ 82 (Town Decl.).

156. If ProMedica raised reimbursement rates to third-party health plans, these health plans' insurance products would become more expensive and, thus, less attractive to employers relative to Paramount's products.  PX 2013 at 62:19-63:5; PX 2067 at ¶ 24 .  As a result, such a rate increase would benefit PHS not only by increasing revenues at its hospitals

(because of the higher rates) but also by attracting more customers to Paramount's insurance products. PX 2013 at 63:6-15; PX 2067 at ¶ 24.

157.   If a third-party health plan were unable to offer a network that included ProMedica, Paramount would benefit because its network would become more attractive relative to the other health plan's network. PX 2067 at ¶ 24; PX 2016 at 98:18-22, 98:25-99:1 ; *cf.* PX 2013 at 63:16-25.

158.   ProMedica's ownership of Paramount makes a health plan's failure to contract with PHS more costly for the health plan because walking away from PHS would cause the health plan to become less attractive to current and potential members, relative to other health plans (including Paramount) that include ProMedica in its network. PX 2067 at ¶ 24 ; PX 2124 at ¶ 82 (Town Decl.); *cf.* PX 2013 at 63:16-25.

159.   The cost to ProMedica of failing to reach an agreement with a health plan is diminished by the increased revenue Paramount will receive from patients switching from that health plan to Paramount as a result of PHS being out of that health plan's network. PX 2067 at ¶ 24; PX 2124 at ¶ 82 (Town Decl.); *cf.* 2013 at 63:16-25.

160.   Adding St. Luke's to ProMedica and, thus, to Paramount's network increases the attractiveness of Paramount's products to customers in Lucas County. PX 2013 at 64:1-6 ; PX 2067 at ¶ 24.

161.   ProMedica's acquisition of St. Luke's makes failing to contract with PHS even more costly to third-party health plans and less costly to PHS, because walking away from PHS creates a much wider disparity than before the Acquisition: the third-party health plan's network becomes significantly less attractive *without* both PHS and SLH, while Paramount's

43

network becomes significantly more attractive *with* both PHS and SLH. PX 2067 at ¶ 24; PX 2124 at ¶ 82 (Town Decl.); *cf*. PX 2013 at 64:15-65:5.

### D. Health Plans Cannot Constrain ProMedica's Price Increases

#### 1. Mercy's Presence in the Relevant Market Will Not Constrain ProMedica's Exercise of Increased Market Power Resulting From the Acquisition

162.    Mercy has not been a sufficiently strong competitive constraint before the Acquisition against ProMedica's exercise of market power. Despite the geographic proximity of Mercy's three Toledo-area hospitals and PHS's three legacy Toledo-area hospitals, and the relative similarity of their service offerings, PHS maintained a substantial advantage in terms of its Lucas County market share prior to the Acquisition. PX 2138 at ¶ 2 (Town Supp. Decl.). Prior to the Acquisition, PHS's market share for inpatient GAC services was 63 percent larger than that of Mercy. For inpatient obstetrics services, PHS's share was 266 percent larger than Mercy's. *Id*.; PX 2125 at 29 (Town Decl. Exhs.). The difference in shares between PHS and Mercy prior to the Acquisition demonstrates that consumers do not view the hospital systems as interchangeable. PX 2138 at ¶ 2 (Town Supp. Decl.); PX 2016 at 87:11-88:2.

163.    The Acquisition has further increased the disparity between ProMedica's and Mercy's market shares in both relevant markets. PX 2138 at ¶ 7 (Town Supp. Decl.). PHS's post-Acquisition market share in inpatient GAC services is roughly twice as large as Mercy's. *Id*.; PX 2125 at 29 (Town Decl. Exhs.). PHS's post-Acquisition market share in inpatient obstetrics services is more than four times greater than Mercy's. PX 2138 at ¶ 7 (Town Supp. Decl.).

44

164.    Prior to the Acquisition, Mercy's presence in the market did not limit ProMedica's ability to charge the highest rates, by far, in Lucas County.  PHS's severity-adjusted (i.e., apples-to-apples) prices were X percent higher than Mercy's, X percent higher than UTMC's, and X percent higher than SLH's.  PX 2138 at ¶ 3 (Town Supp. Decl.); *see also* PX 2125 at 27 (Town Decl. Exhs.).  There is no evidence before the Court suggesting that these price disparities are due to differences in costs of care or quality of care.  PX 2138 at ¶ 3 (Town Supp. Decl.).  If, prior to the Acquisition, Mercy served as a very close substitute to PHS and constrained it accordingly, one would expect ProMedica's rates to be much lower and much closer to Mercy's.  *Id.*

165.    The Acquisition has given PHS a significant locational advantage over Mercy because Mercy offers no direct counterpart to St. Luke's in southwestern Lucas County.   PX 2138 at ¶ 7 (Town Supp. Decl.); PX 2016 at 61:23-62:17. *See also*  PX 2290 at 2-3**.**

166.    In southwestern Lucas County, the combined market share of ProMedica and St. Luke's in both inpatient GAC services and inpatient obstetrics services is much larger than Mercy's corresponding share.  PX 2138 at ¶¶ 5-6 (Town Supp. Decl.); PX 2139 at 3 (Town Supp. Decl. Exhs.); PX 2125 at 38-41 (Town Decl. Exhs.); PX 2290 at 2-3.

167.    Econometric analysis of willingness-to-pay shows that, prior to the Acquisition, commercially-insured patients placed 28 percent more value on having in-network access to ProMedica than on having in-network access to Mercy.  PX 2138 at ¶ 6 (Town Supp. Decl.); PX 2139 at 8 (Town Supp. Decl. Exhs.).  This same analysis shows that the Acquisition has increased by 58 percent the value that commercially-insured patients place on having in-network access to PHS.   PX 2139 at 8 (Town Supp. Decl. Exhs.).  In other

45

words, as a result of the Acquisition, consumers value in-network access to ProMedica nearly twice as much as they value in-network access to Mercy.  *Id*.  Thus, the Acquisition has rendered Mercy a significantly more distant substitute for PHS in the eyes of health plans and their members.  PX 2138 at ¶ 7 (Town Supp. Decl.).

168.  Mercy did not provide a sufficiently strong competitive constraint to prevent ProMedica from exercising its market power before the Acquisition.  PX 2138 at ¶ 8 (Town Supp. Decl.).  In light of the fact that the Acquisition has made ProMedica more dominant and has made Mercy less competitive against ProMedica, there is no reason to believe that Mercy will be able to constrain ProMedica's post-acquisition exercise of enhanced market power.  PX 2138 at ¶ 8 (Town Supp. Decl.).

### 2. A Hospital Network Consisting of Mercy and UTMC is Not a Viable Substitute for One Including ProMedica

169.  No health plan in the last 10 years has ever offered a network comprised of only UTMC and Mercy.  PX 2022 at 69:3-5 (Wachsman (PHS) Dep.); PX 2138 at ¶ 17 (Town Supp. Decl.).

170.  ProMedica's post-Acquisition market share is significantly higher than the combined market share of Mercy and UTMC.  PX 2138 at ¶ 17 (Town Supp. Decl.).  A Mercy and UTMC network is not a viable or close substitute for a ProMedica-St. Luke's network, as evidenced by relative market shares, and patient draw by zip codes, which indicate each hospital's relative desirability among patients.  PX 2138 at ¶ 17 (Town Supp. Decl.).

171.  In particular with respect to obstetrics services, a network comprised of Mercy and UTMC would not be nearly as attractive as a network comprised of ProMedica and St. Luke's because Mercy's St. Anne, located proximally to ProMedica's Flower Hospital, and

46

UTMC, located proximally to St. Luke's, do not offer obstetrics services.  PX 2124 at ¶ 30 n. 22 (Town Decl.).

172.    An X executive testified that prior to the Acquisition, marketing a network consisting of St. Luke's, Mercy, and UTMC would have been feasible.  PX 2067 at ¶ 21.  However, post-Acquisition, marketing a network that excludes ProMedica would be "detrimental to X's business."  PX 2016 at 76:17-18.  X would try to find any solution other than marketing a network comprised of only Mercy and UTMC because employers strongly prefer a network that includes ProMedica.  PX 2016 at 89:5-23.

173.    An X executive testified that marketing a network without ProMedica post-Acquisition makes it much more difficult to serve its members.  PX 2001 at 63:11-19.

174.    X testified that it cannot create a viable hospital network in Lucas County that consists only of Mercy and UTMC.  PX 2073 at ¶ 15.

175.    Employers testified that a network comprised of UTMC and Mercy would not be suitable to employees.  PX 2070 at ¶ 8; PX 2069 at ¶ 8; PX 2062 at ¶ 8; PX 2058 at ¶ 7.

### 3.    Health Plans Cannot Defeat ProMedica's Price Increases By Steering Members to Less Expensive Hospitals

176.    Health plans are currently placing greater emphasis on open-access networks than they did prior to 2008.  PX 2138 at ¶ 16 (Town Supp. Decl.); PX 2067 at ¶ 15.  For example, an X executive testified that it added Mercy in 2008 and St. Luke's in 2009 in response to member preferences for access to all Lucas County hospitals.  PX 2072 at ¶ 13 ; *see also* PX 2067 at ¶ 15.

177.    Employers testified that their employees prefer health plan networks that include all Lucas County hospitals.  PX 2054 at ¶ 5; PX 2059 at ¶ 4; PX 2052 at ¶ 3.

47

178.  It is not practical to steer members to lower cost providers because members prefer full access to their health plan's network and find steering mechanisms inconvenient and difficult to understand.  PX 2124 at ¶ 39 (Town Decl.).  ProMedica's economic expert could only identify one employer in Lucas County, X, who engages in any steering by providing incentives to its employees to use Mercy hospitals.  PX 2026 at 147:24-150:15 (Guerin-Calvert Dep.).

179.  An X executive testified that there generally is member resistance to steering mechanisms in a network plan.  PX 2016 at 68:21-25.

180.  Despite the existence of excess capacity in the Lucas County market prior to the Acquisition, health plans did not attempt to steer patients from ProMedica to lower priced hospitals, such as St. Luke's.  PX 2138 at ¶ 13 (Town Supp. Decl.); PX 2124 at ¶ 39 (Town Decl.).

181.  An X executive testified that, "[a]s of today, X does not have a mechanism in place to steer its members from high-cost hospitals to lower-cost hospitals."  PX 2067 at ¶ 17 .

182.  It would be even more difficult for health plans to steer Lucas County residents to hospitals outside of Lucas County, such as Fulton County Health Center or Wood County Hospital, even if these hospitals have available capacity, in an effort to resist a price increase.  PX 2124 at ¶ 39 (Town Decl.).

183.  An X executive testified that it is probable that hospital systems like ProMedica, with substantial bargaining leverage, can reject a health plan's attempt to negotiate terms that would steer patients to low-cost providers.  PX 2016 at 65:22-68:8.

184. An X executive testified that although it provides online tools that allow members to access quality and cost information about hospitals, it does not provide economic incentives for members to use any particular hospitals, and its online tools have not resulted in any shifts in the hospitals its members utilize. PX 2017 at 12:4-13:10.

   **4.  A High Degree of Overlap in Physicians' Admitting Privileges Has Not And Will Not Constrain ProMedica's Exercise of Increased Market Power Resulting From the Acquisition**

185. It is not uncommon for physicians to maintain admitting privileges at hospitals where they rarely admit patients. PX 2138 at ¶ 28 (Town Supp. Decl.); *see*, *e.g.*, PX 2056 at ¶ 3 ("X has a total of approximately X physicians on its staff. However, many of these physicians visit X only three to four times per year.").

186. Admitting privileges across hospitals is a misleading measure of physician preferences or a physician's actual admission patterns. PX 2138 at ¶ 28 (Town Supp. Decl.). Market shares are a much better measure of physician (and patient) preferences and admission patterns. *Id*.

187. Hospitals in Lucas County are differentiated by location and other characteristics, and, therefore, patients face costs associated with hospital switching independent of the physicians' cost of shifting their patients. PX 2138 at ¶ 28 (Town Supp. Decl.).

188. The fact that many physicians in Lucas County had admitting privileges at both PHS and SLH before the Acquisition, if anything, supports the conclusion that PHS and SLH directly competed with one another before the Acquisition. *Id*.; *see* PX 2136 at ¶ 42 (Guerin-Calvert Supp. Decl.). This is because, in addition to competing for inclusion in health plan networks, PHS and SLH competed prior to the Acquisition to attract patients

49

based on variables such as quality and patient satisfaction while also competing to convince physicians to refer to their hospitals rather than a competitor's hospital.  PX 2138 at ¶ 28 (Town Supp. Decl.).

189.   The high degree of overlap in physician's admitting privileges prior to the Acquisition did not constrain ProMedica from charging among the highest prices in Lucas County and some of the highest in the state.  PX 153 (Oostra (PHS) January 2009 e-mail).

## IX.   LUCAS COUNTY EMPLOYERS AND RESIDENTS WILL BE HARMED BY HIGHER HOSPITAL REIMBURSEMENT RATES

### A.   Local Employers and Physicians are Concerned About the Competitive Harm From the Acquisition

190.   Local employers and physicians recognize that ProMedica is the dominant healthcare provider in Lucas County.  PX 2062 at ¶ 8; PX 2061 at ¶ 6; PX 2051 at ¶ 9 ; PX 2053 at ¶ 5; PX 2076 at ¶ 10.  An employer explained the reasons behind ProMedica's dominance: "ProMedica already has substantial leverage in the Toledo area due to its ownership of several hospitals and numerous physicians, as well as its ownership of Paramount, a dominant local health plan."  PX 2062 at ¶ 8.

191.   Local employers testified that they are concerned that the Acquisition will provide ProMedica with increased bargaining leverage against health plans, enabling ProMedica to raise rates at St. Luke's and ProMedica's other Lucas County hospitals.  PX 2070 at ¶ 8; PX 2052 at ¶ 4; PX 2051 at ¶ 9; PX 2062 at ¶ 8; PX 2058 at ¶ 7; PX 2053 at ¶ 5 ; PX 2061 at ¶ 6; PX 2066 at ¶ 7.  This would result in higher healthcare costs for employers and their employees.  *Id.*

50

192.    Local employers and physicians are concerned that the Acquisition may diminish St.

Luke's quality of care and patient-centered approach.  PX 2075 at ¶ 14 (St. Luke's

provides "an intimate, family-like atmosphere"); PX 2055 at ¶ 6 ("I would be concerned if

St. Luke's quality and community health programs were compromised after its merger

with ProMedica"); PX 2074 at ¶ 9.  One physician testified:  "I am concerned that PHS

will change the quality-driven, patient-focused gestalt of SLH and that SLH's distinct

community feel will diminish, as occurred at DRMC after it was taken over by PHS."  PX

2076 at ¶ 11.  An employer stated:  "St. Luke's provides high-quality patient care and a

personal touch that our employees appreciate.  I hope that St. Luke's warm atmosphere and

attentive patient care will not lessen or disappear after its acquisition by ProMedica."  PX

2058 at ¶ 5.

193.    Local employers and physicians are concerned that the Acquisition will result in the

elimination or transfer of service lines from St. Luke's to other less-preferred and less-

convenient ProMedica facilities.  PX 2074 at ¶ 9; PX 2077 at ¶ 8.  As a local physician

testified, "[t]he elimination of services will result not only in less patient choice but in

longer wait times for appointments, as the same number of patients try to utilize a smaller

number of facilities."  PX 2077 at ¶ 8.

**B.      Self-insured Employers' Costs Will Increase Directly and Immediately**

194.    Unlike fully-insured employers who pay fixed monthly premiums to health plans, self-

insured employers directly pay the full cost of their employees' healthcare claims to

healthcare providers.  PX 2124 at ¶ 10 (Town Decl.); PX 2070 at ¶¶ 3, 8; PX 2069 at ¶¶ 2,

51

8; PX 2054 at ¶ 8.  Thus, when hospital reimbursement rates increase, self-insured employers immediately and directly must pay these higher costs.  *Id.*

195.  In Lucas County, approximately 70 percent of the commercially insured business is self-insured.  PX 2124 at ¶ 10 (Town Decl.).

**C.  Fully-insured Employers' Premiums Will Increase**

196.  Under a fully-insured plan, an employer pays a premium to a health plan and the health plan absorbs all of the costs for the medical care that the employees receive.  PX 2124 at ¶ 10 (Town Decl.).  Thus, the health plan bears the risk that the employees' medical expenses will exceed the amount collected from premiums.  *Id.*

197.  When a health plan incurs a rate increase from a hospital, it must pass down the increased costs to employers in the form of higher premiums.  PX 2067 at ¶ 26; PX 2013 at 15:16-20; PX 2073 at ¶ 16.

198.  Increased premiums can lead some employers to drop or reduce health care coverage.  PX 2124 at ¶ 105 (Town Decl.); PX 2055 at ¶ 4 ("lower funding combined with rising healthcare costs forced us to drop our insurance coverage").  Reducing or dropping health care coverage adversely impacts Lucas County residents' access to important medical services and, as a result, adversely impacts their overall health and well-being. *See, e.g.,* PX 2070 at ¶ 8; PX 2054 at ¶ 8.

**D.  Employees' Premiums and Out-of-Pocket Costs Will Increase**

199.  Employers cite healthcare costs as one of their largest expenses.  PX 2060 at ¶ 8 ("Healthcare is X's largest overhead expenditure"); PX 2061 at ¶ 6 ("[h]ealth insurance costs are one of X**'s** largest expenditures, second only to employee salaries"); PX 2063 at ¶

52

2 ("X spends a significant portion of our budget on healthcare costs"); PX 2069 at ¶ 8

("Healthcare costs are already a significant expense for X").

200. When healthcare costs rise due to hospital rate increases, employers generally must

increase employees' premiums, co-payments, deductibles, and out-of-pocket costs.  PX

2061 at ¶ 6 (**"X already has had to pass along health insurance premium increases to

employees" in recent years); PX 2059 at ¶ 7 (**"X cannot absorb increased healthcare costs,

therefore, we would be forced to pass on these additional costs to our employees by raising

their deductibles and co-payments . . . or increasing the percentage of the health insurance

premium that our employees pay"); PX 2069 at ¶ 8 ("we will have few options but to share

these increased costs with our employees through higher deductibles and co-payments");

PX 2074 at ¶ 8; PX 2058 at ¶ 7 (**"X  may have to start making our employees pay for 10 to

20 percent of the premium costs."); PX 2051 at ¶ 9; PX 2063 at ¶ 7; PX 2069 at ¶ 8.

201. Higher healthcare costs may force employers to offer more restrictive health insurance

plans, with fewer provider choices.  PX 2060 at ¶ 8; PX 2069 at ¶ 8 (a limited provider

network would be "extremely unpopular and burdensome to our employees"); PX 2066 at

¶ 7.  Less provider choice would force some employees to travel farther for services, and to

lose access to their preferred physician or hospital unless they are able to pay higher, out-

of-network rates.  *Id.*  "[I]f our employees wanted to continue to use St. Luke's [and it was

no longer in our health plan's network], they would have to pay double the cost of their

current deductibles, and their out-of-pocket maximum costs would be exponentially higher

than before the merger."  PX 2060 at ¶ 8.

**X. THE ACQUISITION WILL ELIMINATE BENEFICIAL NON-PRICE COMPETITION AND RESULT IN LOWER QUALITY OF CARE AND SERVICE LEVELS**

202. Hospitals compete on the basis of clinical quality, amenities, overall patient experience, and price. PX 2124 at ¶ 84 (Town Decl.).

    **A. Pre-Acquisition Competition Between ProMedica and St. Luke's Resulted in Improved Hospital Quality and Service Offerings**

203. The Acquisition eliminates important non-price competition between ProMedica and St. Luke's. Post-Acquisition, "with lessened competition, ProMedica will have diminished incentives to provide better services or improved quality." PX 2082 at ¶ 13; *see also* PX 2077 at ¶ 7-8); *see* PX 1170 at 20 (Draft SLH Presentation to employers) (St. Luke's as an independent hospital: "Challenges [other hospital] systems to keep service levels up.").

204. Testimony of ProMedica executives confirms that hospital competition within Lucas County has led to increased quality of care, additional service offerings, and other non-financial benefits for the residents of Lucas County. PX 2006 at 127:5-20 (Wachsman (PHS) IH); PX 2005 at 174:2-180:18 (Oostra (PHS) IH).

205. Health plan executives have testified that non-price dimensions, including clinical quality and patient satisfaction levels, are important factors to consider when negotiating for a hospital's inclusion in the health plan's network. PX 2001 at 43:12-44:1; PX 2067 at ¶¶ 6, 13; PX 2072 at ¶ 9.

206. Local employers have noted that competition among healthcare providers has led to higher quality of care and better healthcare services for their employees. PX 2066 at ¶ 7 ; PX 2052 at ¶ 4; PX 2062 at ¶ 8.

    **B. St. Luke's Recognized as Providing High Quality Services**

207. St. Luke's ranks as a high quality, low cost hospital in the Toledo market.  PX 1018 at 12 (Options for SLH); PX 1072 at 11 (SLH Key Messages); PX 2009 at 56:16-58:24, 115:20-22 (Dewey (SLH) IH).

208. Despite St. Luke's rapid growth in patient volume in 2010, patient satisfaction and quality were unaffected and remained at very high levels.  PX 2023 at 17:15-24; 55:9-18; 90:21-91:2 (Wakeman (SLH) Dep.).  In fact, several quality measures improved, such as myocardial infarction (i.e., heart attack) care, emergency and obstetrical satisfaction levels, and door to artery time for cardiac intervention.  PX 2023 at 53:25-54:7 (Wakeman (SLH) Dep.).

209. St. Luke's achievements in clinical quality exceed those of TTH and Flower, its closest competitors in the ProMedica system for inpatient hospital services.  ProMedica's flagship hospital, TTH, ranked *last* in the Toledo market and below the state average for quality.  PX1172 (SLH e-mail, Kathy Connell, Corp. Comm'ns Director, to Scott Rupley, August 28, 2009) ("[I]n the Commonwealth scoring on quality, SLH was the best, just a hair shy of the top 10% nationally, with Toledo Hospital dead last and well below the state average."); PX 1030 at 18-19 (SLH Affiliation Analysis Update, Oct. 2009); PX 1016 at 6 (SLH Board Meeting Affiliation Update, Dec. 2009).  Flower ranked sixth in Lucas County for overall quality.  PX 1030 at 18-19 (SLH Affiliation Analysis Update, Oct. 2009).

210. ProMedica has acknowledged that SLH is a high quality hospital.  PX 2015 at 119:1-4 (Hammerling (PHS) IH) (St. Luke's has a "good reputation historically" for quality and

patient care); PX 2002 at 123:3-5 (Hanley (PHS) IH) ("I think St. Luke's has strong

quality of care [.]"); TRO Hearing Tr. at 54:6-10.

211. ProMedica documents reflect patients' awareness that St. Luke's was a high-quality

hospital, often scoring better than ProMedica in quality rankings.  PX 399 (PHS Central

Region, Great Lakes Marketing Presentation); PX 272 (Commonwealth Fund 2007

scores); PX 2299 (CareChex Hospital Quality Ratings).  ProMedica also has admitted that

St. Luke's scored higher than TTH and Flower in patient satisfaction scores.  PX 2000 at

131:13-18 (Steele (PHS) IH).

212. Health plans have testified that St. Luke's is an attractive and valuable hospital to their

Lucas County provider networks because it provides high-quality services.  *See* PX 2013 at

55:17-56:2; PX 2280 (X document on SLH quality); PX2065 at ¶ 8 (; PX 2073 at ¶ 11.

213. Both X and Y view St. Luke's as a high-quality competitor.  PX 2018 at 89:21-23 ("St.

Luke's is a high-quality hospital.  I mean, their numbers prove that out."); PX 2068 at ¶

27; PX 2019 at 43:10(describing St. Luke's as a "historically excellent, small, community

hospital").

214. St. Luke's "is regularly recognized by third-party quality ratings organizations that rank St.

Luke's within the top 10% of hospitals nationally, based on outcomes, cost and patient

satisfaction."  PX 390 (ProMedica News Release May 26, 2010), *see also* PX 1073 (SLH

Press Release Healthgrades.com).  Third-party quality ranking organizations also regularly

praise St. Luke's for its value, *i.e*., its combination of high quality and low costs.  PX 2300

(Leap Frog 2008) (Leap Frog recognized St. Luke's as one of only 13 hospitals across the

nation to be rated "Highest Value"); PX 1138 (Quality Scoring from

hospitalbenchmark.com).

215. Independent physicians testified that St. Luke's quality was higher than ProMedica's, and

expressed concern that St. Luke's quality would decrease after the Acquisition. PX 2077

at ¶ 7; PX 2081 at ¶¶ 10-11; PX 2075 at ¶¶ 11-13.

216. Employers and community organizations have testified that St. Luke's is committed to

delivering high-quality, patient-minded care. PX 2055 at ¶ 6; PX 2054 at ¶ 6 ; PX 2058 at

¶ 6; PX 2069 at ¶ 3; PX 2074 at ¶ 9.

**C.  ProMedica Cannot Be Expected to Improve St. Luke's Quality**

217. In an internal analysis of potential acquisition options, St. Luke's noted that its "well

maintained facilities," "strong clinical quality outcomes," "strong patient/employee

satisfaction and loyalty," and "positive working relationships with affiliated physicians"

were all important points of leverage "to secure the best offer" for St. Luke's from several

possible affiliation partners. PX 1018 at 18 (Options for SLH).

218. Delivering high-quality service is an important part of St. Luke's culture. According to

Barbara Machin, former Chairman of St. Luke's board, "Our motto has always been

'Patients First Always.' Quality and patient service and patient care has been our mantra."

PX 2007 at 54:19-21 (Machin (SLH) IH).

219. St. Luke's feared that the Acquisition by ProMedica would lower St. Luke's quality. PX

1130 at 2 (Notes from Due Diligence Meetings, August 26, 2009) ("Some of ProMedica's

quality outcomes/measures are not very good. Would not want them to bring poor quality

to St. Luke's."); PX 1016 at 23 (SLH Affiliation Update Dec. 2009); PX 2008 at 237:2-5

(Wakeman (SLH) IH) (acknowledging concern that affiliating with a lower quality institution might have an adverse impact on St. Luke's.).

220. ProMedica acknowledged the need to improve its clinical quality. PX l030 at 18; *see* PX 153 (Oostra (PHS) January 2009 e-mail re: ProMedica's "subpar quality scores"); PX 2000 at 129:10-15 (Steele (PHS) IH) (TTH struggled to be patient-centered). Mr. Wakeman informed the St. Luke's Board of Directors that ProMedica "acknowledges they need to improve" quality measures. PX 1030 at 18 (SLH Oct. 2009 Affiliation Analysis Update); *see also* PX 2023 at 92:14-93:9 (Wakeman (SLH) Dep.).

## XI. NEW ENTRY AND EXPANSION WILL NOT COUNTERACT OR DETER THE ANTICOMPETITIVE EFFECTS OF THE ACQUISITION

### A. Entry or Expansion Will Not Be Timely, Likely, or Sufficient

221. It would take significantly longer than the two-year timeframe prescribed by the *Merger Guidelines* to plan, obtain zoning, licensing, and regulatory permits, and construct a new hospital in Lucas County. ProMedica's CEO Randall Oostra testified that building even a small hospital the size of Bay Park – which has approximately 72 staffed beds and is far smaller than St. Luke's – would be a "several-year project." PX 2005 at 92:17-93:7 (Oostra (PHS) IH). X's executive testified that it took X more than two years to construct and open its facility. PX 2068 at ¶ 25.

222. Constructing a new obstetrics unit and encouraging a sufficient number of obstetricians to utilize and support it would take a substantial amount of time as well. X's executive testified that it would be very challenging to encourage obstetricians to utilize a new unit since most obstetricians tend to deliver at the hospital that employs them, and it is difficult to recruit new obstetricians. PX 2068 at ¶¶ 20, 21. X of Y testified that it would be

58

necessary to build both an obstetrics unit and a NICU unit and to ensure sufficient

emergency department capacity, at a cost of tens of millions of dollars.  PX 2064 at ¶ 10.

223.   The *Merger Guidelines* explain that for entry to be considered likely, it must be a

profitable endeavor, in light of the associated costs and risks.  Constructing a new hospital

requires an extraordinarily large, up-front capital investment, and the pay-off is risky and

deferred into the future, which makes it highly unlikely that a new hospital competitor will

enter the Lucas County hospital market.  PX 2124 at ¶ 97 (Town Decl.).

224.   It would cost a substantial amount of money to construct even a basic 35-bed general

acute-care hospital in Lucas County.  X's executive testified that it would require at least

$55 million in up-front, initial capital to build this type of basic general-acute care

hospital.  PX 2068 at ¶¶ 25, 26.  By comparison, the executive stated that, in the early

2000s, it cost over $61 million to construct X's facility.  PX 2068 at 25.

225.   ProMedica's CEO Randall Oostra testified that it would cost $350 million or more in

today's market to build a hospital with 300 licensed beds similar to St. Luke's.  PX 2005 at

86:13-22 (Oostra (PHS) IH).  Charles Kanthak, SLH's Facilities Services Director,

estimated that to build a new hospital identical to St. Luke's in northwest Ohio in 2009

would cost $165 million "on the cheap" and over $200 million to "do it right."  PX 1257

(October 2009 email describing SLH's buildings and departments and estimating how

much it would cost to build a "replacement" St. Luke's in 2009).  Although ProMedica

purchased land in southwest Lucas County around 2000, ProMedica has not budgeted any

money for constructing a new hospital and no construction has taken place.  *See* PX 2005

at 82:21-25 (Oostra (PHS) IH) (stating that ProMedica purchased property approximately

ten years prior); PX 2132 at ¶ 113 (Dagen Supp. Decl.).  The most recent discussions about developing the property took place over two years ago and no plans for the project appear in ProMedica's 2010-2012 Strategic Plans.  PX 2005 at 93:21-94:18; PX 6 (PHS Hospitals' 2010-2012 Strategic Goals and Objectives); *see infra* Section XV.A.2.

226.  Access to necessary capital is a significant barrier to entry for the vast majority of potential entrants to Lucas County.  PX 2124 at ¶ 97 (Town Decl.).  Current economic conditions make it particularly challenging to obtain the necessary capital to undertake significant hospital expansions or to construct a new hospital in Lucas County.  David Dewey, SLH's VP of Business Development, testified that "it would be more difficult to get [] capital" and establish a new hospital in today's economic environment.  PX 2009 at 174:12-25 (Dewey (SLH) IH).  A 2009 presentation created by SLH's senior executives and presented to SLH's Board explains how the tight capital markets have made new hospital construction or expansion in Toledo highly unlikely: "ProMedica and Mercy do not want to build in the [southwest] area due to lack of capital access.  Also, both have taken on large amounts of debt due to recent major construction projects.  [UTMC does] not want to build either."  PX 1018 at 6.  In his May 2009 planning notes, Scott Rupley, SLH's Marketing and Planning Director, declared, "Nobody is going to be able to build anything for awhile.  Can't borrow money."  PX 1120 at 2.

227.  The fact that Lucas County already has ample general acute-care inpatient beds to fulfill the needs of the community makes entry or expansion even more unlikely.  ProMedica's economic expert, Margaret Guerin-Calvert, testified that there is "substantial excess hospital bed capacity in Toledo."  PX 2122 at ¶ 20 (Guerin-Calvert Decl.).  David Dewey,

SLH's VP of Business Development, testified that "there is enough [hospital service] capacity" in "northwest Ohio as a whole." PX 2009 at 176:8-10, 176:22-177:1 (Dewey (SLH) IH). X's executive shared his perspective that "there are already more than enough hospital beds to serve the community and utilization rates remain low." PX 2068 at ¶ 26.

228. Lucas County's population currently is flat or declining, making it economically unattractive to add more hospital beds. SLH's CEO, Dan Wakeman, testified that "the general metropolitan Toledo area has seen a population decline in the last ten years." PX 2008 at 54:19-21 (Wakeman (SLH) IH). ProMedica's documents also project a flat or declining population for Lucas County. ProMedica's 2010 Environmental Assessment states that "Overall demographics indicate little or no growth for [the] next five years." PX 159 at 5. One of the key assumptions in ProMedica's Strategic Plan for 2009 through 2011 is "flat demographics overall." PX 324 at 5.

229. A potential entrant into the Lucas County obstetrics services market would face significant costs and risks associated with constructing and operating a new obstetrics unit, thus making it highly unlikely that such entry or expansion will occur. X's executive estimated that establishing a new, financially viable labor-and-delivery unit inside a hospital's existing space would cost at least $10 to $12.6 million. PX 2068 at ¶ 20. Further, X's executive testified that constructing a neonatal intensive care unit ("NICU") for high-risk births, in addition to establishing a labor-and-delivery unit, would cost tens of millions of dollars. PX 2064 at ¶ 10. X's executive also noted that Toledo-area hospitals with a NICU and Level II perinatal referral center are "required by law to have an in-house obstetrician

and in-house anesthesiologist that can provide obstetrical coverage, two costly resources." PX 2068 at ¶ 19.

230.  In addition, obstetrics services typically do not generate sufficient revenue to cover their costs, making it economically undesirable to expand or build an obstetrics unit.  David Dewey, SLH's Vice President of Business Development, testified that SLH's obstetrics unit "does not financially cover its costs."  PX 2009 at 243:21-25 (Dewey (SLH) IH).  X's executive affirmed that "[o]bstetrics is often a money-loser for hospitals because payments tend to be low, but expenses are high."  PX 2068 at ¶ 19.  X's representative also asserted that it is difficult to operate a profitable labor-and-delivery unit.  PX 2064 at 10.

231.  The decline in the overall birthrate over the last decade in Lucas County makes entry or expansion into obstetrics particularly unappealing.  David Dewey, SLH's Vice President of Business Development, testified that "[t]he overall OB business in northwest Ohio is going down."  PX 2009 at 171:14-15 (Dewey (SLH) IH).  The Project Director of PHS's Regional Perinatal Center Program sent an email in September 2010 that provided the statistics for total deliveries in Lucas County, noting that deliveries decreased from 2000 through 2009 and explaining that this downward trend has continued through June 2010. PX 1107.   X's executive testified that "we're looking at [] a decrease, continually predictable decrease, in the number of births in and about Lucas County."  PX 2018 at 37:12-14.

232.  Under the *Merger Guidelines*, for entry or expansion to be sufficient, it must replace at least the scale and strength of one of the merging firms in order to replace the lost competition from the Acquisition.  PX 2214 at § 9.3 (*Merger Guidelines*).  Here, any entry

62

that does occur will not be sufficient under the *Merger Guidelines,* for many of the same reasons that entry is unlikely in the first place.  Due to the time and significant expense it takes to become established in the market and earn a sufficient return on investment, an entrant would have a difficult time competing successfully in the market and replacing the competition eliminated from the Acquisition.  PX 2124 at ¶ 98 (Town Decl.).

233.    Establishing a new hospital, let alone obtaining sufficient market share to earn a sufficient return on investment, is challenging.  David Dewey, SLH's Vice President of Business Development, testified that if another hospital entered Lucas County, it "would have to establish its own market share.  It would have to hire its own staff, get its own medical staff support," all of which he stated would be difficult because of the tight capital markets.  PX 2009 at 174:12-25 (Dewey (SLH) IH).

234.    A new entrant also would have a difficult time establishing a new obstetrics unit that would sufficiently replace the competition eliminated by the Acquisition.  X's executive stated that "[t]oday, it would take a substantial monetary commitment to construct a birthing center and hire a sufficient number of obstetricians to generate enough deliveries to break even."  PX 2068 at ¶ 23.  The executive also testified: "One of the most significant difficulties with creating a financially viable obstetrics unit is the ability to encourage obstetricians to utilize the new unit."  PX 2068 at ¶ 21.  The executive noted that "many obstetricians are employed by ProMedica, which instructs its obstetricians to direct expectant mothers to use ProMedica hospitals," making it difficult to gain market share.  PX 2068 at ¶ 19.  Therefore, any new obstetrics entry is highly unlikely to be sufficient to restore the competition lost by the Acquisition.

**B.      No Planned Expansion by Existing Lucas County Firms**

235.    Neither X nor Y has plans to construct a new hospital in Lucas County.  Several years ago, X purchased land in southwest Lucas County and considered building a small, 34-bed hospital that would have provided limited general medical/surgical care, and would not have offered services such as obstetrics or pediatrics.  PX 2068 at ¶ 24.  However, X's executive recently testified that X has "no plans to [build a hospital] now, if ever" in Lucas County.  PX 2068 at ¶ 24.  The executive stated that "X only considered opening a new hospital" through a "50-50 joint venture with participating physicians" so that "X could align objectives with the physicians and share ownership risks."  PX 2068 at ¶ 24 .  The executive testified that because the recently enacted 2010 Healthcare Reform Act prohibits physicians from holding a financial investment in a hospital, X no longer plans to build a hospital on its southwest land.  PX 2068 at ¶ 24.

236.    Similarly, X's representative testified that "X does not currently have any plans to construct a new hospital in the greater Toledo area."  PX 2064 at ¶ 11.  In particular, X does not have plans to adjust or expand its general acute-care inpatient services in response to ProMedica's acquisition of St. Luke's.  PX 2064 at ¶ 11**.**  X's representative testified that a five-percent rate increase would not cause X to rededicate registered beds from their current usage to general acute-care inpatient beds.  PX 2019 at 69:24-71:7.

237.    X has no plans to expand, and Y has no plans to offer, obstetrics services in Lucas County, even if rates for obstetrics services rose by a significant amount as a result of the Acquisition. X's executive asserted that it is not "worthwhile to open a new birthing center at X or another location."  PX 2068 at ¶ 23**.**  X's executive further testified that X "would

64

not build obstetrics." PX 2018 at 56:3-10**.** Y's representative also testified that "it is highly unlikely that Y will build a new obstetrics or delivery unit in the greater Toledo area in the next few years, if ever" even if rates for obstetrics services increased by "10 to 15 percent." PX 2064 at ¶ 10.

## XII. THE ACQUISITION PRODUCES NO CREDIBLE MERGER-SPECIFIC EFFICIENCIES TO REBUT THE PRESUMPTION OF COMPETITIVE HARM

238. The *Horizontal Merger Guidelines* ("*Merger Guidelines*") provide a framework within which to assess the efficiencies that PHS alleges may result from the Acquisition. PX 2214 at § 10 (*Merger Guidelines*).

### A. The Asserted Efficiencies Are Not Credible

239. The May 6, 2010 "Efficiencies Analysis of the Proposed Joinder of PHS Health System and OhioCare Health System" ("Compass Lexecon Report") is a summary of work done primarily by PHS management, under the oversight of Compass Lexecon, an economic consulting firm specializing in antitrust merger litigation. PX 20 at 1-39 (Compass Lexecon Report); PX 2005 at 293:17-21 (Oostra (PHS) IH). The Compass Lexecon Report was created to present the alleged efficiencies that may result from the Acquisition. PX 20 at 3-4.

240. The proposed efficiencies in the Compass Lexecon Report represent an "initial plan." PX 2005 at 291:16-19 (Oostra (PHS) IH). Mr. Oostra, PHS's CEO, testified about the contents of the report: "if we don't find those efficiencies, we will find other efficiencies." PX 2005 at 294:15-25 (Oostra (PHS) IH).

241. PHS's CFO Kathleen Hanley testified that the conclusions in the Compass Lexecon Report were based on a mere "gut feeling" that the Acquisition would generate efficiencies. PX 2002 at 206:14-207:3 (Hanley (PHS) IH).

242. The Compass Lexecon Report itself acknowledges: "estimates . . . are preliminary and subject to further analysis, revision, and substantiation." PX 20 at 3 (Compass Lexecon Report).

243. Key St. Luke's personnel who would be best-positioned to consider possible efficiencies had little or no input into the efficiencies calculations. Douglas Deacon, Vice President of Professional Services at SLH, never saw the Compass Lexecon Report before his investigational hearing in September 2010. PX 2010 at 191:16-192:4. His involvement with the development of the analysis was "nil," even though the analysis was "something [he] should be involved with." PX 2010 at 193:5-194:3 (Deacon (SLH) IH).

244. Dennis Wagner, SLH's Interim Treasurer at the time of the Acquisition, had never before seen the Compass Lexecon Report when he was presented with a copy during his investigational hearing in September 2010. PX 2014 at 156:4-18 (Wagner (SLH) IH). Mr. Wagner testified that the report's alleged savings for supply chain efficiencies involved "no[] or very little analysis." PX 2014 at 204: 19-22 (Wagner (SLH) IH). He said of the speech-and-hearing services efficiency claim, "I don't believe this claim." PX 2014 at 173:1-8 (Wagner (SLH) IH).

245. In her two declarations, Ms. Guerin-Calvert does not discuss most of the efficiency claims contained in the Compass Lexecon Report. *See* PX 2122 (Guerin-Calvert Decl.); PX2136 (Guerin-Calvert Supp. Decl.). Indeed, Ms. Guerin-Calvert admitted that she had not

conducted an efficiencies analysis.  PX 2026 at 42:18-24 (Guerin-Calvert Dep.).

ProMedica has put forth no other expert testimony on the issue of efficiencies.

### 1.    Revenue Enhancements Are Not Cognizable Efficiencies

246.    The numerous claimed revenue enhancement opportunities are not true efficiencies

because they merely shift revenue among the participants in the market and, in effect, do

nothing more than increase PHS's bottom-line.  PX 2132 at ¶¶ 99-110 (Dagen Supp. Decl.)

To be credited, an efficiency must either reduce costs or increase output.  PX 2132 at ¶ 100

(Dagen Supp. Decl.); PX 20 at 29-33 (description of revenue enhancement efficiencies in

Compass Lexecon Report).  The claimed revenue enhancements do neither.

### 2.    Capital Cost Avoidance Opportunities Are Not Cognizable Efficiencies

247.    The bulk of the claimed efficiencies from the Acquisition are avoided capital costs.  *See*

PX 20 at 6-7 (summary of efficiencies).  In general, capital cost avoidance claims are not

cognizable efficiencies.  PX 2138 at ¶ 62 (Town Supp. Decl.).  Firms invest in their

businesses to better compete and thus enhance consumer welfare, and if these competition-

driven investments are "avoided," consumers generally are left worse off.  PX 2138 at ¶ 62

(Town Supp. Decl.).  Moreover, ProMedica's claims of capital cost avoidance are suspect

because ProMedica had no plans to invest the capital that it claims it would have spent

without the Acquisition.  PX 2132 at ¶¶ 113-114 (Dagen Supp. Decl.)

248.    ProMedica alleges that, as a result of the Acquisition, it may be able to avoid spending $90

- 100 million on constructing and equipping a new hospital at its "Arrowhead" property

(located less than three miles away from SLH).  PX 20 at 35 (Compass Lexecon Report);

PX 2104 at ¶ 30 (Akenberger Decl.).  In the course of describing the asserted Arrowhead

hospital capital cost avoidance, Ms. Hanley testified that PHS joined with SLH "instead of investing millions of dollars in a competing facility."  PX 2002 at 243:22-244:22 (Hanley (PHS) IH).

249.   Even if cognizable in theory, the alleged capital cost avoidance savings from not constructing and equipping a new hospital on ProMedica's Arrowhead property cannot be credited under the facts here.  PX 2132 at ¶ 111-113 (Dagen Supp. Decl.); PX 2138 at ¶¶ 63-64 (Town Supp. Decl.).  Mr. Oostra testified that ProMedica has owned the Arrowhead land for a decade.  PX 2005 at 82:21-25 (Oostra (PHS) IH).  Yet PHS has not broken ground, obtained permits, or even undertaken site planning at Arrowhead in recent years.  PX 2132 at ¶ 113 (Dagen Supp. Decl.).  The Arrowhead project does not appear in PHS's 2010-2012 Strategic Plans.  PX 6 (PHS Hospitals' 2010-2012 Strategic Goals and Objectives); PX 7 (PHS 2010-2012 Strategic Goals and Objectives).  Aside from PHS' arguments in court, there is no evidence to suggest that PHS was likely to construct a new hospital at Arrowhead in the next few years, if ever.

250.   ProMedica also alleges that the Acquisition may enable it to avoid spending $25 to 30 million to construct a second bed tower at Flower Hospital.  PX 20 at 36 (Compass Lexecon Report); PX 2104 at ¶ 31 (Akenberger Decl.).  Mr. Dagen concluded that PHS's capital cost avoidance claim relating to the Flower Hospital bed tower is unsubstantiated.  PX 2132 at ¶ 114 (Dagen Supp. Decl.).  PHS's Strategic Plans do not include plans to construct a second bed tower at Flower any time in the near future.  PX 6 (PHS Hospitals' 2010-2012 Strategic Goals and Objectives); PX 7 (PHS 2010-2012 Strategic Goals and Objectives).  Ms. Hanley testified that PHS's plans for financing the expansion were

68

"premature until we really get to a point where we prioritize, authorize . . ." and said that plans had not yet reached the Board level.  PX 2002 at 248:24-246:4, 249:14-15 (Hanley (PHS) IH).  Scott Fought, SLH's Administrative Director of Finance, stated in an email that he had "no basis" for the costs he assigned to building the Flower bed tower (which were used as the basis for the capital cost avoidance savings alleged in the Compass Lexecon Report).  PX 394 at 2.

251.    ProMedica alleges that the Acquisition may save St. Luke's approximately $7.6 to $15.6 million in avoided costs relating to implementation of an Electronic Medical Records ("EMR") system and other information technology upgrades.  PX 20 at 38 (Compass Lexecon Report); PX 2104 at ¶ 32 (Akenberger Decl.).  These claims overstate any savings that might be achieved relating to EMR.  PX 2132 at ¶ 116 (Dagen Supp. Decl.).  In particular, the Compass Lexecon Report asserts a higher price than what is indicated in ordinary course documents for implementing an EMR at SLH absent the joinder.  PX 2132 at ¶ 116 (Dagen Supp. Decl.).  The Compass Lexecon Report also overstates any potential savings because it fails to deduct over $6 million in expected federal subsidies from SLH's total expected costs relating to EMR implementation.  PX 2132 at ¶ 116 (Dagen Supp. Decl.).

252.    Mr. Deacon's testimony and a St. Luke's presentation on EMR indicate that a standalone St. Luke's would receive significant subsidies to fund the project through the American Recovery and Reinvestment Act of 2009.  PX 2010 at 213:9-23 (Deacon (SLH) IH); PX 1281 at 12 (Finance Pillar Challenge Presentation).  The Compass Lexecon Report also fails to take these subsidies into account when estimating how much St. Luke's would

have spent on EMR absent the Acquisition.  PX 2132 at  ¶ 116 (Dagen Supp. Decl.).  And

a declaration filed by the Chairman of the St. Luke's Board suggests that SLH's costs on a

standalone basis for implementing "necessary" EMR and information technology upgrades

would be substantially lower than the costs asserted in the Compass Lexecon Report.  PX

2106 ¶ 10 (Black (SLH) Decl.) (describing total information technology cost of $12 to $14

million); PX 20 at 38 (Compass Lexecon Report alleges costs of $5 to $9 million on

information technology application upgrades, and $11 to $15 million on EMR).

### B.       The Asserted Efficiencies Are Speculative

253.  The *Merger Guidelines* state that "[e]fficiency claims will not be considered if they are

vague, speculative, or otherwise cannot be verified by reasonable means."  PX 2214 at §

10 (*Merger Guidelines*).

254.  Virtually all of the claimed efficiencies in the Compass Lexecon Report contain the caveat

that they "may" be accomplished by the Acquisition.  PX 20 (Compass Lexecon Report).

255.  The Compass Lexecon Report alleges that the Acquisition may generate $1.3 million in

savings from shifting SLH's inpatient rehabilitation services to Flower Hospital, a figure

that subsequently was reduced to $200,000.  PX 20 at 11 (Compass Lexecon Report); PX

2104 at ¶ 9 (Akenberger Decl.).

256.  The inpatient rehabilitation efficiency claim involves only a few hundred thousand dollars

of cost reductions, and the remaining $1 million in alleged savings actually constitutes a

price increase to consumers.  PX 2132 at ¶¶ 74-75 (Dagen Supp. Decl.).

257.  The Compass Lexecon Report asserts that the Acquisition may generate $1.45 million in

savings from consolidating Heart/Vascular, Orthopedics, Women's, Neuro/Stroke, Cancer

70

and Pulmonary services at either a PHS or SLH facility.  PX 20 at 13 (Compass Lexecon Report).  These asserted savings are unsubstantiated because PHS has not conducted a detailed analysis of clinical consolidation opportunities that might result from the Acquisition.  PX 2132 at ¶ 78-79 (Dagen Supp. Decl.).  Mr. Akenberger, PHS's Senior Vice President of Finance, confirmed in his December 23, 2010 declaration that the consolidation of clinical services is still "not yet quantified."  PX 2104 at ¶ 10 (Akenberger (PHS) Decl.).

258.    In January 2011, Navigant Consulting completed a preliminary "Executive Summary" of clinical service consolidation recommendations but did not provide details of how St. Luke's would be impacted by clinical consolidations.  The summary primarily addresses relocating existing ProMedica services to existing ProMedica facilities.  PX 396 at 8-10 (Clinical Integration Strategy Executive Summary).

259.    The Compass Lexecon Report states that approximately $1.4 million in savings may arise from lowering St. Luke's physician coverage costs in General Surgery, Obstetrics, and Interventional Services to a median benchmark rate.  PX 20 at 23.  Mr. Dagen concluded that these claims are unsubstantiated because ProMedica assumed that St. Luke's could lower its physician coverage costs to the benchmark median rate without any consideration of why St. Luke's rates might be higher in the first place.  PX 2132 at  ¶¶ 93-94 (Dagen Supp. Decl.).  Ms. Steele testified that the physician coverage contracts discussed in the Compass Lexecon Report "aren't apples to apples" because they contain different duties. PX 2000 at 182:1-183:8 (Steele (PHS) IH).

260.  ProMedica mistakenly used the benchmark median rate for the lower-priced restricted (part-time) obstetrics coverage, when St. Luke's was paying for the high-priced unrestricted obstetrics coverage prior to the Acquisition, leading to an overstatement of alleged savings.  PX 33 at 1, 8 (PHS back-up materials for physician coverage efficiency); PX 2132 at ¶ 95 (Dagen Supp. Decl.) .

261.  Mr. Dagen concluded that many other efficiency claims asserted by ProMedica are unsubstantiated and speculative because the back-up materials submitted by ProMedica lacked details about how prices paid by St. Luke's and ProMedica differ and omitted analyses of ProMedica's capacity to absorb St. Luke's volumes.  These claims include: lowering the prices that St. Luke's pays for its supplies, cost savings from transferring St. Luke's pathology lab testing services to TTH, eliminating interventional services contracts at St. Luke's, lowering obstetrics coverage costs, and moving St. Luke's speech and hearing services from a third party provider to in-house at PHS.  PX 2132 at ¶¶ 88, 91, 95-98 (Dagen Supp. Decl.).

## C.    The Proposed Efficiencies Are Not Merger-Specific

262.  The *Merger Guidelines* "credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects.  These are termed merger-specific efficiencies."  PX 2214 at § 10 (*Merger Guidelines).

263.  A substantial portion of the claimed efficiencies could be achieved by St. Luke's through an affiliation with UTMC.  PX 2132 at ¶ 121 (Dagen Supp. Decl.)  *See also* PX 2206 at 3-4.

264.  A 2009 St. Luke's Board presentation described various "clinical consolidation" opportunities that could result from a UTMC affiliation.  PX 1035 at 9 (SLH 2009 "Affiliation Analysis Update"); *cf.* PX 20 at 12 (description of clinical consolidation efficiency in Compass Lexecon Report).  In early 2009, SLH's CFO at the time, David Oppenlander, sent an email to St. Luke's CEO Dan Wakeman that stated: **"X has a Y agreement . . . [i]f we were to move down that pathway, that would be [an] inexpensive way to get into one of the big 6 [Health Information Management] systems."**  PX 1317 at 1; *cf.* PX 20 at 38 (description of EMR efficiency in Compass Lexecon Report).  St. Luke's CEO noted that "[t]he community and organizational benefits of [a] partnership [with UTMC] are endless" and that "[i]n terms of reduction of expense, a closer relationship with [UTMC] would provide just as much value as the two systems [Mercy and ProMedica]." PX 1406 (July 2009 Wakeman (SLH) e-mail to Dr. Gold(UTMC)); PX 1407 at 1 (Oct. 2009 Wakeman (SLH) e-mail to Dr. Gold (UTMC)); *see also* PX 2023 at 148:5-149:21 (Wakeman (SLH) Dep.).

265.  In addition to concluding that St. Luke's could attain many of the alleged efficiencies by merging with UTMC, Mr. Dagen also determined that several of the cost savings, and all of the revenue enhancement efficiencies, alleged in the Compass Lexecon Report are not merger-specific because they could be achieved unilaterally by either SLH or PHS absent the Acquisition.  For instance, PHS intends to reduce SLH's staffing level to reflect PHS's practices at Flower Hospital.  PX 20 at 15 (Compass Lexecon Report).  However, this alleged efficiency could be accomplished without the Acquisition because there is nothing proprietary about PHS's "best practices" with respect to "proper" staffing levels, meaning

that SLH could have cut staff on its own if it believed doing so was appropriate.  PX 2132 at ¶ 82 (Dagen Supp. Decl).  Furthermore, testimony by SLH and PHS executives revealed that cutting staff at SLH could lower its quality of care, but no such analysis was performed when calculating the savings from this alleged efficiency.  PX 2009 at 188:20-189:3 (Dewey (SLH) IH) (stating that SLH is "a pretty lean organization" and that cutting staff "would be impacting our service, our quality"); PX 2011 at 199:1-7 (Akenberger (PHS) IH).

266.  The Compass Lexecon Report also states that the Acquisition may generate $4.5 million in savings from eliminating a family practice residency program and replacing it with a regular physician's practice.  PX 20 at 16 (Compass Lexecon Report).  ProMedica's CFO Kathleen Hanley testified that there is an excess of family practice doctors in Toledo, and that ProMedica intends to close a family practice residency program housed at a PHS (not SLH) facility after the Acquisition.  PX 2002 at 211:25-213:6 (Hanley (PHS) IH).  As a result, this efficiency is not merger-specific because PHS could have eliminated one of its residency programs on its own absent the Acquisition.  PX 2132 at ¶ 86 (Dagen Supp. Decl.).

267.  Defendant asserts approximately $2.1 million of efficiencies relating to implementing new coding and charge capture practices at SLH, and $467,000 from increasing referrals between PHS and SLH facilities.  PX 20 at 30, 32-33 (Compass Lexecon Report).  SLH could have improved its coding and charge capture "best practices" on its own, and SLH and PHS each could have unilaterally increased referral of patients to each other without the Acquisition in place.  PX 2132 at ¶¶ 102-106, 110 (Dagen Supp. Decl.).  Dennis

Wagner, SLH's Finance Director, testified about the coding and charge capture efficiency claim: "I would not think there was that much opportunity, because I believe our routines are proper and correct right now."  PX 2014 at 209:15-24 (Wagner (SLH) IH).

268.  The final asserted revenue enhancement is the addition of St. Luke's to the Paramount provider network.  PX 20 at 31 (Compass Lexecon Report).  This alleged efficiency also could have been accomplished absent the Acquisition.  PX 2132 at ¶ 109 (Dagen Supp. Decl.).  SLH's executives expressed interest in participating in Paramount's provider network prior to the Acquisition.  PX 2008 at 135:1-14 (Wakeman (SLH) IH) ("we'd really like to get back in").  Ron Wachsman, PHS's Vice President of Managed Care, testified that it was PHS's reluctance that prevented SLH from being a part of the Paramount provider network prior to the Acquisition.  PX 2006 at 203:16-22 (Wachsman (PHS) IH).

**D.      The Proposed Efficiency Projections Appear Designed for Litigation**

269.  Projections of efficiencies may be viewed with skepticism, particularly if they are generated outside of the usual business planning process.  PX 2214 at § 10 (*Merger Guidelines).*

270.  By late 2009, SLH leadership was aware that a transaction with PHS would generate an antitrust review.  PX 1030 at 17 (SLH 2009 "Affiliation Analysis Update" to the St. Luke's Board containing HHI calculations).  Even before Plaintiffs' investigation began, PHS had budgeted hundreds of thousands of dollars for the anticipated antitrust review, which it expected would last at least several months.  PX 77 (PHS "High Level Timeline"); PX 2021 at 86:19-87:7 (Oostra (PHS) Dep.).  A January 2010 document

planning for the Acquisition includes references to "[e]fficiency [e]xperts" and "[e]fficiency expert reports" under the column "Antitrust Review."  PX 77 at 1 (PHS "High Level Timeline").  And a PHS executive testified that they hired Compass Lexecon, in part, to present an efficiencies analysis of the Acquisition during regulatory review.  PX 2005 (Oostra (PHS) IH) at 284:14-285:12; PX 2002 (Hanley (PHS) IH) at 225:15-24.

271.   The Compass Lexecon Report that contains PHS's alleged efficiencies includes a summary of the underlying process used to generate and document the asserted efficiencies.  The report's summary states that the process was "supervised by antitrust counsel" and that "Compass Lexecon's role . . . was to provide antitrust guidance."  PX 20 at 3 (Compass Lexecon Report).

272.   After ProMedica received "[u]nfavorable responses from Compass Lex[e]con" because it had not "accomplished enough in savings," PHS concluded that it would "need to be more aggressive with a timeline of the first 3-5 years" because the *FTC discounts [the] value of [efficiencies] each year the farther out you go*."  PX 1136 at 1 (PHS "Joinder Efficiencies Opportunities") (emphasis added).

**E.      The Proposed Efficiencies Do Not Outweigh the Anticompetitive Harm Resulting From the Acquisition**

273.   Dr. Town concurred with Mr. Dagen's analysis of PHS's alleged efficiencies, and concluded that the alleged benefits of the Acquisition would not outweigh the significant competitive harm that would result from the Acquisition.  PX 2138 at ¶ 61 (Town Supp. Decl.).

**F.      Healthcare Reform Measures Do Not Justify the Acquisition**

274.    Ongoing healthcare reform provides incentives for providers to form Accountable Care
        Organizations ("ACO").  PX 1449 at 14-15 (Nov. 2009 Reform Readiness Assessment by
        Kaufman Hall).  Another component of healthcare reform is the installation of Electronic
        Medical Records ("EMR"or "EHR") systems at hospitals.  PX 2102 at ¶ 38 (Wakeman
        (SLH) Decl.).

275.    Because SLH was, prior to the Acquisition, a low-cost and high-quality provider, it was
        well-positioned to take advantage of pending healthcare reform.  PX 1072 at 1 ("Key
        Messages from St. Luke' Hospital").  Furthermore, it was in a financial position to
        implement an EMR system and appeared motivated prior to the Acquisition to do so in
        time to receive federal subsidies.  PX 2132 at ¶ 28 (Dagen Supp. Decl.); PX 2010 at 213:9-
        12 (Deacon (SLH) IH).

### 1.    ACO Requirements Have Not Yet Been Finalized

276.    Providers in an ACO agree to be accountable for quality, cost, and overall care in
        exchange for a share of the savings achieved.  PX 1449 at 14-15 (Nov. 2009 "Reform
        Readiness Assessment" by Kaufman Hall).  The savings achieved by an ACO can be
        shared via contractual relationships, joint ventures, and other methods besides mergers,
        joinders, or acquisitions.  PX 2023 at 111:3-8 (Wakeman (SLH) Dep.); PX 1449 at 20-22
        (Reform Readiness Assessment by Kaufman Hall).  Indeed, it is likely that, absent this
        Acquisition, an independent St. Luke's would participate both in ProMedica's and Mercy's
        ACOs – if invited – rather than being limited to only ProMedica's.  PX 2023 at 111:14-16
        (Wakeman (SLH) Dep.).

77

277. Healthcare reform remains in flux, and the nature and form of ACOs remain undetermined. SLH's CEO, Mr. Wakeman, noted: "I think we know there's going to be ACOs. Exactly what they're going to look like and who's going to be in them and how they're going to perform has yet to be defined." PX 2023 at 114:17-20 (Wakeman (SLH) Dep.). Mr. Wakeman added: "[i]t's all speculation at this point because again ACO rules haven't been finalized yet." PX 2023 at 111:24-112:1 (Wakeman (SLH) Dep.). As a result of the ACO rules not yet being clearly defined, SLH's CEO has not studied them in depth. PX 2023 at 114:8-9 (Wakeman (SLH) Dep.).

278. Another component of healthcare reform is the implementation of an EMR system at all hospitals. Under the American Recovery and Reinvestment Act of 2009, hospitals receive incentives for meeting certain "meaningful use" targets for degrees of implementation. PX 1281 at 10-12 (SLH "Financial Pillar Challenge").

## 2. Independent St. Luke's Was Well-Positioned for Healthcare Reform

279. In November 2009, St. Luke's concluded that it was "uniquely positioned for a smooth transition to expected health care reform. The hospital already focuses on quality and cost – key components of reform." PX 1072 at 1 ("Key Messages from St. Luke's Hospital"). Further, St. Luke's could have participated in Lucas County ACOs without the Acquisition. *See* PX 2023 at 111:14-16 (Wakeman (SLH) Dep.).

280. In a "Competitive Profile Matrix" conducted in the ordinary course of business, St. Luke's concluded that its "low cost position" and "[i]nformation flow and infrastructure" meant that it had "much already in place to deal with possible upcoming changes" related to healthcare reform. PX 1132 at 4-5.

281. At the time of the Acquisition, St. Luke's had adequate reserves and cash from operations to fully fund the installation of an EMR system, and still have money left over to fund other capital projects, pay off its debt, and retain sufficient reserves for future use. PX 2132 at ¶¶ 29, 64 (Dagen Supp. Decl.).

282. SLH's ordinary course of business documents indicated that the cost of implementing an EMR system would be approximately $12.5 million. PX 1281 at 17 (SLH "Financial Pillar Challenge"). St. Luke's already had placed a $6 million "placeholder" on its capital budget for EMR. PX 22 at 2. Furthermore, St. Luke's concluded that it would qualify for $6.3 million in federal subsidies to help fund its EMR system. PX 1281 at 12 (SLH "Financial Pillar Challenge").

283. Doug Deacon, SLH's Vice President of Professional Services, testified that SLH "would have to move forward" with implementing an EMR system absent the Acquisition. PX 2010 at 213:9-12 (Deacon (SLH) IH).

## XIII. PROMEDICA CANNOT MEET ITS BURDEN TO SHOW ST. LUKE'S IS A FAILING- OR FLAILING-FIRM

### A. Factual Predicates for Failing-Firm Defense are Lacking

284. ProMedica cannot meet its burden to demonstrate that St. Luke's faced imminent failure and that St. Luke's adequately pursued less harmful alternatives, nor has ProMedica asserted a failing-firm defense in this proceeding.

#### 1. St. Luke's Not in Grave Danger of Imminent Failure

285. St. Luke's Hospital was not in grave danger of imminent failure. PX 2023 at 141:25-142:12 (Wakeman (SLH) Dep.); PX 2014 at 211:12-21 (Wagner (SLH) IH); PX 2021 at 45:19-24 (Oostra (PHS) Dep.).

286. The CEO of St. Luke's, Dan Wakeman, instituted a turnaround plan in 2008 that has been successful and has enabled St. Luke's to improve its financial condition significantly, as evidenced by numerous objective financial indicators. PX 2023 at 13:13-22 (Wakeman (SLH) Dep.); PX 1235 (Toledo Market Share Data); *see infra* Section XVI.B.

287. Plaintiffs' financial expert, Mr. Dagen, concluded that SLH's reserve fund and positive EBITDA have enabled it to make all necessary debt payments, pay its bills on time, and make necessary capital expenditures throughout the last decade. PX 2132 at ¶ 11 (Dagen Supp. Decl.). Mr. Dagen also concluded that focusing solely on SLH's operating margin or cost coverage ratios does not capture its ability to make investments to maintain facilities and quality of care, as well as grow its business. PX 2132 at ¶¶ 20-21 (Dagen Supp. Decl.).

   a.     **Pension Fund Loss is Misleading**

288. Mr. Dagen noted that the 2008 financial crisis precipitated a decline in SLH's pension fund that resulted in an anomalous "paper loss" of X dollars to SLH's operating income in 2009 compared to the year before. PX 2132 at ¶ 40 n.46 (Dagen Supp. Decl.). Focusing solely on the pension shortfall in 2009 ignores the cyclical nature of financial markets and SLH's demonstrated ability to rebound from such events. *Id.* at ¶ 41.

289. The pension fund has since increased in value from its 2008 levels. Between 2007 and 2008, the fair market value of the plan assets declined from X dollars to Y dollars. PX 2132 at ¶ 40 (Dagen Supp. Decl.); PX 1060 at 15 (Feb. 2010 SLH Retirement Plan Actuarial Valuation Report). As of September 2010, the fair market value was X dollars. PX 1288 at 18 (SLH Sep. 2010 interim financial statements). Increases in the equity

markets since September 2010 likely have resulted in additional increases in the value of SLH's pension fund. Between August and September 2010 alone, the pension fund increased by over X dollars. *Compare* PX 1288 at 18 (SLH Sep. 2010 interim financial statements) *with* PX 1287 at 16 (SLH Aug. 2010 interim financial statements)).

290. As the pension fund value has increased, so has the pension funding level. In 2009, the pension was X percent funded, on par with large companies such as Exxon Mobil, CBS, Disney, and Motorola. PX 2132 at ¶ 42 (Dagen Supp. Decl.); PX 1060 at 15 (Feb. 2010 SLH Retirement Plan Actuarial Valuation Report). The pension fund is now Y percent funded. PX 2023 at 14:22-15:3 (Wakeman (SLH) Dep.). Further, based on the current value of its pension fund and the average annual pension payments to SLH retirees, St. Luke's has sufficient funds to meet its obligations for the next decade and beyond, even assuming no increase in the value of fund assets. PX 2132 at ¶ 42 (Dagen Supp. Decl.).

### b. SLH's Credit Rating is Not a Sign of a Firm in Distress

291. Moody's Investors Service, Inc. ("Moody's") assigns a credit rating by performing a holistic qualitative and quantitative analysis of the borrower. PX 1370 at 1 (Moody's Rating Methodology); PX 2130 at ¶ 13 (Brick Decl.). Moody's examines certain variables over time and in relation to the industry generally. PX 1370 at 5 (Moody's Rating Methodology); PX 2130 at ¶ 13 (Brick Decl.).

292. Immediately before the Acquisition by ProMedica, St. Luke's had a medium-grade, "Baa2" credit rating from Moody's. PX 1372 at 1 (Moody's Rating Update: SLH, February 3, 2010); PX 1371 at 4 (Moody's Rating Symbols and Definitions); PX 2130 at ¶ 9 (Brick Decl.). This is in the same category of credit rating as 28 percent of other

hospitals.  PX 2130 at ¶ 9 (Brick Decl.).  As the Plaintiffs' bond-rating expert, Mr. Errol

Brick, testified, "If Moody's felt that this hospital was not going to be able to survive, [it]

would be more than a medium grade risk, . . ."  PX 2024 at 76:9-17 (Brick Dep.).

293.   Investors and the capital markets have an appetite from debt issuers of medium grade risk,

with "Baa" rated hospitals and healthcare systems issuing $2.6 billion in debt from January

2010 through January 2011.  PX 2130 at ¶ 9 (Brick Decl.); PX 2131 (Appendix 1 to Brick

Decl.).

294.   In its last ratings update for an independent St. Luke's, Moody's identified certain factors

that "could change the rating - UP[,]" including: "[c]ontinued growth and stability of

inpatient and outpatient volume trends; significantly improved and sustainable operating

performance for multiple years; strengthening of debt coverage measures and liquidity

balance; improved market share."  PX 1372 at 3 (Moody's Rating Update: SLH, February

3, 2010).  Based on these factors, SLH's recent financial turnaround has produced results

that would have led Moody's to upgrade SLH's credit rating.  PX 2130 at ¶ 13-16 (Brick

Decl.).

295.   St. Luke's had experienced growth and stability of inpatient and outpatient volume in the

period before the Acquisition and expected to continue this trend as an independent

hospital.  PX 170 at 1-2, 6 (SLH Board Monthly Report); PX 2014 at 73:17-74:15

(Wagner (SLH) IH).

296.   SLH's operating performance was steady with positive cash flows and, as Mr. Dagen

concludes, this trend would have improved even more with time.  PX 2132 at ¶ 20, 57

(Dagen Supp. Decl.); PX 2122 at ¶¶ 67, 69, 71-72 (Guerin-Calvert Decl.); PX 2129 at 2 (Hanley (PHS) Decl., Ex. 1).

297.  SLH's debt coverage measures and liquidity balance had also strengthened before the Acquisition.  PX 2130 at ¶ 16, n.32 (Brick Decl.).  SLH's maximum annual debt service ratio had improved from X in 2009 to Y in 2010.  PX 2129 at 2 (Ex. 1 to Hanley Decl.). Even in 2009, St. Luke's cash to debt ratio was X%, compared with a median of 102% for all hospitals rated by Moody's.  PX 1372 at 4 (Moody's Rating Update: SLH, February 3, 2010); PX 1368 at 10 (Moody's 2009 Median Report).

298.  Finally, SLH's market share had increased from 36 percent in 2009 to 43 percent in 2010 for its core service area, PX 1235 at 3 (Toledo Market Share Analysis), along with occupancy rates and expected volumes.  PX 2129 (Hanley (PHS) Decl., Ex. 1).

### 2.  St. Luke's Had Alternatives to ProMedica

299.  ProMedica was not St. Luke's only option.  St. Luke's considered alternative purchasers to ProMedica, including Mercy, UTMC, and out-of-area systems.  PX 1016 at 22-24 (Affiliation Update Board Presentation); PX 2008 at 209:18-210:10 (Wakeman (SLH) IH).

300.  St. Luke's and UTMC had discussed several factors as part of a potential affiliation.  PX 1030 at 11 (St. Luke's Affiliation Analysis Update); PX 1035 at 9 (St. Luke's Affiliation Analysis Update); PX 2206 at 3-4.  St. Luke's and UTMC even drafted an X before St. Luke's ended discussions with UTMC.  PX 2205; PX 2019 at 66:23-67:19.

301.  Partnering with UTMC would have been an option which could have benefitted the community and would have fit within SLH's mission.  PX 1112 (SLH Integration Decision Grid).  "St. Luke's leadership believes this affiliation is in the best interests of the

community with the potential partnership leading the way for economic change."  PX 1030 at 20 (SLH Affiliation Update).  St. Luke's directors and executives saw substantial benefits to partnering with UTMC.  PX 2023 at 148:5-149:2 (Wakeman (SLH) Dep.); PX 1321 at 2 (SLH Dec. 2009 e-mail); PX 1130 at 5 (SLH Recovery/Strategic Plan). *See also* PX 1406 (July 2009 Wakeman (SLH) e-mail) (benefits to UTMC partnership are "endless"); PX 1407 at 1 (Oct. 2009 Wakeman (SLH) e-mail to Dr. Gold (UTMC)) (a UTMC affiliation "would provide just as much [expense reduction] as the two systems [Mercy and ProMedica].").

302. St. Luke's was concerned that UTMC would not be able to deliver sufficient pricing leverage with health plans, however.  PX 1018 at 17 (SLH Partnership Options Presentation) ("Would . . . [UTMC] give us . . . enough managed care clout?"); PX 1130 at 4 (SLH Aug. 2009 Due Diligence Meeting Notes) ("Concern that [UTMC] does/may not have as high of reimbursement rates as ProMedica or Mercy").  St. Luke's also feared retaliation by ProMedica if it affiliated with UTMC.  *See infra* at Section VII.C.  UTMC does not offer OB services, and thus a merger of SLH and UTMC would not increase market share or market concentration in the Lucas County OB services market.  PX 2064 at ¶ 9.  In GAC, the combination of UTMC and St. Luke's would result in a smaller combined share than Mercy, and a combined share more than 60 percent smaller than ProMedica.  PX 2125 at 29 (Town Decl., Ex. 5); PX 2150 at 1 (GAC market share chart reflecting data in Town Decl.).

303. Mr. Wakeman acknowledges that it was St. Luke's that ended discussions with UTMC.  PX 2102 at ¶ 32 (Wakeman Decl.).

304.  For their part, St. Luke's and Mercy had discussed clinical consolidation as well as information technology and administration integration as part of a potential affiliation.  PX 1030 at 11 (St. Luke's Affiliation Analysis Update); PX 1035 at 9 (St. Luke's Affiliation Analysis Update).  St. Luke's ended discussions with Mercy.  PX 2018 at 80:18-19, 89:6-13.

### B.  SLH's Successful Rebound Rebuts ProMedica's "Flailing Firm" Claims

305.  SLH's new CEO as of early 2008, Dan Wakeman, had been involved in improving the operating performance of several hospitals before coming to SLH.  PX 2008 at 27:1-20, 37:1-38:16, 45:2-12, 51:13-21 (Wakeman (SLH) IH).  Mr. Wakeman testified that, at his previous three hospital positions, his leadership led to a "positive trajectory in terms of revenue and operation."  PX 2008 at 51:22-52:1 (Wakeman (SLH) IH).

306.  When first assessing St. Luke's, Mr. Wakeman concluded that it had "huge potential" because a "decline in revenue, in itself, in an area where you have growth, means opportunity."  PX 2008 at 59:25-61:16 (Wakeman (SLH) IH).

### 1.  Wakeman Three-Year Growth Plan, Sustainable Improvements

307.  Mr. Wakeman instituted a "Three Year Plan" in June 2008 that contained several goals, including: increasing inpatient and outpatient net revenues, growing SLH's market share to 40 percent within its "core service area," hiring "core physicians" in various specialties, and attaining "access" to 90 percent of the managed care enrollees in the Toledo area.  PX 1026 at 1-2 (SLH Three Year Plan).

308.  By April 2009, one year into the three year plan, St. Luke's already had achieved its goals for increasing inpatient and outpatient net revenue.  PX 2008 at 161:18-162:21 (Wakeman

(SLH) IH).  SLH's total net patient service revenues increased X percent from X million in 2007 to approximately Y million in 2010 (calculated by annualizing figures as of August 31, 2010).  PX 1265 at 4 (OhioCare Consolidated Statement of Operations as of August 31, 2010).  Mr. Wakeman testified that SLH's inpatient and outpatient revenue growth was "significant" during the twelve months prior to the Acquisition's consummation on August 31, 2010.  PX 2023 at 30:16-31:12 (Wakeman (SLH) Dep.).

309. By the end of the first quarter of 2010, two years into the three year plan, St. Luke's had surpassed its market-share goal by achieving a X percent share in its core service area (compared to Y percent in 2007).  PX 1235 at 3 (SLH market-share reports).

310. Between 2008 and 2009, St. Luke's employed 21 new physicians.  PX 1278 at 7 ("Growth" presentation).  According to Ms. Guerin-Calvert, as of January 2011, St. Luke's had 27 employed physicians.  PX 2136 at ¶ 7(e) (Guerin-Calvert Supp. Decl.).  SLH's strategy for employing physicians was projected to generate a positive return on investment by 2013.  PX 1080 at 3 ("Physician Strategy Investments").

311. St. Luke's successfully re-negotiated its participation in the Anthem provider network as of July 2009.  PX 1016 at 5 (presentation to SLH Board of Directors);  PX 2276 at 2-3 (amendment to the Anthem-SLH "Provider Agreement," effective July 2, 2009).  As a result, St. Luke's achieved access to 83 percent of the managed care enrollees in the Toledo area.  PX 1289 at 3 ("Strategic Plan/Pillar Update").  Although St. Luke's also had sought readmission to Paramount's hospital network, after a long period of nonparticipation, PHS made a "business decision" to decline St. Luke's pleas.  PX 2002 at 229:8-14; 230:18-231:7 (Hanley (PHS) IH).

312.    Based on his experience at other hospitals, Mr. Wakeman also made it a goal to increase SLH's outpatient ratio to X percent**,** meaning that St. Luke's was to earn X percent of its revenues from outpatient procedures.  PX 2008 at 68:10-19; 115:24-116:3 (Wakeman (SLH) IH).  Increasing a hospital's outpatient ratio is beneficial because outpatient procedures typically generate higher margins than inpatient procedures.  PX 2132 at ¶ 46 (Dagen Supp. Decl.).  St. Luke's increased its outpatient ratio from approximately X percent in 2008 to nearly Y percent as of September 2010.  PX 2008 at 115:13-23 (Wakeman (SLH) IH).  St. Luke's acquired four offsite imaging centers, formerly known as "X-Ray Associates," at the close of 2008.  PX 2010 at 24:16-25:2, 26:24-27:10 (Deacon (SLH) IH).  The X-Ray Associates facilities generated X dollars in profits in 2009.  PX 1359 at 43 ("Our Missions" presentation).

313.    St. Luke's acquired another imaging center, Regency Medical Imaging, on August 31, 2010.  PX 2010 at 24:11-15 (Deacon (SLH) IH).  SLH's former CFO, David Oppenlander, called the Regency acquisition a "no brainer," projecting that it would generate approximately X dollars in annual profits.  PX 1162 at 1, 3 (Dec. 2009 SLH e-mail).

314.    Mr. Dagen concluded that accounting for the "marked improvement in SLH's financial performance in 2010" is necessary to properly assess SLH's financial condition at the time of its acquisition by ProMedica.  PX 2132 at ¶ 23 (Dagen Supp. Decl.).  As a result, Mr. Dagen concluded that Ms. Guerin-Calvert's analysis, which instead focuses on 2009, "provides a misleading picture of SLH's financial condition because she captures SLH's financial results at [their] lowest point during the decade."  PX 2136 at ¶ 23 (Guerin-Calvert Supp. Decl.).

### 2.      Increases in Volume and Occupancy

315.  SLH's total acute inpatient admissions were projected to be X in 2010, an increase of X

percent from Y in 2007.  PX 2129 (Hanley (PHS) Decl., Ex. 1) (annualized projection).  Its

patient days increased X percent from Y in 2007 to a projected Z during the same time

period (2010 calculated by annualizing figures as of August 31, 2010).  PX 2129 (Hanley

(PHS) Decl., Ex. 1).

316.  Total outpatient visits at St. Luke's increased X from 2007 (X number) to 2010 (a

projected Y visits based on annualizing figures as of August 31, 2010).   PX 2129 (Hanley

(PHS) Decl. Ex. 1).  A SLH "2010 Strategic Planning" summary through August 2010

shows that, in the first eight months of 2010, outpatient visits increased X percent over the

previous year.  PX 1199 at 1 (SLH Top Three Strategic Issues (Growth)).

317.  The number of cases treated at SLH's Ambulatory Surgery Center, Surgi-Care, increased

from X in 2007 to Y as of August 31, 2010 (which would annualize to X cases for all of

2010).  PX 1214 at 6 ("Surgi-Care Board of Manager Meeting").

318.  SLH's overall occupancy rate in the twelve months prior to the Acquisition increased by

approximately X%.  PX 2023 at 31:13-23 (Wakeman (SLH) Dep.).

319.  In September 2009, David Oppenlander, SLH's CFO at the time, noted that "the hospital is

close to capacity with inpatients."  PX 1292 at 3 (SLH Board Minutes 9/22/09).  A March

2010 letter to the Ohio Department of Health described a "surge in obstetrical patients"

that caused the maternity unit to be "full."  PX 1086 (Konwinski Letter to OH Dep't of

Health 3/19/10).  By August 2010, Mr. Wakeman noted in a monthly update to the St.

88

Luke's Board: "inpatient capacity is limited except for weekends."  PX 170 at 1 (Sept. 2010 Wakeman Memo to SLH Board).

### 3.  Solid and Improving Financials

320.  St. Luke's volume growth in 2010 led to decreasing losses and positive EBITDA.  PX 2026 at 209:20-210:13 (Guerin-Calvert Dep.); PX 2129 (Hanley (PHS) Decl., Ex. 1).  St. Luke's did not, as Defendant asserts, lose money on the commercial patients who received services at St. Luke's.  Based on St. Luke's own ordinary-course-of-business accounting documents, as adopted and verified by ProMedica's expert, Ms. Guerin-Calvert, St. Luke's was covering by a substantial margin its direct costs for each X and Y patient it served, with excess to cover its fixed costs.  PX 2136 at 56 (Guerin-Calvert. Supp. Decl. at 54, Table 11); PX 2025 at 173:8-174:9 (Dagen Dep.).  This analysis is confirmed by Mr. Wakeman's statement in an August 2010 monthly update to the St. Luke's Board – the last update to the Board before the Acquisition – that St. Luke's "positive margin confirms that we can run in the black if activity stays high." PX 170 at 1 (Sept. 2010 Wakeman Memo to SLH Board).

321.  SLH's operating performance improved in the first eight months of 2010 compared to 2008 and 2009.  According to PHS's CFO, Kathleen Hanley, SLH's operating cash flow margin improved from X percent in 2009 to positive Y percent as of August 31, 2010, and its operating margin improved from X percent to Y percent during the same time period.  PX 2129 (Hanley (PHS) Decl. Ex. 1).

322.  SLH's total net revenues for its hospital and all subsidiaries increased X percent from X dollars in 2007 to a projected Y dollars in 2010 (calculated by annualizing August 31,

89

2010 figures).  PX 1003 at 5 (2007 OhioCare Consolidated Financial Report);  PX 1265 at 4 (OhioCare Consolidated Statement of Operations as of August 31, 2010).

323.    As of August 31, 2010, St. Luke's had approximately X dollars in cash and reserves (incorporating both the assets limited as to use and the assets of SLF)  PX 1265 at 1 (OhioCare Consolidated Balance Sheet as of August 31, 2010: sum of "Assets Limited As to Use" and "Cash and Cash Equivalents" lines).  Mr. Dagen concluded that, based on a review of ordinary course of business documents, it was appropriate to include assets from SLF and board-designated funds when calculating SLH's total "reserves."  PX 2132 at ¶ 26 n.19 (Dagen Supp. Decl.).

324.    Ms. Guerin-Calvert described SLH's "Days Cash on Hand" as of August 31, 2010 as "slightly above its comparables."  PX 2136 at ¶ 74 (Guerin-Calvert Supp. Decl.); *see also* PX 1372 at 2 (Moody's Rating Update: SLH, February 3, 2010).

325.    SLH's total outstanding debt as of August 31, 2010 was X dollars.  PX 1265 at 2 (OhioCare Consolidated Balance Sheet as of August 31, 2010: sum of "Current Portion of Long-term Debt" and "Long-term Debt, less current portions").  St. Luke's has never missed or been late on any debt payment.  PX 2023 at 100:13-25 (Wakeman (SLH) Dep.).  Notes from a February 2010 Finance Committee meeting described the bond payments as "a car payment" and not a risk to St. Luke's because "we have [] enough cash to completely defease these."  PX 1204 at 11 (SLH Finance Committee Notes).

326.    Mr. Wakeman stated, "[a]s bond issues go for not-for-profit organizations, it wasn't a large bond issue for a hospital of our size."  PX2023 at 107:4-6 (Wakeman (SLH) Dep.)

327.  Consistent with its historical use, St. Luke's could draw X dollars from its reserve fund "to invest . . . in appropriate capital projects as needed."  PX 2132 at ¶ 28 (Dagen Supp. Decl.).  In particular, Mr. Dagen found that SLH's reserves were sufficient to fund implementation of an Electronic Medical Records system and completion of a private room conversion project.  PX 2132 at ¶ 28 (Dagen Supp. Decl.).  SLH's positive trajectory in 2010 would have caused it to reach increasingly higher levels of EBITDA in the next several years, including positive EBITDA in 2011, 2012, and 2013.  PX 2132 at ¶¶ 63-64 (Dagen Supp. Decl.).  This positive trajectory would have resulting in SLH improving operating income every year for at least the next few years, with positive operating income in 2013.  PX 2132 at ¶¶ 63-64 (Dagen Supp. Decl.).

### 4.  Last Words to the Board as an Independent Hospital

328.  On September 24, 2010, Mr. Wakeman sent a "Monthly Report" to the St. Luke's Board that analyzed SLH's operating performance.  PX 170 (Sept. 2010 Wakeman Memo to SLH Board).  In this memo he advised SLH's Board that:

a.  "[I]n the past three years . . . [w]e went from an organization with declining activity to near capacity."  PX 170 at 7.

b.  "[W]e have built our volume up to a point where we can produce an operating margin and keep our variable expenses under control."  PX 170 at 1.

c.  "Even with our increased activity, the patient satisfaction scores improved . . . ."  PX 170 at 4.

d.  "Our leadership status in quality, service and low cost stayed firmly in place."  PX 170 at 7.

91

e.    "In the past six months our financial performance has improved significantly.  The volume increase and awareness of expense control were key."  PX 170 at 7.

**C.    Even in the Worst Case Scenario, St. Luke's Would Have Been Financially Viable for at Least Four to Seven Years**

329.    In the worst case scenario, at St. Luke's worst financial point in the last decade, St. Luke's CEO told its Board that St. Luke's would stay open for four to seven years without partnering with another hospital, even without the significant financial and economic improvements of 2010.  PX 2023 at 141:25-142:12 (Wakeman (SLH) Dep.); *see also* PX 2014 at 211:12-21 (Wagner (SLH) IH).  Improvements in equities markets and cash-flow operating margins in 2009 to 2010 extend this timeframe even further, PX2023 at 145:3-146:19 (Wakeman (SLH) Dep.), or, even more likely, ensure St. Luke's long-term financial viability.

330.    St. Luke's had access to its reserve fund, which held approximately X dollars as of August 31, 2010.  PX 1273 (unaudited interim financial statements); PX 1274 at 1 (Wakeman e-mail) (noting in mid-2009: "[w]e are blessed to have reserves.").

331.    The reserve fund has been, and can continue to be, used for appropriate capital projects as needed.  St. Luke's "established its investment policy to provide a financial reserve for long-term replacement, modernization and expansion of hospital facilities."  PX 1275 at 47 (SLH Credit Presentation).  St. Luke's has spent an average of X dollars annually on capital projects over the past ten years, including a heart center in 2001, a physical rehabilitation center in 2003, and the acquisitions of multiple physician groups and five freestanding imaging centers since December 2008.  PX 2132 at ¶ 27 (Dagen Supp. Decl.).

332. Currently, St. Luke's has sufficient funds to complete its high priority capital projects, including EMR implementation and private room conversions.  PX 2132 at ¶¶ 28-31 (Dagen Supp. Decl.); *see also* PX 2010 at 216:4-14 (Deacon (SLH) IH); PX 1156 (Scott Rupley's handwritten notes).

333. Mr. Dagen's analysis confirms that St. Luke's would be able to continue to make growth-minded investments, eliminate its outstanding debt, and still have approximately X dollars in cash and reserves.  PX 2132 at ¶ 57 (Dagen Supp. Decl.)

**XIV    PURPORTED EQUITIES ASSERTED BY PROMEDICA DO NOT OUTWEIGH THE PUBLIC'S INTEREST IN EFFECTIVE ANTITRUST ENFORCEMENT**

334. ProMedica and St. Luke's entered into their transaction with full knowledge of the applicable antitrust laws, and a recognition that the Acquisition raised serious antitrust issues.  *See* PX 2021 at 86:19-87:7 (Oostra (PHS) Dep.) (testifying that ProMedica budgeted hundreds of thousands of dollars for an antitrust review of the Acquisition that was expected to take a minimum of several months to complete); PX 1136 at 1 (ProMedica-Ohio Care Efficiency Opportunities) (efficiencies made for FTC review); PX 2002 (Hanley (PHS) IH) at 225:15-24) (stating that the "secondary" purpose of commissioning consultants was for dealing with FTC regulatory review); PX 2008 at 234:17-235:17 (Wakeman (SLH) IH) (presentation to St. Luke's Board about increased antitrust risk of ProMedica affiliation); PX 1030 at 17 (St. Luke's Board Affiliation Analysis Update) (stating that "[a]ny obstetrics affiliation may need to be carefully reviewed.").

335. ProMedica now claims that the Plaintiffs' requested relief – a narrowly-tailored hold-separate order ("HSO") – precludes its investment in St. Luke's.  ProMedica's claim is

93

without merit.  Under the HSO, ProMedica is fully permitted to make investments it had

agreed to make under the Joinder Agreement.  In addition, the order *explicitly and

unambiguously permits* coordination of patient care and sharing of information that is

lawful and reasonably necessary to comply with healthcare reform.  *See infra* Section

XV.D.

## XV.   PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT INTERIM HARM AND TO PRESERVE THE FTC'S ABILITY TO RESTORE BENEFICIAL PRE-ACQUISITION COMPETITION

336.   The strong public interest in the effective enforcement of the antitrust laws weighs  in

favor of a preliminary injunction in the instant case.  A preliminary injunction, continuing

the HSA, is necessary to maintain the *status quo* and ensure availability of relief, if

warranted, after the full administrative proceeding on the merits.  Absent a preliminary

injunction, ProMedica will be free to implement its plans to increase hospital rates,

terminate employees at St. Luke's, and eliminate important clinical services currently

offered at SLH.  These actions will cause immediate harm to the community and will make

it difficult, if not impossible to restore competition to pre-Acquisition levels should the

FTC ultimately prevail in its administrative challenge.

## A.   The Joinder Agreement Does Not Maintain the Competitive Viability of St. Luke's as an Independent Hospital

337.   Under the Joinder Agreement ("Agreement"), ProMedica must retain only six specified

service categories at St. Luke's.  PX 58 at 23 (Joinder Agreement § 7.1) (the covered

service categories are: emergency room, ambulatory surgery, inpatient surgery, obstetrics,

inpatient nursing, and a CLIA-certified laboratory).  Even for these basic service

categories, the Agreement does not include minimum operational or quality standards.

94

338.    Under the Agreement, ProMedica faces no obligation whatsoever to preserve other critical services at St. Luke's, such as oncology, cardiology, orthopedics, radiology and imaging, spinal neurosurgery, pediatrics, and diabetes care, among others.  *Compare* PX 58 at 23 (Joinder Agreement § 7.1) *with* PX 2102 at ¶ 5 (Wakeman (SLH) Decl.) (listing current services); PX 2023 at 152:5-153:20 (Wakeman (SLH) Dep.); *see also* PX 396 at 2-3 (Navigant Consulting, Clinical Integration Strategy: Executive Summary, Jan. 11, 2011) (seven areas analyzed for potential consolidation or "reconfiguration.").  Even if ProMedica were to eliminate or transfer a subset of services within a clinical service line, this could have serious negative implications.  For example, if ProMedica were to discontinue open-heart surgery at St. Luke's (which is permissible under the Agreement), this could undermine the overall viability of St. Luke's Heart Center and interventional cardiology program.

339.    ProMedica can amend the Agreement with approval from SLH's Board, which is now subject to the exercise of PHS's reserve powers.  PX 58 at 51-52 (Joinder Agreement § 17.3); PX 2023 at 155:8-156:2 (Wakeman (SLH) Dep.).

**B.      ProMedica Plans to Increase Hospital Reimbursement Rates**

340.    Under the Agreement, ProMedica will take over the management and negotiation of SLH's contracts with health plans.  PX 58 at 58 (Joinder Agreement, Ex. 9); PX 2006 at 162:2-5 (Wachsman (PHS) IH).  ProMedica already has taken steps to raise rates immediately if the Court does not impose preliminary injunctive relief.  PX 2021 at 33:25-35:21 (Oostra (PHS) Dep.).

95

341.  Health plans expect ProMedica to increase SLH's rates significantly.  *See supra* Section VIII.A.2 ["Health Plans Expect the Acquisitions to Result in Increased Bargaining Leverage and Higher Rates"].  If SLH's rates increase to the rates at ProMedica's hospitals, as health plans expect, this would represent a rate increase of more than X percent, on average.  PX 2125 at 27 (Town Decl., Ex. 4) (severity adjusted price differential between ProMedica and St. Luke's).

342.  Without a Court order protecting competition pending the full administrative trial on the merits, Lucas County employers and their employees clearly could suffer substantial, immediate and irreversible harm from higher healthcare-insurance prices, as PHS plans to raise SLH's rates as soon as possible.  PX 2022 at 82:10-83:17, 85:25-86:11, 87:18-25 (Wachsman (PHS) Dep.).  Ultimately, higher healthcare costs will be borne by Lucas County residents, many of whom already are struggling financially.  *See supra* Section IX.  In response, some Lucas County employers may reduce healthcare benefits for their employees, and some insured employees may drop their healthcare coverage altogether and/or forgo medical treatment due to higher out-of-pocket expenses.  *See supra* Section IX.  There is no means for redressing this harm once it has occurred.

343.  A preliminary injunction is the only meaningful method for preventing this competitive harm, because it is virtually impossible to make consumers whole once such harm has occurred.

**C.     ProMedica Plans to Close and Consolidate Hospital Services and to Reduce Staffing at St. Luke's**

344.  ProMedica's CEO, Mr. Oostra, acknowledged that ProMedica plans to close and consolidate several of SLH's service lines.  PX 2021 at 98:5-9 (Oostra (PHS) Dep.).

96

345.    The Compass Lexecon report initially identified several of SLH's service lines as candidates for consolidation, including heart/vascular, orthopedics, women's, neuro/stroke, cancer, and pulmonary services for consolidation.  PX 20 at 13 (Compass Lexecon Report).  ProMedica then hired Navigant specifically to determine which services to transfer or consolidate.  PX 222 at 2 (Navigant Service Line and Clinical Integration Report); *see also* PX 2011 at 122:10-125:4, 162:15-164:4 (Akenberger (PHS) IH).  In January 2011, Navigant analyzed seven service lines for consolidation, including open-heart surgery, and it also looked at integration opportunities in psychiatry and rehabilitation services.  PX 396 at 3, 8-10 (Navigant Consulting, Clinical Integration Strategy: Executive Summary, Jan. 11, 2011) (the seven service lines were cancer, heart and vascular, neuroscience, orthopedics, obstetrics, pediatrics, gastroenterology/urology).

346.    The same process of service consolidation took place at Flower following its acquisition by ProMedica in 1996.  ProMedica's CFO, Ms. Hanley, testified that Flower had a significant number of redundant practices, and ProMedica consolidated service lines and department heads.  PX 2002 at 172:2-13 (Hanley (PHS) IH).  ProMedica's consolidation of services at Flower included downsizing the number of operating rooms from twelve to three following a sharp reduction in the number of hospital anesthesiologists.  PX 2081 at ¶ 12.

347.    ProMedica also plans to reduce staffing at St. Luke's.  The Compass Lexecon report indicates that ProMedica plans to lower SLH's overall staffing levels to those of Flower Hospital.  PX 20 at 15 (Compass Lexecon Report).  The Agreement does not prevent ProMedica from immediately reducing the number of St. Luke's employees.

348.    St. Luke's ranks highly in quality and patient satisfaction scores, and patient satisfaction levels at St. Luke's have increased further, relative to last year.  PX 2023 at 16:17-17:4, 89:17-21 (Wakeman (SLH) Dep.); PX 390 at 1 (May 2010 ProMedica Press Release); PX 1072 at 1 (Key Messages from St. Luke's).  Such high quality and patient satisfaction levels are made possible by St. Luke's employees and the overall staffing levels that St. Luke's has maintained.  Providing uninterrupted, high-quality patient care and patient safety were the precise reasons for which St. Luke's chose not to lay off employees and in fact *continued hiring* over the past two years.  PX 2023 at 22:13-27:6 (Wakeman (SLH) Dep.).  *See also* PX 1274 at 1 (Wakeman e-mail).  If ProMedica reduces St. Luke's staffing levels – thereby eliminating employees who currently contribute to the attentive, high-quality care the hospital offers – quality, and as a result, patients, appear likely suffer. *See* PX 2077 at ¶ 8.

349.    Absent a preliminary injunction, it will be extremely difficult, if not impossible, to restore clinical service lines to St. Luke's and fully restore St. Luke's to its pre-Acquisition status. Thus, a preliminary injunction is necessary for the FTC to achieve meaningful relief, if warranted, following the administrative trial on the merits and exhaustion of all appeals.

## CONCLUSIONS OF LAW

### I.    APPLICABLE LAW

1.    Section 7 of the Clayton Act states:

> No person . . . shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . of another person . . .  Where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or ten to create a monopoly.

18 U.S.C. § 18.

>   Section 7 is "designed to arrest in its incipiency ... the substantial
>   lessening of competition from the acquisition by one corporation of the
>   whole or any part of the stock" or assets of a competing corporation.
>   *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 589, 77
>   S.Ct. 872, 1 L.Ed.2d 1057 (1957). The Supreme Court has explained
>   that "Congress used the words ' *may* be substantially to lessen
>   competition' (emphasis supplied), to indicate that its concern was with
>   probabilities, not certainties." *Brown Shoe Co. v. United States,* 370
>   U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The government
>   can satisfy its burden by establishing a "reasonable probability" of
>   substantial anticompetitive effects. *Du Pont,* 353 U.S. at 589, 77 S.Ct.
>   872. Section 7 "can deal only with probabilities, not with certainties.
>   And there is certainly no requirement that the anticompetitive power
>   manifest itself in anticompetitive action before § 7 can be called into
>   play. If the enforcement of § 7 turned on the existence of actual
>   anticompetitive practices, the congressional policy of thwarting such
>   practices in their incipiency would be frustrated." *FTC v. Procter &
>   Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967)
>   (citations omitted). However, "ephemeral possibilities" will not satisfy
>   the requirement of a reasonable probability. *United States v. Marine
>   Bancorporation, Inc.,* 418 U.S. 602, 623, 94 S.Ct. 2856, 41 L.Ed.2d 978
>   (1974).
>
>   In perhaps the seminal case on Section 7, the Supreme Court explained
>   that where an acquisition would "produce[ ] a firm controlling an undue
>   percentage share of the relevant market, and results in a significant
>   increase in the concentration of firms in that market," the likelihood
>   that competition will be substantially lessened is so great "that it must
>   be enjoined in the absence of evidence clearly showing that the
>   [acquisition] is not likely to have such anticompetitive effects." *United
>   States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 10
>   L.Ed.2d 915 (1963). Thus, where the government shows that the
>   acquisition in question would result in a firm controlling an undue
>   percentage of the relevant market and a significant increase in the
>   concentration of firms in that market, a presumption of illegality arises
>   because there is a presumption of anticompetitive effects.

*United States v. Dairy Farmers of America, Inc.*, 426 F.3d 850, 848 (6th Cir. 2005).
(Emphasis added.)

2.    Section 13(b) of the FTC Act authorizes the Court to grant a preliminary injunction if,

upon "weighing the equities and considering the Commission's likelihood of ultimate

success, such action would be in the public interest."  15 U.S.C. § 53(b).  As such, this

Court should: (1) determine the likelihood that the FTC will ultimately succeed on the

merits in its case under Section 7 of the Clayton Act; and (2) balance the equities.

*FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001).

3.　　The "only purpose of a proceeding under Section 13[(b)] is to preserve the status quo

until the FTC can perform its function.  *FTC v. Food Town Stores, Inc.,* 539 F.2d

1339, 1342 (4th Cir. 1976).  The ultimate determination as to a Section 7 violation of

the Clayton Act is an "adjudicatory function [] vested in the FTC."  *Id.*

4.　　To show a likelihood of success in a 13(b) proceeding, Plaintiffs must only "raise

questions going to the merits so serious, substantial, difficult and doubtful as to make

them fair ground for thorough investigation, study, deliberation and determination by

the FTC in the first instance and ultimately by the Court of Appeals."  *FTC v.

Butterworth Health Corp.*, 946 F.Supp. 1285, 1289 (W.D. Mich. 1996), *aff'd*, 121 F.3d

708, 1997 WL 420543 (6th Cir. 1997). (Citations omitted.)

5.　　While the FTC need not establish irreparable harm under §13(b) to secure a

preliminary injunction, a burden shifting analysis is appropriate:

> First, the FTC must make a *prima facie* showing that the merger would lead to
> undue concentration in the product market in the geographical area in question; such a
> showing gives rise to a presumption of illegality. *University Health*, 938 F.2d at 1218.
> If a *prima facie* case is made out, the burden of producing evidence to rebut the
> presumption shifts to the defendants.  *Id.*  If the defendants produce such evidence, the
> FTC has the burden of producing additional evidence to show the anticompetitive
> effects of the merger.  *Baker Hughes*, 908 F.2d at 983.  The ultimate burden of
> persuasion remains with the FTC at all times.  *Id.*

*Id.* 1997 WL 420543 at *2, citing, *FTC v. University Health, Inc.*, 938 F.2d 1206,

1218-1219 (11th Cir. 1991); *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 983

(D.C. Cir. 1990); *United States v. Waste Management, Inc.*, 743 F.2d 976, 981 (2d Cir. 1984).

## II.     LEGAL CONCLUSIONS

6.     ProMedica's statements of market dominance may be construed as an admission against interest.  Fed. R. Evid. 801(d)(2).

### A.     GENERAL ACUTE-CARE INPATIENT HOSPITAL SERVICES CONSTITUTE A RELEVANT PRODUCT MARKET

7.     A relevant product market is one in which a hypothetical monopolist could increase prices profitably by a "small but significant" amount for a meaningful period of time. (U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines (2010) § 4.1.1 ("*Merger Guidelines*")).  Defining the product market generally focuses on "demand substitution factors, *i.e.*, on customers' ability and willingness to substitute away from one product to another in response to a price increase or . . . reduction in product quality or service." *Id*. at § 4.  Courts frequently have relied on the *Merger Guidelines* framework to assess how acquisitions impact competition.  *See*, *e.g., Butterworth*, 946 F. Supp. at 1294; *Chicago Bridge & Iron Co. N.V. v. FTC,* 534 F.3d 410, 432 n.11 (5th Cir. 2008); *Heinz*, 246 F.3d at 716 n.9;  *FTC v. Univ. Health Inc.*, 938 F.2d 1206, 1211 n.12 (11th Cir. 1991).

8.     Evidence that predicts a price increase for a group of products "can itself establish that those products form a relevant [product] market."  *Merger Guidelines* § 4; s*ee also Whole Foods*, 548 F.3d at 1046-47 (Tatel, J., concurring) (CEO's statement that it was buying company to "avoid nasty price wars" was relevant evidence of market

definition); *In re Evanston Nw. Healthcare,* No. 9315, 2007 WL 2286195, at 60-61

(FTC Aug. 6, 2007).

9.    The first relevant product market in this case is general acute-care inpatient services

("GAC") sold to commercial health plans.  This is a "cluster market" of services that

courts consistently have found when analyzing hospital mergers.  *See, e.g.,*

*Butterworth,* No. 96-2440, 1997 U.S. App. LEXIS 17422; *Univ. Health Inc.,* 938 F.2d

at 1210-11; *United States v. Rockford Mem'l Corp*., 898 F.2d 1278, 1284 (7th Cir.

1990); *Evanston,* No. 9315, 2007 WL 2286195, at 55-57.

10.   The inpatient services included in the cluster market are not substitutes for one another

(*i.e*., appendectomies and coronary bypass surgery are not interchangeable).  However,

the cluster market is used "as a matter of analytical convenience [because] there is no

need to define separate markets for a large number of individual hospital services . . .

when market shares and entry conditions are similar for each."  *Emigra Group v.*

*Fragomen*, 612 F. Supp. 2d 330, 353 (S.D.N.Y. 2009) (citing Jonathan B. Baker,

*Market Definition: An Analytical Overview*, 74 ANTITRUST L.J. 129, 157-59 (2007)).

11.   The specific inpatient services included in the cluster market are those that both

ProMedica and St. Luke's offer, and therefore those for which competition will be

affected by the Acquisition.  *See Little Rock Cardiology Clinic v. Baptist Health*, 573

F. Supp. 2d 1125 n.46 (E.D. Ar. 2008) (excluding cardiologists' services from market

definition because "[defendant] does not compete in the cardiologists' service market;

it has no market share and therefore no market power in [that market].").

102

12.     Outpatient services are excluded from the GAC market because they are not

        substitutes for inpatient services and because they are subject to different competitive

        conditions (including a different set of providers) than are inpatient services.  *See*

        *Rockford Mem'l Hosp*., 898 F.2d at 1284 (excluding outpatient services from a GAC

        product market).

### B.      INPATIENT OBSTETRICAL SERVICES CONSTITUTE A RELEVANT PRODUCT MARKET

13.     Inpatient obstetrical services constitute a separate relevant product market in which the

        competitive effects of the Acquisition must be analyzed.  A separate product market

        for this service line is necessary because "market shares and entry conditions" are

        different for obstetrics than for the overall cluster of GAC services: UTMC and Mercy

        St. Anne do not offer obstetrical services.  *See Emigra Group*, 612 F. Supp. 2d at 353.

        As such, it would be inappropriate – and misleading – to include obstetrical services in

        the GAC cluster market; the effect of the Acquisition on the provision of obstetrical

        services in Lucas County must be separately analyzed.

14.     Inpatient obstetrical services need not be included in the overall general acute-care

        inpatient services market simply because they are offered within the same facilities as

        the other services.  *Rockford Mem'l Hosp.,* 898 F.2d at 1284 (Posner, J.) ("Hospitals

        can and do distinguish between the patient who wants a coronary bypass and the

        patient who wants a wart removed from his foot; these services are not in the same

        product market merely because they have a common provider.").

15.     Courts in the Sixth Circuit have recognized different product markets with different

        market structures and competitive conditions in hospital mergers.  *Butterworth*, 946 F.

103

Supp. at 1290-91 (accepting two market definitions – general acute care inpatient hospital services and primary care inpatient hospital services – each with different competitors); *Defiance Hosp. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1109 (N.D. Ohio 2004) (finding narrower market of anesthesia services where, *inter alia*, only certain providers perform the service).

### C. THE RELEVANT GEOGRAPHIC MARKET IS LUCAS COUNTY

16. Section 7 of the Clayton Act prohibits acquisitions that are likely to lessen competition in "any section of the country," otherwise known as a geographic market. *Phila. Nat'l Bank*, 374 U.S. at 356.

17. Under the case law and *Merger Guidelines*, the relevant question to define the geographic market is whether a hypothetical monopolist controlling *all* Lucas County hospitals could profitably implement a small but significant non-transitory increase in price ("SSNIP"). *Merger Guidelines* § 4.2. Defining the geographic market is a "pragmatic" undertaking and the Plaintiffs must "present evidence of practical alternative sources to which consumers . . . would turn if the merger were consummated." *Butterworth*, 946 F. Supp. at 1291; *see generally Phila. Nat'l Bank*, 374 U.S. at 358-62. Therefore, the relevant geographic market within which to analyze the competitive effects of the Acquisition is no broader than Lucas County.

### D. THE ACQUISITION IS PRESUMED UNLAWFUL BASED ON CONCENTRATION THRESHOLDS

18. "A transaction resulting in a high concentration of market power and creating, enhancing, or facilitating a potential that such market power could be exercised in anticompetitive ways is presumptively unlawful." *Butterworth*, 946 F. Supp. at 1294

(citations omitted); *see also Phila. Nat'l Bank*, 374 U.S. at 363; *Baker Hughes*, 908 F.2d at 982-83.

19.  Market concentration can be measured using the Herfindahl-Hirschman Index ("HHI"), as adopted by the federal antitrust enforcement agencies.  *Merger Guidelines* § 5.3.  Courts have likewise adopted and relied on the HHI as a measure of market concentration.  *See, e.g., Univ. Health Inc.*, 938 F.2d at 1211 n.12 (HHI is "most prominent method" of measuring market concentration) *FTC v. PPG Indus.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986); *FTC v. Cardinal Health*, 12 F. Supp. 2d 34, 53-54 (D.D.C. 1998); *FTC v. Staples*, 970 F. Supp. 1066, 1081-82 (D.D.C. 1997).  The HHI is calculated by summing the squares of the market shares of all firms in the market.  A transaction that increases concentration by 200 points and results in a highly-concentrated market (HHI over 2,500) is <u>presumed</u> likely to enhance market power.  *Merger Guidelines* § 5.3.

20.  Sufficiently large HHI figures establish the FTC's *prima facie* case that a merger is anti-competitive.  *Heinz,* 246 F.3d at 716 (citing *Phila. Nat'l Bank,* 374 U.S. at 363); *Baker Hughes,* 908 F.2d at 982-83.

21.  The market shares and HHI levels here far exceed levels found to be unlawful by the Supreme Court and other courts. (See ¶ 96)  In *Philadelphia National Bank*, the Supreme Court found that a combined market share of 30 percent, with many remaining competitors, violated the Clayton Act.  374 U.S. at 364.  In *University Health Inc.*, the Court found that the FTC had "clearly established a *prima facie* case of anticompetitive effect" when it proved that a merger of two nonprofit hospitals

105

would have reduced the number of competitors from five to four and resulted in a combined share of about 43 percent, an increase in HHI of over 630, and a post-merger HHI of 3200.  938 F.2d at 1211 n.12, 1219; *see also FTC v. Bass Bros. Enters., Inc.*, No. C84-1304, 1984 U.S. Dist. LEXIS 16122, at *65 (N.D. Ohio June 6, 1984) (enjoining two mergers that would have resulted in 200 and 300 point increases in HHI); *Cardinal Health*, 12 F. Supp. at 52-53 (enjoining two mergers that would have resulted in 600 and 800 point increases in HHI).

22. A duopoly, as in the inpatient obstetrical services market here, is presumptively unlawful in and of itself.  There is "by a wide margin, a presumption that [a three-to-two] merger will lessen competition . . . ."  *Heinz*, 246 F.3d at 716; *PPG*, 798 F.2d at 1503; *Cardinal Health*, 12 F. Supp. 2d at 52-53.

### E.      DEFENDANT HAS FAILED TO REBUT THE PRESUMPTION OF LIKELY HARM

23. Proof that the acquisition will increase concentration in one or more relevant markets with significant barriers to entry establishes a *prima facie* case that a merger is anticompetitive.  *Heinz*, 246 F.3d at 716 (likelihood of success demonstrated by showing that market concentration would increase substantially).  The burden shifts to the Defendant to rebut the *prima facie* case by attempting to show that market-share statistics do not accurately reflect the market.  *Id.* at 715; *Baker Hughes*, 908 F.2d at 982-83.  "The more compelling the *prima facie* case, the more evidence the defendant must present to rebut it successfully."  *Heinz*, 246 F.3d at 725 (quoting *Baker Hughes*, 908 F.2d at 991).

106

### 1. There Will Be No Timely, Likely, or Sufficient Entry or Expansion in the Relevant Markets

24. Entry must be "timely, likely, and sufficient in its magnitude, character and scope to deter or counteract the competitive effects" of a proposed transaction. *Merger Guidelines* § 9; *FTC v. Procter & Gamble*, *Co.,* 386 U.S. 568, 579 (1967); *Bass Bros.*, No. C84-1304, 1984 U.S. Dist. LEXIS 16122, at *32 (noting unlikelihood of entry due to regulatory and cost barriers); *see also Cardinal Health*, 12 F. Supp. 2d at 55-58 (adopting "timely, likely, and sufficient" test). Defendants must show both that entry is *likely* – meaning both technically possible and economically feasible – and that it will *replace* the competition that existed prior to the merger. *See Cardinal Health*, 12 F. Supp. 2d at 56 (quotation omitted); *In re Chicago Bridge & Iron Co.*, 138 F.T.C. 1024, 1067 (2005) (noting "new entrants and fringe competitors" might not replace lost competition), *aff'd sub nom. Chicago Bridge & Iron Co. N.V. v. FTC,* 534 F.3d 410 (5th Cir. 2008).

25. The higher the barriers to entry, as in this case, the less likely it is that the "timely, likely, and sufficient" test can be met. *United States v. Visa U.S.A.*, *Inc.,* 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229, 240 (2d Cir. 2003). (See ¶¶ 221-234).

### 2. Defendant's Efficiencies Claims Fail

26. Defendant has failed in its burden of proving that its asserted efficiencies are: (1) verifiable; (2) not attributable to reduced output or quality; (3) merger-specific; and (4) sufficient to outweigh the transaction's anticompetitive effects. *See Heinz*, 246 F.3d at 721 (evidence cannot be "mere speculation and promises about post-merger

107

behavior"); *Univ. Health Inc.*, 938 F.2d at 1223 ("defendant [cannot] overcome a presumption of illegality based solely on speculative, self-serving assertions"); *Staples*, 970 F. Supp. at 1089; *see also Merger Guidelines* § 10.

27.     Efficiencies must be "extraordinary" to overcome high concentration levels.  *Heinz,* 246 at 721-22.

28.     No court in a 13(b) proceeding, or otherwise, has found efficiencies sufficient to rescue an otherwise illegal merger.  *See Phila. Nat'l Bank*, 374 U.S. at 371 (noting that where a merger substantially lessens competition, it "is not saved because, on some ultimate reckoning of social or economic debits or credits, it may be deemed beneficial."); *Procter & Gamble*, 386 U.S. at 580 ("[P]ossible economies cannot be used as a defense to illegality.  Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition.").

### 3.     St. Luke's Is Not a Failing Firm

29.     Defendant cannot meet the requirements of the failing-firm defense, under which ProMedica must prove that it was St. Luke's only available purchaser and that St. Luke's was in imminent danger of business failure.  *See Citizen Publ'g Co. v. United States*, 394 U.S. 131, 136-37 (1969) (citing *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 302 (1930)); *see also U.S. Steel Corp. v. FTC*, 426 F.2d 592, 608 (6th Cir. 1970); *Merger Guidelines* § 11.

30.     The failing-firm defense has "strict limits[.]" *Warner Commc'ns, Inc.*, 742 F.2d at 1156; *see also United States v. General Dynamics Corp.*, 415 U.S. 486, 507 (1974)

108

(failing-firm defense is "lesser of two evils approach"); *Citizen Publ'g Co.,* 394 U.S. at 137 (failing-firm defense should be confined to its "narrow scope").

31. The failing-firm defense has never succeeded in a 13(b) proceeding.

### 4. St. Luke's Is Not a "Flailing Firm"

32. A defense based on the financial weakness of the acquired company – sometimes referred to as a "flailing-firm defense" – is an even more tenuous ground on which to justify the Acquisition.  Courts have viewed the defense with extreme skepticism, describing it as "probably the weakest ground of all for justifying a merger." *Kaiser Alum. & Chem. Corp. v. FTC*, 652 F.2d 1324, 1338-41 (7th Cir. 1981) (noting further that it "certainly cannot be the primary justification of a merger"). *Id.*  The Ninth Circuit rejected the defense, explaining that it inappropriately expands the "strict limits" of the failing-firm defense. *Warner Commc'ns, Inc.*, 742 F.2d at 1165 (quoting and citing *Kaiser Alum. & Chem. Corp.*, 652 F.2d at 1339).

33. To the limited extent that courts consider the defense, it requires a "substantial showing that the acquired firm's weakness, *which cannot be resolved by any other means*, would cause the firm's market share to reduce to a level that would undermine the government's *prima facie* case." *Univ. Health Inc.*, 938 F.2d at 1221 (emphasis added).  Thus, to succeed, Defendant must make a "substantial showing" of an imminent, steep plummet in St. Luke's market share (from 11.5 percent to less than 2 percent for GAC services and from 9.3 percent to less than 1.3 percent for OB services) such that market concentration falls below levels that trigger the presumption of anticompetitive harm.

109

34.     The strength of the FTC's *prima facie* case here differs greatly from the circumstances

in *FTC v. Arch Coal, Inc.,* 329 F. Supp. 2d 109 (D.D.C. 2004), the only case in which

a court has relied on financial weakness (and only in part) to deny relief in a 13(b)

proceeding.  In *Arch Coal*, the FTC "just barely" raised competitive concerns with "an

increase in HHI of only 49."  *Id.* at 158.  The court noted that less of a showing was

required from the defendant to rebut the "less-than-compelling *prima facie* case" and

further cautioned that it was "important to note that this case is *not* one in which the

post-merger increase in HHI produces an overwhelming statistical case."  *Id.* at 129,

158 (emphasis added).[2]

### 5.  Defendant's Other Novel Defenses Are Entitled to Little Weight

35.     No court has ever denied relief in a 13(b) proceeding despite an acknowledgment by

the defendant that prices will increase by double-digits.  The Court cannot accept

Defendant's argument that recent rate negotiations prove that it will only seek

"reasonable" price increases in the future: "[p]ost-acquisition evidence that is subject

to manipulation by the party seeking to use it is entitled to little or no weight."  *Hosp.*

*Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (Posner, J.).

36.     Furthermore, the Court declines Defendant's invitation to delve into whether St.

Luke's current prices are "subcompetitive" or otherwise unreasonable in some way.

Section 7 of the Clayton Act does not prevent *St. Luke's* from seeking better rates as an

---

[2]

 *Arch Coal* is distinguishable in numerous other ways: *inter alia*, the transaction at issue involved coal reserves that, once depleted, could never be replenished, making the financial decline of the acquired company irreversible; and the transaction did not result in a decrease in the number of competitors in the market.

110

independent hospital, but it does prohibit any transaction that may "substantially lessen competition" and allow higher rates to result from an unlawful exercise of market power. 15 U.S.C. § 18 (2006).

37.     Indeed, no court has ever engaged in an inquiry into the reasonableness of pre-merger or post-merger prices in a 13(b) proceeding.  To do so "is to set sail on a sea of doubt" because courts are "ill-suited to act as central planners, identifying the proper price, quantity and other terms of dealing." *Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.*, 129 S. Ct. 1109, 1121 (2009) (quotations and citations omitted).  Rather, "the normal assumption in examining assertions of market power is that the current price is at least the competitive price."  *CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816, 824 (D.C. Cir. 2001) (citing IIA Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 537b (1995)).  As the leading antitrust treatise states:  "[T]he market is presumably behaving competitively, or at least nearly so, prior to the merger.  The concern is whether the merger may lead to a further price increase *above current levels*."   IIB Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 539a2 (2009) (emphasis added).  No court has ever concluded that significant price increases resulting from an acquisition are fair and reasonable.[3]

---

[3]

  Defendant relies on *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121 (E.D.N.Y. 1997) to argue that this Court may accept price increases because they are purportedly not "supracompetitive."  However, the court in *Long Island Jewish Medical Center* did not condone price increases; rather, it concluded that prices would not increase at all as a result of the merger. *Id.* at 145 ("In sum, the evidence in this case indicates that, in the event the merger is

38.   Defendant cites to prior hospital merger cases in which courts denied preliminary injunctive relief despite allegations of high post-merger market shares. However, in all but one of those cases (discussed below), either the court held that the government did not meet its burden of proving the high market shares or the court did not reach the issue. For example, in *United States v. Mercy Health Servs.*, 902 F. Supp. 968 (N.D. Iowa 1995), the Department of Justice alleged that the parties had a combined 86 percent share. However, the government failed to prove that the relevant geographic market extended beyond an area in which the parties' held only a 10 percent share, which even the government acknowledged would not violate § 7. *Id.*; *see also FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999), (government did not meet burden of proving geographic market that supported an alleged 84 percent market share); *FTC v. Freeman Hosp.*, 69 F.3d 260 (8th Cir. 1995) (FTC alleged market with post-merger HHIs between 3088 and 3417, but court found broader geographic market with post-merger HHIs between 1322 and 1496 and combined shares between 21 and 24 percent); *FTC v. Hosp. Bd. of Dirs.*, 38 F.3d 1184 (11th Cir. 1994) (court never reached market shares because acquisition immune under state action doctrine).

39.   The only case in which the court permitted a hospital merger despite apparently large market shares, *Butterworth*, 946 F. Supp. 1285, involved two key issues that are not relevant here: first, the Court credited arguments that a non-profit hospital was not likely to raise prices, in part because the hospital's Board of Directors, composed of local community members, would not allow it; and second, the Court relied on the

_____

consummated, it is unlikely that there will be a price increase.").

merging hospitals' commitment to freeze prices at both of the merging hospitals for three years and limit price increases for the following four years.  *Id.* at 1302-1304. Neither fact fits the evidence in this case.  *See*  Findings of Fact at Section VI.

**III.   THE EQUITIES FAVOR A PRELIMINARY INJUNCTION**

40.   No court has denied relief to the FTC in a 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits. "The equities will often weigh in favor of the FTC because 'the public interest in effective enforcement of the antitrust laws' was Congress's specific 'public equity consideration' in enacting Section 13(b)." *CCC Holdings*, 605 F. Supp. 2d at 36 (citing *Heinz*, 246 F.3d at 726).

41.   Private equities "are not proper considerations for granting or withholding injunctive relief under section 13(b)" – instead, public equities are paramount.  *Food Town*, 539 F.2d at 1346.  Moreover, if the benefits of a merger are available after the trial on the merits, they do not constitute public equities weighing against a preliminary injunction.  *Heinz*, 246 F.3d at 726 ("If the merger makes economic sense now, the appellees have offered no reason why it would not do so later.").

42.   In a preliminary injunction action under Section 13(b), the FTC is not required to show irreparable harm.  *See Heinz*, 246 F.3d at 714; *Elders Grain*, 868 F.2d at 903; *Warner Commc'ns,* 742 F.2d at 1159.

**IV.   COURT-ORDERED RELIEF IS NECESSARY TO PRESERVE THE POSSIBILITY OF MEANINGFUL PERMANENT RELIEF AND TO PREVENT INTERIM HARM**

43.   The very purpose of a Section 13(b) proceeding is to preserve the FTC's ability to achieve meaningful relief, if it succeeds on the merits, by preventing the difficulty of

113

splitting up operations that have become commingled. *Whole Foods*, 548 F.3d at 1034

("[E]ven with the considerable flexibility of equitable relief, the difficulty of

'unscrambl[ing] merged assets' often precludes 'an effective order of divestiture'"

(citation omitted)); *FTC v. Libbey, Inc*., 211 F. Supp. 2d 34 (D.D.C. 2002)

("Preserving the status quo so that meaningful relief will be available to the FTC, is

another equity that weighs in favor of issuing the preliminary injunction.

'Unscrambling the eggs' after the fact may not be a realistic option in [the] case."

(citations omitted)); *FTC v. Ill. Cereal Mills, Inc*., 691 F. Supp. 1131, 1146 (N.D. Ill.

1988) ("This persistent problem [of unscrambling assets] has been long recognized by

courts, and is the underlying reason for the Commission's authority to seek

preliminary relief under Section 13(b) of the FTC Act.").

44. Another principal reason for preliminary relief is to prevent interim harm to

consumers while the merits trial and any appeals are underway, even if a suitable

divestiture remedy could later be devised. *Bass Bros.*, No. C84-1304, 1984 U.S. Dist.

LEXIS 16122, at *70 (failure to halt illegal acquisitions causes interim harm and "later

remedies cannot remove retroactively the harm that has already occurred.").

45. Accordingly, and for the reasons stated above, the FTC's Motion for Preliminary

Injunction (Doc. No. 4) is hereby Granted.

46. The parties are to abide by terms of the current Hold Separate Agreement until either

(1) the completion of all legal proceedings by the Commission challenging the

Acquisition, including all appeals, or (2) further order of the Court, including upon the

request of the Commission before completion of such legal proceedings.

47.     The Court envisions a relatively short stay of the completion of the relationship between Plaintiffs and SLH, pursuant to the HSA of August 2010.  Toward that end, if the FTC has not completed actions before it by November 30, 2011, this Court will entertain taking additional steps to insure that all parties are treated fairly and expeditiously.

IT IS SO ORDERED.

                                        __S/ *David A. Katz*_____
                                        DAVID A. KATZ
                                        U. S. DISTRICT JUDGE