**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO, WESTERN DIVISION**

FEDERAL TRADE COMMISSION )
)
       and )
)
STATE OF OHIO )
)
         Plaintiffs, )
v. )    No. 3:11-cv-47 (DAK)
)    Hon. David A. Katz
PROMEDICA HEALTH SYSTEM, INC. )
)
       Defendant. )

**<u>MEMORANDUM IN SUPPORT OF
PLAINTIFF FEDERAL TRADE COMMISSION'S
MOTION FOR MODIFICATION OF PRELIMINARY INJUNCTION ORDER</u>**

## TABLE OF CONTENTS

BACKGROUND ……………………………………………………………………1

LEGAL AUTHORITY TO MODIFY PRELIMINARY INJUNCTION …………………...3

ARGUMENT …………………………………………………………………………..4

SUMMARY OF PROPOSED ORDER …………………………………………………..8

## TABLE OF AUTHORITIES

**CASES**

*A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002)……………………….….4

*Canal Auth. of the State of Fla. v. Fullerton*, 489 F.2d 567 (5th Cir. 1974)…………………..4, 5

*Central Hanover Bank & Trust Co. v. Callaway*, 135 F.2d 592 (5th Cir. 1943)…………………4

*In re ProMedica Health Sys., Inc.*, Dkt. No. 9346 (Initial Decision issued Dec. 5, 2011 (public version issued Dec. 12, 2011))……………………………………………………………....2, 3

*FTC v. ProMedica Health Sys., Inc.*, 2011 U.S. Dist. LEXIS 33434; 2011-1 Trade Cas. (CCH) ¶ 77,395 (N.D. Ohio 2011)…………………………………………………………………….…..2

*Movie Sys., Inc. v. MAD Minneapolis Audio Distrib.*, 717 F.2d 427 (8th Cir. 1983)………….4-5

*Omaha Indem. Co. v. Wining*, 949 F.2d 235 (8th Cir. 1991)……………………………………...5

*Sys. Fed'n No. 91, Ry. Employees' Dep't, AFL-CIO v. Wright*, 364 U.S. 642 (1961)…………...4

*Toledo Area AFL-CIO Counsel v. Pizza*, 907 F. Supp. 263 (N.D. Ohio 1995)……………...…4

**STATUTES AND REGULATIONS**

Clayton Action § 7, 15 U.S.C. § 18………………………………………………………1, 2, 5

FTC Act § 13(b), 15 U.S.C. § 53(b)…………………………………………...………….1, 5

FTC Rules of Practice for Adjudicative Proceedings, 16 C.F.R. §§ 3.51(a), 3.52(a)…………....3

**TREATISES**

7 Moore's Federal Practice ¶ 65.07 (2d ed. 1982)…………………………………………5

Plaintiff Federal Trade Commission ("Commission" or "FTC") submits this memorandum in support of its motion to modify the preliminary injunction order issued by this Court on March 29, 2011, which required Defendant ProMedica Health System, Inc. ("ProMedica") to continue to abide by the terms of a Hold-Separate Agreement ("HSA") between ProMedica and Commission staff.  Specifically, Plaintiff now seeks a temporary appointment of a Hold-Separate Monitor to verify and monitor ProMedica's compliance with the HSA.  This order modification is necessitated by a material change in circumstances – issuance of an Initial Decision by FTC Administrative Law Judge Michael Chappell on December 5, 2011 finding ProMedica's acquisition of St. Luke's Hospital to be unlawful in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  This ruling substantially alters ProMedica's economic and strategic incentives relating to the operation of St. Luke's Hospital ("SLH" or "St. Luke's"), as further described below.


## BACKGROUND

On January 7, 2011, Plaintiffs filed a complaint in this Court seeking a temporary restraining order and preliminary injunction under § 13(b) of the FTC Act, 15 U.S.C. § 53(b), to prevent ProMedica from further consolidating its operations with those of St. Luke's, pursuant to a joinder agreement consummated on August 31, 2010 (the "Acquisition"), until the resolution of the Commission's administrative proceeding, and any appeals, on the competitive merits of the Acquisition.

Prior to the complaint being filed, ProMedica agreed to a Hold-Separate Agreement with Commission staff (Appendix A).  The purpose of the HSA was to maintain the competitive viability of St. Luke's while this case and the administrative case proceeded by preventing

ProMedica from, e.g., transferring or eliminating SLH services, renegotiating SLH's health-plan contracts, or raising the rates it charges to health-plan customers and members – namely local employers and employees in Lucas County.

On March 29, 2011, after discovery, extensive briefing, a hearing on February 10-11, 2011, and upon a finding of serious, substantial questions, this Court granted Plaintiffs' Motion for Preliminary Injunction.  The Court's order required ProMedica to continue to abide by the terms of the HSA until either:  (1) the completion of all proceedings, including appeals, challenging the Acquisition, or (2) further order of the Court, "including upon the request of the Commission before completion of such legal proceedings."  *FTC v. ProMedica Health Sys., Inc*., 2011 U.S. Dist. LEXIS 33434; 2011-1 Trade Cas. (CCH) ¶ 77,395, at *164 (N.D. Ohio 2011).[1]

On May 31, 2011, a full administrative trial concerning whether the Acquisition violated Section 7 of the Clayton Act commenced before FTC Chief Administrative Law Judge D. Michael Chappell.  After more than 170 hours of live testimony, the trial ended on August 18, 2011.  The trial record consists of more than 2,600 exhibits, the testimony of 34 witnesses (either live or by deposition), nearly 8,000 pages of trial transcripts, and 2,350 pages of proposed findings of fact, replies to proposed findings of fact, post-trial briefs, and replies to post-trial briefs.  *In re ProMedica Health Sys., Inc.*, Dkt. No. 9346, at 3 (Initial Decision issued Dec. 5, 2011 (public version issued Dec. 12, 2011)) (Chappell, J.).

On December 5, 2011, Judge Chappell issued a 215-page Initial Decision finding that the Acquisition was likely to substantially lessen competition, and therefore is unlawful under Section 7 of the Clayton Act.  *Id.* at 7 (*See* Appendix B (public version)).  Consequently, Judge

---

[1] At that time, the Court declined to enter an order that contained more fulsome hold-separate terms and a monitoring provision, as Plaintiffs has proposed.

Chappell ordered that ProMedica divest St. Luke's and ordered other necessary ancillary relief. *Id*. Pending divestiture, Judge Chappell's order prohibits ProMedica from eliminating or consolidating St. Luke's clinical services; requires the continued employment of St. Luke's employees; requires ProMedica to take such actions as are needed to maintain the viability, marketability, and competitiveness of St. Luke's; and enables the Commission to appoint a person to monitor ProMedica's obligations with Judge Chappell's order. *Id*. at 216-238.

Under the FTC's Rules of Practice for Adjudicative Proceedings, Judge Chappell's decision is automatically reviewed by the full Commission and, notably for purposes of this motion, the provisions of Judge Chappell's order do not take effect unless and until the order becomes final and effective, which occurs if the full Commission issues its final decision upholding the finding of liability and divestiture. *See* 16 C.F.R. §§ 3.51(a), 3.52(a). Under the applicable timing for appeals under 16 C.F.R. § 3.52(a), the Commission's final decision is expected by March 19, 2012.

Two courts have now found in Plaintiff's favor, and it is now more likely than ever that ProMedica will have to divest St. Luke's in the near future. Because this material change in circumstances immediately and significantly affects ProMedica's economic and strategic incentives with respect to its operation and maintenance of St. Luke's Hospital, Plaintiff respectfully requests that this Court appoint a Hold-Separate Monitor during the period from now until the Commission's final decision, in order to verify, monitor, and ensure ProMedica's full compliance with the HSA.

## LEGAL AUTHORITY TO MODIFY PRELIMINARY INJUNCTION

This Court has continuing jurisdiction and inherent authority over the preliminary

3

injunction it ordered in this case.  "There is no doubt that the district court has continuing

jurisdiction over a preliminary injunction."  *Canal Auth. of the State of Fla. v. Fullerton*, 489

F.2d 567, 578 (5th Cir. 1974) (citing *Central Hanover Bank & Trust Co. v. Callaway*, 135 F.2d

592 (5th Cir. 1943)).  Specifically, this Court has "inherent power to modify its own

injunctions."  *Toledo Area AFL-CIO Counsel v. Pizza*, 907 F. Supp. 263, 265 & n.1 (N.D. Ohio

1995) (Katz, J.) ("A preliminary injunction is modified or dissolved under the Court's inherent

powers."); *see also Sys. Fed'n No. 91, Ry. Employees' Dep't, AFL-CIO v. Wright*, 364 U.S. 642,

647 (1961) ("The source of the power to modify [an injunction] is of course the fact that an

injunction often requires continuing supervision by the issuing court and always a continuing

willingness to apply its powers and processes on behalf of the party who obtained that equitable

relief."); *A&M Records, Inc. v. Napster, Inc*., 284 F.3d 1091, 1098 (9th Cir. 2002) ("A district

court has inherent authority to modify a preliminary injunction in consideration of new facts").


## ARGUMENT

Developments following the issuance of a preliminary injunction, or any other good

cause, provide the basis for this Court to modify its preliminary injunction order in any equitable

manner it determines.  *Sys. Fed'n No. 91, Ry. Employees' Dep't, AFL-CIO*, 364 U.S. at 647 ("A

continuing decree of injunction directed to events to come is subject always to adaptation as

events may shape the need. . . . There is also no dispute but that a sound judicial discretion may

call for the modification of the terms of an injunction decree if the circumstances, whether of law

or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.")

(internal citation omitted); *Movie Sys., Inc. v. MAD Minneapolis Audio Distrib*., 717 F.2d 427,

430 (8th Cir. 1983) ("In modifying a preliminary injunction, a district court is not bound by a

4

strict standard of changed circumstances but is authorized to make *any changes* in the injunction that are equitable in light of subsequent changes in the facts or the law, *or for any other good reason*.") (emphasis added) (citations omitted); *Canal Auth. of the State of Fla.*, 489 F.2d at 578 (same) (citing 7 MOORE'S FEDERAL PRACTICE ¶ 65.07 (2d ed. 1982)).  An injunction can be modified, not only to relieve a party from the operation of the injunction, but to strengthen the injunction.  *See Omaha Indem. Co. v. Wining*, 949 F.2d 235, 239 (8th Cir. 1991); *Movie Sys.*, 717 F.2d at 431.

The change in circumstances resulting from Judge Chappell's decision, finding that the Acquisition violates Section 7 of the Clayton Act and ordering ProMedica to divest St. Luke's, affects ProMedica's incentives under the HSA and warrants a minor, but important, modification to this Court's March 29, 2011 order.  This Court found, under § 13(b) of the FTC Act, that Plaintiffs had established a likelihood of success on the merits and that the equities favored entry of an injunction – a decision that had the effect of maintaining the *status quo* under the HSA, pending resolution of the Commission's administrative process, albeit without any monitoring of ProMedica's compliance with the Order or HSA.  Even after the preliminary injunction, however, ProMedica had reason to believe – and, having pursued the case through a full administrative trial, apparently did believe – that it could prevail on the merits and thereby ultimately retain ownership of St. Luke's.  As such, ProMedica had continuing incentive to maintain the viability, marketability, and competitiveness of St. Luke's.

That is likely no longer the case.  Having lost a full trial on the merits and now facing an order to divest St. Luke's that will become effective if and when the Commission affirms Judge Chappell's findings and conclusions, ProMedica's chances of retaining ownership of St. Luke's have diminished.  With the strong prospect that St. Luke's soon will be restored as an

independent, vigorous competitor to ProMedica, ProMedica has a greatly diminished incentive to maintain the viability, marketability, and competitiveness of St. Luke's.  A significant change, such as this, in ProMedica's incentive to comply with the terms of the HSA, through sufficient investment and access to capital, provides a valid basis for an order modification.

Undoubtedly, Defendant will argue that the Initial Decision does not change ProMedica's incentives or obligation to comply with the HSA, but that is directly contrary to what it previously argued before this Court.  During the TRO and preliminary injunction proceedings before this Court, Defendant repeatedly warned that, if the Court entered an injunction and hold-separate order in favor of Plaintiffs, its incentives to invest in St. Luke's would greatly diminish:

- [I]f the Court enters the injunction Plaintiffs seek, PHS's incentive to make those [$30 million capital-project] investments will be *severely reduced*. . . . Besides preventing common sense consolidation, a hold separate order will also dampen PHS's incentive to invest in St. Luke's, leaving it less able to serve the needs of the community.  *Def's Opp'n to Pls.' Mot. for TRO or, In the Alternative, Mot. for Expedited Hr'g on Pls.' Mot. for a Prelim. Inj.* 4-5, 15 (filed Jan. 10, 2011) (emphasis added).

- Barring PHS from integrating St. Luke's into its operations and reviewing any non-public documents would create a *strong disincentive* for PHS to make the $30 million capital infusion that the Joinder Agreement requires over the next three years.  *Def.'s Post-Trial Br. in Opp'n to Pls.' Mot. for Prelim. Inj.* 19 (filed Feb. 22, 2011) (emphasis added).

If ProMedica believed that the prospects of a preliminary injunction and hold-separate order would severely reduce its incentive to invest and maintain St. Luke's, then a divestiture order from the ALJ surely does so.

Of course, ProMedica is still bound by this Court's March 29 order, but the foregoing statements from Defendant indicate that Defendant believed that its obligations under the Joinder Agreement – and potentially the Hold-Separate Agreement  that this Court implemented as a preliminary injunction order – were less than ironclad.  Moreover, there currently is no

mechanism in place to verify that ProMedica is fully complying with the terms of the HSA. Indeed, at no time since the execution of the HSA, or even the Court's preliminary injunction order, through today – i.e., for more than one year – has FTC staff, this Court, or an independent third party had an ability to monitor or assess ProMedica's compliance with the HSA.[2]  And even after the administrative trial on the merits and a divestiture order there, it will still be approximately three more months before any such monitoring would possibly begin under Judge Chappell's order, unless this Court provides such necessary relief now.  In light of the serious and potentially irreversible harm that could result during such time period if SLH is not adequately funded and maintained, the limited relief sought here is appropriate.

In order to ensure the effectiveness of the Commission's divestiture should Judge Chappell's Initial Decision be affirmed, it is critical that ProMedica comply with all the provisions of the HSA, including:  preservation of St. Luke's existing service lines; the employment of staff sufficient to maintain St. Luke's viability and competitiveness; maintenance of privileges for physicians to practice at St. Luke's; contracting and pricing relationships with health plans; and provision of sufficient working capital to St. Luke's.  There continues to be a need to ensure that there is no interim harm to St. Luke's, its viability as an independent competitor to ProMedica in the future, and to Toledo employers and employees.

As is evident from ProMedica's own trial briefs, ProMedica already has contracted with health plans on behalf of St. Luke's and secured higher rates.  Undoubtedly, ProMedica has undertaken numerous other changes at its legacy hospitals and St. Luke's.  This Court and FTC staff have a clear interest in ensuring that health-plan contracting and ProMedica's other

---

[2] As yet, Plaintiff has no evidence that ProMedica has violated the HSA, although FTC staff recently received a voicemail message from a Toledo-area physician who is concerned about the changes ProMedica is making at St. Luke's.  Thus far, FTC staff has not been able to verify the basis or accuracy of such claim or whether the claim, if true, would constitute a violation of the HSA.

activities on behalf of and at St. Luke's are wholly consistent with the Court's order and HSA. The temporary appointment of a Hold-Separate Monitor until the Commission issues its final decision will give the Court, FTC staff, and ultimately the local community, assurance that ProMedica has been complying – and will continue to comply – with this Court's order even as divestiture looms.

## SUMMARY OF PROPOSED ORDER

The proposed order modification that accompanies Plaintiff's motion and memorandum is a simple amendment to this Court's March 29, 2011 order that provides for the appointment of a Hold-Separate Monitor and describes the nature and extent of the Hold-Separate Monitor's duties.  The proposed order modification also provides for periodic reporting regarding ProMedica's compliance with the Order and Hold-Separate Agreement and identifies ProMedica's limited obligations with respect to the Hold-Separate Monitor.

Plaintiff's proposed order is crafted to minimize the compliance burdens on ProMedica and any potential burden on this Court.  Specifically, the proposed order is even more narrowly tailored than the order originally proposed by Plaintiffs in this case and the monitoring provisions in Judge Chappell's order.  Moreover, the proposed appointment of a Hold-Separate Monitor is consistent with the relief ordered by Judge Chappell.  Therefore, if Judge Chappell's Initial Decision and order is upheld by the Commission, this Court's preliminary injunction order as hereby amended can end while the Monitor easily transitions to its comparable duties, if any, under the operative Commission order.  On the other hand, if the Commission reverses Judge Chappell's decision, such monitoring can cease entirely.

Therefore, Plaintiff respectfully submits that the entry of an order providing for the temporary appointment of a Hold-Separate Monitor is reasonable and necessary to protect the Commission's ability to order adequate relief, if warranted, following its review of Judge Chappell's Initial Decision.  The proposed order modification serves an important purpose, while imposing only short-term, temporary relief that will result in minimal burden on ProMedica. Finally, the proposed order modification is equitable to all parties, given the current state of the litigation between the FTC and ProMedica.

Dated:  December 19, 2011   Respectfully submitted,

           /s/ Matthew J. Reilly     

          MATTHEW J. REILLY
          JEFFREY H. PERRY
          SARA Y. RAZI
          ALEXIS J. GILMAN
          Attorneys
          Federal Trade Commission
          Bureau of Competition
          600 Pennsylvania Ave., N.W.
          Washington D.C. 20580
          Telephone: (202) 326-2350
          Facsimile: (202) 326-2286
          Email: mreilly@ftc.gov

          RICHARD A. FEINSTEIN
          Director
          NORMAN A. ARMSTRONG, JR.
          Deputy Director
          Federal Trade Commission
          Bureau of Competition

          WILLARD K. TOM
          General Counsel
          Federal Trade Commission

          *Attorneys for Plaintiff Federal Trade Commission*

**APPENDIX A**

**[HOLD SEPARATE AGREEMENT]**



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Bureau of Competition
Mergers IV Division

August 10, 2010

## VIA ELECTRONIC MAIL

David Marx, Jr., Esq.
McDermott Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096
Counsel for ProMedica Health System, Inc.

### RE: ProMedica Health System, Inc.'s Proposed Acquisition of St. Luke's Hospital

Dear David:

Further to our telephone conversation this morning, we request that ProMedica Health System, Inc. ("ProMedica") agree to certain limited constraints on its operations of St. Luke's Hospital ("St. Luke's") for a period of 60 days following consummation of the above-referenced acquisition ("Acquisition"). Staff of the Federal Trade Commission ("Staff") proposes the following agreement ("Agreement"):

1.  ProMedica shall maintain the viability, competitiveness, and marketability of St. Luke's; not sell or transfer any assets of St. Luke's other than in the ordinary course of business; and not cause or permit the destruction, removal, wasting, or deterioration, or otherwise impair the viability, competitiveness or marketability of St. Luke's.

2.  ProMedica shall not eliminate, transfer, or consolidate any clinical service that is offered at St. Luke's on the day before the Acquisition is consummated.

3.  ProMedica shall keep St. Luke's staffed with sufficient employees to maintain the hospital's viability and competitiveness. ProMedica shall maintain the employment of all St. Luke's employees, except for employees terminated for cause consistent with the procedures in place at St. Luke's on the day before the Acquisition.

4.  ProMedica shall not modify, change, or cancel any physician privileges at St. Luke's, such that all physicians with privileges at St. Luke's on the day before the Acquisition shall retain their privileges; *provided however,* that ProMedica may revoke the privileges of any individual physician consistent with the practices and procedures in place at St. Luke's on the day before the Acquisition.

5.  During the pendency of this Agreement, ProMedica shall not terminate, or cause or allow termination of any contract between any health insurance carrier ("Health Plan") and St. Luke's. For any contract between a Health Plan and St. Luke's that expires during the term of this Agreement, ProMedica shall offer to continue to accept the same terms of the contract for the remaining term of this Agreement.

David Marx, Jr., Esq.
August 10, 2010
Page 2

6.     To the extent St. Luke's is unable to do so with its own working capital, ProMedica shall
       provide sufficient working capital to operate St. Luke's at its current rate of operation.

7.     Nothing in this Agreement shall be construed to limit the type or scope of relief the
       Federal Trade Commission ("Commission") may seek to enjoin ProMedica from
       exercising direction or control over St. Luke's during the pendency of any challenge to
       the Acquisition brought by the Commission. Nothing in this Agreement shall be
       construed as a waiver by ProMedica of any defense or challenge to any action by the
       Commission to enjoin ProMedica from exercising direction or control over St. Luke's
       during the pendency of any challenge to the Acquisition brought by the Commission. In
       addition, before seeking any enforcement action in federal court or in an administrative
       proceeding, Staff agrees to provide sufficient notice to ProMedica to allow for meetings
       with the Bureau Director and the individual Commissioners.

8.     Unless jointly modified by Staff and ProMedica in writing, this Agreement shall
       terminate sixty (60) days following consummation of the Acquisition.

       Please call me at your earliest opportunity to discuss this proposal. If you agree with the
above terms, please sign and return this letter.

                                                       Sincerely,

                                                       Matthew J. Reilly
                                                       Assistant Director
                                                       Mergers IV
                                                       Bureau of Competition
                                                       Federal Trade Commission

Agreed to:

David Marx, Jr., Esq.
McDermott Will & Emery
227 West Monroe Street
Chicago, IL 60606-5096
Counsel for ProMedica Health System, Inc.

2

## APPENDIX B

**[*In re ProMedica Health Sys., Inc.*, Dkt. No. 9346
(Initial Decision issued Dec. 5, 2011 (public version issued Dec. 12, 2011)) (Chappell, J.)]**

**PUBLIC**

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

---

DOCKET NO. 9346

---

In the Matter of

PROMEDICA HEALTH SYSTEM, INC.

Respondent.

---

INITIAL DECISION

---

D. Michael Chappell
Chief Administrative Law Judge

Date: December 12, 2011

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

I.  **INTRODUCTION** ....................................................................................................... 1
   A. Overview ................................................................................................................ 1
   B. Summary of the Complaint and Answer ................................................................ 1
   C. Procedural History ................................................................................................. 3
   D. Evidence ................................................................................................................. 4
   E. Summary of Initial Decision .................................................................................. 6

II.  **FINDINGS OF FACT** ................................................................................................ 7
   A.   The Parties ........................................................................................................... 7
      1.   ProMedica Health Systems, Inc. ............................................................... 7
      2.   St. Luke's Hospital .................................................................................... 8
   B.   The Joinder Agreement ........................................................................................ 8
   C.   The Voluntary Hold Separate Agreement ........................................................... 8
   D.   Federal District Court Proceedings ..................................................................... 9
   E.   Hospital Services ................................................................................................. 9
      1.   Inpatient hospital services ......................................................................... 9
         a.   Primary, secondary, tertiary, and quaternary services .................. 10
         b.   Inpatient obstetrical services .......................................................... 10
      2.   Outpatient services .................................................................................. 11
   F.   Reimbursement/payment for hospital services.................................................. 11
      1.   Government insurance .............................................................................. 12
      2.   Commercial health insurance ................................................................... 12
      3.   Self-pay/indigent ..................................................................................... 13
   G.   The Hospitals ..................................................................................................... 13
      1.   ProMedica Hospitals ............................................................................... 13
         a.   The Toledo Hospital ....................................................................... 13
         b.   Flower Hospital .............................................................................. 14
         c.   Bay Park ......................................................................................... 14
      2.   St. Luke's Hospital .................................................................................. 15
      3.   Mercy Health Partners ............................................................................. 15
         a.   St. Vincent ...................................................................................... 16
         b.   St. Anne .......................................................................................... 16
         c.   St. Charles ...................................................................................... 17
      4.   UTMC ...................................................................................................... 17
   H.   Managed Care Organizations ............................................................................. 18
      1.   MCO terminology ................................................................................... 18
      2.   Medical Mutual of Ohio .......................................................................... 19
      3.   Anthem Blue Cross Blue Shield............................................................... 20
      4.   Paramount Healthcare............................................................................... 22
      5.   FrontPath Health Coalition ...................................................................... 24

|  | 6. | United Healthcare | 25 |
|  | 7. | Aetna, Inc. | 26 |
|  | 8. | Humana, Inc. | 27 |
| I. | | Competitive Dynamics in MCO Contracting | 28 |
|  | 1. | Generally | 28 |
|  | 2. | Employers and employees | 29 |
|  | 3. | Managed care organizations | 31 |
|  | 4. | Hospitals | 34 |
| J. | | The Relevant Market | 35 |
|  | 1. | Relevant product market | 35 |
|  |  | a. General acute-care inpatient hospital services | 35 |
|  |  | b. Inpatient obstetrical hospital services | 36 |
|  | 2. | Relevant geographic market | 37 |
|  |  | a. Lucas County, Ohio | 37 |
|  |  | b. Non-Lucas County hospitals | 38 |
| K. | | Market Shares and Concentration | 40 |
|  | 1. | Framework for evaluating market shares | 40 |
|  |  | a. Markets used for generating statistics | 40 |
|  |  | b. Methodology | 40 |
|  |  | c. HHI calculations | 41 |
|  | 2. | Calculation of market shares | 41 |
|  |  | a. Beds | 41 |
|  |  | b. Billed charges | 41 |
|  |  | c. Discharges | 42 |
|  |  | d. Patient days | 43 |
|  | 3. | Conclusion | 43 |
| L. | | Background Facts Regarding St. Luke's Joinder with ProMedica | 43 |
| M. | | Competitive Effects | 52 |
|  | 1. | Competitive significance of St. Luke's | 52 |
|  |  | a. Hospitals' views on competitive significance of St. Luke's | 52 |
|  |  | b. MCOs' views of competitive significance of St. Luke's | 52 |
|  |  | c. Patients' views, as reflected in consumer preference surveys | 53 |
|  |  | d. Diversion analysis substitutes | 54 |
|  |  | e. Other indicators of competitive significance of St. Luke's | 55 |
|  |  | f. Competitive significance of location in southwest Lucas County | 56 |
|  |  | (i) Demographics of southwest Lucas County | 56 |
|  |  | (ii) MCOs' views | 56 |
|  |  | (iii) Perspective from Mercy | 57 |
|  |  | (iv) Drive-time | 58 |
|  |  | (v) Patient origin | 58 |
|  | 2. | Pre-Joinder pricing | 59 |
|  |  | a. Background | 59 |
|  |  | (i) Terminology | 59 |

|  |  | (ii) | Rate negotiations | 60 |
|  | b. | ProMedica pricing |  | 62 |
|  | c. | St. Luke's pricing |  | 62 |
|  |  | (i) | MMO | 64 |
|  |  | (ii) | Anthem | 64 |
|  |  | (iii) | FrontPath | 65 |
| 3. | Post-Joinder bargaining leverage |  |  | 65 |
|  | a. | General terms relating to bargaining leverage |  | 65 |
|  | b. | MCOs believe that the Joinder increases ProMedica's bargaining leverage |  | 66 |
|  | c. | Walk-away networks |  | 68 |
| 4. | Likelihood of post-Joinder price increases |  |  | 69 |
|  | a. | MCOs believe that the Joinder will likely lead to higher rates |  | 69 |
|  | b. | St. Luke's anticipated its rates to increase to ProMedica's rates |  | 71 |
|  | c. | Correlation between market power and pricing |  | 72 |
|  | d. | Professor Town's econometric model |  | 73 |
| 5. | ProMedica's aim of increasing rates |  |  | 76 |
|  | a. | ProMedica's reimbursement rates |  | 76 |
|  | b. | Post-Joinder pricing |  | 77 |
| 6. | Costs to employers and employees |  |  | 78 |
|  | a. | Self-insured employers |  | 79 |
|  | b. | Fully-insured employers |  | 79 |
|  | c. | Employees |  | 80 |
| 7. | Constraints on price increases |  |  | 80 |
|  | a. | Excess hospital bed capacity |  | 80 |
|  | b. | Steering |  | 82 |
|  |  | i. | Physicians' referrals | 82 |
|  |  | ii. | MCO steering | 83 |
|  |  | iii. | Other steering | 85 |
|  |  | (a) | Hospital employers | 85 |
|  |  | (b) | Lucas County government | 86 |
|  | c. | Demographic and economic conditions |  | 87 |
|  | d. | Mercy's {█████████████} |  | 88 |
| 8. | Quality effects |  |  | 89 |
| N. | St. Luke's Financial Condition |  |  | 91 |
| 1. | Operating margins |  |  | 92 |
| 2. | EBITDA |  |  | 93 |
| 3. | Operating cash flow less capital expenditures |  |  | 93 |
| 4. | Personnel restrictions |  |  | 94 |
| 5. | Capital investment needs |  |  | 94 |
|  | a. | Deferred projects |  | 94 |
|  | b. | Age of plant |  | 95 |
|  | c. | Space conversion/private rooms |  | 95 |

|   |   | d. | Electronic medical records | 96 |
|   | 6. | Pension funding obligations | | 98 |
|   | 7. | Cash reserves | | 100 |
|   | 8. | Moody's downgrade | | 101 |
|   | 9. | Bond covenant non-compliance | | 104 |
|   | 10. | Three-Year Plan and improvements pre-Joinder | | 107 |
|   |   | a. | Strategic Plan | 107 |
|   |   | b. | Cost coverage ratios | 109 |
|   |   | c. | Other financial metrics | 110 |
|   | 11. | St. Luke's future viability | | 111 |
|   |   | a. | Complaint Counsel's expert | 111 |
|   |   | b. | Respondent's expert | 113 |
| O. | | Pro-Competitive Benefits and Efficiencies | | 114 |
|   | 1. | The Joinder provides St. Luke's with capital | | 114 |
|   | 2. | St. Luke's became part of ProMedica's Obligated Group | | 116 |
|   | 3. | Funding for St. Luke's pension plan | | 117 |
|   | 4. | Reduction of some of St. Luke's costs | | 117 |
|   | 5. | Revenues from Paramount members | | 117 |
|   | 6. | Navigant Consulting's clinical service line consolidation recommendations | | 118 |
|   |   | a. | General recommendations | 119 |
|   |   | b. | Recommendations by service line | 119 |
|   |   |   | (i)   Cancer | 120 |
|   |   |   | (ii)  Cardiovascular | 120 |
|   |   |   | (iii) Neurosciences | 121 |
|   |   |   | (iv)  Orthopedics | 121 |
|   |   |   | (v)   OB services | 121 |
|   |   |   | (vi)  Inpatient rehabilitation | 122 |
|   |   |   | (vii) Inpatient psychiatry | 123 |
|   |   | c. | Navigant's recommendations specific to St. Luke's | 123 |
|   |   | d. | Asserted cost savings from clinical integration | 123 |
|   | 7. | Quality programs and systems | | 124 |
|   | 8. | Efficiencies identified by Compass Lexecon | | 126 |
|   |   | a. | Construction of a hospital at Arrowhead | 128 |
|   |   | b. | Construction of a bed tower at Flower Hospital | 129 |
|   | 9. | Other asserted benefits | | 130 |
|   | 10. | Expert testimony on efficiencies | | 131 |
| **III.** | **ANALYSIS** | | | 131 |
| A. | | Jurisdiction | | 131 |
| B. | | Burden of Proof and Statutory Framework | | 133 |
| C. | | The Relevant Market | | 137 |
|   | 1. | Product market | | 137 |
|   |   | a. | Generally applicable standards | 137 |
|   |   | b. | Hospital context | 139 |

|  |  | c. | Product market in this case | 139 |
|  |  |  | (i) Complex tertiary services that St. Luke's does not provide | 140 |
|  |  |  | (ii) Inpatient OB services | 143 |
|  | 2. | Geographic market | | 145 |
| D. | Likelihood of Anticompetitive Effects | | | 146 |
|  | 1. | Market shares and concentration | | 147 |
|  | 2. | Elimination of competition between ProMedica and St. Luke's | | 152 |
|  |  | a. | Two remaining competitors | 153 |
|  |  | b. | Premerger competition between St. Luke's and ProMedica | 154 |
|  |  | c. | Elimination of a close substitute | 155 |
|  |  | d. | Significance of St. Luke's in southwest Lucas County | 160 |
|  | 3. | The Joinder gives ProMedica greater bargaining leverage | | 162 |
|  | 4. | The Joinder gives ProMedica the ability to raise prices | | 166 |
|  |  | a. | Market power | 167 |
|  |  | b. | Likely increase of St. Luke's rates to ProMedica's rates | 168 |
|  |  | c. | Significant price increases predicted throughout the ProMedica system | 170 |
|  |  | d. | Post-Joinder pricing | 171 |
|  |  | e. | Effect in the relevant GAC inpatient hospital services market | 172 |
|  | 5. | Higher prices impact consumers | | 174 |
|  | 6. | Quality of care | | 174 |
|  | 7. | Asserted constraints upon ProMedica's exercise of market power | | 176 |
|  |  | a. | Excess capacity and repositioning | 177 |
|  |  | b. | Steering | 179 |
|  |  |  | i. Physician referrals | 179 |
|  |  |  | ii. Employer programs | 179 |
|  |  |  | iii. MCO steering | 180 |
| E. | Weakened Competitor Justification | | | 181 |
|  | 1. | Overview of applicable law | | 182 |
|  | 2. | Summary of evidence and expert opinion | | 183 |
|  | 3. | Analysis | | 189 |
|  | 4. | Conclusion | | 190 |
| F. | Asserted Procompetitive Benefits and Efficiencies | | | 191 |
|  | 1. | Benefits to St. Luke's | | 193 |
|  |  | a. | Capital contribution to St. Luke's | 193 |
|  |  | b. | Access to Paramount | 194 |
|  |  | c. | Access to ProMedica's Obligated Group | 195 |
|  |  | d. | Responsibility for underfunded defined benefit pension plan | 195 |
|  |  | e. | Lowering of expenses | 195 |
|  | 2. | Costs and quality | | 196 |
|  |  | a. | Consolidation of clinical services | 196 |
|  |  |  | (i) Shift of inpatient rehabilitation services | 197 |
|  |  |  | (ii) Clinical integration of {█████████████} | 198 |

(iii)  Expansion and improvement of {█████} at St.Luke's ................................................................... 199

(iv)  Potential to reconfigure services at ProMedica ......................... 199

(v)  Access for St. Luke's to ProMedica's quality program ................................................................. 199

(vi)  Access for St. Luke's to ProMedica's quality-related technologies ....................................................... 200

b.  Additional claimed efficiencies ....................................... 201

c.  Other benefits ................................................................. 203

3.  Summary ..................................................................................... 203

G.  Remedy ..................................................................................................... 204

1.  Introduction ............................................................................... 204

2.  Applicable legal principles ....................................................... 205

3.  Analysis ..................................................................................... 207

a.  Alternative remedy to divesture .................................... 207

b.  Divestiture order ............................................................ 209

c.  Other provisions ............................................................ 210

4.  Conclusion ................................................................................ 212

IV.  SUMMARY OF CONCLUSIONS OF LAW ................................................ 213

ORDER ................................................................................................................ 217

# I.      INTRODUCTION

## A.      Overview

This is the Initial Decision on an administrative complaint, discussed in further detail below, charging that a hospital joinder (the "Joinder") between ProMedica Health System, Inc. ("Respondent" or "ProMedica") and St. Luke's Hospital ("St. Luke's"), pursuant to which St. Luke's, a previously independent hospital, became part of ProMedica, may substantially lessen competition, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

As explained herein, the preponderance of the evidence presented demonstrates a reasonable probability that the Joinder of St. Luke's with ProMedica is likely to substantially lessen competition in the market for the sale of general acute-care inpatient hospital services to commercial health plans in Lucas County, Ohio.  Having determined that the Joinder violates Section 7 of the Clayton Act, an Order will issue herewith requiring, *inter alia*, that ProMedica divest itself of St. Luke's.

## B.      Summary of the Complaint and Answer

The Commission issued an administrative complaint against Respondent ProMedica on January 6, 2011 ("Complaint").  The Complaint alleges that ProMedica effectively acquired and took control of its nearby competitor, St. Luke's, upon consummation of a Joinder Agreement on August 31, 2010, and that ProMedica's acquisition of St. Luke's threatens to substantially lessen competition for health-care services in Lucas County, Ohio.  Complaint ¶¶ 1, 2.  The relevant service markets alleged in the Complaint are: (1) general acute-care ("GAC") inpatient hospital services sold to commercial health plans; and (2) inpatient obstetrical ("OB") services; and the alleged relevant geographic market is Lucas County, Ohio. Complaint ¶¶ 12-19.

According to the Complaint, the Joinder is presumptively unlawful because it reduces the number of competitors from four to three in the GAC inpatient services market and from three to two in the OB services market, and results in high post-acquisition market shares and concentration.  Complaint ¶¶ 20-22.

The Complaint also charges that having St. Luke's as part of the ProMedica system "vests ProMedica with an increased ability and incentive to demand supracompetitive reimbursement rates from commercial health plans and their membership." Complaint ¶ 23. The Complaint alleges that, with St. Luke's as part of its system, ProMedica becomes a "must have" system for commercial health plan networks in Lucas County, thereby providing ProMedica with significantly greater negotiating "clout" in its negotiations with commercial health plans. Complaint ¶¶ 25-27. The Complaint also alleges that increased reimbursement rates obtained by ProMedica from commercial health plans will be passed on to the plans' employer and employee customers. Complaint ¶¶ 29-30. Further, the Complaint alleges that the Joinder will reduce both the quality and the breadth of available services in Lucas County. Complaint ¶ 31.

Next, the Complaint alleges that neither hospital entry nor expansion by the remaining hospitals in Lucas County will deter or counteract the alleged likely harm to competition and that no merger-specific efficiencies justify the Joinder. Complaint ¶¶ 34-38.

Based on the foregoing, the Complaint charges one violation: the Acquisition may substantially lessen competition in the relevant markets in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. Complaint ¶ 40.

Respondent filed its Answer to the Complaint on January 25, 2011. The Answer admits that GAC inpatient hospital services sold to commercial health plans constitutes a valid service market, but denies that inpatient OB services is an appropriate relevant market. The Answer also admits that Lucas County, Ohio is the relevant geographic market in which to analyze the effects of the Joinder. Answer ¶¶ 12-19. Respondent further denies all other material allegations of the Complaint, including that the Joinder is presumptively unlawful; will enable, or result in, ProMedica's charging supracompetitive reimbursement rates; or reduce the quality and breadth of services available in Lucas County, Ohio. Answer ¶¶ 20-33. Respondent further denies that neither entry nor expansion will deter or counteract the Joinder's alleged likely harm to competition, and that no merger-specific efficiencies justify the Joinder. Answer ¶¶ 34-38.

2

## C.    Procedural History

In July 2010, the Federal Trade Commission ("FTC") and the state of Ohio Attorney General's staff began an investigation into the potential anticompetitive effects of ProMedica's acquisition of St. Luke's. On August 18, 2010, before the Joinder was consummated, the FTC and ProMedica entered into a limited, 60-day Hold Separate Agreement. Among other things, the Hold Separate Agreement prevented: (1) ProMedica's termination of St. Luke's health-plan contracts (while allowing health plans the option to extend their contracts with St. Luke's past the termination date, if a new agreement was not reached); (2) the elimination, transfer, or consolidation of any clinical service at St. Luke's; and (3) the termination of employees at St. Luke's without cause. (PX00069 at ¶¶ 1-5).

On January 7, 2011, the FTC and state of Ohio brought suit in the Northern District of Ohio, seeking a temporary restraining order and preliminary injunction. *FTC and State of Ohio v. ProMedica Health Sys.*, No.3:11-cv-00047-DAK (N.D. Ohio filed January 7, 2011). After hearing summaries of testimony and detailed briefing, on March 29, 2011, Judge Katz of the Northern District of Ohio entered a preliminary injunction holding the parties to the terms of their August 18, 2010 Hold Separate Agreement, pending the outcome of the present administrative proceedings. *FTC v. ProMedica Health Sys., Inc.*, 2011 U.S. Dist. LEXIS 33434 (N.D. Ohio March 29, 2011). The decision reached by the district court on the preliminary injunction hearing does not have preclusive effect on these proceedings. *In re R.R. Donnelley & Sons Co.*, No. 9243, 1995 FTC LEXIS 215, at *25 (July 21, 1995).

The administrative hearing in the instant case began on May 31, 2011 and concluded on August 18, 2011. By Order dated August 23, 2011, the hearing record was closed. Over 2,600 exhibits were admitted, 34 witnesses testified, either live or by deposition, and there are 7,955 pages of trial transcript. The parties' proposed findings of fact, replies to proposed findings of fact, post-trial briefs, and reply briefs total 2,350 pages.

Rule 3.51(a) of the Commission's Rules of Practice states that "[t]he Administrative Law Judge shall file an initial decision within 70 days after the filing of the last filed initial or reply proposed findings of fact, conclusions of law and order . . ." 16 C.F.R. § 3.51(a). The parties filed concurrent post-trial briefs and proposed findings of fact on September 13, 2011.

The parties filed replies to the other's proposed findings and briefs on September 23, 2011. Pursuant to Commission Rule 3.41(b)(6), closing arguments were held on September 29, 2011. This Initial Decision is filed in compliance with Commission Rule 3.51(a).

### D. Evidence

This Initial Decision is based on a consideration of the whole record relevant to the issues, including the exhibits properly admitted into evidence, deposition transcripts, and the transcripts of testimony at trial, and addresses the material issues of fact and law. The briefs and proposed findings of fact and conclusions of law, and the replies thereto, submitted by the parties were thoroughly reviewed. Proposed findings of fact submitted by the parties, but not included in this Initial Decision were rejected, either because they were not supported by the evidence or because they were not dispositive or material to the determination of the allegations of the Complaint or the defenses thereto. The Commission has held that Administrative Law Judges are not required to discuss the testimony of each witness or all exhibits that are presented during the administrative adjudication. *In re Amrep Corp.*, No. 9018, 102 F.T.C. 1362, 1670, 1983 FTC LEXIS 17, *566-67 (Nov. 2, 1983). Further, administrative adjudicators are "not required to make subordinate findings on every collateral contention advanced, but only upon those issues of fact, law, or discretion which are 'material.'" *Minneapolis & St. Louis Ry. Co. v. United States*, 361 U.S. 173, 193-94 (1959). *Accord Stauffer Labs., Inc. v. FTC*, 343 F.2d 75, 89 (9th Cir. 1965). *See also Borek Motor Sales, Inc. v. National Labor Relations Bd.*, 425 F.2d 677, 681 (7th Cir. 1970) (holding that it is adequate for the Board to indicate that it had considered each of the company's exceptions, even if only some of the exceptions were discussed, and stating that "[m]ore than that is not demanded by the [Administrative Procedure Act] and would place a severe burden upon the agency").

Under Commission Rule 3.51(c)(1), "[a]n initial decision shall be based on a consideration of the whole record relevant to the issues decided, and shall be supported by reliable and probative evidence." 16 C.F.R. § 3.51(c)(1); *see In re Chicago Bridge & Iron Co.*, No. 9300, 138 F.T.C. 1024, 1027 n.4, 2005 FTC LEXIS 215, at *3 n.4 (Jan. 6, 2005). Under the Administrative Procedure Act ("APA"), an Administrative Law Judge may not issue an order "except on consideration of the whole record or those parts thereof cited by a party and

4

supported by and in accordance with the reliable, probative, and substantial evidence."
5 U.S.C. § 556(d).  All findings of fact in this Initial Decision are supported by reliable,
probative, and substantial evidence.  Citations to specific numbered findings of fact in this
Initial Decision are designated by "F."[1]

Pursuant to Commission Rule 3.45(b), several orders were issued in this case granting
*in camera* treatment to material, after finding, in accordance with the Rule, that its public
disclosure would likely result in a clearly defined, serious injury to the entity requesting *in
camera* treatment.  16 C.F.R. § 3.45(b).  In addition, when the parties sought to elicit testimony
at trial that revealed information that had been granted *in camera* treatment, the hearing went
into an *in camera* session.

Commission Rule 3.45(a) allows the Administrative Law Judge "to grant *in camera*
treatment for information at the time it is offered into evidence subject to a later determination
by the [administrative] law judge or the Commission that public disclosure is required in the
interests of facilitating public understanding of their subsequent decisions."  *In re Bristol-
Myers Co.*, Nos. 8917-19, 90 F.T.C. 455, 457, 1977 FTC LEXIS 25, at *6 (Nov. 11, 1977).  As
the Commission later reaffirmed in another leading case on *in camera* treatment, since "in
some instances the ALJ or Commission cannot know that a certain piece of information may be
critical to the public understanding of agency action until the Initial Decision or the Opinion of
the Commission is issued, the Commission and the ALJs retain the power to reassess prior *in
camera* rulings at the time of publication of decisions."  *In re General Foods Corp.*, No. 9085,

---

[1] References to the record are abbreviated as follows:
CX – Complaint Counsel's Exhibit
RX – Respondent's Exhibit
JX – Joint Exhibit
Tr. – Transcript of testimony before the Administrative Law Judge
Dep. – Transcript of Deposition
IHT – Investigational Hearing Transcript
CCB – Complaint Counsel's Post-Trial Brief
CCRB – Complaint Counsel's Post-Trial Reply Brief
CCFF – Complaint Counsel's Proposed Findings of Fact
CCRRFF – Complaint Counsel's Reply to Respondent's Proposed Findings of Fact
RB – Respondent's Post-Trial Brief
RRB – Respondent's Reply Brief
RFF – Respondent's Proposed Findings of Fact
RRCCFF – Respondent's Reply to Complaint Counsel's Proposed Findings of Fact

95 F.T.C. 352, 356 n.7; 1980 FTC LEXIS 99, at *12 n.7 (March 10, 1980). Thus, in instances where a document or trial testimony had been given *in camera* treatment, but the portion of the material cited to in this Initial Decision does not in fact require *in camera* treatment, such material is disclosed in the public version of this Initial Decision, pursuant to Commission Rule 3.45(a) (the ALJ "may disclose such *in camera* material to the extent necessary for the proper disposition of the proceeding"). Where *in camera* information is used in this Initial Decision, it is indicated in bold font and braces ("{ }") in the *in camera* version and is redacted from the public version of the Initial Decision, in accordance with Commission Rule 3.45(e).

### E.    Summary of Initial Decision

The preponderance of the evidence in the record, viewed as a whole, demonstrates a reasonable probability that the Joinder of St. Luke's and ProMedica will substantially lessen competition in the relevant market for the sale of general acute-care ("GAC") inpatient hospital services to commercial health plans, referred to herein as managed care organizations ("MCOs"), in Lucas County, Ohio. Complaint Counsel failed to prove a separate relevant product market for the sale of inpatient OB services to MCOs.

The statistical evidence presented demonstrates that the Joinder will significantly increase ProMedica's market share and market concentration in the already highly-concentrated GAC inpatient hospital services market, reducing the number of competing hospital providers with which MCOs can contract from four to three. The preponderance of the evidence also demonstrates that, by eliminating MCOs' option of contracting with St. Luke's alone, the Joinder will significantly increase Respondent's bargaining leverage in negotiations with MCOs and provide Respondent with sufficient market power to enable it to increase the reimbursement rates it charges MCOs for GAC inpatient hospital services. The evidence further shows that increased reimbursement rates charged to MCOs for the provision of GAC inpatient hospital services would likely be passed on to MCOs' customers, including employers and employees, to the detriment of consumers. Thus, there is a reasonable probability that the Joinder is likely to result in anticompetitive effects in the relevant market.

Respondent's claims, that competitor repositioning and/or steering methodologies are likely to constrain Respondent from imposing supracompetitive prices, are not sufficiently

6

supported by the evidence, and are, therefore, rejected.  The procompetitive benefits and efficiencies that Respondent asserts will result from the Joinder, while having some support in the record, are insufficient to outweigh the likely anticompetitive effects of the Joinder.  Thus, Respondent's defenses based upon procompetitive benefits and efficiencies are rejected.  In addition, while the evidence is clear that St. Luke's was in a considerably weakened financial condition in the years prior to the Joinder, applicable case law does not support allowing the Joinder with Respondent on this basis.

Accordingly, Complaint Counsel has met its burden of demonstrating a reasonable probability that the Joinder is likely to substantially lessen competition in the market for the sale of GAC inpatient hospital services to MCOs in Lucas County, Ohio, in violation of Section 7 of the Clayton Act.  Section 11 of the Clayton Act directs the FTC to issue orders requiring a violator of Section 7 to divest itself of the acquired assets.  Divestiture is the usual and proper remedy where a violation of Section 7 has been found.  Respondent has failed to demonstrate that this case presents unusual circumstances sufficient to override the presumption that total divestiture is the appropriate method to restore competition.  Therefore, the Order entered in this case requires total divesture, as well as necessary ancillary relief.

## II.    FINDINGS OF FACT

### A.    The Parties

#### 1.    ProMedica Health Systems, Inc.

1.    ProMedica Health System, Inc. ("ProMedica") is a nonprofit health-care system incorporated in the state of Ohio and headquartered at 1801 Richard Road, Toledo, Ohio, 43607.  ProMedica's health-care system serves northwestern and west-central Ohio and southeastern Michigan.  (Complaint ¶ 7; Answer ¶ 7).

2.    ProMedica is an integrated health-care delivery system that includes a physician component, a hospital component, and Paramount Healthcare, an insurance company.  (Oostra, Tr. 5772, 5784; *see* Section II.H.4, *infra*).

3.    ProMedica has a total of eleven hospitals in Ohio and Michigan.  (Oostra, Tr. 5772-5773).

4.   ProMedica's Michigan hospitals are Bixby Hospital in Adrian, Michigan; Herrick Hospital in Tecumseh, Michigan; and Hillsdale Hospital, a ProMedica affiliate, located in Hillsdale, Michigan.  (Oostra, Tr. 5773).

5.   ProMedica's Ohio hospitals outside of the Lucas County, Ohio area are Defiance Regional Medical Center in Defiance, Ohio; Fostoria Community Hospital in Fostoria, Ohio; and a joint operating company hospital in Lima, Ohio.  (Oostra, Tr. 5773).

## 2.   St. Luke's Hospital

6.   St. Luke's Hospital ("St. Luke's"), located at 5901 Monclova Road, Maumee, Ohio, 43537, is a formerly independent, nonprofit general acute-care community hospital. (Complaint ¶ 9; Answer ¶ 9).

7.   St. Luke's has ownership interests in two medical office buildings in Perrysburg, Wood County, Ohio.  It also operates three outpatient radiology imaging centers: one is located in Sylvania, Ohio; one in Toledo, and one in Oregon, Ohio.  (Wakeman, Tr. 2752-2753).

8.   St. Luke's also has a 50 percent ownership in SurgiCare, an outpatient center located on St. Luke's campus.  (Wakeman, Tr. 2873).

## B.   The Joinder Agreement

9.   On May 25, 2010, the parties entered into a Joinder Agreement ("Joinder Agreement"), to which OhioCare Health System, Inc. ("OhioCare") and the St. Luke's Foundation were also parties.  (PX00058 at 001; Hanley, Tr. 4627-4628, *in camera*).

10.  Prior to the Joinder Agreement, St. Luke's was a wholly owned subsidiary of OhioCare, along with several other subsidiaries including St. Luke's Hospital Foundation; Care Enterprises, Inc.; Physician Advantage MSO; and OhioCare Physicians, LLC ("WellCare").  (Wakeman, Tr. 2733; RX1139 at 000008, 000032-000033; PX00058 at 001).

11.  Pursuant to the Joinder Agreement, effective September 1, 2010, ProMedica became the sole corporate member or shareholder of St. Luke's and other affiliated entities. (Complaint ¶ 2, Answer ¶¶ 2, 11; PX00058 at 009-012 (Joinder Agreement § 3.1)).

## C.   The Voluntary Hold Separate Agreement

12.  On August 18, 2010, the FTC and ProMedica entered into a limited, 60-day Hold Separate Agreement, to allow the FTC investigation to continue.  (PX00069 (Hold Separate Agreement); FTC Petition, Petition Ex. 1 at ¶ 15 (Liu, Decl.), *ProMedica Health Sys., Inc.*, No. 3:10-cv-02340-DAK).

13.   The Hold Separate Agreement includes several key provisions designed to temporarily preserve St. Luke's viability, competitiveness, and marketability. The Hold Separate Agreement prevents, among other things: (1) ProMedica's termination of St. Luke's health-plan contracts (while allowing health plans the option to extend their contracts with St. Luke's past the termination date, if a new agreement is not reached); (2) the elimination, transfer, or consolidation of any clinical service at St. Luke's; and (3) the termination of employees at St. Luke's without cause. (PX00069 at 001 (¶¶ 1-5)).

## D.   Federal District Court Proceedings

14.   On January 6, 2011, the Commission authorized FTC staff to seek preliminary relief in federal district court that would require ProMedica to preserve St. Luke's as a viable, independent competitor during the FTC's administrative proceeding and any subsequent appeals. (Complaint ¶ 18, *ProMedica Health Sys., Inc.*, No. 3:10-cv-02340-DAK).

15.   On January 7, 2011, the FTC and the State of Ohio filed an action for a temporary restraining order ("TRO") and preliminary injunction ("PI"), under Sections 13(b) and 16 of the FTC Act, 15 U.S.C. §§ 53(b), 26. (Complaint, *ProMedica Health Sys., Inc.*, No. 3:10-cv-02340-DAK). Plaintiffs sought temporary and preliminary injunctive relief from the court to prevent further integration of St. Luke's until the conclusion of the full administrative proceeding on the merits. (Complaint ¶ 7, *ProMedica Health Sys., Inc.*, No. 3:10-cv-02340-DAK).

16.   On January 10, 2011, ProMedica answered the complaint and filed a response in opposition to Plaintiffs' motion for a TRO. (Answer, *ProMedica Health Sys., Inc.*, No. 3:10-cv-02340-DAK; Def.'s Resp. in Opp. to Pltfs.' Motion for TRO, *ProMedica Health Sys., Inc.*, No. 3:10-cv-02340-DAK).

17.   On February 10 and 11, 2011, the District Court held a one and a half day hearing regarding the motion for a preliminary injunction. (*FTC v. ProMedica Health Sys.*, No. 3:11 CV 47, 2011 U.S. Dist. LEXIS 33434 at *2-3, *5 (N.D. Ohio March 29, 2011)).

18.   On March 29, 2011, U.S. District Court Judge David A. Katz, issued his decision. (*ProMedica*, 2011 U.S. Dist. LEXIS 33434). Judge Katz ordered that the Hold Separate Agreement was to continue until either the completion of all legal proceedings by the Commission, including all appeals, or further order of the District Court, with an update on November 30, 2011, if the FTC had not completed actions by that date. (*FTC v. ProMedica*, 2011 U.S. Dist. LEXIS 33434 at *164).

## E.   Hospital Services

### 1.   Inpatient hospital services

19.   Inpatient services are those services that require admission to the hospital for a period of 24 hours or more, while outpatient services either do not require admission to the

9

hospital or require patients to stay in a hospital less than a day. (Korducki, Tr. 483-484; Radzialowski, Tr. 638).

### a. Primary, secondary, tertiary, and quaternary services

20. There is a continuum of different levels of intensity of inpatient hospital services. This continuum is typically described with reference to various levels or types of services. (Radzialowski, Tr. 637).

21. Primary services are those that occur regularly in the community and are of mild to moderate severity, including routine procedures such as hernias, gallbladders, and inpatient pediatrics. (Gold, Tr. 195, Korducki, Tr. 481-482; Radzialowski, Tr. 637).

22. Secondary services are more complex than primary services and require some specialization and greater resources, including, for example, complex orthopedic surgery and bariatric services. (Korducki, Tr. 482, 485; Radzialowski, Tr. 637).

23. Tertiary services are more complex and specialized than primary and secondary services, and are often more invasive and require different technology and resources. (Korducki, Tr. 482; Radzialowski, Tr. 637; Shook, Tr. 893). Tertiary services include complex electrophysiology, burn units, or neurological intensive care. (Gold, Tr. 194-195; Shook, Tr. 893).

24. Hospitals that provide tertiary services typically also provide less complex primary and secondary services. (Radzialowski, Tr. 737).

25. Quaternary services are the most complex and include procedures such as transplants and tend to require very specific technologies. (Shook, Tr. 921; Radzialowski, Tr. 637; Guerin-Calvert, Tr. 7185).

26. The dividing line between the various levels of service is not precisely defined and may even differ from patient to patient, depending on the patient's health and medical history. What is a primary or secondary level procedure for one person may be a tertiary level procedure for another patient. (Shook, Tr. 892-894; Korducki, 483; PX01917 at 003-004 (Radzialowski Dep. at 9-10, *in camera*)).

### b. Inpatient obstetrical services

27. Some obstetrical ("OB") services (F. 312) are offered as inpatient services and others are offered as outpatient services. (Marlowe, Tr. 2432).

28. Childbirth, recovery and some postpartum services are provided on an inpatient basis at a hospital. (Marlowe, Tr. 2431-2433; Read, Tr. 5275).

29. LDRP stands for "labor, delivery, recovery, and postpartum." The term refers to a patient room that accommodates a woman from her admission to the hospital when she

10

is in labor through delivery and recovery until she leaves the hospital.  (Marlowe, Tr. 2407-2408).

30.    In an LDR room, patients labor, deliver and recover in one room before being transferred to a postpartum room.  (Marlowe, Tr. 2409; Read, Tr. 5280).

31.    OB services other than actual childbirth, recovery, and immediate postpartum services are generally delivered on an outpatient basis.  These services may include office visits and ultrasound or lab tests.  (Marlowe, Tr. 2431-2433; Read, Tr. 5276).

### 2.    Outpatient services

32.    Outpatient services are those services that do not require an overnight stay in the hospital.  (JX00002A ¶ 2).

33.    Outpatient services include therapeutic services, such as physical therapy or respiratory therapy, and diagnostic services, such as lab, radiology, EKG, MRI and CT scanning. (Shook, Tr. 984-985; Beck, Tr. 429-430).

34.    Outpatient services also include general medical-surgical procedures that do not require a 24-hour admission.  (Shook, Tr. 892-893).  Specialized services such as oncology care, wound care, and sleep studies also constitute outpatient services.  (Beck, Tr. 429-430; Korducki, Tr. 516).

35.    Gynecological care is an outpatient service.  (Gold, Tr. 203).

36.    Most hospitals treat more patients on an outpatient basis than on an inpatient basis. (Radzialowski, Tr. 738).

37.    Hospitals in Toledo have seen a shift in services from the inpatient setting to the outpatient setting and recognize that an increasing percentage of services are being sought, and rendered, on an outpatient basis.  (Shook, Tr. 878-879, 1022; Beck, Tr. 409; RX270 at 000004, *in camera*).

### F.    Reimbursement/payment for hospital services

38.    Hospitals receive reimbursement for their services from various sources.  Most patients treated by hospitals fall into one of three broad payment categories: Medicare/Medicaid, self-pay/indigent, or private commercial insurance.  (Oostra, Tr. 5783; Town, Tr. 3608).

39.    In Lucas County, Ohio, roughly 65 percent of patients receiving inpatient care are covered by Medicare or Medicaid, roughly 29 percent are privately insured, and roughly 6 percent are self-pay.  (PX02148 at 010 (¶ 14) (Town Expert Report), *in camera*).

### 1.  Government insurance

40.  Medicare is a health insurance program administered by the federal government, and Medicaid is a health insurance program administered by state governments. (Wachsman, Tr. 4847-4848).

41.  To be eligible for Medicare, generally, patients must be age 65 or older.  (Pugliese, Tr. 1435).

42.  Hospitals are obligated to accept Medicaid admissions.  (Guerin-Calvert, Tr. 7296).

43.  Providers cannot negotiate Medicare and Medicaid reimbursement rates, which are established by the Centers for Medicare and Medicaid Services ("CMS").  (Wachsman, Tr. 4847-4848; McGinty, Tr. 1169).

### 2.  Commercial health insurance

44.  Privately-insured patients obtain health insurance coverage primarily through commercial health plans.  (PX02148 at 010 (¶ 15) (Town Expert Report), *in camera*). These health plans typically use a variety of methods to manage the cost of the medical care provided to their members.  (Town, Tr. 3616; PX02148 at 010 (¶ 15) (Town Expert Report), *in camera*).

45.  Managed Care Organizations ("MCOs") include companies that negotiate provider networks with hospitals and offer health insurance products to employers.  (Rupley, Tr. 1968; Radzialowski, Tr. 731-733; Pirc, Tr. 2175-2176, 2274-2275).

46.  The health insurance products that health plans offer to employers fall into two broad categories: self-insured and fully-insured.  (Town, Tr. 3612; PX02148 at 011-012 (¶ 18) (Town Expert Report), *in camera*; Pugliese, Tr. 1430-1432; Pirc, Tr. 2175; Radzialowski, Tr. 624-625; McGinty, Tr. 1226-1227; Sheridan, Tr. 6701, *in camera*; Sandusky, Tr. 1293).

47.  For the typical "fully-insured" health insurance product, health plans charge a fixed premium for a set period of time, and the risk that expenses for health-care may exceed the premiums collected is typically borne by the health insurer and not the employer. (Radzialowski, Tr. 624; Sandusky, Tr. 1390; Pugliese, Tr. 1430-1431; Pirc, Tr. 2175-2176; Randolph, Tr. 6916-6917, 6920).

48.  An MCO may also act as a third party administrator ("TPA"), providing claims-handling services as part of an "administrative services only" ("ASO") contract with self-insured employers.  (Neal, Tr. 2096-2097; Radzialowski, Tr. 731-733; Pirc, Tr. 2175-2176, 2273-2275).

49.  For self-insured products, the employer typically funds an account that the insurer draws upon to pay health-care expenses.  (Pugliese, Tr. 1431).

12

50. Under a self-insured plan, or ASO, plan, the employer collects premiums from its employees and bears the risk that health-care expenses paid out may exceed the premiums collected by the employer. (Radzialowski, Tr. 624-625; McGinty Tr. 1155; Sandusky, Tr. 1293-1296, 1390; Pugliese, Tr. 1430-1431; Pirc, Tr. 2175-2176; Randolph, Tr. 6917-6919).

51. Under a self-insured plan, the employer pays the MCO a fee in exchange for access to the health plan's provider network at the rates negotiated by the health plan and, typically, for administration of its employees' claims. (Pirc, Tr. 2175-2176; Pugliese, Tr. 1431-1432; Radzialowski, Tr.621-622, 629-630).

### 3. Self-pay/indigent

52. In Lucas County, if a self-pay patient cannot afford his or her charges, hospitals provide indigent and charity care at their own expense. (Town, Tr. 3608-3609;Wachsman, Tr. 4848-4849; Gold, Tr. 268-269; PX01923 at 025-026 (Town, Dep. at 99-101)).

### G. The Hospitals

### 1. ProMedica Hospitals

53. Not including St. Luke's, ProMedica's hospitals in Lucas County are The Toledo Hospital ("TTH"), Toledo Children's Hospital, Flower Hospital ("Flower") and Bay Park Community Hospital ("Bay Park"). (Complaint ¶ 8; Answer ¶ 8; McGinty, Tr. 1186; Oostra, Tr. 5773).

### a. The Toledo Hospital

54. The Toledo Hospital ("TTH") was the first hospital to become part of what was to become ProMedica Health System. (Oostra, Tr. 5776).

55. TTH is licensed for between 700 and 800 beds (not including the Toledo Children's Hospital on its campus) of which approximately 550 are staffed beds. (Oostra, Tr. 5773; PX01904 at 017 (Steele, IHT at 58-59)).[2]

56. TTH offers all basic general acute-care ("GAC") services, as well as more specialized, higher-acuity tertiary services. (McGinty, Tr. 1186-1187; Pirc, Tr. 2188; Oostra, Tr. 5773-5774).

57. In addition to primary services, ranging from general medical-surgical to orthopedic care and obstetrics, TTH also houses a Level I trauma center. (Oostra, Tr. 5774).

---

[2] The term "staffed beds" refers to beds that are actually set up and available for use by patients and which have nursing staff, physicians, pharmacists, and other support staff to attend to them. The term "registered beds" describes a hospital's maximum beds allowable by state statute. (Gold, Tr. 201-202; Guerin-Calvert, Tr. 7278).

58.     TTH is one of only two Lucas County hospitals that offer Level III inpatient OB services.  (Shook, Tr. 1045; Marlowe, Tr. 2436).

59.     TTH draws its patients primarily from the Toledo area.  (Oostra, Tr. 5776-5777).

**b.      Flower Hospital**

60.     Flower is a full-service community hospital.  (McGinty, Tr. 1186; Pirc, Tr. 2188; Oostra, Tr. 5777).  Flower became part of ProMedica around 1995.  (Oostra, Tr. 5778).

61.     Flower is licensed for approximately 300 beds and has approximately 250 staffed beds.  (Oostra, Tr. 5777; PX02389 at 015, *in camera*).

62.     Flower offers services including GAC, general medical-surgical, obstetrics, outpatient radiation and chemotherapy, and post-acute services, such as a rehab center and an Alzheimer's center.  (Oostra, Tr. 5777).

63.     As a community-style hospital, Flower does not provide tertiary care.  (PX01902 at 008 (Sheridan, IHT at 23-24), *in camera*).

64.     Flower offers Level I inpatient OB services.  (Marlowe, Tr. 2435; Read, Tr. 5276).  Flower offers inpatient OB services in an LDRP setting.  (Marlowe, Tr. 2409, 2435; Read, Tr. 5276, 5281).

65.     Flower is located in Sylvania, Ohio, and draws its patients primarily from Southeast Michigan and the Sylvania area.  Flower draws patients from Michigan because it is located very close to the Michigan border.  (Oostra, Tr. 5778).

**c.      Bay Park**

66.     Bay Park is a full-service community hospital, offering all GAC services, including emergency, OB services, and general medical-surgical services, among other general services.  (Oostra, Tr. 5778; McGinty, Tr. 1186; Pirc, Tr. 2188).

67.     Bay Park opened around the year 2000.  (Oostra, Tr. 5779).

68.     As a community-style hospital, Bay Park does not provide tertiary care.  (PX01902 at 008 (Sheridan, IHT at 23-24), *in camera*).

69.     Bay Park offers Level I inpatient OB services in an LDRP setting.  (Marlowe, Tr. 2435; Read, Tr. 5276, 5281).

70.     Bay Park has approximately 86 staffed and registered beds.  (Oostra, Tr. 5778).

71.     Bay Park is located in Oregon, Ohio, approximately 40 minutes from Flower and 20 minutes from TTH.  (Oostra, Tr.5778-5779).

14

### 2.    St. Luke's Hospital

72.    St. Luke's is located in a suburban area southwest of the city of Toledo, in southwest Lucas County. (Wakeman, Tr. 2477). St. Luke's offers GAC inpatient services. (Joint Stipulations of Law and Fact, JX00002A ¶ 5).

73.    St. Luke's is a full-service community hospital with a range of outpatient and inpatient services, including: emergency services, medical-surgical services, OB services, intensive care services, imaging services, and limited oncology, neurosurgery, and pediatric services. (Wakeman, Tr. 2753-2755).

74.    Other than some tertiary cardiac services through its heart center, such as angioplasty and open heart surgery, St. Luke's performs few if any tertiary services and no quaternary services. (PX01909 at 029 (Dewey, IHT at 109); JX00002A ¶ 6).

75.    St. Luke's offers Level I inpatient OB services. (Shook, Tr. 1045; Marlowe, Tr. 2435; Read, Tr. 5276; Wakeman, Tr. 2755). St. Luke's does not offer more complex OB services. (Wakeman, Tr. 2755-2756). St. Luke's offers its inpatient OB services in an LDRP setting. (Marlowe, Tr. 2408-2409; Read, Tr. 5281).

76.    St. Luke's has delivered approximately 600 babies a year over the past ten years. (Marlowe, Tr. 2443).

77.    St. Luke's has 178 staffed beds. (Wakeman, Tr. 2638, *in camera* (about 175-185 staffed beds); PX01322, *in camera*).

78.    St. Luke's draws most of its patients from the zip codes closest to the hospital, including what St. Luke's refers to as its "primary service area" comprising about 14 surrounding zip codes, and what St. Luke's refers to as its "core service area" comprising 7 or 8 zip codes in southwest Lucas County and north Wood County. (Wakeman, Tr. 2756-2757; PX01016 at 003, *in camera*).

### 3.    Mercy Health Partners

79.    Mercy Health Partners ("Mercy") is a not-for-profit hospital system in northwestern Ohio that is part of Catholic Health Partners ("CHP"). Mercy operates six hospitals in CHP's northern region, three of which are located in Lucas County and near Toledo. (Shook, Tr. 887, 889-890).

80.    Mercy offers GAC inpatient services. (Joint Stipulations of Law and Fact, JX00002A ¶ 7).

81.    Mercy's three general population hospitals in Lucas County are St. Vincent, Mercy St. Anne Hospital ("St. Anne"), and Mercy St. Charles Hospital ("St. Charles"). (Shook, Tr. 892).

### a.    St. Vincent

82.    St. Vincent is a large, tertiary teaching facility with eight intensive care units, a Level I trauma center, a Level III OB unit, and a large cardiology service known as the Regional Heart and Vascular Center.  (Shook, Tr. 887-888, 895-896, 1045).

83.    St. Vincent has 568 registered beds and 445 staffed beds.  (Guerin-Calvert, Tr. 7176-7177).

84.    St. Vincent is the only other Lucas County hospital besides TTH that offers Level III inpatient OB services.  (Shook, Tr. 1045; Marlowe, Tr. 2436).  St. Vincent offers its inpatient OB services in an LDR setting. (Read, Tr. 5281).

85.    St. Vincent also has the only burn unit in Northwest Ohio.  (Shook, Tr. 1029; Wakeman, Tr. 2759).

86.    St. Vincent delivered 1180 babies in 2010.  (Marlowe, Tr. 2444).

87.    St. Vincent is located in downtown Toledo and is the largest provider to Medicaid patients in the state of Ohio.  (Shook, Tr. 887-889).

88.    A disproportionate share payment is a payment that a hospital receives from the state of Ohio when it treats a certain number of Medicaid patients.  (Shook, Tr. 1101, *in camera*).

89.    St. Vincent qualifies for disproportionate share payments due to the high level of Medicaid patients it treats.  (Shook, Tr. 1101-1102, *in camera*).

90.    Mercy is making extensive renovations at St. Vincent to add more private beds. (Shook, Tr. 903-904).

91.    The hospital located closest to St. Vincent is ProMedica's TTH.  (Shook, Tr. 899).

### b.    St. Anne

92.    St. Anne, which opened in 2002 and is located in west Toledo, is a general medical-surgical hospital with operating rooms and performs both inpatient and outpatient surgeries.  St. Anne does not offer tertiary services, obstetrics, psychiatric services, or serious emergency services.  (Shook, Tr. 899-900, 903).

93.    St. Anne has 128 registered beds and 96 staffed beds.  (Guerin-Calvert, Tr. 7178).

94.    St. Anne offered inpatient OB services when it opened, but Mercy discontinued those services at St. Anne in early 2008, because St. Anne experienced a significant decrease

16

in deliveries and no longer performed enough deliveries to maintain quality standards or break even financially. (Shook, Tr. 901, 958, 1047).

95.  Prior to the decision to no longer offer OB services, St. Anne delivered about 400 babies a year. Mercy estimated that a hospital needed to deliver 800 or 900 babies a year in order to break even financially. (Shook, Tr. 1047).

96.  It is highly unlikely that St. Anne's will reinstitute OB services. (Shook, Tr. 958-959).

97.  St. Anne is the closest hospital to ProMedica's Flower Hospital. (Shook, Tr. 917; Oostra, Tr. 5802-5803).

### c.  St. Charles

98.  St. Charles is located in Oregon, Ohio, on the east-side of the Maumee River from downtown Toledo. (Shook, Tr. 902).

99.  St. Charles is a general medical-surgical hospital that also offers Level II OB services. (Shook, Tr. 902). St. Charles is the only Lucas County, Ohio hospital that offers Level II inpatient OB services. (Shook, Tr. 1045). St. Charles offers its inpatient OB services in an LDRP setting. (Read, Tr. 5281).

100.  St. Charles does not offer tertiary services. (Shook, Tr. 903).

101.  St. Charles has approximately 350 registered beds and fewer than 150 staffed beds. (Shook, Tr. 903).

102.  St. Charles is located less than one mile away from ProMedica's Bay Park hospital. (Shook, Tr. 917, 1035-1036).

### 4.  UTMC

103.  University of Toledo Medical Center ("UTMC") is part of the University of Toledo and is an instrumentality of the State of Ohio. (Gold, Tr. 295).

104.  UTMC was formed when the University of Toledo and the Medical College of Ohio merged in 2006. (Gold, Tr. 186).

105.  UTMC is considered a research and teaching hospital. (Radzialowski, Tr. 737; McGinty, Tr. 1188).

106.  UTMC's mission is to support the academic needs of the University of Toledo, to deliver high-quality health-care, and to serve the tertiary and quaternary needs of the community. (Gold, Tr. 192-193, 252-253; Radzialowski, Tr. 743).

17

107. UTMC provides GAC inpatient hospital services. (Joint Stipulations of Law and Fact, JX00002A ¶ 7).

108. UTMC is the only hospital in Lucas County that offers quaternary services. (Radzialowski, Tr. 743)

109. UTMC focuses on providing tertiary and quaternary hospital services, as a way to fulfill its mission of educating medical students. (Gold, Tr. 192-194; Shook, Tr. 920-921).

110. UTMC does not offer inpatient OB services. (Answer ¶¶ 4, 15, 20; Oostra, Tr. 5972; Gold, Tr. 203, 220). UTMC does not plan to offer inpatient OB services in the future. (Gold, Tr. 220).

111. UTMC has more than 300 registered beds of which approximately 225 are staffed. (Gold, Tr. 199-201).

112. In 2008, UTMC treated 3,114 commercially insured patients. (PX02136 at 035, *in camera*).

113. UTMC's service area overlaps substantially with St. Luke's, with a high proportion of St. Luke's GAC discharges drawing from zip codes in which UTMC also draws a significant number of GAC discharges. (PX02136 at 010, *in camera*).

## H.    Managed Care Organizations

114. MCOs operating in Lucas County, Ohio include Medical Mutual of Ohio, Anthem Blue Cross Blue Shield, Paramount Healthcare, FrontPath Health Coalition, United Healthcare, Aetna, Inc., Humana, Inc., and some smaller companies. (Pugliese, Tr. 1574; Pirc, Tr. 2178).

### 1.    MCO terminology

115. "MCO" refers to managed care organization. MCOs may be variously referred to as "payors," "health insurance plans," or "health insurance companies." The terms are used interchangeably. (Pirc, Tr. 2175; Town, Tr. 3610-3612).

116. "Member" or "insured" is the term used to refer to the person who is covered by a particular payor's insurance plan. (Radzialowski, Tr. 616-617).

117. "HMO" stands for Health Maintenance Organization. (Radzialowski, Tr. 609).

118. An HMO is a collaborative product where a member is supposed to work through a primary care physician ("PCP"), who is the gatekeeper for his or her care and ensures coordination among all health-care providers. (Radzialowski, Tr. 609; Randolph, Tr. 6895).

18

119. HMOs traditionally required members to obtain referrals from their PCPs, before they could obtain care from specialists. (Radzialowski, Tr. 610).

120. HMOs have evolved over the years and some HMOs today have fewer restrictions than the traditional HMOs did. (Radzialowski, Tr. 610).

121. In a pure HMO product, if a member goes to a non-preferred provider, they receive no benefits or reimbursement for services. (Radzialowski, Tr. 614).

122. "PPO" stands for Preferred Provider Organization. (Radzialowski, Tr. 612).

123. In a PPO plan, members receive a list of preferred or "in-network" providers. If they obtain care from one of the listed providers, their out-of-pocket costs are lower than if they see a provider that is not on the list (e.g., an "out-of-network" provider). (Radzialowski, Tr. 612).

124. MCOs also offer point-of-service ("POS") plans. These plans vary from MCO to MCO, but are generally less restrictive than an HMO and more restrictive than a PPO. (Radzialowski, Tr. 613).

125. In a POS plan, some out-of-network providers are available to the member, at a higher coinsurance level. (Randolph, Tr. 6895).

126. In a POS plan, a member is encouraged to have a PCP as a gatekeeper, but this is not a requirement. (Radzialowski, Tr. 614).

127. In a traditional indemnity plan, there are no restrictions on the medical care that is received. The MCO will pay whatever amount the hospital bills. (Radzialowski, Tr. 615-616).

### 2. Medical Mutual of Ohio

128. Medical Mutual of Ohio ("MMO") is an MCO that operates statewide networks in Ohio, Indiana, Georgia, and South Carolina and operates in 17 counties of Kentucky. (Pirc, Tr. 2174).

129. MMO offers health insurance plans, dental plans, and term life insurance. (Pirc, Tr. 2273).

130. The commercial health insurance products offered by MMO include PPO, HMO, and POS plans. (Pirc, Tr. 2174-2175). MMO exited the market for Medicare Advantage, a health insurance plan for Medicare recipients, beginning January 1, 2011. (Pirc, Tr. 2273).

131. MMO also provides third party administration services to employers who self-insure their employees' health insurance. (Pirc, Tr. 2273-2274; Neal, Tr. 2096).

132. MMO provides health insurance to approximately 1.4 million individuals ("covered lives") in Ohio, and is the largest MCO in Lucas County, with approximately 100,000 covered lives in Lucas County. (Pirc, Tr. 2177-2178, 2273).

133. MMO has a market share of approximately 25 percent in Lucas County. (Pirc, Tr. 2178).

134. Approximately 60 percent of MMO's commercial health insurance business in Lucas County comes from administrative services it provides to self-insured employers; the remaining 40 percent is for fully-insured products. (Pirc, Tr. 2274).

135. MMO currently has all of the Lucas County hospitals in all of its networks. (Pirc, Tr. 2203).

136. ProMedica's hospitals have participated in the MMO network since January 1, 2008. (Pirc, Tr. 2204; 2275).

137. Mercy has participated in the MMO network for more than 10 years. (Pirc, Tr. 2275).

138. UTMC has participated in MMO's network for more than 10 years. (Pirc, Tr. 2275).

139. St. Luke's has participated in MMO's network for more than 10 years. (Pirc, Tr. 2275).

### 3. Anthem Blue Cross Blue Shield

140. Anthem Blue Cross Blue Shield ("Anthem") is an MCO that offers health, dental, vision, behavioral health, life and disability insurance plans. (Pugliese, Tr. 1534-1535).

141. Anthem's parent company is WellPoint. WellPoint is a publicly traded, for-profit national health insurer, offering health insurance products in Ohio and many other states. WellPoint has over 33.3 million insured members in its MCO and is the largest health benefits company in the United States in terms of medical membership. (Pugliese, Tr. 1427, 1528-1530).

142. WellPoint is an independent licensee of the Blue Cross and Blue Shield Association and markets its health insurance products under the Blue Cross Blue Shield brand. (Pugliese, Tr. 1528)

143. Blue Cross Blue Shield is the most recognized brand in the health-care industry. (Pugliese, Tr. 1528).

144. Anthem's position as the exclusive licensee of Blue Cross Blue Shield in Ohio gives it national name recognition that other health insurance providers do not have. (Pugliese, Tr. 1531).

20

145. Anthem affirmatively markets this national name recognition to health-care providers when trying to contract with them to become part of the Anthem provider network. (Pugliese, Tr. 1531).

146. Anthem also affirmatively markets its national name recognition to employers and members. (Pugliese, Tr. 1531).

147. Anthem, with approximately 30,000 commercially insured members in Lucas County, is one of the top two or three MCOs in Lucas County. (Pugliese, Tr. 1436; RX204 at 000003 (Pugliese, Dep. at 9)).

148. Anthem offers a broad spectrum of managed care plans in Ohio, including PPO plans, HMO plans, POS plans and traditional indemnity plans. (Pugliese, Tr. 1531-1532).

149. In Lucas County, Anthem markets a broad access PPO network, which includes the vast majority of available providers, to commercial customers. (Pugliese, Tr. 1434-1435).[3]

150. Anthem also markets a Medicare Advantage HMO plan with a narrower network, mostly to individual Medicare enrollees. (Pugliese, Tr. 1434-1436).

151. Anthem primarily markets its commercial health insurance products to employers. (Pugliese, Tr. 1429-1430).

152. Anthem serves a wide variety of employers, ranging from large employers with more than 1,000 employees to small companies with less than 50 employees. (Pugliese, Tr. 1429-1430).

153. For its commercial health insurance plans, Anthem offers a fully-insured product and a self-insured product, its administrative services only product. (Pugliese, Tr. 1430).

154. Anthem's self-insured product comprises approximately 55 percent of its commercial business in Lucas County. (Pugliese, Tr. 1432).

155. Anthem's self-insured employers pay an administrative fee to Anthem for managing the benefit design and handling claim administration. To pay for health-care expenses, Anthem draws against an employer-funded account. (Pugliese, Tr. 1431).

156. Anthem currently has all Lucas County hospitals in its commercial PPO network. (Pugliese, Tr. 1450).

157. ProMedica has participated in Anthem's network for at least 20 years. (Pugliese, Tr. 1538).

---

[3] With respect to provider networks, the terms "broad access" and "open provider network" are synonymous. (Pirc, Tr. 2203).

158. Mercy began participating in Anthem's commercial PPO network as of January 1, 2008. (Pugliese, Tr. 1539).

159. UTMC has participated in Anthem's network since 2003 or 2004.  (Pugliese, Tr. 1476, *in camera*; Pugliese, Tr. 1538).

160. St. Luke's participated in Anthem's network prior to 2005.  (Pugliese, Tr. 1538-1539).

161. Anthem terminated St. Luke's PPO contract effective January 31, 2005.  (Pugliese, Tr. 1539; RX1026 at 000001).

162. St. Luke's began participating in Anthem's network again in July 2009.  (Pugliese, Tr. 1477, *in camera*; Wakeman, Tr. 2530-2531).

### 4.  Paramount Healthcare

163. Paramount Healthcare ("Paramount") is a wholly owned subsidiary of ProMedica. Paramount is one of the largest commercial MCOs in Lucas County.  (Complaint ¶ 8; Answer ¶ 8; Wachsman, Tr. 4855-4856; Hanley, Tr. 4784-4785, *in camera*; PX00270 at 024 (S&P Credit Presentation)).

164. Paramount is licensed for its Medicare, Medicaid, and commercial insurance products in Ohio, and is licensed for its commercial and Medicare products in Michigan. (Randolph, Tr. 6905).

165. Paramount's health insurance products are marketed in Lucas County, Ohio, as well as in certain counties in the southeastern part of Michigan and northwest Ohio. (Randolph, Tr. 6895-6896).

166. Paramount's HMO product is its largest product, and is offered as either a fully-insured or self-insured product.  (Randolph, Tr. 6907-6908).

167. Paramount Healthcare is the trade name for Paramount's commercial HMO product. (Randolph, Tr. 6907).

168. There are approximately 85,000 to 90,000 covered lives in Paramount's commercially insured products.  (Randolph, Tr. 6906).

169. Approximately 50 percent of Paramount's commercially insured membership is fully-insured, and approximately 50 percent is self-insured.  (Randolph, Tr. 6929).

170. Paramount's provider network is low cost, meaning Paramount's aggregate premium cost is low compared to its competitors in northwest Ohio.  (Randolph, Tr. 6940).

171. Paramount focuses its marketing efforts to employers and providers by noting its low cost and local service.  (Randolph, Tr. 6915-6916, 6942).

172.  Paramount has an arrangement with ProMedica hospitals, resulting in a closed or limited network of hospitals.  The Mercy hospitals do not participate in Paramount's network.  (Radzialowski, Tr. 627; Pugliese Tr. 1574-1575).

173.  Paramount's hospital provider network in Lucas County includes the ProMedica Hospitals (Flower, TTH, Toledo Children's Hospital, Bay Park, and, pursuant to the Joinder Agreement, St. Luke's) and UTMC.  (Randolph, Tr. 6936; PX00058 at 022-023).

174.  Paramount's low premium costs are attributable in part to Paramount's ability, as a part of the ProMedica Health System, to obtain favorable pricing from ProMedica hospitals. Paramount gets the best pricing from ProMedica compared to any other MCO. (Randolph, Tr. 7070-7071).

175.  Paramount's low premium costs are attributable in part to Paramount's offering a narrow network, and providers' resulting expectation that the narrow network will result in increased patient volume.  (Randolph, Tr. 6966).

176.  Paramount maintains a closed or limited provider network because ProMedica believes that it can keep costs lower by keeping the provider panel limited.  (Oostra, Tr. 5788-5789).

177.  St. Luke's had been included in the Paramount network prior to January 1, 2001, when the contract ended and the parties did not successfully negotiate a new contract. (PX01022 at 002; Rupley, Tr. 1938-1940; Randolph, Tr. 6997-6999).

178.  St. Luke's was not an in-network provider with Paramount between 2001 and August 31, 2010.  (Joint Stipulations of Law and Fact, JX00002A ¶ 46).

179.  St. Luke's rejoined Paramount's hospital provider network as part of the Joinder Agreement with ProMedica in September 2010.  (PX00058 at 021-022; Randolph, Tr. 7004).

180.  Paramount's hospital provider network is the smallest in Lucas County compared to its competitors.  (Randolph, Tr. 6934).

181.  For physician providers, Paramount's network is comparable to the networks of its competitors in Lucas County.  (Randolph, Tr. 6934).

182.  Approximately 80 percent of the physician providers in Paramount's network are independent of a hospital or health system, including physicians employed by Mercy and St. Luke's when St. Luke's was not in Paramount's provider network.  (Randolph, Tr. 6933, 6938-6939).

### 5.  FrontPath Health Coalition

183.  FrontPath Health Coalition ("FrontPath") is a membership organization governed and managed by a coalition of 125 to 130 business "sponsors," which include corporations, labor organizations, and public entities.  (Sandusky, Tr. 1283, 1299).

184.  FrontPath does business in northwest Ohio, southeast Michigan, and northeast Indiana. (Sandusky, Tr. 1298).

185.  FrontPath's sponsors include labor organizations and public entities, but are predominantly self-insured, large employers.  (Sandusky, Tr. 1284-1285, 1293, 1299).

186.  FrontPath has the "lion's share" of the market for self-insured employers, and has recently begun offering a fully-insured product.  (Sandusky, Tr. 1300, 1397).

187.  For its self-insured employers, FrontPath does not design the employee health benefits plans or decide upon the specific elements of the plans they offer, such as deductibles, coverage breadth and limits, or out-of-pocket limits.  These are determined by the employers.  (Sandusky, Tr. 1390-1391, 1395).

188.  FrontPath is one of the top three or four MCOs in Lucas County, with approximately 125,000 total covered lives, of which approximately 80,000 are in Lucas County. (Sandusky, Tr. 1299, 1300).

189.  FrontPath's fully-insured product has only approximately 2,000 covered lives and represents a very small portion of FrontPath's overall preferred provider network business.  (Sandusky, Tr. 1399).

190.  FrontPath seeks to create provider networks that offer a full complement of services, including primary, secondary, tertiary and quaternary care services.  (Sandusky, Tr. 1400-1401).

191.  All Lucas County hospitals participate in the FrontPath network.  (Sandusky, Tr. 1315).

192.  Not every Lucas County hospital offers all the services FrontPath seeks when building its provider network.  (Sandusky, Tr. 1401).

193.  In order for FrontPath to offer a full complement of health-care services, it is essential for it to include a least one hospital that offers advanced services.  (Sandusky, Tr. 1401).

194.  St. Luke's does not offer the high level secondary, tertiary or quaternary services FrontPath requires in its network.  (Sandusky, Tr. 1401).

195.  St. Luke's does not offer neonatal intensive care that FrontPath requires in its network. (Sandusky, Tr. 1402).

196. FrontPath requires other hospitals in addition to St. Luke's in order to meet all the needs of its sponsors. (Sandusky, Tr. 1402).

### 6. United Healthcare

197. United Healthcare ("United") is an MCO that offers various health insurance products throughout the United States. (Sheridan, Tr. 6613).

198. In Lucas County, United offers predominantly PPO plans. (Sheridan, Tr. 6613).

199. United has approximately 1 million commercial members in Ohio. (Sheridan, Tr. 6614).

200. Within Lucas County, United has approximately 15,000 commercially insured members. (Sheridan, Tr. 6615).

201. United's customers in Lucas County included the Catholic Diocese of Toledo and national accounts such as Best Buy that have a presence in Toledo; however, other than these large customers, United generally serves smaller groups in Lucas County. (Sheridan, Tr. 6615; PX01902 at 006 (Sheridan, IHT at 17, *in camera*)).

202. When building its hospital provider network, United considers access, hospital quality, physician privileges, and the types of services offered. (Sheridan, Tr. 6622).

203. In its negotiations with hospital providers, { ▮▮▮▮ } seeks competitive reimbursement rates that are "on par" with or "in the ballpark" with other competing MCOs. (PX01902 at 012 ({ ▮▮▮▮ }, IHT at 39-40, *in camera*)).

204. All hospitals in Lucas County currently participate in United's provider network. (Sheridan, Tr. 6620).

205. ProMedica participated with United until December 31, 2005 when it left the network. ProMedica rejoined United's network in the fall of 2010. (Sheridan, Tr. 6620-6621; PX01902 at 014 (Sheridan, IHT at 49, *in camera*)).

206. Mercy became a participating provider with United on January 1, 2006. (Sheridan, Tr. 6620).

207. UTMC began participating with United in 2008. (PX01902 at 014 (Sheridan, IHT at 49, *in camera*)).

208. Over the past six years, United's membership level has stayed consistent. This consistency was not affected by the loss of ProMedica from the network, or by the addition of Mercy, and later UTMC, to its network. (Sheridan, Tr. 6621-6622).

### 7.  Aetna, Inc.

209.  Aetna, Inc. ("Aetna") is a national, for-profit, publicly traded health insurance company that operates individual subsidiaries in each state that are subsidiaries of the national company. (Radzialowski, Tr. 608, 611, 740, 827, *in camera*).

210.  Aetna has millions of members nationwide. (Radzialowski, Tr. 744).

211.  Aetna's largest customers are large national corporations that have sites throughout the United States. (Radzialowski, Tr. 608).

212.  Aetna offers three types of commercial health insurance products: HMO plans (a standard HMO and a less restrictive Open Access HMO), a Managed Choice plan, and a PPO plan. Aetna's Managed Choice plan is a POS plan that is less restrictive than its HMO plans and more restrictive than its PPO plan. (Radzialowski, Tr. 601-602, 610, 612).

213.  Aetna's customers in Lucas County include large employers such as the State of Ohio, IBM, and Microsoft. (Radzialowski, Tr. 620).

214.  Aetna estimates that, nationally and in Lucas County, its HMO product represents 50 percent of its commercial health-care insurance business; its POS product represents 20 percent of its business; and its PPO product represents 30 percent of its business. (Radzialowski, Tr. 613, 617).

215.  In Ohio, Aetna has between 750,000 and 1,000,000 commercial members. (Radzialowski, Tr. 744).

216.  In Lucas County, Aetna has approximately 30,000 members for its commercial insurance products. Of its 30,000 commercially insured members, approximately 10,000 are fully-insured and 20,000 are self-insured. (Radzialowski, Tr. 618, 626).

217.  For Aetna's self-insured employers, in exchange for an administrative fee paid to Aetna, Aetna designs their policy, provides identification cards for employees, provides access to the network of providers that it has created, and administers member claims. (Radzialowski, Tr. 629-630).

218.  The predominant factors that Aetna looks to when building a provider network are a full complement of services, geographic locations for the provision of those services that meet the needs and desires of the people that buy the insurance, and services that meet Aetna's required quality. (Radzialowski, Tr. 655-656).

219.  Aetna considers it essential to have at least one tertiary hospital in its network, but Aetna does not require more than one Lucas County hospital that provides tertiary or higher-level services in its network. (Radzialowski, Tr. 599-600, 656-657, 743).

220. Individual providers do not need to provide the full spectrum of care as long as the whole network contains all the options needed for individual pieces of care. (Radzialowski, Tr. 656).

221. Aetna believes that it would be unable to provide an adequate network in Lucas County with St. Luke's alone if it did not also have either TTH or St. Vincent in its network. (Radzialowski, Tr. 743).

222. Aetna has contracted with all hospitals in Lucas County since 2006. (Radzialowski, Tr. 670).

223. Prior to 2006, Aetna did not contract with UTMC. (Radzialowski, Tr. 670-671).

224. Aetna did not see a dramatic increase or decrease in its business since 2004, including in the time period from 2006 to 2008 during which Aetna's network included all Toledo area hospitals in its network but the networks of MMO and Anthem did not. (Radzialowski, Tr. 741-742).

225. In contract negotiations with hospitals, Aetna seeks to leverage its national brand image. (Radzialowski, Tr. 658-659, 744).

### 8.    Humana, Inc.

226. Humana, Inc. ("Humana") is a large, publicly-traded, national health-care company that offers a diverse range of products and services. (McGinty, Tr. 1224).

227. Humana operates in all 50 states, and has approximately 10.2 million covered lives nationally in its government and commercial insurance programs, with about 70 percent of those covered by government products. (McGinty, Tr. 1154-1155, 1225).

228. Of the 470,000 persons covered by Humana's commercial and government products in Ohio, approximately 9,000 reside in Lucas County, with approximately 7,000 covered by government products and approximately 2,000 covered by commercial insurance. (McGinty, Tr. 1226).

229. Humana offers both a fully-insured and a self-insured product in Lucas County. The majority of Humana's commercial members are self-insured. (McGinty, Tr. 1226-1228).

230. The only MCO product that Humana offers to employers in Lucas County is its ChoiceCare PPO network. (McGinty, Tr. 1228).

231. In constructing a network, Humana evaluates price, geographic access, and quality, and also seeks to achieve a hospital configuration that offers high-end tertiary services, as well as, a robust network of community hospitals. (McGinty, Tr. 1172-1173).

232. Humana believes that the only way it will be able to sustain a statewide presence in Ohio for the commercial side of its business is to move toward narrower networks composed of high-quality, very efficient hospitals and providers. (McGinty, Tr. 1191).

233. Humana currently includes all Lucas County hospitals in its commercial PPO network. (McGinty, Tr. 1234).

## I.    Competitive Dynamics in MCO Contracting

### 1.    Generally

234. MCOs contract with physicians, hospitals and ancillary providers to create a provider network. Members of MCOs who receive medical services from in-network providers pay a much lower share of the costs than members who receive medical services from out-of-network providers. (Radzialowski, Tr. 584; Pirc, Tr. 2176-2177).

235. A hospital becomes part of an MCO's network by entering into a provider contract with that MCO. (Town, Tr. 3621-3622; *see* Radzialowski, Tr. 658-661; Pugliese, Tr. 1454-1456; Pirc, Tr. 2205-2207).

236. The lower cost that members incur when using in-network providers provides a financial incentive to use in-network providers. (Sandusky, Tr. 1395-1397). Accordingly, a hospital's volume of patients from a specific MCO is largely determined by whether the hospital is part of the MCO's provider network. (Town, Tr. 3621-3622, 3626-3627; PX02148 at 014 (¶ 23) (Town Expert Report), *in camera*; Wachsman, Tr. 4852-4855).

237. MCOs compete with one another to be offered by employers in the menu of insurance products that employers offer to their employees. (Town, Tr. 3616-3617; PX02148 at 011 (¶ 17) (Town Expert Report), *in camera*; PX01944 at 028 (Pirc, Dep. at 106-107); *see also* Neal, Tr. 2092, 2099-2100; Caumartin, Tr. 1839; Buehrer, Tr. 3066-3067 (employers evaluate and negotiate various MCOs offerings for their employees)).

238. Once included in the employer's menu of health insurance products, MCOs compete with one another to attract enrollees. (PX02148 at 011 (¶ 17) (Town Expert Report), *in camera*; PX01944 at 028 (Pirc, Dep. at 106-107); Neal, Tr. 2099-2100; Sandusky, Tr. 1302-1303).

239. Hospitals compete with one another for inclusion in MCOs' provider networks. (Town, Tr. 3626; PX02148 at 013-014 (¶¶ 20-21) (Town Expert Report), *in camera*; Sheridan, Tr. 6676; Pugliese, Tr. 1456-1457; Wachsman, Tr. 4852-4855).

240. One of the aspects upon which hospitals compete with each other is through the reimbursement rate the hospitals are willing in negotiations to offer or agree upon with payers. (Wachsman, Tr. 5115).

241. A hospital's volume of patients from a specific MCO is largely determined by whether the hospital is part of the MCO's network. (Town, Tr. 3621-3622; 3626-3627; PX02148 at 014 (Town Expert Report), *in camera*; Wachsman, Tr. 4852-4855).

242. Once included in an MCO's network, hospitals in that network compete with one another to attract the MCO's members. (Town, Tr. 3630-3631; PX02148 at 014 (¶ 22) (Town Expert Report), *in camera*; Pugliese, Tr. 1456-1457; Sheridan, Tr. 6676).

243. Patients consider a variety of factors when choosing a hospital for inpatient services, including whether their physician has admitting privileges at a particular hospital, their doctor's preferences, and insurance coverage. (RX26 (Riordan, Dep. at 52-54, 56-57, 122); Shook, Tr. 939; Marlowe, Tr. 2444-2445; Town Tr. 3632; Read, Tr. 5283).

244. Patients also consider hospital quality and location as two of many factors when selecting a hospital. (Marlowe, Tr. 2444-2445; Read, Tr. 5283; Town, Tr. 3631).

245. In-network hospitals compete to attract patients primarily on non-price dimensions, clinical quality, amenities, cost, location, visibility, physician location, and patient experience, among others factors. (Town, Tr. 3630-3631; PX02148 at 014 (¶ 22) (Town Expert Report), *in camera*; Wachsman, Tr. 5115-5116; *see* Sandusky, Tr. 1304-1305; Wachsman, Tr. 5110-5111; Shook, Tr. 945-946; *see also* JX00002A at 002 (¶ 11) (Joint Stipulations of Law and Fact)).

246. Historically, MCOs in the Toledo area were comprised of various narrow network configurations. In recent years, employers changed their perspective on narrow networks and, as a result, MCOs, such as Medical Mutual and Anthem, were able to sell plans with broad networks. At present, with the exception of Paramount, all Lucas County MCOs offer broad, open-access networks. (McGinty, Tr. 1262-1263; *see* F. 172).

247. Generally, the lower the premium, the more attractive the MCO's product is to employers and their employees, provided the MCO's network offers the employees' preferred set of providers. (PX02148 at 011 (¶ 17) (Town Expert Report), *in camera*; Sandusky, Tr. 1287-1288; Lortz, Tr. 1699-1700, 1707; Caumartin, Tr. 1848-1849; *see also* Pirc, Tr. 2284; Pugliese, Tr. 1455).

## 2. Employers and employees

248. Employers generally do not negotiate directly with hospitals, but rather rely on MCOs to do so. (Neal, Tr. 2095, 2106; Pugliese, Tr. 1432-1433, 1547; Radzialowski, Tr. 748; PX01914 at 014 (Pirc, IHT at 49); Town, Tr. 3611; *see also* Caumartin, Tr. 1838-1839, 1873; Buehrer, Tr. 3062, 3089).

249. Employers rely on MCOs to develop the network of providers that employees/MCO members can access. (Neal, Tr. 2144-2145; Buehrer, Tr. 3066-3067; Town, Tr. 3955).

250. Commercially insured patients generally obtain health insurance through their employer. (Town, Tr. 3609-3610; PX02148 at 004-005 (¶ 4) (Town Expert Report), *in camera*).

251. Employers offer health insurance to their employees as part of their employees' total compensation package. (Town, Tr. 3610).

252. Some employers have exclusive relationships with a particular MCO, meaning that those employers agree only to use that MCO's provider network for their health services. (Sandusky, Tr. 1399-1400).

253. Employers may offer multiple MCO products to their employees, and from more than one MCO. (Radzialowski, Tr. 619-620; Sandusky, Tr. 1400).

254. When an employer offers multiple plans or networks, the employer may price the offerings at different premium levels. (Sandusky, Tr. 1400).

255. In choosing an MCO, employers consider principally the cost and the breadth of the provider networks available to their employees, in terms of geography, the types of services available, and choice of providers. (Neal, Tr. 2101-2104; Caumartin, Tr. 1848-1849; Buehrer, Tr. 3068, 3074-3075).

256. Employers want a health plan that offers a network with broad provider access so that employees and their family members can use their preferred physician or hospital. (Caumartin, Tr. 1861; Lortz, Tr. 1700-1704; Buehrer, Tr. 3068, 3074-3075; Neal, Tr. 2105-2107; PX02148 at 011 (¶ 17) (Town Expert Report), *in camera*).

257. Employers are generally willing to pay a higher premium for plans that have broad provider networks, than they are for plans that have narrower provider networks. However, some employers may find cost to be more important than breadth and prefer a narrower network in exchange for lower cost. (Pirc, Tr. 2282; Radzialowski, Tr. 665; McGinty, Tr. 1263; Pirc, Tr. 2214-2215; Randolph, Tr. 6943-6944).

258. Employers may use consultants to solicit and evaluate what MCOs offer, including cost, quality and access. (Neal, Tr. 2092; Caumartin, Tr. 1836, 1839, 1848-1849).

259. At the employer level, cost means the premium or the medical expenses. (Randolph, Tr. 6980-6981).

260. Employers seek to meet the health-care coverage preferences of their employees, while keeping their own costs low. (Caumartin, Tr. 1848-1849).

261. At the employee level, cost refers to the employee contribution to the premium, if any. In addition, the level of benefits, *i.e.*, the benefit design, affects employee cost by setting the level of any copays, coinsurance, deductibles, and out-of-pocket maximums. (Randolph, Tr. 6980-6981; Lortz, Tr. 1699-1700).

30

262.  Employees want the best coverage at the lowest cost.  (Lortz, Tr. 1699-1700, 1706-1707).

263.  Based upon a negotiation process, employers select the combination of rates, benefit structures, and health-care provider networks that best meets the needs of the employer and its employees.  (PX02148 at 013 (¶ 19) (Town Expert Report), *in camera*; Town, Tr. 3616-3617; Neal, Tr. 2099-2100, 2102; Caumartin, Tr. 1848-1849; Buehrer, Tr. 3066-3067, 3068, 3074-3075; Pugliese, Tr. 1432-1434; Radzialowski, Tr. 620-622).

### 3.  Managed care organizations

264.  MCOs seek to negotiate the lowest reimbursement rates that they can achieve.  (Radzialowski, Tr. 750; McGinty, Tr. 1240; Pugliese, Tr. 1553; Pirc, Tr. 2211-2112).

265.  In negotiating reimbursement rates with a hospital, an MCO's primary goal is to secure the lowest reimbursement rates possible, so that it can offer the lowest premium to employers relative to competing MCOs and thereby grow its business.  (PX01914 at 014 (Pirc, IHT at 48-49).

266.  The financial incentive for using in-network providers drives more patient volume to in-network providers, and thereby increases the MCOs' "bargaining leverage" with the providers.  (Sandusky, Tr. 1395-1397).

267.  "Bargaining leverage" may be defined as the advantage, or perception of advantage, of a particular entity at the bargaining table to try to make use of certain attributes in the negotiation.  (Guerin-Calvert, Tr. 7440).

268.  An MCO can obtain leverage against a hospital in negotiations by threatening to enter into an exclusive arrangement with a competing hospital.  (Radzialowski, Tr. 659-660).

269.  Narrower hospital networks, *i.e.*, networks that exclude certain hospitals, drive more volume to the hospitals remaining in-network, which increases the network's value to those remaining hospitals, and typically results in the MCO obtaining more favorable reimbursement terms from the hospitals in exchange for that increased volume.  (Radzialowski, Tr. 657-658).

270.  A narrower network can be more valuable to a participating hospital than a broader network, because the hospital in the narrower network would get more patients from that MCO.  (Town, Tr. 4108).  As a result, a hospital and an MCO may agree to lower reimbursement rates for a narrower network than for a broader network.  (Town, Tr. 4109; Radzialowski, Tr. 657-658).  Conversely, if an MCO goes from a narrow network to a broad network, the network becomes less valuable to the in-network hospitals, making those in-network hospitals less willing to agree to a lower price or discount.  (Town, Tr. 4111-4112).

31

271.    The more employer groups an MCO has, the more bargaining leverage it has because the members represent the potential revenue stream to the hospital. (Radzialowski, Tr. 659-660; Pirc, Tr. 2209; Pugliese, Tr. 1459 "The amount of business that [Anthem's] customers are currently giving [the hospital] in terms of the flow of revenue from Anthem . . . is very important and critical."). A national brand name also enhances an MCOs bargaining leverage. (Radzialowski, Tr. 659-660)

272.    The more patient volume that a hospital stands to lose if it fails to reach an agreement with the MCO, the greater the bargaining leverage the MCO will have with the hospital. (PX02148 at 016-017 (¶ 28) (Town Expert Report), *in camera*; PX02072 at 002-003 (¶ 9) (Firmstone, Decl.), *in camera*; *see* Radzialowski. Tr. 661-662).

273.    In building a hospital network, MCOs seek to offer a full complement of GAC inpatient services, which includes access to higher level secondary, tertiary and quaternary services within the network. (Radzialowski, Tr. 655-656; Sandusky, Tr. 1400-1401).

274.    MCOs require at least one hospital in the network that offers advanced services, including tertiary services, but the network need not include more than one such hospital. (Sandusky, Tr. 1401; Radzialowski, Tr. 599-600, 656-657, 743).

275.    Hospital networks that include all hospitals in a given area may be more costly than narrower networks that do not include as many hospitals. (Radzialowski, Tr. 657-658; McGinty, Tr. 1262).

276.    MCOs must balance their customers' preferences for broad networks against the associated higher reimbursement costs the MCO will have to pay the providers, and the resulting effect on their plans' competitiveness to employers. (Radzialowski, Tr. 657-658).

277.    In deciding whether to add a hospital to its network, an MCO balances the value its current and prospective members place on having in-network access to the hospital – and the resulting increase in the marketability of the MCOs network – against the costs, in terms of reimbursements rates, of adding that hospital to the network. (Pirc, Tr. 2167-2169, 2208-2211; *see* Radzialowski, Tr. 655-658; *see also* PX02148 at 013 (¶ 20) (Town Expert Report), *in camera*).

278.    MCOs seek to offer marketable plans to employers, in terms of cost, geographical coverage, quality, and breadth of services, while at the same time staying competitive by, among other things, obtaining low reimbursement rates. (Pirc, Tr. 2284; Pugliese, Tr. 1455; Radzialowski, Tr. 583, 588-589, 595, 600, 652-654; McGinty, Tr. 1172-1173).

279.    Marketability of a hospital network refers to the attractiveness of the network to consumers and the willingness of the consumers to purchase it. (Radzialowski, Tr. 589).

280. MCOs use general market knowledge, feedback from the field, and/or claims utilization data to determine the attractiveness and marketability of their offerings. (Pirc, Tr. 2178-2180; Radzialowski, Tr. 588-590; PX01914 at 014-015 (Pirc, IHT at 49-51).

281. MCOs believe that that Lucas County employers prefer a network with access to a broad provider network. (Radzialowski, Tr. 657; Pugliese, Tr. 1449; Pirc, Tr. 2281; Sheridan, Tr. 6680-6681; Town, Tr. 3617-3618, 3628; PX02148 at 013 (¶ 20) (Town Expert Report), *in camera*).

282. MCOs believe that patients prefer to have open access to a broad network of hospitals and physicians. (Pugliese, Tr. 1544; Pirc, Tr. 2281).

283. MCOs believe that patients generally prefer to obtain basic or routine inpatient care in a hospital that is close to them. (Randolph, Tr. 7102, *in camera*; Pugliese, Tr. 1450; Sheridan, Tr. 6680-6681; Pirc. 2297). For certain services, such as tertiary services, patients are willing to travel further. (Radzialowski, Tr. 633-634).

284. MMO has not performed any market study regarding how far its members are willing to travel for GAC inpatient services, including any study of where expectant mothers went to deliver their babies in Lucas County. (Pirc, Tr. 2297-2298).

285. Anthem has not performed any analysis in Lucas County regarding how far Anthem's insureds will travel for GAC inpatient services, and Anthem has not studied where its insureds in Lucas County obtain GAC inpatient services relative to where those persons actually live. (Pugliese, Tr. 1563).

286. MCOs believe that employers and consumers want affordable plans, broad access provider networks that include all of the major facilities, a complement of physicians, and personal benefit designs that meet their needs. (Pugliese, Tr. 1449; Sandusky, Tr. 1315-1316).

287. MCOs estimate what it would cost to have a network without a particular hospital, *i.e.*, how much business would the MCO lose. "Some customers adapt. They'll work around it, and cost is more important. But other customers would not adapt." (Radzialowski, Tr. 665-666).

288. The reimbursement rates and other terms an MCO will agree to are based primarily on whether the MCO believes it can still sell its plans without that hospital in its network, and what losses the MCO would incur if the hospital were out of network. (Pirc, Tr. 2208).

289. The degree of harm to the marketability of an MCO's provider network from omitting a hospital will depend on whether that MCO's main competitors offer broad or narrow hospital networks. (*See* PX01944 at 025 (Pirc, Dep. at 94-95), *in camera*). The marketability of the MCO's product will suffer more from omitting a hospital if the MCO's competitors market broad hospital networks than if the MCO's competitors

market restricted hospital networks. (*See* PX01944 at 025 (Pirc, Dep. at 94-95), *in camera*).

### 4. Hospitals

290. Hospitals in and around Lucas County seek to maximize the reimbursement they receive from MCOs. Hospitals seek to cover their total cost of patient care, which tends to increase over time, and yield an operating margin to fund capital expenditures, expansion, and maintain a strong balance sheet. (Gold, Tr. 209-210, 265-266, 268; Korducki, Tr. 539, 547-549, 554; Beck, Tr. 432, 434; Shook, Tr. 950, 1050).

291. There is no difference in the way that for-profit and nonprofit hospitals negotiate with MCOs. (Radzialowski, Tr. 670; Sandusky, Tr. 1330; McGinty, Tr. 1239; Pugliese, Tr. 1462-1463; Pirc, Tr. 2212-2213; Sheridan, Tr. 6684). Both for-profit and nonprofit hospitals have a margin of revenue that they need and aim to achieve and they attempt to maximize commercial reimbursement rates to the full extent that their bargaining leverage will allow. (Pugliese, Tr. 1462-1463; Pirc, Tr. 2212-2213; Radzialowski, Tr. 670, 740; Sandusky, Tr. 1330; McGinty Tr. 1185-1186; Sheridan, Tr. 6684-6685; PX01900 at 010-011 (Mullins, IHT at 34-35, 37), *in camera*).

292. In addition to the reimbursement goals described in F. 290, because Medicare and Medicaid reimbursements do not cover the costs of providing the hospital services to Medicare and Medicaid patients, (*see* F. 518 (89 to 90 percent); Wachsman, Tr. 4848; Guerin-Calvert, Tr. 7299; RX71(A) at 000128, 000133, *in camera*), hospitals seek to make up the shortfall from Medicare and Medicaid reimbursements with payments from MCOs. (Guerin-Calvert, Tr. 7304, 7935-7936; Wachsman, Tr. 4848).

293. The greater a hospital's bargaining leverage, the higher, generally speaking, the reimbursement rates will be. (Pirc, Tr. 2211).

294. If an MCO's network is substantially less attractive or less marketable to employers due to the exclusion of a hospital, that hospital will be able to command higher rates for its inclusion in the MCO's network than a less-valued hospital. (PX02148 at 016 (¶ 27), (Town Expert Report), *in camera*; Town, Tr. 3640-3643, 3806, *in camera*; Pirc, Tr. 2209-2211).

295. The more valued the hospital system is by the MCO's members, the more important the system is to the MCO's ability to market its network, and the more bargaining leverage the hospital system will possess in contract negotiations with the MCO. (Sandusky, Tr. 1348-1349, *in camera*; Pirc, Tr. 2168-2169, 2210; *see also* PX02148 at 016 (¶ 27) (Town Expert Report), *in camera*; Town, Tr. 3641-3643).

296. Factors that increase a hospital's bargaining position, vis-a-vis an MCO, are member preferences, a broad geographic distribution of facilities, broad services lines, and a large number of physicians that the hospital employs and controls. (Lortz, Tr. 1700-1701, Pirc, Tr. 2189, 2210; Pugliese, Tr. 1458-1461).

297. A hospital's location in Lucas County is an important factor in contract negotiations, particularly if there are no alternatives in that location. (Radzialowski, Tr. 663 ("hospital's leverage comes from the geographic location, which is where they are situated, whether or not they have any competitors nearby"); Pirc, Tr. 2199 ("if there's no alternative, [location within the county] increases a hospital's leverage); Pugliese, Tr. 1451-1452, 1459).

298. The more hospitals that a system controls, the more bargaining leverage it has. This is because failure to reach an agreement results in more hospitals leaving the network, which decreases the marketability of the MCOs, and results in greater potential loss of business. (Pirc, Tr. 2210; Radzialowski, Tr. 663).

**J.     The Relevant Market**

**1.     Relevant product market**

**a.     General acute-care inpatient hospital services**

299. The relevant product market is all general acute-care ("GAC") inpatient hospital services – primary, secondary, and tertiary services – sold to commercial health plans. F. 300-311; Joint Stipulations of Law and Fact, JX00002A ¶ 3; Response to RFA at ¶ 1; Answer ¶ 12). *See* F. 20-26 for definitions of primary, secondary, tertiary.

300. GAC inpatient services are a broad "cluster market" of inpatient surgical, medical, and supporting services provided in a hospital setting to commercially insured patients. (PX02148 at 021-023 (¶¶ 38, 40) (Town Expert Report), *in camera*); *see* Gold, Tr. 195; Korducki, Tr. 481-482).

301. All GAC inpatient services in the cluster market use the same assets, the same operating rooms, the same beds, the same wards, the same nursing staff, and all require an overnight stay. (Guerin-Calvert, Tr. 7188, 7191).

302. Individual services within the GAC cluster market are not clinical substitutes for each other. (Guerin-Calvert, Tr. 7631-7632; Town, Tr. 3665).

303. In using a cluster market approach, the demand that is analyzed is the demand for a set of services and skills. (Guerin-Calvert, Tr. 7190).

304. MCOs demand, and contract for, a broad array of inpatient services together, such as medical-surgical care. (Guerin-Calvert, Tr. 7190; Town, Tr. 3686-3687).

305. When MCOs contract with hospitals, they do not distinguish between services available to commercially insured patients and government insured patients; they look at all services available at that hospital to any patient. (Guerin-Calvert, Tr. 7202).

306. The parties agree that the following are excluded from the relevant market: outpatient services, quaternary services, rehabilitation, skilled care, psychiatric care, detoxification services, and Major Diagnostic Category ("MDC") Codes 2, 19, 20, and 17. (RPFF 1013-1016; CCRRPFF 1013-1016; Guerin-Calvert, Tr. 7191-7192, 7195; Town 3686-3687).

307. The GAC market excludes outpatient services (F. 32-35) because health plans and patients could not substitute outpatient services for inpatient care in response to a price increase. Such substitution is, instead, based on clinical considerations. (Answer ¶ 13; Response to RFA at ¶ 3; Guerin-Calvert, Tr. 7637; Radzialowski, Tr. 638-639; PX01914 at 007-008 (Pirc, IHT at 21-22); Town, Tr. 3669-3671).

308. It is also appropriate to exclude outpatient services from GAC services because they have different competitive conditions than inpatient services. For example, there may be a different set or mix of market competitors, not just hospitals. (Guerin-Calvert, Tr. at 7637, 7640; *see* Town, Tr. 3672-3673).

309. The GAC inpatient hospital services market excludes quaternary services because they are often excluded in MCOs' contracts for GAC inpatient services or contracted for separately. (Guerin-Calvert, Tr. 7191-7192; F. 306 (parties agree that quaternary services are excluded)).

310. The GAC inpatient hospital services market excludes rehabilitation, skilled care, psychiatric care, and detoxification because these services are separately contracted and negotiated for and are sometimes provided as outpatient services. (Guerin-Calvert, Tr. 7195; Town, Tr. 3686-3687; F. 306 (parties agree that these services are excluded)).

311. The GAC inpatient hospital services market excludes MDC codes 2, 19, 20, and 17 from the relevant product market because these are codes for behavioral health services and have traditionally been excluded. (Guerin-Calvert, Tr. 7197; Town, Tr. 4211, 4221; F. 306 (parties agree that these services are excluded)).

### b. Inpatient obstetrical hospital services

312. Inpatient obstetrical services are a cluster of procedures relating to pregnancy, labor, and post-delivery care provided to patients for the labor and delivery of newborns. (Response to RFA at ¶ 4; Marlowe, Tr. 2388, 2431-2432; Read, Tr. 5275).

313. No other hospital services are reasonably interchangeable with inpatient OB services. (Guerin-Calvert, Tr. 7667-7668; PX01935 at 005 (Read, Dep. at 11); PX02148 at 023-024 (¶ 41) (Town Expert Report), *in camera*; *see* Response to RFA at ¶ 4).

314. ProMedica and St. Luke's track separate market shares and other data for a variety of services, including inpatient OB services, cardiac cases, orthopedics, and cancer services. (Response to RFA at ¶ 5; PX01016 at 003, *in camera*; PX01077 at 003, 005; PX00009 at 022; PX01077 at 004).

36

315. Negotiations between hospital providers and MCOs cover the full range of inpatient services that the MCO's members may need, including inpatient OB services. (Pugliese, Tr. 1550; McGinty, Tr. 1240; Town, Tr. 4049-4050; Guerin-Calvert, Tr. 7229-7230; Randolph, Tr. 6960).

316. Contracts with some major MCOs in Lucas County do not separately carve out obstetric rates from the GAC inpatient care rates. (Pugliese, Tr. 1622, *in camera*; RX1886, *in camera*; RX1882, *in camera*; RX1890, *in camera*; RX1045, *in camera*; PX02385, *in camera*; PX02533, *in camera*; RX305; RX306, *in camera*; RX329, *in camera*).

317. Contracts with some major MCOs in Lucas County do separately carve out obstetric rates from the GAC inpatient care rates. (Radzialowski, Tr. 808, *in camera*; 752-753; Sheridan, Tr. 6662, *in camera*, 6683-6684; *see, e.g.*, PX00365 at 030 (ProMedica-United Contract), *in camera*; PX00363 at 019, 022 (ProMedica-Aetna Contract)).

318. To the extent that inpatient obstetrical rates are listed separately in some contracts, it is at the request of the MCOs rather than ProMedica. (Wachsman, Tr. 5158, *in camera*).

319. Hospitals have not price-discriminated for inpatient OB services and there is no basis on which hospitals could price-discriminate for inpatient OB services. (Guerin-Calvert, Tr. 7230).

320. Inpatient OB services are provided in conjunction with other services, and the terms and conditions on which they are negotiated are very similar. (Guerin-Calvert, Tr. 7230).

## 2. Relevant geographic market

### a. Lucas County, Ohio

321. The relevant geographic market is Lucas County, Ohio. (F. 322-330; Town, Tr. 3688; PX02148 at 025-032 (¶¶ 45-55) (Town Expert Report), *in camera*; Response to RFA at ¶ 7; *see* PX00900 (Map of Northwest Ohio)).

322. Both Complaint Counsel's and Respondent's economic experts agree that the relevant geographic market is Lucas County, Ohio. (Guerin-Calvert, Tr. 7155; Town, Tr. 3688-3689, 4068-4069).

323. No MCO has marketed a health plan to Lucas County customers without including at least one Lucas County hospital. (Randolph, Tr. 7064-7065).

324. A hypothetical monopolist controlling every hospital in Lucas County could increase the price of GAC inpatient services in Lucas County by at least 5 to 10 percent, a small but significant amount. (Guerin-Calvert, Tr. 7681; PX01954 at 042-043 (Guerin-Calvert, Dep. at 164-165), *in camera*; Town, Tr. 3688-3690; PX02148 at 016, 025-026, 029 (¶¶ 27, 45, 51) (Town Expert Report*), in camera*).

37

325. When ProMedica retained Navigant Consulting to perform a clinical integration study for ProMedica's Toledo-area hospitals, (*infra* F. 1026-1027) Navigant examined the geographic area in which ProMedica competed. (Nolan, Tr. 6253, 6275-6276, *in camera*; PX01216 at 004-008 (Navigant Service Line and Clinical Integration Market Trends and Facilities Assessment Aug. 2010), *in camera*). Navigant examined only Lucas County and excluded all hospitals located outside of Lucas County from its market share analysis. (Nolan, Tr. 6326-6327, *in camera*).

326. Patients have a preference for local care and close access to health-care providers. (Pirc, Tr. 2184; Pugliese, Tr. 1450-1451(Anthem's Lucas County members "will stay closer to home for common services, preventative care services.")); Randolph, Tr. 7102; Rupley, Tr. 1962; Sandusky, Tr. 1306; Sheridan, Tr. 6681; Shook, Tr. 942; Town, Tr. 3694, 3759, *in camera*; *see also* PX01917 at 008 (Radzialowski, Dep. at 26-27), *in camera*).

327. With extremely rare exceptions, Lucas County residents do not use more distant providers of GAC inpatient services. (Sheridan, Tr. 6680-6682; Town, Tr. 3691; PX02148 at 026, 155-159 (¶ 46, Ex. 10) (Town Expert Report), *in camera*).

328. Patient flow data reveals that nearly all Lucas County residents (97.9 percent) stay within Lucas County for GAC inpatient services. (PX02148 at 026 (¶ 46) (Town Expert Report), *in camera*). In other words, only 2.1 percent of Lucas County residents leave the county for general acute-care services. (PX02148 at 026 (¶ 46) (Town Expert Report), *in camera*; *see also* Sheridan, Tr. 6682). "[P]atients residing in Lucas County have an obvious and strong preference for hospitals located within Lucas County." (PX02148 at 026 (¶ 46) (Town Expert Report), *in camera*).

329. The average travel time from home to hospital for Lucas County GAC patients is 11.5 minutes, with 50 percent of patients traveling less than 8.7 minutes. (Town, Tr. 3693-3694; PX02148 at 030, 140 (¶ 52, Ex. 5) (Town Expert Report), *in camera*). *Accord* (at 000032 (¶ 52) (Guerin-Calvert Expert Report), *in camera*) (the vast majority of patients travel less than 20 minutes for health-care services).

330. While travel time is important, patients usually rank availability of a service, access to a particular physician, and alignment of a patient's insurance company ahead of the geographic location of the hospital. (Wakeman, Tr. 2510; RX71(A) at 000021, n.22, *in camera*).

### b. Non-Lucas County hospitals

331. The primary reason patients who live in Lucas County do not travel outside of Lucas County is distance. (Radzialowski, Tr. 649; Sheridan, Tr. 6681; *see also* Pirc, Tr. 2184; Pugliese, Tr. 1451; Andreshak, Tr. 1768).

332. Hospitals in counties adjacent to Lucas County are not acceptable alternatives for one MCO's Lucas County members. (Pugliese, Tr. 1451).

333. Wood County Hospital, located in Bowling Green, Ohio, is approximately 25 miles and 35 minutes from downtown Toledo. (Korducki, Tr. 475, 504-505; *see* PX00900 (Map of Northwest Ohio)).

334. Wood County Hospital routinely reviews Ohio Hospital Association data to track patient flow. (Korducki, Tr. 469-470). Wood County Hospital primarily serves the area south of Route 582 in Wood County, southward to the bottom of Wood County, and westward into the eastern half of Henry County. (Korducki, Tr. 506, 508-509).

335. Eighty-one percent of Wood County Hospital's patient admissions are from ten contiguous zip codes in this area. (Korducki, Tr. 506). There are no Lucas County zip codes included in this area. (Korducki, Tr. 509).

336. Wood County Hospital has approximately 3,600 to 3,700 patient admissions per year. (Korducki, Tr. 511). In each of the last two years, approximately 100 Lucas County residents have sought inpatient hospital services at Wood County Hospital. (Korducki, Tr. 510-511). In other words, approximately 2.7 percent of Wood County Hospital's inpatient admissions are of Lucas County residents. (*See* Korducki, Tr. 510-511). Some of these Lucas County residents are coming to Wood County Hospital for bariatric services, for which Wood County Hospital is the only hospital in northwest Ohio that is a Center of Excellence. (Korducki, Tr. 511-512).

337. Fulton County Health Center is approximately 30 miles and a 45 minute drive from St. Luke's. (Beck, Tr. 384-385; *see* PX00900 (map of northwest Ohio)).

338. Fulton County Health Center looks at data provided by the Ohio Hospital Association to track patient flow. (Beck, Tr. 386-388). Most of Fulton County Health Center's patients come from the area around the hospital in Fulton County. (Beck, Tr. 388).

339. Patients in Lucas County do not come to Fulton County Health Center for GAC inpatient services. (Beck, Tr. 389; 392-393 ("there's sufficient health care in Lucas County that there's no need to come to [Fulton County Health Center]")).

340. St. Luke's did not view Wood County Hospital or Fulton County Health Center as significant competitors. (PX01933 at 047 (Oppenlander, Dep. at 178-179), *in camera*).

341. Wood County Hospital and Fulton County Health Center do not compete with Lucas County hospitals for GAC inpatient services, including obstetrical services. (Pirc, Tr. 2191-2193; Radzialowski, Tr. 648-651; Sandusky, Tr. 1315).

### K.    Market Shares and Concentration

### 1.    Framework for evaluating market shares

#### a.    Markets used for generating statistics

342.    The expert witnesses proffered by the parties (hereafter, "experts," (Town, for Complaint Counsel and Guerin-Calvert, for Respondent)) utilized different parameters of the product market in calculating market shares. Complaint Counsel's expert calculated market shares based on a market of only those GAC inpatient services (identified as "diagnostic related groups" or "DRGs" that both ProMedica and St. Luke's sold to MCOs. (PX02148 at 019-021). Respondent's expert included all GAC inpatient services in her market share calculations. (RX71(A) at 000161; Guerin-Calvert, Tr. 7726-7727).

343.    The experts treated OB services differently in calculating market shares. Complaint Counsel's expert's calculation of market share for GAC inpatient services excluded market shares of inpatient OB services. Instead, Complaint Counsel's expert calculated market shares of OB services only as a separate market. (PX02150 at 001). Respondent's expert's calculations of market shares for GAC inpatient services included inpatient OB services. (RX71(A) at 000161-000165).

#### b.    Methodology

344.    The experts utilized different methodologies in calculating market shares. Complaint Counsel's expert calculated market shares based on total patient days. (PX02148 at 034 n.97). Respondent's expert calculated market shares based on billed charges and discharges. (RX71(A) at 000036-000037, 000162-000163). In addition, Respondent calculated shares based on staffed beds and registered beds. (RPFF 1051-53).

345.    Market shares can be accurately based on number of discharges, billing charges, revenue, or patient days. No matter which one is selected, the calculated market shares "would be unaffected." (Town, Tr. 3701-3702, 3709-3710).

346.    Patient days, which measure how long a patient stays in the hospital, take the acuity of the illness or procedure that a patient has into account. (Town, Tr. 3701).

347.    Billed charges are the summation of the retail or list price of hospital services sold to patients. Billed charges may not give the most accurate view of the marketplace, because commercial insurers pay discounted prices for services, not the full chargemaster price. (Town, Tr. 3707-3708; Korducki, Tr. 534-535; Pugliese, Tr. 1507, *in camera*; McGinty, Tr. 1195-1196; Sandusky, Tr. 1346-1347, *in camera*). *See* F. 499 for definition of chargemaster.

348.    Discharges measure the number of patients that were admitted and discharged. (Town, Tr. 3701).

### c. HHI calculations

349. The U.S. Department of Justice and the Federal Trade Commission utilize the Herfindahl-Hirschman Index ("HHI") to measure market concentration. (Answer ¶ 22).

350. The HHI is calculated by summing the squares of the market shares of all firms in the market. A transaction that increases concentration by 200 points or more and results in a highly-concentrated market (HHI over 2,500) is presumed likely to enhance market power. (Town, Tr. 3696-3699; Merger Guidelines § 5.3).

351. Complaint Counsel's expert calculated HHIs for two product markets: GAC inpatient services, exclusive of OB services; and inpatient OB services. (PX02148 at 021-025; PX02150 at 001).

352. Respondent's expert did not calculate HHIs for any of the proposed product markets in this case. (Guerin-Calvert, Tr. 7723).

353. Respondent's expert admits that the appropriate starting point in merger analysis involves calculating market shares and HHI concentration indices and that she has calculated HHIs in previous merger matters where she has testified as an expert. (Guerin-Calvert, Tr. 7718-7721; PX01925 at 005 (Guerin-Calvert, Dep. at 11)).

### 2. Calculation of market shares

#### a. Beds

354. The hospitals' shares of registered beds in 2009 are as follows: ProMedica hospitals, 34.3%; St. Luke's, 9.4 %; Mercy, 32.5%; and UTMC, 9.6%. (PX02123 at 025).[4]

355. The hospitals' shares of staffed beds (less non acute-care beds) in 2009 are as follows: ProMedica hospitals, 39.4%; St. Luke's, 8.4%; Mercy, 31.7% and UTMC, 8.9%. (PX02123 at 025).

356. Before and after the Joinder, ProMedica's market share is higher than its competitors in Lucas County, whether calculated by registered beds, beds-in-use, or occupancy. (Joint Stipulations of Law and Fact, JX00002A ¶ 17).

#### b. Billed charges

357. Based on billed charges, Respondent's expert calculated market shares of Lucas County GAC inpatient services, inclusive of inpatient OB services in 2009 as follows: ProMedica, 46%; St. Luke's, 7%; Mercy, 35%, and UTMC, 10%. Combined,

---

[4] The shares of ProMedica, St. Luke's, Mercy and UTMC set forth in F. 354-355 do not add up to 100% because Respondent's expert also included shares from Fulton County Health Center, Fremont Memorial Hospital, HB Magruder Memorial Hospital, and Wood County Hospital. *See* PX02123 at 025.

ProMedica and St. Luke's have a 53% share, which is higher than the 45% share of Mercy and UTMC combined. (RX71(A) at 000162, *in camera*; *see also* RPFF 1056).[5]

358. Based on billed charges, Respondent's expert calculated market shares of Lucas County "commercial discharges" for "GAC + non-GAC + OB +non-OB" in 2009 as follows: ProMedica, 49%; St. Luke's, 5%; Mercy, 33%; and UTMC, 9%. Combined, ProMedica and St. Luke's have a 54% share, which is higher than the 42% share of Mercy and UTMC combined. (RX71(A) at 000165, *in camera*).

### c. Discharges

359. Based on discharges, Respondent's expert calculated market shares of Lucas County GAC inpatient services, inclusive of inpatient OB services, in 2009 as follows: ProMedica, 42%; St. Luke's, 12%; Mercy, 32%; UTMC, 11%. Combined, ProMedica and St. Luke's have a 54% share, which is higher than the 43% share of Mercy and UTMC combined. (RX71(A) at 000162, *in camera*).

360. Based on discharges, Respondent's expert calculated market shares of Lucas County "commercial discharges" for "GAC + non-GAC + OB +non-OB" in 2009 as follows: ProMedica 48%; St. Luke's, 10%; Mercy, 29%; UTMC, 9%. Combined, ProMedica and St. Luke's have a 58% share, which is higher than the 38% share of Mercy and UTMC combined. (RX71(A) at 000165, *in camera*).

361. Internal documents prepared by St. Luke's indicate the following GAC market shares, based on discharges of ProMedica and St. Luke's combined: 67%[6] (2008, SLH Core Service Area); 50.3%[7] (2007, SLH Primary Service Area); 53.6% (2009, SLH 80% Primary Service Area); and 68.4% (2009, SLH Core Service Area). (PX01016 at 003, *in camera*; PX01077 at 006; PX01236 at 002; and (PX01235 at 003).

362. St. Luke's defines its core service area as the eight zip codes surrounding St. Luke's, where 55-60 percent of the admission base comes from, and defines its primary service area as where approximately 80 percent of St. Luke's patients come from. (Rupley, Tr. 1944, 1949; PX01077 at 008; PX01418 at 005; PX01077 at 008).

363. An internal document prepared by ProMedica in its 2008 Presentation to Standard & Poor's indicates that ProMedica's market share of the Toledo Metropolitan Statistical Area, in 2006, based on discharges, was 45%, while St. Luke's was 10%. (PX00270 at 025).

---

[5] The shares of ProMedica, St. Luke's, Mercy and UTMC set forth in F. 357-358 do not add up to 100% because Respondent's expert also included shares from Wood, Michigan, and the Cleveland Clinic. *See* RX71(A) at 000162, 00165.

[6] These statistics include only St. Luke's, TTH, and Flower, and do not include ProMedica's Bay Park, market shares.

[7] *Ibid.*

### d. Patient days

364. Based on patient days, Complaint Counsel's expert calculated market shares of Lucas County GAC inpatient services, exclusive of OB services pre-acquisition, as follows: ProMedica, 46.8%; St. Luke's, 11.5%; Mercy, 28.7%; UTMC, 13%. Post-acquisition, ProMedica has a 58.3% market share. (PX02148 at 143 (Town Expert Report, Ex. 6, *in camera*); see also PX02150 at 001-002 (market share chart)).

365. The market shares calculated by Complaint Counsel's expert do not change materially if tertiary and quaternary services are included. (Town, Tr. 3714-3715; Guerin-Calvert, Tr. 7694-7695).

366. The market shares calculated by Complaint Counsel's expert do not change materially if Wood County Hospital and Fulton County Health Center are included. (Town, Tr. 3711-3712).

367. Using Complaint Counsel's expert's calculations in F. 364, ProMedica's market share is 60% higher than Mercy's for GAC inpatient services. (PX02148 at 036 (¶ 66) (Town Expert Report, *in camera*)). UTMC's 13% market share is less than one-third of ProMedica's market share. (See PX02148 at 143 (Town Expert Report, Ex. 6, *in camera*); PX02150 at 001 (Market share chart)).

368. Based on the market definition and shares in F. 342-343 and 364, Complaint Counsel's expert calculated HHIs and concluded that the pre-acquisition HHI was 3312; the change in the HHI was 1078.2, well above the 200 point threshold of the Merger Guidelines; and the resulting post-acquisition HHI is 4391, well above the 2500 threshold to be considered "highly concentrated." PX02148 at 034 (¶ 61), 143 (Exhibit 6) (Town Expert Report), *in camera*; PX02150 at 001; Town, Tr. 3703-3704).

### 3. Conclusion

369. Respondent's expert conceded that, using her relevant market definition (F. 342-343), the pre-HHI meets the Merger Guidelines' presumption of a highly concentrated market and that the post-HHI would be around 4000. (Guerin-Calvert, Tr. 7730).

370. Regardless of which methodology or market parameter is used, the Joinder significantly increases concentration in the already highly-concentrated Lucas County GAC inpatient services market. (Town, Tr. 3702-3705).

### L. Background Facts Regarding St. Luke's Joinder with ProMedica

371. St. Luke's was struggling financially in the years preceding the Joinder. (Part II.N., *infra*).

372. St. Luke's had an operating loss of {▮▮} million in 2007, {▮▮} million in 2008, and {▮▮} million in 2009. This amounted to operating margins of {▮▮} percent in 2007,

{█} percent in 2008, and {█} percent in 2009.  (RX56 at 000006 (Table 1), *in camera*).

373.  The overall cost coverage ratio for St. Luke's, including MCOs, government payors, and self-pay, was {████████████████████████████ ████████████}.  (RX56 at 000010).

374.  The cost coverage ratio for St. Luke's, including only Anthem and MMO, which combined represent approximately {██} percent of St. Luke's total revenue, was {██████████}. (RX56 at 000010, *in camera*).

375.  The cost coverage ratio for St. Luke's, including only Medicare and Medicaid, which represent approximately {██} percent of St. Luke's total revenue, was {█████████████████████}.  (RX56 at 000010, *in camera*).

376.  In the first eight months of 2010, St. Luke's contract reimbursement rates with commercial payors, other than {████}, exceeded its costs.  (Dagen, Tr. 3239-3240, *in camera*; PX00512 at 001 (Aug. 2010 year-to-date payor cost ratio spreadsheet), *in camera*).  In 2009, St. Luke's contract reimbursement rates with commercial payors exceeded its costs, except for {████} and {████}.  PX00519 at 001, *in camera*).

377.  The cost coverage ratio figures set forth in F. 373-375 indicate that St. Luke's payments, overall, were not covering St. Luke's total costs and were generating losses.  (Den Uyl, Tr. 6440-6443, *in camera*).

378.  St. Luke's unrestricted reserves decreased from {████} million at the end of 2007 to {███} at the end of 2009.  (RX56 at 000016 (Table 9), *in camera*).

379.  From the end of 2007 through the Joinder St. Luke's was using the reserve fund to fund losses and the capital commitments it needed.  (Den Uyl, Tr. 6460, *in camera*).

380.  Members of St. Luke's Board of Directors (hereafter, the "Board") were concerned about the use of cash reserves, although Mr. Wakeman estimated on March 31, 2010 that St. Luke's had "only accessed the reserves for about {██} million [in] the past 24 months to pay for part of the pension shortfall requirements and the new tax.  That has been offset by gains of almost {███} million in the market in the past year." (PX00923 at 001, *in camera*).

381.  "EBITDA" stands for earnings before interest, taxes, depreciation, and amortization.  (Den Uyl, Tr. 6424-6425).

382.  St. Luke's EBITDA margin was {██} percent in 2007, {██} percent in 2008, and {██} percent in 2009.  The average EBITDA margin of comparably rated hospitals was 9.6

percent in 2007, 7.7 percent in 2008, and 8.1 percent in 2009. (Den Uyl, Tr. 6425; RX56 at 000006-000007 (Tables 3 and 4), *in camera*).

383. St. Luke's investment portfolio cash reserves earned {■} percent on its reserve fund over the ten year period ending December 31, 2009. (RX56 at 000041 (¶ 97), *in camera*).

384. St. Luke's investment portfolio cash reserves lost {■} percent on its reserve fund over the three year period ending December 31, 2009. (RX56 at 000041 (¶ 97), *in camera*).

385. For the period of 2005 through 2008, St. Luke's capital expenditures were over {■} million per year. Because cash reserves were declining, in 2009 St. Luke's reduced its capital expenditures in 2009, to about {■} million, in order to preserve liquidity. (Den Uyl, Tr. 6461, *in camera*).

386. An August 10, 2009 document, prepared for St. Luke's Hospital ("SLH") Board of Directors ("Board") by St. Luke's senior leadership and entitled "Framing the SLH Strategy Discussion for Dan Wakeman and the Board" ("Strategy Discussion" document), posed the question, "What led us to where we are at today?" Answering that question, the document states: "exclusive managed care networks and a decrease in SLH core physicians (and perhaps and aging facility)" had caused a volume problem for St. Luke's and that this volume problem "caused St. Luke's to be a taker in managed care negotiations, not a setter [of rates]." (PX01390 at 001), *in camera*; Wakeman, Tr. 2640, 2643, *in camera*).

387. The Strategy Discussion document identified in F. 386 states that through advertising and increasing physicians, St. Luke's had been able to increase its volume, but that "due to a lack of negotiating power with managed care companies we are now straddled with significantly low reimbursement rates as set forth in our managed care contracts." (PX01390 at 002 (¶ 5), *in camera*).

388. In August 2009, St. Luke's key strategic issue in the near term was identified as "extremely low reimbursement rates from third party payors." (PX01390 at 002 (¶ 6), *in camera*).

389. In August 2009, St. Luke's had two options in the short term: "(1) St. Luke's develops a compelling argument to increase contracted rates with its major managed care customers (MMOH, Anthem, Aetna, etc.) as an independent. (2) St. Luke's enters into an affiliation/partnership with a local health system with the express purpose to raise reimbursement rates to the level of our competitors. This affiliation may be as simple a partnering on clinical service lines or one that is more fully integrated. (PX01390 at 002, *in camera*; Wakeman, Tr. 2640, 2643, *in camera*).

390. In August or September 2009, a presentation was given to the Board, prepared by St. Luke's senior leadership and entitled "Options for St. Luke's – St. Luke's is now at a

crossroads" ("Options Presentation"). (PX01018 at 001, *in camera*; Wakeman, Tr. 2655-2656, *in camera*).

391. The Options Presentation advised the Board that "St. Luke's is being grossly underpaid. St. Luke's has tried to gain revenue through volume. Even though volume has increased due to strategic initiatives, [it] has not been enough to offset costs and still have acceptable margin." (PX01018 at 003, *in camera*).

392. The Options Presentation advised the Board that: "There is no perfect option. Going it alone is extremely challenging. In respect to collaboration, some organizations are a better fit culturally (along with mission); others are a better fit strategically/ financially." (PX01018 at 007, *in camera*).

393. The Options Presentation described St. Luke's first option as: "Remain independent. Surgically remove all financially losing services/ programs until accepted margin is realized." With respect to this option, the Options Presentation noted that St. Luke's was already the low cost provider in the area, and further cuts would be "very painful," including "cut[ting] major services and programs (downsizing), not just rightsizing." St. Luke's would become a "limited" provider and no longer able to fulfill its mission of fully serving the community. (PX01018 at 008, *in camera*; PX01283 at 002 (noting that major reductions to get St. Luke's to "break even will have to come from massive program reduction, like stop hearts, OB and implants")).

394. The Options Presentation identified a second option for St. Luke's as: "Push the payors. Provide compelling argument to raise SLH reimbursement rates to an acceptable margin. In essence, the message would be pay us now (a little bit more) or pay us later (at the other hospital system contractual rates)." With regard to this option of getting increased reimbursement rates, the Board was advised that St. Luke's needed to be "prepared to fall back on a 'collaborating partner strategy.'" (PX01018 at 009, *in camera*).

395. The Options Presentation identified three additional options, involving affiliation with either ProMedica, Mercy or UTMC. (PX01018 at 014-017).

396. With regard to the option of affiliating with ProMedica, the Options Presentation advised the Board that ProMedica would bring, among other things, strong managed care contracts, a "huge" cash inflow, directly, and indirectly through inclusion in Paramount network; likelihood of upgrade to St. Luke's campus; improved information technology ("IT") systems; a good history of execution; and a greater likelihood of local control, due to ProMedica's system being regionally owned and controlled. (PX01018 at 014, *in camera*).

397. As stated in the Options Presentation, the option of affiliating with Mercy would bring, among other things, a mission that was "in line" with St. Luke's mission, high quality, some upgrading of St. Luke's campus, and some cash inflow, although not as much as St. Luke's believed ProMedica would supply. The document also noted a history of

inconsistent execution and that local control would be less, due to the system being governed out of Cincinnati. (PX01018 at 015, *in camera*).

398. With regard to the option of affiliating with UTMC, the Options Presentation noted that St. Luke's and UTMC were "already down the path as to what an affiliation might look like." (PX01018 at 016, *in camera*). UTMC began exploring an affiliation with St. Luke's in late 2008, and signed a non-exclusive Memorandum of Understanding in April 2009. (PX02203 at 001; Wakeman, Tr. 2857; Gold, Tr. 224-225, 239).

399. Factors relating to the option of affiliating with UTMC included: the largest and most stable employer in the area, with state of Ohio backing; a source of physicians and other health professionals; with 4 of 8 board members to be representatives from St. Luke's/OhioCare, the "[o]pportunity for this new Board to truly govern the medical facilities on both campuses"; and UTMC's "low patient satisfaction with academic/union corporate culture," and whether an affiliation with UTMC would give St. Luke's "enough managed care clout." (PX01018 at 016-017, *in camera*).

400. The Options Presentation identified 8 factors for determining an acceptable partner: (1) cultural compatibility; (2) capital access; (3) expense management; (4) affordable physician strategy; (5) vision for competitive community services (especially at the St. Luke's campus); (6) projected risk and opportunity in a "reformed" health-care market (such as limited dependence on insurance products); (7) advantages over "go it alone" / other partner options  (such as "multi-market"); (8) do-able (legal, regulatory considerations); (9) quality; and (10) impact on community. (PX01018 at 021, *in camera*).

401. The Board determined not to undertake service cuts.  Potential service cuts as an option for going forward were not "a major topic of discussion" because the idea was distasteful to the Board. (Black, Tr. 5703-5704).

402. An October 30, 2009 update regarding St. Luke's affiliation options, entitled "Affiliation Analysis Update, St. Luke's Board of Directors" (the "October 2009 Affiliation Update") identified 13 factors for determining an acceptable partner: (1) cultural compatibility; (2) overall effect on employees; (3) governance; (4) capital access; (5) expense management; (6) revenue / reimbursement enhancement; (7) effective physician strategy; (8) vision for competitive community services  (especially at the St. Luke's campus); (9) projected risk and opportunity in a "reformed" health-care market (such as limited dependence on insurance products); (10) advantages over "go it alone" / other partner options (such as "multi-market"); (11) do-able (legal, regulatory considerations); (12) quality; and (13) impact on community. (PX01030 at 007, *in camera*; Wakeman, Tr. 2959-2960, *in camera*; Black, Tr. 5634-5635, *in camera*).

403. All of the factors identified in F. 402 were important to the Board, and the ranking reflected the overall opinion of the Board as to the relative importance of each factor. (Black, Tr. 5635, *in camera*).

404. The October 2009 Affiliation Update summarized the various ongoing affiliation discussions with Mercy, UTMC and ProMedica. Preliminary discussions with Board leadership of hospital systems began prior to August 2008. Discussions began with regard to a joint venture with Mercy in August 2008. Discussions with UTMC began in February 2009, with respect to a shared governance model. Discussions began with ProMedica upon signing a non-exclusive, confidentiality agreement in July 2009. (PX01030 at 002-006, *in camera*).

405. The October 2009 Affiliation Update evaluated in considerable detail the advantages and disadvantages of an affiliation with each Mercy, UTMC and ProMedica, applying each of the 13 factors noted in F. 402. (PX01030 at 015-017, *in camera*).

406. By October 2009, Mr. Wakeman seriously questioned whether it would "really make sense for our best ability to service this community long term to stay independent" given St. Luke's "very disappointing" financial performance, health-care reform requirements, capital demands, difficulty with recruitment, below market compensation, and a plant that needed updating. (PX01283 at 002, *in camera*; Wakeman, Tr. 2949-2950, *in camera*).

407. At a November 4, 2009 Board meeting, St. Luke's Board directed management to "vigorously pursue specific service line joint ventures with provider systems in the community." (Wakeman, Tr. 2965-2966, *in camera*).

408. St. Luke's CEO, Mr. Wakeman, did not agree with the Board's approach on November 4, 2009, as he believed it was not sufficiently focused to resolve St. Luke's serious financial problems. He believed that the November 4 board meeting "was an example of how large boards have an arduous time making difficult decisions. They are struggling with losses of $2 million a month and holding onto independence." (RX880 at 000001; Wakeman, Tr. 2967, *in camera*).

409. The Board received another update on affiliation at a Board meeting on December 15, 2009. (PX01016 at 001, *in camera*) (the "December 2009 Affiliation Update").

410. The December 2009 Affiliation Update included updates on certain of St. Luke's financial metrics, such as net patient care revenue and operating expenses, which indicated that, while both had increased since 2007, operating expenses were still exceeding net patient care revenue. A detailed analysis of cost and revenue per case further showed that in 2008, St. Luke's cost per case exceeded net revenue, and that St. Luke's was the only hospital in the area where this was true. (PX01016 at 002, 008, *in camera*).

411. The December 2009 Affiliation Update also reported certain corrective actions St. Luke's had implemented, including its readmission to Anthem's network as of July 2009. (PX01016 at 005).

412. The December 2009 Affiliation Update reports that despite positive results in a variety of areas, "[t]he Bottom Line is…We have a major insurance/managed care payment issue." (PX01016 at 008, *in camera*).

413. As part of the December 2009 Affiliation Update, St. Luke's management presented St. Luke's Average Payor Rates Compared to Market Median, which concluded that St. Luke's managed care contracts yielded a weighted average of {█} percent below the Toledo market median for inpatient services. The overall rates from MMO, St. Luke's largest payor, were noted to be approximately {█} percent below the Toledo market median. When evaluated by service line, it was determined that, as to St. Luke's top 8 commercial payors, the more high-end commercial services St. Luke's performed, the more money it lost. (PX01016 at 010-011, *in camera*)).

414. As part of the December 2009 Affiliation Update, St. Luke's management presented the following "pressing concerns" to St. Luke's Board: Debt service coverage ratio: in non-compliance; IT upgrade: {█} million net dollars (without operational expenses); Moody's Investors Service, Inc. ("Moody's") possible bond downgrade; SLH employee pay rates falling behind;  Building upgrades: SLH average age of plant ratio nearly {█} well over the 75th percentile benchmark; defined benefit pension funding / expense; New state of Ohio hospital tax; continued increase in bad debt/charity care; and impending health-care reform. (PX01016 at 014, *in camera*; Wakeman, Tr. 2992, *in camera*).

415. At the end of 2009, St. Luke's CEO Wakeman advised the Board that under then-current conditions, St. Luke's would be able to survive between three and five years, and that if St. Luke's was able to get rate increases under contracts with two of St. Luke's largest commercial payers, St. Luke's could survive four to seven years. (Wakeman, Tr. 2624-2625).

416. In its December 23, 2009 "Material Event Notice," to its bond insurer Ambac Assurance Corp. ("AMBAC") (F. 907), St. Luke's stated that its "plan to address its future covenant compliance is to attempt to negotiate new, or renegotiate existing contracts with its insurance carriers." St. Luke's also stated that it "may explore other options, including but not limited to exploring an affiliation with another health system." (RX183 at 000004; Gordon, Tr. 6816-6817, *in camera*).

417. At the December 15, 2009 St. Luke's Board of Directors meeting, three St. Luke's Board members, Mr. Bachey, Mr. Schultz, and Dr. Houston, expressed the view that for St. Luke's an affiliation was inevitable; St. Luke's would have to merge with somebody within the next three years. (Wakeman, Tr. 2999-3000, *in camera*).

418. The December 2009 Affiliation Update described the pros and cons of affiliating with ProMedica, Mercy or UTMC. (PX01016 at 023-024, *in camera*).

419. As to the option of affiliating with Mercy, the December 2009 Affiliation Update to the Board identified the "pros" as: a mission and culture of quality consistent with St.

49

Luke's; some favorable insurance contracts; some investment in St. Luke's campus; and financial stabilization of organization's ability to serve and expand. The "cons" of St. Luke's affiliating with Mercy were identified as: very limited local governance and control, with the "system" having a priority over local circumstances; recent history of poor physician decisions/relations; and could increase prices/cost to the community. (PX01016 at 023, *in camera*).

420.    As to the option of affiliating with UTMC, the December 2009 Affiliation Update to the Board identified the "pros" as: exciting/compelling vision for the future; some opportunity for St. Luke's to make a mark re: a future health-care system; history of working together; access to future physicians; and benefit to the community. The "cons" of St. Luke's affiliating with UTMC were identified as: limited help with regard to insurance contracts; bureaucracy resulting from being a state institution; difficulty working together on many levels; and could increase prices/cost to the community. (PX01016 at 024, *in camera*; *see also* PX01018 at 008, 016).

421.    As to the option of affiliating with ProMedica, the December 2009 Affiliation Update to the Board identified the "pros" as: favorable insurance contracts (also Paramount); access to capital; investment in St. Luke's campus; potential for local governance and control; solid physician strategy and infrastructure; and financial stabilization of organization's ability to serve and expand. The "cons" of St. Luke's affiliating with ProMedica were identified as: some quality measures are poor; history of poor relations with partners/affiliates; and could increase prices/cost to the community. (PX01016 at 023, *in camera*).

422.    On December 15, 2009 St. Luke's CEO, Mr. Wakeman, recommended to the St. Luke's and OhioCare's Board of Directors that St. Luke's pursue affiliating with ProMedica. (Wakeman, Tr. 2996, *in camera*).

423.    On December 15, 2009, St. Luke's Board of Directors voted to pursue exclusive discussions with ProMedica for ninety days with an intent to enter into a joinder. (PX01457 at 004, *in camera*; Black, Tr. 5646-5647, *in camera*).

424.    St. Luke's Board decided not to pursue affiliation with Mercy based upon several issues, including concerns about a lack of local governance and {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛}, and was an issue for the Board. (Wakeman, Tr. 2560-2561, 2980-2982, *in camera*; Black, Tr. 5647-5648, *in camera*; PX01583 at 002, *in camera*; PX01457 at 004, *in camera*; Shook, Tr. 1000-1001, *in camera*; RX16 at 024-025 (Bazeley, Dep. at 91-94)).

425.    St. Luke's Board decided not to pursue affiliation with UTMC principally because UTMC's proposed board structure was not acceptable to St. Luke's, due to UTMC's wanting to maintain full veto power; and the potential cultural incompatibility between

UTMC's state institution and union culture with St. Luke's culture. (Wakeman, Tr. 2556-2557; Black, Tr. 5648, *in camera*).

426.  ProMedica and St. Luke's signed a Memorandum of Understanding on January 15, 2010 to "provide a framework for their discussions" for a proposed transaction in which OhioCare and its subsidiaries including St. Luke's "would become an integral part of ProMedica." (Hanley, Tr. 4545; RX1912 at 000001, *in camera*; Oostra, Tr. 5849).

427.  ProMedica and St. Luke's signed the Joinder Agreement on May 25, 2010. (PX00058 at 001; Hanley, Tr. 4628, *in camera*).

428.  The Joinder Agreement commits ProMedica to "maintain [St. Luke's] using its current name and identity and at its current location for a minimum of ten (10) years . . . as a fully operational acute-care hospital providing the following services: emergency room, ambulatory surgery, inpatient surgery, obstetrics, inpatient nursing and a CLIA certified laboratory." (PX00058 at 023, 045-046; Hanley, Tr. 4631-4632, *in camera*; Oostra, Tr. 5856).

429.  In the Joinder Agreement, ProMedica agreed to provide St. Luke's $30 million in capital to fund capital projects such as those that St. Luke's had deferred because it lacked the funds needed to pay for them. (Hanley, Tr. 4628, *in camera*; PX00058 at 021, 056; Johnston, Tr. 5351-5352, 5372).

430.  The capital commitment referred to in F. 429 was to be used for capital projects at St. Luke's, including converting semi-private rooms to private rooms, updating St. Luke's IT systems, constructing an outpatient lobby, renovating the heart center, moving administrative services, expanding surgical areas, and increasing the private postpartum area and well infant nursery. (Hanley, Tr. 4628, *in camera*; PX00058 at 056).

431.  The Joinder Agreement maintains St. Luke's existing medical staff, bylaws, rules, and regulations. (PX00058 at 046).

432.  The Joinder Agreement provides that St. Luke's would become a participating provider in Paramount upon closing. (Hanley, Tr. 4631, *in camera*; PX00058 at 022-023).

433.  A stated objective in the Joinder Agreement is optimization of health benefits by continued local board governance and oversight of charitable assets. (PX00058 at 007).

434.  Pursuant to the Joinder Agreement, St. Luke's would hold 25 of 27 board seats, reserving 2 to be appointed by ProMedica.  ProMedica holds a reserve power to approve nominees for St. Luke's Board, "which approval shall not be unreasonably withheld." (PX00058 at 009).  ProMedica also holds reserve powers to remove any director, trustee or other board member of St. Luke's without cause, except that during an initial governance period of no less than 3 years, removal must be with cause. (PX00058 at 016-017).

435. ProMedica's reserve powers under the Joinder Agreement also include the right to approve budgets, debt issuance, amendments to governing documents, and to appoint (or remove) St. Luke's president, secretary and/or treasurer, after prior consultation with St. Luke's. (PX00058 at 017-018).

436. The St. Luke's Board vote to approve the Joinder was unanimous, with one abstention. (Black, Tr. 5660, *in camera*; RX1235 at 004, *in camera*).

## M. Competitive Effects

### 1. Competitive significance of St. Luke's

#### a. Hospitals' views on competitive significance of St. Luke's

437. ProMedica considers Mercy to be its most significant competitor in the Toledo area. (Oostra, Tr. 5803-5804; Wachsman, Tr. 4866; Randolph, Tr. 6934-6935).

438. ProMedica considers Mercy to be its most significant competitor because of Mercy's size and backing by Catholic Health Partners, its access to capital, ability to make investments in communities, and re-entry into the physician employment business, and because it is a multi-hospital system that virtually mirrors the ProMedica system. (Oostra, Tr. 5803-5805).

439. Mercy considers ProMedica to be its most significant competitor in the Toledo area. (Shook, Tr. 1091-1092, *in camera*). Marketing studies commissioned by Mercy reflect a high-degree of competition between ProMedica and Mercy. (Shook, Tr. 1090-1091, *in camera*; PX02534 at 003, 006, 013, 020, 023, *in camera*; RX250 at 000005, 000013, 000018, *in camera*).

440. The CEOs of both ProMedica and St. Luke's agree that, before the Joinder, St. Luke's viewed ProMedica as its "most significant competitor." (Wakeman, Tr. 2511, 2523-2527; Oostra, Tr. 6040).

441. St. Luke's CEO, Mr. Wakeman, after joining St. Luke's in 2008, had as his goal to regain volume from ProMedica in St. Luke's core and primary service areas. (Wakeman, Tr. 2504-2505).

#### b. MCOs' views of competitive significance of St. Luke's

442. MCOs believe that, because of their broad service offerings and geographic reach throughout the Toledo metropolitan area, MCOs must have either Mercy or ProMedica in their health plan. (RX27 at 000005 (Sheridan, Dep. at 15), *in camera*; PX02067 at 003, *in camera*).

443. While a ProMedica-UTMC network is attractive, a St. Luke's-UTMC network would not be attractive. (Town, Tr. 3785-3786, *in camera*).

444. United considers the ProMedica and Mercy hospitals to be extremely similar in terms of their location and the types of services and acuity of care they offer. (Sheridan, Tr. 6616-6618).

445. When {▮▮▮} and ProMedica were unable to reach an agreement {▮▮▮} substituted Mercy for ProMedica in its network. (PX01902 at 014 ({▮▮▮}, IHT at 48-49, *in camera*)).

446. MMO considers Mercy and ProMedica to be each other's primary competitor. (RX46 at 000008 (Pirc, IHT at 23-24), *in camera*).

447. All of the MCOs operating in Lucas County have had either ProMedica or Mercy or both in their networks. (Guerin-Calvert, Tr. 7329).

448. Patients cannot get all of the services they may need from only St. Luke's. (Buehrer, Tr. 3092).

449. MCOs could not replace ProMedica with St. Luke's. (Town, Tr. 4057, 4081; RX204 at 000004 (Pugliese Dep. at 11), *in camera*; RX205 at 000004 (Radzialowski, Dep. at 10-11), *in camera*). Because St. Luke's does not offer the high level services, such as transplants, MMO, for example, needs to include other hospitals in its network in order to meet all its members' needs. (Pirc, Tr. 2280).

### c.  Patients' views, as reflected in consumer preference surveys

450. A 2006 survey conducted for St. Luke's revealed that in St. Luke's core service area, St. Luke's (45%) and TTH (24%) were the top two hospitals that came to mind when consumers were asked about hospitals in the area. (PX01352 at 007; Wakeman, Tr. 2521). The consumer survey found that St. Luke's was preferred by 44% of consumers in the core service area and TTH was second, with 21%. (PX01352 at 007; Wakeman, Tr. 2522).

451. A 2008 survey conducted for St. Luke's revealed, similarly to 2006, that in St. Luke's core service area, St. Luke's and TTH were the top two hospitals that came to mind when consumers were asked about hospitals in the area, and the top two preferred hospitals. (PX01077 at 009-014; Wakeman, Tr. 2523). Forty-two percent of residents in St. Luke's primary service area selected TTH as St. Luke's most direct competitor and another 8 percent selected Flower Hospital. (PX01169 at 042; Rupley, Tr. 1958-1959). UTMC was selected by 8 percent and St. Vincent by 16 percent of residents. (PX01169 at 042; Rupley, Tr. 1958-1959).

452. In the same 2008 survey as described in F. 451, St. Luke's was identified most often as the preferred hospital for "routine care," followed by TTH. (PX01169 at 015; Rupley, Tr. 1953-1955).

### d. Diversion analysis substitutes

453. Diversion analysis is a commonly used method to quantify the degree of substitutability between hospitals or hospital systems. In the context of a hospital merger, the diversion ratio measures the predicted share of a hospital's patients that would go to a specific alternative if that hospital was no longer available. (Town, Tr. 3771, *in camera*).

454. Diversion analysis relies on hospital claims data, and estimates a hospital choice model by examining the choices patients make with respect to which hospital to use. (Town, Tr. 3772-3773, *in camera*; PX02148 at 046-047 (¶ 88) (Town Expert Report), *in camera*).

455. In a diversion analysis, the higher the diversion, the higher the substitutability of the hospitals. (Town, Tr. 3773, *in camera*; PX02148 at 046-047 (¶ 88) (Town Expert Report), *in camera*).

456. Complaint Counsel's expert, Professor Town, performed a diversion analysis to measure the predicted share of a specific hospital's patients that would go to a specific alternative hospital or hospital system if the first hospital were no longer available. Professor Town's analysis examined the entire Greater Toledo Area and reported the results for each MCO's member population. (PX02148 at 046-047 (¶ 88 and n.136) (Town Expert Report), *in camera*).

457. The diversion analysis described in F. 456 shows that if St. Luke's were not available, for {▮▮▮} patients, {▮} percent would go to a ProMedica hospital, {▮} percent would go to a Mercy hospital and {▮▮} percent would go to UTMC. (Town, Tr. 3775-3776, *in camera*; PX01850 at 020 (Table 3) (Town Rebuttal Report), *in camera*). Diversion analysis for {▮▮▮} patients reveals that ProMedica is St. Luke's closest competitor. (Town, Tr. 3775-3776, *in camera*; PX01850 at 020 (Table 3) (Town Rebuttal Report), *in camera*).

458. The diversion analysis described in F. 456 shows that if ProMedica hospitals were not available, for {▮▮▮} patients, the second largest number of patients {▮▮▮} percent would have gone to St. Luke's. (Town, Tr. 3775-3776, *in camera*; PX01850 at 020 (Table 3) (Town Rebuttal Report), *in camera*).

459. Professor Town's diversion analysis (F. 456) demonstrates that for {▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮}, ProMedica is St. Luke's closest substitute; for FrontPath, St. Luke's is ProMedica's closest substitute; and for {▮▮▮▮}, ProMedica is the second-closest substitute for St. Luke's. (Town, Tr. 3777, *in camera*; PX01850 at 020 (Table 3) (Town Rebuttal Report), *in camera*).

460. In a year-by-year diversion analysis (F. 456), {▮▮▮} enrollees' diversion from St. Luke's to ProMedica is increasing, reflecting the relatively recent addition of ProMedica to {▮▮▮} network. (Town, Tr. 3780-3781, *in camera*; PX01850 at 018 (Table 2) (Town Rebuttal Report), *in camera*).

461. Based on the diversion analysis (F. 456), Mercy is ProMedica's closest substitute and St. Luke's is ProMedica's second-closest substitute. (Town, Tr. 3777-3778, *in camera*; PX01850 at 020 (Table 3) (Town Rebuttal Report), *in camera*).

### e. Other indicators of competitive significance of St. Luke's

462. St. Luke's is the third-largest hospital in the market based on commercial volume. St. Luke's had 2,846 commercial discharges between July 1, 2009 and March 31, 2010, exceeded only by St. Vincent and TTH. (PX02148 at 171 (Town Expert Report), *in camera*).

463. St. Luke's provides care to approximately ten commercially insured patients per day. (PX02137 at 055, *in camera*). By comparison, ProMedica's hospitals provide care to approximately 53 commercially insured patients per day. (PX02137 at 056, *in camera*).

464. ProMedica and St. Luke's competed to attract patients, especially those who reside between ProMedica's hospitals and St. Luke's. (Oostra, Tr. 6041-6042).

465. Prior to the Joinder, ProMedica and St. Luke's also competed to attract and retain physicians. (Oostra, Tr. 6040-6041).

466. Pursuant to the Joinder Agreement, St. Luke's was added to the provider network of ProMedica's health-insurance subsidiary, Paramount. (PX00058 at 022-023 (Joinder Agreement § 6.2(i)); PX00140 at 002).

467. ProMedica expected that volume shifts to St. Luke's away from ProMedica hospitals would "undoubtedly occur" after St. Luke's joined Paramount. (Randolph, Tr. 7099-7100, *in camera*). In particular, ProMedica expected patients residing in the area around St. Luke's to be most likely to switch from ProMedica hospitals to St. Luke's. (Randolph, Tr. 7100, *in camera*).

468. ProMedica estimated that {▮▮▮▮} Paramount commercial inpatient admissions at ProMedica hospitals would be redistributed from ProMedica to St. Luke's if St. Luke's was added to Paramount's network. (PX00040 at 007, *in camera*).

469. ProMedica estimated if St. Luke's was included in the Paramount network, the potential risk of lost margin annually to Flower Hospital was {▮▮▮} million if every Paramount discharge at Flower from St. Luke's primary zip codes left Flower for St. Luke's. (PX00240 at 002, *in camera*).

470. St. Luke's also believed that if it was readmitted to Paramount, it would gain patients currently going to TTH. (Rupley, Tr. 2010, *in camera*).

471. ProMedica estimated that St. Luke's readmission to Anthem's network in 2009 would cost ProMedica {▮▮} million in gross margin annually. (PX00333 at 002, *in camera*).

### f. Competitive significance of location in southwest Lucas County

#### (i) Demographics of southwest Lucas County

472. Southwest Lucas County is a desirable area for a hospital to be located. (Oostra, Tr. 6036-6037; PX00009 at 029 (ProMedica Credit Presentation) ("desirable section of the Toledo metro area where PHS lacks a physical presence"). St. Luke's CEO believes that St. Luke's location is "terrific" and places it in a "favorable" position. (Wakeman, Tr. 2477). St. Luke's is easily accessible from major highways, and its location provides it with access to a growing population of employed and commercially insured patients. (Wakeman, Tr. 2479-2481; PX01911 at 015 (Wakeman, IHT at 53-55), *in camera*; Oostra, Tr. 6036-6038; Nolan, Tr. 6287, *in camera* (St. Luke's is "in a highly visible area, right off the highway, good highway access, and it's an area with good demographics, reasonable population growth and good average household incomes.") PX01132 at 002-004 (St. Luke's evaluation), *in camera*).

473. The area surrounding St. Luke's is growing and "more and more [is] being built in the adjoining communities to Maumee." (Shook, Tr. 927). The area surrounding St. Luke's contains "very good demographics" with "a reasonably well-affluent community" and a "better insured population" than the rest of Lucas County. (Shook, Tr. 926-927; Wakeman, Tr. 2477, 2479).

474. The January 2011 study titled "Clinical Integration Strategy" developed for ProMedica by Navigant Consulting outlined clinical service consolidation recommendations for ProMedica. One of Navigant's recommendations is that: "SLH will serve as the gateway facility to the southern and western portions of the Toledo MSA." (PX02386 at 010, *in camera*). *See also* PX01215 at 003 (Navigant Presentation: ProMedica Health System Market and Facility Assessment Summary), *in camera* ("good access and visibility from the Interstate").

#### (ii) MCOs' views

475. MCOs recognize that a hospital's location within Lucas County is important because community members prefer hospitals close to them. (Pugliese, Tr. 1450-1452 (Anthem's Lucas County members "will stay closer to home for common services, preventative care services."); (Pirc, Tr. 2184 ("if a loved one is in the hospital, you'd rather be ten minutes away than an hour away . . . ."); *cf.* Radzialowski, Tr. 634 (". . . people do develop connections with their local hospital. You know, their babies, that's where they have babies. Their parents might have died there. They know people that work there. They sit on the board.")).

476. MCOs believe that a hospital's location in Lucas County is an important factor in contract negotiations. (Radzialowski, Tr. 663; Pirc, Tr. 2199; Pugliese, Tr. 1451-1452, 1459).

477.  Specifically, St. Luke's location was important to MCOs in configuring their networks. (Pirc, Tr. 2195-2196; Pugliese, Tr. 1442-1443; Radzialowski, Tr. 713-714, *in camera*; Sheridan, Tr. 6672-6673; *see also* Town, Tr. 3627, 3651).

478.  MMO's Vice President of Network Management, believed that a network without St. Luke's would leave a fairly sizable geographic hole in MMO's network and that MMO needed St. Luke's in its network to have a marketable product at all. (Pirc, Tr. 2195, 2266-2267).

479.  Greg Radzialowski, Senior Network Manager of Aetna, believes that Mercy is unable to cover the southwest portion of Lucas County and that the location of St. Luke's significantly increases ProMedica's leverage with Aetna. (Radzialowski, Tr. 713-714, *in camera*).

480.  Jim Pugliese, Regional Vice President of Contracting and Provider Relations for Anthem, believes that the area around St. Luke's is an important customer base for Anthem. (Pugliese, Tr. 1442-1443).

481.  Paramount's President believed that the addition of St. Luke's to Paramount's network in late 2010 made Paramount more attractive to employers in southwestern Lucas County and had a positive impact on Paramount. (Randolph, Tr. 7007-7008, 7061-7062).

482.  An analysis prepared for ProMedica projected that adding St. Luke's to the Paramount network could net Paramount as many as {█████} new members. (PX00040 at 008, *in camera*).

### (iii)  Perspective from Mercy

483.  A document developed by Mercy in 2010 in the ordinary course of business analyzed market shares for southwest Lucas County and determined that the hospitals in Lucas County had the following market shares: ProMedica, {█████}; St. Luke's, {█████}; Mercy, {█████}; and UTMC, {█████}. (PX02290 at 003, *in camera*; Shook, Tr. 1012-1013). Post-Joinder, ProMedica has a {█████} share in southwestern Lucas County. (PX02290 at 003, *in camera*).

484.  Based on Mercy's review of market share information, St. Luke's had a slim majority of the southwest Lucas County market, with "a fair degree of inpatient admissions going to Flower and Toledo." (Shook, Tr. 934).

485.  Mercy does not have a hospital in southwestern Lucas County and has no plans to build one. (Shook, Tr. 963-965, 968; PX02068 at 002, 006 (¶¶ 8, 24) (Shook, Decl.), *in camera*); PX02148 at 064-065 (¶ 116) (Town Expert Report), *in camera*). {████████████████████████████████████████████████████████████████}. (Shook, Tr. 988, *in camera*).

486. The joinder of St. Luke's with ProMedica gives ProMedica a significant locational advantage over Mercy because Mercy offers no direct counterpart to St. Luke's in southwest Lucas County. (PX02148 at 064-065 (¶ 116) (Town Expert Report), *in camera*; Sheridan, Tr. 6698, *in camera*).

### (iv) Drive-time

487. Out of one hundred admissions at St. Luke's, 75 of those admissions travel less than 14 minutes to get to St. Luke's; 95 of those admissions travel less than 20 minutes. (Guerin-Calvert, Tr. 7336-7337).

488. The average drive-time for St. Luke's patients is approximately 12 minutes. (Guerin-Calvert, Tr. 7336-7337).

489. Looking at the incremental drive-time for patients located in each of St. Luke's top 10 zip codes from which it admits patients shows that, on average, the incremental drive-time for a St. Luke's patient to go to a different hospital is an 18 additional minutes. (Guerin-Calvert, Tr. 7335-7337).

490. Respondent's expert's drive-time analysis shows that many patients for whom St. Luke's is the closest hospital, travel to other hospitals that are farther away. (Guerin-Calvert, Tr. 7351-7352; RX71(A) at 000032-000034, 000186, *in camera*).

491. Patient origin data (discussed below, II.M.1.f.v.) and drive-time analyses show that patients do not necessarily go to the next closest hospital. (Guerin-Calvert, Tr. 7244-7245; RX71(A) at 000034, *in camera*).

### (v) Patient origin

492. Data based on where the patients in a hospital reside (patient origin) demonstrates that approximately 60 percent of the patients who reside in St. Luke's service area travel to hospitals other than St. Luke's to receive GAC inpatient services; however, this may reflect in part the fact that Paramount insureds, for whom St. Luke's was not a network provider at the time the data was collected, were travelling to an in-network hospital. (PX02148 at 161 (Town Expert Report, Ex. 11); Town, Tr. 3938-3939, 4438-4439).

493. Based on patient origin data, patients in St. Luke's service area choose TTH the most, if they do not go to St. Luke's. (Rupley, Tr. 1945).

494. According to internal documents, in St. Luke's core service area, St. Luke's and ProMedica had the first and second highest inpatient market shares, respectively, for GAC inpatient services for all patients. (PX01235 at 003).

495. A December 2009 presentation to St. Luke's Board indicated that St. Luke's and ProMedica treated the first and second greatest percentages of all GAC patients in St. Luke's core service area. (Rupley, Tr. 1978-1983, *in camera*; PX01016 at 003, *in camera*).

496. St. Luke's internal documents also indicate that in 2007, ProMedica and St. Luke's accounted for 66 percent of the inpatient market share for all patients in St. Luke's core service area, compared to 13 percent for UTMC and only 8 percent for Mercy St. Vincent's. (Wakeman, Tr. 2519; PX01352 at 006). Since 2007, St. Luke's inpatient market share in its core service area has increased. (Wakeman, Tr. 2519-2520).

497. Based on Respondent's expert's calculations, in St. Luke's top ten zip codes by volume, (accounting for 64 percent of admissions), ProMedica, (43 percent) and St. Luke's (26 percent) rank first and second in market shares. (PX02148 at 076 (¶ 137) (Town Expert Report), in camera; PX02123 at 042 (Guerin-Calvert, Decl. Exhibits)). In eight of St. Luke's top ten zip codes, and in all of St. Luke's "core" zip codes, St. Luke's and ProMedica had the first and second highest shares of the GAC inpatient service market. (PX02123 at 042 (Guerin-Calvert, Decl. Exhibits); PX02148 at 043, 064-065, 161 (¶ 82, 116-117, Exhibit 11) (Town Expert Report), in camera).

498. Based on market shares, Professor Town concluded that patients residing in St. Luke's core service area prefer St. Luke's and ProMedica for inpatient services. (Town, Tr. 3753-3754, in camera). Mercy and UTMC have much lower market shares and are therefore preferred less by patients in St. Luke's core service area. (Town, Tr. 3754-3755, in camera).

## 2. Pre-Joinder pricing

### a. Background

#### (i) Terminology

499. A hospital chargemaster is a list of the prices for the hospital's services. (Radzialowski, Tr. 761; Randolph, Tr. 6959).

500. The price at which a party perceives it would be just as well off not reaching an agreement is that party's "walk-away" point. (PX02148 at 015-016 (¶ 26) (Town Expert Report), in camera; PX01914 at 015-016 (Pirc, IHT at 51-53), in camera; Radzialowski, Tr. 660).

501. The contract "term" identifies the length of time in which the contract is in force, such as one-year or multi-year terms. (Wachsman, Tr. 4898-4899).

502. A most-favored nation ("MFN") clause is a contractual provision that prohibits a hospital provider that has agreed to rates with one MCO from agreeing to lower rates with competing MCOs unless they also extend the same rates to the first MCO. (Pugliese, Tr. 1549, 1580)

503. "DRG" stands for Diagnosis Related Group. It is a billing methodology that was implemented by Medicare in the 1970s and 1980s and is commonly used today by MCOs. (Radzialowski, Tr. 673; Pugliese, Tr. 1473, *in camera*).

504. A DRG code is assigned to a patient based on the event for which the patient was admitted or the services that the patient obtained. (Guerin-Calvert, Tr. 7161-7162).

505. An "escalator" provision is a negotiated term that allows an adjustment to the contract reimbursement rates, based on an index, such as one of the U.S. Department of Labor's official Consumer Price Indexes. (Radzialowski, Tr. 761; Sandusky, Tr. 1320; Wachsman, Tr. 4904-4905).

506. "Outlier threshold" refers to contract provisions designed to protect providers against catastrophic cases that incur charges outside the range of services covered by a DRG rate, by providing reimbursement for those cases that reach "outlier" status. (Wachsman, Tr. 4901-4902).

507. "Ancillary" services include physician and facility services that are not part of the hospital, including long-term care facilities, home health services, durable medical equipment, pharmacy services, and outpatient surgery centers. Rates for ancillary services are separate from the inpatient and outpatient rates in a contract, and there is a rate attached to each ancillary service. (Wachsman, Tr. 4906).

508. A "cost coverage ratio" identifies for each MCO what percentage of a hospital's operating costs, or direct costs, that MCO is covering. It is calculated by taking all of the operating costs attributed to an MCO and comparing those costs to the actual payments received from that MCO, then the payments are divided by the costs to yield the ratio. (Wachsman, Tr. 4947-4948, *in camera*).

### (ii) Rate negotiations

509. Reimbursement rates for hospital services are determined through the bargaining process between hospitals and MCOs. (PX02148 at 014-015 (¶ 24) (Town Expert Report), *in camera*; Pugliese, Tr. 1472, *in camera*, 1547-1548; Radzialowski, Tr. 658-661; Korducki, Tr. 527-528; Shook, Tr. 948-950).

510. MCOs negotiate rates for hospital services on behalf of their customers, who are both self-insured and fully-insured employers. (Pugliese, Tr. 1432-1433, 1547; PX01914 at 014 (Pirc, IHT at 49); Radzialowski, Tr. 748; PX02148 at 15 (¶ 25) (Town Expert Report), *in camera*; Sandusky, Tr. 1297).

511. Prior to the Joinder, both ProMedica and St. Luke's independently engaged in extensive negotiations with MCOs over rates for services, and other contractual terms, with the goal of reaching a multi-year contract with each MCO. (PX02148 at 015 (¶ 25) (Town Expert Report), *in camera*; Radzialowski, Tr. 681-687, *in camera*; Pugliese, Tr. 1474-1476, *in camera*).

512. Negotiations between hospitals and MCOs cover many contractual terms including: claims adjudication procedures, payment outliers, payment escalators, hold-harmless provisions, chargemaster limits, reimbursement methods, renewal or renegotiation provisions, grievance procedures, medical necessity provisions, coordination of benefits provisions, pay-for-performance provisions, pre-certification requirements, nondiscrimination provisions, "never event" provisions, contract length provisions, termination provisions, and other specific provisions that may be important to the hospital or the MCO. (Shook, Tr. 949-950, 1074; Pugliese, Tr. 1550-1553; McGinty, Tr. 1240-1241, 1258; Pirc, Tr. 2206-2207, 2288-2290; Radzialowski, Tr. 760-763; Radzialowski, Tr. 804, *in camera*; Sheridan, Tr. 6627; Randolph, Tr. 6950-6951).

513. Out of all the contract terms that are negotiated, reimbursement rates, and the contractual terms that impact the total amount of reimbursement, are the most critical. (Wachsman, Tr. 5139-5140, *in camera*; Sandusky, Tr. 1318-1319; Radzialowski, Tr. 660; Pugliese, Tr. 1514, *in camera*; Sheridan, Tr. 6703, *in camera*).

514. An example of a contractual term that impacts reimbursement is reimbursement methodology. The DRG reimbursement methodology is geared toward cases that have a lower level of charges than cases that fall into outlier categories. (Wachsman, Tr. 4903-4904).

515. MCOs and hospitals may negotiate a fixed price list that is based on the DRG codes, (Sandusky, Tr. 1319-1320); however, the DRG rate alone does not fully represent a contract's reimbursement level because a high outlier methodology may cause cases that exceed the DRG rate, but fall short of the outlier threshold, to go unpaid. (Wachsman, Tr. 4903-4904).

516. To gain revenue in a negotiation, a hospital can increase its unit price for particular services in the MCO agreement or can negotiate a higher threshold in terms of its chargemaster allowance, which is the cost that they would be able to pass through the chargemaster. (Pugliese, Tr. 1455).

517. Medicare and Medicaid reimbursements do not cover the costs of providing hospital services to Medicare and Medicaid patients. (Wachsman, Tr. 4848; Guerin-Calvert, Tr. 7298-7299; RX71(A) at 000128, 000133, *in camera*).

518. Medicare reimbursed hospitals, on average, 89 to 90 percent of the hospital's cost of treating Medicare patients in 2009. (Guerin-Calvert, Tr. 7302-7303; RX71(A) at 000133, *in camera*).

519. Because Medicare and Medicaid reimbursement rates cover less than the provider's costs, providers must subsidize the difference between the government reimbursement rates and the provider's costs. (Wachsman, Tr. 4847-4848).

520. Compensation received by hospitals from private MCOs not only covers hospital costs for patients covered by MCOs, but also provides some contribution toward covering the

insufficient funding provided to hospitals from Medicare and Medicaid. (Guerin-Calvert, Tr. 7304).

### b. ProMedica pricing

521. At the time of the Joinder, ProMedica was in-network with MMO, Anthem, FrontPath, United, Paramount, and Aetna. (F. 136, 157, 173, 191, 204, 222).

522. ProMedica seeks to obtain reimbursement rates from MCOs that {███████████████████████████████████████}. ProMedica has established a {█████████████████████████████████████████████████████████████████████████ ██████████████████████████████}. (RX1854 at 000005, *in camera*; Wachsman, Tr. 4949-4950, 5140, *in camera*).

523. Cost coverage ratios consider both the direct and indirect costs that a hospital incurs as a result of providing care. (Den Uyl, Tr. 6438, *in camera*).

524. ProMedica's commercial reimbursement rates pre-Joinder were among the highest in Lucas County. (Radzialowski, Tr. 684, *in camera*; Pugliese, Tr. 1484-1485, 1513, 1656-1657, *in camera*; Pirc, Tr. 2238, *in camera*; PX02148 at 145 (Town Expert Report, Ex. 7), *in camera*; *see also* {█████████}, Tr. 6658-6659, *in camera* (stating that Bay Park's rate with {██████} "reflects an absolutely ridiculously high base rate for the MS-DRG …")).

525. ProMedica was informed by Anthem that its rates were among the highest in the state of Ohio. (Oostra, Tr. 5996; *see also* PX00153 at 001 (ProMedica Jan. 2009 e-mail) ("we hear from payors we are among the most expensive in [O]hio")).

526. ProMedica had the largest market shares and the highest reimbursement rates; Mercy, the next-largest system, had the second highest rates; UTMC, the third largest system, had the third highest prices; and St. Luke's, with the smallest market share, had the lowest prices in the market. (PX02148 at 039 (¶ 71)); *see also* Pugliese, Tr. 1513).

527. ProMedica's prices cannot be explained by competitively-benign factors such as cost or quality. (PX01850 at 057-059 (¶¶ 89-90) (Town Rebuttal Report), *in camera*).

### c. St. Luke's pricing

528. At the time of the Joinder, St. Luke's was in-network with MMO, Anthem, FrontPath, United, and Aetna. (F. 139, 160-162, 191, 204, 222).

529. On December 15, 2009, St. Luke's reported to the Board the findings of Navigant Consulting that (1) St. Luke's average payor rates for inpatient services were {████} percent below the Toledo market median; (2) St. Luke's overall rates with MMO were

{■} percent of the Toledo market median; and (3) if St. Luke's were to be paid at the Toledo market median, this would result in an additional {■} million in reimbursement  (PX01016 at 010).

530.  St. Luke's commercial reimbursement rates are significantly lower than those of ProMedica and Mercy.  (Pirc, Tr. 2238, 2241, *in camera*; Radzialowski, Tr. 684, 687-688, 698-700, *in camera*; Sandusky, Tr. 1338-1340, 1347-1348, *in camera*; *see* Pugliese, Tr. 1512-1513, *in camera*; McGinty, Tr. 1210).

531.  As of August 31, 2010, Anthem and MMO were St. Luke's two largest MCOs, comprising more than {■} percent of St. Luke's net revenue and more than {■} percent of its commercial revenue.  (RX56 at 000010, *in camera*).

532.  St. Luke's was being paid less than its comparable sized hospitals throughout the nation that were members of Voluntary Hospitals of America ("VHA").  St. Luke's was receiving just over {■} per case-adjusted inpatient admission whereas on average a VHA hospital was receiving over $6500.  (PX01018 at 002, *in camera*; Wakeman, Tr. 2904-2906, *in camera*).

533.  St. Luke's was being paid less than comparably sized hospitals in St. Luke's region that were part of the VHA including Flower, Oakwood Hospital and Medical Center, and Akron Medical Center.  St. Luke's was receiving just over {■} per case-adjusted inpatient admission whereas these area hospitals were each receiving over $7000.  (PX01018 at 002, *in camera*; Wakeman, Tr. 2904-2906, *in camera*).

534.  In the fall of 2009, St. Luke's engaged Navigant Consulting to do an "insurance assessment" of the marketplace that would evaluate St. Luke's reimbursement rates in comparison with the average rates paid in the local market.  St. Luke's received the final copy of this study on November 25, 2009.  (Wakeman, Tr. 2986-2987, *in camera*; PX01029, *in camera*).

535.  The November 25, 2009 Navigant study concluded that St. Luke's inpatient commercial insurance rates were about {■} percent below the market average.  (PX01029 at 007, *in camera*; Wakeman, Tr. 2988-2989, *in camera*; RX37 at 000015 (Machin, IHT at 53)).

536.  Prior to the Joinder, St. Luke's had concluded that it was grossly underpaid, and that an increase in volume had been insufficient to offset costs and have an acceptable margin. (PX01018 at 003, *in camera*; Wakeman Tr. 2907-2908, *in camera*).

537.  Prior to the Joinder, St. Luke's believed that its "reimbursement rates were below those of other organizations, not only in [its] area, but throughout the region." (Wakeman, Tr. 2657, *in camera*).

### (i) MMO

538. MMO paid St. Luke's {███████████} of any of St. Luke's MCOs. (Wakeman, Tr. 2936, *in camera*).

539. {████████████████████████████████████████████████████████████████████████████
████████████████████████████}. (PX02280 at 014; Guerin-Calvert, Tr. 7417-7418, *in camera*; Pirc, Tr. 2345-2346, *in camera*).

540. St. Luke's contract with MMO originated in 1995 and was amended several times since then. The last amended contract had an effective date of October 1, 2006 and a termination date of December 31, 2010. (Pirc, Tr. 2339-2340, *in camera*; Wakeman, Tr. 2933-2934, *in camera*).

541. In 2009, St. Luke's requested a renegotiation of rates from MMO prior to the contract's expiration in December 2010. (Guerin-Calvert, Tr. 7415-7416, *in camera*).

542. Contract negotiations between St. Luke's and MMO began in 2009 and continued into early 2010. (Pirc, Tr. 2339, 2353, *in camera*).

543. St. Luke's and MMO negotiated reimbursement rates, bonus formulas, escalator rates, and contract duration, among other terms. (Pirc, Tr. 2349-2353, *in camera*; Wakeman, Tr. 2932-2935, *in camera*, PX02275, *in camera*).

544. MMO's proposed reimbursement rate increase, plus bonus formula, represented an approximately {██} percent rate increase and would have given St. Luke's an additional {███} million in payments after the first full year. With compounding, payments go from {████} million in 2009 for MMO inpatient payments to about {██████} million in 2012, which represents just under a {███} percent increase. (Guerin-Calvert, Tr. 7424-7426, *in camera*; Pirc, Tr. 2350-2351, *in camera*).

545. MMO rejected St. Luke's proposal that MMO agree to the increase referred to in F. 544 {██████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████}. (Pirc, Tr. 2354-2356, *in camera*; PX02284 at 001, *in camera*; PX01016 at 012-013; Guerin-Calvert, Tr. 7422-7423, *in camera*).

### (ii) Anthem

546. The agreement between Anthem and St. Luke's on PPO rates, effective July 1, 2008, had a {██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████}. (Wakeman, Tr. 2650, *in camera*; PX02276 at 002, *in camera*; Pugliese, Tr. 1614-1615, *in camera*, 1620-1621, *in camera*; PX02408 at 001, in camera).

547. In January 2010, St. Luke's sought {▮} percent increase in its rates from Anthem. (Pugliese, Tr. 1512, 1640, *in camera*; PX02382 at 001, *in camera*).

548. When Anthem considered St. Luke's proposal referred to in F. 547, among other things, {█████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████}. (Pugliese, Tr. 1641, *in camera*; RX965 at 000003, *in camera*).

549. Anthem {████████████████████████████████████████████████ ████████████}. (Pugliese, Tr. 1510-1511, *in camera*); PX02382 at 001, *in camera*).

### (iii) FrontPath

550. {█████████████████████████████████████████████████████}. (Sandusky, Tr. 1386-1387, *in camera*; Guerin-Calvert, Tr. 7433-7434, *in camera*).

551. {█████████████████████████████████████████████████████ █████████████████████████████████████████████████████████}. (Sandusky, Tr. 1386-1388, *in camera*).

552. {█████████████████████████████████████████████████████████ ████████████████████████████████████}. (Sandusky, Tr. 1386-1388, *in camera*; RX782 at 000001, *in camera*).

553. {█████████████████████████████████████████████████████████ ██████████████}. (Guerin-Calvert, Tr. 7433-7434, *in camera*).

### 3. Post-Joinder bargaining leverage

#### a. General terms relating to bargaining leverage

554. The rates and terms of the contracts that are negotiated by a hospital and an MCO are a function of the bargaining leverage that each party brings to bear in the negotiation. (Pirc, Tr. 2208; Radzialowski, Tr. 658-660; Shook, Tr. 978, *in camera*; PX01914 at 015 (Pirc, IHT at 53), *in camera* ("Q: Do the rates that are ultimately agreed upon in a negotiation between [MMO] and a given hospital depend on the relative bargaining leverage that [each has]? A: . . . That's a primary factor, yes."); Town, Tr. 3637, 3640-3641).

555.  In an economic sense, "equilibrium" occurs within a bargaining framework when both parties to the negotiation conclude that they are better off with the deal than without the deal. (Town, Tr. 3846-3847).

556.  The bargaining leverage of each party and, therefore, the terms of the agreement depend principally upon how each party evaluates how it would fare if it failed to enter into an agreement with the other party. In other words, each party considers the cost it would face if the negotiations failed. (PX02148 at 015-016 (¶ 26) (Town Expert Report), *in camera*; Town, Tr. 3641-3642; Pirc, Tr. 2208-2211; Sandusky, Tr. 1323-1324; Wachsman, Tr. 5123-5126).

557.  A hospital's bargaining leverage with an MCO depends on how much the MCO perceives it would lose if the MCO failed to reach agreement with the hospital. (Town, Tr. 3641; Pirc, Tr. 2210-2211; Radzialowski, Tr. 665-666; Pugliese, Tr. 1458-1461).

558.  The success or failure of a negotiation depends on the hospital's and the MCO's respective "walk-away" points. (PX02148 at 015-016 (¶ 26) (Town Expert Report), *in camera*; PX01914 at 015-016 (Pirc, IHT at 51-53), *in camera*; Radzialowski, Tr. 659-660).

559.  If a hospital demands rates above an MCO's walk-away point, the MCO will refuse to contract with the hospital. (PX02148 at 015-016 (¶ 26) (Town Expert Report), *in camera*; Radzialowski, Tr. 675-677; Pirc, Tr. 2207-2208; Sheridan, Tr. 6688).

560.  If an MCO refuses to pay rates above a hospital's walk-away point, the hospital will decline to contract with the MCO. (PX02148 at 015-016 (¶ 26) (Town Expert Report), *in camera*; Radzialowski, Tr. 675-677).

### b.  MCOs believe that the Joinder increases ProMedica's bargaining leverage

561.  The addition of St. Luke's to ProMedica will give ProMedica more hospitals and greater geographic coverage in Lucas County, Ohio. (Pugliese, Tr. 1524-1525, *in camera*).

562.  Pre-Joinder competition between St. Luke's and ProMedica's Lucas County hospitals benefited MCOs' members, because competition generally allowed MCOs to obtain lower rates. (Pirc, Tr. 2260-2261, *in camera*).

563.  With respect to {        }, the Joinder has given ProMedica increased bargaining leverage that allows ProMedica to obtain higher reimbursement rates from {        }. ({        }, Tr. 1524-1525, *in camera*; PX01919 at 014 ({        }, Dep. at 51), *in camera*).

564.  With respect to MMO, prior to the Joinder, MMO could have marketed insurance products that excluded ProMedica's three Lucas County hospitals, but could not have

marketed insurance products that excluded both ProMedica and St. Luke's; *i.e.*, MMO could not market insurance products offering only UTMC and Mercy. A network with only Mercy and UTMC leaves a "hole" in southwest Lucas County. (Pirc, Tr. 2195, 2261-2263, *in camera*).

565. No MCO in at least the last ten years has offered a network comprised of only UTMC and Mercy. (JX00002A at ¶ 9; Response to RFA at ¶ 14). Respondent's expert agreed that a Mercy-UTMC network been never been used in the last twenty years. (Guerin-Calvert, Tr. 7895).

566. MCOs believe that a network consisting of only the Mercy Hospitals and UTMC, without St. Luke's or the other, pre-Joinder, ProMedica Hospitals, would not be sufficiently marketable in Lucas County to be commercially viable. (Radzialowski, Tr. 715-716, *in camera*; PX01917 at 020 (Radzialowski, Dep. at 75-76), *in camera* (Aetna); Pugliese, Tr. 1477-1478, *in camera* (Anthem); Pirc, Tr. 2261-2262, *in camera* (MMO); Sandusky, Tr. 1351, *in camera* (FrontPath); PX01902 at 018 (Sheridan, IHT at 63), *in camera*) (United).

567. MCOs believe that a network consisting of only the Mercy Hospitals and UTMC, omitting St. Luke's and the other, pre-Joinder, ProMedica Hospitals, would not be sufficiently marketable in Lucas County to be commercially viable, even if offered at a lower price than a broad network, and that membership would decline. (Pugliese, Tr. 1577-1578 (Anthem); (Pirc, Tr. 2313, *in camera* (MMO); Sandusky, Tr. 1324 (FrontPath).

568. MMO believes that a network consisting of only the Mercy Hospitals and UTMC, without St. Luke's or the other, pre-Joinder ProMedica Hospitals, would not be sufficiently marketable in Lucas County to be commercially viable, in part, because it would require members in southwest Lucas County to travel too far to receive care. (Pirc, Tr. 2199-2200, 2262, *in camera* (MMO)).

569. MMO believes that the Joinder increases ProMedica's bargaining leverage against MMO and that MMO will have to accept ProMedica's rate increases to keep ProMedica in-network and to remain in the marketplace. (Pirc, Tr. 2261-2263, *in camera*; PX01944 at 027 (Pirc, Dep. at 103), *in camera*).

570. With respect to Aetna, the Joinder has made the prospect of walking away from ProMedica substantially more unattractive for Aetna because the attractiveness of Aetna's network would fall to a greater degree from the loss of not only ProMedica's three hospitals, but also from the loss of St. Luke's, which would leave Aetna without coverage in southwestern Lucas County because Mercy does not have a hospital there. (Radzialowski, Tr. 712-713, *in camera*; PX01917 at 020, 023 (Radzialowski, Dep. at 75-76, 86), *in camera*).

571.  With respect to FrontPath, ProMedica is a "significant" provider and FrontPath's business "would suffer significantly" from the absence of ProMedica from FrontPath's network. (Sandusky, Tr. 1323-1324).

572.  FrontPath could not viably market a network consisting only of Mercy and UTMC, as it would account for {███████} percent of FrontPath's current utilization in Lucas County. (Sandusky, Tr. 1351, *in camera*).

573.  With respect to Humana, the Joinder increased ProMedica's "ability to leverage us [Humana] for rates for all of their hospitals and St. Luke's now as well." (McGinty, Tr. 1209; PX02073 at 003 (¶ 11) (McGinty, Decl.), *in camera*).

574.  With respect to {██████}, "ProMedica would find its bargaining power greater after the acquisition than before[.]" ({██████}, Tr. 6698-6700, *in camera*). {██████} would face more difficulty serving its membership without ProMedica and St. Luke's than it would without ProMedica's pre-Joinder hospital network in Lucas County. ({██████}, Tr. 6687).

575.  Prior to entering into a contract with ProMedica {████████████} failed to grow its membership in Toledo by marketing a network that consisted of only Mercy, UTMC, and St. Luke's. ({██████}, Tr. 6691-6693, *in camera*). If ProMedica did not rejoin the {█████} network, {█████████████}. ({██████}, Tr. 6693, *in camera*).

### c.  Walk-away networks

576.  Prior to the Joinder, the MCOs' "walk-away" network with respect to St. Luke's, *i.e.*, the network they had if they failed to reach agreement with St. Luke's in a negotiation, consisted of ProMedica's Lucas County hospitals, Mercy's Lucas County hospitals, and UTMC. (Town, Tr. 3660-3661).

577.  Prior to the Joinder, the MCOs' "walk-away" network with respect to ProMedica's Lucas County hospitals, *i.e.*, the network they had if they failed to reach agreement with ProMedica, consisted of St. Luke's, Mercy's Lucas County hospitals, and UTMC. (Town, Tr. 3656-3657).

578.  As a result of the Joinder, the MCOs' "walk-away" network with respect to ProMedica's Lucas County hospitals, which now includes St. Luke's, is Mercy's Lucas County hospitals and UTMC. (Town, Tr. 3656-3658; PX02067 at 004, 006 (¶¶ 13, 21) (Radzialowski, Decl.), *in camera*; PX02073 at 004 (¶ 15) (McGinty, Decl.), *in camera*; *see* PX02148 at 064-065 (¶ 116) (Town Expert Report), *in camera*).

579.  Because St. Luke's is valued by health plan members, an MCO's failure to contract with ProMedica after the Joinder will be more costly for the MCO, because their walk-away network must exclude both St. Luke's and ProMedica's Lucas County hospitals, and becomes significantly less valuable than a network that excludes only ProMedica.

(Town, Tr. 3657-3659; Radzialowski, Tr. 664-665, 715-716, *in camera*; McGinty, Tr. 1201; Sandusky, Tr. 1312-1313, 1351, *in camera*; Pugliese, Tr. 1477-1478, 1481-1482, *in camera*; Pirc, Tr. 2201-2203, 2262-2263, *in camera*).

580.  Because ProMedica's Lucas County hospitals are valued by health plan members, an MCO's failure to contract with St. Luke's has become much more costly for an MCO as a result of the Joinder, because their walk-away network must exclude both St. Luke's and ProMedica's Lucas County hospitals, and is less valuable than a network that excludes only St. Luke's.  (Town, Tr. 3660-3663; *see* Sheridan, Tr. 6693, *in camera*; Pirc, Tr. 2262, *in camera*; Radzialowski, Tr. 715-716, *in camera*; McGinty, Tr. 1201; Sandusky, Tr. 1348-1349, 1351, *in camera*; Pugliese, Tr. 1477-1478, 1523-1525, *in camera*).

581.  A post-Joinder ProMedica, with St. Luke's in its system, has more bargaining leverage than ProMedica without St. Luke's in its system.  (Radzialowski, Tr. 712-713, *in camera*; McGinty, Tr. 1209-1210; Pugliese, Tr. 1523-1525, *in camera*; *see also* Neal, Tr. 2111; Pirc, Tr. 2262-2263, *in camera*).

582.  A post-Joinder ProMedica, with St. Luke's in its system, has more bargaining leverage than ProMedica without St. Luke's in its system, in part because a network without ProMedica or St. Luke's would leave no non-ProMedica alternatives in southwest Lucas County.  (Radzialowski, Tr. 713-714, *in camera*; Pirc, Tr. 2195; *see also* Neal, Tr. 2168).

### 4.  Likelihood of post-Joinder price increases

#### a.  MCOs believe that the Joinder will likely lead to higher rates

583.  The Joinder will likely lead to higher health-care costs because St. Luke's has been absorbed into a larger health-care system, ProMedica, with a great deal of leverage that ProMedica can exercise during the contract negotiation process.  (Pugliese, Tr. 1524-1525, *in camera*).

584.  Prior to the Joinder, the reimbursement rates that {█████} paid to St. Luke's were "competitive" with (*i.e.*, comparable to) the rates that {█████} paid to other community hospitals in Ohio and were "significantly lower" than the rates {█████} paid to ProMedica's community hospitals, Flower and Bay Park. ({█████}, Tr. 1505-1506, *in camera*).

585.  Anthem is concerned that ProMedica will raise the rates that Anthem pays to St. Luke's closer to the rates that Anthem pays to ProMedica's community hospitals in Lucas County. (Pugliese, Tr. 1517, *in camera*).

586.  {█████} conducted an analysis of the change in reimbursements to St. Luke's that would result if {█████} rates to St. Luke's were increased to equal {█████} rates to ProMedica's Flower, Bay Park, and TTH. ({█████}, Tr. 1506-1508, *in*

*camera*; PX02380, *in camera*).  According to that analysis, if ProMedica brings  {████} rates to St. Luke's in line with {████} rates to Flower and Bay Park, {████} rates to St. Luke's will "increase significantly," between roughly {██} and {██} percent.  ({████}, Tr. 1517-1519, *in camera*; PX02380, *in camera*).

587.   Prior to the Joinder, competition between St. Luke's and ProMedica's Lucas County hospitals benefited MMO's members, because competition generally allows MMO to obtain lower rates.  (Pirc, Tr. 2260-2261, *in camera*).

588.   {████} believes that acquiring St. Luke's allows ProMedica to "demand their price" – that is, to seek "extraordinary" reimbursement rates for inpatient services.  ({███}, Tr. 2261-2262, *in camera*; PX01944 at 013-014 ({███}, Dep. at 49-50, *in camera*)).

589.   Aetna believes that ProMedica's additional leverage from the Joinder gives ProMedica the ability to raise the reimbursement rates that Aetna pays both to St. Luke's and to ProMedica's other Lucas County hospitals.  (Radzialowski, Tr. 712-713, *in camera*).

590.   Aetna expects that ProMedica, as a first step, will increase Aetna's rates to St. Luke's to the level of Aetna's rates to ProMedica and, as a second step, will use the additional leverage it gained from the Joinder to raise rates even further.  (PX01938 at 023 (Radzialowski, Dep. at 88-89), *in camera*).

591.   In 2010, Aetna performed an analysis in October 2010 of the Joinder's impact on Aetna's rates to St. Luke's.  This analysis was based on costs in Aetna's different contracts and on the typical pattern experienced by Aetna, that the acquiring system would raise the acquired hospital's rates to the system-wide rates.  Aetna's analysis projected a {██} percent increase in Aetna's rates to St. Luke's if these were to rise to the level of Aetna's rates to ProMedica, accounting for differences of variation and severity between ProMedica and St. Luke's.  (Radzialowski, Tr. 704, *in camera*, 848-49; *see also* PX01938 at 026 (Radzialowski, Dep. at 99), *in camera*).

592.   Aetna believes that the actual impact on rates could be higher, because its analysis did not account for the additional bargaining leverage that the Joinder gave to ProMedica as a whole.  (Radzialowski, Tr. 843, *in camera*; *see also* PX01938 at 023 (Radzialowski, Dep. at 89), *in camera*).

593.   In early {████████}, ProMedica asked {████} to increase St. Luke's reimbursement rates to the level of those paid to ProMedica.  ({████████}, Tr. 717, *in camera*).

594.   Prior to the Joinder, Humana used its negotiated rates with St. Luke's as a benchmark in negotiations with ProMedica.  The Joinder eliminated Humana's ability to leverage St. Luke's independence against ProMedica and increased ProMedica's "ability to leverage us [Humana] for rates for all of their hospitals and St. Luke's now as well."  (McGinty, Tr. 1209; PX02073 at 003 (¶ 11) (McGinty, Decl.), *in camera*).

595.  After the Joinder was announced, {▮▮▮} expected that rates at St. Luke's would likely increase because "ProMedica's rate structure {▮▮▮▮▮▮} was so substantially higher than St. Luke's to begin with" and because {▮▮▮} believed that "ProMedica would find its bargaining power greater after the acquisition than before[.]" ({▮▮▮}, Tr. 6698-6700, *in camera*; PX01902 at 018 ({▮▮▮}, IHT at 62), *in camera*).

596.  MCO representatives testified that their firms would have little choice but to pass on any rate increases at St. Luke's or ProMedica's hospitals after the Joinder to both the MCOs' self-insured and fully-insured members.  (Pugliese, Tr. 1554; Pirc, Tr. 2174; PX01944 at 020 (Pirc, Dep. at 76), *in camera*; Radzialowski, Tr. 779; Sandusky, Tr. 1296; McGinty Tr. 1210-1211; PX02073 at 004 (¶ 16) (McGinty, Decl.), *in camera*; Sheridan, Tr. 6701, *in camera*; PX01900 at 011 (Mullins, IHT at 39-40), *in camera*).

**b.    St. Luke's anticipated its rates to increase to ProMedica's rates**

597.  A St. Luke's planning document, dated August 10, 2009, notes that an option for St. Luke's would be to "enter[] into an affiliation/partnership with a local health system with the express purpose to raise reimbursement rates to the level of our competitors." (PX01390 at 002; Wakeman, Tr. 2640, 2643, *in camera*).

598.  A 2009 presentation regarding potential affiliation partners, made to St. Luke's Hospital ("SLH") Board of Directors by Mr. Wakeman and other members of St. Luke's leadership team, states: "An SLH affiliation with ProMedica has the greatest potential for higher hospital rates.  A ProMedica-SLH partnership would have a lot of negotiating clout."  (PX01030 at 020, *in camera*; Wakeman, Tr. 2689-2690, *in camera*; Black, Tr. 5634, *in camera*).  This statement conveyed the belief that "ProMedica had a significant leverage on negotiations with some of the [health plans]," that this leverage would allow St. Luke's to obtain higher reimbursement rates, and that an affiliation with ProMedica could, in the short term, "[h]arm the community by forcing higher hospital rates on them."  (Wakeman, Tr. 2698-2700, *in camera*; Rupley, Tr. 2003, *in camera* (discussing PX01124 at 009, which contains the contents of PX01030 at 020)).

599.  Members of St. Luke's due diligence team, who were in charge of finding the best affiliation options for St. Luke's, expressed their belief that a ProMedica or Mercy affiliation could "stick it to employers, that is, to continue forcing high rates on employers and insurance companies" and thereby perpetuate high health-care costs in the area.  (PX01130 at 005), *in camera*; Rupley, Tr. 2013-2014, *in camera*).

600.  St. Luke's believed that among the advantages of a joinder with ProMedica was the ability to increase St. Luke's reimbursement rates.  (Wakeman, Tr. 2685-2686; PX01125 at 002, *in camera* (noting the advantage of ProMedica's "strong market/capital position" and St. Luke's resulting "incredible access to outstanding pricing on managed care agreements"); *see also* PX01018 at 014 (Options for St.

Luke's: St. Luke's is now at a cross-roads), *in camera*, stating: "Option 3: Affiliate with ProMedica. What do they bring? Strong managed care contracts.").

601. Mr. Wakeman hoped that an affiliation with ProMedica would allow St. Luke's to obtain the higher reimbursement rates that ProMedica was receiving. (Wakeman, Tr. 2685-2686, *in camera*).

602. St. Luke's recognized prior to the Joinder that "an independent St. Luke's Hospital keeps the systems a little more honest" and that "MCOs lose clout if St. Luke's is no longer independent." (PX01144 at 003).

603. St. Luke's anticipated as much as { ████████████ } in additional revenues from MMO, Anthem, and Paramount as a result of joining ProMedica. (PX01231, *in camera* ("Yes we asked { ████ } for { ████ }, but if we go over to the dark green side [*i.e.*, ProMedica] … we may pick up as much as { ████ } in additional { ████████ } and Paramount fees")).

### c.   Correlation between market power and pricing

604. Prior to the Joinder, ProMedica acknowledged its market dominance in Lucas County in its ordinary course of business documents. A Standard & Poor's credit presentation stated: "ProMedica Health System has market dominance in the Toledo MSA." (PX00270 at 025; *see also* Oostra, Tr. 5964-5965, 5973-5974). In a "strengths, weaknesses, opportunities and threats" ("SWOT") analysis, ProMedica listed its "[d]ominant market share" as a strength. (PX00319 at 001 ("TTH Medical Executive Committee SWOT Analysis Results 2007")).

605. Using Respondent's expert's calculations, the Joinder increased ProMedica's shares in the market for GAC inpatient services anywhere from 42 to 49 percent pre-acquisition to 53 to 58 percent post-acquisition. *See* F. 357-360.

606. Prior to the Joinder, ProMedica had the highest market shares for GAC inpatient services and the highest prices in Lucas County. (PX02148 at 143 (Ex. 6), 145 (Ex. 7) (Town Expert Report).

607. Professor Town utilized a case-mix adjustment to analyze hospital prices. A case-mix adjustment controls for variation in case-mix, severity, and patient demographics across hospitals, and to allow for an apples-to-apples comparison of prices. PX02148 at 037 (¶68, n. 107) (Town Expert Report), *in camera*; Town, Tr. 3722-3725, *in camera*).

608. Case-mix adjustment is a concept that tries to compare patient volumes at different hospitals when patients have different severities of illness. It is a calculation that takes into account the resources needed to treat patients, with the theory being that patients with more complicated illnesses utilize more resources than those who are not as ill. The methodology is tied to the DRG reimbursements. Thus, the case-mix adjustment number is a weighted factor used by MCOs to make an apples-to-apples comparison

between various rates at each hospital. (Radzialowksi, Tr. 684, 687-688, 698-700, *in camera*, 848-849; Sandusky, Tr. 1338-1348, 1350, *in camera*; *see* Pugliese, Tr. 1512-1513, *in camera*; Wakeman, Tr. 3036-3037; Pirc, Tr. 2238-2242, *in camera*).

609.  Professor Town's examination of hospital prices in Lucas County prior to the Joinder demonstrates that ProMedica's average price was {█} percent higher than Mercy's, {█} percent higher than UTMC's, and {█} percent higher than St. Luke's. (PX02148 at 037 (¶ 68), 145 (Ex. 7) (Town Expert Report), *in camera*).

610.  Professor Town's examination of hospital prices and market shares in Lucas County prior to the Joinder demonstrates a high correlation between market shares and prices. ProMedica, the system with the highest market share, had the highest prices. Mercy, the system with the second-highest share, had the second- highest prices. UTMC, with the third-highest share, had the third-highest prices and St. Luke's, with the smallest share, had the lowest prices. (PX02148 at 039 (¶ 71), 147 (Ex. 8) (Town Expert Report), *in camera*).

611.  MCOs confirmed Professor Town's analysis of the relative price difference between ProMedica and St. Luke's by testifying that ProMedica's rates are the highest and St. Luke's rates are the lowest in Lucas County. (Pirc, Tr. 2238-2242, *in camera*; Radzialowski, Tr. 684, 687-688, 698-700, *in camera*; Sandusky, Tr. 1338-1348, 1350, *in camera*; PX02296 at 001, *in camera*; *see* Pugliese, Tr. 1512-1513, *in camera*; McGinty, Tr. 1210).

### d.  Professor Town's econometric model

612.  Complaint Counsel's expert, Professor Town, utilized an econometric, or merger simulation model, called the "willingness to pay" model, to try to predict what the change in price would be to MCOs from the Joinder. (Guerin-Calvert, Tr. 7485-7486).

613.  The willingness to pay model is a method that economists use to quantify bargaining leverage. It measures the incremental value consumers place on having access to a hospital or system given the availability of alternative hospitals. The more important it is to an MCO to have a hospital in its network, the more an MCO will be willing to pay to have that hospital in-network. (Town, 3655, 3798-3799, *in camera*, 3861-3862; PX02148 at 103 (Technical Appendix ¶ 11) (Town Expert Report), *in camera*).

614.  The willingness to pay model is not a tool to forecast prices into future years. Rather, the willingness to pay model is a tool to predict the effect of the elimination of competition on prices; that is, to isolate and quantify the Joinder's impact on the bargaining leverage of the merged hospitals. (Town, Tr. 3883).

615.  Professor Town used five steps in the willingness to pay model to calculate price changes that will likely result from the Joinder: (1) measure price; (2) measure bargaining power; (3) determine the impact of bargaining power on price; (4) estimate the increase in bargaining power on price; and (5) calculate the price impact of the

Joinder. (PX02148 at 103 (Town Expert Report), *in camera*). At each step, there are a series of calculations. Put simply, step one identifies price differences that exist and creates a database; steps two and three try to explain the price differences and isolate the factors that the Joinder changes; and steps four and five measure the effect of the Joinder. (Guerin-Calvert, Tr. 7487-7488). These five steps are described in greater detail in F. 616-621 below.

616. In step one of the willingness to pay model, Professor Town used MCO data for discharges at greater Toledo area hospitals from January 1, 2004 through December 31, 2009, which includes inpatient discharges from Aetna, Anthem, BCBS of Michigan, MMO, FrontPath, Paramount, Cigna and United. Professor Town used the average case-mix-adjusted hospital prices to control for differences in age, gender, diagnostic code, and length of stay. (Town, Tr. 3722-3723, *in camera*, 4205; PX02148 at 103-105) (Town Expert Report), *in camera*; Guerin-Calvert, Tr. 7488; Town, Tr. 4208-4209).

617. Professor Town excluded all discharges from hospitals outside of Lucas County, except WCH and FCHC; data for managed care organization/hospital-year combinations for which there were fewer than 30 discharges; discharges for Medicare Advantage patients; discharges coded MDC 0, 19, 20 and -1[8]; discharges in which the amount paid to the hospital by the MCO was less than $100; and 2004 discharges reimbursed by Aetna and CIGNA. (Town, Tr. 4210-4212). Professor Town then used the remaining data to run a regression that shows the difference in prices between hospitals, but not any hospital-specific factors that account for any of these differences in the hospital prices. (Town, Tr. 4212-4215).

618. In step two of the willingness to pay model, Professor Town measured the bargaining power possessed by each hospital in its price negotiations with each payer. These measures of bargaining power, called "willingness to pay," are determined using inpatient discharge data and reflect the value-added that patients place upon having in-network access to a hospital, given the other hospitals that are already in the network, and thus measure the incremental importance of the hospital to the MCO. (Town, Tr. 4206; PX02148 at 105-108 (Town Expert Report), *in camera*; Guerin-Calvert, Tr. 7485-7486, 7489-7490).

619. In step three of the willingness to pay model, Professor Town determined the impact of bargaining power on price by using the average case-mix adjusted inpatient prices and the hospital willingness to pay measures to assess the relationship between willingness to pay and the price of inpatient care. Professor Town then used his predicted prices and his willingness to pay measures, controlling for other factors including an MCO's size, year fixed effects, MCO fixed effects, interns per bed and average cost in the regression. (Town, Tr. 4206; PX02148 at 108-109) (Town Expert Report), *in camera*; Guerin-Calvert, Tr. 7492-7493).

---

[8] These MDC categories correspond to missing/invalid, pre-MDC, mental diseases and disorders, and alcohol and drug-induced disorders, respectively. (Town, Tr. 4027-4028). Professor Town dropped these categories because the services within each do not qualify as GAC inpatient services. (Town, Tr. 4027-4028).

620. In step four of the willingness to pay model, Professor Town estimated the increase in bargaining power resulting from the Joinder by calculating the willingness to pay induced by the Joinder. To do this, Professor Town incorporated St. Luke's as the fourth hospital in ProMedica's Lucas County network and recalculated the willingness to pay for ProMedica. (PX02148 at 104 (Technical Appendix ¶ 14) (Town Expert Report), *in camera*; Town, Tr. 4204, 4285).

621. In step five of the willingness to pay model, Professor Town calculated the price impact of the Joinder by using the estimated relationship between willingness to pay and inpatient rates, along with the change in willingness to pay resulting from the Joinder, to calculate the likely impact of the Joinder on the price of inpatient care. (PX02148 at 104 (Technical Appendix ¶ 14) (Town Expert Report), *in camera*); Town, Tr. 4206).

622. Professor Town's analysis of willingness to pay shows that, before the Joinder, MCOs' consumers placed 22 percent more value on having in-network access to ProMedica than to Mercy's Lucas County hospitals. (PX02148 at 066 (¶ 118), 165 (Ex. 13) (Town Expert Report), *in camera*).

623. Professor Town's analysis of willingness to pay shows that the Joinder has increased MCOs' willingness to pay for ProMedica by 50 percent. (PX02148 at 066 (¶ 118), 165 (Ex. 13) (Town Expert Report), *in camera*).

624. Professor Town's analysis of willingness to pay demonstrates that the Joinder has increased ProMedica's bargaining leverage by 13.5 percent. (PX02148 at 066 (¶ 118), 165 (Ex. 13) (Town Expert Report), *in camera*).

625. Professor Town's willingness to pay model predicts that the volume-weighted average (across ProMedica and St. Luke's) price will increase by 16.2 percent. (PX02148 at 110 (¶ 33) (Town Expert Report), *in camera*); Guerin-Calvert, Tr. 7495-7496).

626. Respondent's expert, Ms. Guerin-Calvert took Professor Town's willingness to pay model that predicted a price increase of 16.2 percent, added five variables to it, and predicted a price increase of 7.3 percent. (RX71(A) at 000080-000081; Guerin-Calvert, Tr. 7525-7526, 7928; RRCCFF 1185 ("Ms. Guerin-Calvert is estimating a price increase of 7.3 percent.").

627. Professor Town's willingness to pay model also uses diversion ratios to allocate proportions of harm between ProMedica and St. Luke's by taking allocated harm attributed to St. Luke's to compare it to St. Luke's existing pre-Joinder rates and calculating the percentage change. (PX02148 at 110 (Town Expert Report), *in camera*; Guerin-Calvert, Tr. 7495-7497).

628. Professor Town's willingness to pay merger simulation model predicts that inpatient reimbursement rates paid by third-party MCOs to ProMedica will increase by 10.8 percent and that inpatient reimbursement rates paid by third-party MCOs to St. Luke's

will increase by between 38.4 percent and 56.2 percent.  (PX02148 at 101, 110 (Town Expert Report), *in camera*; Guerin-Calvert, Tr. 7497).

629.  Professor Town finds that even if St. Luke's pre-Joinder rates had been higher, the willingness to pay merger simulation model predicts that the Joinder will still lead to significant rate increases for St. Luke's, ranging from 33.2 percent to 48.6 percent, and that 33.2 percent of this increase is due solely to the Joinder's elimination of competition and that the incremental 15.4 percent is due solely to St. Luke's enjoying ProMedica's unique price-influencing characteristics.  (PX02148 at 102 (¶ 6) (Town Expert Report), *in camera*).

630.  Professor Town's merger simulation results are consistent with the testimony from MCOs.  (PX01850 at 060 (¶ 92) (Town Rebuttal Report), *in camera*).

631.  Professor Town's merger simulation results are consistent with the high concentration in the undisputed relevant geographic market in this matter.  (PX01850 at 060 (¶ 92) (Town Rebuttal Report), *in camera*).

632.  Professor Town's merger simulation results are consistent with the existing academic literature which shows that hospital mergers in highly concentrated markets typically lead to significant price increases.  (PX02148 at 111 (Technical Appendix ¶ 37) (Town Expert Report), *in camera*).

633.  The willingness to pay model has been peer-reviewed and published in two prestigious economics journals.  (PX01850 at 059 (¶ 91) (Town Rebuttal Report), *in camera*).

634.  The willingness to pay model is consistent with the standard economic theory on mergers in differentiated products markets described in the Merger Guidelines.  (PX01850 at 062 (¶ 94) (Town Rebuttal Report), in camera).

### 5.    ProMedica's aim of increasing rates

#### a.    ProMedica's reimbursement rates

635.  ProMedica seeks to maximize its revenues and its reimbursement rates from commercial MCOs.  (Wachsman, Tr. 5145-5146, *in camera*; PX01906 at 066 (Oostra, IHT at 259-260), *in camera*).

636.  ProMedica seeks to obtain reimbursement rates from MCOs that { ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ }.  (RX1854 at 000005, *in camera*; Wachsman, Tr. 4949-4950, 5140, *in camera*).

637.  ProMedica's cost coverage ratios for significant third-party, commercial MCOs range from { ▮▮▮▮▮▮▮▮▮ } to { ▮▮▮▮▮▮▮▮▮ }.  ProMedica's aggregate cost

coverage ratio for all commercial payors in 2009 was close to {█} percent. (PX00233 at 001 (ProMedica's Annualized Cost Coverage Ratios for 2009), *in camera*; PX01927 at 010 (Wachsman, Dep. at 35-36), *in camera*).

638. ProMedica's internal analyses show that its average cost coverage ratio for third-party commercial MCOs was higher than the {█} percent target in 2009 and 2010, exceeding {█} percent in June 2010. (Wachsman, Tr. 5141-5143, *in camera*; PX00233 at 001 (ProMedica's Annualized Cost Coverage Ratios for 2009), *in camera*; PX00443 at 002 (ProMedica's Cost Coverage Ratios for YTD June 2010), *in camera*).

639. ProMedica seeks to achieve a positive operating margin, *i.e.*, the relationship of operating income to revenues, for its hospitals, continuing care service entities, long-term care services entities, and ProMedica's home health entity, of about {█} percent, or an overall cost coverage ratio of {█} percent. (RX1854 at 00005, *in camera*; Hanley, Tr. 4505-4506, 4582).

640. ProMedica's operating margin is significantly above the {█} percent target for the system as a whole, which includes operations that lose money or have low margins. (PX01947 at 012 (Oostra, Dep. at 39), *in camera*).

641. ProMedica's operating margin through September 30, 2010 was {█} percent, which is above the {█} percent target, and a fact significant enough to be presented by ProMedica to investors in January 2011. (PX00532 at 005 (ProMedica Investor Presentation); PX01947 at 012 (Oostra, Dep. at 38-39), *in camera*).

### b.  Post-Joinder pricing

642. ProMedica negotiated a new contract with United, on behalf of St. Luke's, to be effective January 1, 2011. (Guerin-Calvert, Tr. 7432-7433, *in camera*).

643. In the first year of the new contract with United, St. Luke's rates increased approximately {█} percent; in the second year, rates increased {█} percent, for a total of about a {█} percent increase over {█} years. (Guerin-Calvert, Tr. 7432-7433, *in camera*).

644. ProMedica informed United that it had the right to continue its existing contract with St. Luke's while the Hold Separate Agreement was in effect. (Wachsman, Tr. 5074, 5227-5228, *in camera*; RX759).

645. United negotiated these rates even though it could have chosen to keep St. Luke's rates as they were until this litigation was resolved. (Guerin-Calvert, Tr. 7433, *in camera*).

646. ProMedica has not sought to terminate St. Luke's contract with Anthem since the Joinder. (Pugliese, Tr. 1584).

647. Since the Joinder, ProMedica has not sought to modify any of St. Luke's rates to be comparable to the rates that ProMedica is presently getting from Anthem for any of its hospitals. (Pugliese, Tr. 1583-1584).

648. MMO and ProMedica negotiated a new contract for St. Luke's between November 2010 and January 2011. (Pirc, Tr. 2249-2250, *in camera*).

649. The final agreement reached between MMO and ProMedica for St. Luke's provided for { █████████ } percent rate increases in 2011 and 2012. In 2013, increases would be { █████████████ } and in 2014, rates would increase by { █ } percent. (PX02385 at 032-034, *in camera*; Wachsman, Tr. 5064, *in camera*). The contract to which MMO and ProMedica agreed for St. Luke's { ███████████████████ ███████████████ }. (Pirc, Tr. 2251, *in camera*; PX02385 at 032-034, *in camera*).

650. The contract to which MMO and ProMedica agreed for St. Luke's resulted in a { ██ } percent increase in payments to St. Luke's for the 2009 to 2012 time period. (Guerin-Calvert, Tr. 7429-7430, *in camera*).

### 6. Costs to employers and employees

651. Employers cite health-care costs as one of their largest expenses. (Caumartin, Tr. 1846-1847 (health insurance is a "very significant" expense); Buehrer, Tr. 3073 (health insurance is the "second highest expense behind payroll"); Neal, Tr. 2118 (health-care is "the largest fixed cost for [Chrysler's] bargaining unit employees when we negotiate a collective bargaining agreement with the UAW"); Lortz, Tr. 1707-1708 ("health care is one of the big pieces" in collective bargaining)).

652. Inpatient care is a significant contributor to the cost of health-care, although there are many other factors that affect or influence the cost of medical coverage including: the cost of outpatient services, physician services, and ancillary services; the number of employees and family members covered; the benefit design offering; the demographic mix and health history of covered members; prescription drug usage trend; and employees' utilization rate. (Lortz, Tr. 1733-1735; Neal, Tr. 2121-2122, 2140-2142; Caumartin, Tr. 1867, 1872; Buehrer, Tr. 3084-3086; Pugliese, Tr. 1561-1562; McGinty, Tr. 1246-1247; Pirc, Tr. 2292-2294; Town, Tr. 3949-3952).

653. The cost of GAC inpatient hospital services accounts for approximately 20 to 25 percent of the amount of health insurance premiums; the cost of outpatient services, including imaging services and durable medical equipment, accounts for approximately 15 to 30 percent; physician costs account for approximately 25 to 30 percent; and pharmacy costs account for approximately 10 to 15 percent, with administrative fees comprising the remainder. (Pirc, Tr. 2292; Randolph, Tr. 6918-6920).

### a. Self-insured employers

654. Unlike fully-insured employers who pay fixed monthly premiums to MCOs, self-insured employers pay the full cost of their employees' health-care. (F. 50-51). Thus, increases in hospital reimbursement rates impact self-insured employers directly. (Sandusky, Tr. 1296; McGinty, Tr. 1243-1244; Radzialowski, Tr. 625-626, 840-841, *in camera* ("Local employers … [whose] members receive services at St. Luke's, especially the self-insured employers, would feel a direct impact from unexpected [rate] increases."); Town, Tr. 3612-3613; PX02148 at 011-013 (¶ 18) (Town Expert Report), *in camera*).

655. Respondent admits that, for its health insurance subsidiary Paramount, "if the reimbursement rate Paramount pays to hospitals changes, that change is ultimately passed on to the self-insured customer because self-insured customers pay their own claims. . . . [A]ny reimbursement rate change affects self-insured customers on the effective date of the new contract between Paramount and a hospital." (Response to RFA at ¶ 35).

656. If St. Luke's rates increased post-Joinder and self-insured employers' "volume stayed the same, they would pay higher costs per unit." (Wakeman, Tr. 2687, *in camera*).

657. If a Lucas County hospital or hospital system increases its rates to commercial MCOs, those increased costs are "passed on straightforward" to self-insured employers. (Oostra, Tr. 6144).

658. In Lucas County, a large proportion of MCO commercial insurance business is with self-insured employers. (F. 134, 154, 169, 185-186, 216, 229).

### b. Fully-insured employers

659. For fully-insured employers, where the employer pays a premium to an MCO and the MCO pays the costs of medical care received by employees, when an MCO incurs a rate increase from a hospital, it will pass down the increased costs to employers in the form of higher premiums. (Buehrer, Tr. 3063, 3086; Radzialowski, Tr. 625-626, 779; PX01938 at 030 (Radzialowski, Dep. at 114) ("With the fully insured, I can't see any circumstance where we would not automatically pass [a rate increase] on through the premium increase."); *in camera*; Pugliese, Tr. 1558, 1559-1560; PX01942 at 025 (Pugliese, Dep. at 94), *in camera*; McGinty, Tr. 1210, 1242-1243; Pirc, Tr. 2174; PX01944 at 020 (Pirc, Dep. at 76), *in camera*; Sheridan, Tr. 6701-6702, *in camera*; Town, Tr. 3614; PX02148 at 011-013 (¶ 18) (Town Expert Report), *in camera*).

660. Jack Randolph, the President of Paramount, ProMedica's health insurance subsidiary, acknowledged that when Paramount has to pay increased reimbursement rates to providers, at some point, it has to pass on those increased costs to its customers. (Randolph, Tr. 7108-7109).

661.  When advising the St. Luke's Board regarding possible affiliation with ProMedica, St. Luke's CEO assumed that if St. Luke's rates increased to MCOs, the MCOs would pass those increases on to the employers and the community.  (Wakeman, Tr. 2687, *in camera*).

### c.  Employees

662.  When health-care costs increase, some employers might absorb the increase, if they are in a position to do so; but more typically, employers will be required to reduce their costs by restricting health benefits or by increasing the employees' share contributions, via increased premium share, copays, deductibles, out-of-pocket maximums, or otherwise revise compensation or benefits to reduce employer costs.  (Neal, Tr. 2114-2117, 2158; Buehrer, Tr. 3072, 3064-3066; Caumartin, Tr. 1837; Lortz, Tr. 1713; Pugliese, Tr. 1559-1560; Radzialowski, Tr. 782; Town, Tr. 3614; PX02148 at 011-013 (¶ 18) (Town Expert Report), *in camera*).

663.  When costs for employee health insurance coverage increase for employers with union members, in order to offset the increased costs, employers may seek a collective bargaining agreement that will reduce service levels, increase the amount the union members must pay, reduce wages, or make other tradeoffs.  (Lortz, Tr. 1706-1707, 1711-1713; Neal, Tr. 2118).

### 7.  Constraints on price increases

### a.  Excess hospital bed capacity

664.  There were approximately 2,200 staffed beds in Lucas County hospitals in 2009. (Guerin-Calvert, Tr. 7276; *see* F. 55, n.1).

665.  All hospitals in Lucas County, except Bay Park, have many more registered beds than staffed beds ("beds-in-use").  (Guerin-Calvert, Tr. 7276-7277, 7283-7284; RX71(A) at 000208, *in camera*; F. 55, n.1).

666.  MCO configurations in the past have excluded about 40 percent to 50 percent of the bed capacity in the market at any point in time.  (Guerin-Calvert, Tr. 7277-7278).

667.  Mercy believes that, from a community need standpoint, all of St. Luke's beds could be eliminated from the Toledo area and not be missed.  (PX02288 at 002-003 (¶ 5), *in camera*; Shook, Tr. 1112, *in camera*).

668.  Based upon the number of staffed beds per thousand area residents, which is a standard metric used in health-care, the Toledo metropolitan area, as compared to other similar metropolitan areas in the United States, has substantially more beds per thousand residents.  (Guerin-Calvert, Tr. 7278-7279).

669. Toledo has 3.63 beds per thousand residents, while Grand Rapids, Michigan, an area similar to Toledo, has just over 2 beds per thousand residents, and Detroit has approximately 2.5 beds per thousand residents. (Guerin-Calvert, Tr. 7279-7283; RX71(A) at 000150, *in camera*).

670. The number of staffed beds per thousand residents ratio indicates that there are more beds than patients in Toledo, and is a measure of excess capacity. (Guerin-Calvert, Tr. 7278-7279, 7283).

671. The number of registered beds greater than staffed beds indicates the number of beds that are not being deployed to meet patient demand, and therefore is also an indicator of excess capacity. (Guerin-Calvert, Tr. 7283-7284).

672. With the exception of Bay Park, the majority of Lucas County hospitals have numbers of staffed beds that are well under their registered beds. This indicates that hospitals have adjusted to a decline in demand for inpatient hospital services by reducing their staffing levels. (Guerin-Calvert, Tr. 7276-7278).

673. Hospitals could make use of registered, but unused, beds and accommodate any increase in demand, to the extent they can provide the level of staffing required for those registered beds. (Guerin-Calvert, Tr. 7276-7277, 7279, 7283-7284; Shook, Tr. 1042).

674. ProMedica has no plans to eliminate or reduce bed capacity as a result of the Joinder. (Guerin-Calvert, Tr. 7762-7763).

675. Another metric of excess capacity for Toledo area hospitals is the occupancy rate, which divides the average daily census of a hospital by the number of staffed beds or registered beds. (Guerin-Calvert, Tr. 7284-7285).

676. Occupancy rates for hospital beds in Lucas County, based upon an average daily census of inpatient bed use, are significantly below available staffed bed capacity. (Guerin-Calvert, Tr. 7284-7286, 7289-7290; RX71(A) at 000208, *in camera*).

677. Low occupancy rates indicate that hospitals have the capacity to reposition to attempt to attract additional volume and to serve the patients. (Guerin-Calvert, Tr. 7286-7287).

678. Mercy's Toledo area hospitals could treat additional patients, but it would be limited to the number of beds that they could staff. (Shook, Tr. 1042).

679. If UTMC wanted to make use of more of its registered beds, it would have to convert and refurbish spaces that are now occupied by support services, such as vascular ultrasound, and find another location for those support services. (Gold, Tr. 199-200).

680. UTMC is currently renovating to convert all of its two-bed rooms to private, one-bed rooms, which will decrease available beds. (Gold, Tr. 224).

681.   UTMC has no plans to increase its capacity in response to the Joinder.  (Gold, Tr. 224).

### b.      Steering

682.   "Steering" means providing incentives to patients or physicians to pursue health-care with specific providers. (Radzialowski, Tr. 723). "Hard" steerage means providing financial incentives to a member to go to a particular provider. "Soft" steerage is providing information to members and physicians to try to change where care is provided. (Radzialowski, Tr. 723-724).

683.   In-network steering occurs when MCOs charge different prices to members for accessing in-network hospitals, based on the price the MCO pays to the hospital for its members' inpatient care. (Town, Tr. 3809-3810, *in camera*).

### i.      Physicians' referrals

684.   Admitting privileges allow a physician to admit and see patients, prescribe medications, and perform procedures at the hospital. (Andreshak, Tr. 1752).

685.   Most physicians have privileges at multiple hospitals in Lucas County. (Gbur, Tr. 3105; RX35 at 006-007 (Hammerling, IHT at 16-18); Read Tr. 5274; Pugliese, Tr. 1466, 1573-1574).

686.   Physicians obtain privileges at multiple hospitals for various reasons, including personal preference and convenience, access to adequate medical and surgical facilities to treat their patients, and for business reasons, such as the ability to cover for partners in their practice. (Andreshak, Tr. 1754-1755; Marlowe, Tr. 2428-2429).

687.   Physicians also obtain privileges at multiple hospitals to respond to patient preferences and to serve patients whose health insurance plans or MCOs may not have certain hospitals in their networks. (Andreshak, Tr. 1754-1755, 1807; Marlowe, Tr. 2398; Read, Tr. 5268).

688.   Physicians employed by a hospital system tend to admit patients to that hospital system. (Marlowe, Tr. 2393-2394; Beck, Tr. 400; Korducki, Tr. 497-498; *see generally* Shook, Tr. at 1057).

689.   Employed physicians are expected to admit patients to the hospital system that employs the physician. (Pugliese, Tr. 1468).

690.   Physicians consider various factors when choosing a hospital to admit their patients, including the physicians' preferences, patient preferences, insurance coverage, and location. (Gold, Tr. 205-206).

691.  Having privileges at multiple hospitals allows a physician to direct a patient to an in-network hospital for treatment so the patient may minimize out-of-pocket expenses. (Andreshak, Tr. 1805-1807).

692.  When deciding whether to admit a patient to a hospital, physicians consider whether the hospital is in-network for purposes of the patient's insurance coverage. However, physicians are not generally aware of hospital pricing. (Marlowe, Tr. 2417; Read, Tr. 5293; Andreshak, Tr. 1782-1783, 1805-1806, Gbur, Tr. 3105, 3107; PX01932 at 033 (Bazeley, Dep. at 127), *in camera*; PX01948 at 044-045 (Peron, Dep. at 166-167, 169-170), *in camera*).

693.  Physicians are not aware of the rates that hospitals charge MCOs. (Gold, Tr. 206-207; Andreshak, Tr. 1782; Gbur, Tr. 3109; Marlowe, Tr. 2417; Read, Tr. 5293; *see also* Pirc, Tr. 2379, *in camera*; Pugliese, Tr. 1467-1468; Sandusky, Tr. 1325).

694.  Physicians in Lucas County do not have access to contracts between MMO and Lucas County hospitals. (Pirc, Tr. 2378-2379, *in camera*).

695.  Because physicians in Anthem's network are not party to the contracts that Anthem negotiates with hospitals in Lucas County, there is no apparent means by which physicians can routinely access the contracted hospital reimbursement rates. (Pugliese, Tr. 1467-1468).

696.  Physicians are not aware of the rates that FrontPath has negotiated with the Lucas County hospitals. (Sandusky, Tr. 1325).

697.  Physicians are not sensitive to the rates hospitals charge MCOs. (Town, Tr. 3819, *in camera*).

### ii.    MCO steering

698.  MCOs currently place greater emphasis on open-access networks than they did prior to 2008, to meet what MCOs' believe to be member preferences for access to all Lucas County hospitals. (Radzialowski, Tr. 615, 657-658, Pugliese, Tr. 1544; PX02148 at 064 (¶ 121) (Town Expert Report).

699.  MCOs believe that patients do not like health plans steering them to particular hospitals. (Radzialowski, Tr. 657-658; Pugliese, Tr. 1465, 1544-1545; PX01917 at 018 (Radzialowski, Dep. at 68), *in camera*).

700.  Higher-priced providers have displayed resistance to steering. Such resistance arises as part of contract discussions. Higher-priced hospitals resist steering because they may lose business. (Pugliese, Tr. 1466).

701.  Some MCOs use pricing transparency programs to steer patients to lower-cost providers. (Wachsman, Tr. 5167, *in camera*).

702.  MMO does not steer its members to use certain hospitals within MMO's network based on the reimbursement rates that MMO pays.  (Pirc, Tr. 2213-2214; PX01944 at 019 (Pirc, Dep. at 72), *in camera*).

703.  Mr. Pirc's sales staff had informed him of employer interest in steering options and he was told it would be helpful for sales if MMO developed this capability.  (Pirc, Tr. 2307, *in camera*).

704.  MMO has no plans to implement a program to steer members to certain in-network providers using financial incentives.  (Pirc, Tr. 2214; PX01944 at 022 (Pirc, Dep. at 82), *in camera*)).  MMO has never implemented a tiered hospital network and has no plans to do so in the future.  (Pirc, Tr. 2216).

705.  Anthem has never used steering – in the sense of affirmative financial incentives – to entice members to use particular, low-cost hospitals.  (Pugliese, Tr. 1465; PX01942 at 003 (Pugliese, Dep. at 8), *in camera*).

706.  Anthem provides online tools that allow members to access quality and cost information about hospitals.  (PX01919 at 004 (Pugliese, Dep. at 12-13)).

707.  Aetna uses soft steerage in Lucas County.  Its soft steering efforts have not been effective at steering members to low-cost hospitals.  Informational and transparency measures at Aetna "don't have teeth, [so] they haven't had [an] impact[.]" (Radzialowski, Tr. 723-724; PX01938 at 004 (Radzialowski, Dep. at 11-12), *in camera*).

708.  In January 2011, Aetna started a pilot hard-steering program for up to 100 Aetna employees in Toledo.  In the pilot program, hospitals are "tiered" into low cost (*i.e.*, lower rates) "first tier" hospitals, which provide a more financially-advantageous benefit for members, and high cost (*i.e.*, higher rates) "second tier" hospitals, which require members to pay a higher copay.  (Radzialowski, Tr. 724-725).

709.  Aetna's lower-cost hospital tier includes St. Luke's, UTMC, Bay Park, St. Charles, and St. Anne.  (Radzialowski, Tr. 776).

710.  There is insufficient data at this point to conclude whether Aetna's steering program successfully steers members to lower-cost hospitals.  (Radzialowski, Tr. 725-726).

711.  At the end of the year (2011), Aetna will evaluate the effectiveness of the steering program and determine whether to expand it to include other members and markets. (Radzialowski, Tr. 776-777).

712.  Aetna has received "a good number of complaints from the members not liking to have steerage imposed on them[.]" (Radzialowski, Tr. 726).

713. Hospitals have complained to Aetna about its pilot program. Hospitals did not like being identified as a high-cost or low-cost hospital and have complained about being put in tier two, rather than tier one. (Radzialowski, Tr. 726; PX01938 at 004 (Radzialowski, Dep. at 11), *in camera*)).

714. ProMedica complained to Aetna that TTH and Flower were not in tier one. (PX01938 at 004 (Radzialowski, Dep. at 11), *in camera*).

715. A United executive testified that she was not aware of any United programs with tiered benefits. (PX01939 at 007 (Sheridan, Dep. at 23), *in camera*).

716. Humana does not have any plans in Lucas County or Ohio that have incentives to use one in-network provider over another in-network provider (*i.e.*, tiered network). (McGinty, Tr. 1184-1185).

717. FrontPath's agreements with providers have provisions that prevent the use of steering. (Sandusky, Tr. 1328-1329).

718. In contract discussions, ProMedica has a policy of discouraging any strategies to steer patients away from ProMedica facilities through the use of financial incentives, and tries to get protections in its contracts preventing payors from using benefit differentials. (PX01945 at 013 (Wachsman, Dep. at 42-44), *in camera*).

719. ProMedica has anti-steering provisions in its contracts with { ████████ } and { ██████ }, the two { ██████ } payers in Lucas County besides ProMedica's own MCO, Paramount. (Wachsman, Tr. 5162-5163, *in camera*). ProMedica has also negotiated a contract with { ██████ } for St. Luke's that includes an anti-steering provision. (Wachsman, Tr. 5165-5166, *in camera*).

720. ProMedica does not object to informational steering through transparency. (Wachsman, Tr. 4879-4881).

### iii.   Other steering

#### (a)   Hospital employers

721. It is fairly common for hospital employers to provide a higher level of health-care coverage for their employees who obtain services at their own hospitals. This is similar to an employee discount in other types of industries. (Randolph, Tr. 7006-7007).

722. UTMC offers its employees' health insurance benefits. (Gold, Tr. 259). UTMC employees can choose from three health insurance plans: FrontPath, MMO, and Paramount. The plans contain incentives for insured members to seek services from UTMC's faculty physicians. (Gold, Tr. 259).

723. Mercy's health plan for its employees puts its provider hospitals into three tiers in order to steer, or incentivize, its employees to seek services from Mercy's hospitals instead of other Lucas County hospitals. (Shook, Tr. 1068; Marlowe, Tr. 2427-2428; Read, Tr. 5287-5288; Guerin-Calvert, Tr. 7294-7295; Town, Tr. 4383, *in camera*; Guerin-Calvert, Tr. 7395, *in camera*).

724. In Mercy's health plan for its employees, tier one is the preferred tier and includes Mercy's facilities. (Shook, Tr. 1072).

## (b)    Lucas County government

725. Physicians Health Collaborative ("PHC") is a network of Mercy physicians and Lucas County hospitals that markets to self-insured employers in Lucas County. St. Luke's is a member of PHC, but ProMedica is not. (Shook, Tr. 1092, *in camera*).

726. PHC competes with other provider networks that are marketed in Toledo, such as MMO and Paramount. (Shook, Tr. 1095, *in camera*).

727. One of the self-insured employers to which PHC markets its network is the Lucas County government. (Shook, Tr. 1093-1094, *in camera*).

728. Lucas County government represents approximately 3,000-4,000 covered members, making it the eighth largest employer in the Toledo area. (Randolph, Tr. 7039-7040, *in camera*; RX261 at 000004, *in camera*).

729. Lucas County government offers its employees three MCO networks from which to enroll, including Paramount, FrontPath, and PHC. (Shook, Tr. 1093-1096, *in camera*).

730. In 2011, the Lucas County government contributed a greater percentage to its employees' health-care costs if they chose to enroll with PHC instead of their two other options, Paramount or FrontPath. (Guerin-Calvert, Tr. 7294-7295; Shook, Tr. 1095-1096, *in camera*; Guerin-Calvert, Tr. 7395-7396 *in camera*).

731. Specifically, PHC was offered by the Lucas County government with a 90/10 benefit coverage and $1,000/$2,000 out-of-pocket maximums. Paramount was offered with a 75/25 benefit coverage, and $1,500/$3,000 out-of-pocket maximums. FrontPath was offered with a 70/30 benefit coverage and $2,000/$4,000 out-of-pocket maximums. (Randolph, Tr. 7042-7043, *in camera*; PX00524 at 001, *in camera*).

732. Paramount's two-year agreement with the Lucas County government, from March 2010 through February 2012, contains a stipulation that the Lucas County government would offer all health insurance plans with similar benefits. (PX00524 at 001, *in camera*).

733. The changes that the Lucas County government made to its employee health benefits resulted in a steering program that financially penalized Lucas County employees for using Paramount's plan. (Oostra, Tr. 5940, *in camera*).

86

734.  Although ProMedica objected to the Lucas County government's actions, ProMedica could not prevent it from steering employees to other hospitals. (Oostra, Tr. 5941-5942, *in camera*).

735.  As a result of the altered benefit offering, Mercy's PHC Lucas County government member enrollment went from {▆} employees to {▆} employees between 2010 and 2011, while Paramount and FrontPath both declined in membership. Paramount lost approximately {▆} members; and FrontPath lost approximately {▆} members. (Randolph, Tr. 7043, 7050, *in camera*).

736.  Mercy is transitioning PHC into HealthSpan, which is also a network for self-insured employers that is operated by the Mercy network out of Cincinnati and is currently marketing a PPO product to self-insured employers in Lucas County. (Shook, Tr. 1092-1093, *in camera*).

### c.    Demographic and economic conditions

737.  The population in the greater Toledo area is stagnant to declining, aging, and not forecast to grow. (Shook, Tr. 1040).

738.  The declining population of the Toledo area means that there are fewer patients overall. (Guerin-Calvert, Tr. 7274-7275).

739.  Toledo has substantially declining commercially insured hospital admissions. (Guerin-Calvert, Tr. 7272-7275). Today, only 29 percent of Lucas County hospital patients have commercial insurance. (Town, Tr. 3609).

740.  With an aging population in Toledo, the percentage of hospital patients covered by Medicare will increase. (Guerin-Calvert, Tr. 7303, 7272-7275).

741.  Toledo has high unemployment and has had an exodus of employers, which leads to a decline in patients covered by commercial insurance. (Guerin-Calvert, Tr. 7274-7275).

742.  The unemployment rate in Toledo was between 7 percent and 8 percent from the recession in 2001 to the start of the recession in 2008. (Guerin-Calvert, Tr. 7292-7296).

743.  During the recession of 2008, the unemployment rate in Toledo peaked at over 13 percent, coming down only to approximately 9.5 percent in 2011. (Guerin-Calvert, Tr. 7292-7296).

744.  The number of commercially insured patients in the Toledo area has declined since 2004 to 2009 from 45,000 to 35,000. (Guerin-Calvert, Tr. 7300).

745.  To the extent that a higher percentage of the hospital's revenue comes from the government, which does not cover a hospital's total cost of providing care, the factors

set forth in F. 737-744 put increasing financial pressures on hospitals to attract MCOs and their commercially insured patients in order to cover costs. (Guerin-Calvert, Tr. 7274-7275, 7302-7303, 7297-7298).

746. Ongoing health-care reform efforts also will impact the competitive conditions in the Toledo area, because, among other things, the rate of reimbursement from Medicare will continue to decrease and there will be less inpatient care and more outpatient care, thereby putting additional financial pressure on hospitals. (Guerin-Calvert, Tr. 7307-7309).



       **d.**    **Mercy's {**       **}**

747. Mercy has a plan, {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛}. (Shook, Tr. 971, 981-982, *in camera*; PX02288 at 004-005, *in camera*).

748. Mercy's plan for {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛}. (Shook, Tr. 985, *in camera*).

749. Mercy pursued {⬛⬛⬛⬛⬛⬛⬛⬛⬛} seriously once it learned of the likely joinder of St. Luke's and ProMedica. (Shook, Tr. 973, *in camera*; PX02288 at 001, *in camera*).

750. Mercy's {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛}. (PX02288, *in camera*; Shook, Tr. 981-986, *in camera*).

751. In furtherance of {⬛⬛⬛⬛⬛⬛⬛⬛⬛}, Mercy has {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛}. (Shook, Tr. 983, *in camera*; RX295, *in camera*). Mercy is continuing to {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛}. (Shook, Tr. 1018-1019, *in camera*).

752. After the Joinder, Mercy purchased one of St. Luke's physician practices located in Swanton, Ohio, about 13 miles west of St. Luke's. (Wakeman, Tr. 2667-2668, *in camera*).

753. Mercy recruits physicians with the hope that the physicians will refer patients to Mercy's hospitals for inpatient services. (Shook, Tr. 1056).

754. In November 2009, Mercy had a tentative timeline {⬛⬛⬛⬛⬛⬛⬛⬛} for accomplishing {⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛}. (RX286 at 000015, *in camera*). However, {⬛⬛⬛⬛⬛⬛⬛⬛⬛

████████████████████████████████}. (PX01940 at 008 (Shook, Dep. at 28), *in camera*).

755.  At the time of the adjudicative hearing, Mercy had not signed any agreements with any of the physicians it was actively engaged in recruiting. (Shook, Tr. 1019, *in camera*).

756.  Mercy has not noticed any measurable market share impact {████████████████ ████████████}, in connection with {████████████████}. (Shook, Tr. 988, *in camera*).

### 8.  Quality effects

757.  Hospitals compete on the basis of clinical quality, amenities, and patient experience. (Joint Stipulations of Law and Fact, JX00002A ¶ 11; Response to RFA at ¶ 20; *see also* PX2148 at 084-085 (Town Expert Report) ¶ 155, *in camera*; Town, Tr. 3605-3606).

758.  St. Luke's was recognized as a low-cost, high-quality hospital before the Joinder with ProMedica. (Answer ¶ 9; Wakeman, Tr. 2494-2496; Sandusky, Tr. 1310-1311; PX00390 at 001; PX01072 at 001; PX01914 at 016 (Pirc, IHT at 55-56), *in camera*).

759.  Prior to the Joinder, St. Luke's ranked as the highest quality, lowest cost hospital in the Toledo market. (PX01018 at 012 (Options for St. Luke's), *in camera*; PX01072 at 001 (St. Luke's Key Messages); Rupley, Tr. 1920, 1924-1925; Wakeman, Tr. 2482-2483, 2494).

760.  ProMedica believes that St. Luke's is a high-quality hospital. (Answer ¶ 33; Oostra, Tr. 6027-6028; PX01913 at 032 (Hammerling, IHT at 119), *in camera* (St. Luke's has a "good reputation historically" for quality and patient care); PX01903 at 033 (Hanley, IHT at 123), *in camera* ("I think St. Luke's has strong quality of care [.]"); PX01949 at 018 (Riordan Dep. at 64-65)).

761.  ProMedica documents reflect patients' awareness that St. Luke's was a high-quality hospital, often scoring better than ProMedica in quality rankings. (PX00399 at 024, *in camera*; PX00272; PX01138 at 001).

762.  Navigant, the health-care consulting firm that ProMedica hired to analyze the Joinder with St. Luke's, found St. Luke's to have high quality levels based on respected third-party quality rating organizations. (PX01946 at 008 (Nolan, Dep. at 24)).

763.  St. Luke's "is regularly recognized by third-party quality ratings organizations that rank St. Luke's within the top 10% of hospitals nationally, based on outcomes, cost and patient satisfaction." (PX00390 at 001 (ProMedica News Release May 26, 2010); *see also* PX01073 at 001 (St. Luke's Press Release Healthgrades.com)).

764. Third-party quality ranking organizations also regularly praise St. Luke's for its value, *i.e.*, its combination of high quality and low costs. (Rupley, Tr. 1933-1934; PX02300 at 001; PX01170 at 013-014).

765. St. Luke's believed that part of its value as an independent hospital was that it challenged other hospital systems "to keep service levels up." (PX01170 at 020; Wakeman, Tr. 2540-2541; Rupley, Tr. 1935-1936).

766. Despite St. Luke's rapid growth in patient volume in 2010, patient satisfaction and quality were unaffected and remained at very high levels. (Wakeman, Tr. 2495-2497; Black, Tr. 5685, 5690).

767. By some measurements, St. Luke's achievements in clinical quality exceed those of TTH and Flower. (Rupley, Tr. 1984-1985, 1991-1993, *in camera*; PX01016 at 006, *in camera*; PX01172, *in camera* ("[I]n the Commonwealth scoring on quality, SLH was the best, just a hair shy of the top 10% nationally, with Toledo Hospital dead last and well below the state average."); PX01030 at 018-019, *in camera*). Flower ranked sixth in Lucas County for overall quality. (Rupley, Tr. 2002, *in camera*; PX01030 at 018, *in camera*).

768. Respondent's executives and expert witness confirm that competition between hospitals benefits the local community through better customer service, higher-quality care, better access for patients, and improved facilities. (Oostra, Tr. 6039; Guerin-Calvert, Tr. 7792; Waschsman, Tr. 5116-5118; PX01905 at 033 (Wachsman, IHT at 127), *in camera*).

769. Prior to the Joinder, St. Luke's had concerns about poor quality outcomes and measures at ProMedica's hospitals. (Wakeman, Tr. 2674-2677, *in camera*; Black, Tr. 5720, *in camera*; PX01932 at 019 (Bazeley, Dep. at 69-70), *in camera*); PX01130 at 002, *in camera* ("Some of ProMedica's quality outcomes/measures are not very good. Would not want them to bring poor quality to St. Luke's."); *see* PX01016 at 023 (St. Luke's Affiliation Update Dec. 2009), *in camera*).

770. ProMedica executives admit their approach to quality was not keeping pace and that they "needed to catch up." They have described their quality program as involving "too much discussion, process, pages/documents, reporting structures, committees, charts, [and] meetings." (PX00527 at 001; Oostra, Tr. 6015-6019, 6024-6025).

771. Employees at ProMedica found the system's quality program to be confusing. ProMedica's Chief Medical Officer noted that "audiences after hearing quality presentations leave meetings glassy eyed and very confused" and that few employees "can fully explain the PHS approach to quality much less feel compelled to follow." (PX00527 at 001; Oostra, Tr. 6025-6026).

772.  MCOs consider hospital quality when considering a hospital's inclusion in the MCO's network. (Radzialowski, Tr. 655; Sheridan, Tr. 6622; Pugliese, Tr. 1455; McGinty, Tr. 1173; PX01944 at 006 (Pirc, Dep. at 18-19), *in camera*).

773.  MCO customers expect quality to be high at all providers within the offered network. (Pugliese, Tr. 1449-1450).

774.  MMO considers that all hospitals in Lucas County do well in terms of quality. (Pirc, Tr. 2296).

775.  Aetna believes that all hospitals in Lucas County are high-quality hospitals. (Radzialowski, Tr. 640).

776.  FrontPath considers all hospitals in Lucas County to be quality hospitals. (Sandusky, Tr. 1402).

777.  Quality of care can be measured using various data, including mortality rates, patient satisfaction scores, and other common measures of hospitals and hospital systems across the country. (RX18 at 000014 (Marcus, Dep. at 46), *in camera*).

778.  There are varying degrees of reliability for quality metrics. (RX1652). Quality measures can be too "nebulous" to be meaningful. (Pirc, Tr. 2213-2214).

779.  Some of ProMedica's best practices are outdated and not on-par with the practices at St. Luke's. (*E.g.*, PX01611 at 001; PX01610 at 001-003).

780.  Complaint Counsel's expert witness, Professor Town, concluded, based upon economic literature, that decreased competition reduces incentives to compete on non-price dimensions. Quality is a non-price dimension. (Town, Tr. 3605-3606).

781.  Professor Town concluded, based upon economic literature, that competition between hospitals leads to better quality of care. (Town, Tr. 3634-3635).

### N.    St. Luke's Financial Condition

782.  The most important time period for analyzing St. Luke's financial viability is the time period when Mr. Wakeman arrived in 2008 through when the Joinder occurred in 2010. (Dagen, Tr. 3337-3338).

783.  In analyzing the financial viability of St. Luke's as a stand-alone community hospital, absent the Joinder, it would be inappropriate to incorporate any financial effects attributable only to the Joinder, *i.e.*, effects that St. Luke's would not have accomplished on its own. (Dagen, Tr. 3353-3354).

1. **Operating margins**

784. Operating margins reflect total net operating revenue minus total operating expense, divided by net operating revenue, stated in a percentage, and reflect the actual profitability from operations of a company. (Hanley, Tr. 4580)

785. OhioCare, St. Luke's parent, experienced operating losses from 2007 through the Joinder in 2010. OhioCare's operating loss was {▮} million in 2007, {▮} million in 2008, {▮} million in 2009, and {▮} million in the first eight months of 2010. This amounted to operating margins of {▮} percent in 2007, {▮} percent in 2008, {▮} percent in 2009, and {▮} percent for the first eight months of 2010. (Den Uyl, Tr. 6418-6419; RX56 at 000006 (¶ 17), *in camera*).

786. St. Luke's was experiencing operating losses from 2007 through the date of the Joinder in 2010. St. Luke's loss was {▮} million in 2007, {▮} million in 2008, {▮} million in 2009, and {▮} million for the first eight months of 2010. This amounted to operating margins of {▮} percent in 2007, {▮} percent in 2008, {▮} percent in 2009, and {▮} percent in the first eight months of 2010. (PX02129 at 002; Den Uyl, Tr. 6418-6419; RX56 at 000006 (¶ 17), *in camera*; Dagen, Tr. 3304-3305).

787. St. Luke's operating performance was significantly below that of other Ohio hospitals. St. Luke's had negative operating margins in the years leading up to the Joinder, while other Ohio hospitals were profitable. The average operating margin for Ohio hospitals was 4.0 percent in 2007, 1.5 percent in 2008, and 5 percent in 2009. (Den Uyl, Tr. 6420-6421; RX56 at 000006 (Table 2), *in camera*).

788. St. Luke's operating performance was significantly below that of similarly sized (100-249 beds) nonprofit urban hospitals. St. Luke's had negative operating margins in the years leading up to the Joinder, while those similarly sized hospitals were profitable. The average operating margin for similarly sized nonprofit urban hospitals was 3.2 percent in 2007, 1.8 percent in 2008, and 3 percent in 2009. (Den Uyl, Tr. 6420-6421; RX56 at 000006 (Table 2), *in camera*).

789. St. Luke's operating performance was significantly below that of hospitals with comparable Moody's bond ratings as St. Luke's. St. Luke's had negative operating margins in the years leading up to the Joinder, while those hospitals with comparable Moody's bond ratings were profitable. The average operating margin for Moody's A-2 rated hospitals was 2.6 percent in 2007, when St. Luke's bond rating was A-2; the average operating margin for Moody's Baa1 rated hospitals was 0.3 percent in 2008 and 1.6 percent in 2009, when St. Luke's bond rating was Baa1. (Den Uyl, Tr. 6420-6422; RX56 at 000006 (Table 2), *in camera*).

790. In August 2010, St. Luke's earned a positive operating margin of $7,000 on $36.7 million in gross revenue, which Mr. Wakeman described as "not impressive, but it is better than a loss." (PX00170 at 001).

791. In reporting St. Luke's August 2010 positive operating margin to the Board, Mr. Wakeman cited "high activity" in excess of the prior year that "produced a positive operating margin. . . . This positive margin confirms that we can run in the black if activity stays high. After much work, we have built our volume up to a point where we can produce an operating margin and keep our variable expenses under control. (PX00170 at 001).

## 2. EBITDA

792. The "earnings before interest, taxes, depreciation, and amortization," or EBITDA, and the EBITDA margin of OhioCare were negative from 2008 through the Joinder. (Dagen, Tr. 3313-3314). OhioCare's EBITDA was {█} million in 2007, {█} million in 2008, {█} million in 2009, and {█} million for the first eight months of 2010. OhioCare's EBITDA margin was {█} percent in 2007, {█} percent in 2008, {█} percent in 2009, and {█} percent for the first eight months of 2010. (RX56 at 000006-000007 (¶ 19), *in camera*).

793. Having a negative EBITDA as OhioCare did in 2008, 2009, and the first eight months of 2010 is very unusual for a hospital. (Den Uyl, Tr. 6591-6592, *in camera*).

794. St. Luke's EBITDA was {█} million in 2007, {█} million in 2008, {█} million in 2009 and nearly {█} million as of August 31, 2010. This translates into EBITDA margins of {█} percent in 2007, {█} percent in 2008, {█} percent in 2009, and {█} percent as of August 31, 2010. (RX56 at 000006-000007 (¶ 19), *in camera*).

795. St. Luke's EBITDA margin, in the time leading up to the Joinder, was below the EBITDA of Moody's comparably rated hospitals. The average EBITDA margin of comparably rated hospitals was 9.6 percent in 2007, 7.7 percent in 2008, and 8.1 percent in 2009. (RX56 at 000007 (¶ 20), *in camera*).

## 3. Operating cash flow less capital expenditures

796. "Operating cash flow" takes operating income and adds back interest, depreciation, and amortization, similar to the accounting calculation, "EBITDA." EBITDA is another measure of a firm's profitability. (Hanley, Tr. 4694-4695; Den Uyl, Tr. 6424-6425; RX56 at 000006 (¶ 19) (Den Uyl Expert Report) *in camera*).

797. EBITDA does not consider capital expenditures. (Den Uyl, Tr. 6427-6428).

798. It is important to consider capital expenditures as part of the measurement of a hospital's true cash flow. Hospitals are very capital intensive. They need to spend money on capital to maintain their equipment, to provide new systems, and avoid decline. Hospitals need to spend a lot of capital, "just to stay even." (Den Uyl, Tr. 6430-6432).

799.  OhioCare's operating cash flow minus capital expenditures was negative from 2007 through the Joinder: it was {████} million in 2007, {████} million for 2008, {████} million for 2009, and {████} million for the first eight months of 2010. (RX56 at 000008 (¶ 22), *in camera*).

### 4.    Personnel restrictions

800.  In February 2009, St. Luke's began restricting hiring to those essential positions that affected patient care. (Wakeman, Tr. 2574, 2841-2842; PX01597). St. Luke's hiring freeze continues to the present time and was not part of St. Luke's Three-Year Plan. (*see* F. 920; Wakeman, Tr. 2843-2844; PX01026).

801.  During the period of hiring restrictions, St. Luke's patient volume increased, so it generally did not make sense to conduct layoffs. Instead, St. Luke's cut pay, cut benefits, and froze pay. (Wakeman, Tr. 2572-2573).

802.  St. Luke's froze employee compensation in 2008, including step increases and merit pay increases, for all employees; at the time of the Joinder, employees had not received pay increases for two years. (Johnston, Tr. 5317; Wakeman, Tr. 2841-2842; Black, Tr. 5608; RX1226 at 000002-000003).

803.  In 2009, all of St. Luke's executives took a 10 percent pay cut. (Johnston, Tr. 5317).

### 5.    Capital investment needs

804.  ProMedica understood that St. Luke's had significant capital needs for information technology, electronic medical records ("EMR"), outpatient surgery, private rooms, and investing in its OB program. (Hanley, Tr. 4548; Oostra, Tr. 5854-5855).

#### a.    Deferred projects

805.  In 2009, in order to conserve cash, St. Luke's began deferring some capital expenditures, including routine and ongoing upgrades of facilities and replacement of equipment, such as the replacement of air handlers, regular hospital beds and birthing beds, surgical tables, a nurse call system, and a sleep lab system. (Johnston, Tr. 5351-5355, 5362-5363; RX56 at 000015-000016, *in camera*).

806.  The estimated combined cost of the deferred items identified in F. 805 is {███} million. (RX56 at 000016 (¶ 42), *in camera*; *see also* Johnston, Tr. 5357-5363).

807.  St. Luke's also had to defer several information technology infrastructure projects, including: data center cooling, wireless networking, and PC purchases. St. Luke's had estimated that upgrading its data center's cooling system would have cost approximately {██████}, and that upgrading its wireless network would have cost approximately {█████}. (RX22 at 015 (Perron, Dep. at 50-52, *in camera*)).

94

808.  Prior to 2009, St. Luke's normal annual capital expenditures were approximately {▉} million.  In 2009, St. Luke's capital expenditures were about {▉} million.  (Johnston, Tr. 5352; Den Uyl, Tr. 6461, *in camera*)).

809.  In Fall 2010, St. Luke's departments identified {▉} million of necessary capital projects for budgeting purposes, with {▉} million for critical projects for 2011 alone.  (Johnston, Tr. 5411-5412, *in camera*).

### b.  Age of plant

810.  Age of plant "basically tells you how old your hospital is" and is indicative of how well you are maintaining the hospital; it is also one of the statistics that Moody's uses to evaluate hospitals.  (Den Uyl, Tr. 6470-6471, *in camera*).

811.  The average age of plant of a hospital will increase if capital expenditures are slowed down.  (Den Uyl, Tr. 6470-6471, *in camera*).

812.  Slowing down capital expenditures would not be sustainable in the long term for St. Luke's.  (Den Uyl, Tr. 6469-6470, *in camera*).

813.  St. Luke's was built in 1972.  Undertaking routine capital maintenance and improvements is necessary for St. Luke's ongoing business.  (RX56 at 000017-000018 (¶ 44), *in camera*).

814.  During due diligence, ProMedica learned that St. Luke's average age of plant was {▉} years at the end of 2009, as compared to industry norms of about 10 or 11 years.  (Hanley, Tr. 4608; PX01016 at 014, *in camera*).

815.  St. Luke's age of plant was greater than that of comparable Moody's rated hospitals and the difference was increasing in the years leading up to the Joinder.  In 2007, St. Luke's average age of plant was {▉} whereas that of comparably rated Moody's hospitals was 9.5.  In 2008, St. Luke's average age of plant was {▉} whereas that of comparably rated Moody's hospitals was 10.0.  In 2009, St. Luke's average age of plant was {▉} whereas that of comparably rated Moody's hospitals was 10.5.  After the first eight months of 2010 St. Luke's average age of plant was {▉}.  (RX56 at 000017-000018, *in camera*).

### c.  Space conversion/private rooms

816.  The standard of care has changed from semi-private to private rooms.  This is because: (1) inpatients tend to be sicker today than in the past because outpatient care has improved; (2) there is more technology and equipment in hospital rooms than in the past and private rooms provide the space for that equipment; (3) private rooms improve infection control; and (4) private rooms ensure greater patient privacy as mandated by HIPAA regulations.  (Nolan, Tr. 6277-6278, *in camera*; Johnston, Tr. 5376; Guerin-Calvert, Tr. 7287-7289; Black, Tr.5584-5585).

95

817. UTMC is in the process of converting all of its semi-private rooms to private rooms. Mercy is making extensive renovations at St. Vincent to add more private rooms, and also added about 75 private rooms in its Regional Heart and Vascular Center at St. Vincent in 2007. (Gold, Tr. 224; Shook, Tr. 904, 1116, *in camera*).

818. St. Luke's percentage of private rooms prior to the Joinder was 29 percent, which is very low, but typical for a hospital of St. Luke's age. (Nolan, Tr. 6276-6277, *in camera*; PX01216 at 025, *in camera*).

819. Prior to the Joinder, St. Luke's wanted to convert excess space and semi-private rooms into approximately 50 private rooms. The projected cost for that project was approximately $1.8 million. (Black, Tr. 5695).

820. The lack of private rooms impacted St. Luke's emergency room (ER) diversion rate, because ER patients with contagious infections or other conditions requiring isolation must be placed in private rooms. In addition, opposite genders cannot be placed in the same semi-private room. (Johnston, Tr. 5370; Guerin-Calvert, Tr. 7287-7288).

### d.    Electronic medical records

821. St. Luke's realized that to accomplish its Three-Year Plan (F. 920) it would also need to make significant investments in its information technology ("IT") capabilities to keep up with the rest of the marketplace. (Wakeman, Tr. 2816-2817).

822. The Health Information Technology for Economic and Clinical Health Act ("HITECH") passed in 2009, provides hospitals with increased Medicare reimbursement if they implement and upgrade their EMR systems and achieve statutory "meaningful use" requirements by certain deadlines. (Johnston, Tr. 5343-5344; Wakeman, Tr. 2849-2850; RX22 at 013-014 (Perron, Dep. at 45-46)).

823. The "meaningful use" requirements of the HITECH Act mean that the different technological systems related to a patient's care need to be connected and able to share information back and forth. (Johnston, Tr. 5343).

824. "Meaningful use" under HITECH not only requires that health-care providers employ EMR systems, but also that the EMRs in each patient setting have the ability to connect with one another to create an overall EHR, or electronic health record, for each patient. (Johnston, Tr. 5343-5344, 5520-5521).

825. St. Luke's has numerous IT systems that are implicated by the "meaningful use" requirements, including, for example, its patient registration, patient billing, nursing documentation, radiology, laboratory, surgery, pharmacy, cardiac catheter lab, and pulmonary medicine systems. (Johnston, Tr. 5345-5346).

826.  In addition to the IT systems described in F. 825, St. Luke's also requires network and infrastructure systems. New laptops and desktop work stations are also needed to work with the new systems. (Johnston, Tr. 5346).

827.  St. Luke's cannot simply update its current systems. Many are no longer supported by the manufacturers and creating new interfaces between the old systems is costly and inefficient. (Johnston, Tr. 5346; RX22 at 012 (Perron, Dep. at 39-41)).

828.  Hospitals that meet "meaningful use" requirements by 2013 will receive additional Medicare reimbursements for being compliant. But hospitals that fail to do so by 2015 will face penalties in the form of reduced Medicare reimbursements. (Johnston, Tr. 5344-5345; RX22 at 022 (Perron, Dep. at 81)).

829.  In addition to "meaningful use," St. Luke's IT systems required significant investments to meet requirements for health information exchanges, HIPPA 5010, ICD-10, patient centered medical home, and accountable care. (RX22 at 013 (Perron, Dep. at 43)).

830.  St. Luke's had selected Eclipsys as the vendor for its hospital-based EMR system. (Johnston, Tr. 5347).

831.  On November 4, 2009, Eclipsys estimated a total cost for the EMR system of approximately $21 million over seven years. (PX01495; PX01496 at 003; Den Uyl, Tr. 6453, *in camera*). In June 2010, shortly before the Joinder, Eclipsys reduced the quote by approximately $1 million. (PX01502 at 001).

832.  Under the American Recovery and Reinvestment Act of 2009 ("ARRA"), there are financial incentives for meeting "meaningful use" targets for EMR implementation. St. Luke's believed if it met the requirements of ARRA, it would receive $6.3 million in stimulus funds for the project. (PX01281 at 007-012; PX01928 at 014 (Perron, Dep. at 47-48), *in camera*).

833.  With the financial incentives under AARA (F. 832), the total cost for its EMR system could be reduced to approximately $14 million; however, St. Luke's would first have to pay the full cost of purchasing and implementing the system before the required deadline in order to qualify for any available subsidies. (Johnston, Tr. 5349; Black, Tr. 5694-5695).

834.  Upgrading St. Luke's foundation information technology applications was part of the Eclipsys project. (PX01928 at 011 (Perron, Dep. at 36, *in camera*)).

835.  The EMR quote referred to in F. 831 did not account for the operational expenses associated with implementing and maintaining that system, such as training clinical and non-clinical staff. (PX01496; RX22 at 027-029 (Perron, Dep. at 101-106); Johnston, Tr. 5348-5349).

836. The estimated costs associated with the incremental hardware and personnel needed to put in place the EMR system total approximately {█} million over the first three years of the EMR project. (Den Uyl, Tr. 6454–6455, *in camera*; RX56 at 000013-000014 (¶ 36), *in camera*).

837. Patient centered medical home regulations, promulgated in July 2010, mean that St. Luke's would also have to ensure that its ambulatory and hospital-based EMR systems can communicate with each other, requiring the purchase of additional middleware products from a vendor. (PX01928 at 032-033 (Perron, Dep. at 120-124)).

838. St. Luke's CFO through the end of 2009, David Oppenlander, and St. Luke's Computer Information Systems Director, Eric Perron, recommended that St. Luke's move forward with beginning to implement EMR in 2010. (PX01933 at 039 (Oppenlander, Dep. at 147-148), *in camera*; (PX01928 at 021, 023, 030 (Perron, Dep. at 75-76, 84-85, 113), *in camera*).).

839. St. Luke's had budgeted {█} million for 2010 to begin implementation of the EMR system, but funds to purchase a new system were not allocated. (Wakeman, Tr. 2851-2852; PX01928 at 008 (Perron, Dep. at 23, *in camera*)).

840. St. Luke's Chief Financial and Operating Officer believes that St. Luke's would have required financial support to fund the EMR project absent the Joinder. (Johnston, Tr. 5482-5483, *in camera*).

### 6.  Pension funding obligations

841. St. Luke's has two pension plans, a defined benefit pension plan and a 403(b) defined contribution pension plan. (Johnston, Tr. 5331).

842. St. Luke's defined benefit pension plan promises certain benefits, payable over a period of years, upon retirement, to employees. That promise is backed by the assets in the pension plan account. The employer must contribute enough money to the plan to have sufficient assets to live up to the pension plan's obligations. (Arjani, Tr. 6729).

843. Employers who offer a defined benefit pension plan face various risks, including the risk that plan assets may shrink through investment losses and that benefit obligations may increase due to higher salaries, longer life expectancies, or extended employee tenures. (Arjani, Tr. 6730).

844. The contributions that St. Luke's is required to make to its defined benefit pension plan are cash contributions. (Johnston, Tr. 5397, *in camera*).

845. At a board meeting on January 27, 2009, the Board was advised by Mr. Wakeman concerning the "Pension Challenge we are currently facing. Mr. Wakeman explained that the pain this is causing is due to the external market and not the organization. Mr. Wakeman stated we had to make benefit cuts in a year that our employees did a

fabulous job. Total revenue went up by 3.7% but bad debt was over 20%. Over the last quarter, the investments depreciated causing the pension plan to become underfunded going from 111.7% at the end of 2007, to today of 64.7%. If the funded status reaches 60% the hospital must freeze the plan, due to regulatory requirements." (RX1226 at 002).

846. Defined benefit pension funding and expense were "pressing concerns" identified in the December 2009 Affiliation Update to the Board. (F. 414).

847. Each year, actuaries are required to certify the funding level of St. Luke's defined benefit pension plan. (Johnston, Tr. 5333, 5337-5338).

848. Under the Employee Retirement Income Security Act ("ERISA") as modified by the federal Pension Protection Act ("PPA"), if St. Luke's defined benefit pension plan is less than 100 percent funded, it is required to amortize the amount of the under-funding and make payments over seven years to bring the plan to 100 percent funding. (Arjani, Tr. 6736-6737; Den Uyl, Tr. 6446-6447, *in camera*).

849. The "funding target" is an assessment for ERISA purposes of the benefit obligations of the pension plan. It is calculated by examining the census of plan participants, which provides data on how long employees have been with the employer and the level of their accrued pension benefits, as well as the level of accrued benefits for retirees and terminated vested employees who are entitled to future benefits. (Arjani, Tr. 6779).

850. Keeping a defined benefit pension plan above the 80 percent funding level eliminates the danger of having the plan labeled "at risk" under ERISA. (Arjani, Tr. 6758-6759, *in camera*; RX56 at 000011-000012 (¶ 31), *in camera*).

851. If a defined benefit pension plan falls below 80 percent funding, an employer may be required to accelerate contributions or payments into the plan in order to get the plan above the 80 percent level. (Johnston, Tr. 5336-5337).

852. Accelerating payments means that payments made during the current plan year are re-allocated to the prior plan year for purposes of measuring the funding level of the defined benefit pension plan as of January 1st of the current year. (Arjani, Tr. 6739).

853. In order to be certified as 80 percent funded as of January 1, 2010, St. Luke's had to accelerate contributions to its defined benefit pension plan for year 2010 into plan year 2009 and also had to apply or "forfeit" a credit balance from a prior year's payment. (Arjani, Tr. 6739-6740; PX01397).

854. St. Luke's applied approximately $800,000 in defined benefit pension plan contributions from its 2010 plan year contributions back to the 2009 plan year. At the same time, St. Luke's also forfeited its prior credit balance of approximately $1.4 million dollars. (Arjani, Tr. 6739-6740; PX01397; Johnston, Tr. 5401, *in camera*; PX01392 at 005, *in camera*).

855.  St. Luke's was required to make an accelerated contribution to its defined benefit pension plan of {█} million in order to reach the 80 percent funded level as of January 1, 2011, which St. Luke's made prior to the applicable deadline of March 31, 2011. (Johnston, Tr. 5406, *in camera*; Arjani, Tr. 6749, *in camera*; PX00474 at 001, *in camera*).

856.  At the close of the Joinder, St. Luke's defined benefit pension plan was under-funded from both an accounting and funding perspective. (Johnston, Tr. 5336).

857.  St. Luke's actuaries estimate that St. Luke's will need to make annual contributions to its defined benefit pension plan of at least {█} million until 2016 to meet minimum funding requirements, assuming St. Luke's achieves a projected 8 percent return on the plan's assets, and depending on other variables, including discount rates, employee terminations and employee retirements. The required contribution may be less than the estimated {█} million. (Arjani, Tr. 6751-6752, 6765, 6767, *in camera*; PX01943 at 016 (Arjani, Dep. at 54-55), *in camera*).

858.  On December 31, 2009, St. Luke's froze its employee defined benefit pension plan and shifted its employees to a contribution plan. (Johnston, Tr. 5331; Arjani, Tr. 6730). This change resulted in cost savings for St. Luke's. (Wakeman, Tr. 2872).

859.  After St. Luke's defined benefit pension plan was frozen, St. Luke's still had an obligation to make up the difference between the funding target, the present value of the plan's obligations, and the plan's assets. (Arjani, Tr. 6731).

860.  Even if St. Luke's is able to make current payments to its defined benefit pension plan beneficiaries, it must still restore the plan to full funding. (Johnston, Tr. 5342-5343).

861.  Even though St. Luke's froze its defined benefit pension plan at the end of 2009, St. Luke's still faced all of the financial commitments to the plan that it had made through 2009. (Den Uyl, Tr. 6451-6452, *in camera*).

### 7.  Cash reserves

862.  St. Luke's reserve fund (cash reserves) balance on August 31, 2010 was {█} million of which {█} million was "trustee restricted." (RX56 at 000029 (¶ 71), *in camera*).

863.  Trustee restricted funds are those funds that are earmarked for malpractice insurance and one year's debt service on St. Luke's bonds and capital leases. While it is technically possible to reclassify funds from restricted to unrestricted in order to fund capital expenditures and operating losses, it would not be financially prudent to do so, given the ongoing need to make insurance and bond payments. Excess or surplus funds in the restricted fund might be transferred, and one year St. Luke's did transfer surplus trustee funds to St. Luke's pension plan. (PX01951 at 047-048 (Den Uyl, Dep. at 183-187, *in camera*); PX01933 at 044 (Perron, Dep. at 166-167); PX00038 at 006, *in camera*).

864.  St. Luke's unrestricted reserves were {███} million as of August 31, 2010, at the time of the Joinder, down from {███} million in 2009, {███} million in 2008, and {███} million in 2007.  (RX56 at 000015-000016 (¶ 41), *in camera*).

865.  From the end of 2007 through the Joinder, St. Luke's was using the reserve fund to fund losses and the capital commitments it needed.  (Den Uyl, Tr. 6460, *in camera*).

866.  As of August 31, 2010, St. Luke's held a total of at least $65 million in cash and investment balances.  (Joint Stipulations of Law and Fact, JX00002A ¶ 34).

867.  A hospital's cash reserves are used for capital expenditures, strategic capital expenditures, or for unforeseen events that may arise outside of normal operations. (Den Uyl, Tr. 6457, *in camera*; PX01933 at 042 (Oppenlander, Dep. at 161) (stating that St. Luke's reserves could be used to purchase "any types of capital . . . equipment, a table, chairs, anything that essentially is capital"), *in camera*; PX01908 at 009 (Deacon, IHT at 26-28, *in camera*, Johnston Tr. 5521-5522).

868.  "Days cash on hand" reflects the unrestricted cash and investments, both short-term and long-term, that are available to pay the operating costs of a company, based on average expenses per day.  Days cash on hand measures how many days a company could last, assuming no further cash comes in.  It is a measure of liquidity and stability.  (Hanley, Tr. 4583-4584).

869.  The metric that St. Luke's and bond rating agencies use to evaluate the state of its cash reserve fund is days cash on hand.  (Johnston, Tr. 5526-5527).

870.  In 2008, St. Luke's days cash on hand was 135.  In 2009, St. Luke's days cash on hand was 109.  As of August 31, 2010, St. Luke's cash on hand was 104 days.  In 2000, St. Luke's cash on hand had been 358 days.  (PX02129 at 002; Hanley, Tr. 4584).

871.  The amount of days cash on hand held by Aa-rated institutions is about double what St. Luke's currently holds.  St. Luke's days cash on hand is about half of other hospitals its size.  (Johnston, Tr. 5527).

### 8.    Moody's downgrade

872.  Moody's Investors Service, Inc. ("Moody's") assigns a credit rating by performing a holistic qualitative and quantitative analyses of the borrower.  (PX01370 at 001; PX02146 at 009-010 (¶ 15) (Brick Expert Report)).  Moody's examines certain variables over time and in relation to the industry generally.  (PX01370 at 005; PX02146 at 009-010 (¶ 15) (Brick Expert Report)).

873.  Moody's downgraded St. Luke's Series 2004 revenue bonds by two grades in November 2008, from "A2" to "Baa1."  (PX00379 at 001).

101

874.    A possible further bond rating downgrade was identified as one of the "pressing concerns" in the December 2009 Affiliation Update presented to the St. Luke's Board. (F. 414; PX01016 at 014, *in camera*).

875.    In February 2010, during the time that ProMedica was conducting due diligence on St. Luke's, Moody's downgraded St. Luke's bond rating from a Baa1 to a Baa2, with a negative outlook.  (Hanley, Tr. 4590, 4592-4594; PX00053 at 001).

876.    A Baa2 bond rating is "two notches away from junk bond" status.  (Hanley, Tr. 4705-4706).

877.    "Obligations rated Baa are subject to moderate credit risk.  They are considered medium grade and as such may possess certain speculative characteristics."  (PX01371 at 009).

878.    A Moody's survey indicates that in 2009, approximately 100 out of 401, or 28%, not-for-profit freestanding hospitals and single-state health-care systems had a bond rating between Baa1 and Baa3.  (PX01368 at 022; PX02146 at 005-006 (¶ 9) (Brick Expert Report)).

879.    A "negative outlook" means that it is more likely that there will be a further bond rating downgrade, rather than an upgrade, in the future.  (Den Uyl, Tr. 6463, *in camera*).

880.    According to Moody's, the downgrade of St. Luke's bond rating in February 2010 "reflect[ed] larger operating losses and operating cash flow deficit[s] through 11 months of fiscal year (FY) 2009 resulting in insufficient debt service coverage despite a very low debt load.  The outlook remains negative reflecting lower but continued operating losses expected through FY 2010 and ongoing challenges to negotiate favorable commercial contracts as competitive pressures continue.  The outlook also reflects our concern that cash reserves could decline if operating cash flow deficits continue . . ." (PX01372 at 001).

881.    Among St. Luke's "strengths" identified by Moody's were a "very low debt position" with 8.3 million rated debt outstanding, a "very strong" cash-to-debt coverage of 412 percent, "adequate" liquidity measures with 123 days cash on hand; "relatively favorable payor mix" with low Medicaid and self-pay patients; and the Memorandum of Understanding executed between St. Luke's and ProMedica.   (PX01372 at 001-002).

882.    St. Luke's cash-to-debt coverage of 412 percent compared to an average of just over 100 percent for all Moody's-rated hospitals.  (PX01372 at 002; Brick, Tr. 3474).

883.    When Moody's downgraded St. Luke's bond rating in February 2010, it described St. Luke's "Challenges," including: third consecutive year of large operating losses and an operating cash flow deficit posted for the first time through 11 months of FY 2009 (-9.8% operating margin and -2.0% operating cash flow margin); currently unfavorable commercial contracts and ongoing challenges with negotiating higher commercial reimbursement rates; a relatively aggressive investment allocation relative to the

hospital's rating level and the need for more predictable returns to support operations and debt as operating losses continue to grow; a "very competitive market with the presence of a number of hospitals that are part of two larger and financially stronger systems, ProMedica Health System (Aa3-rated) and Mercy Health Partners (owned by A1-rated Catholic Health Partners)"; and weak demographics in the primary service area, which is characterized by declining volume trends, high unemployment levels, and low median income levels.  (PX01372 at 001).

884.  When Moody's downgraded St. Luke's bond rating in February 2010, it noted: "What could change the rating – UP  - Continued growth and stability of inpatient and outpatient volume trends; significantly improved and sustainable operating performance for multiple years; strengthening of debt coverage measures and liquidity balance; improved market share.  What could change the rating – DOWN - Continued weak operating performance; sustained weak debt coverage level; weakening of liquidity; sizable unexpected debt issuance; significant loss in market share."  (PX01372 at 003).

885.  Typically, Moody's looks for three years of sustained operating performance when it comes to a potential upgrade.  (Brick, Tr. 3544).

886.  With respect to operating performance, "a hospital's ability to generate and sustain a level of earnings that ensures ongoing operations, debt service repayment, provides a source of capital for facility needs and strategic initiatives, and increases cash reserves is critical" to Moody's credit analysis.  (PX01370 at 016).

887.  Data collected by Respondent's bond-rating expert, Errol Brick, shows that "Baa" rated hospitals and health-care systems issued $2.6 billion in debt from January 2010 through January 2011, (ranging from $25 million to $527 million per hospital).  In addition, data collected by Brick pertaining to ten bond issues by Baa rated hospitals since August 31, 2010 shows the actual interest rates paid by these hospitals.  (PX02146 at 005-006, 015-035 (¶¶ 9-10 and Appendices 1 and 2) (Brick Expert Report); Brick, Tr. 3480-3483).

888.  Based on his analysis of the data described in F. 887, Brick concluded that, in August 2010, St. Luke's would have been able to access the tax-exempt capital markets for up to $75 million in debt for a reasonable interest rate of no more than 7 percent.  (Brick, Tr. 3483-3490).

889.  When there is negative cash flow, the choice is to draw down cash reserves or borrow money, but borrowing money is difficult for a company that is struggling financially. (Den Uyl, Tr. 6434).

890.  Ms. Hanley, ProMedica's CFO who evaluated St. Luke's financials, believes that as a result of the downgrade, future borrowing by St. Luke's would involve more constraints, such as a higher interest rate, more stringent covenants, and/or a debt-service funds escrow.  Although St. Luke's was not seeking to borrow money in February 2010 when it was downgraded by Moody's, "you look at a company for the

future sustainability long term of a company, not just . . . that point in time." (Hanley, Tr. 4707).

891. St. Luke's did not attempt to issue new bond debt any time between January 1, 2009 and August 31, 2010. (Joint Stipulations of Law and Fact, JX00002A ¶¶ 37-38).

892. St. Luke's was not seeking to borrow money in 2010 because, as Respondent's expert witness opined, St. Luke's was running losses and "to borrow more money would put more leverage on the hospital, . . .[and] would put them in a more difficult position." (Den Uyl, Tr. 6547).

### 9. Bond covenant non-compliance

893. During due diligence, ProMedica learned that St. Luke's was not in compliance with certain covenants for bonds that were insured by AMBAC. (Hanley, Tr. 4600; *see* RX906 at 000001).

894. St. Luke's debt service coverage ratio was negative so St. Luke's was in technical default. (Hanley, Tr. 4600-4601; RX906 at 000001-000002).

895. AMBAC required St. Luke's to retain an independent consultant, but St. Luke's did not do so and, subsequently, AMBAC notified St. Luke's that it was in default on March 11, 2010. (Hanley, Tr. 4601-4602).

896. AMBAC completed a credit analysis of St. Luke's bonds in late 2008 and early 2009 and downgraded St. Luke's credit from an A- to a BBB+ rating. (Gordon, Tr. 6791-6792, 6799-6800, *in camera*; RX177).

897. As part of this credit analysis of St. Luke's, in late 2008 and early 2009 AMBAC evaluated the Moody's and S&P's ratings for St. Luke's bonds and three years of financial metrics including admissions, net patient service revenue, operating margin, EBITDA margin, and debt coverage. (Gordon, Tr. 6792-6796, *in camera*; RX177).

898. In the credit analysis, described in F. 896, AMBAC highlighted that St. Luke's operating margin was negative "and getting larger in the negative direction." (Gordon, Tr. 6796-6797, *in camera*; RX177).

899. In the credit analysis, described in F. 896, AMBAC's, First Vice President Bruce Gordon ("Mr. Gordon"), who had the primary responsibility for tracking the performance of St. Luke's series 2004 Bonds, recommended that St. Luke's rating be put on a downward trend, because "[St. Luke's] financial performance was clearly trending down or in a negative direction during this three-year period." (Gordon, Tr. 6784, 6789, 6798, *in camera*; RX177).

900. Based upon the credit analysis described in F. 896, Mr. Gordon recommended that St. Luke's rating be put on a downward trend, despite the fact that St. Luke's EBITDA

104

margin and days cash on hand were "relatively strong for this particular entity." (Gordon, Tr. 6797-6799, *in camera*; RX177).

901. In his review of the rating analysis, described in F. 896, Mr. Gordon's supervisor downgraded St. Luke's to BBB+ and agreed with Mr. Gordon's downward trend recommendation. (Gordon, Tr. 6799-6800, *in camera*; RX177).

902. The debt service coverage ratio measures a hospital's cash flow for a given year divided by the principal and interest that is payable on its debt for that same year. (Gordon, Tr. 6808, *in camera*).

903. From a credit standpoint, it is important that the debt service coverage ratio is above one, meaning that a company has sufficient cash flow to pay the principal and interest on its bonds. (Gordon, Tr. 6808-6809, *in camera*).

904. St. Luke's bond covenants required that it maintain a debt service coverage ratio of 1.3 as of the end of any fiscal year. (RX906 at 000001; PX01542 at 001).

905. St. Luke's informed AMBAC that its 2008 debt service coverage ratio was {█}. (RX10 at 026 (Gordon, Dep. at 97)).

906. For 2009, St. Luke's debt service coverage ratio was at least negative {█}. (PX02355 at 001; Gordon, Tr. 6806-6809, *in camera*).

907. On December 23, 2009, St. Luke's filed a "Material Event Notice" formally notifying AMBAC, the bond insurer; the Huntington Bank, the trustee; and the City of Maumee, the issuing authority, that St. Luke's had violated its debt service coverage ratio covenants for 2008 and 2009. (RX183 at 000004; Gordon, Tr. 6815-6816, *in camera*).

908. In its December 23, 2009 "Material Event Notice," St. Luke's stated that its "plan to address its future covenant compliance is to attempt to negotiate new, or renegotiate existing contracts, with insurance carriers." And, St. Luke's stated that it "may explore other options, including but not limited to exploring an affiliation with another health care system." These statements did not give AMBAC comfort that St. Luke's financial condition would improve. (RX183 at 000004; Gordon, Tr. 6816-6817, *in camera*).

909. When St. Luke's informed AMBAC that St. Luke's violated its debt service coverage ratio covenants in 2008 and 2009, Mr. Gordon "was certainly concerned that the default might be an indication of a deteriorating financial situation." (Gordon, Tr. 6811, *in camera*).

910. Based on his review of St. Luke's financial statements in December 2009, and upon internal tracking of five or six years of financials, Mr. Gordon concluded that St. Luke's financial "trends were negative, indicating that the financial performance of the hospital was deteriorating." Mr. Gordon was particularly concerned "with the accelerated

deterioration in the hospital's performance during 2008 and year-to-date 2009." (Gordon, Tr. 6814-6815, *in camera*).

911.  "Defeasance" of bonds means that the outstanding bonds are retired for purposes of financial reporting. When a bond issue is "defeased," typically an escrow is established with a trustee and the amount is held in safe investments, in such amount that the principal and the earnings off of those investments is sufficient to repay the principal and the interest on the original bonds over the life of the bonds. (Gordon, Tr. 6803-6804).

912.  To resolve St. Luke's default described in F. 894, AMBAC proposed that St. Luke's defease its bonds rather than pay down the full amount because St. Luke's bonds were not callable. Because they were non-callable bonds, it would have cost St. Luke's more to defease the bonds than the face value of the bonds outstanding, which would not have been financially prudent. In addition, St. Luke's was trying to conserve cash. (Gordon, Tr. 6825-6826, *in camera*; Den Uyl, Tr. 6465-6466, *in camera*).

913.  It would not have been financially prudent for St. Luke's to purchase the balance of its outstanding bonds prior to the Joinder because: (1) St. Luke's was trying to maintain its liquidity and conserve cash; (2) the amount of the bonds was relatively small and the interest rate was fairly low; and (3) it would have been expensive to repurchase them because they are non-callable bonds. (Den Uyl, Tr. 6465-6466, *in camera*).

914.  Based upon a credit review of pre-2010 financial data, on April 27, 2010 AMBAC downgraded St. Luke's internal rating from BBB+ to BBB and gave St. Luke's a "negative outlook." (Gordon, Tr. 6835, *in camera; RX179, in camera*).

915.  AMBAC's April 27, 2010 credit review of St. Luke's lists a number of {



}. (RX179 at 000003-000004, *in camera*).

916.  St. Luke's owed less than $11 million in total bond debt as of August 31, 2010. (JX00002A ¶ 33).

917.  As of August 31, 2010, St. Luke's outstanding bond debt was {███} million. (Response to RFA at ¶ 47).

918.  At the time of the latest Moody's downgrade, F. 875, St. Luke's level of bonds outstanding was fairly low. (Dagen, Tr. 3312).

919.  As of August 31, 2010, St. Luke's had enough cash and investments on its financial statement to pay off all of its outstanding debt.  (JX00002A at ¶ 24).

### 10.  Three-Year Plan and improvements pre-Joinder

#### a.  Strategic Plan

920.  In June 2008, soon after taking the CEO position with St. Luke's in February 2008, Mr. Wakeman developed St. Luke's Hospital's Three-Year Plan (2008-2010) ("Three-Year Plan") that contained growth goals for patient revenues and patient volume.  The plan was based on five strategic pillars: "Growth, People, Quality, Service, and Finance/Corporate."  The five pillars contained associated goals and benchmarks.  (Wakeman, Tr. 2812-2813; JX00002A ¶ 39; PX01026).

921.  St. Luke's growth goals stated in the Three-Year Plan included: increasing inpatient net revenue by $3.5 million per year, within three years; increasing outpatient net revenue by $5 million per year, within 3 years; achieving 40% inpatient market share in core service area, within 3 years; and establishing 2 signature clinical lines.  Strategies to meeting these goals included obtaining 90% access to area managed care enrollees within three years and growing its physician staff.  (PX01026 at 001-002).

922.  St. Luke's pursued a strategy of acquiring physician practices because it expected "that the physicians would generate inpatient and outpatient revenues at St. Luke's."  (Joint Stipulations of Law and Fact, JX00002A ¶ 42).

923.  Employing physicians had both one time and recurring costs, including initial capitalization, insurance coverage, physician salaries, practice operational expenditures and capital expenditures, such as the AllScripts EMR system.  (Wakeman, Tr. 2803-2804, 2819-2820).

924.  By August 31, 2010, St. Luke's achieved the growth goal of increasing inpatient net revenue by more than $3.5 million per year on average.  (Joint Stipulations of Law and Fact, JX00002A ¶ 40; RX1858 at 000018 (Respondent's Answers to Complaint Counsel's Interrogatories ¶ 17)).

925.  By August 31, 2010, St. Luke's achieved the growth goal of increasing outpatient net revenue by more than $5 million per year on average.  (Joint Stipulations of Law and Fact, JX00002A ¶ 41; RX1858 at 000018-000019 (Respondent's Answers to Complaint Counsel's Interrogatories ¶ 17)).

926.  St. Luke's inpatient net revenues increased in each calendar year from 2008 through 2010.  (JX00002A ¶ 32).

927.  St. Luke's outpatient net revenues increased in each calendar year from 2008 through 2010.  (JX00002A ¶ 31).

928. By August 31, 2010, St. Luke's achieved its growth goal of obtaining more than 40% market share in its core service area. (RX1858 at 000018-000019 (Respondent's Answers to Complaint Counsel's Interrogatories ¶ 17)).

929. In a memorandum to the St. Luke's Board of Directors, dated September 24, 2010, Mr. Wakeman wrote: "If there was one pillar [St. Luke's] attained a high level of success in [its] strategic plan in the past two years, it would be growth. The hard numbers prove that out, [in] almost every service." (PX00170 at 006). The Chairman of St. Luke's Board, James Black, agreed with this statement. (Black, Tr. 5686).

930. St. Luke's overall occupancy rate in the twelve months prior to the Joinder increased by approximately {█} percent. (PX01920 at 010 (Wakeman. Dep. at 31), *in camera*).

931. By the time of the Joinder, St. Luke's had achieved four of the five pillars set forth in its Three-Year Plan. (Wakeman, Tr. 2593-2594; PX01326).

932. By the time of the Joinder, St. Luke's was successful on three of the four specific goals identified for "Growth" set forth in its Three-Year Plan. (RX1858 at 000018-000019 (Respondent's Answers to Complaint Counsel's Interrogatories at ¶ 17)).

933. St. Luke's "service" goals stated in the Three-Year Plan included, among other things, systematically converting all St. Luke's double-bed patient rooms to single-bed patient rooms, in order to improve St. Luke's infection control, patient safety, and patient satisfaction. In addition, it was important for St. Luke's to make this conversion to stay competitive locally and keep up with national standards. (PX01010 at 003; Wakeman, Tr. 2815; Black, Tr. 5584-5585). St. Luke's did not accomplish the Three-Year Plan goal of "[w]ithin three years, systematically convert all St. Luke's double-bed patient rooms to single-bed patient rooms." (PX01010 at 003; Wakeman, Tr. 3018-3020, *in camera*).

934. St. Luke's finance/corporate goals for the Three-Year Plan included, among others, achieving a break-even operating margin by the end of 2009, then 2% to 4% for subsequent years; achieving 200 days cash on hand; maintaining St. Luke's "A" rating with Moody's; achieving net revenue growth per case (case-mix adjusted[9]) of 3% to 5% per year; and achieving an average age of plant consistent with Moody's "A" rated hospitals. (PX01026 at 003-004).

935. St. Luke's realized that to accomplish its Three-Year Plan it would also need to make significant investments in its IT capabilities to keep up with the rest of the marketplace. (Wakeman, Tr. 2816-2817).

936. St. Luke's did not achieve the key financial metrics outlined in the Three-Year Plan. (Wakeman, Tr. 3018-3019, *in camera*).

---

[9] See F. 608.

937.  St. Luke's did not achieve the financial goal outlined in the Three-Year Plan of achieving 200 days cash on hand.  (PX01010 at 004; Wakeman, Tr. 3018-3019, *in camera*).

938.  St. Luke's did not achieve the financial goal outlined in the Three-Year Plan of a break-even margin by the end of 2009 and did not achieve the desired margins.  (PX01026 at 003-004; PX01010 at 003-004; Wakeman, Tr. 3018-3019, *in camera*).

939.  St. Luke's did not accomplish the financial goal outlined in the Three-Year Plan to "Maintain St. Luke's "A" rating with Moody's."  (PX01010 at 003-004; Wakeman, Tr. 3018-3019, *in camera*).  St. Luke's bond rating was downgraded by two grades in November 2008, from "A2" to "Baa1," and downgraded again in February 2010 to Baa2. (F. 873, 875).

940.  St. Luke's did not accomplish the Three-Year Plan goal to "[a]chieve an average age of plant consistent with Moody's "A" rated hospitals."  (PX01026 at 003-004; Wakeman, Tr. 3018-3019; F. 814-815).

941.  By the time of the Joinder, St. Luke's debt service coverage ratio was 3.7, which exceeded the financial goal in the Three-Year Plan of a debt service ratio of 2.0. (PX01026 at 004; PX02129 at 002).

### b.     Cost coverage ratios

942.  A "cost coverage ratio" measures whether the payments a hospital is receiving covers its costs of providing care.  For example, "if you're being paid a thousand dollars by a particular [MCO] and your costs are a thousand, you have a cost coverage ratio of 1.  If you have a ratio that's less than 1, you're not covering the costs of providing care, and if it's more than 1, you're more than covering your costs." (Den Uyl, Tr. 6438, *in camera*).

943.  Cost coverage ratios consider both the direct and indirect costs that a hospital incurs as a result of providing care.  (Den Uyl, Tr. 6438, *in camera*).  Direct costs are those costs that are directly related to treating a patient, such as medications, supplies, laundry, and labor.  (Dagen, Tr. 3189).  Indirect costs are not fixed and rise as volume increases. (Den Uyl, Tr. 6476, *in camera*).

944.  St. Luke's overall cost coverage ratio was below one, meaning St. Luke's was not generating sufficient reimbursement to cover its total costs, through the time of the Joinder on August 31, 2010.  (Den Uyl, Tr. 6422-6423).

945.  St. Luke's internal financial systems provide reports that allow it to track its revenue per discharge on a case-mix adjusted basis as well as its cost per discharge on a case-mix adjusted basis.  Earnings per case-mix adjusted discharge is also referred to as "earnings per adjusted discharge" or by the acronym "EPAD."  (Johnston, Tr. 5318-5819).

946. At the time of the Joinder, St. Luke's earnings per adjusted discharge figures showed that, on average, St. Luke's was losing money on its commercially insured patients. (Johnston, Tr. 5318-5322).

947. The overall cost coverage ratio for St. Luke's, across all payors, was only {███████}. Considering all its payments, prior to the Joinder, St. Luke's was not generating enough reimbursement to cover its costs. (Den Uyl, Tr. 6440-6443, *in camera*; RX56 at 000010, *in camera*).

### c.    Other financial metrics

948. Mr. Wakeman's monthly report for August 2010 advised the Board that:

- St. Luke's activity exceeded its Operating Financial Plan (OFP) and last years' activity. "That activity has finally exceeded our fixed expense. . . ."
- The high activity produced a positive operating margin of $7,000 on $36.7 million in gross revenue. It is not impressive, but it is better than a loss.
- This positive margin confirms that we can run in the black if activity stays high. After much work, we have built our volume up to a point where we can produce an operating margin and keep our variable expenses under control.

(PX00170 at 001).

949. St. Luke's financial performance, as of the date of the Joinder, improved over its performance in 2008 and 2009. (F. 950-954, 957-958; PX02147 at 006).

950. St. Luke's operating margin for the time period January 1, 2010 through August 31, 2010 was an improvement over St. Luke's operating margin for calendar year 2009. JX00002A at ¶ 30).

951. St. Luke's operating cash flow margin (*i.e.,* EBITDA margin) and operating income improved in the first eight months of 2010, prior to the Joinder, compared to 2009. (F. 794; PX02129 at 002; Wakeman, Tr. 2594-2596; JX00002A ¶ 29).

952. In the first eight months of 2010, prior to the Joinder, St. Luke's losses decreased and its operating cash flow improved. (F. 786, 794; Dagen, Tr. 3191-3193; PX01925 at 054-055 (Guerin-Calvert, Dep. 207-208)).

953. St. Luke's operating cash flow margin for the time period January 1, 2010 through August 31, 2010 was an improvement over St. Luke's operating cash flow margin for calendar year 2009. (JX00002A ¶ 28).

954. St. Luke's operating cash flow margin improved by {██} percent from the end of 2009 to August 31, 2010, from {███} percent to positive {██} percent. (Wakeman, Tr. 2703-

110

2704, *in camera*, Wakeman, Tr. 3035; PX02129 at 002; RX56 at 000007, Table 3 (Den Uyl Expert Report), *in camera;* JX00002A ¶ 27).

955. EBITDA does not consider capital expenditures. At certain times, it also does not reflect pension expenses or gains and losses from investments. These items need to be examined as well to get a full picture of the true cash flow of a hospital. (Den Uyl, Tr. 6427-6428).

956. Improving EBITDA does not necessarily indicate financial strength. (Dagen, Tr. 3188).

957. As of August 31, 2010, St. Luke's showed increased revenue, due in part to referrals from newly added physician practices and recent access to Anthem members. (RX56 at 000011 (¶ 30), *in camera*; F. 162 (St. Luke's began participating in Anthem's network again in July 2009)).

958. As of August 31, 2010, St. Luke's showed decreased expenses, in part related to restrictions St. Luke's instituted with respect to salaries, hiring and pensions. (RX56 at 000011 (¶ 30), *in camera*; F. 800-803, 858).

### 11.    St. Luke's future viability

959. At the end of 2009, St. Luke's CEO Wakeman advised the Board of St. Luke's regarding how long St. Luke's would survive as an independent entity under different scenarios. Wakeman advised that under then-current conditions, St. Luke's would be able to survive between three and five years, and that if St. Luke's was able to get rate increases under contracts with two of St. Luke's largest commercial payers, St. Luke's could survive four to seven years. (Wakeman, Tr. 2624-2625).

960. These survival time periods set forth in F. 959 could expand, if all other factors were unchanged and equity markets and operating cash flow improved. (Wakeman, Tr. 2625-2627).

### a.    Complaint Counsel's expert

961. Complaint Counsel's proffered expert regarding St. Luke's financial condition, H. Gabriel Dagen, is Assistant Director of Accounting and Financial Analysis at the FTC. He has a Bachelor of Science degree in Psychology and a Masters in Business Administration with a concentration in Finance. He has completed 27 credit hours in accounting at Memphis State University and has an inactive Certified Public Accounting License. He has been with the FTC since 1998. Mr. Dagen's experience includes reviewing financial and related information for over a dozen hospitals, hospital systems and health-care providers. (PX2147 at 001-004 (¶¶ 1-3, 7) (Dagen Expert Report).

962. Mr. Dagen concluded that the improvements in St. Luke's operating performance in 2010 compared to 2009 were "driven primarily by increases in volume." (Dagen. Tr. 3192-3193, 3197-3199).

963. Mr. Dagen's pro forma analysis predicts that volume growth could act as the primary driver for improved operating financial performance absent the Joinder, even to the point of profitability by 2013. (*See* PX02147 at 036-042 (¶¶ 65-76) (Dagen Expert Report); PX01950 at 042-043 (Dagen, Dep. at 161-162), *in camera*).

964. Mr. Dagen concluded that because St. Luke's reimbursements covered its direct costs during the first eight months of 2010, growth in St. Luke's patient volume alone improved St. Luke's overall cost coverage ratio. (Dagen, Tr. 3191-3193, 3241-3242, *in camera* ("As patient volume increases . . . – as long as the reimbursement rates are higher than direct costs [–] the cost coverage ratio will improve.")).

965. Mr. Dagen concluded that St. Luke's payor reimbursements can fall short of covering its total costs but, as long as it covers its direct costs and makes some contribution to indirect costs, volume growth alone can improve St. Luke's profitability (even without increases in rates). According to Mr. Dagen this is because direct costs are variable in nature and indirect costs are more fixed. (Dagen, Tr. 3189-3193, 3198-3199, 3239-3242, *in camera* ("[a]s long as you're making a contribution to your indirect costs . . . it's beneficial to add the next patient"); PX01852 at 017 (¶ 25) (Dagen Rebuttal Report)).

966. Mr. Dagen concluded that, absent the Joinder, St. Luke's would not only be able to avoid service cuts, but would be able to continue to make growth-minded investments, implement EMR, convert semi-private rooms to private rooms, eliminate its outstanding bond debt, and still have approximately $33 million in cash and reserves at the end of 2013. (Dagen, Tr. 3210-3214; PX02147 at 036 (¶ 65) (Dagen Expert Report)).

967. Mr. Dagen concluded that St. Luke's cash flow and reserve fund "ensure that, absent the Joinder, St. Luke's would have remained financially viable into the foreseeable future" and in particular "that St. Luke's would have been able to fund necessary capital improvements and growth-minded investments without any additional borrowing." (PX02147 at 006 (¶ 12) (Dagen Expert Report)).

968. Mr. Dagen concluded that St. Luke's was in the midst of a successful financial turnaround at the time of the Joinder. He concluded that Mr. Wakeman's Three-Year Plan was producing the desired results: increasing revenues, market share, and improving St. Luke's operating performance. (Dagen, Tr. 3229-3231; PX02147 at 006 (¶ 15) (Dagen Expert Report)).

969. Mr. Dagen concluded that "[a]bsent the Joinder, St. Luke's was heading toward further financial growth and stability in 2011 and beyond." (PX02147 at 006-007 (¶ 16) (Dagen Expert Report)).

112

**b.** **Respondent's expert**

970.   Respondent's proffered expert on St. Luke's financial condition, Bruce Den Uyl, is managing director for AlixPartners, LLP, a professional services firm. He has a Bachelor of Arts in Economics and a Masters in Resource Economics. He has over 25 years of experience providing valuation and financial consulting, and expert testimony, to a wide range of hospitals, MCOs, physician practices, and surgery centers, among other health-care and related entities. (RX56 at 001-002 (¶¶ 2-3), 046, *in camera*).

971.   Mr. Den Uyl concluded that St. Luke's struggled financially as a stand-alone entity during the years leading up to the Joinder and faced significant financial obstacles in going forward as an independent hospital. (RX56 at 000003 (Den Uyl Expert Report), Section II.A., *in camera*).

972.   Mr. Den Uyl was not asked to, and did not, analyze or provide an expert opinion on how long St. Luke's could have survived as a stand-alone hospital had it not been acquired by ProMedica. (Den Uyl, Tr. 6520-6522).

973.   Mr. Den Uyl did not analyze whether St. Luke's would have been profitable as a stand-alone hospital in the future had it not been acquired by ProMedica. (Den Uyl, Tr. 6522).

974.   Mr. Den Uyl offered no expert opinion on whether St. Luke's, as a stand-alone hospital, without the Joinder, could have issued additional debt. (Den Uyl, Tr. 6530-6531).

975.   Mr. Den Uyl, was not asked to, and did not provide, an expert opinion in his expert report as to whether St. Luke's could have issued additional debt as a stand-alone organization; however, when nevertheless elicited during cross-examination, Den Uyl's opinions were that St. Luke's did not "have the wherewithal to borrow money" and that from a financial standpoint it would not have been prudent." St. Luke's was running losses, "[a]nd to borrow more money would put more leverage on the hospital, and put them in a more difficult position." (Den Uyl, Tr. 6530-6531, 6547-6548 (denying Motion to Strike)).

976.   Mr. Den Uyl concluded that it is possible that St. Luke's might have become profitable as a stand-alone hospital, without the Joinder, within two years, but that it is unlikely. (Den Uyl, Tr. 6523).

977.   Slowing down capital expenditures would not be sustainable in the long term for St. Luke's because a hospital must be maintained and eventually put in new systems. The average age of plant of a hospital will increase if capital expenditures are slowed down. (Den Uyl, Tr. 6469-6471, *in camera*).

978.   The employee cost cutting measures that St. Luke's undertook in 2009 were not sustainable in the long term. "You eventually would have to pay your employees more to remain competitive in the marketplace." (Den Uyl, Tr. 6468, *in camera*).

979.  Mr. Den Uyl concluded that St. Luke's cash flow losses from 2007 through the Joinder were not sustainable, because St. Luke's could not draw down on its reserves indefinitely. St. Luke's capital requirements would deplete St. Luke's cash reserves, if it was unable to generate positive cash flow.  In addition, to funding its loses, St. Luke's was facing significant capital expenditures, and St. Luke's had to fund its underfunded pension plan.  (Den Uyl, Tr. 6429, 6434-6435; RX56 at 000015, *in camera*).

## O.  Pro-Competitive Benefits and Efficiencies

### 1.  The Joinder provides St. Luke's with capital

980.  As part of the Joinder, ProMedica has committed to contribute $30 million over three years to St. Luke's Hospital.  ProMedica has also contributed $5 million to the St. Luke's Foundation.  (Hanley, Tr. 4679; Johnston, Tr. 5375).

981.  ProMedica set aside $10 million in strategic capital and approximately {█} million in routine capital for St. Luke's for the 2011 budget year.  (RX31 at 011 (Akenberger, Dep. at 39-40, *in camera*)).

982.  ProMedica's $10 million allocation of strategic capital to St. Luke's for 2011 was based upon the obligation ProMedica made to invest $30 million in St. Luke's over a three-year period.  (RX31 at 012 (Akenberger, Dep. at 41, *in camera*); Hanley, Tr. 4679; Johnston, Tr. 5375).

983.  The $10 million of strategic capital ProMedica allocated to St. Luke's for 2011 will be spent on priorities identified by the St. Luke's Board.  (RX31 at 012 (Akenberger, Dep. at 41, *in camera*)).

984.  ProMedica's preliminary 2012 budget for St. Luke's also provides St. Luke's with $10 million in strategic capital and approximately {█} million in routine capital.  (RX31 at 011-012 (Akenberger, Dep. at 40-41, *in camera*)).

985.  ProMedica defines routine capital expenditures as capital that is currently in service with the various facilities and will need to be replaced; examples of routine capital expenditures include replacement of medical imaging machines, such as CT scanners, and replacement of carpeting in a facility.  (RX31 at 009 (Akenberger, Dep. at 30)).

986.  Routine capital is capital that needs to be replaced because its useful life is no longer operating at an appropriate level.  (RX31 at 010 (Akenberger, Dep. at 34)).

987.  ProMedica defines strategic capital expenditures as reflecting investments that it is making in the community to provide support for ProMedica's strategic plan to meet patient and quality needs, employee needs, and financial needs.  (RX31 at 010 (Akenberger, Dep. at 34)).

114

988. Strategic capital would be something that would require new investment of capital towards a new service, expansion of a service, or new technology. (RX31 at 010 (Akenberger, Dep. at 34)).

989. The capital commitment from ProMedica is to be used for capital projects at St. Luke's, including converting semi-private rooms to private rooms, updating St. Luke's IT systems, constructing an outpatient lobby, renovating the heart center, moving administrative services, expanding surgical areas, and increasing the private postpartum area and well infant nursery. (Hanley, Tr. 4628 *in camera*, 4679-4680, PX00058 at 056).

990. With the benefit of capital it received from ProMedica, St. Luke's plans to add 17 additional private rooms. (Johnston, Tr. 5372-5373, 5376-5377).

991. The current project budget for the additional 17 private rooms described in F. 990 is $3 million. (Johnston, Tr. 5377).

992. Prior to the Joinder, St. Luke's projected the cost of its highest priority capital projects, EMR implementation and private room conversions, to be $14 million and $1.8 million, respectively. (Black, Tr. 5694-5695).

993. St. Luke's had $65 million in cash and investments as of August 31, 2010, while its estimate for the cost of a private room conversion project was $1.8 million. (*See* Joint Stipulations of Law and Fact, JX00002A ¶ 34; Black, Tr. 5695-5696). Mr. Black, St. Luke's Chairman, testified that St. Luke's had adequate capital to fund its private room conversion project as a stand-alone hospital. (Black, Tr. 5695-5696).

994. ProMedica believes that St. Luke's has allocated part of its initial capital contribution of $10 million toward IT investment to become compliant for "meaningful use." (For explanation and context on "meaningful use," *see* F. 822-824, 832; Hanley, Tr. 4679).

995. Although several of the components necessary to meet meaningful use requirements have been implemented, St. Luke's overall implementation of necessary systems is still in the planning stages. (Johnston, Tr. 5380-5381).

996. ProMedica will not start implementing EMR at St. Luke's until 2012 at the earliest. Mr. Perron, St. Luke's Computer Information Systems Director, was "[u]nsure" whether ProMedica could implement EMR at St. Luke's in time to take advantage of all federal ARRA financial incentives. (PX01928 at 037 (Perron, Dep. at 139), *in camera*; *see also* PX01912 at 068 (Akenberger, IHT at 262-263), *in camera*).

997. St. Luke's intended to begin implementing EMR in 2010, but stopped the process because of the Joinder. (Johnston, Tr. 5484, *in camera*; PX01928 at 023 (Perron, Dep. at 84), *in camera*; Den Uyl, Tr. 6575-6576, *in camera*).

998. ProMedica also provided approximately 55 individual employees who have assisted with the "meaningful use" conversion process. (Johnston, Tr. 5380).

115

999. ProMedica would not invest in St. Luke's without the Joinder.  (Town, Tr. 4374; RX1855 at 000024, *in camera*).

## 2. St. Luke's became part of ProMedica's Obligated Group

1000. ProMedica's Obligated Group is the group that guarantees ProMedica's public debt. (Hanley, Tr. 4513).

1001. ProMedica's debt associated with its Obligated Group has bond ratings of "Aa3" from Moody's, with a stable outlook, and "Aa-" from Standard & Poor's with a positive outlook.  (Hanley, Tr. 4514).

1002. AMBAC, St. Luke's bond insurer (F. 893), believed that "the risk associated with the St. Luke's bonds that we insured would be much safer if St. Luke's was a part of ProMedica."  (Gordon, Tr. 6824-6825, *in camera*).

1003. Among the positive developments noted by AMBAC in its April 27, 2010 credit review report for St. Luke's, which recommended downgrading St. Luke's credit from BBB+ to BBB (F. 914), was St. Luke's negotiation of a merger "with A+ rated ProMedica Health System."  (RX179 at 000003, *in camera*.)

1004. On June 1, 2010, AMBAC, St. Luke's and ProMedica came to a Forbearance and Waiver Agreement to resolve St. Luke's debt covenant violation.  (PX01542; Gordon, Tr. 6844-6855, *in camera*).

1005. In the 2010 Forbearance and Waiver Agreement, AMBAC agreed to waive its remedies against St. Luke's upon a Joinder between St. Luke's and ProMedica when ProMedica would become responsible for making payments on those bonds.  If St. Luke's did not join with ProMedica, then St. Luke's would be required to defease the complete balance of the bonds by the end of the year, December 31, 2010.  The Agreement required St. Luke's to set up an irrevocable escrow in case this defeasance would become necessary. (PX01542 at 003-004; Gordon, Tr. 6845-6855, *in camera*).

1006. St. Luke's default of its bond covenants (F. 894-895) was cured when St. Luke's joined with ProMedica.  (Den Uyl, Tr. 6466, *in camera*).

1007. Effective at closing of the Joinder, St. Luke's became part of the ProMedica Obligated Group.  (Hanley, Tr. 4513; Johnston, Tr. 5372).

1008. Subsequent to the Joinder, AMBAC granted a waiver to St. Luke's, which required that ProMedica's Obligated Group replace St. Luke's on the bond note.  (Hanley, Tr. 4677; RX907).

1009. On September 28, 2010, Moody's upgraded St. Luke's bond rating to ProMedica's rating because St. Luke's joined ProMedica's Obligated Group and took on its bond rating. (Hanley, Tr. 4676; RX350 at 000001).

### 3. Funding for St. Luke's pension plan

1010. Since the Joinder, ProMedica has helped fund contributions to St. Luke's defined benefit pension plan. (Hanley, Tr. 4678).

1011. ProMedica's goal is to keep its defined benefit pension plans fully funded and is committed to increase the funding to make St. Luke's defined benefit pension plan {█████████}. (Johnston, Tr. 5409, *in camera*).

1012. The accounting liability for St. Luke's defined benefit pension plan was {█████} million at the end of December 2008 and {█████} million at the end of December 2009. (Johnston, Tr. 5391, *in camera*).

1013. ProMedica's financial statements show that ProMedica's own defined benefit pension plan was underfunded in 2008 by {█████} million and in 2009 by {█████} million. (PX00015 at 32; Oostra, Tr. 6129-6130).

### 4. Reduction of some of St. Luke's costs

1014. St. Luke's was not large enough to fund a captive insurance company (an insurance company subsidiary) or to be a part of a captive insurance plan on its own. (Wakeman, Tr. 2837-2838).

1015. Following the Joinder, St. Luke's has saved about $500,000 in malpractice insurance by becoming part of ProMedica's captive insurance company. (Hanley, Tr. 4680).

1016. Moving St. Luke's into ProMedica's captive insurance company had the effect of freeing up over $8 million in cash as "unencumbered" on St. Luke's balance sheet. (Hanley, Tr. 4680).

1017. St. Luke's has benefited from the Joinder through the consolidation of non-clinical backroom services such as billing services, legal services, physician practice management, and IT support for physician practices. (Wakeman, Tr. 3023-3025, *in camera*).

### 5. Revenues from Paramount members

1018. Prior to the Joinder, St. Luke's, and Mr. Wakeman personally, made serious attempts to have St. Luke's rejoin Paramount's network, but the attempts were unsuccessful. (Rupley, Tr. 1940-1941).

117

1019. On April 10, 2009, Paramount informed UTMC that Paramount would not add St. Luke's to its provider network because "[t]here is no benefit to ProMedica for inclusion of an additional hospital in all of Paramount's product lines." (PX00224 at 002, *in camera*).

1020. ProMedica believed that St. Luke's admission into Paramount would have hurt patient volume at ProMedica's Lucas County hospitals. (Oostra, Tr. 6045-6046; Randolph, Tr. 7076-7077; Rupley, Tr. 1941; PX00405 at 001; PX01233 at 005, *in camera*).

1021. Following the Joinder, St. Luke's became a participating provider in Paramount, and its volume of Paramount patients has increased significantly since then. (Hanley, Tr. 4678-4679; Johnston, Tr. 5374-5375, 5382; Wakeman, Tr. 3023-3025, *in camera*).

1022. The increased Paramount volume had a positive effect on St. Luke's bottom line, because Paramount pays St. Luke's above its costs. (Wakeman, Tr. 3023-3025, *in camera*; Johnston, Tr. 5512-5513, *in camera*).

1023. St. Luke's addition to the Paramount network was one reason St. Luke's financial performance improved after its Joinder with ProMedica. (Dagen, Tr. 3329).

1024. Mr. Dagen estimates that St. Luke's addition to the Paramount network accounted for 23 percent of the total increase in St. Luke's revenues during the last four months of 2010. (*See* Dagen, Tr. 3243-3244, *in camera*, 3330).

### 6.   Navigant Consulting's clinical service line consolidation recommendations

1025. Navigant Consulting, Inc. ("Navigant") is regarded as reliable and authoritative in health-care consulting. (Shook, Tr. 1110, *in camera*).

1026. ProMedica retained Navigant in mid-2010 to conduct a clinical integration study to determine how best to deploy services across the ProMedica system following the Joinder with St. Luke's. (Nolan, Tr. 6253, 6263; Hanley, Tr. 4670, *in camera*).

1027. The 2010 ProMedica project required Navigant to review the Toledo metropolitan marketplace and develop a set of recommendations as to the best distribution of services across ProMedica's facilities to meet community needs. (Nolan, Tr. 6253-6254).

1028. Clinical integration describes the process of when two organizations join together and combine their clinical capabilities in an optimal manner to provide high-quality and cost-effective health-care. (Nolan, Tr. 6254-6255).

1029. Clinical integration refers to consolidation of services in some circumstances, and refers to distribution of services in other cases. (Nolan, Tr. 6328, *in camera*).

1030. When making clinical integration recommendations, Navigant considers the market demographics and population projections, physical plants and facilities, anticipated health-care-related legislation, and emerging community needs. (Nolan, Tr. 6255-6256).

1031. In the course of its engagement by ProMedica, Navigant examined TTH, Toledo Children's Hospital, Flower, Bay Park, and St. Luke's. (Hanley, Tr. 4670, *in camera*).

1032. During the initial months of the 2010 ProMedica engagement, Navigant created and presented interim progress reports to a steering committee, consisting of members of ProMedica's executive team and St. Luke's executive team, and a physician advisory committee to get continuous feedback and input from the client on preliminary findings and proposed recommendations. (Nolan, Tr. 6268-6270, *in camera*).

1033. Navigant produced its final report to ProMedica in January 2011 (hereafter "Navigant Report"). (Nolan, Tr. 6284, *in camera*; PX00479, *in camera*).

### a.        General recommendations

1034. The Navigant Report made key findings including that: (i) ProMedica's hospitals served the entire Toledo metropolitan area, but St. Luke's was unique because it was more focused in the southwest area, (ii) when combined, the volumes for all ProMedica hospitals, including St. Luke's, was sufficient to reach critical mass numbers, and (iii) physicians supported developing centers of excellence, particularly for complex tertiary or quaternary cases. (Nolan, Tr. 6286-6288, *in camera*; PX00479 at 007-008, *in camera*).

1035. Navigant believed it was important to consolidate complex cases in order to gain efficiencies and improve quality. (Nolan, Tr. 6289, *in camera*).

1036. Navigant recommended that ProMedica concentrate its high-acuity, complex, but lower-volume cases in one facility or location, but also recommended that ProMedica ensure its general low-acuity, high-volume services were available across the Toledo market so that they would be easily accessible to the population. (Nolan, Tr. 6291-6292, *in camera;* PX00479 at 009, *in camera*).

### b.        Recommendations by service line

1037. The Navigant Report focused specifically on nine service lines that Navigant developed with the assistance of ProMedica to cover the vast majority of patients and opportunities for integration. (Nolan, Tr. 6284-6285, *in camera*; PX00479 at 006, *in camera*).

1038. The nine service lines that Navigant reviewed in the Navigant Report were cancer, heart and vascular, neurosciences, orthopedics, women's obstetrics and gynecology, children's, gastroenterology/urology, psychiatry, and rehabilitation. (PX00479 at 006, *in camera*; Hanley, Tr. 4670-4671, *in camera*).

### (i)    Cancer

1039.  The Navigant Report recommended that ProMedica {█████████████████████
████████████████████████████████████████████}. (Nolan, Tr. 6301-
6302, *in camera*).

1040.  No existing services at St. Luke's were directly affected by the recommendations in the
Navigant Report with respect to cancer services.  (PX01946 at 019 (Nolan, Dep. at 67).

### (ii)    Cardiovascular

1041.  The Navigant Report recommended that ProMedica {█████████████████████
█████████████████████████████████████████}. (Nolan, Tr. 6298-
6303, *in camera*; Hanley, Tr. 4672, *in camera*).

1042.  The leadership of the {████████████████████████████████████████████
██████████████████}, with no change in capital investment.  (RX31 at 034 (Akenberger,
Dep. at 131-132, *in camera*)).

1043.  Cardiac physicians believe that a hospital needs about 180 cardiac cases a year to break
even.  (RX26 at 017 (Riordan, Dep. at 59)).

1044.  Prior to the Joinder, St. Luke's had about 150 cardiac cases a year and had been unable
to raise it above that number.  (RX26 at 017 (Riordan, Dep. at 60)).

1045.  The consolidation described in F. 1041 entails {████████████████████████
███████████████████████████████}.  (PX01931 at 034 (Akenberger, Dep. at
131), *in camera*).  As a result, some patients who require {█████████████████████
████████████████}.  (Nolan, Tr. 6331-6333, *in camera*).  Also, patients who arrive at St.
Luke's – or who are already there for another procedure – and then require {████████████
████████████████████}.  (Nolan, Tr. 6330-6334, *in camera*; Hanley, Tr. 4743, 4745-4746,
*in camera*).

1046.  Dr. Gbur, an independent physician who performs interventional cardiology procedures
at St. Luke's, testified that the elimination of open heart services at St. Luke's could add
10 to 15 minutes of additional transit time for some patients who experience a heart
attack and must go to a hospital with open heart capabilities for treatment.  (Gbur, Tr.
3112-3113).

1047.  ProMedica did not explain how shifting St. Luke's heart and vascular volume to Flower Hospital would impact the revenues earned on those procedures.  (PX2105 at 051 (Exhibits to Akenberger, Decl.).

1048.  Given that ProMedica's reimbursement rates for services is on average higher than St. Luke's, a price increase resulting from this consolidation may exceed any actual cost savings generated by it.  (PX02147 at 060-061 (¶ 111) (Dagen Expert Report)).

### (iii)  Neurosciences

1049.  The Navigant Report recommended that ProMedica {███████████████ █████████████████████████████████████████████████████████}.  (Nolan, Tr. 6303, *in camera*).

1050.  No existing services at St. Luke's were directly affected by the recommendations in the Navigant Report with respect to neuroscience services.  (PX01946 at 019 (Nolan, Dep. at 68).

### (iv)  Orthopedics

1051.  The Navigant Report recommended that ProMedica {████████████████ ███████████████████████████████████████ ███████████████}.  (Nolan, Tr. 6295, 6304, *in camera*).

1052.  No existing services at St. Luke's were directly affected by the recommendations in the Navigant Report with respect to orthopedics services.  (PX01946 at 019 (Nolan, Dep. at 68).

### (v)  OB services

1053.  The Navigant Report recommended that ProMedica {████████████████ ████████}.  (Nolan, Tr. 6304, *in camera*).  Navigant also recommended {████ ████████████████████████████}.  (Hanley, Tr. 4672, *in camera*).

1054.  With regard to {██████████████████}, the Navigant Report recommended that ProMedica {██████████████████████████████████████████ ████}.  (Nolan, Tr. 6299, *in camera*).

1055.  The Navigant Report recommended that {████████████████████████████} because of its location in a demographically attractive area.  (Nolan, Tr. 6300, *in camera*).

### (vi)  Inpatient rehabilitation

1056.  The Navigant Report recommended that ProMedica consolidate inpatient rehabilitation at Flower to develop a center of excellence, but also to maintain outpatient services in accessible locations around the community. (Nolan, Tr. 6305, *in camera*). A center of excellence is a specialized facility with specialized staff and equipment for a specific service or array of services. (Nolan, Tr. 6296, *in camera*).

1057.  The Navigant Report also recommended that St. Luke's inpatient rehabilitation cases be redirected to Flower. The purpose of this recommendation was to free up space for St. Luke's to redeploy for its expanding OB program and to use when converting semi-private rooms into private rooms. (Nolan, Tr. 6299-6300, *in camera*).

1058.  With the approval of the Federal Trade Commission, ProMedica consolidated inpatient rehabilitation services at Flower. This involved closing St. Luke's inpatient rehabilitation center and shifting those patients to Flower Hospital. (Wakeman, Tr. 3025-3026, *in camera*; PX02104 at 005-006 (¶ 9) (Akenberger, Decl.), *in camera*).

1059.  As of March 25, 2011, ProMedica and St. Luke's had consolidated St. Luke's inpatient rehabilitation program at Flower Hospital. (RX31 at 028 (Akenberger, Dep. at 108, *in camera*)).

1060.  ProMedica and St. Luke's concluded that consolidating St. Luke's and Flower's inpatient rehabilitation programs at Flower, which utilized approximately 50 percent of its rehabilitation bed capacity and could accommodate St. Luke's cases, would enable St. Luke's to convert its inpatient rehabilitation beds to private rooms. (PX02105 at 011, *in camera*; Hanley, Tr. 4681).

1061.  As a result of adding new beds in the previous inpatient rehabilitation unit, St. Luke's has been able to reduce its ER diversions virtually to zero. (Johnston, Tr. 5374).

1062.  Shifting inpatient rehabilitation services from St. Luke's to Flower permits St. Luke's to convert its former inpatient rehabilitation beds to private rooms. (Hanley, Tr. 4681).

1063.  After the consolidation described in F. 1059 above, patients who previously chose St. Luke's inpatient rehabilitation center no longer have St. Luke's as an option. (Nolan, Tr. 6351, *in camera*; Andreshak, Tr. 1796-1797; Dagen, Tr. 3256-3257, *in camera*).

1064.  St. Luke's inpatient rehabilitation center provided high-quality care before it was closed and some patients – in particular, those who live in Maumee and Bowling Green – are inconvenienced by having to go to Flower Hospital instead of St. Luke's for these services. (Andreshak, Tr. 1797-1799).

1065.  Revenue from patients who would have gone to St. Luke's inpatient rehabilitation center but must now go to more expensive Flower Hospital will generate approximately $1.4 million in additional revenue for Flower Hospital compared to what these patients

would have paid for the same services at St. Luke's.  (PX00905 at 001 (spreadsheet containing calculations of various efficiencies), *in camera*; Dagen, Tr. 3257-3262, *in camera*).

1066.  ProMedica initially claimed {███} million in savings from consolidating inpatient rehabilitation services at Flower Hospital.  (PX00020 at 011 (Compass Lexecon Report), *in camera*; PX02104 at 005-006 (¶ 9) (Akenberger, Decl.), *in camera*).

1067.  ProMedica subsequently revised the savings that it claims may result from the inpatient rehabilitation consolidation from the original {███} million down to {██████}. (PX02104 at 003 (Akenberger, Decl.), *in camera*).

### (vii)  Inpatient psychiatry

1068.  The Navigant Report recommended that ProMedica {████████████████ ███████} to align with a nationwide trend of fewer but larger providers of inpatient psychiatry.  (Nolan, Tr. 6305-6306, *in camera*).

1069.  The Navigant Report recommended that {████████████████████████ ██████████████}.  (Nolan, Tr. 6299-6300, *in camera*).

1070.  St. Luke's provides very few inpatient psychiatry services, limited to 0.1 patients per day, and has zero psychiatric beds.  (Nolan, Tr. 6328-6329, *in camera*; PX01931 at 042 (Akenberger, Dep. at 162), *in camera*).

### c.  Navigant's recommendations specific to St. Luke's

1071.  During the course of its engagement by ProMedica, Navigant made recommendations for St. Luke's for the time period of 2011 to 2013 to include {██████████████ █████████████████████████████████ ███████}.  (Nolan, Tr. 6315-6316, in camera).

1072.  Navigant also made recommendations for St. Luke's for 2014 to 2016 to include {████████████████████████████████████ ████████}.  (PX0479 at 70; Nolan, Tr. 6316-6317, *in camera*).

### d.  Asserted cost savings from clinical integration

1073.  ProMedica's Joinder with St. Luke's gives ProMedica more options and more opportunity to consolidate services across the system, as well as higher volumes to meet critical mass and develop centers of excellence.  (Nolan, Tr. 6321-6322, *in camera*).

1074.  The Navigant study reported that officials from St. Luke's and ProMedica estimated that the clinical integration strategy would result in operational efficiencies that would total {███} million annually.  (PX0479 at 14; Nolan, Tr. 6355-6356, *in camera*).

1075.  The {█} million in asserted efficiencies (F. 1074) is for the entire clinical integration. Many of the clinical integration projects and recommendations do not involve St. Luke's. (PX01946 at 019-023 (Nolan, Dep. at 67-85); Nolan, Tr. 6354-6355, *in camera*).

1076.  Navigant did no independent analysis to determine the reasonableness of the estimated efficiencies of {█} million annually. Navigant only "had some discussions with [ProMedica] in terms of what some of their assumptions were." (Nolan, Tr. 6355-6356, *in camera*). Additionally, the cost of the clinical integration, over three years, is estimated to be {█} million. (PX01946 at 034 (Nolan, Dep. at 128)).

### 7.    Quality programs and systems

1077.  Each of ProMedica's hospitals, as well as Paramount and ProMedica Physician Group, has its own quality council. (PX01930 at 007 (Reiter, Dep. at 19)).

1078.  ProMedica also has service line and institute quality councils for the cancer institute, the orthopedic institute, the heart and vascular institute, and a fourth related to critical care services. (PX01930 at 008 (Reiter, Dep. at 22-23)).

1079.  ProMedica's corporate quality department provides quality report cards to measure how each hospital and business unit is doing based on valid quality metrics. (PX01930 at 007 (Reiter, Dep. at 19-20)).

1080.  ProMedica compares its performance with and sets its goals in comparison to national quality scores and best practices, as well as local and regional hospitals. (RX25 at 027 (Reiter, Dep. at 99-100)). In that way, ProMedica tracks the quality performance of each of its business units. (PX01930 at 007 (Reiter, Dep. at 20)).

1081.  Following the Joinder, ProMedica began the process of bringing St. Luke's into its system-wide quality efforts. For example, ProMedica took steps to bring St. Luke's into its patient safety council, which includes the safety officers from all of ProMedica's provider organizations. (PX01930 at 016 (Reiter, Dep. at 56-57)).

1082.  ProMedica also involved St. Luke's in its best practice standardization initiatives. (PX01930 at 016-017 (Reiter, Dep. at 57-58)).

1083.  Some of ProMedica's best practices are outdated and not on-par with the practices at St. Luke's. (*E.g.*, PX01611 at 001; PX01610 at 001-003).

1084.  Prior to the Joinder, St. Luke's ranked as the highest quality, lowest cost hospital in the Toledo market. F. 758-759.

1085.  Additional facts on ProMedica's and St. Luke's quality of care are found at II.M.8.

1086. Electronic Intensive Care Unit ("eICU") is a computerized telemonitoring system that allows ProMedica to monitor all of its ICU beds across the system from a central control tower. (PX01930 at 008 (Reiter, Dep. at 24)).

1087. ProMedica implemented eICU to achieve better critical care quality scores. (PX01930 at 047 (Reiter, Dep. at 180)).

1088. ProMedica determined that implementing its eICU program of remotely monitoring critical care patients saved {███} lives by the end of 2010. (PX00605 at 004, *in camera*).

1089. St. Luke's did not have the eICU system before the Joinder. (RX25 at 019 (Reiter, Dep. at 66); PX01930 at 047 (Reiter, Dep. at 180-181)).

1090. In the early Joinder discussions, ProMedica identified the eICU as a potential benefit that St. Luke's would realize from joining the ProMedica system. (PX01930 at 047 (Reiter, Dep. at 180-181)).

1091. After the Joinder, St. Luke's is required to pay for all of the equipment and system upgrades itself. (PX01850 at 074 (¶ 108) (Town Rebuttal Report)).

1092. Smart pumps are computerized infusion pumps that allow for medication to be infused into the body through veins, like an IV. (RX25 at 018 (Reiter, Dep. at 65)).

1093. Unlike regular IVs, smart pumps are computerized allowing the hospital staff to set safe limits for drug doses and alerting the staff if the dosing exceeds those limits. (RX25 at 018 (Reiter, Dep. at 65)).

1094. ProMedica believes that smart pumps improve quality of care by reducing medication errors. (RX25 at 018 (Reiter, Dep. at 65)).

1095. St. Luke's did not have smart pumps before the Joinder. (RX25 at 019 (Reiter, Dep. at 66); PX01930 at 047 (Reiter, Dep. at 180-181)).

1096. St. Luke's had been planning to acquire smart pumps before the Joinder, had already obtained quoted prices, and was determining how to integrate the smart pumps into their EMR system. (PX1609; PX1613 at 002; PX01850 at 074 (¶ 108) (Town Rebuttal Report)).

1097. As a result of the Joinder, St. Luke's was able to join with other ProMedica system hospitals to lease infusion pumps at a favorable lease rate. (Johnston, Tr. 5412-5413, *in camera*).

1098. St. Luke's may have been able to obtain discounts by purchasing smart pumps through a purchasing organization such as VHA, which St. Luke's used to reduce cost during its

supply chain initiative. (PX01909 at 049 (Dewey, IHT at 189), *in camera*; PX01933 at 023, 028 (Oppenlander, Dep. at 82-84, 102-103), *in camera*).

### 8. Efficiencies identified by Compass Lexecon

1099. ProMedica began exploring efficiency opportunities related to its Joinder with St. Luke's in the spring of 2010 to develop ideas and quantify possibilities. (Hanley, Tr. 4619-4621, *in camera*; PX00421 at 010-011, *in camera*).

1100. ProMedica hired Compass Lexecon to help identify potential efficiencies. (Hanley, Tr. 4625, *in camera*; Oostra Tr. 5868, *in camera*).

1101. The May 6, 2010 "Efficiencies Analysis of the Proposed Joinder of ProMedica Health System and OhioCare Health System" ("Compass Lexecon Report") is a summary of the efficiencies analysis that was prepared by ProMedica management and the economic consulting firm Compass Lexecon. (PX00020 at 001-039 (Compass Lexecon Report), *in camera*; PX02104 at 002 (¶ 5) (Akenberger, Decl.), *in camera*; PX01906 at 075 (Oostra, IHT at 293), *in camera*).

1102. Mr. Akenberger, ProMedica's Senior Vice President of Finance, submitted a declaration that discussed ProMedica's claimed efficiencies. Mr. Akenberger's December 23, 2010 declaration is a more recent summary of efficiencies. (PX02104 (Akenberger, Decl.), *in camera*; PX02105 (Exhibits to Akenberger, Decl.), *in camera*).

1103. Kathleen Hanley, ProMedica's CFO, testified that Mr. Akenberger was one of the key employees familiar with the specifics and details of ProMedica's efficiencies analysis. (Hanley, Tr. 4729, *in camera*).

1104. Mr. Akenberger did not testify at trial. During his deposition, Mr. Akenberger described himself as the lead individual responsible for the financial analysis, substantiation, and verification of ProMedica's claimed efficiencies. He testified that, to the extent an efficiency required financial substantiation, he was responsible for the financial analysis and that either he or members of his staff reviewed the documentation to make sure it was appropriate. (PX01931 at 025, 026 (Akenberger, Dep. at 93, 100), *in camera*).

1105. The proposed efficiencies contained in the Compass Lexecon Report represent an "initial plan." (Oostra, Tr. 6148 ("first plan"); PX01906 at 074 (Oostra, IHT at 291), *in camera* ("initial plan")). Mr. Oostra, ProMedica's CEO, testified that the efficiencies contained in the report were "preliminary" and he felt that "if we don't find those efficiencies, we will find other efficiencies." (Oostra, Tr. 6145, 6148; PX01906 at 075 (Oostra, IHT at 294), *in camera*).

1106. Since the closing of the Joinder on August 31, 2010, ProMedica and St. Luke's have established a steering committee that has charged approximately 20 integration teams to further develop the efficiencies opportunities summarized in the Compass Lexecon

Report and identify new opportunities not identified in the Compass Lexecon Report. (RX31 at 026 (Akenberger, Dep. at 97-98)).

1107. The efficiencies that Compass Lexecon helped to identify consisted of cost savings, backroom functions, and combining separate programs. (Hanley, Tr. 4648, *in camera*).

1108. The preliminary efficiency estimates in the Compass Lexecon Report were based on ProMedica's past experiences, and the best data ProMedica had at that time, but ProMedica did not consider them to be final projections because due diligence was still ongoing. (Hanley, Tr. 4650-4651, *in camera*).

1109. ProMedica estimated that it could achieve about {███} million in annual savings as a result of the Joinder with St. Luke's, as well as approximately {████████} million in capital avoidance savings, and related operating cost savings of {██████} million "resulting primarily from the avoidance of capital and operating costs associated with the construction and operation of a hospital at Arrowhead and a new bed tower at Flower Hospital." (PX00020 at 004, *in camera*; Hanley, Tr. 4650, *in camera*). (Arrowhead hospital and Flower bed tower discussed *infra* F. 1120-1128).

1110. ProMedica viewed the preliminary efficiency estimates in the Compass Lexecon Report as a general road map to understand how St. Luke's entry into its system may affect the system's entities. (Hanley, Tr. 4652).

1111. ProMedica understood that the efficiencies estimates in the Compass Lexecon Report would evolve as due diligence continued and the parties could "drill down" further on the data. (Hanley, Tr. 4652-4653, *in camera*).

1112. Since ProMedica developed its preliminary efficiency analysis in the spring of 2010, ProMedica's estimated efficiency gains from the Joinder have increased above the original {███} million estimate. (Hanley, Tr. 4728, *in camera*).

1113. ProMedica's CFO, Kathleen Hanley, testified that the conclusions in the Compass Lexecon Report were "estimates" and based on a "gut feeling" that the Joinder would generate savings. (Hanley, Tr. 4728, *in camera*; PX01903 at 054 (Hanley, IHT at 206-207), *in camera*).

1114. Douglas Deacon, St. Luke's Vice President of Professional Services, had not even seen the Compass Lexecon Report before his investigational hearing in September 2010. (PX01908 at 050 (Deacon, IHT at 191-192), *in camera*). His involvement with the development of the analysis was "nil," even though he believed that such an analysis was "something [he] should be involved with." (PX01908 at 050-051 (Deacon, IHT at 193-194), *in camera*).

1115. Eric Perron, St. Luke's Computer Information Systems Director, testified that neither he nor his staff was involved in quantifying the information technology-related savings that ProMedica claims St. Luke's may experience as a result of the Joinder. (PX01928

at 038 (Perron, Dep. at 145), *in camera*).  When presented during his deposition with the portion of the Compass Lexecon Report containing ProMedica's claimed EMR savings for St. Luke's, Mr. Perron indicated that he had never seen the document and was unaware of the claimed savings.  (PX01928 at 040 (Perron, Dep. at 150-151), *in camera*).

1116.  Dennis Wagner, St. Luke's Interim Treasurer at the time of the Joinder, had never before seen the Compass Lexecon Report when he was presented with a copy during his investigational hearing in September 2010.  (PX01915 at 040 (Wagner, IHT at 156), *in camera*).  Mr. Wagner testified that the report's claimed savings for supply chain efficiencies involved "no[] or very little analysis."  (PX01915 at 052 (Wagner, IHT at 204), *in camera*).  He said of the speech-and-hearing services efficiency claim: "I don't believe this claim."  (PX01915 at 045 (Wagner, IHT at 173), *in camera*).

1117.  One ProMedica document states that the timeline in which to achieve efficiencies was deliberately revised to be "more aggressive" in order to meet the anticipated reaction of the FTC.  (PX01136 at 001, *in camera*).

1118.  Revenue enhancements that ProMedica claims will result from improving St. Luke's coding and charge capture practices have no impact on the quality or quantity of clinical services that St. Luke's provides to patients.  (Hanley, Tr. 4733-4735, *in camera*; PX00020 at 030 (Compass Lexecon Report), *in camera*).  These practices will merely increase the amount that is paid to St. Luke's by patients (or their insurers) for the same quantity and quality of services.  (Hanley, Tr. 4733-4735, *in camera*).

1119.  The bulk of the claimed efficiencies from the Joinder are avoided capital costs.  (PX00020 at 006-007 (Compass Lexecon Report summary of efficiencies), *in camera*; PX02104 at 003-005 (chart summarizing claimed efficiencies in Mr. Akenberger's affidavit), *in camera*).

### a.    Construction of a hospital at Arrowhead

1120.  ProMedica claims that, as a result of the Joinder, it may be able to avoid spending {███ ███} million on constructing and equipping a new hospital at its Arrowhead property (located less than three miles from St. Luke's).  (PX00020 at 035 (Compass Lexecon Report), *in camera*; PX02104 at 016-017 (¶ 30) (Akenberger, Decl.), *in camera*).

1121.  ProMedica had identified developing the Arrowhead property on its 2008-2010 Strategic Goals and Implementation Plan but temporarily postponed its Arrowhead plans because of the recession which began in 2008.  ProMedica has not needed to pursue these plans because of the Joinder.  (PX02104 at 016-017 (¶ 30) (Akenberger, Decl.), *in camera*; RX114 at 251, *in camera*).

1122.  ProMedica has owned the Arrowhead land for a decade.  (PX01906 at 022 (Oostra, IHT at 82), *in camera*).  The 2010-2012 Strategic Plan, the most recent such plan to be created prior to ProMedica's merger negotiations with St. Luke's, does not mention

constructing a new hospital at Arrowhead. (Joint Stipulations of Law and Fact, JX00002A ¶ 49; Hanley, Tr. 4720-4721, *in camera*; PX00006 (ProMedica Hospitals' 2010-2012 Strategic Goals and Objectives), *in camera*; PX00007 (ProMedica 2010-2012 Strategic Goals and Objectives), *in camera*.

1123. Ms. Hanley, ProMedica's CFO, explained that the Joinder eliminated the need to construct a new hospital. (PX01903 at 063 (Hanley, IHT at 243-244), *in camera*).

1124. Mr. Akenberger, current Senior Vice President of Finance and a financial executive at ProMedica for most of the last decade, has seen little financial analysis of constructing a hospital at Arrowhead. (PX01931 at 038 (Akenberger, Dep. at 145-146), *in camera*; PX01912 at 004-005 (Akenberger, IHT at 9-11), *in camera*). Construction of a new ProMedica general acute-care hospital at Arrowhead Park was discussed in a past ProMedica central region capital budget that was not approved by the ProMedica Board. (RX31 at 039 (Akenberger, Dep. at 150-151, *in camera*)).

### b. Construction of a bed tower at Flower Hospital

1125. The Compass Lexecon Report indicates that the Joinder may enable ProMedica to avoid spending {█████} million to construct a second bed tower to increase bed capacity at Flower Hospital. (PX00020 at 036 (Compass Lexecon Report), *in camera*; PX02104 at 17 (¶ 31) (Akenberger, Decl.), *in camera*).

1126. ProMedica's most recent pre-Joinder Strategic Plans did not evidence an intention to construct a second bed tower at Flower Hospital. (Joint Stipulations of Law and Fact, JX00002A ¶ 48 ("The construction of a new bed tower at Flower Hospital did not appear on ProMedica's 2010-2012 Strategic Plan."); PX00006 (ProMedica Hospitals' 2010-2012 Strategic Goals and Objectives), *in camera*; PX00007 (ProMedica 2010-2012 Strategic Goals and Objectives), *in camera*). At no time in the two to three years leading up to the Joinder did ProMedica generate any plans relating to construction of a new bed tower at Flower Hospital. (Hanley, Tr. 4542-4543).

1127. The construction of a new bed tower at Flower Hospital has not appeared on any capital budget approved by the ProMedica Board since January 1, 2007. (Joint Stipulations of Law and Fact, JX00002A ¶ 47). Ms. Hanley testified that the Flower Hospital bed tower project "did not end up … at the top of the list from a capital allocation standpoint." (Hanley, Tr. 4541-4542). She also stated that ProMedica's plans for financing the project were "premature until . . . we prioritize [and] authorize [the project,]" and said that such plans had not yet reached the ProMedica Board level. (PX01903 at 064 (Hanley, IHT at 248-249), *in camera*).

1128. The proposed bed tower would add 136 beds to Flower Hospital, of which 92 would be classified as either psychiatric or skilled nursing facility beds. (PX01931 at 041 (Akenberger, Dep. at 158-160), *in camera*). However, St. Luke's has no skilled nursing facility or psychiatric beds. (PX01931 at 042 (Akenberger, Dep. at 161-162), *in camera*).

### 9. Other asserted benefits

1129. St. Luke's employees received a 1 percent pay increase on January 1, 2011 and a second 1 percent pay increase in July 2011. (Johnston, Tr. 5373).

1130. In June 2011, all employees received a one-time financial thank-you. Full-time employees received $200; part-time employees received $100; and contingent employees received $25. (Johnston, Tr. 5373).

1131. In the past, as its patient volumes increased before the Joinder, St. Luke's was forced to place many of its nursing staff on mandatory call. (Johnston, Tr. 5365). Mandatory call requires a nurse to be on call beyond their normal hours of work and in most cases being on call resulted in nurses being called in and required to work overtime. (Johnston, Tr. 5365).

1132. Being part of ProMedica enables St. Luke's to tap into the ProMedica staffing pool to help ramp up staffing at its facilities. (Johnston, Tr. 5373-5374). St. Luke's has been able to use ProMedica's nurse staffing pool and reduce the number of units that have mandatory call duty. (Johnston, Tr. 5386-5387).

1133. St. Luke's has been able to utilize the services of ProMedica's physician recruiters to help with physician recruitment. (Johnston Tr. 5374).

1134. Since the Joinder, ProMedica's recruiters have assisted three of St. Luke's physician groups with their recruitment efforts. (Johnston, Tr. 5386). ProMedica's recruiters have already helped recruit certified registered nurse anesthetists for St. Luke's anesthesiology group. (Johnston, Tr. 5385-5386).

1135. Through ProMedica's partnership with the University of Toledo, all full-time employees will receive free tuition to any undergraduate or graduate program. Part-time employees will receive 50 percent tuition. (Johnston, Tr. 5374).

1136. St. Luke's has improved its cash-on-hand after payroll from $1.6 million at the time of the Joinder to a current total of between $3 and $7 million. (Johnston, Tr. 5380).

1137. St. Luke's has been able to pool its investments with the ProMedica investment pool and reduce investment fees. (Johnston, Tr. 5373).

1138. St. Luke's deferred capital projects in 2009 including { █████████████████████████████████████████████████████ }. (RX56 at 024-025 (¶¶ 61-62)).

1139. Since the Joinder, St. Luke's has started or is about to start work on several deferred capital projects, including { ███████████████████████

130

████████████████████████████████████████
███████████████████████████████ }. (Johnston, Tr. 5495-5497, *in camera*).

1140. Since the Joinder, {█████████████████████████████████████
███████████████████████████████████████ }.
(Johnston, Tr. 5496-5497, *in camera*).

1141. At the time of the Joinder, St. Luke's had $65 million in cash and investments, compared to a total estimated cost of less than {████} million to complete the deferred projects identified in F. 1138 above. (Joint Stipulations of Law and Fact, JX00002A ¶ 34; Den Uyl, Tr. 6571-6572, *in camera*).

### 10. Expert testimony on efficiencies

1142. Neither of Respondent's expert witnesses conducted any analyses or offered any opinions on whether Respondent's claimed efficiencies are cognizable under the Merger Guidelines. Ms. Guerin-Calvert testified that she has not conducted an efficiencies analysis. (Guerin-Calvert, Tr. 7580; PX01925 at 013 (Guerin-Calvert, Dep. at 42)).

1143. Mr. Den Uyl testified that he did not analyze Respondent's claimed efficiencies to determine whether they are cognizable under the Merger Guidelines. For instance, Mr. Den Uyl did not analyze whether ProMedica's claimed efficiencies are merger-specific, and he has no expert opinion on the issue. Mr. Den Uyl testified that he would be qualified to conduct an efficiencies analysis in this case – if he were asked to do so – because he has conducted such analyses in numerous other cases, including cases involving hospital mergers. However, he was not asked to conduct such an analysis in this case. (Den Uyl, Tr. 6515-6516).

1144. Mr. H. Gabriel Dagen, Complaint Counsel's expert, is the only expert witness in this case who conducted an analysis of the efficiencies asserted by Respondent. Mr. Dagen is the only expert witness in this case who analyzed each of the claimed efficiencies to determine whether they are merger-specific and presented an expert opinion on whether ProMedica's claimed efficiencies are cognizable under the Merger Guidelines. (*See* Dagen, Tr. 3245, *in camera*).

## III. ANALYSIS

### A. Jurisdiction

The Complaint is brought pursuant to the provisions of the Federal Trade Commission

Act ("FTC Act") and charges Respondent with violating Section 7 of the Clayton Act, 15

U.S.C. § 18. Section 7 of the Clayton Act provides:

> No person subject to the jurisdiction of the Federal Trade Commission shall
> acquire, directly or indirectly, the whole or any part of the stock or other share
> capital . . . of another person . . . where in any line of commerce or in any
> activity affecting commerce in any section of the country, the effect of such
> acquisition may be substantially to lessen competition, or tend to create a
> monopoly.

15 U.S.C. § 18. The word "person" includes corporations and associations existing under or
authorized by the laws of any state. 15 U.S.C. § 12(a). Pursuant to Section 11 of the Clayton
Act, the Commission is expressly vested with jurisdiction to determine the legality of a
corporate acquisition under Section 7. 15 U.S.C. § 21(b); *R.R. Donnelley & Sons Co.*, 1995
FTC LEXIS 450, at *11. Sections 7 and 11 of the Clayton Act apply to acquisitions involving
nonprofit hospitals. *FTC v. University Health, Inc.*, 938 F.2d 1206, 1214-17 (11th Cir. 1991).

The Complaint challenges the acquisition by ProMedica Health System, Inc.
("ProMedica") of St. Luke's Hospital ("St. Luke's") pursuant to a joinder agreement, dated
May 25, 2010, and effective as of September 1, 2010 ("Joinder"). F. 9-11. ProMedica is a
nonprofit health-care system incorporated in the state of Ohio and headquartered at 1801
Richard Road, Toledo, Ohio. F. 1. ProMedica's health-care system serves northwestern and
west-central Ohio and southeastern Michigan. F. 1. Prior to the Joinder, ProMedica's hospitals
in Lucas County were: The Toledo Hospital ("TTH"), Toledo Children's Hospital, Flower
Hospital ("Flower"), and Bay Park Community Hospital ("Bay Park"). F. 53. Prior to the
Joinder, St. Luke's was a nonprofit general acute-care community hospital located at 5901
Monclova Road, Maumee, Ohio, and a wholly-owned subsidiary of OhioCare Health System,
Inc. ("OhioCare"). F. 6, 10. Pursuant to the Joinder, ProMedica became the sole corporate
member or shareholder of St. Luke's and other affiliated entities. F. 11. Pursuant to a
voluntary Hold Separate Agreement, the parties agreed, pending the outcome of these
administrative proceedings, to a number of provisions designed to temporarily preserve St.
Luke's viability, competitiveness, and marketability. F. 12-13. The Hold Separate Agreement
prevents, among other things: (1) ProMedica's termination of St. Luke's health-plan contracts
(while allowing health plans the option to extend their contracts with St. Luke's past the
termination date, if a new agreement is not reached); (2) the elimination, transfer, or
consolidation of any clinical service at St. Luke's; and (3) the termination of employees at St.
Luke's without cause. F. 13.

In its Answer to the Complaint, Respondent admits that ProMedica, through its relevant operating subsidiaries, is, and at all relevant times has been, engaged in commerce or in activities affecting commerce, within the meaning of the Clayton Act. Answer ¶ 10. Respondent further admits that the Joinder constitutes an acquisition under Section 7 of the Clayton Act. Answer ¶ 10. Further, the parties stipulate that ProMedica, including its relevant operating subsidiaries, is, and at all relevant times has been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44 (2006), and Section 1 of the Clayton Act, 15 U.S.C. § 12 (2006). Joint Stipulations of Law and Fact, JX00002A ¶ 53.

Accordingly, the Commission has jurisdiction over Respondent and the subject matter of this proceeding, pursuant to Section 7 of the Clayton Act.[10]

## B.     Burden of Proof and Statutory Framework

The parties' burdens of proof are governed by Federal Trade Commission Rule 3.43(a), Section 556(d) of the Administrative Procedure Act ("APA"), and case law. Pursuant to Commission Rule 3.43(a), "[c]ounsel representing the Commission . . . shall have the burden of proof, but the proponent of any factual proposition shall be required to sustain the burden of proof with respect thereto." 16 C.F.R. § 3.43(a). Under the APA, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d). The APA, "which is applicable to administrative adjudicatory proceedings unless otherwise provided by statute, 'establishes . . . [the] preponderance-of-the-evidence standard.'" *In re Rambus Inc.*, No. 9302, 2006 FTC LEXIS 101, at *45 (Aug. 20, 2006) (quoting *Steadman v. SEC*, 450 U.S. 91, 95-102 (1981)), *rev'd on other grounds,* 522 F.3d 456 (D.C. Cir. 2008), *cert. denied*, 129 S. Ct. 1318 (2009). *See In re Automotive Breakthrough Sciences, Inc.*, No. 9275, 1998 FTC LEXIS 112, at *37 n.45 (Sept. 9, 1998) (holding that each finding must be supported by a preponderance of the evidence in the record); *In re Adventist Health System/West*, No. 9234, 1994 FTC LEXIS 54, at *28 (Apr. 1, 1994) ("Each element of the case must be established by a preponderance of the evidence.").

---

[10] Nonprofit corporations, such as ProMedica, are not exempt from the FTC's jurisdiction under the Clayton Act. *See University Health,* 938 F.2d at 1214-17 (holding that 15 U.S.C. § 21 grants the FTC jurisdiction to enforce Clayton Act § 7 and contains no exemption for nonprofit corporations).

Section 7 of the Clayton Act prohibits the acquisition of assets "in any line of commerce or in any activity affecting commerce in any section of the country, [where] the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.  Congress used the phrase "'*may* be substantially to lessen competition' to indicate that its concern was with probabilities, not certainties." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)).  "Thus, to establish a violation of Section 7, the FTC need not show that the challenged merger or acquisition *will* lessen competition, but only that the loss of competition is a 'sufficiently probable and imminent' result of the merger or acquisition." *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 35 (D.D.C. 2009) (quoting *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 623 (1974)).

"Ephemeral possibilities" of anticompetitive effects, however, are not sufficient. *Marine Bancorp.*, 418 U.S. at 623; *see also FTC v. Tenet Health Care, Inc.*, 186 F.3d 1045, 1051 (8th Cir. 1999).  Rather, "'there must be "the reasonable probability" of a substantial impairment of competition by an increase in prices above competitive levels to render a merger illegal under § 7.  A "mere possibility" will not suffice.'" *United States v. Long Island Jewish Med. Center*, 983 F. Supp. 121, 136-37 (E.D.N.Y. 1997) (quoting *Fruehauf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir. 1979)).

The first step in analyzing a Section 7 case is to determine the "line of commerce" and the "section of the country"; in other words, to determine the relevant product and geographic markets. *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1110 (N. D. Cal. 2004); *R.R. Donnelley & Sons*, 1995 FTC LEXIS 450, at *37-38.  *See United States v. General Dynamics Corp.*, 415 U.S. 486, 510 (1974) ("[D]elineation of proper geographic and product markets is a necessary precondition to assessment of the probabilities of a substantial effect on competition within them.").  Complaint Counsel bears "the burden of proving a relevant market within which anticompetitive effects are likely as a result of the acquisition." *R.R. Donnelley & Sons*, 1995 FTC LEXIS 450, at *38.  *Accord Tenet Health Care*, 186 F.3d at 1052; *Adventist Health Sys./West*, 1994 FTC LEXIS 345, at *10.

The second step in analyzing a Section 7 case is to determine whether the effect of the acquisition "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. In *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990), the D.C. Circuit adopted an analytical approach to Section 7 cases, which has been followed in subsequent cases. *E.g.*, *FTC v. Chicago Bridge*, 534 F.3d 410, 423 (5th Cir. 2008); *Heinz*, 246 F.3d at 715. That analytical framework, by which the government can establish the probable effect of an acquisition, has traditionally consisted of a burden shifting exercise with three parts.

First, the government must establish a prima facie case that an acquisition is unlawful. *Baker Hughes*, 908 F.2d at 982; *Heinz*, 246 F.3d at 715. Typically, the government establishes a prima facie case by showing that the transaction in question will significantly increase market concentration, thereby creating a presumption that the transaction is likely to substantially lessen competition. *Chicago Bridge*, 534 F.3d at 423; *Heinz*, 246 F.3d at 715. The government can establish a presumption that the transaction will substantially lessen competition by showing that the acquisition will lead to undue concentration in the relevant markets. *Baker Hughes*, 908 F.2d at 982.

Second, once the government establishes its prima facie case, the respondent may rebut it by producing evidence to cast doubt on the accuracy of the government's statistical evidence as predictive of future anticompetitive effects. *Chicago Bridge*, 534 F.3d at 423; *Baker Hughes*, 908 F.2d at 982. "Nonstatistical evidence which casts doubt on the persuasive quality of the statistics to predict future anticompetitive consequences may be offered to rebut the prima facie case made out by the statistics." *Kaiser Alum. & Chem. Corp.*, 652 F.2d 1324, 1341 (7th Cir. 1981). Factors which may be considered to rebut a prima facie case include "ease of entry into the market, the trend of the market either toward or away from concentration, and the continuation of active price competition." *Id.* In addition, courts and the Commission typically consider "efficiencies, including quality improvements, after the government has shown that the transaction is likely to reduce competition." *In re Evanston NW Healthcare Corp.*, No. 9315, 2007 FTC LEXIS 210, at *191 (Aug. 6, 2007) (citing *Heinz*, 246 F.3d at 715, 720). Rebuttal evidence may also include factors relating to competition in the relevant market or the competitive or financial weakness of the acquired company. *Baker*

135

*Hughes, Inc.*, 908 F.2d at 985 (citing, *e.g.*, *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981) (acquired company's deteriorating market position both before and after acquisition rebutted prima facie case); *United States v. International Harvester Co.*, 564 F.2d 769, 773-79 (7th Cir. 1977) (company successfully rebutted prima facie case by showing, inter alia, financial weakness of acquired company, de facto independence of acquired company from acquiring company, strong level of competition in relevant market, and tendency of the market toward even stronger levels of competition) (other citations omitted).

Third, and finally, if the respondent successfully rebuts the prima facie case, the burden of production shifts back to the government and merges with the ultimate burden of persuasion, which is incumbent on the government at all times. *Chicago Bridge*, 534 F.3d at 423; *Baker Hughes*, 908 F.2d at 983.

Courts recognize, however, that in practice, evidence is often considered all at once and the burdens are often analyzed together. *Chicago Bridge*, 534 F.3d at 424-25 (citing *University Health*, 938 F.2d at 1218-19). "The Ninth and Eleventh Circuits interpret *Baker Hughes'* burden-shifting language as describing a flexible framework, rather than an air-tight rule." *Chicago Bridge*, 534 F.3d at 424. As a practical matter, the distinction between the burden of production and the ultimate burden of persuasion can be elusive. *See Baker Hughes*, 908 F.2d at 991. Thus, in *Chicago Bridge*, where the government's prima facie case addressed why the respondent's rebuttal evidence was not sufficient or not credible, the court held that the Commission could conclude that the respondent's burden of production on rebuttal had not been satisfied, without having to formally switch the burden of production back to the government. *Chicago Bridge*, 534 F.3d at 424; *Evanston*, 2007 FTC LEXIS 210, at *141-42 ("Although the courts discuss merger analysis as a step-by-step process, the steps are, in reality, interrelated factors, each designed to enable the fact-finder to determine whether a transaction is likely to create or enhance existing market power.") (citing *Baker Hughes*, 908 F.2d at 984 (Section 7 inquiry is of a "comprehensive nature")).

This more flexible approach of considering the evidence all at once and analyzing the burdens of proof together accommodates the practical difficulties in separating the burden to persuade and the burden to produce, and "allows the Commission to preserve the *prima facie*

136

presumption if the respondent . . . fails to satisfy the burden of production in light of contrary evidence in the *prima facie* case." *Chicago Bridge*, 534 F.3d at 425. *See also Oracle*, 331 F. Supp. 2d at 1111 (noting that the Supreme Court and appellate courts acknowledge the need to adopt a flexible approach in determining whether anticompetitive effects are likely to result from a merger, and that the Merger Guidelines view statistical and non-statistical factors as an integrated whole, avoiding the burden shifting presumptions of the case law).

### C.  The Relevant Market

#### 1.  Product market

##### a.  Generally applicable standards

Proper definition of the product market is "a necessary precondition to assessment" of the effect of a merger or acquisition on competition. *General Dynamics*, 415 U.S. at 510; *see Brown Shoe*, 370 U.S. 294, 324 (1962) (interpreting the phrase "any line of commerce" in Section 7 of the Clayton Act to require determination of the product market). To prevail, Complaint Counsel bears the burden of identifying a relevant market. *FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1239 (8th Cir. 2011); *United States v. SunGard Data Sys.*, 172 F. Supp. 2d 172, 182-83 (D.D.C. 2001); *Long Island Jewish Med. Center*, 983 F. Supp. at 137 ("[T]he Government has the burden of identifying the credible properly defined relevant markets . . .").

"Prerequisite to establishment of the prima facie case by the FTC is definition of the 'relevant market' within which the merged entity would have significant market power." *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1289-90 (W.D. Mich. 1996), *aff'd*, 1997 U.S. App. LEXIS 17422 (6th Cir. 1997) (citing *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995). A relevant market consists of "products that have reasonable interchangeability for the purposes for which they are produced – price, use and qualities considered." *United States v. E.I. du Pont de Nemours Co.*, 351 U.S. 377, 404 (1956). "In determining relevant product markets, courts have traditionally considered two factors: '(1) the reasonable interchangeability of use and (2) the cross-elasticity of demand between the product itself and substitutes for it.'" *CCC Holdings Inc.*, 605 F. Supp. 2d at 38 (quoting *Brown Shoe*, 370 U.S. at 325). "Interchangeability of use and cross-elasticity of demand look to the availability of products that are similar in character or use to the product in question and the degree to which buyers are

137

willing to substitute those similar products for the product." *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 157 (D.D.C. 2000) (citing *du Pont*, 351 U.S. at 393); *Evanston*, 2007 FTC LEXIS 210, at *144. Thus, "the relevant market is defined by identifying competitors who could provide defendants' customers with alternative sources for defendants' services in the event defendants, as the merged entity, attempted to exercise their market power by raising prices above competitive levels." *Butterworth*, 946 F. Supp. at 1290 (citing *United States v. Mercy Health Services*, 902 F. Supp. 968, 975 (N.D. Iowa 1995), *vacated as moot*, 107 F.3d 632 (8th Cir. 1997)).

Under the 2010 revised Horizontal Merger Guidelines, the product market is defined by asking whether a hypothetical monopolist of the proposed product market could impose a small but significant and nontransitory increase in price ("SSNIP") and not lose an amount of its sales to alternative products that would make the price increase unprofitable. U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines, § 4.1 (Aug. 19, 2010) *available at* http://www.ftc.gov/os/2010/08/100819hmg.pdf (hereafter "Merger Guidelines § __"). *See, e.g., FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008); *Butterworth Health Corp.*, 946 F. Supp. at 1290, 1294. The Merger Guidelines provide that "what constitutes a 'small but significant and nontransitory' increase in price, commensurate with a significant loss of competition caused by the merger, depends on the nature of the industry and the merging firms' positions in it." Merger Guidelines § 4.1.2. Thus, while the Agencies most often use a SSNIP of five percent of the price paid by customers, "the Agencies may use a price increase that is larger or smaller than five percent." Merger Guidelines § 4.1.2.

While courts are not required to follow the Merger Guidelines' approach, many courts have applied either the hypothetical monopolist test or some related test that defines markets by determining the set of products over which a dominant or monopolist firm could exercise market power. *See, e.g., Coastal Fuels, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 198 (1st Cir. 1996) ("The touchstone of market definition is whether a hypothetical monopolist could raise prices."); *Swedish Match,* 131 F. Supp. 2d at 160-61 (paraphrasing the Merger Guidelines and informally applying the hypothetical monopolist test).

Finally, courts continue to refer to "*Brown Shoe's* 'practical indicia' in determining the relevant market." *In re Polypore Int'l, Inc.*, No. 9327, 2010 FTC LEXIS 97, at *31 & n.19 (Dec. 13, 2010) (citations omitted); *see also CCC Holdings*, 605 F. Supp. 2d at 38 ("Courts have relied on several 'practical indicia' as aids in identifying the relevant product market[.]") (citations omitted). These indicia include industry or public recognition, the product's particular characteristics and uses, unique production facilities, distinct customers, distinct prices, and other factors. *CCC Holdings*, 605 F. Supp. 2d at 38.

### b.       Hospital context

A cluster of products or services can constitute a relevant market, even if the individual components of the cluster may not all be – and likely are not – interchangeable or substitutable. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 356 (1963) (cluster of products and services constituting "commercial banking" constituted a relevant market); *FTC v. Staples*, 970 F. Supp. 1066, 1074 (D.D.C. 1997). As both experts in this case agreed, the purpose of the cluster market is to provide a convenient and efficient way to conduct a competitive analysis across a multitude of different services, instead of evaluating each individual service separately. (Guerin-Calvert, Tr. 7633; Town, Tr. 3666-3667). In cases analyzing hospital mergers, federal courts and the Commission have consistently held that general acute-care inpatient services are a "cluster of services" that constitute a relevant product market. *See, e.g., Freeman Hosp.,* 69 F.3d at 268; *University Health*, 938 F.2d at 1210-12; *United States v. Rockford Mem'l Hosp.,* 898 F.2d 1278, 1284 (7th Cir. 1990); *Butterworth Health*, 946 F. Supp. at 1290-91; *Long Island Jewish Med. Center*, 983 F. Supp. at 138-40; *Evanston,* 2007 FTC LEXIS 210, at *146-48. A cluster market provides the ability to assess all services at once in the context of one market. (Guerin-Calvert, Tr. 7188). As set forth below, the record in this case does not support departing from this precedent.

### c.       Product market in this case

Both Complaint Counsel's and Respondent's expert witnesses agree that a cluster market approach is appropriate for defining the relevant product market in this case. (Guerin-Calvert, Tr. 7189; Town, Tr. 3665). The parties agree that a relevant product market is general acute-care ("GAC") inpatient hospital services. Complaint ¶ 12; Answer ¶ 12; CCB at 7; RB at

139

44-45.[11]  Generally, the GAC inpatient hospital services offered by St. Luke's are also offered by the other hospitals or hospital systems operating in Lucas County, Ohio: ProMedica, Mercy Health Partners ("Mercy"), and University of Toledo Medical Center ("UTMC"). F. 56, 62, 66, 72, 80, 107. Services in the cluster market of all GAC inpatient hospital services use the same assets, the same operating rooms, the same beds, the same wards, the same nursing staff, and all require an overnight stay. F. 301.

The parties also agree that the "consumers" of these services are commercial health plans. Complaint ¶ 12 (defining a relevant market as GAC services "sold to commercial health plans"); Answer ¶ 12; CCB at 7; RB at 44-45. Commercial health plans, or managed care organizations ("MCOs"), include companies that negotiate provider networks with hospitals and offer health insurance products to employers. F. 45, 115. MCOs demand, and contract for, a broad array of inpatient hospital services together, such as medical/surgical care, on behalf of the members they insure. F. 304. When MCOs contract with hospitals, they do not distinguish between services available to commercially insured patients and government insured patients; they look at all services available at that hospital to any patient. F. 305.

The parties disagree on the following issues: 1) whether the product market includes complex tertiary services that St. Luke's does not provide; and 2) whether there is a separate relevant product market for inpatient obstetrical ("OB") services.

### (i)  Complex tertiary services that St. Luke's does not provide

Tertiary services generally involve highly-specialized treatments for higher acuity conditions, such as neurosurgery. F. 23. Respondent admits that St. Luke's provides few, if any, tertiary services and no quaternary services.[12] Respondent's Response to Request for

---

[11] In addition, the parties agree that the following are excluded from the relevant product market: outpatient services, quaternary services, rehabilitation, skilled care, psychiatric care, detoxification services, and MDC Codes 2, 19, 20, and 17. F. 306.

[12] Quaternary services are the most complex and include procedures such as transplants and tend to require very specific technologies. F. 25.

Admission at ¶ 2 (hereafter, "Response to RFA"); Joint Stipulations of Law and Fact, JX00002A at ¶ 6. Thus, Complaint Counsel contends, tertiary services do not belong in the relevant service market. CCB at 11.[13]

Cases adjudicating hospital mergers are split on whether the GAC inpatient services market includes or excludes tertiary services, with some cases specifically excluding tertiary care. In *Butterworth*, the court defined the relevant market as general acute-care inpatient hospital services in part by rejecting "defendants' innovative effort to demonstrate that employers and third-party payors might respond to a price increase for primary and secondary acute-care services by steering outpatients and tertiary care patients away from the merged entity so as to inhibit or reverse such a price increase[.]" *Butterworth*, 946 F. Supp. at 1291. In *Long Island Jewish Medical Center*, where "[t]he Government's version of the product market [was] limited to primary and secondary care and exclude[d] tertiary care provided at the anchor hospitals," the court rejected the Government's "narrow definition" and found "that the Government failed to establish its definition of the relevant product market as an anchor hospital providing primary/secondary service." *Long Island Jewish Med. Center*, 983 F. Supp. at 137, 140.[14]

By contrast, other courts have included tertiary services. In *Sutter Health*, where the parties agreed that the relevant product market consisted of the cluster of services comprising acute inpatient care, the court noted, "the services and resources that hospitals provide tend to be similar across a wide range of primary, secondary, and tertiary inpatient services." *California v. Sutter Health Sys.,* 130 F. Supp. 2d 1109, 1119 (N.D. Cal. 2001). The court

---

[13] Complaint Counsel also argues that because patients are willing to travel farther to get certain tertiary services, those services do not belong in the relevant product market. CCB at 14. While it may be that the relevant geographic market for those tertiary services is broader than Lucas County, this does not provide a factual justification or legal basis for excluding those services from the relevant product market.

[14] Other cases cited by Complaint Counsel excluded tertiary care based on the agreement of the parties. *FTC v. Tenet Healthcare Corp.*, 17 F. Supp. 2d 937, 942 (E.D. Mo. 1998) ("The parties agree that the product market is general acute-care in-patient hospital services, including primary and secondary services, but not including tertiary or quaternary care hospital services."), *rev'd on other grounds*, 186 F.3d 1045 (8th Cir. 1999); *United States v. Mercy Health Servs.*, 902 F. Supp. 968, 976 (N.D. Iowa 1995) ("The parties have agreed that the relevant product market is acute-care inpatient services offered by both Mercy and Finley. This definition excludes inpatient psychiatric care, substance abuse treatment, rehabilitation services, and open heart surgery."), *vacated as moot*, 107 F.3d 632 (8th Cir. 1997) (transaction abandoned prior to decision on appeal). In *Mercy Health*, neither hospital offered tertiary care. *Id.* at 996.

further noted that this product market included not only services provided by hospitals that offer the full range of general acute inpatient services, but also those available at "niche" hospitals, that compete with [the merging parties] in providing only part of the "cluster of services" that constitutes general acute inpatient care. *Id.* (citing *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) ("Specialty shops which offer only a limited range of goods are generally considered in the same market with larger, more diverse, 'one-stop shopping' centers.")). Thus, in *Sutter Health,* the market was defined broadly enough to encompass services that were not offered by all hospitals in the relevant geographic market.

In *Evanston*, the relevant product market advanced by complaint counsel was "general acute-care hospital services, including primary, secondary, and tertiary services, sold to MCOs." *Evanston*, 2007 FTC LEXIS 210, at *146. Whether the market should include tertiary services was not challenged by the respondent. *Id.* The Commission found that the acquired hospital there, similar to St. Luke's here, did not provide the tertiary services provided by the acquiring hospital, but that this did not negate the interchangeability of the hospitals' primary and secondary services. *Id.* at *197. In *University Health,* the court of appeals upheld the district court's definition of the relevant product market as "in-patient services by acute-care hospitals," even though the two merging hospitals "do not compete in every acute-care service," stating that it did not appear that the district court intended to limit its market definition solely to the 19 major diagnostic categories in which these hospitals did compete. *University Health*, 938 F.2d at 1211 and n.11.

In seeking to exclude tertiary services on the basis that St. Luke's does not supply complex tertiary services, Complaint Counsel seeks to shift the focus away from what customers demand toward what the sellers supply. It is well established, however, that market definition "focuses solely on demand substitution factors." Merger Guidelines § 4 (defining a market by "customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change"). *See also Brown Shoe*, 370 U.S. at 325 (stating the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"). "In defining the relevant product market, the Court must consider what products or services a consumer, confronting a price increase, would reasonably substitute for

142

the products or services of the merging parties." *Long Island Jewish Med. Center*, 983 F. Supp. at 137. Therefore, it is important to look for what the consumer – here the MCOs – want or contract for.

The evidence in this case establishes that MCOs contract for a broad array of primary, secondary, and tertiary inpatient services from hospitals together in a single negotiated transaction. F. 304. The evidence also shows that the prices that MCOs negotiate for quaternary inpatient services, psychiatric and substance abuse services, and outpatient services are distinct from the prices for GAC inpatient services. F. 308-311. To narrow the product market to only those services that both St. Luke's and ProMedica actually provide is not what MCOs demand or contract to purchase from ProMedica, Mercy, or UTMC. Accordingly, the relevant product market will not be narrowed to exclude tertiary services that St. Luke's does not provide.

### (ii)    Inpatient OB services

In addition to a GAC inpatient hospital services market, the Complaint also alleges a separate market for inpatient OB services. Complaint ¶¶ 12, 14. Inpatient OB hospital services are a cluster of procedures relating to pregnancy, labor and delivery of newborns, and post-delivery care. F. 312. Complaint Counsel argues that is it is appropriate to carve out inpatient OB services from the general acute-care cluster because the market participants and market structure for OB services differ significantly from the other GAC services. CCB at 16-17. In support, Complaint Counsel argues that, applying the hypothetical monopolist test of the Merger Guidelines, OB services is a separate relevant market because "no other services are reasonably interchangeable with, or substitutes for, inpatient obstetrical services." CCB at 20. In addition, Complaint Counsel cites evidence that two Lucas County hospitals, UTMC and Mercy St. Anne, do not provide OB services (F. 94, 110); that market participants separately track GAC and OB market shares (F. 314); and that ProMedica's and St. Luke's contracts with MCOs often specify different reimbursement rates for GAC inpatient services than for inpatient OB services (F. 317). CCB at 18-20.

In prior hospital merger cases, inpatient OB services have been included in the GAC inpatient services market. (Guerin-Calvert, Tr. 7229-7230). With the exception of the district

143

court's opinion on the preliminary injunction related to this matter, no hospital merger case has recognized OB services as a separate product market. *See FTC v. ProMedica Health Sys. Inc.*, 2011 U.S. Dist. LEXIS 33434, at *147-49 (N.D. Ohio 2011).

As Complaint Counsel pointed out in its Post-Trial Brief, the use of a cluster market of all GAC inpatient services is appropriate in hospital merger cases. CCB at 8 ("Because there are hundreds of inpatient medical and surgical services offered by general acute-care hospitals, it is analytically convenient, appropriate, and efficient to group these services in a single cluster market where 'market shares and entry conditions are similar for each.'"). Nevertheless, Complaint Counsel seeks to carve out of the cluster market inpatient OB services because "no other services are reasonably interchangeable with, or substitutes for, inpatient obstetrical services." CCB at 20. The argument that inpatient OB services constitute a separate product market because no other inpatient hospital services can substitute for them applies with equal force to other hospital services such as inpatient cardiac surgery, inpatient knee surgery, and inpatient gastro-intestinal services, but Complaint Counsel does not allege that those services constitute separate markets. That a patient seeking inpatient OB services cannot substitute an appendectomy for a Caesarian section utterly fails to provide a valid justification for carving out inpatient OB services into a separate product market. Indeed, to carve out individual hospital services would be contrary to the logic upon which the inpatient services "cluster market" rests. *See Sutter Health Sys.*, 130 F. Supp. 2d at 1119 (explaining that "[w]hile the treatments offered to patients within this cluster of services are not substitutes for one another (for example, one cannot substitute a tonsillectomy for heart bypass surgery), the services and resources that hospitals provide tend to be similar across a wide range of primary, secondary, and tertiary inpatient services").

In addition, there is no basis in the evidence in this case for recognizing a separate product market for inpatient OB services. Negotiations between hospital providers and MCOs for inpatient services cover the full range of services that MCOs' members may need, including inpatient OB services. F. 315. Many contracts with MCOs do not separately carve out OB rates from GAC inpatient rates. F. 316. That ProMedica and St. Luke's analyze their market shares for OB services separately is of little significance, as the hospitals also track cardiac cases, orthopedics, and cancer services separately. F. 314.

144

Furthermore, there is no evidence that hospitals can price-discriminate for inpatient OB services because inpatient OB services are provided in conjunction with other services, and the terms and conditions on which they are negotiated are very similar. F. 320. Thus, the potential for price discrimination does not provide a basis for carving out a separate inpatient OB services market. *See* Merger Guidelines § 4.1.4 ("If a hypothetical monopolist could profitably target a subset of customers for price increases, the Agency may identify relevant markets defined around those targeted customers, to whom a hypothetical monopolist would profitably and separately impose at least a [small but significant and non-transitory increase in price].").

Accordingly, there is no basis in fact or law to deviate from many cases consistently finding GAC inpatient services to be a "cluster of services" that constitute a relevant product market or to carve out of this cluster one of those services. Complaint Counsel has failed to prove that inpatient OB services is a separate relevant product market, as is its burden. *See Tenet Health,* 186 F.3d at 1052; *Lundbeck,* 650 F.3d at 1239. Accordingly, the relevant product market in which to analyze the likely effects of the Joinder is all GAC inpatient hospital services – primary, secondary, and tertiary services – sold to commercial health plans.

### 2.    Geographic market

The relevant geographic market is "the 'area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *Philadelphia Nat'l Bank,* 374 U.S. at 359 (quoting *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961)). To prove the relevant geographic market, Complaint Counsel must present evidence on "where consumers of hospital services could practicably turn for alternative services should the merger be consummated and prices become anticompetitive." *Tenet,* 186 F.3d at 1052; *Freeman Hosp.,* 69 F.3d at 268.

In this case, Complaint Counsel and Respondent agree that the proper geographic market for GAC inpatient hospital services is Lucas County, Ohio. F. 322; CCB at 22; RB at 47. Because inpatient OB services do not constitute a separate product market (*see* Part III.C.1.c.ii., *supra*), argument and evidence relating to where consumers might turn for inpatient OB services is not relevant and, therefore, not addressed. With respect to the GAC

145

inpatient services market, which includes OB services, the evidence establishes: no MCO has marketed a health plan to Lucas County customers without including at least one Lucas County hospital; a hypothetical monopolist controlling every hospital in Lucas County could increase the price of GAC inpatient services in Lucas County by at least 5 to 10 percent, a small but significant amount; with extremely rare exceptions, Lucas County residents do not use more distant providers of GAC inpatient hospital services; and hospitals in counties adjacent to Lucas County are not acceptable alternatives for one MCO's Lucas County members. F. 323-328, 332. Thus, the relevant geographic market in which to assess the likelihood of anticompetitive effects of the Joinder is Lucas County, Ohio.

### D.    Likelihood of Anticompetitive Effects

Although Complaint Counsel did not prove the relevant product markets advanced at trial, Complaint Counsel did prove one of the relevant product markets the Commission alleged in its Complaint: GAC inpatient hospital services sold to commercial health plans; and the relevant geographic market of Lucas County, Ohio. Complaint ¶¶ 12, 16. The analysis next turns to the likelihood of anticompetitive effects of the Joinder in this market, which includes primary, secondary, and tertiary services and inpatient OB services.

"[T]o satisfy section 7, the government must show a reasonable probability that the proposed transaction would substantially lessen competition in the future." *University Health*, 938 F.2d at 1218 (citing *FTC v. Warner Communs. Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)). "[A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Philadelphia Nat'l Bank*, 374 U.S. at 363. Thus, the government can establish a presumption that the transaction will substantially lessen competition by showing that the acquisition will lead to undue concentration in the relevant markets. *Chicago Bridge*, 534 F.3d at 423; *Baker Hughes*, 908 F.2d at 982.

In support of its position that the Joinder is likely to have anticompetitive effects, Complaint Counsel advances the following arguments: the Joinder is presumptively unlawful

because it results in tremendous concentration in already highly-concentrated markets (CCB at 30-39); the Joinder eliminated close and vigorous competition between ProMedica and St. Luke's (CCB at 39-50); the Joinder allows ProMedica to raise prices (CCB at 50-63); the Joinder will harm hospital quality (CCB at 63-66); and higher prices and lower quality will impact consumers directly (CCB at 66-68). These arguments, and Respondent's counter-arguments thereto, are addressed, in turn, below.

### 1.    Market shares and concentration

Calculation of market shares and market concentration provide the starting point for the analysis of whether a transaction is likely to substantially lessen competition. *CCC Holdings, Inc.*, 605 F. Supp. 2d at 46, 64. Market concentration is a function of the number of firms in the market and their respective market shares. *Butterworth*, 946 F. Supp. at 1294.

The Herfindahl-Hirschman Index ("HHI") is the most prominent method of measuring market concentration, commonly used by the Department of Justice, the FTC, and courts in evaluating proposed mergers. *Butterworth*, 946 F. Supp. at 1294 (citing *University Health*, 938 F.2d at 1211, n.12; *FTC v. PPG Ind. Inc.*, 798 F.2d 1500, 1502-06 (D.C. Cir. 1986); *FTC v. Freeman Hosp.*, 911 F. Supp. 1213, 1218 (W.D. Mo. 1995), *aff'd* 69 F.3d 260 (8th Cir. 1995)). The HHI is calculated by squaring the market share of each competing firm in a market and adding the resulting numbers. Merger Guidelines § 5.3; *Butterworth*, 946 F. Supp. at 1294. Under the Merger Guidelines, a post-merger HHI above 2500 is deemed to reflect a highly concentrated market, and a merger resulting in a highly concentrated market and producing an increase in the HHI of between 100 and 200 points potentially raises significant competitive concerns. Merger Guidelines § 5.3.

However, "market share figures are not always decisive in a section 7 case." *Hospital Corp. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986); *see also CCC Holdings*, 605 F. Supp. 2d at 64; Merger Guidelines § 5.3. "[T]he Supreme Court [has] cautioned that, although significant, statistics concerning market share and concentration are 'not conclusive indicators of anticompetitive effects.'" *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 130 (D.D.C. 2004) (quoting *General Dynamics*, 415 U.S. at 498). Courts recognize that "determining the existence or threat of anticompetitive effects has not stopped at a calculation of market shares"

and, therefore, "[a] finding of market shares and consideration of [the presumption created by market shares] should not end the court's inquiry." *Oracle*, 331 F. Supp. 2d at 1111; *see also Baker Hughes*, 908 F.2d at 992 ("The Herfindahl-Hirschman Index cannot guarantee litigation victories."). Rather, the "structure, history, and probable future" of the market must be examined to determine whether market shares are indicative of likely anticompetitive effects from the Joinder. *General Dynamics*, 415 U.S. at 498.

Relying solely on market shares to analyze competitive effects is "especially problematic" when the transaction involves differentiated products, such as general acute-care inpatient services. *Oracle*, 331 F. Supp. 2d at 1122. "When dealing with a heterogeneous product or service, such as the full range of medical care, a reasonable finder of fact cannot infer monopoly power just from higher prices--the difference may reflect a higher quality more costly to provide--and it is always treacherous to try to infer monopoly power from a high rate of return." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995).

The analysis turns next to the arguments and evidence advanced by the parties on market shares and concentration. Not surprisingly, the parties' experts utilized different methods to arrive at their market share statistics. The experts differed in both their methods for calculating market shares in several areas and in the markets they used for calculating market shares.

With respect to the methodology used to determine market shares, Complaint Counsel's expert calculated market shares based on total patient days. F. 344. Respondent's expert calculated market shares based on billed charges and discharges. F. 344. Respondent additionally calculated market shares based on staffed beds and registered beds. F. 344. Respondent asserts that billed charges, rather than patient days, is a more appropriate measure of market shares, because billed charges reflect the fact that many diagnostic related groups ("DRGs") and service lines require care that costs hospitals more to provide, result in longer hospital stays, and generate higher revenue. RRB at 37. Complaint Counsel counters that billed charges do not give the most accurate view of the marketplace, because commercial

insurers pay discounted prices for services, not the full chargemaster price.[15]  CCRRFF 1054.
Courts in hospital merger decisions have accepted various methods of measuring market
shares.  *E.g.*, *Butterworth*, 946 F. Supp. at 1294 (finding that the expert estimated the merging
hospitals would control "47 to 65% of the market for general acute care inpatient hospital
services . . . depending on whether market share is measured by licensed beds, discharges or
inpatient revenues"); *Rockford Mem'l Hosp.*, 898 F.2d at 1283 (stating that "[t]he district judge
estimated the combined market share of the parties to the merger . . . at between 64 and 72
percent, depending on whether beds, admissions, or patient days are used as the measure of
output").  In this case, regardless of which method is used, the calculated market shares are not
significantly different.  *See* Part II.K.2., *supra.*  Therefore, calculations of market shares are
analyzed using each of the methods advanced by the parties.

With respect to the market used to determine market shares, the market used by
Complaint Counsel's expert and Respondent's expert differed in two significant respects.[16]
First, Complaint Counsel's expert calculated market shares based on a market comprising only
those GAC inpatient services (identified as diagnostic related groups) that both ProMedica and
St. Luke's sold to MCOs, whereas the Complaint alleged the relevant market more broadly as
"general acute-care inpatient hospital services sold to commercial health plans."  (F. 342;
*compare* PX02148 at 019-021 *with* Complaint ¶ 12).  Respondent's expert included all
available GAC inpatient services in her market share calculations.  F. 342.  Second, Complaint
Counsel's expert's calculation of market share for GAC inpatient hospital services excluded
market shares for inpatient OB services.  F. 343.[17]  Respondent's expert's calculations of shares
of GAC inpatient hospital services included inpatient OB services.  F. 343.  As found in Part
II.K.2., *supra*, and analyzed below, these differences in approaches do not significantly alter
the conclusions one can draw from market share and concentration statistics.

---

[15] A hospital chargemaster is a list of the prices for the hospital's services.  F. 499.

[16] There were a number of other differences in the scope of the market used by the experts.  However, because it is
not material to the ultimate conclusion on market shares, these differences are not analyzed.

[17] Complaint Counsel's expert calculated market shares and HHI for OB services separately and found markedly
higher shares and concentration levels in its proposed inpatient OB services market.  *E.g.*, PX02150 at 002.
However, because inpatient OB services do not constitute a separate product market, discussion of these statistics
is neither necessary nor appropriate.

Neither party's expert performed an HHI analysis on the market found to be the relevant product market in this case – all GAC inpatient hospital services – primary, secondary, and tertiary, and including inpatient OB services – sold to commercial health plans. This defect, however, is not fatal. Unlike in *Oracle*, where the court wholly rejected the plaintiff's proposed market definition and was left with no means of calculating market shares, 331 F. Supp. 2d at 1161, 1165, here there is sufficient data to evaluate whether Complaint Counsel is entitled to the presumption that the merger is likely to substantially lessen competition. Regardless of which method is used or how the GAC inpatient hospital services market is defined, the data overwhelmingly shows that the Joinder created market shares and concentrations in the relevant market that warrant a presumption of illegality.

Complaint Counsel's expert's calculations for GAC inpatient hospital services, as Complaint Counsel's expert defined that market, show that post-Joinder, Respondent has a combined market share of 58.3%; the pre-Joinder HHI was 3312; the change in the HHI is 1078, which is well above the 200 point threshold of the Merger Guidelines; and the resulting post-Joinder HHI is 4391, which is well above the 2500 threshold to be considered "highly concentrated." F. 368.

Respondent's expert's calculations for GAC inpatient hospital services, as Respondent's expert defined that market, indicate that, post-Joinder, Respondent's combined market share is between 53% and 58%, whereas Mercy and UTMC's combined market share is between 38% and 45%. F. 357-360. Respondent's expert conceded that, using her relevant product market definition, the post-Joinder market is still highly concentrated and would be presumed to result in increased market power, with a post-Joinder HHI around 4000. F. 369.

In addition, as summarized by Complaint Counsel, the following alternative methods of viewing the market statistics could be used:

- Analyze market shares and HHIs based on the broader service and geographic markets proposed by Respondent's economic expert and add the University of Michigan Medical Center and the Cleveland Clinic as fringe competitors. Using this data, Respondent has a 43% market share, concentration increases by 560 points, and the resulting HHI is 2855.

150

- Analyze market shares and HHIs based on beds-in-use data prepared by Respondent's economic expert and add Wood County Hospital, Fulton County Health Center, Fremont Memorial Hospital, and H.B. Magruder Memorial as fringe competitors. Using this data, Respondent has a 47.8% market share, concentration increases by 662 points, and the resulting HHI is 3413.

- Analyze market shares by expanding the geographic market to include Wood and Fulton counties. Using this data for GAC, Respondent has a 55.8% market share, concentration increases by 989 points, and the resulting HHI is 4037.

- Analyze market shares and HHIs in Lucas County based on all inpatient DRGs, including those that Respondent's expert excluded from her relevant service market definition and those DRGs that St. Luke's does not offer. Using this data, Respondent has a 58.7% market share in a combined GAC-OB market; concentration increases by 867 points in a combined GAC-OB market; and the resulting HHI is 4424 in a combined GAC-OB market. (Ohio Hospital Association Data; based on commercial patient days (7/09 – 3/10) including all Major Diagnostic Categories/DRGs).

(CCRB at 9-11). In addition, an internal document generated by ProMedica projected its GAC market share, combined with St. Luke's, to be 55% of the Toledo Metropolitan Statistical area, based on discharges. F. 363.

Under each one of the above scenarios, the statistics exceed the thresholds for presumptive illegality provided in the Merger Guidelines and *Philadelphia National Bank*, 374 U.S. at 364 (enjoining acquisition with 30 percent combined share and where many competitors remained). *See also University Health*, 938 F.2d at 1211 n.12, 1219 (prima facie case established where merger reduced competitors from five to four, and resulted in a combined market share of 43 percent, HHI increase of 630 points, and a post-merger HHI of 3200). Regardless of how the market shares are determined in this case, the Joinder results in a tremendous increase in concentration in a market that already was highly concentrated. The statistical evidence demonstrates that the Joinder results in a significant increase in the concentration of power in the GAC inpatient hospital service market and produces an entity controlling an undue share of the relevant product market.

Respondent argues that the market share statistics in this case do not accurately predict the likelihood of anticompetitive effects because St. Luke's financial condition "suggests" that it would have been unable to sustain its market share in the future. RB at 50. "[A] defendant

151

may rebut the government's prima facie case by showing that the government's market share statistics overstate the acquired firm's ability to compete in the future and that, discounting the acquired firm's market share to take this into account, the merger would not substantially lessen competition." *University Health*, 938 F.2d at 1221. According to Respondent, St. Luke's market share must be discounted by its financial weakness, which, absent the Joinder with ProMedica, would have limited its ability to continue to compete effectively in the market, and, thereby, would have diminished its competitive significance. RB at 54. However, to prevail on this argument, Respondent would have to make the "substantial showing" that St. Luke's purported financial weakness "would cause that firm's market share to reduce to a level that would undermine the government's *prima facie* case." *University Health*, 938 F.2d at 1221. For the following reasons, Respondent has failed to do so.

First, the competitive significance of removing an independent St. Luke's from the relevant market does not rest on St. Luke's percentage share of the relevant product market; indeed, it held the lowest market share among the four market participants in Lucas County. F. 357-360. Rather, as discussed below, despite St. Luke's relatively low market share, ProMedica's acquisition of St. Luke's has the effect of further concentrating an already concentrated market, by reducing the number of ProMedica's competitors from three to two. Part III.D.2.a., *infra*. In addition, as also discussed below, because of its location in Lucas County, St. Luke's is competitively significant, despite its relatively low market share. Part III.D.2.d., *infra*. Moreover, as discussed in Part III.E., *infra*, the evidence does not demonstrate that St. Luke's financial condition would render it competitively insignificant in the future. Thus, even if St. Luke's market share is discounted by its financial weakness, the evidence of the financial weakness of St. Luke's does not undermine the predictive value of Complaint Counsel's market share statistics. Accordingly, Complaint Counsel has established its prima facie case that the Joinder violates Section 7 of the Clayton Act.

### 2. Elimination of competition between ProMedica and St. Luke's

More powerful than the market share and concentration statistics is the simple fact that after the Joinder, there are only two remaining competitors to ProMedica that provide GAC

inpatient hospital services in Lucas County: Mercy and UTMC. The competitive significance of the elimination of St. Luke's as an independent entity is discussed below.

### a. Two remaining competitors

The ProMedica hospital system, prior to the Joinder, included a children's hospital and three general population hospitals in Lucas County: The Toledo Hospital ("TTH"), Flower Hospital ("Flower"), and Bay Park Community Hospital ("Bay Park"). F. 53. TTH has approximately 550 staffed beds, offers all basic GAC services, as well as more specialized, higher-acuity tertiary services. F. 54-59. Flower has approximately 250 staffed beds, offers general acute-care, OB, outpatient radiation and chemotherapy, and post-acute services, but does not provide tertiary care. F. 60-65. Bay Park has approximately 86 staffed beds and is a full-service community hospital, offering all GAC services, including emergency, OB, and general medical-surgical services. F. 66-71. St. Luke's Hospital, prior to the Joinder, was a stand-alone, full-service community hospital with 178 staffed beds, which provided a range of outpatient and inpatient services, but performed few, if any, tertiary services. F. 72-78.

Of the two remaining competitors, one is a hospital system, Mercy, which includes three general population hospitals in Lucas County: St. Vincent, St. Anne, and St. Charles. F. 79. The other competitor is UTMC, a research and teaching hospital. F. 103-106. Within the Mercy system, St. Vincent has 445 staffed beds, and is a large, tertiary teaching facility with eight intensive care units, a Level I trauma center, a Level III OB unit, and a large cardiology service. F. 82-91. St. Anne has 96 staffed beds and is a general medical-surgical hospital with operating rooms. St. Anne does not offer tertiary services, OB services, psychiatric services, or serious emergency services. F. 92-97. St. Charles has approximately 150 staffed beds and is a general medical-surgical hospital that also offers Level II OB services. St. Charles is the only Lucas County hospital that offers Level II inpatient OB services, but does not offer tertiary services. F. 98-102. UTMC, a teaching hospital, has as its mission to support the academic needs of the University of Toledo, to deliver high-quality health-care, and to serve the tertiary and quaternary needs of the community. UTMC has approximately 224 staffed beds and provides GAC services, but does not offer inpatient OB services. UTMC is the only hospital in Lucas County that offers quaternary services. F. 103-113.

With the elimination of St. Luke's as an independent entity, only Mercy and UTMC remain in competition with ProMedica. Overwhelmingly, cases evaluating hospital mergers have not allowed a merger to proceed where the result is similar to this case -- to reduce the number of competitors from four to three. *E.g.*, *Hospital Corp.*, 807 F.2d at 1387, 1389 (holding that the reduction of the number of competing hospitals in the geographic market from 11 to 7, among other factors, supported the Commission's conclusion that the challenged acquisitions were likely to have anticompetitive effects); *Rockford Mem'l Hosp.*, 898 F.2d at 1284 (enjoining merger where there were four other acute-care hospitals remaining in the area); *University Health*, 938 F.2d at 1219 (enjoining merger where the acquirer would control approximately forty-three percent of the relevant market, and three smaller hospitals would share the remainder of the market). *But see Butterworth*, 946 F. Supp. at 1288, 1302 (allowing merger of four to three hospitals where defendants persuasively rebutted both the FTC's prima facie case and its additional evidence of anticompetitive effects).

In *Swedish Match*, the defendant argued that the two remaining manufacturers of loose leaf chewing tobacco would replace any competition lost by the acquisition and prevent the acquirer from unilaterally increasing prices. The court rejected this argument, holding that the weight of the evidence demonstrated that a unilateral price increase was likely because the acquisition would eliminate one of the acquirer's primary direct competitors. *Swedish Match*, 131 F. Supp. 2d at 168-69. As analyzed below, in this case, too, the evidence of the elimination of competition by St. Luke's, and the resulting effect upon ProMedica's bargaining power with MCOs, demonstrates a substantial likelihood of unilateral price increases by ProMedica.

### b. Premerger competition between St. Luke's and ProMedica

The evidence shows that St. Luke's was a meaningful market participant in Lucas County. St. Luke's is the third-largest stand-alone hospital in Lucas County based on commercial volume, exceeded only by St. Vincent and TTH. F. 462. Although St. Luke's provided care only to approximately 10 commercially insured patients per day, ProMedica, by comparison, through its three general population hospitals, provided care to approximately 53 commercially insured patients per day. F. 463. The addition of ten commercially insured patients per day to ProMedica's total is not insignificant, as it amounts to a nearly 19 percent

increase of commercially insured patients per day for ProMedica. The CEOs of both ProMedica and St. Luke's agree that, before the Joinder, St. Luke's viewed ProMedica as its "most significant competitor." F. 440. Furthermore, St. Luke's CEO testified that after he came to St. Luke's in 2008, his goal was to regain volume from ProMedica in St. Luke's core and primary service areas. F. 441.

As acknowledged by ProMedica in its own internal assessments, ProMedica saw St. Luke's as a competitor capable of taking significant patient volume away from ProMedica's nearby hospitals. F. 467-471. ProMedica calculated that St. Luke's readmission to Anthem's network in 2009 would cost ProMedica {█████} million in gross margin annually. F. 471. Similarly, ProMedica believed that St. Luke's would draw Paramount patients away from ProMedica hospitals, once St. Luke's became part of Paramount's network pursuant to the Joinder Agreement. F. 467. ProMedica estimated that {████████} Paramount commercial inpatient admissions at ProMedica hospitals would be redistributed to St. Luke's if St. Luke's was added to Paramount's network. F. 468. ProMedica also estimated that the impact on Flower Hospital could be {█████} million of lost margin annually if St. Luke's was included in the Paramount network. F. 469.

### c. Elimination of a close substitute

With only two competitors to ProMedica remaining, Complaint Counsel argues that the elimination of St. Luke's as an independent entity will likely harm competition because St. Luke's was a close substitute for ProMedica's nearby hospitals. CCB at 38. Complaint Counsel posits that, under a unilateral effects theory, the merger of close substitutes leads to increased bargaining leverage and higher prices. CCB at 36. Respondent counters that Mercy, not St. Luke's, was ProMedica's closest competitor. RB at 58-61.

Cases and the Merger Guidelines recognize two types of anticompetitive effects: unilateral and coordinated.[18] *Oracle*, 331 F. Supp. 2d at 1112-13; Merger Guidelines §§ 6, 7.

---

[18] Coordinated effects are reductions in competition caused by express or tacit interaction by the merged firm and the remaining firms in the market, with respect to competitive variables such as prices, price differentials, market shares, customers, or territories. *Oracle*, 331 F. Supp. 2d at 1113; *Evanston*, 2007 FTC LEXIS 210, at *157-58 (citation omitted). Complaint Counsel does not assert that the Joinder may result in coordinated effects and, therefore, the likelihood of coordinated effects need not be and is not addressed.

Unilateral effects result when a merger leads to higher prices due to the loss of competition between the two merging firms, independent of the action of other firms in the market. *Evanston*, 2007 FTC LEXIS 210, at *157 (citations omitted). As the Merger Guidelines explain, "[u]nilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice." Merger Guidelines § 6.1. Therefore, the degree of and preferences regarding substitutability of hospitals in Lucas County are analyzed.

In evaluating whether buyers of hospital services consider services sold by ProMedica and St. Luke's to be close substitutes, an initial question is: from whose perspective should the issue of substitutability be evaluated? Respondent analyzes substitutability from the perspective of *the MCOs*, noting that MCOs do not consider St. Luke's to be a close substitute for the ProMedica hospital system. RB at 59. Complaint Counsel analyzes substitutability from the perspective of the potential patient, asserting that *patients* who seek hospital services consider St. Luke's and one of ProMedica's hospitals to be close substitutes. CCRB at 12. Complaint Counsel's position appears somewhat inconsistent with the allegation in the Complaint that a relevant product market is GAC inpatient hospital services "sold to commercial health plans," Complaint ¶ 12, and the position of Complaint Counsel's expert that "[t]he competitive analysis properly focuses upon the Acquisition's impact on the hospital-MCO bargaining process," PX2148 at 014-015 (Town Expert Report), both of which focus on the perspective of the MCO.

In *Freeman,* the court of appeals addressed the issue of whose perspective governs as follows: "We realize that in the case of health care, the term 'consumers' often means not individual patients but large purchasers of health care such as managed care coalitions or third-party payors." *Freeman Hosp.*, 69 F.3d at 270 n.14. Nevertheless, in assessing the relevant geographic market, the court's inquiry focused upon "where patients could practicably turn for alternative sources of acute care inpatient hospital services." *Id.* at 270. The court in *Sutter Health System* also noted that the behavior of MCOs is important in analyzing where patients will seek acute-inpatient hospital services because "these organizations are to a large extent, the true consumer of acute inpatient services." *Sutter Health Sys.*, 130 F. Supp. 2d at 129 (citing *University Health*, 938 F.2d at 1213 n.13 (holding that the true customers of acute-inpatient

156

services were third party payers)). But, "[a]n MCO's demand for hospital services is largely derived from an aggregation of the preferences of its employer and employee members." *Evanston,* 2007 FTC LEXIS 210, at *195. Accordingly, in this case, the perspectives of both the MCOs and the patients are relevant and are considered. *See Long Island Jewish Med. Center,* 983 F. Supp. at 134 (finding "that there [were] five categories of 'consumers' in [that] hospital merger case, including patients and MCOs).

As Respondent correctly points out, no MCO testified that, for purposes of its Toledo hospital provider network, it considers St. Luke's to be the "next best substitute" for ProMedica. RB at 59. Rather, all MCOs agreed that Mercy and ProMedica are each other's primary competitor. F. 442-447. The evidence further establishes that ProMedica's and Mercy's hospitals are similar in their locations and the types of services and acuity of care they offer. (*Compare* F. 53-71 *with* F. 79-102). For each ProMedica hospital, there is a Mercy hospital close by. *Id.* Each system has a large flagship hospital near downtown Toledo, a children's hospital, and two smaller community hospitals. *Id.* Because of their similar broad service offerings and geographic reach throughout the Toledo metropolitan area, MCOs believe that they must have either Mercy or ProMedica in their health plan. F. 442-447; 566-568. In contrast, St. Luke's is a small, stand-alone community hospital, offering a limited array of the least complex inpatient hospital services. F. 72-78.

The evidence further establishes that MCOs could not substitute St. Luke's for the ProMedica system. Prior to the Joinder, faced with an anticompetitive price increase, no MCO would have dropped ProMedica from its network in exchange for St. Luke's. F. 448-449. But MCOs can market, and successfully have marketed, networks with only one of the two main systems. F. 447. Thus, from the perspective of the MCOs when constructing a marketable network, the Mercy hospital system is the closest substitute to the ProMedica hospital system.

Complaint Counsel does not dispute that St. Luke's, as a single hospital, could not adequately replace ProMedica's three hospitals in the networks of the MCOs. CCRB at 13. Instead, Complaint Counsel asserts, the relevant inquiry is whether St. Luke's is a close substitute for any one of ProMedica's hospitals from the perspective of MCOs' members, because this is what affects ProMedica's bargaining leverage with MCOs. CCRB at 13. As

157

acknowledged in *Evanston*, MCOs' demand for hospital services is largely derived from the preferences of their members. *Evanston,* 2007 FTC LEXIS 210, at *195-96 (noting that whether the MCO decides to drop a hospital that raises its prices depends on a potentially complex assessment of the preferences of its employer and membership base). There, the Commission concluded that the two merging hospitals were likely to be "close substitutes for MCOs' members and employers, and thus for the MCOs." *Evanston,* 2007 FTC LEXIS 210, at *196-97. Here, as in *Evanston*, the record demonstrates that the merging entities, St. Luke's and ProMedica, were close substitutes for employers and MCOs' members, and, thus, for the MCOs.

The evidence shows that MCOs enter contracts with hospitals or hospital systems in order to be able to offer employers, and their employees, a network for obtaining GAC inpatient hospital services. F. 234-235, 273-274. MCOs seek to offer marketable plans to employers, in terms of cost, geographical coverage, quality, and breadth of services, while at the same time staying competitive by, among other things, obtaining low reimbursement rates. F. 190, 203, 218, 231, 237-238, 278-279. Employers want a health plan that offers a network with broad provider access so that employees and their family members can use their preferred physician or hospital. F. 256, 281. MCOs believe that patients generally prefer to obtain basic or routine inpatient care in a hospital that is close to them. F. 283. Because MCOs must fulfill their members' preferences in order to be marketable, the question of where patients wish to turn for GAC inpatient hospital services is critical.

The question of where patients would turn is also integral to a diversion analysis. *Sutter Health Sys.*, 130 F. Supp. 2d at 1129-32. A diversion analysis seeks to quantify the extent of direct competition between a product sold by one merging firm and a second product sold by the other merging firm by estimating the diversion ratio from the first product to the second product. F. 453; Merger Guidelines § 6.1 ("Diversion ratios . . . can be very informative for assessing unilateral price effects, with higher diversion ratios indicating a greater likelihood of such effects."). *See also Swedish Match*, 131 F. Supp. 2d at 169 (stating that in determining the likelihood of a unilateral price increase, "the diversion ratio is important because it calculates the percentage of lost sales that go to [the acquired company]. High margins and high diversion ratios support large price increases, a tenet endorsed by most economists.").

158

In the context of a hospital merger, diversion analysis attempts to calculate the substitutability of one hospital for another; that is, it tries to answer the question: if a specific hospital was not available to patients, to which other hospitals would that hospital's patients go? F. 453. The diversion ratio measures the predicted share of a hospital's patients that would go to a specific alternative if that hospital was no longer available. F. 453.

Diversion analysis relies on actual choices of patients among hospitals, as reflected in the claims data routinely collected by MCOs. F. 454. The higher the diversion between two hospitals, the higher the substitutability of the hospitals. F. 455. A merger can produce significant price effects even though the merging parties do not have the highest diversions to one another. Merger Guidelines § 6.1; *Evanston,* 2007 FTC LEXIS 210, at *160 (stating that "[a] merger may produce significant unilateral effects even though a large majority of the substitution away from each merging product goes to non-merging products" (citing Merger Guidelines Commentary 27 and Jonathan B. Baker & Carl Shapiro, *Reinvigorating Horizontal Merger Enforcement* 10 (June 2007) ("[U]nilateral effects will arise so long as some customers of one of the merging firms consider its merger partner's product as their second choice, even if more of the firms' customers consider a third firm's products to be their second choice."))).

Professor Town performed a diversion analysis for specific health plans and concluded that for the members of five of the six major health plans in Lucas County, ProMedica is St. Luke's next-best substitute.[19] F. 459. That is, Town concluded, the highest share of those health plans' members would go to a ProMedica hospital if St. Luke's was unavailable. In performing this analysis, Town relied on data from the Greater Toledo Area. F. 456.

In summary, the diversion analysis supports the conclusion that St. Luke's and one or more of the three ProMedica hospitals are close substitutes. It is not necessary, for purposes of finding unilateral effects, to demonstrate that St. Luke's and ProMedica were the first and second choices for all consumers. *Evanston,* 2007 FTC LEXIS 210, at *160 ("[I]t is not

---

[19] The sixth health plan is {■■■■■■■■■■■■■■■■}. The fact that ProMedica was not the next-best substitute for St. Luke's for {■■■} members may reflect the fact that, until recently, {■■■} was aligned with Mercy. (PX2148 at 047 (¶ 88) (Town Expert Report), *in camera*).

necessary for the merged firms to be the closest substitutes for all customers, or even a majority of customers."). Rather, if customers accounting for a "significant share of sales" view the merging parties as their first and second choices for a particular need, a merger can enable the merged firms to raise prices unilaterally. *Evanston,* 2007 FTC LEXIS 210, at *159. Thus, the fact that MCOs, when constructing a network, viewed the hospital systems of ProMedica and Mercy to be each other's closest substitute is not a determinative issue.

### d.    Significance of St. Luke's in southwest Lucas County

Southwest Lucas County is affluent, with a population that is "better insured" than the rest of Lucas County. F. 473. The area around St. Luke's is one of the few around Toledo that is growing, with an increasing population of employed and commercially-insured patients. F. 473. St. Luke's is easily accessible from major highways and is in a highly visible area. F. 473. Thus, St. Luke's location in southwest Lucas County is a geographically desirable part of Lucas County. F. 473.

Complaint Counsel argues that the elimination of an independent St. Luke's, as a result of the Joinder, is likely to have anticompetitive effects, in part, because of its location in southwest Lucas County, relying upon the importance to patients and MCOs of having a hospital located in southwest Lucas County. CCB at 41-43. Respondent counters that St. Luke's location in southwest Lucas County is immaterial to any analysis of the competitive effects of the Joinder because the relevant geographic market is Lucas County in its entirety. Respondent further asserts that, even if the evidence shows patient preference for St. Luke's within St. Luke's service area, travel in the Toledo area is rapid and easy; hospitals in Lucas County are all located conveniently to patients, with short drive-times to and between any of the hospitals in Toledo; and patients frequently travel to more distant hospitals than the one closest to their homes. RB at 12, 53-54.

It must first be acknowledged that the relevant geographic market alleged in the Complaint, and found to be the geographic market in this case, is Lucas County, Ohio. *Supra* Part III.C.2. Southwest Lucas County, St. Luke's "core service area," or St. Luke's "primary

service area" do not constitute the relevant geographic market.[20]  Therefore, it would be inappropriate to rely on market shares derived solely from the subset of the market comprising St. Luke's core or primary service areas to conclude that, because ProMedica and St. Luke's have high market shares in this submarket, ProMedica now has market power.  However, it is appropriate to rely on market shares in the subset comprising St. Luke's core or primary service area to evaluate patients' preferences, and, hence, the importance of St. Luke's to MCOs.

Complaint Counsel relies on consumer preference surveys that show that, for patients located near St. Luke's, St. Luke's and a ProMedica hospital were the most preferred.  F. 450-452.  According to St. Luke's internal documents, in St. Luke's core service area, St. Luke's and ProMedica had the first and second highest inpatient market shares, respectively, for GAC services for all patients.  F. 494-496.  According to Respondent's expert's calculations, in St. Luke's top ten zip codes by volume, accounting for 64 percent of admissions, ProMedica ranked first, with 43 percent, and St. Luke's ranked second, with 26 percent, of patient admissions.  F. 497.  Based on market shares, Professor Town concluded that patients residing in St. Luke's core service area prefer St. Luke's and ProMedica for inpatient services.  F. 498.  This conclusion is consistent with other courts' findings, in determining the relevant geographic market, that the hospital's distance from a patient's home is a consideration.  *E.g.*, *Rockford Mem'l Hosp.,* 898 F.2d at 1285 ("For the most part hospital services are local.  People want to be hospitalized near their families and homes, in hospitals in which their own -- local -- doctors have hospital privileges.").

The average drive-time for St. Luke's patients is approximately 12 minutes.  F. 488.  Respondent points out that for patients located in each of St. Luke's top 10 zip codes from which it admits patients, the incremental drive-time to go to a different hospital is 18 additional minutes.  F. 489.  Respondent's expert's drive-time analysis shows that many patients for whom St. Luke's is the closest hospital travel to other hospitals that are farther away.  F. 490.  Thus, patient origin and drive-time analyses show that patients do not necessarily go to the next

---

[20] St. Luke's defines its core service area as the eight zip codes surrounding St. Luke's, where 55 to 60 percent of the admission base comes from.  St. Luke's defines its primary service area as the area where approximately 80 percent of St. Luke's patients come from.  F. 362.

closest hospital. F. 491. This fact, however, does not contradict a finding that St. Luke's and ProMedica are the two most preferred hospitals in St. Luke's core service area.

In addition, the evidence shows that, in order to be saleable, networks offered by MCOs must have broad geographic coverage, including southwest Lucas County, to meet the preferences of their members. MCOs believe that patients generally prefer to obtain basic or routine inpatient care in a hospital that is close to them. F. 218, 278, 283, 475. For example, MMO's Vice President of Network Management, testified that MMO needed St. Luke's in its network to have a marketable product. F. 478. An analysis prepared for ProMedica projected that adding St. Luke's to the Paramount network could net Paramount as many as {▮▮▮▮} new members. F. 482. Paramount's President testified that the addition of St. Luke's to Paramount's network in late 2010 made Paramount more attractive to employers in southwestern Lucas County and had a positive impact on Paramount. F. 481.

Although southwest Lucas County is not itself the relevant geographic market in this case, because it is important to MCOs for their networks to include a hospital in southwest Lucas County, the elimination of an independent hospital in southwest Lucas County is competitively significant. The significance of this fact directly relates to ProMedica's increased bargaining leverage in negotiations with MCOs, as more fully discussed below.

### 3. The Joinder gives ProMedica greater bargaining leverage

As discussed above, for many patients, St. Luke's and one of ProMedica's hospitals are patients' top two choices for GAC inpatient hospital services. Because many MCOs' members view St. Luke's as a close substitute to ProMedica's Flower Hospital and Toledo Hospital, before the Joinder patients could still have access to their first-choice or second-choice hospital – St. Luke's – even if the MCO failed to reach an agreement with ProMedica. Similarly, because many MCOs' members view ProMedica's Flower or Toledo Hospitals as a close substitute for St. Luke's, before the Joinder patients could still have access to their first-choice or second-choice hospital – a ProMedica hospital – even if the MCO failed to reach an agreement with St. Luke's.

162

After the Joinder, St. Luke's is no longer available as an alternative if an MCO fails to reach an agreement with ProMedica. As a result, MCOs that fail to reach an agreement with ProMedica can offer only a provider network consisting of UTMC and Mercy, which fails to include the top two hospital choices for many patients and which, the evidence shows, is believed to be less marketable. *See* Part II.M.1. In addition, after the Joinder, St. Luke's is no longer an independent alternative for obtaining the geographic coverage that MCOs want in southwest Lucas County. F. 475-480. Even if patients *could* switch to more distant hospitals within Lucas County, MCOs competing to successfully market their products must fulfill their members' *preference* not to travel too far and, specifically, the *preference* of their members in southwest Lucas County to go to either St. Luke's, Flower, or TTH. Thus, the Joinder gives ProMedica greater bargaining leverage, as further explained below.

Similar evidence was relied upon in *Evanston* to find that the merger enabled the combined firm unilaterally to exercise market power. There, the Commission found:

> If the MCO drops the hospital, it may cause some members who have a strong preference for that hospital to switch to another MCO, and cause employers with a significant number of such members to drop the MCO altogether. If a significant portion of an MCO's members view a hospital that raises its prices as particularly important, the MCO likely will be more willing to pay some or all of the increase.

*Evanston,* 2007 FTC LEXIS 210, at *195-96.

"Bargaining leverage" may be defined as the advantage, or perception of advantage, of a particular entity at the bargaining table to try to make use of certain attributes in the negotiation. F. 267. A hospital's bargaining leverage with an MCO depends on how much the MCO perceives it would lose if the MCO failed to reach agreement with the hospital. F. 287-289, 557. The success or failure of a negotiation depends on the hospital's and MCO's respective "walk-away" points. F. 558. If a hospital demands rates above an MCO's walk-away point, the MCO will refuse to contract with the hospital. F. 559.

Prior to the Joinder, the MCOs' "walk-away" network with respect to St. Luke's, *i.e.,* the network they had if they failed to reach agreement with St. Luke's, consisted of ProMedica's Lucas County hospitals, Mercy's Lucas County hospitals, and UTMC. F. 576.

163

Also prior to the Joinder, the MCOs' "walk-away" network with respect to ProMedica's Lucas County hospitals, *i.e.*, the network they had if they failed to reach agreement with ProMedica, consisted of St. Luke's, Mercy's Lucas County hospitals, and UTMC.  F. 577.

As a result of the Joinder, the MCOs' "walk-away" network with respect to ProMedica's Lucas County hospitals, which now includes St. Luke's, is Mercy's Lucas County hospitals and UTMC.  F. 578.  MCOs believe that a network consisting of only the Mercy Hospitals and UTMC, without St. Luke's and the ProMedica hospitals, would not be sufficiently marketable in Lucas County to be commercially viable.  F. 566-567.  For example, United believed it would face more difficulty serving its membership without ProMedica and St. Luke's than it would without ProMedica's pre-Joinder hospital network in Lucas County.  F. 574.  *See also* F. 575 (United representative testifying that {█████████████████████ ████████████████████████████████████}).  Also, MMO believed that while it could have marketed insurance products that excluded ProMedica's three Lucas County hospitals, it could not have marketed insurance products that excluded both ProMedica and St. Luke's.  F. 568.  *See also* F. 588 (MMO representative testifying that ProMedica's increased bargaining leverage enables ProMedica to name its price).  MCOs unanimously agreed that a health plan consisting of only Mercy and UTMC would leave them without coverage in southwest Lucas County and, thus, would be unmarketable.  F. 563-575.

Respondent, relying on *Tenet, Oracle,* and *Arch Coal,* argues that testimony of MCOs and employers regarding post-Joinder price effects is suspect and urges that their testimony be discredited because it is based solely on preferences and apprehensions.  RB at 72-74.  In *Tenet,* the court noted that "large, sophisticated third-party buyers can and do resist price increases" and stated that MCOs' testimony that they would unhesitatingly accept a price increase was contrary to their economic interests and, therefore, suspect.  *Tenet,* 186 F.3d at 1054.  The court of appeals there criticized the district court's reliance on the testimony of managed care payers, in the face of contrary evidence, that the for-profit entities would unhesitatingly accept a price increase rather than send their members to other hospitals.  *Id.* at 1054.  In *Oracle,* the court stated that "unsubstantiated customer apprehensions do not substitute for hard evidence."  *Oracle,* 331 F. Supp. 2d at 1131.  There, the customer witnesses testified "with a kind of rote, that they would have no choice but to accept a ten percent

increase." *Id.* In *Arch Coal*, the court noted that "antitrust authorities do not accord great weight to the subjective views of customers in the market," and stated that the concern expressed by the customers there "is little more than a truism of economics: a decrease in the number of suppliers may lead to a decrease in the level of competition in the market." *Arch Coal,* 329 F. Supp. 2d at 145-46. There, the customer witnesses made only simple and conclusory statements about their concerns. *Id.* at 146.

In this case, unlike in *Tenet*, the evidence does not indicate that MCOs can easily send their customers to other hospitals. *E.g.*, F. 332 (hospitals in counties adjacent to Lucas County are not acceptable alternatives); F. 567 (a network consisting of only Mercy and UTMC would not be marketable). Furthermore, the MCOs did not give merely conclusory opinions, as in *Oracle* and *Arch Coal*, that they could not constrain unreasonable rate requests by ProMedica post-Joinder. Instead, the MCOs used general market knowledge, feedback from the field, and/or claims utilization data to determine the attractiveness and marketability of their offerings (F. 280) and provided explanations to support their beliefs. *E.g.*, F. 568 (MMO representative explaining that MMO could not market a product without ProMedica and St. Luke's due to travel distances); F. 570 (Aetna representative explaining that Aetna's network would lose more marketability without ProMedica and St. Luke's together by leaving Aetna without coverage in southwest Lucas County). In addition, MCO witnesses in this case relied on reviews of utilization data and pricing analyses, experience negotiating with health plans and evaluating provider networks, and their understanding of bargaining dynamics and provider-network marketability in Lucas County. *See, e.g.,* F. 586 ({ ▓▓▓▓ } conducted an analysis of the change in reimbursement rates); F. 591 (Aetna performed statistical analysis based on Aetna's contract rates and the typical pattern experienced by Aetna that the acquiring system would raise the acquired hospital's rate to the system-wide rate). Testimony from MCOs relating to expected price increases is also consistent with economic expert testimony, including the econometric and diversion analyses (*infra* Part III.D.4) that were lacking in *Oracle*. 331 F. Supp. 2d at 1172. Accordingly, the testimony of MCOs here is not completely unsubstantiated, is less suspect than the testimony given in the cases cited by Respondent, and is, therefore, given due weight.

Furthermore, the MCOs' beliefs that they could not market a network consisting of only Mercy and UTMC is entirely consistent with their real world experience. Indeed, as Respondent has stipulated, "[i]n at least the last ten years, no commercial health plan has offered a product with a hospital network consisting only of UTMC and Mercy." F. 565. *See also* F. 565 (Respondent's expert agreeing that a Mercy-UTMC network has never been used in the last twenty years). By way of example, FrontPath could not viably market a network consisting only of Mercy and UTMC, as it would account for less than {█} percent of FrontPath's current utilization in Lucas County. F. 572. One MCO, {████}, prior to entering into a contract with ProMedica {██████████}, failed to grow its membership in Toledo by marketing a network that consisted of only Mercy, UTMC, and St. Luke's. F. 575. Because a network consisting only of UTMC and Mercy is not marketable, ProMedica now has even greater bargaining leverage in its negotiations with the MCOs. Respondent's contrary argument, that MCOs can avoid any attempt by ProMedica to raise prices to anticompetitive levels by walking away from ProMedica and forming a UTMC-Mercy network, RB at 81-83; RRB at 55-56, is, therefore, rejected. This greater bargaining leverage allows ProMedica to increase rates (*i.e.*, prices) to MCOs, as analyzed below.

### 4.    The Joinder gives ProMedica the ability to raise prices

Complaint Counsel argues that prior to the Joinder, ProMedica was already the dominant provider, charging the highest prices, and that the Joinder enables ProMedica to raise prices further. CCB at 50-59. Respondent counters that Complaint Counsel must show that the Joinder will enable (or has enabled) ProMedica to increase prices to supracompetitive levels and that Complaint Counsel has not met its burden of demonstrating that the Joinder will empower ProMedica to raise prices above competitive levels. RB at 42-44, 63-70.

Section 7 of the Clayton Act forbids mergers that are likely to hurt consumers by making it easier for the firms in the market to price above or farther above the competitive level. *Rockford Mem'l Hosp.*, 898 F.2d at 1283-84 (citing *Hospital Corp.*, 807 F.2d at 1386). However, "[s]ection 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future. A predictive judgment, necessarily

166

probabilistic and judgmental rather than demonstrable is called for." *Hospital Corp.*, 807 F.2d at 1389 (internal citation omitted).

"In making a determination as to whether a merger will result in an anti-competitive effect, the courts have focused on whether the merger would likely cause the merged entity to wield sufficient market power to enable it to profitably increase prices." *Long Island Jewish Med. Center*, 983 F. Supp. at 142 (citing *du Pont,* 351 U.S. at 391; *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988)). Thus, the starting point for evaluating whether the Joinder enables ProMedica to profitably increase prices is ProMedica's market power.

### a.    Market power

As analyzed above, before the Joinder ProMedica's market share was already higher than its competitors' market shares, whether calculated by registered beds, beds-in-use, or occupancy. F. 356. Using Respondent's expert's calculations, ProMedica had between 42 and 49 percent of the market for GAC inpatient hospital services in Lucas County. F. 357-360. These same calculations by Respondent's expert show the following shares of the GAC inpatient hospital services market for ProMedica's three competitors: Mercy, 29 to 35 percent; UTMC, 9 to 11 percent; and St. Luke's, 5 to 12 percent. F. 357-360. After the Joinder, using these same calculations, ProMedica's GAC market share is anywhere from 53 to 58 percent. F. 357-360.

Market shares themselves can be an important indicator of market power. *See Brown Shoe*, 370 U.S. at 322 n.38 ("Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power[.]"). As explained in *Rockford Memorial Hospital*:

> Market share is the fraction of that output that is controlled by a particular supplier or particular suppliers whose market power we wish to assess. The higher the aggregate market share of a small number of suppliers, the easier it is for them to increase price above the competitive level without losing so much business to other suppliers as to make the price increase unprofitable; this is the power we call market power.

*Rockford Mem'l Hosp.*, 898 F.2d at 1283.

In this case, Professor Town's examination of pre-Joinder hospital prices in Lucas County reveals a correlation between market shares and prices. F. 610. Professor Town found that ProMedica had the largest market shares and the highest reimbursement rates; Mercy, the next-largest system, had the second highest rates; UTMC, the third largest system, had the third highest prices; and St. Luke's, with the smallest market share, had the lowest prices in the market. F. 610. The increases in ProMedica's market shares, and the resulting increase in market concentration, create a strong presumption of enhanced market power as a result of the Joinder. (PX02148 at 035-036 (¶ 63) (Town Expert Report), *in camera*). In addition, as discussed below, the expectations of ProMedica's customers and the expectations of St. Luke's, as well as the economic analysis undertaken by Complaint Counsel's expert, support the conclusion that ProMedica wields sufficient market power to enable it to profitably increase rates (*i.e.*, prices).

b.      **Likely increase of St. Luke's rates to ProMedica's rates**

Professor Town examined differences in the case-mix adjusted hospital prices in Lucas County prior to the Joinder and determined that ProMedica's average price was {█} percent higher than St. Luke's.[21] F. 609. MCOs confirmed Professor Town's analysis of the relative price difference between ProMedica and St. Luke's by testifying that ProMedica's rates are the highest and St. Luke's rates are the lowest in Lucas County. F. 611. Respondent's own documents show that St. Luke's inpatient commercial insurance rates were about {█} percent below the market average. F. 535. Based on the evidence, as analyzed below, it is reasonable to expect that ProMedica will raise prices at St. Luke's to prices paid to ProMedica's other community hospitals in Lucas County, Flower and Bay Park.

MCOs expected ProMedica to raise prices at St. Luke's to prices paid at other ProMedica community hospitals. For example, Aetna expected ProMedica to raise the rates it

---

[21] Case-mix adjustment is a calculation that takes into account the resources needed to treat patients, with the theory being that patients with more complicated illnesses utilize more resources than those who are not as ill. The methodology is tied to the DRG reimbursements. Thus, the case mix adjustment number is a weighted factor used by MCOs to make an apples-to-apples comparison between various rates at each hospital. F. 608.

pays to St. Luke's to the level of rates it pays to ProMedica. F. 590. Aetna performed an analysis of the Joinder's impact on Aetna's rates to St. Luke's and projected a {██} percent increase in Aetna's rates to St. Luke's if these were to rise to the level of Aetna's rates to ProMedica. F. 591. {████████} also conducted an analysis of the change in reimbursements to St. Luke's that would result if {██████} rates to St. Luke's were increased to {████████} rates to ProMedica's Flower, Bay Park, and TTH, and predicted that {██████} rates to St. Luke's would "increase significantly," between roughly {██} and {██} percent. F. 586.

St. Luke's also anticipated that its reimbursement rates would be increased to the level of ProMedica's. F. 597-603. A presentation regarding potential affiliation partners, made to St. Luke's Board of Directors by Mr. Wakeman and other members of St. Luke's leadership team, states: "ProMedica had a significant leverage on negotiations with some of the [health plans]," and that this leverage would allow St. Luke's to obtain higher reimbursement rates. F. 598. A St. Luke's planning document, dated August 10, 2009, notes that an option for St. Luke's would be to "enter[] into an affiliation/partnership with a local health system with the express purpose to raise reimbursement rates to the level of our competitors." F. 597. Mr. Wakeman hoped that an affiliation with ProMedica would allow St. Luke's to obtain the higher reimbursement rates that ProMedica was receiving. F. 601. By joining ProMedica, St. Luke's anticipated as much as {████████} million in additional revenues from {██████████}, and Paramount. F. 603.

Because ProMedica's case-mix adjusted prices are {██} percent higher than St. Luke's rates as a volume-weighted average (F. 609), the likely increase of St. Luke's rates to ProMedica's rates alone is a significant rate increase in Lucas County. It must, however, be acknowledged that St. Luke's rates were below market. F. 535 (results of a 2009 study performed for St. Luke's by Navigant Consulting concluded that St. Luke's inpatient commercial insurance rates were about {██} percent below the market average); CCRRFF 1789-1791. St. Luke's, as of August 2009, recognized that it had "extremely low reimbursement rates from third party payors," and viewed itself as having two options in the short term: "(1) St. Luke's develops a compelling argument to increase contracted rates with its major managed care customers (MMO, Anthem, Aetna, etc.) as an independent. (2) St. Luke's enters into an affiliation/partnership with a local health system with the express purpose to raise

reimbursement rates to the level of our competitors." F. 389. *See also* Part II.L, *supra* (facts on St. Luke's financial condition as it considered whether to enter an affiliation with another partner). Indeed, Respondent's expert concluded "that a reasonable price increase at St. Luke's but-for the joinder would have been in the range of 15 to 36% over the period 2011 through 2012." RX71(A) at 00052. Thus, because St. Luke's likely would have increased rates regardless of the Joinder, a finding that the Joinder is likely to result in price increases at St. Luke's does not, alone, satisfy Complaint Counsel's burden of showing that the Joinder is likely to cause anticompetitive price increases in the relevant market. However, Complaint Counsel has also shown, through its expert, that the Joinder enables ProMedica to raise rates at not only St. Luke's, but throughout the ProMedica hospital system, as discussed below.

### c. Significant price increases predicted throughout the ProMedica system

As found in Part III.D.3., *supra*, ProMedica now has greater bargaining leverage in its negotiations with MCOs on rates for GAC inpatient hospital services. Complaint Counsel's expert, Professor Town, modeled the bargaining relationship between hospitals and MCOs in a GAC inpatient services market and used the "willingness to pay" model to measure the value that a hospital brings to a health plan's network, as perceived by the MCO's members. F. 612-613. The willingness to pay model is a tool to predict the effect of the elimination of competition on prices – that is, to isolate and quantify the Joinder's impact on the bargaining leverage of the merged hospitals. F. 613.

Professor Town's willingness to pay model predicts that the volume-weighted average (across ProMedica and St. Luke's) price will increase by 16.2 percent. F. 625. Allocating this increase between St. Luke's and ProMedica yielded predicted price increases of between 38.4 to 56.2 percent at St. Luke's and 10.8 percent at ProMedica's other hospitals.[22] F. 628.

Respondent and its expert criticize Professor Town's analysis. Although there may be flaws with Professor Town's model, none are so severe as to substantively undercut its predictive value. When Respondent's expert, Ms. Guerin-Calvert, added several variables to

---

[22] Professor Town recognized that ProMedica has claimed that St. Luke's was under-reimbursed by MCOs and, thus, also used a higher, pre-Joinder price for St. Luke's, to predict an increase in St. Luke's price between 33.2 and 48.6 percent. F. 629.

Professor Town's model, even those additions resulted in a projected price increase of 7.3 percent. F. 626. Complaint Counsel's expert's prediction of price increases is also consistent with the testimony of the MCOs who were unequivocal in testifying that ProMedica will be able to increase rates due to its newly enhanced bargaining leverage.

### d. Post-Joinder pricing

Respondent asserts that its post-Joinder contract negotiations with MCOs do not show anticompetitive price increases and, therefore, support a conclusion that the Joinder will not enable ProMedica to raise rates beyond competitive levels. For example, ProMedica negotiated a new contract on behalf of St. Luke's with United, to be effective January 1, 2011, which results in rate increases for St. Luke's totaling about {████████████████}; ProMedica negotiated a new contract with MMO for St. Luke's between November 2010 and January 2011, which resulted in a {██████████████████████████████}; and pursuant to the Hold Separate Agreement (F. 13), ProMedica has not sought to terminate St. Luke's contract with Anthem, or increase St. Luke's rates to Anthem to be comparable to the rates that ProMedica is presently getting from Anthem for any of its hospitals. F. 642-643, 646-647, 650.

The post-Joinder contracts were negotiated under the auspices of the Hold Separate Agreement between FTC staff and ProMedica that constrained ProMedica's leverage by allowing health plans to extend their current contracts at existing rates. Thus, the rates that ProMedica has negotiated for St. Luke's do not necessarily reflect the full and unrestrained market power that ProMedica ultimately will have and can exercise as a result of the Joinder.

Moreover, it is well-settled that post-acquisition evidence that is subject to manipulation by the merging parties is entitled to little weight. As the Supreme Court explained in *General Dynamics*:

> In *FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 598, this Court stated that postacquisition evidence tending to diminish the probability or impact of anticompetitive effects might be considered in a § 7 case. . . . But in *Consolidated Foods* . . . and in *United States v. Continental Can Co.* . . . , the probative value of such evidence was found to be extremely limited, and judgments against the Government were in each instance reversed in part

because "too much weight" had been given to postacquisition events. The need for such a limitation is obvious. If a demonstration that no anticompetitive effects had occurred at the time of trial or of judgment constituted a permissible defense to a § 7 divestiture suit, violators could stave off such actions merely by refraining from aggressive or anticompetitive behavior when such a suit was threatened or pending.

*General Dynamics*, 415 U.S. at 504-05. The probative value of post-acquisition evidence is deemed limited not just when evidence is actually subject to manipulation, but "whenever such evidence *could arguably* be subject to manipulation." *Chicago Bridge*, 534 F.3d at 435 (citing *Lektro-Vend Corp.*, 660 F.2d at 276 ("The post-acquisition evidence in this case is the type which *cannot arguably have been subject to the defendant's deliberate manipulation,* nor is it likely that the market was less competitive after the acquisition than it would have been otherwise."); *Hospital Corp.*, 807 F.2d at 1384 ("Post-acquisition evidence *that is subject to manipulation* by the party seeking to use it is entitled to little or no weight.") (emphasis added).

Applying the foregoing principles, the post-Joinder pricing evidence upon which Respondent relies is of the type that is subject to manipulation. It cannot credibly be disputed that any and all negotiations since the Joinder were under scrutiny. The negotiations took place during the FTC's investigation and challenge of the Joinder and under the restrictions of the Hold Separate Agreement between the FTC and ProMedica, which obligated ProMedica to give health plans the option to extend their existing rates with ProMedica throughout the duration of the Hold Separate Agreement. F. 13. As such, ProMedica could "stave off" the alleged violations charged in this case "by refraining from aggressive or anticompetitive behavior," *General Dynamics,* 415 U.S. at 505. Thus, in this case, evidence of Respondent's post-Joinder negotiations with MCOs is arguably subject to manipulation and, therefore, entitled to little, if any, weight. *See Chicago Bridge*, 534 F.3d at 434-35.

### e.        Effect in the relevant GAC inpatient hospital services market

Respondent argues that the complexity and breadth of negotiations between MCOs and hospitals prevents Respondent from exercising its increased market power in the relevant market. Respondent states: "But the negotiations between MCOs and hospital providers in Lucas County over the rates paid for inpatient hospital services do not occur in a vacuum – that is, in isolation from their negotiations for all other services the hospitals provide to an MCO's

insureds. Rather, MCOs and hospitals negotiate both reimbursement rates and other non-compensation terms and conditions to reach agreement for a single contract that covers all services the hospital offers (inpatient, outpatient, physician, and ancillary) for a variety of products marketed by the MCO." RB at 55. Accordingly, Respondent argues, "no presumption about the joinder's competitive effects can be drawn from the hospitals' [market] shares [in the relevant market], which represent a small component of the services about which MCOs and hospitals negotiate and for which they contract." RB at 56.

The evidence shows that hospital-MCO negotiations are complex and that each side tries to obtain the best rates it can. *See, e.g.*, 234-236, 509-516. In addition, hospitals typically strive for total reimbursement that exceeds the total cost of treatment of an MCO's insureds so that the hospital can subsidize the care it provides to Medicare and Medicaid patients – reimbursement for whom does not cover the hospital's costs – plus a margin for re-investment in the hospital's infrastructure. F. 292, 517-520.

Although there are various factors that affect negotiations between hospitals and MCOs and those negotiations encompass far more than GAC inpatient hospital services rates, these facts do not negate the simple fact that because ProMedica now has St. Luke's in its hospital system, and because MCOs need either ProMedica or St. Luke's in their networks, ProMedica now has market power to demand increased rates from MCOs for GAC inpatient hospital services. This market power did not exist prior to the Joinder.

Based on the evidence of increased market power, the importance to MCOs of having either St. Luke's or ProMedica in their networks, and the economic models that persuasively predict significant price increases, Complaint Counsel has demonstrated on the whole that it is likely that the Joinder enables ProMedica to exercise market power and increase prices. In addition, as analyzed below, Complaint Counsel has also demonstrated that consumers and employers would be directly impacted by any increase in rates charged by ProMedica to MCOs.

### 5. Higher prices impact consumers

The higher reimbursement rates that ProMedica can demand from MCOs will directly harm the employers and employees who use Lucas County hospitals. Self-insured employers, accounting for a large percentage of commercial business in Lucas County, directly pay the full cost of their employees' health-care claims to MCOs. F. 50, 654, 658. As ProMedica's CEO explained, if a Lucas County hospital or hospital system increases its rates to commercial MCOs, those increased costs are "passed on straightforward" to self-insured employers. F. 657. Thus, increases in hospital reimbursement rates impact self-insured employers directly.

Fully-insured employers pay a premium to an MCO and the MCO pays the costs of medical care received by employees. F. 47, 659. For fully-insured employers, when an MCO incurs a rate increase from a hospital, the MCO passes down the increased costs to employers in the form of higher premiums. F. 659. As one MCO representative made clear, "[w]ith the fully insured, I can't see any circumstance where we would not automatically pass [a rate increase] on through the premium increase." F. 659.

Health-care costs are a significant expense for businesses. F. 651. Inpatient hospital services account for approximately 20 to 25 percent of the total cost of health insurance premiums. F. 652-653. When employers face increased health-care costs, some employers might absorb the increase, but more typically, employers will be required to reduce their costs by restricting health benefits or by increasing the employees' share of the costs, through increased premium contribution, copays, deductibles, out-of-pocket maximums, or by otherwise revising compensation or benefits to reduce employer costs. F. 662. When costs for employee health insurance coverage increase for employers with union members, in order to offset the increased costs, employers may seek a collective bargaining agreement that will reduce service levels, increase the amount the union members must pay, reduce wages, or make other tradeoffs. F. 663.

### 6. Quality of care

Complaint Counsel contends that the Joinder will likely lead to higher prices and lower quality for consumers. CCB at 30. Complaint Counsel further argues that the Joinder will

174

harm non-price competition by eliminating a high-quality independent hospital. Complaint Counsel asserts that, because hospitals compete on non-price dimensions, such as quality, the elimination of St. Luke's, a high-quality competitor that challenged other hospitals to keep service levels up, will result in diminished incentives for ProMedica and the other Lucas County hospitals to provide better services and improve quality. CCB at 60.

Respondent counters that there is no evidence indicating that the Joinder will, in fact, cause St. Luke's quality to decrease from its pre-Joinder levels. RRB at 47. To the contrary, Respondent asserts, the Joinder of ProMedica and St. Luke's will allow both ProMedica and St. Luke's to improve quality in the future. RB at 101-104.

The evidence shows that hospitals compete to be in an MCO's network. F. 239-241, 757. Once in that network, they compete to attract patients, including on the basis of quality. F. 242, 245, 772-773. In addition, the evidence shows that competition between hospitals tends to result in a higher quality of care. F. 781. According to Professor Town, decreased competition among hospitals reduces incentives to compete on such non-price dimensions as quality. F. 780.

Evidence of likely reduced incentives to compete on quality, however, does not necessarily translate into proof that quality among Lucas County hospitals is likely to decrease as a result of the Joinder. As the Commission noted in *Evanston*: "[q]uality of medical care is not easily defined or measured." *Evanston*, 2007 FTC LEXIS 210, at *134. Further, "[t]he case law provides no clear answers regarding how, or whether, . . . claimed qualitative benefits ought to fit into a competitive effects analysis." *Evanston,* 2007 FTC LEXIS 210, at *225. The Commission, in *Evanston*, noted that the district court, in *Rockford Memorial Corp.*, was of the opinion that "weighing the claimed quality improvements against the merger's anticompetitive effects would require a 'value choice . . . beyond the ordinary limits of judicial competence.'" *Evanston,* 2007 FTC LEXIS 210, at *225 n.97 (quoting *Rockford Memorial Corp.*, 717 F. Supp. 1251, 1288 (N.D. Ill. 1989), *aff'd,* 898 F.2d 1278 (7th Cir. 1990)). The Commission further noted, "[o]ther courts have been more receptive to quality-of-care arguments, but those decisions shed little light on how qualitative benefits are to be weighed

175

against the competitive harm shown to result from a merger." *Evanston,* 2007 FTC LEXIS 210, at *225-26 (citing *Tenet Healthcare,* 186 F.3d at 1053-54).

Under Section 7 of the Clayton Act, Complaint Counsel must show a reasonable probability that the proposed transaction would substantially lessen competition in the future. *University Health,* 938 F.2d at 1218. Typically, the government does so by making a prima facie case showing that the acquisition would produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market. *Id.* Complaint Counsel has done so in this case. Complaint Counsel has also shown the likelihood of increased prices as a result of the Joinder. It is not necessary to also prove that the Joinder will likely harm the quality of hospital care. Accordingly, this decision need not, and does not, conclude whether the evidence demonstrates the likelihood of the anticompetitive effect of decreases in quality as well.[23]

Respondent in this case asserts that the Joinder allows ProMedica and St. Luke's to make quality improvements which, according to Respondent, constitute procompetitive benefits of the Joinder that outweigh any anticompetitive effects. RB at 99-102. The arguments and evidence on the issue of whether quality will increase are addressed in Part III.F., *infra,* which evaluates Respondent's asserted procompetitive benefits.

### 7. Asserted constraints upon ProMedica's exercise of market power

Respondent argues that the Joinder will not enable ProMedica to raise prices because various market forces and competitive conditions in the Toledo area will operate as competitive constraints, including: (1) excess inpatient hospital capacity and resulting repositioning by rivals, specifically Mercy's {▮▮▮▮▮▮▮▮▮▮}, RB at 75-80; RRB at 52-55; RRB at 59-62; *see also* RB at 79-80; and (2) the ability of MCOs, employers and physicians to "steer" patients to lower cost hospitals, RB at 80-81, 84-85; RRB at 56-59. As further explained below, Respondent's arguments are either legally or factually insufficient, and, therefore, do not outweigh Complaint Counsel's showing of likely anticompetitive effects.

---

[23] Although the Complaint also alleged that the Joinder was likely to result in decreased breadth of available services, Complaint Counsel did not submit proposed findings or provide briefing on the allegation. As Complaint Counsel has declined to pursue that claim, this Initial Decision contains no findings or conclusions on the issue.

a.       **Excess capacity and repositioning**

The evidence demonstrates that there is excess inpatient hospital bed capacity in Lucas County.  F. 664-672, 676.  Based upon the number of staffed beds per thousand area residents, which is a standard metric used in health-care, the Toledo metropolitan area, as compared to other similar metropolitan areas in the United States, has substantially more beds per thousand residents.  F. 668.  Toledo has 3.63 beds per thousand residents, while Grand Rapids, Michigan, an area similar to Toledo, has just over 2 beds per thousand residents, and Detroit has approximately 2.5 beds per thousand residents.  F. 669.  In addition, the number of registered beds greater than staffed beds is an indicator of excess capacity because it also shows the number of beds that are not being deployed to meet patient demand.  F. 670-671.  With the exception of Bay Park, the majority of Lucas County hospitals have numbers of staffed beds that are well under their numbers of registered beds.  F. 672.  Another metric of excess capacity for Toledo area hospitals is the occupancy rate, which divides the average daily census of a hospital by the number of staffed beds or registered beds.  F. 675.  Occupancy rates for hospital beds in Lucas County, based upon an average daily census of inpatient bed use, are significantly below available staffed bed capacity.  F. 676.  Toledo's stagnant population further indicates that community need for inpatient hospital beds will not increase in the near future.  F. 737-739.  The foregoing evidence confirms Mercy's belief that "from a community need standpoint, all of St. Luke's beds could be eliminated from the Toledo area and not be missed."  F. 667.  Not surprisingly, neither Mercy nor UTMC have any plans to build more inpatient facilities in Lucas County.  F. 485, 681, 750.

In addition, the evidence demonstrates that, due to Toledo's aging population, the number of Medicare patients will increase.  F. 737, 740.  At the same time, Toledo has a high unemployment rate and has experienced an exodus of employers, which translates into a decline in the number of commercially insured patients.  F. 739, 742-744.

The evidence shows that Mercy intends {███████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████}.  F. 747.  Mercy is
{█████████████████████████████████████████████████████████████████



▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆}. F. 751, 753. Mercy's {▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆}. F. 750.  In November 2009, Mercy had a tentative timeline

{▆▆▆▆▆▆▆▆} for accomplishing {▆▆▆▆▆▆▆▆▆▆▆▆}. F. 754.  However, currently,

{▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆}. F. 754.

Respondent claims that the excess capacity of inpatient beds, and concomitant increased competition for commercially insured patients, means that rival hospitals will be in a position to, and will have to, compete aggressively for patients through repositioning, and that this response will militate against ProMedica raising prices.  RB at 75.  Respondent points to Mercy's {▆▆▆▆▆▆▆▆▆▆▆} as evidence of such repositioning.  *Id.*  In support of its theory, Respondent cites the Horizontal Merger Guidelines.  The Merger Guidelines recognize that "[a] merger is unlikely to generate substantial unilateral price increases if non-merging parties offer very close substitutes for the products offered by the merging firms.  In some cases, non-merging firms may be able to reposition their products to offer close substitutes for the products offered by the merging firms."  Merger Guidelines § 6.1.  The Merger Guidelines further note that "[r]epositioning is evaluated much like entry, with consideration given to timeliness, likelihood, and sufficiency."  Merger Guidelines § 6.1.  Thus, Respondent must show that the purported repositioning will be timely, likely, and sufficient.  Merger Guidelines § 9.

Applying the foregoing principles, Respondent's "repositioning" theory fails.  Although the evidence discussed above shows that there is excess capacity and a declining supply of commercially insured patients in the Toledo area, Respondent's conclusion that the Joinder is, therefore, unlikely to lead to unilateral price increases is unpersuasive.  In addition, the evidence regarding Mercy's {▆▆▆▆▆▆▆▆▆▆▆} does not support a conclusion that Mercy's {▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆} (F. 747) is likely to replace the competition lost by the Joinder, or that any such replacement would be timely and sufficient.

### b.      Steering

"Steering" means providing incentives to patients or physicians to pursue health-care with specific providers.  F. 682.  "Hard" steerage means providing financial incentives to a member to go to a particular provider.  F. 682.  "Soft" steerage is providing information to members and physicians to try to change where care is provided.  F. 682.  Respondent contends that physicians, employers, and MCOs each have the ability to direct patients to less costly providers, and, thereby, constrain ProMedica from raising prices to anticompetitive levels. RRB at 56-59.

### i.      Physician referrals

The evidence shows that most physicians have admitting privileges at multiple hospitals in Lucas County.  F. 685.  One of the reasons physicians obtain privileges at multiple hospitals is to be able to serve patients whose MCOs may not have certain hospitals in their networks. F. 686-687.  Although having privileges at multiple hospitals allows a physician to direct a patient to an in-network hospital for treatment so that the patient may minimize out-of-pocket expenses, and physicians do attempt to accommodate a patient's insurance needs, physicians are not generally aware of, or sensitive to, the prices that hospitals charge for services.  F. 684, 690-693, 697.  Thus, the evidence does not support the conclusion that physicians can steer their patients to lower cost hospitals, and, thereby, help defeat attempted price increases by ProMedica.

### ii.      Employer programs

The evidence shows that UTMC and Mercy, like many hospital employers, provide a higher level of health-care coverage for their employees who obtain services at their own hospitals.  F. 722-723.  This is similar to an employee discount in other types of industries. F. 721.  The evidence also shows that the Lucas County government, a self-insured large employer, has a program through which it contributes a greater percentage to its employees' health-care costs if they choose to enroll with the preferred provider, Physicians Health Collaborative, instead of their two other options, Paramount or FrontPath.  F. 728-731.  These limited examples of employer steering are insufficient to support a conclusion that employer

steering in Lucas County could constrain ProMedica from imposing anticompetitive price increases.

### iii.    MCO steering

In-network steering occurs when MCOs charge different prices to members for accessing in-network hospitals, based on the price the MCO pays to the hospital for its members' inpatient care.  F. 683.  The evidence shows that MCOs are not likely to constrain anticompetitive price increases by ProMedica.  First, MCOs perceive that patients prefer open access and dislike steering that uses financial incentives (*i.e.*, "hard" steering).  F. 699.  Thus, except for an ongoing 100 person pilot program by Aetna, discussed below, MCOs in Lucas County do not employ hard steering methods.  F. 702-706, 715-717.

In January 2011, Aetna started a pilot hard-steering program for up to 100 Aetna employees in Toledo.  In the pilot program, hospitals are "tiered" into low-cost (*i.e.*, lower rates) "first tier" hospitals, which provide a more financially-advantageous benefit for members, and high-cost (*i.e.*, higher rates) "second tier" hospitals, which require members to pay a higher copay.  F. 708.  Aetna's lower-cost hospital tier includes St. Luke's, UTMC, Bay Park, St. Charles, and St. Anne.  F. 709.  There is insufficient data at this point for Aetna to conclude whether its steering program successfully steers members to lower-cost hospitals, although Aetna has received complaints about the program from members and hospitals. F. 710-713.  In addition, while some MCOs use pricing transparency programs to steer patients to lower-cost providers, the evidence does not demonstrate that such transparency programs are effective.  F. 701, 706-707.

Moreover, ProMedica has a policy of discouraging any strategies to steer patients away from ProMedica facilities through the use of financial incentives, and tries to get protections in its contracts preventing payors from using benefit differentials.  F. 718.  For example, ProMedica has anti-steering provisions in its contracts with {███████} and {██████} and also has negotiated a contract with {██████} for St. Luke's that includes an anti-steering provision. F. 719.  ProMedica expressed its dislike of steering programs when it complained to Aetna that TTH and Flower were not in the preferred "tier one" in Aetna's pilot program.  F. 714.

For all the foregoing reasons, the evidence does not support the conclusion that MCOs are likely to make use of steering programs or that such programs would be effective to counter the impact of likely price increases by ProMedica. Respondent, therefore, has not demonstrated that market participants can constrain ProMedica from raising rates. Respondent's defenses, that absent the Joinder, St. Luke's competitive significance would decrease, and that the Joinder has resulted in, and will continue to yield, procompetitive benefits are addressed next.

### E.    Weakened Competitor Justification

Respondent argues that evaluating the likely competitive effects of the Joinder requires consideration of what St. Luke's competitive strength would be absent the Joinder. According to Respondent, the evidence shows that, absent the Joinder with ProMedica, St. Luke's competitive significance would diminish. RB at 90. Specifically, Respondent argues that St. Luke's concluded that it would have to cut services in order to stay independent; that key financial metrics, such as its operating margins, credit rating, and pension funding obligations, among others, show a financially weakened company; that St. Luke's poor financial condition hampered its ability to make the capital investments needed to compete effectively in the future; and that St. Luke's was poorly positioned to react to a changing health-care environment. RB 90-96.

Complaint Counsel responds that Respondent has failed to make the evidentiary showing required for a defense based on weakened financial condition. According to Complaint Counsel, the evidence shows that prior to the Joinder, St. Luke's was gaining market share; that due to a successful strategic plan instituted in 2008, St. Luke's profitability as of the date of the Joinder had improved significantly over 2009; that Respondent did not have significant pension obligations or debt; and that Respondent had sufficient cash reserves to make necessary capital investments, including those necessary for health-care reform requirements. CCB at 89-102. Complaint Counsel further argues that St. Luke's had other alternatives to the Joinder with ProMedica, such as merging with UTMC or Mercy, or staying independent for "years to come." CCB at 102-103.

### 1.    Overview of applicable law

The Supreme Court has held that, in determining whether an acquisition is substantially likely to lessen competition, it is proper to consider the competitive weakness of the acquired company. *General Dynamics*, 415 U.S. at 503-04. As the Seventh Circuit explained in *United States v. International Harvester*, evaluating the weakness of the acquired company is an appropriate part of the competitive effects analysis because "only a further examination of the particular market - its structure, history and probable future - can provide the appropriate setting for judging the probable anticompetitive effect of the merger." *Int'l Harvester*, 564 F.2d at 773- 74 (quoting *Brown Shoe*, 370 U.S. at 322 n.38).

While the precise standard for establishing a "weakened competitor" defense is unclear, it is a fact-specific inquiry. In *Evanston,* the Commission held that "[t]he precise standard for evaluating a weakened company justification [was] not material" because the facts in that case regarding the pre-merger financial condition of the acquired hospital, Highland Park, including its operating income and losses, and available cash and assets in relation to the hospital's debt and anticipated capital expenditures evidence, did not substantiate Respondent's contention that Highland Park's pre-merger financial condition "prevented it from competing effectively," but instead showed Highland Park's financial condition to be "essentially sound." *Evanston*, 2007 FTC LEXIS 210, at *218.

Despite the lack of a clear standard for establishing a financial weakness defense, it is clear that the defense is strongly disfavored. As the court stated in *Kaiser Aluminum*, "[f]inancial weakness, while perhaps relevant in some cases, is probably the weakest ground of all for justifying a merger" and "certainly cannot be the primary justification" for permitting one. 652 F.2d at 1339, 1341; *accord University Health*, 938 F.2d at 1221; *Arch Coal*, 329 F. Supp. 2d at 154; *Evanston*, 2007 FTC LEXIS 210 at *216. "Moreover, a weak company defense would extend the failing company doctrine, a defense which the Supreme Court in *General Dynamics* observed has strict limits." *Kaiser Aluminum*, 652 F.2d at 1339; *accord FTC v. Warner Communs.*, 742 F.2d at 1164.

2.     **Summary of evidence and expert opinion**

The evidence shows that St. Luke's, and its parent, OhioCare, were consistently losing money on operations from at least 2007 through the date of the Joinder. St. Luke's lost {███} million in 2007, {███} million in 2008, {███} million in 2009, and {███} million during the first eight months of 2010. F. 784-786. These losses reflected negative operating margins of {███} percent in 2007, {███} percent in 2008, {███} percent in 2009, and {███} percent in the first eight months of 2010. F. 786; *see also* F. 785. St. Luke's operating performance was significantly below that of other Ohio hospitals, which averaged operating margins of 4.0 percent in 2007, 1.5 percent in 2008, and 5 percent in 2009. F. 787. Thus, St. Luke's had negative operating margins in the years leading up to the Joinder, while other Ohio hospitals were profitable. *See* F. 786-787. St. Luke's operating performance was also significantly below similarly sized hospitals and hospitals with comparable bond ratings. F. 788-789.

"Operating cash flow" takes operating income and adds back interest, depreciation, and amortization, similar to the accounting calculation "EBITDA," (earnings before interest, depreciation, taxes and amortization) and provides another measure of profitability. F. 796. St. Luke's experienced positive EBITDA margins in 2007 and 2008; a negative margin of {███} in 2009, but that increased to positive {███} percent as of August 31, 2010. F. 794. These margins fell significantly below the average EBITDA margins of Moody's comparably rated hospitals, which were 9.6 percent in 2007, 7.7 percent in 2008, and 8.1 percent in 2009. F. 795. St. Luke's also had a relatively low debt load, with St. Luke's owing less than $11 million in total bond debt as of August 31, 2010, of which {███} million was outstanding bond debt. F. 881, 916-918.

Based upon the EBITDA data set forth above, St. Luke's operating performance appears to have been improving as of the time of the Joinder. F. 794, 951. In addition, the data shows that St. Luke's losses had decreased and operating income improved as of the time of the Joinder. F. 952. St. Luke's operating cash flow margin from January 1, 2010 through August 31, 2010 was an improvement over St. Luke's operating cash flow margin for calendar year 2009. F. 953. As a result of achieving many of the "growth" goals targeted in St. Luke's

Three-Year Plan, F. 920, net patient revenues also improved between 2009 and the date of the Joinder. F. 924-927.

Based on the foregoing, it appears that St. Luke's financial performance, as of the date of the Joinder, was improved over its performance in 2008 and 2009. F. 949. However, the conclusion drawn by Complaint Counsel's expert witness, FTC accounting and financial analyst H. Gabriel Dagen, that at the time of the Joinder, St. Luke's was in the "midst of a successful financial turnaround," F. 968, exaggerates the state of St. Luke's finances prior to the Joinder. Mr. Dagen's opinion unduly focuses on the first eight months of 2010, in which St. Luke's experienced increased patient revenue and positive EBITDA, e.g., F. 794, 926-927, 968, despite St. Luke's previous history of consistent operating losses and financial under-performance, e.g., F. 786-789, 794-795. As Complaint Counsel's expert acknowledged, improving EBITDA does not necessarily indicate financial strength. F. 956. EBITDA does not consider capital expenditures, and may not always reflect pension expenses or investment gains or losses. F. 955.

It is important to consider capital expenditures as part of the measurement of a hospital's true cash flow, as hospitals are very capital intensive. F. 798. Hospitals must spend money on capital to maintain their equipment, to provide new systems, and to avoid decline. F. 798. In 2009, in order to conserve cash, St. Luke's began deferring capital expenditures, including routine and ongoing upgrades of facilities and replacement of equipment, such as the replacement of air handlers, regular hospital beds and birthing beds, surgical tables, a nurse call system, and a sleep lab system, which were estimated to cost a total of {███} million. F. 805-806. St. Luke's also needed significant additional capital investments, including conversion to "meaningful use" of electronic medical records ("EMR"), at a total cost of {████████} million depending on the availability of federal subsidies (F. 831-832) and not including various operational expenses associated with implementing and maintaining that system (F. 835), and conversion from semi-private to private rooms in the approximate amount of $1.8 million. F. 819. In the fall of 2010, St. Luke's departments identified {████} million of necessary capital projects for budgeting purposes, with {███} million for critical projects for 2011 alone. F. 809. St. Luke's desire to get access to capital was a recurring factor in St. Luke's evaluation of whether or not to affiliate, and with which one of its potential partners. F. 396-

397, 400, 402.  As part of the Joinder, ProMedica agreed to provide $30 million in capital contribution, for, among other things, converting semi-private rooms to private rooms, and updating St. Luke's information technology ("IT") systems.  F. 429-430, 980.

St. Luke's is required to make cash contributions to its defined benefit pension plan.  F. 841-842.  Under the  Employee Retirement Income Security Act ("ERISA"), as modified by the federal Pension Protection Act ("PPA"), if St. Luke's defined benefit pension plan is less than 100 percent funded, it is required to make payments, based on a formula, to bring the plan to 100 percent funding.  F. 848.  The state of St. Luke's defined benefit funding was one of the "pressing concerns" identified in the December 2009 Affiliation Update to St. Luke's Board.  F. 846.  In order to be certified as 80 percent funded as of January 1, 2010, St. Luke's had to accelerate contributions, and forfeit a credit balance, in the combined total of {███} million.  F. 853-854.  In order to reach the 80 percent funded level as of January 1, 2011, St. Luke's was required to make an accelerated contribution to its defined benefit pension plan of {██} million.  F. 855.  At the time of the Joinder, St. Luke's defined benefit pension plan was under-funded from both an accounting and funding perspective.  F. 856.  Depending on such variables as employee retirements and the performance of the market, St. Luke's may need to make annual contributions of at least {██} million until 2016 to meet minimum funding requirements.  F. 857.

St. Luke's unrestricted cash reserves are available for capital expenditures, strategic capital expenditures, or for unforeseen events that may arise outside of normal operations. F. 867.  St. Luke's unrestricted cash reserves declined by half from 2007 to the date of the Joinder, {███} million in 2007 to {███} million as of August 31, 2010.  F. 864.  Including the value of investments, as of August 31, 2010, St. Luke's had approximately $65 million in cash and investment balances.  F. 866.  St. Luke's available cash reserves declined from 2007 through 2010, as St. Luke's drew down its cash reserves to cover operational losses, as well as to make necessary capital expenditures.  F. 864-865.  It is undisputed, however, that as of August 31, 2010, St. Luke's had enough cash and investments on its financial statement to pay off all of its outstanding debt.  F. 919.

"Days cash on hand" is another measure of liquidity and stability. F. 868. As of the date of the Joinder, St. Luke's cash position translated into only 104 days cash on hand, *i.e.*, the number of days St. Luke's could last without additional revenue. F. 868-870. St. Luke's days cash on hand, as of the date of the Joinder, was about half the amount of days cash on hand held by hospitals of similar size to St. Luke's. F. 871. St. Luke's days cash on hand also had declined steadily from 2007 to the date of the Joinder. F. 870. To cut expenses, St. Luke's had imposed restrictions with respect to hiring and had frozen pay and pension benefits. F. 800-803.

Independent entities evaluated St. Luke's financial condition negatively prior to the Joinder. In February 2010, Moody's Investors Service, Inc. ("Moody's") downgraded St. Luke's bond rating from Baa1, to Baa2 (close to "junk bond" status), with a negative outlook, pointing to three consecutive years of large operating losses and an operating cash flow deficit, at a margin -2.0%; unfavorable commercial contracts and ongoing challenges with negotiating higher commercial reimbursements; an unsuitably aggressive investment allocation; a "very competitive market" with the larger systems of ProMedica and Mercy; and weak demographics in the primary service area, characterized by declining volume trends, high unemployment levels, and low median income levels. F. 875-884. St. Luke's bond insurer, Ambac Assurance Corp. ("AMBAC"), also downgraded St. Luke's credit rating, from an A- to a BBB+ rating, after completing a credit analysis of St. Luke's bonds in late 2008 and 2009, and viewed St. Luke's as having a "downward trend." F. 896-899. St. Luke's debt coverage ratio of approximately { ▉ } for 2009, a decrease from { ▉ } in 2008, resulted in St. Luke's being in material technical default of its bond covenants. F. 905-907. AMBAC found, based on its review of St. Luke's financial statements, that St. Luke's financial trends were negative and its performance was deteriorating. F. 910. Based upon a credit review of pre-2010 financial data, on April 27, 2010, AMBAC downgraded St. Luke's internal rating from BBB+ to BBB and gave St. Luke's a "negative outlook." F. 914.

The totality of the evidence supports the conclusions, as stated by Respondent's health-care financial expert witness, Mr. Bruce Den Uyl, that St. Luke's was struggling financially as a stand-alone entity during the years leading up to the Joinder and faced

significant financial obstacles to going forward as an independent hospital, including, among other challenges over the next few years, as much as {█} million in accelerated pension payments (F. 857), approximately {█████} million in capital expenditures (F. 806, 819, 831-832), an aging plant requiring future outlays (F. 811-814), declining cash reserves (F. 864-865), and perhaps most critical, below-cost reimbursement rates contributing to operating losses (F. 372-377). To be sure, continuing losses, depleting cash reserves, deferring capital expenditures, and employee cost cutting measures are not a sustainable path for a hospital. F. 812, 977-979.

However, notwithstanding the Moody's downgrade and negative outlook, it would have been possible for St. Luke's to borrow money to address its financial challenges, and, thereby, stay competitive in the future, although such borrowing may have proved to be difficult and would not necessarily be on the most favorable terms. F. 888-890, 892. A Moody's survey indicates that in 2009, approximately 100 out of 411, or 28%, not-for-profit freestanding hospitals and single-state health-care systems had a bond rating between Baa1 and Baa3. F. 878. Data collected by Complaint Counsel's bond-rating expert, Errol Brick, shows that "Baa" rated hospitals and health-care systems issued $2.6 billion in debt from January 2010 through January 2011 (ranging from $25 million to $527 million per hospital). F. 887. In addition, data collected by Mr. Brick pertaining to ten bond issues by Baa rated hospitals since August 31, 2010 shows the actual interest rates paid by these hospitals. F. 887. The data supports Mr. Brick's conclusion that, in August 2010, St. Luke's would have been able to access the tax-exempt capital markets for up to $75 million in debt for a reasonable interest rate of no more than 7 percent. F. 888.

Although St. Luke's was struggling and facing significant challenges, St. Luke's cash reserves of up to $65 million as of August 31, 2010 could be sufficient to pay off all of St. Luke's obligations, including debt and pension obligations, and meet its capital investment needs, even without additional borrowing, as concluded by Complaint Counsel's expert, F. 806-807, 819, 838-839, 857, 919, 966-967, 993, particularly if St. Luke's operating cash flow and decreased losses continued to improve and, thereby, slow the previous rate of cash depletion. F. 377-379, 952-953. The evidence does not,

however, clearly answer the question of whether or not, given the totality of St. Luke's financial circumstances, it would be appropriate for St. Luke's to spend down its cash reserves in this manner. *See, e.g.*, F. 862-863 (trustee-restricted funds are dedicated to bond and insurance payments), F. 870 (St. Luke's days cash on hand as of August 31, 2010 was 104 days).

Moreover, the evidence demonstrates that St. Luke's experienced increased patient volume. F. 924-927. Although St. Luke's overall payor ratio was insufficient to cover its total costs, F. 371-377, 413, increased patient volume appears to have played a role in St. Luke's decreasing losses and improved operating cash flow in 2010 and, thus, as concluded by Mr. Dagen, such increased volume can drive St. Luke's to profitability in the future. F. 962-965. Mr. Dagen's opinion that patient volume can drive profitability appears consistent with Mr. Wakeman's statements to the St. Luke's Board in September 2010 that St. Luke's "high activity" produced a positive operating margin in August 2010, thereby confirming that "we can run in the black if activity stays high. After much work, we have built our volume up to a point where we can produce an operating margin and keep our variable expenses under control." F. 948.

Based on St. Luke's improving cash flow and cash reserves, Mr. Dagen concluded that "absent the joinder, St. Luke's would have remained financially viable into the foreseeable future." F. 967. This open-ended prediction of the "foreseeable future" is vague and overreaches, looking at the evidentiary record as a whole. In comparison, Mr. Wakeman estimated that, under the conditions current in December 2009, St. Luke's would be able to survive between three and five years, and that if St. Luke's was able to get rate increases under contracts with two of St. Luke's largest commercial payers, St. Luke's could survive four to seven years. F. 959. Mr. Den Uyl was not asked to, and did not, analyze or provide an expert opinion on how long St. Luke's could have survived as a stand-alone hospital had it not been acquired by ProMedica. F. 972.

In summary, the evidence demonstrates that St. Luke's had been struggling financially prior to the Joinder and faced significant financial challenges going forward.

The evidence further shows that St. Luke's losses had declined and operating cash flow had improved by the time of the Joinder and that St. Luke's cash reserves, along with potential future borrowing, would be available to meet St. Luke's challenges going forward. However, the evidence does not support a conclusion that, absent the Joinder, St. Luke's would be a viable hospital for the foreseeable future; rather, the evidence demonstrates that, while St. Luke's was not in imminent danger of failure, absent the Joinder, St. Luke's future viability beyond the next several years is uncertain.[24]

### 3.    Analysis

In support of its weakened competitor defense, Respondent relies chiefly upon *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004). In *Arch Coal*, the court refused to enjoin the acquisition by Arch Coal of Triton, both mine owners and operators. Among other reasons, the court held that Triton was a "relatively weak competitor" in the relevant market "with no convincing prospects for improvement." 329 F. Supp. 2d at 157. The court relied on the facts that Triton "has high costs, has low [coal] reserves, has at best uncertain prospects for loans or new [coal] reserves, is in a weakened financial condition, and has no realistic prospects for other buyers." *Id*. Based on the foregoing, the court concluded that the FTC's "claims of Triton's past and future competitive significance in the [relevant] market [have] been far overstated." *Id*.

Unlike *Arch Coal*, the evidence in this case shows that prior to the Joinder, St. Luke's succeeded in significantly raising its patient volume and market share, F. 924-932, and by these measures was a strong competitor. Also in contrast to the facts in *Arch Coal*, St. Luke's has prospects for improvement, based upon 2010 positive EBITDA and decreased losses, strong volume, cash reserves, and the potential for new borrowing, as discussed above. In addition, unlike *Arch Coal*, the evidence in this case shows that St. Luke's had merger options other than ProMedica. F. 395-399, 405, 418-420. In this regard, it should be noted, however, that if St. Luke's were to have merged with Mercy, as Complaint Counsel suggests was an option, such a merger would also likely have been subject to antitrust scrutiny. According to Respondent's

---

[24] While in August 2009, St. Luke's considered service cuts in lieu of pursuing affiliation with other hospitals, *see* F. 393, the evidence does not warrant the conclusion that St. Luke's was likely to undertake service cuts absent the Joinder. Potential service cuts were not considered a serious option for an independent St. Luke's, and the idea was rejected by the Board. F. 401.

calculations, using Complaint Counsel's market shares for GAC inpatient services, a Mercy-St. Luke's merger would result in a post-merger HHI of 3975 and a UTMC-St. Luke's merger would result in a post-merger HHI of 3614. Both alternative mergers would result in highly concentrated markets as measured by HHI. RRB at 17 n.10 (citing Merger Guidelines, § 5.3 (HHI above 2500 considered highly concentrated)).

Respondent correctly notes that, as in *Arch Coal*, St. Luke's "consistently lost money," and that a "company with a positive EBITDA but a negative net income is not sustainable for the long term." 327 F. Supp. 2d at 155. However, unlike the transaction in *Arch Coal*, where the acquired company was at risk of exiting the market, St. Luke's was still competing in the market and, thus, the Joinder reduced the number of competitors. Moreover, unlike *Arch Coal*, St. Luke's competitive viability is not dependent on a finite, and depleted, natural resource such as coal reserves. In addition, the statistical and HHI evidence in this case is much stronger than that in *Arch Coal*, where the transaction "just barely" raised competitive concerns. 329 F. Supp. 2d at 128-30, 155-56.

On balance, therefore, *Arch Coal* is insufficiently analogous to provide precedent to allow the Joinder in this case on the basis of St. Luke's being a "weakened competitor." Accordingly, Respondent's weakened competitor justification is rejected.

### 4.    Conclusion

St. Luke's clearly was struggling financially prior to the Joinder and faced significant financial challenges to remaining independent in the future. There were signs of some improvement in operating performance by the time of the Joinder, as well as relatively low debt, cash reserves, and potential borrowing to help St. Luke's move forward; however, absent significant and sustained improvements in St. Luke's financial condition, its viability as an independent hospital, beyond the next few years, is by no means clear. Nevertheless, current case law, applied to the facts of this case, does not provide support for allowing the Joinder to proceed on the basis of St. Luke's weakened financial condition. This conclusion is especially mindful of the admonition from the courts that financial weakness "cannot be the primary

justification" for permitting a merger. *Kaiser*, 652 F.2d at 1339, 1341; *University Health*, 938 F.2d at 1221.[25]

### F.    Asserted Procompetitive Benefits and Efficiencies

The procompetitive benefits and efficiencies asserted by Respondent fail to outweigh the likely anticompetitive effects of the Joinder. Respondent urges that, as a result of the Joinder, St. Luke's is a stronger competitor than it would have been without the Joinder. RB at 98. Respondent, thus, asserts that the Joinder has resulted in procompetitive benefits because it has improved St. Luke's financial condition and will continue to do so. RB at 98-101. In addition, Respondent asserts that the Joinder results in other benefits and efficiencies. RB at 101-106.

"[E]vidence that a proposed acquisition would create significant efficiencies benefiting consumers is useful in evaluating the ultimate issue -- the acquisition's overall effect on competition." *University Health*, 938 F.2d at 1222. Courts and the Commission in merger cases typically "consider efficiencies, including quality improvements, after the government has shown that the transaction is likely to reduce competition." *Evanston*, 2007 FTC LEXIS 210, at *191 (citing *Heinz*, 246 F.3d at 715, 720). "A defendant who seeks to overcome a presumption that a proposed acquisition would substantially lessen competition must demonstrate that the intended acquisition would result in significant economies and that these economies ultimately would benefit competition and, hence, consumers." *University Health*, 938 F.2d at 1223. Respondent "has the burden of production to show that efficiencies offset

---

[25] It should be noted that St. Luke's financial condition prior to the Joinder was considerably weaker than the hospital that the Commission deemed "essentially sound" in *Evanston*, 2007 FTC LEXIS 210, at *218. Highland Park had "historically achieved strong financial results compared to the median of not-for-profit hospitals," *id.* at *218-19, while, as discussed above, St. Luke's was consistently losing money and its financial results were below other hospitals. Highland Park's cash and unrestricted investments totaled approximately $218 million, while St. Luke's were only $65 million. F. 866. Highland Park had 444 days cash on hand, which was 2.4 times the national average for "A" rated hospitals, while St. Luke's had 104 days cash on hand as of the date of the Joinder, which constituted half the amount held by Moody's Aa-rated hospitals, and half the amount held by hospitals of comparable size to St. Luke's. F. 870-871. In addition, Highland Park's management believed that Highland Park would "remain financially strong over the foreseeable future," *id.* at *219-20, while St. Luke's management believed that St. Luke's had only two options – raise reimbursement rates or affiliate with a hospital system. F. 389. Highland Park had a long-range capital budget that included over $100 million for various strategic initiatives and capital investments, *id.* at *220, while St. Luke's was deferring capital projects. F. 805, 807. The evidence in *Evanston* also showed, unlike the instant case, that Highland Park had wealthy benefactors to help fund its capital projects. *Id.* at *220.

any likely anticompetitive effects of the increase in market power produced by the merger." *Evanston*, 2007 FTC LEXIS 210, at *191 (citing *Heinz*, 246 F.3d at 715, 720; *Staples, Inc.*, 970 F. Supp. at 1088-89).

"Efficiencies are cost savings generated by the increased economies of scale which result from mergers." *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 61 (D.D.C. 1998). As stated in the Merger Guidelines, "[c]ognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service. Cognizable efficiencies are assessed net of costs produced by the merger or incurred in achieving those efficiencies." Merger Guidelines § 10. As the Commission explained in *Evanston*, the claimed efficiencies must be:

> (1) verifiable; (2) merger-specific, *i.e.*, ones that could not practicably be achieved without the proposed merger; and (3) greater than the transaction's substantial anticompetitive effects. *See Merger Guidelines* § 4; *see also Heinz*, 246 F.3d at 721-22 (finding that, among other things, asserted efficiencies must be "merger-specific").

*Evanston*, 2007 FTC LEXIS 210, at *226-27.

Furthermore, "'a rigorous analysis' is required to ensure that [Respondent's] claims of offsetting procompetitive benefits 'represent more than mere speculation.'" *Evanston*, 2007 FTC LEXIS 210, at *234 (citing *Heinz*, 246 F.3d at 721). "[S]peculative, self-serving assertions" will not suffice. *University Health*, 938 F.2d at 1223; *Staples*, 970 F. Supp. at 1089-90 (rejecting claimed efficiencies that were "unverified" and not supported by "credible evidence").

Cases with high market concentration levels "require, in rebuttal, proof of extraordinary efficiencies." *Heinz*, 246 F.3d at 720 (citing *University Health*, 938 F.2d at 1223; Merger Guidelines § 4 (stating that "efficiencies almost never justify a merger to monopoly or near-monopoly"). In the instant case, Respondent's expert concedes that the pre-HHI meets the Merger Guidelines' presumption of a highly concentrated market and that the post-HHI would be around 4000. F. 369. With these high concentration levels, Respondent must show "extraordinary" efficiencies. *See Heinz*, 246 F.3d at 720.

192

As analyzed below, the evidence shows that as a result of the Joinder, St. Luke's is a stronger hospital. A St. Luke's that is financially well-off is more beneficial to the community than a hospital that is struggling financially. However, based upon applicable legal principles, it cannot be concluded that the benefits and efficiencies generated from the Joinder represent "significant economies" that ultimately would benefit competition and, hence, consumers, or that the benefits and efficiencies asserted are greater than the likely anticompetitive effects of the increase in market power produced by the Joinder, where St Luke's is no longer a competitor to ProMedica.

### 1. Benefits to St. Luke's

Respondent asserts that the Joinder has improved St. Luke's competitive position, stabilized St. Luke's finances, and enhanced St. Luke's ability to compete in Lucas County. RB at 98-99. This argument, and the evidence offered in support thereof, is addressed below.

### a. Capital contribution to St. Luke's

The Joinder Agreement obligates ProMedica to contribute $10 million in each of the years 2011 through 2013 to fund capital projects at St. Luke's. F. 980-982. The capital commitment from ProMedica is to be used for capital projects at St. Luke's including private room expansion, facility upgrades, and IT upgrades relating to St. Luke's "meaningful use" compliance.[26] F. 989, 994. With respect to private rooms, St. Luke's has budgeted $3 million of the capital it received from ProMedica to create 17 new private rooms. F. 990-991. Prior to the Joinder, St. Luke's projected the cost of its private room conversions to be $1.8 million. F. 992. With respect to IT upgrades, ProMedica believes that St. Luke's has allocated a portion of its initial $10 million investment from ProMedica to implement a new EMR system and meet "meaningful use" requirements. F. 994. However, it is not clear that St. Luke's could not have implemented these measures but for the Joinder. St. Luke's had $65 million in cash and investments as of August 31, 2010, while its estimate for the cost of a private room conversion project was $1.8 million and for EMR implementation was $14 million. F. 992-993. Prior to

---

[26] The HITECH Act, passed in 2009, provides hospitals with increased Medicare reimbursement rates if they implement and upgrade their emergency medical records ("EMR") systems and achieve statutory "meaningful use" requirements by certain deadlines. F. 822.

the Joinder, St. Luke's had intended to begin implementing EMR in 2010 and had budgeted {■} million for it in 2010, but stopped the process because of the Joinder.  F. 838-840, 997. Further, St. Luke's Computer Information Systems Director, was "[u]nsure" whether ProMedica could implement EMR at St. Luke's in time to take advantage of all financial incentives under the federal American Recovery and Reinvestment Act of 2009 ("ARRA"). F. 995.  Thus, Respondent has not demonstrated that the capital contribution to St. Luke's allows St. Luke's to make improvements that St. Luke's could not have made but for the Joinder.

### b.    Access to Paramount

As part of the Joinder Agreement, St. Luke's became an in-network provider with Paramount.  F. 1021.  This has lead to greater patient volume and has increased St. Luke's revenues.  Paramount patients have a positive effect on St. Luke's bottom line because {■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■}.  F. 1021-1022. Thus, Respondent argues, the additional Paramount revenues will help St. Luke's remain viable and improve St. Luke's services and facilities.  RB at 100.

Prior to the Joinder, St. Luke's, and Mr. Wakeman personally, made serious attempts to have St. Luke's rejoin Paramount's network, but those attempts were unsuccessful.  F. 1018. Paramount, as it stated to UTMC, would not add St. Luke's to its provider network because "[t]here is no benefit to ProMedica for inclusion of an additional hospital in all of Paramount's product lines."  F. 1019.  Indeed, ProMedica believed that St. Luke's admission into Paramount would have hurt patient volume at ProMedica's Lucas County hospitals.  F. 1020.  This claimed efficiency could have been accomplished without the Joinder if Paramount, which is owned by Respondent, had chosen to contract with St. Luke's.  (Dagen, Tr. 3289-3290, *in camera*; PX02147 at 080-081 (¶ 158) (Dagen Expert Report)).  As a result, any financial benefits that St. Luke's enjoyed from being permitted to join the Paramount provider network are not merger-specific.  (*See* Dagen, Tr. 3289-3290, *in camera*; PX02147 at 080-081 (¶ 158) (Dagen Expert Report)).

### c.      Access to ProMedica's Obligated Group

The evidence shows that as a result of the Joinder, St. Luke's became part of ProMedica's Obligated Group, which is the group that guarantees ProMedica's public debt. F. 1000, 1007.  As a result, Moody's increased its rating of St. Luke's outstanding bonds. F. 1009.  The Joinder also resulted in curing St. Luke's bond default with AMBAC, because of the greater the credit security provided by ProMedica.  F. 1004-1006.  Accordingly, the Joinder was beneficial to St. Luke's credit rating, thereby improving its ability to access capital through borrowing.

### d.      Responsibility for underfunded defined benefit pension plan

At the close of the Joinder, St. Luke's defined benefit pension plan was under-funded from both an accounting and funding perspective.  F. 856.  Respondent notes that "ProMedica plans to allocate capital to St. Luke's pension plan to keep it {███████}."  RB at 100; *see* F. 1011.  Notably, ProMedica did not keep its own pension plan 100% funded during the economic downturn – it was underfunded in 2008 by {███} million and in 2009 by {███} million, compared to underfunding at St. Luke's of {███} million and {███} million in the same years.  F. 1012-1013.  Respondent's claimed "plans" to fund St. Luke's pension plan, even if implemented, do not outweigh the Joinder's likely substantial anticompetitive effects.

### e.      Lowering of expenses

Respondent asserts that the Joinder has already allowed St. Luke's to reduce St. Luke's expenses and that ProMedica and St. Luke's expect the Joinder to generate significant additional future savings and efficiencies.  RB at 101.  Respondent notes that following the Joinder, St. Luke's saved about a half million dollars in professional liability insurance by becoming part of ProMedica's captive insurance company.  F. 1015.  In addition to reduced insurance premiums, joining ProMedica's captive insurance plan and spreading risk has had the effect of freeing up $8 million on St. Luke's balance sheet.  F. 1016.  These claimed savings are

similar to those rejected in *Arch Coal* and are similarly rejected here because the majority of these savings are not merger-specific. *Arch Coal*, 329 F. Supp. 2d at 152.[27]

Respondent asserts, in addition, that St. Luke's has been able to reduce expenses through the consolidation of non-clinical backroom services such as billing services, legal services, physician practice management, and IT support. RB at 101. However, Respondent does not identify by how much St. Luke's has been able to reduce expenses, nor does Respondent identify whether any costs were required to achieve the consolidation, and, thus, whether there are any net savings to St. Luke's. In addition, Respondent identifies no evidence that any such costs savings could be achieved only by St. Luke's joining ProMedica. In fact, Respondent admitted that "*any* St. Luke's affiliation with *any* potential partner, including UTMC, may have led to certain efficiencies[.]" (Response to RFA at ¶ 12 (emphasis added)). Thus, these savings are not merger-specific and Respondent has not met its burden on these claims.

### 2. Costs and quality

Respondent asserts that the addition of St. Luke's will allow ProMedica to consolidate clinical services to optimize ProMedica's and St. Luke's services and facilities to best meet community needs, as well as produce other efficiencies, and that the Joinder will provide other benefits. RB at 101-106. These arguments, and the evidence offered in support thereof, are addressed below.

#### a. Consolidation of clinical services

Respondent asserts that the Joinder gives ProMedica the opportunity to assess community needs and optimize the delivery of care based on its network of hospitals and facilities located across the Toledo area. Respondent states that, to aid in its integration efforts, ProMedica retained Navigant Consulting ("Navigant") in mid-2010 to conduct a clinical

---

[27] In *Arch Coal*, Arch claimed that it received quotes for insurance to cover Triton's property, including the risk of business interruption, at no additional cost to it, and, thus, that savings would be achieved. *Arch Coal*, 329 F. Supp. 2d at 152. The court found that only a fraction of those savings were merger-specific because Triton could have been able to realize over 80% of those savings on its own and another potential purchaser of Triton might have been able to achieve those same savings. *Id.*

integration study and recommend how best to distribute services across the ProMedica system following the Joinder with St. Luke's. F. 1026-1027. Most of Respondent's claims that the Joinder enables it to optimize the delivery of care are based on the recommendations of Navigant. At the outset, it should be noted that ProMedica has been prohibited by the Hold Separate Agreement from consolidating services provided at St. Luke's, with one exception relating to inpatient rehabilitation, discussed below. F. 12-13, 1058. Thus, Navigant's "recommendations," (Part II.O.6.) are only recommendations and ProMedica is under no obligation to follow them.

Moreover, while the Navigant study reported that officials from St. Luke's and ProMedica estimated that the clinical integration strategy would result in operational efficiencies that would total {███} million annually, this amount of savings is for the entire clinical integration. F. 1074. Many of the clinical integration projects and recommendations do not involve St. Luke's. F. 1075. Navigant did no independent analysis to determine the reasonableness of the estimated efficiencies of {███} million annually, but instead "had some discussions with [ProMedica] in terms of what some of their assumptions were." F. 1076. Additionally, the cost of the clinical integration, over three years, is estimated to be {███} million. F. 1076.

In support of its position that the Joinder allows ProMedica to optimize its services and facilities, Respondent points to the following examples: (1) shift of inpatient rehabilitation services from St. Luke's to Flower; (2) clinical integration of {█████████}; (3) expansion and improvement of OB services; (4) potential to reconfigure services at ProMedica; (5) access for St. Luke's to ProMedica's quality program aimed at increasing patient safety; and (6) access for St. Luke's to ProMedica's quality-related technologies. RB at 101-104. These examples are discussed below.

### (i) Shift of inpatient rehabilitation services

On October 15, 2010, the FTC granted ProMedica's request for a modification to the Hold Separate Agreement to allow ProMedica to move inpatient rehabilitation beds from St. Luke's to Flower Hospital to create additional medical/surgical rooms at St. Luke's. F. 1058. ProMedica's shift of inpatient rehabilitation services from St. Luke's to Flower increases

197

utilization of Flower's existing inpatient rehabilitation services capacity.  F. 1060.  This move increased St. Luke's capacity and virtually eliminated the need to temporarily close St. Luke's emergency room to new patients.  F. 1061.  In addition, it allowed St. Luke's to convert its former inpatient rehabilitation spaces into private rooms.  F. 1062.  However, as a result of this consolidation, patients who previously chose to go to St. Luke's inpatient rehabilitation center no longer have that option and, instead, must now go to the more expensive Flower Hospital. F. 1063, 1065.  ProMedica's claimed savings from the inpatient rehabilitation consolidation, while originally claimed to be {███} million, is now estimated to be only {██████}.  F. 1066-1067.  Thus, the evidence does not demonstrate that the elimination of services at one hospital, and the transfer of those services to another hospital results in "significant economies" (*University Health*, 938 F.2d  at 1223) that benefit consumers.

### (ii)    Clinical integration of {████████████████}

Respondent points to {██████████████} as an example of beneficial clinical integration.  RB at 102.  Prior to the Joinder, St. Luke's did not have a sufficient number of {████████████████} to maintain quality thresholds or break even, financially.  F. 1044-1045.  Respondent states that it {████████████████████████

████████████████████████████████████

████████████████}.  RB at 102-103.  If St. Luke's {██████████████████

████████████████████████████████}.  F. 1045-1046.  Given that ProMedica's reimbursement for services is on average higher than St. Luke's, a price increase resulting from this consolidation may exceed any actual cost savings generated by it. F. 1047-1048.  And, as with the shift of rehabilitation services, the evidence does not support the conclusion that the elimination of services from one hospital to transfer them to another hospital results in "significant economies" (*University Health*, 938 F.2d  at 1223) that benefit consumers.

### (iii)    Expansion and improvement of {█████████} at St. Luke's

Another example of beneficial clinical integration that the Joinder may facilitate, according to Respondent, relates to {█████████}.  RB at 103.  Navigant recommended that ProMedica {███████████████████████████████████████ ███████████████████████████████████}.  F. 1053-1054.  If implemented, this would benefit the {██████████████████████████████████████ ██████████████████████████████████}.  Accordingly, it is an efficiency that would be generated from the Joinder.

### (iv)    Potential to reconfigure services at ProMedica

Respondent states that ProMedica could not achieve the integration benefits outlined in Navigant's plan without the Joinder because it needs St. Luke's to achieve a critical mass of patients in some service lines, and it needs St. Luke's facility as a location at which it can reposition services to achieve an optimal distribution of services across the market.  RB at 103. Complaint Counsel counters, "[p]ut differently, rather than compete with St. Luke's for additional patients – by improving quality and service and lowering prices – ProMedica prefers to enhance its market share and dominant position through the Acquisition and then transfer services around its system to achieve some nebulous 'optimal distribution.'"  CCRB at 47. Citing as support only to its own response to a Civil Investigative Demand, Respondent asserts that "St. Luke's could not have achieved integration benefits without the joinder because it would not have had another entity with which to integrate or transfer underutilized services." RB at 103.  Complaint Counsel argues that an affiliation with UTMC or Mercy could have brought similar results.  CCRB at 48.  Regardless of whether ProMedica could have achieved the integration benefits without St. Luke's or whether St. Luke's could have obtained the benefits by affiliating with UTMC or Mercy, the claimed efficiencies are not greater than the transaction's substantial likely anticompetitive effects.

### (v)    Access for St. Luke's to ProMedica's quality program

Respondent also asserts that the Joinder gives St. Luke's access to ProMedica's comprehensive quality program and technologies aimed at increasing patient safety.  RB at

104. ProMedica has quality councils for each of its hospitals, for Paramount Health Care, and for ProMedica Physician Group, as well as four service line quality councils for cancer, orthopedics, heart and vascular, and critical care. F. 1077-1078. ProMedica's corporate quality department provides report cards based on valid quality metrics to each hospital, enabling ProMedica to monitor and track the quality performance of each of its hospitals. F. 1079. Following the Joinder, ProMedica began the process of bringing St. Luke's into its system-wide quality programs. F. 1081.

The evidence indicates, however, that, based on some measurements, St. Luke's quality was superior to ProMedica's. Some of ProMedica's best practices are outdated and not on-par with the practices at St. Luke's. F. 1083. By some measurements, St. Luke's achievements in clinical quality exceed those of TTH and Flower. F. 767. ProMedica's own executives remarked that ProMedica has not kept pace and needed to catch up; and ProMedica's Chief Medical Officer noted that "very few people . . . can fully explain the [ProMedica Health System] approach to quality much less feel compelled to follow it." F. 770-771.

Moreover, there are varying degrees of reliability for quality metrics; quality measures can be too "nebulous" to be meaningful. F. 777-778; *see also Evanston*, 2007 FTC LEXIS 210, at *134 ("quality of medical care is not easily defined or measured"). Although the Joinder gives St. Luke's access to ProMedica's quality program, this does not constitute verifiable evidence that any improvement from such program is of sufficient magnitude to offset the competitive harm that is likely to result from the Joinder.

### (vi) Access for St. Luke's to ProMedica's quality-related technologies

Respondent claims, in addition, that the Joinder gives St. Luke's access to ProMedica's quality-related technologies, such as electronic Intensive Care Units ("eICU") and smart pumps. RB at 104. Respondent asserts that "St. Luke's has access to those technologies only because of the joinder." RB at 104.

The eICU is a computerized telemonitoring system that allows hospitals to monitor its ICU beds across the system from a central control tower. F. 1086. Smart pumps are

200

computerized infusion pumps that allow hospital staff to set safe limits for drug doses and alert the staff if the dosing exceeds those limits. F. 1092. St. Luke's did not have the eICU or smart pumps before the Joinder. F. 1089, 1095. However, St. Luke's had been planning to acquire smart pumps before the Joinder, had already obtained quoted prices, and was determining how to integrate the smart pumps into their electronic medical records system. F. 1096. And, while as a result of the Joinder St. Luke's was able to join with other ProMedica system hospitals to lease infusion pumps at a favorable lease rate, St. Luke's may have been able to obtain discounts by purchasing smart pumps through a purchasing organization like Voluntary Hospitals of America. F. 1097-1098. Furthermore, after the Joinder, St. Luke's is still required to pay for all of the equipment and system upgrades, such as eICU, itself. F. 1091. Thus, the evidence does not demonstrate that St. Luke's has access to those technologies only because of the Joinder.

### b. Additional claimed efficiencies

Respondent asserts that ProMedica and St. Luke's began exploring efficiency opportunities in early 2010 in order to develop ideas and quantify possibilities. RB at 105. In this regard, ProMedica created teams of individuals from ProMedica and St. Luke's to identify potential efficiencies opportunities and hired Compass Lexecon to identify efficiencies from cost savings, backroom functions, and combining separate programs. F. 1099-1100, 1106-1107. Compass Lexecon issued a report on May 6, 2010, titled "Efficiencies Analysis of the Proposed Joinder of ProMedica Health System and OhioCare Health System." (Compass Lexecon Report). F. 1101. However, some of Respondent's key personnel had little or no involvement in developing many of the claimed efficiencies, and, in some instances, St. Luke's executives actually disputed claimed efficiencies. F. 1113-1116. One document indicates that the size of the purported efficiencies and time period in which to achieve them was deliberately revised to meet the FTC's anticipated reaction to the Joinder. F. 1117.

Based on the Compass Lexecon Report, in the spring of 2010, ProMedica estimated that the Joinder could achieve approximately {          } in annual savings, approximately {          } in capital avoidance savings, and related operating cost savings of {          }. F. 1109. Following the Joinder, ProMedica and St. Luke's established a steering

committee to oversee approximately 20 integration teams to further develop the efficiencies opportunities that Compass Lexecon identified, and to identify new opportunities. F. 1106. Since first estimating efficiencies in the spring of 2010, ProMedica's projected efficiencies from the Joinder have {████████████} the original annual projection of {███████}. F. 1112.

While Respondent claims {██████████████} in capital avoidance savings and related operating-cost savings of {█████████████}, as stated in the Compass Lexecon Report, these claimed efficiencies result "primarily from the avoidance of capital and operating costs associated with the construction and operation of a hospital at Arrowhead and a new bed tower [to increase capacity] at Flower Hospital." F. 1109. The evidence in the record fails to show, however, that ProMedica actually intended to build the Arrowhead hospital absent the Joinder. F. 1122, 1124. *See also* Dagen, Tr. 3279-3280, *in camera* (no strategic plans, capital budgeting documents, or permits for constructing a hospital at Arrowhead); PX02147 at 046-049 (¶¶ 85-89) (Dagen Expert Report); PX02148 at 094-095 (¶¶ 172-173) (Town Expert Report), *in camera*). In addition, ProMedica's most recent pre-Joinder Strategic Plans did not evince an intention to construct a second bed tower at Flower Hospital. F. 1126-1127. At no time in the two to three year period leading up to the Joinder did ProMedica generate any plans relating to construction of a new bed tower at Flower Hospital. F. 1126.

Although avoiding undertaking the major expense of building a new facility or bed tower is a cognizable efficiency (*e.g.*, *Butterworth*, 946 F. Supp. at 1300-01), the evidence shows that ProMedica had no concrete plans to actually proceed with building the Arrowhead hospital or new bed tower at Flower. Accordingly, Respondent's claims of {███████████ ████████} in capital avoidance savings and related operating-cost savings of {██████ ████████} resulting "primarily from the avoidance of capital and operating costs associated with the construction and operation of a hospital at Arrowhead and a new bed tower at Flower Hospital" (F. 1109) are unpersuasive.

In addition, the bulk of the claimed efficiencies from the Joinder are avoided capital costs. F. 1119. In general, capital cost avoidance claims are not cognizable efficiencies. (Town, Tr. 3928-3929 ("removing an expenditure that would create value [is not] an

202

efficiency"); PX02148 at 094 (¶ 172) (Town Expert Report), *in camera*. Firms invest in their businesses to better compete and, thus, enhance consumer welfare, and if these competition-driven investments are "avoided," consumers generally are left worse off. (PX02148 at 094 (¶ 172) (Town Expert Report), *in camera*). To the extent that avoided capital investments would have benefitted the community, capital avoidance with respect to those investments are not efficiencies, but rather constitute anticompetitive harm resulting from the Joinder. (Town, Tr. 3928-3929; PX02148 at 094 (¶ 172) (Town Expert Report), *in camera*). Thus, Respondent has failed to provide sufficient proof of cognizable efficiencies.

### c. Other benefits

As additional benefits of the Joinder, Respondent points to evidence that St. Luke's employees have received and will continue to receive pay increases in 2011 (F. 1129); St. Luke's has gained ProMedica's assistance for its physician recruitment efforts and ProMedica's recruiters have already helped recruit anesthetists for St. Luke's (F. 1133-1134); and St. Luke's has started or is about to start work on several deferred capital projects, including {███████████ ███████████████████████████████████████████████████ ██████████████████████████}. F. 1139.

Respondent cites no authority to support a conclusion that lifting a salary freeze to give two one percent pay increases and "thank-you checks" to St. Luke's employees ranging from $25 to $200 (F. 1129-1130) are legally cognizable merger benefits. Further, even if St. Luke's has started or is about to start work on the above described deferred capital projects, St. Luke's had $65 million in cash and investments at the time of the Joinder, compared to a total estimated cost of less than {███} million to complete St. Luke's deferred projects. F. 1141. In any event, Respondent has not shown that these claimed efficiencies are greater than the transaction's substantial likely anticompetitive effects.

### 3. Summary

In *Cardinal Health*, the defendants, after performing a due diligence study, represented that the proposed mergers would result in cost savings and other efficiencies of roughly 82 million dollars per year and represented that they would pass through at least half of the

projected cost savings to consumers. *Cardinal Health*, 12 F. Supp. 2d at 62. The FTC did not contest that the proposed mergers would result in large-scale efficiencies, some of which will be passed on to the consumer. *Id.* at 63. Weighing the evidence, the court found that the defendants had sufficiently proved that significant efficiencies would likely result from the proposed mergers, but that the evidence presented by the FTC strongly suggested that much of the savings anticipated from the mergers could also be achieved through continued competition. *Id.* The court then stated: "The critical question raised by the efficiencies defense is whether the projected savings from the mergers are enough to overcome the evidence that tends to show that possibly greater benefits can be achieved by the public through existing, continued competition. The Defendants simply have not made their case on this point." *Id.*

In this case, Respondent has demonstrated that the Joinder would make St. Luke's a stronger hospital and would achieve some efficiencies, but those efficiencies are insufficient to legally justify the Joinder. Complaint Counsel has pointed out deficiencies in Respondent's estimates of efficiencies and has shown that some of the efficiencies identified by Respondent are not merger-specific or are speculative. Overall, Respondent has not demonstrated that the Joinder has resulted in "significant economies" (*University Health*, 938 F.2d at 1223) that benefit consumers or that the benefits are greater than the transaction's substantial likely anticompetitive effects. Accordingly, Respondent has not met its burden of showing "extraordinary" procompetitive benefits or of demonstrating that the asserted efficiencies offset the likely anticompetitive effects of the increase in market power produced by the Joinder.

### G.    Remedy

#### 1.    Introduction

Complaint Counsel has proved that Respondent's Joinder with St. Luke's constitutes an illegal acquisition in violation of Section 7 of the Clayton Act. As a remedy for Respondent's unlawful Joinder with St. Luke's, Complaint Counsel seeks an order requiring ProMedica to completely divest its ownership of St. Luke's "at no minimum price . . . to an Acquirer that receives the prior approval of the Commission and . . . pursuant to a Divestiture Agreement that receives the prior approval of the Commission." Complaint Counsel's proposed order, Paragraph II.A.1.; *see* CCB at 105-107. Respondent objects to ordering divestiture in this case,

and proposes entry of an alternative order, requiring, *inter alia*, that ProMedica create a second "firewalled" negotiation team that will negotiate and administer MCO contracts exclusively for St. Luke's, independent of ProMedica's other Lucas County hospitals. RRB at 81-82, and Exhibit A thereto. Because MCOs would be free to contract with St. Luke's alone, and not with ProMedica, if they so choose, Respondent argues its proposal will reverse ProMedica's increased bargaining power resulting from the Joinder and restore St. Luke's as an independent competitive restraint. *Id.* at 83.

Respondent further objects to divestiture to an acquirer, as provided in Complaint Counsel's proposed order, rather than divestiture through an unwinding of the Joinder transaction. RRB at 86-87. Finally, Respondent objects to two of the ancillary provisions in Complaint Counsel's proposed order: (1) the requirement that Paramount maintain St. Luke's, and its affiliate SurgiCare, as participating network providers for a period of one year after the effective date of divestiture, Complaint Counsel's proposed order, Paragraph II.N.; and (2) the notification requirements of Paragraph IX of Complaint Counsel's proposed order. RRB at 87-88.[28]

All provisions of the order proposed by Complaint Counsel, as well as Complaint Counsel's arguments in support thereof have been fully considered. This Initial Decision has also fully considered Respondent's alternative proposed order and arguments in support thereof, as well as Respondent's objections to Complaint Counsel's proposed order and supporting arguments. As more fully explained below, the order proposed by Complaint Counsel will be issued herewith as the Order in this case (hereafter "Order"), except that Paragraph II.N. of Complaint Counsel's proposed order will not be included. As so modified, the order proposed by Complaint Counsel is supported by the record and applicable case law.

## 2.     Applicable legal principles

Pursuant to Section 11(b) of the Clayton Act:

---

[28] As noted above, Respondent's alternative proposed order, as well as its objections to Complaint Counsel's proposed order, were set forth in Respondent's Reply Brief. Complaint Counsel did not seek leave to submit a surreply to Respondent's Reply Brief.

> If upon such hearing the Commission . . . shall be of the opinion that any of the provisions of [Section 7] have been or are being violated, it shall . . . issue and cause to be served on such person an order requiring such person to cease and desist from such violations, and divest itself of the . . . assets, held . . . in the manner and within the time fixed by said order.

15 U.S.C. § 21(b).

The Commission, in *Evanston*, summarized the law regarding remedies for unlawful mergers, as follows:

> The goal of a remedy for a Section 7 violation is to impose relief that is "necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute." *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 607, 77 S. Ct. 872, 1 L. Ed. 2d 1057 (1957). Thus, we attempt to craft a remedy that will create a competitive environment that would have existed in the absence of the violations. *In re RSR Corp.*, 88 F.T.C. 800, 893 (1976), *aff'd*, *RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979). "The antitrust laws would deserve little respect if they permitted those who violated them to escape with the fruits of their misconduct on the grounds that imposition of an effective remedy would incidentally result in even a substantial monetary loss." *RSR*, 88 F.T.C. at 895.
>
> Structural remedies are preferred for Section 7 violations. *See United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 329, 81 S. Ct. 1243, 6 L. Ed. 2d 318 (1961) (calling divestiture "a natural remedy" when a merger violates the antitrust laws). As we recently said, "[m]uch of the case law has . . . found divestiture the most appropriate means for restoring competition lost as a consequence of a merger or acquisition." *In re Chicago Bridge & Iron Co.*, No. 9300, 138 F.T.C. 1024, 2005 WL 120878, at 93 (FTC Jan. 6, 2005). Divestiture is desirable because, in general, a remedy is more likely to restore competition if the firms that engaged in pre-merger competition are not under common ownership. There are also usually greater long-term costs associated with monitoring the efficacy of a conduct remedy than with imposing a structural solution.

*Evanston*, 2007 FTC LEXIS 210, at *244-46.

Although divestiture is the preferred remedy, unusual circumstances may necessitate some departure from this norm. *Evanston*, 2007 FTC LEXIS 210, at *245-46; *In re RSR Corp.*, No. 8959, 1976 FTC LEXIS 40, at *208 (1976). In determining a remedy, the Commission does not:

> . . . minimize the practical difficulties that may militate against divestiture or other structural relief in particular cases. Despite the breadth of its powers, the Commission would not attempt to apply remedies so drastic, or inequitable, that the cure would be worse than the disease. Thus, while divestiture is normally the appropriate remedy in a Section 7 proceeding, on occasion it may possibl[y] be impracticable or inadequate, or impose unjustifiable hardship . . . .

*In re Ekco Prods. Co.*, No. 8122, 65 F.T.C. 1163, 1964 FTC LEXIS 115, at *126-27 (June 30, 1964). "In cases where several equally effective remedies are available short of a complete divestiture, a due regard should be given to the preservation of substantial efficiencies or important benefits to the consumer in the choice of an appropriate remedy." *In re Retail Credit Co.*, No. 8290, 92 F.T.C. 1, 1978 FTC LEXIS 246, at *260 (July 7, 1978).

"[T]he burden rests with respondent to demonstrate that a remedy other than full divestiture would adequately redress any violation which is found." *In re Fruehauf Corp.*, No. 8972, 1977 FTC LEXIS 9, at *3 n.1, 90 F.T.C. 891 (Dec. 21, 1977); *In re Chicago Bridge & Iron*, No. 9300, 2003 FTC LEXIS 96, at **277 (June 18, 2003), *modified by* 2005 FTC LEXIS 215 (Jan. 6, 2005). *See also In re Diamond Alkali, Co.*, No. 8572, 72 F.T.C. 700, 742, 1967 FTC LEXIS 44, at *88-89 (Oct. 2, 1967) ("In the absence of proof to the contrary the assumption of this Commission must be that 'only divestiture can reasonably be expected to restore competition and make the affected markets whole again.'") (quoting *National Tea Company*, 69 F.T.C. 226, 1966 FTC LEXIS 41, at *88 (March 4, 1966)). Where, as in this case, "the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *du Pont*, 366 U.S. at 334.

### 3. Analysis

#### a. Alternative remedy to divesture

The remedy proposed by Respondent is patterned after the remedy ordered in *Evanston*. In *Evanston*, the Commission applied existing legal standards to the facts of that case and ultimately determined that the merger at issue presented "the highly unusual case in which a conduct remedy, rather than divestiture, is more appropriate." 2007 FTC LEXIS 210, at *246. The Commission required respondent Evanston Northwestern Healthcare ("ENH") "to

establish separate and independent negotiating teams -- one for Evanston and Glenbrook
Hospitals . . . and another for Highland Park." *Evanston*, 2007 FTC LEXIS 210, at *249. The
Commission reasoned:

> While not ideal, this remedy will allow MCOs to negotiate separately again for
> these competing hospitals, thus re-injecting competition between them for the
> business of MCOs. Further, ENH should be able to implement the required
> modifications to its contract negotiating procedures in a very short time. In
> contrast, divesting Highland Park after seven years of integration would be a
> complex, lengthy, and expensive process.

*Id.* at *249.

Respondent makes a cogent argument that enabling MCOs to contract separately with
St. Luke's, independent of ProMedica's other Lucas County hospitals, through separate,
firewalled, MCO negotiating teams, would restore ProMedica's bargaining power to its pre-
Joinder state and preserve St. Luke's as a competitive constraint. In addition, an *Evanston–*
style remedy would enable St. Luke's to continue to benefit from ProMedica's stronger
financial resources, and, thereby, preserve St. Luke's viability, to the benefit of consumers. *See
In re Retail Credit Co.*, 1978 FTC LEXIS 246, at *260 ("due regard should be given to the
preservation of substantial efficiencies or important benefits to the consumer"). However, the
reasoning of *Evanston* was based upon the extensive integration of Highland Park into the ENH
system over the seven years that had elapsed from the time of the merger, during which ENH
had integrated the operations of Highland Park into the ENH system. ENH had also made two
significant improvements to Highland Park -- the development and implementation of a cardiac
surgery program and implementation at Highland Park of "EPIC, the state-of-the-art medical
record computer system." *Evanston*, 2007 FTC LEXIS 210, at *248.

Analogizing to *Evanston*, Respondent points to the freeing of space for the addition of
private rooms, as a result of the shift of St. Luke's rehabilitation services to Flower, and the
allocation by St. Luke's of part of ProMedica's initial capital contribution toward implementing
meaningful use of an EMR system. RRB at 84-85. In this regard, the evidence shows that,
with the approval of the FTC, ProMedica and St. Luke's had consolidated St. Luke's inpatient
rehabilitation program at Flower Hospital and that shifting inpatient rehabilitation services
from St. Luke's to Flower permits St. Luke's to convert its former inpatient rehabilitation beds

208

to private rooms. F. 1058-1060. The evidence further shows that ProMedica "believes" that St. Luke's has allocated part of its initial capital contribution of $10 million toward IT investment to become compliant for "meaningful use." F. 994. Although several of the necessary components to meet meaningful use requirements have been implemented, St. Luke's overall implementation of the system is still in the planning stages. F. 995. Thus, the evidence does not demonstrate, as it did in *Evanston*, that divestiture in this case would be a "complex, lengthy, and expensive process." *Evanston*, 2007 FTC LEXIS 210, at *249. Instead, because of the Hold Separate Agreement, the extensive integration that occurred in *Evanston* has not occurred here. Where, as here, "it is relatively clear that the unwinding of a hospital merger would be unlikely to involve substantial costs, all else being equal, the Commission likely would select divestiture as the remedy." *Evanston*, 2007 FTC LEXIS 210, at *250. Respondent has failed to meet its burden of proving that a remedy other than the usual remedy of divestiture should be ordered in this case, and the Order therefore provides for divestiture.

### b.  Divestiture order

Respondent objects to an order requiring divestiture of St. Luke's to a willing acquirer, as proposed by Complaint Counsel, *see* proposed order, Paragraph II.A., rather than requiring a simple unwinding of the Joinder transaction and returning St. Luke's to its pre-Joinder status. RRB at 86-87. Considering St. Luke's weakened financial condition, as found in Part II.N. and analyzed in Part III.E. of this Initial Decision, St. Luke's viability beyond the next few years is uncertain and, therefore, returning St. Luke's to its pre-Joinder status may not be an effective remedy in the long term. An order that could result in St. Luke's ultimate demise is not a remedy that is "necessary and appropriate in the public interest to eliminate the effects of the acquisition. . . ." *du Pont*, 353 U.S. at 607.

Respondent specifically objects to a divestiture of St. Luke's to Mercy or UTMC, arguing that a Joinder with either entity will raise its own anticompetitive concerns. There is record evidence that St. Luke's believed an affiliation with Mercy, and to a far lesser extent, UTMC, would result in HHI's that could trigger antitrust enforcement, and that an affiliation with either entity could result in increased prices. (PX01030 at 017; PX01016 at 023-024); *see*

Merger Guidelines § 5.3.  However, the proposed order does not, and the Order will not, limit potential acquirers to Mercy or UTMC.  Thus, there is no basis for Respondent's conclusion that divestiture to a willing acquirer, rather than a "spinoff" of St. Luke's "would create the same competitive harms that they assert exist in this case."  RRB at 87.

### c.  Other provisions

Respondent objects to Paragraph II.N. of Complaint Counsel's proposed order.  That Paragraph provides that, from the date this Order becomes final and until one (1) year from the effective date of divestiture, and for so long as ProMedica offers any Paramount insurance product, ProMedica may not terminate any agreement with St. Luke's pursuant to which St. Luke's, and its affiliate SurgiCare, shall be participating providers with Paramount, at rates comparable to ProMedica's analogous facilities, as provided in the Joinder Agreement documents.  Respondent argues that such provisions give St. Luke's a competitive advantage that it did not have prior to the Joinder, and go beyond the remedial purpose of returning the competitive environment to what it would have been prior to the Joinder.  RRB at 87.

The Supreme Court has recognized that "[t]he relief which can be afforded" from an illegal acquisition "is not limited to the restoration of the status quo ante."  *Ford Motor Co. v. United States*, 405 U.S. 562, 573 n.8 (1972).  However, "the relief must be directed to that which is 'necessary and appropriate in the public interest to eliminate the effects of the acquisition offensive to the statute.'"  *Id.*  In addition, although the Commission has broad discretion to determine the type of order necessary to remedy the unlawful conduct found to exist, the provisions must be reasonably related to the violation.  *Jacob Siegal Co. v. FTC*, 327 U.S. 608, 611-13 (1946).  Complaint Counsel provides no support for this provision, since Complaint Counsel's Post-Trial Brief does not even address, much less explain, how requiring ProMedica to include St. Luke's and its affiliate in the Paramount network, as set forth in Paragraph II.N., is necessary or appropriate, or reasonably related to the unlawful Joinder.

The evidence shows that St. Luke's was not a member of Paramount's network from January 1, 2001 until the Joinder Agreement with ProMedica in September 2010.  F. 177-179.  There is no claim, however, and there has been no finding, that Respondent's failing to include

St. Luke's in its Paramount networks prior to the Joinder constituted unlawful conduct. Under such circumstances, Respondent should not be ordered to contract with St. Luke's, which after divestiture, will return to its status as ProMedica's competitor. *See Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (noting the general rule that an entity is free to choose with whom to deal, and the qualified right to refuse to deal with rivals). Accordingly, the provisions of Paragraph II.N. are unsupported by the record and are not included in the Order.

Moreover, the evidence shows that St. Luke's considered inclusion in the Paramount network to be a significant advantage to an affiliation with ProMedica. F. 396, 421. In addition, both St. Luke's and ProMedica believed that inclusion of St. Luke's in the Paramount network would take volume, and dollars, away from ProMedica. F. 467-470. Paramount has an arrangement with ProMedica, resulting in a limited network of hospitals that excluded the Mercy hospitals and, prior to the Joinder, St. Luke's. F. 172-173. Although Paramount's network did include UTMC (F. 173), and could have included St. Luke's, if Paramount had chosen to include St. Luke's, the evidence does not demonstrate that St. Luke's would have become a participating provider with Paramount absent the Joinder. The foregoing evidence supports the conclusion that requiring ProMedica to include St. Luke's in the Paramount network would confer a competitive advantage that did not exist prior to the Joinder. For this reason, Paragraph II.N. from Complaint Counsel's proposed order is rejected and is not included in the Order.

Finally, Respondent objects to Paragraph IX of Complaint Counsel's proposed order, which states: "ProMedica shall notify the Commission at least thirty (30) days prior to (1) any proposed dissolution of ProMedica, (2) any proposed acquisition, merger, or consolidation of ProMedica, or (3) any other change in ProMedica that may affect compliance obligations arising out of this Order, including but not limited to assignment, the creation or dissolution of subsidiaries, or any other change in ProMedica." RRB at 88. Respondent argues that the foregoing provision is overbroad because it would require ProMedica to report to the Commission on its activities with regard to all its hospitals, several of which are located outside the relevant geographic market of Lucas County. RRB at 88; *see* F. 3-5. Respondent's argument is unpersuasive. The notification provisions are reasonably necessary to monitor

211

Respondent's future conduct, and to this extent, are reasonably related to the unlawful practice found to exist in this case. *Jacob Siegal*, 327 U.S. at 611-13. Any doubt regarding remedy is to be resolved in favor of Complaint Counsel. *du Pont*, 366 U.S. at 334. Accordingly, Paragraph IX is included in the Order.

### 4. Conclusion

Upon consideration of the entire record, relief designed to remedy the violation of law found to exist is hereby ordered. The Order is designed to restore competition as it existed prior to the Respondent's unlawful conduct and to remedy the anticompetitive effects arising therefrom.

## IV.  SUMMARY OF CONCLUSIONS OF LAW

1.  The Commission has jurisdiction over Respondent ProMedica Health System ("Respondent" or "ProMedica") and the subject matter of this proceeding, pursuant to Sections 7 and 11 of the Clayton Act.  15 U.S.C. §§ 18, 21(b).

2.  Respondent is, and at all times relevant herein, has been, engaged in "commerce" as defined in Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12.

3.  On May 25, 2010, Respondent and St. Luke's Hospital ("St. Luke's") entered into a Joinder Agreement, effective as of September 1, 2010, pursuant to which ProMedica became the sole corporate member or shareholder of St. Luke's and its other affiliated entities (hereafter, "Joinder").  The Joinder constitutes an "acquisition" subject to Section 7 of the Clayton Act.  15 U.S.C. § 18.

4.  Section 7 of the Clayton Act prohibits acquisitions, "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18.

5.  Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), expressly vests the Commission with jurisdiction to determine the legality of a corporate acquisition under Section 7 and, if warranted, to order divestiture.

6.  To establish a violation of Section 7, it is not necessary to show that the challenged acquisition *will* lessen competition.  It is sufficient to show a reasonable probability that the proposed transaction would substantially lessen competition in the future.

7.  The appropriate line of commerce within which to evaluate the probable competitive effects of the Joinder is general acute-care ("GAC") inpatient hospital services sold to commercial health plans, referred to as managed care organizations ("MCOs") (the "relevant product market").

8.  Complaint Counsel failed to demonstrate a separate line of commerce consisting of the sale of inpatient obstetrical ("OB") services to MCOs.

9.  The appropriate section of the country within which to evaluate the probable competitive effects of the Joinder is Lucas County, Ohio (the "relevant geographic market").

10.  Complaint Counsel has proven that there is a reasonable probability that the Joinder will substantially lessen competition in the relevant market for the sale of GAC inpatient hospital services to MCOs in Lucas County, Ohio.

11.  The government can establish a presumption that a transaction will substantially lessen competition by showing that an acquisition will lead to undue concentration in the

213

relevant market. However, market share and concentration data provide only the starting point for analyzing the competitive impact of an acquisition. Other market factors that pertain to likely competitive effects are also assessed.

12. The Joinder between St. Luke's and ProMedica reduces the number of competitors in the market for the sale of GAC inpatient hospital services to MCOs in Lucas County, Ohio from four to three, and increases ProMedica's market share. The statistical evidence demonstrates that the Joinder causes a significant increase in the concentration of power in the relevant market and enables Respondent to control an undue percentage share of the relevant market. Accordingly, the Joinder is presumptively illegal.

13. Complaint Counsel has proven that, from the perspective of MCOs competing to meet the demands of their customers, St. Luke's and one or more of the ProMedica hospitals are close substitutes, and an MCO network that consists only of ProMedica's remaining competitors, University of Toledo Medical Center ("UTMC") and Mercy Health Partners ("Mercy"), would not be marketable in Lucas County. Thus, the Joinder would eliminate ProMedica's close competitor and provide ProMedica with increased bargaining leverage with MCOs.

14. Complaint Counsel has proven that the Joinder enables ProMedica to acquire, and exercise, the power to charge supracompetitive reimbursement rates for the provision of GAC inpatient hospital services provided by ProMedica's Lucas County hospitals, and that increases in Respondent's prices to MCOs would be passed on to MCOs' employer-customers and/or employee-customers, in the form of higher overall health care costs. Thus, Complaint Counsel has proven a likelihood of anticompetitive effects resulting from the Joinder.

15. Having proven the likelihood of the anticompetitive effect of price increases in the relevant market, it is not necessary that Complaint Counsel also prove that the Joinder would result in the non-price anticompetitive effect of reduced quality.

16. Respondent asserted a defense based upon the ability of market participants to reposition themselves so as to constrain Respondent from imposing price increases. The Merger Guidelines recognize that "[i]n some cases, non-merging firms may be able to reposition their products to offer close substitutes for the products offered by the merging firms." Merger Guidelines § 6.1. The Merger Guidelines further note that "[r]epositioning is evaluated much like entry, with consideration given to timeliness, likelihood, and sufficiency." Merger Guidelines § 6.1. Thus, Respondent must show that the purported repositioning will be timely, likely, and sufficient. The evidence fails to show that market participants are likely to reposition, as claimed by Respondent, or that such repositioning would be timely or sufficient. Respondent's repositioning defense is rejected.

17. Respondent presented a defense based on the asserted weakened financial condition of St. Luke's at the time of the Joinder. Evaluating the weakness of the acquired company is an appropriate part of the competitive effects analysis because only a further

examination of the particular market - its structure, history and probable future - can provide the appropriate setting for judging the probable anticompetitive effect of the merger.

18. While the precise standard for establishing a "weakened competitor" defense is unclear, the law is clear that financial weakness is probably the weakest ground of all for justifying a merger and certainly cannot be the primary justification for permitting one.

19. Although St. Luke's was struggling financially prior to the Joinder and its future viability as an independent hospital, beyond the next few years, is by no means certain, current case law does not permit allowing the Joinder to proceed on the basis of St. Luke's weakened financial condition. Respondent's weakened competitor defense is rejected.

20. Respondent raised defenses based upon asserted procompetitive benefits and efficiencies of the Joinder. Claimed efficiencies must be: (1) verifiable; (2) merger-specific, *i.e.*, ones that could not practicably be achieved without the proposed merger; and (3) greater than the transaction's substantial anticompetitive effects.

21. To overcome a presumption that a proposed acquisition would substantially lessen competition, a respondent must demonstrate that the intended acquisition would result in significant economies and that these economies ultimately would benefit competition and, hence, consumers.

22. Although a financially well-off St. Luke's is more beneficial to the community than a hospital that is struggling financially, based upon applicable legal principles, it cannot be concluded that the benefits and efficiencies generated from the Joinder represent "significant economies" that ultimately would benefit competition and, hence, consumers, or that the asserted benefits and efficiencies are greater than the likely anticompetitive effects of the Joinder. Respondent's defenses based upon asserted procompetitive benefits and efficiencies resulting from the Joinder are rejected.

23. The goal of a remedy for a Section 7 violation is to impose relief that is necessary and appropriate in the public interest to eliminate the anticompetitive effects of the unlawful acquisition. The appropriate remedy seeks to create a competitive environment that would have existed in the absence of the violation.

24. Divestiture is the preferred remedy for a Section 7 violation. Although divestiture is the preferred remedy, unusual circumstances may necessitate some departure from this norm. The burden is on the respondent to demonstrate that a remedy other than full divestiture would adequately redress the violation found to exist.

25. Respondent proposed an alternative remedy, patterned after the remedy ordered in *Evanston*, pursuant to which ProMedica would create a second "firewalled" negotiation team that would negotiate and administer MCO contracts exclusively for St. Luke's, independent of ProMedica's other Lucas County hospitals.

26. Respondent has not met its burden of demonstrating unusual circumstances justifying a departure from the preferred remedy of divestiture. Although an *Evanston*-style remedy would likely restore ProMedica's bargaining power to its pre-Joinder state, preserve St. Luke's as a competitive constraint, and secure St. Luke's financial viability, to the benefit of consumers, the facts of the instant case are not sufficiently analogous to the unusual circumstances presented in *Evanston*. Respondent's proposed alternative remedy is rejected, and divestiture of St. Luke's is ordered.

27. Although the Commission has broad discretion to determine the type of order necessary to remedy the unlawful conduct found to exist, the provisions must be reasonably related to the violation.

28. Complaint Counsel's proposal that ProMedica be ordered to maintain St. Luke's and St. Luke's affiliate as providers with ProMedica's health insurance subsidiary Paramount, as promised under the Joinder Agreement, is rejected. There is no claim, and there has been no finding, that Respondent's failing to include St. Luke's in its Paramount networks prior to the Joinder constituted unlawful conduct. Under such circumstances, Respondent should not be ordered to contract with St. Luke's, which after divestiture, will return to its status as ProMedica's competitor. In addition, requiring ProMedica to include St. Luke's in the Paramount network confers a competitive advantage that did not prior to the Joinder.

29. The Order entered herein is necessary and appropriate to remedy the violations of law found to exist.

# ORDER

## I.

**IT IS ORDERED** that, as used in this Order, the following definitions shall apply:

A. "ProMedica" means ProMedica Health System, Inc., its directors, officers, employees, agents, representatives, successors, and assigns; and its joint ventures, subsidiaries (including, but not limited to, ProMedica Health Insurance Corporation), divisions, groups, and affiliates controlled by ProMedica Health System, Inc., and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B. "St. Luke's Hospital" means the Acute-Care Hospital operated at 5901 Monclova Road, Maumee, Ohio 43537.

C. "Commission" means the Federal Trade Commission.

D. "Acquirer" means the Person that acquires, with the prior approval of the Commission, the St. Luke's Hospital Assets from ProMedica pursuant to Paragraph II, or from the Trustee pursuant to Paragraph VII of this Order.

E. "Acquirer Hospital Business" means all activities relating to general Acute-Care Hospital services and other related health-care services to be conducted by the Acquirer in connection with the St. Luke's Hospital Assets.

F. "Acute-Care Hospital" means a health-care facility licensed as a hospital, other than a federally-owned facility, having a duly organized governing body with overall administrative and professional responsibility, and an organized professional staff, that provides 24-hour inpatient care, that may also provide outpatient services, and having as a primary function the provision of General Acute-Care Inpatient Hospital Services.

G. "Direct Cost" means the cost of direct material and direct labor used to provide the relevant assistance or service.

H. "Divestiture Agreement" means any agreement, including all exhibits, attachments, agreements, schedules and amendments thereto, that has been approved by the Commission pursuant to which the St. Luke's Hospital Assets are divested by ProMedica pursuant to Paragraph II, or by the Divestiture Trustee pursuant to Paragraph VII of this Order.

I. "Divestiture Trustee" means the Person appointed pursuant to Paragraph VII of this Order to divest the St. Luke's Hospital Assets.

217

J.    "Effective Date of Divestiture" means the date on which the divestiture of the St. Luke's Hospital Assets to an Acquirer pursuant to Paragraph II or Paragraph VII of this Order is completed.

K.    "General Acute-Care Inpatient Hospital Services" means a broad cluster of basic medical and surgical diagnostic and treatment services for the medical diagnosis, treatment, and care of physically injured or sick persons with short term or episodic health problems or infirmities, that includes an overnight stay in the hospital by the patient. General Acute-Care Inpatient Hospital Services include what are commonly classified in the industry as primary, secondary, and tertiary services, but exclude: (i) services at hospitals that serve solely military and veterans; (ii) services at outpatient facilities that provide same-day service only; (iii) those services known in the industry as specialized tertiary services and quaternary services; and (iv) psychiatric, substance abuse, and rehabilitation services.

L.    "Hospital Provider Contract" means a contract between a Payor and any hospital to provide General Acute-Care Inpatient Hospital Services and related health-care services to enrollees of health plans.

M.    "Intangible Property" means intangible property relating to the Operation of St. Luke's Hospital including, but not limited to, Intellectual Property, the St. Luke's Hospital Name and Marks, logos, and the modifications or improvements to such intangible property.

N.    "Intellectual Property" means, without limitation: (i) all patents, patent applications, inventions, and discoveries that may be patentable; (ii) all know-how, trade secrets, software, technical information, data, registrations, applications for governmental approvals, inventions, processes, best practices (including clinical pathways), formulae, protocols, standards, methods, techniques, designs, quality-control practices and information, research and test procedures and information, and safety, environmental and health practices and information; (iii) all confidential or proprietary information, commercial information, management systems, business processes and practices, patient lists, patient information, patient records and files, patient communications, procurement practices and information, supplier qualification and approval practices and information, training materials, sales and marketing materials, patient support materials, advertising and promotional materials; and (iv) all rights in any jurisdiction to limit the use or disclosure of any of the foregoing, and rights to sue and recover damages or obtain injunctive relief for infringement, dilution, misappropriation, violation, or breach of any of the foregoing.

O.    "Joinder" means the Operation of St. Luke's Hospital by ProMedica pursuant to the Joinder Agreement.

P.    "Joinder Agreement" means the agreement by and among ProMedica Health System, Inc., OhioCare Health System, Inc., St. Luke's Hospital, and St. Luke's

Hospital Foundation, Inc., dated May 25, 2010, and all subsequent amendments thereto.

Q. "Licensed Intangible Property" means Intangible Property licensed to ProMedica or to St. Luke's Hospital from a third party relating to the Operation of St. Luke's Hospital including, but not limited to, Intellectual Property, software, computer programs, patents, know-how, goodwill, technology, trade secrets, technical information, marketing information, protocols, quality-control information, trademarks, trade names, service marks, logos, and the modifications or improvements to such intangible property that are licensed to ProMedica or to St. Luke's Hospital ("Licensed Intangible Property" does not mean modifications and improvements to intangible property that are not licensed to ProMedica).

R. "Monitor" means the Person appointed pursuant to Paragraph VI of the Order and with the prior approval of the Commission.

S. "Monitor Agreement" means the agreement ProMedica enters into with the Monitor and with the prior approval of the Commission.

T. "Operation of St. Luke's Hospital" means all activities relating to the business of St. Luke's Hospital, operating as an Acute-Care Hospital, including, but not limited to, the activities and services provided at outpatient facilities.

U. "Ordinary Course of Business" means actions taken by any Person in the ordinary course of the normal day-to-day Operation of St. Luke's Hospital that is consistent with past practices of such Person in the Operation of St. Luke's Hospital, including, but not limited to, past practice with respect to amount, timing, and frequency.

V. "Payor" means any Person that purchases, reimburses for, or otherwise pays for medical goods or services for themselves or for any other person, including, but not limited to: health insurance companies; preferred provider organizations; point-of-service organizations; prepaid hospital, medical, or other health-service plans; health maintenance organizations; government health-benefits programs; employers or other persons providing or administering self-insured health-benefits programs; and patients who purchase medical goods or services for themselves.

W. "Person" means any natural person, partnership, corporation, association, trust, joint venture, government, government agency, or other business or legal entity.

X. "Physician" means a doctor of allopathic medicine ("M.D.") or a doctor of osteopathic medicine ("D.O.").

Y. "ProMedica Medical Protocols" means medical protocols promulgated by ProMedica, whether in hard copy or embedded in software, that have been in effect at any ProMedica Hospital, excluding St. Luke's Hospital, at any time since

Joinder; provided, however, that "ProMedica's Medical Protocols" does not mean medical protocols adopted or promulgated, at any time, by any Physician or by any Acquirer, even if such medical protocols are identical, in whole or in part, to medical protocols promulgated by ProMedica.

Z. "Post-Joinder Hospital Business" means all activities relating to the provision of General Acute-Care Inpatient Hospital Services and other related health-care services conducted by ProMedica after Joinder including, but not limited to, all health-care services, including outpatient services, offered in connection with the St. Luke's Hospital Business.

AA. "Pre-Joinder St. Luke's Hospital Business" means all activities relating to the provision of General Acute-Care Inpatient Hospital Services and other related health-care services that St. Luke's Hospital was offering as an Acute-Care Hospital prior to Joinder.

BB. "Real Property of St. Luke's Hospital" means all real property interests (including fee simple interests and real property leasehold interests including all rights, easements and appurtenances, together with all buildings, structures, facilities) that ProMedica acquired pursuant to the Joinder Agreement, whether or not located at St. Luke's Hospital or whether or not related to the Operation of St. Luke's Hospital. Real Property of St. Luke's Hospital includes, but is not limited to, the assets which are identified and listed on confidential Appendix 1 to this Order.

CC. "St. Luke's Hospital Assets" means all of ProMedica's right, title, and interest in and to St. Luke's Hospital and all related health-care and other assets, tangible or intangible, business, and properties, including any improvements or additions thereto made subsequent to Joinder, relating to the operation of the Post-Joinder Hospital Business, including, but not limited to:

1. All Real Property of St. Luke's Hospital;

2. All Tangible Personal Property, including Tangible Personal Property related to the Operation of St. Luke's Hospital, whether or not located at St. Luke's Hospital, and Tangible Personal Property located at the Real Property of St. Luke's Hospital;

3. All consumable or disposable inventory, including but not limited to, janitorial, office, and medical supplies, and at least thirty (30) treatment days of pharmaceuticals;

4. All rights under any contracts and agreements (*e.g.,* leases, service agreements such as dietary and housekeeping services, supply agreements, and procurement contracts), including, but not limited to, all rights to contributions, funds, and other provisions for the benefit of St. Luke's Hospital pursuant to the Joinder Agreement;

220

5.     All rights and title in and to use of the St. Luke's Hospital Name and Marks on a permanent and exclusive basis;

6.     St. Luke's Medicare and Medicaid provider numbers, to the extent transferable;

7.     All Intellectual Property; provided, however, that St. Luke's Hospital Medical Protocols do not include ProMedica Medical Protocols;

8.     All governmental approvals, consents, licenses, permits, waivers, or other authorizations to the extent transferable;

9.     All rights under warranties and guarantees, express or implied;

10.    All items of prepaid expense; and

11.    Books, records, files, correspondence, manuals, computer printouts, databases, and other documents relating to the Operation of St. Luke's Hospital, electronic and hard copy, located on the premises of St. Luke's Hospital or in the possession of the ProMedica Employee responsible for the Operation of St. Luke's Hospital (or copies thereof where ProMedica has a legal obligation to maintain the original document), including, but not limited to:

   a.   documents containing information relating to patients (to the extent transferable under applicable law), including, but not limited to, medical records, including, but not limited to, any electronic medical records system,

   b.   financial records,

   c.   personnel files,

   d.   St. Luke's Hospital Physician Contracts, Physician lists, and other records of St. Luke's Hospital dealings with Physicians,

   e.   maintenance records,

   f.   documents relating to policies and procedures,

   g.   documents relating to quality control,

   h.   documents relating to Payors,

   i.   documents relating to Suppliers, and

221

    j.    copies of Hospital Provider Contracts and contracts with Suppliers, unless such contracts cannot, according to their terms, be disclosed to third parties even with the permission of ProMedica to make such disclosure.

DD. "St. Luke's Hospital Contractor" means any Person that provides Physician or other health-care services pursuant to a contract with St. Luke's Hospital or ProMedica (including, but not limited to, the provision of emergency room, anesthesiology, pathology, or radiology services) in connection with the Operation of St. Luke's Hospital.

EE. "St. Luke's Hospital Physician Contracts" means all agreements to provide the services of a Physician in connection with the Operation of St. Luke's Hospital, regardless of whether any of the agreements are with a Physician or with a medical group, including, but not limited to, agreements for the services of a medical director for St. Luke's Hospital and joiner agreements with Physicians in the same medical practice as a medical director of St. Luke's Hospital.

FF. "St. Luke's Hospital Employee" means any individual who was employed by St. Luke's Hospital prior to Joinder or was employed by ProMedica after Joinder in connection with the Operation of St. Luke's Hospital, and who has worked part-time or full-time on the premises of St. Luke's Hospital at any time since Joinder, regardless of whether that individual has also worked on the premises of ProMedica.

GG. "St. Luke's Hospital License" means: (i) a worldwide, royalty-free, paid-up, perpetual, irrevocable, transferable, sublicensable, exclusive license under all Intellectual Property owned by or licensed to St. Luke's Hospital relating to operation of the Post-Joinder Hospital Business at St. Luke's Hospital (that is not included in the St. Luke's Hospital Assets) and (ii) such tangible embodiments of the licensed rights (including, but not limited to, physical and electronic copies) as may be necessary or appropriate to enable the Acquirer to utilize the rights.

HH. "St. Luke's Hospital Medical Protocols" means medical protocols promulgated by St. Luke's Hospital, whether in hard copy or embedded in software, that were in effect at any time prior to Joinder with ProMedica.

II.   "St. Luke's Hospital Medical Staff Member" means any Physician or other health-care professional who: (1) is not a St. Luke's Hospital Employee and (2) is a member of the St. Luke's Hospital medical staff, including, but not limited to, any St. Luke's Hospital Contractor.

JJ.   "St. Luke's Hospital Name and Marks" means the name "St. Luke's Hospital" and any variation of that name, in connection with the St. Luke's Hospital Assets, and all other associated trade names, business names, proprietary names, registered and unregistered trademarks, service marks and applications, domain names, trade

222

dress, copyrights, copyright registrations and applications, in both published works and unpublished works, relating to the St. Luke's Hospital Assets.

KK. "Software" means executable computer code and the documentation for such computer code, but does not mean data processed by such computer code.

LL. "Supplier" means any Person that has sold to ProMedica any goods or services, other than Physician services, for use in connection with the Operation of St. Luke's Hospital; provided, however, that "Supplier" does not mean an employee of ProMedica.

MM. "Tangible Personal Property" means all machinery, equipment, spare parts, tools, and tooling (whether customer specific or otherwise); furniture, office equipment, computer hardware, supplies and materials; vehicles and rolling stock; and other items of tangible personal property of every kind whether owned or leased, together with any express or implied warranty by the manufacturers, sellers or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

NN. "Transitional Administrative Services" means administrative assistance with respect to the operation of an Acute-Care Hospital and related health-care services, including but not limited to assistance relating to billing, accounting, governmental regulation, human resources management, information systems, managed care contracting, and purchasing.

OO. "Transitional Clinical Services" means clinical assistance and support services with respect to operation of an Acute-Care Hospital and related health-care services, including but not limited to cardiac surgery, oncology services, and laboratory and pathology services.

PP. "Transitional Services" means Transitional Administrative Services and Transitional Clinical Services.

## II.

**IT IS FURTHER ORDERED** that:

A.   ProMedica shall:

1.       No later than one hundred and eighty (180) days from the date this Order becomes final and effective, divest absolutely and in good faith, and at no minimum price, the St. Luke's Hospital Assets to an Acquirer that receives the prior approval of the Commission and in a manner, including pursuant to a Divestiture Agreement, that receives the prior approval of the Commission;

223

2.      Comply with all terms of the Divestiture Agreement approved by the Commission pursuant to this Order, which agreement shall be deemed incorporated by reference into this Order; and any failure by ProMedica to comply with any term of the Divestiture Agreement shall constitute a failure to comply with this Order.  The Divestiture Agreement shall not reduce, limit or contradict, or be construed to reduce, limit or contradict, the terms of this Order; provided, however, that nothing in this Order shall be construed to reduce any rights or benefits of any Acquirer or to reduce any obligations of ProMedica under such agreement; provided further, that if any term of the Divestiture Agreement varies from the terms of this Order ("Order Term"), then to the extent that ProMedica cannot fully comply with both terms, the Order Term shall determine ProMedica's obligations under this Order. Notwithstanding any paragraph, section, or other provision of the Divestiture Agreement, any failure to meet any condition precedent to closing (whether waived or not) or any modification of the Divestiture Agreement, without the prior approval of the Commission, shall constitute a failure to comply with this Order.

B.    Prior to the Effective Date of Divestiture, ProMedica shall not rescind the Joinder Agreement or any term of the Joinder Agreement necessary to comply with any Paragraph of this Order.

C.    Prior to the Effective Date of Divestiture, ProMedica shall restore to St. Luke's Hospital any assets of St. Luke's Hospital as of the date of Joinder that were removed from St. Luke's Hospital at any time from the date of Joinder through the Effective Date of Divestiture, other than Inventories consumed in the Ordinary Course of Business.  To the extent that:

1.      The St. Luke's Hospital Assets as of the Effective Date of Divestiture do not include (i) assets that ProMedica acquired on the date of Joinder, (ii) assets that replaced those acquired on the date of Joinder, or (iii) any other assets that ProMedica acquired and has used in or that are related to the Post-Joinder Hospital Business, then ProMedica shall add to the St. Luke's Hospital Assets additional assets (of a quality that meets generally acceptable standards of performance) to replace the assets that no longer exist or are no longer controlled by ProMedica;

2.      After the date of Joinder and prior to the Effective Date of Divestiture, ProMedica terminated any clinical service, clinical program, support function, or management function (i) performed by the Pre-Joinder St. Luke's Hospital Business, or (ii) performed by the Post-Joinder Hospital Business, then ProMedica shall restore such service, program, or function (of a quality that meets generally acceptable standards of care or performance), no later than the Effective Date of Divestiture of the St. Luke's Hospital Assets or any other date that receives the prior approval of the Commission.

224

Provided, however, that ProMedica shall not be required to replace any asset or to restore any service, program, or function described by Paragraphs II.C.1. or II.C.2. of this Order if and only if in each instance ProMedica demonstrates to the Commission's satisfaction: (i) that such asset, service, program, or function is not necessary to achieve the purpose of this Order; and (ii) that the Acquirer does not need such asset, service, program, or function to effectively operate the Acquirer Hospital Business in a manner consistent with the purpose of this Order, and if and only if the Commission approves the divestiture without the replacement or restoration of such asset, service, program, or function.

D.  No later than the Effective Date of Divestiture, ProMedica shall grant to the Acquirer a St. Luke's Hospital License for any use in the Acquirer Hospital Business, and shall take all actions necessary to facilitate the unrestricted use of the St. Luke's Hospital License.

E.  ProMedica shall take all actions and shall effect all arrangements in connection with the divestiture of the St. Luke's Hospital Assets necessary to ensure that the Acquirer can conduct the Acquirer Hospital Business in substantially the same manner as St. Luke's Hospital has operated as the Post-Joinder Hospital Business, and in full compliance with the March 29, 2011, order issued by Judge Katz in *Federal Trade Commission, et al. v. ProMedica Health System*, Civil No. 3:11 CV 47, at St. Luke's Hospital, with an independent full-service medical staff capable of providing General Acute-Care Inpatient Hospital Services, and an independent full-service hospital staff and management, including, but not limited to, providing:

1.  Assistance necessary to transfer to the Acquirer all governmental approvals needed to operate the St. Luke's Hospital Assets as an Acute-Care Hospital;

2.  Transitional Services;

3.  The opportunity to recruit and employ St. Luke's Hospital Employees; and

4.  The opportunity to recruit, contract with, and extend medical staff privileges to any St. Luke's Hospital Medical Staff Member, including as provided in Paragraphs II.I, II.J, and II.K of this Order.

F.  ProMedica shall convey as of the Effective Date of Divestiture to the Acquirer the right to use any Licensed Intangible Property (to the extent permitted by the third-party licensor), if such right is needed for the Operation of St. Luke's Hospital by the Acquirer and if the Acquirer is unable, using commercially-reasonable efforts, to obtain equivalent rights from other third parties on commercially-reasonable terms and conditions.

G.  ProMedica shall:

    1.  Place no restrictions on the use by the Acquirer of the St. Luke's Hospital Assets;

    2.  On or before the Effective Date of Divestiture, provide to the Acquirer contact information about Payors and Suppliers for the St. Luke's Hospital Assets;

    3.  Not object to the sharing of Payor and Supplier contract terms relating to the St. Luke's Hospital Assets: (i) if the Payor or Supplier consents in writing to such disclosure upon a request by the Acquirer, and (ii) if the Acquirer enters into a confidentiality agreement with ProMedica not to disclose the information to any third party; and

    4.  With respect to contracts with St. Luke's Hospital Suppliers, at the Acquirer's option and as of the Effective Date of Divestiture:

        a.  if such contract can be assigned without third-party approval, assign its rights under the contract to the Acquirer; and

        b.  if such contract can be assigned to the Acquirer only with third-party approval, assist and cooperate with the Acquirer in obtaining:

            (1)  such third-party approval and in assigning the contract to the Acquirer; or

            (2)  a new contract.

H.  At the request of the Acquirer, for a period not to exceed twelve (12) months from the Effective Date of Divestiture, except as otherwise approved by the Commission, and in a manner (including pursuant to an agreement) that receives the prior approval of the Commission:

    1.  ProMedica shall provide Transitional Services to the Acquirer sufficient to enable the Acquirer to conduct the Acquirer Hospital Business in substantially the same manner that ProMedica has conducted the Post-Joinder Hospital Business at St. Luke's Hospital; and

    2.  ProMedica shall provide the Transitional Services required by this Paragraph II.H. at substantially the same level and quality as such services are provided by ProMedica in connection with its operation of the Post-Joinder Hospital Business.

Provided, however, that ProMedica shall not (i) require the Acquirer to pay compensation for Transitional Services that exceeds the Direct Cost of providing such goods and services, (ii) terminate its obligation to provide Transitional Services because

of a material breach by the Acquirer of any agreement to provide such assistance, in the absence of a final order of a court of competent jurisdiction, or (iii) include a term in any agreement to provide Transitional Services that limits the type of damages (such as indirect, special, and consequential damages) that the Acquirer would be entitled to seek in the event of ProMedica's breach of such agreement.

I.  ProMedica shall allow the Acquirer an opportunity to recruit and employ any St. Luke's Hospital Employee in connection with the divestiture of the St. Luke's Hospital Assets so as to enable the Acquirer to establish an independent, full-service medical staff, hospital staff and management, including as follows:

   1.  No later than five (5) days after execution of a divestiture agreement, ProMedica shall (i) identify each St. Luke's Hospital Employee, (ii) allow the Acquirer an opportunity to interview any St. Luke's Hospital Employee, and (iii) allow the Acquirer to inspect the personnel files and other documentation relating to any St.Luke's Hospital Employee, to the extent permissible under applicable laws.

   2.  ProMedica shall (i) not offer any incentive to any St. Luke's Hospital Employee to decline employment with the Acquirer, (ii) remove any contractual impediments that may deter any St. Luke's Hospital Employee from accepting employment with the Acquirer, including, but not limited to, any non-compete or confidentiality provisions of employment or other contracts with ProMedica that would affect the ability of the St. Luke's Hospital Employee to be employed by the Acquirer, and (iii) not otherwise interfere with the recruitment of any St. Luke's Hospital Employee by the Acquirer, including, but not limited to, by refusing or threatening to refuse to extend medical staff privileges at any ProMedica Acute-Care Hospital.

   3.  ProMedica shall (i) vest all current and accrued pension benefits as of the date of transition of employment with the Acquirer for any St. Luke's Hospital Employee who accepts an offer of employment from the Acquirer no later than thirty (30) days from the Effective Date of Divestiture and (ii) if the Acquirer has made a written offer of employment to any key personnel, as identified and listed on confidential Appendix 2 to this Order, provide such key personnel with reasonable financial incentives to accept a position with the Acquirer at the time of the Effective Date of Divestiture, including, but not limited to (and subject to Commission approval), payment of an incentive equal to up to three (3) months of such key personnel's base salary to be paid only upon such key personnel's completion of one (1) year of employment with the Acquirer.

   4.  For a period ending two (2) years after the Effective Date of Divestiture, ProMedica shall not, directly or indirectly, solicit, hire, or enter into any arrangement for the services of any St. Luke's Hospital Employee employed by the Acquirer, unless such St. Luke's Hospital Employee's employment has been terminated by the Acquirer; provided, however, this Paragraph II.I.4 shall

227

not prohibit ProMedica from: (i) advertising for employees in newspapers, trade publications, or other media not targeted specifically at the St. Luke's Hospital Employees, (ii) hiring employees who apply for employment with ProMedica, as long as such employees were not solicited by ProMedica in violation of this Paragraph II.I.4, or (iii) offering employment to a St.Luke's Hospital Employee who is employed by the Acquirer in only a part-time capacity, if the employment offered by ProMedica would not, in any way, interfere with that employee's ability to fulfill his or her employment responsibilities to the Acquirer.

J. ProMedica shall allow the Acquirer an unimpeded opportunity to recruit, contract with, and otherwise extend medical staff privileges to any St. Luke's Hospital Medical Staff Member in connection with the divestiture of the St. Luke's Hospital Assets so as to enable the Acquirer to establish an independent, complete, full-service medical staff, including as follows:

1. No later than the date of execution of a divestiture agreement, ProMedica shall (i) identify each St. Luke's Hospital Medical Staff Member, (ii) allow the Acquirer an opportunity to interview any St. Luke's Hospital Medical Staff Member, and (iii) allow the Acquirer to inspect the files and other documentation relating to any St. Luke's Hospital Medical Staff Member, to the extent permissible under applicable laws.

2. ProMedica shall (i) not offer any incentive to any St. Luke's Hospital Medical Staff Member to decline to join the Acquirer's medical staff; (ii) remove any contractual impediments that may deter any St. Luke's Hospital Medical Staff Member from joining the Acquirer's medical staff, including, but not limited to, any non-compete or confidentiality provisions of employment or other contracts with ProMedica that would affect the ability of the St. Luke's Hospital Medical Staff Members to be recruited by the Acquirer; and (iii) not otherwise interfere with the recruitment of any St. Luke's Hospital Medical Staff Member by the Acquirer, including, but not limited to, by refusing or threatening to refuse to extend medical staff privileges at any ProMedica Acute-Care Hospital.

K. With respect to each Physician who has provided services to St. Luke's Hospital pursuant to any St. Luke's Hospital Physician Contract in effect at any time preceding the Effective Date of Divestiture ("Contract Physician"), ProMedica shall not offer any incentive to the Contract Physician, the Contract Physician's practice group, or other members of the Contract Physician's practice group to decline to provide services to St. Luke's Hospital, and shall eliminate any confidentiality restrictions that would prevent the Contract Physician, the Contract Physician's practice group, or other members of the Contract Physician's practice group from using or transferring to the Acquirer of the St. Luke's Hospital Assets any information relating to the Operation of St. Luke's Hospital.

228

L.   Except in the course of performing its obligations under this Order, ProMedica shall:

    1.   not provide, disclose, or otherwise make available any trade secrets or any sensitive or proprietary commercial or financial information relating to the Acquirer or the Acquirer Hospital Business to any Person other than the Acquirer, and shall not use such information for any reason or purpose;

    2.   disclose trade secrets or any sensitive or proprietary commercial or financial information relating to the Acquirer or the Acquirer Hospital Business to any Person other than the Acquirer (i) only in the manner and to the extent necessary to satisfy ProMedica's obligations under this Order and (ii) only to Persons who agree in writing to maintain the confidentiality of such information; and

    3.   enforce the terms of this Paragraph II.L as to any Person and take such action as is necessary, including training, to cause each such Person to comply with the terms of this Paragraph II.L., including any actions that ProMedica would take to protect its own trade secrets or sensitive or proprietary commercial or financial information.

M.   No later than the Effective Date of Divestiture, ProMedica shall assign to the Acquirer any Hospital Provider Contract for the provision of services in connection with the Operation of St. Luke's Hospital that is in effect as of the date the divestiture provisions of this Order become final and effective; provided, however, that nothing in this Paragraph II.M. shall preclude ProMedica from completing any post-termination obligations relating to any Hospital Provider Contract.

N.   The purpose of the divestiture of the St. Luke's Hospital Assets is to ensure the continued Operation of St. Luke's Hospital by the Acquirer, independent of ProMedica, and to remedy the lessening of competition resulting from ProMedica's acquisition of St. Luke's Hospital.

### III.

**IT IS FURTHER ORDERED** that:

A.   From the date this Order becomes final and effective (without regard to the finality of the divestiture requirements herein) until the Effective Date of Divestiture, ProMedica shall not:

    1.   Sell or transfer any St. Luke's Hospital Assets, other than in the Ordinary Course of Business;

2. Eliminate, transfer, or consolidate any clinical service offered in connection with the Post-Joinder Hospital Business;

3. Fail to maintain the employment of all St. Luke's Hospital Employees or otherwise fail to keep the Post-Joinder Hospital Business staffed with sufficient employees; provided, however, that ProMedica may terminate employees for cause consistent with the Operation of St. Luke's Hospital on the day before Joinder (in which event ProMedica shall replace such employees);

4. Modify, change, or cancel any Physician privileges in connection with the Post-Joinder Hospital Business; provided, however, that ProMedica may revoke the privileges of any individual Physician consistent with the practices and procedures in place in connection with the Operation of St. Luke's Hospital on the day before Joinder; or

5. Terminate, or cause or allow termination of any contract between any Payor and St. Luke's Hospital. For any contract between a Payor and St. Luke's Hospital that expires during the term of this Order, ProMedica shall offer to extend such contract at rates for services in connection with the Post-Joinder Hospital Business that shall be increased no more than the highest year-over-year escalator percentage as provided in such contract.

## IV.

**IT IS FURTHER ORDERED** that:

A. From the date this Order becomes final and effective (without regard to the finality of the divestiture requirements herein) until the Effective Date of Divestiture, ProMedica shall take such actions as are necessary to maintain the viability, marketability, and competitiveness of the St. Luke's Hospital Assets and the Post-Joinder Hospital Business relating to the St. Luke's Hospital Assets. Among other things that may be necessary, ProMedica shall:

1. Maintain the operations of the Post-Joinder Hospital Business relating to the St. Luke's Hospital Assets in the Ordinary Course of Business and in accordance with past practice (including regular repair and maintenance of the St. Luke's Hospital Assets).

2. Use best efforts to maintain and increase revenues of the Post-Joinder Hospital Business relating to the St. Luke's Hospital Assets, and to maintain at budgeted levels for the year 2010 or the current year, whichever are higher, all administrative, technical, and marketing support for the Post-Joinder Hospital Business relating to the St. Luke's Hospital Assets.

3. Use best efforts to maintain the current workforce and to retain the services of employees and agents in connection with the Post-Joinder Hospital Business

relating to the St. Luke's Hospital Assets, including payment of bonuses as necessary, and maintain the relations and goodwill with patients, Physicians, Suppliers, vendors, employees, landlords, creditors, agents, and others having business relationships with the Post-Joinder Hospital Business relating to the St. Luke's Hospital Assets.

4. Assure that ProMedica's employees with primary responsibility for managing and operating the Post-Joinder Hospital Business relating to the St. Luke's Hospital Assets are not transferred or reassigned to other areas within ProMedica's organization, except for transfer bids initiated by employees pursuant to ProMedica's regular, established job-posting policy (in which event ProMedica shall replace such employees).

5. Provide sufficient working capital to maintain the Post-Joinder Hospital Business relating to the St. Luke's Hospital Assets as an economically viable and competitive ongoing business and shall not, except as part of a divestiture approved by the Commission pursuant to this Order, remove, sell, lease, assign, transfer, license, pledge for collateral, or otherwise dispose of the St. Luke's Hospital Assets.

B. No later than thirty (30) days from the date this Order becomes final and effective (without regard to the finality of the divestiture requirements herein), ProMedica shall file a verified written report to the Commission that identifies (i) all assets included in the St. Luke's Hospital Assets, (ii) all assets originally acquired or that replace assets originally acquired by ProMedica as a result of Joinder, (iii) all assets relating to the Post-Joinder Hospital Business that are not included in the St. Luke's Hospital Assets, and (iv) all clinical services, support functions, and management functions that ProMedica discontinued at St. Luke's Hospital after Joinder (hereafter "Accounting").

## V.

**IT IS FURTHER ORDERED** that no later than five (5) days from the date this Order becomes final and effective (without regard to the finality of the divestiture requirements herein), ProMedica shall provide a copy of this Order and Complaint to each of ProMedica's officers, employees, or agents having managerial responsibility for any of ProMedica's obligations under Paragraphs II, III, and IV of this Order.

## VI.

**IT IS FURTHER ORDERED** that:

A. At any time after this Order becomes final and effective (without regard to the finality of the divestiture requirements herein), the Commission may appoint a Person ("Monitor") to monitor ProMedica's compliance with its obligations under this Order,

231

consult with Commission staff, and report to the Commission regarding ProMedica's compliance with its obligations under this Order.

B.   If a Monitor is appointed pursuant to Paragraph VI.A of this Order, ProMedica shall consent to the following terms and conditions regarding the powers, duties, authorities, and responsibilities of the Monitor:

    1.   The Monitor shall have the power and authority to monitor ProMedica's compliance with the terms of this Order, and shall exercise such power and authority and carry out the duties and responsibilities of the Monitor pursuant to the terms of this Order and in a manner consistent with the purposes of this Order and in consultation with the Commission or its staff.

    2.   Within ten (10) days after appointment of the Monitor, ProMedica shall execute an agreement that, subject to the approval of the Commission, confers on the Monitor all the rights and powers necessary to permit the Monitor to monitor ProMedica's compliance with the terms of this Order in a manner consistent with the purposes of this Order. If requested by ProMedica, the Monitor shall sign a confidentiality agreement prohibiting the use or disclosure to anyone other than the Commission (or any Person retained by the Monitor pursuant to Paragraph VI.B.5. of this Order), of any competitively-sensitive or proprietary information gained as a result of his or her role as Monitor, for any purpose other than performance of the Monitor's duties under this Order.

    3.   The Monitor's power and duties under this Paragraph VI shall terminate three (3) business days after the Monitor has completed his or her final report pursuant to Paragraph VI.B.8. of this Order or at such other time as directed by the Commission.

    4.   ProMedica shall cooperate with any Monitor appointed by the Commission in the performance of his or her duties, and shall provide the Monitor with full and complete access to ProMedica's books, records, documents, personnel, facilities, and technical information relating to compliance with this Order, or to any other relevant information, as the Monitor may reasonably request. ProMedica shall cooperate with any reasonable request of the Monitor. ProMedica shall take no action to interfere with or impede the Monitor's ability to monitor ProMedica's compliance with this Order.

    5.   The Monitor shall serve, without bond or other security, at the expense of ProMedica, on such reasonable and customary terms and conditions as the Commission may set. The Monitor shall have the authority to employ, at the expense of ProMedica, such consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities. The Monitor shall account for all expenses incurred, including fees for his or her services, subject to the approval of the Commission.

6.      ProMedica shall indemnify the Monitor and hold the Monitor harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Monitor's duties, including all reasonable fees of counsel and other expenses incurred in connection with the preparation for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from the Monitor's gross negligence or willful misconduct. For purposes of this Paragraph VI.B.6., the term "Monitor" shall include all Persons retained by the Monitor pursuant to Paragraph VI.B.5. of this Order.

7.      If at any time the Commission determines that the Monitor has ceased to act or failed to act diligently, or is unwilling or unable to continue to serve, the Commission may appoint a substitute to serve as Monitor in the same manner as provided by this Order.

8.      The Monitor shall report in writing to the Commission (i) every sixty (60) days from the date this Order becomes final, (ii) no later than thirty (30) days from the date ProMedica completes its obligations under this Order, and (iii) at any other time as requested by the staff of the Commission, concerning ProMedica's compliance with this Order.

C.      ProMedica shall submit the following reports to the Monitor: (i) no later than twenty (20) days after the date the Monitor is appointed by the Commission pursuant to Paragraph VI.A. of this Order, a copy of the Accounting required by Paragraph IV.B. of this Order; and (ii) copies of all compliance reports filed with the Commission.

D.      ProMedica shall provide the Monitor with: (i) prompt notification of significant meetings, including date, time and venue, scheduled after the execution of the Monitor Agreement, relating to the regulatory approvals, marketing, sale and divestiture of the St. Luke's Hospital Assets, and such meetings may be attended by the Monitor or his representative, at the Monitor's option or at the request of the Commission or staff of the Commission; and (ii) the minutes, if any, of the above-referenced meetings as soon as practicable and, in any event, not later than those minutes are available to any employee of ProMedica.

E.      The Commission may, on its own initiative or at the request of the Monitor, issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of this Order.

F.      The Monitor appointed pursuant to this Order may be the same Person appointed as Divestiture Trustee pursuant to Paragraph II of this Order.

## VII.

**IT IS FURTHER ORDERED** that:

A.    If ProMedica has not divested, absolutely and in good faith, the St. Luke's Hospital Assets pursuant to the requirements of Paragraph II of this Order, within the time and manner required by Paragraph II of this Order, the Commission may at any time appoint one or more Persons as Divestiture Trustee to divest the St. Luke's Hospital Assets, at no minimum price, and pursuant to the requirements of Paragraph II of this Order, in a manner that satisfies the requirements of this Order.

B.    In the event that the Commission or the Attorney General of the United States brings an action pursuant to § 5(l) of the Federal Trade Commission Act, 15 U.S.C. § 45(l), or any other statute enforced by the Commission, ProMedica shall consent to the appointment of a Divestiture Trustee in such action. Neither the appointment of a Divestiture Trustee nor a decision not to appoint a Divestiture Trustee under this Paragraph VII shall preclude the Commission or the Attorney General from seeking civil penalties or any other relief available to it, including appointment of a court-appointed Divestiture Trustee, pursuant to § 5(l) of the Federal Trade Commission Act, or any other statute enforced by the Commission, for any failure by the ProMedica to comply with this Order.

C.    If a Divestiture Trustee is appointed by the Commission or a court pursuant to this Paragraph VII, ProMedica shall consent to the following terms and conditions regarding the Divestiture Trustee's powers, duties, authority, and responsibilities:

    1.    Subject to the prior approval of the Commission, the Divestiture Trustee shall have the exclusive power and authority to effect the divestiture pursuant to the requirements of Paragraph II of this Order and in a manner consistent with the purposes of this Order.

    2.    Within ten (10) days after appointment of the Divestiture Trustee, ProMedica shall execute an agreement that, subject to the prior approval of the Commission and, in the case of a court-appointed Divestiture Trustee, of the court, transfers to the Divestiture Trustee all rights and powers necessary to permit the Divestiture Trustee to effect the divestiture and perform the requirements of Paragraph II of this Order for which he or she has been appointed.

    3.    The Divestiture Trustee shall have twelve (12) months from the date the Commission approves the agreement described in Paragraph VII.C.2. of this Order to accomplish the divestiture, which shall be subject to the prior approval of the Commission. If, however, at the end of the twelve-month period the Divestiture Trustee has submitted a plan of divestiture or believes that divestiture can be achieved within a reasonable time, the divestiture period may be extended by the Commission, or, in the case of a court appointed Divestiture Trustee, by the court.

4.    ProMedica shall provide the Divestiture Trustee with full and complete access to the personnel, books, records, and facilities related to the assets to be divested, or to any other relevant information, as the Divestiture Trustee may request. ProMedica shall develop such financial or other information as the Divestiture Trustee may reasonably request and shall cooperate with the Divestiture Trustee. ProMedica shall take no action to interfere with or impede the Divestiture Trustee's accomplishment of the divestiture. Any delays in divestiture caused by ProMedica shall extend the time for divestiture under this Paragraph in an amount equal to the delay, as determined by the Commission or, for a court-appointed Divestiture Trustee, by the court.

5.    The Divestiture Trustee shall use his or her best efforts to negotiate the most favorable price and terms available in each contract that is submitted to the Commission, but shall divest expeditiously at no minimum price. The divestiture shall be made only to an Acquirer that receives the prior approval of the Commission, and the divestiture shall be accomplished only in a manner that receives the prior approval of the Commission; provided, however, if the Divestiture Trustee receives bona fide offers from more than one acquiring entity, and if the Commission determines to approve more than one such acquiring entity, the Divestiture Trustee shall divest to the acquiring entity or entities selected by ProMedica from among those approved by the Commission; provided, further, that ProMedica shall select such entity within ten (10) business days of receiving written notification of the Commission's approval.

6.    The Divestiture Trustee shall serve, without bond or other security, at the cost and expense of ProMedica, on such reasonable and customary terms and conditions as the Commission or a court may set. The Divestiture Trustee shall have the authority to employ, at the cost and expense of ProMedica, such consultants, accountants, attorneys, investment bankers, business brokers, appraisers, and other representatives and assistants as are necessary to carry out the Divestiture Trustee's duties and responsibilities. The Divestiture Trustee shall account for all monies derived from the divestiture and all expenses incurred. After approval by the Commission of the account of the Divestiture Trustee, including fees for his or her services, all remaining monies shall be paid at the direction of the ProMedica, and the Divestiture Trustee's power shall be terminated. The Divestiture Trustee's compensation may be based in part on a commission arrangement contingent on the Divestiture Trustee's divesting the assets.

7.    ProMedica shall indemnify the Divestiture Trustee and hold the Divestiture Trustee harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Divestiture Trustee's duties, including all reasonable fees of counsel and other expenses incurred in connection with the preparation for, or defense of any claim, whether or not resulting in any liability, except to the extent that such liabilities, losses,

235

damages, claims, or expenses result from gross negligence or willful misconduct by the Divestiture Trustee. For purposes of this Paragraph VII.C.7., the term "Divestiture Trustee" shall include all Persons retained by the Divestiture Trustee pursuant to Paragraph VII.C.6. of this Order.

8. If the Divestiture Trustee ceases to act or fails to act diligently, the Commission may appoint a substitute Divestiture Trustee in the same manner as provided in this Paragraph VII for appointment of the initial Divestiture Trustee.

9. The Divestiture Trustee shall have no obligation or authority to operate or maintain the assets to be divested.

10. The Divestiture Trustee shall report in writing to the Commission every sixty (60) days concerning the Divestiture Trustee's efforts to accomplish the divestiture.

D. The Commission or, in the case of a court-appointed Divestiture Trustee, the court, may on its own initiative or at the request of the Divestiture Trustee issue such additional orders or directions as may be necessary or appropriate to accomplish the divestiture required by this Order.

E. The Divestiture Trustee appointed pursuant to this Paragraph may be the same Person appointed as the Monitor pursuant to Paragraph VI of this Order.

## VIII.

**IT IS FURTHER ORDERED** that:

A. ProMedica shall file a verified written report with the Commission setting forth in detail the manner and form in which it intends to comply, is complying, and has complied with this Order (i) no later than thirty (30) days from the date this Order becomes final and effective (without regard to the finality of the divestiture requirements herein), and every thirty (30) days thereafter until the divestiture of the St. Luke's Hospital Assets is accomplished, and (ii) thereafter, every sixty (60) days (measured from the Effective Date of Divestiture) until the date ProMedica completes its obligations under this Order; provided, however, that ProMedica shall also file the report required by this Paragraph VIII at any other time as the Commission may require.

B. ProMedica shall include in its compliance reports, among other things required by the Commission, a full description of the efforts being made to comply with the relevant Paragraphs of this Order, a description (when applicable) of all substantive contacts or negotiations relating to the divestiture required by Paragraph II of this Order, the identity of all parties contacted, copies of all written communications to and from such parties, internal documents and communications, and all reports and recommendations

236

concerning the divestiture, the date of divestiture, and a statement that the divestiture has been accomplished in the manner approved by the Commission.

## IX.

**IT IS FURTHER ORDERED** that ProMedica shall notify the Commission at least thirty (30) days prior to (1) any proposed dissolution of ProMedica, (2) any proposed acquisition, merger, or consolidation of ProMedica, or (3) any other change in ProMedica that may affect compliance obligations arising out of this Order, including but not limited to assignment, the creation or dissolution of subsidiaries, or any other change in ProMedica.

## X.

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, and upon written request with reasonable notice, ProMedica shall permit any duly authorized representative of the Commission:

A.  Access, during office hours of ProMedica, and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession, or under the control, of ProMedica relating to compliance with this Order, which copying services shall be provided by ProMedica at its expense; and

B.  To interview officers, directors, or employees of ProMedica, who may have counsel present, regarding such matters.

ORDERED:

D m Chappell
D. Michael Chappell
Chief Administrative Law Judge

Date: December 12, 2011

237

*In Camera*

Appendix 1 to Order



*In Camera*

Appendix 2 to Order

{█████████████}

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 19th of December, 2011, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

/s/ Alexis J. Gilman
Alexis J. Gilman
Attorney for Plaintiff Federal Trade Commission
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Ave., NW
Washington, DC 20580
Telephone: (202) 326-2579
Facsimile:  (202) 326-2286
agilman@ftc.gov